**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF NEW YORK**

| | |
|---|---|
| PATRICK SAGET, SABINA BADIO FLORIAL, NAÏSCHA VILME, GERALD MICHAUD, BEATRICE BELIARD, RACHELLE GUIRAND, JEAN CLAUDE MOMPOINT, YOLNICK JEUNE, GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI LIBERTÉ, and FAMILY ACTION NETWORK MOVEMENT, INC., <br><br> Plaintiffs, <br><br> v. <br><br> DONALD TRUMP, President of the United States of America, UNITED STATES OF AMERICA, DEPARTMENT OF HOMELAND SECURITY, KIRSTJEN NIELSEN, Secretary of Homeland Security, and ELAINE C. DUKE, Deputy Secretary of Homeland Security, <br><br> Defendants. | Case No. 1:18-cv-01599 <br><br> **FIRST AMENDED COMPLAINT** |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs Patrick Saget, Sabina Badio Florial, Naïscha Vilme, Gerald Michaud, Beatrice Beliard, Rachelle Guirand, Jean Claude Mompoint, Yolnick Jeune, Guerline Francois, Leoma Pierre, Haïti Liberté, and Family Action Network Movement, Inc. (FANM) bring this action against Defendants Donald Trump, President of the United States of America; the United States of America; the Department of Homeland Security; Kirstjen Nielsen, Secretary of Homeland Security; and Elaine C. Duke, Deputy Secretary of Homeland Security. Plaintiffs seek to enjoin Defendants' November 20, 2017 decision to rescind Temporary Protected Status for Haitian immigrants. Defendants' decision to terminate Temporary Protected Status for Haitians was impermissibly infected by invidious discrimination on the basis of race and national origin and

1

therefore cannot stand. Further, Defendants' decision was based on a new legal rule that represents a misunderstanding and misapplication of the laws relevant to Temporary Protected Status, is arbitrary and capricious, and was put in place without notice and comment or other procedural protections.

## PRELIMINARY STATEMENT

1.     Temporary Protected Status (TPS) was created as part of the Immigration Act of 1990. 104 Stat. 4978, 5030 (1990). TPS permits individuals from designated foreign countries to live and work lawfully in the United States when they cannot return safely to their homeland due to armed conflict, natural disaster, or other "extraordinary" circumstances. *See* 8 U.S.C. § 1254a. TPS is, and was intended by Congress to be, a reflection of American humanitarian values and the United States' role as a "beacon of freedom and hope for the world" to those displaced from their homelands by havoc beyond their control. 126 Cong. Rec. H8687 (Oct. 2, 1990) (statement of Rep. Moakley).

2.     Such havoc hit Haiti on January 12, 2010, when the deadliest earthquake in the history of the Western Hemisphere struck Haiti, the nation least prepared to handle one. At the time, millions of people were packed in and around the nation's capital, many living in poorly made buildings stacked atop a fault line. The 7.0 magnitude earthquake threw the fragile nation into chaos, killing as many as 200,000 people and displacing more than 2.3 million people from their homes. It caused $7.8 billion in damages in a country with a gross domestic product of only $6.6 billion.

3.     At that time, the Secretary of the Department of Homeland Security (DHS) designated Haiti for TPS because it was unsafe for Haitian nationals to return to their country due to "extraordinary" conditions. The Secretary cited the collapse of hospitals, schools, and

government buildings, as well as the shortage of electricity, water, and food. The TPS designation provided employment authorization and protection from deportation to Haitians residing in the United States as of the date of the earthquake. A year later, on May 19, 2011, DHS re-designated Haiti for TPS because of new "extraordinary" conditions—in particular, the deadliest cholera epidemic in recent history, caused by the very UN soldiers sent to Haiti to protect its people.

4.      Since 2011, DHS has regularly renewed Haitian TPS based on careful consideration of the totality of "extraordinary" conditions affecting Haiti under 8 U.S.C. § 1254a(b)(1)(C), including housing shortages; the cholera epidemic; limited access to medical care, food, and water; political instability; the fragile economy; security risks; gender-based violence; and environmental risks. These conditions continue to this day.

5.      On January 20, 2017, however, Donald Trump became President of the United States. Well-known for his animus toward racial minorities and certain groups of immigrants, he adopted a policy of ending current TPS designations—which benefit primarily members of these disfavored groups—without due regard to the relevant conditions on the ground or the procedures and policies of the statute protecting persons granted TPS under 8 U.S.C. § 1254a. On November 20, 2017, DHS Acting Secretary Elaine Duke, applying President Trump's policies, disregarded the mandatory statutory criteria that previous Secretaries had considered, and terminated TPS for Haiti.

6.      This decision—a stunning reversal of course—affects the lives of over 50,000 Haitian nationals living in the United States, along with their 27,000 U.S. citizen children. Among those affected are Plaintiffs, each of whom has made a home and a life in the United States, and each of whom has relied on a settled expectation that he or she would be allowed to

live and work in the United States until it was safe to return to Haiti. The termination of Haitian TPS will jeopardize the health of Mr. Saget who because of his cerebral palsy is dependent on his U.S. citizen brother for his personal and medical care. It will risk separating Ms. Florial, Ms. Beliard, Ms. Guirand, Ms. Jeune, Ms. Francois, and Mr. Pierre from their U.S. citizen children, as they will face the heartrending decision whether to bring their children to a country with harsh and unsafe conditions or to leave them in the care of someone else for the sake of their own futures and physical safety. It will force FANM to divert its limited resources to assist Haitian nationals with their displacement from the United States. It will adversely impact the sales of Haïti Liberté, the largest Haitian newspaper distributed in the United States, should a leading writer be forced to return to Haiti.

7.      DHS's decision to terminate Haiti's TPS designation violates the Fifth Amendment due process and equal protection rights of current Haitian TPS holders. Further, it is an arbitrary and capricious agency action that was undertaken without statutory authority and without the procedures required by law; it is *ultra vires*; it was improperly issued without notice-and-comment rulemaking; and it violates the Regulatory Flexibility Act.

**PARTIES**

8.      Plaintiff Haïti Liberté, whose headquarters are located at 1583 Albany Avenue, Brooklyn, NY, is the largest Haitian weekly newspaper distributed throughout the United States, Canada, Europe, and Haiti. The paper offers weekly news and analysis of Haitian affairs by some of the foremost writers and intellectuals in Haiti and its diaspora. The paper is published in French, Kreyòl and English, reaching communities of nearly 2 million Haitians living in North America and Europe. In North America and Europe, the paper is principally distributed through newsstands or subscriptions. In the New York metropolitan area, Haïti Liberté distributes mostly

in Brooklyn, Queens, and Nassau county, as well as Elizabeth, Irvington, East Orange, South Orange and Newark in New Jersey.

9.     Haïti Liberté relies almost entirely on the contributions of its writers and other members of an affiliated organization—Club des Amis de Haïti Liberté—to write, photograph, publish, and distribute its weekly newspapers. One of the newspaper's leading writers and Club des Amis de Haïti Liberté members holds TPS from Haiti. He is a skilled writer in both the French and Kreyòl languages, and is one of only a handful of contributors able to write about current events in Haiti. Based in New York, he is able to participate in the publication's regular editorial meetings, where the staff analyze the extremely complex and dynamic Haitian political situation. All told, he contributes approximately 10% of Haïti Liberté's weekly articles over the course of a year. It would be exceedingly difficult, if not impossible, for Haïti Liberté to replace him should he be forced to return to Haiti.

10.     Established in 1991, Plaintiff Family Action Network Movement, Inc. (FANM), formerly Fanm Ayisyen nan Miyami, Inc., is a Miami-based organization founded to empower Haitian women and their families socially and politically, and to facilitate their adjustments to South Florida. For over two decades, FANM has been at the center of pivotal issues affecting South Florida's Haitian immigrant community.

11.     The agency is small, comprised of nine staff members. Nevertheless, FANM provides services to the entire South Florida Haitian community in the areas of Adult Education and Literacy; Community Economic Development; Family Intervention and Empowerment; Health Promotion and Prevention; Immigration Advocacy, Citizenship, and Public Policy; and Youth Development and Leadership. For eight years, following Haiti's January 10, 2010 earthquake, FANM has also advocated throughout the United States for extending TPS for

Haitians in our country, and has assisted TPS holders throughout the United States to remain lawfully in this country.

12.     The decision to terminate TPS has had a significant adverse impact on FANM, severely taxing the agency and employees' time and resources. Many Haitians with TPS depend on FANM for help. Haitians with TPS—a substantial percentage of Miami's Haitian community—have been and are increasingly concerned about their legal status, requiring that FANM employees divert limited staff and scarce resources from other critical services it provides to address concerns arising from the termination of TPS. FANM has thus been forced to decrease their services in the areas of Adult Education and Literacy, Community Economic Development, Family Intervention and Empowerment, Health Promotion and Prevention, and Youth Development and Leadership. As a result of the fears now plaguing South Florida's Haitian community, FANM has also seen an increase in the number of child referrals to FANM's mental health program for treatment of anxiety and situational depression.

13.     FANM has also had to re-allocate limited resources from its work locally to advocate nationally for the continuation of TPS. FANM's Executive Director, Marleine Bastien, has made numerous trips to Washington, D.C. to speak with and educate members of Congress about the impact that terminating TPS would have on the largest Haitian communities in the United States, including the one in Miami.

14.     The decision to terminate TPS has affected the community in which FANM operates, and thus has strained the resources of other service organizations in that community, further increasing demand for FANM's services. As the termination date approaches, FANM anticipates that the needs of the community it serves will only increase, requiring that FANM devote even more resources to providing legal and immigration-related advice, and assistance to

community members as they prepare to depart the United States. FANM will continue to re-allocate its limited resources and provide these services at the expense of the other core services that FANM was established to provide.  Additionally, the Florida plaintiffs work with FANM in advancing its mission, and FANM will lose the benefit of their assistance if they lose TPS and return to Haiti.

15.     Individual Plaintiffs Patrick Saget, Sabina Badio Florial, Naïscha Vilme, Gerald Michaud, Beatrice Beliard, Rachelle Guirand, Jean Claude Mompoint, Yolnick Jeune, Guerline Francois, and Leoma Pierre are all Haitian nationals and beneficiaries of TPS. If the Court does not enjoin DHS from enforcing its termination of Haiti's TPS designation, Plaintiffs' TPS status will expire on July 22, 2019, ending their employment authorization and rendering their presence in the United States unauthorized. Plaintiffs, each of whom has made a home and a life in the United States, will face being rounded up, placed in removal proceedings, and separated from their U.S. citizen children. Plaintiffs, who relied on a settled expectation that they would be allowed to live and work in the United States until it was safe to return to Haiti, will face deportation to a country where its own government recognizes that it lacks the capacity to receive and protect an influx of returning nationals. Significantly, none of the Plaintiffs currently have alternative routes to obtain lawful immigration status or otherwise remain in the United States. Moreover, if deported, Plaintiffs will face a statutory bar preventing them from returning to the United States for ten years, even to visit U.S. citizen children that they may be forced to leave behind. 8 U.S.C. § 1182(a)(9)(A)(ii). The circumstances of the Plaintiffs here who hold TPS illustrate the irreparable harm that inevitably will occur if TPS is not continued and Plaintiffs are deported.

16.     Plaintiff Patrick Saget resides in Brooklyn, New York. Mr. Saget is 48 years old and has cerebral palsy. Prior to the earthquake, he lived with a paid caretaker in Haiti. After his caretaker died in the earthquake and with no remaining family in Haiti, Mr. Saget was able to join his brother in the United States. He now lives with his brother, Marc Saget, a U.S. citizen and registered nurse, who cares for him. If Mr. Saget were deported, he would have no one to care for his personal and medical needs in Haiti.

17.     Plaintiff Sabina Badio Florial resides in Brooklyn, New York. Ms. Florial has worked as a health home aide for Bristol Assisted Living for more than three years. In 2013, she married Mr. Andre Florial in Spring Valley, New York. He is also a Haitian TPS beneficiary. They have two young children, ages three and one. Both children were born in New York. Ms. Florial is active in her church, the Baraca Baptist Church, and for a year has been a member of the Women's Choir.

18.     Plaintiff Naïscha Vilme lives in Brooklyn, New York. Ms. Vilme is a successful college graduate who recently completed a double major in math and psychology. She earned a degree from York College in Jamaica, Queens and repeatedly made the Dean's List. Before the Trump Administration terminated TPS for Haiti, she was preparing for the future and exploring graduate programs in clinical psychology. She was specifically considering Rutgers, New York University, and the University of California, Los Angeles because of their strong programs in psychology.

19.     Plaintiff Gerald Michaud lives in Brooklyn, New York. In Haiti, Mr. Michaud was a teacher both of art and martial arts. Prior to the earthquake, he visited the United States to promote the culture and heritage of Haiti during the Haitian Independence Day celebrations in Miami. He did this through teaching art and Haitian culture to young Haitians in the United

States. For the last several years, he has worked as a security officer at LaGuardia Airport. He also has a part-time job as a martial arts instructor.

20.    Plaintiff Beatrice Beliard is 41 years old and lives in Brooklyn, New York. Ms. Beliard works with patients with mental health issues at the Beacon, Pearl Care, and Human Care agencies. She married a fellow Haitian TPS beneficiary in the United States. They have one five-year old child, born here in the United States. Ms. Beliard sends regular and frequent remittances to her surviving family in Haiti.

21.    Plaintiff Rachelle Guirand is a 40-year old who lives in Brooklyn, New York. Ms. Guirand is a certified nursing assistant. She has been a home health aide for roughly two years. She has one eight-year old son born in the United States. If Ms. Guirand is deported, she will be faced with the excruciating decision which will face all Haitians with TPS who have U.S.-born children—whether to bring her son with her to Haiti, thereby depriving him of his right as an American to live in safety in the United States, or instead to leave him behind in the United States in the care of someone else for the sake of his own future and physical safety, but separating him from and depriving him of his mother.

22.    Plaintiff Jean Claude Mompoint is 59 years old and resides in Valley Stream, Nassau County, New York. He has worked since 2014 for the Block Institute, a non-profit agency dedicated to improving the quality of life for people with disabilities and their families. He sends remittances to support several people in Haiti.

23.    Plaintiff Yolnick Jeune lives in Palm Beach, Florida. She works three jobs to support her five children, one of whom was born in the United States. Ms. Jeune is active in her church, where she is the Sabbath school director and a member of the choir. She has been employed since 2011 as a cashier by the Palm Beach School District, since 2014 as a behavior

assistant helping special needs children, and since 2013 as a certified nursing assistant for Trinity Healthcare Services. Last year, Ms. Jeune traveled twice to Washington D.C. on trips organized by FANM around TPS. She visited congressional offices and testified in a Senate briefing coordinated by FANM and Senator Bill Nelson's office.

24.     Plaintiff Guerline Francois lives in Coral Springs, Florida. Ms. Francois has worked as a customer service representative for most of the last five years. Her husband, Erick, is also a Haitian TPS beneficiary. They have a son, age fifteen, and a daughter, age six. Their daughter was born in Florida. Ms. Francois is active in the South Florida Church of Christ in Davie, Florida, attending twice a week. She sends money and clothing to support her two sisters and their children in Haiti. Her husband, very concerned by the termination of Haiti's TPS, has become involved with FANM on the family's behalf.

25.     Plaintiff Leoma Pierre lives in North Miami Beach, Florida. Mr. Pierre has been a dishwasher at a Miami Beach hotel for nearly four years. His wife, Fania, is also a Haitian TPS beneficiary. Mr. Pierre has eight children in the United States, two of whom were born in the United States. He regularly sends remittances to support loved ones in Haiti and frequently attends meetings at FANM, which he strongly supports and values.

26.     Defendant Donald Trump is the President of the United States of America. He is sued in his official capacity.

27.     Defendant United States of America includes all government agencies and departments responsible for the termination of Haitian nationals' eligibility for TPS.

28.     Defendant Department of Homeland Security is an agency of the United States government and is responsible for designating countries whose nationals may receive TPS, and

for administering the benefit. Plaintiffs challenge the Department of Homeland Security's termination of its designation of Haiti as a TPS country.

29.     Defendant Kirstjen Nielsen is the Secretary of the Department of Homeland Security. She is sued in her official capacity.

30.     Defendant Elaine C. Duke is the Deputy Secretary of the Department of Homeland Security and formerly served as the Acting Secretary of the Department of Homeland Security.  She is the signatory to the notice terminating temporary protected status for Haitian immigrants. She is sued in her official capacity.

## JURISDICTION AND VENUE

31.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331, as this case arises under the United States Constitution, the Administrative Procedure Act (APA), 5 U.S.C. § 551 *et seq*., and federal common law. This Court has remedial authority pursuant to the APA, 5 U.S.C. § 706, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*.

32.     Venue properly lies in this District because individual Plaintiffs Patrick Saget, Sabina Badio Florial, Naïscha Vilme, Gerald Michaud, Beatrice Beliard, Rachelle Guirand, and Jean Claude Mompoint reside in the district, and Plaintiff Haïti Liberté's principal place of business is in the district. 28 U.S.C. § 1391(e)(1).

## FACTS

### *Background on Temporary Protected Status*

33.     In the Immigration Act of 1990, Congress established a procedure for the Attorney General to provide Temporary Protected Status (TPS) to immigrants in the United

States who are temporarily unable to return safely to their home country because of specified statutory conditions.

34.     The authority to designate a country for TPS now rests with the Department of Homeland Security (DHS). *See* Homeland Security Act of 2002, Pub. L. 107-296, 116 Stat. 2135, 2142–45, 2177–2212 (Nov. 25, 2002) and the Homeland Security Act of 2002 Amendments Act, Pub. L. 108-7, 117 Stat. 11, 526–32 (Feb. 20, 2003).

35.     TPS is not a designation that DHS may grant, extend, or terminate at whim. Rather, the Secretary of Homeland Security must follow the rubric specified in the Immigration Act of 1990 for determining whether nationals of a certain country need a safe haven in the United States because of certain exigent circumstances.

36.     After "consultation with the appropriate agencies of the Government," the Secretary of Homeland Security may designate a country for TPS "only if" she finds:

> (A) [] that there is an ongoing armed conflict within the state and, due to such conflict, requiring the return of aliens who are nationals of that state to that state (or to the part of the state) would pose a serious threat to their personal safety;
> (B) [] that—
> (i) there has been an earthquake, flood, drought, epidemic, or other environmental disaster in the state resulting in a substantial, but temporary, disruption of living conditions in the area affected,
> (ii) the foreign state is unable, temporarily, to handle adequately the return to the state of aliens who are nationals of the state, and
> (iii) the foreign state officially has requested designation under this subparagraph; or
> (C) [] that there exist extraordinary and temporary conditions in the foreign state that prevent aliens who are nationals of the state from returning to the state in safety, unless the [DHS Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States.

8 U.S.C. § 1254a(b)(1).

37.     When DHS designates a country for TPS, immigrants from that country are granted protection from deportation and employment authorization, among other benefits. 8 U.S.C. § 1254a(a)(1).

38.     To be eligible for TPS, the immigrant must be a national of the TPS-designated country; must have been present in the United States on the date of the initial designation; be otherwise admissible into the United States; and register within a designated time frame. 8 U.S.C. § 1254a(c)(1)(A); 8 C.F.R. § 244.2.

39.     An immigrant is ineligible if she has been convicted of a felony or two or more misdemeanors in the United States, 8 U.S.C. § 1254a(c)(2)(B), or if DHS determines that she has committed a crime described in 8 U.S.C. § 1158(b)(2)(A), or is otherwise a danger to the security of the United States. *Id.*

40.     TPS protects only eligible individuals present at the time of the designation and does not affect the government's ability to deport subsequent entrants or ineligible individuals.

41.     The Act gives DHS the authority to grant TPS for a period of six to eighteen months, and requires a review of that designation periodically thereafter. 8 U.S.C. § 1254a(b)(2).

42.     At least sixty days before the end of the period of the TPS designation, the Secretary, in consultation with the other agencies, must review the conditions in the foreign state. 8 U.S.C. § 1254a (b)(3)(A). The law sets forth a wholly non-discretionary procedure for extending or terminating a designation. Unless the Secretary determines that a foreign state "*no longer meets* the conditions for designation under paragraph (1)" of 8 U.S.C. § 1254a(b) (quoted in ¶ 36  *supra*), the period of designation is *automatically extended* for an additional period of at least six months. 8 U.S.C. § 1254a(b)(3)(C). The Secretary's decision to extend or terminate must follow directly from the result of this inquiry into conditions. 8 U.S.C. § 1254(b)(3)(B)-(C).

43.     TPS is "temporary" in the sense that designations are subject to periodic reviews, but Congress did not restrict the number of times TPS can be extended. Rather than setting a cap on the number of extensions, the statute requires the Secretary to extend the designation based on his or her evaluation of country conditions. As long as the periodic review indicates that conditions continue to require an extension, the Secretary must extend. *See*, *e.g.*, 136 Cong. Rec. S 17112 (Oct. 26, 1990) ("As long as the violence continues…, we should open our arms to Lebanese already in this country who fear for their lives if they should return.").

44.     The Secretary's decision to renew or rescind TPS must be timely published in the Federal Register. The timing of that publication has important consequences for TPS recipients because their employment authorization and other authorization documents expire when their TPS expires.

### *Haiti's TPS Designation under the Previous Administration*

45.     On January 12, 2010, a 7.0 magnitude earthquake hit Haiti, destroying most of the capital city, Port-au-Prince, and killing as many as 200,000 people (some estimates are higher).[1] More than 2.3 million people were displaced, and many more were affected by the emergency conditions caused by the earthquake.[2] Hospitals overflowed with victims, electricity was cut off, potable water was hard to find, and telephone service was severely affected. Food and medicine were scarce. Roads blocked with debris and makeshift housing encampments set up by

---

[1] U.N. OFFICE FOR THE COORDINATION OF HUMANITARIAN AFFAIRS (U.N. OCHA), *Haiti: One Year Later* (Jan. 18, 2011), http://www.unocha.org/story/haiti-one-year-later.

[2] For example, the earthquake destroyed close to 300,000 homes. *See* U.N. OFFICE OF THE SECRETARY-GENERAL'S SPECIAL ADVISER ON COMMUNITY-BASED MEDICINE & LESSONS FROM HAITI, *Lessons from Haiti: Key Statistics* (2012), http://www.lessonsfromhaiti.org/lessons-from-haiti/key-statistics/. It also killed 17% of the federal work force, and destroyed or badly damaged most of the hospitals and close to 4,000 schools. *See* INTERIM HAITI RECOVERY COMMISSION, Haiti One Year Later: The Progress to Date and the Path Forward 3 (2011), http://www.lessonsfromhaiti.org/download/Report_Center/IHRC_Haiti_One_Year_Later_EN__original.pdf.

earthquake victims impeded the transport of food, clean water, and medical supplies. Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476, 3477 (Jan. 21, 2010).

46. Because of the combination of these "extraordinary conditions," DHS designated Haiti for TPS. *Id.*

47. The TPS designation allowed Haitian nationals who had been "continuously physically present" in the United States since January 21, 2010 and had "continuously resided" in the United States since January 12, 2010, to apply for TPS.

48. The initial TPS designation was effective through July 22, 2011. *Id.* at 3476.

49. Less than ten months after the earthquake, one of the deadliest cholera outbreaks in modern history erupted, overwhelming Haiti's public health system. Cholera, which has sickened one million Haitians and claimed more than 12,000 lives since 2010, continues to debilitate Haiti today. The cholera epidemic is a disaster in its own right, adding to and exacerbating the damage caused by the earthquake.[3]

50. On May 19, 2011, DHS Secretary Napolitano both extended the existing TPS designation for Haiti *and* re-designated Haiti for TPS in order to "allow[] additional individuals who have been continuously residing in the United States since January 12, 2011," including "certain Haitians who arrived in the United States following the January 12, 2010 earthquake in Haiti," to obtain TPS. Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000 (May 19, 2011).

51. Secretary Napolitano cited the fact that the earthquake had "exacerbated Haiti's position as the least-developed country in the Western Hemisphere and one of the poorest in the

---

[3] *See* GLOBAL JUSTICE CLINIC, *Extraordinary Conditions: A Statutory Analysis of Haiti's Qualifications for TPS* at 7 (Oct. 2017) [hereinafter GJC Report], http://chrgj.org/wp-content/uploads/2017/10/171025_Global-Justice-Clinic-Haiti-TPS-Report-web-version.pdf.

world," where 80 percent of the population lived below the poverty line, and per capita gross domestic product was under $2 per day. She specifically noted that the cholera outbreak in Haiti evidenced the vulnerability of the public health sector, citing 199,497 cholera cases since the earthquake, including 112,656 hospitalizations and 3,297 deaths. *Id.* at 29,001.

52. This 18-month TPS extension and re-designation were effective through January 22, 2013. *Id.* at 29,000.

53. The original designation in 2010 and the re-designation in 2011 were pursuant to 8 U.S.C. § 1254a(b)(1)(C) ("extraordinary" conditions), as opposed to 8 U.S.C. § 1254a(b)(1)(A) or (B), which are tied to a specific precipitating event.

54. TPS was extended for Haitian nationals for 18-month intervals again in October 2012, March 2014, and August 2015. Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943 (Oct. 1, 2012); Extension of the Designation of Haiti for Temporary Protected Status, 79 Fed. Reg. 11,808 (Mar. 3, 2014); Extension of the Designation of Haiti for Temporary Protected Status, 80 Fed. Reg. 51,582 (Aug. 25, 2015).

55. For each extension, DHS outlined conditions arising from the January 12, 2010 earthquake in Haiti and its attendant damage to infrastructure, public health, agriculture, transportation, and educational facilities. Each subsequent extension named the cholera epidemic and the exacerbation of pre-existing vulnerabilities caused by the earthquake, including food insecurity and a housing crisis, as contributing to the extension of TPS for Haitian nationals.

### *Donald Trump's Racial and National Origin Animus Towards Immigrants of Color and Haitians in Particular*

56. Donald Trump campaigned for President on an explicitly anti-immigrant platform.

57.     In June 2015, he started his presidential bid by disparaging South and Central American immigrants: "When Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems, and they're bringing those problems with us. They're bringing drugs. They're bringing crime. They're rapists."[4]

58.     Then-candidate Trump repeated that sentiment in August 2015, when he said: "The Mexican government . . . send[s] the bad ones over because they don't want to pay for them. They don't want to take care of them."[5]

59.     In October 2016, then-candidate Trump responded to a presidential debate question about immigration by stating: "We have some bad hombres here, and we're going to get them out."[6]

60.     Both during his campaign and after taking office, President Trump has repeatedly compared immigrants and refugees to snakes who will bite and kill anyone foolish enough to take them in.[7] More recently, in a roundtable discussion with California officials, he referred to immigrants as "animals."[8]

61.     After his election, President Trump continued to voice his animus toward immigrants of color and Haitians in particular. In June 2017, during a meeting in the Oval Office with then-DHS Secretary John Kelly and Secretary of State Rex Tillerson, President Trump

---

[4] *Full Text: Trump announces a presidential bid*, Wash. Post (June 16, 2015), https://www.washingtonpost.com/news/post-politics/wp/2015/06/16/full-text-donald-trump-announces-a-presidential-bid/?utm_term=.6fa0170ce812.

[5] Andrew O'Reilly, *At GOP debate, Trump says 'stupid' U.S. leaders are being duped by Mexico*, Fox News (Aug. 6, 2015), http://www.foxnews.com/politics/2015/08/06/at-republican-debate-trump-says-mexico-is-sendingcriminals-because-us.html.

[6] Katie Zezima, *Trump on immigration: There are 'bad hombres' in the United States*, Wash. Post (Oct. 19, 2016), https://www.washingtonpost.com/news/post-politics/wp/2016/10/19/trump-on-immigration-there-are-bad-hombres-in-the-united-states/?utm_term=.546dcc77b96b.

[7] See Dara Lind, "The Snake": Donald Trump brings back his favorite anti-immigrant fable at CPAC (Feb. 23, 2018), https://www.vox.com/policy-and-politics/2018/2/23/17044744/trump-snake-speech-cpac

[8] Julie Hirschfeld Davis, *Trump Calls Some Unauthorized Immigrants 'Animals' in Rant*, N.Y. Times (May 16, 2018), https://www.nytimes.com/2018/05/16/us/politics/trump-undocumented-immigrants-animals.html.

reacted to a document listing how many immigrants had received visas to enter the U.S. in 2017. Upon learning that 15,000 Haitian people had received such visas, President Trump stated they "all have AIDS."[9] During that same meeting, President Trump also learned that 40,000 immigrants from Nigeria had received visas to enter the U.S. in 2017. He reacted by stating that, once they had seen the U.S., these Nigerian immigrants would never go back to their "huts" in Africa.[10]

62.     On January 11, 2018, during a White House meeting with several U.S. Senators, the President disparaged a draft immigration plan that protected people from Haiti, El Salvador, and some African countries, asking "Why are we having all these people from shithole countries come here?"[11] President Trump further denigrated Haitians, asking "Why do we need more Haitians?" and ordered the bill's drafters to "take them out."[12] In this meeting, the President further expressed his preference for more immigrants from places like Norway,[13] where the population is more than 90 percent white. Haiti's population, by contrast, is over 95 percent Black.

---

[9] Michael D. Shear & Julie Hirschfeld Davis, *Stoking Fears, Trump Defied Bureaucracy to Advance Immigration Agenda*, N.Y. Times (Dec. 23, 2017), https://www.nytimes.com/2017/12/23/us/politics/trump-immigration.html.."

[10] *Id.*

[11] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-inoval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.b56f11cc896f. Other senators have suggested the word used might have been "shithouse." Julie Hirschfeld Davis, *Trump's Harsh Words, Not His Plan for Wall, Dominate Hearing*, N.Y. Times (Jan. 16, 2018), https://www.nytimes.com/2018/01/16/us/politics/trump-shithole-shithouse-immigration.html.

[12] Josh Dawsey, *Trump derides protections for immigrants from 'shithole' countries*, Wash. Post (Jan. 12, 2018), https://www.washingtonpost.com/politics/trump-attacks-protections-for-immigrants-from-shithole-countries-inoval-office-meeting/2018/01/11/bfc0725c-f711-11e7-91af-31ac729add94_story.html?utm_term=.b56f11cc896f.

[13] *Id.*

63. In January 2018, DHS announced that it would make H-2A and H-2B visas for Haitian nationals unavailable, citing "high levels of fraud and abuse," without providing any evidence to support this assertion.[14]

64. President Trump's racial animus returns the country to a darker time in its recent past when courts had to intervene repeatedly to protect Haitian asylum seekers against race and national origin discrimination by former executive officials.

65. For example, after the passage of the Refugee Act of 1980, Pub. L. 96-212, which implemented the United Nations Refugee Convention and allowed migrants with a credible fear of persecution to apply for asylum in the United States, the Reagan administration implemented a policy of interdiction of Haitian vessels on the high seas, intending to prevent Haitians from receiving the greater procedural protections afforded to them on U.S. shores. Of the 22,940 Haitians the U.S. Coast Guard interdicted at sea between 1981-1990, the Immigration and Naturalization Services (INS) considered only eleven qualified to apply for asylum.[15]

66. The discriminatory treatment of Haitian immigrants who did reach the United States, particularly with respect to rates of detention, was extensively documented. *See*, *e.g.*, *Jean v. Nelson*, 711 F.2d 1455, 1488 (11th Cir. 1983) (finding that the higher rates of detention of Haitian immigrants compared to other nationalities was only likely to be accounted for by chance "on the order of less than two in ten billion times"), *vacated on legal grounds only and adopting factual findings of panel opinion,* 727 F.2d 957, 962 (11th Cir. 1984).

---

[14] Yeganeh Torbati, *Trump administration bars Haitians from U.S. Visas for Low-Skilled Work*, Reuters (Jan. 17, 2018), https://www.reuters.com/article/us-usa-immigration-haiti/trump-administration-bars-haitians-from-u-s-visas-for-low-skilled-work-idUSKBN1F702O.

[15] Ruth E. Wasem, Cong. Research Serv., RS21349, *U.S. Immigration Policy on Haitian Migrants* 4 (May 17, 2011).

67.     Haitians were also unlawfully denied their statutory and treaty rights to a hearing before an immigration judge in exclusion proceedings on their claims for political asylum. *Sannon v. United States*, 427 F. Supp. 1270 (S.D. Fla. 1977), *vacated and remanded on other grounds*, 566 F.2d 104 (5th Cir. 1978).

68.     They were also unlawfully denied their right to notice of the procedures that the government intended to use against them in exclusion proceedings. *Sannon v. United States*, 460 F. Supp. 458 (S.D. Fla. 1978).

69.     They were also unlawfully denied the right to work during the pendency of their asylum claims. *National Council of Churches v. Egan*, Case No. 79-cv-02959 (S.D. Fla. 1979).

70.     They were unlawfully denied access to information to support their asylum claims. *National Council of Churches v. INS*, Case No. 78-cv-05163 (S.D. Fla. 1979).

71.     They were unlawfully denied the right to present their asylum claims, and were discriminatorily singled out and  subjected to a special "Haitian Program"  to remove them without due process from the United States. *Haitian Refugee Center v. Civiletti*, 503 F. Supp. 442 (S.D. Fla. 1980), *aff'd as modified sub nom. Haitian Refugee Center v. Smith*, 676 F.2d 1023 (5th Cir. 1982).

72.     They have even been unlawfully denied their right to counsel and fair process during exclusion hearings by being shipped to remote areas of the United States. *Louis v. Meissner*, 530 F. Supp. 924, 926 (S.D. Fla. 1981).

73.     As these cases demonstrate, the courts have played a crucial role in protecting this vulnerable class from violations of the laws and the Constitution.

## *The Trump Administration Terminates TPS for Haiti*

74.     In December 2016, before President Trump took office, then-Secretary of State

John Kerry oversaw an assessment of country conditions in Haiti and recommended that DHS

extend the designation of TPS "because certain extraordinary and temporary conditions related to

the 2010 earthquake continue to exist." Ex. 1 at 1. A DHS report issued by the Refugee, Asylum,

and International Operations Directorate Research Unit ("Research Unit") around the same time

entitled "TPS Considerations: Haiti" similarly concluded that seven key "conditions prompting

the original January 2010 TPS designation persist," justifying ongoing TPS designation: (1) an

ongoing housing shortage requiring as many as 500,000 additional housing units; (2) the ongoing

cholera epidemic, including the lack of access to safe drinking water, and lack of sanitation

infrastructure; (3) damage to the country's economy, including nearly 40% unemployment and

6.3 million people living in poverty and unable to meet basic needs; (4) political instability

following the end of former President Michel Martelly's term in February 2016; (5) security

risks related to the displacement of hundreds of thousands of Haitians after the earthquake; (6) a

lack of food security for as many as 3.2 million people as of September 2016; and (7) ongoing

environmental risks caused by natural disasters, including October, 2016's Hurricane Matthew,

the worst hurricane to hit Haiti in fifty-two years. Ex. 2 at 1-8.

75.     Consistent with these assessments, on March 2, 2017, U.S. Citizenship and

Immigration Services (USCIS) staff circulated a memo discussing relevant country conditions in

Haiti and recommended that the Secretary of Homeland Security extend the TPS designation for

Haiti. USCIS staff included a corresponding draft Federal Register Notice extending the

designation for an additional 18 months. Ex. 3 at 4-5.  The memo received a number of clearances and was awaiting only the USCIS Director's approval. *Id*. at 2-3.

76. On April 3, 2017, less than three months after President Trump took office and approximately three days into USCIS Acting Director James McCament's term, USCIS officials pulled the memo and replaced it with one providing the Acting Director an option to terminate the designation. *Id*. at 1-2.

77. On Friday, April 7, 2017, Kathy Nuebel Kovarik, who had been appointed USCIS Chief of Policy and Strategy only five days earlier, instructed agency staff to obtain data on existing Haitian TPS *recipients*, including criminal records and use of public benefits. Ex. 4 at 1. Kovarik shared some resulting data with the Secretary of Homeland Security, but requested additional information from staff for a briefing the following Monday with Acting Director McCament. *Id*. at 31.

78. On Monday, April 10, 2017, in a stunning reversal, McCament issued a memorandum recommending that Secretary Kelly terminate Haiti's TPS designation. Ex. 5 at 1.

79. As the deadline for deciding whether to extend TPS for Haiti loomed, USCIS Chief of Policy and Strategy Kovarik continued to press for statistics on the criminal records and welfare use of Haitian TPS recipients.[16] Ex. 4 at 44, 48. She also sought data on how many Haitian TPS recipients were "illegal pre-TPS designation." *Id*. at 48. For the latter, she suggested that staff conduct a random sampling of files to generalize the immigration status pre-TPS designation for the entire population. *Id*. at 56. Despite multiple responses that much of the data requested was unavailable, Kovarik in an email responded that "I know some of it is not captured, but we'll have to figure out a way to squeeze more data out of our system." *Id*. at 55.

---

[16] Alicia A. Caldwell, *U.S. Digs for Evidence of Haiti Immigrant Crimes*, AP (May 9, 2017), https://apnews.com/740ed5b40ce84bb398c82c48884be616.

She told staff to adduce information "[g]iven that the Sec is going to need it to make a decision . . ." *Id*. at 77.

80.     These DHS officials sought information on crime rates and public benefit usage by TPS recipients for the express purpose of evaluating whether to extend or terminate Haiti's designation. That information, however, is legally irrelevant to the government's evaluation of the conditions on the ground in Haiti, which is governed by factors set out in the statute. Nor would those considerations even make sense—criminal convictions render applicants ineligible for TPS, and TPS holders are generally ineligible for federal welfare benefits. Although not legally or logically relevant to the decision whether to extend TPS, those requests are consistent with President Trump's racial and national-origin bias against Haitians. Thus, upon information and belief, DHS officials were seeking the information in an attempt to justify terminating Haiti's designation despite conditions on the ground.

81.     Shortly thereafter, in May 2017, Senators Robert Menendez, Ron Wyden, Ed Markey, Kirsten Gillibrand, and Sherrod Brown wrote to then-DHS Secretary John F. Kelly "regarding the troubling news that your department has asked for information on the criminal history and public benefits use of Haitians protected under [TPS]."[17] The senators explained that they were "concerned that you will use this information in your decision. Such analysis would be outside the statutory framework for deciding whether to extend TPS, and it would be a disturbing executive overreach."[18] Further, they noted that "the timing of this information request suggests that this information is pretext to deny an extension of TPS," and urged DHS to "keep [its] review within the bounds dictated by Congress."[19]

---

[17] Letter from Sens. Robert Menendez, et al., to John F. Kelly, Sec'y of DHS (May 19, 2017), https://www.menendez.senate.gov/imo/media/doc/HAITI-TPS_5_19_17.pdf.
[18] *Id*.
[19] *Id*.

82. There were other instances of DHS grasping for evidence to support a policy of TPS termination. On May 1, in response to a request for conditions on the ground, the chief of the Research Unit replied "[u]nfortunately, conditions in Haiti remain difficult," citing in an email to a number of conditions including the ongoing housing shortage for earthquake victims, the unfulfilled promise of humanitarian aid following the earthquake, dire food scarcity, flooding on the island, and economic challenges. Ex. 4 at 95.

83. Despite such email correspondence clearly stating that Haiti had not fully recovered from the 2010 earthquake, DHS officials made a request on May 9, 2017 to the Research Unit, for a new addendum to the December 2016 report entitled, "TPS Considerations: Haiti." *See* Ex. 2. The December 2016 report had already been updated by addendum, dated February 7, 2017, in light of (1) the severe impact of Hurricane Matthew, which struck the island in October 2016, and (2) elections which culminated in the swearing in of President Jovenel Moïse. Ex. 6. Now, DHS requested that the following information be added:

(1) "GDP growth -longer-term trend. 2% growth in 2015 is noted in the Decision Memo. In your report, you note it was 5.5% in 2011 and slowed to 2% in 2015 for various reasons. Can we get the year-over-year numbers/trends for some period of years preceding the earthquake to the present (or the most recent year following the earthquake for which GDP is tracked)?

(2) Information regarding the UN's decision to conclude its peacekeeping mission in October 2017. In particular, what served as the basis for the decision to end the mission? What will replace it and in what capacity will it serve? And,

(3) Information regarding the status of reconstruction of the Presidential Palace, and what that suggests regarding the Government of Haiti's post-earthquake recovery and capacity." *See* Ex. 4 at 94.

84.　　The figures above—requested as early as May 9, 2017—would subsequently constitute three of the four considerations used in the Federal Register notice of January 18, 2018 to justify the termination of Haiti's designation for TPS. *See* Termination of the Designation for Temporary Protected Status, 83 Fed. Reg. 2,648, 2,650 (Jan. 18, 2018).

85.　　On May 24, 2017, Secretary Kelly once again extended TPS for Haiti based on a review of the statutory criteria, but nevertheless warned Haitian nationals that they should begin to prepare to return to Haiti. Extension of the Designation of Haiti for Temporary Protected Status, 82 Fed. Reg. 23,830 (May 24, 2017). In his designation notice, Secretary Kelly documented several country conditions that continued to prevent Haitian nationals from returning to Haiti in safety, including the "ongoing cholera epidemic," stating that since October 2010, close to 800,000 Haitians had contracted cholera, and nearly 10,000 people had died of the disease. *Id.* at 23,832.

86.　　Secretary Kelly presented the fact that Hurricane Matthew, which made landfall on October 4, 2016, caused 546 fatalities and left over 175,000 people without housing, as well as causing "extensive damage to crops, housing, livestock, and infrastructure" across Haiti. *Id.* Further, Secretary Kelly noted that approximately 3.2 million people faced food insecurity. *Id.*

87.　　Though Secretary Kelly found that 96% of people had moved out of internally displaced person (IDP) camps, he noted that 55,000 people continued to live in IDP camps, where they remained vulnerable to gender based violence (GBV) and other security risks. *Id.*

88.　　Secretary Kelly acknowledged that many camp residents may have moved back to

unsafe conditions: "Some people who were displaced by the earthquake, although no longer in camps, have moved back to unsafe homes or relocated to informal settlements located in hazardous areas." *Id.*

89. Secretary Kelly's 6-month extension was effective through January 22, 2018. *Id.* at 23,830.

90. Despite his finding that conditions warranted an extension of TPS, Secretary Kelly advised Haitian nationals to prepare to return to Haiti and made public statements that the short extension was meant to be an "alert." Thus, the TPS termination decision for Haiti appears to have been a foregone conclusion.

91. Shortly after the extension, Secretary Kelly testified to the Senate in early June 2017, and attributed past TPS extensions to "automatic renewals."[20]

92. Secretary Kelly indicated that he would *only* look at "the earthquake" in Haiti—not the other "horrible conditions"—even though past Secretaries have looked at a range of "extraordinary" conditions to determine whether the TPS extension was warranted.[21]

93. Secretary Kelly repeatedly said he wanted to focus on the word "temporary" in the program's name.[22]

94. Secretary Kelly's remarks reveal a misunderstanding of the TPS program and the relevant statute. The word "temporary" in the program name does not refer to arbitrarily-measured time periods of short duration, but rather to measurable criteria used for regular evaluation of whether the extraordinary conditions giving rise to the need for protection

---

[20] *The Department of Homeland Security Fiscal Year 2018 Budget Request: Hearing Before the S. Comm. on Homeland Security & Governmental Affairs* (June 6, 2017), https://www.hsgac.senate.gov/hearings/the-department-of-homeland-security-fiscal-year-2018-budget-request.
[21] *Id.*
[22] *Id.*

continue. Because those conditions, such as war or natural disaster, are extraordinary, they are by definition not permanent or indefinite. Secretary Kelly's notion of temporary disregards the statutory text and the clear statutory criteria that govern whether the program's protection for vulnerable noncitizens, once granted, may be terminated.

95. Secretary Kelly's remarks indicate that he was focused on terminating Haiti's TPS status designation rather than evaluating the conditions on the ground as the statute requires.

96. DHS officials were communicating the same message in internal correspondence. For example, in preparation for a meeting between newly-elected Haitian President Jovenel Moïse and the Vice President Mike Pence at a Chamber of Commerce conference in Miami, Director of Latin American and Caribbean Affairs at DHS, David Cloe, circulated talking points including: "TPS is meant to be a temporary measure, not a permanent parole policy," and "S1 decided to extend TPS for qualifying Haitians for six months because he recognizes the administration of President Moïse has only been in office for a few months, and wants to support the new president's plans to entice Haitians living abroad to return to the island, using their skills and capital to invest in Haiti and help create jobs." Ex. 7 at 1.

97. In October 2017, the Research Unit updated DHS's "TPS Considerations: Haiti" report. The 18-page update continued to identify the same seven previously identified areas of concern as justifying ongoing TPS designation, and again concluded that "conditions prompting the original January 2010 TPS designation persist." Ex. 8 at 1. Additionally, the update identified "setbacks that have impeded [Haiti's] recovery, including a cholera epidemic and the impact of Hurricane Matthew," and noted that the "impact of recurring natural disasters is particularly severe" in Haiti. *Id*. at 1, 18. The update concluded by characterizing the nation's recovery as a "tragic pattern of one step forward, two steps back." *Id*. at 18 (internal quotation marks and

citation omitted).

98.     On October 4, 2017, the Haitian government requested DHS provide an 18-month extension to allow the country to "adequately move forward with its recovery and redevelopment plan."[23] In its letter, the government explained that its ongoing efforts to continue to recover from the earthquake and from the ravages of the cholera epidemic and Hurricane Matthew had been hampered by significant setbacks, including both Hurricanes Irma and Maria, as Haiti continued to face daunting challenges. The Haitian government warned that terminating TPS would force the government to halt its "ongoing, short-term redevelopment efforts" and to "focus its limited resources on receiving the influx of citizens."[24] In the same letter, the government invited then-Acting DHS Secretary Duke to Haiti so that she could see the conditions on the ground first hand.

99.     Consistent with indications that DHS officials had predetermined an end to Haiti's TPS designation despite conditions on the ground, upon receiving the invitation for the Acting Secretary to visit Haiti, a DHS official advised, "She definitely is not going to Haiti. We can ask about a meeting here."[25] Ex. 9 at 1, 3, 5.

100.     On or about October 31, 2017, Secretary of State Tillerson sent a letter to Acting Secretary Duke, stating that conditions in Haiti no longer justify its TPS designation.[26] In the

---

[23] Letter from Paul G. Altidor, Haitian Ambassador to the United States, to Elaine C. Duke, Acting Secretary of Dep't of Homeland Sec. (Oct. 4, 2017), http://www.miamiherald.com/latest-news/article178072401.ece/binary/LettertotheHonorableElaineC.Duke.pdf.

[24] *Id*.

[25] Acting Secretary Duke would go on to meet with the Haitian Ambassador to the United States and the Haitian Foreign Minister on November 13, 2017, one week before terminating Haiti's TPS designation. Ted Hesson, *Haitian officials press Duke*, Politico (Nov. 17, 2017), https://www.politico.com/newsletters/morning-shift/2017/11/17/haitian-officials-press-duke-026792.

[26] Nick Miroff and Karen DeYoung, *Protected Status No Longer Justified for Central Americans and Haitians in U.S., State Dept. says*, Wash. Post (Nov. 3, 2017), https://www.washingtonpost.com/world/central-americans-and-haitians-no-longer-need-protected-status-state-dept-says/2017/11/03/647cbd5c-c0ba-11e7-959c-fe2b598d8c00_story.html?utm_term=.5dbdde5a666a.

same letter, Tillerson recommended that TPS be terminated across the board for countries in Central America.

101.    Secretary Tillerson's October 2017 recommendation to terminate TPS was directly contrary to the counsel and expertise of State Department officials in Washington, D.C. and at the U.S. Embassy in Haiti.[27] In a diplomatic cable, officials from the U.S. Embassy in Haiti stated that it would be in the "U.S. national interest" to renew the TPS designations for Haiti. Ex. 10 at 3. Embassy officials further observed that repatriating tens of thousands of TPS beneficiaries would pose challenges to the Haitian National Police's ability to guarantee security throughout the country. *Id*. The Department of State Recommendations for Haiti also stated that it would not be contrary to U.S. national interests to allow TPS beneficiaries from all three countries to remain in the United States. *Id*.

102.    Trump senior adviser Stephen Miller, however, placed phone calls to top Tillerson advisers telling them to end TPS anyway without due regard to the relevant conditions on the ground.[28] By Fall of 2017, Tillerson's message to Acting Secretary Duke was that

---

[27] Nick Miroff, Seung Min Kim, and Joshua Partlow, *U.S. Embassy Cables Warned Against Expelling 300,000 Immigrants. Trump Officials Did it Anyway,* Wash. Post (May 8, 2017), https://www.washingtonpost.com/world/national-security/us-embassy-cables-warned-against-expelling-300000-immigrants-trump-officials-did-it-anyway/2018/05/08/065e5702-4fe5-11e8-b966-bfb0da2dad62_story.html?utm_term=.986362e8fcd1.

[28] *Id*. Miller is the President's 32-year-old advisor, and is himself an outspoken critic of immigrants, both documented and undocumented. Miller has "had a direct hand in several of the Administration's most significant immigration decisions, including the travel bans and the cancellation of Deferred Action for Childhood Arrivals (DACA)." Jonathan Blitzer, *How Stephen Miller Single-Handedly Got The U.S. To Accept Fewer Refugees*, New Yorker (Oct. 13, 2017), https://www.newyorker.com/news/news-desk/how-stephen-miller-single-handedly-got-the-us-to-accept-fewer-refugees. And, in at least one policy-making process involving the so-called "refugee cap," Miller "suppressed evidence that was important to consider" according to an official at the State Department. *Id*. Moreover, according to the same official, he inserted "spurious statistics" into reports; "Things like: refugees are thirty times more likely to commit a terrorist act." *Id*. One White House official described Miller's conduct as "manipulation to get the result he wanted. He basically just had a political agenda: to limit the number of foreign nationals who come into our country." *Id*. As part of this same policy-making process, Miller "rejected a study by the Department of Health and Human Services that found that refugees brought in . . . more in government revenues . . . than they cost." Julie Hirschfeld Davis & Somali Sengupta, *Trump Administration Rejects Study Showing Positive Impact of Refugees*, New York Times (Sept. 18, 2017), https://www.nytimes.com/2017/09/18/us/politics/refugees-revenue-cost-report-trump.html.

terminating TPS "was just something she had to do."[29]

103. Before being sent to DHS, State Department officials "edited" the Department's Country Conditions Report for Haiti, which describe conditions on the ground, to reflect Secretary Tillerson's recommendation to terminate Haiti's TPS designation. Officials specifically "deleted the portions the Secretary disapproved." Ex. 11 at 1, 25-26.

104. On November 3, 2017, L. Francis Cissna, Director of U.S. Citizenship and Immigration Services, relied on the updated October 2017 DHS report on Haiti to recommend termination of Haiti's TPS designation to then-Acting DHS Secretary Duke. Cissna blatantly misconstrued the evidence and analysis contained in the updated DHS report—and completely ignored the evidence relating to post-earthquake setbacks to Haiti's recovery (contrary to prior DHS practice)—when Cissna cited to and relied on the report to assert that "Haiti has made significant progress in recovering from the 2010 earthquake, and no longer continues to meet the conditions for designation." Ex. 12 at 3.

105. Significantly, Cissna also dismissed as unconnected to the earthquake conditions that were explicitly tethered to the earthquake under prior analyses. For example, he claimed that "Haiti is the poorest country in the western hemisphere, but it had enormous problems long before, and unrelated to, the 2010 earthquake." *Id. Compare* October 2017 DHS Report, Ex. 8 at 1 ("Although some progress regarding reconstruction and recovery has been made in a variety of sectors, billions of dollars in pledged foreign assistance never materialized, and the pace and scope of Haiti's recovery has been uneven. Many of the conditions prompting the original January 2010 TPS designation persist, and the country remains vulnerable to external shocks and internal fragility.").

---

[29] Jonathan Blitzer, *The Battle Inside the Trump Administration Over T.P.S.*, The New Yorker (May 11, 2018), https://www.newyorker.com/news/daily-comment/the-battle-inside-the-trump-administration-over-tps.

106.    On November 20, 2017, DHS announced that it was terminating TPS for Haiti with a delayed effective date of July 22, 2019.[30] The announcement ignored the basis for the original and ongoing designation based upon extraordinary conditions under 8 U.S.C. § 1254a(b)(1)(C), which included all of the events enumerated in Kelly's extension. Instead, it stated that the decision "was made after a review of the conditions upon which the country's original designation were based," and summarily asserted that the "extraordinary but temporary conditions caused by the 2010 earthquake no longer exist. Thus, under the applicable statute, the current TPS designation must be terminated."[31]

107.    DHS went on to assert that Haiti had taken unspecified "[s]ignificant steps," and the country was now "able to safely receive traditional levels of returned citizens."[32]

108.    The statement ignored key evidence and its own internal analysis, failing to explain how Haiti had managed to overcome the seven key justifications for *maintaining* TPS that had been repeatedly identified by DHS, namely: enduring housing shortages; a cholera epidemic; widespread economic insecurity; continued political instability; security threats; repeated food shortages; the massive destruction and food insecurity caused by Hurricane Matthew; and ongoing risks caused by even more recent environmental disasters, including flooding associated with Hurricanes Irma and Maria. Ex. 3 at 1-14. Similarly, it failed to explain how Haiti had managed to overcome the list of extraordinary conditions, including post-earthquake conditions, that were considered by DHS only months earlier when Secretary Kelly had reauthorized Haiti's TPS designation. As a result, DHS's review of the conditions in Haiti

---

[30] DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status* (Nov. 20, 2017), https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti.

[31] *Id.*

[32] *Id.*

failed to adequately assess whether conditions in Haiti had changed or the statutory criteria for TPS designation continued to be met.

109.     Almost two months later, on January 18, 2018, DHS published the notice of its termination of Haiti's TPS designation in the Federal Register. Termination of the Designation of Haiti for Temporary Protected Status, 83 Fed. Reg. 2648. The notice, signed by then-Deputy Secretary Duke, was issued after an unprecedented delay and just four days before the expiration of the then-current TPS period for Haitians, January 22, 2018. Because TPS holders rely on the notice to obtain work authorization and driver's licenses, the delay likely caused unknown numbers of TPS recipients to lose their jobs.

110.     The termination notice, like the earlier press release, provided little information about what factors DHS reviewed in reaching its decision to revoke the protected status of 50,000 Haitians,[33] who have remained in the U.S. for at least seven years.

111.     Deputy Secretary Duke simply stated that the number of people in IDP camps had decreased and that the United Nations had withdrawn its peacekeeping mission. She noted that a new Haitian president was in office, and that he intended to rebuild the National Palace. She further stated that Haiti's economy had been recovering since the earthquake. Last, she cursorily mentioned the cholera epidemic, but offered no analysis of its reach other than to say that it was "at its lowest level." 83 Fed. Reg. at 2650.

112.     Crucially, DHS's termination notice referred *exclusively* to the country's 2010 earthquake, making no notice of the extraordinary conditions that Secretary Kelly had noted only months earlier—and that had been emphasized in the October 2017 DHS report—such as the enormous damage caused by Hurricane Matthew.

---

[33] Robert Warren and Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5(3) J. MIGRATION & HUM. SEC. 577, 581 (2017).

113.    Under 8 U.S.C. § 1254a(b)(3)(C), unless DHS determines that a foreign state "no longer meets the conditions" for which a designation is in effect, the period of designation "is extended." Under previous Administrations, consistent with this statutory mandate, DHS conducted a careful review to determine whether conditions in Haiti continued to reflect the severe problems with respect to housing, food security, infrastructure, access to health care, and gender-based violence that have plagued Haiti since the 2010 earthquake and that justified Haiti's TPS designation. Unlike these prior extensions of Haiti's TPS protection, Defendants failed to consider the numerous natural disasters Haiti recently experienced, the slow process of economic and infrastructural recovery described in recent extensions, the housing crisis, the remaining food scarcity, or the persistent reports of gender-based violence. The limited scope of analysis dramatically departs from previous notices issued by the Department. *See, e.g.*, 82 Fed. Reg. at 23,831.

114.    To the extent that DHS did purport to examine the facts regarding country conditions in Haiti, it was only to identify facts to provide an *ex post facto* rationalization of the unlawful decision that had already been made to terminate Haiti's TPS designation.

115.    Reviews of country conditions in Haiti made in the weeks prior to the November 20, 2017 decision to terminate TPS demonstrate that the country continues to experience the extraordinary and temporary conditions for which Haiti was designated for TPS in 2010 and re-designated for TPS in 2011. The conditions include:

(i)     internal displacement: More than 37,000 people remain in IDP camps,[34] with tens of thousands more displaced but not recorded in official statistics due to lack of

---

[34] U.N. OCHA, *Haiti: Humanitarian Snapshot* (Aug. 2017), https://www.humanitarianresponse.info/system/files/documents/files/hti_humanitarian_snapshot_august2017-en_0.pdf.

tracking or reclassification;[35]

(ii)      a housing and physical infrastructure crisis: many people who left camps settled in equally inadequate and unsafe homes, many of which were damaged by the earthquake and have not been repaired.[36] For example, upwards of 200,000 live in Canaan, a makeshift, informal settlement created shortly after the earthquake whose inhabitants lack access to basic services—including water, health care, and waste management;[37]

(iii)      one of the world's worst cholera epidemics;[38]

(iv)      grave hunger and malnutrition, with more than 2.35 million people "in need of immediate assistance," facing severe food insecurity,[39] greatly exacerbated by the massive destruction of crops, livestock, and infrastructure in Haiti's southern peninsula by Hurricane Matthew in October 2016;[40]

(v)      political instability and security risks, including the risk of gender-based violence.[41] The United Nations Peacekeeping force played an important role in stabilizing Haiti. Its replacement with a smaller force has generated concern that Haiti lacks necessary police presence. Nearly one quarter of police supervisory positions remain unfilled, and the police have a presence in fewer than half of

---

[35] GJC Report at 9-11.

[36] Ex. 8 (DHS Oct. 2017 Report) at 2.

[37] *Id*. at 2, 12.

[38] U.N. OCHA, *Haiti: Humanitarian Snapshot* (November 2017), https://www.humanitarianresponse.info/system/files/documents/files/hti_humanitarian_snapshot_november2017-en.pdf.

[39] Ex. 8 (DHS Oct. 2017 Report) at 12.

[40] GJC Report at 19-21.

[41] REFUGEES INTERNATIONAL, *Two Steps Back: Haiti Still Reeling from Hurricane Matthew* 5 (2017), https://www.refugeesinternational.org/reports/2017/4/6/haiti.

Haiti's 570 communal sections;[42] and

(vi)    a widening fiscal deficit, with economic growth slowing to one percent and public

expenditures on the rise to meet post-Matthew reconstruction needs.[43]

### *DHS's Termination of Haitian TPS Violated the Statute and Was Motivated by Unlawful Discrimination Against Immigrants of Color and Haitians in Particular*

116.    Prior to the election of Donald Trump, DHS applied the mandatory statutory

criteria for review and considered all the "extraordinary" conditions in Haiti that prevented

Haitian nationals from returning safely—including Haiti's housing crisis, cholera epidemic, lack

of access to medical care, its struggling economy, political instability, security concerns, gender-

based violence, inadequate access to food and water, and environmental factors.

117.    In testimony to the Senate, however, Secretary Kelly implied that he thought

Haitian TPS should be terminated despite these conditions. He ignored the specific and

measurable factors Congress has enacted to govern TPS extensions.

118.    This Administration has employed its implausible interpretation of the statute—

misreading the word "temporary" to ignore the specific mandatory statutory framework

Congress established—as a blunt instrument for accomplishing an agenda motivated by race and

national origin discrimination against Haitians and animosity in general toward immigrants of

color. And President Trump has made clear his hostility toward Black immigrants and his wish

to prevent them from obtaining any benefits. He has expressed in shockingly forthright terms his

desire to prevent Haitians from remaining in the United States. Because he believes that Haitians

"all have AIDS" and that they come from "shithole countries," he has directed that they should

---

[42] U.N. SECRETARY-GENERAL, *Report of the Secretary-General on the United Nations Stabilization Mission in Haiti*, ¶ 39, U.N. Doc. S/2016/753 (Aug. 31, 2016).

[43] THE WORLD BANK, *Haiti: Overview* (October 2017), http://www.worldbank.org/en/country/haiti/overview.

be "take[n] … out" of any consideration of TPS.  His administration's rescission of Haiti's TPS is part of his irrational and discriminatory agenda.

119.     In departing from the careful statutory reviews employed by prior DHS Secretaries, in changing (without any explanation or justification) the standard for reviewing TPS designation that DHS had previously applied, and in ignoring the factual evidence available to them, Defendants employed an arbitrary, unauthorized, unlawful, and invalid process, requiring judicial intervention.

120.     Haitians with TPS in the United States, including Plaintiffs, relied on Defendants following the mandatory statutory procedure and its prior long-held standard in deciding whether to extend TPS and understood that they would not be forced to return to Haiti until conditions were safe.

121.     If the termination of Haiti's TPS goes into effect, Plaintiffs and other TPS beneficiaries will suffer immediate and irreparable injuries to their rights under the U.S. Constitution and federal law; to their proprietary interests; and to their safety.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

**Administrative Procedure Act: Agency Action that is Arbitrary and Capricious, An Abuse of Discretion, and Otherwise Not In Accordance with Law, In Excess of Statutory Authority, And Without Observance of Procedure Required By Law**

122.     Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth herein.

123.     The APA directs federal courts to hold unlawful and set aside federal agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A); "in excess of statutory jurisdiction, authority, or limitations, or short

36

of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id.* § 706(2)(D).

124.    Although the TPS statute provides for "no judicial review of any determination of the DHS Secretary with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection," 8 U.S.C. § 1254a(b)(5), Plaintiffs are not challenging a TPS "determination" but the practice or procedure that Defendants have employed in making decisions to terminate TPS, including but not limited to Defendants' failure to undertake the statutory review process and their failure to base their termination of Haiti's TPS on any determination that Haiti no longer meets the statutory review criteria.

125.    Defendants' termination of TPS for Haiti constitutes final agency action.

126.    In terminating Haiti's TPS, Defendants abandoned their well-established standard for reviewing TPS designations. Defendants terminated Haiti's TPS based solely on an overly narrow consideration of the "conditions on which the country's original designation were based,"[44] without any consideration of the extraordinary conditions that currently prevent Haitian immigrants from safely returning to Haiti. Under the prior policy, such extraordinary conditions were taken into account in reviewing TPS, as required by statute.

127.    As further evidence of its departure from prior policy, the Administration applied this new standard in 2017 and 2018 not only in terminating Haiti's TPS designation, but also in terminating TPS designations for El Salvador, Honduras, Nicaragua, and Sudan.[45]

---

[44] DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status* (Nov. 20, 2017), https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti.

[45] *Compare id. with Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Nicaragua and Honduras* (Nov. 6, 2017), https://www.dhs.gov/news/2017/11/06/acting-secretary-elaine-duke-announcement-temporary-protected-status-nicaragua-and; *Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for El Salvador* (Jan. 8, 2018), https://www.dhs.gov/news/2018/01/08/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected; *Secretary of Homeland Security Kirstjen M. Nielsen Announcement on Temporary Protected Status for Honduras* (May 4, 2018),

128.     The Administration has adopted this new standard for reviewing TPS designations without sufficient explanation or justification. Defendants have not even publically displayed any awareness that they have changed their policy, but rather, have adopted a new standard *sub silentio*, without meeting the APA's requirement that they demonstrate good reasons for the change in policy. Defendants have arbitrarily and capriciously ignored both the contrary factual findings connected with the prior policy and the serious reliance interests that the prior policy engendered on the part of Haitian immigrants, and thus, Defendants have failed to provide the detailed justification for the new policy that such considerations warrant. *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009).

129.     On information and belief, Defendants also failed to undertake the process of reviewing country conditions that the statute requires, and they failed to base their decision to terminate Haiti's TPS on the required process of review. Whereas Congress enacted statutory criteria for review to ensure the protection of noncitizens vulnerable to extraordinary environmental, geopolitical, health and/or other human tragedies, Defendants instead made an arbitrary decision to terminate TPS for Haiti. To the extent that Defendants engaged in any process of review, it was only to identify facts that might appear to rationalize the predetermined, arbitrary decision to terminate Haiti's TPS based on the Trump Administration's irrational and racist immigration policy agenda. In particular, Defendants disregarded and misconstrued the factual evidence available to them, including by ignoring and/or directing their subordinates to rewrite reports and recommendations supporting an extension of Haiti's TPS. Defendants also adopted and implemented a new legal standard for making TPS termination decisions, which

---

https://www.dhs.gov/news/2018/05/04/secretary-homeland-security-kirstjen-m-nielsen-announcement-temporary-protected; *cf.* Termination of the Designation of Sudan for Temporary Protected Status, 82 Fed. Reg. 47,228, 47,230 (Oct. 11, 2017).

Defendants have used to rationalize the decision to terminate Haiti's TPS, notwithstanding their failure to comply with the statutory criteria for review. Defendants, thus, employed an invalid and unauthorized process to terminate Haiti's TPS designation.

130. Defendants' termination of Haitian TPS is arbitrary and capricious; an abuse of discretion; otherwise not in accordance with the law; in excess of statutory authority; and was undertaken without observance of procedure required by law, and therefore should be held invalid and set aside under the APA.

## SECOND CLAIM FOR RELIEF
### Fifth Amendment (Due Process)

131. Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth herein.

132. The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from depriving individuals of their liberty or property interests without due process of law.

133. Defendants' termination of TPS violates TPS recipients' due process rights because it was based on the President's racial animus towards immigrants of color and Haitians in particular—thus, the TPS termination decision was irrational under the Due Process Clause.

134. Further, because the TPS termination was based on racial animus, it is neither narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.

135. Further, Defendants' termination of Haitian TPS arbitrarily deprives current TPS recipients of the process to which they are entitled, as shown by the Administration's departure from and apparent disregard of the process for termination of TPS set forth in 8 U.S.C. § 1254a,

which otherwise provides for the continuation of the statute's benefits if the conditions that justify its application persist.

136. Further, termination of Haitian TPS violates Haitian TPS recipients' due process rights because the termination was based on the President's categorical and defamatory assertions about all Haitians, which the Haitian TPS recipients were given no opportunity to challenge.

## THIRD CLAIM FOR RELIEF
### Fifth Amendment (Equal Protection)

137. Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth herein.

138. The Due Process Clause of the Fifth Amendment prohibits the federal government, including Defendants, from denying to any person equal protection of the laws.

139. The government has acknowledged that it does not have the right to discriminate based upon race or national origin. *See Jean v. Nelson,* 472 U.S. 846, 855-57 (1985).

140. Defendants' TPS termination targets immigrants of color and Haitians in particular and was improperly motivated by discriminatory animus based on race and national origin.

141. There is clear evidence—including President Trump's own outrageous assertions that Haitians "all have AIDS" and that United States policy should be to accept more immigrants from countries like Norway rather than "shithole countries" like Haiti, as well as the Administration's failure to conduct any adequate review of country conditions in Haiti as required by statute—that the decision to terminate TPS for Haiti was motivated by racism and discriminatory animus and that the same decision would not otherwise have been made.

142.     Thus, because the TPS termination was based on racial animus, it is neither narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.

143.     Accordingly, the action violated Plaintiffs' rights to Equal Protection of the laws.

**FOURTH CLAIM FOR RELIEF**
**Administrative Procedure Act: Notice-and-Comment Rulemaking**

144.     Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth herein.

145.     When an agency promulgates a substantive rule, it must give notice of that rule in the Federal Register and "shall give interested persons an opportunity to participate in the rule making through submission of written data, views, or arguments with or without opportunity for oral presentation." 5 U.S.C. § 553(b), (c).

146.     When the agency fails to adhere to this requirement, its action may be set aside under 5 U.S.C. § 706(2)(D).

147.     The Trump Administration has substantively changed the criteria employed for terminating TPS designations. Contrary to prior Administrations, DHS has determined that TPS designations must be terminated when the conditions caused by the event on which the country's designation was originally based have improved, irrespective of whether other extraordinary conditions prevent nationals from safely returning to the country.

148.     These new criteria have not been codified in any published rule or regulation and are contrary to statute. Nevertheless, they have been applied to terminate multiple TPS designations, including Haiti's TPS designation. The new criteria constitute a substantive legal and policy change with significant effects on individuals living in the United States pursuant to TPS designations that have been terminated but would not have been terminated under prior

policy. Further, DHS has applied the new criteria in a way that indicates that the new criteria are binding. In particular, DHS concluded that Haiti's designation "must be terminated" because the new criteria supposedly have not been met.[46]

149. Alternatively, the termination of Haitian TPS itself constitutes a rule that implements a substantive policy change by the Administration and binds DHS to deny applications for TPS to individuals who previously met eligibility criteria.

150. Accordingly, DHS was required to engage in notice-and-comment rulemaking before adopting their new unpublished rule for making TPS termination decisions and before terminating Haiti's designation.

151. Defendants did not follow notice-and-comment rulemaking procedures before adopting their new unpublished rule for making TPS termination decisions. Nor did they follow notice-and-comment rulemaking procedures before terminating Haitian TPS or terminating any other TPS designations that implemented their new rule.

152. Accordingly, Defendants' termination of Haitian TPS violated the notice-and-comment provisions of the APA and should be set aside.

### FIFTH CLAIM FOR RELIEF
### Regulatory Flexibility Act

153. Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth herein.

154. DHS failed to conduct any regulatory flexibility analysis to determine how the termination of Haitian TPS will affect small entities, such as Haïti Liberté, in violation of the Regulatory Flexibility Act (RFA). 5 US.C. §§ 601 *et seq.*

---

[46] DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status* (Nov. 20, 2017), https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti.

155.    Haïti Liberté, as a "small organization" within the meaning of 5 U.S.C. § 601(4), is directly affected by the termination of Haitian TPS, and therefore DHS was required to conduct a regulatory flexibility analysis prior to promulgating the rule.

156.    Defendants failed to conduct a regulatory flexibility analysis.

157.    Defendants' termination of Haitian TPS violated the RFA.

**SIXTH CLAIM FOR RELIEF**
***Ultra Vires* Under Federal Common Law**

158.    Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth here.

159.    DHS's termination of the designation of Haiti as a TPS country is *ultra vires* of the provisions in the Immigration and Nationality Act (INA), which govern the designation, termination, and extension of TPS countries.

160.    As demonstrated by publicly available reports regarding the President's racially motivated desire to remove Haitian TPS holders from the country and DHS's stated focus on the "temporary" nature of the TPS designation, it is clear that DHS's decision was not properly based on the required factors set forth at 8 U.S.C. § 1254a(b)(1)(A-C).

161.    The termination of Haiti's TPS designation is *ultra vires* of the INA and should be held invalid and set aside.

**ATTORNEYS' FEES UNDER EQUAL ACCESS TO JUSTICE ACT**

162.    Plaintiffs incorporate the allegations in paragraphs 1-121 by reference as if fully set forth here.

163.    Because of the Defendants' unlawful actions, Plaintiffs were required to retain legal counsel.

164.    Pursuant to the Equal Access to Justice Act ("EAJA"), 5 U.S.C. § 504 and 28 U.S.C. § 2412, Plaintiffs are entitled to recover their costs, expenses, and fees because Defendants' actions are not and have not been substantially justified.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court:

a.    Declare that Defendants' decision to terminate the designation of Haiti as a TPS country violates Plaintiffs' Fifth Amendment rights to Equal Protection and Due Process; is arbitrary and capricious; is in excess of statutory authority; was undertaken without observance of procedure required by law; and is *ultra vires* of the INA.

b.    Declare that Defendants' failure to subject its termination of the designation for Haiti to notice-and-comment rulemaking violates 5 U.S.C. § 553 et seq.;

c.    Declare that Defendants' failure to publish an initial regulatory flexibility analysis violates the requirements of the Regulatory Flexibility Act, 5 U.S.C. § 601 et seq.;

d.    Enjoin and restrain Defendants, their agents, servants, employees, attorneys, and all persons in active concert or participation with any of them from implementing or enforcing the decision to rescind Haitian TPS and from taking any other action to rescind Haitian TPS that is not in compliance with applicable law;

e.    Reverse DHS's determination to terminate Haiti's TPS designation, and enjoin Defendants from removing Haitian nationals with TPS from the United States based on the termination;

f.    Order the Defendants to accept applications for TPS after July 22, 2019 and to accept late-filed applications during the TPS period;

g.    Award Plaintiffs costs and attorneys' fees; and

h.     Grant such further relief as the Court deems just and proper.


Dated:  May 31, 2018

　　　Respectfully Submitted,
　　　/s/ Ira J. Kurzban

Ira J. Kurzban, (NY Bar No. 5347083)
Edward F. Ramos*
Kevin Gregg
Celso Perez*
KURZBAN, KURZBAN, WEINGER,
TETZELI & PRATT, P.A.
2650 S.W. 27th Avenue, 2nd Floor
Miami, FL 33133
Phone: (312) 660-1364
ira@kkwtlaw.com

Sejal Zota
Elizabeth Simpson*
NATIONAL IMMIGRATION PROJECT OF
THE NATIONAL LAWYERS GUILD
14 Beacon Street, Suite 602
Boston, MA 02018
Phone: (919) 698-5015
sejal@nipnlg.org


Clarel Cyriaque*
CLAREL CYRIAQUE LAW OFFICE
108 S. Miami Avenue
Miami, FL 33130
Phone: (305) 377-3838


*Application for *pro hac vice* admission
forthcoming

Christopher J. Houpt (NY Bar No. 4452462)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Phone: (212) 506-2500
choupt@mayerbrown.com

Miriam Nemetz*
MAYER BROWN LLP
1999 K Street, NW
Washington, DC 20006
Phone: (202) 263-3000
mnemetz@mayerbrown.com

Geoffrey M. Pipoly
Christopher J. Ferro
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
gpipoly@mayerbrown.com

*Attorneys for Plaintiffs*