# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATRICK SAGET, SABINA BADIO FLORIAL, NAÏSCHA VILME, GERALD MICHAUD, BEATRICE BELIARD, RACHELLE GUIRAND, JEAN CLAUDE MOMPOINT, YOLNICK JEUNE, GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI LIBERTÉ, and FAMILY ACTION NETWORK MOVEMENT, INC., | |
| Plaintiffs, | Case No. 1:18-cv-01599-WFK-ST |
| v. | *Leave to File Granted on 6/27/18* |
| DONALD J. TRUMP, President of the United States; UNITED STATES OF AMERICA; DEPARTMENT OF HOMELAND SECURITY; KIRSTJEN NIELSEN, Secretary of the Department of Homeland Security; and ELAINE C. DUKE, Deputy Secretary of the Department of Homeland Security, | |
| Defendants. | |

**BRIEF OF AMICI STATES MASSACHUSETTS, CALIFORNIA, THE DISTRICT OF COLUMBIA, CONNECTICUT, DELAWARE, HAWAII, ILLINOIS, IOWA, MAINE, MARYLAND, MINNESOTA, NEW JERSEY, NEW YORK, OREGON, RHODE ISLAND, VERMONT, VIRGINIA, AND WASHINGTON IN SUPPORT OF PLAINTIFFS' OPPOSITION TO THE MOTION TO DISMISS**

i

## TABLE OF CONTENTS

**INTRODUCTION AND INTEREST OF AMICI STATES** ........................................................ 1

**ARGUMENT** ....................................................................................................................... 2

   I.  This Court Has Jurisdiction to Review Defendants' Actions. ............................................ 2

     A. Section 1254a Shows No Evidence of Congressional Intent to Foreclose Review of Constitutional Claims............................................................................. 3

     B. Plaintiffs' Claims Are Subject to Judicial Review Because They Challenge Practices and Policies, not an Individual TPS Termination. ........................... 5

   II. Defendants' Policy Will Inflict Serious Harm on Individuals, Families, Communities, and Amici States. ....................................................................................... 8

     A. Families Will Be Torn Apart. ....................................................................................... 9

     B. Amici States' Economies and Workforces Will Suffer................................................. 13

     C. Vulnerable Residents Will Suffer from Disruptions in Care Provided by TPS Holders................................................................................................................ 14

     D. Public Health Will Suffer. ............................................................................................ 16

     E. Public Safety Will Suffer.............................................................................................. 17

   **CONCLUSION** .................................................................................................................... 17

# TABLE OF AUTHORITIES

## CASES

*Abbott Laboratories v. Gardner*,
  387 U.S. 136 (1967) ................................................................................................ 2

*Alfred L. Snapp & Son, Inc. v. P.R.* ex rel. *Barez*,
  458 U.S. 592 (1982) .............................................................................................. 17

*Bowen v. Michigan Acad. of Family Physicians*,
  476 U.S. 667 (1986) ....................................................................................... 2, 3, 5

*Demore v. Kim*,
  538 U.S. 510 (2003) ................................................................................................ 4

*Johnson v. Robison*,
  415 U.S. 361 (1974) ................................................................................................ 4

*Krua v. Dep't of Homeland Sec.*,
  729 F. Supp. 2d 452 (D. Mass. 2010) .................................................................... 3

*Lockerty v. Phillips*,
  319 U.S. 182 (1943) ................................................................................................ 3

*McNary v. Haitian Refugee Ctr., Inc.*,
  498 U.S. 479 (1991) ....................................................................................... 4, 5, 7

*Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*,
  279 F. Supp. 3d 1011 (N.D. Cal. 2018) ................................................................. 7

*Rusk v. Cort*,
  369 U.S. 367 (1962) ........................................................................................... 2, 5

*United States v. Nourse*,
  34 U.S. 8 (1835) ..................................................................................................... 2

*Webster v. Doe*,
  486 U.S. 592 (1988) ....................................................................................... 3, 4, 5

*Weinberger v. Salfi*,
  422 U.S. 749 (1975) ................................................................................................ 3

## STATUTES

8 U.S.C. § 1252(b)(9) ................................................................................................. 3

8 U.S.C. § 1254a(b)(3)(A) ...................................................................................... 5, 6

8 U.S.C. § 1254a(b)(5)(A) ...................................................................................... 3, 7

8 U.S.C. § 1255a(f)(1) ................................................................................................ 7

### OTHER AUTHORITIES

Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr., 7 (Apr. 2017), https://tinyurl.com/TPSEcon ........................................................................ 13

Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments*, 8 (Dec. 2007), https://tinyurl.com/CBOImm ............................................................................................ 16

Decl. of Anne McCleod, *Regents v. U.S. Department of Homeland Security*, 3:17-cv-05211-WHA ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017) ..................... 16

Decl. of Jesse M. Caplan, *New York v. Trump*, 1:17-cv-05228-NGG-JO ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017) ......................................................................................... 16

G. Thomas Kingsley, et al., *The Impacts of Foreclosures on Families and Communities*, The Urban Inst., 13 (May 2009), https://tinyurl.com/GTKUrban ....................................................................................... 14

*Health care for unauthorized immigrants*, Comm. Op. No. 627, Am. C. of Obstetricians & Gynecologists, 125 Obstet. Gynecol. 755 (2015), https://tinyurl.com/ACOG627 ........................................................................................ 16

Heather Koball, et al., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst., 5 (Sept. 2015), https://tinyurl.com/MIRFinal ........................................................... 10

Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120–136 (2011) ........................................................................... 10

Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures*, 3 Sociological Science 1053 (2016), https://www.sociologicalscience.com/articles-v3-46-1053/ ............................... 14

James Queally, *Fearing deportation, many domestic violence victims are steering clear of police and courts*, L.A. Times, Oct. 9, 2017, https://tinyurl.com/Queally ............................................................................................ 17

Jens Hainmueller, et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, Science (Aug. 31, 2017), https://tinyurl.com/HainScience ................................................................................... 10

K. Yun, et al., *Parental immigration status is associated with children's health care utilization: Findings from the 2003 new immigrant survey of US legal permanent residents*, 17 Matern. Child Health J. 1913–1921 (2013) .............................. 16

Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, ConstructionDive.com, Jan. 24, 2018, https://tinyurl.com/TPSConst .................... 14

Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Polytechnic St. Univ., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno ............................................................. 10

Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*, Boston Globe, Dec. 4, 2017, https://tinyurl.com/Serotkin ........................................................................... 15

*Massachusetts Industry-Occupation Employment Matrix, 2014-2024*, Mass. Exec. Office of Labor & Workforce Dev., https://tinyurl.com/MALabMar ........................... 15

Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, Kaiser Health News (Mar. 26, 2018), https://tinyurl.com/KHNImmig ........................... 15

Meredith King Ledford, *Immigrants and the U.S. Health Care System: Five Myths that Misinform the American Public*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth ........................................................................... 16

New Amer. Economy Research Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS ........................................................................... 14

Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 2011), https://tinyurl.com/ZillAdopt ........................................................................... 11

Nicole Prhcal Svajlenka, et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP ........................................................................... 8

Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urban Planning & Pol'y, Univ. of Ill. at Chi. (May 2013), https://tinyurl.com/InsecComm ........................................................................... 17

Randy Capps, et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI ........................................................................... 10

Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Security 573, 578 (2017), https://tinyurl.com/WarKer ........................................................................... 8, 13, 14, 15

Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Research Ctr. (Nov. 2011), https://tinyurl.com/ARCFam ........................................................................... 11

Wendy Cervantes, et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears ........................................................................... 9

## INTRODUCTION AND INTEREST OF AMICI STATES

Collectively, Amici States[1] are home to hundreds of thousands of people who hold Temporary Protected Status ("TPS")—a legal status provided to foreign nationals who are present in the United States when their countries of origin become unsafe and cannot handle their return. Thousands of these TPS holders are from Haiti, which was first designated for TPS after a devastating earthquake in 2010. Haitian TPS holders are nurses, roofers, pastors, chefs, bus drivers, teachers, landscapers, and child care providers. They are homeowners, business owners, union members, class presidents, and civic leaders. They are our neighbors, co-workers, family members, and friends.

The Department of Homeland Security's ("DHS's") termination of TPS for Haiti would strip these community members of legal authorization to work and could result in their deportation to a country that is unprepared to receive them. Many TPS holders would presumably be deported or otherwise have no choice but to leave; others would go into the shadows; all would lose the right to remain legally in the United States and support themselves and their families under the terms of TPS. The result would be harm to the welfare of TPS holders and their families, shuttered businesses, labor shortages, empty church pews, and strain on public and private social services.

The termination of TPS designations for Haiti and other countries is already hurting the economy and civil society, as the prospect of widespread deportation has left whole communities uncertain, confused, and afraid. The termination of Haiti's TPS will inflict greater damage in the months ahead if it is not enjoined. Judicial review of Defendants' actions is legally sound, serves

---

[1] The States are Massachusetts, California, Connecticut, Delaware, Hawaii, Illinois, Iowa, Maine, Maryland, Minnesota, New Jersey, New York, Oregon, Rhode Island, Vermont, Virginia, and Washington. The District of Columbia is included as an "Amici State" for the purposes of this brief.

1

as a vital check on executive action, and could alleviate unnecessary harms, including direct and indirect harms to Amici States. Amici therefore have a strong interest in judicial review of Defendants' actions, which have already affected thousands of families across the Amici States and threaten to inflict further harm if left unchecked by the judiciary. The public interest, as well as settled law, weighs in favor of judicial review.

**ARGUMENT**

**I.    This Court Has Jurisdiction to Review Defendants' Actions.**

For centuries, our courts have emphasized the "strong presumption" of judicial review of administrative action. *Bowen v. Michigan Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Abbott Laboratories v. Gardner*, 387 U.S. 136, 140 (1967); *United States v. Nourse*, 34 U.S. 8, 28–29 (1835). Judicial review is particularly important in cases like this one, where Plaintiffs allege that a constitutionally and legally flawed process has impacted multiple agency decisions and threatens to inflict harm on vulnerable populations and the public. As a result, agencies seeking to prevent judicial review of their actions must show "clear and convincing" evidence of congressional intent to bar such review. *Bowen*, 476 U.S. at 671 (citations omitted); *see also Rusk v. Cort*, 369 U.S. 367, 379–80 (1962); *Abbott Laboratories*, 387 U.S. at 140–41 (citing *Rusk* for the "clear and convincing evidence" standard); *Sharkey v. Quarantillo*, 541 F.3d 75, 84 (2d Cir. 2008) (citing *Bowen* for the "clear and convincing evidence" standard). Defendants' arguments against review of Plaintiffs' constitutional and statutory claims do not meet that high standard.

Recently, two district courts have explicitly held that courts have jurisdiction to review constitutional and statutory challenges to the criteria used to terminate TPS for Haiti. *Ramos v. Nielsen*, No. 18-CV-01554, 2018 WL 3730429 (N.D. Cal. Aug. 6, 2018); *Centro Presente v. U. S. Dep't of Homeland Sec.*, No. 18-CV-10340, 2018 WL 3543535 (D. Mass. July 23, 2018). This Court should follow suit.

2

### A.  Section 1254a Shows No Evidence of Congressional Intent to Foreclose Review of Constitutional Claims.

Where agency action allegedly violates constitutional rights—of tens of thousands of people in this case—the presumption of judicial review is particularly strong. As the Supreme Court has noted, a "serious constitutional question [] would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (quotation marks omitted); *see also Bowen*, 476 U.S. at 681 n.12; *Calcano-Martinez v. I.N.S.*, 232 F.3d 328, 340 (2d Cir. 2000) (citing *Webster*, and finding no congressional intent to bar habeas review in Illegal Immigration Reform and Immigrant Responsibility Act), *aff'd*, 533 U.S. 348 (2001). Thus, the Court has described arguments that Congress intended to bar judicial review of constitutional claims as "extreme," *Bowen*, 476 U.S. at 680, "extraordinary," *Weinberger v. Salfi*, 422 U.S. 749, 762 (1975), and "not to be favored," *Lockerty v. Phillips*, 319 U.S. 182, 188 (1943).

The language at issue here does not come close to meeting the demanding "clear and convincing" standard of congressional intent to foreclose review of constitutional claims, and this Court therefore need not confront the "serious constitutional question" that would arise if it did.[2] The statute, which bars "judicial review of any determination of the [Secretary] with respect to the . . . termination . . . of a designation[] of a foreign state," 8 U.S.C. § 1254a(b)(5)(A), is notably silent as to the reviewability of constitutional claims. This is in stark contrast to other provisions limiting jurisdiction in the Immigration and Nationality Act ("INA"), which do expressly address

---

[2] Defendants' lone citation in support of their argument that the language of 8 U.S.C. § 1254a(b)(5)(A) precludes constitutional claims is *Krua v. U.S. Dep't of Homeland Sec.*, 729 F. Supp. 2d 452 (D. Mass. 2010). However, that ruling does not include analysis of the reviewability issue or mention the cases which apply the "clear and convincing" standard required to bar such review. This is understandable since it does not appear that Krua—a pro se plaintiff—addressed jurisdictional issues in his briefing. Thus, this decision should not carry significant weight here.

how constitutional claims should be reviewed, *e.g.*, 8 U.S.C. § 1252(b)(9).[3] "Congress legislates with knowledge of our basic rules of statutory construction," including the Court's "well-settled presumption favoring interpretations of statutes that allow judicial review of administrative action." *McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479, 496 (1991). The statute's silence as to constitutional claims is thus enough to dispense with the argument that "clear and convincing evidence" exists to bar review of constitutional claims. *See Johnson v. Robison*, 415 U.S. 361, 367 (1974) ("Plainly, no explicit provision of § 211(a) bars judicial consideration of appellee's constitutional claims."); *Demore v. Kim*, 538 U.S. 510, 517 (2003) ("Section 1226(e) contains no explicit provision barring habeas review . . . ."); *Webster*, 486 U.S. at 603–04 (holding that "only those determinations specifically identified by Congress" were excluded from judicial review).

Perhaps understanding the gravity of suggesting that judicial review of constitutional claims should be precluded, Defendants suggest that it "may" be possible for individual plaintiffs to raise constitutional claims during their removal proceedings (to the immigration court and applicable court of appeals), in that a specific INA provision "could allow" for such review. Def. Br. at 15. This purported alternative is inadequate. Even putting aside Defendants' obvious hedging as to whether this "alternative" actually exists, it would be severely underinclusive, providing *no* forum for individuals who are never placed in removal proceedings,[4] or for institutional or organizational plaintiffs to raise a claim of constitutional injury. As in *McNary*, this "alternative" would provide that individuals "can ensure themselves review in courts of appeals

---

[3] Where language is included in some statutory provisions and not others, "'it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.'" *Jaen v. Sessions*, No. 17-1512, 2018 WL 3826019, at *5 (2d Cir. Aug. 13, 2018) (quoting *Russello v. United States*, 464 U.S. 16, 23 (1983)).

[4] It bears noting that TPS holders will be harmed by the termination even if they are not ultimately placed in removal proceedings. Most prominently, they will lose their immigration status and authorization to legally work in the United States, leading to significant hardship.

only if they voluntarily surrender themselves for deportation." 498 U.S. at 496. Defendants'

"alternative" would thus "deny any judicial forum for a colorable constitutional claim" for many

of those affected—exactly what the relevant cases prohibit. *See Webster*, 486 U.S. at 603; *Batalla*

*Vidal v. Duke*, 295 F. Supp. 3d 127, 151 (E.D.N.Y. 2017), *motion to certify appeal granted sub*

*nom. Batalla Vidal v. Nielsen*, No. 16-CV-4756, 2018 WL 333515 (E.D.N.Y. Jan. 8, 2018). In

short, this hypothetical remedy is no remedy at all; it would allow irreversible damage to tens of

thousands of people and numerous organizations like Family Action Network Movement, Inc.,

which are already suffering collateral consequences.

### B. Plaintiffs' Claims Are Subject to Judicial Review Because They Challenge Practices and Policies, not an Individual TPS Termination.

Plaintiffs' constitutional and statutory claims arise not out of a determination for a single

country, but rather out of "a group of decisions or a practice or procedure employed in making

decisions," which they argue are unconstitutional and unlawful. *McNary*, 498 U.S. at 492. The

termination of TPS for Haiti was not an isolated incident. Instead it was the result of a change in

policies and practices related to TPS determinations that has led to the termination of TPS for six

countries in the past year. This Court can and should review these broad policies and practices to

determine whether DHS violated the Administrative Procedure Act when it adopted them, and

whether the termination was premised on unconstitutional discrimination.[5]

Under the TPS statute, DHS must undertake a periodic review of "the conditions in" any

country currently designated for TPS and determine whether conditions for TPS designation

---

[5] It is well established that "the [Supreme] Court will not hold that the broadly remedial provisions of the Administrative Procedure Act are unavailable to review administrative decisions under the [INA] in the absence of clear and convincing evidence that Congress so intended." *Rusk,* 369 U.S. at 379–80. *See also Bowen*, 476 U.S. at 681 ("We ordinarily presume that Congress intends the executive to obey its statutory commands and, accordingly, that it expects the courts to grant relief when an executive agency violates such a command.").

"continue to be met." 8 U.S.C. § 1254a(b)(3)(A). For years, DHS met this statutory mandate by considering all relevant conditions on the ground when deciding whether TPS should be extended as to any particular country. DHS's policy did not require that those conditions be related to the specific condition under which the country at issue was originally designated for TPS.[6] In recent months, however, DHS changed this longstanding policy. For Haiti, DHS made its TPS termination decision solely on the "conditions upon which the country's *original designation* was based," and the Acting Secretary's assessment that the "extraordinary but temporary conditions *caused by the 2010 earthquake* no longer exist," based on the agency's new position that the statute *only* allows consideration of whether a country has made progress vis-à-vis the condition that prompted the original TPS designation. This new position was made clear in a press release that the Acting Secretary issued at the time,[7] and is corroborated by documents produced in *Ramos v. Nielson*, a parallel case in the Northern District of California.[8]

The Plaintiffs allege that this new policy relies on an erroneous legal interpretation of the

---

[6] For example, Haiti was designated for TPS in 2010 due to a catastrophic earthquake. Designation of Haiti for Temporary Protected Status, 75 Fed. Reg. 3476 (Jan. 21, 2010). Yet, that designation itself was made pursuant to 8 U.S.C. § 1254a(b)(1)(C) ("extraordinary" conditions), and not subsections (A) or (B), which are tied to specific precipitating events. In the years that followed, Haiti was re-designated for TPS and its designation was extended multiple times, often for reasons in addition to the 2010 earthquake, including the subsequent unprecedented cholera epidemic. Extension and Redesignation of Haiti for Temporary Protected Status, 76 Fed. Reg. 29,000 (May 19, 2011). This is consistent with DHS's practice for other countries as well, where events subsequent to TPS designation have consistently been considered in extension determinations.

[7] Press Release, U.S. Dep't of Homeland Sec., *Acting Secretary Elaine Duke Announcement on Temporary Protected Status for Haiti* (Nov. 20, 2017), https://www.dhs.gov/news/2017/11/20/acting-secretary-elaine-duke-announcement-temporary-protected-status-haiti (emphasis added).

[8] *Ramos*, Pls.' Mot. for Prelim. Inj. ("*Ramos* PI Mot."), ECF 89 at 10, 21 & Exh. 45, ECF 96-45 at 5–6 (DHS memorandum stating that "Haiti's food insecurity problems seem related to tropical storms and a drought rather than from the lingering effects of the 2010 earthquake. . . . Haiti's current challenges cannot be directly tied to the 2010 earthquake. . . . Any current issues in Haiti are unrelated to the 2010 earthquake").

TPS statute which is a pretext for decision-making that was infected by invidious animus against persons of Haitian origin. DHS's new policy and associated practices, as applied to Haiti, warrants judicial scrutiny because the statute's bar to judicial review refers specifically to "any determination of the [Secretary] with respect to the . . . termination . . . of a designation[] of a foreign state," 8 U.S.C. § 1254a(b)(5)(A), *not* to broader policies and practices that inform such determinations, including embedded legal interpretations. *Ramos,* 2018 WL 3730429 at \*12 (claims are reviewable where they challenge "DHS's change in interpretation of the TPS statute (a general procedural issue), not an individual determination."); *Centro Presente,* 2018 WL 3543535 at \*9 (TPS statute's jurisdiction-stripping provision does not apply to claims that "challenge[] the . . . process of adjudication rather than the content of any particular adjudication."); *see also Batalla Vidal*, 295 F. Supp. 3d at 154 (interpreting jurisdiction-stripping provision in INA not to preclude judicial review of legal questions underlying programmatic decision); *Regents of the Univ. of Cal. v. U.S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1030 (N.D. Cal. 2018) (citing defendants' concession that "where the agency's interpretation of a statute is embedded in a non-reviewable . . . policy, the former may be reviewable") (internal quotation marks omitted).

Reviewing a remarkably similar statute,[9] the Supreme Court held in *McNary* that "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." 498 U.S. at 492. *McNary* went on to hold that such language cannot be read to "refer[] to general collateral challenges to unconstitutional practices

---

[9] *Compare* 8 U.S.C. § 1255a(f)(1) ("There shall be no administrative or judicial review of a determination respecting an application for adjustment of status under this section except in accordance with this subsection.") *with* § 1254a(b)(5)(A) ("There is no judicial review of any determination of the Attorney General with respect to the designation, or termination or extension of a designation, of a foreign state under this subsection.").

7

and policies used by the agency." *Id.*; *see also id.* at 497 (rejecting "denial of judicial review of generic constitutional and statutory claims"). Likewise, Plaintiffs here challenge practices and policies that they allege to be unconstitutional (in that they were motivated by animus) and unlawful (in that they misinterpreted the statute). This Court should review these claims because nothing in § 1254a is so "clear and convincing" as to overcome the strong presumption favoring judicial review of claims of the kind advanced here.

Judicial review is all the more important where, as here, an agency's policy will result in broad and systemic impact on the public. DHS's new policy has already resulted in the termination of TPS for Haiti and five other countries in the past year. As a result, hundreds of thousands of TPS holders will lose their legal status and be forced to choose between remaining in the United States without legal status or returning to countries that are unsafe and that cannot handle their return. In turn, the families, employers, and communities that rely on these individuals—including Amici States—will also suffer.

## II.    Defendants' Policy Will Inflict Serious Harm on Individuals, Families, Communities, and Amici States.

Defendants' decision is already inflicting broad and systemic harm on the public. A majority of TPS holders from Haiti have lived here for many years—in some instances, decades. On average, Haitian TPS recipients have lived in the United States for 13 years.[10] Sixteen percent of Haitian TPS holders have resided in the United States for 20 years or more.[11] These individuals have built lives in the United States. They have started families, founded businesses, bought

---

[10] Nicole Prchal Svajlenka, et al., *TPS Members Are Integral Members of the U.S. Economy and Society*, Ctr. Am. Progress (Oct. 20, 2017), https://tinyurl.com/TPSCAP.

[11] Robert Warren & Donald Kerwin, *A Statistical and Demographic Profile of the US Temporary Protected Status Populations from El Salvador, Honduras, and Haiti*, 5 J. Migration & Hum. Security 573, 577–78, 581 (2017), https://tinyurl.com/WarKer.

homes, joined churches, earned degrees, and advanced in their careers. They contribute to our economy and civic life in countless ways, both quantifiable and intangible. Judicial review of the Plaintiffs' legal claims could prevent needless harm not only to Haitian TPS holders, but to those who rely on them for care, friendship, family and community cohesion, and economic vitality.

### A.  Families Will Be Torn Apart.

Having lived and worked legally in the United States for years, many Haitian TPS holders have gotten married, had children, and raised families in the Amici States. In fact, 27,000 U.S. citizen children have been born to Haitian TPS holders in the United States and nine percent of TPS holders are married to a U.S. citizen spouse.[12] As a result, tens of thousands of people live in "mixed-status" households, where one or both parents hold TPS, while some or all of their children (and, sometimes, a spouse) are U.S. citizens.

Terminating TPS guarantees that these "mixed-status" families will—at the very least— face agonizing choices. With the loss of TPS, a parent will face the unacceptable options of (1) returning to her country of origin alone, leaving her children behind; (2) taking her U.S. citizen children with her to a country that they do not know, and where the safety of the TPS holder and her children cannot be ensured; or (3) staying in the United States and retreating into the shadows, knowing she cannot work legally and could be deported at any time. These are choices no parent should have to face, yet DHS is forcing tens of thousands of families to make these decisions through its new policy.

In fact, the prospect of confronting these choices is already harming children. Due to fears about family members' deportation, children across the country are experiencing serious mental

---

[12] *Id.* at 578 and 582.

health problems, including depression, anxiety, self-harm, and regression.[13] Studies show that children's concerns about their parents' immigration status can impair their socioemotional and cognitive development.[14] And perhaps unsurprisingly, children whose immigrant mothers are subject to deportation have higher incidence of adjustment and anxiety disorders.[15]

Of course, these harms are worsened when fears of forcible separation come true. In one study, children with deported parents refused to eat, pulled out their hair, had persistent stomach-aches and headaches, engaged in substance abuse, lost interest in daily activities, and had trouble maintaining positive relationships with non-deported parents.[16] These traumatic childhood experiences can also inflict lasting harm, including severe impairments of a child's self-worth and ability to form close relationships later in life, increased anxiety, and depression.[17]

In addition to threatening children's health, deporting a family member who is the primary source of income for the household can lead to economic hardship and loss of housing for remaining family members, and can put the care of children, seniors, and disabled family members at serious risk.[18] As a result, many families will be forced to seek increased social services,

---

[13] Wendy Cervantes et al., *Our Children's Fear: Immigration Policy's Effects on Young Children*, Ctr. Law & Soc. Pol'y (Mar. 2018), https://tinyurl.com/ChildFears.

[14] Hirokazu Yoshikawa, *Immigrants Raising Citizens: Undocumented Parents and Their Young Children* 120–36 (2011).

[15] Jens Hainmueller et al., *Protecting unauthorized immigrant mothers improves their children's mental health*, Science (Aug. 31, 2017), https://tinyurl.com/HainScience (concluding that "[p]arents' unauthorized status is [] a substantial barrier to normal child development and perpetuates health inequalities through the intergenerational transmission of disadvantage").

[16] Heather Koball et al., *Health and Social Services Needs of US-Citizen Children with Detained or Deported Immigrant Parents*, Migration Pol'y Inst., 5 (Sept. 2015), https://tinyurl.com/MIRFinal.

[17] Kristen Lee Gray, *Effects of Parent-Child Attachment on Social Adjustment and Friendship in Young Adulthood*, Cal. Poly. St. U., San Luis Obispo (June 2011), https://tinyurl.com/j3lgrno.

[18] Randy Capps et al., *Implications of Immigration Enforcement Activities for the Well-Being of Children in Immigrant Families: A Review of the Literature*, Migration Pol'y Inst. (Sept. 2015), https://tinyurl.com/CappsMPI.

stretching the limited resources of the Amici States. For example, as of 2011, more than 5,000 children nationally were estimated to be living in foster care due to their parents' detention or deportation.[19] With long-term foster care estimated to cost about $25,000 per child per year,[20] these immigration enforcement actions cost states and local governments $125 billion dollars annually.[21] That burden could substantially increase if Haitian TPS holders lose status and are forced to separate from their families.

All of these harms are exacerbated by the fact that—despite DHS's determination to the contrary—conditions in Haiti still "prevent aliens who are nationals of the state from returning to the state in safety."[22] As recently as last year, the United States itself warned that Haiti does not have the ability to ensure that large numbers of TPS beneficiaries and their U.S. citizen children can safely return. Specifically, the State Department concluded that "Haiti continues to lack the capacity to ensure that the large population [of] TPS beneficiaries currently residing in the United States can return in safety."[23] United States military experts also warned of serious security problems should Haitian TPS beneficiaries be forced to return, to the point of possibly necessitating U.S. military intervention in Haiti. The Air Force Major General serving as Chief of Staff for the U.S. Southern Command stated that the forced repatriation of Haitian TPS holders would "likely overwhelm a fragile government system and infrastructure . . . [and] may place

---

[19] Seth Freed Wessler, *Shattered Families: The Perilous Intersection of Immigration Enforcement and the Child Welfare System*, Applied Res. Ctr. 22 (Nov. 2011), https://tinyurl.com/ARCFam.

[20] Nicholas Zill, *Better Prospects, Lower Cost: The Case for Increasing Foster Care Adoption*, Nat'l Council for Adoption (May 1 2011), https://tinyurl.com/ZillFoster.

[21] *See also* Section D, *infra*, for a discussion of increased public health care costs to states and their political subdivisions if TPS holders are left without legal status.

[22] 8 U.S.C. § 1254a(b)(1)(C).

[23] U.S. Dep't of State, *Recommendations Regarding TPS for Haiti* (Oct. 31, 2017), tinyurl.com/TPS-St-Dept.

additional security stress on the Haitian government, . . . [which would] increase the risk of triggering an event that necessitates an external intervention to establish order and stability."[24] The government of Haiti also warned of serious risks to returning nationals, including a lack of housing, food and infrastructure, and the risk of contracting cholera.[25] These threats to returnees' safety were also discussed in DHS intelligence reports,[26] as well as in a U.S. Citizenship & Immigration Services (USCIS) memorandum drafted to guide the Acting Secretary's decision.[27] The Acting Secretary herself noted some of these problems in talking points relating to the terminations.[28]

Although Defendants claim to have received and reviewed input from "other appropriate U.S. Government agencies" in the course of their decisions to terminate TPS,[29] and promised to consider the Haitian government's concerns,[30] they seem to have ignored them. In fact, communications among decisionmakers and staff in the Administration that were recently produced in the *Ramos* case show a radical departure from the normal process for TPS determinations, with political appointees repeatedly overriding career expert staff who had concluded that Haiti and other countries designated for TPS were, in fact, far too dangerous for people to safely return. *See Ramos* PI Mot. 2–3, 6–14, 15–16. In short, the current administration knowingly decided to force Haitian TPS holders and their children to return to a country that is clearly unsafe. That decision was, according to contemporaneous notes taken by the Acting

---

[24] *Ramos*, Not. of Filing of Admin. Rec. for Haiti, Exh. 1 ("Haiti AR 1"), ECF 113-1 at 2 (Sept. 5, 2018).

[25] *Id.* at 8–10.

[26] *Id.* at 70, 78–79.

[27] Id. at 15–21.

[28] *Ramos*, Not. of Filing of Admin. Rec. for Haiti, Exh. 2 ("Haiti AR 2"), ECF 113-2 at 154 (Sept. 5, 2018).

[29] Termination of Designation of Haiti for TPS, 83 Fed. Reg. 2648, 2650 (Jan. 18, 2018).

[30] Haiti AR 1 at 14.

Secretary, driven by the White House's concern for "domestic politics,"[31] and its desire to move to a "merit based immigration process"[32] and pursue an "America first strategy."[33] Defendants disregarded warnings from civilian and military experts in making that decision, warnings that show that the impossible choices faced by parents discussed above are, literally, matters of life and death.

### B.  Amici States' Economies and Workforces Will Suffer.

State economies will also suffer if the TPS termination is upheld. The labor force participation rate for TPS holders from Haiti is 81 percent, significantly higher than the overall national rate (63 percent).[34] Over ten years, loss of legal status for Haitian TPS holders is projected to cost more than $2.7 billion in GDP (due to lost earnings as well as decreased industry outputs), more than $428 million in Social Security and Medicare contributions, and almost $60 million in employers' turnover costs.[35]

This impact will be felt most acutely in fields where Haitian TPS holders are concentrated, including hospitality, food service, education and child care, construction, health care, and retail.[36] These jobs may prove difficult to fill, leading to a lack of needed services and economic strain. For example, an estimated 1,000 construction workers are TPS holders from Haiti.[37] The loss of these workers would hurt the construction industry, which is already "having trouble hiring

---

[31] *Id.* at 114.

[32] Haiti AR 2 at 29.

[33] *Id.* at 155.

[34] Warren & Kerwin, *supra* note 11 at 577, 582.

[35] Amanda Baran & Jose Magaña-Salgado, *Economic Contributions by Salvadoran, Honduran, and Haitian TPS Holders*, Immigrant Legal Resource Ctr., 5, 7, 8 (Apr. 2017), https://tinyurl.com/TPSEcon.

[36] Warren & Kerwin, *supra* note 11 at 583–84.

[37] *Id.* at 584.

workers."[38] Among other things, this labor shortage could have specific impacts on infrastructure development, jeopardizing Amici States' ability to prepare for natural disasters,[39] as well as rebuild after them (for example, the recent California wildfires).[40]

Amici States will also suffer by losing TPS holders as homeowners. Twenty-three percent of Haitian TPS households have mortgages,[41] an important measure of their economic contribution to Amici States. These homeowners' loss of status could lead to job loss or deportation, which would result in more foreclosures.[42] In turn, foreclosures cause hardship for families and require more local resources to be spent to address the effects of foreclosure, including declining property values, abandoned homes, crime and social disorder.[43]

### C.  Vulnerable Residents Will Suffer from Disruptions in Care Provided by TPS Holders.

Terminating TPS will also disrupt schools, nursing homes, home healthcare companies, and hospitals, many of which rely on Haitian TPS holders in their workforce. Almost 2,000 Haitian TPS holders work in elementary and secondary schools.[44] Losing school employees will be disruptive for the children, families, and communities they serve, and for the economy.

Terminations of TPS will also hurt seniors and people with disabilities. Hundreds of

---

[38] Kim Slowey, *DACA Expiration, TPS Elimination Threaten 100K+ Construction Jobs*, Construction Dive (Jan. 24, 2018), https://tinyurl.com/TPSConst.

[39] New Amer. Economy Research Fund, *How Temporary Protected Status Holders Help Disaster Recovery and Preparedness* (Nov. 6, 2017), https://tinyurl.com/NewAmTPS.

[40] Louis Hansen, *Another problem for fire victims — shortage of construction workers*, San Jose Mercury News, Aug. 2, 2018, https://tinyurl.com/Merc-Contstr.

[41] Warren & Kerwin, *supra* note 11 at 582.

[42] *See* Jacob S. Rugh & Matthew Hall, *Deporting the American Dream: Immigration Enforcement and Latino Foreclosures*, 3 Soc. Sci. 1053 (2016), https://tinyurl.com/Rugh-frclse.

[43] G. Thomas Kingsley et al., *The Impacts of Foreclosures on Families and Communities*, The Urb. Inst. 13 (May 2009), https://tinyurl.com/GTKUrban.

[44] Warren & Kerwin, *supra* note 12 at 584.

Haitian TPS holders work in hospitals,[45] and many others work in other health care facilities or as home health aides.[46] Over 60,000 Haitian immigrants are employed in direct care, making Haiti one of the top five countries of origin for workers in this field.[47] In Massachusetts alone, nursing facilities employ about 4,300 Haitians.[48] If TPS holders can no longer legally work in these jobs, vulnerable residents will lose the services of health care workers with whom they have established trusting relationships. This loss of care could cause a serious deterioration in their physical and mental health. Moreover, it may prove difficult for employers to fill the positions Haitian TPS holders are forced to leave. Workers in direct care fields generally receive low wages and no or minimal benefits, and the work is physically and emotionally demanding. As a result, turnover in the industry is high. In Massachusetts, one in seven certified nursing assistant positions is vacant, leaving a shortage of 3,000 workers.[49] Making matters worse, the demand for direct care assistance is increasing with a growing elderly population.[50] If home care positions go unfilled, patients who would otherwise be able to stay in their homes may be forced to move to nursing facilities, incurring higher costs for them and Amici States and, in many cases, significantly decreasing

---

[45] Warren & Kerwin, *supra* note 120 at 584.

[46] Melissa Bailey, *As Trump Targets Immigrants, Elderly Brace to Lose Caregivers*, Kaiser Health News (Mar. 26, 2018), https://tinyurl.com/KHNImmig.

[47] Robert Espinoza, *Immigrants and the Direct Care Workforce* 4–5, Paraprofessional Healthcare Inst. (June 2017), https://tinyurl.com/PHI-Immig.

[48] Marva Serotkin & Tara Gregorio, *Nursing facilities, and their residents, will feel impact if Haitians' status ends*,  Boston Globe, Dec. 4, 2017, https://tinyurl.com/Serotkin.

[49] Bailey, *supra* note 46.

[50] In California and Massachusetts, the position of home health aide is the fastest growing job, predicted to grow by 41% and 38%, respectively, in the next few years. Cal. Employ. Dev. Dep't, 2016-2026 Statewide Employment Projections Highlights, https://tinyurl.com/CALabMar ("CA Long-Term" tab); Mass. Exec. Off. of Lab. & Workforce Dev., *Labor Market Information: Most Job Openings for Massachusetts*, https://tinyurl.com/MALabMar; *see also* Nina Liss-Schultz, *Assisted Living*, Mother Jones, Sept. & Oct. 2018, at 40, 41 ("Researchers project a shortage of several hundred thousand home care workers in the coming decades").

patients' quality of life.[51]

### D. Public Health Will Suffer.

The termination of Haiti's TPS will also harm public health and strain state resources. When Haitian TPS holders lose work authorization, many will lose employer-sponsored health insurance for themselves and their families, hindering their access to health care.[52] For example, studies show that children of undocumented immigrants are often sicker when seeking emergency room care and frequently miss their preventive annual exams.[53] In the same vein, undocumented women are less likely to get needed healthcare and preventive screenings than the general U.S. population;  this leads to significantly higher rates of adverse conditions, including cervical cancer and birth complications, neonatal morbidity, respiratory distress syndrome, and seizures for newborns.[54] All these individual health problems add up, creating public health consequences that could have been prevented if these patients had had better access to preventive and routine care. Less employer-sponsored health insurance increases Amici States' costs to provide care to uninsured residents—including emergency health insurance, payments to hospitals and community health centers, and public health programs that serve underinsured patients.[55]

---

[51] *See, e.g., Christine Olsen et al., Differences in quality of life in home-dwelling persons and nursing home residents with dementia – a cross-sectional study*, 16 BMC Geriatrics 137 (2016), https://tinyurl.com/NursHomeQual.

[52] *See, e.g*., Decl. of Jesse M. Caplan, *New York v. Trump*, 1:17-cv-05228 ECF No. 55-83 (E.D.N.Y. Oct. 4, 2017); Decl. of Anne McCleod, *Regents v. U.S. Department of Homeland Security*, 3:17-cv-05211 ECF No. 118-1 (App. 789–90) (N.D. Cal. Nov. 1, 2017); Meredith King, *Immigrants in the U.S. Health Care System: Five Myths that Misinform the American Public*, Ctr. for Am. Progress (June 2007), https://tinyurl.com/ImmHealth.

[53] King, *supra* note 42; K. Yun et al., *Parental immigration status is associated with children's health care utilization: Findings from the 2003 new immigrant survey of US legal permanent residents*, 17 Matern. Child Health J. 1913–21 (2013).

[54] Am. C. of Obstet. & Gynecol., *Health care for unauthorized immigrants*, Comm. Op. No. 627, 125 Obstet. Gynecol. 755 (2015), https://tinyurl.com/ACOG627.

[55] *See, e.g*., Cong. Budget Off., *The Impact of Unauthorized Immigrants on the Budgets of State and Local Governments* 8 (Dec. 2007), https://tinyurl.com/CBOImm (stating that county

### E.  Public Safety Will Suffer.

The signatories to this brief are Attorneys General, most of whom serve as the Amici

States' chief law enforcement officers. In that role, the Attorneys General are dedicated to ensuring

that police and prosecutors are able to do their jobs to protect public safety. Terminating TPS for

Haiti will make that job harder because Haitian TPS holders and their families will be less likely

to report crime when they witness it, even if they are victims, after they lose legal status.[56] When

law enforcement is unable to obtain evidence of crimes, public safety suffers, and Amici States

will have more difficulty enforcing their criminal codes, a core aspect of state sovereignty. *See,*

*e.g.*, *Alfred L. Snapp & Son, Inc. v. P.R.* ex rel. *Barez*, 458 U.S. 592, 601 (1982).

### CONCLUSION

The Government's motion to dismiss should be denied.

Dated:  September 19, 2018                      Respectfully Submitted,

                                                MAURA HEALEY
                                                *Attorney General*
                                                *Commonwealth of Massachusetts*

                                                */s/ Jonathan B. Miller_____*
                                                Jonathan B. Miller
                                                Assistant Attorney General
                                                *One Ashburton Place*
                                                *Boston, MA 02108*
                                                *(617) 727-2200*
                                                *Jonathan.Miller@state.ma.us*

---

governments that share a border with Mexico incurred almost $190 million in costs for providing uncompensated care to unauthorized immigrants in 2000, representing about one-quarter of all their uncompensated health costs); Caplan Decl., *supra* note 52 (discussing fiscal harms to Massachusetts when immigrants lose employer-sponsored health insurance).

[56] Nik Theodore, *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement*, Dep't of Urb. Plan. & Pol'y, U. of Ill. at Chi. (May 2013), https://tinyurl.com/InsecComm (70 percent of undocumented immigrants reporting they are less likely to contact law enforcement if they were victims of a crime "for fear they will ask me or other people I know about our immigration status"); James Queally, *Fearing deportation, many domestic violence victims are steering clear of police and courts*, L.A. Times, Oct. 9, 2017, https://tinyurl.com/Queally (Los Angeles law enforcement officials reporting precipitous drop in domestic violence reports in Latino community, attributed to victims' fear of deportation).

XAVIER BECERRA
*Attorney General*
*State of California*
1300 I Street
Sacramento, CA  95814

GEORGE JEPSEN
*Attorney General*
*State of Connecticut*
55 Elm Street
Hartford, CT  06106

RUSSELL A. SUZUKI
*Attorney General*
*State of Hawaii*
425 Queen Street
Honolulu, HI  96813

TOM MILLER
*Attorney General*
*State of Iowa*
Hoover State Office Building
1305 E. Walnut Street
Des Moines, IA 50319

BRIAN E. FROSH
*Attorney General*
*State of Maryland*
200 Saint Paul Place
Baltimore, MD 21202

GURBIR S. GREWAL
*Attorney General*
*State of New Jersey*
RJ Hughes Justice Complex
25 Market Street, Box 080
Trenton, NJ 08625

KARL A. RACINE
*Attorney General*
*District of Columbia*
441 4th Street, N.W.
Washington, D.C. 20001

MATTHEW P. DENN
*Attorney General*
*State of Delaware*
Department of Justice
Carvel State Building, 6th Floor
820 North French Street
Wilmington, DE 19801

LISA MADIGAN
*Attorney General*
*State of Illinois*
100 W. Randolph Street
12th Fl.
Chicago, IL 60601

JANET T. MILLS
*Attorney General*
*State of Maine*
6 State House Station
Augusta, ME  04333-0006

LORI SWANSON
*Attorney General*
*State of Minnesota*
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

BARBARA D. UNDERWOOD
*Attorney General*
*State of New York*
28 Liberty Street
New York, NY 10005

ELLEN F. ROSENBLUM
*Attorney General*
*State of Oregon*
1162 Court Street NE
Salem, OR 97301

THOMAS J. DONOVAN, JR.
*Attorney General*
*State of Vermont*
Office of the Attorney General
109 State Street
Montpelier, VT 05609-1001

ROBERT W. FERGUSON
*Attorney General*
*State of Washington*
P.O. Box 40100
Olympia, WA 98504-0100

PETER F. KILMARTIN
*Attorney General*
*State of Rhode Island*
150 South Main Street
Providence, RI 02903

MARK R. HERRING
*Attorney General*
*Commonwealth of Virginia*
202 North Ninth Street
Richmond, VA 23219

19

**<u>Certificate of Service</u>**

I, Jonathan B. Miller, hereby certify that a true copy of the above document, filed through the CM/ECF system, will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

Dated:  September 19, 2018                    */s/ Jonathan B. Miller*_____