## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| PATRICK SAGET, SABINA BADIO FLORIAL, NAÏSCHA VILME, GERALD MICHAUD, BEATRICE BELIARD, RACHELLE GUIRAND, JEAN CLAUDE MOMPOINT, YOLNICK JEUNE, GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI LIBERTÉ, and FAMILY ACTION NETWORK MOVEMENT, INC., | ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | No. 1:18-cv-01599 Kuntz, J. Tiscione, M.J. |
| vs. | ) ) | |
| DONALD TRUMP, President of the United States of America, UNITED STATES OF AMERICA, DEPARTMENT OF HOMELAND SECURITY, KIRSTJEN NIELSEN, Secretary of Homeland Security, and ELAINE C. DUKE, Deputy Secretary of Homeland Security, | ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) | |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(1), FED R. CIV. P. 12(B)(6), OR, ALTERNATIVELY, FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV P. 56**

Ira J. Kurzban, (NY Bar No. 5347083)
Kevin Gregg*
KURZBAN, KURZBAN, WEINGER,
TETZELI & PRATT, P.A.
2650 S.W. 27th Avenue, 2nd Floor
Miami, FL 33133
Phone: (312) 660-1364
ira@kkwtlaw.com

Sejal Zota*
NATIONAL IMMIGRATION PROJECT OF THE
NATIONAL LAWYERS GUILD
14 Beacon Street, Suite 602
Boston, MA 02018
Phone: (919) 698-5015
sejal@nipnlg.org

*Admitted *Pro Hac Vice*

Christopher J. Houpt (NY Bar No. 4452462)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Phone: (212) 506-2500
choupt@mayerbrown.com

Geoffrey M. Pipoly*
Christopher J. Ferro*
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
gpipoly@mayerbrown.com

*Attorneys for Plaintiffs*

## TABLE OF CONTENTS

Page

PRELIMINARY STATEMENT ..................................................................................... 1

BACKGROUND ........................................................................................................... 2

    I.      Statutory Background ..................................................................................... 2

            A.     Designation ...................................................................................... 3

            B.     Extension and Termination ............................................................. 3

    II.     Factual Background ....................................................................................... 4

            A.     Haiti is Designated for TPS Following the 2010 Earthquake ................... 4

            B.     President Trump's Racial Bias ......................................................... 5

            C.     The Trump Administration Reluctantly Extends, Then Terminates, Haitian TPS ..................................................................................... 6

STANDARD OF REVIEW .......................................................................................... 12

ARGUMENT ............................................................................................................... 13

    I.      This Court Has Jurisdiction to Review Plaintiffs' Claims ................................. 13

            A.     The TPS Statute's Judicial-Review Bar Does Not Apply To Plaintiffs' Non-Constitutional Claims ........................................... 13

            B.     This Court Has Jurisdiction to Review Plaintiffs' Constitutional Claims ........................................................................................... 16

            C.     This Court Has Jurisdiction Over the President ..................................... 19

    II.     This Court Should Deny Defendants' Motion With Regard to Plaintiffs' Statutory Claims .......................................................................................... 19

            A.     Plaintiffs Should Be Allowed To Proceed With Their APA Claims Asserting That Defendants Acted Arbitrarily And Their Common Law Claim That Termination of TPS Was Ultra Vires .......................... 19

            B.     Plaintiffs' Claim That Defendants Violated The APA In Applying A New Standard for TPS Should Proceed .............................................. 21

            C.     Defendants' New Standard for TPS Review Constitutes a New Rule, which Defendants Promulgated without APA-Required Notice and Comment ................................................................... 22

    III.    This Court Should Deny Defendants' Motion With Regard to Plaintiffs' Constitutional Claims .................................................................................... 23

            A.     Equal Protection ............................................................................ 23

                   1.     To Prevail, Plaintiffs Are Not Required to Show That a Similarly Situated Group was Treated Differently than They Were ................................................................. 23

i

**TABLE OF CONTENTS**
(continued)

**Page**

2.  To Prevail, Plaintiffs Are Not Required to Show that Duke "Personally" Harbored Discriminatory Animus ......................... 24

3.  Neither *Trump v. Hawaii* Nor *Reno v. AADC* Apply Here .......... 25

4.  Plaintiffs Easily Satisfy *Arlington Heights'* Standard ................. 27

B.  Due Process ........................................................................................ 30

CONCLUSION ............................................................................................................. 30

ii

Case 1:18-cv-01599-WFK-ST   Document 62   Filed 10/09/18   Page 4 of 38 PageID #: 2284

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Arce v. Douglas*,
   793 F.3d 968 (9th Cir, 2015) ...............................................................................27

*Battaglia v. General Motors Corp.*,
   169 F.2d 254 (2d Cir. 1948)................................................................................17

*Battalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) ......................................................24, 25, 29

*Bowen v. Mich. Academy of Family Physicians*,
   476 U.S. 667 (1986)............................................................................................13

*Bridges v. Wixon*,
   326 U.S. 135 (1945).............................................................................................30

*Carter v. HealthPort Techs., LLC*,
   822 F.3d 47 (2d Cir. 2016)..................................................................................12

*Celotex Corp. v. Catrett*,
   477 U.S. 317 (1986).............................................................................................12

*Centro Presente, at al., v. DHS, et al.*,
   No. 1:18-cv-10340 (D. Mass. July 23, 2018) ................................................... *passim*

*Chamber of Commerce of the U.S. v. Reich*,
   74 F.3d 1322 (D.C. Cir. 1996)............................................................................20

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002)................................................................................12

*Elgin v. Dept. of Treasury*,
   567 U.S. 1 (2012)................................................................................................18

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016)........................................................................................21

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).............................................................................................21

*Henderson v. INS*,
   157 F.3d 106 (2d Cir. 1998)................................................................................17

iii

*I.N.S. v. Cardoza-Fonseca,*
   480 U.S. 421 (1987) ...................................................................................................17

*INS v. St. Cyr,*
   533 U.S. 289 (2001) ...................................................................................................15

*Kandamar v. Gonzales,*
   464 F.3d 65 (1st Cir. 2006) ........................................................................................27

*Krua v. DHS,*
   729 F.Supp.2d 452 (D. Mass. 2010) ..........................................................................17

*L.M. v. Johnson,*
   150 F. Supp. 3d 202 (E.D.N.Y. 2015) ........................................................................23

*Leedom v. Kyne,*
   358 U.S. 184 (1958) ...................................................................................................20

*Lewis-Mota v. Sec'y of Labor,*
   469 F.2d 478 (2d Cir. 1972) .......................................................................................23

*McNary v. Haitian Refugee Center,*
   498 U.S. 479 (1991) ........................................................................................15, 16, 18

*Mhany Mgmt., Inc. v. Cty. of Nassau,*
   819 F.3d 581 (2d Cir. 2016) .......................................................................................28

*Mississippi v. Johnson,*
   71 U.S. (4 Wall.) 475 (1866) ......................................................................................19

*Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.,*
   463 U.S. 29 (1983) .....................................................................................................21

*Nat'l Sec. Counselors v. CIA,*
   931 F.Supp.2d 77 (D.D.C. 2013) ...............................................................................23

*Nixon v. Sirica,*
   487 F.2d 700 (D.C. Cir. 1973) ...................................................................................19

*Ohio v. Wyandotte Chems. Corp.,*
   401 U.S. 493 (1971) ...................................................................................................19

*Padberg v. McGrath-McKechnie,*
   203 F.Supp.2d 261 (E.D.N.Y. 2002) ..........................................................................30

*Pyke v. Cuomo,*
   258 F.3d 107 (2d Cir. 2001) .......................................................................................24

iv

*Ramos, et al. v. Nielsen et al*,
    No. 3:18-cv-01554 (N.D. Cal., August 6, 2018) .............................................................. *passim*

*Regents of Univ. of Cal. v. Bakke*,
    438 U.S. 265 (1978) ..................................................................................................... 30

*Reno v. AADC*,
    525 U.S. 471 (1999) ........................................................................................... 25, 26, 27

*Reno v. Catholic Soc. Servs., Inc.*,
    509 U.S. 43 (1993) ....................................................................................................... 17

*Ru Jun Zhang v. Lynch*,
    2018 WL 1157756 (E.D.N.Y. 2018) ........................................................................ 19, 20

*Sessions v. Morales-Santana*,
    137 S.Ct. 1678 (2017) .................................................................................................. 27

*Sharkey v. Quarantillo*,
    541 F.3d 75 (2d Cir. 2008) ...................................................................................... 12, 13

*Trump v. Hawaii*,
    138 S.Ct. 2392 (2018) ............................................................................................. 25, 26

*United States v. Nixon*,
    418 U.S. 683 (1974) ..................................................................................................... 19

*United States v. Yonkers Bd. Of Educ.*,
    837 F.2d 1181 (2d Cir. 1987) ....................................................................................... 29

*Village of Arlington Heights v. Metropolitan Housing Development Corporation*,
    429 U.S. 252 (1977) ................................................................................................ *passim*

*Webster v. Doe*,
    486 U.S. 592 (1988) ..................................................................................................... 17

*Yick Wo v. Hopkins*,
    118 U.S. 356 (1886) ................................................................................................ 26, 30

*Zadvydas v. Davis*,
    533 U.S. 678 (2001) ..................................................................................................... 26

**Statutes**

5 U.S.C. § 500, *et seq*. ................................................................................................... *passim*

8 U.S.C. § 1160(e)(1) ........................................................................................................ 15

8 U.S.C. § 1182(f) ............................................................................................................. 25

8 U.S.C. § 1252(a)(2)(D) ................................................................................................18

8 U.S.C. § 1252(b)(9) ....................................................................................................17

8 U.S.C. § 1254a ...................................................................................................... *passim*

5 U.S.C. § 601 *et seq.*...................................................................................................23

**Other Authorities**

75 Fed. Reg. 3476 ............................................................................................................4

76 Fed. Reg. 29,000 ........................................................................................................4

77 Fed. Reg. 59,943 ........................................................................................................5

79 Fed. Reg. 11,808 ........................................................................................................5

80 Fed. Reg. 51,582 ........................................................................................................5

82 Fed. Reg. 23,830 ........................................................................................................7

83 Fed. Reg. 2,648 ........................................................................................................11

Fed. R. Civ. P. 12(b)(1)................................................................................................12

Fed. R. Civ. P. 12(b)(6)................................................................................................12

Fed. R. Civ. P. 56(c) ....................................................................................................12

## **PRELIMINARY STATEMENT**

When he took office in January 2017, President Donald Trump and his Administration quickly set about taking steps to fulfil his campaign promise to deport as many immigrants as possible. Among the targets of his anti-immigrant agenda were recipients of Temporary Protected Status ("TPS"), a legal designation for people from countries devastated by war, natural disaster, or other "extraordinary" conditions. In November 2017, the Acting Secretary of Homeland Security, Elaine Duke, announced she was terminating TPS for people from several countries, including 60,000 Haitians. Those who lost their TPS are overwhelmingly racial minorities.

Publicly, the Administration referenced factors in the TPS statute to justify termination of TPS. In reality, the Administration resolved from the beginning to terminate TPS no matter what.

During 2017, Administration officials at multiple levels worked feverishly to manufacture rationales for termination. Even though the TPS statute instructs that conditions on the ground in the foreign country dictate whether TPS should be extended, political surrogates sought data on how many TPS recipients were criminals and welfare beneficiaries. They took reports prepared by neutral experts and rewrote them because extending TPS was not "the conclusion we are looking for." They then justified terminating TPS for hundreds of thousands of people based on a new and restrictive interpretation of the statute that they adopted without explanation. Rather than focus on current country conditions, they focused *only* on the *initial* catastrophe prompting the TPS designation, ignoring other devastating events that occurred after.

Acting Secretary Duke herself confirmed that the decision to terminate TPS was pre-ordained. She struggled to engineer a rationale to terminate TPS, writing "rationale: don't know, need to rationalize conflicting info," but added that "all" in the Administration "agree[d]" that TPS "must end." Separately, she wrote that her decisions to terminate TPS designations for specific countries were designed to "send a clear signal that TPS in general is coming to a close."

1

The decision to terminate TPS was the direct result of President Trump's animus towards immigrants of color and Haitians in particular. Evoking this country's long history of discrimination against Haitians, President Trump has repeated the racist lie that Haitans "all have AIDS." In a meeting *about TPS*, he described Haitians as people from a "shithole countr[y]" and asked "why do we need more Haitians." The White House exerted tremendous pressure on the officials charged with making TPS decisions. Duke wrote that the decision to end "TPS in general" was "consistent with the President's position on immigration" and a way to "get to the President's objectives." John Kelly, the White House Chief of Staff, saw nothing wrong with pressuring Duke to end TPS; in his view, he was just "ensuring agenda adherence."

None of this was legal. The preordained, arbitrary, and capricious decision to terminate Haiti's TPS violated the Administrative Procedure Act ("APA") (and was ultra vires). It was based on a new and changed standard for conducting TPS review, violating the APA as well as the Regulatory Flexibility Act. And, because it flowed directly from President Trump's discriminatory animus, it violated the Constitution's Equal Protection and Due Process Guarantees. Two other cases challenging TPS terminations, *Ramos, et al. v. Nielsen et al*, No. 3:18-cv-01554 (N.D. Cal., August 6, 2018) (Ex. 1), and *Centro Presente, at al., v. DHS, et al.*, No. 1:18-cv-10340 (D. Mass. July 23, 2018) (Ex. 2) have already denied the Government's motions to dismiss on issues like the ones raised here. This Court should do the same.

## BACKGROUND

### I.    Statutory Background

TPS may be granted to foreign nationals who are unable to return to their countries of origin due to circumstances there beyond their control—such as a natural disaster, an epidemic, or a war—which make it unsafe for them to return.

### A.    Designation

The Secretary of Homeland Security (the "Secretary;" or "DHS Secretary") may designate a foreign state for TPS if, after "consultation with the appropriate agencies of the Government," she determines that the foreign state is in the midst of an "ongoing armed conflict;" has suffered an "environmental disaster" like an "earthquake, flood, drought, or epidemic;" or "that there exist [other] extraordinary and temporary conditions in the foreign state that prevent" safe return. 8 U.S.C. § 1254a(b)(1)(A-C).

Following such a designation, eligible citizens from the designated country may be granted TPS, receiving benefits that include employment authorization and protection from deportation. 8 U.S.C. § 1254a(a)(1). Not everyone from designated country is automatically eligible for TPS. Those who have been convicted of a felony, or two or more misdemeanors, for example, are ineligible for TPS. *Id*. § 1254a(c)(2)(B). And only foreign nationals who are present in the United States at the time of designation are eligible. *Id*. §1254a(c)(1)(A)(i).

### B.    Extension and Termination

The Secretary's initial TPS designation lasts for, at most, 18 months. 8 U.S.C. § 1254a(b)(2)(B). "At least 60 days before the end of the initial period of designation," and "after consultation with appropriate agencies of the Government," the Secretary must "review the conditions" in the foreign state. *Id*. § 1254a(b)(3)(A). This review focuses on whether conditions in the foreign state continue to "meet the conditions for designation" (*i.e*. armed conflict, natural disaster, or other "extraordinary" conditions which prevent TPS recipients' safe return to the foreign state). *Id*. § 1254a(b)(3)(A).

Unless the Secretary "determines," based on this mandatory review, that the foreign state "no longer meets the conditions for designation," the designation is automatically extended for six months, or, in the Secretary's discretion, for "12 or 18 months." 8 U.S.C. § 1254a(b)(3)(B),(C).

3

The Secretary may terminate TPS *only if* she "determines . . . that [the] foreign state . . .no longer continues to meet the conditions for designation." *Id*. at § 1254a(b)(3)(B). The termination or extension of TPS thus follows directly from the mandatory review of in-country conditions.

If TPS is extended, then this mandatory review process must begin anew sixty days before the end of the extension,. 8 U.S.C. § 1254a(b)(3)(A). Thus, TPS is "temporary" in that it must be periodically reviewed.  Congress did not restrict the number of times TPS can be extended. As long as period reviews indicate that the "conditions for designation" exist and recipients are unable to safely return, the statute requires that the Secretary extend the TPS designation.

## II.    **Factual Background**

### A.    *Haiti is Designated for TPS Following the 2010 Earthquake*

On January 12, 2010, a 7.0 magnitude earthquake hit Haiti, killing as many as 200,000 people. Ex. 3. The earthquake displaced more than 2.3 million people, and many more were affected by the resulting emergency conditions. Ex. 4; Ex. 5. Hospitals overflowed with victims, electricity was cut off, potable water was unavailable, and telephone service was severely affected. Roads blocked with debris and makeshift housing encampments set up by earthquake victims impeded the transport of food, clean water, and medical supplies. On January 21, 2010, because of these "extraordinary conditions," DHS designated Haiti for TPS. 75 Fed. Reg. 3476, 3477.

Less than ten months later, one of the deadliest cholera outbreaks in modern history erupted in Haiti. A million people became sick and 12,000 died. Haiti's cholera epidemic is ongoing, a disaster in its own right, and substantially magnified the earthquake's toll. Ex. 6. On May 19, 2011, based on the cholera outbreak and the earthquake, Homeland Security Secretary Janet Napolitano both extended and re-designated TPS for Haiti. 76 Fed. Reg. 29,000.

This 18-month TPS extension and re-designation were effective through January 22, 2013. *Id*. TPS was extended for Haitian nationals for 18-month intervals again in October 2012, March

2014, and August 2015. 77 Fed. Reg. 59,943 (Oct. 1, 2012); 79 Fed. Reg. 11,808 (Mar. 3, 2014); 80 Fed. Reg. 51,582 (Aug. 25, 2015). These subsequent extensions were based on conditions arising from the 2010 earthquake in Haiti and its attendant damage to infrastructure, public health, agriculture, and transportation. Each subsequent extension named the cholera epidemic and the exacerbation of pre-existing vulnerabilities caused by the earthquake, including food insecurity and a housing crisis, as contributing to the extension of TPS for Haitian nationals.

   B.     *President Trump's Racial Bias*

   President Trump has long exhibited bias against immigrants, particularly immigrants of color. He campaigned on an explicitly anti-immigrant platform, repeatedly referring to immigrants as criminals and rapists. Ex. 7; Ex. 8. He routinely uses derogatory epithets to describe immigrants, such as "bad hombres" and "animals." Ex. 9; Ex. 10.

   While in office, President Trump made numerous statements reflecting his explicit bias against immigrants of color and Haitians in particular. For example, during a June 2017 meeting in the Oval Office, at which then-DHS Secretary John Kelly and then-Secretary of State Rex Tillerson were present, President Trump said that Haitians "all have AIDS." Ex. 11. This racist stereotype traces its roots to the early days of the AIDS epidemic in the 1990's, when rumors abounded in New York that Haitians were the source of the disease. Ex. 12. During a January 11, 2018, meeting attended by DHS Secretary Kirstjen Nielsen—the subject of which was TPS— President Trump referred to Haitians as people from "shithole countries" and asked "why do we need more Haitians," and "demand[ed] that congressional negotiators 'take them out' of any further talks about extending" TPS.  Ex. 13. This was not the first time President Trump referred to Haiti as a "shithole"—he had done so on the campaign trail, as well. Ex. 14. In the same meeting, President Trump said he wanted more immigrants from "places like Norway." Ex. 15. Senators of both parties who attended the meeting confirmed President Trump's comments. Ex. 14.

C.      *The Trump Administration Reluctantly Extends, Then Terminates, Haitian TPS*

In the early months of 2017, the deadline for then-Secretary Kelly to review Haiti's TPS designation loomed. Career researchers and country conditions experts within DHS were unified in their view that TPS should be extended. For example, on January 27, 2017, DHS staff drafted a report recommending an extension of TPS for Haiti because "[m]any of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist." Ex. 16. On February 7, 2017, U.S. Citizenship and Immigration Services ("USCIS") staff issued a memo noting that country conditions in Haiti had deteriorated since Hurricane Matthew. Ex. 17. And, on March 2, 2017, USCIS staff circulated another memo recommending an 18 month extension, attaching a corresponding draft Federal Register Notice to that effect. Ex. 18. At this point, President Trump's surrogates—many of whom came from Candidate Trump's immigration policy transition team—took control within the DHS apparatus.

On April 7, 2017, Gene Hamilton, a Trump Administration Special Advisor within DHS, sent an e-mail to other Trump appointees within USCIS, indicating that Secretary Kelly wanted to know, among other things, how many Haitian TPS recipients were criminals, and how many were on some form of public assistance. Ex. 19. Kathy Nuebel Kovarik, the newly-appointed USCIS Chief of Policy and Strategy, passed on Kelly's request for this information to the career researchers at USCIS, later noting that Kelly needed some of this data to make a decision regarding Haiti. Ex. 20; Ex. 21.

These data are irrelevant under the statute. They have nothing to do with country conditions within Haiti. Yet they were requested numerous times in April, 2017, when every career researcher and subject-matter expert within the DHS apparatus—who *had* conducted an analysis of country conditions—recommended extending Haitian TPS.

6

Career staff at DHS recognized that the Trump Administration was taking a fundamentally different approach to TPS review than in the past. On April 13, career USCIS researcher ▉▉▉▉ ▉▉▉▉ emailed fellow career researcher ▉▉▉▉▉▉▉▉, asking her for clarity on Trump officials' approach to Haitian TPS. ▉▉▉▉▉ replied: "the short answer" is that their approach was "a political one by . . . [the Secretary's] advisors." Ex. 22.

On May 1, 2017, ▉▉▉ responding to Kovarik's email passing along Secretary Kelly's request for irrelevant data on Haitian TPS recipients, wrote that "[u]nfortunately, conditions in Haiti remain difficult." ▉▉▉▉ email listed numerous factors, such as Hurricane Matthew and scarcity of food and shelter, which contributed to these "difficult" conditions. Ex. 23.

It was evident to those within the Administration that Kelly was determined to terminate TPS if he could justify it. For example, James Nealon, who at the time of Kelly's decision was the Ambassador to Honduras, testified he "had the feeling from my conversations with Kelly that he was probably going to terminate." Ex. 24 pp. 127-130.

On May 24, 2017, Secretary Kelly ultimately settled on a six-month extension of TPS, but with language clearly signaling that it would be the last. The extension cited, among other things, the original earthquake, the cholera epidemic, flooding, landslides, as well as Hurricane Matthew as bases for the extension. 82 Fed. Reg. 23,830. Despite this short extension, Kelly warned Haitian TPS recipients that they "need to start thinking about returning" while foreshadowing future termination: Haitian TPS recipients, Kelly said, should "settle their issues" "in the event it's not extended next time." Ex. 25.

Two weeks later, Kelly testified in the Senate. He described the Pre-Trump Administration TPS extensions as "automatic renewals" and said his decision was based exclusively on an evaluation of "the earthquake," not on other "horrible conditions" that existed before—and

7

persisted after—the earthquake. Ex. 26. Of course, past Secretaries had looked to a wide range of country conditions to determine whether an extension was warranted. But this standard changed in the Trump Administration. Former Ambassador Nealon confirmed as much;  he testified that he recalled conversations at DHS in which agency officials acknowledged the shift.  He also testified that White House officials had communicated with DHS with respect to this new standard. Ex. 24 pp. 220 – 222. Similarly, in 2018 testimony before the House of Representatives, Kristjen Nielsen explained her view that "[t]he law does not allow me to look at the country conditions of a country writ large. It requires me to look very specifically as to whether the country conditions originating from the original designation continue to exist." Ex. 27. Thus, under the Trump Administration's new standard, it did not matter if the exact same humanitarian crisis that warranted an initial designation—like food insecurity—continued to persist if it was due to intervening disasters and not the initial event prompting designation. Ex.28 ("Haiti's food insecurity problems seem related to tropical storms and a drought rather than from the lingering effects of the 2010 earthquake. …. Any current issues in Haiti are unrelated to the 2010 earthquake.").

On July 28, 2017, Elaine Duke replaced Kelly as the Secretary of Homeland Security. Kelly became President Trump's Chief of Staff. In the fall of 2017, with Haiti's TPS set to expire in January, 2018, it fell to Duke to conduct the review process.

In October 2017, the research unit at USCIS updated its working report titled "TPS Considerations: Haiti," which the research unit periodically updated. The October, 2017 update identified seven previously identified areas of concern justifying ongoing TPS designation, including the cholera epidemic, food insecurity, and the devastation of Hurricane Matthew. The report described Haiti's progress as "one step forward, two steps back," noting that "conditions prompting the original January 2010 TPS designation persist," and that Haiti had also experiences

8

disasters that "severely worsened the pre-existing humanitarian situation." Ex. 29. The government of Haiti itself wrote a letter to Duke requesting an 18-month extension based on many of the same conditions noted in the USCIS report. Ex. 30.

On October 13, 2017, Kovarik emailed career staffers at USCIS regarding their country condition reports for several countries, including Haiti. Kovarik was frustrated with the reports' accurate reflection of country conditions: "[t]he problem," she wrote, "is that it reads as though we'd recommend an extension b/c we talk so much about how bad it is." Ex. 31. █████ █████ the Chief of International and Humanitarian Affairs at USCIS, and a subject matter expert, replied: "the basic problem is that it IS bad [with respect to] all the standard metrics. . . . We can . . . comb through the country conditions … looking for positive gems, but the conditions are what they are." *Id.*

On October 22, 2017, Kovarik sent USCIS Adviser and Trump Appointee Robert Law a draft decision memo for Haiti; ██████ the memo's author, had written it neutrally to "support either extension or termination." Law disagreed. In his view, "[t]he draft is overwhelmingly weighted for extension which I do not think is the conclusion we are looking for." Law edited the memo to "fully support termination," adding comment boxes to the document "where additional data should be provided to back up the decision." Ex. 32.

At the end of October, 2017, Secretary of State Tillerson wrote to Duke, and overriding the "strong opposition" of career diplomats, (Ex. 33), recommend that she terminate TPS. Ex. 34. Tillerson's top advisors had also been in contact with White House immigration advisor Stephen Miller. Ex. 35. This type of involvement by Miller and the White House in the TPS process was not uncommon—Kovarik later testified that Miller would "[p]retty regularly" attend meetings with USCIS senior staff about TPS. Ex. 36 pp. 69–70. Miller had "numerous conversations" with

9

Duke's office on the subject of TPS. Ex. 24 p. 225. The pressure worked: on a phone call, Tillerson told Duke that ending TPS for Honduras was "just something she had to do." Ex. 35.

On November 3, the White House held a "Principles Small Group Meeting" on TPS attended by Kelly, Press Secretary Sarah Sanders, and Kirstjen Nielsen among others. The discussion paper for the meeting reflects that the White House desired termination as a means to "engage Congress to pass . . . .immigration reform to include a merit based entry system." Ex. 37.

On November 5, 2017, with her decision fast approaching, Duke met with Tom Bossert, a Homeland Security Advisor to the President, and Zachary Fuentes, the White House Deputy Chief of Staff, regarding TPS for Haiti. Duke's handwritten notes from this meeting reflect her impression that it would be "extremely disappointing" if she were to "kick" the TPS decision into the "lap of the next sec[retary]." Ex. 38.

Another document from around this time,[1] containing Duke's typed and handwritten notes, is especially revealing. Reciting a Trump campaign slogan, Duke hand-wrote "I believe America First," but opined, "not sure ending TPS is America first strategy." She wrote of the need to "foreshadow" the impending terminations, but that she had had yet to find a rationale to terminate. Specifically, she wrote: "rationale: don't know, need to rationalize conflicting info."[2] Finally, Duke wrote that "all agree[d]" that TPS "must end." Ex. 39.

On November 6, 2017, Duke emailed John Kelly at the White House with her decision on TPS for Honduras and Nicaragua. She had decided to terminate TPS for Nicaragua, while delaying the effective date of the termination by 18 months. As for Honduras, she had decided to "not

---

[1] Though this document does not contain a date, it is clear that it reflects Duke's decision-making process and thus predated her decision.

[2] In yet another document from around this time Duke wrote "[t]he TPS program must end . . . soon" for El Salvador, Nicaragua, and Honduras. Again parroting the Trump campaign slogan, Duke added that terminating TPS for these countries was "the result of an America first view" of TPS, and that the only question she had was "the appropriate timing for the termination." Ex. 40.

10

affirmatively extend[]" TPS. "These decisions," Duke wrote, "send a clear signal that TPS in general is coming to a close. . . . [c]onsistent with the President's position on immigration." Ex. 41.

Just three hours later, after a "discussion with Tom B[ossert at the White House], "Duke e-mailed Kelly again to explain that she was changing her recommendation on the effective date for the Nicaragua termination from 18 months to 12. *Id.* Bossert separately emailed Duke's office: "Thank you . . . for the 12 month outcome." Ex. 42.

After Duke's decisions on Nicaragua and Honduras, the *Washington Post* reported that the White House had applied "massive pressure" to Duke to reach its desired outcome. Ex. 43. In response, Kelly emailed Duke and other senior administration officials decrying the reporting as "foolishness." A half-hour later, Kelly replied to his own email to opine that all he had done was give Duke "guidance" on her decision; his job, he wrote "includes ensuring agenda adherence." Ex. 44.

On November 20, 2017, DHS announced in a press release Duke's termination of TPS. The announcement stated that the decision "was made after a review of the conditions upon which the country's original designation were based," and summarily asserted that the "extraordinary but temporary conditions caused by the 2010 earthquake no longer exist. Thus, under the applicable statute, the current TPS designation must be terminated." In short, the press release referred exclusively to the 2010 earthquake, making no mention of the conditions Kelly had relied on only a few months earlier to extent TPS for Haiti. Ex. 45.

On January 18, 2018, DHS published the notice of its TPS termination for Haiti in the Federal Register. 83 Fed. Reg. 2648. The termination notice, like the earlier press release, provided little information about what factors Duke reviewed in reaching her decision. The few metrics

11

cited by Duke all existed in May when Kelly *extended* TPS for Haiti. She cited that the number of people in IDP camps had decreased; that the United Nations had withdrawn its peacekeeping mission; that a new Haitian president was in office; that he intended to rebuild the National Palace; and that Haiti's economy had recovered somewhat since the earthquake. Last, she cursorily mentioned the cholera epidemic, but offered no analysis of its reach other than to say that it was "at its lowest level." 83 Fed. Reg. at 2650. TPS for Haiti officially expires July 22, 2019.

## STANDARD OF REVIEW

A motion to dismiss for lack of jurisdiction under Fed. R. Civ. P. 12(b)(1) can be either "facial, *i.e.*, based solely on the allegations of the complaint" or "fact-based," "proffering evidence beyond the Pleading." *Carter v. HealthPort Techs., LLC*, 822 F.3d 47, 57 (2d Cir. 2016). Because Defendants' Rule 12(b)(1) motion is facial, s*ee* Def. Br. at 14-17, this Court should "accept as true all material factual allegations in the complaint, and draw all reasonable inferences" in Plaintiffs' favor. *Id*. (internal citations, alterations, and quotation marks omitted).

Similarly, when ruling on a motion to dismiss for failure to state a claim for which relief can be granted under Fed. R. Civ. P. 12(b)(6), courts should construe the complaint "liberally, accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc*., 282 F.3d 147, 152 (2d Cir. 2002). So long as a claim is "plausible on its face," dismissal is inappropriate. *Sharkey v. Quarantillo*, 541 F.3d 75, 92 (2d Cir. 2008). That counts are brought under the APA does not change these standards. *Id*.

A motion for summary judgment under Fed. R. Civ. P. 56(c) should be granted only if there is "no genuine issue of any material fact and . . . the moving party is entitled to judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

12

**ARGUMENT**

## I.    This Court Has Jurisdiction to Review Plaintiffs' Claims

### A.    *The TPS Statute's Judicial-Review Bar Does Not Apply To Plaintiffs' Non-Constitutional Claims*

The TPS statute provides: "There is no judicial review of any ***determination*** of the [Secretary] with respect to the designation, or termination or extension of a designation, of a foreign state." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). This provision must be construed narrowly due to the "'the strong presumption that Congress intends judicial review of administrative action,'" which can be rebutted only "upon a showing of 'clear and convincing evidence' of a contrary legislative intent." *Sharkey*, 541 F.3d at 84 (quoting *Bowen v. Mich. Academy of Family Physicians*, 476 U.S. 667, 670 (1986). Thus, Plaintiffs' claims are barred only if they seek review of a TPS "determination" under the statute.

"Determination" has a specific meaning within the context of the required statutory process for terminating TPS. That process requires, first, that the Secretary periodically "review the conditions in the foreign state." 8 U.S.C. § 1254a(b)(3)(A). Then, the Secretary "shall ***determine whether the conditions for [the state's] designation . . . continue to be met***." *Id*. (emphases added). That means a determination of whether "there exist extraordinary and temporary conditions . . . that prevent aliens . . . from returning to the state in safety." *Id*., § 1254a(b)(1)(C). Lastly, ***only*** "[i]f the [Secretary] ***determines*** . . . that a foreign state . . . no longer continues to meet the conditions for designation," the Secretary "shall terminate the designation." *Id.*, § 1254a(b)(3)(B) (emphasis added). Thus, under the statute, "determination" refers specifically to the judgment ***that*** the statutory criteria for designation are or are not met—a determination that must have a rational "basis" in the required review of country conditions. *Id*., § 1254a(b)(3)(A). It does ***not*** encompass ***any***—even arbitrary—decision to terminate. Because the judicial-review provision only bars

13

review of any "determination" by the Secretary, Congress only clearly intended to bar review of a TPS termination where the Secretary's decision reflects the required, evidence-based "determination" that the statutory criteria for designation are no longer met. Congress did *not* clearly intend to bar review where the Secretary violates the statute by terminating TPS arbitrarily, without ever having made any evidence-based judgment that conditions warrant termination.

That is precisely what Plaintiffs' Complaint alleges. Plaintiffs allege that: (1) Defendants violated the TPS statute, the APA, and the Due Process clause because they made a preordained, arbitrary decision to terminate Haiti's TPS *without* ever having reached a good-faith, evidence-based determination that the statutory criteria for termination are met (*i.e.* that country conditions prevents Haitian nationals from safely returning); (2) Defendants violated the APA by adopting a novel, unjustified rule for evaluating TPS under which they could terminate TPS *despite* the fact that those statutory criteria are *not* met; and (3) the termination decision was unconstitutionally motivated by discriminatory animus. Plaintiffs thus do not seek judicial review of *any* "determination" by the Secretary under the statute—and thus, review of this case is not barred.

Defendants' motion totally ignores Plaintiffs' allegation and the supporting evidence that Defendants terminated TPS for Haiti despite never having determined in good faith that conditions there had improved. The decision to terminate was contrary to internal memos revealing Defendants' awareness that "conditions prompting the original January 2010 TPS designation persist." Ex. 29; *see also* Ex. 46; Ex. 47. Thus, DHS had to fish for a pretext to rationalize the termination. *E.g.*, Ex. 31 (███ to Kovarik in Oct. 2016: "We can . . . [look] for positive gems, but the conditions are what they are."). Duke's own notes show that her decisionmaking was not based in the statutory criteria for termination, the evidence of country conditions, or *any* other rational considerations: her "rationale" for the decision was: "don't know." Ex. 39. Duke had

14

decided (in her own words) that "TPS *in general* is coming to a close," "consistent with the President's position on immigration." Ex. 41(emphasis added).

As this evidence shows that Duke's decision to terminate TPS for Haiti failed to reflect any judgment that termination is warranted under the statute, her decision is not encompassed by the judicial-review bar, which only clearly expresses an intent to bar review of non-arbitrary "determination[s]" that the statutory criteria for designation are no longer met. 8 U.S.C. § 1254a(b)(5)(A). Moreover, even if the word "determination" were ambiguous—*i.e.*, even if (despite the clear meaning that the surrounding context of the statute provides) the word could be read broadly to bar review of *any* decision to terminate TPS (even an arbitrary, irrational one that violates the statute's procedural requirements)—this Court should adopt the narrower construction advanced above, which favors review of Plaintiffs' claims: that is because of the "longstanding principle of construing any lingering [statutory] ambiguities … in favor of the alien" who faces deportation. *INS v. St. Cyr*, 533 U.S. 289, 298 (2001).

Further, even if the section 1254a judicial-review provision unambiguously precluded challenges to *any* TPS termination, there would still be jurisdiction to hear Plaintiffs' claims for a second reason: the word "determination" does not encompass practices and procedures employed by the Government in making TPS termination decisions, so the TPS statute does not preclude collateral challenges to TPS terminations resulting from unlawful practices and procedures. The Court's jurisdiction to review such claims is confirmed by *McNary v. Haitian Refugee Center*, 498 U.S. 479 (1991). In *McNary*, a class brought statutory and constitutional challenges to Government policies and practices administering the special agricultural worker ("SAW") program, which granted legal status to qualifying workers. *Id.* at 481-84. The statute barred "judicial review of a determination respecting an application for adjustment of status." *Id.* at 491 (quoting 8 U.S.C. §

15

1160(e)(1)). Relying on *Bowen's* "well-settled presumption" in favor of judicial review, the Supreme Court concluded that plaintiffs' claims were not barred because "the reference to a 'determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 492.

Here, too, Plaintiffs' claims are directed at underlying "practices and procedures" that Defendants employed in terminating TPS for Haiti no less than for other countries—specifically: (1) their practice of terminating TPS *in general*, whether or not statutory criteria for termination are met; (2) their adoption of a new, generally applicable rule limiting review of TPS to conditions on which TPS designations were originally based rather than considering all relevant country conditions; and (3) their "America First" agenda, which broadly discriminates against immigrants of color. As in *Ramos* and *Presente* (where the plaintiffs are pursuing similar theories), *McNary* compels the conclusion that section 1254a's preclusion of review of any TPS "determination" does not bar Plaintiffs' challenges to Defendants' TPS practices and practices. Defendants' motion presents no reason to doubt that conclusion.[3]  And indeed, the courts in both *Ramos* and *Presente* rejected the Government's jurisdictional arguments on precisely this ground. Ex. 1; Ex. 2.

   B.      *This Court Has Jurisdiction to Review Plaintiffs' Constitutional Claims*

Initially, "although Congress exercises broad power over immigration matters, that power is limited by the Constitution," and thus Congress cannot bar review of all constitutional claims.

---

[3] In a footnote, Def. Br. at 15 n.10, Defendants argue that *McNary* is inapplicable because this litigation does not "involve some collateral challenge to DHS's policies or procedures, nor does it concern the legality of DHS regulations," because Plaintiffs "are challenging the Acting Secretary's TPS determination … and they are seeking declaratory and injunctive relief that would undo that determination." *Ramos* squarely—and correctly—rejected this argument, stating: "[T]he fact that Plaintiffs' challenge might result in vacating the … TPS [decisions] at issue in this case is not dispositive…. The same was true in *McNary*… [which] had the effect of vacating individual determinations and requiring the agency to re-consider them after correcting procedural deficiencies and applying the correct legal standard. Similarly, if Plaintiffs prevail here, Defendants would not be compelled to extend each country's TPS designation. Instead, Defendants may make a new determination whether TPS should be extended or terminated once they correct any legal errors identified by the Court." Ex. 1 at 19-20.

*Henderson v. INS*, 157 F.3d 106, 118 (2d Cir. 1998), citing *Battaglia v. General Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948).

Even assuming, though, that Congress has the power to strip courts of constitutional jurisdiction, it did not do so here. As Defendants themselves acknowledge, "where Congress intends to preclude judicial review of constitutional claims its intent do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). Indeed, "clear and convincing" evidence of Congressional intent is required. *Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 64 (1993).[4] As *Ramos* held, the TPS Statute "does not reflect a clear Congressional intent"—let alone "clear and convincing" evidence of intent—to strip the courts of jurisdiction over Plaintiffs' constitutional claims. Ex. 1 at 21-22. Indeed, as *Presente* recognized, the fact that Congress specifically included constitutional jurisdiction-stripping provisions elsewhere in the INA but did not do so in the TPS statute strongly suggests Congress did not intend to eliminate jurisdiction over constitutional claims. *Compare* 8 U.S.C. § 1252(b)(9) (stripping courts of jurisdiction over constitutional challenges to orders of removal) *with* 8 U.C.C. § 1254a (containing no equivalent provision); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987); ("Where congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). *See* Ex. 2 at 21.

Moreover, Plaintiffs' constitutional claims do not, as Defendants assert, require this Court to "probe the sufficiency" of any specific fact-based evaluations under the TPS statute. Def. Br. at 14. Put another way, Plaintiffs do not challenge any determination that any "country is not in fact

---

[4] Defendants cite *Krua v. DHS*, 729 F.Supp.2d 452, 455 (D. Mass. 2010) as their lone authority that this Court lacks jurisdiction over Plaintiffs' constitutional claims. But the *pro se* plaintiff in *Krua* did not raise any jurisdictional argument at all, and the court thus did not have an opportunity to consider *Webster*. As such, "it is not persuasive." Ex. 1 at 21. In any event, the constitutional claims raised in *Krua* did not allege that the decision at issue there was made "on the basis of racial animus." *See id*. Thus, *Krua* is distinguishable.

safe, an evaluation which [the TPS statute] was intended to insulate" from review. Ex. 1 at 22. Rather, Plaintiffs contend that TPS decision was "driven by unconstitutional animus" and violated their due process rights. *Id*. Although the "evaluation of particular facts based on statutory criteria . . . may be closely tied to the application and interpretation of statutes related to" the TPS decision, "***whether the decision is driven by unconstitutional racial animus is not***." Ex. 1 at 22 (emphasis added, citation and quotation marks omitted).

Finally, Defendants' argument Congress intended to "channel" Plaintiffs' constitutional challenges into thousands of individualized removal proceedings in immigration court is meritless. *See Elgin v. Dept. of Treasury*, 567 U.S. 1, 9 (2012). *Elgin* is inapposite here, as both *Presente* and *Ramos* recognized. For one thing, the "channeling" Defendants advocate would require Plaintiffs to "voluntarily surrender themselves for deportation" in order to obtain review, and "[q]uite obviously, that price is tantamount to a complete denial of judicial review." *McNary*, 498 U.S. at 496-97. For another, the statute in *Elgin* "channeled" the plaintiffs' claims into the Merit System Review Board and the Federal Circuit; those fora had the "tools to create the necessary record," and the "authority to consider and decide" their claims. 657 U.S. at 20. That is not the case in removal proceedings in immigration court. *See* Ex. 2. at 22-23 ("[T]he assertion of claims here would require developing a record that would not be possible or relevant in any one individual plaintiff's removal proceeding."); Ex. 1 at 24 (same). Further, the "channeling" provision of the INA on which Defendants rely, 8 U.S.C. § 1252(a)(2)(D), which was enacted well ***after*** the TPS statute, "reflects Congress' intent to channel constitutional challenges to a ***removal*** order" not a "Congressional purpose to circumvent constitutional challenges to TPS country determinations." Ex. 1 at 23. For these reasons, this Court has jurisdiction to review Plaintiffs' constitutional claims.

C.      *This Court Has Jurisdiction Over the President*

Defendants rely on *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475, 501 (1866) for the proposition that the President's official actions can *never* be enjoined. *Johnson* was a political question case—it did not establish a *per se* rule that the President is above the law even when he himself has violated the Constitution. *See Ohio v. Wyandotte Chems. Corp*., 401 U.S. 493, 496 (1971) (*Johnson* was a case that attempted to "embroil [the Supreme Court] in 'political questions'"). Indeed, the Supreme court has not "expressly held" that courts may "*never* enjoin the President" for official acts. Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002). Indeed, if "the President himself" violates the law, then "the court's order must run directly to the President." *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973); *see also United States v. Nixon*, 418 U.S. 683, 706 (1974) ("[N]either the doctrine of separation of powers, nor the need for confidentiality . . . can sustain an absolute, unqualified Presidential privilege of immunity from judicial process.").

Here, Plaintiffs allege that the personal racial bias of President Trump himself motivated the TPS terminations. *See generally* Part III, *infra*. Accordingly, this court can, and should, exercise jurisdiction over Plaintiffs' claims against President Trump.

II.      <u>**This Court Should Deny Defendants' Motion With Regard to Plaintiffs' Statutory Claims**</u>

A.      *Plaintiffs Should Be Allowed To Proceed With Their APA Claims Asserting That Defendants Acted Arbitrarily And Their Common Law Claim That Termination of TPS Was Ultra Vires*

Defendants assert that Plaintiffs' APA count—insofar as it is based on Plaintiffs' theory that terminating Haiti's TPS was arbitrary, capricious, and in violation of the TPS statute—has no merit because the Secretary "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." Def. Br. at 20 (quoting *Ru Jun Zhang v. Lynch*,

2018 WL 1157756, at *6 (E.D.N.Y. 2018) (Kuntz, J.)). Defendants recite the improved conditions on which the Secretary purported to rely in concluding that Haitian nationals "can safely return home"—including "positive gems" like the announcement of a plan to rebuild the national palace. Ex. 31. Remarkably though—like the Federal Register notice terminating Haiti's TPS—Defendants' fail even to *acknowledge* the ongoing humanitarian crisis in Haiti, which USCIS memos from around the time of the Secretary's decision detailed in concluding that "the conditions prompting the original January 2010 designation persist." *E.g.*, Ex. 29. The decision to terminate was a "a political one." Ex. 22. As it does not even try to explain why the Secretary's decision was reasonable in light of those countervailing facts, Defendants' argument is patently inadequate to show that the Secretary "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action." *Ru Jun Zhang*, 2018 WL 1157756, at *6.

Indeed, even at this preliminary stage, Plaintiffs have presented evidence that the TPS termination was predetermined without regard to the statutory criteria and that Defendants constructed a *post hoc* rationalization to support it, irrespective of actual conditions in Haiti. *See* Background, Part II, *supra*. Defendants' argument, Def. Br. at 24, that the Secretary's decision was not *ultra vires* because it was "consistent with the plain text of the statute" and "a permissible interpretation of the statute" is conclusory.[5]

---

[5] Defendants also argue that the *ultra vires* claim should be dismissed because "Plaintiffs assert the same claim … as both a violation of the INA and as a substantive violation of the APA." If, however, this Court or an appellate court were to hold that the APA does not provide a cause of action, Plaintiffs would still be entitled to pursue a standalone *ultra vires* claim. *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958)) (plaintiff could bring common-law *ultra vires* claim against the Executive where conditions for judicial review of APA claim were not satisfied). Accordingly, Plaintiffs should be permitted to pursue these two theories in the alternative..

B.      *Plaintiffs' Claim That Defendants Violated The APA In Applying A New Standard for TPS Should Proceed*

Under the APA, agency action may be set aside if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," 5 U.S.C. § 706(2)(A) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right," *id.* § 706(2)(C); or "without observance of procedure required by law," *id*. § 706(2)(D). The decision to terminate Haiti's TPS designation runs afoul of each of these provisions.

*First*, Defendants' termination decision was arbitrary and capricious because it represents an unexplained change in agency policy. Under this standard, an agency must examine the relevant data and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). "An agency may not, for example, depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). An "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (internal citation omitted). Here, the fact that Defendants' provided no explanation for the abrupt and significant change in the standard under which they reviewed TPS renders the termination an arbitrary and capricious action.

Defendants' response—that the termination of TPS did not result from a change in policy—is unavailing. Under the standard applied by DHS in the past, the Secretary analyzed the real-world conditions on the ground in TPS-designated countries to ascertain whether it was safe for TPS recipients to return. The TPS statute does not direct that this review be limited to the conditions which gave rise to the initial TPS designation. Consistent with the text of the TPS statute, review of TPS extensions before the November termination of TPS for Haiti considered not only

21

conditions arising out of the earthquake that triggered the initial TPS designation, but also conditions related to subsequent catastrophes like Hurricane Matthew. 82 Fed. Reg. at 23,832. In terminating Haiti's TPS, however, Trump Administration officials suddenly announced that they could analyze only whether the TPS-triggering conditions themselves were still active, regardless of other, separate conditions. Ex. 45. Defendants provided no explanation for this new, more limited standard.

*Second*, given that the Trump Administration's new standard for reviewing TPS has no basis in the TPS statute and, in fact, runs counter to the text of the law, the decision to terminate TPS here was in excess of the Secretary's statutory authority, violating APA Section 706(2)(A).

*Third*, even if the Trump Administration's rationale for terminating TPS were permitted under the APA, the record shows that this rationale was never actually employed in reviewing Haiti for re-designation under TPS, in violation of APA Section 706(2)(D). Instead of undertaking a meaningful analysis of whether conditions related to the earthquake still impacted Haiti's ability to reabsorb people, officials examined statutorily irrelevant factors such as use of public benefits and crime rates for TPS-recipients. Ex. 19; Ex. 20; Ex. 21. The TPS statute does not permit consideration of factors other than conditions on the ground in the foreign state. Thus, the termination was made "without observance of procedure required by law," in violation of the APA.

C.      *Defendants' New Standard for TPS Review Constitutes a New Rule, which Defendants Promulgated without APA-Required Notice and Comment*

The Trump Administration's departure from the prior standard for TPS review constitutes a new legislative rule, which should have been promulgated using notice and comment rulemaking. The APA requires that when an agency engages in rulemaking, it must provide public notice of the proposed rule and an opportunity to comment. 5 U.S.C. § 553(b), (c). The APA's notice and comment requirement, however, applies only substantive rules, which create new law, rights, or

22

duties, as opposed to so-called interpretative rules, which do not alter the rights of parties, though they may change how parties make arguments to an agency. *L.M. v. Johnson*, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015). Defendants argue that the new approach to TPS review is merely an agency interpretation, but they cannot escape the fact that this new rule has a substantial impact on those persons permitted to reside the United States under TPS.

"When determining whether an agency action is subject to the notice-and-comment exemption under Section 553, the court looks not to labels given by the agency, but rather to the nature of the impact of the agency action." *Id.*; *Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481–82 (2d Cir. 1972) ("[W]hat the agency does in fact" is determinative). Rules are considered interpretative "so long as they do not 'change the substantive standards by which the [agency] evaluates' applications which seek a benefit that the agency has the power to provide." *Nat'l Sec. Counselors v. CIA*, 931 F.Supp.2d 77, 107 (D.D.C. 2013) (citation omitted).

The Trump Administration's new standard is a substantive rule which fundamentally impacts the rights of TPS recipients. Because this new rule fundamentally alters the circumstances under which DHS will renew or revoke TPS, the fact that the agency failed to use notice and comment rulemaking to promulgate the rule violates APA Section 553.[6]

### III.     This Court Should Deny Defendants' Motion With Regard to Plaintiffs' Constitutional Claims

#### A.     *Equal Protection*

      1.    To Prevail, Plaintiffs Are Not Required to Show That a Similarly Situated Group was Treated Differently than They Were

---

[6] For these reasons, Plaintiffs also should be allowed to proceed on their claim that Defendants violated the Regulatory Flexibility Act ("RFA"), 5 U.S.C. §§ 601 *et seq.*, by failing to evaluate the TPS termination's significant economic impact on small-businesses entities; the RFA's requirements apply where, as here, the section 553 notice-and-comment provisions of the APA apply. *See* 5 U.S.C. § 603.

As a threshold matter, Defendants argue that Plaintiffs' equal protection claim is "facially defective" as a matter of law because it "does not involve classifications of groups of aliens for favored (or disfavored) treatment." Def. Br. at 25. Defendants are wrong.

Plaintiffs bring their equal protection claim under *Village of Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977), asserting that President Trump's "discriminatory purpose"—that is, his explicit racial animus towards Haitians and other immigrants of color—was "a motivating factor in the decision" to terminate TPS. *Id.* at 266; *see also* Compl. at ¶ 140 (alleging that the termination decision was "motivated by discriminatory animus based on race"). For this very reason, Plaintiffs "***need not plead or show the disparate treatment of other similarly situated individuals***." *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001) (emphasis added).[7] *See also* Ex. 1 at 46 (no need to show "that a group of similarly situated persons were treated more favorably to demonstrate discriminatory intent").

> 2.    To Prevail, Plaintiffs Are Not Required to Show that Duke "Personally"
>        Harbored Discriminatory Animus

Defendants also argue that Plaintiffs' equal protection claim is "fatal[ly] defect[ive]" as a matter of law because Duke did not "personally harbor[] discriminatory animus" against Haitians or immigrants of color. Def. Br. at 28. Defendants' argument is nothing new. For example, in *Battalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 278-79 (E.D.N.Y. 2018), a case about President Trump's decision to rescind the DACA program, the court found this same attempt to "pass the buck" to Duke "remarkable" in light of the fact that the "Constitution vests 'executive power' in the President," not Duke, "who reports to the President and is removable by him at will." *Id.* The court noted that "in far more mundane contexts, liability for discrimination will lie when a biased

---

[7] Even assuming that Plaintiffs were required to show that a similarly situated group was favored over Haitians and immigrants of color, they can. In particular, President Trump's preference for immigrants from "places like Norway" and disfavoring immigrants from "shithole countries" like Haiti is evidence of a preference for white immigrants.

individual manipulates a non-biased decision-maker into taking discriminatory action." *Id*. (collecting cases which explain "cat's paw" liability and hold that it applies in the equal protection context). Indeed, "it would be surprising" if the law were to permit President Trump's racial animus to "be laundered by being implemented by an agency under his control." *Id*. (citation omitted). More recently, Defendants made this same argument in *Ramos* and *Presente*. Both courts rejected it. Ex. 1. at 43-44; Ex. 2. at 34-35. This court should, too.

### 3. Neither *Trump v. Hawaii* Nor *Reno v. AADC* Apply Here

Defendants make much of the Supreme Court's recent Travel Ban decision in *Trump v. Hawaii*, 138 S.Ct. 2392 (2018). In Defendants' view, *Trump* insulates a President and his subordinates from liability for even intentional discrimination, so long as that discrimination arises in any context involving noncitizens. *See* Def. Br. at 26 (arguing that *Trump* requires "at most, rational basis" review "given the deference owed to the political branches in this area"). But *Trump* did not purport to overturn *Arlington Heights*, the case that applies to Plaintiffs' claims here; *Trump* never even mentions *Arlington Heights*.

*Trump* is distinguishable in other key respects, too. *First*, and most importantly, *Trump* involved the President's constitutional authority on matters of national security. The Court noted that the case "differe[d]" from a "conventional" constitutional case precisely because the plaintiffs sought "to invalidate a national security directive." 138 S.Ct. at 2418. Defendants have never argued—in this or any other TPS case—that decisions about TPS implicate national security. That is because they do not—people with a criminal record are statutorily ineligible for TPS.

*Second*, and consistent with the Constitution's recognition that national security is a "matter within the core of executive responsibility," *id*. at 2418, *Trump* concerned a statute which, "by its plain language . . . grants the President broad discretion to suspend the entry of aliens into the United States." *Id*. at 2408 (citing 8 U.S.C. § 1182(f)). By contrast, the TPS statute prescribes

a mandatory review by the Secretary of Homeland Security of country conditions in the foreign state; TPS may be terminated *only* if those conditions no longer exist. 8 U.S.C. § 1254a(b)(3)(B).

*Third*, *Trump* involved foreign nationals who had never set foot on American soil—a critical factor in the Court's conclusion that the Constitution's protections did not apply. *Id.* at 2419. ("[F]oreign nationals seeking admission have no constitutional right to entry."). By contrast, each and every TPS recipient was physically present in the United States at the time of a designation or extension—that is because the TPS statute *requires* physical presence to receive TPS. 8 U.S.C. § 1254a(c)(1)(A)(i). Moreover, noncitizens residing within the United States have greater constitutional protections than those outside the United States. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law . . . . [O]nce an alien enters the country, the legal circumstance changes."); *id.* (citing *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886) and noting the "equal protection guarantee applies" to noncitizens in the United States). Relying on these and other factors, both *Ramos* and *Presente* correctly concluded that *Trump* did not affect the analysis of constitutional challenges to TPS terminations. Ex. 1 at 53; Ex. 2. at 28. This Court should do the same.

Similarly, Defendants argue that *Reno v. AADC*, 525 U.S. 471 (1999) requires Plaintiffs to meet a "particularly demanding" standard of showing by "clear evidence" that the TPS termination was based on "outrageous" discrimination. Def. Br. at 3, 28. *AADC* says no such thing. *AADC* involved allegations that the plaintiffs were unconstitutionally selected for deportation "because of their affiliation with a politically unpopular group," not because of racial animus. 525 U.S. at 472. The Court insisted on a "particularly demanding" standard because the plaintiffs' claims "invade a special province of the Executive—its prosecutorial discretion" to choose to deport some

26

people but not others. *Id*. at 488. Here, though, Plaintiffs' equal protection claims do not challenge the government's right under *AADC* to make discretionary decisions about which individual noncitizens to remove in a particular case. They challenge TPS terminations based on racial animus.[8] For these reasons, *Ramos* and *Presente* correctly held that *AADC* did not apply to equal protection challenges to TPS terminations. Ex. 1 at 26; Ex. 2 at 27. This Court should do the same.

### 4.    Plaintiffs Easily Satisfy *Arlington Heights'* Standard

Thus, *Arlington Heights*—not *Trump* or *AADC*—controls Plaintiffs' equal protection claim. Under *Arlington Heights*, Plaintiffs need not show that the decision to terminate TPS was "motivated solely by" racial animus, nor that animus "was the 'dominant' or 'primary'" purpose. 429 U.S. at 265. Rather, because "racial discrimination is not just another competing consideration" that governments are permitted to consider when making decisions, "[w]hen there is proof that a discriminatory purpose has been *a* motivating factor in the decision . . . judicial deference" to the government's decision-making "is no longer justified." *Id*. at 265-66 (emphasis added). Satisfying this standard requires a "sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Id*. at 266. And, because they "rely[] on *Arlington Heights*," Plaintiffs "need provide very little" evidence of discriminatory purpose "to raise a genuine issue of fact; *any* indication of discriminatory motive may suffice to raise a question that can only be resolved by a fact-finder." *Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir, 2015) (emphasis added). Plaintiffs easily satisfy this standard.

---

[8] Attempting to salvage *AADC*, Defendants rely on several cases involving equal protection challenges to the NSEERS program, reasoning that if *AADC* applies to "broader, programmatic" challenges like NSEERS, it should apply here. Def. Br. at 29. But each of those cases involved individual plaintiffs challenging individual removal proceedings. Moreover, in *Kandamar v. Gonzales*, 464 F.3d 65, 72 (1st Cir. 2006), the leading NSEERS case cited by Defendants, the court did not apply *AADC* to the plaintiffs' programmatic challenge, opting instead for traditional standards of scrutiny. And, as *Presente* noted, "the Supreme Court recently applied heightened scrutiny in the context of an equal protection challenge to a gender-based classification in the immigration context." Ex. 2. at 28 (citing *Sessions v. Morales-Santana*, 137 S.Ct. 1678, 1686, 1690 (2017)).

Ordinarily, "discriminatory intent is rarely susceptible to direct proof." *Mhany Mgmt., Inc. v. Cty. of Nassau*, 819 F.3d 581, 606 (2d Cir. 2016). Indeed, courts and scholars tend to believe that "'smoking gun' evidence of discrimination is largely a thing of the past," and courts are often "surprised when explicit bias appears" in a case. Jessica Clarke, *Explicit Bias,* 113 N.W. L. REV. at 4, 5 (forthcoming 2018), Ex. 48. But this case is far from ordinary. While in office, the President of the United States has referred to Haitians as people from "shithole countries" while expressing a preference for immigrants from mostly white countries "like Norway." Ex. 15. He believes Haitians "all have AIDS," a view based on a decades-old, racist misconception about Haitians. Ex. 11. He asked "why do we need more Haitians?" in the U.S. Ex. 13. And, of course, he has referred to immigrants as "rapists" and criminals  Ex. 7; Ex. 8. Under *Arlington Heights*, "statements of explicit bias" like these are "'highly relevant' to [the] contextual inquiry into whether discrimination was a motivating factor" in the decision.[9] Ex. 48 at 52; *Arlington Heights*, 429 U.S. at 268 (emphasizing the importance of "contemporary statements" by decision makers). These statements alone—***which Defendants do not deny***—are "more than sufficient" to establish that the President harbors "animus based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians . . . in particular." Ex. 1 at 54.

Plaintiffs have also plausibly alleged that TPS was terminated ***because the White House wanted it to be,*** regardless of conditions on the ground. President Trump himself has linked his race-laden invective to TPS. In the same meeting when he referred to Haitians as people from "shithole" countries, he "demand[ed] that congressional negotiators 'take them out' of any further talks about extending" TPS." Ex. 13.

---

[9] Indeed, even assuming that *AADC*'s standard applied, and Plaintiffs were required to show "outrageous" conduct, these racist statements undoubtedly qualify.

28

On November 6, 2017, Duke wrote that the reason "TPS in general is coming to a close," was because doing so was "consistent with the President's position on immigration," and as a means to "get to the President's objectives." Ex. 41. Separately, Duke wrote "the TPS program must end" and, parroting a Trump campaign slogan, added that terminating TPS was the "result of an America first view of the TPS decision." Ex. 40.

This evidence confirms reporting that the White House exerted direct pressure on Duke to terminate TPS, causing her to change parts of her decision. Ex. 43. Kelly and other officials spoke with Duke in the days leading up to her decisions to terminate TPS for Nicaragua and Honduras. In Kelly's own words, the purpose of the call was to "ensure[] . . . adherence" to the President's "agenda." Ex. 44. And, Duke modified the effective date of Nicaragua's termination from 18 months to 12 after talking with White House official Tom Bossert, who later thanked Duke for the change. Ex. 41; Ex. 42. White House advisor Stephen Miller "[p]retty regularly" attended meetings with USCIS senior staff tasked with writing reports on which Duke based her decisions. Ex. 36.

These facts are more than sufficient to survive Defendants' motion. *See, e.g. United States v. Yonkers Bd. Of Educ.*, 837 F.2d 1181, 1221-24 (2d Cir. 1987) (holding that a housing plan was enacted with discriminatory intent under *Arlington Heights* where, *inter alia*, the City's constituents made numerous racist comments at public meetings, and the City's "deviat[ions] from its normal procedur[es]" and "swift zoning obstructions" were enough to "infer[] that the City intended to preserve racially segregated neighborhoods"); *Battalla Vidal*, 291 F. Supp. 3d at 279 (E.D.N.Y. 2018) ("[L]iability for discrimination will lie when a biased individual manipulates a non-biased decision-maker.").

Finally, despite Defendants' arguments to the contrary, strict scrutiny, not rational basis, should apply to Plaintiffs' equal protection claim. *See Regents of Univ. of Cal. v. Bakke*, 438 U.S.

265, 291 (1978) ("Racial and ethnic distinctions of any sort are inherently suspect and thus call for the most exacting judicial examination."); *see also Yick Wo*, 118 U.S. at 373-74. In light of the ample evidence that the TPS termination was motivated by President Trump's racism, however, Plaintiffs can prevail even under rational basis review. *See* Ex. 2. at 37 ("[E]ven under rational basis review, Plaintiffs have plausibly stated constitutional claims."). For these reasons, Defendants' motion with regard to Plaintiffs' equal protection claim should be denied.

### B.       Due Process

The Constitution's due process guarantee, at bottom "protects against arbitrary government action that deprives individuals of a protected interest." *Padberg v. McGrath-McKechnie*, 203 F.Supp.2d 261, 277 (E.D.N.Y. 2002). As *Ramos* explained, TPS recipients have a protectable interest in ensuring that the termination complied with the process mandated in the statute, namely, "'review' and determin[ation].'" Ex. 1 at 41; *see also id.* (noting that there is a due process liberty interest in residing in the United States, as deportation "visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom." *Bridges v. Wixon*, 326 U.S. 135, 154 (1945)). Thus, as *Ramos* already held, Plaintiffs have plausibly pleaded a due process claim "co-extensive with their ability to prove that Defendants violated the APA or equal protection guarantee." *Id.*; *see also* Ex. 2 at 37 (denying the defendants' motion to dismiss due process claim). Here, Plaintiffs have established both that Defendants violated the APA and their rights under the Equal Protection Clause. *See* Argument, Part III, *supra*.

**CONCLUSION**

For the foregoing reasons, this Court should deny Defendants' motion.

30

Dated:  September 14, 2018

Respectfully Submitted,

/s/ Geoffrey M. Pipoly

/s/ Ira J. Kurzban

/s/ Sejal Zota