UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
PATRICK SAGET, SABINA BADIO FLORIAL,
NAÏSCHA VILME, GERALD MICHAUD,
BEATRICE BELIARD, RACHELLE GUIRAND,
JEAN CLAUDE MOMPOINT, YOLNICK JEUNE,
GUERLINE FRANCOIS, LEOMA PIERRE, HAÏTI
LIBERTÉ, and FAMILY ACTION NETWORK
MOVEMENT, INC.,

                              Plaintiffs,

                    v.

DONALD TRUMP, President of the United
States of America, UNITED STATES OF
AMERICA, DEPARTMENT OF HOMELAND
SECURITY, KIRSTJEN NIELSEN, Secretary of
Homeland Security, and ELAINE C. DUKE,
Deputy Secretary of Homeland Security,

                              Defendants.
------------------------------------------------------------------ X

**FILED**
IN CLERK'S OFFICE
US DISTRICT COURT E.D.N.Y.

★   DEC 14 2018   ★

BROOKLYN OFFICE

**DECISION & ORDER**
18-CV-1599 (WFK) (ST)

**WILLIAM F. KUNTZ, II, United States District Judge:**

Plaintiffs bring this action challenging then-Acting Secretary of Homeland Security Elaine C.
Duke's November 20, 2017 determination to terminate Haiti's Temporary Protected Status
designation, based on her assessment that Haiti had sufficiently recovered from a 2010 earthquake
and there were no longer "extraordinary and temporary conditions" preventing Haitian nationals
residing in the United States from safely returning to Haiti. Defendants President Donald Trump,
Department of Homeland Security ("DHS"), DHS Secretary Kirstjen Nielsen, and DHS Acting
Deputy Secretary Claire M. Grady filed a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(1)
and 12(b)(6). Defendants also filed a motion to stay this action. For the reasons stated below,
Defendants' motion to dismiss and motion to stay are both DENIED.

## BACKGROUND

On March 15, 2018, Patrick Saget, Family Action Network Movement, Inc., Yolnick

Jeune, Sabina Badio Florial, Jean Claude Mompoint, Gerald Michaud, Leoma Pierre, Naischa

Vilme, Guerline Francois, Beatrice Beliard, Haiti Liberté, and Rachelle Guirand (collectively,

"Plaintiffs") filed this action against President Donald Trump, the United States of America,

DHS, Kirstjen Nielsen in her capacity as the Secretary of DHS, and Elaine C. Duke in her

1

capacity as Deputy Secretary of DHS (who was later replaced by Claire M. Grady) (collectively, "Defendants") seeking declaratory and injunctive relief. Compl., ECF No. 1. On May 31, 2018, Plaintiffs filed an Amended Complaint. Am. Compl., ECF No. 21.

Plaintiffs challenge then-Acting Secretary of Homeland Security Elaine C. Duke's termination of Temporary Protected Status ("TPS") for Haiti, effective July 22, 2019. Plaintiffs claim, *inter alia*, the decision to terminate TPS for Haiti violated the requirements of the TPS statute, 8 U.S.C. § 1254a, implemented a new standard for terminating TPS that is arbitrary and unlawful under the Administrative Procedures Act ("APA"), violated the Due Process and Equal Protection clauses of the Fifth Amendment of the Constitution, and was *ultra vires* of the Immigration and Nationality Act ("INA").

The Court assumes the reader's familiarity with the history of TPS and Haiti's TPS designation, and the allegations in Plaintiffs' Amended Complaint. As such, this opinion only engages in a brief recitation of the background of this litigation and references alleged facts as needed for analysis.

As pleaded in the Amended Complaint, Haiti was initially designated for TPS in January 2010, following a devastating earthquake. Am. Compl. ¶¶ 2-3. On May 19, 2011, following a deadly cholera outbreak, DHS extended and re-designated TPS for Haiti. *Id.* ¶ 50. TPS was extended for Haitian nationals for 18-month intervals again in October 2012, March 2014, and August 2015. *Id.* ¶ 54. On May 24, 2017, then-DHS Secretary John Kelly once again extended TPS for Haiti for six months, but nevertheless warned Haitian nationals they should begin to prepare to return to Haiti. *Id.* ¶¶ 85, 89. In the designation notice published in the Federal Register, Secretary Kelly noted the ongoing cholera epidemic, the extensive damage wrought by

Hurricane Matthew's landfall in 2016, and the 55,000 people in internally displaced person camps. *Id.* ¶¶ 85-88; 82 Fed. Reg. 23830.

On November 20, 2017, DHS terminated Haiti's TPS, stating the decision "was made after a review of the conditions upon which the country's original designation were based," and asserting the "extraordinary but temporary conditions caused by the 2010 earthquake no longer exist. Thus, under the applicable statute, the current TPS designation must be terminated." *Id.* ¶ 106 (citing DHS Press Release, *Acting Secretary Elaine Duke Announcement on Temporary Protected Status* (Nov. 20, 2017)). On January 18, 2018, DHS published notice of its termination of Haiti's TPS designation in the Federal Register citing, *inter alia*, Haiti's progress in recovering from the earthquake, the October 2017 withdrawal of the U.N. peacekeeping mission, the successful completion of a presidential election, continuing economic recovery, and the lowest levels of cholera since an outbreak began. *Id.* ¶¶ 109-112; 83 Fed. Reg. 2648.

On October 9, 2018, Defendants filed their fully briefed motion to dismiss this action, and Plaintiffs filed their opposition thereto. Def. Mot., ECF No. 58; Def. Mem., ECF No. 59; Pl. Opp'n, ECF No. 62; Def. Reply, ECF No. 63. On October 30, 2018, Defendants filed a motion to stay this action pending final appellate review of the preliminary injunction issued in a parallel matter in the Northern District of California, *Ramos v. Nielsen*, 18-CV-1554. Mot. to Stay, ECF No. 65. Plaintiffs filed their opposition on November 7, 2018, and Defendants filed their reply on November 8, 2018. Pl. Stay Opp'n, ECF No. 69; Def. Stay Reply, ECF No. 70. The Court held oral argument on the motions on November 13, 2018. Nov. 13, 2018 Tr. ("Tr."), ECF No. 72. At the oral argument, the Court issued an oral ruling from the bench denying both Defendants' motion to dismiss and motion to stay. The Court now provides a written decision and order setting forth the reasons for its ruling.

**LEGAL STANDARDS**

An action is properly dismissed under Federal Rule Civil Procedure ("FRCP") 12(b)(1) for lack of subject matter jurisdiction "when the district court lacks the statutory or constitutional power to adjudicate" the case. *Doyle v. Midland Credit Mgmt., Inc.*, 722 F.3d 78, 80 (2d Cir. 2013) (citation omitted). Plaintiffs bear the burden of showing that subject matter jurisdiction exists. *MLC Fishing, Inc. v. Velez*, 667 F.3d 140, 141 (2d Cir. 2011). In reviewing a motion to dismiss for lack of subject matter jurisdiction under FRCP 12(b)(1), the Court must accept all material factual allegations in the complaint as true. *See Atl. Mut. Ins. Co. v. Balfour Maclaine Int'l Ltd.*, 968 F.2d 196, 198 (2d Cir. 1992). "In deciding a Rule 12(b)(1) motion, the court may also rely on evidence outside the complaint." *Cortlandt St. Recovery Corp. v. Hellas Telecomm., S.a.r.l*, 790 F.3d 411, 417 (2d Cir. 2015) (citation omitted).

When ruling on a motion to dismiss for failure to state a claim for which relief can be granted under FRCP 12(b)(6), courts should construe the complaint "liberally, accepting all factual allegations . . . as true, and drawing all reasonable inferences in the plaintiff's favor." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002). So long as a claim is "plausible on its face," dismissal is inappropriate. *Sharkey v. Quarantillo*, 541 F.3d 75, 92 (2d Cir. 2008) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 544 (2007)). Counts brought under the APA are subject to the same standards. *Id.* In deciding a Rule 12(b)(6) motion, the court may consider, in addition to the factual allegations of the complaint, documents attached to the complaint as exhibits or incorporated in it by reference, matters of which the court may take judicial notice, and documents in the plaintiff's possession or of which the plaintiff had knowledge and relied on in bringing suit. *Roth v. CitiMortgage Inc.*, 756 F.3d 178, 180 (2d Cir. 2014) (citation omitted). "Agency determinations and administrative findings are public records

4

of which a court may properly take judicial notice." *Lia v. Saporito*, 909 F. Supp. 2d 149, 161

(E.D.N.Y. 2012) (Feuerstein, J.) (citations omitted); *Bates v. Donley*, 935 F. Supp. 2d 14, 17

(D.D.C. 2013) ("[W]hen faced with a motion to dismiss in the APA context, a court may

consider the administrative record and public documents without converting the motion into a

motion for summary judgment." (citation omitted)).

## ANALYSIS

### I. The Court Has Subject Matter Jurisdiction Over this Action.

Defendants move to dismiss this action as a whole on the ground that this Court lacks

subject matter jurisdiction under 8 U.S.C. § 1254a(b)(5)(A). Def. Mem. at 13-16. Additionally,

Defendants contend this Court lacks subject matter jurisdiction over Plaintiffs' claims against the

President. *Id.* at 16-18.

#### a. Plaintiffs' Action Generally

The TPS statute, 8 U.S.C. § 1254a(b)(5)(A), provides "[t]here is no judicial review of *any*

*determination* of the [Secretary] with respect to the designation, or termination or extension of a

designation, of a foreign state under this subsection." (emphasis added). However, there is a

strong presumption that administrative actions are reviewable in federal court. *Bowen v. Mich.*

*Acad. of Family Physicians*, 476 U.S. 667, 670 (1986); *Sharkey*, 541 F.3d at 84 (citations

omitted). The presumption in favor of judicial review may be overcome "only upon a showing

of 'clear and convincing evidence' of a contrary legislative intent." *Sharkey*, 541 F.3d at 84

(citations omitted).

Defendants' contend the judicial review preclusion provision found in the TPS statute

forecloses *all* claims in this Court relating to the Secretary's TPS determinations, whether

statutory or constitutional in nature. Def. Mem. at 13. They further argue that Plaintiffs "attempt

to plead around [the] statutory bar by alleging a 'new standard' (that does not exist) to serve as a proxy for the underlying TPS determinations entrusted to DHS by statute," and they "should not be allowed to recast their claim as collateral to challenging a TPS determination (while seeking the same underlying relief)." *Id.* at 13.

Plaintiffs first argue that the statute only bars determinations "where the Secretary's decision reflects the required, evidence-based 'determination' that the statutory criteria for designation are no longer met"—it does not bar review of decisions terminating TPS arrived at arbitrarily or for reasons unrelated to the statute. Pl. Opp'n at 14; Tr. 30:8-31, 70:1-19. Plaintiffs further argue the word "determination" does not encompass "practices and procedures employed by the Government in making TPS termination decisions, so the TPS statute does not preclude collateral challenges to TPS terminations resulting from unlawful practices and procedures." Pl. Opp'n at 15; Tr. 29:22-25. More specifically, Plaintiffs allege Defendants violated the APA by engaging in an arbitrary and capricious decision-making process and by adopting a new rule limiting review of TPS to conditions on which TPS designations were originally based rather than considering all relevant country conditions. Am. Compl. ¶¶ 122-130, 144-152.

The defendants in both *Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. Aug. 6, 2018), and *Centro Presente v. Dep't of Homeland Sec'y*, 332 F. Supp. 3d 393 (D. Mass. July 23, 2018), pending in the Northern District of California and the District of Massachusetts, respectively, advanced similar, though not identical, arguments regarding the Court's lack of subject matter jurisdiction. In both cases, the courts found that subject matter jurisdiction existed over the claims of the plaintiffs in those actions. This Court agrees with the holdings of its fellow district courts and finds subject matter jurisdiction exists over Plaintiffs' claims in this case as well.

*McNary v. Haitian Refugee Center*, which is cited by Plaintiffs and discussed at length in both *Ramos* and *Centro Presente*, is instructive here. 498 U.S. 479 (1991). In that case, a class brought statutory and constitutional challenges to government policies and practices administering the special agricultural worker ("SAW") program. The defendants in that case argued the district court lacked jurisdiction to review plaintiffs' claims because of a provision in the applicable statute barring "judicial review of *a determination* respecting an application for adjustment of status." *Id.* at 491 (emphasis added). The Court focused on the use of the singular "a", stating "the reference to 'a determination' describes a single act rather than a group of decisions or a practice or procedure employed in making decisions." *Id.* at 492. Further, in distinguishing a case cited by petitioners, *Heckler v. Ringer*, 466 U.S. 602 (1984), the Court in *McNary* noted that the plaintiffs were not "seek[ing] a substantive declaration that they are entitled to SAW status. Nor would the fact that they prevail on the merits of their purportedly procedural objections have the effect of establishing their entitlement to SAW status." *Id.* at 495. The Court ultimately held that "given the absence of clear congressional language mandating preclusion of federal jurisdiction and the nature of respondents' requested relief" the federal district court had jurisdiction to hear the plaintiffs' challenges to the process by which the agency made decisions regarding applications for SAW status. *Id.* at 483-84.

Like the statute at issue in *McNary*, it is clear from context that the judicial review provision in the TPS statute refers to an individual designation, termination, or extension of a designation with respect to a particular country, not to Defendants' determination practices or adoption of general policies or practices employed in making such determinations. *McNary*, 98 U.S. at 492; *see also Reno v. Catholic Soc. Servs., Inc.*, 509 U.S. 43, 55 (1993) (statute barring judicial review of "a determination" does not "preclude[] [an] action challenging the legality of a

regulation"). Plaintiffs here challenge the process of the adjudication and whether an evidence-based determination under the statutory criteria occurred, rather than the content of the decision, and contend defendants adopted a new rule when they began limiting review of TPS terminations to the conditions on which TPS designations were originally based. Am. Compl. ¶¶ 123-130; Pl. Opp'n at 16. Further, Plaintiffs are not seeking a substantive declaration from the Court that they are entitled to any particular TPS determination. Pl. Opp'n at 16 n.3. Were Plaintiffs to prevail on their claims, Defendants would not be compelled to extend Haiti's TPS designation, but rather would be required to make a new, good faith, evidence-based determination regarding Haiti's status by applying lawful criteria. Such a new determination may very well still result in Haiti losing its temporary protected status. *See McNary*, 498 U.S. at 495; *Centro Presente*, 332 F. Supp. 3d. at 408.

The Court also has the authority to review Plaintiffs' constitutional claims. "[W]here Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citations omitted). "[T]his heightened showing is in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Id.* (citation omitted).

The TPS statute does not reflect clear evidence of congressional intent to strip the courts of jurisdiction over Plaintiffs' constitutional claims. Indeed, as *Centro Presente*, 332 F. Supp. 3d at 407, and *Ramos*, 321 F. Supp. 3d at 1105-06, recognized, the fact that Congress specifically included constitutional jurisdiction-stripping provisions elsewhere in the INA but did not do so in the TPS statute strongly suggests Congress did not intend to eliminate jurisdiction over constitutional claims. *See, e.g.*, 8 U.S.C. § 1252(b)(9) ("Judicial review of all questions of law

and fact, *including interpretation and application of constitutional and statutory provisions*, arising from any action taken or proceeding brought to remove an alien . . . shall be available only in judicial review of a final order under this section. Except as otherwise provided in this section, no court shall have jurisdiction . . . to review such an order or such questions of law or fact." (emphasis added)); *I.N.S. v. Cardoza-Fonseca*, 480 U.S. 421, 433 (1987) ("Where Congress includes particular language in one section of a statute but omits it in another section . . . it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." (citation omitted)). Any intent on the part of Congress to insulate claims such as Plaintiffs' from judicial review is far from clear and does not meet the heightened standard under *Webster*.

Defendants argue "the implicit premise" of "Plaintiffs' equal protection and due process theories both rely on attacking Acting Secretary Duke's conclusion that the current conditions in Haiti no longer warrant TPS," which would require "prob[ing] the sufficiency of Acting Secretary Duke's stated reasons for terminating TPS—the very assessment that Congress foreclosed from judicial review." Def. Mem. at 14. However, Plaintiffs' constitutional claims do not challenge the factual accuracy of Secretary Duke's findings. Rather, Plaintiffs allege the decision to terminate Haiti's TPS was premised on facts and motivations the TPS statute does not permit the Secretary to consider, and the decision was driven by unconstitutional racial animus. Am. Compl. ¶ 129; Pl. Opp'n at 17-18.

Finally, Defendants' argument that "individuals who lose TPS protection may ultimately have an avenue to bring their constitutional claims" by making those claims only once they are ordered removed is unavailing. Def. Mem. at 15 (citing *Elgin v. Dept. of Treasury*, 567 U.S. 1, 9 (2012)). As the Supreme Court found in *McNary*, for Plaintiffs to bring their constitutional

claims, they would have to "voluntarily surrender themselves for deportation." 498 U.S. at 496. Such a price is "tantamount to complete denial of judicial review." *Id.* at 496-97. Furthermore, the statute in *Elgin* channeled the plaintiffs' claims into the Merit System Review Board and the Federal Circuit; those fora had the "tools to create the necessary record," and the "authority to consider and decide" their claims. 557 U.S. at 20-21. Plaintiffs would not be able to assert the claims they pursue here in immigration court because such claims would require developing a record that would not be relevant to an individual removal proceeding. *See Centro Presente*, 332 F. Supp. 3d at 407.

### b. *Plaintiffs' Claims Against the President*

Relying principally on *Mississippi v. Johnson*, 71 U.S. (4 Wall.) 475 (1867) and *Franklin v. Massachusetts*, 505 U.S. 788 (1992), Defendants contend that this Court does not have subject matter jurisdiction over Plaintiffs' claims against the President, who is sued in his official capacity. Def. Mem. at 16.

In *Franklin*, a plurality of the Supreme Court stated that a "grant of injunctive relief against the President himself is extraordinary, and should [raise] judicial eyebrows." 505 U.S. at 802. However, the Supreme Court has never held that "a court may *never* enjoin the President with regard to his official behavior," only that "there is something unique about litigation against the President *eo nomine* that should cause a special judicial hesitation." Patricia M. Wald & Jonathan R. Siegel, *The D.C. Circuit and the Struggle for Control of Presidential Information*, 90 Geo. L.J. 737, 758 (2002).

The factors to consider in determining whether injunctive relief against the President would be appropriate are whether injunctive relief against a lower official or declaratory relief would be an adequate remedy and the level of intrusion into the President's authority. *See Int'l*

*Refugee Assistance Project v. Trump*, 857 F.3d 554, 605 (4th Cir.), *as amended* (May 31, 2017), *as amended* (June 15, 2017) (reasoning President was not proper defendant because "[r]eview of the legality of Presidential action can ordinarily be obtained in a suit seeking to enjoin the officers who attempt to enforce the President's directive") (citation omitted), *vacated and remanded on other grounds sub nom. Trump v. Int'l Refugee Assistance*, 138 S. Ct. 353 (2017); *Nixon v. Fitzgerald*, 457 U.S. 731, 754 (1982) ("[A] court, before exercising jurisdiction, must balance the constitutional weight of the interest to be served against the dangers of intrusion on the authority and functions of the Executive Branch." (citations omitted)); *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973) ("[C]ourts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President.").

As the District of Massachusetts found in *Centro Presente*, the record in this case has not been fully developed regarding "what relief would be appropriate if Plaintiffs prevailed on their claim or whether an injunction against lower officials or declaratory relief would be sufficient." 332 F. Supp. 3d at 419. Because this could be one of the rare cases in which the extraordinary remedy of injunctive relief against the President could be appropriate, it is premature to dismiss the President as a party at this time.

## II. Plaintiffs' Statutory and *Ultra Vires* Claims Survive Dismissal.

Plaintiffs claim Defendants' termination of TPS for Haiti violated the APA because it was arbitrary and capricious, an abuse of discretion, otherwise not in accordance with the law, in excess of statutory authority, and was undertaken without observance of the procedure required by law (Count I); and violated the notice-and-comment provisions of the APA (Count IV). Plaintiffs further claim DHS failed to conduct any Regulatory Flexibility Act ("RFA") analysis to determine how the termination of TPS for Haiti would affect small entities, such as Haiti

11

Liberté, in violation of the RFA (Count V), and DHS's termination of Haiti's designation as a TPS country was *ultra vires* of the provisions in the Immigration and Nationality ("INA") (Count VI). Defendants move to dismiss these counts.

### a. APA Claims

The crux of Plaintiffs' two claims under the APA is that "Defendants abandoned their well-established standard for reviewing TPS designations [when] Defendants terminated Haiti's TPS based solely on an overly narrow consideration of the 'conditions on which the country's original designation were based,' without any consideration of the extraordinary conditions that currently prevent Haitian immigrants from safely returning to Haiti. Under the prior policy, such extraordinary conditions were taken into account in reviewing TPS, as required by statute." Am. Compl. ¶ 126 (footnote omitted); *see also id.* ¶ 147. Plaintiffs argue the application of this more narrow standard: 1) renders Secretary Duke's decision to terminate Haiti's TPS arbitrary and capricious under 5 U.S.C. § 706(2)(a), (c), and (d); and 2) promulgated a new rule without fulfilling the notice-and-comment requirements of 5 U.S.C. § 553(b), (c). Am. Compl. ¶¶ 123-26, 145-148. Plaintiffs also allege, alternatively, the termination of Haitian TPS itself constitutes a rule that implements a substantive policy change by Defendants and binds DHS to deny applications for TPS to individuals who previously met eligibility criteria. *Id.* ¶¶ 149-50.

### i. Count I

Under the APA, agency action may be set aside if it is arbitrary or capricious. *See* 5 U.S.C. § 706(2)(A). But a court is not to substitute its judgment for that of the agency and should uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 513-14 (2009) ("*Fox*") (citation omitted).

An agency must examine the relevant data and articulate a satisfactory explanation for its action. *Motor Vehicle Mfrs. Assn. of United States, Inc. v. State Farm Mut. Automobile Ins. Co.*, 463 U.S. 29, 43 (1983). "In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.'" *Id.* (citation omitted). "[A]n agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

"An agency may not . . . depart from a prior policy *sub silentio* or simply disregard rules that are still on the books." *Fox*, 556 U.S. at 515. Where an agency departs from prior agency practice or polices, the APA requires the agency to provide a "reasoned explanation" for such departure. *Id.* at 515-16. The Supreme Court has made clear that an "unexplained inconsistency in agency policy is a reason for holding an interpretation to be an arbitrary and capricious change from agency practice." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126 (2016) (citation and modifications omitted). To survive arbitrary and capricious review when changing a policy, an agency must "at least display awareness that it is changing position," "show that there are good reasons for the new policy," and "be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* (citation and quotations omitted).

Plaintiffs have plausibly alleged Defendants failed to undertake the required statutory review process by abandoning their well-established standard for reviewing TPS designations in favor of a narrower construction. Plaintiffs cite public statements issued by DHS making clear

Secretary Duke only considered findings on whether the conditions supporting Haiti's initial TPS designation continued to exist. *See e.g.*, Am. Compl. ¶¶ 92-97, 106. Given that prior decisions extending TPS relied on current country conditions as a whole to determine whether an extension was warranted, Plaintiffs have plausibly alleged a policy change. *Compare* Jan. 18, 2018 Termination Notice, 83 Fed. Reg. 2648-01 ("Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS—on the basis of 'extraordinary and temporary conditions' relating to the 2010 earthquake that prevented Haitian nationals from returning in safety—are no longer met" and failing to mention Hurricane Matthew's impact), *with* May 24, 2017 Extension Notice, 82 Fed. Reg. 23832 (discussing country conditions caused by Hurricane Matthew and ongoing cholera epidemic and finding "conditions that prompted the July 23, 2011 redesignation of Haiti for TPS continue to be met . . . [and t]here continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals . . . from returning to Haiti in safety.").

Defendants have provided no "reasoned explanation" for their departure from prior practices or polices as they deny any such change in policy has occurred. Def. Mem. at 20-22. Defendants point to earlier TPS termination decisions in the Federal Register and argue "[p]rior Administrations terminated TPS for TPS countries despite ongoing crises." Def. Mem. at 21-22 (collecting Federal Register notices). And Secretary Duke's determination for Haiti does make mention of current country conditions beyond those directly attributable to the earthquake. 83 Fed. Reg. at 2650. However, the January 18, 2018 Federal Register Notice makes clear the Secretary's judgment to terminate Haiti's TPS was based solely on whether the "'extraordinary and temporary conditions' relating to the 2010 earthquake" persisted. *Id.*

Furthermore, Plaintiffs have plausibly alleged that to the extent Defendants engaged in any process of review, it was to identify facts to support a pre-determined decision to terminate TPS for Haiti. In their Complaint, Plaintiffs allege DHS relied on factors not contemplated by the TPS statute, like crime rates and public benefit usage by TPS holders, while also failing to consider relevant reports and data evidencing that the extraordinary conditions relevant under the statute persisted. Am. Compl. ¶¶ 79-103.

Defendants' motion to dismiss Count I is, therefore, DENIED.

ii. Count IV

The APA requires that when an agency engages in rulemaking, it must provide public notice of the proposed rule and an opportunity to comment. 5 U.S.C. § 553(b), (c). The APA's notice-and-comment requirement, however, applies only to substantive rules, which create new law, rights, or duties, as opposed to so-called interpretative rules, which do not alter the rights of parties, though they may change how parties make arguments to an agency. *L.M. v. Johnson*, 150 F. Supp. 3d. 202, 215 (E.D.N.Y. 2015) (Garaufis. J.). "When determining whether an agency action is subject to the notice-and-comment exemption under Section 553, the court looks not to labels given by the agency, but rather to the nature of the impact of the agency action." *Id.* (citation omitted); *Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481-82 (2d Cir. 1972) ("[W]hat the agency does in fact" is determinative (citation omitted)).

At this stage, the Court need not decide whether the new policy Plaintiffs have alleged is an interpretive or substantive rule. Even if the new policy is interpretive, Defendants would be required to provide a reasoned explanation of the change in position. *See Centro Presente*, 332 F. Supp. 3d at 417; *Nat'l Labor Relations Bd. v. Lily Transp. Corp.*, 853 F.3d 31, 36 (1st Cir. 2017) ("The Court in *Fox* was unanimous in its acceptance of the view, often expressed, that an agency is not forever bound by an earlier resolution of an interpretive issue, but that a change

must be addressed expressly, at least by the agency's articulate recognition that it is departing from its precedent." (citations omitted)).

Defendants' motion to dismiss Count IV is, therefore, DENIED.

### b. Count V: Regulatory Flexibility Act

The Regulatory Flexibility Act imposes procedural requirements on agency rulemaking, in particular the preparation of a "final regulatory flexibility analysis regarding the effect of the rule on small businesses." *See U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 42 (D.C. Cir. 2005) (citing 5 U.S.C. § 604). That requirement applies "[w]hen an agency promulgates a final rule under section 553 of this title, after being required by that section or any other law to publish a general notice of proposed rulemaking." *Id.* (quoting 5 U.S.C. § 604). Because Plaintiffs' notice-and-comment claim survives dismissal at this stage, Plaintiffs' claim that Defendants violated the RFA by failing to evaluate the TPS termination's economic impact on small business entities should proceed.

Defendants' motion to dismiss Count V, therefore, is DENIED.

### c. Claim VI: Ultra Vires Claim

Defendants move to dismiss Plaintiffs' *ultra vires* claim because "Plaintiffs assert the same claim . . . as both a violation of the INA and as a substantive violation of the APA." Def. Mem. at 24. If, however, this Court or an appellate court were to hold that the APA does not provide a cause of action, Plaintiffs would still be entitled to pursue a standalone *ultra vires* claim. *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996) (citing *Leedom v. Kyne*, 358 U.S. 184 (1958) and *Am. School of Magnetic Healing v. McAnnulty*, 187 U.S. 94 (1902)) (plaintiff could bring common-law *ultra vires* claim against Executive

where conditions for judicial review of APA claim were not satisfied).  Accordingly, the Court finds it would be premature to dismiss Plaintiffs' *ultra vires* claim.

Defendants' motion to dismiss Count VI is DENIED.

### III.    Plaintiffs' Constitutional Claims Survive Dismissal.

Plaintiffs claim Defendants' decision to terminate TPS for Haiti: 1) violated the Due Process Clause of the Fifth Amendment (Count II); and 2) violated the Equal Protection Clause of the Fifth Amendment (Count III).  Defendants move to dismiss these counts.

Plaintiffs allege Defendants' termination of TPS violates TPS recipients' due process rights because the termination was based on the President's racial animus towards immigrants of color, and Haitians in particular, making the decision irrational.  Am. Compl. ¶ 133.  Further, because the decision was based on racial animus, it can therefore neither be narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.  *Id.* ¶ 134.  Additionally, Plaintiffs argue the decision, in departing under the settled process set forth in 8 U.S.C. § 1254a, arbitrarily deprives current TPS holders of the process to which they are entitled; and the termination was based on the President's categorial and defamatory assertions about all Haitians, which the Haitian TPS holders were given no opportunity to challenge.  Am. Compl. ¶ 135.  With respect to their Equal Protection claim, Plaintiffs contend that because the decision targeted immigrants of color, Haitians in particular, and was improperly motivated by discriminatory animus based on race and national origin, it is not narrowly tailored to a compelling government interest nor rationally related to a legitimate government interest.  Am. Compl. ¶¶ 137-43.

### a. Plaintiffs Need Not Show a Similarly Situated Group Was Treated Differently and May Rely on Discriminatory Intent.

Defendants argue that Plaintiffs' equal protection claim is facially defective because the determination did not involve classifications of groups of aliens for favored or disfavored treatment of individuals on the basis of their individual immutable characteristics. Def. Mem. at 25. However, Plaintiffs bring their equal protection claim under *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977). Under *Arlington Heights*, government actions may violate equal protection if a discriminatory purpose was one motivating factor, *id.* at 265-66, and Plaintiffs "need not plead or show the disparate treatment of other similarly situated individuals," *Pyke v. Cuomo*, 258 F.3d 107, 109 (2d Cir. 2001). Plaintiffs are not required to show that the decision to terminate TPS was "motivated solely by" racial animus, nor that animus "was the 'dominant' or 'primary'" purpose. *Arlington Heights*, 429 U.S. at 265. They need only plausibly plead direct or circumstantial evidence of discriminatory intent. *See Arce v. Douglas*, 793 F.3d 968, 977-78 (9th Cir. 2015).

### b. Neither Trump v. Hawaii Nor Reno v. AADC Applies Here.

Defendants argue that rational basis review applies here, and there was a rational basis for Secretary Duke's determination. Def. Mem. at 26-28. Defendants rely on a series of decisions holding the rational-basis standard applies to classifications made under federal immigration law. *Id.* at 26 (collecting cases). Defendants extensively discuss *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), the Supreme Court's recent decision which applied rational basis review in an Establishment Clause challenge to an executive order restricting entry of foreign nationals of particular countries. *Id.* at 26-27.

In *Trump v. Hawaii*, two factors informed the standard of review: 1) "plaintiffs [sought] to invalidate a *national security* directive regulating the *entry* of aliens abroad"; and 2) the

executive order was "facially neutral toward religion" and this required "prob[ing] the sincerity of the stated justifications for the policy by reference to extrinsic statements —many of which were made before the President took the oath of office." 138 S. Ct. at 2418 (emphasis added). These factors are not present in this case. First, Defendants here do not allege the determination in this case implicates national security concerns, a factor the Supreme Court stressed was critical in finding the rational basis standard applied in *Hawaii*. *Id.* at 2419-20. Second, the foreign nationals at issue in *Hawaii* were not in the United States. *Id.* at 2419. Here, every TPS holder was in the United States at the time Haiti's TPS status was designated or extended. 8 U.S.C. § 1254a(c)(1)(A)(i). It is without question that foreign nationals lawfully present in the United States are accorded greater Constitutional protections that those outside the United States. *Zadvydas v. Davis*, 533 U.S. 678, 693 (2001) ("The distinction between an alien who has effected an entry into the United States and one who has never entered runs throughout immigration law." (collecting cases)). Thus, this Court agrees with the courts in *Ramos* and *Centro Presente*—*Trump v. Hawaii*'s deferential standard does not affect the analysis of Plaintiffs' constitutional challenges to Haiti's TPS termination. *See Ramos*, 321 F. Supp. 3d at 1130 ("*Trump* did not address the standard of review to be applied under the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit from aliens lawfully present and admitted into the United States for reasons unrelated to national security or foreign affairs."); *Centro Presente*, 332 F. Supp. 3d at 410.

Defendants also argue *Reno v. Am.-Arab Anti-Discrimination*, 525 U.S. 471 (1999) ("*AADC*") requires Plaintiffs to meet a "particularly demanding" standard of showing by "clear evidence" that the TPS termination was based on "outrageous" discrimination. Def. Mem. at 3, 28. But *AADC* does not require such a showing here. In that case, Plaintiffs alleged the

19

Attorney General had unconstitutionally selected them for deportation "because of their affiliation with a politically unpopular group." *AADC*, 525 U.S. at 472. The Court applied a "particularly demanding" standard because plaintiffs' claims "invade[d] a special province of the Executive—its prosecutorial discretion" to choose to deport some people but not others. *Id.* at 489. The Supreme Court explained, "[a]s a general matter . . . an alien unlawfully in this country has no constitutional right to assert selective enforcement as a defense against his deportation." *Id.* at 488 (footnote omitted). However, the Court did not "rule out the possibility of a rare case in which the alleged basis of discrimination is so outrageous that the foregoing considerations can be overcome." *Id.* at 491. Here, the challenged action is not to a specific removal decision and does not implicate prosecutorial discretion. Therefore, *AADC*'s "outrageous" standard does not apply here.

### c. *Plaintiffs Satisfy the Standard Set by Arlington Heights.*

In *Arlington Heights*, the Supreme Court reviewed plaintiffs' claims that the city's denial of a rezoning request was motivated by racial animus in violation of the equal protection clause of the fourteenth amendment. 429 U.S. at 258-59. The Court stated that most facially neutral decisions by legislators and administrators, including those that "result[ ] in a racially disproportionate impact," are subject only to judicial review to determine if the decision was "arbitrar[y] or irrational[ ]"—that is, rational basis review—"because legislators and administrators are properly concerned with balancing numerous competing considerations." *Id.* at 264-65. The Supreme Court explained, however, that "racial discrimination is not just another competing consideration," so "[w]hen there is a proof that a discriminatory purpose has been a motivating factor in the decision, this judicial deference is no longer justified." *Id.* at 265-66.

Under *Arlington Heights*, the Court may look beyond the stated reasons for the government action to determine "whether invidious discriminatory purpose was a motivating

20

factor." *Id.* at 266. Such examination "demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available," including: "the impact of the official action;" "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes;" "[t]he specific sequence of events leading up to the challenged decision;" any "[d]epartures from the normal procedural sequence;" any "[s]ubstantive departures . . . particularly if the factors usually considered important by the decisionmaker strongly favor a decision contrary to the one reached;" the "legislative or administrative history," including "contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports;" and finally, in "extraordinary instances," testimony of members "concerning the purpose of the official action." *Id.* at 266-68.

Plaintiffs have plausibly alleged an equal protection claim under the standard of *Arlington Heights*. Plaintiffs have alleged several instances of anti-Haitian and anti-immigrant comments made by President Trump. For instance, upon learning 15,000 Haitians had received visas in 2017, President Trump allegedly stated, "they all have AIDS." Am. Compl. ¶ 61. He also allegedly stated that once Nigerian immigrants had seen the United States, they would never go back to their "huts" in Africa. *Id.*

One week before the Federal Register Notice ending TPS for Haiti was published, President Trump allegedly asked aloud in a meeting with several U.S. Senators about a draft immigration plan regarding Haiti, among other countries in Latin America and Africa, "Why are we having all these people from shithole countries come here?" *Id.* ¶ 62. The President also allegedly asked specifically, "Why do we need more Haitians?" and insisted they be removed from an immigration deal. *Id.* In this same meeting, the President allegedly expressed his preference for more immigrants from places like Norway. *Id.*

Plaintiffs characterize these statements and other evidence as evidence of animus toward immigrants of color, and Haitians in particular. Am. Compl. ¶ 61. These allegations are more than sufficient to support a plausible inference of the President's animus based on race and/or national origin/ethnicity against non-white immigrants in general and Haitians in particular.

Defendants argue Plaintiffs fail to allege that Acting Secretary Duke personally harbored discriminatory animus that motivated the termination of Haiti's TPS. Def. Mem. at 3, 28. But Plaintiffs are not required to show that Acting Secretary Duke personally harbored discriminatory animus. As recently explained in another case in this district in the context of the decision to rescind Deferred Action for Childhood Arrivals (DACA), "[o]ur Constitution vests 'executive Power' in the President, not in the Secretary of DHS, who reports to the President and is removable by him at will." *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 279 (E.D.N.Y. 2018) (Garaufis, J.) (citing U.S. Const., art. II, § 1, cl. 1). "[L]iability for discrimination will lie when a biased individual manipulates a non-biased decision-maker into taking discriminatory action." *Id.* (collecting cases). Furthermore, *Arlington Heights* analysis considers not only the "contemporary statements by members of the decisionmaking body" but also more broadly "[t]he historical background of the decision" and "[t]he specific sequence of events leading up to the challenged decision." *Arlington Heights*, 429 U.S. at 267. Under the factors prescribed by *Arlington Heights*, including the combination of statements of animus by people allegedly involved in the decision-making process here and an allegedly unreasoned shift in policy, Plaintiffs have plausibly alleged that a discriminatory purpose was a motivating factor behind the decision to terminate TPS for Haiti.

Therefore, Defendants' motion to dismiss Count III, Plaintiffs' Equal Protection claim, is DENIED. Plaintiffs have also plausibly pled that Defendants' termination decision violated their

due process rights because, to the extent the decision violated the APA and/or equal protection guarantee, it did not involve pursuit of a legitimate governmental interest. Thus, Defendants' motion to dismiss Count II, Plaintiffs' Due Process claim, is DENIED.

## IV.     Defendants' Motion to Stay is Denied.

Defendants have also moved to stay this action pending final appellate review of the preliminary injunction in *Ramos*. This Court "has broad discretion to stay proceedings as an incident to its power to control its own docket." *Clinton v. Jones*, 520 U.S. 681, 706 (1997); *Landis v. N. Am. Co.*, 299 U.S. 248, 254 (1936); *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) ("As part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit." (citations omitted)). The factors courts use to decide when a stay is warranted are: "(1) the private interests of the plaintiffs in proceeding expeditiously with the civil litigation as balanced against the prejudice to the plaintiffs if delayed; (2) the private interests of and burden on the defendants; (3) the interests of the courts; (4) the interests of persons not parties to the civil litigation; and (5) the public interest." *In re HSBC Bank, N.A., Debit Card Overdraft Fee Litig.*, 99 F. Supp. 3d 288, 315 (E.D.N.Y. 2015) (Spatt, J.) (citations omitted). The burden is on the movant—here, Defendants—"to establish a clear case of hardship or inequity in being required to go forward." *Id.*

The Court declines to stay proceedings in this action. Plaintiffs have a strong interest in proceeding with this case in this Circuit, while the burden on Defendants in moving forward is minimal. The injunction issued in *Ramos* provides only preliminary relief to Plaintiffs and could be overturned at any time in the Ninth Circuit. Defendants have provided no compelling reasons why moving forward with this case would result in a clear case of hardship or inequity or result

in unnecessary litigation burdens on the federal government.  For these reasons, Defendants' motion to stay is DENIED.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss and motion for a stay are DENIED.  The Clerk of Court is directed to terminate the motion pending at ECF No. 58.

**SO ORDERED.**

s/WFK

HON. WILLIAM F. KUNTZ, II
United States District Judge

Dated: Brooklyn, New York
       December 14, 2018