UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____

PATRICK SAGET,                )Case No.

et al.,                       )18-cv-01599-WFK-ST

   Plaintiffs                 )

vs.                           )

DONALD TRUMP, President       )

of the United States          )

et al.,                       )

   Defendants                 )

_____


Videotaped Deposition of Kathryn Anderson

Washington, D.C.

December 13, 2018

10:11 a.m.


Reported by:  Bonnie L. Russo

Job No. 448917


Magna Legal Services

866-624-6221

www.MagnaLS.com



Page 2

1    Videotaped Deposition of Kathryn Anderson held

2    at:

3

4

5

6              Mayer Brown, LLP

7              1999 K Street, N.W.

8              Washington, D.C.

9

10

11

12

13

14

15

16

17

18

19   Pursuant to Notice, when were present on behalf

20   of the respective parties:

21

22



```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
         VINCENT J. CONNELLY, Esq,
 3       JILL M. FORTNEY, Esq.
         MAYER BROWN, LLP
 4       71 South Wacker Drive
         Chicago, Illinois 60606
 5       312-701-7912
         vconnelly@mayerbrown.com
 6       jfortney@mayerbrown.com
 7
 8   On behalf of Defendants:
         JOSEPH A. MARUTOLLO, Esq.
 9       JAMES R. CHO, Esq.
         UNITED STATES DEPARTMENT OF JUSTICE
10       UNITED STATES ATTORNEY'S OFFICE
         CIVIL DIVISION
11       Eastern District of New York
         271 Cadman Plaza East
12       Brooklyn, New York 11201
         718-254-6288
13       joseph.marutollo@usdoj.gov
         james.cho@usdoj.gov
14
15
16
17
     Also Present:
18   Marcus A. Christian, Esq., Mayer Brown, LLP
     Brantley Webb, Esq., Mayer Brown, LLP
19   Glen Fortner, Videographer
20
21
22
```



```
 1                    C O N T E N T S
 2  EXAMINATION OF KATHRYN ANDERSON          PAGE
 3  BY MR. CONNELLY                          11
 4
 5
                       EXHIBITS
 6
 7  Exhibit 1   Section 1254a Temporary      25
                Protected Status
 8
    Exhibit 2   Extension and Redesignation  47
 9              of Haiti for Temporary
                Protected Status
10              5-19-11
11  Exhibit 2A  Extension and Redesignation  49
                of Haiti for Temporary
12              Protected Status
                1-21-10
13
    Exhibit 4   E-Mail Chain                 55
14              dated 4-10-17
                CP_00011216
15
    Exhibit 5   Extension of the Designation 69
16              of Haiti for Temporary
                Protected Status
17              10-1-12
18  Exhibit 6   Extension of the Designation 72
                of Haiti for Temporary
19              Protected Status
                3-3-14
20
    Exhibit 7   Extension of the Designation 75
21              of Haiti for Temporary
                Protected Status
22              8-25-15
```



```
 1    EXHIBITS (CONTINUED):
 2    Exhibit 8    Temporary Protected Status:    87
                   Calendar Year 2016
 3                 Annual Report
                   DPP_00000395-436
 4
      Exhibit 9    Haiti:  TPS Addendum          93
 5                 2-7-17
                   DPP_00008521-523
 6
      Exhibit 10   E-Mail Chain                  111
 7                 dated 2-7-17
                   CP_00011167-68
 8    Exhibit 10A  E-Mail Chain                  118
                   dated 2-23-17
 9                 DPP_00018582-585
10    Exhibit 11   E-Mail Chain                  132
                   dated 4-3-17
11
      Exhibit 12   E-Mail Chain                  143
12                 dated 3-29-17
                   CP_00012164-165
13
      Exhibit 13   Typewritten Notes             164
14                 DPP_00013063-064
15    Exhibit 14   E-Mail Chain                  181
                   dated 4-7-17
16                 CP_00010782-783
17    Exhibit 15   E-Mail Chain                  186
                   dated 4-27-17
18                 DPP-00003286-3296
19    Exhibit 16   E-Mail Chain                  193
                   dated 4-14-17
20                 DPP_00018751
21    Exhibit 18   E-Mail Chain                  201
                   dated 4-30-17
22                 Attachment
```



```
 1    EXHIBITS (CONTINUED):
 2    Exhibit 21  E-Mail Chain                   215
                  dated 5-8-17
 3                CP_00007859-872
 4    Exhibit 22  E-Mail Chain                   220
                  dated 5-12-17
 5                CP_00013016-017
 6    Exhibit 23  E-Mail Chain                   225
                  dated 5-15-17
 7                CP_00011564-566
 8    Exhibit 25  E-Mail Chain                   233
                  dated 5-20-17
 9                CP_00008090-8097
10    Exhibit 27  Extension of the Designation   246
                  of Haiti for Temporary
11                Protected Status
                  5-24-17
12
      Exhibit 28  E-Mail Chain                   328
13                dated 5-25-17
                  CP_00009691-693
14
      Exhibit 29  E-Mail Chain                   334
15                dated 6-7-17
                  DPP_00010924-926
16
      Exhibit 30  E-Mail Chain                   347
17                dated 6-7-17
                  CP_00020560-563
18
      Exhibit 31  E-Mail Chain                   351
19                dated 7-18-17
                  DPP_00010880-881
20
21
22
```



```
                                                              Page 7
 1    EXHIBITS (CONTINUED):
 2
      Exhibit 34  Termination of the Designation 364
 3                of Haiti for Temporary
                  Protected Status:  Automatic
 4                Extension of Employment
                  Authorization Documentation
 5                for TPS Haiti
                  DPP_00021948-969
 6
      Exhibit 36  E-Mail Chain                   365
 7                dated 10-13-17
                  DPP_0003323-3329
 8
      Exhibit 37  E-Mail Chain                   369
 9                dated 10-13-17
                  CP_00003462-3468
10
      Exhibit 38  E-Mail Chain                   373
11                dated 10-13-17
                  DPP_00021118
12
      Exhibit 39  E-Mail Chain                   381
13                dated 10-19-17
                  DPP_00011673-676
14
      Exhibit 40  E-Mail Chain                   385
15                dated 10-22-17
                  DPP_00003336
16
      Exhibit 40A E-Mail Chain                   390
17                dated 10-23-17
                  CP_00029539-545
18
      Exhibit 41  E-Mail Chain                   391
19                dated 11-2-17
                  DPP_00022248-249
20
      Exhibit 42  E-Mail Chain                   394
21                dated 11-20-17
                  DPP_00011273-274
22
```



```
                                                        Page 8
  1    EXHIBITS (CONTINUED):

  2

       Exhibit 50  Handwritten Notes                    101
  3               Anderson_00007

  4    Exhibit 51  Handwritten Notes                    102
                  Anderson_00008-11
  5

       Exhibit 52  Handwritten Notes                    102
  6               Anderson_00012-18

  7    Exhibit 53  Handwritten Notes                    105
                  Anderson_00001-6

  8

  9

 10

 11

 12

 13

 14

 15    (Exhibits included with transcript.)

 16

 17

 18

 19

 20

 21

 22
```



Page 9

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.

 5              This begins Videotape 1 in the

 6    deposition of Kathryn Anderson in the matter of

 7    Patrick Saget, et al., v. Donald Trump, U.S.

 8    Department of Homeland Security, et al., in the

 9    United States District Court for the Eastern

10    District of New York.

11              Today's date is December 13th, 2018.

12    And the time is 10:11.

13              This deposition is being taken at

14    Mayer Brown, LLP, at the request of Mayer

15    Brown.

16              The videographer is Glen Fortner of

17    Magna Legal Services.

18              And the court reporter is Bonnie

19    Russo of Magna Legal Services.

20              Will counsel and all parties present

21    state their appearance and who they represent.

22              MR. CONNELLY:  Vincent Connelly of
```



Page 10

```
 1   the law firm Mayer Brown representing the

 2   plaintiffs.

 3           MS. FORTNEY:  This is Jill Fortney

 4   of the law firm Mayer Brown representing the

 5   plaintiffs.

 6           MR. CHRISTIAN:  Marcus Christian of

 7   the law firm Mayer Brown representing the

 8   plaintiffs.

 9           MS. WEBB:  Brantley Webb, Mayer

10   Brown, on behalf of the plaintiffs.

11           MR. MARUTOLLO:  Joseph Marutollo

12   from the U.S. Attorneys Office on behalf -- on

13   behalf of the government.

14           MR. CHO:  James Cho, also with the

15   U.S. Attorney's Office, on behalf of the

16   government.

17           MS. AFANEH:  Tahani Afaneh, with the

18   Department of Homeland Security on behalf of

19   the government.

20           MS. SHAH:  Liza Shah with the United

21   States Citizenship and Immigration Services for

22   the government.
```



1          THE VIDEOGRAPHER:  The court

2    reporter will please swear in the witness.

3

4              KATHRYN ANDERSON,

5          being first duly sworn, to tell the

6    truth, the whole truth and nothing but the

7    truth, testified as follows:

8

9      EXAMINATION BY COUNSEL FOR PLAINTIFF

10         BY MR. CONNELLY:

11    Q.    Good morning.

12    A.    Good morning.

13    Q.    Would you please tell us your name.

14    A.    Kathryn Anderson.

15    Q.    And, Kathryn, where -- with -- for

16   whom do you work?

17    A.    At the Department of Homeland

18   Security, U.S. Citizenship and Immigration

19   Services.

20    Q.    How long have you worked with that

21   agency?

22    A.    I started with -- I'll call it



Page 12

1   USCIS -- in 2011.

2       Q.    Okay.  And I don't want a home -- I

3   don't want a home address, but would you tell

4   me where your residence is?

5       A.    In Washington, D.C.

6       Q.    Okay.  You have -- you're a lawyer;

7   is that correct?

8       A.    Correct.

9       Q.    All right.  Have you ever

10  participated in depositions before, either, you

11  know, in taking, defending or serving as a

12  witness?

13      A.    I've participated in taking and

14  defending but never served as a witness.

15      Q.    Okay.  Well, I won't spend too much

16  time on the preliminaries.  But if -- you know,

17  particularly if there's something I ask you

18  that's confusing, tell me.

19      A.    Okay.

20      Q.    Because otherwise the record will

21  obviously -- your answer will reflect, you

22  know, the presumption that you understand the



1    question.

2              Any time you want to take a break,

3    feel free to do so.

4              I think that's all I need to tell

5    someone who's -- who's been through the process

6    before.

7              Why don't you give me -- let's --

8    let's just go back to college.

9              Where did you go to college?

10   A.     The University of Notre Dame.

11   Q.     Oh.  And what -- what -- what year

12   did you graduate?

13   A.     2003 for undergrad.

14   Q.     Okay.  And from there what did you

15   do before -- or maybe went -- you went directly

16   to law school?

17   A.     I went straight to law school, also

18   at the University of Notre Dame.

19   Q.     And graduated when, '06?

20   A.     Correct.

21   Q.     From there what did you do before

22   joining your present position?


MAGNA
LEGAL SERVICES

Page 14

1      A.      I worked for a law firm that at that

2  time was called Baker & Daniels in South Bend,

3  Indiana.

4      Q.      All right.  For how long a period of

5  time?

6      A.      I was there until 2010.

7      Q.      What -- what was your practice area?

8      A.      Business litigation, a little bit of

9  white collar crime defense.

10     Q.      Any immigration or anything that,

11 you know, was related to your -- I mean similar

12 to what you're currently doing with the

13 government?

14     A.      Sure.  I had a couple of pro bono

15 asylum cases.

16     Q.      From -- do you happen to recall

17 where -- where were those people from?

18             MR. MARUTOLLO:  Objection.

19             You can answer.

20             THE WITNESS:  Africa and Central

21 America.

22             BY MR. CONNELLY:



Page 15

```
 1       Q.    And after your stint -- well, why
 2   don't you just walk me through.
 3             When you -- when you left the South
 4   Bend firm, where did you do?
 5       A.    Sure.  I took on a volunteer
 6   position with the Mennonite Voluntary Service.
 7   I moved to New York City for that.  And my
 8   placement for the Mennonite Voluntary Service
 9   was with World Vision International, their
10   United Nations office.
11       Q.    You were acting in a legal capacity
12   for them?
13       A.    No.
14       Q.    How long did you stay with that
15   organization?
16       A.    The volunteer stint was one year.
17       Q.    And just, in ten words or less, what
18   -- what -- what did you do during that time?
19       A.    Sure.  I did policy and advocacy
20   work to the United Nations on behalf of World
21   Vision.
22       Q.    And what -- what is -- what is
```



Page 16

1    the -- kind of the purpose of World Vision?

2         A.    Sure.   They focus on humanitarian

3    aid and development work around the world with

4    a particular focus on children.

5         Q.    After that one-year voluntary work,

6    what did you do?

7         A.    That's when I got the position with

8    USCIS.

9         Q.    In -- here in Washington?

10        A.    No.   That was in New York.

11        Q.    And so we have a kind of cleaner

12   record, so what -- what year now are we talking

13   about when you joined USCIS?

14        A.    We're in 2011.

15        Q.    Okay.   Why don't you brief -- very

16   briefly kind of walk me through.   Because

17   obviously you're going to have a geographic

18   change.   I don't know whether you'll have a

19   title change.

20             Tell me, you know, what you -- what

21   the -- your progress is within the

22   organization.



1      A.     Sure.  So I started in the New York

2   asylum office -- this was in 2011 -- as an

3   asylum officer.  I was there for about a year

4   and a half before I transferred to the Newark

5   asylum office, also still as an asylum officer.

6   So I was there for about another year and a

7   half.

8            And that's when I moved to D.C. and

9   got a position at USCIS headquarters in the

10  office of policy and strategy.

11     Q.     And was the move to D.C. -- I'm

12  adding up your -- your one and a half years

13  plus one and a half years -- that's 2014?

14     A.     It was early 2014.

15     Q.     Okay.  Going back just for a moment.

16            What -- what are the -- what were

17  your responsibilities and duties as an asylum

18  officer, rather, in New -- in New York or in

19  Newark?

20     A.     Sure.  In both offices I interviewed

21  applicants for asylum and adjudicated their

22  cases.  Also in the New York office I



1    interviewed credible fear cases as well.

2       Q.    I'm sorry.  I missed it.

3             Credible?

4       A.    Credible fear.

5       Q.    Explain that for me.

6       A.    Sure.  The process for people who

7    are in the expedited removal process.  So maybe

8    somebody who comes in through the southern

9    border, doesn't have documents to enter, and is

10   placed in a expedited removal process.  If they

11   claim a fear of return to their country of

12   nationality, our laws prescribe that the asylum

13   division screens them to see if they have a

14   credible fear of persecution.

15      Q.    Okay.  And I -- I'm sorry.  If you

16   gave me your title, I missed it.

17            When you moved to Washington, what

18   was your position?

19      A.    So my initial position was policy

20   analyst.

21      Q.    What did you do in that capacity?

22      A.    So I was a policy analyst in the



1   international and humanitarian affairs division

2   of the USCIS office of policy and strategy.

3   And in that role, I worked on policy issues

4   related to humanitarian immigration benefits

5   for USCIS.

6       Q.    How long did you remain a policy

7   analyst?

8       A.    I was in the policy analyst role

9   until I think about the fall of 2015 when I

10  became acting chief of that same division.

11      Q.    Let me momentarily retreat, although

12  I will try to stay on --

13      A.    Sure.

14      Q.    -- sequential, chronological,

15  unilateral questions.

16            What prompted your decision to move

17  from Newark, where you were an asylum officer,

18  down to Washington, where you became a policy

19  analyst?

20      A.    Sure.  I've always been interested

21  both in individual casework and working with

22  individuals and at the same time doing broader



1    policy work.

2            So in the asylum officer context, I

3    was interviewing people day after day.  And I

4    -- I loved that.  I loved meeting people and

5    making decision on their cases.

6            But I was also interested in -- in

7    getting a -- a higher-level policy perspective

8    as well.  So it was just -- I felt as though it

9    was the right time to -- to make that move.

10   Q.    Would -- would this -- would --

11   would the change to become a policy analyst be

12   perceived within the organization as a

13   promotion?

14   A.    Yes.

15           MR. MARUTOLLO:  Objection.

16           You can answer.

17           THE WITNESS:  Sorry.

18           BY MR. CONNELLY:

19   Q.    And now we're -- you've brought us

20   to the fall of 2015 when you're the acting

21   chief of that division.

22           How -- I assume that that expanded



Page 21

```
 1    your responsibilities in some fashion?

 2         A.    It did.  I took on a supervisory

 3    capacity and also took on responsibility for

 4    overseeing all of the work of the division as

 5    opposed to just my particular areas.

 6         Q.    How many people did you supervise?

 7         A.    It varied over the time that I was

 8    in that role.  I think anywhere from two to

 9    four or five.

10         Q.    Were the people that you supervised,

11    were they also lawyers?

12         A.    Some, but not all.  It's not a

13    requirement for that position.

14         Q.    And let's finish off.

15               Further titles and position since

16    the fall of 2015?

17         A.    Sure.  So I was acting as the chief

18    of the division from fall of 2015 until the day

19    that the administration changed.  So what was

20    that, January 2017, when the -- excuse me --

21    when the permanent chief of the division

22    returned from a detail that he had been on.  So
```



MAGNA
LEGAL SERVICES

1    at that point I became the deputy chief of the

2    division.

3        Q.    And who was the permanent chief who

4    returned?

5        A.    Brandon Prelogar.

6        Q.    And have you -- have you continued

7    to serve as deputy chief through today?

8        A.    No.  I --

9        Q.    Okay.

10       A.    -- took on a new position just over

11   two weeks ago.

12       Q.    Okay.  What's that?

13       A.    It's a senior advisor for the USCIS

14   refugee asylum and international operations

15   directorate.

16       Q.    I think that organization is one of

17   the acronyms that I'm going to ask you about

18   because --

19       A.    RAIO.

20       Q.    RAIO?

21       A.    Yes.

22       Q.    Yeah.



1          R-A-I-O?

2     A.    Yes.  Correct.

3     Q.    Okay.  Would you describe that as

4  a -- a promotion? a lateral move?

5          Or describe --

6     A.    I saw it as --

7     Q.    -- it any way you like.

8     A.    Sure.  I saw it as a promotion, yes.

9     Q.    Do you still remain in the same

10  physical location as you had been as a deputy

11  chief and acting chief?

12    A.    What do you mean "physical

13  location"?

14    Q.    I mean I just don't -- is your -- is

15  your -- are you new responsibilities now as

16  senior adviser -- do -- do you -- are you still

17  basically in the same building that you were in

18  previously?

19    A.    Oh, it's the same building, a

20  different floor.

21          MR. CONNELLY:  Okay.  I'm going to

22  start showing you some documents.  And I think



Page 24

```
 1    what we'll do is we'll just number them

 2    numerically, and we'll put your initials in

 3    front of them so that, as other deposition

 4    documents load up this case, it'll be a little

 5    bit easier to remember which ones we showed to

 6    you.

 7              MR. MARUTOLLO:  Excuse me for a

 8    moment.

 9              MR. CONNELLY:  Sure.

10              MR. MARUTOLLO:  For the sake of

11    clarity, can we also has attach them to the

12    transcript --

13              MR. CONNELLY:  Sure.

14              MR. MARUTOLLO:  -- when this is all

15    completed, just so we'll have it all in one

16    place?

17              MR. CONNELLY:  Sure.  Sure.

18    Absolutely.

19              So I'm going to -- I'm going to show

20    you what I believe to be a copy of the TPS

21    statute.

22              We'll make that KA-1.
```



Page 25

1          Let's go off the record for a

2   second.

3          THE VIDEOGRAPHER:  Off the record.

4          The time is 10:22.

5          (A short recess was taken.)

6          (Deposition Exhibit KA-1 was marked

7   for identification.)

8          THE VIDEOGRAPHER:  We're going back

9   on record.

10         The time is 10:24.

11         BY MR. CONNELLY:

12     Q.    Have you had a chance to look at

13   KA-1, which I'll suggest is a -- a copy of the

14   TPS statute?

15     A.    I have it in front of me.  I have

16   not reread the entire thing, but --

17     Q.    Okay.

18     A.    -- I see it.

19     Q.    Okay.  Do you have -- I mean is this

20   statute something that you are familiar with --

21     A.    Yes.

22     Q.    -- from your duties at CIS?



1          A.     Yes.

2          Q.     Okay.  If you could go to the second

3     page, which is numbered on the bottom as Page 2

4     of the statute.  And -- and in the lower part

5     of this page -- of the page you'll see in bold

6     there is designations.  And then under

7     "Designations" it begins "(1) In General."

8                Are -- are you there with me on

9     that?

10         A.     I see it, yes.

11         Q.     Okay.  My first question is this

12    statute references the attorney general

13    throughout the statute.

14         A.     Correct.

15         Q.     Okay?

16                From my current understanding -- but

17    I'm looking to you to be educated -- my sense

18    is that a lot of the decisions, you know, in

19    terms of both the termination and extensions of

20    TPS status, are made by the Department of

21    Homeland Security; is that correct?

22                MR. MARUTOLLO:  Objection.



Page 27

```
 1              You know, I -- the witness is

 2    testifying as a fact witness.  I object to the

 3    extent this is calling for some kind of legal

 4    conclusion.

 5              But you can answer the question.

 6              THE WITNESS:  Correct.  The

 7    decisions about TPS designations are made by

 8    the secretary of Homeland Security.

 9              BY MR. CONNELLY:

10    Q.    Okay.  And -- and if you know -- I

11    mean I -- I'm not -- I'm not, frankly, very

12    concerned about this -- you know, this --

13    the -- the titles.

14              But I'm curious is -- do you -- do

15    you know whether there -- there are other

16    statutes, or is there -- is there something

17    that the attorney general at some point

18    designated to the head of the Department of

19    Homeland Security making these decisions?

20              MR. MARUTOLLO:  Objection.

21              You can answer.

22              THE WITNESS:  I believe part of the
```



MAGNA ▶

LEGAL SERVICES

Page 28

1    Homeland Security Act of 2001 changed the

2    references in this statute to refer to the

3    secretary of Homeland Security instead of the

4    attorney general.

5              MR. CONNELLY:  Okay.

6              THE WITNESS:  I think that citation

7    is in the Federal Register notices, if you need

8    it.  I don't know it.

9              BY MR. CONNELLY:

10   Q.    All right.  Okay.  Fine.

11             Also, because it's going to be --

12   inform, you know, some greater part of my

13   questions during the course of the day, if you

14   would just follow along with me, where we're

15   at, there are not -- there are three

16   subsections, (A) then (B) and then (C), which

17   spills over to Page 3.

18             Do you see those?

19   A.    I see.

20   Q.    Yeah.  And again, I'm not -- I'm

21   going to try to move things along.  But I don't

22   want to put any words your mouth.  So if what



Page 29

1  I -- what I suggest to you doesn't seem right,

2  just correct me.

3         It appears that those are the three

4  sections that indicate the kinds of things that

5  would occur in a country that might -- might

6  bring about the country, you know, having a TPS

7  designation; is that correct?

8         MR. MARUTOLLO:  Objection.  Again,

9  that calls for legal conclusion.  The law

10  speaks for itself.

11         But you can certainly answer the

12  question.

13         THE WITNESS:  I understand A, B and

14  C to be the three potential bases -- legal

15  bases for -- upon which a TPS designation could

16  be made.

17         BY MR. CONNELLY:

18  Q.   Okay.  And let -- let me just

19  broadly -- and I'll re-ask.

20         In the course of your duties at CIS,

21  have you become familiar with the concepts of

22  ongoing armed conflict; the concepts of



Page 30

```
 1    earthquake, flood, drought, epidemic or other

 2    environmental disaster; and the concepts of

 3    extraordinary and temporary conditions?

 4        A.    I'm very familiar in my work with

 5    these three sections, yes.

 6        Q.    Okay.  If we could just move down

 7    Page 3 just a little bit to near the bottom

 8    where, under (3), "Periodic review,

 9    terminations and extensions of designations."

10              Do you see that?

11        A.    I do.

12        Q.    And in the immediate large paragraph

13    under it, which begins by talking about at

14    least 60 days before the end of the initial

15    period of designation, the -- there will be a

16    determination about whether or not to extend.

17    I -- that -- that's paraphrasing.

18              But do you see where I'm at?

19        A.    I see where you're talking.

20        Q.    Okay.

21        A.    Yes.

22        Q.    Are you also familiar with the --
```



1    the concepts and the -- the review process or

2    the -- or the extension of a designation?

3              Has that -- has that been a part of

4    your duties?

5              MR. MARUTOLLO:  Objection.

6              You can answer.

7              THE WITNESS:  Yes.  I'm very

8    familiar with this section as well.

9              BY MR. CONNELLY:

10    Q.    Okay.  Let me ask, in this section,

11    parenthetically after the reference to the

12    attorney general, it states:  "After

13    consultation with appropriate agencies of the

14    government."

15              Do you see that?

16    A.    I do.

17    Q.    And if you go back just to the

18    previous page, under the Designation section

19    that we just briefly went through, that -- that

20    qualifier is also mentioned, exactly the same

21    phrasing:  "After consultation with appropriate

22    agencies of the government."



Page 32

1          See that?

2     A.    I see, yes.

3     Q.    Okay.  Would you tell me, from your

4  practical perspective, who does the head of the

5  Department of Homeland Security -- what

6  agencies does he or she consult with when

7  making the decisions either about designations

8  or extensions?

9          MR. MARUTOLLO:  Objection.  First,

10  it calls for speculation.  And it also calls

11  for legal conclusion.

12          But you can answer to the extent you

13  have knowledge of this as a fact witness.

14          THE WITNESS:  In my personal

15  experience and the work that I've done in the

16  office of policy and strategy, it's routine for

17  our office, the office of policy and strategy,

18  to begin consultations and have some level of

19  consultations with the Department of State

20  routinely on both initial designations for TPS

21  as well as extensions.

22          Beyond the Department of State, we



1   would reach out and consult with other agencies

2   as it may be relevant to a particular country

3   or the situation in that particular country.

4          For example, when the West Africa

5   countries were designated on the basis of

6   Ebola, we contacted and had discussions with

7   the CDC regarding their view of the safety for

8   nationals of those countries.

9          That's at my level and my

10  experience.  I don't know who the secretary

11  always reaches out to at the secretary's level.

12          BY MR. CONNELLY:

13     Q.    But you mentioned reaching out to

14  the State Department, correct?

15     A.    Correct.

16     Q.    Could you again, on a factual level,

17  on your personal knowledge level, illustrate

18  that for me or explain how there's an

19  interaction on occasion for either designation

20  or extensions between Department of Homeland

21  Security and Department of State.

22          MR. MARUTOLLO:  Objection.



Page 34

1           You can answer.

2           THE WITNESS:  The division that I

3    was in within the office of policy and strategy

4    kind of runs and coordinates TPS policy making

5    for USCIS.  And so it's the responsibility of

6    the -- I'll -- I'll call it IHAD, the

7    International and Humanitarian Affairs

8    Division.  It's the responsibility of IHAD to

9    start the review process, to kind of kick off,

10   I would say, the review process for any country

11   that's already designated when that time frame

12   comes up.

13          Similarly, if there's discussion of

14   a new initial designation, IHAD also kicks off

15   that process.

16          So as part of kicking off that

17   process, IHAD reaches out to PRM.

18          BY MR. CONNELLY:

19   Q.   Hang on for a second, again, to both

20   education me and to keep our record clean.

21          First, I-H-A-D, I-H-A-D, is -- that

22   is a -- that is a part of Department of



1    Homeland Security, correct?

2         A.    Correct.  That's --

3         Q.    Okay.  That's right.

4               And now who is -- who do they reach

5    out to?

6               You just -- you just mentioned an

7    acronym.

8         A.    Sure.  At the Department of State,

9    the bureau is PRM.  I think that's Population,

10   Refugees and Migration.

11        Q.    Okay.  And what is the purpose of

12   reaching out to -- going outside of Department

13   of Homeland Security to PRM, which is a part of

14   the Department of State?

15        A.    Historically PRM has coordinated the

16   TPS input and development of the State

17   Department's position on TPS designations.  So

18   they are the point of contact for the

19   Department of State for TPS.

20        Q.    And -- and -- and to what purpose is

21   there this outreach?

22               What is -- what is the information



Page 36

1    flow or what's the decision making process

2    between the agencies?

3         A.    Sure.

4              MR. MARUTOLLO:  Objection.  Vague.

5    Also, again, calls for legal conclusion.

6    Again, this is a fact witness.

7              So you can answer to the extent you

8    know.  But I instruct you to answer only to the

9    extent that you have personal knowledge of this

10   information.

11             THE WITNESS:  We reach out to the

12   Department of State to ask them if they have

13   any position on TPS designations.  But the

14   primary purpose is to get their input on

15   conditions in the country.  Because looking at

16   conditions in the country is a very important

17   part of both the TPS review process and initial

18   designations.

19             So they have inmate knowledge of

20   various countries around the world.  And so we

21   ask them for their input on reviewing country

22   conditions.



Page 37

```
 1              BY MR. CONNELLY:

 2      Q.    Who makes the final decision on

 3   whether a country -- a country will be

 4   designated or the TPS status?

 5      A.    The secretary --

 6              MR. MARUTOLLO:  Objection.

 7              THE WITNESS:  Sorry.

 8              MR. MARUTOLLO:  But you can answer.

 9              THE WITNESS:  The secretary of

10   Homeland Security.

11              BY MR. CONNELLY:

12      Q.    So is that also true for the final

13   decision on an extension of the designation?

14      A.    Yes.

15      Q.    In the course of your duties at CI

16   -- oh, let -- here.  Let -- let's -- let's

17   frame this a little bit better.

18              As of two weeks ago, in your new

19   job, do you remain involved in designations or

20   extension -- extensions of designations for

21   TPS?

22      A.    I don't believe that TPS policy
```



Page 38

1  making will be a part of my portfolio in my new

2  position.

3      Q.    Okay.  Prior to that time though,

4  during your -- your when you were with CIS in

5  Washington as of 2014, were you involved in

6  making decisions regarding either a designation

7  of a country or the extension of that

8  designation?

9          MR. MARUTOLLO:  Objection.  Vague.

10         You can answer.

11         THE WITNESS:  TPS policy making was

12  part of my portfolio during almost all of the

13  time that I worked in the office of policy and

14  strategy.

15         BY MR. CONNELLY:

16     Q.    All right.  And were there specific

17  occasions when you were a part of the process

18  trying to determine whether a country should be

19  designated for TPS status?

20     A.    Yes.

21     Q.    What -- and what exactly was your

22  role?



Page 39

1          What -- what -- what information did

2     you look at?  What information did you convey?

3          MR. MARUTOLLO:  Objection.  Compound

4     and -- and vague.

5          But You can answer.

6          THE WITNESS:  Okay.  Generally my

7     role typically was to kick off that process for

8     USCIS.

9          Let me take a step back.

10         MR. CONNELLY:  Sure.

11         THE WITNESS:  The way that the DHS

12    department kind of policy making works for TPS

13    is that USCIS is responsible for the

14    adjudication of TPS applications and therefore

15    is the primary agency that has equities in a

16    TPS designation.

17         So traditionally the director of

18    USCIS makes a recommendation to the secretary

19    of the Department of Homeland Security.  And

20    the initial package that goes to the secretary

21    is prepared by USCIS.

22         So my role for the office of policy



Page 40

1    and strategy was to pull that package together.

2    And so the initial steps would be to, as I

3    mentioned, reach out to the Department of State

4    to request country conditions; also to reach

5    out to the research unit within USCIS that also

6    prepared a country conditions report.

7              And then, once we received those

8    reports, review them, compile the information,

9    and draft the initial draft of the

10   recommendation memo that would go from the

11   director of USCIS to the secretary of Homeland

12   Security.

13   Q.    And was there a similar process

14   regarding extensions as opposed to the initial

15   designation?

16   A.    There's a similar process, yes, both

17   for initials and the review of currently

18   designated countries.

19   Q.    And again, you mentioned that there

20   was a package, as you've describe, for the

21   initial process.

22              Was there some kind -- kind of --



Page 41

1    similar package of information pulled together

2    for extensions?

3            MR. MARUTOLLO:  Objection.

4            Again, you can answer to the extent

5    as -- as your knowledge as a fact -- fact

6    witness.  You're not a 30(b)(6) witness.

7            MR. CONNELLY:  Yeah.

8            MR. MARUTOLLO:  But you can answer

9    to the extent, in your personal knowledge, you

10   know.

11           THE WITNESS:  There was typically a

12   similar package for both.

13           BY MR. CONNELLY:

14   Q.    Did you ever do what I'll call

15   primary research from -- from -- in your

16   position?

17           You mention the package of

18   information that came to your attention, and

19   then it ultimately moved up to the head of the

20   department.

21           Did -- did -- did you have a -- did

22   you have a role where you -- you brought in



Page 42

1    factual information beyond what was provided to

2    you in the package?

3              MR. MARUTOLLO:  Objection.  Vague.

4              You can answer.

5              THE WITNESS:  Not typically.

6              BY MR. CONNELLY:

7         Q.    Do you have any recollection of ever

8    doing so?

9         A.    There were certain occasions, yes.

10        Q.    Focusing on Haiti, do you have a

11   recollection of ever doing it, you know, on

12   either the Haiti designation or the Haiti

13   extensions?

14             MR. MARUTOLLO:  Objection.

15             You can answer.

16             THE WITNESS:  I think that with

17   Haiti there were some specific instances where

18   I looked into country conditions on my own.

19             BY MR. CONNELLY:

20        Q.    And again, we'll try to stay

21   chronological, but just so I have a -- kind of

22   a place maker, tell me, you know, to your best



Page 43

1    recollection when that occurred.

2        A.    I would say that that was probably

3    in the spring of 2017, for the most part.

4        Q.    All right.  Can you recall any other

5    instances in which you, you know, took, as you

6    described it, a look on, you know, your own for

7    any determinations or extensions beyond Haiti

8    in the spring of 2017?

9        A.    I mean let me say generally I viewed

10   part of my role as being aware of what was

11   going on in various countries around the world

12   to determine if we should even be looking at

13   certain countries for new TPS designations, et

14   cetera.

15          So actually, stepping back on Haiti,

16   I mean throughout the time that I was working

17   only the TPS portfolio, I would keep an eye on

18   what was going on in Haiti.

19          So actually, for example, in -- I

20   guess it would have been late 2016, Hurricane

21   Matthew hit Haiti.  And so I was watching that

22   personally, looking at the country conditions


MAGNA
LEGAL SERVICES

Page 44

1    to think about how that might impact TPS

2    designations.

3              And so especially any time that any

4    country was coming up for review, I would be

5    looking into country conditions.

6         Q.    The initial designation for Haiti

7    was based upon the 2010 earthquake; is that

8    correct?

9         A.    That's correct.

10             MR. MARUTOLLO:  Objection.

11             But you can answer.

12             THE WITNESS:  That's correct.

13             BY MR. CONNELLY:

14        Q.    Okay.  And then there were -- there

15   were a series -- and I'll -- I'll -- I'll show

16   them to you in a minute, but there were a

17   series then of extensions of that initial

18   determination; is that correct?

19        A.    Actually, the next decision that was

20   made was in 2011.  And I think it's important

21   to note that it was a redesignation --

22        Q.    Yes.



Page 45

1       A.      -- and extension of Haiti for TPS.

2       Q.      Okay?

3       A.      Following that 2011 redesignation

4    and extension, there were a series of

5    extensions.

6       Q.      All right.  And in that -- in that

7    2011 time frame as well as the subsequent

8    extensions, were current conditions reviewed as

9    a part of the process in -- in deciding whether

10   or not a redesignation and extension should be

11   granted?

12          MR. MARUTOLLO:  Objection.  The

13   decisions speak for themselves.  The witness

14   wasn't even working at USCIS for -- I believe

15   for half that period.  It calls for legal

16   conclusion.  Calls for speculation.

17          But with that caveat, and to your

18   personal knowledge, you can answer the

19   question.

20          THE WITNESS:  I started working on

21   the TPS portfolio in approximately late summer

22   or fall 2014 I believe.  So I don't have



1    personal knowledge of what happened before

2    then.

3              BY MR. CONNELLY:

4        Q.    Okay.  After at the time.  Let -- so

5    we'll just take it, you know, whatever

6    extensions occurred between 2014 through 2017.

7        A.    Could you ask --

8              MR. MARUTOLLO:  Can I get -- yeah.

9              I'm sorry.  Go ahead.

10             THE WITNESS:  Yeah.  Could you ask

11   the question again.  I'm sorry.

12             BY MR. CONNELLY:

13       Q.    To your recollection, were -- when

14   the extensions that -- that occurred between

15   2014 and 2017 for Haiti took place, was a part

16   of the process in making that determination to

17   take a look at the current conditions in Haiti,

18   during, you know, whatever year was in

19   question, be it 2014, '15 or '16?

20       A.    Yes.  Part of the review process was

21   to look at current conditions in Haiti.

22             MR. CONNELLY:  Okay.  I'm going to



Page 47

1    walk you through the redesignation in 2011 and

2    then some of the extensions that occurred

3    afterwards as the next series of documents.

4              THE WITNESS:  Okay.

5              MR. CONNELLY:  So we'll call the

6    first one that I will show you KA-2.

7              (Deposition Exhibit KA-2 was marked

8    for identification.)

9              THE WITNESS:  Thank you.

10             MR. CONNELLY:  I think I'm a little

11   ahead of myself.

12             BY MR. CONNELLY:

13        Q.    Do you have that before you?

14        A.    I do.

15        Q.    KA-2?

16             And if you still -- you -- and you

17   have the original document in front of you.

18             K -- KA-1 is the -- help me with the

19   acronym.

20             Is -- is this the FRN no -- or the

21   FRN for the initial designation of temporary

22   protective status --oh, I'm sorry.  I'm sorry.


MAGNA
LEGAL SERVICES

Page 48

1          Forget about everything I just said.

2     I'm -- I'm back on track now.

3          The first document I showed you was

4     just a general statute, correct?

5     A.    KA-1 is, yes, the TPS statute.

6     Q.    Yeah.  Okay.

7          KA-2, is this the official notice

8     that Haiti has been put on Temporary Protected

9     Status as of January 21, 2010?

10    A.    I'm just looking at this, but it

11    looks to be the redesignation in 2011.

12    Q.    I've got -- yeah.  We'll -- we'll --

13    we'll get on track.  We'll be okay with this.

14         I've got -- I've got -- what's

15    before you?

16         Just read the top of the document.

17    We'll get -- we'll get back on track.

18    A.    76FR29000-01.

19         MR. CONNELLY:  Ah.  Okay.  Okay.

20    Fine.  All right.

21         Do we have -- do we have copies of

22    the original?  Yeah.  Will you hand me this.



Page 49

```
1              Let -- let's -- I'm going to -- I'm

2    going to give you another document.  And we'll

3    call it 2A.

4              (Deposition Exhibit KA-2A was marked

5    for identification.)

6              THE WITNESS:  Thank you.

7              MR. MARUTOLLO:  So do you have

8    copies of that document?

9              MR. CONNELLY:  Oh, I'm sorry.

10             (Discussion off the stenographic

11   record.)

12             BY MR. CONNELLY:

13        Q.   And what -- what is document 2A?

14             (Discussion off the stenographic

15   record.)

16             THE WITNESS:  I'm sorry?

17             BY MR. CONNELLY:

18        Q.   What is document that we've -- we've

19   now labeled KA-2A?

20        A.   From the title, it appears to be the

21   federal register notice announcing Haiti's

22   designation for TPS in 2010.
```



Page 50

1      Q.    Okay.  And am I correct that, given

2   what you've told me about your own time at CIS,

3   this was done before you were in Washington,

4   correct?

5      A.    That is correct.

6      Q.    Okay.  If you wouldn't mind, if you

7   would go to the third page of the document.  In

8   bold type, about a quarter of the way from the

9   top, there is a question:  "Why is the

10   secretary designating Haiti for TPS?"

11          Do you see that?

12      A.    I do.

13      Q.    Did you ever have any reason, in the

14   course of your later duties, to become familiar

15   with this particular document?

16          MR. MARUTOLLO:  Objection.  Again,

17   you know, it's vague.  The witness is not a

18   30(b)(6) witness.

19          But you can answer the question to

20   the extent you became aware of this document.

21          THE WITNESS:  Yes.  I reviewed this

22   document in working on Haiti TPS.



Page 51

1        BY MR. CONNELLY:

2    Q.    And -- and explain that just a

3    little bit.

4         Why -- why was it useful for you to

5    go back and review this document in your lather

6    duties at CIS?

7    A.    It was helpful to look at this to

8    see the bases upon which the original decision

9    had been made, to see the country conditions

10   that were cited as the reason for the

11   designation.

12        And also we often generally used

13   previous federal register notices as the basis

14   for drafting future federal register notices.

15   Q.    Now let's go to the next doc --  the

16   document that you already have before you,

17   which we've labeled KA-2.

18        Tell me what that document is.

19   A.    So this looks to be the Federal

20   Register notice from 2011 announcing the

21   extension and redesignation of Haiti for TPS.

22   Q.    Okay.  And again, this was -- you



Page 52

1    weren't in Washington at the time of this

2    extension and redesignation; is that right?

3        A.    That's right.

4        Q.    But did you similarly draw on this

5    document in some capacity for your own work

6    once you were in Washington?

7            MR. MARUTOLLO:  Objection.

8            You can answer.

9            THE WITNESS:  I did -- I did review

10   this document, yes.

11           BY MR. CONNELLY:

12       Q.    For the same purposes as you've

13   already explained, that you had reviewed the

14   earlier one?

15       A.    Yes.

16       Q.    You made a point, and I appreciate

17   that this document is not merely an extension;

18   it's also a redesignation, correct?

19       A.    Correct.

20       Q.    And in -- in the first narrative

21   paragraph of the document on the first page,

22   does that explain what purpose is served by a



Page 53

1    redesignation as opposed to, you know, merely

2    having an extension?

3             MR. MARUTOLLO:  Objection.

4             Again, you're not a 30(b)(6)

5    witness.  You weren't drafting this document.

6    You're a fact witness.  It -- the document

7    speaks for itself.

8             But you can answer the question.

9             THE WITNESS:  I don't fully

10   understand the question.  I'm sorry.

11            BY MR. CONNELLY:

12     Q.    Okay.  I -- I -- let -- let's --

13   beyond this document -- but use it if it helps

14   you a little bit -- are -- are you, from your

15   own responsibilities, familiar with the

16   redesignation process?

17     A.    Yes.

18     Q.    And -- and what impact does that

19   have for -- let's -- we'll -- we'll use Haitian

20   -- Haitians as an example.

21            How is a redesignation process --

22   how does that impact Haitians who may be in the



Page 54

 1   United States who weren't in the United States

 2   at the time of the original designation?

 3            MR. MARUTOLLO:  Objection.  Calls

 4   for legal conclusion.

 5            And again, not -- you're not a

 6   30(b)(6) witness.

 7            But you can answer the question to

 8   the extent you're aware in your personal

 9   knowledge.

10            THE WITNESS:  One of the primary

11   functions of a redesignation, or distinctions,

12   I should say, as opposed to an extension, a

13   redesignation, because it is essentially just a

14   new initial designation, allows for the

15   secretary of Homeland Security to set a new

16   continuous residence and continuous physical

17   presence state for TPS beneficiaries, which

18   functions to potentially allow for people who

19   weren't originally eligible for TPS to apply

20   for TPS under the redesignation.

21            MR. CONNELLY:  All right.  I'm going

22   to give you the next document, which we're



Page 55

```
 1   going to label as K -- KA-4.

 2             (Discussion off the stenographic

 3   record.)

 4             (Deposition Exhibit KA-4 was marked

 5   for identification.)

 6             BY MR. CONNELLY:

 7       Q.   Take a moment to acclimate yourself

 8   to this one-page e-mail.

 9       A.   Thank you.

10       Q.   Is -- is this e-mail familiar to

11   you?

12             MR. MARUTOLLO:  But just make -- be

13   sure you've a chance to read the whole --

14             MR. CONNELLY:  Yeah, yeah.  No.  I'm

15   sorry.  No.  I didn't mean to jump on you.  No,

16   no.  Take your time and let me --

17             THE WITNESS:  I need some --

18             MR. CONNELLY:  Give me an

19   indication --

20             THE WITNESS:  -- additional time to

21   read it.  Yes.

22             MR. CONNELLY:  -- when you're --
```



Page 56

1              THE WITNESS:  Thank you.

2              MR. CONNELLY:  -- comfortable

3     answering questions.  Yeah.

4              THE WITNESS:  Okay.

5              BY MR. CONNELLY:

6        Q.    Okay.  Do you have a recollection

7     of -- of exchanging these e-mails?

8        A.    I don't have an independent

9     recollection apart from this document, but it

10    looks like I did.

11       Q.    But do -- let me ask you -- and

12    again, I -- you know, it's -- it's backing into

13    your comfort level.

14             Do you have any reason to think that

15    this e -- that this e-mail was not generated on

16    the times and dates that it indicates?

17       A.    No.

18       Q.    And is this -- was this an e-mail

19    that was on your government computer to the

20    government computer of Brook E. Hefright?

21             I probably just mispronounced her

22    last name.



Page 57

1      A.     It's a he, and it's Hefright.

2      Q.     Oh, okay.

3      A.     Yes.

4      Q.     Thank you.

5      A.     Yes.  I believe this was on our

6   government e-mails.

7      Q.     Okay.  And was this e-mail, you

8   know, generated in the ordinary course of

9   business?

10     A.     Yes.

11     Q.     Okay.  A long preface to -- but

12  to -- to acclimate you, we're going out of

13  sequence here a little bit only because what --

14  what I just showed you was the redesignation

15  and extension on -- in 2011.  And it appears

16  that this now April of 2017 e-mail exchange

17  references back to that document.

18     A.     That's my understanding.

19     Q.     Okay.  That -- I just -- as I say, I

20  wanted you to understand why we're -- we're

21  doing --

22     A.     Yes.



Page 58

```
1         Q.      -- what we're doing right now.

2                 All right.  So let's -- you know,

3    with all e-mail chains, we'll -- we'll find

4    this, you know, throughout -- the earlier one

5    is at the bottom, and then -- and -- and so

6    it's -- it's usually a good idea to start

7    there.

8                 So first let me ask you what was

9    your purpose in sending the e-mail to Mr.

10   Hefright who appears to be over in the State

11   Department?

12                MR. MARUTOLLO:  Objection.

13                You know, again, to the extent this

14   calls for internal government deliberations, I

15   would instruct you not to answer on the

16   deliberative process privilege.

17                To the extent you can answer based

18   on the text that's in front of you, you can

19   answer the question.

20                THE WITNESS:  From the e-mail chain,

21   it looks like he reached out to me with a

22   question.  So I was responding to him.
```



Page 59

1            BY MR. CONNELLY:

2      Q.    Okay.  And help me out now a little

3   bit.  Let's stay in his e-mail for a moment

4   with the acronyms.

5            He begins by saying:  "Our A/AS sent

6   back the Haiti TPS review package."

7            What is A/AS?

8            MR. MARUTOLLO:  Objection.

9            You know, answer to extent you know.

10  If you --

11           BY MR. CONNELLY:

12     Q.    If you know.  And, you know,

13  obviously, if you don't know, you'll tell me

14  that you don't know.

15     A.    My understanding of what he meant is

16  acting assistant secretary.

17     Q.    Do you happen to recall who that was

18  in April of 2017?

19     A.    I don't know.  It would have been

20  for the Bureau of Population, Refugees and

21  Migration.  I don't know who it was.

22     Q.    And -- and acting assistant



Page 60

1    secretary of state or of Homeland Security?

2         A.    I take it to mean of the Bureau of

3    Population, Refugees and Migration at the U.S.

4    Department of State.

5         Q.    Okay.

6         A.    It is definitely within state.

7         Q.    Okay.  All right.  And then moving

8    to the second sentence, he -- he -- I quote:

9    Reading the FRN for the 2011

10   extension/redesignation.

11             Do -- do you see that?

12        A.    The first paragraph?

13        Q.    First paragraph, second sentence.

14   Yeah.

15        A.    Yes.

16        Q.    Okay.  FRN is what?

17        A.    Federal Register notice.

18        Q.    Okay.  And would that -- would that

19   appear to be the document that I previously

20   showed you?

21             Is that a reference to that

22   document, or -- or -- or would it so appear?



Page 61

```
 1              MR. MARUTOLLO:  Objection.

 2              You can answer to the extent you

 3    know.

 4              THE WITNESS:  I believe it to be.

 5              BY MR. CONNELLY:

 6         Q.   Okay.  Okay.  And then further in

 7    that sentence -- and I'll quote it -- he -- he

 8    says:  "It looks like both were" -- "It looks

 9    like both were based on the same continuing

10    temporary and extraordinary conditions - that

11    is aftereffects of Hurricane Matthew."

12              Did you follow that?

13         A.   I see that.

14         Q.   Okay.  Am I correct that Hurricane

15    Matthew occurred in -- I think you've already

16    referenced this -- 2016?

17         A.   Yes.

18         Q.   Okay.  And the earthquake that

19    caused the original designation, that occurred

20    in 2010; is that correct?

21         A.   Correct.

22         Q.   Now, going to his second paragraph,
```



Page 62

1    he states:  "I've revised our AM."

2            What -- what is an AM?

3            MR. MARUTOLLO:  Objection.

4            You can answer to the extent you

5    know.

6            THE WITNESS:  I believe it to be

7    action memo.

8            BY MR. CONNELLY:

9    Q.    Okay.  And then further quoting,

10   again now from his second sentence in the

11   second paragraph:  "We don't want to speculate

12   that the cholera epidemic played into the

13   decision to redesignate since it's not cited in

14   the FRN.  But the institutional memory here in

15   PRM is that in 2011 people were looking at

16   conditions in Haiti through the lens of the

17   epidemic."

18           MR. MARUTOLLO:  Objection.

19           I'm not sure what -- what the

20   question is.

21           MR. CONNELLY:  No.  I -- I don't

22   have a question yet.  I just wanted to -- okay.



Page 63

1           BY MR. CONNELLY:

2      Q.    Were you able to follow along with

3   me --

4      A.    I see --

5      Q.    -- on that?

6      A.    -- that sentence, yes.

7      Q.    Okay.  And what is -- what is PRM?

8      A.    PRM is, as cited below here, Bureau

9   of Population, Refugees and Migration --

10     Q.    I see.  Okay.

11     A.    At the Department of State.

12     Q.    Okay.  All right.  Now, let's go up

13  to your reply.  And I don't know that I need to

14  read it to you.  But if you'll -- if you'll

15  read it to yourself and tell me when you're

16  ready for a question.

17     A.    Okay.

18     Q.    First, let me ask you,

19  chronologically, am I correct that the

20  earthquake occurred first, and the cholera

21  epidemic did not break out until some time

22  after the earthquake; is that correct?



Page 64

1            MR. MARUTOLLO:  Objection.

2            You can answer to the extent you're

3    aware in your personal capacity -- personal

4    knowledge.

5            THE WITNESS:  That is my

6    understanding.

7            BY MR. CONNELLY:

8    Q.    Okay.  And then you -- you indicate

9    -- am I correct that the cholera epidemic and

10   the public health concerns did play a big in

11   the 2011 redesignation?

12           MR. MARUTOLLO:  Objection.

13           Again, to the extent it calls for

14   internal government deliberations, I'd instruct

15   you not to answer under the deliberative

16   process privilege.

17           But to the extent you're talking

18   about this e-mail and about what you wrote in

19   this e-mail, you can answer the question.

20           THE WITNESS:  I did state in the

21   e-mail that the cholera epidemic and public

22   health concerns played a big role in the 2011



Page 65

1   redesignation.

2          BY MR. CONNELLY:

3      Q.    Yes.

4          And then on -- in your next sentence

5   did you also indicated that the redesignation

6   also cited the severe insecurity that was

7   still -- was -- still existed in certain camps?

8          MR. MARUTOLLO:  Objection.  First,

9   I -- I don't think that's exactly what was

10  written here.  But we would note, again, to the

11  extent this calls for internal government

12  deliberations, instruct the witness not to

13  answer.

14         She can certainly answer to the

15  extent -- based on this e-mail in front of us.

16         THE WITNESS:  I stated that the

17  redesignation cited the severe insecurity that

18  those still in camps were facing.

19         BY MR. CONNELLY:

20     Q.    Okay.  And is your view on the --

21  what you say in this e-mail, has it changed at

22  all?



Page 66

1              Does this remain your -- your

2       personal view, that the cholera epidemic and

3       the public health concerns and the severe

4       insecurity in the camps were a part of the

5       determination in 2011 to redesignate?

6              MR. MARUTOLLO:  Objection.  I'm

7       going to direct the witness not to answer that

8       question.  It calls for internal government

9       deliberations.  And -- and it would implicate

10      the deliberative process privilege.

11             But further, her personal view has

12      no bearing on this case.  So I'd instruct the

13      witness not to answer that question.

14             MR. CONNELLY:  I'm going to -- I'm

15      only going to slightly change the question.

16      Maybe your lawyer will continue not to want you

17      to answer it.

18             BY MR. CONNELLY:

19      Q.    Is what you stated, to your

20      knowledge, to Mr. Hefright on April 10th, 2017,

21      and your -- and your responsive e-mail

22      accurate?



Page 67

1          MR. MARUTOLLO:  I'm sorry.  Can you

2    repeat the question?

3          MR. CONNELLY:  Yeah.

4          BY MR. CONNELLY:

5    Q.    I -- I -- I would like to know

6    whether your -- your statement in your reply

7    e-mail that we're looking at -- is that -- does

8    that -- is that an accurate statement?

9          MR. MARUTOLLO:  Objection.  Again,

10   to the extent this calls for internal

11   governmental deliberations, I instruct the

12   witness not to answer under the deliberative

13   process privilege.

14         But given that clarification, you

15   can answer that question.

16         THE WITNESS:  I believe what I

17   stated in this e-mail accurately captures my

18   understanding of the 2011 redesignation.

19         BY MR. CONNELLY:

20   Q.    Okay.  Could you give me a -- a

21   sense of how many extensions or determination

22   decisions you've been involved in since coming



Page 68

1    to Washington in 2014?

2            MR. MARUTOLLO:  Objection.  Vague.

3            But You can answer.

4            THE WITNESS:  I'm not sure I can

5    easily break it down for extension or

6    terminations.  But in terms of TPS designation

7    decisions -- so initial designations,

8    extensions, determinations, et cetera -- I

9    would estimate probably around 15.

10           BY MR. CONNELLY:

11      Q.    I'm sorry.

12            1-5?

13      A.    Yes.

14      Q.    Okay.

15      A.    That's an estimate.  I --

16      Q.    Right?

17      A.    -- haven't counted.

18      Q.    Do you -- and do -- do you have a

19   recollection of what -- what countries were

20   involved in those determinations that you were

21   involved in?

22      A.    Sure.  It would have been -- because



Page 69

1    I worked on it for a number of years, it would

2    have been actually all the countries, you know,

3    that are currently designated for TPS.  They

4    would have come up for review, so I would have

5    worked on all of those.

6            Additionally, some countries that

7    are no longer designated, such Sierra Leone,

8    Liberia, Guinea.

9            MR. CONNELLY:  I'm going to show you

10   a short series of extension documents that I

11   don't think I'll have too many questions on.

12           The first one will be KA-5.

13           (Deposition Exhibit KA-5 was marked

14   for identification.)

15           THE WITNESS:  I see it.

16           BY MR. CONNELLY:

17   Q.    Ready?

18   A.    Yes.

19   Q.    Okay.  Are you familiar with this

20   document?

21           MR. MARUTOLLO:  Objection.

22           You can answer.  Again, this is



Page 70

1    before you worked at USCIS.  But you can answer

2    to the extent you became familiar with the

3    document.

4            THE WITNESS:  I believe I have seen

5    it before.  I'm not intimately familiar with

6    this one.

7            BY MR. CONNELLY:

8    Q.    Okay.  And is this document what

9    would be -- the acronym FRN would apply to it?

10   A.    Yes.

11   Q.    Okay.  And if you'll go to Page 3,

12   the format would appear to be similar to what

13   we've already seen where there was a bolded

14   title:  "Why is the secretary extending the TPS

15   designation for Haiti for TPS through July

16   22nd, 2014?"

17           See that section?

18   A.    I see it.

19   Q.    Okay.  And if you'll -- if you'll

20   turn the page, if you go down maybe four

21   paragraphs, there's a statement:  "Poor camp

22   conditions were exacerbated by steady rains in



Page 71

1    October 2010, which lead to flooding and

2    contributed to a deadly cholera outbreak."

3         Do you see that?

4    A.    I see.

5    Q.    Okay.  Did you ever -- to your best

6    recollection, in your -- in your individual

7    capacity, did you ever reference back to this

8    section explaining why the extension was being

9    made at this time?

10        MR. MARUTOLLO:  Objection.  First,

11   vague.  And also I'm not sure what it means by

12   "individual capacity."

13        But to the extent -- to your

14   personal knowledge you became aware of this or

15   you dealt with this issue, you can answer.

16        THE WITNESS:  I don't recall if I

17   ever looked back at this particular paragraph

18   in the 2012 FRN.

19        BY MR. CONNELLY:

20   Q.    All right.  And to make clear, when

21   I said "individual capacity" -- I know your

22   lawyer's been concerned that I'm trying to turn



Page 72

```
1    you in an ex -- into an expert, which -- which

2    is not -- which is not my intent.

3           By "individual capacity, I was

4    short-handing referencing back that you had

5    told us ten minutes or so ago that at least

6    some documents that existed prior to your

7    arrival in 2014, you -- you made some use of

8    them during your duties.

9           And I -- and I wondered whether this

10   was one -- one such document.

11   A.    As I mentioned, I believe that I

12   looked at this document at some point, yes.

13          MR. CONNELLY:  Okay.  Next I'll show

14   you KA-6.

15          (Deposition Exhibit KA-6 was marked

16   for identification.)

17          MR. MARUTOLLO:  Need some more

18   water?

19          THE WITNESS:  Yeah.  That'd be

20   great.

21          MR. MARUTOLLO:  Mind taking a

22   one-minute break to get some more water for the
```



Page 73

1   witness?

2           MR. CONNELLY:  Yeah, yeah.  Sure.

3           THE VIDEOGRAPHER:  We're going off

4   the record.

5           The time is 11:06.

6           (A short recess was taken.)

7           THE VIDEOGRAPHER:  Going back on the

8   record.

9           The time is 11:07.

10          BY MR. CONNELLY:

11      Q.    Is Document KA-6 the FRN for the

12  extension for Haiti for March 3rd, 2014?

13      A.    It looks to be.

14      Q.    Okay.  Did you have any involvement

15  in -- in -- in this process, or was it before

16  your time in Washington?

17      A.    This was before me.

18      Q.    If you would go with me to the

19  fourth page, again under that same, you know,

20  general rubric that seems to be used for these

21  FRNs, at the top of the page it says:  "Why is

22  the secretary extending the TPS designation for


MAGNA
LEGAL SERVICES

Page 74

1    Haiti through January 22nd, 2016?"

2         A.    I see it.

3         Q.    Okay.  Way at the bottom of the

4    page, and then it -- and then it spills over on

5    to page 5, first it references the January 2010

6    earthquake.  We've already established

7    that that -- that's when that occurred.

8              And then -- but then it makes a

9    reference to:  "In 2011 the Haitian economy

10   began to slowly recover from the effects of the

11   earthquake.  However, Tropical Storm Isaac and

12   Hurricane Sandy adversely affected the economic

13   recovery in 2012."

14             Do you see that?

15        A.    I do.

16        Q.    Okay.  And as a matter of calendar

17   logic, those events occurred after the

18   earthquake; is that right?

19        A.    Yes.

20        Q.    Do you recall whether you ever

21   referenced back to this particular document

22   after you became more actively involved in the



Page 75

1    process of designations or extensions?

2              MR. MARUTOLLO:  Objection.

3              But you can answer.

4              THE WITNESS:  I'm sure, again, I

5    looked at this at some point.

6              MR. CONNELLY:  All right.  Let's

7    move on to KA-7.

8              (Deposition Exhibit KA-7 was marked

9    for identification.)

10             BY MR. CONNELLY:

11        Q.    Is this the FRN for the extension of

12   the TPS designation for Haiti on August 25th,

13   2015?

14        A.    It does look to be.

15        Q.    Okay.  Now, that would have been

16   after you had taken over your position in late

17   2014; is that correct?

18        A.    I'm sorry.

19             What do you mean by position in

20   2014?

21        Q.    When you came to Washington as a

22   policy analyst?



Page 76

1       A.      Yes.

2       Q.      Okay.

3       A.      In August 2015 I would have been a

4  policy analyst.

5       Q.      Yeah.  Okay.

6               And did you -- did you participate

7  in gathering information leading to the

8  extension?

9               MR. MARUTOLLO:  Objection.

10              To the extent it calls for internal

11  government deliberations, I instruct you not to

12  answer.  But you could certainly testify about

13  if you gathered any information.

14              THE WITNESS:  I believe that I did.

15              BY MR. CONNELLY:

16      Q.      And to your best recollect, what was

17  your role in the process?

18      A.      I don't have a specific recollection

19  of this Haiti review.  But as I mentioned

20  earlier, generally my role in the process was

21  to kick off the gathering of country

22  conditions, review them, and draft the initial



1    memo.

2         Q.    And your memo would have been --

3    then traveled to -- to what office?

4         A.    Sure.  It would have worked its way

5    up through our office, the office of policy and

6    strategy.  And then it would have gone to the

7    director's office in USCIS and ultimately to

8    the secretary.

9         Q.    And am I right that your initial

10   memo would have been based, as you told us a

11   little bit earlier, on a -- a package of

12   information you previously described that would

13   be brought to your attention?

14              MR. MARUTOLLO:  Objection.

15              Again, to the extent it calls for

16   internal government deliberations, instruct you

17   not to answer.  To the extent you can answer

18   about generally what was part of that package,

19   you can answer the general subject matter.

20              THE WITNESS:  We generally, yes,

21   pulled the package together in our office.  So

22   that would have consisted of country conditions



1   provided by our research unit within USCIS as

2   well as the department of state recommendation

3   and then this, as I mentioned, draft

4   recommendation memo from the USCIS director to

5   the secretary of Homeland Security.

6           BY MR. CONNELLY:

7   Q.    If you'll go with me to Page 4 of

8   this document.  And again, the same section

9   spelling out:  "Why is the secretary extending

10  the TPS designation for Haiti through July

11  22nd, 2017?"

12          Are you with me on Page 4?

13  A.    I'm on Page 4, yes.

14  Q.    Okay.  And I will represent -- but

15  give yourself an opportunity to -- you know, to

16  review the information that's on Page 4 through

17  Page 5.

18          But is part of the -- part of the

19  conditions that are said to be prompting -- or,

20  well, a part of the redesignation and -- and

21  extension process the cholera epidemic?

22          MR. MARUTOLLO:  I would just ask the



Page 79

1   witness to take a moment to read --

2            MR. CONNELLY:  Yeah.  Yeah, please.

3            MR. MARUTOLLO:  -- page 4 and 5.

4            BY MR. CONNELLY:

5       Q.   I -- I could bring you -- I could

6   bring you to those sections if it's easier.  I

7   just don't want to -- if you'd -- if you'd

8   rather look at the entire page, you should feel

9   free.

10      A.   Are you looking at the

11  second-to-last paragraph on that page?

12      Q.   No.  Actually, let's -- I'll tell --

13  I'll you where I'm at.  The second paragraph on

14  the page mentions on the second line a cholera

15  epidemic.

16           Do you see that reference?

17      A.   I do.

18      Q.   And then, if you go down two

19  paragraphs to the paragraph that begins "While

20  the country continues," in the middle of that

21  paragraph there's a reference to:  "Most camps

22  lacking waste management services and adequate


MAGNA
LEGAL SERVICES

Page 80

1    sanitation facilities - leading to a high risk

2    of cholera transmission - and possessing

3    malnutrition rates," et cetera.

4              Do you see that?

5         A.    I do.

6         Q.    Okay.  And then I guess you --

7    you -- you may have spotted something a little

8    further down on the page that also references

9    the concerns with -- oh, yeah, I see --

10   cholera -- the -- the second-to-the-last

11   paragraph starts:  "As of December 2014, the

12   cholera epidemic has affected approximately"

13   725 -- "725,000 people and claimed over 8,800

14   lives in Haiti since October 2010."

15        A.    I see that.

16        Q.    Okay.  And it's -- it's -- it's a --

17   it's a calendar truth, is it not, that the --

18   the -- the cholera problem did not exist at the

19   moment of the earthquake; it came about after

20   the earthquake, right?

21              MR. MARUTOLLO:  Objection.

22              Again, to the extent you know in



Page 81

```
 1    your duties while at USCIS, you can answer the

 2    question.

 3              THE WITNESS:   My understanding is

 4    the cholera -- the cholera epidemic in Haiti

 5    began after the earthquake, yes.

 6              BY MR. CONNELLY:

 7    Q.    Okay.  And -- and am I correct

 8    that -- it seems patently obvious, but let me

 9    ask you -- that thinking about things --

10    current conditions such as the cholera

11    epidemic, it was entirely appropriate for the

12    secretary to consider those factors in the

13    extension of a determination that had

14    originally been made largely because of the

15    earthquake.

16              MR. MARUTOLLO:  Objection.  Again,

17    that calls for the fact witness's view.  She's

18    not a 30(b)(6) witness.  Calls for legal

19    conclusion.

20              So I'd instruct her not to answer

21    that question as -- as phrased.

22              BY MR. CONNELLY:
```



Page 82

1     Q.    Did you find -- and -- and -- and --

2  well, did you became -- I take it, because you

3  were involved in the process, ultimately you

4  saw -- you had a chance and -- and -- and saw

5  the FNR [sic] of August 25th, 2015, correct?

6  The document KA-7 that's before you?

7     A.    I worked on this document, yes.

8     Q.    Yeah.  Okay.

9           Did you find anything inappropriate

10 about the cholera epidemic being considered as

11 one of the factors for the extension?

12          MR. MARUTOLLO:  Objection.

13          To the extent that it calls for

14 internal government deliberations, I would

15 instruct you not to answer.  To the extent it's

16 about your understanding of certain factors,

17 you can answer -- in your own capacity you can

18 answer.

19          THE WITNESS:  I'm sorry.  Can you

20 repeat the question for me.

21          BY MR. CONNELLY:

22    Q.    Yeah.



Page 83

1              In your own capacity, but obviously,

2    you know, within -- with -- within your

3    official duties, did you think it was

4    appropriate that the cholera epidemic was

5    considered as one of the current conditions in

6    Haiti when making a decision about extending

7    the designation?

8              MR. MARUTOLLO:  Again, I would

9    instruct you not to answer to the extent it

10   calls for any internal government deliberations

11   on the grounds of deliberative process

12   privilege.

13             And it also calls for legal

14   conclusion about what is or is not appropriate.

15             So I'd instruct the witness not to

16   answer.

17             MR. CONNELLY:  We're going to stay

18   on this.  Or -- or something's going to happen,

19   and we'll -- somebody else will solve this

20   issue for me.

21             BY MR. CONNELLY:

22   Q.    In -- if you could bring yourself



Page 84

1    back to this time in -- which -- which

2    ultimately generates an FNR in August 2015,

3    correct?

4         A.    I'm sorry.  Is it -- 2015.  Yes.

5    Sorry.

6         Q.    Yeah.  Okay.

7               And we're -- and we're, again, in

8    this, you know, section that's formatted into

9    the extensions, giving the reason why an

10   extension should be granted, correct?

11        A.    Correct.

12        Q.    And would you agree with me that

13   among the reasons that are given for the

14   extension are repeated references to a cholera

15   epidemic?

16              MR. MARUTOLLO:  Object --

17              BY MR. CONNELLY:

18        Q.    Can we agree on that?

19              MR. MARUTOLLO:  Objection to the

20   extent the document speaks for itself.

21              But yes, you can answer the

22   question.



Page 85

1          THE WITNESS:  Yes.

2          BY MR. CONNELLY:

3     Q.    Okay.  Is that -- is -- is -- from

4  your perspective as someone involved in this

5  process, was it appropriate to think about

6  current conditions that existed in Haiti

7  subsequent to the January 2010 earthquake?

8          MR. MARUTOLLO:  Objection.

9          To the extent it calls for internal

10  government deliberations, I would instruct you

11  not to answer.  However, to the extent it's

12  from your perspective, you -- and as raised by

13  counsel, you can -- you can answer that

14  question.

15          THE WITNESS:  Yes.  I believe that a

16  review of currently existing conditions in the

17  country designated for TPS is an important part

18  of considering whether the designation should

19  be extended or terminated.

20          BY MR. CONNELLY:

21     Q.    All right.  And -- and currently

22  existing conditions would not necessarily have



Page 86

1    existed at the time of the initial designation,

2    correct?

3              MR. MARUTOLLO:  Objection.

4              You can answer.

5              THE WITNESS:  Yes.  Current

6    conditions would not have necessarily existed

7    at the time of the initial designation.

8              MR. CONNELLY:  I'll stay on the

9    record.

10             And -- and -- and your lawyer should

11   and has the perfect right to try to make sure

12   that you're -- you know, that you don't answer

13   questions that -- that are -- that are

14   privileged.  I -- I -- I'm not trying to break

15   through that privilege.

16             I'm -- I'm never seeking to have you

17   tell me about some deliberative process that

18   took place between you and others, you know,

19   inside -- inside the government, although some

20   of your e-mails you'll -- we'll see about, you

21   know, whether you would quarrel with that.

22             But when I'm asking you these



Page 87

1    questions, I -- I don't want you to tell me,

2    "Well, somebody told me this," or, "I" -- you

3    know, or, "Some" -- "Someone told me that."

4              I'm -- I'm simply trying to probe

5    what you -- within your own responsibilities

6    and doing your own job, what kind of factual

7    information you considered or -- and considered

8    appropriate in making determinations about the

9    extensions or redesignations.

10             THE WITNESS:  Okay.

11             MR. CONNELLY:  So we'll go to the

12   next document, KA-8.

13             (Deposition Exhibit KA-8 was marked

14   for identification.)

15             BY MR. CONNELLY:

16   Q.    I'm going to be asking you about,

17   you know, a very narrow part of this document

18   relating to Haiti.  But acclimate yourself, and

19   then let me know --

20   A.    Sure.

21   Q.    -- when you're comfortable ask --

22   for me to ask questions.



Page 88

1      A.    You can direct me to a part if you

2  want.

3      Q.    Okay.  First let me point out that

4  the title page of this document is "Temporary

5  Protected Status:  Calendar Year 2016 Annual

6  Report, Report to Congress,"  and then "Insert

7  Date."

8           You see -- you see all that on the

9  title page?

10     A.    I do.

11     Q.    So that would certainly suggest to

12  me that this was -- somehow this was not --

13  this -- the document that I have is not

14  finalized.

15          Do you have any -- do you have any

16  independent recollection of this document?

17     A.    I do.

18     Q.    Okay.  And I -- and again, I -- I

19  apologize for -- I have what I've -- what --

20  what's available to me.

21          Do you recall whether this ever

22  became finalized or at least a -- a date was



Page 89

1    inserted for it?

2         A.    I believe that it was.  So I assumed

3    that it was a draft.  So I'm not sure which

4    draft this was.  But yes, I think that the

5    final report did go to congress.

6         Q.    Did you have a role in pulling

7    together this report?

8         A.    I reviewed and provided input, yes.

9         Q.    If you'll go to the fourth page in,

10   which is Roman numeral IV.  Or -- or the Bates

11   number on the bottom is 399.

12        A.    I see.

13        Q.    See that?

14        A.    Uh-huh.

15        Q.    And it indicates:  "The secretary

16   did not announce any TPS actions regarding

17   Haiti, as well as several other countries, in

18   calendar year 2016, although their existing

19   designations were ongoing through calender year

20   2016."

21             Is that -- did I read that

22   correctly?



Page 90

```
 1        A.    Yes.

 2        Q.    Okay.  And does that comport with

 3   your recollection of what occurred as far as

 4   Haiti's designation in 2016?

 5        A.    Yes.

 6        Q.    If you'll go a little -- why don't

 7   you skip a lot of pages but go to Page 24,

 8   which is also deposition No. 425 -- I'm

 9   sorry -- Bates No. 425 on the bottom.

10        A.    Okay.

11        Q.    And take a look at this for a

12   minute.  Because it -- it -- it covers a couple

13   of pages.  Acclimate yourself to it.

14        A.    Okay.

15        Q.    Did you have -- did you have a hand

16   in the process of pulling together this

17   information?

18              MR. MARUTOLLO:  Objection.

19              You can answer.

20              THE WITNESS:  I did review and

21   provide input for this report.

22              BY MR. CONNELLY:
```



Page 91

1      Q.    Do you recall -- and again, you may

2    want to slow down a little bit.

3           To -- to the best of your

4    recollection, is all of the information

5    contained in these two pages regarding the --

6    the circumstances in Haiti accurate?

7           MR. MARUTOLLO:  Objection.

8           Again, I'd first just instruct the

9    witness to read the full two pages.

10          But again, as -- in -- in your role,

11   if you can make that determination, then you

12   can answer the question.  Again, not as a

13   30(b)(6) witness but as a fact witness, if you

14   can -- if you believe that this information is

15   accurate, you can answer the question.

16          THE WITNESS:  I believe that the

17   country conditions stated here are supposed to

18   be an exact duplicate of what is in the Federal

19   Register --

20          MR. CONNELLY:  Okay.

21          THE WITNESS:  -- notice that we

22   looked at for 2015.  I -- unless you want me to



Page 92

1    do a line-by-line comparison, I don't want to

2    certify here that -- that they are exactly the

3    same.  But I think the idea was that this

4    section was supposed to be copied and pasted

5    from the Federal Register notice.

6              BY MR. CONNELLY:

7         Q.   Okay.  Well, and again, whether you

8    want to look at -- and again, I don't care -- I

9    don't -- I don't really care if they're a

10   mirror image.

11             But if you -- if you're more

12   comfortable taking a look at the information in

13   the -- in the FRN.  I would just like your

14   best -- best recollection, not based upon

15   deliberating with anyone else, whether the

16   information that's contained, whether it's in

17   the FRN or whether it's in the -- you know, the

18   document that you've before you, this -- this

19   summary of the circumstances in Haiti, as best

20   you recall, if it's accurate.

21             MR. MARUTOLLO:  Objection.

22             You can answer.



Page 93

```
 1              THE WITNESS:  I would say that we

 2   rely on a lot of people to pull together the

 3   country condition information and statistics

 4   about what is going on in Haiti at the time.

 5              So I can't personally speak to

 6   whether these -- each fact is -- is correct.

 7   But I believed it to be as accurate as we could

 8   get, which is why we relied upon it.

 9              MR. CONNELLY:  I'll go to KA-9.

10              (Deposition Exhibit KA-9 was marked

11   for identification.)

12              BY MR. CONNELLY:

13       Q.    Let me know when you've familiarized

14   yourself with the document.

15       A.    Okay.

16       Q.    All right.  This document apparently

17   was put out by the refugee asylum at

18   International Operations Research Unit; is

19   that -- is that correct?

20       A.    Yes.

21       Q.    And that is the part of CIS that you

22   recently joined a few weeks ago?
```



Page 94

1      A.      Not the research unit --

2      Q.      Well --

3      A.      -- but RAIO, the --

4      Q.      Okay.

5      A.      -- Refugee Asylum and International

6    Operations --

7      Q.      Okay.

8      A.      -- directorate.

9      Q.      All right.  And are -- are you

10   familiar with this document?

11              MR. MARUTOLLO:  Objection.

12              You can answer.

13              THE WITNESS:  I'm not entirely sure

14   if this is a draft or final, where this came

15   from.  But the general TPS addendum about

16   Hurricane Matthew provided by RAIO, yes.

17              BY MR. CONNELLY:

18     Q.      Okay.  Did you have any -- did you

19   have any role in generating this document?

20     A.      I wasn't involved in the drafting of

21   the document.  But the -- my recollection is

22   that we asked the research unit to provide an



Page 95

1    update on conditions in Haiti related Hurricane

2    Matthew.

3         Q.    Okay.  And as noted in the first

4    sentence, Hurricane Matthew occurred in October

5    2016, correct?

6         A.    Correct.

7         Q.    And this is the first time I'm

8    showing you a -- a document coming from RAIO.

9    And obviously, you know, it -- it indicates

10   that it's an -- it's a Haiti TPS addendum.  So

11   help -- help me understand.

12             How -- how frequently or perhaps not

13   frequently did RAIO, the research unit, provide

14   information as far as Haiti and its TPS status?

15             MR. MARUTOLLO:  Objection.

16             Again, to the extent you can answer

17   based on your knowledge as a fact witness, you

18   can answer.

19             THE WITNESS:  Usually the research

20   unit would provide information when our office

21   requested it of them.  So generally, throughout

22   the TPS review process, they would produce an



1    initial report related to the TPS designation.

2    And then, you know, if we needed updated

3    information, possibly because something

4    significant had happened in the country since

5    they had done their previous report, we would

6    ask them to update that information for us.

7              BY MR. CONNELLY:

8         Q.    Okay.  And again, just as a matter

9    of calendar, the hurricane occurred in October

10   2016, and this indicates last updated February

11   7th, 2017, correct?

12        A.    Yes.

13        Q.    Which would have been about 90 days,

14   a hundred days after the hurricane blew through

15   Haiti; is that correct?

16              I don't worry --

17        A.    Without doing --

18        Q.    -- about the math.

19        A.    -- the math, it was after.

20        Q.    Yeah.  Well --

21        A.    October to February.

22        Q.    Yeah.  Well, the -- and the reason I



Page 97

1    ask you that is I don't know whether that helps

2    at all in your recollect.

3            Is -- is it -- if you've a real

4    recollection.  I'm not trying to put words in

5    your mouth.

6            Is it -- is it that the RAIO, you

7    know, a reasonable time after the hurricane,

8    someone asked them to assess, okay, what's the

9    impact of Hurricane Matthew?  Tell us -- tell

10   us, you know, what the impact is in -- in Haiti

11   from the hurricane.

12   A.    We'd been closely watching the

13   impact of the hurricane since October 2016.

14   I'm not exactly sure, without having further

15   record of what prompted this particular update.

16           But my guess is that this was part

17   of the -- the TPS review process for Haiti.

18   And the existing report that RAIO had put out,

19   you know, didn't have this current information

20   about the hurricane.

21           And the recovery from the hurricane

22   continued to evolve.  So the information that



Page 98

1    was available in October 2016, you know, wasn't

2    the same as what the status was in February

3    2017.

4         Q.    All right.  And if you'll note --

5    and I -- and I -- in the third paragraph, it --

6    it --it indicates:  "However, it will likely

7    take Haiti years to recover from the damages of

8    Hurricane Matthew."

9         A.    I see that.

10        Q.    All right.  Let me ask a -- going

11   back to the first paragraph.  There's a

12   reference to the El Nino induced drought.

13             Do you see that?

14        A.    Okay.

15        Q.    Do you have -- do you recall --

16   when -- when did that occur?

17        A.    I don't know.

18        Q.    Do you know whether there was -- are

19   you able to tell me whether it occurred before

20   or after the January 2010 earthquake?

21        A.    I don't want to speculate.  I'm not

22   sure.



Page 99

1       Q.    Is it correct to say that Hurricane

2    Matthew was a subsequent environmental event

3    occurring after the January 2010 earthquake?

4              MR. MARUTOLLO:  Objection.  Vague.

5              But you can answer.

6              THE WITNESS:  Yes.

7              MR. CONNELLY:  Okay.  We're about to

8    go into some e-mails, which will occupy us for

9    a while.  And we don't have to take a break

10   right now.  I'm just -- I'm -- I'm just giving

11   you that just as a --

12             MR. MARUTOLLO:  Sure.  Why don't we

13   take a...

14             THE WITNESS:  I think that'd be

15   great.

16             MR. MARUTOLLO:  Do you want to take

17   a -- a --

18             MR. CONNELLY:  Whatever you --

19             MR. MARUTOLLO:  -- a short break and

20   then --

21             MR. CONNELLY:  Whatever you guys

22   need.



1            MR. MARUTOLLO:  -- come back --

2            MR. CONNELLY:  Sure.  Yeah.

3            MR. MARUTOLLO:  -- and have a lunch

4    break maybe after that?

5            MR. CONNELLY:  Yeah.  What -- what

6    do you guys want to do for -- I mean what would

7    you -- what's your preference for lunch?

8            THE VIDEOGRAPHER:  I'm just going to

9    take us off real quick.

10           MR. CONNELLY:  Oh.

11           THE VIDEOGRAPHER:  We're going off

12   the record.

13           The time is 11:32.

14           (A short recess was taken.)

15           THE VIDEOGRAPHER:  We're going back

16   on the record.

17           The time is 11:41.

18           MR. CONNELLY:  Before we get to some

19   e-mails, I'm going to show you a copy of

20   handwritten documents that I believe are yours.

21   But you'll -- you -- you can help confirm that.

22           The first one is going to be --



MAGNA ▶
LEGAL SERVICES

Page 101

1    let's make this KA-50.

2              (Deposition Exhibit KA-50 was marked

3    for identification.)

4              (Discussion off the stenographic

5    record.)

6              THE WITNESS:  Thank you.

7              BY MR. CONNELLY:

8        Q.    Is that your handwritten note?

9        A.    Yes.  It looks to be.

10       Q.    Okay.  I'm going to show you a -- a

11   further series, just to see if you can confirm.

12   And I hadn't seen these until yesterday, so

13   help me out a little bit.

14             When -- when was this -- when was

15   KA-50 generated?

16       A.    It looks like I dated it at the top

17   5-31-17.

18       Q.    Okay.

19       A.    So I think that that was the date

20   that I wrote this.

21             MR. CONNELLY:  And -- well, let

22   me -- let me give you the next one.  I'll give



1    you KA-51.

2             (Deposition Exhibit KA-51 was marked

3    for identification.)

4             BY MR. CONNELLY:

5        Q.    Is this also your handwritten note?

6        A.    Yes.

7        Q.    And I'm giving you these in the

8    order of the Bates numbers on the bottom.

9    You'll see the first -- the KA-50 is Anderson

10   7, and KA-51 is a couple of pages.  It's

11   Anderson 8 through 10.  Okay?

12       A.    Okay.

13       Q.    Do you know when you generated

14   KA-51?

15       A.    I think that these are my notes from

16   a media background call related to the Haiti

17   TPS decision in May 2017.

18             To the best of my recollection, I

19   think they were probably May 20th, 2017, but

20   I'm not 100 percent certain on the exact day.

21             MR. CONNELLY:  I'll give you KA-52.

22             (Deposition Exhibit KA-52 was marked



Page 103

1    for identification.)

2           BY MR. CONNELLY:

3    Q.    And this document runs several

4    pages.  The Bates numbers are Anderson 12

5    through Anderson 18.

6           Do you recall when you generated

7    these -- well, first confirm for me that these

8    are all your notes, and then if you can tell me

9    when you think you generated them.

10   A.    They do look to be my notes.  And I

11   believe these were notes from a general TPS

12   meeting with Secretary Kelly.  I think that was

13   held a few days following the May 2017 Haiti

14   decision announcement.

15          And to the best of my recollection,

16   I would put this at May 23rd, 2017.

17   Q.    I'm sorry.  I thought you said that

18   you -- maybe I didn't follow.  I thought you

19   said that you thought these were generated

20   after the announcement.

21          If the announcement was May 27th, I

22   missed -- then how would it be May 23rd?



1      A.      I guess I was recalling that the

2   secretary's announcement was May 20th.

3      Q.      Okay.

4      A.      But that could be mistaken on the

5   exact dates.

6      Q.      And I didn't -- and I don't mean to

7   confuse you, but do -- your -- your best

8   recollection is that the -- the notes on KA-52

9   were generated shortly after the late May

10  announcement by Secretary Kelly of the

11  extension?

12     A.      Yes.  After DHS had made the -- the

13  public announcement of the decision.  Not

14  necessarily after the federal register notice

15  published.  Maybe that's the confusion about

16  the announcement date.

17     Q.      Okay.  And I see on these notes --

18  we'll -- we'll explore these, as I say.  We'll

19  -- I'll -- I'll fold these into your -- the --

20  my -- my outline when we get to these dates.

21          But on this page the, at least on

22  the first page, most of the points are -- are



Page 105

1    preceded by an asterisk.

2             Do you see that?

3    A.    I do.

4    Q.    Does that have -- what -- does that

5    have any import, or what -- what does that

6    convey when you're taking your notes?

7    A.    I'm not entirely sure.  I think that

8    was just kind of separate and distinct

9    thoughts, kind of bullet point ideas to

10   separate them from each other.

11            MR. CONNELLY:  Next I'll have you

12   look at KA-53.

13            (Deposition Exhibit KA-53 was marked

14   for identification.)

15            BY MR. CONNELLY:

16   Q.    These are actually -- according to

17   the Bates stamping, these are Anderson 1

18   through 5.  I don't know whether that'll help

19   you at all in terms of, you know, determining

20   at what time you made these notes.

21            But let's first ask whether these

22   are your notes.



1      A.    Yes.

2      Q.    And do you -- what's your best

3  recollection of when they were made?

4      A.    I believe these were made during a

5  meeting with Deputy Secretary Duke, also in

6  that May 2017 time frame.  And to the best of

7  my recollection, I believe this meeting was

8  held on May 19th, 2017.

9      Q.    Is your -- and -- and again, we'll

10  get -- we'll -- we'll -- we'll be able to

11  tighten up on this.

12          Is your present best recollection

13  were -- were these notes made after the

14  decision to go with the six-month extension

15  some time in late May of 2017?

16          MR. MARUTOLLO:  Objection.

17          You can answer.

18          THE WITNESS:  In reviewing the

19  notes, it appears that the decision had been

20  made internally, at least.  I'm not sure that

21  it had been publicly announced at this time.

22          BY MR. CONNELLY:



1      Q.    Okay.  To make my life a little

2   easier and all of our lives a little faster

3   when we finally get to these, you'll notice on

4   the third line -- and you help me out -- is it

5   S2, or is it SZ?

6            I -- I can't tell.

7      A.    Sure.  S2.

8      Q.    Okay.  What -- what is that a

9   reference to?

10     A.    Deputy secretary.

11     Q.    What's that secretary's name?

12     A.    It was Deputy Secretary Duke.

13     Q.    Okay.  And I think -- am I right

14   that all -- all of these notes are related to

15   and seem to be in -- in the May time frame and

16   are related to Haiti in general and maybe more

17   specifically, although we haven't gone through

18   all the lines, but perhaps, you know, more

19   specifically the decision to extend in May of

20   2017?

21     A.    I'm just thinking.  That was a lot

22   of questions in one.



1              I think that some of -- they were

2    certainly made in the May 2017 time frame.

3    Some of them related to the Haiti TPS decision

4    made at that time.  But some of the meetings

5    were pulled together to more generally discuss

6    the TPS process.

7         Q.    Fine.  Fine.  I didn't mean to --

8         A.    No, no --

9         Q.    -- restrict you --

10        A.    That's fine --

11        Q.    -- to that -- that it's exclusively

12   Haiti.  I was just trying to -- but -- okay.

13             So if we -- but if have -- we've

14   reached that common ground that these are, you

15   know, your best recollection.  They're all made

16   in a reasonably close time frame, at least

17   somewhat -- at least partially at least related

18   to Haiti.

19             So with that by way of -- of

20   background, did you take any other notes

21   regarding the Haiti decision to terminate or

22   the -- or -- or a decision to extend, other



Page 109

1    than these notes, which all seem to be, you

2    know, just in -- in the May 2017 time frame?

3         A.    No.   These are the handwritten notes

4    that I have related to Haiti TPS.

5         Q.    And how -- I mean is it your

6    ordinary process to take handwritten notes, or

7    -- or is it unusual for you to do so?

8              MR. MARUTOLLO:   Objection.

9              You can answer.

10             THE WITNESS:   I would say it varies.

11   Depends on my mood.

12             BY MR. CONNELLY:

13        Q.    Does -- when we get there, we can

14   talk about it a little bit more.   But again, I

15   -- and maybe I'm being redundant.   But just to

16   be -- I want to make sure that I'm not missing

17   an opportunity.

18             To your best recollection, these are

19   the only handwritten notes that you took, let's

20   say during the course of 2017, regarding the

21   various decisions about the TPS status of

22   Haiti?



Page 110

1      A.    That's correct.

2            MR. CONNELLY:  Okay.  Well, let's

3      put these aside.  As I say, we'll fold them in

4      when we get to May of 2017.

5            And I was about to hand you -- no.

6      Maybe we haven't done it yet.

7            So now we're going to go to KA-10.

8            THE WITNESS:  I'm sorry.  Can I

9      correct one thing?

10           MR. CONNELLY:  Sure.  Sure.  Of

11     course.  Well, listen to your lawyer.

12           MR. MARUTOLLO:  Yeah.  Yeah.

13           THE WITNESS:  There's another set of

14     handwritten notes.  I didn't want to say these

15     are the only ones.

16           MR. MARUTOLLO:  That -- that's

17     correct.  We did note in our letter last night

18     there is one document -- and I'll just refer to

19     the language in our letter that -- that may

20     contain classified information that was not

21     produced as -- as reflected in our letter last

22     night.  So there was one other set of



1    handwritten notes.  The witness is -- is

2    accurate.

3             (Deposition Exhibit KA-10 was marked

4    for identification.)

5             BY MR. CONNELLY:

6    Q.    Have you had a chance to familiarize

7    yourself with this document?

8    A.    I'm still reading it.

9    Q.    Okay.  Let me know.

10   A.    Okay.

11   Q.    All right.  Let start, as usual,

12   from the -- the earliest e-mail, which would be

13   the -- the last one on this two-page document.

14            So the first e-mail is from you to

15   several people on February 3rd, 2017, at 10:14

16   a.m.

17            Are -- are you there with me?

18   A.    Yes.

19   Q.    Okay.  And am I right that the basic

20   gist of -- of your e-mail is you're noting that

21   there's, you know, a new administration, and so

22   you're raising, as far as Haiti TPS, whether



Page 112

1    there might be, you know, any changes in terms

2    of TPS status of Haiti?

3              MR. MARUTOLLO:  Objection.

4              You can answer.  I mean to the

5    extent the document speaks for itself.  But

6    you -- you can answer.  And again, instruct you

7    not to provide any internal government

8    deliberations apart from what's written here in

9    this e-mail.

10             THE WITNESS:  I reached out to State

11   as part of the review process for Haiti TPS

12   because of the expiration date coming up, and

13   we needed to get the package to secretary Kelly

14   to make a determination.

15             BY MR. CONNELLY:

16   Q.    Okay.  So is this -- this -- the

17   e-mail that we're focused on, this was at your

18   initiative as opposed to someone asking you to,

19   you know, raise -- as -- as part of the e-mail

20   says "refresh and repackage and resubmitting"?

21             I'm just trying to get a sense of

22   who the prime mover was on this.



1          It's you?

2     A.    To the best of my recollection, this

3  was, you know, our division.  And I, you know,

4  was charged with pulling together the package.

5  And so this was something that I sent out

6  knowing that I needed to get State's input as

7  part of that package.

8     Q.    Okay.

9     A.    Yes.

10    Q.    And help me out in terms of you --

11 you -- you've four people.  Well, you -- you

12 sent it to two, and you copied two.

13         Chris and Susan, tell me who is

14 Chris Ashe, A-S-H-E?

15    A.    He works within PRM at the

16 Department of State.  He is -- at this time at

17 least was Brooks's supervisor.  I don't know

18 his specific title.

19    Q.    Okay.  And Susan Keyack,

20 K-E-Y-A-C-K?

21    A.    Yes.  She also was in PRM and had

22 worked on the TPS portfolio.



Page 114

1      Q.    All right.  And then the people who

2  are copied, are they within CIS?

3            Oh, no, no.  Go ahead.  Go ahead.

4      A.    Yeah.  Sure.

5      Q.    Help me out.  Yeah.

6      A.    Brandon is.  But Brook, no, was at

7  PRM, at State.

8      Q.    Yeah.  Okay.

9            And -- and indeed, if we just

10  then -- then if you move up the page, you see

11  that Brook gets back to you, correct?

12     A.    Yes.

13     Q.    And then if we -- if we turn the

14  page, there's another e-mail from Brook to you

15  on February 6th at 9:17 a.m.?

16     A.    Yes.

17     Q.    And he references:  "I heard back

18  from the Haiti desk."

19            What's the Haiti desk?

20            MR. MARUTOLLO:  Objection.

21            You can answer to the extent you're

22  familiar with it through your work at -- at the



1    DHS.

2              THE WITNESS:  I'm not entirely sure

3    if he means the Haiti desk within PRM, which

4    would be the people within PRM who focus on

5    Haiti regionally.  I think that's probably who

6    he means.

7              But they also do outreach to post

8    when they look into country conditions for TPS.

9    So it could potentially be a reference to the

10   Haiti post within the western hemispheres

11   affairs.

12             BY MR. CONNELLY:

13   Q.    And finally, the very -- the top

14   memo, again from Brook to you, he -- he -- he

15   mentions in his memo:  "We assume DHS."

16             DHS would be Department of Homeland

17   Security, correct?

18   A.    Correct.

19   Q.    Okay.  And then it says:  "Will

20   formally ask state (DHS HQ)."

21             Help me out.

22             What does -- what -- what does that



1    phrase mean?

2            I'm -- I'm confused because State

3    would suggest to me State Department.  But then

4    the paren under it is DHS HQ, which would seem

5    to be homeland security.

6            MR. MARUTOLLO:  Objection.

7            And it -- this calls for

8    speculation.  That -- this e-mail's not from

9    Ms. Anderson.

10           But you can answer to the extent you

11   know.

12           THE WITNESS:  I think he was

13   suggesting that it would be DHS HQ rather than

14   USCIS who would reach out to State at that

15   point to ask to reconsider the recommendation.

16           BY MR. CONNELLY:

17   Q.    And is that how the process would

18   ordinarily work for reconsideration.

19           Would -- would it ordinarily travel

20   through DHS headquarters as opposed through --

21   as opposed to through CIS?

22           MR. MARUTOLLO:  Objection.



Page 117

1              You can answer to the extent you

2    know as a fact witness, not as a 30(b)(6)

3    witness.  You can answer.

4              THE WITNESS:  This was a little bit

5    of an unusual situation.  Because there had

6    been a recent recommendation at the end of the

7    previous year.  And so state -- it -- it

8    essentially is an unusual situation where we

9    would be asking if state wanted to update or

10   reconsider a standing recommendation.

11             BY MR. CONNELLY:

12       Q.    Okay.  And again, indeed, if we --

13   we go back to the initial e-mail in the chain,

14   there's a reference to I think -- yeah --

15   Secretary Kerry's recommendation in the

16   previous year, correct?

17       A.    Yes.

18       Q.    So let's -- to set the stage

19   Secretary Kerry of course is -- in the previous

20   year is the secretary of state in the Obama

21   administration, and that's all going to change

22   on January 20th or so with the new



Page 118

1    administration coming in, right?

2         A.    Right.

3         Q.    Okay.  Okay.  And so, again, maybe

4    you -- maybe you fully explained.

5              So -- but -- so -- so that I follow,

6    you're saying that, okay, now we've got a new

7    State Department, we've got a new secretary of

8    state, and it's possible that they'll want to

9    reconsider where the former secretary of state

10   in a different administration left things?

11             MR. MARUTOLLO:  Objection.

12             You can answer to the extent that

13   characterization is accurate.

14             But you can answer.

15             THE WITNESS:  Correct.

16             MR. CONNELLY:  I'll give you next

17   what I'm going to call KA-10A, for -- to

18   maintain my -- our sequence.

19             (Deposition Exhibit KA-10A was

20   marked for identification.)

21             THE WITNESS:  Are you testing my

22   eyes with this one?



Page 119

1          BY MR. CONNELLY:

2      Q.    Well, I'm giving you the -- I'm

3  giving you the whole chain, although I -- I

4  only care about the top e-mail to you from

5  Samantha D-E-S-H-O-M-M-E-S.

6          But take your time to the extent

7  that you need to put it in context.

8      A.    Okay.

9      Q.    Okay.  How does Samantha pronounce

10  her last name?

11      A.    I think it's Deshommes.

12      Q.    Deshommes?  All right.

13          And who -- who is she?

14      A.    She is chief of the regulatory

15  coordination division in the office -- office

16  of policy and strategy.

17      Q.    Is she someone that you -- you

18  ordinarily interact with?

19      A.    Yes.  Fairly frequently in -- in my

20  role in policy and strategy, yes.

21      Q.    All right.  So we're now -- we've

22  moved -- the last one -- document I think I



Page 120

1   showed you was an -- an early -- earlier

2   February.  We're a couple of weeks deeper now

3   in February.  It's February 23rd of 2017.

4           And I'm going to ask you to

5   translate a few of these acronyms in her e-mail

6   to you.

7           She begins by -- well, she starts

8   with "Yes, of course," and then moves on to say

9   "We discussed this with OGC."

10          Who is OGC?

11      A.    That is the -- I believe it to be

12   the DHS office of general counsel.

13      Q.    Okay.  And who -- do you know who --

14   or are you familiar with who the general

15   counsel would be at that -- at this -- at this

16   time?

17      A.    I'm not sure who it was then, no.

18      Q.    All right.  She moves on to say:

19   "I'm not sure how this crew is planning to

20   approach TPS in general.  But for whatever

21   reason, they are signalling some concerns with

22   this group of countries especially."



Page 121

1          When she references "this crew," who

2     is she referencing?

3          MR. MARUTOLLO:  Objection.  Calls

4     for speculation.

5          But to the extent you know who --

6     the individuals that she's referencing, you can

7     answer -- or -- or organization that she's

8     referencing.

9          THE WITNESS:  I'm not entirely sure.

10    I take that to mean people who were newly

11    coming in.  It signals a transition.  So people

12    who are new to the office or DHS.

13          BY MR. CONNELLY:

14    Q.    Okay.  And your -- your best

15    understanding.

16    A.    That's --

17    Q.    I understand all you --

18    A.    Yeah.  I'm not --

19    Q.    -- can do -- I mean --

20    A.    -- entirely sure.

21    Q.    -- is -- is your understanding of

22    what she was conveying.



1          Your understanding is she was

2    talking about some -- some of the new people

3    coming into DHS.

4         A.    That's my best understanding.

5         Q.    Yeah.  All right.

6              And then moving down just a few

7    sentences, she says:  "Then again, if we have a

8    permanent OP&S chief by that time, what you're

9    permitted to put forward may or may not change

10   depending on her feelings about TPS."

11             Do you see that?

12        A.    I do.

13        Q.    What is OP&S?

14        A.    That's the office of policy and

15   strategy where we both worked.

16        Q.    And can you recall back -- you know,

17   in -- in late February of 2017, was -- was

18   the -- was there someone filling the position

19   of chief of OP&S at that time?  Was the

20   position empty?

21             I -- I -- because this is a

22   reference to -- sounds like someone new coming



1   in to serve as the permanent chief.

2       A.    I think that Larry Levine was acting

3   as the chief of OP&S at this time.

4       Q.    And help me out.

5           What role does the chief of OP&S

6   have in determining what you are permitted to

7   put forward?

8       A.    The chief of OP&S is the head of the

9   office of policy and strategy.  So in talking

10  before about the TPS package that moves

11  forward, it comes out of the office of policy

12  and strategy and then moves to the director's

13  office within USCIS.

14          So the OP&S chief traditionally has

15  the final say on what package comes out of that

16  office, OP&S, and moves forward to the

17  director's office for review.

18      Q.    And where was your input in that

19  process?

20          Have you -- have you given your

21  input and that -- and that -- and that moves up

22  to the office of policy and strategy?



1           MR. MARUTOLLO:  Objection.  Again,

2    to the extent it calls for internal government

3    deliberations, I'll instruct the witness not to

4    answer.  And -- and also objection to the

5    grounds that the question was vague.

6           But otherwise, you can answer the

7    question.

8           THE WITNESS:  Just in terms of

9    structure, there's the -- the chief of the

10   office of policy and strategy.  And within the

11   office of policy and strategy, there are

12   several divisions.

13          So the international and

14   humanitarian affairs division, within which I

15   worked while I was there, directly reported to

16   the chief of the office of policy and strategy.

17          So whatever we worked up within our

18   division as the initial draft would go, you

19   know, through the chief of the office of policy

20   and strategy for review.

21          BY MR. CONNELLY:

22   Q.   Was there ever a time, you know,



1  after February 23rd of 2017, when someone told

2  you, as far as your part, as you've just

3  explained, your part of the process, told you

4  what to put forwarded or -- or move -- or move

5  on, you know, to OP&S?

6        MR. MARUTOLLO:  Objection.

7        I would direct the witness not to

8  answer to the extent it calls for internal

9  government deliberations, again under the

10 deliberative process privilege.  So I would

11 instruct the witness not to answer that

12 question as phrased.

13       BY MR. CONNELLY:

14 Q.    In the past was -- was it usual or

15 unusual for anyone to ever suggest to you what

16 you should put forward?

17       MR. MARUTOLLO:  Objection.  Again,

18 I'm going to direct the witness not to answer

19 to the extent it calls for internal government

20 deliberations, again under the deliberative

21 process privilege.

22       And also I object on the grounds



Page 126

1    that the question is vague.

2           So I'd instruct the witness not to

3    answer that question.

4           BY MR. CONNELLY:

5    Q.    I -- I don't want -- as I've told

6    you, you know, previously, I don't want

7    anything you're deliberating or anyone is

8    deliberating, you know, with you about.

9           I just want to have -- I want to

10   have an understanding simply of you as a

11   government worker being involved in the process

12   to make determinations on TPS status or their

13   extension.

14          I -- I'm trying to find out how the

15   process worked and whether the process remained

16   in its usual place in 2017 or whether suddenly

17   people were telling you what to do.

18          So I don't -- I don't want to hear

19   about any -- any conversations that you're --

20   and your lawyer won't let me -- you know, won't

21   -- wouldn't want you to tell me about those

22   conversations.



1          I'm simply trying to find out if

2   historically, when you put things forward to

3   the office of policy -- at OP -- OP&S is what,

4   office of policy and -- tell me again?

5      A.    Office of policy and strategy.

6      Q.    And strategy.  Yeah, yeah.

7          Prior to -- prior to 2017, did --

8   did anyone suggest to you what you should put

9   forward?

10          MR. MARUTOLLO:  Objection.  Again,

11   I'm going to direct the witness not to answer

12   the question as phrased.  It calls for internal

13   government deliberations, including suggestions

14   or recommendations about what to put forward.

15   And therefore, it's -- I think it's protected

16   by the deliberative process privilege.

17          BY MR. CONNELLY:

18      Q.    Prior to February of 2017, was there

19   ever a time when you planned to put forward

20   something but you didn't put it forward?

21          I don't want to know why.  I don't

22   care who you talked to.  I just want you to



1  think back, all right, before the Trump

2  administration when I was putting things

3  forward, I -- I just want to know was there

4  ever a time when there was something you

5  planned to put forward but it didn't go

6  forward?

7        MR. MARUTOLLO:  Objection.  Again, I

8  would -- first, I would object on the ground

9  of -- of vagueness.  But I think that -- that

10  -- that calls for internal government

11  deliberations about predecision deliberations.

12  I think it's protected by the deliberative

13  process privilege.

14        To the extent the question is

15  whether she drafted documents, she can answer

16  that question.  But I mean, as the question is

17  phrased, I would instruct the witness not to --

18  not to answer the question.

19        BY MR. CONNELLY:

20    Q.    Are -- are you going to follow that

21  instruction?

22        Because I don't want -- I don't want



Page 129

1    anything other than the simple objective fact

2    of whether, prior to February of 2017, was

3    there ever a time when you were planning on

4    putting something forward but you didn't put it

5    forward?

6            I don't care why.  I don't care what

7    caused it.  I just want to know that simple

8    objective fact, which strikes me as no

9    different than asking you time or temperature.

10           But -- so I want to know are you --

11   are you -- are you not going to answer that

12   question based upon your attorney's cautions?

13           MR. MARUTOLLO:  Well, again, I would

14   instruct the witness not to answer that

15   question as phrased.

16           Again I would also object on grounds

17   of vagueness in terms of what -- what that's

18   even referring to.

19           But my understanding is, if it's

20   related to anything as per the prior questions,

21   I think that calls for internal government

22   deliberations.  And again, we would instruct



Page 130

1   the witness not to answer under the

2   deliberative process privilege.

3          BY MR. CONNELLY:

4   Q.    Are you going to follow your

5   attorney's advice?

6   A.    I am.

7   Q.    Okay.  Was there ever a time after

8   February 23rd of 2017 when there were things

9   you wished to put forward or had planned to put

10  forward but weren't permitted to do so?

11         MR. MARUTOLLO:  Objection.  Again,

12  you know -- I won't waste time, but I'll

13  repeat --

14         MR. CONNELLY:  Yeah.

15         MR. MARUTOLLO:  -- the same

16  objection from a moment ago.

17         BY MR. CONNELLY:

18  Q.    Okay.  And again, will you follow --

19  you'll follow your attorney's advice not to

20  answer that question?

21  A.    Yes.

22  Q.    Do you recall whether, after



Page 131

1    February 23rd of 2017, anything at all changed

2    depending on -- I mean did you in any way

3    change how you handled your job or

4    responsibilities based upon the feelings of the

5    permanent OP&S chief?

6            MR. MARUTOLLO:  Objection.  I think

7    that's clearly deliberative.  To the extent --

8    and I'll -- I'll instruct the witness not --

9    not to answer that question on the ground of

10   deliberative process privilege.

11           BY MR. CONNELLY:

12   Q.    Let me ask you.

13         You think that Larry Levine --

14   Levine -- is that's how it's pronounced?

15   A.    Yes.

16   Q.    -- was the acting chief in February

17   of 2017?

18   A.    I think he was.

19   Q.    Okay.  Did -- did -- did a permanent

20   chief replace Larry at some point?

21   A.    Yes.

22   Q.    Who was that and -- and when?



Page 132

1      A.     It was Kathy Nuebel Kovarik.   And

2    I'm not entirely sure when she was designated

3    the permanent chief.

4              MR. CONNELLY:  I'm going to show

5    you KA-11.

6              (Deposition Exhibit KA-11 was marked

7    for identification.)

8              BY MR. CONNELLY:

9      Q.     While you're -- while you're taking

10    a look at the document, I'll represent to you

11    this is an exhibit attached to our complaint,

12    the lawsuit.  And a lot of the information --

13    well, a lot of what has been redacted is -- is

14    largely, almost exclusive but not entirely,

15    just names of people, just for privacy reasons.

16    It -- it had nothing to do with our lawsuit.

17    So we didn't want to publish their names.  And

18    so we -- we eliminated them.

19      A.     Okay.

20      Q.     Okay.  If you'll go to the

21    second-to-the-last page, which has, on the

22    far-right bottom -- it's Page 16.  Or in the



Page 133

1    middle of the page, it has the number 4.

2            Are you with me on that?

3    A.    Yes.

4    Q.    Okay.  And you'll see that there is

5    a March 2nd, 2017 e-mail at 3:46 p.m.

6            Help me out a little bit with the

7    acronyms.

8            EXSO, what is that?

9    A.    That's the USCIS -- I guess it would

10   be the executive secretary's office.

11   Q.    And what role, if any, does the EXSO

12   have in determinations of initial TPS status or

13   extensions?

14   A.    In this particular case, and

15   generally, they would just distribute a

16   document for review by various entities within

17   USCIS.

18   Q.    Prior to the decision being made?

19   A.    Yes.  They would provide the

20   administrative function of circulating it to

21   the right people who needed to review it.

22   Q.    Okay.  And under -- and -- and



Page 134

1    there's a -- a reference, FO.

2              Can you tell me what that is?

3        A.    Front office.

4        Q.    Meaning who or -- or where within

5    the organization?

6        A.    The USCIS front office.  So that

7    would typically mean -- it would encompass

8    usually both the director and deputy director

9    and their offices.

10       Q.    Okay.  And at this time, were you

11   the deputy director?

12             Or no, no.

13             You're -- where -- where are you in

14   the firmament in -- what's -- what's your --

15   your -- you -- you were at this time a deputy

16   chief?

17       A.    So at this time I was deputy --

18       Q.    Within your division.

19       A.    -- chief of the division.

20       Q.    Yeah.

21       A.    Yes.

22       Q.    Yeah.



Page 135

1      A.    This is -- I was speaking about the

2  director and deputy director of USCIS.

3      Q.    Yes.  Okay.  I got it.  All right.

4            Mostly I show you this document

5  because, again, on the story line -- the --

6  the -- the time line, you'll see a summary now

7  in the middle of the page that would -- you

8  help -- tell me if I'm right about this.

9            But it would seem to suggest that

10 USCIS has a recommendation memo that discusses

11 Haiti, and it has a recommendation that the

12 secretary extend the designation for another 18

13 months.

14            Have I fairly summarized --

15     A.    I see what you're --

16     Q.    -- what that says?

17     A.    -- talking about.

18     Q.    Yeah.  Okay.

19            Does -- does that comport with your

20 recollection of what -- that there was a

21 recommendation memo at this time, and that it

22 was recommending an extension of 18 months?



Page 136

1      A.    Yes.  That there -- this was a draft

2   memo, yes.

3      Q.    Yeah.

4            Were you involved in the draft memo?

5      A.    I was in --

6            MR. MARUTOLLO:  Objection.

7            You can answer.

8            THE WITNESS:  I was involved in

9   drafting the memo.

10           BY MR. CONNELLY:

11     Q.    Okay.  And was it your -- and -- and

12   the memo did recommend an extension for 18

13   months?

14           MR. MARUTOLLO:  Objection.  Again,

15   to the extent it the calls for internal

16   government deliberations, I would instruct the

17   witness not to answer the question.

18           So I don't think you should answer

19   that question.

20           BY MR. CONNELLY:

21     Q.    Do you -- do you remember whether

22   your recommendation was to extend for 18



Page 137

1    months?

2              MR. MARUTOLLO:  Objection.  Again,

3    since this is a recommendation, I would

4    instruct the witness not to answer under the

5    deliberative process privilege.

6              MR. CONNELLY:  We can stay on

7    record.  Although, if you want to go off

8    record, Joe, that's okay.

9              But I'm simply asking what this lady

10   is doing in her capacity in her -- in -- in

11   doing her job.  I'm not asking, you know, what

12   anybody else suggested to her or what she

13   talked about with anyone else.  I -- I -- I

14   just -- I fail to see how that narrow question

15   entails, you know, a privilege that, by its

16   definition, requires, you know, communications

17   and -- with others.

18             MR. MARUTOLLO:  I think the case law

19   is very clear about recommendations and drafts

20   in terms of being protected by the deliberative

21   process privilege.

22             I think the question, as posed, is


MAGNA
LEGAL SERVICES

Page 138

1    about whether or not Ms. Anderson had a

2    recommendation that was included or provided as

3    part of this draft.

4              I think questions related to this

5    document, you know, which -- the four corners

6    of this document and -- and perhaps by Ms.

7    Anderson explaining this doc -- this e-mail --

8    this exhibit, Exhibit KA-11, are -- are fine.

9    And, you know, we'll make objections, you know,

10   not on deliberative process, on just explaining

11   this document.

12             But at the same time, any questions

13   about recommendations that are made, even by

14   Ms. Anderson, would still fall under the

15   deliberative process privilege.

16             BY MR. CONNELLY:

17   Q.    But am I correct that -- that, as of

18   early March of 2017, at least some people in

19   USCIS, including yourself, thought that the TPS

20   status for Haiti should be extended for 18

21   months?

22             MR. MARUTOLLO:  Again, I object.



Page 139

1    Instruct the witness not to answer.  Certainly

2    that question calling not only about her own

3    views but other people at USCIS, what they were

4    thinking, calls for internal deliberations that

5    are protected by the deliberative process

6    privilege.

7              So I'd instruct the witness not to

8    answer.

9              BY MR. CONNELLY:

10    Q.    If you'll -- move along.  I'm just

11    going to -- I'm going to ask you about a bunch

12    of acronyms now in this -- in this memo.  So if

13    you'll turn back to Page 14.

14    A.    Okay.

15    Q.    There's a reference to AD1?

16    A.    Yes.

17    Q.    What is -- what is that?  Who is

18    that?

19    A.    That means the acting director of

20    USCIS.

21    Q.    Who was that at the time?

22    A.    I believe it was James McCament.



Page 140

```
 1      Q.     Could you spell that last name for

 2  me.

 3      A.     M-c-C-A-M-E-N-T.

 4      Q.     Do you recall how long he remained

 5  the acting director through 2017?

 6      A.     I am not sure when the permanent

 7  director Cissna was appointed.

 8      Q.     Okay.  But at some point in 2017, a

 9  permanent director came in?

10      A.     I believe it was 2017, yes.

11      Q.     Yeah.  Okay.

12             And -- and who was that?

13      A.     Francis Cissna.

14      Q.     Could you spell that last name?

15      A.     C-I-S-S-N-A.

16      Q.     Okay.  A little higher on this -- on

17  this page there's a reference to COS.

18             Tell me what that is.

19      A.     Chief of staff.

20      Q.     And who was that at the time?

21      A.     I don't remember.

22      Q.     Going back to Page 13, near the top
```



1    there is a reference to James.

2              Is it safe to say that was probably

3    James McCament, the acting director?

4              MR. MARUTOLLO:  Objection.

5              You can answer.

6              THE WITNESS:  I believe that it

7    would be, yes.

8              BY MR. CONNELLY:

9       Q.    Okay.  And then in that same

10   sentence, there's a reference to NAC.

11             What's that?

12      A.    That stands for the Nebraska Avenue

13   Complex.

14      Q.    Tell me about that a little bit.

15      A.    That's the DHS headquarters.

16      Q.    At the very top of the page, maybe

17   the first time that I -- her name is on the

18   documents that I've shown you, is a lady you --

19   you mentioned a few minutes ago, Kathy Kovarik.

20             Is that how it's pronounced?

21      A.    Yes.

22      Q.    Okay.  And --



Page 142

1       A.      Kathy Nuebel Kovarik.

2       Q.      Kathy Nuebel Kovarik?

3       A.      Kovarik, yeah.

4       Q.      Okay.  What's her position?

5               I think you told me, but I've

6    forgotten.

7       A.      Well, she's currently chief of the

8    office of policy and strategy.

9       Q.      Do you remember what her position

10   was back in April of 2017?

11      A.      I'm not entirely sure the date that

12   she took on the role of chief of office and

13   policy and strategy.  But prior to that, she

14   was on the transition team for USCIS.  So she

15   was either in that role on the transition

16   team -- the beach head team they were called --

17   or she had already at this point taken on her

18   role as chief of the office and policy and

19   strategy.

20      Q.      To your best recollection, she

21   joined CIS with the new administration?

22      A.      Yes.



Page 143

1              MR. CONNELLY:  Okay.  We'll go to

2    KA-12.

3              (Deposition Exhibit KA-12 was marked

4    for identification.)

5              THE WITNESS:  Okay.

6              BY MR. CONNELLY:

7       Q.    All right.  You've helped me out

8    with the acronyms in the -- in the of the first

9    e-mails on March 22nd.  So let's move up on

10   that back page to the March 24th e-mail from

11   Mark Boivin.

12              Is that how it's pronounced?

13      A.    Boivin.

14      Q.    Boivin.

15              What position does Mark have?

16      A.    Mark works in the regulatory

17   coordination division of the office of policy

18   and strategy.  It looks like it has his

19   information at the bottom --

20      Q.    Yeah.

21      A.    -- of the e-mail.

22      Q.    And he says:  "Hi Katherine, I just



1    spoke to Sam."

2              Who was that?

3    A.    That's Samantha Deshommes.

4    Q.    And goes on to say:  "When the memo

5    is ready, I'll send it to SCOPS."

6              Tell me about SCOPS.

7    A.    Service center operations.  That's a

8    directorate within USCIS.

9    Q.    "And to OCC."

10             Who is that?

11   A.    Office of chief counsel within

12   USCIS.

13   Q.    And I just want process here.  I

14   don't want conversations.  I don't want

15   deliberations.

16             The -- well, let -- let's -- hang

17   onto that question for just one second.

18             In his second sentence -- or second

19   paragraph he says:  "I understand that this

20   will now be an action/decision memo, and one of

21   the options will be to terminate with a

22   six-month orderly transition like we did for



Page 145

1    West Africa."

2              And this is -- we're -- we're

3    talking about Haiti, correct?

4              You picked that up from the context

5    of the earlier e-mail?

6        A.    Correct.

7        Q.    Okay.  So let me ask -- the last

8    document that I showed you, which was in early

9    March, I'm going to suggest that at least

10   someone at CIS seemed to think there was going

11   to be an 18-month extension.

12             This memo on March 24th talks about

13   the possibility that there may be the decision

14   to terminate with a six-month orderly

15   transition.

16             Would- - would you agree with me

17   that that is different than an 18-month

18   extension?

19             MR. MARUTOLLO:  Objection.  Just

20   to -- to the extent it assumes facts not in

21   evidence or the extent it's vague.  But -- and

22   also asserting deliberative process privilege.



1          You can answer the question based on

2    the -- the documents that the -- counsel has

3    provided you.

4          THE WITNESS:  I think Mark is

5    stating that the memo will now be an options

6    memo with options provided for the secretary.

7    And one of those options would be to terminate.

8          BY MR. CONNELLY:

9    Q.    Were you involved in this -- in this

10   action decision memo?

11         MR. MARUTOLLO:  Objection.

12         You can answer.

13         THE WITNESS:  I was involved in

14   revising the memo, this action decision memo,

15   yes.

16         BY MR. CONNELLY:

17   Q.    And when you say "the memo," are --

18   are you referencing back to whatever had --

19   whatever the previous memo was, which I'm

20   suggesting, according to these internal

21   documents, would seem -- would contained a

22   suggestion for an 18-month extension?



1          MR. MARUTOLLO:  Objection again to

2     the extent that it assumes facts not in

3     evidence.  And also, under the deliberative

4     process privilege, we would assert an

5     objection.

6          But based on these documents, you

7     can answer the question.

8          THE WITNESS:  The memo we're talking

9     about is the recommendation memo from the

10    director of USCIS to the DHS secretary.  It's

11    the same memo.

12          BY MR. CONNELLY:

13    Q.    Okay.  Okay.  And is this -- is

14    this -- in this time frame, March 24th or

15    thereabouts in 2017, is that the first time

16    that you learned that one option that should be

17    included in the memo was a decision to

18    terminate with a six-month orderly transition?

19          I don't want to know who you talked

20    to.  I just want to know when you first learned

21    that one of the things that you were going to

22    have a hand in writing would include an option



Page 148

1      to terminate.

2              MR. MARUTOLLO:  Objection.  Again,

3      vague.  But also I'd instruct the witness not

4      to answer to the extent it the calls for

5      internal government deliberations.

6              However, but based on these e-mails

7      that are in front of the witness, you can

8      answer the question with that limitation in

9      mind.

10             THE WITNESS:  I don't think that

11     this was the first time I had understood that

12     the memo would be revised, no.

13             BY MR. CONNELLY:

14     Q.    When -- when did you first

15     understand it?

16             And we're bracketing -- basically

17     I'm bracketing with the documents that I've

18     shown you, which, you know, the -- the previous

19     document was in much earlier March, and now

20     this document is -- or this e-mail is on

21     March 24th.

22             MR. M:  Objection.



Page 149

```
 1              You know, you can understand the

 2    question.

 3              But I object on the grounds of

 4    vagueness.

 5              But you can answer the question.

 6              THE WITNESS:  I'm sorry.  I don't

 7    quite understand the question.

 8              BY MR. CONNELLY:

 9      Q.    Because you said weren't quite sure

10    when -- or you didn't know that this was the

11    first time that you had, you know, learn about

12    a possible option to terminate.

13              I -- and I guess -- whatever my

14    earlier question was, what's your recollection

15    of when you did first learn about that as a

16    possibility?

17              MR. MARUTOLLO:  Again, object to the

18    extent it calls for internal government

19    deliberations and to the extent it calls for

20    any -- any -- relaying of any information about

21    recommendations that were made.

22              So I -- I'd limit your answer to
```



1    what is in the e-mail, what is in these -- in

2    these exhibits before you.

3             THE WITNESS:  I guess I would just

4    restate that I don't think that Mark's e-mail

5    to me was the first time that I had heard that

6    there was a request to revise the memo to

7    include options.

8             BY MR. CONNELLY:

9    Q.    Was the first time that you heard it

10   sometime earlier in March of 2017?

11            MR. MARUTOLLO:  Objection.  Same

12   objection stated.

13            But again, with the objections in

14   mind, that you can answer the question.

15            THE WITNESS:  Yes.  Yes.

16            BY MR. CONNELLY:

17   Q.    And then you're involved in the

18   process of revising the memo.  And take --

19   taking you back up to Mark's first line when he

20   says:  "When the memo's ready, I'll send it to

21   SCOPS and OCC."

22            Just tell me -- help me in the



Page 151

1    process.

2           Is that -- is that ordinarily how

3    the process works, regardless of whether we're

4    talking about Haiti or any other country?

5           Once a memo of this type is

6    generated, is -- is that -- is that the unusual

7    path it takes?

8           MR. MARUTOLLO:  Objection.

9           Again, you can answer to the extent

10   you are aware in your capacity as a fact

11   witness in this case but not as a 30(b)(6)

12   witness.

13          But in terms of the timing, you can

14   answer the question.

15          THE WITNESS:  Yes.  Generally the

16   office of policy and strategy drafts the memo.

17   And then other offices with equities in TPS

18   receive it for review.  So SCOPS and OCC are

19   two of those offices.

20          BY MR. CONNELLY:

21      Q.   Okay.  Now, if you'll turn to the

22   first page of the memo to the March 24th e-mail



MAGNA ▶
LEGAL SERVICES

Page 152

1    from Brandon to you and Mark at 4:21 p.m. on

2    March 24th.

3              Do you see that?

4        A.    Yes.

5        Q.    Let me -- let me take care of a

6    couple of the acronyms.

7              Within his e-mail, he makes

8    reference to S1s, that's S, numeral 1s, senior

9    counselor.

10             Who was that?

11       A.    I would --

12             MR. MARUTOLLO:  Objection.

13             Again, to the extent you're aware.

14             THE WITNESS:  I was going to say my

15   understanding of that is that it would refer to

16   Gene Hamilton.

17             BY MR. CONNELLY:

18       Q.    Okay.  And when did he take on that

19   position?

20       A.    I don't know when he started.

21       Q.    Was he -- was he coming in fresh

22   with the Trump administration, as opposed to



Page 153

1    having been in CIS in -- at a prior time?

2         A.    He began after the administration

3    changed, yes.

4         Q.    Okay.  And who -- what -- the

5    reference to S1, who is that?

6         A.    That would refer to the secretary.

7         Q.    Okay.  Do you remember, at this

8    time, is that the acting secretary that you

9    referenced earlier?

10              Is it -- how is it pronounced Mc --

11   Mc -- McCarrot?

12              Help me out.

13        A.    That's pronounced McCament.

14        Q.    Okay.

15        A.    But this is talking about the

16   secretary of the Department of Homeland

17   Security, S1.

18        Q.    So at the time that would have been

19   Kelly?

20        A.    Yes.  I believe it was Secretary

21   Kelly.

22        Q.    Okay.  And one more acronym on the



1    -- further up the page.  On his March 28th

2    e-mail, he -- he talks about a redraft up to

3    the FO.

4              But I guess that's -- again, that's

5    front office?

6        A.    Correct.  The USCIS front office.

7        Q.    All right.  Okay.

8              And so in this -- now going back to

9    that lower memo on the first page, the

10   March 24th 4:21 memo to you.

11             Am I correct that, in the second

12   paragraph, he reiterates:  "The word you got

13   regarding refashioning the memo to provide

14   options is right and quoting termination (with

15   perhaps a few options, not just six months for

16   orderly transition delayed effective date)."

17             Okay.  I read that exactly; yes?

18       A.    Yes.

19       Q.    Okay.  And so that's the context

20   we're -- we're -- now we're talking about the

21   refashioning the memo.

22             Then he says -- after that he says:



1    "Ultimately, we're (USCIS still going to assess

2    that conditions continue to be met and

3    extension is warranted (we hope).  So think an

4    extension FRN is the appropriate one to go up

5    with the package."

6            What was your understanding when he

7    references "we're," the contraction for "we

8    are," and then (USCIS)?

9            Who is he referring to there, to --

10   to your best understanding?

11           MR. MARUTOLLO:  Objection.

12           Again, to the extent this calls for

13   internal government deliberations, I would

14   instruct you not to answer and if it calls for

15   internal deliberations beyond the four corners

16   of this document.

17           But you can explain your -- you can

18   explain the document in the manner that the

19   counsel has just asked.

20           THE WITNESS:  I think that the first

21   "we're" after "ultimately" is, as he's

22   indicated in the parenthetical, he intends that



Page 156

1    to mean USCIS corporately.

2            And in the second instance, after

3    "warranted," I think that he means the "we" to

4    be himself and me.

5            BY MR. CONNELLY:

6    Q.    All right.  And then he further

7    says:  "Also our thinking is we should try to

8    avoid getting in the business of sending up a

9    buffet of FRNs, even if we're including options

10   in TPS decision memos going forward."

11           What was your understanding of the

12   phrase "sending up a buffet of FRNs"?

13           MR. MARUTOLLO:  Objection, again to

14   the extent it calls for internal government

15   deliberations.

16           But you can answer to the extent

17   it's based on explaining this document.

18           Further objection though under the

19   sense that this is -- calls for speculation, as

20   you did not write this doc -- write this

21   e-mail.

22           You -- you can answer with those



1  objections.

2          THE WITNESS:  Typically the TPS

3  package that I mentioned our office would pull

4  together would include the recommendation memo

5  as well as a draft federal register notice

6  reflecting the recommendations that was in that

7  memo so that they were both already drafted.

8          But if a decision memo went up to

9  the secretary with several options, then you're

10  faced with a situation of needing to draft an

11  FRN to reflect each of those options.

12          So when he says "a buffet of FRNs,"

13  he was hoping, I believe, that we would not

14  need to draft several versions of an FRN to

15  reflect all of the different options reflected

16  in the -- in the memo.

17          BY MR. CONNELLY:

18  Q.    Okay.  Prior to this time, had you

19  ever drafted, to use his phrase, a buffet of

20  FRNs?

21          Or I'll just -- you know, define

22  that as FRNs with several different options.



Page 158

1          Had you done that previously?

2          MR. MARUTOLLO:  Objection.

3          Again, to the extent it calls for

4    internal government deliberations, I would

5    instruct the witness not to answer under the

6    deliberative process privilege with the

7    limitation that you can answer whether or not

8    you had drafted multiple FRNs.

9          THE WITNESS:  I don't recall

10   previously drafting multiple FRNs to accompany

11   recommendation memo, no.

12         BY MR. CONNELLY:

13   Q.    In this instance, did it turn out

14   that you -- did it end up that there were, you

15   know, multiple FRNs that were -- were -- were

16   generated?

17         MR. MARUTOLLO:  Again, object to the

18   extent it calls for internal government

19   deliberations.  And I would instruct the

20   witness not to answer under the deliberative

21   process privilege.

22         And -- and here again, I think the



Page 159

1    way that question's phrased, I would instruct

2    the witness not to answer.

3              BY MR. CONNELLY:

4        Q.    I don't want to know the content of

5    any conversations or communications.

6              But did you -- did you have

7    communications with senior counsellor Gene

8    Hamilton regarding the decision to -- in May to

9    extend and then ultimately to terminate Haiti's

10   TPS status?

11             MR. MARUTOLLO:  Again, I would

12   object to the extent it calls for internal

13   government deliberations and instruct the

14   witness not to answer under the deliberative

15   process privilege.

16             But I -- I would instruct the

17   witness, if she can answer -- Ms. Anderson can

18   answer, to the extent she had -- whether she

19   had any communications with Mr. Hamilton

20   related to the TPS determination that's being

21   questioned now by counsel.

22             THE WITNESS:  Yes.  I believe that I



Page 160

1    did have some communication with him.

2              BY MR. CONNELLY:

3        Q.    Do you recall approximately how

4    many?

5              MR. MARUTOLLO:  Same objection.

6              But you can answer.

7              THE WITNESS:  I don't know exactly.

8    It would have been typically in the form of

9    meetings.

10             BY MR. CONNELLY:

11       Q.    Did you have any written

12   communications from you to him or from him to

13   you?

14             MR. MARUTOLLO:  Again, the same

15   objection.

16             But you -- you can answer whether or

17   not you had any written communications with Mr.

18   Hamilton on this issue.

19             THE WITNESS:  I don't recall

20   specifically.

21             BY MR. CONNELLY:

22       Q.    The meetings that you attended with



Page 161

1      Mr. Hamilton, were those one-on-one meetings,

2      or were -- were those group meetings?

3              MR. MARUTOLLO:  Objection.

4              You can answer.

5              Same -- same objection.

6              You can answer.

7              THE WITNESS:  The meetings would

8      have been group meetings.

9              BY MR. CONNELLY:

10     Q.     And who would have been in

11     attendance at those meetings?

12             MR. MARUTOLLO:  Again, the same

13     objection I've been asserting.

14             But you can answer the question.

15             THE WITNESS:  It certainly would

16     have varied.  It wasn't the same group of

17     people.  But it would have been representatives

18     from USCIS as well as DHS headquarters.

19             BY MR. CONNELLY:

20     Q.     But to your best recollection,

21     always confined to people within CIS?

22     A.     I'm sorry.  What do you mean?



Page 162

1      Q.    What I'm looking for -- no -- no

2    curve balls here.

3           I'm not sure that the deliberative

4    process applies.  But we can -- you know,

5    reasonable people can -- can disagree with

6    that.

7           But as -- as a lawyer, you're

8    probably familiar with the more common concept

9    of kind of attorney-client privilege, which is

10   -- this is at least a cousin of.

11          If you're just having a deliberative

12   process within your own agency, you know, maybe

13   there's, you know, an argument to be made.  If

14   there are outsiders at these meetings, I would

15   suggest there's no privilege.

16          And so I want to find out who was in

17   attendance, whether -- whether it's strictly

18   within CIS people who are make -- who are part

19   of this decision making process or whether

20   there are others in the room.

21          MR. MARUTOLLO:  Again, I would just

22   object.  I know there's not exactly a question



Page 163

1    pending.  But just object to the extent it's

2    asking the witness to make any legal

3    conclusions about whether a privilege applies.

4             But if -- if the question's just

5    about who was in the room, you can -- subject

6    to the earlier objections, you can answer that

7    question, to the extent you know.

8             THE WITNESS:  Certainly it would not

9    have been limited to within USCIS.  Gene

10   Hamilton, in fact, was part of the secretary's

11   office at the Department of Homeland Security.

12   So --

13            MR. CONNELLY:  Okay.  I --

14            THE WITNESS:  Definitely some of

15   these --

16            MR. CONNELLY:  I should have

17   broadened it --

18            THE WITNESS:  -- meetings, yeah --

19            MR. CONNELLY:  Yeah.  I'm --

20            THE WITNESS:  -- would have included

21   representatives from the Department of Homeland

22   Security as well.



1          BY MR. CONNELLY:

2     Q.    Yeah.  Okay.  A fair point.  And --

3     and -- and my -- my mistake in make -- in

4     limiting it to just CIS.  I should have said

5     DHS.

6          To your best recollection, were all

7     of your meetings with Mr. Hamilton exclusively

8     attended by people within DHS?

9          MR. MARUTOLLO:  Objection.

10         You can answer.

11         THE WITNESS:  There could have been

12    meeting that also included the Department of

13    State.

14         BY MR. CONNELLY:

15    Q.    Any -- anyone else beyond DHS and

16    Department of State?

17    A.    Not that I can recall, no.

18         MR. CONNELLY:  All right.  I'll show

19    you KA-13.

20         (Deposition Exhibit KA-13 was marked

21    for identification.)

22         THE WITNESS:  Okay.



Page 165

1          BY MR. CONNELLY:

2     Q.    Let me tell you that the -- we're

3  not going to find a -- you know, a date on this

4  memo, I don't think, other than where it says

5  "Start April 24th, 2017.

6          I'm going to represent -- in good

7  faith I'll represent that I believe this may

8  have been a part of Mr. Prelogar's Outlook file

9  and that this was generated -- my best belief

10  is it was generated in early April, probably on

11  April 4th of 2018.

12          You don't have the accept that.  I'm

13  just giving you that by way of, you know,

14  fairness in background in terms of my -- my

15  understanding of where this fits into the

16  chronology of events.

17          So let me ask you, in the middle of

18  the -- of this file, the first bullet point

19  says:  "Haiti e-mail Kolner," K-o-l-n-e-r,

20  "response."

21          Do you see that?

22     A.    Yes.



Page 166

1      Q.    What -- what is -- what or who is

2   Kolner?

3      A.    I don't know.

4      Q.    Okay.  And the third bullet point,

5   it says: "S1 Haiti memo."

6            S1, would you -- assuming that I'm

7   right that this is in -- in the April time

8   frame, would that be a reference to the

9   Department of Homeland Security, Secretary

10  Kelly?

11     A.    I read it that way, yes.

12     Q.    Okay.  And after it:  "(1) How many

13  current Haitian TP folks were illegal pre-TPS

14  designation?"

15            Do you see that?

16     A.    Uh-huh.

17     Q.    And then the next -- the next -- and

18  I'll go ahead and read the next couple:  "(2)

19  Since designation, how many have committed

20  crimes?  (3) Since designation, how many are on

21  public assistance? out of work?"

22            Is it -- is it your -- did you have



Page 167

1    an understanding at the time that Secretary

2    Kelly had a -- had a memo seeking the answers

3    to those questions that are summarized in what

4    I'm referring to as the Outlook file of Mr.

5    Prelogar?

6              MR. MARUTOLLO:  Objection.  Again,

7    to the extent this calls for internal

8    government deliberations, I would instruct the

9    witness not to answer under the deliberative

10   process privilege.

11             The -- Ms. Anderson can answer to

12   the extent -- she can explain the document but

13   certainly not how others interpreted the doc --

14   document or other recommendations that were

15   made by other officials within DHS or -- or

16   anyone else, for that matter.

17             So with those limitations in mind,

18   you can answer the question.

19             THE WITNESS:  My understanding of

20   this bullet point is that this was an item on

21   our list of work to-dos that reflected a memo

22   including these items that we needed to draft



Page 168

1    for the secretary.

2              BY MR. CONNELLY:

3       Q.    Okay.  So make sure I understand

4    properly.

5              So the reference to Sa 80 memo,

6    which I'll translate as Secretary Kelly 80

7    memo, do I understand correctly you're saying

8    that's shorthand for this is a memo that we

9    were being asked to create and provided to

10   Secretary Kelly?

11             MR. MARUTOLLO:  Objection, again to

12   the extent it calls for internal government

13   deliberations.

14             But you can explain what this means

15   in the context of this document on KA-13, your

16   understanding of what it -- what this document

17   means.

18             THE WITNESS:  Yes.  I believe that

19   this was a memo that we needed to provide to

20   the secretary.

21             BY MR. CONNELLY:

22      Q.    And independent of -- I'm using this



Page 169

1    to refresh your recollection.

2            Independent of what -- what's

3    written in KA-13, do you have an independent

4    recollection that, you know, sometime in the

5    April time frame of 2017 you were asked to

6    generate this type of memo?

7            MR. MARUTOLLO:  Again, to the extent

8    it calls for internal government deliberations,

9    I'd instruct the witness not to answer under

10   the deliberative process privilege.

11           So I -- I would instruct not to

12   answer on that -- on that point.

13           MR. CONNELLY:  Really?

14           MR. MARUTOLLO:  It's about a

15   recommendation.  I mean it's not --

16           MR. CONNELLY:  Well --

17           MR. MARUTOLLO:  It's separate and

18   apart from the documents.  I mean I guess --

19           MR. CONNELLY:  Okay.  And maybe --

20   maybe I was too verbose.

21           BY MR. CONNELLY:

22   Q.    I don't -- I don't care about any



Page 170

1    recommendations.

2            I just want to know if you were --

3    you were asked to generate this memo.

4            MR. MARUTOLLO:  Again, are we

5    referring to this memo that's in KA-13 --

6            MR. CONNELLY:  Yes.

7            MR. MARUTOLLO:  -- or -- okay.

8            MR. CONNELLY:  Yes.  The -- the memo

9    that -- my understanding from her testimony is

10   a memo that was going to go up to Secretary

11   Kelly regarding Haiti and try to answer the

12   various questions that are posed in the bullet

13   point.

14           MR. MARUTOLLO:  To the -- and again,

15   we'll reassert the deliberative process

16   privilege to the extent question's whether you

17   drafted a memo that went to Secretary Kelly

18   related to TPS on -- at this time frame.

19           You can answer the question with

20   that limitation.

21           THE WITNESS:  Yes.  We were asked to

22   draft a memo reflecting the information in that



Page 171

1    bullet point as one Haiti memo.

2              BY MR. CONNELLY:

3         Q.    Okay.  And who -- who was it that

4    asked you to generate that memo?

5              MR. MARUTOLLO:  And same objection.

6              But you can answer as to who made

7    that request.

8              THE WITNESS:  I don't remember

9    specifically who gave us the request.

10             BY MR. CONNELLY:

11        Q.    Okay.  What -- what was your

12   understanding of the -- of how the information

13   regarding these questions about illegal preTPS

14   designation Haitians and whether they had

15   committed crimes, whether any Haitians were on

16   public assistance or were out of work -- first

17   of all, let me ask you.

18             Was it your understanding that all

19   of those questions were -- were directed toward

20   Haitians who were in the United States?

21             MR. MARUTOLLO:  Again, objection on

22   deliberative process grounds.



Page 172

1          But you can answer the question.

2          THE WITNESS:  I'm sorry.  Can you

3     repeat that.

4          BY MR. CONNELLY:

5     Q.   Were all of the questions that --

6     you know that were in Bullet Point 3 on -- on

7     this KA-13, were those all questions focused on

8     Haitians living in the United States?

9          MR. MARUTOLLO:  Objection.

10         But you can answer.

11         THE WITNESS:  I think questions 1

12    through 3 are related to Haitian TPS

13    beneficiaries.  4 is obviously talking about

14    conditions in Haiti, not --

15         MR. CONNELLY:  Right.

16         THE WITNESS:  Yeah.

17         MR. CONNELLY:  Right.  No.  That's

18    why I restricted it to the first 3.

19         THE WITNESS:  Okay.

20         BY MR. CONNELLY:

21    Q.   Okay.  And when you say "TPS

22    beneficiaries," you mean Haitians who have the



Page 173

1    benefit of the TPS designation and are living

2    in the United States?

3        A.    I --

4              MR. MARUTOLLO:  Objection.

5              You can answer.

6              THE WITNESS:  I caveat the living in

7    the United States part because some people

8    could be Haitian TPS beneficiaries and not

9    currently present in the United States, but

10   they could still technically hold the status.

11             BY MR. CONNELLY:

12       Q.    Okay.  Well, let's -- let me try it

13   this way.

14             But -- but certainly Haitians who

15   were not in Haiti, who were outside of Haiti.

16             MR. MARUTOLLO:  Objection.

17             You can answer, to the extent you

18   know.

19             THE WITNESS:  Not necessarily.

20             MR. CONNELLY:  Oh, I could --

21             THE WITNESS:  A Haitian --

22             MR. CONNELLY:  Sure.



Page 174

1           THE WITNESS:  -- TPS beneficiary

2    could be --

3           MR. CONNELLY:  He could decide to go

4    --

5           THE WITNESS:  -- located in Haiti --

6           BY MR. CONNELLY:

7    Q.    Yeah.  His wife is on the island,

8    and he decides, I don't care; I'm going back.

9    Yeah.  Okay.

10          But -- but -- but generally --

11   A.    Haiti TPS beneficiaries.

12   Q.    Yeah.  Okay.  And we -- I mean we're

13   going to go through a slug of documents that I

14   think, you know, proves this point beyond any

15   debate.  But I'm just -- this is -- I'm trying

16   to take you through it, you know,

17   chronologically.  So I'm trying to under --

18   have your understanding.

19          In as early-ish April of -- of 2017,

20   you've been apparently asked to generate a memo

21   and answer these questions.

22          And am I correct that you don't



Page 175

1    recall -- you -- you can't specifically recall

2    who it was who asked you to get these questions

3    answered?

4         A.    Correct.

5         Q.    Okay.  And had you been asked to --

6    at any time, you know, prior to this Haiti

7    situation in April of 2017, ever been -- ever

8    generated a memo answering these kinds of

9    questions?

10             MR. MARUTOLLO:  Objection.  Again, I

11   think this goes beyond the document that's

12   produced in which we're permitting questions

13   on -- again, that question calls for internal

14   government deliberations.  And I instruct the

15   witness not to answer that question under the

16   deliberative process privilege.

17             MR. CONNELLY:  Okay.

18             MR. MARUTOLLO:  To the extent it

19   relates to this particular document, you know,

20   an -- an -- an explanation of this particular

21   document, KA-13, she can certainly answer that.

22             But -- and given the productions



1   that have been made in this case, she can

2   answer that.  But otherwise, we would instruct

3   the witness not to answer that question under

4   the deliberative process privilege.

5         BY MR. CONNELLY:

6   Q.   I -- I think there's a window in

7   there for you to answer the question, unless

8   I'm wrong.  But your -- or no.

9         MR. MARUTOLLO:  I disagree.  Yeah.

10        MR. CONNELLY:  Okay.  No, no.

11  That's fine.  I'm not -- I'm not trying to

12  sneak one by you.  Let me -- I'll -- I'll

13  change the question.

14        BY MR. CONNELLY:

15  Q.   Is this the first time, to your best

16  recollection, that you had been asked to

17  generate a memo answering these questions?

18        MR. MARUTOLLO:  Again, I would -- I

19  would raise the same objection and direct you

20  not to answer.  That -- that's a

21  deliberative -- the questions themselves are

22  deliberative.



1               And again, under the deliberative

2      process privilege, we instruct the witness not

3      to answer that question.

4               BY MR. CONNELLY:

5      Q.     Had you ever generated a memo

6      answering these types of questions prior to

7      April of 2017?

8               I don't -- I don't care who asked

9      you to do it.  I don't care why you did it.  I

10     just want to know whether you ever had a memo

11     answering these questions before.

12              MR. MARUTOLLO:  Again, make the same

13     objection.  The questions themselves are

14     deliberative.  So if the question posed by

15     counsel is whether or not a memo was created

16     about these particular questions prior to, you

17     know, certain date, the date on this -- on this

18     exhibit, I'd instruct the witness not to answer

19     the question under the deliberative process

20     privilege.

21              BY MR. CONNELLY:

22     Q.     Did had ever tried to answer any of



1    the questions posed in 1 through 3 on this memo

2    other than on this occasion?

3              MR. MARUTOLLO:  Again, same

4    objection.

5              Direct the witness not to answer.

6              BY MR. CONNELLY:

7         Q.   Why don't you move ahead a little

8    bit.  We're -- we'll keep the documents rolling

9    in date order.

10             But ultimately did you generate a

11   memo or be -- were you a part of a process in

12   generating a memo?

13             MR. MARUTOLLO:  Objection.

14             You can answer.

15             THE WITNESS:  Yes.  I believe we

16   did.

17             BY MR. CONNELLY:

18        Q.   Were you -- was that a group

19   authorship, or -- or were you the author of the

20   memo?

21        A.   I think that Brandon and I probably

22   drafted the initial draft.  But of course



Page 179

1    various people had input into it after that.

2        Q.    And did -- was the memo finalized

3    and -- and moved up the ladder?

4            MR. MARUTOLLO:  Objection.

5            You can answer.

6            THE WITNESS:  I believe that a memo

7    along these lines was, yes.

8            BY MR. CONNELLY:

9        Q.    Do you know whether the -- let's

10   assume that -- I mean let's assume that these

11   questions were -- are answered or factual

12   information could be gathered on these

13   questions.

14           Do -- do any of these questions

15   relate to current conditions in Haiti in April

16   of 2017?

17           MR. MARUTOLLO:  Objection.  Again,

18   assumes facts not in evidence and is vague.

19   And I think may even call for a legal

20   conclusion.  But -- and also that the witness

21   is not a- - an expert, is -- and is a fact

22   witness.



Page 180

1          With those limitations in mind, you

2     can answer the question.

3          THE WITNESS:  I think that No. 4

4     relates to current conditions in Haiti.

5          BY MR. CONNELLY:

6     Q.    Okay.  But not any -- but not the --

7     the first three?

8     A.    No.

9     Q.    I'm sorry.

10          To make -- to make a clean record,

11    it is correct that none of the questions posed

12    in 1, 2 and 3 in the center of this document

13    relate to current conditions in Haiti, correct?

14          MR. MARUTOLLO:  Objection.

15          MR. CONNELLY:  I have my answer

16    already.  But I just want to clarify.  I mean

17    the no's could be ambiguous.  I just want to --

18    I just want to get this down hard and for

19    certain.

20          MR. MARUTOLLO:  Again, I -- I would

21    still object.  I mean I still think it calls

22    for legal conclusion and assumes facts that are



Page 181

1    not in evidence.

2            But you can answer the question.

3            THE WITNESS:  I do not understand

4    question 1, 2 or 3 to relate to current

5    conditions in Haiti.

6            MR. CONNELLY:  Okay.  I might be

7    able to -- oh, we'll go to KA-14.  That might

8    help your recollection.

9            (Deposition Exhibit KA-14 was marked

10   for identification.)

11           BY MR. CONNELLY:

12   Q.    I'm only interested in the first

13   memo at 9:19 on April 7th.  But I'll wait for

14   you to feel comfortable in reviewing it.

15   A.    Okay.

16   Q.    So directing you to the memo from

17   Kathy Kovarik on April 7th at 9:19 a.m., would

18   you remind me again, your best recollection,

19   what was her position at that time?

20   A.    Looking at the e-mail above it from

21   --

22   Q.    Uh-huh.



Page 182

```
 1        A.      -- Brandon on April 7th, it looks

 2    like he says:  "Our new OP&S chief, Kathy

 3    Nuebel Kovarik."  So I take that to be --

 4        Q.      Okay.

 5        A.      -- that, as of April 7, she was

 6    officially the --

 7        Q.      Okay.

 8        A.      -- OP&S chief.

 9        Q.      Thank you.  Okay.

10            And then she -- I mean it does --

11    obviously it's relatively self-explanatory.

12            But for the record, she says -- I'll

13    skip a -- a little bit of the prefatory --

14    first few sentences.  But it says:  "Here's

15    what I need:  'Details on how many TPS holders

16    are on public and private relief.'"

17            Next bullet point:  "Any demographic

18    data, including how many with TPS are

19    school-aged kids."

20            The next point:  "How many have been

21    convicted of crimes of any kind (any

22    criminal/detainer statute confined)."
```



Page 183

1           Next:  "How often they travel back

2    and forth to the island."

3           And then the final bullet point is:

4    "Remittances data."

5           Does that help you in -- in you

6    recollecting who it was who asked you to try to

7    gather this type of information?

8           MR. MARUTOLLO:  Objection.  And to

9    the extent that the e-mail speaks for itself.

10          But -- and while not explaining any

11   internal government communications, you can

12   answer that question.

13          THE WITNESS:  I recall Kathy sending

14   this e-mail requesting this information.  I

15   don't necessarily know that that means she

16   requested the information referenced in KA-13

17   that we were talking about earlier.

18          BY MR. CONNELLY:

19   Q.   Okay.  Do you have any -- a

20   recollection of ever having anyone else request

21   this information from you beyond Kathy?

22          MR. MARUTOLLO:  Objection.



Page 184

1             And just for clarification, you're

2    referring to the information that's in KA-14?

3             MR. CONNELLY:  Yes.

4             MR. MARUTOLLO:  The memo?

5             MR. CONNELLY:  Yes.  KA-14.  Right.

6             MR. MARUTOLLO:  And again, without

7    disclosing any internal government

8    communications, and limited to explaining this

9    e-mail, you can answer the question.

10            THE WITNESS:  I mean this was the

11   direct request we got to look into this

12   information.

13            BY MR. CONNELLY:

14    Q.   Okay.  Did -- had you ever pulled

15   this kind of information on any of the matters

16   that you handled prior to April 7th of 2017?

17            MR. MARUTOLLO:  Again, I would

18   object to the extent it calls for internal

19   government deliberations.  And I -- I would

20   instruct the witness not to answer that

21   question.

22            BY MR. CONNELLY:



Page 185

1      Q.    Could you tell me the reference to

2   remittances, R-E-M-I-T-T-A-N-C-E-S, data, the

3   last of the bullet points, what is that?

4      A.    I understand that to mean

5   information related to the money sent from

6   usually Haitians living in the United States

7   back to Haiti.

8      Q.    Lastly on this document, at the very

9   top of the page, there's an e-mail from

10   Alexander King.

11         You see that?

12      A.    Yes.

13      Q.    I -- I don't recall -- we haven't

14   talked about him, at least, previously.

15         Who is Mr. King?

16      A.    He is in SCOPS, so service center

17   operations.  And I believe at the time he was

18   heading the division of SCOPS overseeing TPS

19   adjudications.

20         MR. CONNELLY:  Next I'm going to

21   give you KA-15, which is a enormously --

22   about -- it's on the holder -- but a fairly



Page 186

1   lengthy e-mail chain, of which I don't have

2   much interest in -- in most of the e-mail.  But

3   you'll want to obviously look it all over for

4   context.

5            (Deposition Exhibit KA-15 was marked

6   for identification.)

7            THE WITNESS:  Okay.

8            MR. CONNELLY:  Okay.  Why don't --

9   we'll do this document and I think the next

10  one.  And then we'll -- if you'd like, we can

11  break for lunch.

12           MR. MARUTOLLO:  Sure.

13           MR. CONNELLY:  I didn't realize, you

14  know, that it was past the usual lunch hour.

15           BY MR. CONNELLY:

16       Q.    All right.  So this is all on a --

17  on a long e-mail chain.  And that's how it

18  was -- it was provided to me.

19           And to your best -- I mean I haven't

20  reviewed it.  This was all a back-and-forth

21  within your agency, you know, as a -- as an

22  ordinary part of the business of the agency.


MAGNA
LEGAL SERVICES

Page 187

1           This is all just -- this is all a

2    business document, in other words, correct?

3        A.    Yes.

4             MR. MARUTOLLO:  Objection.

5             THE WITNESS:  Sorry.

6             MR. MARUTOLLO:  You can answer.

7             BY MR. CONNELLY:

8        Q.    Okay.  Now -- well, now -- and then,

9    if you go to the page that has the Bates No.

10   3287.  It's -- it's the -- it's the second page

11   of the document.  There's an e-mail from an

12   April Padilla, P-A-D-I-L-L-A, on April 25th,

13   2017 at 2:21 p.m. to you and others.

14           Do you see that?

15       A.    I do.

16       Q.    Okay.  And then Padillla's e-mail is

17   -- it give -- it gives us that her position is

18   unit chief fraud detection security and fraud

19   office, service center headquarters, USCIS

20   headquarters, correct?

21       A.    Yes.

22       Q.    Okay.  And I hadn't seen her name



1  previously.

2       But so I -- my question to you is do

3  you have -- I mean beyond this particular

4  exchange, do you have -- ordinarily have

5  communication and exchanges with April

6  Padillla?

7       MR. MARUTOLLO:  Objection.

8       You can answer.

9       THE WITNESS:  She's not regularly

10  involved in the TPS process.

11       BY MR. CONNELLY:

12  Q.   Okay.  And at the -- the very -- the

13  top e-mail, which is the one that I was most

14  curious about, which is -- which is from Kathy

15  Kovarik to you and many others, she notes --

16  and I'll quote her -- the sentence:  "I do want

17  to alert you, however, that the secretary" --

18       You take that to be a reference to

19  Secretary Kelly?

20  A.   I do.

21  Q.   Okay -- "is going to be sending a

22  request to us to be more responsive.  I know



1    that some of it is not captured, but we'll have

2    to figure out a way to squeeze more data out of

3    our systems."

4            What -- what was your understanding

5    of that observation?

6            MR. MARUTOLLO:  Objection.

7            To the extent it calls for internal

8    government deliberations, I instruct you not to

9    answer the question under the deliberative

10   process privilege.  Also calls for speculation.

11           I mean you can answer the question

12   to the extent it's limited to what's in this

13   e-mail.  But apart from that and the four

14   corners of this document, I instruct you not to

15   answer the question.

16           THE WITNESS:  My interpretation of

17   that sentence is that Kathy was reporting that

18   the secretary was not satisfied with the

19   information that we had been able to gather in

20   response to those requests, so we would have

21   to, as she says, figure out a way to squeeze

22   more data out of our systems.



1          BY MR. CONNELLY:

2      Q.    I -- I take it that -- I mean you

3    can only speak for itself.

4          But you had done, I assume, your

5    level best to try to find responsive data

6    already?

7          When -- when she sends this e-mail

8    to you, you had already been about -- about the

9    process and had been trying to gather data,

10   correct?

11     A.    Yes.

12     Q.    Okay.  And was there any data, you

13   know, that you had held back or not provided

14   that you had been able to locate?

15          MR. MARUTOLLO:  Objection.  Again,

16   to the extent it -- it calls for internal

17   government deliberations, I would instruct the

18   witness not to answer with respect to any draft

19   information that you located and did not

20   provide.

21          So I'd instruct the witness not to

22   answer with that objection in mind.



1          But otherwise you can answer.

2          THE WITNESS:  No.  I believe we

3   provided the -- the best and most accurate

4   answers that we could come up with based on the

5   information available.

6          BY MR. CONNELLY:

7   Q.    Did you -- did you try to take any

8   further steps based on Kathy's request?

9          Did -- did you -- I mean to use her

10  phrasing, did you then -- okay.  Your superior

11  is asking you to do something.

12         Did you try to squeeze more data out

13  of the system based on her request?

14         MR. MARUTOLLO:  I'm going to direct

15  the witness not to answer that question.  That

16  calls for internal government deliberations

17  about information that may or may not have been

18  done.  It goes beyond the four corners of this

19  document that we produced.

20         So I'd instruct the witness not to

21  answer that question under the deliberative

22  process privilege.



Page 192

1          BY MR. CONNELLY:

2     Q.    Did you provide -- after April 27th

3  at 10 -- 10:08 a.m., did you provide any more

4  data beyond what you had already provided up to

5  that point?

6          MR. MARUTOLLO:  Objection.

7          But you can answer.

8          THE WITNESS:  I don't recall, off

9  the top of my head, what we did following this

10  e-mail, no.

11          BY MR. CONNELLY:

12     Q.    Or if you're -- again, I -- only

13  your best recollection.

14          Do you have a -- do you have -- is

15  your best recollection that you did? you might

16  have? you didn't?

17          What -- what's your best

18  recollection as you sit here?

19          MR. MARUTOLLO:  Objection.  Vague.

20  And it -- the witness asked and answered the

21  question.

22          You can answer it again.



Page 193

```
 1                    THE WITNESS:  I just don't recall

 2      our next step.

 3                    MR. CONNELLY:  Lastly, before we

 4      take a break, let's go to KA-16.

 5                    (Deposition Exhibit KA-16 was marked

 6      for identification.)

 7                    THE WITNESS:  Okay.

 8                    BY MR. CONNELLY:

 9        Q.    Okay.  Who is Leroy Potts,

10      P-O-T-T-S?

11        A.    He is chief of the research unit

12      within RAIO.

13        Q.    Do you have a -- how longstanding a

14      relationship do you have with him?

15        A.    I --

16                    MR. MARUTOLLO:  Objection.

17                    You can answer.

18                    THE WITNESS:  Sure.

19                    I think I've known him since about

20      when I started at headquarters in Washington,

21      D.C.

22                    BY MR. CONNELLY:
```



Page 194

1     Q.    Okay.  Is it a fair characterization

2    that he's asking you, in his memo to you -- or

3    his e-mail to you, he'd like to know a little

4    bit more about, you know, what's being decided

5    on the Haiti TPS situation and -- and the

6    decision perhaps that the TPS status might be

7    terminated?

8          MR. MARUTOLLO:  Objection.  Again,

9    to the extent it calls for internal government

10   deliberations, the -- the witness, Ms.

11   Anderson, can explain the document.  And the

12   document certainly speaks for itself.

13         But I'd instruct her not to provide

14   any testimony about how Mr. Potts or what --

15   what he is saying or -- or how he's

16   interpreting any TPS designation.

17         So again, under the deliberative

18   process and with that objection in mind, you

19   can answer the question.

20         THE WITNESS:  I took Roy's message

21   to mean that he was asking me for more insight

22   and background on what was going on with the



Page 195

1    TPS decision making process that I was privy to

2    that he wasn't.

3              BY MR. CONNELLY:

4         Q.   Okay.  And then perhaps, as you

5    might expect, when we go to your -- your answer

6    to Mr. Potts, you say:  "The short answer is

7    that the decision was a political one by the

8    FO" --

9              FO being front office?

10        A.   The USCIS front office.

11        Q.   Yeah -- "and S1's advisors."

12             That would be Secretary Kelly's

13   advisors?

14        A.   Yes.

15        Q.   Okay.  And what did you mean by your

16   conclusion that the decision was a political

17   one?

18             MR. MARUTOLLO:  Objection.  Again,

19   first I -- that although it is an accurate

20   recitation of that phrase within a larger

21   sentence in a larger paragraph, I'd object on

22   vagueness grounds.



1          But also, again, to the extent it

2    calls for internal government deliberations, I

3    would instruct the witness not to answer under

4    the deliberative process privilege.

5          You can explain the document but not

6    any interpretation of what the front office or

7    what the secretary or the secretary's advisors

8    were doing.

9          MR. CONNELLY:  I think that's way

10   too broad.  But you've said -- you know, as

11   long as she restrict herself from those --

12   those qualifiers, she can answer.

13         So let's -- let's see what the

14   answer is.

15         THE WITNESS:  I think I meant to

16   indicate to Roy that the -- the decision was

17   made by political leadership.

18         BY MR. CONNELLY:

19   Q.    As opposed to what?

20         The -- ordinarily decisions --

21   that -- that wouldn't be true for prior

22   decisions on -- on designations and



 1   terminations?

 2           MR. MARUTOLLO:  Objection.  Again,

 3   to the -- first, to the extent that it goes

 4   beyond this witness's knowledge of prior

 5   designations; and second, based on the fact

 6   that she's a fact witness, not an expert

 7   witness; and third, to the extent it calls for

 8   internal government deliberations about how

 9   prior or other decisions were made relating to

10   TPS, I'd instruct the witness not to answer.

11           But with those limitations in mind,

12   you can -- I would instruct you could answer.

13           THE WITNESS:  My intention was to

14   indicate that it was made by political

15   leadership, in line, I would add, with

16   political priorities.

17           BY MR. CONNELLY:

18   Q.    Okay.  But I think --

19           MR. CONNELLY:  Could you read back

20   -- read back my earlier question before the

21   objection, my previous question.

22           (Discussion off the stenographic



1    record.)

2              (The record was read as requested.)

3              MR. CONNELLY:  And I'm going to --

4    I'm going to have the record reflect you nodded

5    in agreement, but there was an objection.  So I

6    just want to now get the record, you know,

7    clarified.

8              BY MR. CONNELLY:

9        Q.    Do you -- do you need that -- would

10   you like to hear that question again, or was it

11   -- I mean do you want me to rework the

12   question?

13             MR. MARUTOLLO:  And I would just

14   object again.  I mean to the extent there was

15   -- I didn't see if there were nodding or not.

16             But I would instruct the witness

17   only to answer with my limitation in mind.

18             But if you want to ask the question

19   again or have it based off of -- of the

20   rereading that the -- the court reporter just

21   provided, that's fine too.

22             THE WITNESS:  I need the question



Page 199

1    again, please.

2              MR. CONNELLY:  Okay.  Do you want --

3    do you want me -- should we just have her

4    reread it?

5              THE WITNESS:  That's fine.

6              MR. CONNELLY:  Okay.

7              (The record was read as requested.)

8              MR. MARUTOLLO:  Again, with the same

9    objection in mind, you -- that I spoke of a

10   moment ago, you can answer that question.

11             THE WITNESS:  TPS decisions are

12   normally made by political leadership.

13             BY MR. CONNELLY:

14   Q.    Are normally made by political

15   leadership.

16             But are the decisions themselves

17   normally political decisions?

18             MR. MARUTOLLO:  Objection.  Asked

19   and answered already.

20             But you can answer it again.

21             THE WITNESS:  My sense is that TPS

22   decisions are not always as impacted by



Page 200

1    political priorities as this one was.

2              MR. CONNELLY:  Okay.  We can break

3    for lunch.

4              MR. MARUTOLLO:  We agree.

5              MR. CONNELLY:  Whatever you guys may

6    need.

7              MR. MARUTOLLO:  Okay.

8              THE VIDEOGRAPHER:  We're going off

9    the record.

10             The time is 13:22.

11             (A short recess was taken.)

12             THE VIDEOGRAPHER:  Going back on the

13   record.

14             The time is 14:12.

15             MR. CONNELLY:  This is going to be

16   KA-18.

17             I used the lunch break to winnow

18   down some things.  So there's going to be some

19   gaps in the numbering.

20             MR. MARUTOLLO:  Sure.  That's fine.

21             MR. CONNELLY:  So you understand it.

22   Yeah.



Page 201

1              (Deposition Exhibit KA-18 was marked

2        for identification.)

3              MR. MARUTOLLO:  Thank you.

4              THE WITNESS:  Thank you.

5              BY MR. CONNELLY:

6        Q.    Okay?

7        A.    Okay.

8        Q.    All right.  And this appears -- it's

9    an e-mail chain.  And it appears that the

10   New York Times had an editorial on the Haiti

11   TPS circumstance apparently on -- on or about

12   April 30th of 2017, correct?

13       A.    Yes.

14       Q.    And if you look in the -- in the

15   New York Times article, which is included, it

16   references that there's apparently a -- some

17   type of a writing or a memo from the acting

18   head of CIS, James McCament, M-c-C-A-M-E-N-T,

19   to the then secretary of the Department of

20   Homeland Security, Mr. Kelly, correct?

21       A.    Where are you looking?

22       Q.    Right in the -- I'm sorry.  Right in



Page 202

1    the middle of the New York Times article under

2    the photo.

3         A.    The paragraph that begins "That is a

4    reasonable conclusion"?

5         Q.    Correct.

6         A.    Oh.

7         Q.    Yeah?

8         A.    Let me look at that.

9               I see.  Okay.

10        Q.    And then it -- and later -- then it

11   -- there's a quote, presumably from the memo.

12   And then there -- the next paragraph it -- it

13   refers to this writing as Mr. McCament's memo.

14   Okay?

15        A.    Two paragraphs down?

16        Q.    Correct.

17        A.    Okay.

18        Q.    Okay.  Did you -- are -- are you

19   familiar with the McCament memo to then

20   Secretary Kelly?

21             MR. MARUTOLLO:  Objection.  Again,

22   to the extent it calls for internal government



Page 203

1    deliberations, I'd ask you not to answer under

2    the deliberative process privilege.

3            But you can answer whether or -- or

4    not you are aware that there was such a memo.

5            THE WITNESS:  I've aware that there

6    was a memo.

7            BY MR. CONNELLY:

8    Q.    Did you have any part in its

9    drafting?

10           MR. MARUTOLLO:  Same objection.

11           But you can answer.

12           THE WITNESS:  I believe it's

13   referencing the recommendation memo from the

14   director of the USCIS to the secretary of

15   Homeland Security that I did have a role in

16   drafting in its initial phases.

17           BY MR. CONNELLY:

18   Q.    As opposed to the final -- the final

19   memo?

20           Did you have -- did you have a role

21   at all in the -- in the finalized memo?

22           MR. MARUTOLLO:  Again, objection.



Page 204

1    To the extent it calls for internal government

2    deliberations, I would instruct the wit -- Ms.

3    Anderson not to answer under the deliberative

4    process privilege.

5            To the extent you created any

6    document in connection with this question, you

7    can answer the question.

8            THE WITNESS:  I worked to create the

9    original document.

10           BY MR. CONNELLY:

11       Q.   Okay.  And I'm -- and I -- I'm just

12   drawing a distinction.  Maybe I'm making too

13   much of you saying that you worked on, you

14   know, the original draft.

15           It looks like the New York Times

16   obtained a memo that actually went from

17   McCament to Flynn.  So that's no longer a

18   draft.  That's the McCament memo.  Okay?

19       A.   The memo that went from Mr. McCament

20   to Secretary Kelly?

21       Q.   Yes.

22       A.   I have seen that memo.



Page 205

1      Q.    Yeah.

2      A.    Yes.

3      Q.    And was that memo different from

4   your draft memo?

5            MR. MARUTOLLO:  Objection.

6            Again, I'll direct you not to answer

7   this question under the deliberative process

8   privilege because it calls for internal

9   government deliberations.

10           She can answer questions related to

11   this e-mail and -- you know, and that's it.

12   But otherwise we would object under

13   deliberative process privilege and direct her

14   not to answer.

15           MR. CONNELLY:  Not to answer?

16           I -- you're probably going to come

17   back here.  I -- I hate to tell you that.  But

18   we're -- we -- we're, you know, obviously at

19   loggerheads on a lot of things.  And I suspect

20   there's going to be a lot more.  And only the

21   judge is going to sort this out.

22           So there's -- there's nothing more



Page 206

1    to be done.  And you shouldn't answer over --

2    you know if you're going to follow your

3    attorney's objection.

4              MR. MARUTOLLO:  I would note, as

5    discussed previously with plaintiff's counsel,

6    I mean we're willing and there's already been a

7    letter an order.  My understanding today that

8    the judge is available to deal with any issues.

9              So we're not going to be producing

10   Ms. Anderson again.  We're happy to go to the

11   Court, if necessary.  But we're make --

12   maintaining our objection, maintaining a

13   record.

14             BY MR. CONNELLY:

15     Q.    All right.  And so see if I've got

16   this right.

17             You have a recollection that you

18   were involved in the drafting of a -- a memo

19   that ultimately resulted in McCament sending a

20   memo to Secretary Kelly.

21     A.    Yes.

22     Q.    Okay.  And I'm trying to probe --



Page 207

1            MR. MARUTOLLO:  Excuse me for just

2     one moment.

3            MR. CONNELLY:  Sure.

4            MR. MARUTOLLO:  Let me just go off

5     the record for a minute --

6            MR. CONNELLY:  Oh.

7            MR. MARUTOLLO:  -- just to --

8            MR. CONNELLY:  Sure.

9            THE VIDEOGRAPHER:  Just one second.

10           MR. CONNELLY:  Oh.

11           THE VIDEOGRAPHER:  Going off the

12    record.

13           (A short recess was taken.)

14           THE VIDEOGRAPHER:  Going back on the

15    record.

16           The time is 14:19.

17           BY MR. CONNELLY:

18      Q.   And I take it you have in mind --

19    you have in mind the -- the actual memo that

20    went between McCament and Kelly?

21           MR. MARUTOLLO:  Objection.  It calls

22    for speculation.  And also we assert the



Page 208

1    deliberative process privilege.

2           But you can answer the question.

3           THE WITNESS:  What do you mean I

4    have in mind?

5           BY MR. CONNELLY:

6    Q.    Do you have a recollection of that

7    memo that actually went from McCament to Kelly?

8    A.    I've seen it, yes.

9    Q.    Okay.  Good.

10          Here's my question:  I want you to,

11   in your own mind, compare whatever draft you

12   provided with that final memo that went and

13   tell me whether, you know, in essential

14   substance, the final memo was pretty much the

15   same or different than your draft.

16          I don't want to know what anybody

17   said to you.  I don't want to know what you

18   said to anyone else.  I don't care how it came

19   about.

20          I just want the comparison between

21   two documents.  And you tell me whether they're

22   basically the same or if they're different.



Page 209

1          MR. MARUTOLLO:  Again, I would

2    object.  And I appreciate the distinction that

3    counsel is drawing.  But that still calls for

4    internal government deliberations because it

5    goes to the substance of draft materials.

6          And I'd instruct the witness,

7    Ms. Anderson, not to answer that question.

8          BY MR. CONNELLY:

9    Q.    If you go to the first page of this

10   document, the -- it -- you have an e-mail to

11   Mr. Prelogar on April 30th at 8:46 p.m.

12         Do you see that?

13   A.    I do.

14   Q.    You say:  "I especially appreciated

15   that they noted the memo."

16         And do I correctly understand that

17   your -- your reference here to "the memo" is

18   the -- is the memo in the New York Times

19   between -- the final memo that was sent between

20   Mr. McCament sent to -- from Mr. McCament to

21   then Secretary Kelly?

22   A.    That's the memo I'm referring to.



1      Q.    Okay.  Okay.  And you go on to say

2    that:  "The memo did cite a bunch of horrible

3    conditions, but then somehow it reached the

4    wrong conclusion."

5           Now, to be -- let me be fair about

6    this.

7           It appears that you're saying you

8    appreciated that at the New York Times noted

9    that the memo cited a bunch of horrible

10   conditions but then somehow reached the wrong

11   conclusion.

12          And if you go back to the New York

13   Times article, you'll see that just above the

14   bottom of Page 6081, the New York Times

15   editorial says:  "And yet it reached the wrong

16   conclusion."

17          Okay?

18          MR. MARUTOLLO:  Again, I would

19   object on the grounds that I think it's a

20   compound question.  And also to the extent that

21   the document speaks for itself.  But -- and --

22   and on the deliberative process grounds as



1    well.

2              But you can answer the question.

3              MR. CONNELLY:  Yeah.

4              THE WITNESS:  I see the statement in

5    the article "and yet it reached the wrong

6    conclusion."

7              MR. CONNELLY:  Yeah.  Okay.

8              THE WITNESS:  But what is the

9    question?

10             BY MR. CONNELLY:

11       Q.    Well, actually --

12       A.    Okay.

13       Q.    Without going back to law school,

14   this is one of those unusual times when this

15   document really doesn't speak for itself.  But

16   -- and -- and -- and I don't want to blow one

17   by you on what you had to say in your e-mail.

18             So here is -- here is the question:

19   When you write and talk about the memo did cite

20   a bunch of horrible conditions, would you agree

21   that the memo does cite a bunch of horrible

22   conditions?



Page 212

1          MR. MARUTOLLO:  Objection.

2          First, just for clarification, are

3  you referring to the memo that's in the

4  New York Times -- that's referenced in the

5  New York Times article?

6          MR. CONNELLY:  Yes.  Yes.  Yes.

7          MR. MARUTOLLO:  You can answer that

8  question, to the extent you know.

9          THE WITNESS:  My statement that the

10  -- the -- "they noted the memo did cite a bunch

11  of horrible conditions" was referring primarily

12  to this sentence in the article that says:  "In

13  fairness, Mr. McCament's memo does acknowledge

14  many of the other afflictions," and then lists

15  a bunch of negative conditions in Haiti.

16          BY MR. CONNELLY:

17  Q.    Yeah.

18          And then -- but then you go on to

19  say -- and it's a compound sentence, so I'll

20  just, you know, shrink it too.

21          But you -- you essentially say the

22  memo -- that the New York Times article says



Page 213

1    that the memo somehow reached the wrong

2    conclusion.

3              Is that -- is that what you were try

4    -- is that what you were trying to convey in

5    your e-mail?

6              MR. MARUTOLLO:  Objection.  Again, I

7    think the e-mail speaks for itself.

8              And to the extent this calls for

9    internal government deliberations, I instruct

10   you not to answer.

11             But you can, you know, provide an

12   explanation of what you wrote in your e-mail

13   limited to this e-mail, this document.

14             THE WITNESS:  I was -- excuse me --

15   highlighting that the New York Times article

16   highlighted the fact that McCament's memo had,

17   you know, cited all of these conditions that I

18   just referred to and then noted in the

19   following sentence "and yet it reached the

20   wrong conclusion."

21             BY MR. CONNELLY:

22   Q.    Yeah.  The memo.



Page 214

1               So my -- my -- my simple question to

2       you -- and again, I wanted to be completely

3       transparent about this.  I didn't want you to,

4       you know, not appreciate, you know, what was in

5       the New York article.

6               When you referenced that the memo

7       somehow reached the wrong conclusion, were you

8       referencing that's what the New York Times

9       concluded, or was that your own conclusion,

10      that -- that the memo reached the wrong

11      conclusion?

12              MR. MARUTOLLO:  Objection.

13              Again, to the extent that calls for

14      an internal government deliberation, in turn --

15      including your own interpretation of the memo,

16      I would instruct you not to answer.  But

17      otherwise, you can answer the question.

18              THE WITNESS:  My e-mail is noting

19      that the New York Times stated that the memo

20      reached the wrong conclusion.  I was stating

21      that I appreciated the statement by the

22      New York Times.



Page 215

1           MR. CONNELLY:  Okay.  Let's now go

2   to 20 -- KA-21.

3           (Deposition Exhibit KA-21 was marked

4   for identification.)

5           BY MR. CONNELLY:

6   Q.    This is a relatively long e-mail

7   chain.  I'm only going to be asking you

8   questions about the final two memos which are

9   contained on the first page of this long chain.

10  A.    Okay.

11  Q.    Okay.  On the first page of this

12  memo, there is a May 1st e-mail from LeRoy

13  Potts at 4:30 p.m. to you and others, bullet

14  pointing what he describes as difficult

15  conditions in Haiti.

16          Do you see that?

17  A.    Yes.

18  Q.    Okay.  To your knowledge, were the

19  factual observations made by Potts accurate?

20          MR. MARUTOLLO:  Objection.  Again,

21  to the extent it calls for internal government

22  deliberations, I instruct you not to answer



Page 216

1  under the deliberative process privilege, but

2  you can answer within the four corners of this

3  document.

4         THE WITNESS:  I mean, I can't speak

5  to the accuracy of the information in these

6  bullet points, that is the research unit's

7  expertise.  I treated them as accurate in my

8  work.

9         BY MR. CONNELLY:

10     Q.    Okay.  And then the last memo, which

11  is the top memo, appears to go from Brandon

12  Prelogar to you on May 8 of 2017, but his, you

13  know, the top line of his memo is Roy/Tom.

14         Is it safe to assume that Roy was

15  probably LeRoy Potts?

16     A.    Yes.

17     Q.    Who would Tom be?

18     A.    Tom Perkowski.

19     Q.    Who was he?

20     A.    He worked for Roy in the research

21  unit.

22     Q.    Okay.  And this is -- I get to ask



Page 217

1   the questions, but some of them are more -- may

2   be more difficult to answer than others.

3           Do you have an understanding if the

4   -- if Brandon is addressing Roy and Tom, but it

5   appears that the memo only goes to you, are you

6   able to puzzle through that or do you have some

7   understanding of that?

8           MR. MARUTOLLO:  Objection.  Calls

9   for speculation, but you can answer.

10          THE WITNESS:  I don't remember

11  regarding this specific e-mail, but Brandon and

12  I have a general practice sometimes of sending

13  a draft e-mail to each other before we send it

14  to the final recipient, to see if the other

15  person has any thoughts or edits.

16          BY MR. CONNELLY:

17  Q.    Okay.  Are you guys basically -- are

18  kind of co-equals in the organization at least

19  at this time, you and Brandon?

20  A.    He was the chief of the division, I

21  was deputy chief of the division, but we led it

22  together essentially.


MAGNA
LEGAL SERVICES

Page 218

1      Q.    Okay.  And according to Brandon's

2  e-mail, you have been asked to gather up

3  certain information and then he itemizes them

4  as numerically 1, 2, 3 in his e-mail.

5            Do you see that?

6      A.    Yes.

7            MR. MARUTOLLO:  Objection.

8            BY MR. CONNELLY:

9      Q.    When I said you, I guess let's be

10  more specific.

11            Were you personally asked to be a

12  part of this or who is being asked to gather

13  this information?

14            MR. MARUTOLLO:  Objection.

15            Without divulging any government

16  deliberations, you can answer that question.

17            THE WITNESS:  I think we, Brandon

18  and I were going to be asking Roy and Tom for

19  the research unit to be gathering this

20  information.

21            BY MR. CONNELLY:

22      Q.    And it was Kathy -- help me out with



Page 219

1    the last name.  I don't have it in front of me.

2    Nuebel Kovarik who asked you to do this?

3         A.    I believe the reference in the first

4    sentence of Brandon's e-mail, Kathy, refers to

5    Kathy Nuebel Kovarik.

6         Q.    Okay.  That's fine.  And what was

7    your understanding of the purpose of gathering

8    this information?

9              MR. MARUTOLLO:  Objection.  I'm

10   going to direct the witness not to answer that

11   question.  Again, that relates to deliberative

12   process privilege and, you know, I think that

13   goes beyond just the mere general subject

14   matter of the communication that would be

15   permitted, if we were to put a privilege log in

16   place here, so when we produce the documents, I

17   think you can answer questions related to the

18   document, but the question as raised, we would

19   object.

20             BY MR. CONNELLY:

21        Q.    Do you have a recollection of

22   whether -- in what portion of, you know, a memo



Page 220

1    for extension or termination, this type of

2    information would be used.

3            Was that the purpose of gathering

4    it, so that ultimately, it might be

5    incorporated into some memo exploring either

6    designation or termination or extension?

7            MR. MARUTOLLO:  Objection.  Vague.

8            And also again, to the extent it

9    calls for internal government deliberations, I

10   instruct you not to answer the question.  It

11   also calls for speculation, as you didn't draft

12   this e-mail, but you can answer to the extent

13   you can base that answer on this document that

14   is in front of you.

15           THE WITNESS:  Looking at this

16   e-mail, it looks like this information was

17   being requested by DHS headquarters in order to

18   feed into the Haiti TPS decision memo, which is

19   the memo we have been talking about from the

20   director of USCIS to the secretary.

21           MR. CONNELLY:  Let's go to KA-22.

22           (Deposition Exhibit KA-22 was marked



Page 221

1    for identification.)

2              THE WITNESS:  Okay.

3              BY MR. CONNELLY:

4        Q.    Okay.  I am interested in your final

5    memo on May 12 at 3:38 p.m., which is at the

6    top.  It is obviously part of the chain.

7              Am I correct that the context is

8    that your group has been asked to review some

9    materials for the head of Homeland Security's

10   upcoming meeting with the Haitian foreign

11   minister?

12             MR. MARUTOLLO:  Objection, to the

13   extent the document speaks for itself, but you

14   can answer limited to the document.

15             THE WITNESS:  Yes.  It looks like

16   this is asking for our review of the materials

17   that had been drafted for that meeting.

18             BY MR. CONNELLY:

19       Q.    Do you have a recollection of

20   reviewing that sum of materials?

21       A.    I believe that I did review the

22   materials based on this e-mail, but I certainly



Page 222

1    don't recall the details of those materials.

2         Q.    And your observation in your e-mail

3    is:  "The explanation of the current

4    situation/conditions in Haiti in the BM is

5    amazing.  I love it."

6              Correct?

7         A.    Yes.

8         Q.    When you say, "the explanation,"

9    what does that mean?  Is that a reference to

10   the materials or -- or what document are you

11   referring to?

12             MR. MARUTOLLO:  Objection.  Again to

13   the extent it calls for internal government

14   deliberations, I instruct you not to answer

15   under the deliberative process privilege.

16             You can answer -- your explanation

17   in this document but I instruct you not to

18   answer to the extent it's related to how you

19   interpreted something or how others interpreted

20   something.  You can answer with those

21   limitations.

22             THE WITNESS:  I think I was



Page 223

1    referring to something that must have been

2    included in the briefing memo that I reviewed,

3    that explained the current situation and

4    conditions in Haiti.

5              BY MR. CONNELLY:

6    Q.    What is the acronym BM?

7    A.    Briefing memo.

8    Q.    So I'm going to reword your

9    observation and that will be:  "The explanation

10   of the current situation/conditions in Haiti in

11   the briefing memo is amazing."

12             And is the briefing memo, is that

13   the document that you received from who?  Who

14   generated the briefing memo?  I don't care what

15   is in it.  I am just trying to understand who

16   is the author of the document.

17   A.    Looking at the e-mail chain in the

18   initial e-mail from 3:30, when it says:  "DHS

19   policy has requested USCIS review materials for

20   the meeting," I take that to mean that most

21   likely, DHS policy was the originator of those

22   materials.



Page 224

1     Q.     Have you in the past -- beyond this

2   particular circumstance, have you been asked in

3   the past to review a briefing memo generated by

4   DHS policy?

5          MR. MARUTOLLO:  Again, I would

6   instruct the witness not to answer to the

7   extent it calls for any internal government

8   deliberation.  If it doesn't, you can answer

9   the question.

10         THE WITNESS:  Yes, it is very common

11  practice.

12         BY MR. CONNELLY:

13    Q.     Okay.  And when you indicate that

14  the briefing memo or at least the explanation

15  of the current conditions is amazing, do you

16  recall, you know, whether you were using, you

17  know, either sarcasm, irony, valley girl talk,

18  whatever, you know, I mean amazing gets used

19  quite a bit, most overused words at weddings

20  that I can recall, what was your -- what were

21  you conveying by using that term?

22         MR. MARUTOLLO:  Again, I would



Page 225

1    object on deliberative process grounds and

2    object to vagueness as well.  You can certainly

3    explain but not how others interpreted it, what

4    is written in this e-mail.

5              THE WITNESS:  My best recollection

6    of what I meant is -- by amazing, is that I

7    found the explanation of conditions in the

8    briefing memo to be surprising to me.

9              BY MR. CONNELLY:

10    Q.    And then you say, "I love it."

11              Again, just your explanation of what

12    you meant to convey by that, that you genuinely

13    agreed or were you speaking sarcastically,

14    ironically, or in some fashion other than just

15    a declarative statement?

16              MR. MARUTOLLO:  Objection.

17              You can answer.

18              THE WITNESS:  I was speaking

19    sarcastically.

20              MR. CONNELLY:  Okay.  I will go to

21    KA-23, which is 1564.

22              (Deposition Exhibit KA-23 was marked



Page 226

1   for identification.)

2          THE WITNESS:  Okay.

3          BY MR. CONNELLY:

4   Q.    Your memo on May 15 at 12:40 p.m.,

5   you start off by saying:  "We finished our

6   review and inserted our edits/comments into the

7   documents."

8          What documents?  I just need a

9   better -- I would like a more specific

10  description of what the documents were.

11  A.    I think they were communications

12  documents relating to Haiti TPS and my best

13  guess is that they were the documents

14  hyperlinked in the May 15, 9:50 e-mail in this

15  chain.

16  Q.    And you go on to say:  "The majority

17  of our changes are to make clear that the

18  decision is to terminate Haiti's designation."

19         Am I correct that as of the middle

20  of May in 2017, in that time frame, you thought

21  that the decision was that Haiti's status as a

22  TPS entity was going to be terminated, correct?



1             MR. MARUTOLLO:  Objection.  Again, I

2    would direct you not to answer that question to

3    the extent it goes to your own personal views

4    or personal thoughts.  I would instruct you not

5    to answer that question under the deliberative

6    process privilege as to that question as

7    phrased.

8             MR. CONNELLY:  You're not going to

9    let her answer that question at all?

10            MR. MARUTOLLO:  No, I mean, the way

11   it's phrased --

12            MR. CONNELLY:  Okay, okay.  All

13   right.  Let me see if I can rework it.

14            BY MR. CONNELLY:

15   Q.    What was your -- what was your

16   understanding in terms of the work that you

17   were generating in the middle of May of 2017,

18   what was the decision going to be as far as

19   continuing or terminating Haiti's TPS

20   designation?

21            MR. MARUTOLLO:  Again, I would

22   direct the witness not to answer, that calls



1    for internal government deliberations.  To the

2    extent then under the deliberative process

3    privilege, to the extent the question is to

4    explain something within this e-mail, KA-23,

5    you know, we will allow her to answer the

6    question along those lines with certain

7    objections, but a blanket question about her

8    thoughts of where the decision was at a certain

9    point is clearly predecisional, clearly

10   deliberative, and we would instruct

11   Ms. Anderson not to answer.

12            MR. CONNELLY:  So you're not going

13   to let her answer that question at all?  I

14   thought -- you put a qualifier in there, but

15   you went on for a little bit.

16            MR. MARUTOLLO:  No, I mean, I put

17   the qualifier in.  I mean, if you rephrase the

18   question.  It's about the e-mail.  I don't want

19   to put words in her mouth either.  I mean, if

20   the question is rephrased and it is related to

21   the e-mail, I think we might, you know, there

22   may be more ability to have Ms. Anderson answer



Page 229

1    the question.

2              MR. CONNELLY:  Well, I'm just going

3    to stay with what's commonsensical.

4              BY MR. CONNELLY:

5        Q.    Let's look back -- I mean, let's go

6    back and forth so you know where I am coming

7    from.

8              Ultimately, at the end of May, there

9    was a decision made to extend the TPS status of

10   Haiti, correct?

11             MR. MARUTOLLO:  Objection.

12             You can answer.

13             THE WITNESS:  Yes.

14             BY MR. CONNELLY:

15       Q.    Yes, okay.  But a few weeks earlier

16   in the middle of May, am I correct that at that

17   time, you were helping to try to generate

18   documents under what appeared to be the

19   consensus, the CIS trying to assist in

20   terminating Haiti's designation.

21             I am just trying to -- it couldn't

22   be plainer to me, but you were there and I'm



Page 230

1    not.  I'm just reading from a document.  I want

2    to hear from someone who was there whether in

3    the middle of May, the decision appears there

4    was going to be to terminate.

5                MR. MARUTOLLO:  Objection.  Again, I

6    would direct the witness not to answer.  The

7    question as posed is about whether it appeared

8    that the decision was going to be to terminate,

9    that goes right to a predecisional deliberative

10   communication.  So I'm going to direct this

11   witness not to answer that question.

12               Again, I'm happy to direct the

13   witness to answer questions that are more

14   limited to this e-mail, KA-23, but the way the

15   question is phrased, I will instruct

16   Ms. Anderson not to answer the question.

17               BY MR. CONNELLY:

18        Q.    Were the majority of the changes

19   that you made to the document, did they make

20   clear that the decision was to terminate

21   Haiti's designation?

22               MR. MARUTOLLO:  Again, I would raise



Page 231

1    the same objection.  I think, again, unless you

2    are talking about something specific in this

3    e-mail, KA-23, I would direct the witness not

4    to answer because again, it remains a

5    predecisional memorandum that is -- or a

6    document that is subject to deliberative

7    process privilege.

8           BY MR. CONNELLY:

9    Q.    Was it accurate on May 15, 2017,

10   that the majority of your changes made clear

11   that the decision was to terminate Haiti's

12   designation?

13          MR. MARUTOLLO:  Again, I'm sorry to

14   keep pushing this, but I think the question is

15   still substantively the same, it's the same

16   objection.  It's a predecisional, deliberative

17   document that you are asking about substantive

18   changes to, and we would assert the

19   deliberative process privilege and direct

20   Ms. Anderson not to answer.

21          BY MR. CONNELLY:

22   Q.    Were you being truthful when you



Page 232

1    made the assertion in your May 15, 2017 e-mail:

2    "The majority of our changes are to make clear

3    that the decision is to terminate Haiti's

4    designation rather than focusing on the

5    six-month extension of benefits."

6              Was that a truthful statement at the

7    time?

8              MR. MARUTOLLO:  Objection.

9              But you can answer that question.

10             THE WITNESS:  Yes.

11             BY MR. CONNELLY:

12   Q.    The sentence continues on a bit, and

13   to pick it up, you say the -- your changes are

14   to make clear that the decision is to terminate

15   rather than focusing on a six-month extension:

16   "Which we did for West Africa at the

17   encouragement of the White House."

18             Is that a reference to some type of

19   a six-month extension given to West Africa?

20   A.    That's a reference to the decision

21   that was made to terminate the TPS decisions of

22   Guinea, Liberia and Sierra Leone.  In 2016,



Page 233

```
 1    that decision was made.  And it had been

 2    explained as a six-month extension of benefits

 3    in many of the communication materials.

 4         Q.    So West Africa was a catch-all

 5    phrase for the more specific countries that you

 6    just mentioned?

 7         A.    Yes.

 8         Q.    And then the last one, the one

 9    that's above it, by Alex Echevarria,

10    E-C-H-E-V-A-R-R-I-A, there's a reference to an

11    acronym CSPED.

12              Do you see that?

13         A.    Yes.

14         Q.    Can you tell me what that is?

15         A.    It's the customer service and public

16    engagement division or directorate, I'm not

17    sure.

18              MR. CONNELLY:  I'm going to go to

19    KA-25, which is 8094.

20              (Deposition Exhibit KA-25 was marked

21    for identification.)

22              MR. MARUTOLLO:  Can we go off the
```



Page 234

1    record for just a moment.

2            MR. CONNELLY:  Yes.

3            THE VIDEOGRAPHER:  We're going off

4    the record.

5            The time is 14:50.

6            (A short recess was taken.)

7            THE VIDEOGRAPHER:  We're going back

8    on the record.

9            The time is 14:53.

10           BY MR. CONNELLY:

11      Q.    All right.  I have given you KA-25

12   which is an e-mail chain that ends up on May

13   20, 2017.

14           Do you have that before you?

15      A.    Yes.

16      Q.    What I think I will do for your sake

17   to ease working with your handwritten notes

18   that we got last night, do you still have in

19   front of you the series of handwritten notes

20   which run from KA-50 to KA--- I think 53?

21      A.    Yes.

22           MR. MARUTOLLO:  I'll just note for



Page 235

1    the record, we do object to questions related

2    to KA-50, 51, 52 and 53 on the grounds of

3    deliberative process privilege.

4         We will permit questions to be asked

5    on this as we produced them yesterday, with the

6    caveat that they were produced because they

7    were -- that Ms. Anderson had used them to

8    refresh her recollection as we noted in the

9    government's letter last night, but we do want

10   to at least maintain our objection that these

11   are deliberative documents.

12        BY MR. CONNELLY:

13   Q.   I may ask you to multitask, we'll

14   eventually get to these, you know, separately

15   if need be, but because you had told me earlier

16   in the day that at least some of these

17   documents, your -- kind of the best

18   recollection was that maybe they were generated

19   sometime around the May 20 or, you know,

20   slightly later dates, with the one on top

21   perhaps being as late as May 31.

22        I thought I would ask you to keep



Page 236

1   those nearby because in asking you questions

2   now about the next several documents which were

3   all in this time frame, if any of that, you

4   know, I am going to get around to asking you

5   about all of these.  You're not going to be

6   able to duck me asking you about them, so if

7   it's easier for you to bring to my attention,

8   okay, well, that is not matching up with my

9   notes, that's how we will handle it.  I will

10  leave it up to you whether you want to do that

11  or not.  Okay.

12          So for the moment, let's just go to

13  KA-25.

14          Have you had a chance to review it?

15  I'm sorry, maybe you haven't looked at it yet.

16     A.    I'm okay.  I have looked at it.

17     Q.    You have?

18     A.    Yes.

19     Q.    If we go to the -- on the bottom of

20  the first page, Mr. Prelogar on May 20, at 9:58

21  a.m., sends you an e-mail and the subject is:

22  "Haiti Comms," C-O-M-M-S.



Page 237

1          What does COMMS mean?

2     A.    I believe it's an abbreviation for

3 communications.

4     Q.    Okay.  And he says in his e-mail:

5 "These people need a helping handout."  I'm

6 continuing:  "So deeply disrupted here this

7 pillar of normality (our trusty second in

8 charge) was anything but.  Looks like there are

9 whack jobs everywhere, even in the civil

10 service."

11          Who -- what was your understanding

12 of who the people were who needed helping out?

13          MR. MARUTOLLO:  Objection.  Again,

14 this calls for internal government

15 deliberations, instruct Ms. Anderson not to

16 answer this question under the deliberative

17 process privilege.

18          Also calls for speculation as she

19 did not -- she did not draft this e-mail.  I

20 will, however, limit Ms. Anderson's testimony

21 in this area to explain her understanding of

22 this document, but not how Mr. Prelogar, what



Page 238

1    he meant or how he interpreted this

2    characterization.

3             BY MR. CONNELLY:

4        Q.    That's okay.  I will say, you know,

5    I will not pretend to be the world's greatest

6    lawyer, I'd like to think my skills lie in some

7    other directions, but that really wasn't my

8    question.  I didn't ask anything at all about

9    what was in Brandon's head.

10            So, but what I was asking her was

11   exactly what you said she could answer, so

12   let's go ahead.

13            MR. MARUTOLLO:  I disagree with that

14   characterization, but understood.

15            MR. CONNELLY:  Okay.

16            THE WITNESS:  I'm not sure who he

17   was referring to when he said these people need

18   a helping handout.

19            BY MR. CONNELLY:

20       Q.    Do you know who he was referring to

21   when he talked about a person who was

22   characterized as our trusty second in charge?



Page 239

1              MR. MARUTOLLO:  I would just

2    reassert the same objection from a moment ago,

3    but you can answer given that objection.

4              THE WITNESS:  I read that to mean

5    Deputy Secretary Duke.

6              BY MR. CONNELLY:

7    Q.    And what -- did you have an

8    understanding at the time, your understanding,

9    I am not asking you to get inside of Mr.

10   Prelogar's head.

11             When you read whack jobs, who did

12   you think that referred to?

13             MR. MARUTOLLO:  Again, I instruct

14   you not to provide internal government

15   deliberations, but to the extent you have an

16   understanding of what this meant, I am also

17   objecting on the grounds of speculation, you

18   can answer that question.

19             THE WITNESS:  I'm not sure of what

20   individuals he's speaking about, but I think

21   that this general transmission was talking

22   about my meeting with Deputy Secretary Duke the



MAGNA
LEGAL SERVICES

Page 240

1    previous day.

2           BY MR. CONNELLY:

3    Q.    Okay.  And was that a meeting that

4    he also attended?

5    A.    No.

6    Q.    So is it a fair conclusion you

7    reached that you had relayed to him in some

8    fashion, some aspects of that meeting and he's

9    giving you his reaction to what he learned

10   about the meeting from you?

11          MR. MARUTOLLO:  Objection.  Again, I

12   think that directly calls for internal

13   government deliberations and I instruct the

14   witness not to answer under the deliberative

15   process privilege.

16          BY MR. CONNELLY:

17   Q.    Do you -- let's go back then.

18          What was the nature of your meeting

19   with what was then, what, Acting Secretary

20   Duke?

21   A.    The question is what her position

22   was at the time?



1     Q.     Yeah.

2     A.     I believe she was deputy secretary

3    at that time.  I can't remember if she was

4    acting deputy secretary or actually deputy

5    secretary.

6     Q.     And you said that the e-mail from

7    Mr. Prelogar is on a Saturday, May 20, and you

8    just told me that you think he was commenting

9    on a meeting that you had with Deputy Secretary

10   Duke the previous day?

11    A.     Correct.

12    Q.     Who was in attendance of that

13   meeting with you and the Acting Secretary Duke?

14    A.     The people that I recall being at

15   the meeting, I'm not entirely sure that this

16   was everybody who was there.  I was there,

17   Deputy Secretary Duke was there, James McCament

18   was there and Gene Hamilton.

19    Q.     So those were all Department of

20   Homeland Security folks?

21    A.     Yes.

22    Q.     And what was the -- I don't want to



Page 242

1    get into deliberative process, just what was

2    the topic or topics covered at the meeting?

3        A.    The nature of the meeting was to

4    talk about the TPS process.

5        Q.    Talk about it more broadly than just

6    Haiti?

7        A.    Yes.

8        Q.    Did you have disagreements with

9    Deputy Secretary Duke in terms of some of the

10   aspects of that process?

11           MR. MARUTOLLO:   Again, objection.

12   This calls for internal government

13   deliberations arising out of a meeting that was

14   attended by various people within the

15   Department of Homeland Security, so I instruct

16   Ms. Anderson not to answer that question under

17   the deliberative process privilege.

18           BY MR. CONNELLY:

19       Q.    You -- I guess responded.  He wrote

20   to you on a Saturday at 9:58 a.m., and you got

21   back to him at 10:41 a.m., and part of your

22   response is:  "You caught me at the peak of my



Page 243

1   fuming."

2           What is that a reference to?

3           MR. MARUTOLLO:  Objection.

4   Deliberative process grounds, same as we

5   discussed earlier, but you can answer that

6   question.

7           THE WITNESS:  I believe I was

8   referring to being frustrated following the

9   meeting that had occurred the previous day.

10          BY MR. CONNELLY:

11      Q.   And frustrated, not -- again, I

12  don't want to go into any kind of

13  deliberations, but just in terms of your job

14  duties and responsibilities, were you

15  frustrated about them in some fashion?

16          MR. MARUTOLLO:  Objection.

17          You can answer.

18          THE WITNESS:  Them, being my job

19  duties?

20          BY MR. CONNELLY:

21      Q.   Yeah, or responsibilities.  Yeah.

22      A.   No, I wasn't frustrated about my job



Page 244

1     duties or responsibilities.

2          Q.    Is it safe to say you weren't -- the

3     meeting wasn't about you getting a salary raise

4     or a promotion.  Your frustration had nothing

5     to do with those kinds of topics, correct?

6               MR. MARUTOLLO:  Objection.

7               THE WITNESS:  I'm sorry, I didn't

8     understand.

9               BY MR. CONNELLY:

10         Q.    No.  I am just trying to -- I'm just

11    trying to narrow the universe of what -- again,

12    without going into who said what, I just want

13    the topic area.  Much like an attorney

14    privilege log, you are given the topic area

15    even though you are not given any detail.

16              I just want to get a sense of what

17    it was that you were frustrated about.

18              MR. MARUTOLLO:  Objection, again,

19    she did already give like a privilege log, the

20    general subject matter of that meeting, the

21    document speaks for itself, and what that

22    question is posing, is getting into the



Page 245

1    deliberative discussions that took place at

2    that meeting so it goes right to the heart of

3    the substance of that meeting, so I instruct

4    the witness not to answer under the

5    deliberative process privilege.

6            BY MR. CONNELLY:

7    Q.    Your -- the final e-mail is about an

8    hour later, back from Mr. Prelogar, where he

9    says:  "Maybe we should start flooding them

10   with new TPS recs."

11           Is recs a shortened form of

12   recommendations?

13   A.    Yes, I believe so.

14   Q.    And he goes on to say:  "Could be a

15   real hoot."

16           Do I take it that this is, at least

17   in some fashion, not intended to be taken

18   literally?

19           MR. MARUTOLLO:  Objection.  Calls

20   for speculation.  You can answer.

21           THE WITNESS:  I think it may have

22   been somewhat hyperbolic.



Page 246

1          BY MR. CONNELLY:

2     Q.    That was on May 20th.

3          I am going to now give you KA-27.

4     We will skip a document.  This is the register,

5     2383.

6          (Deposition Exhibit KA-27 was marked

7     for identification.)

8          BY MR. CONNELLY:

9     Q.    Am I correct that this is the FRN

10    for the extension of the TPS status for Haiti

11    issued on May 24, 2017?

12    A.    Yes, that's what it looks like.

13    Q.    And if I recall correctly from this

14    morning, you thought that perhaps most of your

15    handwritten notes related to meetings that

16    occurred prior to the time that this FRN came

17    out?

18    A.    I think that's correct, yes.

19    Q.    With the possible exception, if you

20    look at it -- of KA-50, which at least at the

21    top seems to indicate that the call occurred on

22    May 31 which would have been a week later?



Page 247

1    A.    Yes, that was after the FRN came

2  out.

3    Q.    Okay.  And let me go into this

4  document for a minute and then we will return

5  and get to your handwritten documents.

6          If you will go to Page 4 of the FRN.

7          And again, as I had asked you about

8  earlier, extensions, there is a bold category

9  that begins with the question:  "Why is the

10  secretary extending the TPS designation for

11  Haiti through January 22, 2018."

12          Is that right?

13    A.    Yes.

14    Q.    Could you help me -- this must have

15  something to with printing.  You will see that

16  the second paragraph has an asterisk that

17  begins with -- that has a number 23832 in bold?

18    A.    Uh-huh.

19    Q.    Can you decipher or translate that

20  for me?

21    A.    It's the physical Federal -- Federal

22  Register notice page number.  That's the page



Page 248

1    number that begins a new page in the printed

2    Federal Register.

3        Q.    I see.  I am just going back to -- I

4    seem to have forgotten 31 if we go back, but I

5    shouldn't waste time on that.

6        A.    I see it.

7        Q.    You found it?

8        A.    It's in the last photograph on Page

9    2.

10       Q.    I see it.  They don't necessarily

11   put it in the margin.

12       A.    No, it's just wherever the page

13   break is in the printed version.

14       Q.    Thank you.  Am I correct, and this

15   is really -- I mean, it does speak for itself,

16   but as a participant -- you were a participant

17   and had a role in the process of generating the

18   materials that ultimately led to a decision

19   that is summarized in this document, correct?

20             MR. MARUTOLLO:  Objection.  Vague,

21   but you can answer.

22             THE WITNESS:  Yes, I participated in



Page 249

1      the process that led to this decision.

2               BY MR. CONNELLY:

3        Q.    Okay.  Okay.  And under the section

4      that explains why the secretary extended the

5      designation, if you go down two paragraphs, the

6      paragraph that begins with Hurricane Matthew,

7      was that one of the factors that is raised

8      under the category of why the secretary

9      extended the designation?

10       A.    Yes.  Hurricane Matthew is discussed

11     in that section.

12       Q.    Hurricane Matthew which hit Haiti in

13     October of 2016, which would have been

14     substantially after the January 2010

15     earthquake, correct?

16               MR. MARUTOLLO:  Objection.  Vague.

17               You can answer.

18               THE WITNESS:  It's after 2010, yes.

19               BY MR. CONNELLY:

20       Q.    And then the next paragraph talks

21     about some heavy rains in late April of 2017

22     that caused flooding and landslides as being a



Page 250

1    part of the reasons why the secretary extended

2    the designation, correct?

3         A.    Yes.

4         Q.    And again, I am just making this for

5    the record.

6              Those heavy rains would have been

7    well after the January 2010 earthquake,

8    correct?

9         A.    They were in 2017 which was after

10   the 2010 earthquake.

11        Q.    Then finally, the next paragraph, I

12   will quote a portion of -- the early portion of

13   the paragraph:  "Haiti's weak public health

14   system is further strained due to an ongoing

15   cholera epidemic whose inception was traced to

16   U.N. peacekeepers assisting with earthquake

17   recovery."

18              And that was also included among the

19   reasons why the secretary extended the

20   designation?

21        A.    Yes.

22        Q.    And again, if peacekeepers couldn't



Page 251

1    show up until after the earthquake, so the

2    cholera epidemic occurred after the January

3    2010 earthquake, correct?

4              MR. MARUTOLLO:  Objection.  I think

5    the document speaks for itself, but you can

6    answer the question.

7              THE WITNESS:  My understanding is

8    that the cholera epidemic started after the

9    earthquake.

10             BY MR. CONNELLY:

11        Q.   Okay.  Now, framing -- we have the

12   FRN which occurs on May 24 and the previous

13   document that I had been asking you about, I

14   think was on -- I think it was May 20, yeah, it

15   was May 20th.  All right.

16             Now that we are in this part of the

17   calendar, why don't you help me through these

18   meetings that occurred that you thought

19   sometime in the time frame and if you would, go

20   ahead and arrange these documents in whatever

21   you think is the proper sequential order and

22   that's how I'll talk to you about them.



Page 252

1      A.      So I believe that KA-53 which is TPS

2      colon at the top.

3      Q.      Okay.

4      A.      I think these were notes from the

5      May 19 meeting with Deputy Secretary Duke that

6      I was referring to in the May 20th e-mail.

7      Q.      So I should start with that, or do

8      you want to tell me how you have these shuffled

9      so I know the order?

10     A.      Let me put them in order first so

11     that I am doing it all at the same time.

12             I think that KA-51 were notes from

13     the media call once the announcement was made.

14     I think I had previously said maybe that was on

15     May 20th, but now after we looked at this

16     e-mail, the 20th was a Saturday so I don't

17     think it was Saturday so it possibly was Monday

18     following that, although I'm not certain of the

19     date.  But it was the day that the public

20     announcement from the secretary was made,

21     possibly the 22nd.

22     Q.      Okay.



Page 253

1      A.     And then KA-52, I believe followed

2    that.  I was thinking it was the same week that

3    the announcement was made.  Again, my best

4    recollection was that maybe it was the 23rd of

5    May, so I think that was next, but again, I'm

6    not a hundred percent certain without looking

7    at my calendar.  And then the May 31 for 50, I

8    think.  So I have 53, 51, 52, 50 in

9    chronological order.

10     Q.     All right.  So starting with KA-53,

11   the third line says S2, and is that a reference

12   to Deputy Secretary Duke?

13     A.     Yes.

14     Q.     Okay.  If you will turn the page,

15   near the bottom of what is the Bates number on

16   this page now is Anderson 2, the last five

17   lines start with G.

18            Could you read the remainder of that

19   page.

20     A.     "Gene, we haven't tracked data.

21   Public benefits, we don't know, hey, what are

22   you doing with your time here.  During next six



1    months for Haiti."

2        Q.    Do you remember who or where you put

3    the quotes from, hey, we don't -- "hey, what

4    are you doing with your time here?"

5            Who are you quoting?

6            MR. MARUTOLLO:  Again, objection to

7    the extent it calls for internal government

8    deliberations, I instruct you not to answer

9    under the deliberative process privilege.  You

10   can identify, and I think this is consistent

11   with the question, the only identity -- just

12   for clarification purposes, only the identity

13   of the person who you quoted here in your

14   notes.

15           THE WITNESS:  I think all of these

16   last five lines were reflecting statements made

17   by Gene including what it is in quotes.

18           BY MR. CONNELLY:

19       Q.    And if you go -- let's go to the

20   next page.  Let's start -- about four lines

21   down after the little break.  If you'd start

22   reading that for about six or seven lines, I



Page 255

1   will tell you when to stop.

2        A.    "If a new designation, what can we

3   do to gather new info.  Not if a million man

4   hours.  S1 and S2 like to make decisions on the

5   facts.  Gene, yes, ma'am, that's the right way

6   to do things.  Not to disparage anyone in past

7   administrations, but kind of a perfunctory

8   decision, things are still bad.  Don't want to

9   give false hope.  Don't want people to go back

10  to war zone.  Need to use our resources wisely.

11  Bring back programatic integrity."

12       Q.    Okay.  That's fine.  What is -- S1

13  would have been Secretary Kelly?

14       A.    That was a reference to Secretary

15  Kelly.

16       Q.    And S2 would have been a reference

17  to Duke?

18       A.    Yes.

19       Q.    On the next page, could you tell me

20  -- well, first of all, the reference -- there

21  is a reference -- not reference, there is the

22  word James.



Page 256

1           Is that McCament?

2      A.    Where do you see that?

3      Q.    I'm sorry.  On Page 04.

4      A.    Yes, that was a reference to James

5   McCament.

6      Q.    And the next lines, apparently S2

7   being Duke and then it says:  "Can we support

8   keeping state in their lane?"

9           Is that right?

10     A.    That's what it says.

11     Q.    Did I read it correctly?

12     A.    Yes.

13     Q.    Let's just use that as an easy

14   example to set this up.

15         MR. CONNELLY:  Joe, I will just ask

16   the question and then we're going to probably

17   have a little bit of conversation.  You may get

18   a breather.

19         I would like to know, you know, her

20   best recollection of what, you know, Duke was

21   asking and what the answer was.

22         Are you going to assert privilege



Page 257

1    for my exploring the, you know what is behind

2    the notes that are obviously less than the

3    entire conversation?

4            MR. MARUTOLLO:  Yes.  I mean, I

5    would assert deliberative process privilege.

6            MR. CONNELLY:  Help me out here.

7    I'm kind of making a record.  Let's stay on the

8    record on this.

9            MR. MARUTOLLO:  Sure.

10           MR. CONNELLY:  I understand that you

11   felt, you know, you should give us these

12   documents because they apparently were used by

13   the deponent in getting ready.  But of what

14   value are they to me, and how have you not

15   waived any possible privilege by having handed

16   me contemporaneous documents that occurred at

17   the time of these meetings?

18           MR. MARUTOLLO:  Well, I think you

19   can answer that in a few ways.  First, we

20   produced deliberative materials that were

21   produced in the Ramos case in this matter,

22   consistent with how we produce materials that



Page 258

1  were formerly deliberative.  We have limited --

2  throughout this deposition, we have limited

3  Ms. Anderson's testimony to just explaining

4  certain items in her e-mails but not about

5  anything that goes beyond the four corners of

6  the document.

7          Here, we produced these documents in

8  good faith because they were used by

9  Ms. Anderson to refresh her own memory.  We

10  wanted to produce them to plaintiffs as quickly

11  as possible upon receipt, and having said that

12  though, we noted explicitly in our letter that

13  the reason we were producing them is because

14  they were independently used to refresh her

15  recollection.

16          We did not waive any privilege in

17  our letter and the notes speak for themselves.

18  You can ask her questions about, you know, what

19  things mean and to explain things within the

20  notes, but from our perspective, any discussion

21  about what Secretary Duke said or what

22  Secretary Duke asked to do is, I think by



Page 259

1   definition, an internal government deliberation

2   predecisional and, you know, we would instruct

3   the witness not to answer that question under

4   the deliberative process privilege.

5           MR. CONNELLY:  And I may have

6   misunderstood what you just told me, but if you

7   say, well, we have these notes so I can ask,

8   you know, what they mean.  Obviously, I think,

9   you know, that I would love to ask, okay, when

10  Deputy Secretary Duke said, can we support

11  keeping state in their lane, question mark, I

12  would like to know what she meant by that.

13          MR. MARUTOLLO:  Well, I mean, I

14  think first off, that kind of question would

15  call for speculation anyway, but I think it's

16  fair and again, not to put questions in your

17  mouth, but I think it's fair to limit it to Ms.

18  Anderson's explanation of -- that statement

19  without her then also saying why or any other

20  information that Secretary Duke provided that

21  is not within these notes.

22          So again, I appreciate that



Page 260

1    deliberative process and particularly in a

2    situation like this, where we produced

3    documents that we still maintain an assertion

4    that they are deliberative, just like the Ramos

5    documents, we still assert are deliberative.

6            We have not lost that in this case,

7    but they have been produced in this case, but

8    we still, you know, want to assert the

9    privilege and we will assert the privilege so

10   the question is about, what, you know, why did

11   Secretary Duke say, according to these notes,

12   support keeping state in their lane or, you

13   know, why did she say that, we would object on

14   deliberative ground.

15           MR. CONNELLY:  And I, you know,

16   maybe we can find common ground here, I'm not

17   sure, but really, I will be happy to dovetail

18   asking the question in a fashion that you think

19   she can answer.

20           So what is -- I mean, is the rubric,

21   if I have a question and I'm not quite sure --

22   well, if I have a question like the one that



1    we're just on, if I say, what did she mean when

2    she said can we support keeping the state in

3    their lane.

4              I presently -- I have no idea what

5    she meant.  I mean, she was there, I would like

6    to find out what she thinks Duke meant, but is

7    that something that is fair game?

8              MR. MARUTOLLO:  I don't think that

9    is fair game.  I would submit that is a

10   deliberative -- any discussion that Secretary

11   Duke made during this meeting or any of these

12   participants made during this meeting is

13   deliberative.  And certainly would chill

14   further communications, if any comments that

15   are made during these predecisional meetings

16   would then be questioned at -- in litigation,

17   you know, at depositions.

18             I mean, I think, you know, we would

19   limit any discussion of these documents related

20   to the four corners of these documents.  I

21   mean, obviously, we've had a number of times

22   during this deposition, where we've instructed



Page 262

1    Ms. Anderson not to answer and other times

2    where she has been able to at least explain

3    portions of the document or how she interpreted

4    things, you know, in terms of explanations, but

5    not how others interpreted items.

6              But I think frankly, it's going to

7    depend on how the question is asked.  I mean, I

8    think that our objection has been clear

9    throughout the deposition about deliberative

10   process.

11             MR. CONNELLY:  And as you know, you

12   know, this is a -- this process has been moving

13   along at a fast clip, so I am not aware in

14   terms of whatever you sent over to us, to the

15   plaintiffs' lawyers, you know, in terms of your

16   views on deliberative process, have you

17   specifically -- because I haven't read it.

18             Have you specifically addressed

19   these notes in terms of what your position is

20   on the notes?

21             MR. MARUTOLLO:  Yes.  So last night

22   in the letter, we did -- I mean, just to be



Page 263

1    clear for the record, we produced these

2    documents yesterday which is, you know, which

3    we appreciate is after we received them but

4    still, I appreciate that the deposition was

5    today.

6              We did note in the letter that we

7    produced them purely because they were

8    independently from her attorneys used to

9    refresh Ms. Anderson's deposition, and we did

10   not waive any deliberative privilege.

11             I would further note just for the

12   record that again, there are a number of

13   documents in this case and in this deposition,

14   that were originally deemed deliberative and

15   that a Court in Northern District of California

16   had since not deemed deliberative, that ruling

17   has not been made in this case, but in the case

18   here in the Eastern District of New York, but

19   we still allowed for questions in a good faith

20   effort to avoid litigation.

21             So I mean, I think we would instruct

22   the witness at least with these notes, she can



Page 264

1    answer, you know, explaining a statement, you

2    know, or what is written here, but anything

3    that goes to the actual underlying meeting or

4    the substance of that meeting beyond the four

5    corners of these documents, we would raise

6    deliberative process privilege and instruct the

7    witness not to answer.

8           MR. CONNELLY:  And do you know --

9    have the collective plaintiff attorneys given

10   your letter to us on this -- on these

11   particular documents, if we indicated that

12   we're going to get back to you with our, you

13   know, response in some fashion?

14          MR. MARUTOLLO:  Again, I, you know,

15   we did speak to Mr. Jeff Propoli last night on

16   this -- on these issues.  My understanding was

17   that there was one document that was

18   outstanding.  There was a -- there may be a

19   classified document that we did a little note

20   in our letter that we were withholding, but

21   otherwise, you know, we have kind of been -- I

22   think we've been consistent throughout the



Page 265

1    litigation about where we stand on deliberative

2    process and I think if you need an

3    individualized showing plaintiffs noted that in

4    their opposition to our original motion to --

5    for a protective order for deliberative process

6    that we ultimately withdrew so we can be on the

7    same page as plaintiff's counsel.

8            So from our perspective, you know, I

9    think we are being consistent, but I would

10   note, again as alluded to your point earlier,

11   and particularly given the fact that there

12   seems to be depositions scheduled every day

13   from now until January 7, the trial date, when

14   the trial begins, you know, we won't be

15   producing Ms. Anderson again, you know, after

16   the Court order, because, you know, we have

17   asserted our privilege but we've allowed for

18   questions to be asked during this deposition.

19           MR. CONNELLY:  Okay.  And the reason

20   I had asked that was, because I don't know

21   exactly, you know, if this is already sort of

22   crystalized because you made your position



Page 266

1   clear and we've gotten back to you and you

2   responded or you said, well, there is no more

3   to talk about or whether I'm in the process

4   right now of crystallizing this to take it to

5   the Court.

6           That's what I was trying to figure

7   out, but if the parties have already exchanged

8   their views on this, I would just move that to

9   the Court as opposed to making my own pitch.

10          MR. MARUTOLLO:  I honestly -- I

11  don't mean to speak for Jeff, I know he's not

12  here right now, but my understanding was that

13  we produced these materials last night and I

14  don't know if there was any issues about -- we

15  had talked about deliberative process in full

16  candor, but at the same time, I think we are

17  being consistent with how we have addressed the

18  Ramos documents as well, the formerly

19  deliberative documents of Ramos.

20          MR. CONNELLY:  All right.  Well, let

21  me ask the deponent a few questions.  I may

22  take a somewhat different tack given your



Page 267

1    position on this -- on these documents in terms

2    of how we handle them.

3             BY MR. CONNELLY:

4      Q.    So if we are still on the record,

5    let me ask you generally, for these four sets

6    of handwritten notes.

7             Did you capture any of your own

8    comments on these notes or do these notes only

9    reflect comments made by others in the room for

10   these various meetings?

11            MR. MARUTOLLO:  Objection.

12            You can answer.

13            THE WITNESS:  I am not entirely

14   sure.  My practice is to try to capture the

15   flow of the conversation during a meeting to

16   the extent that I can get it and to capture

17   things that are relevant to me and that I would

18   like to try to remember.

19            Sometimes I write down when I

20   contribute something to a meeting and other

21   times, I can't get that in.

22            BY MR. CONNELLY:



Page 268

1      Q.    Yeah, okay.  Well, let's -- this may

2    be slightly laborious, but we will find out,

3    we'll see.

4            Let's start with KA-53, which I

5    think you told us you think may have been --

6    may relate to a meeting held, Deputy Secretary

7    Duke and others and perhaps on May 19 and if

8    so, that would have been a Friday?

9      A.    I believe so.

10     Q.    Okay.  Okay.  So let's try this.

11   Why don't you just start reading -- and you're

12   not going to be able to anticipate what I'm

13   going to ask questions, so I'll give you a

14   little time for that.

15           When you get to the second line and

16   you have Section 2044, I'm going to stop you

17   there and I will ask you what is that.  And

18   then we will see whether I can glean

19   information that your lawyer doesn't feel is

20   privileged in any way.

21           I also want to try to find out, you

22   know, how often the comments on your notes are


MAGNA
LEGAL SERVICES

Page 269

1    your comments as opposed to reflecting a

2    summary of what someone else said.

3         A.    Okay.

4         Q.    All right.  So why don't you get

5    started.

6         A.    "TPS.  Gene.  Section 244 statute."

7         Q.    And I will ask you, what is the

8    Section 244 statute?

9         A.    I am referring to Immigration and

10   Nationality Act, Section 244, which is the TPS

11   statute.

12        Q.    And then continue, the third line

13   begins S2.

14        A.    "S2.  Read TPS website.  Great

15   website.  Gene.  Not created out of whole air

16   like Obama Administration did.  Explained what

17   TPS is.  To be used in extreme measure,

18   legitimate protection."

19        Q.    Let me interrupt you now.  Once you

20   started, to be used in extreme measure,

21   legitimate protection, do you recall whose

22   comments those are that you are recording?



Page 270

1      A.    I believe I was capturing things

2   that Gene was saying.

3      Q.    Then go ahead and continue.

4      A.    "Can designate part of a country.

5   Never been done.  People from whole country get

6   it.  In this administration, want to look at

7   parts of country."

8      Q.    What is your best recollection of

9   who made those observations?

10      A.    This is still Gene.

11      Q.    Okay.  Then you have a line break

12   and it starts up again with S2, that would be

13   Deputy Duke, correct?

14      A.    Correct.

15      Q.    And again, we will see if this holds

16   up.  Is it generally you think that -- you have

17   taken line break when you are summarizing when

18   someone else starts talking.  You -- that's

19   kind of an easy visual way to recognize when

20   that occurs?

21      A.    I don't think that is consistent.

22   I'm sorry.  Not that easy.



Page 271

1      Q.    Okay.  All right.  Fine.  So we are

2    still on Anderson 01, we're in the middle of

3    the page, after an empty line.  Why don't you

4    go ahead and read what follows.

5      A.    "S2.  Prep to make decision easier.

6    What data can we produce about beneficiaries.

7    Can we do all of these earlier.  Practical.

8    How can we brief in groups.  S2.  S1 thought

9    our report nearly met the conditions for ending

10   it, but because of the time ... wanted to warn

11   people to prepare."

12     Q.    Let's stop there.  To your best

13   recollection, is everything that you just

14   related, was that a summary of things that

15   Deputy Secretary Duke was saying?

16     A.    Yes.

17     Q.    And when she references our report,

18   what report was that?

19           MR. MARUTOLLO:  Objection.

20           You can answer.

21           THE WITNESS:  I thought that meant

22   the recommendation memo from USCIS to the



Page 272

1    secretary.

2              BY MR. CONNELLY:

3    Q.    Do you recall what was the

4    recommendation as far as extending or not

5    extending in that memo?

6              MR. MARUTOLLO:  Again, I would

7    object to the extent it wasn't a final

8    memorandum, I would instruct the witness not to

9    answer because that calls for internal

10   government deliberations, but I don't want to

11   testify for the witness, but I mean, if it was

12   a final memo, then you can answer.  If it

13   wasn't a final memo, then I'd instruct you not

14   to answer.

15             THE WITNESS:  I think she was

16   speaking about the final memo that went from

17   James McCament to the secretary.

18             BY MR. CONNELLY:

19   Q.    Okay.  And what was the

20   recommendation in that memo as far as extending

21   or terminating?

22             MR. MARUTOLLO:  Again, just to be



Page 273

1    clear, I am objecting to the -- when I say

2    final memo, just to clarify, I am referring to

3    the final decision from the secretary on a TPS

4    determination, not a final internal memo within

5    USCIS to DHS.

6              So with that objection, I would

7    argue that this question calls for internal

8    government deliberation, and I instruct you not

9    to answer under the deliberative process

10   privilege unless it's a final decision from the

11   secretary or acting secretary of Homeland

12   Security.

13             BY MR. CONNELLY:

14        Q.    Are you able to answer?

15        A.    On my attorney's advice, I don't

16   think I can answer then because this is, I

17   believe, referring to the internal memo, the

18   final internal memo from James McCament to the

19   secretary.

20        Q.    All right.  So let's -- now we're on

21   the top of Page 2.  Why don't you pick up --

22   and let's -- if you can acclimate yourself, now



Page 274

1    when you begin reciting your notes, what is

2    your best recollection of whose observations

3    you are capturing?

4         A.    I believe this continues to be

5    Deputy Secretary Duke.

6         Q.    Why don't you go ahead.

7         A.    "Say conditions are nearly there in

8    messaging.  Every expectation Haiti may not be

9    renewed again.  S1 wants to follow the law.

10   Have someone who hates us read the report.

11   Says ... while Haiti is still a horrible place

12   to live, but good ... if recommends

13   termination, has to be straightforward and

14   sensitive to how this could be turned around.

15   If we recommend ending, be cautious, process

16   can't be turned on us.  If we recommend ending,

17   S1 will be inclined to follow us but be clear."

18        Q.    Let me stop you there.  Your best

19   recollection is that all of those observations

20   were in a summary fashion capturing things that

21   Deputy Director Duke was saying?

22              MR. MARUTOLLO:  Objection.



Page 275

1          You can answer.

2          THE WITNESS:  Yes.

3          BY MR. CONNELLY:

4     Q.    Am I correct, broadly speaking, are

5     these notes chronological?  In other words, you

6     -- they capture -- obviously it doesn't capture

7     the entirety of the meeting, but they capture

8     in the order in which the observations were

9     made?

10     A.    Yes.  The notes follow the

11     chronological flow of the meeting.

12     Q.    Now on Page 2, the first line or the

13     first word is Gene.  Why don't you -- go ahead

14     and read that.

15     A.    "Gene.  We haven't tracked data.

16     Public benefits?  We don't know."

17     Q.    I'm sorry, public benefits with a

18     question mark after it?

19     A.    With a question mark, yes.  "We

20     don't know.  Hey, what are you doing with your

21     time here?"

22          I believe this first word is during,



1    but I'm not entirely sure.  "During next six

2    months for Haiti and going forward.  Have to

3    increase reporting and metrics so we can tell

4    American people what is happening.  Not limited

5    to TPS."

6        Q.    Let's stop because you have kind of

7    a break there.  Your best recollection is that

8    all of those observations were made by Gene

9    Hamilton?

10       A.    Yes.

11       Q.    All right.  Pick it up then.  We are

12   now on Page 3.

13       A.    "If new designation.  What can we do

14   to gather new information.  Not if it -- not if

15   a million man hours.  S1 and S2 like to make

16   decisions on the facts."

17       Q.    Let's stop there.  Because we see

18   that Gene is apparently going to say something,

19   so does that help you in context?  Could you

20   recall whose observations those were that you

21   just read?

22       A.    I'm not entirely sure.  It's not



Page 277

```
 1    Gene because he responded and it wasn't me.
 2        Q.    And it looks like he's responding to
 3    a woman.
 4        A.    Yes.
 5        Q.    Were there other women in the room
 6    beyond you and Deputy Secretary Duke?
 7        A.    Not that I recall.
 8        Q.    By process of elimination, again,
 9    you're not -- you can't be sure, but if you
10    know that he wasn't directed to you, Duke was
11    the only other woman in the room?
12            MR. MARUTOLLO:  Objection.
13            You can answer.  To the extent it
14    mischaracterizes testimony.  You said you don't
15    recall if there were other women in the room,
16    but you can answer.
17            THE WITNESS:  I was going to say I
18    mentioned before I was not entirely sure if
19    there was anybody else in the room but I don't
20    recall other women.
21            BY MR. CONNELLY:
22        Q.    All right.  So let's go ahead now in
```



Page 278

1    the middle of the page where it begins with

2    Gene.

3         A.    "Gene.  Yes, ma'am.  That's the

4    right way to do things."

5         Q.    Let's me ask -- your lawyer can

6    object or maybe he won't.  Why did you capture

7    -- I mean, these are not verbatim notes,

8    correct?

9         A.    Correct.

10        Q.    Why did you capture him using the

11   phrase, ma'am, in giving the response to

12   whoever it was, where he's raising the points

13   that he was addressing?

14             MR. MARUTOLLO:  Objection.  I mean,

15   it was government deliberative process, but you

16   can answer the question.

17             THE WITNESS:  Well, when I take

18   notes in meetings, I write down things that I

19   am interested in remembering, and for some

20   reason, this struck me as something that I

21   wanted to remember.

22             BY MR. CONNELLY:



Page 279

1     Q.    Do you recall now why it was that

2     you thought that was still something you wanted

3     to remember?

4           MR. MARUTOLLO:  Objection.

5           You can answer.

6           THE WITNESS:  Not in particular.

7           BY MR. CONNELLY:

8     Q.    All right.  So let's keep going.

9     Pick it up again.  Do you know where we are?  I

10    think we were at the line that begins "not to."

11    A.    "Not to disparage anyone in past

12    administrations, but kind of a perfunctory

13    decision.  Things are still bad.  Don't want to

14    give false hope.  Don't want people to go back

15    to war zone.  Need to use our resources wisely.

16    Bring back programmatic integrity."

17    Q.    Do you think, is your best

18    recollection that all of those comments were

19    made by Gene Hamilton?

20    A.    Yes.

21    Q.    Okay.  So let's pick up on the next

22    line.



Page 280

1       A.      "Is the population" -- I can't read

2    the next word, my best guess is trying, but I'm

3    not sure.  "Is the population trying here?"

4       Q.      With a question mark, correct?

5       A.      Yes.  "If so.  If -- I don't know

6    the next word.  It begins with a P.

7       Q.      Okay.

8       A.      "If" something "don't."

9       Q.      So let me ask, is your best

10   recollection that that would -- that those were

11   continued observations by Gene Hamilton?

12      A.      Yes.

13      Q.      And when you captured, is the

14   population trying here, do you recall, was he

15   referring to the Haitians who were outside of

16   Haiti, presumably largely in the U.S., is that

17   the reference to trying here?

18              MR. MARUTOLLO:  Objection.  Again, I

19   think that goes to internal government

20   deliberations, and it goes beyond the four

21   corners of the document and it also goes to

22   speculation as to what Mr. Hamilton was



Page 281

1   referring to, if anything.

2          So I'd instruct the witness not to

3   answer.

4          BY MR. CONNELLY:

5   Q.    Is the, you know, obviously, you

6   know, it's ambiguous, next observation.  If so,

7   if and then the word, five or six letter word

8   beginning with P, is not decipherable, don't,

9   do you have a recollection from those cryptic

10  notes in terms of what the actual words used by

11  Mr. Hamilton were?

12         MR. MARUTOLLO:  Objection.  Again,

13  same objection about internal government

14  deliberations.  I mean, to the extent you

15  recall based on these notes and what is said in

16  the notes, you can answer but otherwise, I'd

17  instruct you not to answer.

18         THE WITNESS:  I think, at least this

19  is the population trying here was referring to

20  the population being TPS beneficiaries

21  generally.  This part of the meeting was

22  talking about TPS generally, not specifically



1   Haiti, so I think the population is meaning TPS

2   beneficiaries was my understanding.

3          BY MR. CONNELLY:

4     Q.    All right.  And now we are down to

5   the last three lines which appear to begin S2,

6   which would be Deputy Secretary Duke.  But go

7   ahead and read.

8     A.    "S2.  Really tries to get the facts.

9   And apply them to the law.  Now that we" --

10  "now that we're looking at this afresh."

11    Q.    We are on Page 4 now which begins

12  with the word James.

13    A.    "James.  DOS uses as foreign policy.

14  S2.  Can we support keeping state in their

15  lane?"

16    Q.    And when DOS is a reference to what

17  organization?

18    A.    Department of State.

19    Q.    And is this in the context -- is

20  this when DOS uses -- ordinarily, you would

21  expect to find an object there, is this

22  instance in the context of TPS, or do you know?



1   Again, I don't want -- just what was said by

2   James, because I am guessing, this obviously

3   captures in a summary fashion, but not all

4   together.

5           MR. MARUTOLLO:  Again, I would

6   request that Ms. Anderson not answer that

7   question as it goes into internal government

8   deliberations and instruct her not to answer.

9   She can testify about the sentence that she

10  wrote in her notes, but apart from that, to the

11  extent it goes further into what occurred in

12  the conversation, I instruct Ms. Anderson not

13  to answer.

14          THE WITNESS:  I think this note that

15  I captured that states DOS uses as foreign

16  policy, my understanding was that James was

17  referring to TPS.

18          BY MR. CONNELLY:

19     Q.    All right.  And then go ahead and

20  proceed.

21     A.    "S2.  Can we support keeping state

22  in our lane?  Need."



Page 284

```
1      Q.    I'm sorry.  I had used that as an

2   earlier example of my being more interested.

3           MR. CONNELLY:  And, Joe, I don't

4   want to keep hitting my head against the wall.

5   So I will try a question and you can tell me if

6   I am hitting the wall again.

7           BY MR. CONNELLY:

8      Q.    Do you -- did you have an

9   understanding of what the phrase "keep state in

10  their lane" conveyed at the time?  By that, I

11  mean, you are obviously capturing a summary of

12  the conversation, not a verbatim.

13           Can you tell me from your summary

14  note what Duke said that you partially captured

15  with the quote, "can we support keeping state

16  in their lane?"

17           MR. MARUTOLLO:  I mean, I would

18  object first on the ground of the questioning

19  vague, but again, I would assert that this

20  calls for internal government deliberations as

21  it raises a question about what Secretary Duke

22  was saying, the substance of what she was
```



Page 285

1   saying, rather than a question about notes that

2   are on the page that Ms. Anderson kept, so I

3   would instruct Ms. Anderson not to answer the

4   question on the deliberative process privilege.

5           BY MR. CONNELLY:

6   Q.    So with that instruction, let's

7   continue.  Why don't you go ahead and continue

8   reading what is on the page.

9   A.    "Need to be able to point back to

10  the statute.  Everything that supported the

11  decision.  SS came over without Tillerson

12  actually seeing it."

13  Q.    Let's stop there.  Best

14  recollection, are these all comments that were

15  made by Duke?

16          MR. MARUTOLLO:  Objection to the

17  extent you know and given our earlier objection

18  about deliberative process, you can answer the

19  question.

20          THE WITNESS:  I can't say with

21  certainty that these were all made by Deputy

22  Secretary Duke.  The one with S2 before it was.



Page 286

1    The next statement, "need to be able to point

2    back to the statute," my best recollection is

3    that she probably made that statement as well.

4    Similarly with the next one, "everything that

5    supported the decision," I am much less certain

6    about the next statement that, "SS came over

7    without Tillerson actually seeing it."

8            BY MR. CONNELLY:

9    Q.    Let me stop you for a second.

10           MR. CONNELLY:  I am going back to

11   that same line, Joe, so you can be sensitive.

12           MR. MARUTOLLO:  Okay.  Thank you.

13           BY MR. CONNELLY:

14   Q.    When you wrote down, "S2.  Can we

15   support keeping state in their lane?"

16           Can you tell me what you meant when

17   you wrote those words down.  What did you --

18   what did you mean and what were you trying to

19   remember with that note?

20           MR. MARUTOLLO:  Again, I would

21   object.  So that it calls for internal

22   government deliberations.  You know, I think --



Page 287

1   I mean to the extent -- I would instruct the

2   witness to answer only to the extent you are

3   talking about a note that you took and then the

4   fact that you put -- you handwrote something

5   onto a document, but to the extent it goes to

6   the actual deliberations and the actual

7   discussion with Secretary Duke, I instruct you

8   not to answer, so with that objection, I think

9   you can answer that question with that

10  limitation.

11          THE WITNESS:  I wanted to remember

12  that S2 had raised a question regarding, can we

13  support keeping state in their lane, which to

14  me meant, can we look into how we can have

15  state focus on providing country conditions as

16  opposed to using TPS as a foreign policy tool.

17          BY MR. CONNELLY:

18      Q.    Let me -- what you had previously

19  read, there is a reference to SS came over

20  without Tillerson.

21          What is SS a reference to?

22      A.    South Sudan.



Page 288

1      Q.    I'm sorry.  I'm not quite sure where

2   we -- did we -- have you read the remainder of

3   this page which starts with Gene?

4      A.    No, not yet.

5      Q.    Okay.

6      A.    "Gene.  S1 not hesitant to make TPS

7   designations when warranted.  S2.  He's so

8   neutral.  We need to know who is here, what

9   they are doing, are they being productive."

10      Q.    The next page begins with James.

11      A.    Yes.  "James."

12      Q.    Go ahead.

13      A.    "In January.  Which ones up for

14   review and send groups up.  What can we bundle.

15   Send up chart calendar.  Expand chart.  New

16   metrics.  Specific reasons for designating that

17   can be measured for future designations.

18   Deviation from starting point."

19      Q.    Best recollection, that all that you

20   just related were observations made by James?

21      A.    I'm not sure.  I can't tell.

22      Q.    Okay.



Page 289

1      A.     "On I-821 form."

2      Q.     What is that?

3      A.     That is the TPS application.

4      Q.     All right.

5      A.     "On I-821 form.  What other data

6  could we gather and put into our systems to

7  gather merit based and contributions to

8  society."

9      Q.     Do you have a recollection of whose

10  observation that was?

11      A.     No.  I'm not sure who said that.

12      Q.     What did you mean -- or what was the

13  purpose for you to capture the observation

14  about gathering merit based and contributions

15  to society?

16           MR. MARUTOLLO:  Objection.  Again, I

17  think that still goes to something beyond this

18  document in terms of calling for internal

19  government deliberations so I instruct

20  Ms. Anderson not to answer.

21           BY MR. CONNELLY:

22      Q.     Go ahead.  You can continue reading



Page 290

1    on the bottom of the page.

2        A.    "New data collecting proposal to S2.

3    Present a plan by" -- I can't read the next

4    couple of words, "by the" something "of"

5    something "June/July for a plan to gather new

6    data as part of Sudan, South Sudan briefing.

7    Prospective for new form.  Late June/early July

8    proposals for more data collection.  Check with

9    Kathy on info."

10       Q.    The reference to Kathy, is that

11   Kathy Kovarik?

12       A.    Kathy Nuebel Kovarik.

13       Q.    And the last thing that you just

14   read which concludes your handwritten notes, do

15   you have a recollection of whose observations

16   those were?

17       A.    I'm sorry.  I was looking at -- can

18   I go back for one second.

19       Q.    Sure.

20       A.    This Anderson 0005 that -- the page

21   that begins James --

22       Q.    Uh-huh.



Page 291

1      A.      -- at the top.  I think that

2    reflects from there on, a separate conversation

3    that I had with James immediately following the

4    broader meeting, so I think that -- the end of

5    the Page 00004 was the end of the group

6    meeting.

7      Q.    And then near the end of the

8    separate meeting with James, there is a

9    reference to a new form.

10          Can you tell me what the new form

11   was?

12     A.    Where are you?

13     Q.    About five lines from the very end

14   on 06.  Prospective for new form.

15     A.    I think that was continuing to talk

16   about the possibility of amending the TPS

17   application form.

18     Q.    Is the larger meeting, not the James

19   meeting afterwards, but is this meeting held

20   perhaps on May 19 which included Secretary Duke

21   and Gene Hamilton, is this the meeting that

22   left you as you described in your e-mail



Page 292

1    fuming?

2            MR. MARUTOLLO:  Objection.

3            You can answer.

4            THE WITNESS:  This is the meeting

5    that I was referring to in that May 20 e-mail,

6    yes.

7            BY MR. CONNELLY:

8       Q.    What was it about the meeting that

9    left you fuming?

10           MR. MARUTOLLO:  Objection.  I'm

11   going to direct the witness not to answer, that

12   would go to the deliberations that occurred

13   during the meeting, the substance of which

14   would be subject to deliberative process

15   privilege.

16           MR. CONNELLY:  Okay.  Well, that --

17   actually, that, among the many disagreements we

18   have, that is probably the best example and we

19   will probably run up to the judge in terms of

20   who is right or wrong in terms of how much

21   right we have to probe this witness's

22   understanding of what happened and her reaction



Page 293

1    to it.

2           MR. MARUTOLLO:  Again, that's fine,

3    I mean, we are happy to go to the Court, but at

4    the same time, I mean, we are not pretending to

5    bring Ms. Anderson back, because, I mean, if

6    we're going to go --

7           MR. CONNELLY:  I'm going to do it

8    today.

9           MR. MARUTOLLO:  Right, I mean, at

10   the same time, look, if there is other -- I

11   mean, I realize there have been a number of

12   issues that I have instructed the witness not

13   to answer, I mean, not sure what exactly we're

14   going to go to the Court on, which one or which

15   particular question, but...

16          MR. CONNELLY:  I mean, I'm not going

17   to give the guy a long laundry list and we will

18   kind of tighten it up and give him several at

19   some point this afternoon.

20          MR. MARUTOLLO:  Again, that's fine.

21   I think we are in, like, the fifth hour, so I

22   mean -- of the deposition.



Page 294

1          MR. CONNELLY:  Not quite, but okay.

2    Who is counting?

3          MR. MARUTOLLO:  We're getting close,

4    right?  But, you know, again, we are happy if

5    you want to talk off the record, too, about

6    other compromises that could be reached, we are

7    happy to go to the Court.

8          MR. CONNELLY:  No, either she is

9    here or she comes back or she doesn't.  We will

10   figure it out.  We will see where we go.

11         MR. MARUTOLLO:  And again, the

12   reason I bring up the time though is that if

13   the Court is not available now and if we wait

14   until the end, we're not going to bring the

15   witness back.

16         MR. CONNELLY:  That's my bad.  Maybe

17   the Court will still tell you to bring her

18   back, but I understand, that is my risk if that

19   happens.

20         MR. MARUTOLLO:  Right.

21         BY MR. CONNELLY:

22   Q.    Okay.  Let's go now to -- let me ask



Page 295

1    our last question, perhaps getting the same

2    objection.

3              Do you recall whether any of the

4    lines that you captured here in these

5    observations or summaries that -- were any of

6    these observations the basis for your fuming

7    after the meeting?

8              MR. MARUTOLLO:  Objection.

9              You can answer.

10             THE WITNESS:  I think that many of

11   the notes that I capture here formed the basis

12   for my frustration after the meeting, yes.

13             BY MR. CONNELLY:

14   Q.   I take it -- I should ask the

15   question, then you can object.

16             And more specifically, what in the

17   notes or -- led to your frustration or your

18   fuming?

19             MR. MARUTOLLO:  Objection.

20             You can answer that.

21             THE WITNESS:  I think broadly, it

22   was a general sense coming out of the meeting



Page 296

1    of the direction of the TPS program and the

2    types of information that was going to be

3    considered as part of TPS.

4              BY MR. CONNELLY:

5        Q.    Let's go now to KA-51, which your

6    best guess might have occurred perhaps on

7    Monday, May 22, when you thought that perhaps

8    the public announcement of the extension was

9    made.

10       A.    I have it in front of me.

11       Q.    Okay.  So the first line, I will

12   quote to you and then ask you.  It says:  "End

13   close to 7/23," I will interpret that as July

14   23.

15              What is that a reference to?

16              MR. MARUTOLLO:  Again, objection.

17   Without revealing any internal government

18   deliberations, you can explain what that is

19   referencing.

20              THE WITNESS:  I'm not entirely sure

21   but my best guess is that that is when we

22   expected that the 50-day reregistration period



1    for Haiti TPS would be likely to end.

2           BY MR. CONNELLY:

3       Q.    All right.

4       A.    Under the extension that was being

5    announced.

6       Q.    Why don't you go ahead now and read

7    the bullet points or the tick marks on the

8    first page.

9       A.    "S1 made decision on Section 244,

10   nothing more.  Conditions have substantially

11   improved since 2010.  Congress asked us to look

12   at conditions that led to initial designations

13   and not at other conditions.  Understand some

14   fine lines to draw there.  S1.  Commitments and

15   statements from Haitian government that they

16   want their nationals back to help rebuild.

17   These are precisely the entrepreneurial people.

18   Some language skills.  S1 highly encouraging to

19   pack up."

20      Q.    And S1 is a reference to then

21   Secretary Kelly?

22      A.    Yes.



Page 298

1     Q.    Do you have a recollection as to

2 whose observations these are on this page?

3     A.    I don't.

4     Q.    Do you have in mind, even though you

5 have already indicated you can't be quite

6 precise of the date from the notes, do you have

7 a recollection of who attended this meeting?

8     A.    This was I think -- it was called an

9 embargoed media call, so it was just prior to

10 the public announcement of the Haiti TPS

11 extension decision.  So it was a public call

12 that many media individuals participated in.

13          I went to the NAC, the DHS

14 headquarters, to be part of the call and speak

15 on behalf of the government.  I was there, Gene

16 Hamilton spoke on the call, Brandon Prelogar

17 spoke on the call, and then there were a host

18 of communications individuals there for DHS as

19 well.

20     Q.    Does this page capture things that

21 were said on the call by someone in the

22 government?



Page 299

1      A.     That is my best guess, but it's hard

2   to know for certain.

3      Q.     And then I realize you've already

4   told me this but I can't help myself, but you

5   don't -- as we sit here this afternoon, you are

6   uncomfortable, you know, giving your best

7   estimate of who it was, whose observations you

8   are capturing on this first page?

9      A.     I don't remember who was saying

10   this.

11      Q.     Okay.  Let's go to Page 2.

12           Let me ask you again, now that

13   you've put this in context, so all of these

14   notes which run four pages, all of these will

15   be notes that occurred contemporaneously during

16   the course of this embargoed media call which

17   occurred shortly before the public

18   announcement?

19      A.     I think so.

20      Q.     Okay.

21      A.     "Evidence to show Haiti on track to

22   recover and why six months.  Gene.  FRN will



1  outline conditions.  Must look at statute.  Can

2  be differing views.  No, they are not ideal as

3  compared to United States.  Six months

4  warranted now.  But may not be the case in the

5  future."  We are going to make the hard

6  decisions.  Congress -- "we are going to make

7  the hard decisions Congress requires us to

8  make.  S1 felt six months.  Draw conclusion in

9  the future.  Will look at each country and

10 analyze conditions and make independent

11 informed analysis.  Crime?"

12      Q.    I'm sorry.  Let's stop there.  Do

13 you have a recollection, was this a -- let me

14 first ask you.

15          In this embargoed media call, does

16 there come a point where people on the call are

17 allowed to ask questions?

18      A.    Yes, there was.

19      Q.    Okay.  And do you have any

20 recollection off of this note:  "Crime?"  Was

21 that an issue that was raised by someone in the

22 media or do you have a recollection?



Page 301

1      A.    What issue?

2      Q.    Crime?

3      A.    Oh, crime.  I would guess yes, but

4   it is possible that knowing that it would

5   likely be a question that was affirmatively

6   raised on the call, but my assumption is that

7   somebody asked on the call.

8      Q.    Why don't you go ahead and read that

9   last four or five lines of Page 9.

10     A.    "Crime?  S1 made his decision on

11  factors outlined in 244."  S1 asked for -- "S1

12  asks for info.  Is about programmatic

13  integrity.  Common sense questions.  Like

14  crime.  Employed in school.  U.S. has not

15  previously collected or reported on previously.

16  S1 needs to be able to answer to American

17  people.  Static conditions in Haiti independent

18  of earthquake."

19     Q.    Let's stop there.  Do you know

20  whether the government has someone record and

21  type up the -- something closer to a verbatim

22  when these embargoed media calls are made?



Page 302

1           MR. MARUTOLLO:  Objection.

2           You can answer to the extent you

3    know.

4           THE WITNESS:  I don't know if there

5    is a record kept of it.

6           BY MR. CONNELLY:

7    Q.    Do you recall how the portion that

8    you just read to us which relates to quote

9    unquote common sense and then crime and then

10   employed and then in school and then the

11   observation U.S. has not previously collected

12   or reported on properly?

13   A.    I believe that was previously.

14   Q.    Previously.  Okay.  First of all,

15   are these, you know, shorthand concepts of

16   crime, employment and schools, do you recall,

17   was that -- was the actual observation, was

18   that about TPS people or Haiti or other

19   countries who are in the U.S.?

20          MR. MARUTOLLO:  Again, only -- I

21   would object but only to the extent that the

22   answer refers to internal government



1    deliberations that took place outside of this

2    media embargo, in which media were not

3    presented.  If media was present during -- and

4    that answers his question, then you can answer

5    the question assuming that the media were

6    present at that point.

7                THE WITNESS:  Yes.  I believe this

8    was reflecting things that were said on the

9    media call and I think that crime, employed in

10   school, were referring to looking at the TPS

11   population in the United States or the TPS

12   population generally.

13               BY MR. CONNELLY:

14   Q.    Does the characteristics of the TPS

15   population in the United States, is that a

16   factor, is that a relevant factor at all in

17   terms of the continuing conditions in the

18   country itself?

19               MR. MARUTOLLO:  Objection.  I think

20   that, first, again, Ms. Anderson is not a

21   30(b)(6) witness and that calls for more of a

22   policy assessment and second, I would object to



Page 304

1    the extent it calls for information that is

2    related to internal government deliberations,

3    but with those two limitations in mind, you can

4    answer the question.

5              THE WITNESS:  Can you state the

6    question one more time.

7              BY MR. CONNELLY:

8    Q.    Sure.  I would rather make the

9    reporter find it.  I might change it, so you

10   can answer this one.

11             In your personal efforts, you know,

12   in your involvement over several years with TPS

13   issues including determinations of TPS or

14   determinations of extensions or redesignations

15   of TPS, a part of that process, as I think we

16   have established, is a factor, not the only

17   factor, but a factor in -- especially in

18   extensions is the current conditions in the

19   foreign country, correct?

20             MR. MARUTOLLO:  Objection.  First,

21   again, I -- it assumes facts not in evidence,

22   and I think it mischaracterizes the testimony



1    as well, and I still assert deliberative

2    process privilege but you can answer the

3    question.

4          THE WITNESS:  Looking at current

5    conditions in a country is part of the TPS

6    review process.

7          BY MR. CONNELLY:

8    Q.    Okay.  Prior to the May of 2017, had

9    you ever used any statistics or information

10   about crime or employment or schooling in the

11   U.S. for TPS people who were displaced in the

12   U.S., as a part of your gathering information

13   to make a determination about whether a TPS

14   status should be extended?

15         MR. MARUTOLLO:  I would just object

16   again to the extent the answer calls for

17   information related to internal government

18   deliberations, I instruct you not to answer

19   that portion.  Otherwise, you can answer the

20   question.  Although I note also an objection on

21   vagueness grounds.

22         THE WITNESS:  I think there were



Page 306

1    several pieces in there that make it difficult

2    for me to give one clear answer to the

3    question.  Could you break it down a little

4    bit?

5              BY MR. CONNELLY:

6         Q.   I could.  You know what, let me -- I

7    mean, it's fair for me to do this, but I mean,

8    rather than for me to guess, where does your

9    confusion lie?  Where is it -- how is it easier

10   for you to answer the question if I break it

11   down?

12             MR. MARUTOLLO:  Objection.  I think

13   you can answer that question, but I mean, it's

14   ultimately the counsel's deposition, but you

15   can answer the question.

16             THE WITNESS:  I am struggling with

17   kind of the piece in my previous experience,

18   what are you talking about, also TPS people

19   displaced in the United States, I'm not sure

20   what you mean by that exactly.

21             BY MR. CONNELLY:

22        Q.   Thank you.  That's helpful because I



Page 307

1    can do a better job.

2            Talking about the topics of crime,

3    employment and schools, was that a reference to

4    trying to gather statistics on those topics

5    relating to people who were enjoying TPS status

6    in the United States?

7            MR. MARUTOLLO:  Objection.  Again,

8    to the extent it calls for internal government

9    deliberations, I instruct you not to answer,

10   but otherwise, to the extent you understand the

11   question, you can answer the question.

12           THE WITNESS:  I do think those were

13   referring to characteristics of individuals who

14   held TPS status.

15           BY MR. CONNELLY:

16   Q.    Okay.  And prior to this time, in

17   your work generating determinations about

18   designations or redesignations or extensions,

19   had you ever considered or used any of those

20   factors in the work that you did?

21           MR. MARUTOLLO:  Objection.  I would

22   still first argue vague, and then to the extent



Page 308

1    -- and compound, and to the extent this calls

2    for internal government deliberations, I still

3    instruct you not to answer that question, but

4    you can answer it with that limitation.

5             THE WITNESS:  Prior to this May

6    Haiti TPS extension determination process, I

7    don't recall looking at the criminality, the

8    rate of employment or the rate of public school

9    attendance of TPS beneficiaries in order to

10   make a recommendation on whether TPS should be

11   designated, extended or terminated.

12            THE VIDEOGRAPHER:  Can we go off the

13   record for a second so I can swap tapes.

14            MR. CONNELLY:  Sure.

15            THE VIDEOGRAPHER:  We're going off

16   the record.

17            The time is 16:11.

18            (A short recess was taken.)

19            THE VIDEOGRAPHER:  We're going back

20   on the record.

21            The time is 16:19.

22            BY MR. CONNELLY:



Page 309

```
 1      Q.    Could you go to KA-52.  That's the

 2   third of your four sets of handwritten

 3   documents, and I think you told us before that

 4   you best -- as you can place this, this meeting

 5   would have occurred perhaps sometime before the

 6   FRN was issued on May 24?

 7      A.    I believe it was, but the more

 8   important piece of it, I think it was after the

 9   decision was made.

10      Q.    That decision was that the

11   designation would be extended?

12      A.    For six months.

13      Q.    For six months, just for Haiti.

14      A.    Yes.

15      Q.    I'm sorry, if you told me, I don't

16   recall.

17            Who was at this meeting?

18      A.    This was a meeting convened by

19   Secretary Kelly and again, it was to talk about

20   TPS more broadly than just Haiti.  It was

21   following this scramble to make the TPS

22   decision about Haiti and looking at the process
```



Page 310

1    in general going forward.

2        Q.    I'm going to ask you -- we may not

3    cover all of this, but why don't you go ahead

4    and read the first page where there are four

5    asterisked items.

6              You know what, after the first

7    asterisk, I will have you stop because you have

8    a page break and perhaps that suggests a

9    different -- let's get started.

10       A.    "Temporary in the title.  But no

11   other clear guidance in statute to indicate how

12   long it can go on.  18 months at a time.

13   Temporary element.  But nothing that says how

14   many times can extend.  And in" --

15       Q.    Could that be fact?

16       A.    Yes.  "And, in fact, discretionary

17   in initial designation.  But not in whether to

18   extend.  Must continue as long as conditions

19   are met and no limit on that."

20       Q.    Do you recall whose observations

21   those were?

22       A.    Looking at this first page in the



Page 311

```
 1    items that are asterisked, my best recollection

 2    is that these were points that I was thinking

 3    about prior to this meeting that if I had an

 4    opportunity to make in the meeting, I might

 5    make.  I'm not sure that these were statements

 6    made in the meeting.

 7         Q.    All right.  Let's go to the second

 8    asterisk in the middle of the page.

 9         A.    "Need to look back at last

10    redesignation for relevant condition."

11         Q.    Continue to the third asterisk.

12         A.    "Can look at subsequent events that

13    compound effects of initial event and prevent

14    country from recovery.  Food insecurity."

15         Q.    And the final asterisk on the first

16    page?

17         A.    "State.  Political tool.  Valuable

18    partner in understanding conditions on the

19    ground since they are there.  Usually solid

20    analysis of country conditions.  Then include

21    discretionary factors.  Helpful for us to know

22    their position especially in initial.  When
```



Page 312

1    have discretion.  And good to understand the

2    bilateral issues.  For example, work with

3    government on repatriation.  Bundling where we

4    can.  Consider in relationship but case by

5    case."

6         Q.    And then the last asterisk which

7    finishes Page 2 or Anderson 13 is the Bates

8    number.

9         A.    "Could include what we do have in

10   memo.  Demographic data, gender, age, resident

11   status at time of application, travel to

12   country, remittances, standard section in memos

13   could continue to enrich" -- I'm not sure of

14   the next word:  "On time."

15        Q.    Is your best recollection that all

16   of these points that you just read were things

17   that you had arranged in your own mind and

18   committed to writing prior to the meeting?

19        A.    Yes.  I think these were my thoughts

20   of contributions I might make in the meeting if

21   there was an opportunity.

22        Q.    Did you ever have an opportunity to



Page 313

1   make any of these points?

2          MR. MARUTOLLO:  Objection.  To the

3   extent it calls for internal government

4   deliberations, I would instruct you not to

5   answer because it goes to the substance of what

6   was actually discussed at the meeting but to

7   the extent, it's reflected in your subsequent

8   notes, you can answer that as well.

9          THE WITNESS:  I don't know

10  specifically.  I contributed to the meeting,

11  we'd have to walk through the notes and see how

12  they match up.  I'm not sure.

13         BY MR. CONNELLY:

14  Q.     Besides yourself and Secretary

15  Kelly, who else was at the meeting?

16  A.     I attended with James McCament for

17  USCIS.  I remember that Gene Hamilton was

18  there.  I don't remember other specific

19  individuals off the top of my head although I

20  think the office of general counsel for DHS was

21  represented.

22  Q.     All right.  Let's do this.  I have a



1    curiosity about a couple of things, so I'm

2    going to go to those.

3            On page -- the third page which is

4    Anderson 14.

5        A.    Okay.

6        Q.    Near the bottom, it says:  "How do

7    you send CA home?"

8            See that?

9        A.    I do.

10       Q.    What is CA a reference to?

11       A.    Central Americans.

12       Q.    Do you have a recollection of whose

13   observation or question that was?

14       A.    I believe that that was Secretary

15   Kelly.

16       Q.    And then why don't you go ahead and

17   read the entirety of that little section.

18       A.    "How do you send Central Americans

19   home.  Been here for so long.  Work with

20   Congress to fix.  Can't kick people out after

21   15 years.  Haitians saying long roots here."

22       Q.    Could you go back to the top of that

1    page and just go ahead and read it to yourself.

2    It will be faster, but anytime you believe that

3    the observations were made by Secretary Kelly,

4    point those out and I will have you read them.

5        A.    I'm sorry, the top of Page 14?

6        Q.    Yes.  I mean, just begin on the top

7    of Page 14, if you would like to silently go

8    through it.

9        A.    "Understanding 18 months."

10       Q.    No, no.  I'm sorry.

11       A.    I was going to say I believe that

12   this was Secretary Kelly's opening statement.

13   "Understanding 18 months only."  I believe that

14   was Secretary Kelly.

15       Q.    Okay.

16       A.    Other than James's response, "yes."

17   I believe that these next things were also

18   reflecting Secretary Kelly.  "People recovered

19   in short term.  Temporary."  I don't know,

20   "this temp, temporary, NAT."  I'm not sure what

21   I meant.  "Up to me."  That was Secretary

22   Kelly.



Page 316

1          I believe this was all from

2    Secretary Kelly.  "Compounding events, bodies

3    all buried."  I don't know what "O/C" means.

4    "Armed conflict.  By definition not temporary."

5          So then you have a break where it

6    looks like Gene made a comment and then again:

7    "How do you send Central Americans home" was

8    Secretary Kelly, as I mentioned before.

9       Q.    Do you happen to recall what you

10   meant when you recorded "bodies all buried?"

11          MR. MARUTOLLO:  Objection.

12          You can answer.

13          THE WITNESS:  I think there must

14   have been some kind of example talking about,

15   as mentioned before, compounding events, and

16   then in that discussion of looking at whether

17   the bodies were all buried or not.  I don't

18   know more than that.  I think it was an

19   example.

20          On Page 15, I'm looking at Page 15.

21          BY MR. CONNELLY:

22      Q.    Okay.



Page 317

1      A.    I think that at least from the

2   beginning of the page through:  "Sunset clause.

3   Would be good but Congress has no moral

4   courage."  I believe that whole part of the

5   page is Secretary Kelly.

6      Q.    What are the observations -- what

7   did you mean by writing down:  "Why not make

8   them all legal."

9           MR. MARUTOLLO:  Objection.  Again,

10  to the extent it calls for internal government

11  deliberations, I ask you not to answer, that's

12  under the deliberative process privilege, but

13  if you can answer that question with that

14  limitation, you can do so.

15          THE WITNESS:  I think Secretary

16  Kelly was musing about steps that Congress

17  could take related to TPS.

18          I'm not sure about this line that

19  looks like it begins SUM.  I'm not sure who

20  said that, but the next line:  "Why did S1

21  extend without thinking about it," was

22  Secretary Kelly.



Page 318

1          BY MR. CONNELLY:

2     Q.    Is S1 a reference to Secretary

3  Kelly?

4     A.    I think it's a reference to past

5  secretaries of Homeland Security.

6     Q.    Is your note capturing what

7  Secretary Kelly used?  In other words, what did

8  you mean by the former Homeland Security

9  secretaries extended without thinking about it?

10         MR. MARUTOLLO:  Objection.

11         You can answer.

12         THE WITNESS:  My note captures what

13  I believe Secretary Kelly asked the question,

14  why did previous secretaries extend without

15  thinking about it.  And then I think that's --

16         BY MR. CONNELLY:

17     Q.    Was there a response?

18         MR. MARUTOLLO:  Objection.  I mean,

19  if -- to the extent it calls for internal

20  government deliberations, I instruct you not to

21  answer.  To the extent it's on your notes, I

22  think that's fair for you to answer.



Page 319

1              THE WITNESS:  I think there was

2       discussion following that question that is not

3       reflected in my notes.

4              MR. CONNELLY:  Fair game for me,

5       Robert, or do you view that as deliberative?

6              MR. MARUTOLLO:  I still think any

7       substantive discussions at the meeting that are

8       not reflected in these notes would be

9       deliberative.  I mean, we would maintain our

10      objection.

11             MR. CONNELLY:  All right.

12             BY MR. CONNELLY:

13      Q.    Let's look, if you would, let's move

14      along to 16, the next page, in the middle of

15      the page, there is a reference to Haitian

16      ambassador or AMB, which I would interpret as

17      ambassador.

18      A.    Ambassador, yes.

19      Q.    Could you read that?

20      A.    "Haitian ambassador.  They had" -- I

21      haven't been able to figure out this word that

22      begins with S.  "They have" blank "and thought



Page 320

1    it would be automatic.  Not a bad people but

2    they are welfare recipients.  James.  Yep.

3    Upper one-half percent."

4        Q.    So the comment yep, presumably that

5    was made by James?

6        A.    Yes.

7        Q.    The rest of the comments that you

8    just read, do you recall whose observations

9    they were?

10       A.    Secretary Kelly.

11       Q.    And what did you mean by "they are

12   not a bad people but they are welfare

13   recipients, "in taking that note down.  Was

14   that a reference to Haitians in the U.S.?

15            MR. MARUTOLLO:  Again, I would

16   object to the extent it calls for internal

17   government deliberations and instruct you not

18   to answer under the deliberative process

19   privilege and also to the extent it calls for

20   speculation.  To the extent it's explaining

21   what this note meant, we would permit

22   Ms. Anderson to answer.



Page 321

1          THE WITNESS:  I wrote this down to

2     remember what Secretary Kelly said.

3          BY MR. CONNELLY:

4     Q.    Is that a -- did you capture

5     everything he said or is this just a summary of

6     this particular topic?

7          MR. MARUTOLLO:  Objection.

8          You can answer.

9          THE WITNESS:  Certainly, in general.

10    My notes don't capture every word that was

11    said, so I can't guarantee that I captured

12    every word.

13         BY MR. CONNELLY:

14    Q.    But to the extent you can recall and

15    that the note is refreshing your recollection,

16    which apparently was your purpose of using

17    them, the reference to "not a bad people but

18    they are welfare recipients," do you recall

19    whether that was -- whether that was

20    articulated that that was a reference to

21    Haitians in the U.S. as opposed to Haitians

22    living in Haiti?



Page 322

1          MR. MARUTOLLO:  Objection.

2          You can answer.

3          THE WITNESS:  I understood it to

4   mean Haitians generally.

5          BY MR. CONNELLY:

6     Q.   What about the reference to upper

7   half percent?  What did you mean by capturing

8   that observation?

9          MR. MARUTOLLO:  Same objection as

10   earlier related to deliberative process, but

11   you can answer.

12          THE WITNESS:  Best I can recall,

13   Secretary Kelly was saying something about the

14   upper one-half percent of Haitian society and

15   I'm not sure.  I can't recall what he meant by

16   that or why he was referencing that.

17          BY MR. CONNELLY:

18     Q.   Okay.  Let's -- because the

19   remainder of the notes I think largely cover

20   countries other than Haiti, I think we will --

21   I'll forego having you review it.

22     A.   Okay.



Page 323

1      Q.    Let's go to the very last page of

2    your notes, KA-50, which are the ones that were

3    -- pretty clearly seem to be on May 31, 2017?

4      A.    Yes.

5      Q.    It also references Haiti TPS

6    stakeholder call.  Is that unique or is that

7    something that has a recurring call?

8            MR. MARUTOLLO:  Objection.  Again, I

9    instruct the witness to answer only to the

10   extent you know as a fact witness rather than

11   as a 30(b)(6) witness for anything else.

12           THE WITNESS:  It's a common practice

13   for USCIS after any TPS decision is made, to

14   host a call and invite TPS stakeholders to call

15   in and get information about the decision and

16   ask questions.

17           BY MR. CONNELLY:

18     Q.    Who would the stakeholders be?

19     A.    They are often NGOs or legal service

20   providers, individuals can call in.  Sometimes

21   you have individuals who have TPS, any members

22   of the public who are interested in the TPS



Page 324

1    decision.

2        Q.    So this would be obviously not just

3    an internal government call, but would include

4    third parties and outsiders?

5        A.    Correct.

6        Q.    Did you participate in this call?

7        A.    Yes, I did.

8        Q.    Have you regularly participated in

9    calls like this?

10       A.    Yes.

11       Q.    And then you have Q&A.  Tell me,

12   well, why don't you read your middle note and

13   then I will ask you a little bit about it.

14       A.    "Haitian community disappointed for

15   only six months as opposed to 18 months.  Cruel

16   to require fee for six months.  Also

17   disappointed.  Kathy asked for criminal

18   background when statute allows for two

19   misdemeanors."

20       Q.    Go ahead.

21       A.    "To get auto extension, must request

22   new EAD and pay the fee."



Page 325

1       Q.    Do you have a recollection of about

2   how long this call lasted?

3       A.    They usually last approximately an

4   hour.  I don't know for sure.

5       Q.    Do you know whether any government

6   agency makes a transcript or keeps a recording

7   of these calls?

8           MR. MARUTOLLO:  Objection.

9           You can answer.

10          THE COURT:  Our USCIS, I think it's

11  actually changed titles but the customer --

12  customer service and public engagement

13  directorate at least at this time hosted these

14  calls, and I know they provide a readout of the

15  call so there should be some record.  I don't

16  know that it is a transcript, but there should

17  be some more official record of the call.

18          BY MR. CONNELLY:

19      Q.    So obviously, your little summary

20  doesn't come anywhere close to, you know,

21  intending to capture -- if indeed, the call

22  lasted about an hour, you don't pretend to



1    capture everything that was asked and answered,

2    correct?

3        A.    Not even close.

4        Q.    Do you happen to remember why the

5    couple of comments that you did make, that you

6    quoted about disappointment with only six

7    months and cruel to require fees and

8    disappointment about Kathy.  Again, I assume

9    that that is your supervisor?

10       A.    Kathy Nuebel Kovarik.

11       Q.    Yeah.  Asking about criminal

12   backgrounds, why did you -- what caused you to

13   capture those particular observations during

14   the course of this longer call?

15             MR. MARUTOLLO:  Objection.  Again,

16   to the extent it does call for internal

17   government deliberations, I would instruct you

18   not to answer.  To the extent it is related to

19   a media assessment or something that was done

20   to an outside government entity, then you can

21   answer the question, but if it is only related

22   to internal deliberations, again, I would



Page 327

1    instruct you not to answer, but otherwise,

2    please answer.

3             THE WITNESS:  I think these are two

4    questions that came up during the question and

5    answer period, and many of the questions and

6    answers in this type of call are procedural or

7    operationally-focused, asking how to get TPS or

8    extend TPS, and because I work on the policy

9    aspect of TPS, these two questions were more

10   policy-related so I wanted to remember them.

11            BY MR. CONNELLY:

12   Q.    Do you recall in a little greater

13   detail whatever the question might have been

14   that prompted Kathy or maybe how the topic of

15   Kathy asking for criminal background

16   information, give me the larger context as best

17   you can remember from your note helping your

18   memory what that was about.

19   A.    My best recollection is that

20   somebody on the call, a public caller, must

21   have been aware, I assume through possibly

22   leaked e-mails at this point, although I'm not



Page 328

```
 1    sure of the timing of that, but my best guess

 2    is that someone was aware that Kathy had made

 3    the request and just made the statement on the

 4    call that that person was disappointed that

 5    this information had been asked for,

 6    particularly because the TPS statute allows

 7    someone who has up to two misdemeanors to

 8    receive and maintain TPS.

 9         Q.    Do you remember, was Kathy on the

10    call?

11         A.    I don't think so.

12         Q.    Do you remember that someone on

13    behalf of the government responded to the

14    question, or maybe it wasn't a question, maybe

15    it was an observation.

16              Was there a response to this topic

17    being raised?

18         A.    I don't recall what the response

19    was.

20         Q.    Okay.  Let's go to 28.

21              (Deposition Exhibit KA-28 was marked

22    for identification.)
```



Page 329

1          BY MR. CONNELLY:

2          Q.    I am only interested in what's on

3    the first page but as always, acclimate

4    yourself.

5          A.    Okay.

6          Q.    Okay.  The middle e-mail on May 23

7    at 3:44 p.m., you are not initially on that

8    e-mail, correct?

9          A.    No.

10         Q.    It looks like -- but you did get in

11   the e-mail chain then two days later on May 25?

12         A.    Yes.

13         Q.    Okay.  And May 23 was the day before

14   the FRN extending the Haiti designation for six

15   months, correct?

16         A.    I believe that was.

17         Q.    You can go back and take a look at

18   it.

19         A.    May 24th, wasn't it?

20         Q.    Yeah, I believe so.  Okay.  And in

21   this e-mail in the middle of it, I'll read it

22   to you, it says:  "DCOS comments, for S1



Page 330

1    letters on Haiti TPS."

2              S1 letters would be letters for

3    Secretary Kelly?

4       A.    I'm sorry, what is what?

5       Q.    S1 is Kelly?

6       A.    S1 is Kelly, but can you repeat what

7    you said.

8       Q.    That's okay.  That's really what I

9    wanted to know.  So it effectively says:  "For

10   Kelly letters on Haiti TPS, he wants a stronger

11   response beginning to build a case for not

12   extending."

13             Did I read that correctly?

14      A.    Yes.

15      Q.    Then it says:  "From S1, make case

16   as such," and then emphasizes some points that

17   include highlight temporary nature, 2010

18   earthquake is the only reason for TPS being

19   granted, as well as some additional suggested

20   language.

21             Do you see that?

22      A.    I see that.



1     Q.    I understand you are neither -- you

2    only get this two days later, but this is all

3    being written literally the day before the

4    extension is made public, right?

5                MR. MARUTOLLO:  Objection.  Again,

6    to the extent that you became aware of that

7    information, you can answer.

8                THE WITNESS:  I think we have had

9    some confusion about this today and we've never

10   quite pinned it down, but the date that the

11   federal register notice was published was the

12   24th.  I thought that the announcement was made

13   in the days prior to that, so there was a

14   public announcement and that was followed by

15   the publication of the Federal Register notice.

16               BY MR. CONNELLY:

17    Q.    Okay.  So these observations and --

18   again, I am not asking you to embrace them

19   because you didn't make them, but these

20   observations, your best recollection are being

21   made, this internal e-mail is, to your best

22   recollection, circulating just sometime very



Page 332

1    shortly after it was publicly announced that

2    Haiti was going to be extended for six months?

3         A.    That's my best recollection, yes.

4         Q.    And then you are brought into --

5    somebody pulls you in, gives you the e-mail

6    chain.  Do you know who -- because it just says

7    from policy clearance.

8               Do you know what person sent this

9    e-mail to you and others?

10        A.    It is signed from Efren.

11        Q.    Signed in the body?

12        A.    In the body.  The one from policy

13   clearance mailbox it looks like.

14        Q.    Who is Efren?

15        A.    Efren is somebody who works in the

16   office of policy and strategy and part of his

17   role was circulating taskers, we call them, to

18   the right people in the office to get the work

19   done.

20        Q.    What is Efren's last name?

21        A.    I believe it's Hernandez.

22        Q.    Okay.  And he begins by saying:  "It



Page 333

1    pains me to send this in light of yesterday's

2    conversation."

3              Do you recall being in a

4    conversation with Efren and perhaps others on

5    May 24?

6         A.    I don't, no.

7         Q.    He goes on to say:  "There were

8    problems with the person who was supposed to

9    cover the box on Tuesday.  I am doing it

10    today."

11             What is the task of covering the

12    box?

13        A.    I think he's talking about the

14    policy clearance mailbox, the e-mail address

15    that is in the From line so it's an e-mail box

16    that circulates again tasks for people in the

17    office to complete.

18        Q.    And after May 25, did you become one

19    of the people who at least partially was asked

20    to try to assist in the stronger response that

21    was being sought by Secretary Kelly?

22             MR. MARUTOLLO:  Again, I would



Page 334

1    object to the extent it calls for internal

2    government deliberations, but I would instruct

3    you not to answer under the deliberative

4    process privilege, but otherwise, you can

5    answer the question.

6           THE WITNESS:  I did work on the

7    response to this incoming letter.  It looks

8    like it was from Cardinal Joseph Hogan.  I did

9    work on the response.

10          BY MR. CONNELLY:

11   Q.    Let's go to KA-29, which is 10924.

12          (Deposition Exhibit KA-29 was marked

13   for identification.)

14          BY MR. CONNELLY:

15   Q.    We will probably go through most of

16   this.  I know you have been good about reading

17   everything already.

18   A.    Okay.  Okay.

19   Q.    The very first e-mail is from Tina

20   Wimbush, W-I-M-B-U-S-H, on June 7, and she

21   references the department.

22          Is that the Department of Homeland



Page 335

1    Security?

2         A.    Yes.

3         Q.    You told me this previously, but

4    EXSO, what is that an acronym for?

5         A.    I think it's executive secretariat

6    or executive secretary's office.

7         Q.    An office that she is in apparently,

8    right?

9         A.    Yes.  Oh, I see it says below.

10   Office of the executive secretary.

11        Q.    And then is it fair to say, and if

12   you flip if you want to, that she notes, I'll

13   quote it:  "Upon review of the revised draft,

14   it does not cover all the specific points as

15   laid out by DCOS for S1 letters on Haiti TPS.

16   He wants a stronger response, beginning to

17   build a case for not extending," and then

18   further, the additional language in terms of

19   what is being looked for is exactly -- he just

20   picks up exactly what was in the May 23 e-mail

21   that I just showed you, which is part of KA-28.

22        A.    Yes.


MAGNA
LEGAL SERVICES

Page 336

1      Q.    Is that right?

2      A.    Yes.

3      Q.    And then this chain does run a bit,

4  but you first get involved, as best I can tell,

5  on June 7, so same day, she was at 1:16 p.m.,

6  at 2:38 p.m., a little more than an hour later,

7  you are first writing something in the chain

8  and you say:  "This is ridiculous.  No need to

9  consult, but feel free to give me a call this

10  afternoon" if you'd like someone to talk it

11  through with, "if you would like someone to

12  talk you through with."

13           What were you referencing was

14  ridiculous?

15           MR. MARUTOLLO:  Again, objection to

16  the extent it calls for internal government

17  deliberations.  I would instruct you not to

18  answer under the deliberative process

19  privilege.  I think you can answer as to the

20  document that you were referring to, that you

21  termed ridiculous.

22           THE WITNESS:  I was referring to the



Page 337

1    request to further revise this response letter.

2              BY MR. CONNELLY:

3         Q.    And why had you concluded that it

4    was ridiculous to try to do that?

5              MR. MARUTOLLO:  I would object to

6    the extent again, this calls for internal

7    government deliberations.  I would instruct you

8    not to answer under the deliberative process

9    privilege.  Again, it reflects a personal

10   opinion of Ms. Anderson, you know, and I think

11   it -- I'm going to instruct the witness not to

12   answer that question as phrased.

13             BY MR. CONNELLY:

14        Q.    What -- did you have concerns with

15   the request, presumably so, if you summarized

16   it as ridiculous, correct?

17             MR. MARUTOLLO:  Objection.  I will

18   make the same objection I made a moment ago.  I

19   direct the witness not to answer at least again

20   based on that phrasing.

21             BY MR. CONNELLY:

22        Q.    What -- you had a negative reaction



Page 338

1    to the request.  Is that a fair statement?

2            MR. MARUTOLLO:  Same objection, but

3    you can answer based on what is in front of

4    you, the document in front of you.

5            THE WITNESS:  Yes.

6            BY MR. CONNELLY:

7    Q.    And why did you have that reaction?

8            MR. MARUTOLLO:  Again, I would

9    object to the extent, first, it goes beyond

10   this document, and second, it calls for

11   internal government deliberations.  Reflects

12   personal opinion, interpretation of the author

13   of this document, Ms. Anderson, at least this

14   e-mail, so I would instruct the witness not to

15   answer the question.

16           MR. CONNELLY:  And, you know, a

17   couple of times, Joe, you said the question as

18   asked.  Not your responsibility to get me to

19   ask the right question but we've been dancing

20   around this for a very long time.  Is there any

21   -- I want to probe, you know, what, why she had

22   this reaction.



Page 339

1          Is there any way for me to formulate

2    any question that you're going to not instruct

3    her to not answer?

4          MR. MARUTOLLO:  I mean, I don't

5    think that's a fair assessment.  I mean,

6    throughout this deposition, there have been

7    multiple times when I've objected and then

8    you've rephrased and I have permitted her to

9    answer so, I mean, I am not formulating

10   questions, but I am happy to continue in good

11   faith.

12          I would note again, this is a

13   document that was originally deemed

14   deliberative.  This is a comment that was made

15   by a government official and I think, you know,

16   there is even an argument that, you know, what

17   we could potentially argue here, that it's

18   intended to embarrass the witness as well under

19   Rule 30(d)(3), so I mean, I think there is a

20   number of arguments we raise.  I think the

21   document speaks for itself, but we are happy to

22   continue the deposition obviously.



Page 340

1           MR. CONNELLY:  Okay.  Okay.  For

2    whatever it's worth, I can easily see where

3    this e-mail chain may embarrass Tina Wimbush.

4    I don't know why it would necessarily embarrass

5    anybody who had a strong negative reaction to

6    it, but that was not my intent.

7           BY MR. CONNELLY:

8    Q.    Well, let me try this.  What did you

9    mean when you said this is ridiculous?

10          MR. MARUTOLLO:  Again, I would

11   object on the grounds of internal government

12   deliberations, but I think given my prior

13   objections, I think it's fair to explain what

14   you meant by ridiculous.  I think that's a fair

15   compromise, without waiving any other

16   privileges but specific to that question.

17          THE WITNESS:  I guess I would say I

18   meant that I thought that a request to continue

19   to revise this letter was ridiculous, that's

20   what I meant by saying it.  I thought that it

21   was ridiculous.

22          BY MR. CONNELLY:



Page 341

1      Q.    And then your -- the next person in

2  the chain, Mr. Prelogar makes the observation,

3  "unreal?"

4            Do you see that?

5      A.    I do.

6      Q.    Did you have an understanding --

7  well, did you have an understanding -- I don't

8  want you to speculate on what was in his head,

9  but did you have any understanding what he

10  meant by that word?

11           MR. MARUTOLLO:  Again, I would

12  object because it also calls for speculation as

13  counsel notes, but again, to the extent you can

14  explain this document, subject to our

15  objections related to deliberative process

16  privilege, you can do so.

17           THE WITNESS:  You are asking for my

18  understanding of his entire message or one

19  particular word?

20           BY MR. CONNELLY:

21      Q.    Well, I mean, his message is

22  relatively short.  The whole message is -- I



Page 342

1    will just pull some stuff from his statement,

2    "unreal."

3         I am just asking for you to explain,

4    if you had an understanding at the time, if you

5    had an understanding of what unreal was

6    intended to convey.

7         What is the import of that

8    observation?

9         MR. MARUTOLLO:  Again, I would just

10   instruct the witness to answer only to the

11   extent it does not implicate the deliberative

12   process privilege.  Doesn't go beyond the four

13   corners of this document, particularly since

14   you did not draft that e-mail.

15        With those limitations in mind, you

16   can answer the question.

17        THE WITNESS:  I took him to have a

18   reaction that was similar to mine, that the

19   request to further revise this response letter

20   was surprising.

21        BY MR. CONNELLY:

22   Q.    You then -- less than three minutes



Page 343

1    later, closer to two minutes later, you got

2    back to Mr. Prelogar and said:  "Do you see the

3    suggested language?  It's amazing (and mostly

4    incorrect.)  This idea of localized damage from

5    the earthquake is insane."

6             What did you mean when you said the

7    idea of localized damage for the earthquake is

8    insane?

9             MR. MARUTOLLO:  Again, I would

10   object to the extent it calls for internal

11   government deliberations.  I instruct you not

12   to answer under the deliberative process

13   privilege, but to the extent you can explain

14   what that sentence means within the four

15   corners of this document, you can answer the

16   question.

17            THE WITNESS:  In the suggested

18   language that was sent to us in the 1:16

19   e-mail, a piece of that proposed or suggested

20   language says:  "Primarily localized damage in

21   capital region of Port-au-Prince," I think it's

22   talking about the previous sentence, that the



Page 344

1    damage from the 2010 earthquake that had

2    ravaged Port-au-Prince and that there was

3    primarily localized damage, that statement did

4    not accord with my understanding of the impact

5    of the 2010 earthquake.

6              BY MR. CONNELLY:

7        Q.    And going to the top of page

8    Bates-numbered 10925, same page we are on, let

9    me make sure.

10             I'm sorry.  The top e-mail is a

11   trailer from the previous page, so this is your

12   e-mail on June 7 at 2:51 p.m. back to Mr.

13   Prelogar, and you say at the end of your

14   relatively short message:  "At least the

15   untruth things said by SEC K can be attributed

16   to him."

17             I take it that SEC K is Secretary

18   Kelly?

19       A.    Yes.

20       Q.    And what did you mean by noting that

21   the untruth things could be attributed to him?

22             MR. MARUTOLLO:  Again, I assert the



Page 345

1    objection not to answer anything that reveals

2    internal government deliberations, but again,

3    as a compromise here, we will agree for you to

4    answer and explain that sentence in the e-mail

5    that you drafted.

6            THE WITNESS:  I think I meant that

7    you can see in this chain that we were

8    discussing the potentially one way to respond

9    to this request to revise, was to essentially

10   use the language from Secretary Kelly's public

11   statement about the decision that he had made

12   on TPS, and so in the sentence, I was

13   reflecting that anything in that statement that

14   I thought might be untrue were stated by him

15   rather than us.

16           BY MR. CONNELLY:

17   Q.    The final e-mail in the chain is by

18   Mr. Prelogar shared with you about -- it

19   appears to be less than an hour later, about 40

20   minutes later, and here, this looks like a

21   draft of some kind of a memo or a letter.

22           Can you tell me what -- just the



Page 346

1    format of what he's providing to you after his

2    observation:  "This ought to do it."

3        A.    I think this was his proposed draft,

4    new draft letter to respond to this request to

5    further revise the response letter.  This was

6    the language he proposed to put forward.

7        Q.    And who was the letter going to be

8    sent to?

9             MR. MARUTOLLO:  Objection.

10            You can answer to the extent you

11   know, or if it is not readily apparent in the

12   e-mail.

13            THE WITNESS:  I can't tell from this

14   e-mail chain from KA-28 that we had looked at

15   earlier.  It looks like this entire task was

16   related to a response letter to go to Cardinal

17   Joseph Hogan but I can't tell that for sure

18   from KA-29.

19            BY MR. CONNELLY:

20       Q.    Who is -- okay.  Cardinal, I happen

21   to know as long as it may be, I still remember

22   some of my Catholic terminology.  Eminence is



Page 347

1    often used as a -- I think is the appropriate

2    designation to give to a cardinal.

3        A.    I think this was the appropriate

4    title or at least Brandon thought it to be,

5    yes.

6        Q.    And where was the cardinal?  Just

7    broadly, was he in Haiti or was he in the

8    United States or do you know?

9        A.    I don't know.  I guess my assumption

10   was that it was -- he was in the United States

11   but I don't know for sure.

12       Q.    All right.  I'm going to give you

13   the next document which will be KA-30.

14            (Deposition Exhibit KA-30 was marked

15   for identification.)

16            BY MR. CONNELLY:

17       Q.    This is really just a continuation.

18   Most of this document, I think is the same

19   chain through the last couple of entries on the

20   first page.

21       A.    Okay.

22       Q.    But I am going to take you to the



1    middle page.

2            Let's go back to where we have been

3    already in the middle of Page 561, the second

4    page, we have already covered this a bit, but

5    you -- I'm drawing your attention to your 2:51

6    p.m. statement on June 7, at least the:  "At

7    least the untruth things said by Secretary

8    Kelly can be attributed to him."

9            And then that is followed by a draft

10   by Prelogar in response to the cardinal.  In

11   that draft, there are a number of quotes

12   attributed to Secretary Kelly.

13           Are you able to tell me which, among

14   those quotes, you think were untrue things?

15           MR. MARUTOLLO:  Again, objection to

16   the extent this calls for internal government

17   deliberations, I will instruct the witness not

18   to answer under the deliberative process

19   privilege.

20           To the extent there are items that

21   you want to explain further than you've already

22   answered and explained, then so be it, but


MAGNA
LEGAL SERVICES

Page 349

```
 1   otherwise, I would instruct you not to answer.

 2              BY MR. CONNELLY:

 3        Q.    Let me -- I'm going to deliberately

 4   make this a compound question before you got to

 5   answer because it's kind -- your e-mail

 6   brackets this draft letter.

 7              If you go to the first page at 4:54

 8   p.m., so we are now talking about two hours

 9   later, you send an e-mail to Mr. Prelogar and

10   you say:  "That's the best possible combo of

11   true things from you and quotes of not true

12   things from SK."

13              SK is Secretary Kelly?

14        A.    Yes.

15        Q.    "Nicely done."  So whether you --

16   whether you formulate, you know, what you were

17   thinking, wondering was untrue at 2:51 or what

18   was untrue at 4:54 p.m., I'd like you to tell

19   me what you found to be untrue things stated by

20   Secretary Kelly that were included in the draft

21   response to the cardinal?

22              MR. MARUTOLLO:  Again, I would
```



Page 350

1    assert the same objection related to internal

2    government deliberations, and instruct you not

3    to answer under the deliberative process

4    privilege.  To the extent you want to explain

5    any items within the four corners of this

6    document, we would permit you to answer that

7    question.

8              THE WITNESS:  Saying these items

9    were untrue perhaps was a bit hyperbolic, but I

10   did have concerns about some of the country

11   conditions stated, and again, I don't know that

12   what Brandon proposed to go forward was

13   everything that was in the secretary's

14   statement, so between my two e-mails, the 2:51

15   e-mail was referring to the entire statement

16   that I made, so there may have been more

17   elements in a statement that I found to be or

18   characterized as untruth than what ultimately

19   got in this draft.

20             But if you look at Page 20561, the

21   second paragraph, talking about the secretary

22   elaborating on Haiti's progress.



Page 351

1        BY MR. CONNOLLY:

2        Q.    Right.  And then a fairly long

3    quote, the remainder of that paragraph is a

4    quote presumably from the secretary, correct?

5        A.    So to me, several of those elements

6    didn't characterize the current conditions in

7    Haiti fully or in the same way that I would

8    have characterized them as being fully

9    accurate.

10       Q.    Let's go to KA-31 which is 880.

11             (Deposition Exhibit KA-31 was marked

12   for identification.)

13             BY MR. CONNOLLY:

14       Q.    Okay.  I want to direct your

15   attention to your e-mail of July 18 at 12:53

16   p.m. to David Cloe, C-L-O-E.

17       A.    Yes.

18       Q.    David is who?

19       A.    He's, as you can see in his

20   signature block above, the director of the

21   Latin America Caribbean affairs in the DHS

22   headquarters office of policy.



Page 352

1      Q.    And I am going to read the

2   paragraph.

3            "Yesterday, we participated in a

4   call with our Acting Director McCament and

5   Ambassador Merten relating to S1's interest in

6   the Haitian government actually to facilitate

7   the return of its nationals to Haiti during the

8   six-month TPS extension that was announced in

9   May.  S1 has told the Haitian government on a

10  couple of occasions that the steps they take

11  during the six-month TPS extension to help

12  their nationals in the U.S. obtain updated

13  travel documents and to otherwise encourage and

14  facilitate their return to Haiti, will be

15  something that he takes into account when

16  considering whether Haiti's TPS designation

17  should be further extended.  The State is not

18  aware of any affirmative steps that the Haitian

19  government has taken in this regard so far?"

20           Did I read that accurately?

21      A.    Yes.

22      Q.    Does your little summary accurately



Page 353

1    reflect, you know, where things stood on this

2    issue in July 18 of 2017?

3              MR. MARUTOLLO:  Objection.  Again,

4    to the extent it calls for internal government

5    deliberations, I would instruct you to answer

6    -- not -- I would instruct you not to answer

7    under the deliberative process privilege.  You

8    can limit your answer to what is in the four

9    corners of this document which is KA-31.

10              THE WITNESS:  It accurately

11    reflected my understanding at that time.

12              BY MR. CONNELLY:

13    Q.    Okay.  So the -- I'm going to

14    summarize, and you can tell me whether I've it

15    right.  That Kelly was saying that if the Haiti

16    government encouraged and facilitated the

17    return to Haiti of some of their people, that

18    action would be something that he, the decision

19    maker on the TPS status, would take into

20    account when he next considered whether Haiti's

21    TPS designation should be further extended.

22              Is that a fair characterization?



1           MR. MARUTOLLO:  Again, I would

2    object to the characterization as the document

3    speaks for itself and I would also object on

4    the ground it's vague, and further with respect

5    to deliberative process, because this was still

6    a deliberative e-mail communication, but given

7    those limitations, you can answer the question.

8           THE WITNESS:  I think that the

9    sentence as I worded it in the e-mail is a fair

10   characterization of what I understood to be the

11   -- what the secretary had told the Haitian

12   government.

13          BY MR. CONNELLY:

14   Q.    Okay.  Would -- in your estimation

15   and in your, you know, the professional factors

16   that you consider in these determinations for

17   an extension, does the return of foreigners to

18   their country, is that a current condition to

19   be considered in deciding on whether or not an

20   extension should be granted?

21          MR. MARUTOLLO:  I would object to

22   that question as phrased.  First, vagueness



Page 355

1    grounds and second, again, this witness is not

2    a 30(b)(6) witness.  This is a question for the

3    decision maker, and I think it certainly goes

4    to deliberative materials as to what factors

5    were considered in reaching a final decision,

6    so we would certainly object and direct the

7    witness not to answer that question as phrased.

8              BY MR. CONNELLY:

9         Q.    Are you going to follow that

10   direction?

11        A.    Yes.

12        Q.    Had you ever, prior to this

13   suggestion by Secretary Kelly that he might be

14   influencing his decision making by whether

15   people were returning to the country, had that

16   factor, people returning to their country, ever

17   been a part of your process in making

18   determinations about extensions or

19   designations?

20             MR. MARUTOLLO:  Objection, again, as

21   phrased.  I would object as -- first as vague

22   and certainly calls for information related to



Page 356

1    internal government deliberations, and also

2    presumes facts not testified to today regarding

3    a process and whether or not -- and frankly,

4    ultimately, the secretary is the one who makes

5    the decisions not Ms. Anderson, so on those

6    grounds as well, we would object and direct the

7    witness not to answer that question as phrased.

8           BY MR. CONNELLY:

9    Q.    Could you tell me if there is

10   anything -- if you go back to the very first

11   document that I provided to you today, which

12   presumably is KA-1, and that's the actual

13   statutory basis for the TPS issue.

14          Do you have that before you?

15   A.    Yes.

16   Q.    We just briefly glanced along some

17   of the ideas or some of the concerns about

18   ongoing armed conflict, earthquake, flood,

19   drought, epidemic, other environmental disaster

20   and then finally, extraordinary and temporary

21   conditions.  Remember, I think we had at least

22   a brief discussion about that.



Page 357

1      A.    We discussed the statute.

2      Q.    Yeah.  And I think you told me that

3  you were, you know, familiar with those

4  concepts, correct?

5      A.    I'm familiar with this section of

6  the law.

7      Q.    Yeah.  Okay.  Then we briefly

8  discussed it in -- a little bit further, the

9  extensions and what the attorney general or his

10  designee which in this case would be the

11  secretary of Homeland Security, what he would

12  do in determining whether or not conditions for

13  redesignation should be continued.

14      A.    You are talking about Section 3A?

15      Q.    Yes.

16      A.    Yes.

17      Q.    Okay.  I would just like to ask you

18  if there is any basis in the statute itself,

19  show me in the statute where swapping out

20  whether a country would ask its people back is

21  a valid consideration in terms of whether a

22  designation should be further extended.



Page 358

1          MR. MARUTOLLO:  I would object and

2    instruct the witness not to answer.  Again,

3    this is a fact witness, she is not an expert

4    witness, not a 30(b)(6) witness.

5               If that question calls -- as

6    phrased, calls for a legal conclusion and, you

7    know, frankly at this stage, I think it is

8    bordering on harassment.  We are now in Hour 6

9    at least I think of the deposition, it is about

10   5:15, and admittedly, we did take an hour lunch

11   break, but we haven't even gotten into the Duke

12   determination at issue in this litigation yet.

13              Now we are going back to earlier

14   exhibits, you know, so I mean, obviously, you

15   can take a deposition as you like, but I'm not

16   going to permit Ms. Anderson to, you know, to

17   answer questions again about her understanding

18   of the statute and statutory factors when it's

19   irrelevant as a fact witness to her testimony

20   and, you know, so I would just object and

21   instruct the witness not to answer that

22   question.



Page 359

1           BY MR. CONNELLY:

2      Q.    Have you ever -- in your role in

3  helping assist and gather information so that

4  the secretary can make a decision about either

5  designating or extending a TPS status for a

6  country, have you -- have you ever offered that

7  encouraging people to return to the country

8  would be an appropriate factor to consider in

9  making that determination?

10          MR. MARUTOLLO:   Again, I object.   I

11  think that calls for internal government

12  deliberations about the substance of

13  communications that are made.   Given the way

14  that the question is phrased, we'd instruct the

15  witness not to answer that question under the

16  deliberative process privilege.

17          BY MR. CONNELLY:

18     Q.    Have you ever -- other than this

19  singular instance, are you aware of a secretary

20  or his delegate ever seeking to at least

21  partially base his decision on extending a TPS

22  determination based upon whether the country



Page 360

1    was encouraging its people to return?

2            MR. MARUTOLLO:  Again, I would make

3    the same objection again.  To the extent you

4    later learned in a Federal Register notice or a

5    final determination, that was a factor, if you

6    learned at some point based on public

7    information that was made final, I think you

8    can answer that, but otherwise, I direct you

9    not to answer, so you can answer with that

10   limitation in mind.

11           THE WITNESS:  Can you specify what

12   element in particular you are wondering if --

13   was ever taken into account?

14           BY MR. CONNELLY:

15   Q.    An attempt by Haiti or any other

16   foreign country to facilitate the return of its

17   people.

18           MR. MARUTOLLO:  I would just object

19   on vagueness grounds as well, but again, given

20   our limitation that I just noted about being

21   related to a final agency determination that

22   you came across, even though you are not an



Page 361

1    expert witness or a 30(b)(6) witness, you can

2    answer in your capacity as a fact witness in

3    this case.

4              THE WITNESS:  In general, the

5    ability for a state to handle returns to this

6    date, as well as whether nationals can return

7    in safety, is part of the statutory basis that

8    has been considered in the past as far as I

9    understand it, as to whether a TPS designation

10   can be made and should be extended or

11   terminated.

12             BY MR. CONNELLY:

13   Q.    Are you basically referencing an

14   ability of a country to reabsorb their people

15   would be a factor to consider in continuing TPS

16   status or deciding whether to extend it?

17             MR. MARUTOLLO:  Object on vagueness

18   grounds and mischaracterizing the testimony

19   that Ms. Anderson just provided, but with those

20   objections in mind, you can answer the

21   question.

22             THE WITNESS:  In particular, I'm



Page 362

1  referencing the statutory language for

2  environmentally-based designation, which is

3  (b)(1)(b).

4          So in the environmental basis for a

5  designation, part of the statutory

6  requirements, II, is that the foreign state is

7  unable temporarily to handle adequately the

8  return to the state of aliens who are

9  nationals, so for environmentally-based

10 designations, that is a statutory

11 consideration.  Under C, for countries that are

12 designated on the basis of extraordinary and

13 temporary conditions, one of the -- again,

14 statutory considerations is whether those

15 extraordinary and temporary conditions in the

16 foreign state prevent aliens who are nationals

17 of the state from returning to the state and

18 safety.

19         So for Haiti, which was designated

20 on extraordinary and temporary conditions

21 grounds, one of the statutory elements to

22 consider is whether there are conditions in the



Page 363

1    foreign state that prevent aliens who are

2    nationals of the state from running to the

3    state and safety.

4              MR. CONNELLY:  Let's do this.  I

5    think maybe we have got about an hour left.  I

6    could be better if I spent some time thinking

7    through where I want to go and what I want to

8    do with that time, so let's take a short break.

9    I don't care if you stay in place or you want

10   to move around, but let's do that.

11             MR. MARUTOLLO:  Sure.  Thank you.

12             THE VIDEOGRAPHER:  We're going off

13   the record.

14             The time is 17:22.

15             (A short recess was taken.)

16             THE VIDEOGRAPHER:  We're back on the

17   record.

18             The time is 17:32.

19             BY MR. CONNELLY:

20   Q.    We're going to ask you to take a

21   look at KA-34 which appears to be a draft of a

22   DHS statement about terminating Haiti.



1          (Deposition Exhibit KA-34 was marked

2     for identification.)

3          BY MR. CONNELLY:

4     Q.    I'm really not going to ask you much

5     about the content, but you let me know when you

6     are comfortable having me ask you questions.

7     A.    Let me look at it a bit.  Okay.

8     Q.    Did you take part in generating this

9     draft?

10    A.    Yes, I believe so.

11    Q.    Do you know who else was involved in

12    that process?  That's too broad a question.

13         I mean, were there co-authors

14    besides yourself or were you the principal

15    drafter?

16         MR. MARUTOLLO:  Objection to the

17    extent the -- which time, I guess I would just

18    ask for clarification, but you can answer the

19    question.

20         THE WITNESS:  Sure, without knowing

21    exactly which draft this is, it looks like it

22    was leading up to the May decision because we



Page 365

1    are talking about the designation being set to

2    expire on July 22.

3              So I would say, yes, I was involved

4    in drafting this, probably co-authored it with

5    Brandon.

6              BY MR. CONNELLY:

7    Q.    Let's go to -- I'm going to give you

8    another document.  I'm going to give you KA-36.

9              (Deposition Exhibit KA-36 was marked

10   for identification.)

11             THE WITNESS:  Okay.

12             BY MR. CONNELLY:

13   Q.    This one I'm going to go a little

14   bit differently.  I mean, this -- the chain

15   runs for a full week, it starts on October 6

16   and runs through October 13.  I'm going to go

17   to the last memo first with you.

18             That's a memo from Kathy Nuebel

19   Kovarik to several people including yourself

20   and she says:  "I am going to send you a

21   revision of all three memo by 10:00 a.m."

22             Having looked through the full



Page 366

1    chain, can you tell me or do you have a

2    recollection of what the three memo are that

3    she is referencing here?

4              MR. MARUTOLLO:  Objection.

5              You can answer.

6              THE WITNESS:  It's hard for me to be

7    certain from this chain, but my best guess is

8    that there were recommendation memos for the

9    three Central American countries designated for

10   TPS, Honduras, Nicaragua and El Salvador, but

11   it's hard for me to be certain.

12             BY MR. CONNELLY:

13   Q.    All right.  Just a one-off question.

14   There is a -- on the first page, there is an

15   acronym reference to RU and one of the other

16   memos.

17             What is RU?

18   A.    It's research unit, a research unit.

19   Q.    Okay.  Were you involved in any or

20   all of those three Central American memos?

21             MR. MARUTOLLO:  Objection.

22             You can answer.



Page 367

1                THE WITNESS:  Again, I am not

2     entirely sure that those are the three memos

3     being referred to here but I was involved in

4     drafting the recommendation memos for the three

5     Central American countries.

6                BY MR. CONNELLY:

7      Q.    Okay.  I assume that it would be

8     expected in drafting those memos, you did your

9     level best to, you know, take all available

10    information and generate a memo that, you know,

11    reflected your best efforts to let the decision

12    makers know what the circumstances were in the

13    country?

14               MR. MARUTOLLO:  Objection.

15               But you can answer the question.

16               THE WITNESS:  Yes, that's my normal

17    process.

18               BY MR. CONNELLY:

19     Q.    And then Kovarik goes on to say in

20    her October 13 memo:  "The problem is that it

21    reads as though we'd recommend an extension

22    because we talk so much about how bad it is,



Page 368

1    but there is not enough in there about positive

2    steps that have been taken since its

3    designation."

4              Given your uncertainty of the three

5    memos and now we go into a singular tense,

6    using the phrase "it," but could you tell me --

7    can you recall from having received this

8    memo -- I mean having received this e-mail,

9    what Kovarik was referencing when she said,

10   there is a problem that it reads as though we'd

11   recommend an extension because of how much is

12   bad and not enough about positive steps?

13             MR. MARUTOLLO:  Objection.  Again,

14   it calls for speculation for the reasons

15   counsel noted, but you can answer the question.

16             THE WITNESS:  It seems to me as

17   though she is talking about either all three

18   memos in question, although using the singular

19   or one of those memos in particular.  I guess

20   it would be all three as they were being done

21   at the same time.

22             BY MR. CONNELLY:



1      Q.    Okay.  And more particularly, do you

2    have any recollection that your product, if

3    indeed you had drafted one or more of these

4    memos, do you have a recollection of your

5    product being questioned by Kathy Kovarik for

6    talking about, you know, how bad it is in the

7    country and not enough about the positive

8    steps?

9            MR. MARUTOLLO:  Objection.  I would

10   instruct the witness not to answer to the

11   extent that that question calls for the -- it

12   calls for internal government deliberation that

13   will be protected by the deliberative process

14   privilege, in terms of what a supervisor was

15   discussing about a draft predecisional

16   memorandum, so given the way the question was

17   phrased, I would direct that Ms. Anderson not

18   answer the question.

19           BY MR. CONNELLY:

20     Q.    I'm going to show you KA-37, which

21   is just one add-on to this long chain.

22           (Deposition Exhibit KA-37 was marked



Page 370

1    for identification.)

2            BY MR. CONNELLY:

3       Q.    Feel free to fully compare but I'll

4    represent in good faith that I believe the only

5    thing new on this document from the previous

6    one is the final e-mail which is at the top of

7    it.

8       A.    Okay.

9       Q.    The top memo is from Brandon

10   Prelogar on October 13 at 8:59 a.m.  As I say,

11   it follows that previous chain so it's still on

12   that same topic area.

13           He says:  "We can comb through the

14   country conditions to try to see what else

15   there might be, but the basic problem is that

16   it IS bad there WRT," is that with regard to --

17   is that the acronym for with regard to or do

18   you know?

19      A.    I think so, with regard to or with

20   respect to.  I'm not sure which.

21      Q.    Or with respect to, "all of the

22   standard metrics" for his first observation.



Page 371

1          When he says "we," and you are

2   included on this e-mail, does that help you --

3   or tell me your best recollection, were you

4   involved in the process of taking a look at

5   least one or more of three memos that Kovarik

6   had mentioned in the prior e-mail, which was

7   8:51 in the morning on the same day, October

8   13?

9          MR. MARUTOLLO:  Again, I would

10  object to the extent it calls for internal

11  government deliberations.  I instruct the

12  witness not to answer under the deliberative

13  process privilege, but to the extent you can

14  explain this e-mail based on this document

15  that's in front of you, you can answer.  I

16  would also object on the ground it calls for

17  speculation as you did not draft this e-mail.

18          THE WITNESS:  I think that when he

19  says "we," he's talking about him and me.  I

20  was involved.

21          BY MR. CONNELLY:

22  Q.    And he goes on to state as a part of



Page 372

1  his relatively short e-mail:  "We can work with

2  RU," that is research unit?

3      A.    Yes.

4      Q.    "To try to get more and/or comb

5  through the country conditions, we are again

6  looking for positive gems, but the conditions

7  are what they are."

8          And is it basically kind of just a

9  bedrock concept in making decisions about

10  designations or extensions that you are

11  supposed to try to take a good hard look at

12  exactly what the conditions are in the country

13  in order to make an informed decision?

14          MR. MARUTOLLO:  Again, I would

15  object to the extent it calls for internal

16  government deliberations and I would instruct

17  the witness not to answer under the

18  deliberative process privilege, but also

19  instruct the witness, she may answer but only

20  to the extent it is in her role as a fact

21  witness and not as a 30(b)(6) witness for the

22  agency and in her personal dealings with TPS.



Page 373

1              THE WITNESS:  Part of my role is to

2    take the full and very comprehensive country

3    condition report that was provided to us by the

4    research unit and pull out items from the full

5    report that would be included in the memo that

6    would go to the secretary.

7              I always tried to pull an objective

8    and balanced and the most critical, as they

9    seem to me, factors that were in the research

10   unit report and include them in the draft memo.

11             BY MR. CONNELLY:

12        Q.    All right.  Let's go to KA-38 which

13   is 1118.

14             (Deposition Exhibit KA-38 was marked

15   for identification.)

16             THE WITNESS:  Okay.

17             BY MR. CONNELLY:

18        Q.    All right.  And part of that October

19   12 memo to Kathy Nuebel Kovarik, the core part

20   of it says:  "We have written" -- I better go

21   back.

22             Let's take it through, "Kathryn,"



1    that is you, correct, in the second -- his

2    second paragraph?

3        A.    Yes.

4        Q.    "And I have completed a draft Haiti

5    TPS decision memo attached.  In short, based on

6    our review of country conditions, we have

7    written it so that it could support either

8    extension or termination, but left the

9    recommendation blank pending further

10   discussion."

11           Does that comport with your own

12   recollection of writing a memo that could

13   support either extension or termination?

14           MR. MARUTOLLO:  Again, I object to

15   the extent it calls for internal government

16   deliberations, but otherwise, you can answer

17   the question to the extent you can explain

18   based on this document.

19           THE WITNESS:  I believe this was an

20   accurate characterization of how we drafted the

21   memo.

22           BY MR. CONNELLY:



1      Q.   Okay.  And did anyone ask you to

2    draft the memo giving those dual options?

3           MR. MARUTOLLO:  Objection.  Again, I

4    would say that that calls for internal

5    government deliberations and as phrased, I

6    would instruct Ms. Anderson not to answer under

7    the deliberative process privilege.

8           MR. CONNELLY:  No room to answer on

9    that one?

10          MR. MARUTOLLO:  Not -- at least not

11    the way that's phrased.  I mean, if it's

12    related to something in this e-mail or

13    something that she can explain based on this

14    e-mail, that is one thing, but the way it is

15    phrased, I would instruct Ms. Anderson not to

16    answer the question under the deliberative

17    process privilege.

18          BY MR. CONNELLY:

19      Q.   If you take a look at his first

20    observation in his e-mail, he says:  "Kathy,"

21    and that Kathy is spelled K-A-T-H-Y, that is

22    presumably Kathy Nuebel Kovarik?



Page 376

1       A.      Yes.

2       Q.      And "(and Larry.)"  And Larry is

3   Larry Levine?

4       A.      Yes.

5       Q.      "Kathy and Larry who has been

6   pestering - I mean, italicized "reminding -

7   us," and then it moves on to talk about the

8   draft that you completed.  Okay?

9               What did you understand Brandon to

10  be conveying to you in terms of what was being

11  asked by Kathy and Larry?

12              MR. MARUTOLLO:  Objection.  It

13  assumes facts not in evidence and it also calls

14  for speculation, and I again reassert the

15  deliberative process privilege, but limiting

16  your answer to the objections I've just set

17  forth and limiting it to this document, you can

18  answer the question.

19              THE WITNESS:  You mean what is being

20  conveyed to me in this whole e-mail?

21              BY MR. CONNELLY:

22      Q.      Yeah.  Well, that's fine.  Why don't



Page 377

1    you try that and we will see whether your

2    lawyer is concerned that you are giving me too

3    much information.

4            MR. MARUTOLLO:  I think to the

5    extent again, that you don't relay any internal

6    government deliberations and limiting it to

7    this e-mail, you can answer the question.

8            THE WITNESS:  So my understanding of

9    what Brandon explained here is to provide the

10   draft of the memo to Kathy for her review,

11   noting that we had completed the draft and that

12   following our review of the country conditions,

13   we had structured it again so that it could

14   support either an extension determination by

15   the secretary or a termination determination by

16   the secretary, but without filling in a USCIS

17   recommendation.

18           BY MR. CONNELLY:

19   Q.    Do you recall any other times when

20   you generated a draft -- I don't need to know

21   the content, just whether you generated any

22   draft for a TPS decision which, rather than



1   coming down with a recommendation, was written

2   either to support extension or termination?

3           MR. MARUTOLLO:  Again, I would

4   object and I would say that the question as

5   phrased does call for internal governmental

6   deliberations, because even though it may not

7   go into the substance of the country at issue,

8   it would go into whether or not a

9   recommendation was or was not provided, and

10  that would be internal government

11  deliberations, so the way the question is

12  phrased, I would instruct the witness not to

13  answer under the deliberative process

14  privilege.

15          MR. CONNELLY:  Do you -- I'm not

16  sure this is any different, but I can't think

17  of any reason why this is privileged

18  information.

19          BY MR. CONNELLY:

20      Q.   I would like to know whether, other

21  than on this occasion, you provided TPS

22  decision memos that were written to support



Page 379

1    either extension or termination?

2              MR. MARUTOLLO:  Again, I would

3    assert the same objection.  I think it's the

4    same question.  The fact that it's going to the

5    underlying conclusion and whether or not the

6    recommendation is blank, is still, in itself,

7    essentially a recommendation, because it's left

8    open-ended, so I think again, the way that is

9    phrased, I think it calls for deliberative

10   process.  It's subject to the deliberative

11   process privilege.

12             To the extent Ms. Anderson can

13   answer whether or not she drafted memos related

14   to TPS more generally, and not limiting it to

15   times when she left the recommendation blank, I

16   think she can answer that question, so I mean,

17   with that limitation, perhaps you can answer.

18             MR. CONNELLY:  Although I'm not sure

19   that that is very useful.  I think it's, you

20   know, well-established that she drafted other

21   memos.  I already know that.  I think she's

22   provided that answer, so I am interested in



Page 380

1    whether this memo was idiosyncratic in the

2    sense that it was the only one she ever drafted

3    that left open whether or not to extend or

4    terminate.

5            MR. MARUTOLLO:  Again, I would

6    reassert the objection and also I would note

7    that in addition to the deliberative process

8    privilege, the fact that it's not limited in

9    any way by any other country and it's the fact

10   that this is a -- you know, this is already --

11   an e-mail is included and there's already been

12   testimony about the Haiti TPS decision memo is

13   further grounds to instruct the witness not to

14   answer.

15           BY MR. CONNELLY:

16       Q.    When you said that it was someone

17   else would be -- it would be left to be filled

18   in, who was going to fill it in?  Who was going

19   to make that decision?

20           MR. MARUTOLLO:  Just objection.

21   First, I think it mischaracterizes testimony

22   about what was said about who would fill things



Page 381

1    in or whether -- whether that was Mr. Prelogar

2    or Ms. Anderson.

3              I further object to the extent it

4    calls for internal government deliberations,

5    but I would instruct the witness she can answer

6    the question with those objections in mind.

7              THE WITNESS:  I would note that we

8    left it blank and as Brandon said, my

9    understanding was we left it pending further

10   discussion, so I think we were not sure what

11   the corporate CIS position was going to be.

12             I don't know that it was clear at

13   the point that this e-mail was written who

14   ultimately would fill in the recommendation,

15   but we understood that there were -- there was

16   further discussion to be had to arrive at the

17   USCIS recommendation.

18             BY MR. CONNELLY:

19   Q.    I will give you KA-39.

20             (Deposition Exhibit KA-39 was marked

21   for identification.)

22             BY MR. CONNELLY:



Page 382

1       Q.     I'm going to be focused on the

2   second page.  I will -- take your time to

3   familiar yourself with the entire e-mail chain.

4       A.     Okay.

5       Q.     Am I right that this e-mail chain is

6   about the CA or Central American TPS decision

7   memos?

8       A.     Yes.

9       Q.     Okay.  And Haiti is not included, I

10  don't think.

11      A.     I don't think so.

12      Q.     Okay.  So very briefly, just on the

13  Kathy Kovarik October 19, 12:45 a.m. e-mail,

14  which is on Page 674, the Bates number.

15      A.     Okay.

16      Q.     She references comments, suggestions

17  from Craig.

18             Who is Craig?

19             MR. MARUTOLLO:  Objection.  Again,

20  you can answer to the extent you know, but I

21  instruct the witness not to speculate.

22             THE WITNESS:  He's a USCIS chief



Page 383

1    counsel.

2              BY MR. CONNELLY:

3    Q.    Was he an ordinary part of the kind

4    of revision process for the TPS decision memos?

5              MR. MARUTOLLO:  Again, I would

6    object not only to the extent it calls for

7    internal government deliberations, but as chief

8    counsel, to the extent it implicates the

9    attorney-client privilege.  I believe as the

10   witness stated, Craig Symons is the -- I

11   believe is the chief counsel at USCIS, so to

12   the extent that there is any questions related

13   to communications made between Craig Symons

14   specifically or the office of chief counsel, we

15   would assert, first, the deliberative process

16   privilege but also the attorney-client

17   privilege, so I instruct the witness not to

18   answer.

19             MR. CONNELLY:  Okay.  Again, I am

20   not a judge, but I think that is pretty thin.

21   I don't want content.  I am just asking

22   outwardly, you know, the question without any



```
1    contents requested, whether Symons was an

2    ordinary part of the revision, not any process

3    on the TPS memos.

4              MR. MARUTOLLO:  Well, I think the

5    question about whether it goes to revisions or

6    editing goes to substance of the memos.  I

7    mean, I think if the extent of your questions

8    is whether or not, you know, on a privileged

9    log, Craig Symons would have been listed, I

10   think that is one thing, but I think that would

11   be as far as we would permit any questioning

12   related to the office of legal counsel.

13             BY MR. CONNELLY:

14   Q.    Prior to 2017, did you have any

15   interactions with Craig Symons?

16   A.    Craig Symons was a political

17   appointee and I guess he did work for USCIS

18   prior to 2017, but I didn't know him prior to

19   then.

20   Q.    When was he -- when did he become a

21   political appointee?

22   A.    I think he was part of the beachhead
```



Page 385

1    team that helped with the transition for USCIS.

2        Q.    Transition to the Trump

3    Administration?

4        A.    Transition to the administration.

5        Q.    And then what, did he become general

6    counsel then after the Trump Administration?

7    His title changed to general counsel?

8        A.    At some point towards the beginning

9    of the Trump Administration, he received the

10   position of chief counsel.

11       Q.    Okay.  We will go to KA-40.

12             (Deposition Exhibit KA-40 was marked

13   for identification.)

14             THE WITNESS:  Okay.

15             BY MR. CONNELLY:

16       Q.    And part of this memo was in a prior

17   document that I showed you with the lower part,

18   so I will focus on the -- in the middle of the

19   memo on October 22, Kathy Nuebel Kovarik asks

20   Robert Law to take a look at the draft Haiti

21   TPS decision memo.

22             Tell me who Robert Law is.



Page 386

1      A.    Robert Law is Kathy's -- I guess his

2   technical title is senior advisor.  He's a

3   political.

4      Q.    Appointee?

5      A.    Yes.

6      Q.    Brought in by the Trump

7   Administration?

8      A.    Yes.

9      Q.    And he responds to her on October

10  22:  "The draft," and the draft we are

11  referring to is the draft that you and Mr.

12  Prelogar had provided; is that right?

13          MR. MARUTOLLO:  Objection.  I would

14  direct the witness not to answer this question.

15  This is an e-mail that is between Ms. Kovarik

16  and Mr. Law.  Ms. Anderson is not even

17  referenced in this part of the e-mail.

18          I think this calls for -- obviously

19  calls for speculation, but certainly, it is

20  internal government deliberations of other

21  government officials not even involving

22  Ms. Anderson.



Page 387

1          BY MR. CONNELLY:

2      Q.    We're going to slow down.  Let's go

3   to Brandon Prelogar's Thursday, October 12,

4   10:11 p.m. e-mail which is on this page, and am

5   I correct that he says -- copies you, and says

6   to Kathy Nuebel Kovarik:  "Kathryn" -- meaning

7   you, "and I have completed a draft Haiti TPS

8   decision memo attached.

9          Is that what he represents in his

10  e-mail?

11     A.    Yes.

12     Q.    And later that day, the next e-mail,

13  this is all in a chain provided to us within,

14  you know, the ordinary business records of the

15  government.

16          MR. MARUTOLLO:  With respect to it,

17  it was not the ordinary business record of the

18  government.  It was -- we produced it because

19  it was produced in the Ramos litigation.  We

20  have not waived deliberative process but in an

21  effort to avoid really unnecessary litigation,

22  we have agreed to allow for questions related



Page 388

1   to these documents as long as they are limited

2   to the four corners of these documents, so I

3   would object to that characterization.

4           MR. CONNELLY:  Okay.  Although

5   again, I wasn't looking for an edge, but

6   really, Joe, is there going to be any question

7   when we go to trial, is anybody going to claim

8   these are not business records of the

9   government?

10          MR. MARUTOLLO:  Well, no.  I am not

11  making a representation about that.  I'm saying

12  you said in the ordinary course, it was

13  produced.

14          MR. CONNELLY:  Okay.

15          MR. MARUTOLLO:  I'm sorry.  To the

16  extent you meant in the ordinary course at

17  USCIS, that's one thing.  I'm sorry, if you

18  meant US -- in the ordinary course of this

19  litigation, then understood.

20          MR. CONNELLY:  That's all right.

21  Nobody's going to fight about that I don't

22  think.  The judge won't permit it.



Page 389

1          BY MR. CONNELLY:

2      Q.    But in any event, where -- Prelogar

3  references a completed draft, a Haiti TPS

4  decision memo by himself and you on October 12.

5          On October 22, on the same e-mail

6  chain, Kovarik writes to Law and doesn't

7  include either you or Prelogar, says:  "Can you

8  look at this draft."

9          And he gets back to her later, a few

10  hours later, and says:  "The draft is

11  overwhelmingly weighted for extension, which I

12  do not think is the conclusion we are looking

13  for."  I guess I'll leave it.

14          You know, I mean, it's unfair for

15  you.  You don't have to be the prover on this,

16  but I don't think there is any question that we

17  are talking about the draft Haiti TPS decision

18  memo by you and your colleague.  That was

19  observational.  We'll just leave it at that and

20  move on.

21          MR. MARUTOLLO:  We would object to

22  that observation.



1          MR. CONNELLY:  That's a fair point

2    on your part.

3          BY MR. CONNELLY:

4    Q.    Let's go to what I'm going to call

5    what is 40-A because it wasn't in my original

6    grouping, 9539.

7          (Deposition Exhibit 40-A was marked

8    for identification.)

9          BY MR. CONNELLY:

10   Q.    I'm not going to spend very much

11   time on this.  It is largely going to be a

12   parenthetical observation you make on Page 542

13   which is four pages in.

14   A.    542?

15   Q.    Yes.

16   A.    Okay.

17   Q.    My general understanding is that you

18   were asked to comment on a transcript that was

19   generated by public comments that Dave Lapin,

20   L-A-P-I-N, made; is that right?

21          MR. MARUTOLLO:  Objection.

22          You can answer to the extent it's



Page 391

1    related to this e-mail.

2              THE WITNESS:  We were asked to

3    review and comment this transcript that was

4    provided to us.  I'm not entirely sure.  I

5    mean, yes, Dave Lapin spoke, it appears.

6              BY MR. CONNELLY:

7         Q.   Okay.  Who is Dave Lapin?

8         A.   To the best of my knowledge and

9    recollection, although I am not certain, I

10   think he's part of DHS Office of Public

11   Affairs.

12        Q.   And down on the bottom, near the

13   bottom on Page 542, there is a large bracketed

14   capital letter parenthetical.  Did you generate

15   those comments?

16        A.   I think Brandon and I worked on

17   these comments together.

18        Q.   Okay.

19             MR. CONNELLY:  Let's move to KA-41,

20   2248.

21             (Deposition Exhibit KA-41 was marked

22   for identification.)



Page 392

1          BY MR. CONNELLY:

2      Q.    My only question is going to be

3  about numerical point No. 6 that you raise in

4  the top e-mail.

5          Can I ask you a question?  Are you

6  ready?

7      A.    Go ahead.

8      Q.    Is this -- the context of this

9  e-mail chain, you and Brandon Prelogar are

10  looking at what I am going to assume are drafts

11  of decisions that the secretary is going to be

12  making about extending or terminating TPS

13  status for various countries?

14          MR. MARUTOLLO:  Objection.

15          You can answer to the extent it is

16  limited to this e-mail.

17          THE WITNESS:  No.  I think we had

18  recently received the State Department's

19  recommendations and country condition

20  assessments for these countries.

21          BY MR. CONNELLY:

22      Q.    Okay.



Page 393

1      A.    And were --

2      Q.    You are commenting on your --

3      A.    Reading and commenting on our

4  impressions of the State Department's

5  recommendations.

6      Q.    State Department's recommendations.

7  Okay.

8           And the one that relates to Haiti,

9  numerical No. 6 quote by you:  "Don't know

10 whether you read Haiti but it looks like one of

11 our messes, the country conditions cited

12 completely support an extension, but the stated

13 conclusion of termination."

14          What were you conveying or what did

15 you mean by using the phrase "one of our

16 messes?

17          MR. MARUTOLLO:  Objection.

18          You can answer.

19          THE WITNESS:  I was referring to

20 some of the recent DHS memos that -- from which

21 the assessment or the description of country

22 conditions didn't necessarily lead to the



Page 394

1    recommended conclusion of the memo.

2              BY MR. CONNELLY:

3         Q.    Okay.  I will show you KA-42 which

4    is 1273.

5              (Deposition Exhibit KA-42 was marked

6    for identification.)

7              THE WITNESS:  Okay.

8              BY MR. CONNELLY:

9         Q.    Okay.  And this -- the major part of

10   this chain e-mail is the -- Secretary Elaine

11   Duke's announcement of ending TPS designation

12   for Haiti, correct?

13        A.    That's a good chunk of it, yes.

14        Q.    And then you -- Mr. Prelogar shared

15   that with you on November 20 at 8:17 in the

16   evening, and you got back to him a half an hour

17   or so later, with the observation:  "Brilliant.

18   How did we end up with a department of dunces."

19             Was brilliant declaratory, ironic,

20   sarcastic?  How would you characterize your use

21   of that word?

22             MR. MARUTOLLO:  Objection.



1          You can answer.

2          THE WITNESS:  I think it was

3    intended to be somewhat sarcastic.

4          BY MR. CONNELLY:

5     Q.    And what were you conveying or what

6    was your meaning for posing the question of how

7    you ended up with a department of dunces?

8          MR. MARUTOLLO:  Objection.

9          You can answer.

10          THE WITNESS:  I think I was

11    expressing frustration at the decision to

12    terminate Haiti's TPS and the conclusions that

13    had been drawn in this announcement.

14          BY MR. CONNELLY:

15     Q.    Have you had, since this time in

16    November of last year, have you continued to be

17    engaged in working on the decisions about Haiti

18    and its status -- its TPS status?

19          MR. MARUTOLLO:  Objection.  Vague.

20          You can answer.

21          THE WITNESS:  I can say with the

22    decision to terminate Haiti's TPS, there are no



Page 396

```
 1    further decisions scheduled to be made.

 2             BY MR. CONNELLY:

 3        Q.    Okay.

 4        A.    But I continue to work on issues

 5    related to Haiti's TPS status.

 6        Q.    Again, I don't want to know anything

 7    more than what the issues are that you continue

 8    to work on.

 9             MR. MARUTOLLO:  Again, I would

10    object to the extent there's anything related

11    to deliberative, that would be protected by the

12    deliberative process privilege, which would

13    include internal government deliberations, but

14    generally, you can answer general subject areas

15    to the extent there are any related to TPS

16    designations on Haiti.

17             THE WITNESS:  In my role -- again,

18    I'm in a new role now, but when I was in the

19    office of policy and strategy, any policy

20    issues related to TPS that come up are within

21    our portfolio, so, you know, if there are

22    questions that come up related to employment
```



Page 397

1   authorization documents, related to, you know,

2   Haiti TPS that sometimes are ongoing, if there

3   are policy determinations to be made about who

4   should maintain TPS or TPS should be withdrawn

5   from certain individuals.

6           If there are Congressional inquiries

7   related to Haiti TPS, I might be involved in

8   responding to those, so just kind of ongoing

9   questions related to administering the TPS

10  program.

11          BY MR. CONNELLY:

12  Q.    Can you tell me, if you can, in some

13  rough fraction of your time since the decision

14  to terminate last November, how much of your

15  2018 time has been occupied with issues or

16  matters involving Haiti?

17  A.    That's hard for me to characterize.

18  I mean, TPS ebbs and flows in terms of time

19  that we spend on it, whether it's busy or not.

20  Like I said, the litigation has taken a good

21  amount of the time spent on Haiti TPS as well.

22  Q.    Even through 2018?



Page 398

```
1              MR. MARUTOLLO:  And, again, I would

2    just object to the extent it implicates an

3    attorney-client privilege or anything along the

4    lines of preparation for litigation or things

5    of that nature.

6              But apart from that, you can answer

7    the question.

8              THE WITNESS:  I would say

9    TPS-related issues continue to be a regular

10   part of -- or continued in my previous role to

11   be a regular part of my work.

12             BY MR. CONNELLY:

13   Q.    Lastly, in the course of dealing

14   with the TPS situation with Haiti, since the

15   new administration came in in January of 2017,

16   did you ever have any direct contact, whether

17   oral, e-mail or in any other possible

18   communication formats, with anyone at the White

19   House regarding Haiti and its TPS status?

20             MR. MARUTOLLO:  I would object on

21   the grounds laid out in our White House -- or

22   our motion for protective order related to
```


MAGNA ▶
LEGAL SERVICES

Page 399

1    White House, related to discovery issues, and

2    also to the extent there is any further

3    questioning about presidential communications,

4    but with those limitations in mind, you can

5    answer the question.

6              THE WITNESS:  What was the time

7    frame again?

8              BY MR. CONNELLY:

9        Q.    Since the beginning of the

10   administration, since January of 2017.

11             MR. MARUTOLLO:  And again, only to

12   the extent, the question is whether --

13             BY MR. CONNELLY:

14       Q.    I'm sorry.  The start of the

15   administration, January 2017.

16             MR. MARUTOLLO:  Again, we would

17   permit -- over -- we would assert our

18   objections again for the reasons set forth in

19   our motion for protective order with the White

20   House discovery, and also to the extent it does

21   not implicate any presidential communication

22   privilege, and to the extent that it only is --



Page 400

1    this question about whether there were even any

2    communications between Ms. Anderson and the

3    White House during that period, and with that

4    limitation in mind, we can instruct you to

5    answer the question.

6                THE WITNESS:  I attended a meeting

7    at the White House in May 2017, the meeting

8    that was referenced earlier that was hosted by

9    a director at the National Security Council,

10   that was about Haiti.

11               MR. MARUTOLLO:  I'm sorry.  I don't

12   mean to interrupt, but as that is a -- that

13   meeting may include classified information, I

14   just want to -- I don't mean to interrupt the

15   witness, but since it is a classified issue, I

16   do want to at least note that, but with that

17   caveat, you may continue to answer if there is

18   anything further you'd like to add.

19               THE WITNESS:  Okay.  Only that I

20   attended a meeting that was regarding Haiti

21   generally and TPS was discussed, and so there

22   was a White House representative from the



Page 401

1    National Security Council there at the meeting.

2              Additionally, it had been a regular

3    practice in the past administration and the

4    Obama Administration and the current

5    administration to occasionally have contact

6    with individuals working at the National

7    Security Council who work on the TPS portfolio.

8              Sometimes they will reach out to ask

9    about the status of TPS determination, and so I

10   don't have a record of specific contacts but I

11   probably had some contact with an NSC

12   representative relating to Haiti's TPS.

13             BY MR. CONNELLY:

14        Q.   Do you recall the name of the

15   representative?

16             MR. MARUTOLLO:  I would just assert

17   the same objection, but you can provide the

18   name.

19             THE WITNESS:  In the 2017 year, I'm

20   not sure when they transitioned, but I worked

21   some with Melissa Bishop and also a man named

22   Scott Oudkirk.



Page 402

1          BY MR. CONNELLY:

2      Q.    Can you spell that last name.

3      A.    O-U-D-K-I-R-K.

4      Q.    Anybody else come to mind?  I am

5  talking White House at large.  I'm not -- that

6  wasn't shorthand for just the president, but

7  anyone who was working in the White House.

8          MR. MARUTOLLO:  Again, assert the

9  same objection and only to the extent you

10  identify names, we would permit the witness to

11  answer.

12          THE WITNESS:  Possibly Monte Hawkins

13  at the National Security Council.  I'm not sure

14  if I had contact with him about Haiti or not,

15  but he was there at the beginning of this

16  administration still.

17          And then Jill St. John who was

18  detailed to the National Security Council from

19  DHS.

20          BY MR. CONNELLY:

21      Q.    So is it your best recollection that

22  any contact or communications you had with



Page 403

1    anyone involved with the White House, that was

2    strictly -- your best recollection was

3    strictly, it was people at the National

4    Security Council?

5        A.    Yes.

6             MR. CONNELLY:  Okay.  That's all

7    I've got.

8             MR. MARUTOLLO:  So we would just ask

9    for an opportunity for the witness to sign and

10   review the transcript which is part of Rule 31.

11            MR. CONNELLY:  And let me -- I

12   should say.  It's kind of embedded in the

13   record.

14            There may be, you know, a dust-up

15   over whether or not you should have answered or

16   had her answer questions and whether or not --

17   we will have to decide whether we think that is

18   worth bringing to the judge or not, and

19   obviously, we will have to abide by whatever

20   the judge tells us to do.

21            I give you that as a caveat to this

22   deposition having concluded.



Page 404

1              MR. MARUTOLLO:  I would just

2     reiterate that, again, we are willing to go to

3     the Court now while the witness is here.

4     Ms. Anderson is obviously a career employee.

5     We have a very strict schedule.

6              We have an agreement related to -- a

7     joint agreement that the plaintiffs filed the

8     other night to have the judge available during

9     these depositions to have real-time rulings, so

10    we would object to bringing Ms. Anderson back,

11    besides on the deliberative piece, just as a

12    practical matter, given the tight schedule but

13    that is our position.  Thank you.

14              MR. CONNELLY:  Thank you.

15              THE VIDEOGRAPHER:  This concludes

16    the deposition of Ms. Anderson.

17              We are going off the record at

18    18:24.

19              (Whereupon, the proceeding was

20    concluded at 6:24 p.m.)

21

22



1    DEPOSITION ERRATA SHEET

2    Our Assignment No. 448917

3    Case Caption:  Saget

4    vs. Trump

5

6       DECLARATION UNDER PENALTY OF PERJURY

7    I declare under penalty of perjury that I have

8    read the entire transcript of my Deposition

9    taken in the captioned matter or the same has

10   been read to me, and the same is true and

11   accurate, save and except for changes and/or

12   corrections, if any, as indicated by me on the

13   DEPOSITION ERRATA SHEET hereof, with the

14   understanding that I offer these changes as if

15   still under oath.

16

17   Signed on the_____day of _____,

18   2018.

19   _____

20   KATHRYN ANDERSON

21

22



Page 406

1              DEPOSITION ERRATA SHEET

2       Page No._____ Line No._____ Change to:_____

3       _____

4       Reason for change:_____

5       Page No._____ Line No._____ Change to:_____

6       _____

7       Reason for change:_____

8       Page No._____ Line No._____ Change to:_____

9       _____

10      Reason for change:_____

11      Page No._____ Line No._____ Change to:_____

12      _____

13      Reason for change:_____

14      Page No._____ Line No._____ Change to:_____

15      _____

16      Reason for change:_____

17      Page No._____ Line No._____ Change to:_____

18      _____

19      Reason for change:_____

20

21      SIGNATURE_____DATE:_____

22              KATHRYN ANDERSON



1                DEPOSITION ERRATA SHEET

2        Page No._____ Line No._____ Change to:_____

3        _____

4        Reason for change:_____

5        Page No._____ Line No._____ Change to:_____

6        _____

7        Reason for change:_____

8        Page No._____ Line No._____ Change to:_____

9        _____

10       Reason for change:_____

11       Page No._____ Line No._____ Change to:_____

12       _____

13       Reason for change:_____

14       Page No._____ Line No._____ Change to:_____

15       _____

16       Reason for change:_____

17       Page No._____ Line No._____ Change to:_____

18       _____

19       Reason for change:_____

20

21       SIGNATURE:_____DATE_____

22                KATHRYN ANDERSON



Page 408

1              CERTIFICATE OF NOTARY PUBLIC

2              I, Bonnie L. Russo, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18              _____

19              Notary Public in and for

20               the District of Columbia

21

22   My Commission expires:  June 30, 2020



## A

**abbreviation** 237:2
**abide** 403:19
**ability** 228:22
  361:5,14
**able** 63:2 98:19
  106:10 181:7
  189:19 190:14
  217:6 236:6 262:2
  268:12 273:14
  285:9 286:1
  301:16 319:21
  348:13
**Absolutely** 24:18
**accept** 165:12
**acclimate** 55:7
  57:12 87:18 90:13
  273:22 329:3
**accompany** 158:10
**accord** 344:4
**account** 352:15
  353:20 360:13
**accuracy** 216:5
**accurate** 66:22
  67:8 91:6,15
  92:20 93:7 111:2
  118:13 191:3
  195:19 215:19
  216:7 231:9 351:9
  374:20 405:11
**accurately** 67:17
  352:20,22 353:10
**acknowledge**
  212:13
**acronym** 35:7
  47:19 70:9 153:22
  223:6 233:11
  335:4 366:15
  370:17
**acronyms** 22:17
  59:4 120:5 133:7
  139:12 143:8
  152:6
**Act** 28:1 269:10
**acting** 15:11 19:10

**20:20 21:17 23:11**
  59:16,22 123:2
  131:16 139:19
  140:5 141:3 153:8
  201:17 240:19
  241:4,13 273:11
  352:4
**action** 62:7 146:10
  146:14 353:18
  408:12,17
**actions** 89:16
**action/decision**
  144:20
**actively** 74:22
**actual** 207:19 264:3
  281:10 287:6,6
  302:17 356:12
**add** 197:15 400:18
**addendum** 5:4
  94:15 95:10
**adding** 17:12
**addition** 380:7
**additional** 55:20
  330:19 335:18
**Additionally** 69:6
  401:2
**address** 12:3
  333:14
**addressed** 262:18
  266:17
**addressing** 217:4
  278:13
**add-on** 369:21
**adequate** 79:22
**adequately** 362:7
**adjudicated** 17:21
**adjudication** 39:14
**adjudications**
  185:19
**administering**
  397:9
**administration**
  21:19 111:21
  117:21 118:1,10
  128:2 142:21
  152:22 153:2

**269:16 270:6**
  385:3,4,6,9 386:7
  398:15 399:10,15
  401:3,4,5 402:16
**administrations**
  255:7 279:12
**administrative**
  133:20
**admittedly** 358:10
**adversely** 74:12
**advice** 130:5,19
  273:15
**adviser** 23:16
**advisor** 22:13
  386:2
**advisors** 195:11,13
  196:7
**advocacy** 15:19
**AD1** 139:15
**Afaneh** 10:17,17
**affairs** 19:1 34:7
  115:11 124:14
  351:21 391:11
**affirmative** 352:18
**affirmatively** 301:5
**afflictions** 212:14
**afresh** 282:10
**Africa** 14:20 33:4
  145:1 232:16,19
  233:4
**aftereffects** 61:11
**afternoon** 293:19
  299:5 336:10
**age** 312:10
**agencies** 31:13,22
  32:6 33:1 36:2
**agency** 11:21 39:15
  162:12 186:21,22
  325:6 360:21
  372:22
**ago** 22:11 37:18
  72:5 93:22 130:16
  141:19 199:10
  239:2 337:18
**agree** 84:12,18
  145:16 200:4

**211:20 345:3**
**agreed** 225:13
  387:22
**agreement** 198:5
  404:6,7
**Ah** 48:19
**ahead** 46:9 47:11
  114:3,3 166:18
  178:7 238:12
  251:20 270:3
  271:4 274:6
  275:13 277:22
  282:7 283:19
  285:7 288:12
  289:22 297:6
  301:8 310:3
  314:16 315:1
  324:20 392:7
**aid** 16:3
**air** 269:15
**al** 1:4,7 9:7,8
**alert** 188:17
**Alex** 233:9
**Alexander** 185:10
**aliens** 362:8,16
  363:1
**allow** 54:18 228:5
  387:22
**allowed** 263:19
  265:17 300:17
**allows** 54:14
  324:18 328:6
**alluded** 265:10
**amazing** 222:5
  223:11 224:15,18
  225:6 343:3
**AMB** 319:16
**ambassador** 319:16
  319:17,18,20
  352:5
**ambiguous** 180:17
  281:6
**amending** 291:16
**America** 14:21
  351:21
**American** 276:4

**301:16 366:9,20**
  367:5 382:6
**Americans** 314:11
  314:18 316:7
**amount** 397:21
**analysis** 300:11
  311:20
**analyst** 18:20,22
  19:7,8,19 20:11
  75:22 76:4
**analyze** 300:10
**Anderson** 1:11 2:1
  4:2 9:6 11:4,14
  102:9,11 103:4,5
  105:17 116:9
  138:1,7,14 159:17
  167:11 194:11
  204:3 206:10
  209:7 228:11,22
  230:16 231:20
  235:7 237:15
  242:16 253:16
  258:9 262:1
  265:15 271:2
  283:6,12 285:2,3
  289:20 290:20
  293:5 303:20
  312:7 314:4
  320:22 337:10
  338:13 356:5
  358:16 361:19
  369:17 375:6,15
  379:12 381:2
  386:16,22 400:2
  404:4,10,16
  405:20 406:22
  407:22
**Anderson's** 237:20
  258:3 259:18
  263:9
**Anderson_00001-6**
  8:7
**Anderson_00007**
  8:3
**Anderson_00008...**
  8:4



**Anderson_00012...**
8:6
**and/or** 372:4
405:11
**announce** 89:16
**announced** 106:21
297:5 332:1 352:8
**announcement**
103:14,20,21
104:2,10,13,16
252:13,20 253:3
296:8 298:10
299:18 331:12,14
394:11 395:13
**announcing** 49:21
51:20
**Annual** 5:3 88:5
**answer** 12:21 14:19
20:16 27:5,21
29:11 31:6 32:12
34:1 36:7,8 37:8
38:10 39:5 41:4,8
42:4,15 44:11
45:18 50:19 52:8
53:8 54:7 58:15
58:17,19 59:9
61:2 62:4 64:2,15
64:19 65:13,14
66:7,13,17 67:12
67:15 68:3 69:22
70:1 71:15 75:3
76:12 77:17,17,19
81:1,20 82:15,17
82:18 83:9,16
84:21 85:11,13
86:4,12 90:19
91:12,15 92:22
94:12 95:16,18
99:5 106:17 109:9
112:4,6 114:21
116:10 117:1,3
118:12,14 121:7
124:4,6 125:8,11
125:18 126:3
127:11 128:15,18
129:11,14 130:1

130:20 131:9
136:7,17,18 137:4
139:1,8 141:5
146:1,12 147:7
148:4,8 149:5,22
150:14 151:9,14
155:14 156:16,22
158:5,7,20 159:2
159:14,17,18
160:6,16 161:4,6
161:14 163:6
164:10 167:9,11
167:18 169:9,12
170:11,19 171:6
172:1,10 173:5,17
174:21 175:15,21
176:2,3,7,20
177:3,18,22 178:5
178:14 179:5
180:2,15 181:2
183:12 184:9,20
187:6 188:8 189:9
189:11,15 190:18
190:22 191:1,15
191:21 192:7,22
193:17 194:19
195:5,6 196:3,12
196:14 197:10,12
198:17 199:10,20
203:1,3,11 204:3
204:7 205:6,10,14
205:15 206:1
208:2 209:7 211:2
212:7 213:10
214:16,17 215:22
216:2 217:2,9
218:16 219:10,17
220:10,12,13
221:14 222:14,16
222:18,20 224:6,8
225:17 227:2,5,9
227:22 228:5,11
228:13,22 229:12
230:6,11,13,16
231:4,20 232:9
237:16 238:11

239:3,18 240:14
242:16 243:5,17
245:4,20 248:21
249:17 251:6
254:8 256:21
257:19 259:3
260:19 262:1
264:1,7 267:12
271:20 272:9,12
272:14 273:9,14
273:16 275:1
277:13,16 278:16
279:5 281:3,16,17
283:6,8,13 285:3
285:18 287:2,8,9
289:20 292:3,11
293:13 295:9,20
301:16 302:2,22
303:4 304:4,10
305:2,16,18,19
306:2,10,13,15
307:9,11 308:3,4
313:5,8 316:12
317:11,13 318:11
318:21,22 320:18
320:22 321:8
322:2,11 323:9
325:9 326:18,21
327:1,2,5 331:7
334:3,5 336:18,19
337:8,12,19 338:3
338:15 339:3,9
342:10,16 343:12
343:15 345:1,4
346:10 348:18
349:1,5 350:3,6
353:5,6,8 354:7
355:7 356:7 358:2
358:17,21 359:15
360:8,9,9 361:2
361:20 364:18
366:5,22 367:15
368:15 369:10,18
371:12,15 372:17
372:19 374:16
375:6,8,16 376:16

376:18 377:7
378:13 379:13,16
379:17,22 380:14
381:5 382:20
383:18 386:14
390:22 392:15
393:18 395:1,9,20
396:14 398:6
399:5 400:5,17
402:11 403:16
**answered** 175:3
179:11 192:20
199:19 326:1
348:22 403:15
**answering** 56:3
175:8 176:17
177:6,11
**answers** 167:2
191:4 303:4 327:6
**anticipate** 268:12
**anybody** 137:12
208:16 277:19
340:5 388:7 402:4
**anytime** 315:2
**anyway** 259:15
**apart** 56:9 112:8
169:18 189:13
283:10 398:6
**apologize** 88:19
**apparent** 346:11
**apparently** 93:16
174:20 201:11,16
256:6 257:12
276:18 321:16
335:7
**appear** 60:19,22
70:12 282:5
**appearance** 9:21
**APPEARANCES**
3:1
**appeared** 229:18
230:7
**appears** 29:3 49:20
57:15 58:10
106:19 201:8,9
210:7 216:11

217:5 230:3
345:19 363:21
391:5 408:5
**applicants** 17:21
**application** 289:3
291:17 312:11
**applications** 39:14
**applies** 162:4 163:3
**apply** 54:19 70:9
282:9
**appointed** 140:7
**appointee** 384:17
384:21 386:4
**appreciate** 52:16
209:2 214:4
259:22 263:3,4
**appreciated** 209:14
210:8 214:21
**approach** 120:20
**appropriate** 31:13
31:21 81:11 83:4
83:14 85:5 87:8
155:4 347:1,3
359:8
**approximately**
45:21 80:12 160:3
325:3
**April** 57:16 59:18
66:20 142:10
165:5,10,11 166:7
169:5 174:19
175:7 177:7
179:15 181:13,17
182:1,5 184:16
187:12,12 188:5
192:2 201:12
209:11 249:21
**area** 14:7 237:21
244:13,14 370:12
**areas** 21:5 396:14
**argue** 273:7 307:22
339:17
**argument** 162:13
339:16
**arguments** 339:20
**arising** 242:13



**armed** 29:22 316:4
    356:18
**arrange** 251:20
**arranged** 312:17
**arrival** 72:7
**arrive** 381:16
**article** 201:15
    202:1 210:13
    211:5 212:5,12,22
    213:15 214:5
**articulated** 321:20
**Ashe** 113:14
**aside** 110:3
**asked** 94:22 97:8
    155:19 168:9
    169:5 170:3,21
    171:4 174:20
    175:2,5 176:16
    177:8 183:6
    192:20 199:18
    218:2,11,12 219:2
    221:8 224:2 235:4
    247:7 258:22
    262:7 265:18,20
    297:11 301:7,11
    318:13 324:17
    326:1 328:5
    333:19 338:18
    376:11 390:18
    391:2
**asking** 86:22 87:16
    112:18 117:9
    129:9 137:9,11
    163:2 191:11
    194:2,21 215:7
    218:18 221:16
    231:17 236:1,4,6
    238:10 239:9
    251:13 256:21
    260:18 326:11
    327:7,15 331:18
    341:17 342:3
    383:21
**asks** 301:12 385:19
**aspect** 327:9
**aspects** 240:8

242:10
**assert** 147:4 207:22
    231:18 256:22
    257:5 260:5,8,9
    284:19 305:1
    344:22 350:1
    379:3 383:15
    399:17 401:16
    402:8
**asserted** 265:17
**asserting** 145:22
    161:13
**assertion** 232:1
    260:3
**assess** 97:8 155:1
**assessment** 303:22
    326:19 339:5
    393:21
**assessments** 392:20
**Assignment** 405:2
**assist** 229:19
    333:20 359:3
**assistance** 166:21
    171:16
**assistant** 59:16,22
**assisting** 250:16
**assume** 20:22
    115:15 179:10,10
    190:4 216:14
    326:8 327:21
    367:7 392:10
**assumed** 89:2
**assumes** 145:20
    147:2 179:18
    180:22 304:21
    376:13
**assuming** 166:6
    303:5
**assumption** 301:6
    347:9
**asterisk** 105:1
    247:16 310:7
    311:8,11,15 312:6
**asterisked** 310:5
    311:1
**asylum** 14:15 17:2

17:3,5,5,17,21
    18:12 19:17 20:2
    22:14 93:17 94:5
**attach** 24:11
**attached** 132:11
    374:5 387:8
**Attachment** 5:22
**attempt** 360:15
**attendance** 161:11
    162:17 241:12
    308:9
**attended** 160:22
    164:8 240:4
    242:14 298:7
    313:16 400:6,20
**attention** 41:18
    77:13 236:7 348:5
    351:15
**attorney** 26:12
    27:17 28:4 31:12
    244:13 357:9
    408:15
**attorneys** 10:12
    263:8 264:9
**attorney's** 3:10
    10:15 129:12
    130:5,19 206:3
    273:15
**attorney-client**
    162:9 383:9,16
    398:3
**attributed** 344:15
    344:21 348:8,12
**August** 75:12 76:3
    82:5 84:2
**author** 178:19
    223:16 338:12
**authorization** 7:4
    397:1
**authorship** 178:19
**auto** 324:21
**automatic** 7:3
    320:1
**available** 88:20
    98:1 191:5 206:8
    294:13 367:9

404:8
**Avenue** 141:12
**avoid** 156:8 263:20
    387:21
**aware** 43:10 50:20
    54:8 64:3 71:14
    151:10 152:13
    203:4,5 262:13
    327:21 328:2
    331:6 352:18
    359:19
**A-S-H-E** 113:14
**a.m** 1:14 111:16
    114:15 181:17
    192:3 236:21
    242:20,21 365:21
    370:10 382:13
**A/AS** 59:5,7

_____
               **B**
**b** 28:16 29:13 362:3
    362:3
**back** 13:8 17:15
    25:8 31:17 39:9
    43:15 48:2,17
    51:5 57:17 59:6
    71:7,17 72:4 73:7
    74:21 84:1 98:11
    100:1,15 114:11
    114:17 117:13
    122:16 128:1
    139:13 140:22
    142:10 143:10
    146:18 150:19
    154:8 174:8 183:1
    185:7 190:13
    197:19,20 200:12
    205:17 207:14
    210:12 211:13
    229:5,6 234:7
    240:17 242:21
    245:8 248:3,4
    255:9,11 264:12
    266:1 279:14,16
    285:9 286:2,10
    290:18 293:5

294:9,15,18
    297:16 308:19
    311:9 314:22
    329:17 343:2
    344:12 348:2
    356:10 357:20
    358:13 363:16
    373:21 389:9
    394:16 404:10
**background** 102:16
    108:20 165:14
    194:22 324:18
    327:15
**backgrounds**
    326:12
**backing** 56:12
**back-and-forth**
    186:20
**bad** 255:8 279:13
    294:16 320:1,12
    321:17 367:22
    368:12 369:6
    370:16
**Baker** 14:2
**balanced** 373:8
**balls** 162:2
**base** 220:13 359:21
**based** 44:7 58:17
    61:9 65:15 77:10
    92:14 95:17
    129:12 131:4
    146:1 147:6 148:6
    156:17 191:4,8,13
    197:5 198:19
    221:22 281:15
    289:7,14 337:20
    338:3 359:22
    360:6 371:14
    374:5,18 375:13
**bases** 29:14,15 51:8
**basic** 111:19
    370:15
**basically** 23:17
    148:16 208:22
    217:17 361:13
    372:8



**basis** 33:5 51:13 295:6,11 356:13 357:18 361:7 362:4,12
**Bates** 89:10 90:9 102:8 103:4 105:17 187:9 253:15 312:7 382:14
**Bates-numbered** 344:8
**beach** 142:16
**beachhead** 384:22
**bearing** 66:12
**bedrock** 372:9
**began** 74:10 81:5 153:2
**beginning** 281:8 317:2 330:11 335:16 385:8 399:9 402:15
**begins** 9:5 26:7 30:13 59:5 79:19 120:7 202:3 247:9 247:17 248:1 249:6 265:14 269:13 278:1 279:10 280:6 282:11 288:10 290:21 317:19 319:22 332:22
**behalf** 2:19 3:2,8 10:10,12,13,15,18 15:20 298:15 328:13
**belief** 165:9
**believe** 24:20 27:22 37:22 45:14,22 57:5 61:4 62:6 67:16 70:4 72:11 76:14 85:15 89:2 91:14,16 100:20 103:11 106:4,7 120:11 139:22 140:10 141:6 153:20 157:13

159:22 165:7
168:18 178:15
179:6 185:17
191:2 203:12
219:3 221:21
237:2 241:2 243:7
245:13 252:1
253:1 268:9 270:1
273:17 274:4
275:22 302:13
303:7 309:7
314:14 315:2,11
315:13,17 316:1
317:4 318:13
329:16,20 332:21
364:10 370:4
374:19 383:9,11
**believed** 93:7
**Bend** 14:2 15:4
**beneficiaries** 54:17 172:13,22 173:8 174:11 271:6 281:20 282:2 308:9
**beneficiary** 174:1
**benefit** 173:1
**benefits** 19:4 232:5 233:2 253:21 275:16,17
**best** 42:22 71:5 76:16 91:3 92:14 92:14,19 102:18 103:15 104:7 106:2,6,12 108:15 109:18 113:2 121:14 122:4 142:20 155:10 161:20 164:6 165:9 176:15 181:18 186:19 190:5 191:3 192:13,15,17 225:5 226:12 235:17 253:3 256:20 270:8 271:12 274:2,18

276:7 279:17
280:2,9 285:13
286:2 288:19
292:18 296:6,21
299:1,6 309:4
311:1 312:15
322:12 327:16,19
328:1 331:20,21
332:3 336:4
349:10 366:7
367:9,11 371:3
391:8 402:21
403:2
**better** 37:17 226:9 307:1 363:6 373:20
**beyond** 32:22 42:1 43:7 53:13 155:15 164:15 174:14 175:11 183:21 188:3 191:18 192:4 197:4 219:13 224:1 258:5 264:4 277:6 280:20 289:17 338:9 342:12
**big** 64:10,22
**bilateral** 312:2
**Bishop** 401:21
**bit** 14:8 24:5 30:7 37:17 51:3 53:14 57:13 59:3 77:11 91:2 101:13 109:14 117:4 133:6 141:14 178:8 182:13 194:4 224:19 228:15 232:12 256:17 306:4 324:13 336:3 348:4 350:9 357:8 364:7 365:14
**blank** 319:22 374:9 379:6,15 381:8
**blanket** 228:7
**blew** 96:14

**block** 351:20
**blow** 211:16
**BM** 222:4 223:6
**bodies** 316:2,10,17
**body** 332:11,12
**Boivin** 143:11,13 143:14
**bold** 26:5 50:8 247:8,17
**bolded** 70:13
**Bonnie** 1:17 9:18 408:2
**bono** 14:14
**border** 18:9
**bordering** 358:8
**bottom** 26:3 30:7 58:5 74:3 89:11 90:9 102:8 132:22 143:19 210:14 236:19 253:15 290:1 314:6 391:12,13
**box** 333:9,12,15
**bracketed** 391:13
**bracketing** 148:16 148:17
**brackets** 349:6
**Brandon** 22:5 114:6 152:1 178:21 182:1 216:11 217:4,11 217:19 218:17 298:16 347:4 350:12 365:5 370:9 376:9 377:9 381:8 387:3 391:16 392:9
**Brandon's** 218:1 219:4 238:9
**Brantley** 3:18 10:9
**break** 13:2 63:21 68:5 72:22 86:14 99:9,19 100:4 186:11 193:4 200:2,17 248:13 254:21 270:11,17

276:7 306:3,10
310:8 316:5
358:11 363:8
**breather** 256:18
**brief** 16:15 271:8 356:22
**briefing** 223:2,7,11 223:12,14 224:3 224:14 225:8 290:6
**briefly** 16:16 31:19 356:16 357:7 382:12
**brilliant** 394:17,19
**bring** 29:6 79:5,6 83:22 236:7 255:11 279:16 293:5 294:12,14 294:17
**bringing** 403:18 404:10
**broad** 196:10 364:12
**broadened** 163:17
**broader** 19:22 291:4
**broadly** 29:19 242:5 275:4 295:21 309:20 347:7
**Brook** 56:20 114:6 114:11,14 115:14
**Brooklyn** 3:12
**Brooks's** 113:17
**brought** 20:19 41:22 77:13 332:4 386:6
**Brown** 2:6 3:3,18 3:18 9:14,15 10:1 10:4,7,10
**buffet** 156:9,12 157:12,19
**build** 330:11 335:17
**building** 23:17,19
**bullet** 105:9 165:18



166:4 167:20
170:12 171:1
172:6 182:17
183:3 185:3
215:13 216:6
297:7
**bunch** 139:11
210:2,9 211:20,21
212:10,15
**bundle** 288:14
**Bundling** 312:3
**bureau** 35:9 59:20
60:2 63:8
**buried** 316:3,10,17
**business** 14:8 57:9
156:8 186:22
187:2 387:14,17
388:8
**busy** 397:19

---

**C**

**C** 4:1 9:1 28:16
29:14 362:11
**CA** 314:7,10 382:6
**Cadman** 3:11
**calendar** 5:2 74:16
80:17 88:5 89:18
96:9 251:17 253:7
288:15
**calender** 89:19
**California** 263:15
**call** 11:22 34:6
41:14 47:5 49:3
102:16 118:17
179:19 246:21
252:13 259:15
298:9,11,14,16,17
298:21 299:16
300:15,16 301:6,7
303:9 323:6,7,14
323:14,20 324:3,6
325:2,15,17,21
326:14,16 327:6
327:20 328:4,10
332:17 336:9
352:4 378:5 390:4

**called** 14:2 142:16
298:8
**caller** 327:20
**calling** 27:3 139:2
289:18
**calls** 29:9 32:10,10
36:5 45:15,16
54:3 58:14 64:13
65:11 66:8 67:10
76:10 77:15 81:17
81:18 82:13 83:10
83:13 85:9 116:7
121:3 124:2 125:8
125:19 127:12
128:10 129:21
136:15 139:4
148:4 149:18,19
155:12,14 156:14
156:19 158:3,18
159:12 167:7
168:12 169:8
175:13 180:21
184:18 189:7,10
190:16 191:16
194:9 196:2 197:7
202:22 204:1
205:8 207:21
209:3 213:8
214:13 215:21
217:8 220:9,11
222:13 224:7
227:22 237:14,18
240:12 242:12
245:19 254:7
272:9 273:7
284:20 286:21
301:22 303:21
304:1 305:16
307:8 308:1 313:3
317:10 318:19
320:16,19 324:9
325:7,14 334:1
336:16 337:6
338:10 341:12
343:10 348:16
353:4 355:22

358:5,6 359:11
368:14 369:11,12
371:10,16 372:15
374:15 375:4
376:13 379:9
381:4 383:6
386:18,19
**camp** 70:21
**camps** 65:7,18 66:4
79:21
**candor** 266:16
**capacity** 15:11
18:21 21:3 52:5
64:3 71:7,12,21
72:3 82:17 83:1
137:10 151:10
361:2
**capital** 343:21
391:14
**Caption** 405:3
**captioned** 405:9
**capture** 267:7,14
267:16 275:6,6,7
278:6,10 289:13
295:11 298:20
321:4,10 325:21
326:1,13
**captured** 189:1
280:13 283:15
284:14 295:4
321:11
**captures** 67:17
283:3 318:12
**capturing** 270:1
274:3,20 284:11
299:8 318:6 322:7
**cardinal** 334:8
346:16,20 347:2,6
348:10 349:21
**care** 92:8,9 119:4
127:22 129:6,6
152:5 169:22
174:8 177:8,9
208:18 223:14
363:9
**career** 404:4

**Caribbean** 351:21
**case** 1:4 24:4 66:12
133:14 137:18
151:11 176:1
257:21 260:6,7
263:13,17,17
300:4 312:4,5
330:11,15 335:17
357:10 361:3
405:3
**cases** 14:15 17:22
18:1 20:5
**casework** 19:21
**catch-all** 233:4
**category** 247:8
249:8
**Catholic** 346:22
**caught** 242:22
**caused** 61:19 129:7
249:22 326:12
**cautions** 129:12
**cautious** 274:15
**caveat** 45:17 173:6
235:6 400:17
403:21
**CDC** 33:7
**center** 144:7
180:12 185:16
187:19
**Central** 14:20
314:11,18 316:7
366:9,20 367:5
382:6
**certain** 42:9 43:13
65:7 82:16 102:20
177:17 180:19
218:3 228:6,8
252:18 253:6
258:4 286:5 299:2
366:7,11 391:9
397:5
**certainly** 29:11
65:14 76:12 88:11
108:2 139:1
161:15 163:8
167:13 173:14

175:21 194:12
221:22 225:2
261:13 321:9
355:3,6,22 386:19
**certainty** 285:21
**CERTIFICATE**
408:1
**certify** 92:2 408:4
**cetera** 43:14 68:8
80:3
**chain** 4:13 5:6,8,10
5:11,15,17,19,21
6:2,4,6,8,12,14,16
6:18 7:6,8,10,12
7:14,16,18,20
58:20 117:13
119:3 186:1,17
201:9 215:7,9
221:6 223:17
226:15 234:12
329:11 332:6
336:3,7 340:3
341:2 345:7,17
346:14 347:19
365:14 366:1,7
369:21 370:11
382:3,5 387:13
389:6 392:9
394:10
**chains** 58:3
**chance** 25:12 55:13
82:4 111:6 236:14
**change** 16:18,19
20:11 66:15
117:21 122:9
131:3 176:13
304:9 406:2,4,5,7
406:8,10,11,13,14
406:16,17,19
407:2,4,5,7,8,10
407:11,13,14,16
407:17,19
**changed** 21:19 28:1
65:21 131:1 153:3
325:11 385:7
**changes** 112:1



226:17 230:18
231:10,18 232:2
232:13 405:11,14
**characteristics**
303:14 307:13
**characterization**
118:13 194:1
238:2,14 353:22
354:2,10 374:20
388:3
**characterize** 351:6
394:20 397:17
**characterized**
238:22 350:18
351:8
**charge** 237:8
238:22
**charged** 113:4
**chart** 288:15,15
**Check** 290:8
**Chicago** 3:4
**chief** 19:10 20:21
21:17,21 22:1,3,7
23:11,11 119:14
122:8,19 123:1,3
123:5,8,14 124:9
124:16,19 131:5
131:16,20 132:3
134:16,19 140:19
142:7,12,18
144:11 182:2,8
187:18 193:11
217:20,21 382:22
383:7,11,14
385:10
**children** 16:4
**chill** 261:13
**Cho** 3:9 10:14,14
**cholera** 62:12
63:20 64:9,21
66:2 71:2 78:21
79:14 80:2,10,12
80:18 81:4,4,10
82:10 83:4 84:14
250:15 251:2,8
**Chris** 113:13,14

**Christian** 3:18 10:6
10:6
**chronological**
19:14 42:21 253:9
275:5,11
**chronologically**
63:19 174:17
**chronology** 165:16
**chunk** 394:13
**CI** 37:15
**circulates** 333:16
**circulating** 133:20
331:22 332:17
**circumstance**
201:11 224:2
**circumstances** 91:6
92:19 367:12
**CIS** 25:22 29:20
38:4 50:2 51:6
93:21 114:2
116:21 142:21
145:10 153:1
161:21 162:18
164:4 201:18
229:19 381:11
**Cissna** 140:7,13
**citation** 28:6
**cite** 210:2 211:19
211:21 212:10
**cited** 51:10 62:13
63:8 65:6,17
210:9 213:17
393:11
**Citizenship** 10:21
11:18
**City** 15:7
**civil** 3:10 237:9
**claim** 18:11 388:7
**claimed** 80:13
**clarification** 67:14
184:1 212:2
254:12 364:18
**clarified** 198:7
**clarify** 180:16
273:2
**clarity** 24:11

**classified** 110:20
264:19 400:13,15
**clause** 317:2
**clean** 34:20 180:10
**cleaner** 16:11
**clear** 71:20 137:19
226:17 230:20
231:10 232:2,14
262:8 263:1 266:1
273:1 274:17
306:2 310:11
381:12
**clearance** 332:7,13
333:14
**clearly** 131:7 228:9
228:9 323:3
**clip** 262:13
**Cloe** 351:16
**close** 108:16 294:3
296:13 325:20
326:3
**closely** 97:12
**closer** 301:21 343:1
**collar** 14:9
**colleague** 389:18
**collected** 301:15
302:11
**collecting** 290:2
**collection** 290:8
**collective** 264:9
**college** 13:8,9
**colon** 252:2
**Columbia** 408:20
**comb** 370:13 372:4
**combo** 349:10
**come** 69:4 100:1
191:4 205:16
300:16 325:20
396:20,22 402:4
**comes** 18:8 34:12
123:11,15 294:9
**comfort** 56:13
**comfortable** 56:2
87:21 92:12
181:14 364:6
**coming** 44:4 67:22

95:8 112:12 118:1
121:11 122:3,22
152:21 229:6
295:22 378:1
**comment** 316:6
320:4 339:14
390:18 391:3
**commenting** 241:8
393:2,3
**comments** 261:14
267:8,9 268:22
269:1,22 279:18
285:14 320:7
326:5 329:22
382:16 390:19
391:15,17
**Commission**
408:22
**Commitments**
297:14
**committed** 166:19
171:15 312:18
**common** 108:14
162:8 224:10
260:16 301:13
302:9 323:12
**commonsensical**
229:3
**Comms** 236:22
237:1
**communication**
160:1 188:5
219:14 230:10
233:3 354:6
398:18 399:21
**communications**
137:16 159:5,7,19
160:12,17 183:11
184:8 226:11
237:3 261:14
298:18 359:13
383:13 399:3
400:2 402:22
**community** 324:14
**compare** 208:11
370:3

**compared** 300:3
**comparison** 92:1
208:20
**compile** 40:8
**complaint** 132:11
**complete** 333:17
**completed** 24:15
374:4 376:8
377:11 387:7
389:3
**completely** 214:2
393:12
**Complex** 141:13
**comport** 90:2
135:19 374:11
**compound** 39:3
210:20 212:19
308:1 311:13
349:4
**compounding**
316:2,15
**comprehensive**
373:2
**compromise**
340:15 345:3
**compromises** 294:6
**computer** 56:19,20
**computerized**
408:8
**concept** 162:8
372:9
**concepts** 29:21,22
30:2 31:1 302:15
357:4
**concerned** 27:12
71:22 377:2
**concerns** 64:10,22
66:3 80:9 120:21
337:14 350:10
356:17
**concluded** 214:9
337:3 403:22
404:20
**concludes** 290:14
404:15
**conclusion** 27:4



29:9 32:11 36:5
45:16 54:4 81:19
83:14 179:20
180:22 195:16
202:4 210:4,11,16
211:6 213:2,20
214:7,9,11,20
240:6 300:8 358:6
379:5 389:12
393:13 394:1
**conclusions** 163:3
395:12
**condition** 93:3
311:10 354:18
373:3 392:19
**conditions** 30:3
36:15,16,22 40:4
40:6 42:18 43:22
44:5 45:8 46:17
46:21 51:9 61:10
62:16 70:22 76:22
77:22 78:19 81:10
83:5 85:6,16,22
86:6 91:17 95:1
115:8 155:2
172:14 179:15
180:4,13 181:5
210:3,10 211:20
211:22 212:11,15
213:17 215:15
223:4 224:15
225:7 271:9 274:7
287:15 297:10,12
297:13 300:1,10
301:17 303:17
304:18 305:5
310:18 311:18,20
350:11 351:6
356:21 357:12
362:13,15,20,22
370:14 372:5,6,12
374:6 377:12
393:11,22
**confined** 161:21
182:22
**confirm** 100:21

101:11 103:7
**conflict** 29:22
316:4 356:18
**confuse** 104:7
**confused** 116:2
**confusing** 12:18
**confusion** 104:15
306:9 331:9
**congress** 88:6 89:5
297:11 300:6,7
314:20 317:3,16
**Congressional**
397:6
**connection** 204:6
**Connelly** 3:2 4:3
9:22,22 11:10
14:22 20:18 23:21
24:9,13,17 25:11
27:9 28:5,9 29:17
31:9 33:12 34:18
37:1,11 38:15
39:10 41:7,13
42:6,19 44:13
46:3,12,22 47:5
47:10,12 48:19
49:9,12,17 51:1
52:11 53:11 54:21
55:6,14,18,22
56:2,5 59:1,11
61:5 62:8,21 63:1
64:7 65:2,19
66:14,18 67:3,4
67:19 68:10 69:9
69:16 70:7 71:19
72:13 73:2,10
75:6,10 76:15
78:6 79:2,4 81:6
81:22 82:21 83:17
83:21 84:17 85:2
85:20 86:8 87:11
87:15 90:22 91:20
92:6 93:9,12
94:17 96:7 99:7
99:18,21 100:2,5
100:10,18 101:7
101:21 102:4,21

103:2 105:11,15
106:22 109:12
110:2,10 111:5
112:15 115:12
116:16 117:11
118:16 119:1
121:13 124:21
125:13 126:4
127:17 128:19
130:3,14,17
131:11 132:4,8
136:10,20 137:6
138:16 139:9
141:8 143:1,6
146:8,16 147:12
148:13 149:8
150:8,16 151:20
152:17 156:5
157:17 158:12
159:3 160:2,10,21
161:9,19 163:13
163:16,19 164:1
164:14,18 165:1
168:2,21 169:13
169:16,19,21
170:6,8 171:2,10
172:4,15,17,20
173:11,20,22
174:3,6 175:17
176:5,10,14 177:4
177:21 178:6,17
179:8 180:5,15
181:6,11 183:18
184:3,5,13,22
185:20 186:8,13
186:15 187:7
188:11 190:1
191:6 192:1,11
193:3,8,22 195:3
196:9,18 197:17
197:19 198:3,8
199:2,6,13 200:2
200:5,15,21 201:5
203:7,17 204:10
205:15 206:14
207:3,6,8,10,17

208:5 209:8 211:3
211:7,10 212:6,16
213:21 215:1,5
216:9 217:16
218:8,21 219:20
220:21 221:3,18
223:5 224:12
225:9,20 226:3
227:8,12,14
228:12 229:2,4,14
230:17 231:8,21
232:11 233:18
234:2,10 235:12
238:3,15,19 239:6
240:2,16 242:18
243:10,20 244:9
245:6 246:1,8
249:2,19 251:10
254:18 256:15
257:6,10 259:5
260:15 262:11
264:8 265:19
266:20 267:3,22
272:2,18 273:13
275:3 277:21
278:22 279:7
281:4 282:3
283:18 284:3,7
285:5 286:8,10,13
287:17 289:21
292:7,16 293:7,16
294:1,8,16,21
295:13 296:4
297:2 302:6
303:13 304:7
305:7 306:5,21
307:15 308:14,22
313:13 316:21
318:1,16 319:4,11
319:12 321:3,13
322:5,17 323:17
325:18 327:11
329:1 331:16
334:10,14 337:2
337:13,21 338:6
338:16 340:1,7,22

341:20 342:21
344:6 345:16
346:19 347:16
349:2 351:13
353:12 354:13
355:8 356:8 359:1
359:17 360:14
361:12 363:4,19
364:3 365:6,12
366:12 367:6,18
368:22 369:19
370:2 371:21
373:11,17 374:22
375:8,18 376:21
377:18 378:15,19
379:18 380:15
381:18,22 383:2
383:19 384:13
385:15 387:1
388:4,14,20 389:1
390:1,3,9 391:6
391:19 392:1,21
394:2,8 395:4,14
396:2 397:11
398:12 399:8,13
401:13 402:1,20
403:6,11 404:14
**CONNOLLY**
351:1
**consensus** 229:19
**consider** 81:12
312:4 354:16
359:8 361:15
362:22
**consideration**
357:21 362:11
**considerations**
362:14
**considered** 82:10
83:5 87:7,7 296:3
307:19 353:20
354:19 355:5
361:8
**considering** 85:18
352:16
**consisted** 77:22



consistent 254:10
257:22 264:22
265:9 266:17
270:21
consult 32:6 33:1
336:9
consultation 31:13
31:21
consultations 32:18
32:19
contact 35:18
398:16 401:5,11
402:14,22
contacted 33:6
contacts 401:10
contain 110:20
contained 91:5
92:16 146:21
215:9
contemporaneous
257:16
contemporaneou...
299:15
content 159:4
364:5 377:21
383:21
contents 384:1
context 20:2 119:7
145:4 154:19
168:15 186:4
221:7 276:19
282:19,22 299:13
327:16 392:8
continuation
347:17
continue 66:16
155:2 269:12
270:3 285:7,7
289:22 310:18
311:11 312:13
339:10,22 340:18
396:4,7 398:9
400:17
continued 5:1 6:1
7:1 8:1 22:6 97:22
280:11 357:13

395:16 398:10
continues 79:20
232:12 274:4
continuing 61:9
227:19 237:6
291:15 303:17
361:15
continuous 54:16
54:16
contraction 155:7
contribute 267:20
contributed 71:2
313:10
contributions
289:7,14 312:20
convened 309:18
conversation
256:17 257:3
267:15 283:12
284:12 291:2
333:2,4
conversations
126:19,22 144:14
159:5
convey 39:2 105:6
213:4 225:12
342:6
conveyed 284:10
376:20
conveying 121:22
224:21 376:10
393:14 395:5
convicted 182:21
coordinated 35:15
coordinates 34:4
coordination
119:15 143:17
copied 92:4 113:12
114:2
copies 48:21 49:8
387:5
copy 24:20 25:13
100:19
core 373:19
corners 138:5
155:15 189:14

191:18 216:2
258:5 261:20
264:5 280:21
342:13 343:15
350:5 353:9 388:2
corporate 381:11
corporately 156:1
correct 12:7,8
13:20 23:2 26:14
26:21 27:6 29:2,7
33:14,15 35:1,2
44:8,9,12,18 48:4
50:1,4,5 52:18,19
61:14,20,21 63:19
63:22 64:9 75:17
81:7 82:5 84:3,10
84:11 86:2 93:6
93:19 95:5,6
96:11,15 99:1
110:1,9,17 114:11
115:17,18 117:16
118:15 138:17
145:3,6 154:6,11
174:22 175:4
180:11,13 187:2
187:20 190:10
201:12,20 202:5
202:16 221:7
222:6 226:19,22
229:10,16 241:11
244:5 246:9,18
248:14,19 249:15
250:2,8 251:3
270:13,14 275:4
278:8,9 280:4
304:19 324:5
326:2 329:8,15
337:16 351:4
357:4 374:1 387:5
394:12
corrections 405:12
correctly 89:22
168:7 209:16
246:13 256:11
330:13
COS 140:17

Council 400:9
401:1,7 402:13,18
403:4
counsel 9:20 11:9
85:13 120:12,15
144:11 146:2
155:19 159:21
177:15 206:5
209:3 265:7
313:20 341:13
368:15 383:1,8,11
383:14 384:12
385:6,7,10 408:11
408:15
counsellor 159:7
counselor 152:9
counsel's 306:14
counted 68:17
counting 294:2
countries 35:5,8
36:20 40:18 43:11
43:13 68:19 69:2
69:6 89:17 120:22
233:5 302:19
322:20 362:11
366:9 367:5
392:13,20
country 18:11 29:5
29:6 33:2,3 34:10
36:15,16,21 37:3
37:3 38:7,18 40:4
40:6 42:18 43:22
44:4,5 51:9 76:21
77:22 79:20 85:17
91:17 93:3 96:4
115:8 151:4 270:4
270:5,7 287:15
300:9 303:18
304:19 305:5
311:14,20 312:12
350:10 354:18
355:15,16 357:20
359:6,7,22 360:16
361:14 367:13
369:7 370:14
372:5,12 373:2

374:6 377:12
378:7 380:9
392:19 393:11,21
couple 14:14 90:12
102:10 120:2
152:6 166:18
290:4 314:1 326:5
338:17 347:19
352:10
courage 317:4
course 28:13 29:20
37:15 50:14 57:8
109:20 110:11
117:19 120:8
178:22 299:16
326:14 388:12,16
388:18 398:13
court 1:2 9:9,18
11:1 198:20
206:11 263:15
265:16 266:5,9
293:3,14 294:7,13
294:17 325:10
404:3
cousin 162:10
cover 310:3 322:19
333:9 335:14
covered 242:2
348:4
covering 333:11
covers 90:12
co-authored 365:4
co-authors 364:13
co-equals 217:18
CP_00003462-34...
7:9
CP_00007859-872
6:3
CP_00008090-80...
6:9
CP_00009691-693
6:13
CP_00010782-783
5:16
CP_00011167-68
5:7



**CP_00011216** 4:14
**CP_00011564-566** 6:7
**CP_00012164-165** 5:12
**CP_00013016-017** 6:5
**CP_00020560-563** 6:17
**CP_00029539-545** 7:17
**Craig** 382:17,18
 383:10,13 384:9
 384:15,16
**create** 168:9 204:8
**created** 177:15
 204:5 269:15
**credible** 18:1,3,4
 18:14
**crew** 120:19 121:1
**crime** 14:9 300:11
 300:20 301:2,3,10
 301:14 302:9,16
 303:9 305:10
 307:2
**crimes** 166:20
 171:15 182:21
**criminal** 324:17
 326:11 327:15
**criminality** 308:7
**criminal/detainer** 182:22
**critical** 373:8
**cruel** 324:15 326:7
**cryptic** 281:9
**crystalized** 265:22
**crystallizing** 266:4
**CSPED** 233:11
**curiosity** 314:1
**curious** 27:14
 188:14
**current** 26:16 45:8
 46:17,21 81:10
 83:5 85:6 86:5
 97:19 166:13
 179:15 180:4,13

181:4 222:3 223:3
 223:10 224:15
 304:18 305:4
 351:6 354:18
 401:4
**currently** 14:12
 40:17 69:3 85:16
 85:21 142:7 173:9
**curve** 162:2
**customer** 233:15
 325:11,12
**C-I-S-S-N-A** 140:15
**C-L-O-E** 351:16
**C-O-M-M-S** 236:22

**D**

**D** 9:1
**damage** 343:4,7,20
 344:1,3
**damages** 98:7
**Dame** 13:10,18
**dancing** 338:19
**Daniels** 14:2
**data** 182:18 183:4
 185:2 189:2,22
 190:5,9,12 191:12
 192:4 253:20
 271:6 275:15
 289:5 290:2,6,8
 312:10
**date** 9:11 88:7,22
 101:19 104:16
 112:12 142:11
 154:16 165:3
 177:17,17 178:9
 252:19 265:13
 298:6 331:10
 361:6 406:21
 407:21
**dated** 4:14 5:7,8,10
 5:12,15,17,19,21
 6:2,4,6,8,13,15,17
 6:19 7:7,9,11,13
 7:15,17,19,21

101:16
**dates** 56:16 104:5
 104:20 235:20
**Dave** 390:19 391:5
 391:7
**David** 351:16,18
**day** 20:3,3 21:18
 28:13 102:20
 235:16 240:1
 241:10 243:9
 252:19 265:12
 329:13 331:3
 336:5 371:7
 387:12 405:17
**days** 30:14 96:13
 96:14 103:13
 329:11 331:2,13
**DCOS** 329:22
 335:15
**deadly** 71:2
**deal** 206:8
**dealing** 398:13
**dealings** 372:22
**dealt** 71:15
**debate** 174:15
**December** 1:13
 9:11 80:11
**decide** 174:3
 403:17
**decided** 194:4
**decides** 174:8
**deciding** 45:9
 354:19 361:16
**decipher** 247:19
**decipherable** 281:8
**decision** 19:16 20:5
 36:1 37:2,13
 44:19 51:8 62:13
 83:6 102:17
 103:14 104:13
 106:14,19 107:19
 108:3,21,22
 133:18 145:13
 146:10,14 147:17
 156:10 157:8
 159:8 162:19

194:6 195:1,7,16
 196:16 220:18
 226:18,21 227:18
 228:8 229:9 230:3
 230:8,20 231:11
 232:3,14,20 233:1
 248:18 249:1
 255:8 271:5 273:3
 273:10 279:13
 285:11 286:5
 297:9 298:11
 301:10 309:9,10
 309:22 323:13,15
 324:1 345:11
 353:18 355:3,5,14
 359:4,21 364:22
 367:11 372:13
 374:5 377:22
 378:22 380:12,19
 382:6 383:4
 385:21 387:8
 389:4,17 395:11
 395:22 397:13
**decisions** 26:18
 27:7,19 32:7 38:6
 45:13 67:22 68:7
 109:21 196:20,22
 197:9 199:11,16
 199:17,22 232:21
 255:4 276:16
 300:6,7 356:5
 372:9 392:11
 395:17 396:1
**DECLARATION** 405:6
**declarative** 225:15
**declaratory** 394:19
**declare** 405:7
**deemed** 263:14,16
 339:13
**deeper** 120:2
**deeply** 237:6
**Defendants** 1:7 3:8
**defending** 12:11,14
**defense** 14:9
**define** 157:21

**definitely** 60:6
 163:14
**definition** 137:16
 259:1 316:4
**delayed** 154:16
**delegate** 359:20
**deliberately** 349:3
**deliberating** 92:15
 126:7,8
**deliberation** 214:14
 224:8 259:1 273:8
 369:12
**deliberations** 58:14
 64:14 65:12 66:9
 67:11 76:11 77:16
 82:14 83:10 85:10
 112:8 124:3 125:9
 125:20 127:13
 128:11,11 129:22
 136:16 139:4
 144:15 148:5
 149:19 155:13,15
 156:15 158:4,19
 159:13 167:8
 168:13 169:8
 175:14 184:19
 189:8 190:17
 191:16 194:10
 196:2 197:8 203:1
 204:2 205:9 209:4
 213:9 215:22
 218:16 220:9
 222:14 228:1
 237:15 239:15
 240:13 242:13
 243:13 254:8
 272:10 280:20
 281:14 283:8
 284:20 286:22
 287:6 289:19
 292:12 296:18
 303:1 304:2
 305:18 307:9
 308:2 313:4
 317:11 318:20
 320:17 326:17,22



334:2 336:17
337:7 338:11
340:12 343:11
345:2 348:17
350:2 353:5 356:1
359:12 371:11
372:16 374:16
375:5 377:6 378:6
378:11 381:4
383:7 386:20
396:13
**deliberative** 58:16
64:15 66:10 67:12
83:11 86:17
125:10,20 127:16
128:12 130:2
131:7,10 137:5,20
138:10,15 139:5
145:22 147:3
158:6,20 159:14
162:3,11 167:9
169:10 170:15
171:22 175:16
176:4,21,22 177:1
177:14,19 189:9
191:21 194:17
196:4 203:2 204:3
205:7,13 208:1
210:22 216:1
219:11 222:15
225:1 227:5 228:2
228:10 230:9
231:6,16,19 235:3
235:11 237:16
240:14 242:1,17
243:4 245:1,5
254:9 257:5,20
258:1 259:4 260:1
260:4,5,14 261:10
261:13 262:9,16
263:10,14,16
264:6 265:1,5
266:15,19 273:9
278:15 285:4,18
292:14 305:1
317:12 319:5,9

320:18 322:10
334:3 336:18
337:8 339:14
341:15 342:11
343:12 348:18
350:3 353:7 354:5
354:6 355:4
359:16 369:13
371:12 372:18
375:7,16 376:15
378:13 379:9,10
380:7 383:15
387:20 396:11,12
404:11
**demographic**
182:17 312:10
**department** 3:9 9:8
10:18 11:17 26:20
27:18 32:5,19,22
33:14,20,21 34:22
35:8,12,14,19
36:12 39:12,19
40:3 41:20 58:11
60:4 63:11 78:2
113:16 115:16
116:3 118:7
153:16 163:11,21
164:12,16 166:9
201:19 241:19
242:15 282:18
334:21,22 394:18
395:7
**Department's**
35:17 392:18
393:4,6
**depend** 262:7
**depending** 122:10
131:2
**Depends** 109:11
**deponent** 257:13
266:21
**deposition** 1:11 2:1
9:6,13 24:3 25:6
47:7 49:4 55:4
69:13 72:15 75:8
87:13 90:8 93:10

101:2 102:2,22
105:13 111:3
118:19 132:6
143:3 164:20
181:9 186:5 193:5
201:1 215:3
220:22 225:22
233:20 246:6
258:2 261:22
262:9 263:4,9,13
265:18 293:22
306:14 328:21
334:12 339:6,22
347:14 351:11
358:9,15 364:1
365:9 369:22
373:14 381:20
385:12 390:7
391:21 394:5
403:22 404:16
405:1,8,13 406:1
407:1 408:3,5,9
408:13
**depositions** 12:10
261:17 265:12
404:9
**deputy** 22:1,7
23:10 106:5
107:10,12 134:8
134:11,15,17
135:2 217:21
239:5,22 241:2,4
241:4,9,17 242:9
252:5 253:12
259:10 268:6
270:13 271:15
274:5,21 277:6
282:6 285:21
**describe** 23:3,5
40:20
**described** 43:6
77:12 291:22
**describes** 215:14
**description** 226:10
393:21
**Deshommes** 119:11

119:12 144:3
**designate** 270:4
**designated** 27:18
33:5 34:11 37:4
38:19 40:18 69:3
69:7 85:17 132:2
308:11 362:12,19
366:9
**designating** 50:10
288:16 359:5
**designation** 4:15,18
4:20 6:10 7:2 29:7
29:15 30:15 31:2
31:18 33:19 34:14
37:13 38:6,8
39:16 40:15 42:12
44:6 47:21 49:22
51:11 54:2,14
61:19 68:6 70:15
73:22 75:12 78:10
83:7 85:18 86:1,7
90:4 96:1 135:12
166:14,19,20
171:14 173:1
194:16 220:6
226:18 227:20
229:20 230:21
231:12 232:4
247:10 249:5,9
250:2,20 255:2
276:13 309:11
310:17 329:14
347:2 352:16
353:21 357:22
361:9 362:2,5
365:1 368:3
394:11
**designations** 26:6,7
27:7 30:9 32:7,20
35:17 36:13,18
37:19,20 43:13
44:2 68:7 75:1
89:19 196:22
197:5 288:7,17
297:12 307:18
355:19 362:10

372:10 396:16
**designee** 357:10
**desk** 114:18,19
115:3
**detail** 21:22 244:15
327:13
**detailed** 402:18
**details** 182:15
222:1
**detection** 187:18
**determination**
30:16 44:18 46:16
66:5 67:21 81:13
91:11 112:14
159:20 273:4
305:13 308:6
358:12 359:9,22
360:5,21 377:14
377:15 401:9
**determinations**
43:7 68:8,20 87:8
126:12 133:12
304:13,14 307:17
354:16 355:18
397:3
**determine** 38:18
43:12
**determining**
105:19 123:6
357:12
**development** 16:3
35:16
**Deviation** 288:18
**DHS** 39:11 104:12
115:1,15,16,20
116:4,13,20
120:12 121:12
122:3 141:15
147:10 161:18
164:5,8,15 167:15
220:17 223:18,21
224:4 273:5
298:13,18 313:20
351:21 363:22
391:10 393:20
402:19



different 23:20
118:10 129:9
145:17 157:15,22
205:3 208:15,22
266:22 310:9
378:16
differently 365:14
differing 300:2
difficult 215:14
217:2 306:1
direct 66:7 88:1
125:7,18 127:11
176:19 178:5
184:11 191:14
205:6,13 219:10
227:2,22 230:6,10
230:12 231:3,19
292:11 337:19
351:14 355:6
356:6 360:8
369:17 386:14
398:16
directed 171:19
277:10
directing 181:16
direction 296:1
355:10 408:9
directions 238:7
directly 13:15
124:15 240:12
director 39:17
40:11 78:4 134:8
134:8,11 135:2,2
139:19 140:5,7,9
141:3 147:10
203:14 220:20
274:21 351:20
352:4 400:9
directorate 22:15
94:8 144:8 233:16
325:13
director's 77:7
123:12,17
disagree 162:5
176:9 238:13
disagreements

242:8 292:17
disappointed
324:14,17 328:4
disappointment
326:6,8
disaster 30:2
356:19
disclosing 184:7
discovery 399:1,20
discretion 312:1
discretionary
310:16 311:21
discuss 108:5
discussed 120:9
206:5 243:5
249:10 313:6
357:1,8 400:21
discusses 135:10
discussing 345:8
369:15
discussion 34:13
49:10,14 55:2
101:4 197:22
258:20 261:10,19
287:7 316:16
319:2 356:22
374:10 381:10,16
discussions 33:6
245:1 319:7
disparage 255:6
279:11
displaced 305:11
306:19
disrupted 237:6
distinct 105:8
distinction 204:12
209:2
distinctions 54:11
distribute 133:15
District 1:2,2 3:11
9:9,10 263:15,18
408:20
division 3:10 18:13
19:1,10 20:21
21:4,18,21 22:2
34:2,8 113:3

119:15 124:14,18
134:18,19 143:17
185:18 217:20,21
233:16
divisions 124:12
divulging 218:15
doc 51:15 138:7
156:20 167:13
document 47:17
48:3,16 49:2,8,13
49:18 50:7,15,20
50:22 51:5,16,18
52:5,10,17,21
53:5,6,13 54:22
56:9 57:17 60:19
60:22 69:20 70:3
70:8 72:10,12
73:11 74:21 78:8
82:6,7 84:20
87:12,17 88:4,13
88:16 92:18 93:14
93:16 94:10,19,21
95:8 103:3 110:18
111:7,13 112:5
119:22 132:10
133:16 135:4
138:5,6,11 145:8
148:19,20 155:16
155:18 156:17
167:12,14 168:15
168:16 175:11,19
175:21 180:12
185:8 186:9 187:2
187:11 189:14
191:19 194:11,12
196:5 204:6,9
209:10 210:21
211:15 213:13
216:3 219:18
220:13 221:13,14
222:10,17 223:13
223:16 230:1,19
231:6,17 237:22
244:21 246:4
247:4 248:19
251:5,13 258:6

262:3 264:17,19
280:21 287:5
289:18 336:20
338:4,10,13
339:13,21 341:14
342:13 343:15
347:13,18 350:6
353:9 354:2
356:11 365:8
370:5 371:14
374:18 376:17
385:17
Documentation 7:4
documents 18:9
23:22 24:4 47:3
69:10 72:6 100:20
128:15 141:18
146:2,21 147:6
148:17 169:18
174:13 178:8
208:21 219:16
226:7,8,10,12,13
229:18 235:11,17
236:2 247:5
251:20 257:12,16
258:7 260:3,5
261:19,20 263:2
263:13 264:5,11
266:18,19 267:1
309:3 352:13
388:1,2 397:1
doing 14:12 19:22
42:8,11 57:21
58:1 87:6 96:17
137:10,11 196:8
252:11 253:22
254:4 275:20
288:9 333:9
Donald 1:6 9:7
DOS 282:13,16,20
283:15
dovetail 260:17
DPP-00003286-3...
5:18
DPP_00000395-4...
5:3

DPP_00003336
7:15
DPP_00008521-5...
5:5
DPP_00010880-8...
6:19
DPP_00010924-9...
6:15
DPP_00011273-2...
7:21
DPP_00011673-6...
7:13
DPP_00013063-0...
5:14
DPP_00018582-5...
5:9
DPP_00018751
5:20
DPP_00021118
7:11
DPP_00021948-9...
7:5
DPP_00022248-2...
7:19
DPP_0003323-33...
7:7
draft 40:9,9 76:22
78:3 89:3,4 94:14
124:18 136:1,4
138:3 157:5,10,14
167:22 170:22
178:22 190:18
204:14,18 205:4
208:11,15 209:5
217:13 220:11
237:19 335:13
342:14 345:21
346:3,4 348:9,11
349:6,20 350:19
363:21 364:9,21
369:15 371:17
373:10 374:4
375:2 376:8
377:10,11,20,22
385:20 386:10,10
386:11 387:7



389:3,8,10,17
**drafted** 128:15
  157:7,19 158:8
  170:17 178:22
  221:17 345:5
  369:3 374:20
  379:13,20 380:2
**drafter** 364:15
**drafting** 51:14 53:5
  94:20 136:9
  158:10 203:9,16
  206:18 365:4
  367:4,8
**drafts** 137:19
  151:16 392:10
**draw** 52:4 297:14
  300:8
**drawing** 204:12
  209:3 348:5
**drawn** 395:13
**Drive** 3:4
**drought** 30:1 98:12
  356:19
**dual** 375:2
**duck** 236:6
**due** 250:14
**Duke** 106:5 107:12
  239:5,22 240:20
  241:10,13,17
  242:9 252:5
  253:12 255:17
  256:7,20 258:21
  258:22 259:10,20
  260:11 261:6,11
  268:7 270:13
  271:15 274:5,21
  277:6,10 282:6
  284:14,21 285:15
  285:22 287:7
  291:20 358:11
**Duke's** 394:11
**duly** 11:5 408:5
**dunces** 394:18
  395:7
**duplicate** 91:18
**dust-up** 403:14

**duties** 17:17 25:22
  29:20 31:4 37:15
  50:14 51:6 72:8
  81:1 83:3 243:14
  243:19 244:1
**D-E-S-H-O-M-M...**
  119:5
**D.C** 1:12 2:8 12:5
  17:8,11 193:21

_____

**E**

**e** 4:1 9:1,1 56:15,20
**EAD** 324:22
**earlier** 52:14 58:4
  76:20 77:11 120:1
  145:5 148:19
  149:14 150:10
  153:9 163:6
  183:17 197:20
  229:15 235:15
  243:5 247:8
  265:10 271:7
  284:2 285:17
  322:10 346:15
  358:13 400:8
**earliest** 111:12
**early** 17:14 120:1
  138:18 145:8
  165:10 250:12
**early-ish** 174:19
**earthquake** 30:1
  44:7 61:18 63:20
  63:22 74:6,11,18
  80:19,20 81:5,15
  85:7 98:20 99:3
  249:15 250:7,10
  250:16 251:1,3,9
  301:18 330:18
  343:5,7 344:1,5
  356:18
**ease** 234:17
**easier** 24:5 79:6
  107:2 236:7 271:5
  306:9
**easily** 68:5 340:2
**East** 3:11

**Eastern** 1:2 3:11
  9:9 263:18
**easy** 256:13 270:19
  270:22
**ebbs** 397:18
**Ebola** 33:6
**Echevarria** 233:9
**economic** 74:12
**economy** 74:9
**edge** 388:5
**editing** 384:6
**editorial** 201:10
  210:15
**edits** 217:15
**edits/comments**
  226:6
**educated** 26:17
**education** 34:20
**effective** 154:16
**effectively** 330:9
**effects** 74:10
  311:13
**effort** 263:20
  387:21
**efforts** 304:11
  367:11
**Efren** 332:10,14,15
  333:4
**Efren's** 332:20
**either** 12:10 32:7
  33:19 38:6 42:12
  142:15 220:5
  224:17 228:19
  294:8 359:4
  368:17 374:7,13
  377:14 378:2
  379:1 389:7
**El** 98:12 366:10
**elaborating** 350:22
**Elaine** 394:10
**element** 310:13
  360:12
**elements** 350:17
  351:5 362:21
**eligible** 54:19
**eliminated** 132:18

**elimination** 277:8
**embargo** 303:2
**embargoed** 298:9
  299:16 300:15
  301:22
**embarrass** 339:18
  340:3,4
**embedded** 403:12
**embrace** 331:18
**Eminence** 346:22
**emphasizes** 330:16
**employed** 301:14
  302:10 303:9
  408:12,15
**employee** 404:4
  408:14
**employment** 7:4
  302:16 305:10
  307:3 308:8
  396:22
**empty** 122:20
  271:3
**encompass** 134:7
**encourage** 352:13
**encouraged** 353:16
**encouragement**
  232:17
**encouraging**
  297:18 359:7
  360:1
**ended** 395:7
**ends** 234:12
**engaged** 395:17
**engagement** 233:16
  325:12
**enjoying** 307:5
**enormously** 185:21
**enrich** 312:13
**entails** 137:15
**enter** 18:9
**entire** 25:16 79:8
  257:3 341:18
  346:15 350:15
  382:3 405:8
**entirely** 81:11
  94:13 105:7 115:2

121:9,20 132:2,14
  142:11 241:15
  267:13 276:1,22
  277:18 296:20
  367:2 391:4
**entirety** 275:7
  314:17
**entities** 133:16
**entity** 226:22
  326:20
**entrepreneurial**
  297:17
**entries** 347:19
**environmental**
  30:2 99:2 356:19
  362:4
**environmentally-...**
  362:2,9
**epidemic** 30:1
  62:12,17 63:21
  64:9,21 66:2
  78:21 79:15 80:12
  81:4,11 82:10
  83:4 84:15 250:15
  251:2,8 356:19
**equities** 39:15
  151:17
**ERRATA** 405:1,13
  406:1 407:1
**especially** 44:3
  120:22 209:14
  304:17 311:22
**Esq** 3:2,3,8,9,18,18
**essential** 208:13
**essentially** 54:13
  117:8 212:21
  217:22 345:9
  379:7
**established** 74:6
  304:16
**estimate** 68:9,15
  299:7
**estimation** 354:14
**et** 1:4,7 9:7,8 43:13
  68:8 80:3
**evening** 394:16



**event** 99:2 311:13
389:2
**events** 74:17
165:16 311:12
316:2,15
**eventually** 235:14
**everybody** 241:16
**evidence** 145:21
147:3 179:18
181:1 299:21
304:21 376:13
**evolve** 97:22
**ex** 72:1
**exacerbated** 70:22
**exact** 91:18 102:20
104:5
**exactly** 31:20 38:21
65:9 92:2 97:14
154:17 160:7
162:22 238:11
265:21 293:13
306:20 335:19,20
364:21 372:12
**EXAMINATION**
4:2 11:9
**example** 33:4 43:19
53:20 256:14
284:2 292:18
312:2 316:14,19
**exception** 246:19
**exchange** 57:16
188:4
**exchanged** 266:7
**exchanges** 188:5
**exchanging** 56:7
**exclusive** 132:14
**exclusively** 108:11
164:7
**excuse** 21:20 24:7
207:1 213:14
**executive** 133:10
335:5,6,10
**exhibit** 4:7,8,11,13
4:15,18,20 5:2,4,6
5:8,10,11,13,15
5:17,19,21 6:2,4,6

6:8,10,12,14,16
6:18 7:2,6,8,10,12
7:14,16,18,20 8:2
8:4,5,7 25:6 47:7
49:4 55:4 69:13
72:15 75:8 87:13
93:10 101:2 102:2
102:22 105:13
111:3 118:19
132:6,11 138:8,8
143:3 164:20
177:18 181:9
186:5 193:5 201:1
215:3 220:22
225:22 233:20
246:6 328:21
334:12 347:14
351:11 364:1
365:9 369:22
373:14 381:20
385:12 390:7
391:21 394:5
**exhibits** 4:5 5:1 6:1
7:1 8:1,15 150:2
358:14
**exist** 80:18
**existed** 65:7 72:6
85:6 86:1,6
**existing** 85:16,22
89:18 97:18
**Expand** 288:15
**expanded** 20:22
**expect** 195:5
282:21
**expectation** 274:8
**expected** 296:22
367:8
**expedited** 18:7,10
**experience** 32:15
33:10 306:17
**expert** 72:1 179:21
197:6 358:3 361:1
**expertise** 216:7
**expiration** 112:12
**expire** 365:2
**expires** 408:22

**explain** 18:5 33:18
51:2 52:22 155:17
155:18 167:12
168:14 194:11
196:5 225:3 228:4
237:21 258:19
262:2 296:18
340:13 341:14
342:3 343:13
345:4 348:21
350:4 371:14
374:17 375:13
**explained** 52:13
118:4 125:3 223:3
233:2 269:16
348:22 377:9
**explaining** 71:8
138:7,10 156:17
183:10 184:8
258:3 264:1
320:20
**explains** 249:4
**explanation** 175:20
213:12 222:3,8,16
223:9 224:14
225:7,11 259:18
**explanations** 262:4
**explicitly** 258:12
**explore** 104:18
**exploring** 220:5
257:1
**expressing** 395:11
**EXSO** 133:8,11
335:4
**extend** 30:16
107:19 108:22
135:12 136:22
159:9 229:9
310:14,18 317:21
318:14 327:8
361:16 380:3
**extended** 85:19
138:20 249:4,9
250:1,19 305:14
308:11 309:11
318:9 332:2

352:17 353:21
357:22 361:10
**extending** 70:14
73:22 78:9 83:6
247:10 272:4,5,20
329:14 330:12
335:17 359:5,21
392:12
**extension** 4:8,11,15
4:18,20 6:10 7:4
31:2 37:13,20
38:7 45:1,4,10
51:21 52:2,17
53:2 54:12 57:15
68:5 69:10 71:8
73:12 75:11 76:8
78:21 81:13 82:11
84:10,14 104:11
106:14 126:13
135:22 136:12
145:11,18 146:22
155:3,4 220:1,6
232:5,15,19 233:2
246:10 296:8
297:4 298:11
308:6 324:21
331:4 352:8,11
354:17,20 367:21
368:11 374:8,13
377:14 378:2
379:1 389:11
393:12
**extensions** 26:19
30:9 32:8,21
33:20 37:20 40:14
41:2 42:13 43:7
44:17 45:5,8 46:6
46:14 47:2 67:21
68:8 75:1 84:9
87:9 133:13 247:8
304:14,18 307:18
355:18 357:9
372:10
**extension/redesig...**
60:10
**extent** 27:3 32:12

36:7,9 41:4,9
50:20 54:8 58:13
58:17 59:9 61:2
62:4 64:2,13,17
65:11,15 67:10
70:2 71:13 76:10
77:15,17 80:22
82:13,15 83:9
84:20 85:9,11
95:16 112:5
114:21 116:10
117:1 118:12
119:6 121:5 124:2
125:8,19 128:14
131:7 136:15
145:20,21 147:2
148:4 149:18,19
151:9 152:13
155:12 156:14,16
158:3,18 159:12
159:18 163:1,7
167:7,12 168:12
169:7 170:16
173:17 175:18
183:9 184:18
189:7,12 190:16
194:9 196:1 197:3
197:7 198:14
202:22 204:1,5
210:20 212:8
213:8 214:13
215:21 220:8,12
221:13 222:13,18
224:7 227:3 228:2
228:3 239:15
254:7 267:16
272:7 277:13
281:14 283:11
285:17 287:1,2,5
302:2,21 304:1
305:16 307:8,10
307:22 308:1
313:3,7 317:10
318:19,21 320:16
320:19,20 321:14
323:10 326:16,18



331:6 334:1
336:16 337:6
338:9 341:13
342:11 343:10,13
346:10 348:16,20
350:4 353:4 360:3
364:17 369:11
371:10,13 372:15
372:20 374:15,17
377:5 379:12
381:3 382:20
383:6,8,12 384:7
388:16 390:22
392:15 396:10,15
398:2 399:2,12,20
399:22 402:9
**extraordinary** 30:3
61:10 356:20
362:12,15,20
**extreme** 269:17,20
**eye** 43:17
**eyes** 118:22
**E-C-H-E-V-A-R-...**
233:10
**e-mail** 4:13 5:6,8
5:10,11,15,17,19
5:21 6:2,4,6,8,12
6:14,16,18 7:6,8
7:10,12,14,16,18
7:20 55:8,10
56:15,18 57:7,16
58:3,9,20 59:3
64:18,19,21 65:15
65:21 66:21 67:7
67:17 111:12,14
111:20 112:9,17
112:19 114:14
117:13 119:4
120:5 133:5 138:7
143:10,21 145:5
148:20 150:1,4
151:22 152:7
154:2 156:21
165:19 181:20
183:9,14 184:9
185:9 186:1,2,17

187:11,16 188:13
189:13 190:7
192:10 194:3
201:9 205:11
209:10 211:17
213:5,7,12,13
214:18 215:6,12
217:11,13 218:2,4
219:4 220:12,16
221:22 222:2
223:17,18 225:4
226:14 228:4,18
228:21 230:14
231:3 232:1
234:12 236:21
237:4,19 241:6
245:7 252:6,16
291:22 292:5
329:6,8,11,21
331:21 332:5,9
333:14,15 334:19
335:20 338:14
340:3 342:14
343:19 344:10,12
345:4,17 346:12
346:14 349:5,9
350:15 351:15
354:6,9 368:8
370:6 371:2,6,14
371:17 372:1
375:12,14,20
376:20 377:7
380:11 381:13
382:3,5,13 386:15
386:17 387:4,10
387:12 389:5
391:1 392:4,9,16
394:10 398:17
**e-mails** 56:7 57:6
86:20 99:8 100:19
143:9 148:6 258:4
327:22 350:14
**e-mail's** 116:8

———— **F** ————

**faced** 157:10

**facilitate** 352:6,14
360:16
**facilitated** 353:16
**facilities** 80:1
**facing** 65:18
**fact** 27:2 32:13 36:6
41:5,5 53:6 81:17
91:13 93:6 95:17
117:2 129:1,8
151:10 163:10
179:21 197:5,6
213:16 265:11
287:4 310:15,16
323:10 358:3,19
361:2 372:20
379:4 380:8,9
**factor** 303:16,16
304:16,17,17
355:16 359:8
360:5 361:15
**factors** 81:12 82:11
82:16 249:7
301:11 307:20
311:21 354:15
355:4 358:18
373:9
**facts** 145:20 147:2
179:18 180:22
255:5 276:16
282:8 304:21
356:2 376:13
**factual** 33:16 42:1
87:6 179:11
215:19
**fail** 137:14
**fair** 164:2 194:1
210:5 240:6
259:16,17 261:7,9
306:7 318:22
319:4 335:11
338:1 339:5
340:13,14 353:22
354:9 390:1
**fairly** 119:19
135:14 185:22
351:2

**fairness** 165:14
212:13
**faith** 165:7 258:8
263:19 339:11
370:4
**fall** 19:9 20:20
21:16,18 45:22
138:14
**false** 255:9 279:14
**familiar** 25:20
29:21 30:4,22
31:8 50:14 53:15
55:10 69:19 70:2
70:5 94:10 114:22
120:14 162:8
202:19 357:3,5
382:3
**familiarize** 111:6
**familiarized** 93:13
**far** 90:3 95:14
111:22 125:2
227:18 272:4,20
352:19 361:8
384:11
**far-right** 132:22
**fashion** 21:1 225:14
240:8 243:15
245:17 260:18
264:13 274:20
283:3
**fast** 262:13
**faster** 107:2 315:2
**fear** 18:1,4,11,14
**February** 96:10,21
98:2 111:15
114:15 120:2,3,3
122:17 125:1
127:18 129:2
130:8 131:1,16
**federal** 28:7 49:21
51:13,14,19 60:17
91:18 92:5 104:14
157:5 247:21,21
248:2 331:11,15
360:4
**fee** 324:16,22

**feed** 220:18
**feel** 13:3 79:8
181:14 268:19
336:9 370:3
**feelings** 122:10
131:4
**fees** 326:7
**felt** 20:8 257:11
300:8
**fifth** 293:21
**fight** 388:21
**figure** 189:2,21
266:6 294:10
319:21
**file** 165:8,18 167:4
**filed** 404:7
**fill** 380:18,22
381:14
**filled** 380:17
**filling** 122:18
377:16
**final** 37:2,12 89:5
94:14 123:15
183:3 203:18,18
208:12,14 209:19
215:8 217:14
221:4 245:7 272:7
272:12,13,16
273:2,3,4,10,18
311:15 345:17
355:5 360:5,7,21
370:6
**finalized** 88:14,22
179:2 203:21
**finally** 107:3
115:13 250:11
356:20
**financially** 408:16
**find** 58:3 82:1,9
126:14 127:1
162:16 165:3
190:5 260:16
261:6 268:2,21
282:21 304:9
**fine** 28:10 48:20
108:7,7,10 138:8



176:11 198:21
199:5 200:20
219:6 255:12
271:1 293:2,20
297:14 376:22
**finish** 21:14
**finished** 226:5
**finishes** 312:7
**firm** 10:1,4,7 14:1
15:4
**firmament** 134:14
**first** 11:5 26:11
32:9 34:21 47:6
48:3 52:20,21
58:8 60:12,13
63:18,20 65:8
69:12 71:10 74:5
88:3 91:8 95:3,7
98:11 100:22
102:9 103:7
104:22 105:21
111:14 128:8
141:17 143:8
147:15,20 148:11
148:14 149:11,15
150:5,9,19 151:22
154:9 155:20
165:18 171:16
172:18 176:15
180:7 181:12
182:14 195:19
197:3 209:9 212:2
215:9,11 219:3
236:20 252:10
255:20 257:19
259:14 272:12,13
275:22 284:18
296:11 297:8
299:8 300:14
302:14 303:20
304:20 307:22
310:4,6,22 311:15
329:3 334:19
336:4,7 338:9
347:20 349:7
354:22 355:21

356:10 365:17
366:14 370:22
375:19 380:21
383:15
**fits** 165:15
**five** 21:9 253:16
254:16 281:7
291:13 301:9
**fix** 314:20
**flip** 335:12
**flood** 30:1 356:18
**flooding** 71:1 245:9
249:22
**floor** 23:20
**flow** 36:1 267:15
275:11
**flows** 397:18
**Flynn** 204:17
**FNR** 82:5 84:2
**FO** 134:1 154:3
195:8,9
**focus** 16:2,4 115:4
287:15 385:18
**focused** 112:17
172:7 382:1
**focusing** 42:10
232:4,15
**fold** 104:19 110:3
**folks** 166:13 241:20
**follow** 28:14 61:12
63:2 103:18 118:5
128:20 130:4,18
130:19 206:2
274:9,17 275:10
355:9
**followed** 253:1
331:14 348:9
**following** 45:3
103:13 192:9
213:19 243:8
252:18 291:3
309:21 319:2
377:12
**follows** 11:7 271:4
370:11
**Food** 311:14

**forego** 322:21
**foregoing** 408:3,5
**foreign** 221:10
282:13 283:15
287:16 304:19
360:16 362:6,16
363:1
**foreigners** 354:17
**Forget** 48:1
**forgotten** 142:6
248:4
**form** 160:8 245:11
289:1,5 290:7
291:9,10,14,17
**formally** 115:20
**format** 70:12 346:1
**formats** 398:18
**formatted** 84:8
**formed** 295:11
**former** 118:9 318:8
**formerly** 258:1
266:18
**formulate** 339:1
349:16
**formulating** 339:9
**forth** 183:2 229:6
376:17 399:18
**Fortner** 3:19 9:16
**Fortney** 3:3 10:3,3
**forward** 122:9
123:7,11,16
125:16 127:2,9,14
127:19,20 128:3,5
128:6 129:4,5
130:9,10 156:10
276:2 310:1 346:6
350:12
**forwarded** 125:4
**found** 225:7 248:7
349:19 350:17
**four** 21:9 70:20
113:11 138:5
155:15 189:13
191:18 216:2
254:20 258:5
261:20 264:4

267:5 280:20
299:14 301:9
309:2 310:4
342:12 343:14
350:5 353:8 388:2
390:13
**fourth** 73:19 89:9
**fraction** 397:13
**frame** 34:11 37:17
45:7 106:6 107:15
108:2,16 109:2
147:14 166:8
169:5 170:18
226:20 236:3
251:19 399:7
**framing** 251:11
**Francis** 140:13
**frankly** 27:11
262:6 356:3 358:7
**fraud** 187:18,18
**free** 13:3 79:9
336:9 370:3
**frequently** 95:12
95:13 119:19
**fresh** 152:21
**Friday** 268:8
**FRN** 47:20,21 60:9
60:16 62:14 70:9
71:18 73:11 75:11
92:13,17 155:4
157:11,14 246:9
246:16 247:1,6
251:12 299:22
309:6 329:14
**FRNs** 73:21 156:9
156:12 157:12,20
157:22 158:8,10
158:15
**front** 24:3 25:15
47:17 58:18 65:15
134:3,6 148:7
154:5,6 195:9,10
196:6 219:1
220:14 234:19
296:10 338:3,4
371:15

**frustrated** 243:8,11
243:15,22 244:17
**frustration** 244:4
295:12,17 395:11
**full** 91:9 266:15
365:15,22 373:2,4
**fully** 53:9 118:4
351:7,8 370:3
**fuming** 243:1 292:1
292:9 295:6,18
**function** 133:20
**functions** 54:11,18
**further** 21:15 61:6
62:9 66:11 80:8
97:14 101:11
154:1 156:6,18
191:8 250:14
261:14 263:11
283:11 335:18
337:1 342:19
346:5 348:21
352:17 353:21
354:4 357:8,22
374:9 380:13
381:3,9,16 396:1
399:2 400:18
408:13
**future** 51:14
288:17 300:5,9

---

## G

**G** 9:1 253:17
**game** 261:7,9 319:4
**gaps** 200:19
**gather** 183:7
189:19 190:9
218:2,12 255:3
276:14 289:6,7
290:5 307:4 359:3
**gathered** 76:13
179:12
**gathering** 76:7,21
218:19 219:7
220:3 289:14
305:12
**gems** 372:6



**gender** 312:10
**Gene** 152:16 159:7
  163:9 241:18
  253:20 254:17
  255:5 269:6,15
  270:2,10 275:13
  275:15 276:8,18
  277:1 278:2,3
  279:19 280:11
  288:3,6 291:21
  298:15 299:22
  313:17 316:6
**general** 26:7,12
  27:17 28:4 31:12
  48:4 73:20 77:19
  94:15 103:11
  107:16 120:12,14
  120:20 217:12
  219:13 239:21
  244:20 295:22
  310:1 313:20
  321:9 357:9 361:4
  385:5,7 390:17
  396:14
**generally** 39:6 43:9
  51:12 76:20 77:18
  77:20 95:21 108:5
  133:15 151:15
  174:10 267:5
  270:16 281:21,22
  303:12 322:4
  379:14 396:14
  400:21
**generate** 169:6
  170:3 171:4
  174:20 176:17
  178:10 229:17
  367:10 391:14
**generated** 56:15
  57:8 101:15
  102:13 103:6,9,19
  104:9 151:6
  158:16 165:9,10
  175:8 177:5
  223:14 224:3
  235:18 377:20,21

  390:19
**generates** 84:2
**generating** 94:19
  178:12 227:17
  248:17 307:17
  364:8
**genuinely** 225:12
**geographic** 16:17
**getting** 20:7 156:8
  244:3,22 257:13
  294:3 295:1
**girl** 224:17
**gist** 111:20
**give** 13:7 49:2
  54:22 55:18 67:20
  78:15 101:22,22
  102:21 118:16
  185:21 187:17
  244:19 246:3
  255:9 257:11
  268:13 279:14
  293:17,18 306:2
  327:16 336:9
  347:2,12 365:7,8
  381:19 403:21
**given** 50:1 67:14
  84:13 123:20
  175:22 232:19
  234:11 239:3
  244:14,15 264:9
  265:11 266:22
  285:17 340:12
  354:6 359:13
  360:19 368:4
  369:16 404:12
  408:10
**gives** 187:17 332:5
**giving** 84:9 99:10
  102:7 119:2,3
  165:13 240:9
  278:11 299:6
  375:2 377:2
**glanced** 356:16
**glean** 268:18
**Glen** 3:19 9:16
**go** 13:8,9 25:1 26:2

31:17 40:10 46:9
  50:7 51:5,15
  63:12 70:11,20
  73:18 78:7 79:18
  87:11 89:5,9 90:6
  90:7 93:9 99:8
  106:14 110:7
  114:3,3 117:13
  124:18 128:5
  132:20 137:7
  143:1 155:4
  166:18 170:10
  174:3,13 181:7
  187:9 193:4 195:5
  206:10 207:4
  209:9 210:1,12
  212:18 215:1
  216:11 220:21
  225:20 226:16
  229:5 233:18,22
  236:12,19 238:12
  240:17 243:12
  247:3,6 248:4
  249:5 251:19
  254:19,19 255:9
  270:3 271:4 274:6
  275:13 277:22
  279:14 282:6
  283:19 285:7
  288:12 289:22
  290:18 292:12
  293:3,6,14 294:7
  294:10,22 296:5
  297:6 299:11
  301:8 308:12
  309:1 310:3,12
  311:7 314:2,16,22
  315:1,7 323:1
  324:20 328:20
  329:17 334:11,15
  342:12 346:16
  348:2 349:7
  350:12 351:10
  356:10 363:7
  365:7,13,16 368:5
  373:6,12,20 378:7

378:8 385:11
  387:2 388:7 390:4
  392:7 404:2
**goes** 39:20 144:4
  175:11 191:18
  197:3 209:5 217:5
  219:13 227:3
  230:9 245:2,14
  258:5 264:3
  280:19,20,21
  283:7,11 287:5
  289:17 313:5
  333:7 338:9 355:3
  367:19 371:22
  384:5,6
**going** 16:17 17:15
  22:17 23:21 24:19
  24:19 25:8 28:11
  28:21 35:12 43:11
  43:18 46:22 49:1
  49:2 54:21 55:1
  57:12 61:22 66:7
  66:14,15 69:19
  73:3,7 83:17,18
  87:16 93:4 98:10
  100:8,11,15,19,22
  101:10 110:7
  117:21 118:17
  120:4 125:18
  127:11 128:20
  129:11 130:4
  132:4 139:11,11
  140:22 145:9,10
  147:21 152:14
  154:8 155:1
  156:10 165:3,6
  170:10 174:8,13
  185:20 188:21
  191:14 194:22
  198:3,4 200:8,12
  200:15,18 205:16
  205:20,21 206:2,9
  207:11,14 211:13
  215:7 218:18
  219:10 223:8
  226:22 227:8,18

228:12 229:2
  230:4,8,10 233:18
  234:3,7 236:4,5
  244:12 246:3
  248:3 256:16,22
  262:6 264:12
  268:12,13,16
  276:2,18 277:17
  279:8 286:10
  292:11 293:6,7,14
  293:16 294:14
  296:2 300:5,6
  308:15,19 310:1,2
  314:2 315:11
  332:2 337:11
  339:2 344:7 346:7
  347:12,22 349:3
  352:1 353:13
  355:9 358:13,16
  363:12,20 364:4
  365:7,8,13,16,20
  369:20 379:4
  380:18,18 381:11
  382:1 387:2 388:6
  388:7,21 390:4,10
  390:11 392:2,10
  392:11 404:17
**good** 11:11,12 58:6
  165:6 208:9 258:8
  263:19 274:12
  312:1 317:3
  334:16 339:10
  370:4 372:11
  394:13 397:20
**gotten** 266:1
  358:11
**government** 10:13
  10:16,19,22 14:13
  31:14,22 56:19,20
  57:6 58:14 64:14
  65:11 66:8 76:11
  77:16 82:14 83:10
  85:10 86:19 112:7
  124:2 125:9,19
  126:11 127:13
  128:10 129:21



136:16 148:5
149:18 155:13
156:14 158:4,18
159:13 167:8
168:12 169:8
175:14 183:11
184:7,19 189:8
190:17 191:16
194:9 196:2 197:8
202:22 204:1
205:9 209:4 213:9
214:14 215:21
218:15 220:9
222:13 224:7
228:1 237:14
239:14 240:13
242:12 254:7
259:1 272:10
273:8 278:15
280:19 281:13
283:7 284:20
286:22 289:19
296:17 297:15
298:15,22 301:20
302:22 304:2
305:17 307:8
308:2 312:3 313:3
317:10 318:20
320:17 324:3
325:5 326:17,20
328:13 334:2
336:16 337:7
338:11 339:15
340:11 343:11
345:2 348:16
350:2 352:6,9,19
353:4,16 354:12
356:1 359:11
369:12 371:11
372:16 374:15
375:5 377:6
378:10 381:4
383:7 386:20,21
387:15,18 388:9
396:13
**governmental**

67:11 378:5
**government's** 235:9
**graduate** 13:12
**graduated** 13:19
**granted** 45:11
84:10 330:19
354:20
**great** 72:20 99:15
269:14
**greater** 28:12
327:12
**greatest** 238:5
**ground** 108:14
128:8 131:9
260:14,16 284:18
311:19 354:4
371:16
**grounds** 83:11
124:5 125:22
129:16 149:3
171:22 195:22
210:19,22 225:1
235:2 239:17
243:4 305:21
340:11 355:1
356:6 360:19
361:18 362:21
380:13 398:21
**group** 120:22 161:2
161:8,16 178:18
221:8 291:5
**grouping** 390:6
**groups** 271:8
288:14
**guarantee** 321:11
**guess** 43:20 80:6
97:16 104:1 133:9
149:13 150:3
154:4 169:18
218:9 226:13
242:19 280:2
296:6,21 299:1
301:3 306:8 328:1
340:17 347:9
364:17 366:7

368:19 384:17
386:1 389:13
**guessing** 283:2
**guidance** 310:11
**Guinea** 69:8 232:22
**guy** 293:17
**guys** 99:21 100:6
200:5 217:17

### H

**Haiti** 4:9,11,16,18
4:21 5:4 6:10 7:3
7:5 42:10,12,12
42:17 43:7,15,18
43:21 44:6 45:1
46:15,17,21 48:8
50:10,22 51:21
59:6 62:16 70:15
73:12 74:1 75:12
76:19 78:10 80:14
81:4 83:6 85:6
87:18 89:17 91:6
92:19 93:4 95:1
95:10,14 96:15
97:10,17 98:7
102:16 103:13
107:16 108:3,12
108:18,21 109:4
109:22 111:22
112:2,11 114:18
114:19 115:3,5,10
135:11 138:20
145:3 151:4
165:19 166:5
170:11 171:1
172:14 173:15,15
174:5,11 175:6
179:15 180:4,13
181:5 185:7 194:5
201:10 212:15
215:15 220:18
222:4 223:4,10
226:12 229:10
236:22 242:6
246:10 247:11
249:12 254:1

274:8,11 276:2
280:16 282:1
297:1 298:10
299:21 301:17
302:18 308:6
309:13,20,22
321:22 322:20
323:5 329:14
330:1,10 332:2
335:15 347:7
351:7 352:7,14
353:15,17 360:15
362:19 363:22
374:4 380:12
382:9 385:20
387:7 389:3,17
393:8,10 394:12
395:17 396:16
397:2,7,16,21
398:14,19 400:10
400:20 402:14
**Haitian** 53:19 74:9
166:13 172:12
173:8,21 221:10
297:15 319:15,20
322:14 324:14
352:6,9,18 354:11
**Haitians** 53:20,22
171:14,15,20
172:8,22 173:14
185:6 280:15
314:21 320:14
321:21,21 322:4
**Haiti's** 49:21 90:4
159:9 226:18,21
227:19 229:20
230:21 231:11
232:3 250:13
350:22 352:16
353:20 395:12,22
396:5 401:12
**half** 17:4,7,12,13
45:15 322:7
394:16
**Hamilton** 152:16
159:8,19 160:18

161:1 163:10
164:7 241:18
276:9 279:19
280:11,22 281:11
291:21 298:16
313:17
**hand** 48:22 90:15
110:5 147:22
**handed** 257:15
**handle** 236:9 267:2
361:5 362:7
**handled** 131:3
184:16
**handout** 237:5
238:18
**handwritten** 8:2,4
8:5,7 100:20
101:8 102:5 109:3
109:6,19 110:14
111:1 234:17,19
246:15 247:5
267:6 290:14
309:2
**handwrote** 287:4
**hang** 34:19 144:16
**happen** 14:16
59:17 83:18 316:9
326:4 346:20
**happened** 46:1
96:4 292:22
**happening** 276:4
**happens** 294:19
**happy** 206:10
230:12 260:17
293:3 294:4,7
339:10,21
**harassment** 358:8
**hard** 180:18 299:1
300:5,7 366:6,11
372:11 397:17
**hate** 205:17
**hates** 274:10
**Hawkins** 402:12
**head** 27:18 32:4
41:19 123:8
142:16 192:9



201:18 221:9
238:9 239:10
284:4 313:19
341:8
**heading** 185:18
**headquarters** 17:9
116:20 141:15
161:18 187:19,20
193:20 220:17
298:14 351:22
**health** 64:10,22
66:3 250:13
**hear** 126:18 198:10
230:2
**heard** 114:17 150:5
150:9
**heart** 245:2
**heavy** 249:21 250:6
**Hefright** 56:20
57:1 58:10 66:20
**held** 2:1 103:13
106:8 190:13
268:6 291:19
307:14
**help** 47:18 59:2
95:11,11 100:21
101:13 105:18
107:4 113:10
114:5 115:21
123:4 133:6 135:8
150:22 153:12
181:8 183:5
218:22 247:14
251:17 257:6
276:19 297:16
299:4 352:11
371:2
**helped** 143:7 385:1
**helpful** 51:7 306:22
311:21
**helping** 229:17
237:5,12 238:18
327:17 359:3
**helps** 53:13 97:1
**hemispheres**
115:10

**hereof** 405:13
**hereto** 408:16
**Hernandez** 332:21
**hesitant** 288:6
**hey** 253:21 254:3,3
275:20
**Hi** 143:22
**high** 80:1
**higher** 140:16
**higher-level** 20:7
**highlight** 330:17
**highlighted** 213:16
**highlighting** 213:15
**highly** 297:18
**historically** 35:15
127:2
**hit** 43:21 249:12
**hitting** 284:4,6
**Hogan** 334:8
346:17
**hold** 173:10
**holder** 185:22
**holders** 182:15
**holds** 270:15
**home** 12:2,3 314:7
314:19 316:7
**homeland** 9:8
10:18 11:17 26:21
27:8,19 28:1,3
32:5 33:20 35:1
35:13 37:10 39:19
40:11 54:15 60:1
78:5 115:16 116:5
153:16 163:11,21
166:9 201:20
203:15 221:9
241:20 242:15
273:11 318:5,8
334:22 357:11
**Honduras** 366:10
**honestly** 266:10
**hoot** 245:15
**hope** 155:3 255:9
279:14
**hoping** 157:13
**horrible** 210:2,9

211:20,21 212:11
274:11
**host** 298:17 323:14
**hosted** 325:13
400:8
**hour** 186:14 245:8
293:21 325:4,22
336:6 345:19
358:8,10 363:5
394:16
**hours** 255:4 276:15
349:8 389:10
**House** 232:17
398:19,21 399:1
399:20 400:3,7,22
402:5,7 403:1
**HQ** 115:20 116:4
116:13
**humanitarian** 16:2
19:1,4 34:7
124:14
**hundred** 96:14
253:6
**hurricane** 43:20
61:11,14 74:12
94:16 95:1,4 96:9
96:14 97:7,9,11
97:13,20,21 98:8
99:1 249:6,10,12
**hyperbolic** 245:22
350:9
**hyperlinked** 226:14

**I**

**idea** 58:6 92:3
261:4 343:4,7
**ideal** 300:2
**ideas** 105:9 356:17
**identification** 25:7
47:8 49:5 55:5
69:14 72:16 75:9
87:14 93:11 101:3
102:3 103:1
105:14 111:4
118:20 132:7
143:4 164:21

181:10 186:6
193:6 201:2 215:4
221:1 226:1
233:21 246:7
328:22 334:13
347:15 351:12
364:2 365:10
370:1 373:15
381:21 385:13
390:8 391:22
394:6
**identify** 254:10
402:10
**identity** 254:11,12
**idiosyncratic** 380:1
**IHAD** 34:6,8,14,17
**II** 362:6
**illegal** 166:13
171:13
**Illinois** 3:4
**illustrate** 33:17
**image** 92:10
**immediate** 30:12
**immediately** 291:3
**immigration** 10:21
11:18 14:10 19:4
269:9
**impact** 44:1 53:18
53:22 97:9,10,13
344:4
**impacted** 199:22
**implicate** 66:9
342:11 399:21
**implicates** 383:8
398:2
**import** 105:5 342:7
**important** 36:16
44:20 85:17 309:8
**impressions** 393:4
**improved** 297:11
**inappropriate** 82:9
**inception** 250:15
**inclined** 274:17
**include** 147:22
150:7 157:4
311:20 312:9

324:3 330:17
373:10 389:7
396:13 400:13
**included** 8:15
138:2 147:17
163:20 164:12
201:15 223:2
250:18 291:20
349:20 371:2
373:5 380:11
382:9
**including** 127:13
138:19 156:9
167:22 182:18
214:15 254:17
304:13 365:19
**incoming** 334:7
**incorporated** 220:5
**incorrect** 343:4
**increase** 276:3
**independent** 56:8
88:16 168:22
169:2,3 300:10
301:17
**independently**
258:14 263:8
**Indiana** 14:3
**indicate** 29:4 64:8
196:16 197:14
224:13 246:21
310:11
**indicated** 65:5
155:22 264:11
298:5 405:12
**indicates** 56:16
89:15 95:9 96:10
98:6
**indication** 55:19
**individual** 19:21
71:6,12,21 72:3
**individualized**
265:3
**individuals** 19:22
121:6 239:20
298:12,18 307:13
313:19 323:20,21



397:5 401:6
**induced** 98:12
**influencing** 355:14
**info** 255:3 290:9
  301:12
**inform** 28:12
**information** 35:22
  36:10 39:1,2 40:8
  41:1,18 42:1 76:7
  76:13 77:12 78:16
  87:7 90:17 91:4
  91:14 92:12,16
  93:3 95:14,20
  96:3,6 97:19,22
  110:20 132:12
  143:19 149:20
  170:22 171:12
  179:12 183:7,14
  183:16,21 184:2
  184:12,15 185:5
  189:19 190:19
  191:5,17 216:5
  218:3,13,20 219:8
  220:2,16 259:20
  268:19 276:14
  296:2 304:1 305:9
  305:12,17 323:15
  327:16 328:5
  331:7 355:22
  359:3 360:7
  367:10 377:3
  378:18 400:13
**informed** 300:11
  372:13
**initial** 18:19 30:14
  32:20 34:14 36:17
  39:20 40:2,9,14
  40:21 44:6,17
  47:21 54:14 68:7
  76:22 77:9 86:1,7
  96:1 117:13
  124:18 133:12
  178:22 203:16
  223:18 297:12
  310:17 311:13,22
**initially** 329:7

**initials** 24:2 40:17
**initiative** 112:18
**inmate** 36:19
**input** 35:16 36:14
  36:21 89:8 90:21
  113:6 123:18,21
  179:1
**inquiries** 397:6
**insane** 343:5,8
**insecurity** 65:6,17
  66:4 311:14
**Insert** 88:6
**inserted** 89:1 226:6
**inside** 86:19,19
  239:9
**insight** 194:21
**instance** 156:2
  158:13 282:22
  359:19
**instances** 42:17
  43:5
**institutional** 62:14
**instruct** 36:8 58:15
  64:14 65:12 66:12
  67:11 76:11 77:16
  81:20 82:15 83:9
  83:15 85:10 91:8
  112:6 124:3
  125:11 126:2
  128:17 129:14,22
  131:8 136:16
  137:4 139:1,7
  148:3 155:14
  158:5,19 159:1,13
  159:16 167:8
  169:9,11 175:14
  176:2 177:2,18
  184:20 189:8,14
  190:17,21 191:20
  194:13 196:3
  197:10,12 198:16
  204:2 209:6 213:9
  214:16 215:22
  220:10 222:14,17
  224:6 227:4
  228:10 230:15

237:15 239:13
  240:13 242:15
  245:3 254:8 259:2
  263:21 264:6
  272:8,13 273:8
  281:2,17 283:8,12
  285:3 287:1,7
  289:19 305:18
  307:9 308:3 313:4
  318:20 320:17
  323:9 326:17
  327:1 334:2
  336:17 337:7,11
  338:14 339:2
  342:10 343:11
  348:17 349:1
  350:2 353:5,6
  358:2,21 359:14
  369:10 371:11
  372:16,19 375:6
  375:15 378:12
  380:13 381:5
  382:21 383:17
  400:4
**instructed** 261:22
  293:12
**instruction** 128:21
  285:6
**integrity** 255:11
  279:16 301:13
**intended** 245:17
  339:18 342:6
  395:3
**intending** 325:21
**intends** 155:22
**intent** 72:2 340:6
**intention** 197:13
**interact** 119:18
**interaction** 33:19
**interactions** 384:15
**interest** 186:2
  352:5
**interested** 19:20
  20:6 181:12 221:4
  278:19 284:2
  323:22 329:2

379:22 408:16
**internal** 58:14
  64:14 65:11 66:8
  67:10 76:10 77:16
  82:14 83:10 85:9
  112:7 124:2 125:8
  125:19 127:12
  128:10 129:21
  136:15 139:4
  146:20 148:5
  149:18 155:13,15
  156:14 158:4,18
  159:12 167:7
  168:12 169:8
  175:13 183:11
  184:7,18 189:7
  190:16 191:16
  194:9 196:2 197:8
  202:22 204:1
  205:8 209:4 213:9
  214:14 215:21
  220:9 222:13
  224:7 228:1
  237:14 239:14
  240:12 242:12
  254:7 259:1 272:9
  273:4,7,17,18
  280:19 281:13
  283:7 284:20
  286:21 289:18
  296:17 302:22
  304:2 305:17
  307:8 308:2 313:3
  317:10 318:19
  320:16 324:3
  326:16,22 331:21
  334:1 336:16
  337:6 338:11
  340:11 343:10
  345:2 348:16
  350:1 353:4 356:1
  359:11 369:12
  371:10 372:15
  374:15 375:4
  377:5 378:5,10
  381:4 383:7

**386:20** 396:13
**internally** 106:20
**international** 15:9
  19:1 22:14 34:7
  93:18 94:5 124:13
**interpret** 296:13
  319:16
**interpretation**
  189:16 196:6
  214:15 338:12
**interpreted** 167:13
  222:19,19 225:3
  238:1 262:3,5
**interpreting** 194:16
**interrupt** 269:19
  400:12,14
**interviewed** 17:20
  18:1
**interviewing** 20:3
**intimately** 70:5
**invite** 323:14
**involved** 37:19 38:5
  67:22 68:20,21
  74:22 82:3 85:4
  94:20 126:11
  136:4,8 146:9,13
  150:17 188:10
  206:18 336:4
  364:11 365:3
  366:19 367:3
  371:4,20 397:7
  403:1
**involvement** 73:14
  304:12
**involving** 386:21
  397:16
**ironic** 394:19
**ironically** 225:14
**irony** 224:17
**irrelevant** 358:19
**Isaac** 74:11
**island** 174:7 183:2
**issue** 71:15 83:20
  160:18 300:21
  301:1 353:2
  356:13 358:12



378:7 400:15
**issued** 246:11 309:6
**issues** 19:3 206:8
264:16 266:14
293:12 304:13
312:2 396:4,7,20
397:15 398:9
399:1
**italicized** 376:6
**item** 167:20
**itemizes** 218:3
**items** 167:22 258:4
262:5 310:5 311:1
348:20 350:5,8
373:4
**it'll** 24:4
**IV** 89:10
**I-H-A-D** 34:21,21
**I-821** 289:1,5

**J**

**J** 3:2
**James** 3:9 10:14
139:22 141:1,3
201:18 241:17
255:22 256:4
272:17 273:18
282:12,13 283:2
283:16 288:10,11
288:20 290:21
291:3,8,18 313:16
320:2,5
**James's** 315:16
**james.cho@usdo...**
3:13
**January** 21:20 48:9
74:1,5 85:7 98:20
99:3 117:22
247:11 249:14
250:7 251:2
265:13 288:13
398:15 399:10,15
**Jeff** 264:15 266:11
**jfortney@mayer...**
3:6
**Jill** 3:3 10:3 402:17

**job** 1:18 37:19 87:6
131:3 137:11
243:13,18,22
307:1
**jobs** 237:9 239:11
**Joe** 137:8 256:15
284:3 286:11
338:17 388:6
**John** 402:17
**joined** 16:13 93:22
142:21
**joining** 13:22
**joint** 404:7
**Joseph** 3:8 10:11
334:8 346:17
**joseph.marutollo...**
3:13
**judge** 205:21 206:8
292:19 383:20
388:22 403:18,20
404:8
**July** 70:15 78:10
290:7 296:13
351:15 353:2
365:2
**jump** 55:15
**June** 334:20 336:5
344:12 348:6
408:22
**June/early** 290:7
**June/July** 290:5
**JUSTICE** 3:9

**K**

**K** 2:7 47:18 55:1
344:15,17
**KA** 234:20
**Katherine** 143:22
**Kathryn** 1:11 2:1
4:2 9:6 11:4,14,15
373:22 387:6
405:20 406:22
407:22
**Kathy** 132:1
141:19 142:1,2
181:17 182:2

183:13,21 188:14
189:17 218:22
219:4,5 290:9,10
290:11,12 324:17
326:8,10 327:14
327:15 328:2,9
365:18 369:5
373:19 375:20,21
375:22 376:5,11
377:10 382:13
385:19 387:6
**Kathy's** 191:8
386:1
**KA-1** 24:22 25:6,13
47:18 48:5 356:12
**KA-10** 110:7 111:3
**KA-10A** 118:17,19
**KA-11** 132:5,6
138:8
**KA-12** 143:2,3
**KA-13** 164:19,20
168:15 169:3
170:5 172:7
175:21 183:16
**KA-14** 181:7,9
184:2,5
**KA-15** 185:21
186:5
**KA-16** 193:4,5
**KA-18** 200:16
201:1
**KA-2** 47:6,7,15
48:7 51:17
**KA-2A** 49:4,19
**KA-21** 215:2,3
**KA-22** 220:21,22
**KA-23** 225:21,22
228:4 230:14
231:3
**KA-25** 233:19,20
234:11 236:13
**KA-27** 246:3,6
**KA-28** 328:21
335:21 346:14
**KA-29** 334:11,12
346:18

**KA-30** 347:13,14
**KA-31** 351:10,11
353:9
**KA-34** 363:21
364:1
**KA-36** 365:8,9
**KA-37** 369:20,22
**KA-38** 373:12,14
**KA-39** 381:19,20
**KA-4** 55:1,4
**KA-40** 385:11,12
**KA-41** 391:19,21
**KA-42** 394:3,5
**KA-5** 69:12,13
**KA-50** 101:1,2,15
102:9 234:20
235:2 246:20
323:2
**KA-51** 102:1,2,10
102:14 252:12
296:5
**KA-52** 102:21,22
104:8 253:1 309:1
**KA-53** 105:12,13
252:1 253:10
268:4
**KA-6** 72:14,15
73:11
**KA-7** 75:7,8 82:6
**KA-8** 87:12,13
**KA-9** 93:9,10
**keep** 34:20 43:17
178:8 231:14
235:22 279:8
284:4,9
**keeping** 256:8
259:11 260:12
261:2 282:14
283:21 284:15
286:15 287:13
**keeps** 325:6
**Kelly** 103:12
104:10 112:13
153:19,21 166:10
167:2 168:6,10
170:11,17 188:19

201:20 202:20
204:20 206:20
207:20 208:7
209:21 255:13,15
297:21 309:19
313:15 314:15
315:3,14,18,22
316:2,8 317:5,16
317:22 318:3,7,13
320:10 321:2
322:13 330:3,5,6
330:10 333:21
344:18 348:8,12
349:13,20 353:15
355:13
**Kelly's** 195:12
315:12 345:10
**kept** 285:2 302:5
**Kerry** 117:19
**Kerry's** 117:15
**Keyack** 113:19
**kick** 34:9 39:7
76:21 314:20
**kicking** 34:16
**kicks** 34:14
**kids** 182:19
**kind** 16:1,11,16
27:3 34:4,9 39:12
40:22,22 42:21
87:6 105:8,9
162:9 182:21
184:15 217:18
235:17 243:12
255:7 257:7
259:14 264:21
270:19 276:6
279:12 293:18
306:17 316:14
345:21 349:5
372:8 383:3 397:8
403:12
**kinds** 29:4 175:8
244:5
**King** 185:10,15
**know** 12:11,16,22
14:11 16:18,20



26:18 27:1,10,12
27:15 28:8,12
29:6 33:10 36:8
41:10 42:11,22
43:5,6 46:5,18
50:17 53:1 56:12
57:8 58:2,4,13
59:9,9,12,12,13
59:14,19,21 61:3
62:5 63:13 67:5
69:2 71:21 73:19
78:15 80:22 83:2
84:8 86:12,18,21
87:3,17,19 92:17
93:13 95:9 96:2
97:1,7,10,19 98:1
98:17,18 102:13
105:18,19 107:18
108:15 109:2
111:9,21 112:1,19
113:3,3,17 116:11
117:2 120:13
121:5 122:16
124:19,22 125:5
126:6,8,20 127:21
128:3 129:7,10
130:12 137:11,15
137:16 138:5,9,9
147:19,20 148:18
149:1,10,11
152:20 157:21
158:15 159:4
160:7 162:4,12,13
162:22 163:7
165:3,13 166:3
169:4 170:2 172:6
173:18 174:14,16
175:6,19 177:10
177:17 179:9
183:15 186:14,21
188:22 190:13
194:3,4 196:10
198:6 204:14
205:11,18 206:2
208:13,16,17
212:8,20 213:11

213:17 214:4,4
216:13 219:12,22
224:16,17,18
228:5,21 229:6
235:14,19 236:4
238:4,20 252:9
253:21 256:19,19
256:20 257:1,11
258:18 259:2,8,9
259:12 260:8,10
260:13,15 261:17
261:18 262:4,11
262:12,15 263:2
264:1,2,8,13,14
264:21 265:8,14
265:15,16,20,21
266:11,14 268:22
275:16,20 277:10
279:9 280:5 281:5
281:6 282:22
285:17 286:22
288:8 294:4 299:2
299:6 301:19
302:3,4,15 304:11
306:6 310:6
311:21 313:9
315:19 316:3,18
323:10 325:4,5,14
325:16,20 330:9
332:6,8 334:16
337:10 338:16,21
339:15,16 340:4
346:11,21 347:8,9
347:11 349:16
350:11 353:1
354:15 357:3
358:7,14,16,20
364:5,11 367:9,10
367:12 369:6
370:18 377:20
378:20 379:20,21
380:10 381:12
382:20 383:22
384:8,18 387:14
389:14 393:9
396:6,21 397:1

403:14
**knowing** 113:6
301:4 364:20
**knowledge** 32:13
33:17 36:9,19
41:5,9 45:18 46:1
54:9 64:4 66:20
71:14 95:17 197:4
215:18 391:8
**known** 193:19
**Kolner** 165:19
166:2
**Kovarik** 132:1
141:19 142:1,2,3
181:17 182:3
188:15 219:2,5
290:11,12 326:10
365:19 367:19
368:9 369:5 371:5
373:19 375:22
382:13 385:19
386:15 387:6
389:6
**K-A-T-H-Y** 375:21
**K-E-Y-A-C-K**
113:20
**K-o-l-n-e-r** 165:19

───────────
**L**
**L** 1:17 408:2
**label** 55:1
**labeled** 49:19 51:17
**laborious** 268:2
**lacking** 79:22
**ladder** 179:3
**lady** 137:9 141:18
**laid** 335:15 398:21
**landslides** 249:22
**lane** 256:8 259:11
260:12 261:3
282:15 283:22
284:10,16 286:15
287:13
**language** 110:19
297:18 330:20
335:18 343:3,18

343:20 345:10
346:6 362:1
**Lapin** 390:19 391:5
391:7
**large** 30:12 391:13
402:5
**largely** 81:14
132:14 280:16
322:19 390:11
**larger** 195:20,21
291:18 327:16
**Larry** 123:2 131:13
131:20 376:2,2,3
376:5,11
**lasted** 325:2,22
**Lastly** 185:8 193:3
398:13
**late** 43:20 45:21
75:16 104:9
106:15 122:17
235:21 249:21
290:7
**lateral** 23:4
**lather** 51:7
**Latin** 351:21
**laundry** 293:17
**law** 10:1,4,7 13:16
13:17 14:1 29:9
137:18 211:13
274:9 282:9 357:6
385:20,22 386:1
386:16 389:6
**laws** 18:12
**lawsuit** 132:12,16
**lawyer** 12:6 66:16
86:10 110:11
126:20 162:7
238:6 268:19
278:5 377:2
**lawyers** 21:11
262:15
**lawyer's** 71:22
**lead** 71:1 393:22
**leadership** 196:17
197:15 199:12,15
**leading** 76:7 80:1

364:22
**leaked** 327:22
**learn** 149:11,15
**learned** 147:16,20
240:9 360:4,6
**leave** 236:10
389:13,19
**led** 217:21 248:18
249:1 295:17
297:12
**left** 15:3 118:10
291:22 292:9
363:5 374:8 379:7
379:15 380:3,17
381:8,9
**legal** 1:20 9:17,19
15:11 27:3 29:9
29:14 32:11 36:5
45:15 54:4 81:18
83:13 163:2
179:19 180:22
317:8 323:19
358:6 384:12
**legitimate** 269:18
269:21
**lengthy** 186:1
**lens** 62:16
**Leone** 69:7 232:22
**Leroy** 193:9 215:12
216:15
**letter** 110:17,19,21
206:7 235:9
258:12,17 262:22
263:6 264:10,20
281:7 334:7 337:1
340:19 342:19
345:21 346:4,5,7
346:16 349:6
391:14
**letters** 330:1,2,2,10
335:15
**let's** 13:7,8 21:14
25:1 37:16,16
49:1 51:15 53:12
53:19 58:2 59:3
63:12 75:6 79:12



101:1 105:21
109:19 110:2
117:18 143:9
144:16 173:12
179:9,10 193:4
196:13,13 215:1
218:9 220:21
229:5,5 236:12
238:12 240:17
254:19,20 256:13
257:7 268:1,4,10
271:12 273:20,22
276:6,17 277:22
278:5 279:8,21
285:6,13 294:22
296:5 299:11
300:12 301:19
310:9 311:7
313:22 319:13,13
322:18 323:1
328:20 334:11
348:2 351:10
363:4,8,10 365:7
373:12,22 387:2
390:4 391:19
**level** 32:18 33:9,11
33:16,17 56:13
190:5 367:9
**Levine** 123:2
131:13,14 376:3
**Liberia** 69:8
232:22
**lie** 238:6 306:9
**life** 107:1
**light** 333:1
**limit** 149:22 237:20
259:17 261:19
310:19 353:8
**limitation** 148:8
158:7 170:20
198:17 287:10
308:4 317:14
360:10,20 379:17
400:4
**limitations** 167:17
180:1 197:11

222:21 304:3
342:15 354:7
399:4
**limited** 163:9 184:8
189:12 213:13
221:14 230:14
258:1,2 276:4
380:8 388:1
392:16
**limiting** 164:4
376:15,17 377:6
379:14
**line** 79:14 107:4
135:5,6 150:19
197:15 216:13
253:11 268:15
269:12 270:11,17
271:3 275:12
279:10,22 286:11
296:11 317:18,20
333:15 406:2,5,8
406:11,14,17
407:2,5,8,11,14
407:17
**lines** 107:18 179:7
228:6 253:17
254:16,20,22
256:6 282:5
291:13 295:4
297:14 301:9
398:4
**line-by-line** 92:1
**list** 167:21 293:17
**listed** 384:9
**listen** 110:11
**lists** 212:14
**literally** 245:18
331:3
**litigation** 14:8
261:16 263:20
265:1 358:12
387:19,21 388:19
397:20 398:4
**little** 14:8 24:4 30:7
37:17 47:10 51:3
53:14 57:13 59:2

77:11 80:7 90:6
91:2 101:13 107:1
107:2 109:14
117:4 133:6
140:16 141:14
178:7 182:13
194:3 228:15
254:21 256:17
264:19 268:14
306:3 314:17
324:13 325:19
327:12 336:6
352:22 357:8
365:13
**live** 274:12
**lives** 80:14 107:2
**living** 172:8 173:1,6
185:6 321:22
**Liza** 10:20
**LLP** 2:6 3:3,18,18
9:14
**load** 24:4
**localized** 343:4,7
343:20 344:3
**locate** 190:14
**located** 174:5
190:19
**location** 23:10,13
**log** 219:15 244:14
244:19 384:9
**loggerheads** 205:19
**logic** 74:17
**long** 11:20 14:4
15:14 19:6 57:11
140:4 186:17
196:11 215:6,9
293:17 310:12,18
314:19,21 325:2
338:20 346:21
351:2 369:21
388:1
**longer** 69:7 204:17
326:14
**longstanding**
193:13
**look** 25:12 39:2

43:6 46:17,21
51:7 75:14 79:8
90:11 92:8,12
103:10 105:12
115:8 132:10
184:11 186:3
201:14 202:8
229:5 246:20
270:6 287:14
293:10 297:11
300:1,9 311:9,12
319:13 329:17
350:20 363:21
364:7 371:4
372:11 375:19
385:20 389:8
**looked** 42:18 71:17
72:12 75:5 91:22
236:15,16 252:15
335:19 346:14
365:22
**looking** 26:17
36:15 43:12,22
44:5 48:10 62:15
67:7 79:10 162:1
181:20 201:21
220:15 223:17
253:6 282:10
290:17 303:10
305:4 308:7
309:22 310:22
316:16,20 372:6
388:5 389:12
392:10
**looks** 48:11 51:19
56:10 58:21 61:8
61:8 73:13 101:9
101:16 143:18
182:1 204:15
220:16 221:15
237:8 246:12
277:2 316:6
317:19 329:10
332:13 334:7
345:20 346:15
364:21 393:10

**lost** 260:6
**lot** 26:18 90:7 93:2
107:21 132:12,13
205:19,20
**love** 222:5 225:10
259:9
**loved** 20:4,4
**lower** 26:4 154:9
385:17
**lunch** 100:3,7
186:11,14 200:3
200:17 358:10
**L-A-P-I-N** 390:20

**M**
**M** 3:3 148:22
**Magna** 1:20 9:17
9:19
**mailbox** 332:13
333:14
**maintain** 118:18
235:10 260:3
319:9 328:8 397:4
**maintaining** 206:12
206:12
**major** 394:9
**majority** 226:16
230:18 231:10
232:2
**maker** 42:22
353:19 355:3
**makers** 367:12
**making** 20:5 27:19
32:7 34:4 36:1
38:1,6,11 39:12
46:16 83:6 87:8
162:19 195:1
204:12 250:4
257:7 266:9
355:14,17 359:9
372:9 388:11
392:12
**malnutrition** 80:3
**man** 255:3 276:15
401:21
**management** 79:22



**manner** 155:18
**March** 73:12 133:5
  138:18 143:9,10
  145:9,12 147:14
  148:19,21 150:10
  151:22 152:2
  154:1,10
**Marcus** 3:18 10:6
**margin** 248:11
**mark** 143:11,15,16
  146:4 152:1
  259:11 275:18,19
  280:4
**marked** 25:6 47:7
  49:4 55:4 69:13
  72:15 75:8 87:13
  93:10 101:2 102:2
  102:22 105:13
  111:3 118:20
  132:6 143:3
  164:20 181:9
  186:5 193:5 201:1
  215:3 220:22
  225:22 233:20
  246:6 328:21
  334:12 347:14
  351:11 364:1
  365:9 369:22
  373:14 381:20
  385:12 390:7
  391:21 394:5
**marks** 297:7
**Mark's** 150:4,19
**Marutollo** 3:8
  10:11,11 14:18
  20:15 24:7,10,14
  26:22 27:20 29:8
  31:5 32:9 33:22
  36:4 37:6,8 38:9
  39:3 41:3,8 42:3
  42:14 44:10 45:12
  46:8 49:7 50:16
  52:7 53:3 54:3
  55:12 58:12 59:8
  61:1 62:3,18 64:1
  64:12 65:8 66:6

67:1,9 68:2 69:21
71:10 72:17,21
75:2 76:9 77:14
78:22 79:3 80:21
81:16 82:12 83:8
84:16,19 85:8
86:3 90:18 91:7
92:21 94:11 95:15
99:4,12,16,19
100:1,3 106:16
109:8 110:12,16
112:3 114:20
116:6,22 118:11
121:3 124:1 125:6
125:17 127:10
128:7 129:13
130:11,15 131:6
136:6,14 137:2,18
138:22 141:4
145:19 146:11
147:1 148:2
149:17 150:11
151:8 152:12
155:11 156:13
158:2,17 159:11
160:5,14 161:3,12
162:21 164:9
167:6 168:11
169:7,14,17 170:4
170:7,14 171:5,21
172:9 173:4,16
175:10,18 176:9
176:18 177:12
178:3,13 179:4,17
180:14,20 183:8
183:22 184:4,6,17
186:12 187:4,6
188:7 189:6
190:15 191:14
192:6,19 193:16
194:8 195:18
197:2 198:13
199:8,18 200:4,7
200:20 201:3
202:21 203:10,22
205:5 206:4 207:1

207:4,7,21 209:1
210:18 212:1,7
213:6 214:12
215:20 217:8
218:7,14 219:9
220:7 221:12
222:12 224:5,22
225:16 227:1,10
227:21 228:16
229:11 230:5,22
231:13 232:8
233:22 234:22
237:13 238:13
239:1,13 240:11
242:11 243:3,16
244:6,18 245:19
248:20 249:16
251:4 254:6 257:4
257:9,18 259:13
261:8 262:21
264:14 266:10
267:11 271:19
272:6,22 274:22
277:12 278:14
279:4 280:18
281:12 283:5
284:17 285:16
286:12,20 289:16
292:2,10 293:2,9
293:20 294:3,11
294:20 295:8,19
296:16 302:1,20
303:19 304:20
305:15 306:12
307:7,21 313:2
316:11 317:9
318:10,18 319:6
320:15 321:7
322:1,9 323:8
325:8 326:15
331:5 333:22
336:15 337:5,17
338:2,8 339:4
340:10 341:11
342:9 343:9
344:22 346:9

348:15 349:22
353:3 354:1,21
355:20 358:1
359:10 360:2,18
361:17 363:11
364:16 366:4,21
367:14 368:13
369:9 371:9
372:14 374:14
375:3,10 376:12
377:4 378:3 379:2
380:5,20 382:19
383:5 384:4
386:13 387:16
388:10,15 389:21
390:21 392:14
393:17 394:22
395:8,19 396:9
398:1,20 399:11
399:16 400:11
401:16 402:8
403:8 404:1
**match** 313:12
**matching** 236:8
**materials** 209:5
  221:9,16,20,22
  222:1,10 223:19
  223:22 233:3
  248:18 257:20,22
  266:13 355:4
**math** 96:18,19
**matter** 9:6 74:16
  77:19 96:8 167:16
  219:14 244:20
  257:21 404:12
  405:9
**matters** 184:15
  397:16
**Matthew** 43:21
  61:11,15 94:16
  95:2,4 97:9 98:8
  99:2 249:6,10,12
**Mayer** 2:6 3:3,18
  3:18 9:14,14 10:1
  10:4,7,9
**ma'am** 255:5 278:3

278:11
**Mc** 153:10,11
**McCament** 139:22
  141:3 153:13
  201:18 202:19
  204:17,18,19
  206:19 207:20
  208:7 209:20,20
  241:17 256:1,5
  272:17 273:18
  313:16 352:4
**McCament's**
  202:13 212:13
  213:16
**McCarrot** 153:11
**mean** 14:11 23:12
  23:14 25:19 27:11
  43:9,16 55:15
  60:2 75:19 100:6
  104:6 108:7 109:5
  112:4 116:1
  121:10,19 128:16
  131:2 134:7 156:1
  161:22 169:15,18
  172:22 174:12
  179:10 180:16,21
  182:10 184:10
  185:4 186:19
  188:3 189:11
  190:2 191:9
  194:21 195:15
  198:11,14 206:6
  208:3 216:4 222:9
  223:20 224:18
  227:10 228:16,17
  228:19 229:5
  237:1 239:4
  248:15 257:4
  258:19 259:8,13
  260:20 261:1,5,18
  261:21 262:7,22
  263:21 266:11
  272:11 278:7,14
  281:14 284:11,17
  286:18 287:1
  289:12 293:3,4,5



293:9,11,13,16,22
306:7,7,13,20
315:6 317:7 318:8
318:18 319:9
320:11 322:4,7
339:4,5,9,19
340:9 341:21
343:6 344:20
358:14 364:13
365:14 368:8
375:11 376:6,19
379:16 384:7
389:14 391:5
393:15 397:18
400:12,14
meaning 134:4
282:1 387:6 395:6
means 71:11 115:3
115:6 139:19
156:3 168:14,17
183:15 316:3
343:14
meant 59:15
196:15 225:6,12
238:1 239:16
259:12 261:5,6
271:21 286:16
287:14 315:21
316:10 320:21
322:15 340:14,18
340:20 341:10
345:6 388:16,18
measure 269:17,20
measured 288:17
media 102:16
252:13 298:9,12
299:16 300:15,22
301:22 303:2,2,3
303:5,9 326:19
meeting 20:4
103:12 106:5,7
164:12 221:10,17
223:20 239:22
240:3,8,10,18
241:9,13,15 242:2
242:3,13 243:9

244:3,20 245:2,3
252:5 261:11,12
264:3,4 267:15,20
268:6 275:7,11
281:21 291:4,6,8
291:18,19,19,21
292:4,8,13 295:7
295:12,22 298:7
309:4,17,18 311:3
311:4,6 312:18,20
313:6,10,15 319:7
400:6,7,13,20
401:1
meetings 108:4
160:9,22 161:1,2
161:7,8,11 162:14
163:18 164:7
246:15 251:18
257:17 261:15
267:10 278:18
Melissa 401:21
members 323:21
memo 40:10 62:7
77:1,2,10 78:4
115:14,15 135:10
135:21 136:2,4,9
136:12 139:12
144:4,20 145:12
146:5,6,10,14,14
146:17,19 147:8,9
147:11,17 148:12
150:6,18 151:5,16
151:22 154:9,10
154:13,21 157:4,7
157:8,16 158:11
165:4 166:5 167:2
167:21 168:5,7,8
168:19 169:6
170:3,5,8,10,17
170:22 171:1,4
174:20 175:8
176:17 177:5,10
177:15 178:1,11
178:12,20 179:2,6
181:13,16 184:4
194:2 201:17

202:11,13,19
203:4,6,13,19,21
204:16,18,19,22
205:3,4 206:18,20
207:19 208:7,12
208:14 209:15,17
209:18,19,22
210:2,9 211:19,21
212:3,10,13,22
213:1,16,22 214:6
214:10,15,19
215:12 216:10,11
216:13 217:5
219:22 220:5,18
220:19 221:5
223:2,7,11,12,14
224:3,14 225:8
226:4 271:22
272:5,12,13,16,20
273:2,4,17,18
312:10 345:21
365:17,18,21
366:2 367:10,20
368:8 370:9 373:5
373:10,19 374:5
374:12,21 375:2
377:10 380:1,12
385:16,19,21
387:8 389:4,18
394:1
memorandum
231:5 272:8
369:16
memory 62:14
258:9 327:18
memos 156:10
215:8 312:12
366:8,16,20 367:2
367:4,8 368:5,18
368:19 369:4
371:5 378:22
379:13,21 382:7
383:4 384:3,6
393:20
memo's 150:20
Mennonite 15:6,8

mention 41:17
mentioned 31:20
33:13 35:6 40:3
40:19 72:11 76:19
78:3 141:19 157:3
233:6 277:18
316:8,15 371:6
mentions 79:14
115:15
mere 219:13
merely 52:17 53:1
merit 289:7,14
Merten 352:5
message 194:20
341:18,21,22
344:14
messaging 274:8
messes 393:11,16
met 155:2 271:9
310:19
metrics 276:3
288:16 370:22
middle 79:20 133:1
135:7 165:17
202:1 226:19
227:17 229:16
230:3 271:2 278:1
311:8 319:14
324:12 329:6,21
348:1,3 385:18
Migration 35:10
59:21 60:3 63:9
million 255:3
276:15
mind 50:6 72:21
148:9 150:14
167:17 180:1
190:22 194:18
197:11 198:17
199:9 207:18,19
208:4,11 298:4
304:3 312:17
342:15 360:10
361:20 381:6
399:4 400:4 402:4
mine 342:18

minister 221:11
minute 44:16 90:12
207:5 247:4
minutes 72:5
141:19 342:22
343:1 345:20
mirror 92:10
mischaracterizes
277:14 304:22
380:21
mischaracterizing
361:18
misdemeanors
324:19 328:7
mispronounced
56:21
missed 18:2,16
103:22
missing 109:16
mistake 164:3
mistaken 104:4
misunderstood
259:6
moment 17:15 24:8
55:7 59:3 79:1
80:19 130:16
199:10 207:2
234:1 236:12
239:2 337:18
momentarily 19:11
Monday 252:17
296:7
money 185:5
Monte 402:12
months 135:13,22
136:13 137:1
138:21 154:15
254:1 276:2
299:22 300:3,8
309:12,13 310:12
315:9,13 324:15
324:15,16 326:7
329:15 332:2
mood 109:11
moral 317:3
morning 11:11,12



246:14 371:7
**motion** 265:4
398:22 399:19
**mouth** 28:22 97:5
228:19 259:17
**move** 17:11 19:16
20:9 23:4 28:21
30:6 75:7 114:10
125:4,4 139:10
143:9 178:7 266:8
319:13 363:10
389:20 391:19
**moved** 15:7 17:8
18:17 41:19
119:22 179:3
**mover** 112:22
**moves** 120:8,18
123:10,12,16,21
376:7
**moving** 60:7 122:6
262:12
**multiple** 158:8,10
158:15 339:7
**multitask** 235:13
**musing** 317:16
**M-c-C-A-M-E-N...**
140:3 201:18

**N**

**N** 4:1,1 9:1
**NAC** 141:10
298:13
**name** 11:13 56:22
107:11 119:10
140:1,14 141:17
187:22 219:1
332:20 401:14,18
402:2
**named** 401:21
**names** 132:15,17
402:10
**narrative** 52:20
**narrow** 87:17
137:14 244:11
**NAT** 315:20
**National** 400:9

401:1,6 402:13,18
403:3
**nationality** 18:12
269:10
**nationals** 33:8
297:16 352:7,12
361:6 362:9,16
363:2
**Nations** 15:10,20
**nature** 240:18
242:3 330:17
398:5
**near** 30:7 140:22
253:15 291:7
314:6 391:12
**nearby** 236:1
**nearly** 271:9 274:7
**Nebraska** 141:12
**necessarily** 85:22
86:6 104:14
173:19 183:15
248:10 340:4
393:22
**necessary** 206:11
**need** 13:4 28:7
55:17 63:13 72:17
99:22 119:7
157:14 182:15
198:9,22 200:6
226:8 235:15
237:5 238:17
255:10 265:2
279:15 283:22
285:9 286:1 288:8
311:9 336:8
377:20
**needed** 96:2 112:13
113:6 133:21
167:22 168:19
237:12
**needing** 157:10
**needs** 301:16
**negative** 212:15
337:22 340:5
**neither** 331:1
408:11

**neutral** 288:8
**never** 12:14 86:16
270:5 331:9
**new** 1:2 3:11,12
9:10 15:7 16:10
17:1,18,18,22
22:10 23:15 34:14
37:18 38:1 43:13
54:14,15 111:21
117:22 118:6,7
121:12 122:2,22
142:21 182:2
201:10,15 202:1
204:15 209:18
210:8,12,14 212:4
212:5,22 213:15
214:5,8,19,22
245:10 248:1
255:2,3 263:18
276:13,14 288:15
290:2,5,7 291:9
291:10,14 324:22
346:4 370:5
396:18 398:15
**Newark** 17:4,19
19:17
**newly** 121:10
**NGOs** 323:19
**Nicaragua** 366:10
**Nicely** 349:15
**night** 110:17,22
234:18 235:9
262:21 264:15
266:13 404:8
**Nino** 98:12
**Nobody's** 388:21
**nodded** 198:4
**nodding** 198:15
**normal** 367:16
**normality** 237:7
**normally** 199:12,14
199:17
**Northern** 263:15
**Notary** 408:1,19
**note** 44:21 65:10
98:4 101:8 102:5

110:17 206:4
234:22 263:6,11
264:19 265:10
283:14 284:14
286:19 287:3
300:20 305:20
318:6,12 320:13
320:21 321:15
324:12 327:17
339:12 380:6
381:7 400:16
**noted** 95:3 209:15
210:8 212:10
213:18 235:8
258:12 265:3
360:20 368:15
**notes** 5:13 8:2,4,5,7
102:15 103:8,10
103:11 104:8,17
105:6,20,22
106:13,19 107:14
108:20 109:1,3,6
109:19 110:14
111:1 188:15
234:17,19 236:9
246:15 252:4,12
254:14 257:2
258:17,20 259:7
259:21 260:11
262:19,20 263:22
267:6,8,8 268:22
274:1 275:5,10
278:7,18 281:10
281:15,16 283:10
285:1 290:14
295:11,17 298:6
299:14,15 313:8
313:11 318:21
319:3,8 321:10
322:19 323:2
335:12 341:13
**notice** 2:19 48:7
49:21 51:20 60:17
91:21 92:5 104:14
107:3 157:5
247:22 331:11,15

360:4
**notices** 28:7 51:13
51:14
**noting** 111:20
214:18 344:20
377:11
**Notre** 13:10,18
**November** 394:15
395:16 397:14
**no's** 180:17
**NSC** 401:11
**Nuebel** 132:1 142:1
142:2 182:3 219:2
219:5 290:12
326:10 365:18
373:19 375:22
385:19 387:6
**number** 24:1 69:1
89:11 133:1
247:17,22 248:1
253:15 261:21
263:12 293:11
312:8 339:20
348:11 382:14
**numbered** 26:3
**numbering** 200:19
**numbers** 102:8
103:4
**numeral** 89:10
152:8
**numerical** 392:3
393:9
**numerically** 24:2
218:4
**N.W** 2:7

**O**

**O** 4:1 9:1
**oath** 405:15
**Obama** 117:20
269:16 401:4
**object** 27:2 84:16
125:22 128:8
129:16 138:22
149:3,17 158:17
159:12 162:22



MAGNA
LEGAL SERVICES

163:1 180:21
184:18 195:21
198:14 205:12
209:2 210:19
219:19 225:1,2
235:1 260:13
272:7 278:6
282:21 284:18
286:21 295:15
302:21 303:22
305:15 320:16
334:1 337:5 338:9
340:11 341:12
343:10 354:2,3,21
355:6,21 356:6
358:1,20 359:10
360:18 361:17
371:10,16 372:15
374:14 378:4
381:3 383:6 388:3
389:21 396:10
398:2,20 404:10
**objected** 339:7
**objecting** 239:17
273:1
**objection** 14:18
20:15 26:22 27:20
29:8 31:5 32:9
33:22 36:4 37:6
38:9 39:3 41:3
42:3,14 44:10
45:12 50:16 52:7
53:3 54:3 58:12
59:8 61:1 62:3,18
64:1,12 65:8 66:6
67:9 68:2 69:21
71:10 75:2 76:9
77:14 80:21 81:16
82:12 84:19 85:8
86:3 90:18 91:7
92:21 94:11 95:15
99:4 106:16 109:8
112:3 114:20
116:6,22 118:11
121:3 124:1,4
125:6,17 127:10

128:7 130:11,16
131:6 136:6,14
137:2 141:4
145:19 146:11
147:1,5 148:2,22
150:11,12 151:8
152:12 155:11
156:13,18 158:2
160:5,15 161:3,5
161:13 164:9
167:6 168:11
171:5,21 172:9
173:4,16 175:10
176:19 177:13
178:4,13 179:4,17
180:14 183:8,22
187:4 188:7 189:6
190:15,22 192:6
192:19 193:16
194:8,18 195:18
197:2,21 198:5
199:9,18 202:21
203:10,22 205:5
206:3,12 207:21
212:1 213:6
214:12 215:20
217:8 218:7,14
219:9 220:7
221:12 222:12
225:16 227:1
229:11 230:5
231:1,16 232:8
235:10 237:13
239:2,3 240:11
242:11 243:3,16
244:6,18 245:19
248:20 249:16
251:4 254:6 262:8
267:11 271:19
273:6 274:22
277:12 278:14
279:4 280:18
281:12,13 285:16
285:17 287:8
289:16 292:2,10
295:2,8,19 296:16

302:1 303:19
304:20 305:20
306:12 307:7,21
313:2 316:11
317:9 318:10,18
319:10 321:7
322:1,9 323:8
325:8 326:15
331:5 336:15
337:17,18 338:2
345:1 346:9
348:15 350:1
353:3 355:20
360:3 364:16
366:4,21 367:14
368:13 369:9
375:3 376:12
379:3 380:6,20
382:19 386:13
390:21 392:14
393:17 394:22
395:8,19 401:17
402:9
**objections** 138:9
150:13 157:1
163:6 228:7
340:13 341:15
361:20 376:16
381:6 399:18
**objective** 129:1,8
373:7
**observation** 189:5
222:2 223:9 281:6
289:10,13 302:11
302:17 314:13
322:8 328:15
341:2 342:8 346:2
370:22 375:20
389:22 390:12
394:17
**observational**
389:19
**observations**
215:19 270:9
274:2,19 275:8
276:8,20 280:11

288:20 290:15
295:5,6 298:2
299:7 310:20
315:3 317:6 320:8
326:13 331:17,20
**obtain** 352:12
**obtained** 204:16
**obvious** 81:8
**obviously** 12:21
16:17 59:13 83:1
95:9 172:13
182:11 186:3
205:18 221:6
257:2 259:8
261:21 275:6
281:5 283:2
284:11 324:2
325:19 339:22
358:14 386:18
403:19 404:4
**OCC** 144:9 150:21
151:18
**occasion** 33:19
178:2 378:21
**occasionally** 401:5
**occasions** 38:17
42:9 352:10
**occupied** 397:15
**occupy** 99:8
**occur** 29:5 98:16
**occurred** 43:1 46:6
46:14 47:2 61:15
61:19 63:20 74:7
74:17 90:3 95:4
96:9 98:19 243:9
246:16,21 251:2
251:18 257:16
283:11 292:12
296:6 299:15,17
309:5
**occurring** 99:3
**occurs** 251:12
270:20
**October** 71:1 80:14
95:4 96:9,21
97:13 98:1 249:13

365:15,16 367:20
370:10 371:7
373:18 382:13
385:19 386:9
387:3 389:4,5
**offer** 405:14
**offered** 359:6
**office** 3:10 10:12,15
15:10 17:2,5,10
17:22 19:2 32:16
32:17,17 34:3
38:13 39:22 77:3
77:5,5,7,21 95:20
119:15,15 120:12
121:12 122:14
123:9,11,13,16,17
123:22 124:10,11
124:16,19 127:3,4
127:5 133:10
134:3,6 142:8,12
142:18 143:17
144:11 151:16
154:5,6 157:3
163:11 187:19
195:9,10 196:6
313:20 332:16,18
333:17 335:6,7,10
351:22 383:14
384:12 391:10
396:19
**officer** 17:3,5,18
19:17 20:2 408:2
**offices** 17:20 134:9
151:17,19
**official** 48:7 83:3
325:17 339:15
**officially** 182:6
**officials** 167:15
386:21
**OGC** 120:9,10
**oh** 13:11 23:19
37:16 47:22 49:9
57:2 80:9 100:10
114:3 173:20
181:7 202:6 207:6
207:10 301:3



335:9
**okay** 12:2,6,15,19
13:14 16:15 17:15
18:15 22:9,12
23:3,21 25:17,19
26:2,11,15 27:10
28:5,10 29:18
30:6,20 31:10
32:3 35:3,11 38:3
39:6 44:14 45:2
46:4,22 47:4 48:6
48:13,19,19 50:1
50:6 51:22 53:12
56:4,6 57:2,7,11
57:19 59:2 60:5,7
60:16,18 61:6,6
61:14,18 62:9,22
63:7,10,12,17
64:8 65:20 67:20
68:14 69:19 70:8
70:11,19 71:5
72:13 73:14 74:3
74:16 75:15 76:2
76:5 78:14 80:6
80:16 81:7 82:8
84:6 85:3 87:10
88:3,18 90:2,10
90:14 91:20 92:7
93:15 94:4,7,18
95:3 96:8 97:8
98:14 99:7 101:10
101:18 102:11,12
104:3,17 107:1,8
107:13 108:12
110:2 111:9,10,19
112:16 113:8,19
114:8 115:19
117:12 118:3,3,6
119:8,9 120:13
121:14 130:7,18
131:19 132:19,20
133:4,22 134:10
135:3,18 136:11
137:8 139:14
140:8,11,16 141:9
141:22 142:4

143:1,5 145:7
147:13,13 151:21
152:18 153:4,7,14
153:22 154:7,17
154:19 157:18
163:13 164:2,22
166:4,12 168:3
169:19 170:7
171:3,11 172:19
172:21 173:12
174:9,12 175:5,17
176:10 180:6
181:6,15 182:4,7
182:9 183:19
184:14 186:7,8
187:8,16,22
188:12,21 190:12
191:10 193:7,9
194:1 195:4,15
197:18 199:2,6
200:2,7 201:6,7
202:9,14,17,18
204:11,18 206:22
208:9 210:1,1,17
211:7,12 215:1,10
215:11,18 216:10
216:22 217:17
218:1 219:6 221:2
221:4 224:13
225:20 226:2
227:12,12 229:15
236:8,11,16 237:4
238:4,15 240:3
247:3 249:3,3
251:11 252:3,22
253:14 255:12
259:9 265:19
268:1,10,10 269:3
270:11 271:1
272:19 279:21
280:7 286:12
288:5,22 292:16
294:1,22 296:11
299:11,20 300:19
302:14 305:8
307:16 314:5

315:15 316:22
322:18,22 328:20
329:5,6,13,20
330:8 331:17
332:22 334:18,18
340:1,1 346:20
347:21 351:14
353:13 354:14
357:7,17 364:7
365:11 366:19
367:7 369:1 370:8
373:16 375:1
376:8 382:4,9,12
382:15 383:19
385:11,14 388:4
388:14 390:16
391:7,18 392:22
393:7 394:3,7,9
396:3 400:19
403:6
**once** 40:7 52:6
151:5 252:13
269:19
**ones** 24:5 110:15
288:13 323:2
**one-half** 320:3
322:14
**one-minute** 72:22
**one-off** 366:13
**one-on-one** 161:1
**one-page** 55:8
**one-year** 16:5
**ongoing** 29:22
89:19 250:14
356:18 397:2,8
**OP** 127:3
**open** 380:3
**opening** 315:12
**open-ended** 379:8
**operationally-foc...**
327:7
**operations** 22:14
93:18 94:6 144:7
185:17
**opinion** 337:10
338:12

**opportunity** 78:15
109:17 311:4
312:21,22 403:9
**opposed** 21:5 40:14
53:1 54:12 112:18
116:20,21 152:22
196:19 203:18
266:9 269:1
287:16 321:21
324:15
**opposition** 265:4
**option** 147:16,22
149:12
**options** 144:21
146:5,6,7 150:7
154:14,15 156:9
157:9,11,15,22
375:2
**OP&S** 122:8,13,19
123:3,5,8,14,16
125:5 127:3 131:5
182:2,8
**oral** 398:17
**order** 102:8 178:9
206:7 220:17
251:21 252:9,10
253:9 265:5,16
275:8 308:9
372:13 398:22
399:19
**orderly** 144:22
145:14 147:18
154:16
**ordinarily** 116:18
116:19 119:18
151:2 188:4
196:20 282:20
**ordinary** 57:8
109:6 186:22
383:3 384:2
387:14,17 388:12
388:16,18
**organization** 15:15
16:22 20:12 22:16
121:7 134:5
217:18 282:17

**original** 47:17
48:22 51:8 54:2
61:19 204:9,14
265:4 390:5
**originally** 54:4
81:14 263:14
339:13
**originator** 223:21
**Oudkirk** 401:22
**ought** 346:2
**outbreak** 71:2
**outcome** 408:17
**outline** 104:20
300:1
**outlined** 301:11
**Outlook** 165:8
167:4
**outreach** 35:21
115:7
**outside** 35:12
173:15 280:15
303:1 326:20
**outsiders** 162:14
324:4
**outstanding** 264:18
**outwardly** 383:22
**overseeing** 21:4
185:18
**overused** 224:19
**overwhelmingly**
389:11
**O-U-D-K-I-R-K**
402:3
**O/C** 316:3

---

**P**
**P** 9:1 280:6 281:8
**pack** 297:19
**package** 39:20 40:1
40:20 41:1,12,17
42:2 59:6 77:11
77:18,21 112:13
113:4,7 123:10,15
155:5 157:3
**Padilla** 187:12
**Padillla** 188:6



**Padilila's** 187:16
**page** 4:2 26:3,3,5,5
  28:17 30:7 31:18
  50:7 52:21 70:11
  70:20 73:19,21
  74:4,5 78:7,12,13
  78:16,17 79:3,8
  79:11,14 80:8
  88:4,9 89:9 90:7
  104:21,22 114:10
  114:14 132:21,22
  133:1 135:7
  139:13 140:17,22
  141:16 143:10
  151:22 154:1,9
  185:9 187:9,10
  209:9 210:14
  215:9,11 236:20
  247:6,22,22 248:1
  248:8,12 253:14
  253:16,19 254:20
  255:19 256:3
  265:7 271:3
  273:21 275:12
  276:12 278:1
  282:11 285:2,8
  288:3,10 290:1,20
  291:5 297:8 298:2
  298:20 299:8,11
  301:9 310:4,8,22
  311:8,16 312:7
  314:3,3 315:1,5,7
  316:20,20 317:2,5
  319:14,15 323:1
  329:3 344:7,8,11
  347:20 348:1,3,4
  349:7 350:20
  366:14 382:2,14
  387:4 390:12
  391:13 406:2,5,8
  406:11,14,17
  407:2,5,8,11,14
  407:17
**pages** 90:7,13 91:5
  91:9 102:10 103:4
  299:14 390:13

**pains** 333:1
**paragraph** 30:12
  52:21 60:12,13
  61:22 62:11 71:17
  79:11,13,19,21
  80:11 98:5,11
  144:19 154:12
  195:21 202:3,12
  247:16 249:6,20
  250:11,13 350:21
  351:3 352:2 374:2
**paragraphs** 70:21
  79:19 202:15
  249:5
**paraphrasing**
  30:17
**paren** 116:4
**parenthetical**
  155:22 390:12
  391:14
**parenthetically**
  31:11
**part** 26:4 27:22
  28:12 31:3 34:16
  34:22 35:13 36:17
  38:1,12,17 43:3
  43:10 45:9 46:15
  46:20 66:4 77:18
  78:18,18,20 85:17
  87:17 88:1 93:21
  97:16 112:11,19
  113:7 125:2,3
  138:3 162:18
  163:10 165:8
  173:7 178:11
  186:22 203:8
  218:12 221:6
  242:21 250:1
  251:16 270:4
  281:21 290:6
  296:3 298:14
  304:15 305:5,12
  317:4 332:16
  335:21 355:17
  361:7 362:5 364:8
  371:22 373:1,18

373:19 383:3
  384:2,22 385:16
  385:17 386:17
  390:2 391:10
  394:9 398:10,11
  403:10
**partially** 108:17
  284:14 333:19
  359:21
**participant** 248:16
  248:16
**participants** 261:12
**participate** 76:6
  324:6
**participated** 12:10
  12:13 248:22
  298:12 324:8
  352:3
**particular** 16:4
  21:5 33:2,3 50:15
  71:17 74:21 97:15
  133:14 175:19,20
  177:16 188:3
  224:2 264:11
  279:6 293:15
  321:6 326:13
  341:19 360:12
  361:22 368:19
**particularly** 12:17
  260:1 265:11
  328:6 342:13
  369:1
**parties** 2:20 9:20
  266:7 324:4
  408:12,15
**partner** 311:18
**parts** 270:7
**pasted** 92:4
**patently** 81:8
**path** 151:7
**Patrick** 1:4 9:7
**pay** 324:22
**peacekeepers**
  250:16,22
**peak** 242:22
**penalty** 405:6,7

**pending** 163:1
  374:9 381:9
**people** 14:17 18:6
  20:3,4 21:6,10
  54:18 62:15 80:13
  93:2 111:15
  113:11 114:1
  115:4 121:10,11
  122:2 126:17
  132:15 133:21
  138:18 139:3
  161:17,21 162:5
  162:18 164:8
  173:7 179:1 237:5
  237:12 238:17
  241:14 242:14
  255:9 270:5
  271:11 276:4
  279:14 297:17
  300:16 301:17
  302:18 305:11
  306:18 307:5
  314:20 315:18
  320:1,12 321:17
  332:18 333:16,19
  353:17 355:15,16
  357:20 359:7
  360:1,17 361:14
  365:19 403:3
**perceived** 20:12
**percent** 102:20
  253:6 320:3 322:7
  322:14
**perfect** 86:11
**perfunctory** 255:7
  279:12
**period** 14:4 30:15
  45:15 296:22
  327:5 400:3
**Periodic** 30:8
**perjury** 405:6,7
**Perkowski** 216:18
**permanent** 21:21
  22:3 122:8 123:1
  131:5,19 132:3
  140:6,9

**permit** 235:4
  320:21 350:6
  358:16 384:11
  388:22 399:17
  402:10
**permitted** 122:9
  123:6 130:10
  219:15 339:8
**permitting** 175:12
**persecution** 18:14
**person** 217:15
  238:21 254:13
  328:4 332:8 333:8
  341:1
**personal** 32:14
  33:17 36:9 41:9
  45:18 46:1 54:8
  64:3,3 66:2,11
  71:14 227:3,4
  304:11 337:9
  338:12 372:22
**personally** 43:22
  93:5 218:11
**perspective** 20:7
  32:4 85:4,12
  258:20 265:8
**pestering** 376:6
**phases** 203:16
**photo** 202:2
**photograph** 248:8
**phrase** 116:1
  156:12 157:19
  195:20 233:5
  278:11 284:9
  368:6 393:15
**phrased** 81:21
  125:12 127:12
  128:17 129:15
  159:1 227:7,11
  230:15 337:12
  354:22 355:7,21
  356:7 358:6
  359:14 369:17
  375:5,11,15 378:5
  378:12 379:9
**phrasing** 31:21



191:10 337:20
**physical** 23:10,12
54:16 247:21
**pick** 232:13 273:21
276:11 279:9,21
**picked** 145:4
**picks** 335:20
**piece** 306:17 309:8
343:19 404:11
**pieces** 306:1
**pillar** 237:7
**pinned** 331:10
**pitch** 266:9
**place** 24:16 42:22
46:15 86:18
126:16 219:16
245:1 274:11
303:1 309:4 363:9
**placed** 18:10
**placement** 15:8
**plainer** 229:22
**plaintiff** 11:9 264:9
**plaintiffs** 1:5 3:2
10:2,5,8,10
258:10 262:15
265:3 404:7
**plaintiff's** 206:5
265:7
**plan** 290:3,5
**planned** 127:19
128:5 130:9
**planning** 120:19
129:3
**play** 64:10
**played** 62:12 64:22
**Plaza** 3:11
**please** 11:2,13 79:2
199:1 327:2
**plus** 17:13
**point** 22:1 27:17
35:18 52:16 72:12
75:5 88:3 105:9
116:15 131:20
140:8 142:17
164:2 165:18
166:4 167:20

169:12 170:13
171:1 172:6
174:14 182:17,20
183:3 192:5 228:9
265:10 285:9
286:1 288:18
293:19 300:16
303:6 315:4
327:22 360:6
381:13 385:8
390:1 392:3
**pointing** 215:14
**points** 104:22 185:3
216:6 278:12
297:7 311:2
312:16 313:1
330:16 335:14
**policy** 15:19 17:10
18:19,22 19:2,3,6
19:8,18 20:1,7,11
32:16,17 34:3,4
37:22 38:11,13
39:12,22 75:22
76:4 77:5 119:16
119:20 122:14
123:9,11,22
124:10,11,16,19
127:3,4,5 142:8
142:13,18 143:17
151:16 223:19,21
224:4 282:13
283:16 287:16
303:22 327:8
332:7,12,16
333:14 351:22
396:19,19 397:3
**policy-related**
327:10
**political** 195:7,16
196:17 197:14,16
199:12,14,17
200:1 311:17
384:16,21 386:3
**Poor** 70:21
**population** 35:9
59:20 60:3 63:9

280:1,3,14 281:19
281:20 282:1
303:11,12,15
**portfolio** 38:1,12
43:17 45:21
113:22 396:21
401:7
**portion** 219:22
250:12,12 302:7
305:19
**portions** 262:3
**Port-au-Prince**
343:21 344:2
**posed** 137:22
170:12 177:14
178:1 180:11
230:7
**posing** 244:22
395:6
**position** 13:22 15:6
16:7 17:9 18:18
18:19 21:13,15
22:10 35:17 36:13
38:2 41:16 75:16
75:19 122:18,20
142:4,9 143:15
152:19 181:19
187:17 240:21
262:19 265:22
267:1 311:22
381:11 385:10
404:13
**positive** 368:1,12
369:7 372:6
**possessing** 80:2
**possibility** 145:13
149:16 291:16
**possible** 118:8
149:12 246:19
257:15 258:11
301:4 349:10
398:17
**possibly** 96:3
252:17,21 327:21
402:12
**post** 115:7,10

**potential** 29:14
**potentially** 54:18
115:9 339:17
345:8
**Potts** 193:9 194:14
195:6 215:13,19
216:15
**practical** 32:4
271:7 404:12
**practice** 14:7
217:12 224:11
267:14 323:12
401:3
**preceded** 105:1
**precise** 298:6
**precisely** 297:17
**predecision** 128:11
**predecisional** 228:9
230:9 231:5,16
259:2 261:15
369:15
**preface** 57:11
**prefatory** 182:13
**preference** 100:7
**preliminaries**
12:16
**Prelogar** 22:5
167:5 209:11
216:12 236:20
237:22 241:7
245:8 298:16
341:2 343:2
344:13 345:18
348:10 349:9
370:10 381:1
386:12 389:2,7
392:9 394:14
**Prelogar's** 165:8
239:10 387:3
**Prep** 271:5
**preparation** 398:4
**prepare** 271:11
**prepared** 39:21
40:6
**prescribe** 18:12
**presence** 54:17

**present** 2:19 3:17
9:20 13:22 106:12
173:9 290:3 303:3
303:6
**presented** 303:3
**presently** 261:4
**president** 1:6 402:6
**presidential** 399:3
399:21
**presumably** 202:11
280:16 320:4
337:15 351:4
356:12 375:22
**presumes** 356:2
**presumption** 12:22
**pretend** 238:5
325:22
**pretending** 293:4
**preTPS** 171:13
**pretty** 208:14 323:3
383:20
**prevent** 311:13
362:16 363:1
**previous** 31:18
51:13 96:5 117:7
117:16,19 146:19
148:18 197:21
240:1 241:10
243:9 251:12
306:17 318:14
343:22 344:11
370:5,11 398:10
**previously** 23:18
60:19 77:12 126:6
158:1,10 185:14
188:1 206:5
252:14 287:18
301:15,15 302:11
302:13,14 335:3
**pre-TPS** 166:13
**primarily** 212:11
343:20 344:3
**primary** 36:14
39:15 41:15 54:10
**prime** 112:22
**principal** 364:14



**printed** 248:1,13
**printing** 247:15
**prior** 38:3 72:6
  127:7,7,18 129:2
  129:20 133:18
  142:13 153:1
  157:18 175:6
  177:6,16 184:16
  196:21 197:4,9
  246:16 298:9
  305:8 307:16
  308:5 311:3
  312:18 331:13
  340:12 355:12
  371:6 384:14,18
  384:18 385:16
**priorities** 197:16
  200:1
**privacy** 132:15
**private** 182:16
**privilege** 58:16
  64:16 66:10 67:13
  83:12 86:15
  125:10,21 127:16
  128:13 130:2
  131:10 137:5,15
  137:21 138:15
  139:6 145:22
  147:4 158:6,21
  159:15 162:9,15
  163:3 167:10
  169:10 170:16
  175:16 176:4
  177:2,20 189:10
  191:22 196:4
  203:2 204:4 205:8
  205:13 208:1
  216:1 219:12,15
  222:15 227:6
  228:3 231:7,19
  235:3 237:17
  240:15 242:17
  244:14,19 245:5
  254:9 256:22
  257:5,15 258:16
  259:4 260:9,9

263:10 264:6
265:17 273:10
285:4 292:15
305:2 317:12
320:19 334:4
336:19 337:9
341:16 342:12
343:13 348:19
350:4 353:7
359:16 369:14
371:13 372:18
375:7,17 376:15
378:14 379:11
380:8 383:9,16,17
396:12 398:3
399:22
**privileged** 86:14
  268:20 378:17
  384:8
**privileges** 340:16
**privy** 195:1
**PRM** 34:17 35:9,13
  35:15 62:15 63:7
  63:8 113:15,21
  114:7 115:3,4
**pro** 14:14
**probably** 43:2
  56:21 68:9 102:19
  115:5 141:2 162:8
  165:10 178:21
  205:16 216:15
  256:16 286:3
  292:18,19 334:15
  365:4 401:11
**probe** 87:4 206:22
  292:21 338:21
**problem** 80:18
  367:20 368:10
  370:15
**problems** 333:8
**procedural** 327:6
**proceed** 283:20
**proceeding** 404:19
**process** 13:5 18:6,7
  18:10 31:1 34:9
  34:10,15,17 36:1

36:17 38:17 39:7
40:13,16,21 45:9
46:16,20 53:16,21
58:16 64:16 66:10
67:13 73:15 75:1
76:17,20 78:21
82:3 83:11 85:5
86:17 90:16 95:22
97:17 108:6 109:6
112:11 116:17
123:19 125:3,10
125:21 126:11,15
126:15 127:16
128:13 130:2
131:10 137:5,21
138:10,15 139:5
144:13 145:22
147:4 150:18
151:1,3 158:6,21
159:15 162:4,12
162:19 167:10
169:10 170:15
171:22 175:16
176:4 177:2,19
178:11 188:10
189:10 190:9
191:22 194:18
195:1 196:4 203:2
204:4 205:7,13
208:1 210:22
216:1 219:12
222:15 225:1
227:6 228:2 231:7
231:19 235:3
237:17 240:15
242:1,4,10,17
243:4 245:5
248:17 249:1
254:9 257:5 259:4
260:1 262:10,12
262:16 264:6
265:2,5 266:3,15
273:9 274:15
277:8 278:15
285:4,18 292:14
304:15 305:2,6

308:6 309:22
317:12 320:18
322:10 334:4
336:18 337:8
341:15 342:12
343:12 348:18
350:3 353:7 354:5
355:17 356:3
359:16 364:12
367:17 369:13
371:4,13 372:18
375:7,17 376:15
378:13 379:10,11
380:7 383:4,15
384:2 387:20
396:12
**produce** 95:22
  219:16 257:22
  258:10 271:6
**produced** 110:21
  175:12 191:19
  235:5,6 257:20,21
  258:7 260:2,7
  263:1,7 266:13
  387:18,19 388:13
**producing** 206:9
  258:13 265:15
**product** 369:2,5
**productions** 175:22
**productive** 288:9
**professional** 354:15
**program** 296:1
  397:10
**programatic**
  255:11
**programmatic**
  279:16 301:12
**progress** 16:21
  350:22
**promotion** 20:13
  23:4,8 244:4
**prompted** 19:16
  97:15 327:14
**prompting** 78:19
**pronounce** 119:9
**pronounced** 131:14

141:20 143:12
153:10,13
**proper** 251:21
**properly** 168:4
  302:12
**Propoli** 264:15
**proposal** 290:2
**proposals** 290:8
**proposed** 343:19
  346:3,6 350:12
**Prospective** 290:7
  291:14
**protected** 4:7,9,12
  4:16,19,21 5:2
  6:11 7:3 48:8 88:5
  127:15 128:12
  137:20 139:5
  369:13 396:11
**protection** 269:18
  269:21
**protective** 47:22
  265:5 398:22
  399:19
**prover** 389:15
**proves** 174:14
**provide** 90:21
  94:22 95:13,20
  112:7 133:19
  154:13 168:19
  190:20 192:2,3
  194:13 213:11
  239:14 325:14
  377:9 401:17
**provided** 42:1 78:1
  89:8 94:16 138:2
  146:3,6 168:9
  186:18 190:13
  191:3 192:4
  198:21 208:12
  259:20 356:11
  361:19 373:3
  378:9,21 379:22
  386:12 387:13
  391:4
**providers** 323:20
**providing** 287:15



346:1
**public** 64:10,21
  66:3 104:13
  166:21 171:16
  182:16 233:15
  250:13 252:19
  253:21 275:16,17
  296:8 298:10,11
  299:17 308:8
  323:22 325:12
  327:20 331:4,14
  345:10 360:6
  390:19 391:10
  408:1,19
**publication** 331:15
**publicly** 106:21
  332:1
**publish** 132:17
**published** 104:15
  331:11
**pull** 40:1 93:2
  157:3 342:1 373:4
  373:7
**pulled** 41:1 77:21
  108:5 184:14
**pulling** 89:6 90:16
  113:4
**pulls** 332:5
**purely** 263:7
**purpose** 16:1 35:11
  35:20 36:14 52:22
  58:9 219:7 220:3
  289:13 321:16
**purposes** 52:12
  254:12
**Pursuant** 2:19
**pushing** 231:14
**put** 24:2 28:22 48:8
  93:17 97:4,18
  103:16 110:3
  119:7 122:9 123:7
  125:4,16 127:2,8
  127:14,19,20
  128:5 129:4 130:9
  130:9 219:15
  228:14,16,19

248:11 252:10
  254:2 259:16
  287:4 289:6
  299:13 346:6
**putting** 128:2 129:4
**puzzle** 217:6
**P-A-D-I-L-L-A**
  187:12
**P-O-T-T-S** 193:10
**p.m** 133:5 152:1
  187:13 209:11
  215:13 221:5
  226:4 329:7 336:5
  336:6 344:12
  348:16 349:8,18
  351:16 387:4
  404:20

___
## Q

**qualifier** 31:20
  228:14,17
**qualifiers** 196:12
**quarrel** 86:21
**quarter** 50:8
**question** 13:1 26:11
  27:5 29:12 45:19
  46:11,19 50:9,19
  53:8,10 54:7
  58:19,22 62:20,22
  63:16 64:19 66:8
  66:13,15 67:2,15
  81:2,21 82:20
  84:22 85:14 91:12
  91:15 124:5,7
  125:12 126:1,3
  127:12 128:14,16
  128:16,18 129:12
  129:15 130:20
  131:9 136:17,19
  137:14,22 139:2
  144:17 146:1
  147:7 148:8 149:2
  149:5,7,14 150:14
  151:14 161:14
  162:22 163:7
  167:18 170:19

172:1 175:13,15
  176:3,7,13 177:3
  177:14,19 180:2
  181:2,4 183:12
  184:9,21 188:2
  189:9,11,15
  191:15,21 192:21
  194:19 197:20,21
  198:10,12,18,22
  199:10 204:6,7
  205:7 208:2,10
  209:7 210:20
  211:2,9,18 212:8
  214:1,17 218:16
  219:11,18 220:10
  224:9 227:2,5,6,9
  228:3,6,7,13,18
  228:20 229:1
  230:7,11,15,16
  231:14 232:9
  237:16 238:8
  239:18 240:21
  242:16 243:6
  244:22 247:9
  251:6 254:11
  256:16 259:3,11
  259:14 260:10,18
  260:21,22 262:7
  273:7 275:18,19
  278:16 280:4
  283:7 284:5,21
  285:1,4,19 287:9
  287:12 293:15
  295:1,15 301:5
  303:4,5 304:4,6
  305:3,20 306:3,10
  306:13,15 307:11
  307:11 308:3
  314:13 317:13
  318:13 319:2
  326:21 327:4,13
  328:14,14 334:5
  337:12 338:15,17
  338:19 339:2
  340:16 342:16
  343:16 349:4

350:7 354:7,22
  355:2,7 356:7
  358:5,22 359:14
  359:15 361:21
  364:12,19 366:13
  367:15 368:15,18
  369:11,16,18
  374:17 375:16
  376:18 377:7
  378:4,11 379:4,16
  381:6 383:22
  384:5 386:14
  388:6 389:16
  392:2,5 395:6
  398:7 399:5,12
  400:1,5
**questioned** 159:21
  261:16 369:5
**questioning** 284:18
  384:11 399:3
**questions** 19:15
  28:13 56:3 69:11
  86:13 87:1,22
  107:22 129:20
  138:4,12 167:3
  170:12 171:13,19
  172:5,7,11 174:21
  175:2,9,12 176:17
  176:21 177:6,11
  177:13,16 178:1
  179:11,13,14
  180:11 205:10
  215:8 217:1
  219:17 230:13
  235:1,4 236:1
  258:18 259:16
  263:19 265:18
  266:21 268:13
  300:17 301:13
  323:16 327:4,5,9
  339:10 358:17
  364:6 383:12
  384:7 387:22
  396:22 397:9
  403:16
**question's** 159:1

163:4 170:16
**quick** 100:9
**quickly** 258:10
**quite** 149:7,9
  224:19 260:21
  288:1 294:1 298:5
  331:10
**quote** 60:8 61:7
  188:16 202:11
  250:12 284:15
  296:12 302:8
  335:13 351:3,4
  393:9
**quoted** 254:13
  326:6
**quotes** 254:3,17
  348:11,14 349:11
**quoting** 62:9
  154:14 254:5
**Q&A** 324:11

___
## R

**R** 3:9 9:1
**rains** 70:22 249:21
  250:6
**RAIO** 22:19,20
  94:3,16 95:8,13
  97:6,18 193:12
**raise** 112:19 176:19
  230:22 244:3
  264:5 339:20
  392:3
**raised** 85:12 219:18
  249:7 287:12
  300:21 301:6
  328:17
**raises** 284:21
**raising** 111:22
  278:12
**Ramos** 257:21
  260:4 266:18,19
  387:19
**rate** 308:8,8
**rates** 80:3
**ravaged** 344:2
**reabsorb** 361:14



**reach** 33:1 35:4 36:11 40:3,4 116:14 401:8
**reached** 58:21 108:14 112:10 210:3,10,15 211:5 213:1,19 214:7,10 214:20 240:7 294:6
**reaches** 33:11 34:17
**reaching** 33:13 35:12 355:5
**reaction** 240:9 292:22 337:22 338:7,22 340:5 342:18
**read** 48:16 55:13 55:21 63:14,15 79:1 89:21 91:9 154:17 166:11,18 197:19,20 198:2 199:7 239:4,11 253:18 256:11 262:17 269:14 271:4 274:10 275:14 276:21 280:1 282:7 287:19 288:2 290:3,14 297:6 301:8 302:8 310:4 312:16 314:17 315:1,4 319:19 320:8 324:12 329:21 330:13 352:1,20 393:10 405:8,10
**readily** 346:11
**reading** 60:9 111:8 230:1 254:22 268:11 285:8 289:22 334:16 393:3
**readout** 325:14
**reads** 367:21 368:10

**ready** 63:16 69:17 144:5 150:20 257:13 392:6
**real** 97:3 100:9 245:15
**realize** 186:13 293:11 299:3
**really** 92:9 169:13 211:15 238:7 248:15 260:17 282:8 330:8 347:17 364:4 387:21 388:6
**real-time** 404:9
**reason** 50:13 51:10 56:14 84:9 96:22 120:21 258:13 265:19 278:20 294:12 330:18 378:17 406:4,7,10 406:13,16,19 407:4,7,10,13,16 407:19
**reasonable** 97:7 162:5 202:4
**reasonably** 108:16
**reasons** 84:13 132:15 250:1,19 288:16 368:14 399:18
**reassert** 170:15 239:2 376:14 380:6
**rebuild** 297:16
**recall** 14:16 43:4 59:17 71:16 74:20 88:21 91:1 92:20 98:15 103:6 122:16 130:22 140:4 158:9 160:3 160:19 164:17 175:1,1 183:13 185:13 192:8 193:1 222:1 224:16,20 241:14 246:13 269:21

272:3 276:20 277:7,15,20 279:1 280:14 281:15 295:3 302:7,16 308:7 309:16 310:20 316:9 320:8 321:14,18 322:12,15 327:12 328:18 333:3 368:7 377:19 401:14
**recalling** 104:1
**receipt** 258:11
**receive** 151:18 328:8
**received** 40:7 223:13 263:3 368:7,8 385:9 392:18
**recess** 25:5 73:6 100:14 200:11 207:13 234:6 308:18 363:15
**recipient** 217:14
**recipients** 320:2,13 321:18
**recitation** 195:20
**reciting** 274:1
**recognize** 270:19
**recollect** 76:16 97:2
**recollecting** 183:6
**recollection** 42:7 42:11 43:1 46:13 56:6,9 68:19 71:6 76:18 88:16 90:3 91:4 92:14 94:21 97:4 102:18 103:15 104:8 106:3,7,12 108:15 109:18 113:2 135:20 142:20 149:14 161:20 164:6 169:1,4 176:16 181:8,18 183:20 192:13,15 192:18 206:17

208:6 219:21 221:19 225:5 235:8,18 253:4 256:20 258:15 270:8 271:13 274:2,19 276:7 279:18 280:10 281:9 285:14 286:2 288:19 289:9 290:15 298:1,7 300:13,20 300:22 311:1 312:15 314:12 321:15 325:1 327:19 331:20,22 332:3 366:2 369:2 369:4 371:3 374:12 391:9 402:21 403:2
**recommend** 136:12 274:15,16 367:21 368:11
**recommendation** 39:18 40:10 78:2 78:4 116:15 117:6 117:10,15 135:10 135:11,21 136:22 137:3 138:2 147:9 157:4 158:11 169:15 203:13 271:22 272:4,20 308:10 366:8 367:4 374:9 377:17 378:1,9 379:6,7,15 381:14 381:17
**recommendations** 127:14 137:19 138:13 149:21 157:6 167:14 170:1 245:12 392:19 393:5,6
**recommended** 394:1
**recommending** 135:22

**recommends** 274:12
**reconsider** 116:15 117:10 118:9
**reconsideration** 116:18
**record** 9:4 12:20 16:12 25:1,3,9 34:20 49:11,15 55:3 73:4,8 86:9 97:15 100:12,16 101:5 137:7,8 180:10 182:12 198:1,2,4,6 199:7 200:9,13 206:13 207:5,12,15 234:1 234:4,8 235:1 250:5 257:7,8 263:1,12 267:4 294:5 301:20 302:5 308:13,16 308:20 325:15,17 363:13,17 387:17 401:10 403:13 404:17 408:10
**recorded** 316:10
**recording** 269:22 325:6
**records** 387:14 388:8
**recover** 74:10 98:7 299:22
**recovered** 315:18
**recovery** 74:13 97:21 250:17 311:14
**recs** 245:10,11
**recurring** 323:7
**redacted** 132:13
**redesignate** 62:13 66:5
**redesignation** 4:8 4:11 44:21 45:3 45:10 47:1 48:11 51:21 52:2,18 53:1,16,21 54:11



54:13,20 57:14
64:11 65:1,5,17
67:18 78:20
311:10 357:13
**redesignations** 87:9
304:14 307:18
**redraft** 154:2
**reduced** 408:8
**redundant** 109:15
**refashioning**
154:13,21
**refer** 28:2 110:18
152:15 153:6
**reference** 31:11
60:21 71:7 74:9
79:16,21 98:12
107:9 115:9
117:14 122:22
134:1 139:15
140:17 141:1,10
152:8 153:5 166:8
168:5 185:1
188:18 209:17
219:3 222:9
232:18,20 233:10
243:2 253:11
255:14,16,20,21
255:21 256:4
280:17 282:16
287:19,21 290:10
291:9 296:15
297:20 307:3
314:10 318:2,4
319:15 320:14
321:17,20 322:6
366:15
**referenced** 61:16
74:21 153:9
183:16 212:4
214:6 386:17
400:8
**references** 26:12
28:2 57:17 74:5
80:8 84:14 114:17
121:1 155:7
201:16 271:17

323:5 334:21
382:16 389:3
**referencing** 72:4
121:2,6,8 146:18
203:13 214:8
296:19 322:16
336:13 361:13
362:1 366:3 368:9
**referred** 213:18
239:12 367:3
**referring** 129:18
155:9 167:4 170:5
184:2 209:22
212:3,11 222:11
223:1 238:17,20
243:8 252:6 269:9
273:2,17 280:15
281:1,19 283:17
292:5 303:10
307:13 336:20,22
350:15 386:11
393:19
**refers** 202:13 219:4
302:22
**reflect** 12:21
157:11,15 198:4
267:9 353:1
**reflected** 110:21
157:15 167:21
313:7 319:3,8
353:11 367:11
**reflecting** 157:6
170:22 254:16
269:1 303:8
315:18 345:13
**reflects** 291:2 337:9
338:11
**refresh** 112:20
169:1 235:8 258:9
258:14 263:9
**refreshing** 321:15
**refugee** 22:14
93:17 94:5
**Refugees** 35:10
59:20 60:3 63:9
**regard** 352:19

370:16,17,19
**regarding** 33:7
38:6 40:14 89:16
91:5 108:21
109:20 154:13
159:8 170:11
171:13 217:11
287:12 356:2
398:19 400:20
**regardless** 151:3
**region** 343:21
**regionally** 115:5
**register** 28:7 49:21
51:13,14,20 60:17
91:19 92:5 104:14
157:5 246:4
247:22 248:2
331:11,15 360:4
**regular** 398:9,11
401:2
**regularly** 188:9
324:8
**regulatory** 119:14
143:16
**reiterate** 404:2
**reiterates** 154:12
**relate** 179:15
180:13 181:4
268:6
**related** 14:11 19:4
95:1 96:1 102:16
107:14,16 108:3
108:17 109:4
129:20 138:4
159:20 170:18
172:12 185:5
205:10 219:17
222:18 228:20
235:1 246:15
261:19 271:14
288:20 304:2
305:17 317:17
322:10 326:18,21
341:15 346:16
350:1 355:22
360:21 375:12

379:13 383:12
384:12 387:22
391:1 396:5,10,15
396:20,22 397:1,7
397:9 398:22
399:1 404:6
408:11
**relates** 175:19
180:4 219:11
302:8 393:8
**relating** 87:18
197:9 226:12
307:5 352:5
401:12
**relationship** 193:14
312:4
**relative** 408:14
**relatively** 182:11
215:6 341:22
344:14 372:1
**relay** 377:5
**relayed** 240:7
**relaying** 149:20
**relevant** 33:2
267:17 303:16
311:10
**relied** 93:8
**relief** 182:16
**rely** 93:2
**remain** 19:6 23:9
37:19 66:1
**remainder** 253:18
288:2 322:19
351:3
**remained** 126:15
140:4
**remains** 231:4
**remember** 24:5
136:21 140:21
142:9 153:7 171:8
217:10 241:3
254:2 267:18
278:21 279:3
286:19 287:11
299:9 313:17,18
321:2 326:4

327:10,17 328:9
328:12 346:21
356:21
**remembering**
278:19
**remind** 181:18
**reminding** 376:6
**remittances** 183:4
185:2 312:12
**removal** 18:7,10
**renewed** 274:9
**repackage** 112:20
**repatriation** 312:3
**repeat** 67:2 82:20
130:13 172:3
330:6
**repeated** 84:14
**rephrase** 228:17
**rephrased** 228:20
339:8
**replace** 131:20
**reply** 63:13 67:6
**report** 5:3 40:6
88:6,6 89:5,7
90:21 96:1,5
97:18 271:9,17,18
274:10 373:3,5,10
**reported** 1:17
124:15 301:15
302:12
**reporter** 9:18 11:2
198:20 304:9
**reporting** 189:17
276:3
**reports** 40:8
**represent** 9:21
78:14 132:10
165:6,7 370:4
**representation**
388:11
**representative**
400:22 401:12,15
**representatives**
161:17 163:21
**represented** 313:21
**representing** 10:1,4



10:7
**represents** 387:9
**request** 9:14 40:4
  150:6 171:7,9
  183:20 184:11
  188:22 191:8,13
  283:6 324:21
  328:3 337:1,15
  338:1 340:18
  342:19 345:9
  346:4
**requested** 95:21
  183:16 198:2
  199:7 220:17
  223:19 384:1
**requesting** 183:14
**requests** 189:20
**require** 324:16
  326:7
**requirement** 21:13
**requirements**
  362:6
**requires** 137:16
  300:7
**reread** 25:16 199:4
**rereading** 198:20
**reregistration**
  296:22
**research** 40:5
  41:15 78:1 93:18
  94:1,22 95:13,19
  193:11 216:6,20
  218:19 366:18,18
  372:2 373:4,9
**residence** 12:4
  54:16
**resident** 312:10
**resources** 255:10
  279:15
**respect** 190:18
  354:4 370:20,21
  387:16
**respective** 2:20
**respond** 345:8
  346:4
**responded** 242:19

266:2 277:1
  328:13
**responding** 58:22
  277:2 397:8
**responds** 386:9
**response** 165:20
  189:20 242:22
  264:13 278:11
  315:16 318:17
  328:16,18 330:11
  333:20 334:7,9
  335:16 337:1
  342:19 346:5,16
  348:10 349:21
**responsibilities**
  17:17 21:1 23:15
  53:15 87:5 131:4
  243:14,21 244:1
**responsibility** 21:3
  34:5,8 338:18
**responsible** 39:13
**responsive** 66:21
  188:22 190:5
**rest** 320:7
**restate** 150:4
**restrict** 108:9
  196:11
**restricted** 172:18
**resubmitting**
  112:20
**resulted** 206:19
**retreat** 19:11
**return** 18:11 247:4
  352:7,14 353:17
  354:17 359:7
  360:1,16 361:6
  362:8
**returned** 21:22
  22:4
**returning** 355:15
  355:16 362:17
**returns** 361:5
**revealing** 296:17
**reveals** 345:1
**review** 30:8 31:1
  34:9,10 36:17

40:8,17 44:4
  46:20 51:5 52:9
  59:6 69:4 76:19
  76:22 78:16 85:16
  90:20 95:22 97:17
  112:11 123:17
  124:20 133:16,21
  151:18 221:8,16
  221:21 223:19
  224:3 226:6
  236:14 288:14
  305:6 322:21
  335:13 374:6
  377:10,12 391:3
  403:10
**reviewed** 45:8
  50:21 52:13 89:8
  186:20 223:2
**reviewing** 36:21
  106:18 181:14
  221:20
**revise** 150:6 337:1
  340:19 342:19
  345:9 346:5
**revised** 62:1 148:12
  335:13
**revising** 146:14
  150:18
**revision** 365:21
  383:4 384:2
**revisions** 384:5
**reword** 223:8
**rework** 198:11
  227:13
**re-ask** 29:19
**ridiculous** 336:8,14
  336:21 337:4,16
  340:9,14,19,21
**right** 12:9 14:4 20:9
  28:10 29:1 35:3
  38:16 43:4 45:6
  48:20 52:2,3
  54:21 58:1,2 60:7
  63:12 68:16 71:20
  74:18 75:6 77:9
  80:20 85:21 86:11

93:16 94:9 98:4
  98:10 99:10
  107:13 111:11,19
  114:1 118:1,2
  119:12,21 120:18
  122:5 128:1
  133:21 135:3,8
  143:7 154:7,14
  156:6 164:18
  166:7 172:15,17
  184:5 186:16
  201:8,22,22
  206:15,16 227:13
  230:9 234:11
  245:2 247:12
  251:15 253:10
  255:5 256:9 266:4
  266:12,20 269:4
  271:1 273:20
  276:11 277:22
  278:4 279:8 282:4
  283:19 289:4
  292:20,21 293:9
  294:4,20 297:3
  311:7 313:22
  319:11 331:4
  332:18 335:8
  336:1 338:19
  347:12 351:2
  353:15 366:13
  373:12,18 382:5
  386:12 388:20
  390:20
**risk** 80:1 294:18
**Robert** 319:5
  385:20,22 386:1
**role** 19:3,8 21:8
  38:22 39:7,22
  41:22 43:10 64:22
  76:17,20 89:6
  91:10 94:19
  119:20 123:5
  133:11 142:12,15
  142:18 203:15,20
  248:17 332:17
  359:2 372:20

373:1 396:17,18
  398:10
**rolling** 178:8
**Roman** 89:10
**room** 162:20 163:5
  267:9 277:5,11,15
  277:19 375:8
**roots** 314:21
**rough** 397:13
**routine** 32:16
**routinely** 32:20
**Roy** 196:16 216:14
  216:20 217:4
  218:18
**Roy's** 194:20
**Roy/Tom** 216:13
**RU** 366:15,17
  372:2
**rubric** 73:20
**ruby** 200:20
**Rule** 339:19 403:10
**ruling** 263:16
**rulings** 404:9
**run** 234:20 292:19
  299:14 336:3
**running** 363:2
**runs** 34:4 103:3
  365:15,16
**Russo** 1:17 9:19
  408:2
**R-A-I-O** 23:1
**R-E-M-I-T-T-A-...**
  185:2

_____
**S**
_____
**S** 4:1 9:1 152:8
  319:22
**Sa** 168:5
**safe** 141:2 216:14
  244:2
**safety** 33:7 361:7
  362:18 363:3
**Saget** 1:4 9:7 405:3
**sake** 24:10 234:16
**salary** 244:3
**Salvador** 366:10



**Sam** 144:1
**Samantha** 119:5,9 144:3
**Sandy** 74:12
**sanitation** 80:1
**sarcasm** 224:17
**sarcastic** 394:20 395:3
**sarcastically** 225:13,19
**satisfied** 189:18
**Saturday** 241:7 242:20 252:16,17
**save** 405:11
**saw** 23:6,8 82:4,4
**saying** 59:5 118:6 168:7 194:15 204:13 210:7 226:5 259:19 270:2 271:15 274:21 284:22 285:1 299:9 314:21 322:13 332:22 340:20 350:8 353:15 388:11
**says** 61:8 73:21 112:20 115:19 122:7 135:16 143:22 144:19 150:20 154:22,22 156:7 157:12 165:4,19 166:5 182:2,12,14 189:21 210:15 212:12,22 223:18 237:4 245:9 253:11 256:7,10 274:11 296:12 310:13 314:6 329:22 330:9,15 332:6 335:9 343:20 365:20 370:13 371:1,19 373:20 375:20 387:5,5 389:7,10

**schedule** 404:5,12
**scheduled** 265:12 396:1
**school** 13:16,17 211:13 301:14 302:10 303:10 308:8
**schooling** 305:10
**schools** 302:16 307:3
**school-aged** 182:19
**SCOPS** 144:5,6 150:21 151:18 185:16,18
**Scott** 401:22
**scramble** 309:21
**screens** 18:13
**SEC** 344:15,17
**second** 25:2 26:2 34:19 60:8,13 61:22 62:10,11 79:13,14 144:17 144:18,18 154:11 156:2 187:10 197:5 207:9 237:7 238:22 247:16 268:15 286:9 290:18 303:22 308:13 311:7 338:10 348:3 350:21 355:1 374:1,2 382:2
**second-to-last** 79:11
**second-to-the-last** 80:10 132:21
**secretariat** 335:5
**secretaries** 318:5,9 318:14
**secretary** 27:8 28:3 33:10 37:5,9 39:18,20 40:11 50:10 54:15 59:16 60:1 70:14 73:22 77:8 78:5,9 81:12 89:15 103:12

104:10 106:5
107:10,12 112:13
117:15,19,20
118:7,9 135:12
146:6 147:10
153:6,8,16,20
157:9 166:9 167:1
168:1,6,10,20
170:10,17 188:17
188:19 189:18
195:12 196:7
201:19 202:20
203:14 204:20
206:20 209:21
220:20 239:5,22
240:19 241:2,4,5
241:9,13,17 242:9
247:10 249:4,8
250:1,19 252:5,20
253:12 255:13,14
258:21,22 259:10
259:20 260:11
261:10 268:6
271:15 272:1,17
273:3,11,11,19
274:5 277:6 282:6
284:21 285:22
287:7 291:20
297:21 309:19
313:14 314:14
315:3,12,14,18,21
316:2,8 317:5,15
317:22 318:2,7,13
320:10 321:2
322:13 330:3
333:21 335:10
344:17 345:10
348:7,12 349:13
349:20 350:21
351:4 354:11
355:13 356:4
357:11 359:4,19
373:6 377:15,16
392:11 394:10
**secretary's** 33:11
104:2 107:11

133:10 163:10
196:7 335:6
350:13
**section** 4:7 31:8,10 31:18 70:17 71:8 78:8 84:8 92:4 249:3,11 268:16 269:6,8,10 297:9 312:12 314:17 357:5,14
**sections** 29:4 30:5 79:6
**security** 9:8 10:18 11:18 26:21 27:8 27:19 28:1,3 32:5 33:21 35:1,13 37:10 39:19 40:12 54:15 60:1 78:5 115:17 116:5 153:17 163:11,22 166:9 187:18 201:20 203:15 241:20 242:15 273:12 318:5,8 335:1 357:11 400:9 401:1,7 402:13,18 403:4
**Security's** 221:9
**see** 18:13 25:18 26:5,10 28:18,19 30:10,18,19 31:15 32:1,2 50:11 51:8 51:9 60:11 61:13 63:4,10 69:15 70:17,18 71:3,4 74:2,14 79:16 80:4,9,15 86:20 88:8,8 89:12,13 98:9,13 101:11 102:9 104:17 105:2 114:10 122:11 133:4 135:6,15 137:14 152:3 165:21 166:15 185:11 187:14 196:13

198:15 202:9
206:15 209:12
210:13 211:4
215:16 217:14
218:5 227:13
233:12 247:15
248:3,6,10 256:2
268:3,18 270:15
276:17 294:10
313:11 314:8
330:21,22 335:9
340:2 341:4 343:2
345:7 351:19
370:14 377:1
**seeing** 285:12 286:7
**seeking** 86:16
167:2 359:20
**seen** 70:4,13 101:12
187:22 204:22
208:8
**self-explanatory**
182:11
**send** 144:5 150:20
217:13 288:14,15
314:7,18 316:7
333:1 349:9
365:20
**sending** 58:9 156:8
156:12 183:13
188:21 206:19
217:12
**sends** 190:7 236:21
**senior** 22:13 23:16
152:8 159:7 386:2
**sense** 26:17 67:21
112:21 156:19
199:21 244:16
295:22 301:13
302:9 380:2
**sensitive** 274:14
286:11
**sent** 59:5 113:5,12
185:5 209:19,20
262:14 332:8
343:18 346:8
**sentence** 60:8,13



61:7 62:10 63:6
65:4 95:4 141:10
144:18 188:16
189:17 195:21
212:12,19 213:19
219:4 232:12
283:9 343:14,22
345:4,12 354:9
**sentences** 122:7
182:14
**separate** 105:8,10
169:17 291:2,8
**separately** 235:14
**sequence** 57:13
118:18
**sequential** 19:14
251:21
**series** 44:15,17 45:4
47:3 69:10 101:11
234:19
**serve** 22:7 123:1
**served** 12:14 52:22
**service** 15:6,8
144:7 185:16
187:19 233:15
237:10 323:19
325:12
**services** 1:20 9:17
9:19 10:21 11:19
79:22
**serving** 12:11
**set** 54:15 110:13,22
117:18 256:14
365:1 376:16
399:18
**sets** 267:5 309:2
**seven** 254:22
**severe** 65:6,17 66:3
**Shah** 10:20,20
**shared** 345:18
394:14
**SHEET** 405:1,13
406:1 407:1
**short** 25:5 69:10
73:6 99:19 100:14
195:6 200:11

207:13 234:6
308:18 315:19
341:22 344:14
363:8,15 372:1
374:5
**shortened** 245:11
**shorthand** 168:8
302:15 402:6
408:7
**shortly** 104:9
299:17 332:1
**short-handing** 72:4
**show** 24:19 44:15
47:6 69:9 72:13
100:19 101:10
132:4 135:4
164:18 251:1
299:21 357:19
369:20 394:3
**showed** 24:5 48:3
57:14 60:20 120:1
145:8 335:21
385:17
**showing** 23:22 95:8
265:3
**shown** 141:18
148:18
**shrink** 212:20
**shuffled** 252:8
**sic** 82:5
**Sierra** 69:7 232:22
**sign** 403:9
**signalling** 120:21
**signals** 121:11
**signature** 351:20
406:21 407:21
**signed** 332:10,11
405:17
**significant** 96:4
**silently** 315:7
**similar** 14:11 40:13
40:16 41:1,12
70:12 342:18
**similarly** 34:13
52:4 286:4
**simple** 129:1,7

214:1
**simply** 87:4 126:10
127:1 137:9
**singular** 359:19
368:5,18
**sit** 192:18 299:5
**situation** 33:3
117:5,8 157:10
175:7 194:5 223:3
260:2 398:14
**situation/conditi...**
222:4 223:10
**six** 154:15 253:22
254:22 276:1
281:7 299:22
300:3,8 309:12,13
324:15,16 326:6
329:14 332:2
**six-month** 106:14
144:22 145:14
147:18 232:5,15
232:19 233:2
352:8,11
**SK** 349:12,13
**skills** 238:6 297:18
**skip** 90:7 182:13
246:4
**slightly** 66:15
235:20 268:2
**slow** 91:2 387:2
**slowly** 74:10
**slug** 174:13
**sneak** 176:12
**society** 289:8,15
322:14
**solid** 311:19
**solve** 83:19
**somebody** 18:8
83:19 87:2 301:7
327:20 332:5,15
**something's** 83:18
**somewhat** 108:17
245:22 266:22
395:3
**sorry** 18:2,15 20:17
37:7 46:9,11

47:22,22 49:9,16
53:10 55:15 67:1
68:11 75:18 82:19
84:4,5 90:9
103:17 110:8
149:6 161:22
172:2 180:9 187:5
201:22 231:13
236:15 244:7
256:3 270:22
275:17 284:1
288:1 290:17
300:12 309:15
315:5,10 330:4
344:10 388:15,17
399:14 400:11
**sort** 205:21 265:21
**sought** 333:21
**sounds** 122:22
**South** 3:4 14:2 15:3
287:22 290:6
**southern** 18:8
**speak** 45:13 93:5
190:3 211:15
216:4 248:15
258:17 264:15
266:11 298:14
**speaking** 135:1
225:13,18 239:20
272:16 275:4
**speaks** 29:10 53:7
84:20 112:5 183:9
194:12 210:21
213:7 221:13
244:21 251:5
339:21 354:3
**specific** 38:16
42:17 76:18
113:18 217:11
218:10 226:9
231:2 233:5
288:16 313:18
335:14 340:16
401:10
**specifically** 107:17
107:19 160:20

171:9 175:1
262:17,18 281:22
295:16 313:10
383:14
**specify** 360:11
**speculate** 62:11
98:21 341:8
382:21
**speculation** 32:10
45:16 116:8 121:4
156:19 189:10
207:22 217:9
220:11 237:18
239:17 245:20
259:15 280:22
320:20 341:12
368:14 371:17
376:14 386:19
**spell** 140:1,14
402:2
**spelled** 375:21
**spelling** 78:9
**spend** 12:15 390:10
397:19
**spent** 363:6 397:21
**spills** 28:17 74:4
**spoke** 144:1 199:9
298:16,17 391:5
**spotted** 80:7
**spring** 43:3,8
**squeeze** 189:2,21
191:12
**SS** 285:11 286:6
287:19,21
**St** 402:17
**staff** 140:19
**stage** 117:18 358:7
**stakeholder** 323:6
**stakeholders**
323:14,18
**stamping** 105:17
**stand** 265:1
**standard** 312:12
370:22
**standing** 117:10
**stands** 141:12



start 23:22 34:9
  58:6 111:11 165:5
  226:5 245:9 252:7
  253:17 254:20,21
  268:4,11 399:14
started 11:22 17:1
  45:20 152:20
  193:20 251:8
  269:5,20 310:9
starting 253:10
  288:18
starts 80:11 120:7
  270:12,18 288:3
  365:15
state 9:21 32:19,22
  33:14,21 35:8,14
  35:16,19 36:12
  40:3 54:17 58:10
  60:1,4,6 63:11
  64:20 78:2 112:10
  113:16 114:7
  115:20 116:2,3,14
  117:7,9,20 118:7
  118:8,9 164:13,16
  256:8 259:11
  260:12 261:2
  282:14,18 283:21
  284:9,15 286:15
  287:13,15 304:5
  311:17 352:17
  361:5 362:6,8,16
  362:17,17 363:1,2
  363:3 371:22
  392:18 393:4,6
stated 65:16 66:19
  67:17 91:17
  150:12 214:19
  345:14 349:19
  350:11 383:10
  393:12
statement 67:6,8
  70:21 211:4 212:9
  214:21 225:15
  232:6 259:18
  264:1 286:1,3,6
  315:12 328:3

338:1 342:1 344:3
  345:11,13 348:6
  350:14,15,17
  363:22
statements 254:16
  297:15 311:5
states 1:2,6 3:9,10
  9:9 10:21 31:12
  54:1,1 62:1
  171:20 172:8
  173:2,7,9 185:6
  283:15 300:3
  303:11,15 306:19
  307:6 347:8,10
State's 113:6
Static 301:17
stating 146:5
  214:20
statistics 93:3
  305:9 307:4
status 4:7,9,12,16
  4:19,21 5:2 6:11
  7:3 26:20 37:4
  38:19 47:22 48:9
  88:5 95:14 98:2
  109:21 112:2
  126:12 133:12
  138:20 159:10
  173:10 194:6
  226:21 229:9
  246:10 305:14
  307:5,14 312:11
  353:19 359:5
  361:16 392:13
  395:18,18 396:5
  398:19 401:9
statute 24:21 25:14
  25:20 26:4,12,13
  28:2 48:4,5
  182:22 269:6,8,11
  285:10 286:2
  300:1 310:11
  324:18 328:6
  357:1,18,19
  358:18
statutes 27:16

statutory 356:13
  358:18 361:7
  362:1,5,10,14,21
stay 15:14 19:12
  42:20 59:3 83:17
  86:8 137:6 229:3
  257:7 363:9
steady 70:22
stenographic 49:10
  49:14 55:2 101:4
  197:22
step 39:9 193:2
stepping 43:15
steps 40:2 191:8
  317:16 352:10,18
  368:2,12 369:8
stint 15:1,16
stood 353:1
stop 255:1 268:16
  271:12 274:18
  276:6,17 285:13
  286:9 300:12
  301:19 310:7
Storm 74:11
story 135:5
straight 13:17
straightforward
  274:13
strained 250:14
strategy 17:10 19:2
  32:16,17 34:3
  38:14 40:1 77:6
  119:16,20 122:15
  123:9,12,22
  124:10,11,16,20
  127:5,6 142:8,13
  142:19 143:18
  151:16 332:16
  396:19
Street 2:7
strict 404:5
strictly 162:17
  403:2,3
strikes 129:8
strong 340:5
stronger 330:10

333:20 335:16
struck 278:20
structure 124:9
structured 377:13
struggling 306:16
stuff 342:1
subject 77:19 163:5
  219:13 231:6
  236:21 244:20
  292:14 341:14
  379:10 396:14
submit 261:9
subsections 28:16
subsequent 45:7
  85:7 99:2 311:12
  313:7
substance 208:14
  209:5 245:3 264:4
  284:22 292:13
  313:5 359:12
  378:7 384:6
substantially
  249:14 297:10
substantive 231:17
  319:7
substantively
  231:15
Sudan 287:22
  290:6,6
suddenly 126:16
suggest 25:13 29:1
  88:11 116:3
  125:15 127:8
  135:9 145:9
  162:15
suggested 137:12
  330:19 343:3,17
  343:19
suggesting 116:13
  146:20
suggestion 146:22
  355:13
suggestions 127:13
  382:16
suggests 310:8
sum 221:20 317:19

summaries 295:5
summarize 353:14
summarized
  135:14 167:3
  248:19 337:15
summarizing
  270:17
summary 92:19
  135:6 269:2
  271:14 274:20
  283:3 284:11,13
  321:5 325:19
  352:22
summer 45:21
Sunset 317:2
superior 191:10
supervise 21:6
supervised 21:10
supervisor 113:17
  326:9 369:14
supervisory 21:2
support 256:7
  259:10 260:12
  261:2 282:14
  283:21 284:15
  286:15 287:13
  374:7,13 377:14
  378:2,22 393:12
supported 285:10
  286:5
supposed 91:17
  92:4 333:8 372:11
sure 14:14 15:5,19
  16:2 17:1,20 18:6
  19:13,20 21:17
  23:8 24:9,13,17
  24:17 35:8 36:3
  39:10 55:13 62:19
  68:4,22 71:11
  73:2 75:4 77:4
  86:11 87:20 89:3
  94:13 97:14 98:22
  99:12 100:2 105:7
  106:20 107:7
  109:16 110:10,10
  114:4 115:2



120:17,19 121:9
121:20 132:2
140:6 142:11
149:9 162:3 168:3
173:22 186:12
193:18 200:20
207:3,8 233:17
238:16 239:19
241:15 257:9
260:17,21 267:14
276:1,22 277:9,18
280:3 288:1,21
289:11 290:19
293:13 296:20
304:8 306:19
308:14 311:5
312:13 313:12
315:20 317:18,19
322:15 325:4
328:1 344:9
346:17 347:11
363:11 364:20
367:2 370:20
378:16 379:18
381:10 391:4
401:20 402:13
**surprising** 225:8
342:20
**Susan** 113:13,19
**suspect** 205:19
**swap** 308:13
**swapping** 357:19
**swear** 11:2
**sworn** 11:5 408:6
**Symons** 383:10,13
384:1,9,15,16
**system** 191:13
250:14
**systems** 189:3,22
289:6
**SZ** 107:5
**S1** 153:5,17 166:5,6
255:4,12 271:8
274:9,17 276:15
288:6 297:9,14,18
297:20 300:8

301:10,11,11,16
317:20 318:2
329:22 330:2,5,6
330:15 335:15
352:9
**S1s** 152:8
**S1's** 195:11 352:5
**S2** 107:5,7 253:11
255:4,16 256:6
269:13,14 270:12
271:5,8 276:15
282:5,8,14 283:21
285:22 286:14
287:12 288:7
290:2

---

**T**

**T** 4:1,1
**tack** 266:22
**Tahani** 10:17
**take** 13:2 39:9 46:5
46:17 55:7,16
60:2 79:1 82:2
90:11 98:7 99:9
99:13,16 100:9
108:20 109:6
119:6 121:10
150:18 152:5,18
174:16 182:3
188:18 190:2
191:7 193:4
207:18 223:20
245:16 266:4,22
278:17 295:14
317:17 329:17
344:17 347:22
352:10 353:19
358:10,15 363:8
363:20 364:8
367:9 372:11
373:2,22 375:19
382:2 385:20
**taken** 9:13 25:5
73:6 75:16 100:14
142:17 200:11
207:13 234:6

245:17 270:17
308:18 352:19
360:13 363:15
368:2 397:20
405:9 408:3,7,13
**takes** 151:7 352:15
**talk** 109:14 211:19
224:17 242:4,5
251:22 266:3
291:15 294:5
309:19 336:10,12
367:22 376:7
**talked** 127:22
137:13 147:19
185:14 238:21
266:15
**talking** 16:12 30:13
30:19 64:17 122:2
123:9 135:17
145:3 147:8 151:4
153:15 154:20
172:13 183:17
220:19 231:2
239:21 270:18
281:22 287:3
306:18 307:2
316:14 333:13
343:22 349:8
350:21 357:14
365:1 368:17
369:6 371:19
389:17 402:5
**talks** 145:12 154:2
249:20
**tapes** 308:13
**task** 333:11 346:15
**taskers** 332:17
**tasks** 333:16
**team** 142:14,16,16
385:1
**technical** 386:2
**technically** 173:10
**tell** 11:5,13 12:3,18
13:4 16:20 32:3
42:22 51:18 59:13
63:15 79:12 86:17

87:1 97:9,9 98:19
103:8 107:6
113:13 126:21
127:4 134:2 135:8
140:18 141:14
144:6 150:22
165:2 185:1
205:17 208:13,21
233:14 252:8
255:1,19 276:3
284:5,13 286:16
288:21 291:10
294:17 324:11
336:4 345:22
346:13,17 348:13
349:18 353:14
356:9 366:1 368:6
371:3 385:22
397:12
**telling** 126:17
**tells** 403:20
**temp** 315:20
**temperature** 129:9
**temporarily** 362:7
**temporary** 4:7,9,11
4:16,18,21 5:2
6:10 7:3 30:3
47:21 48:8 61:10
88:4 310:10,13
315:19,20 316:4
330:17 356:20
362:13,15,20
**ten** 15:17 72:5
**tense** 368:5
**term** 224:21 315:19
**termed** 336:21
**terminate** 108:21
144:21 145:14
146:7 147:18
148:1 149:12
159:9 226:18
230:4,8,20 231:11
232:3,14,21 380:4
395:12,22 397:14
**terminated** 85:19
194:7 226:22

308:11 361:11
**terminating** 227:19
229:20 272:21
363:22 392:12
**termination** 7:2
26:19 154:14
220:1,6 274:13
374:8,13 377:15
378:2 379:1
393:13
**terminations** 30:9
68:6 197:1
**terminology** 346:22
**terms** 26:19 68:6
105:19 112:1
113:10 124:8
129:17 137:20
151:13 165:14
227:16 242:9
243:13 262:4,14
262:15,19 267:1
281:10 289:18
292:19,20 303:17
335:18 357:21
369:14 376:10
397:18
**testified** 11:7 356:2
**testify** 76:12 272:11
283:9
**testifying** 27:2
**testimony** 170:9
194:14 237:20
258:3 277:14
304:22 358:19
361:18 380:12,21
408:4,6,10
**testing** 118:21
**text** 58:18
**Thank** 47:9 49:6
55:9 56:1 57:4
101:6 182:9 201:3
201:4 248:14
286:12 306:22
363:11 404:13,14
**that'd** 72:19 99:14
**thereabouts** 147:15



**thin** 383:20
**thing** 25:16 110:9
  290:13 370:5
  375:14 384:10
  388:17
**things** 28:21 29:4
  81:9 118:10 127:2
  128:2 130:8
  147:21 200:18
  205:19 255:6,8
  258:19,19 262:4
  267:17 270:1
  271:14 274:20
  278:4,18 279:13
  298:20 303:8
  312:16 314:1
  315:17 344:15,21
  348:7,14 349:11
  349:12,19 353:1
  380:22 398:4
**think** 13:4 19:9
  21:8 22:16 23:22
  28:6 35:9 42:16
  44:1,20 47:10
  56:14 61:15 65:9
  69:11 83:3 85:5
  89:4 92:3 99:14
  101:19 102:15,19
  103:9,12 105:7
  107:13 108:1
  115:5 116:12
  117:14 119:11,22
  123:2 127:15
  128:1,9,12 129:21
  131:6,13,18
  136:18 137:18,22
  138:4 142:5
  145:10 146:4
  148:10 150:4
  155:3,20 156:3
  158:22 165:4
  172:11 174:14
  175:11 176:6
  178:21 179:19
  180:3,21 186:9
  193:19 196:9,15

197:18 210:19
213:7 218:17
219:12,17 222:22
226:11 228:21
231:1,14 234:16
234:20 238:6
239:12,20 240:12
241:8 245:21
246:18 251:4,14
251:14,21 252:4
252:12,14,17
253:5,8 254:10,15
257:18 258:22
259:8,14,15,17
260:18 261:8,18
262:6,8 263:21
264:22 265:2,9
266:16 268:5,5
270:16,21 272:15
273:16 279:10,17
280:19 281:18
282:1 283:14
286:22 287:8
289:17 291:1,4,15
293:21 295:10,21
298:8 299:19
303:9,19 304:15
304:22 305:22
306:12 307:12
309:3,8 312:19
313:20 316:13,18
317:1,15 318:4,15
318:22 319:1,6
322:19,20 325:10
327:3 328:11
331:8 333:13
335:5 336:19
337:10 339:5,15
339:19,20 340:12
340:13,14 343:21
345:6 346:3 347:1
347:3,18 348:14
354:8 355:3
356:21 357:2
358:7,9 359:11
360:7 363:5

370:19 371:18
377:4 378:16
379:3,8,9,16,19
379:21 380:21
381:10 382:10,11
383:20 384:4,7,10
384:10,22 386:18
388:22 389:12,16
391:10,16 392:17
395:2,10 403:17
**thinking** 81:9
  107:21 139:4
  156:7 253:2 311:2
  317:21 318:9,15
  349:17 363:6
**thinks** 261:6
**third** 50:7 98:5
  107:4 166:4 197:7
  253:11 269:12
  309:2 311:11
  314:3 324:4
**thought** 103:17,18
  103:19 138:19
  226:20 228:14
  235:22 246:14
  251:18 271:8,21
  279:2 296:7
  319:22 331:12
  340:18,20 345:14
  347:4
**thoughts** 105:9
  217:15 227:4
  228:8 312:19
**three** 28:15 29:3,14
  30:5 180:7 282:5
  342:22 365:21
  366:2,9,20 367:2
  367:4 368:4,17,20
  371:5
**Thursday** 387:3
**tick** 297:7
**tight** 404:12
**tighten** 106:11
  293:18
**Tillerson** 285:11
  286:7 287:20

**time** 9:12 12:16
  13:2 14:2,5 15:18
  19:22 20:9 21:7
  25:4,10 34:11
  38:3,13 43:16
  44:3 45:7 46:4
  50:2 52:1 54:2
  55:16,20 63:21
  71:9 73:5,9,16
  84:1 86:1,7 93:4
  95:7 97:7 100:13
  100:17 105:20
  106:6,15,21
  107:15 108:2,4,16
  109:2 113:16
  119:6 120:16
  122:8,19 123:3
  124:22 127:19
  128:4 129:3,9
  130:7,12 134:10
  134:15,17 135:6
  135:21 138:12
  139:21 140:20
  141:17 147:14,15
  148:11 149:11
  150:5,9 153:1,8
  153:18 157:18
  166:7 167:1 169:5
  170:18 175:6
  176:15 181:19
  185:17 200:10,14
  207:16 217:19
  226:20 229:17
  232:7 234:5,9
  236:3 239:8
  240:22 241:3
  246:16 248:5
  251:19 252:11
  253:22 254:4
  257:17 266:16
  268:14 271:10
  275:21 284:10
  293:4,10 294:12
  304:6 307:16
  308:17,21 310:12
  312:11,14 325:13

338:20 342:4
353:11 363:6,8,14
363:18 364:17
368:21 382:2
390:11 395:15
397:13,15,18,21
399:6
**times** 56:16 201:10
  201:15 202:1
  204:15 209:18
  210:8,13,14
  211:14 212:4,5,22
  213:15 214:8,19
  214:22 261:21
  262:1 267:21
  310:14 338:17
  339:7 377:19
  379:15
**timing** 151:13
  328:1
**Tina** 334:19 340:3
**title** 16:19 18:16
  49:20 70:14 88:4
  88:9 113:18
  310:10 347:4
  385:7 386:2
**titles** 21:15 27:13
  325:11
**today** 22:7 206:7
  263:5 293:8 331:9
  333:10 356:2,11
**Today's** 9:11
**told** 50:2 72:5
  77:10 87:2,3
  125:1,3 126:5
  142:5 235:15
  241:8 259:6 268:5
  299:4 309:3,15
  335:3 352:9
  354:11 357:2
**Tom** 216:17,18
  217:4 218:18
**tool** 287:16 311:17
**top** 48:16 50:9
  73:21 101:16
  115:13 119:4



140:22 141:16
185:9 188:13
192:9 216:11,13
221:6 235:20
246:21 252:2
273:21 291:1
313:19 314:22
315:5,6 344:7,10
370:6,9 392:4
**topic** 242:2 244:13
244:14 321:6
327:14 328:16
370:12
**topics** 242:2 244:5
307:2,4
**to-dos** 167:21
**TP** 166:13
**TPS** 5:4 7:5 24:20
25:14 26:20 27:7
29:6,15 32:20
34:4 35:16,17,19
36:13,17 37:4,21
37:22 38:11,19
39:12,14,16 43:13
43:17 44:1 45:1
45:21 48:5 49:22
50:10,22 51:21
54:17,19,20 59:6
68:6 69:3 70:14
70:15 73:22 75:12
78:10 85:17 89:16
94:15 95:10,14,22
96:1 97:17 102:17
103:11 108:3,6
109:4,21 111:22
112:2,11 113:22
115:8 120:20
122:10 123:10
126:12 133:12
138:19 151:17
156:10 157:2
159:10,20 170:18
172:12,21 173:1,8
174:1,11 182:15
182:18 185:18
188:10 194:5,6,16

195:1 197:10
199:11,21 201:11
220:18 226:12,22
227:19 229:9
232:21 242:4
245:10 246:10
247:10 252:1
269:6,10,14,17
273:3 276:5
281:20,22 282:1
282:22 283:17
287:16 288:6
289:3 291:16
296:1,3 297:1
298:10 302:18
303:10,11,14
304:12,13,15
305:5,11,13
306:18 307:5,14
308:6,9,10 309:20
309:21 317:17
323:5,13,14,21,22
327:7,8,9 328:6,8
330:1,10,18
335:15 345:12
352:8,11,16
353:19,21 356:13
359:5,21 361:9,15
366:10 372:22
374:5 377:22
378:21 379:14
380:12 382:6
383:4 384:3
385:21 387:7
389:3,17 392:12
394:11 395:12,18
395:22 396:5,15
396:20 397:2,4,4
397:7,9,18,21
398:14,19 400:21
401:7,9,12
**TPS-related** 398:9
**traced** 250:15
**track** 48:2,13,17
299:21
**tracked** 253:20

275:15
**traditionally** 39:17
123:14
**trailer** 344:11
**transcript** 8:15
24:12 325:6,16
390:18 391:3
403:10 405:8
**transcription** 408:8
**transferred** 17:4
**transition** 121:11
142:14,15 144:22
145:15 147:18
154:16 385:1,2,4
**transitioned** 401:20
**translate** 120:5
168:6 247:19
**transmission** 80:2
239:21
**transparent** 214:3
**travel** 116:19 183:1
312:11 352:13
**traveled** 77:3
**treated** 216:7
**trial** 265:13,14
388:7
**tried** 177:22 373:7
**tries** 282:8
**Tropical** 74:11
**true** 37:12 196:21
349:11,11 405:10
408:9
**Trump** 1:6 9:7
128:1 152:22
385:2,6,9 386:6
405:4
**trusty** 237:7 238:22
**truth** 11:6,6,7
80:17
**truthful** 231:22
232:6
**try** 19:12 28:21
42:20 86:11 156:7
170:11 173:12
183:6 190:5 191:7
191:12 213:3

229:17 267:14,18
268:10,21 284:5
333:20 337:4
340:8 370:14
372:4,11 377:1
**trying** 38:18 71:22
86:14 87:4 97:4
108:12 112:21
126:14 127:1
174:15,17 176:11
190:9 206:22
213:4 223:15
229:19,21 244:10
244:11 266:6
280:2,3,14,17
281:19 286:18
307:4
**Tuesday** 333:9
**turn** 70:20 71:22
114:13 139:13
151:21 158:13
214:14 253:14
**turned** 274:14,16
**two** 21:8 22:11
37:18 79:18 91:5
91:9 113:12,12
151:19 202:15
208:21 215:8
249:5 304:3
324:18 327:3,9
328:7 329:11
331:2 343:1 349:8
350:14
**two-page** 111:13
**type** 50:8 151:5
169:6 183:7
201:17 220:1
232:18 301:21
327:6
**types** 177:6 296:2
**Typewritten** 5:13
**typically** 39:7
41:11 42:5 134:7
157:2 160:8

———— **U** ————

**Uh-huh** 89:14
166:16 181:22
247:18 290:22
**ultimately** 41:19
77:7 82:3 84:2
155:1,21 159:9
178:10 206:19
220:4 229:8
248:18 265:6
306:14 350:18
356:4 381:14
**unable** 362:7
**uncertainty** 368:4
**uncomfortable**
299:6
**undergrad** 13:13
**underlying** 264:3
379:5
**understand** 12:22
29:13 53:10 57:20
95:11 121:17
144:19 148:15
149:1,7 168:3,7
181:3 185:4
200:21 209:16
223:15 244:8
257:10 294:18
297:13 307:10
312:1 331:1 361:9
376:9
**understanding**
26:16 57:18 59:15
64:6 67:18 81:3
82:16 121:15,21
122:1,4 126:10
129:19 152:15
155:6,10 156:11
165:15 167:1,19
168:16 170:9
171:12,18 174:18
189:4 206:7 217:3
217:7 219:7
227:16 237:11,21
239:8,8,16 251:7
264:16 266:12
282:2 283:16



284:9 292:22
311:18 315:9,13
341:6,7,9,18
342:4,5 344:4
353:11 358:17
377:8 381:9
390:17 405:14
**understood** 148:11
238:14 322:3
354:10 381:15
388:19
**unfair** 389:14
**unilateral** 19:15
**unique** 323:6
**unit** 40:5 78:1
93:18 94:1,22
95:13,20 187:18
193:11 216:21
218:19 366:18,18
372:2 373:4,10
**United** 1:2,6 3:9,10
9:9 10:20 15:10
15:20 54:1,1
171:20 172:8
173:2,7,9 185:6
300:3 303:11,15
306:19 307:6
347:8,10
**unit's** 216:6
**universe** 244:11
**University** 13:10
13:18
**unnecessary**
387:21
**unquote** 302:9
**unreal** 341:3 342:2
342:5
**untrue** 345:14
348:14 349:17,18
349:19 350:9
**untruth** 344:15,21
348:7 350:18
**unusual** 109:7
117:5,8 125:15
151:6 211:14
**upcoming** 221:10

**update** 95:1 96:6
97:15 117:9
**updated** 96:2,10
352:12
**upper** 320:3 322:6
322:14
**USCIS** 12:1 16:8
16:13 17:9 19:2,5
22:13 34:5 39:8
39:13,18,21 40:5
40:11 45:14 70:1
77:7 78:1,4 81:1
116:14 123:13
133:9,17 134:6
135:2,10 138:19
139:3,20 142:14
144:8,12 147:10
154:6 155:1,8
156:1 161:18
163:9 187:19
195:10 203:14
220:20 223:19
271:22 273:5
313:17 323:13
325:10 377:16
381:17 382:22
383:11 384:17
385:1 388:17
**use** 53:13,19 72:7
157:19 191:9
255:10 256:13
279:15 345:10
394:20
**useful** 51:4 379:19
**uses** 282:13,20
283:15
**usual** 111:11
125:14 126:16
186:14
**usually** 58:6 95:19
134:8 185:6
311:19 325:3
**U.N** 250:16
**U.S** 9:7 10:12,15
11:18 60:3 280:16
301:14 302:11,19

305:11,12 320:14
321:21 352:12

---
**V**

**v** 9:7
**vague** 36:4 38:9
39:4 42:3 50:17
68:2 71:11 99:4
124:5 126:1
145:21 148:3
179:18 192:19
220:7 248:20
249:16 284:19
307:22 354:4
355:21 395:19
**vagueness** 128:9
129:17 149:4
195:22 225:2
305:21 354:22
360:19 361:17
**valid** 357:21
**valley** 224:17
**Valuable** 311:17
**value** 257:14
**varied** 21:7 161:16
**varies** 109:10
**various** 36:20
43:11 109:21
133:16 170:12
179:1 242:14
267:10 392:13
**vconnelly@maye...**
3:5
**verbatim** 278:7
284:12 301:21
**verbose** 169:20
**version** 248:13
**versions** 157:14
**videographer** 3:19
9:3,16 11:1 25:3,8
73:3,7 100:8,11
100:15 200:8,12
207:9,11,14 234:3
234:7 308:12,15
308:19 363:12,16
404:15

**Videotape** 9:5
**Videotaped** 1:11
2:1
**view** 33:7 65:20
66:2,11 81:17
319:5
**viewed** 43:9
**views** 139:3 227:3
262:16 266:8
300:2
**Vincent** 3:2 9:22
**Vision** 15:9,21 16:1
**visual** 270:19
**voluntary** 15:6,8
16:5
**volunteer** 15:5,16
**vs** 1:5 405:4

---
**W**

**Wacker** 3:4
**wait** 181:13 294:13
**waive** 258:16
263:10
**waived** 257:15
387:20
**waiving** 340:15
**walk** 15:2 16:16
47:1 313:11
**wall** 284:4,6
**want** 12:2,3 13:2
28:22 62:11 66:16
79:7 87:1 88:2
91:2,22 92:1,8
98:21 99:16 100:6
109:16 110:14
118:8 126:5,6,9,9
126:18,21 127:21
127:22 128:3,22
128:22 129:7,10
132:17 137:7
144:13,14,14
147:19,20 159:4
162:16 170:2
177:10 180:16,17
180:18 186:3
188:16 198:6,11

198:18 199:2,3
208:10,16,17,20
211:16 214:3
228:18 230:1
235:9 236:10
241:22 243:12
244:12,16 252:8
255:8,9 260:8
268:21 270:6
272:10 279:13,14
283:1 284:4 294:5
297:16 335:12
338:21 341:8
348:21 350:4
351:14 363:7,7,9
383:21 396:6
400:14,16
**wanted** 57:20 62:22
117:9 214:2
258:10 271:10
278:21 279:2
287:11 327:10
330:9
**wants** 274:9 330:10
335:16
**war** 255:10 279:15
**warn** 271:10
**warranted** 155:3
156:3 288:7 300:4
**Washington** 1:12
2:8 12:5 16:9
18:17 19:18 38:5
50:3 52:1,6 68:1
73:16 75:21
193:20
**wasn't** 45:14 94:20
98:1 161:16 195:2
238:7 243:22
244:3 272:7,13
277:1,10 328:14
329:19 388:5
390:5 402:6
**waste** 79:22 130:12
248:5
**watching** 43:21
97:12



water 72:18,22
way 23:7 39:11
    50:8 74:3 77:4
    108:19 131:2
    159:1 165:13
    166:11 173:13
    189:2,21 196:9
    227:10 230:14
    255:5 268:20
    270:19 278:4
    339:1 345:8 351:7
    359:13 369:16
    375:11,14 378:11
    379:8 380:9
ways 257:19
weak 250:13
Webb 3:18 10:9,9
website 269:14,15
weddings 224:19
week 246:22 253:2
    365:15
weeks 22:11 37:18
    93:22 120:2
    229:15
weighted 389:11
welfare 320:2,12
    321:18
well-established
    379:20
went 13:15,15,17
    31:19 157:8
    170:17 204:16,19
    207:20 208:7,12
    228:15 272:16
    298:13
weren't 52:1 53:5
    54:1,19 130:10
    149:9 244:2
West 33:4 145:1
    232:16,19 233:4
western 115:10
we'll 24:1,1,2,15,22
    42:20 46:5 47:5
    48:12,12,13,13,17
    48:17 49:2 53:19
    53:19 58:3,3

83:19 86:20 87:11
    104:18,18,18
    106:9,10,10,10
    110:3 138:9 143:1
    170:15 178:8
    181:7 186:9,10
    189:1 235:13
    268:3 389:19
we're 16:14 20:19
    25:8 28:14 54:22
    57:12,20,20 58:1
    67:7 73:3 83:17
    84:7,7 99:7
    100:11,15 110:7
    112:17 119:21
    120:2 145:2,2
    147:8 148:16
    151:3 154:20,20
    154:20 155:1,7,21
    156:9 165:2
    174:12 175:12
    178:8 200:8
    205:18,18 206:6,9
    206:10,11 234:3,7
    256:16 261:1
    264:12 271:2
    273:20 282:10
    293:6,13 294:3,14
    308:15,19 363:12
    363:16,20 387:2
we've 49:18,18
    51:17 70:13 74:6
    108:13 118:6,7
    119:21 261:21,22
    264:22 265:17
    266:1 331:9
    338:19
whack 237:9
    239:11
white 14:9 232:17
    398:18,21 399:1
    399:19 400:3,7,22
    402:5,7 403:1
wife 174:7
willing 206:6 404:2
Wimbush 334:20

340:3
window 176:6
winnow 200:17
wisely 255:10
    279:15
wished 130:9
wit 204:2
withdrawn 397:4
withdrew 265:6
withholding 264:20
witness 11:2 12:12
    12:14 14:20 20:17
    27:1,2,6,22 28:6
    29:13 31:7 32:13
    32:14 34:2 36:6
    36:11 37:7,9
    38:11 39:6,11
    41:6,6,11 42:5,16
    44:12 45:13,20
    46:10 47:4,9 49:6
    49:16 50:17,18,21
    52:9 53:5,6,9 54:6
    54:10 55:17,20
    56:1,4 58:20 61:4
    62:6 64:5,20
    65:12,16 66:7,13
    67:12,16 68:4
    69:15 70:4 71:16
    72:19 73:1 75:4
    76:14 77:20 79:1
    81:3,18 82:19
    83:15 85:1,15
    86:5 87:10 90:20
    91:9,13,13,16,21
    93:1 94:13 95:17
    95:19 99:6,14
    101:6 106:18
    109:10 110:8,13
    111:1 112:10
    115:2 116:12
    117:2,3,4 118:15
    118:21 121:9
    124:3,8 125:7,11
    125:18 126:2
    127:11 128:17
    129:14 130:1

131:8 136:8,17
    137:4 139:1,7
    141:6 143:5 146:4
    146:13 147:8
    148:3,7,10 149:6
    150:3,15 151:11
    151:12,15 152:14
    155:20 157:2
    158:5,9,20 159:2
    159:14,17,22
    160:7,19 161:7,15
    163:2,8,14,18,20
    164:11,22 167:9
    167:19 168:18
    169:9 170:21
    171:8 172:2,11,16
    172:19 173:6,19
    173:21 174:1,5
    175:15 176:3
    177:2,18 178:5,15
    179:6,20,22 180:3
    181:3 183:13
    184:10,20 186:7
    187:5 188:9
    189:16 190:18,21
    191:2,15,20 192:8
    192:20 193:1,7,18
    194:10,20 196:3
    196:15 197:6,7,10
    197:13 198:16,22
    199:5,11,21 201:4
    203:5,12 204:8
    208:3 209:6 211:4
    211:8 212:9
    213:14 214:18
    216:4 217:10
    218:17 219:10
    220:15 221:2,15
    222:22 224:6,10
    225:5,18 226:2
    227:22 229:13
    230:6,11,13 231:3
    232:10 238:16
    239:4,19 240:14
    243:7,18 244:7
    245:4,21 248:22

249:18 251:7
    254:15 259:3
    263:22 264:7
    267:13 271:21
    272:8,11,15 275:2
    277:17 278:17
    279:6 281:2,18
    283:14 285:20
    287:2,11 292:4,11
    293:12 294:15
    295:10,21 296:20
    302:4 303:7,21
    304:5 305:4,22
    306:16 307:12
    308:5 313:9
    316:13 317:15
    318:12 319:1
    321:1,9 322:3,12
    323:9,10,11,12
    327:3 331:8 334:6
    336:22 337:11,19
    338:5,14 339:18
    340:17 341:17
    342:10,17 343:17
    345:6 346:13
    348:17 350:8
    353:10 354:8
    355:1,2,7 356:7
    358:2,3,4,4,19,21
    359:15 360:11
    361:1,1,2,4,22
    364:20 365:11
    366:6 367:1,16
    368:16 369:10
    371:12,18 372:17
    372:19,21,21
    373:1,16 374:19
    376:19 377:8
    378:12 380:13
    381:5,7 382:21,22
    383:10,17 385:14
    386:14 391:2
    392:17 393:19
    394:7 395:2,10,21
    396:17 398:8
    399:6 400:6,15,19



401:19 402:10,12
403:9 404:3 408:4
408:6,10
**witness's** 81:17
197:4 292:21
**woman** 277:3,11
**women** 277:5,15,20
**wondered** 72:9
**wondering** 349:17
360:12
**word** 154:12
255:22 275:13,22
280:2,6 281:7,7
282:12 312:14
319:21 321:10,12
341:10,19 394:21
**worded** 354:9
**words** 15:17 28:22
97:4 187:2 224:19
228:19 275:5
281:10 286:17
290:4 318:7
**work** 11:16 15:20
16:3,5 20:1 21:4
30:4 32:15 52:5
114:22 116:18
166:21 167:21
171:16 216:8
227:16 307:17,20
312:2 314:19
327:8 332:18
334:6,9 372:1
384:17 396:4,8
398:11 401:7
**worked** 11:20 14:1
19:3 38:13 69:1,5
70:1 77:4 82:7
113:22 122:15
124:15,17 126:15
204:8,13 216:20
391:16 401:20
**worker** 126:11
**working** 19:21
43:16 45:14,20
50:22 234:17
395:17 401:6

402:7
**works** 39:12 113:15
143:16 151:3
332:15
**world** 15:9,20 16:1
16:3 36:20 43:11
**world's** 238:5
**worry** 96:16
**worth** 340:2 403:18
**wouldn't** 50:6
126:21 196:21
**write** 156:20,20
211:19 267:19
278:18
**writes** 389:6
**writing** 147:22
201:17 202:13
312:18 317:7
336:7 374:12
**written** 65:10 112:8
160:11,17 169:3
225:4 264:2 331:3
373:20 374:7
378:1,22 381:13
**wrong** 176:8 210:4
210:10,15 211:5
213:1,20 214:7,10
214:20 292:20
**wrote** 64:18 101:20
213:12 242:19
283:10 286:14,17
321:1
**WRT** 370:16
**www.MagnaLS.c...**
1:22
**W-I-M-B-U-S-H**
334:20

_____

**Y**

**yeah** 22:22 28:20
41:7 46:8,10 48:6
48:12,22 55:14,14
56:3 60:14 67:3
72:19 73:2,2 76:5
79:2,2 80:9 82:8
82:22 84:6 96:20

96:22 100:2,5
110:12,12 114:4,5
114:8 117:14
121:18 122:5
127:6,6 130:14
134:20,22 135:18
136:3 140:11
142:3 143:20
163:18,19 164:2
172:16 174:7,9,12
176:9 195:11
200:22 202:7
205:1 211:3,7
212:17 213:22
241:1 243:21,21
251:14 268:1
326:11 329:20
357:2,7 376:22
**year** 5:2 13:11
15:16 16:12 17:3
17:6 46:18 88:5
89:18,19 117:7,16
117:20 395:16
401:19
**years** 17:12,13 69:1
98:7 304:12
314:21
**yep** 320:2,4
**yesterday** 101:12
235:5 263:2 352:3
**yesterday's** 333:1
**York** 1:2 3:11,12
9:10 15:7 16:10
17:1,18,22 201:10
201:15 202:1
204:15 209:18
210:8,12,14 212:4
212:5,22 213:15
214:5,8,19,22
263:18

_____

**Z**

**zone** 255:10 279:15

_____

**0**

**00004** 291:5

**0005** 290:20
**01** 271:2
**04** 256:3
**06** 13:19 291:14

_____

**1**

**1** 4:7 9:5 26:7
105:17 166:12
172:11 178:1
180:12 181:4
218:4 362:3
**1s** 152:8
**1st** 215:12
**1-21-10** 4:12
**1-5** 68:12
**1:16** 336:5 343:18
**10** 5:6 102:11 192:3
**10A** 5:8
**10th** 66:20
**10-1-12** 4:17
**10-13-17** 7:7,9,11
**10-19-17** 7:13
**10-22-17** 7:15
**10-23-17** 7:17
**10:00** 365:21
**10:08** 192:3
**10:11** 1:14 9:12
387:4
**10:14** 111:15
**10:22** 25:4
**10:24** 25:10
**10:41** 242:21
**100** 102:20
**101** 8:2
**102** 8:4,5
**105** 8:7
**10924** 334:11
**10925** 344:8
**11** 4:3 5:10
**11-2-17** 7:19
**11-20-17** 7:21
**11:06** 73:5
**11:07** 73:9
**11:32** 100:13
**11:41** 100:17
**111** 5:6

**1118** 373:13
**11201** 3:12
**118** 5:8
**12** 5:11 103:4 221:5
373:19 387:3
389:4
**12:40** 226:4
**12:45** 382:13
**12:53** 351:15
**1254a** 4:7
**1273** 394:4
**13** 1:13 5:13 140:22
312:7 365:16
367:20 370:10
371:8
**13th** 9:11
**13:22** 200:10
**132** 5:10
**14** 5:15 139:13
314:4 315:5,7
**14:12** 200:14
**14:19** 207:16
**14:50** 234:5
**14:53** 234:9
**143** 5:11
**15** 5:17 46:19 68:9
226:4,14 231:9
232:1 314:21
316:20,20
**1564** 225:21
**16** 5:19 46:19
132:22 319:14
**16:11** 308:17
**16:19** 308:21
**164** 5:13
**17:22** 363:14
**17:32** 363:18
**18** 5:21 103:5
135:12,22 136:12
136:22 138:20
310:12 315:9,13
324:15 351:15
353:2
**18-cv-01599-WF...**
1:4
**18-month** 145:11



145:17 146:22
**18:24** 404:18
**181** 5:15
**186** 5:17
**19** 252:5 268:7
291:20 382:13
**19th** 106:8
**193** 5:19
**1999** 2:7

**2**

**2** 4:8 26:3 166:18
180:12 181:4
218:4 248:9
253:16 273:21
275:12 299:11
312:7
**2A** 4:11 49:3,13
**2nd** 133:5
**2-23-17** 5:8
**2-7-17** 5:5,7
**2:21** 187:13
**2:38** 336:6
**2:51** 344:12 348:5
349:17 350:14
**20** 215:2 234:13
235:19 236:20
241:7 251:14
292:5 394:15
**20th** 102:19 104:2
117:22 246:2
251:15 252:6,15
252:16
**2001** 28:1
**2003** 13:13
**201** 5:21
**2010** 14:6 44:7 48:9
49:22 61:20 71:1
74:5 80:14 85:7
98:20 99:3 249:14
249:18 250:7,10
251:3 297:11
330:17 344:1,5
**2011** 12:1 16:14
17:2 44:20 45:3,7
47:1 48:11 51:20

57:15 60:9 62:15
64:11,22 66:5
67:18 74:9
**2012** 71:18 74:13
**2014** 17:13,14 38:5
45:22 46:6,15,19
68:1 70:16 72:7
73:12 75:17,20
80:11
**2015** 19:9 20:20
21:16,18 75:13
76:3 82:5 84:2,4
91:22
**2016** 5:2 43:20
61:16 74:1 88:5
89:18,20 90:4
95:5 96:10 97:13
98:1 232:22
249:13
**2017** 21:20 43:3,8
46:6,15 57:16
59:18 66:20 78:11
96:11 98:3 102:17
102:19 103:13,16
106:6,8,15 107:20
108:2 109:2,20
110:4 111:15
120:3 122:17
125:1 126:16
127:7,18 129:2
130:8 131:1,17
133:5 138:18
140:5,8,10 142:10
147:15 150:10
165:5 169:5
174:19 175:7
177:7 179:16
184:16 187:13
201:12 216:12
226:20 227:17
231:9 232:1
234:13 246:11
249:21 250:9
305:8 323:3 353:2
384:14,18 398:15
399:10,15 400:7

401:19
**2018** 1:13 9:11
165:11 247:11
397:15,22 405:18
**2020** 408:22
**2044** 268:16
**20561** 350:20
**21** 6:2 48:9
**215** 6:2
**22** 6:4 247:11 296:7
365:2 385:19
386:10 389:5
**22nd** 70:16 74:1
78:11 143:9
252:21
**220** 6:4
**2248** 391:20
**225** 6:6
**23** 6:6 296:14 329:6
329:13 335:20
**23rd** 103:16,22
120:3 125:1 130:8
131:1 253:4
**233** 6:8
**2383** 246:5
**23832** 247:17
**24** 90:7 246:11
251:12 309:6
333:5
**24th** 143:10 145:12
147:14 148:21
151:22 152:2
154:10 165:5
329:19 331:12
**244** 269:6,8,10
297:9 301:11
**246** 6:10
**25** 4:7 6:8 329:11
333:18
**25th** 75:12 82:5
187:12
**27** 6:10
**27th** 103:21 192:2
**271** 3:11
**28** 6:12 328:20
**28th** 154:1

**29** 6:14

**3**

**3** 28:17 30:7,8
70:11 166:20
172:6,12,18 178:1
180:12 181:4
218:4 276:12
**3A** 357:14
**3rd** 73:12 111:15
**3-29-17** 5:12
**3-3-14** 4:19
**3:30** 223:18
**3:38** 221:5
**3:44** 329:7
**3:46** 133:5
**30** 6:16 408:22
**30th** 201:12 209:11
**30(b)(6)** 41:6 50:18
53:4 54:6 81:18
91:13 117:2
151:11 303:21
323:11 355:2
358:4 361:1
372:21
**30(d)(3)** 339:19
**31** 6:18 235:21
246:22 248:4
253:7 323:3
403:10
**312-701-7912** 3:5
**328** 6:12
**3287** 187:10
**334** 6:14
**34** 7:2
**347** 6:16
**351** 6:18
**36** 7:6
**364** 7:2
**365** 7:6
**369** 7:8
**37** 7:8
**373** 7:10
**38** 7:10
**381** 7:12
**385** 7:14

**39** 7:12
**390** 7:16
**391** 7:18
**394** 7:20
**399** 89:11

**4**

**4** 4:13 78:7,12,13
78:16 79:3 133:1
172:13 180:3
247:6 282:11
**4th** 165:11
**4-10-17** 4:14
**4-14-17** 5:19
**4-27-17** 5:17
**4-3-17** 5:10
**4-30-17** 5:21
**4-7-17** 5:15
**4:21** 152:1 154:10
**4:30** 215:13
**4:54** 349:7,18
**40** 7:14 345:19
**40A** 7:16
**40-A** 390:5,7
**41** 7:18
**42** 7:20
**425** 90:8,9
**448917** 1:18 405:2
**47** 4:8
**49** 4:11

**5**

**5** 4:15 74:5 78:17
79:3 105:18
**5-12-17** 6:4
**5-15-17** 6:6
**5-19-11** 4:10
**5-20-17** 6:8
**5-24-17** 6:11
**5-25-17** 6:13
**5-31-17** 101:17
**5-8-17** 6:2
**5:15** 358:10
**50** 8:2 253:7,8
**50-day** 296:22
**51** 8:4 235:2 253:8



**52** 8:5 235:2 253:8
**53** 8:7 234:20 235:2
  253:8
**542** 390:12,14
  391:13
**55** 4:13
**561** 348:3

---
**6**
---
**6** 4:18 358:8 365:15
  392:3 393:9
**6th** 114:15
**6-7-17** 6:15,17
**6:24** 404:20
**60** 30:14
**60606** 3:4
**6081** 210:14
**674** 382:14
**69** 4:15

---
**7**
---
**7** 4:20 102:10 182:5
  265:13 334:20
  336:5 344:12
  348:6
**7th** 96:11 181:13,17
  182:1 184:16
**7-18-17** 6:19
**7/23** 296:13
**71** 3:4
**718-254-6288** 3:12
**72** 4:18
**725** 80:13
**725,000** 80:13
**75** 4:20
**76FR29000-01**
  48:18

---
**8**
---
**8** 5:2 102:11 216:12
**8,800** 80:13
**8-25-15** 4:22
**8:17** 394:15
**8:46** 209:11
**8:51** 371:7
**8:59** 370:10

**80** 168:5,6
**8094** 233:19
**866-624-6221** 1:21
**87** 5:2
**880** 351:10

---
**9**
---
**9** 5:4 301:9
**9:17** 114:15
**9:19** 181:13,17
**9:50** 226:14
**9:58** 236:20 242:20
**90** 96:13
**93** 5:4
**9539** 390:6



Page 405

1   DEPOSITION ERRATA SHEET

2   Our Assignment No. 448917

3   Case Caption:  Saget

4   vs. Trump

5

6      DECLARATION UNDER PENALTY OF PERJURY

7   I declare under penalty of perjury that I have

8   read the entire transcript of my Deposition

9   taken in the captioned matter or the same has

10  been read to me, and the same is true and

11  accurate, save and except for changes and/or

12  corrections, if any, as indicated by me on the

13  DEPOSITION ERRATA SHEET hereof, with the

14  understanding that I offer these changes as if

15  still under oath.

16

17  Signed on the   31   day of   December ,

18  2018.

19  _Kathryn E. Anderson_

20  KATHRYN ANDERSON

21

22



Page 406

1          DEPOSITION ERRATA SHEET

2     Page No. _17_ Line No. _22_ Change to: _____

3     *Cases. Also in the Newark office I*

4     Reason for change: *"New York" to "Newark"*

5     Page No. _51_ Line No. _5_ Change to: _____

6     *go back and review this document in your later*

7     Reason for change: *"lather" to "later"*

8 ·   Page No. _54_ Line No. _17_ Change to: _____

9     *presence date for TPS beneficiaries, which*

10    Reason for change: *"state" to "date"*

11    Page No. _67_ Line No. _21_ Change to: _____

12    *sense of how many extensions or termination*

13    Reason for change: *"determination" to "termination"*

14    Page No. _68_ Line No. _8_ Change to: _____

15    *extensions, terminations, et cetera -- I*

16    Reason for change: *"determinations" to "terminations"*

17    Page No. _93_ Line No. _17_ Change to: _____

18    *was put out by the refugee, asylum and*

19    Reason for change: *add comma to "at" to "and"* (change)

20

21    SIGNATURE *Kathryn E. Anderson*  DATE: _12/31/18_

22         KATHRYN ANDERSON



MAGNA ›
LEGAL SERVICES

Page 407

1          DEPOSITION ERRATA SHEET

2     Page No. *113*  Line No. *17*  Change to: _____

3     *least was Brook's supervisor. I don't know*

4     Reason for change: *"Brooks's" to "Brook's"*

5     Page No. *115*  Line No. *10*  Change to: _____

6     *Haiti post within Western Hemisphere Affairs*

7     Reason for change: *delete "the" & "s" from "Hemispheres"*

8     Page No. *154*  Line No. *14*  Change to: _____

9     *options is right, including termination (with*

10    Reason for change: *"and quoting" to "including"; add comma*

11    Page No. *155*  Line No. *1*  Change to: _____

12    *"Ultimately, we're (USCIS) still going to assess*

13    Reason for change: *add parenthesis*

14    Page No. *157*  Line No. *6*  Change to: _____

15    *reflecting the recommendation that was in that*

16    Reason for change: *"recommendations" to "recommendation"*

17    Page No. *158*  Line No. *10*  Change to: _____

18    *previously drafting multiple FRNs to accompany a*

19    Reason for change: *add "a"*

20

21    SIGNATURE: *Kathryn E. Anderson* DATE *12/31/18*

22          KATHRYN ANDERSON



Page 40**8**

1           DEPOSITION ERRATA SHEET

2   Page No. *168* Line No. *5*   Change to: _____

3   *So the reference to S1 Haiti memo,*

4   Reason for change: *"Sa 80" to "S1 Haiti"*

5   Page No. *168* Line No. *6*   Change to: _____

6   *Which I'll translate as Secretary Kelly Haiti*

7   Reason for change: *"80" to "Haiti"*

8   Page No. *182* Line No. *22*   Change to: _____

9   *Criminal / detainer stats you can find."*

10   Reason for change: *"statute confined" to "stats you can find"*

11   Page No. *203* Line No. *5*   Change to: _____

12   *THE WITNESS: I'm aware that there*

13   Reason for change: *"I've" to "I'm"*

14   Page No. *218* Line No. *18*   Change to: _____

15   *and I, were going to be asking Roy and Tom for*

16   Reason for change: *add comma*

17   Page No. *232* Line No. *21*   Change to: _____

18   *that was made to terminate the TPS designations of*

19   Reason for change: *"decisions" to "designations"*

20

21   SIGNATURE: *Kathryn E. Anderson* DATE *12/31/18*

22          KATHRYN ANDERSON



Page 40 9̶/̶7

1        DEPOSITION ERRATA SHEET

2     Page No. 237 Line No. 6   Change to: _____

3  Continuing: "So deeply distraught to hear this

4  Reason for change: "disrupted here" to "distraught to
                                                              hear"

5     Page No. 237 Line No. 9   Change to: _____

6  Whack jobs everywhere, even the civil

7  Reason for change: delete "in"

8     Page No. 248 Line No. 8   Change to: _____

9  A. It's in the last paragraph on Page

10 Reason for change: "photograph" to "paragraph"

11    Page No. 268 Line No. 16   Change to: _____

12 you have Section 244, I'm going to stop you

13 Reason for change: "2044" to "244"

14    Page No. 296 Line No. 22   Change to: _____

15 expected that the 60-day reregistration period

16 Reason for change: "50-day" to "60-day"

17    Page No. 301 Line No. 14   Change to: _____

18 crime. Employed. In school. U.S. has not

19 Reason for change: sentence break after "employed"

20

21 SIGNATURE: Kathryn E. And___ DATE 12/31/18

22        KATHRYN ANDERSON



Page 410 ~~407~~

1     DEPOSITION ERRATA SHEET

2  Page No. _303_ Line No. _9_ Change to: _____

3 *media call and I think that crime, employed, in*

4 Reason for change: *add comma*

5  Page No. _310_ Line No. _22_ Change to: _____

6 *A. Looking at this first page and the*

7 Reason for change: *"in" to "and"*

8  Page No. _318_ Line No. _12_ Change to: _____

9 *THE WITNESS: My note captures that*

10 Reason for change: *"What" to "that"*

11  Page No. _319_ Line No. _22_ Change to: _____

12 *begins with S. "They had" blank "and thought*

13 Reason for change: *"have" to "had"*

14  Page No. _320_ Line No. _13_ Change to: _____

15 *recipients", in taking that note down. Was*

16 Reason for change: *move quotation mark*

17  Page No. _321_ Line No. _9_ Change to: _____

18 *THE WITNESS: Certainly, in general,*

19 Reason for change: *add comma*

20

21 SIGNATURE: *Kathryn E. Anderson* DATE _12/31/18_

22    KATHRYN ANDERSON



Page ~~407~~ 411

1              DEPOSITION ERRATA SHEET

2        Page No. 321 Line No. 10 Change to: _____

3   *my notes don't capture every word that was*

4        Reason for change: *lower case "m" - not a new sentence*

5        Page No. 324 Line No. 17 Change to: _____

6   *disappointed Kathy asked for criminal*

7        Reason for change: *delete period*

8        Page No. 334 Line No. 8 Change to: _____

9   *like it was from Cardinal Joseph Tobin. I did*

10       Reason for change: *"Hogan" to "Tobin"*

11       Page No. 336 Line No. 10 Change to: _____

12  *afternoon if you'd like someone to talk it*

13       Reason for change: *delete quotation mark*

14       Page No. 336 Line No. 11 Change to: _____

15  *through with."*

16       Reason for change: *add period & quotation mark; delete duplicative language*

17       Page No. 336 Line No. 12 Change to: _____

18  *[delete all language in line 12]*

19       Reason for change: *delete duplicative language*

20

21       SIGNATURE: *Kathryn E. And* DATE 12/31/18

22              KATHRYN ANDERSON



Page 412 ~~407~~

```
 1                DEPOSITION ERRATA SHEET

 2    Page No. 343 Line No. 7   Change to: _____

 3   idea of localized damage from the earthquake is

 4   Reason for change: "for" to "from"

 5   Page No. 344 Line No. 15   Change to: _____

 6   untrue things said by Sec K can be attributed

 7   Reason for change: "untruth" to "untrue"

 8   Page No. 344 Line No. 21   Change to: _____

 9   the untrue things could be attributed to him?

10   Reason for change: "untruth" to "untrue"

11   Page No. 345 Line No. 8   Change to: _____

12   discussing that potentially one way to respond

13   Reason for change: "the" to "that"

14   Page No. 346 Line No. 14   Change to: _____

15   e-mail chain. From KA-28 that we had looked at

16   Reason for change: add period - new sentence

17   Page No. 346 Line No. 15   Change to: _____

18   earlier, it looks like this entire task was

19   Reason for change: add comma; lowercase "i"

20

21   SIGNATURE: Kathryn E. And    DATE 12/31/18

22              KATHRYN ANDERSON
```



Page 413 ~~407~~

1    DEPOSITION ERRATA SHEET

2    Page No. 346   Line No. 17   Change to:_____

3    *Joseph Tobin but I can't tell that for sure*

4    Reason for change: *"Hogan" ✗ "Tobin"*

5    Page No. 348   Line No. 7   Change to:_____

6    *least the untrue things said by Secretary*

7    Reason for change: *"untruth" ✗ "untrue"*

8    Page No. 350   Line No. 16   Change to:_____

9    *, so there may have been more*

10   Reason for change: *delete "that I made"*

11   Page No. 350   Line No. 17   Change to:_____

12   *clement in the statement that I found ✗ be or*

13   Reason for change: *"a" ✗ "the"*

14   Page No. 350   Line No. 18   Change to:_____

15   *characterized as untrue than what ultimately*

16   Reason for change: *"untruth" ✗ "untrue"*

17   Page No. 352   Line No. 6   Change to:_____

18   *the Haitian government's actions ✗ facilitate*

19   Reason for change: *"government actually" ✗ "government's actions"*

20

21   SIGNATURE: *Kathy E. And*_____   DATE 12/31/18

22            KATHRYN ANDERSON



Page ~~407~~ 414

1    DEPOSITION ERRATA SHEET

2    Page No. 352 Line No. 17 Change to: _____

3    *should be further extended. State is not*

4    Reason for change: *delete "the"*

5    Page No. 361 Line No. 5 Change to: _____

6    *ability for a state to handle returns to the*

7    Reason for change: *"this" to "the"*

8    Page No. 361 Line No. 6 Change to: _____

9    *State, as well as whether nationals can return*

10   Reason for change: *"date" to "state"*

11   Page No. 363 Line No. 2 Change to: _____

12   *nationals of the state from returning to the*

13   Reason for change: *"running" to "returning"*

14   Page No. 363 Line No. 3 Change to: _____

15   *state in safety*

16   Reason for change: *"and" to "in"*

17   Page No. 372 Line No. 5 Change to: _____

18   *through the country conditions we have again*

19   Reason for change: *delete comma; "are" to "have"*

20

21   SIGNATURE: *Kath E. And* _____ DATE *12/31/18*

22          KATHRYN ANDERSON

