UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

_____

PATRICK SAGET,                    )

et al.,                           )

      Plaintiffs,            ) Case No.

  vs.                             ) 18-cv-01599-WFK-ST

DONALD TRUMP, President           )

of the United States,            )

et al.,                           )

      Defendants.            )

_____


Videotaped Deposition of LEE FRANCIS CISSNA

Washington, D.C.

December 20, 2018


Reported by:  Michele E. Eddy

Job No. 450087


Magna Legal Services

866-624-6221

www.MagnaLS.com



1    Videotaped Deposition of Lee Francis Cissna held

2    at:

3

4

5

6

7                      Mayer Brown, LLP

8                 1999 K Street, Northwest

9                    Washington, D.C.

10

11

12

13

14

15

16

17

18

19   Pursuant to Notice, when were present on behalf

20   of the respective parties:

21

22



```
 1                   A P P E A R A N C E S

 2

 3     ON BEHALF OF THE PLAINTIFFS:

 4              BRANTLEY WEBB, ESQUIRE

 5              MARCUS A. CHRISTIAN, ESQUIRE

 6              Mayer Brown

 7              1999 K Street, Northwest

 8              Washington, D.C.  20006

 9              (202) 263-3188

10              bwebb@mayerbrown.com

11              mchristian@mayerbrown.com

12

13     ON BEHALF OF THE DEFENDANTS:

14              JOSEPH A. MARUTOLLO, ESQUIRE

15              U.S. Department of Justice

16              United States Attorney's Office

17              Eastern District of New York

18              271 Cadman Plaza East

19              Brooklyn, New York  11201

20              (718) 254-6288

21              joseph.marutollo@usdoj.gov

22
```



Page 4

1    ATTENDANCE, Continued

2

3    ON BEHALF OF THE DEFENDANTS:

4            JOSEPH C. DUGAN, ESQUIRE

5            U.S. Department of Justice

6            Ben Franklin Station

7            P.O. Box 883

8            Washington, D.C.  20044

9            (202) 514-3259

10           joseph.dugan@usdoj.gov

11

12   ALSO PRESENT:

13           Sarah Vuong, Associate Counsel

14              U.S. Citizenship and Immigration Services

15           David Voigtsberger, Videographer

16

17

18

19

20

21

22



Page 5

1                    EXAMINATION INDEX

2                                                          PAGE

3  EXAMINATION BY MS. WEBB                                 10

4

5

6

7                    E X H I B I T S

8             (Attached to the Transcript)

9  DEPOSITION EXHIBIT                                       PAGE

10  Exhibit 102  U.S.C.A. 1254a.                            40

11               Temporary protected status

12

13  Exhibit 103  Email dated 4-7-17 from Gene              65

14               Hamilton to Francis Cissna,

15               etc.; CP_00001526

16

17  Exhibit 104  Secretary Kelly's Statement on            83

18               the Limited Extension of Haiti's

19               Designation for Temporary

20               Protected Status released

21               5-22-17

22



Page 6

1              EXHIBIT INDEX CONTINUED

2

3    DEPOSITION EXHIBIT                              PAGE

4    Exhibit 105   Email chain; top email dated        86

5                  8-29-17 from Briana Petyo to

6                  Gene Hamilton, etc.;

7                  CP_00000678 - 679

8

9    Exhibit 106   August 28, 2017 Decision -          86

10                 Memorandum for the Secretary

11                 from James W. McCament;

12                 DPP_00000473 - 478

13

14   Exhibit 107   Decision - Memorandum for the      112

15                 Secretary from L. Francis Cissna;

16                 CP_00021753 - 759

17

18   Exhibit 108   Decision dated 11-3-17 -           121

19                 Memorandum for the Secretary

20                 from J. Francis Cissna;

21                 CP_00028905 - 911

22



Page 7

1                    EXHIBIT INDEX CONTINUED

2

3    DEPOSITION EXHIBIT                               PAGE

4    Exhibit 109   Defendants' Objections and         131

5                  Responses to Plaintiffs' First

6                  Set of Interrogatories to

7                  Defendant U.S. Department of

8                  Homeland Security

9

10   Exhibit 110   Email chain; top email dated       160

11                 11-12-17 from Francis Cissna

12                 to Jared Culver;

13                 CP_00029138 - 139

14

15   Exhibit 111   Email chain; top email dated       181

16                 11-12-17 from Francis Cissna

17                 Kathy Nuebel Kovarik;

18                 CP_00031945 - 946

19

20   Exhibit 112   Memorandum RE:  Conference         190

21                 Call - Haiti TPS; 1-18-18, 11:30;

22                 CP_00026912



```
                                                        Page 8
 1                    EXHIBIT INDEX CONTINUED

 2

 3   DEPOSITION EXHIBIT                              PAGE

 4   Exhibit 113  Email dated 4-27-18 from Aaron     190

 5                Calkins to Francis Cissna, etc.;

 6                CP_00031967

 7

 8   Exhibit 114  Acting Secretary Elaine Duke       201

 9                Announcement on Temporary

10                Protected Status for Haiti;

11                DPP_00019502

12

13

14

15

16

17

18

19

20

21

22
```



Page 9

1                P R O C E E D I N G S

2                      Washington, D.C.

3                      December 20, 2018

4                          - - -

5           THE VIDEOGRAPHER:  Good morning.

6    This is the video deposition of Francis Cissna

7    in the matter of -- in the matter of Patrick

8    Saget, et al., versus Donald Trump, President

9    of the United States, in the United States

10   District Court for the Eastern District of New

11   York.

12          Today is December 20th, 2018, and

13   the time on my video screen is 10:03 a.m.

14   This deposition is being taken at 1999 K

15   Street, Northwest, Washington, D.C., at the

16   request of Mayer Brown.

17          The videographer today is David

18   Voigtsberger of Magna Legal Services, and the

19   court reporter is Michele Eddy of Magna Legal

20   Services.

21          Will counsel please introduce

22   yourselves and whom you represent.



Page 10

1          MS. WEBB:  Brantley Webb, from Mayer

2     Brown, on behalf of the plaintiffs.

3          MR. CHRISTIAN:  Marcus Christian,

4     with Mayer Brown, on behalf of the plaintiff.

5          MR. MARUTOLLO:  Joseph Marutollo,

6     from the U.S. Attorney's Office, Eastern

7     District of New York, for the government.

8          MR. DUGAN:  Joseph Dugan, from the

9     U.S. Department of Justice, Civil Division,

10    Federal Programs Branch for the defense.

11         MS. VUONG:  Sarah Vuong, with the

12    United States Citizenship and Immigration

13    Services for the government.

14         THE VIDEOGRAPHER:  Will the court

15    reporter please swear in the witness.

16              - - -

17              LEE FRANCIS CISSNA,

18    having been duly sworn, testified as follows:

19         EXAMINATION BY COUNSEL FOR PLAINTIFFS

20    BY MS. WEBB:

21    Q    Good morning.

22    A    Good morning.



Page 11

1      Q     Would you please state your full

2   name for the record.

3      A     Lee Francis Cissna.

4      Q     And your home address for the record

5   as well.

6            MR. MARUTOLLO:  Objection.  Just --

7   I just direct the witness to provide generally

8   where he lives, what city.

9            MS. WEBB:  That's fine.

10     A     I live in Chevy Chase, Maryland.

11     Q     And do you understand, Director

12   Cissna, that you're here to testify today

13   pursuant to a deposition notice and subpoena?

14     A     I do.

15     Q     Do you understand that you've just

16   taken an oath so you're under oath just as if

17   you were testifying in a courtroom?

18     A     Yes.

19     Q     Have you ever been deposed before?

20     A     No.

21     Q     Did you qualify that?  Have you ever

22   --



1        A     No, I have not been deposed before.

2        Q     So I'll just go over a few of the

3    basic ground rules.  So please answer audibly

4    instead of shaking your head so she can get

5    down the answer.  Please allow me to finish my

6    questions before you answer and I'll allow you

7    to finish your answers before I continue

8    questioning you.

9              If you don't understand a question,

10   please ask me to clarify.  Otherwise, I'll

11   assume and the record will reflect that you

12   understood the question.  If I would like to

13   amend an answer at any time, just let me know

14   and we can go back and do that.

15             You can also take a break at any

16   time.  I would just ask that you answer the

17   question that I have pending.

18             So your attorney will undoubtedly

19   object from time to time, but those are for

20   the record.  So unless he instructs you not to

21   answer, you should answer the question.

22             Is there any reason you can think of



1    why you can't give full and truthful answers

2    today?

3        A    No.

4        Q    Are you presently suffering from any

5    physical, mental, or other conditions that

6    might affect your ability to answer truthfully

7    today?

8        A    No.

9        Q    We always have to ask, are you

10   taking any medication that might affect your

11   ability to provide full and complete answers

12   today?

13       A    No.

14       Q    Do you have any questions for me?

15       A    No.

16       Q    Okay.

17            So I would just like to get a bit of

18   background from your life and your history

19   first.

20            So, where did you attend undergrad

21   school?

22       A    I attended undergraduate school at



1    the Massachusetts Institute of Technology.

2         Q    What was your major?

3         A    I had two majors.  I studied physics

4    and, separately, political science.

5         Q    What about in graduate school?

6         A    I attended graduate school at

7    Columbia University.  I got a master's degree

8    in international affairs.  Subsequently I went

9    to law school at the Georgetown University Law

10   Center.

11        Q    Do you remember approximately what

12   year you graduated from law school?

13        A    1995.

14        Q    And coming out of law school, what

15   was your first job?

16        A    My first job coming out of law

17   school was as an associate at the law firm of

18   Kirkpatrick and Lockhart, which now goes by a

19   different name, in Harrisburg, Pennsylvania.

20        Q    How long were you an associate

21   there?

22        A    Approximately two years.



1      Q     What kind of work did you do?

2      A     I principally handled federal

3 environmental litigation.

4      Q     And what did you do next?

5      A     After working at Kirkpatrick and

6 Lockhart for about two years, I got a job as

7 an associate attorney at a law firm here in

8 Washington, D.C., the firm of Steptoe &

9 Johnson.

10     Q     Steptoe, okay.

11           How long were you there?

12     A     I was there, to the best of my

13 recollection, between two and two and a half

14 years.

15     Q     And what kind of law did you

16 practice there?

17     A     There I principally handled matters

18 relating to international trade law.

19     Q     Okay.  And after two, two and a half

20 years, what was your next job after that?

21     A     After working at Steptoe, I got into

22 the United States Foreign Service, Department



Page 16

1    of State, and accepted that position and went

2    to foreign service training and then was

3    posted overseas.

4         Q    How long was the training for that?

5         A    The training was, as I recall, about

6    -- between six and eight months, all told.

7         Q    What did it entail?

8         A    Well, principally, the State

9    Department training entailed language

10   training.  That was the bulk of the time, but

11   there was a module of courses relating to the

12   nature of the work in embassies overseas.

13   Since I was going to be assigned -- since we

14   were all entry level officers, we were almost

15   certainly going to be assigned as consulate

16   officers.  We had a month or two long module

17   on that subject and what consulate work

18   entails.  And then there was -- and that's

19   about it.  It was about eight months or so of

20   training.  Most of it was language.

21        Q    Okay.  What language did you study?

22        A    I studied Swedish.



Page 17

1      Q     Swedish, okay.

2            And was that based on your choice or

3   the department's choice?

4      A     The department's choice, because

5   that's where they decided to send me.

6      Q     Okay.  And then you said you were

7   stationed overseas.  So where were you

8   stationed?

9      A     So, first, I was sent on a temporary

10  duty assignment to Haiti to the U.S. consulate

11  at Port-au-Prince, and that was about, as I

12  recall, about five or six weeks.  This would

13  have been in early 2000, sometime around

14  March, April, May, sometime around there.

15     Q     All right.

16     A     Maybe earlier -- a little earlier

17  than that, but it was sometime in the year

18  2000.  And then upon finishing that temporary

19  duty assignment, I was sent -- I came back to

20  Washington very briefly, and then went out to

21  my permanent assignment, which was in

22  Stockholm, Sweden, at the U.S. Embassy there.



MAGNA ▶
LEGAL SERVICES

1      Q    And how long were you in Sweden?

2      A    I was there a little over two and a

3 half years.

4      Q    So going back to your temporary

5 assignment in Haiti, could you describe for me

6 what your duties were while you were on

7 assignment there?

8      A    I was on some temporary duty.  I was

9 assigned to work on the immigrant visa

10 adjudications line, as it was called,

11 immigration -- the immigrant visa part of the

12 consulate.

13      Q    Okay.  What sort of work did you do?

14      A    I adjudicated immigrant Visa

15 applications from Haitian nationals who were

16 seeking -- or applying for immigrant visas to

17 come to the United States.

18      Q    And did you live in Port-au-Prince

19 during those five to six weeks or somewhere

20 else?

21      A    I did.

22      Q    And how was your experience there,



1    just generally?

2           MR. MARUTOLLO:  Objection.  You can

3    answer.

4      A    I loved my experience there.  I

5    thought it was a fantastic experience.  I was

6    sad to leave at the end of the six weeks.  I

7    got to know, you know, my colleagues at the

8    Embassy very well during that six weeks.  The

9    nature of the work was very interesting.  I

10   got to learn some Creole language while I was

11   there.  I had to to interview people.  Overall

12   it was a fantastic experience, short but

13   memorable.

14     Q    Okay.  So, fast forward, you were

15   stationed in Sweden.  And what were your

16   responsibilities there?

17     A    I was the chief of the nonimmigrant

18   visa section at the Embassy.

19     Q    And what sort of duties did that

20   role entail?

21     A    I was the head of the group of --

22   the group of foreign -- of State Department



1    employees who worked on the nonimmigrant visa

2    applications, so temporary visa applications.

3    I managed a group of roughly six, seven

4    people, more or less, including locally

5    employed foreign nationals, a couple American

6    nationals, American citizens, and we were the

7    group that handled all matters relating to

8    nonimmigrant visa applications.

9         Q    You said temporary visa

10   applications.  What sorts of reasons would one

11   get a temporary visa application,

12   nonimmigrant?

13             MR. MARUTOLLO:  Objection.  You can

14   answer.

15        A    You could be applying for a student

16   visa.  You could be applying for a temporary

17   employment-based visa of some sort, for

18   example, or you could be applying for an

19   exchange visit or visa.  Those are the

20   examples of the sorts of visas.

21        Q    Okay.  What was your next job after

22   that?



1      A    After that, I returned to the United

2   States.  I joined -- I became an associate at

3   a law firm in Richmond, Virginia.  The law

4   firm of Kaufman & Canoles.  It's a general

5   practice law firm with a section devoted to

6   only immigration law, so I was an associate in

7   that group at that law firm.

8      Q    How long were you there?

9      A    I was there from -- I guess,

10  probably two and a half years, something like

11  that.

12     Q    And I take it, did you practice

13  immigration law there in that practice?

14     A    Yes.  There I only practiced

15  immigration law.

16     Q    What kind of immigration law

17  specifically?

18     A    The partner that I worked for

19  handled a wide variety of immigration cases

20  ranging from immigrant cases, nonimmigrant

21  cases.  Typically it would be -- they were

22  employment-based cases.



Page 22

```
 1        Q     Representing companies or

 2   individuals trying to work through the

 3   immigration process or something else?

 4        A     Both.

 5        Q     Okay.

 6        A     Both companies and individuals.

 7        Q     Okay.  And then after two and a half

 8   years there, what was your next job?

 9        A     My next job was with the Department

10   of Homeland Security.

11        Q     And what was that job?

12        A     I was -- in late 2005, as I recall,

13   in October, as I recall, I got a job as an

14   associate counsel in the Office of Chief

15   Counsel in the United States Citizenship and

16   Immigration Services.

17        Q     And what made you want to take on

18   that new job at the time?

19        A     Well, I wanted to come back to

20   Washington, D.C., where my family was, and

21   remains to this day, and I had an strong

22   interest in returning to government service,
```



Page 23

1    which I had enjoyed during my time with the

2    Department of State.

3         Q    And what were your duties as

4    associate counsel, USCIS?

5         A    I would handle, you know, again, a

6    wide variety of immigration-related legal

7    matters.  I didn't have a specific portfolio,

8    but principally the sorts of things that would

9    come up typically related to employment-based

10   immigration, either immigrant or nonimmigrant.

11   Those were typically the matters that I had

12   dealt with.  Also worked a lot on legislative

13   initiatives that the agency was working on at

14   the time.

15        Q    How long were you there in that

16   role?

17        A    In that role I -- so starting around

18   October 2005, I remained a USCIS employee

19   until around October, November 2006.

20        Q    Okay.  And then what did you do

21   next?

22        A    Then I became an employee of the



1  actual Department of Homeland Security, the

2  umbrella organization of the agency.

3      Q    What was that position that you

4  held?

5      A    The position that I had -- held was

6  Deputy Director of the Immigration Policy

7  Group inside of the DHS Office of Policy at

8  DHS headquarters.

9      Q    So that wasn't a strictly attorney

10  position anymore.  You were doing other

11  duties; is that right?

12          MR. MARUTOLLO:  Objection.  Vague.

13  You can answer.

14      A    Correct.  It was not a legal

15  position.

16      Q    Did you have a particular portfolio

17  in that position?

18      A    There, too, the portfolio was --

19  there was no one specific portfolio.  It was

20  very broad.  It was -- the nature of the DHS

21  Office of Policy is -- its purpose is to

22  coordinate policy across all of the DHS



1    components, so the -- my portfolio necessarily

2    involved immigration matters that would touch

3    not just USCIS, but all of the components,

4    CBP, ICE, any of the components that had

5    anything to do with immigration.

6         Q    Okay.  How long were you in that

7    role?

8         A    In that role as the deputy, I was

9    probably -- to the best of my recollection,

10   about two years.

11        Q    Okay.  Then after two years?

12        A    After two years, the individual who

13   was the director, my superior, left the

14   department.  I became the acting director.

15   This would have been sometime around late

16   2008, so I became the acting director.

17        Q    Okay.  Late 2008.

18             And how long were you acting

19   director?

20        A    I don't recall.

21        Q    Months, years?

22        A    Well, the -- at some point in early



Page 26

1    2009, the structure of the office changed.  A

2    person was appointed to be the Deputy

3    Assistant Secretary in charge of that group

4    and other related groups, and I don't recall

5    exactly when, but at some point I became the

6    Director of the Immigration Policy Group

7    working under this Deputy Assistant Secretary.

8    It was sometime in 2010, I think.  I'm not --

9    I don't recall right now.

10        Q    Okay.  And so your title then was

11   the -- I won't put words in your mouth -- was

12   what?

13        A    When that bureaucratic change

14   settled down, I -- my title was Director for

15   Immigration Policy in the Office of Policy of

16   the Department of Homeland Security.

17        Q    And was that a promotion of sorts

18   from being acting director?

19             MR. MARUTOLLO:  Objection.  You can

20   answer.

21        A    Yes.

22        Q    And who was responsible for



1    promoting you?

2         A    I don't know that any -- the -- my

3    getting that title or that position was the

4    decision of the then-Assistant Secretary for

5    Policy, who would have been the -- who is the

6    person who runs the entire Office of Policy.

7         Q    Who was that at the time?

8         A    I don't recall specifically who it

9    was at the time that I got that position

10   because it was a time of change between

11   administrations and I don't remember when the

12   new Assistant Secretary came in or the last

13   one left.

14        Q    And you said that was around 2010.

15   How long were you in that specific role?

16        A    I was in that role up until I took

17   my current role.

18        Q    Okay.  We may have our research

19   wrong, but at some point were you working for

20   a chairman under Senator Chuck Grassley in any

21   of this?

22        A    Yes.



Page 28

1        Q    When was that?

2        A    I was detailed from the job that I

3   had at the Office of Policy when I was

4   director for the immigration group to Capitol

5   Hill in, as I recall, roughly February of 2015

6   and the detail lasted -- it was two years --

7   ended up being two years and ended roughly

8   February 2017.

9        Q    Okay.  Why were you put on that

10  detail?

11       A    I was put on that detail because, as

12  best as I understand it, Senator Grassley

13  requested a detail.  Other committee chairmen

14  had in the past, of Senate Judiciary committee

15  chairmen in the past, had similarly requested

16  details and been granted them.

17       Q    What sort of issues did you work on

18  for the Senator?

19       A    During that time --

20            MR. MARUTOLLO:  Objection.  You can

21  answer.

22       A    During the time I was detailed



Page 29

1    there, I offered technical assistance as a DHS

2    subject matter expert on a wide variety of

3    immigration-related issues that the Senator

4    wanted assistance with relating to oversight,

5    drafting the legislation, you know, the

6    general matters falling under his chairmanship

7    of the committee that touched on immigration.

8         Q    You mentioned -- you said two years

9    beginning approximately 2015.  So that would

10   take you to 2017.

11        A    Correct.

12        Q    And then -- so your current

13   position, when were you first appointed?

14        A    Well, my current position, do you

15   mean being the Director of CIS?

16        Q    Yes.

17        A    I was nominated for the position, as

18   I recall, sometime around April of 2017, and I

19   was confirmed by the Senate for the position

20   in October of 2017.

21        Q    I apologize.  Prior to that, were

22   you acting director?



Page 30

1      A     When I returned from Capitol Hill in

2     February of 2017, I returned to the exact same

3     job I had when I left two years earlier.  So I

4     returned to the position of Director of the

5     Immigration Policy Group inside of DHS Policy.

6      Q     Okay.

7            And from there you were nominated to

8     your current position?

9      A     Correct.  And during that entire

10    time that I was nominated but not yet

11    confirmed, I carried out my duties as I did

12    before, in that same job that I had before I

13    left.

14     Q     Okay.  Thank you.

15            How would you describe your current

16    responsibilities as Director of USCIS?

17     A     I would describe them as being

18    responsible for the executive direction of the

19    agency.

20     Q     How many people report to you?

21            MR. MARUTOLLO:  Objection.  Again,

22    what was the question, how many people work --



1          MS. WEBB:  How many people report to

2     him.

3          MR. MARUTOLLO:  Report to him.

4          MS. WEBB:  Yes.

5          MR. MARUTOLLO:  Objection.  You can

6     answer.

7      A     The number of people who directly

8     report to me, do you mean?

9      Q     Yes.

10     A     I would say -- let me think.  Do you

11    want ... about half a dozen.

12     Q     And generally who are they, what are

13    their subject matter areas?

14          MR. MARUTOLLO:  Objection.  Vague.

15    You can answer.

16     A     One is the current acting deputy.

17    Another is the chief of staff.  Another is the

18    -- there is a counselor position in the front

19    office who reports to me as well.  The chief

20    counsel of the agency and the chief of the

21    Office of Policy and Strategy, as I understand

22    the bureaucratic structure, also report to me.



Page 32

1    I may have left some out, but those are the

2    principal direct reports to me.

3         Q    Okay.  And who is the acting deputy

4    right now?

5         A    The acting deputy is Tracy Renaud.

6         Q    And what about the chief of staff?

7         A    The chief of staff is Lora Ries,

8    spelled R-I-E-S.  First name L-O-R-A.

9         Q    And what about the counselor?  You

10   mentioned the counselor position in the front

11   office.

12        A    The counselor is currently Kaitlin

13   Stoddard, K-A-I-T-L-I-N, S-T-O-D-D-A-R-D.

14        Q    Thank you.

15             And what is she -- first of all, let

16   me just ask you generally.  We hear the term

17   "front office" used a lot.  How would you

18   describe what the front office is in your

19   agency?

20             MR. MARUTOLLO:  Objection.  And,

21   again, I would just note that the witness is

22   not a 30(b)(6) witness, but to the extent he



Page 33

1    can answer in the capacity of a fact witness,

2    he can answer it.

3         Q    Just very generally.

4         A    The front office is the group of

5    individuals that surround the director's

6    office and -- including people performing

7    administrative tasks in the director's

8    immediate suite.  And people who discharge

9    executive functions with regard to the whole

10   agency, for example, the chief of staff, it's

11   -- it's, I guess, best described as people who

12   directly support the director and/or have

13   functions that relate to the management of the

14   entire agency.

15        Q    Okay, thank you.  That's very

16   helpful.  Okay.

17             So Ms. Stoddard, what are her --

18   just very generally, what are her

19   responsibilities?

20        A    Ms. Stoddard is -- she assists me in

21   a variety of ways.  She directs -- manages and

22   directs special projects and initiatives that



Page 34

1   require some sort of front office involvement

2   or role.  Certain projects and initiatives cut

3   across multiple directorates of the agency and

4   it's preferable, in those types of situations,

5   to have someone who is one level above, from

6   an office that is one level above to

7   coordinate the entities that are doing the

8   project.  So there's a number of projects

9   she's involved in on that.

10          She transmits requests from me that

11  may require coordination amongst multiple

12  directorates, requests for information that I

13  might have or requests for data, statistics,

14  and at the same time she transmits to me

15  information or concerns that she might glean

16  from her work with the various directorates

17  that I might not have insight into personally

18  or directly.

19      Q    Is she an attorney?  Is it an

20  attorney position or broader?  I should --

21  strike that.

22          Is she also an attorney?



Page 35

1      A     No.

2      Q     Then you said chief counsel.  Who is

3   that right now?

4      A     The chief counsel of the agency is

5   Craig Symons, S-Y-M-O-N-S.

6      Q     And who is the Chief of the Office

7   of Policy and Strategy right now?

8      A     Currently, the chief of that office

9   is Kathy Nuebel Kovarik.

10     Q     And you also mentioned some

11  bureaucratic functions.  Could you explain

12  what you mean by that just a little more?

13           MR. MARUTOLLO:  Objection.  You can

14  answer.

15     A     In the -- you mean -- do you mean in

16  the DHS front office?

17     Q     No.  I thought when you mentioned

18  the various people, areas who report to you,

19  you mentioned at the end, you thought there

20  were some other bureaucratic areas or

21  functions who report up to you.

22           MR. MARUTOLLO:  Objection.



Page 36

1    Objection.  I don't think that's quite what he

2    testified to, but you can answer.

3         A    In the DHS front office, there are

4    administrative staff, but they do not report

5    to me.  They report either to the chief of

6    staff -- I forgot.  There's a deputy chief of

7    staff as well in the -- in the front office.

8    That position is currently being filled by

9    Kaitlin Stoddard in an acting capacity, but

10   the administrative staff that I just talked

11   about typically reports to that person, the

12   deputy chief of staff or the chief of staff

13   herself.

14          Like I said, I may be forgetting

15   other people in that front office, other

16   roles, I should say, but I think that that's

17   the bulk of it.

18        Q    Okay.  Okay.  Thank you.

19          Very briefly, before we start

20   getting into documents, so you mentioned very

21   broadly what you see your role as the

22   director.  How would you describe -- I know it



Page 37

1   must vary substantially, but how would you

2   describe your sort of day-to-day

3   responsibilities at the agency?

4        A    My day-to-day responsibilities vary

5   widely depending on the day.  Today I'm being

6   deposed.  On other days I could be -- I am

7   promoting initiatives, changes, policy

8   direction that I think makes sense for the

9   agency or that the Secretary wants the agency

10  to accomplish.  I review and clear memoranda,

11  documents, regulations, proposed regulations,

12  final regulations, updates to field guidance.

13  All manner of instruments for carrying out the

14  policy for the agency that either I have

15  requested the initiative or -- be initiated or

16  that staff have on their own initiative

17  proposed to me.  I engage with the public.  I

18  attend meetings with stakeholders.  I attend

19  meetings with internal offices within the

20  agency.  I travel a great deal to the field

21  offices that we have all around the country.

22  Those are my typical duties.



Page 38

1      Q     When you said you review and clear

2    memos and other documents, could you explain a

3    little bit more what you mean by clear?

4      A     As in any other agency, there is an

5    executive secretariate that moves -- basically

6    has the function of moving paper around.  And

7    any document, memo, letter, for example,

8    correspondence to a member of Congress,

9    anything that is leaving the agency that is a

10   substantial document needs to have front

11   office clearance.  As we discussed before, the

12   front office is that -- is that -- is the

13   entity, including myself, the chief of staff,

14   the deputy chief of staff, and the counselor,

15   and detailee, so we may have subject matter

16   detailees, you know, from the staff at any

17   given time assigned to the front office to

18   assist.

19          Those documents that the executive

20   secretariate circulates, if they are

21   substantial, will come through the front

22   office and most are cleared, meaning that they



Page  39

1    are given front office approval, without me

2    having to -- without my having to get

3    involved, if they're normal, routinely

4    operational types of things.

5            If it's a letter to a member of

6    Congress or a substantial policy memorandum,

7    then the director would need to clear it.

8    What that means is that the document would

9    come to me in a formal manner and I would read

10   the document.

11           I would make any edits I think are

12   necessary and either send it back for further

13   consideration or review or I would approve it,

14   in which case in most -- in most instances

15   that means I would sign it and then the

16   document would go on to whatever its

17   destination would be, either the member of

18   Congress, the Secretary, or whoever.

19      Q    And in the course of reviewing and

20   clearing documents, would you ever consult

21   statutes or other agency regulations?

22           MR. MARUTOLLO:  Objection.  You can



Page 40

```
 1   answer.

 2        A    Certainly, yes.

 3             MS. WEBB:  Let's go ahead and mark

 4   this as Exhibit 102.

 5             (Exhibit 102 was marked for

 6   identification and attached to the deposition

 7   transcript.)

 8   BY MS. WEBB:

 9        Q    This is -- in general, during the

10   deposition, I will pass you -- I'll mark some

11   exhibits for the record and you should review

12   them and take as much time as you want to

13   familiarize yourself with the document,

14   whether it's a statute or email, anything like

15   that.  So take your time and just let me know

16   when you're ready.

17        A    Okay.

18             (Document review.)

19             I have reviewed the document.

20        Q    And is this the federal statute U.S.

21   -- excuse me, 8 U.S.C. Section 1254, titled

22   "Temporary Protected Status"?
```



Page 41

1      A    Yes.

2      Q    And are you familiar with this

3  statute?

4      A    Yes.

5      Q    In the course of your duties at

6  USCIS, do you work with this statute?

7      A    Yes.

8      Q    And just to make sure that you read

9  the parts we're going to discuss, I want to go

10  through in a little more detail a few sections

11  of the statute.

12          So if you see under the second page,

13  it's under bold, the designations.  And then

14  on page 3 it continues.  Do you see the

15  further subcategories that are (A), (B) and

16  (C)?

17      A    I do.

18      Q    And (A) states, "The Attorney

19  General finds that there is an ongoing armed

20  conflict within the state and, due to such

21  conflict, requiring the return of aliens who

22  are nationals of that state to that state (or


MAGNA ▶
LEGAL SERVICES

1   to the part of the state) would pose a serious

2   threat to their personal safety."

3          Are you familiar with that

4   subsection of the statute?

5      A    Yes.

6          MR. MARUTOLLO:   Objection.   You can

7   answer.

8      A    Yes.

9      Q    And then (B) states, "The Attorney

10  General finds that there has been an

11  earthquake, flood, drought, epidemic or other

12  environmental disaster in the state resulting

13  in a substantial, but temporary, disruption of

14  living conditions in the area affected."

15         Subsection 2, (ii), "The foreign

16  state is unable, temporarily, to handle

17  adequately the return to the state of aliens

18  who are nationals of the state," and, 3, or

19  (iii), "the foreign state officially has

20  requested designation under this subparagraph

21  or."

22         Are you familiar with that



Page 43

1    subsection of the statute as well?

2            MR. MARUTOLLO:  Objection.  You can

3    answer.

4        A    I am.

5        Q    And, then, finally (C), "The

6    Attorney General finds that there exist

7    extraordinary and temporary conditions in the

8    foreign state that prevent aliens who are

9    nationals of the state from returning to the

10   state in safety, unless the Attorney General

11   finds that permitting the aliens to remain

12   temporarily in the United States is contrary

13   to the national interest of the United

14   States."

15           Same question, are you familiar with

16   that subsection of the statute?

17           MR. MARUTOLLO:  Objection.  You can

18   answer.

19       A    I am.

20       Q    And, then, there's just one

21   additional subsection to take a look at.  It's

22   on the next page.  Subsection (3), "Periodic



Page 44

1    Review, Terminations, and Extensions of

2    Designations."

3            And under that it has three, again,

4    three subparts, (A), Periodic Review; (B),

5    Termination of Designation; and, (C),

6    Extension of Designation.

7            Are you familiar with that

8    subsection of the statute?

9            MR. MARUTOLLO:  Objection.  You can

10   answer.

11       A    I am.

12       Q    Okay.  So turning back to

13   designations, does USCIS perform a role in

14   determining whether a country will be given a

15   TPS status under the subsection?

16           MR. MARUTOLLO:  Again, I just object

17   that this witness is not a 30(b)(6) witness,

18   but he can answer in his capacity as a fact

19   witness in this case.

20       A    The decision whether a country

21   should be designated for TPS is the

22   Secretary's.  The role of USCIS is to advise



Page 45

1    the Secretary in making the most informed

2    decision.

3        Q    How does -- to your understanding,

4    how does the -- how does the USCIS advise the

5    Secretary in making an informed decision?

6    What sort of -- well, let me back up.

7            Could you just walk us through the

8    process that USCIS engages in, sort of from

9    start to finish, in the designation prong of

10   the statute to help advise the Secretary.

11           MR. MARUTOLLO:  I'll just object,

12   again, to the extent it calls for internal

13   governmental deliberations.  But given the

14   court's order, the witness can answer the

15   question.

16       A    Well, I would start by saying first

17   that USCIS isn't the only entity to advise the

18   Secretary in making the most informed

19   decision.  USCIS is only one component that

20   has a role in advising her on this subject.

21   The DHS Office of Policy, the Office of

22   General Counsel, the other immigration-related



Page 46

1    components, ICE and CBP, all have a say in the

2    recommendations that they might make to the

3    Secretary, which may or may not be the same as

4    the ones that USCIS makes.

5              But with respect to CIS, the

6    process, as I understand it, is that the --

7    within USCIS, the Office of Policy and

8    Strategy coordinates the drafting of a

9    memorandum to the Secretary from me, from the

10   director.  And in that memorandum, the nature

11   of the situation in the country in question is

12   described, and the -- a recommendation is made

13   to the Secretary regarding whether USCIS

14   thinks the country should remain or be

15   designated or remain designated or not be

16   designated any longer.

17             That memorandum, as I say, is

18   coordinated by the Office of Policy and

19   Strategy.  There are other offices within CIS

20   that have a role in that, including the Office

21   of Refugee Asylum and International

22   Operations.  That coordinated memo is



Page 47

1    presented to the director's office for final

2    review.

3        Q    Okay.  And then -- but you said OPS

4    coordinates the drafting of the memo.

5             Who in principal prepares the memo?

6    Or who initially does the research that goes

7    into the memo?

8             MR. MARUTOLLO:  Objection to the

9    extent it misstates his prior testimony as to

10   who coordinates the memo, but you can answer

11   the question.

12       A    I don't know for certain.  As best

13   as I understand it, the Office of Policy and

14   Strategy, which includes subject matter

15   experts in this and every field of policy that

16   the agency is engaged in, will consult with

17   other subject matter experts, like I said, in

18   the Office of Refugee Asylum and International

19   Operations, and as far as I know the Office of

20   Chief Counsel and other directorates within

21   the agency -- other directorates in offices

22   within the agency.  I don't know that any one



Page 48

1    person or entity is the chief scribe to draft

2    it.

3         Q    And could you describe your -- your

4    specific role in the process.

5              MR. MARUTOLLO:  Objection.  You can

6    answer.

7         A    My role is to review the final

8    product or the final proposed memo that is --

9    that comes out of this coordinated drafting

10   process and determine whether it -- whether I

11   feel comfortable signing the memo and

12   transmitting that recommendation -- the memo

13   and the included recommendation to the

14   Secretary.  And if I am, I sign it, and it

15   moves on.

16        Q    Are there differences between the

17   process for an initial designation -- excuse

18   me.  Are there differences in the types of

19   research and ground level process between the

20   decision to designate versus the decision to

21   extend or not extend?

22             MR. MARUTOLLO:  Objection.  Vague



Page 49

1    and calls for a legal conclusion as well, but

2    you can answer.

3        A    I don't know.

4        Q    Since you've been director of USCIS,

5    have you made any changes to the process of

6    agencies as to prepare this -- these memos?

7             MR. MARUTOLLO:  Objection.  Vague.

8    You can answer.

9        A    To the best of my recollection, I

10   have made no changes to this process.

11       Q    So you mentioned RAIO, Refugee

12   Asylum and International Operations, that they

13   perform the research on the country conditions

14   for TPS.  How -- how many people,

15   approximately, are in RAIO, to your knowledge?

16       A    Well, what I -- what I thought --

17   what I think I said was that RAIO is consulted

18   as part of the coordinated memo drafting

19   process.  I don't know with specificity what

20   exactly they do.  I know that within RAIO,

21   there are subject matter experts on different

22   countries and -- because we have international



Page 50

1   operations.  I know that in RAIO, they have --

2   or RAIO, they have expertise in assessing

3   country conditions, but I can't say that I

4   fully understand the exact details of what

5   their role is in doing the researching

6   underlying the memo that is coordinated by

7   OP&S, Office of Policy and Strategy.  With

8   respect to how many people are in RAIO, I

9   can't say off the top of my head with -- I

10  couldn't tell you with accuracy.

11      Q    And are the employees in RAIO, are

12  they sort of career civil servants?  Do they

13  have a high turnover or do they turn over from

14  administration to administration?

15           MR. MARUTOLLO:  Objection.  Compound

16  and vague, but you can answer.

17      A    As far -- I know of no political

18  appointee employees in RAIO.  As far as I

19  know, they are, indeed, all career civil

20  servants and -- that continue to work from

21  administration to administration.

22      Q    So, other than helping with this



Page 51

1    process to prepare these memos, what sort of

2    other functions do the employees in RAIO --

3    RAIO perform?

4            MR. MARUTOLLO:  Objection.  Vague.

5    But you can answer.

6        A    RAIO has a very wide portfolio of

7    duties.  They -- as the acronym describes,

8    they handle all refugee-related operations,

9    which entails sending -- there's an

10   established cadre of people, about 100, 150

11   strong, that are constantly sent out around

12   the world to interview prospective refugee

13   candidates for resettlement.  There are --

14   there is the A part of RAIO, asylum.  That is

15   -- we have about 5-, 600 people that are

16   asylum officers.  Their responsibility is to

17   handle, process, interview people who have

18   asylum claims in the United States, which is

19   the only place you can make an asylum claim.

20           The nature of the work that the

21   refugee and the asylum officers do is very

22   similar but not the same.  They both



Page 52

1  adjudicate protection claims based on the same

2  fundamental principles of persecution, the

3  five grounds of persecution, but the nature of

4  the process is different for an asylum claim

5  in the states versus a refugee resettlement

6  application process overseas.

7          The I and the O of RAIO,

8  international operations, that is a cadre of

9  people, a couple hundred, 2- or 300 people, to

10 the best of my recollection, that work in --

11 either at overseas offices that we have in a

12 handful of places around the world or support

13 that work.  And those offices sometimes do

14 refugee work.  At other times they will

15 process certain types of cases and forms that

16 we are able to receive overseas from either

17 American citizens or aliens seeking some

18 benefit overseas.  So the entirety of RAIO's

19 mission is very broad, and -- has worldwide

20 reach.

21     Q    So who in that -- who in RAIO then

22 is working on the memos here?  Is it a staff



Page 53

1    in D.C. that's devoted to this kind of task?

2            MR. MARUTOLLO:  Objection.  You can

3    answer.

4        A    I don't know -- to the best of my

5    understanding, the people in RAIO that work on

6    these TPS memos are subject matter experts in

7    a research arm of RAIO that supports the other

8    functions I just described, the refugee,

9    asylum operations and international

10   operations.  That, I believe, but I'm not

11   certain, that that group reposes in

12   Washington, D.C., somewhere, but it may be

13   that they have people around the country in

14   different remote work sites or other places.

15       Q    Okay.  How does -- how do the people

16   in that research arm gain their expertise on

17   these type of country condition issues?

18           MR. MARUTOLLO:  Objection, to the

19   extent it calls for speculation and also

20   vague, but you can answer.

21       A    I don't know.

22       Q    Okay.  Is it fair to say that the



Page 54

1    agency relies on them for that type of country

2    condition and expertise in various capacity?

3            MR. MARUTOLLO:  Objection.  Again,

4    the witness is not a 30(b)(6) witness here,

5    but you can answer to your personal knowledge

6    as a fact witness.

7        A    I don't have a complete

8    understanding of the full breadth of what that

9    research arm does, but it is my understanding

10   that the work that they do does greatly

11   support our overseas operations.  They also

12   assist with outreach to stakeholders, the

13   media when they're asking us for statistics on

14   anything ranging from refugee adjudication to

15   the rate of fraud and asylum applications.

16   These are things that they would be able to

17   dig up pretty quickly, but more than that, I

18   can't really say what the full extent of the

19   nature of the agency's reliance on their

20   services is.

21       Q    Is it fair to say that the agency

22   relies on their support in the TPS process?



1          MR. MARUTOLLO:  Objection.  Again,

2     the witness is not a 30(b)(6) witness, but you

3     can answer the question, to the extent it's

4     not already been answered, but you can answer

5     it.

6          A     I don't know that it would be fair

7     to say to that.  I would have to defer to the

8     chief of the Office of Policy and Strategy who

9     solicits their -- who I assume solicits their

10    input, along with all the other offices, in

11    the drafting of the memo or whatever other

12    documentation relating to TPS is being

13    presented to me for review.

14         Q     Sure.  It wasn't a trick question.

15    I guess I was just trying to understand the

16    agency relies on -- or excuse me -- the agency

17    seeks their input in the process, seeks their

18    help in the process.  Okay.

19              So turning back to your role in

20    reviewing the draft memos that are coming up

21    from -- during -- excuse me, during the TPS

22    process, what would happen if you were to



Page 56

1  disagree with the assessment in the memo of

2  country conditions?

3          MR. MARUTOLLO:  Objection.  Again,

4  the witness is not an expert witness and I

5  would instruct him not to answer any

6  hypothetical questions, so I direct him not to

7  answer that question.

8          MS. WEBB:  Okay.  We can -- we can

9  get it out in the documents.

10 BY MS. WEBB:

11     Q    To your knowledge, are there any

12 sort of formal policies or guidelines in place

13 that would govern how the RAIO employees

14 conduct the country conditions research?

15         MR. MARUTOLLO:  Objection.  You can

16 answer.

17     A    I have no knowledge of any such

18 policies or guidelines.

19     Q    Do you know whether any other parts

20 of USCIS, leaving aside other parts of DHS,

21 other agencies, any other parts of USCIS

22 contribute to the research that goes into the



Page 57

1    memos?

2             MR. MARUTOLLO:  Objection.  Vague.

3    But you can answer.

4        A    I don't know.

5             MS. WEBB:  Let's take a break now

6    before I get into --

7             MR. MARUTOLLO:  Sure.

8             THE VIDEOGRAPHER:  We're going off

9    the record at 11:04.

10            (A brief recess was taken.)

11            THE VIDEOGRAPHER:  We're back on the

12   record at 11:12.

13   BY MS. WEBB:

14       Q    If you would turn back to Exhibit

15   102, please.  And on page 4, subsection

16   (3)(A), which is entitled "Periodic review,"

17   which states, "At least 60 days before end of

18   the initial period of designation, and any

19   extended period of designation, of a foreign

20   state (or part thereof) under this section,

21   the Attorney General, after consultation with

22   appropriate agencies of the government, shall



Page 58

1 review the conditions in the foreign state (or

2 part of such foreign state) for which a

3 designation is in effect under this subsection

4 and shall determine whether the conditions for

5 such designation under this subsection

6 continue to be met."

7          You mentioned you were familiar with

8 that subsection of the statute, correct?

9     A    Yes.

10     Q    And what do you understand that

11 provision of the statute to mean?

12          MR. MARUTOLLO:  Objection to the

13 extent the statute speaks for itself, but you

14 can answer.

15     A    As I understand it, the Secretary of

16 Homeland Security, not the Attorney General,

17 because that was changed by the Operation

18 Homeland Security Act, the Secretary of

19 Homeland Security is required to review the

20 conditions in the country in question and at

21 least two months before the end of the

22 designation period to determine if the country



Page 59

1    continues to meet the eligibility criteria set

2    forth in 244(b)(1), the section that describes

3    the various prongs for eligibility for TPS.

4         Q    And when you say "review the

5    conditions in the country in question," would

6    that include -- would that be limited to

7    conditions that prompted the initial TPS

8    designation?

9              MR. MARUTOLLO:  Objection.  I don't

10   know if that's a hypothetical question, but

11   you can answer the question.

12        A    As I see it, conditions means

13   conditions.  So the Secretary should review

14   the totality of the circumstances, the

15   universe of conditions in place in that

16   country at the time of the review.

17        Q    Okay.  Including taking into

18   account, perhaps, adverse conditions caused by

19   intervening events between the originating

20   designation event and the present or -- excuse

21   me -- or at the time of review?

22             MR. MARUTOLLO:  Objection.  Calls


MAGNA
LEGAL SERVICES

Page 60

1    for a legal conclusion, is vague.  Also calls

2    for speculation, what the Secretary would do,

3    but you can answer the question.

4         A    As I understand the statute, the

5    requirement is to consider all conditions in

6    place at the time of the review, everything,

7    yes.

8         Q    Okay.  So turning to the Haiti TPS

9    designation.  So you are aware -- you're aware

10   that Haiti was designated for TPS in January

11   2010, correct?

12             MR. MARUTOLLO:  You have to answer

13   verbally.

14        A    I didn't even get a chance to

15   answer.

16             Yes.

17        Q    Did you have anything -- did you

18   have any role in that designation?

19             MR. MARUTOLLO:  Objection.  I'm

20   sorry, which designation are we talking about?

21   I just missed it.

22             MS. WEBB:  The 2010 designation of



Page 61

1    Haiti.

2            MR. MARUTOLLO:  Sorry.  You can go

3    ahead and answer.

4        A    Not that I recall.  I was certainly

5    aware of it at the time in 2010.

6        Q    Okay.  And you were -- you were at

7    DHS at the time but not specifically working

8    on TPS?

9            MR. MARUTOLLO:  Objection.  You can

10   answer.

11       A    Correct.  I was indeed at DHS

12   headquarters at the time, but TPS was not

13   something I normally dealt with.

14       Q    Let me just pause and ask, during

15   that time that you were at headquarters and

16   before you were detailed to Senator Grassley,

17   did you ever work on TPS issues?

18           MR. MARUTOLLO:  Objection.  Vague.

19   You can answer.

20       A    I don't recall ever working on TPS

21   issues during my -- during the years that I

22   was up there.  There were other people in the



Page 62

1    group, the immigration group that worked on

2    those issues.  I was, of course, aware of TPS

3    decisions and determinations as they were

4    being made, but it was not something that I

5    normally worked on during those years.

6         Q    Okay.  What about when you were

7    working for Senator Grassley, did you work

8    specifically -- did your work touch on TPS

9    issues?

10        A    I don't specifically recall TPS

11   coming up in anything I ever did during my --

12   during the time I was detailed there.  It may

13   very well have come up in questions the

14   Senator may have had relating to oversight

15   just generally of the department, but I don't

16   recall myself having been involved in that

17   issue area.

18        Q    Okay.  Okay.  So going back to the

19   January 2010 Haiti TPS designation, are you

20   aware that the basis for that was the

21   earthquake in 2010 that struck Haiti?

22             MR. MARUTOLLO:  Objection.  Vague



Page 63

1    and calls for a legal conclusion.  But you can

2    answer.

3         A    I'm aware of that, yes.

4         Q    Okay.  And you -- are you aware that

5    that designation was extended in 2011 due to

6    -- also to a cholera outbreak?

7              MR. MARUTOLLO:  Objection.  Vague.

8    Again, calls for a legal conclusion, but you

9    can answer.

10        A    That is my understanding, though I

11   have no direct knowledge of that.  I don't

12   recall having read the 2011 Federal Register

13   Notice or any of the subsequent -- subsequent

14   ones, for that matter.

15        Q    But you are aware that the

16   designation and redesignation was extended

17   several times since 2011, correct?

18             MR. MARUTOLLO:  Objection to the

19   extent -- well, objection.  I think that

20   assumes facts not in evidence, but you can

21   answer.  And vague, but you can answer.

22        A    I am indeed generally aware that the



Page 64

```
 1    initial designation was renewed or extended

 2    several times, yes.

 3         Q    Okay.  Moving forward to 2017, are

 4    you aware of whether the Haiti TPS designation

 5    was set to expire in July of 2017?

 6         A    I am aware of that, yes.

 7         Q    Do you recall how that was brought

 8    to your attention?

 9              MR. MARUTOLLO:  Objection.  You know

10    not to disclose anything from attorney-client

11    privilege, but apart from that, you can

12    answer.

13         A    At the time I was still working at

14    DHS headquarters and -- though, as I described

15    it before, TPS was not something I normally

16    dealt with.  Nevertheless, I was aware that

17    the designation was expiring soon and -- so

18    the reason I was aware was because it was the

19    subject of discussion just generally in the

20    department and within the immigration group.

21         Q    Okay.  So in -- as of July, just

22    remind me, I apologize, as of July 2017, you
```



Page 65

1    had been nominated to the director, correct,

2    but you had not yet been confirmed?  Where

3    were you in the process as of July?

4         A    Yes, as I recall, I was nominated

5    around April, and -- but I wasn't confirmed

6    until October, so that entire time from

7    February when I came back from Capitol Hill

8    until October 6th or 7th, whenever it was I

9    was sworn in, I was at DHS headquarters doing

10   my normal job.

11        Q    All right.  Okay.

12             MS. WEBB:  Let's mark Exhibit 103.

13             (Exhibit 103 was marked for

14   identification and attached to the deposition

15   transcript.)

16   BY MS. WEBB:

17        Q    Take your time.

18        A    Okay.

19             (Document review.)

20             Okay, I've reviewed the document.

21        Q    Okay.  Do you recognize the email?

22        A    I don't remember the email, but I



Page 66

1    see it, yes.

2         Q    Okay.  Just a couple questions about

3    who's who.

4              So, first, who is Gene Hamilton?

5         A    Gene Hamilton at the time that this

6    email was sent in April of 2017, was a

7    counselor to the Secretary.

8         Q    Okay.  And James McCament?

9         A    As I recall, at the time James

10   McCament was the acting director of USCIS.

11        Q    Okay.  And Dimple Shah -- I'm not

12   sure I pronounced that right --

13        A    Dimple Shah at that time was the --

14   I think she -- she was the acting head of the

15   DHS Office of Policy.  I don't remember her --

16   the exact title that she had, but she was the

17   senior official from DHS policy.

18        Q    And what is she now?

19        A    Currently Dimple is the head -- I

20   don't know her exact title, but she is the

21   head -- she's in DHS -- the DHS Office of

22   Policy, and she's the head of the -- part of



Page  67

1    DHS policy that relates to overseas relations,

2    international relations.

3         Q    Okay.

4         A    Between the agency and foreign

5    countries.

6         Q    Okay.  Michael Dougherty.

7         A    Yes, Michael Dougherty at that time

8    was and still is the Assistant Secretary for

9    Immigration and -- Immigration Border and

10   Trade Policy, I believe is his title.  He's

11   also -- he was then and is now in the DHS

12   Office of Policy.

13        Q    Okay.  And Carl Risch?

14        A    Carl Risch at that time, as I

15   recall, was the Acting Chief of Staff at

16   USCIS.

17        Q    Okay.  And Ms. Nuebel Kovarik?

18        A    Kathy Nuebel Kovarik -- let me amend

19   my -- when I mentioned Carl -- I can't say

20   with certainty, but Carl Risch, Kathy Nuebel

21   and Craig Symons, all three of them were at

22   USCIS at the time.



Page 68

```
 1              I don't know with precision what

 2   their exact titles were at the time, this

 3   being very early on, April, but I know that

 4   they had -- they were at USCIS, but I don't --

 5   I'm not certain that they had actually been

 6   given a formal role or title at that time.

 7        Q    Okay.  And when the email refers to

 8   S1, just to clarify, is that the Secretary of

 9   DHS?

10        A    Yes, S1 is the typical way the

11   Secretary is referred to.

12        Q    Okay, thank you.

13             Okay.  So the subject of the email

14   is TPS, correct?

15        A    Yes.

16        Q    And it mentions -- the email

17   mentions a "briefing on TPS likely on Monday."

18             Do you by chance recall that

19   meeting?

20        A    I do not recall that meeting, no.

21        Q    Okay.  So then it says, "In addition

22   to the general TPS document we had last week
```



Page 69

1   (showing country, designation, expiration), he

2   would like the following related to Haiti."

3           And "he," is that a reference to the

4   Secretary, to your understanding?

5           MR. MARUTOLLO:  Objection.  You can

6   answer.

7       A    As I read the email, Mr. Hamilton is

8   indeed referring to the Secretary.

9       Q    Okay.  And when it references "he

10  would like the following related to Haiti," is

11  that in relation to the Haiti TPS decision --

12          MR. MARUTOLLO:  Objection.

13      Q    -- to your understanding?

14          MR. MARUTOLLO:  Objection.  The

15  document speaks for itself.  Also calls for

16  speculation, but you can answer.

17      A    I don't know.  I -- it's included in

18  the email relating to TPS, but I have no idea

19  whether the Secretary wanted that information

20  for purposes of TPS or for some other reason.

21      Q    Okay.  Do you recall USCIS working

22  to gather this -- the information listed here,



Page 70

1    details on how many are on public and private

2    relief, how many are school-aged kids and

3    other general demographic data, how many have

4    been convicted of crimes of any kind and how

5    often they travel back and forth to the

6    island, remittances, et cetera?

7            MR. MARUTOLLO:  Objection to the

8    extent it calls for internal governmental

9    deliberations, but you can answer the

10   question.

11       A    As I recall, at the time that all of

12   this was going on, in the spring of 2017, I

13   was aware that USCIS was working on the TPS

14   issue, which is appropriate for that agency

15   but that -- I had no specific knowledge what

16   the -- the specific things they were looking

17   at or researching.  So beyond, you know, what

18   it says here, I -- I really don't know what

19   they were doing in their -- in the development

20   of whatever document they eventually came up

21   with.

22       Q    Okay.  You mentioned in the spring



Page 71

1    of 2017.  At some point after that, did you --

2    did you see this data or did you become aware

3    that this data was being collected?

4             MR. MARUTOLLO:  Objection.

5        Q    Do you recall?

6             MR. MARUTOLLO:  Compound and vague,

7    but you can answer.

8        A    I have a very vague recollection

9    that at some later time I was aware that

10   information like this had been collected.  It

11   may be that I gleaned it from news reports,

12   but I -- I don't have any specific

13   recollection of being presented with these

14   statistics or being shown to me.

15       Q    Okay.  This group of individuals on

16   the email, was this some sort of policy group,

17   or why did Mr. Hamilton choose these

18   particular recipients?

19            MR. MARUTOLLO:  Objection.  Calls

20   for speculation.

21       Q    To the extent that you know.

22       A    I can't get into Mr. Hamilton's



Page 72

1    head, but I can assume -- I would assume that

2    he wanted to communicate with all relevant DHS

3    headquarters and component agency entities

4    that were working on the question of TPS

5    extension or termination.  So naturally USCIS

6    would be included, and there they are.  The

7    DHS Office of Policy would be included, and

8    indeed there they are.  At the time I was a

9    DHS policy official.  So it seems like a

10   natural, you know, universe of people to

11   communicate with on this.

12        Q    Okay.  And towards the end of the

13   email, he states, "Please keep the prep for

14   this briefing limited to those on this email.

15   If you need a specific data set and need to

16   ask someone to pull it, please do not indicate

17   what it is for.  I don't want to turn this

18   into a big thing where people start prodding

19   and things start leaking out."

20             What is your understanding of what

21   he meant by that?

22             MR. MARUTOLLO:  Objection.  The



Page 73

1    document speaks for itself.  Calls for

2    speculation.  You can answer.

3       A    My understanding is that he wanted

4    the discussion of the -- the preparation for

5    the Secretary's brief to be kept to as small

6    of a group as possible.

7       Q    Was that a typical practice with

8    preparing briefings for the Secretary, to

9    limit it to very small groups, just the heads

10   of the agencies?

11           MR. MARUTOLLO:  Objection.  Again,

12   first that the witness is not a 30(b)(6)

13   witness and, second, this is related to an

14   email from Gene Hamilton, not from Mr. Cissna,

15   but you can answer the question.

16      Q    Just in his experience -- in your

17   experience.

18      A    In my experience going back years,

19   going back all the way to Secretary Chertoff,

20   it is not uncommon for a Secretary and his

21   immediate counselors to choose to or to

22   request that certain decisions the Secretary



Page 74

1    is making or contemplating be -- that -- that

2    the universe of people advising the Secretary

3    on one decision or another be limited to a

4    small group.

5         Q    So with respect to the information

6    requested that I listed out before, in your

7    view, are any of those sets of data relevant

8    to a decision to extend or terminate TPS?

9              MR. MARUTOLLO:  Objection.  Again,

10   that calls for internal deliberations of the

11   government.  And, again, this is also beyond

12   the scope of this witness.  He's not the final

13   decision-maker here.

14             You can answer the question.

15        A    It could be.  It could be.  Under

16   the section of the law relating to -- under

17   section 244(b)(1)(C), this is on page 3 of

18   Exhibit 102, the extraordinary and temporary

19   conditions prong of TPS designation, it does

20   say, "The Secretary -- the AG, rather -- "The

21   Secretary finds that there exists

22   extraordinary and temporary conditions in the



Page 75

1    foreign state that prevent aliens or nationals

2    of the state to return to the state in safety"

3    --

4          MR. MARUTOLLO:  Hang on, just slow

5    down for the court reporter.

6          A    Sorry.

7          "From returning to the state in

8    safety, unless the Secretary finds that

9    permitting the aliens to remain temporarily in

10   the United States is contrary to the national

11   interest of the United States."

12         So, that last part, potentially,

13   such information could be useful in

14   considering whether allowing the population of

15   whatever country to remain might or might not

16   be in the national interest of the United

17   States.

18         Q    Okay.  And I'll just ask you, with

19   respect to each one, just to elaborate a

20   little bit.  So when he asks for details on

21   how many are in public and private relief, in

22   your view how would that relate to the United



Page 76

1    States' national interest?

2            MR. MARUTOLLO:  Objection.  Again,

3    that calls for speculation.  I mean, I direct

4    the witness not to answer to the extent it's a

5    hypothetical question, but otherwise, you can

6    answer the question.

7        A    I think that -- it would not be

8    unreasonable for a Secretary to consider

9    whether, if a population -- if a large

10   percentage of a population were on public or

11   private relief, to consider that to be --

12   whether allowing such people to remain is or

13   is not in the national interest I think would

14   be a reasonable thing to consider.

15       Q    And then what about the second one,

16   how many are school-aged kids and other

17   general demographic -- well, let's just take

18   how many are school-aged kids?  How would that

19   relate to that last part of the statute there

20   as contrary to the national interest of the

21   United States?

22           MR. MARUTOLLO:  Again, same



1    objection.  It calls for internal governmental

2    deliberations.  And it certainly calls for

3    speculation, is a hypothetical question, but

4    you can answer the question.

5        A    As I read, I think the general point

6    would be what is the demographic -- what are

7    the demographic characteristics of the

8    population in question.  Whatever those may

9    be, may or may not, may impact the

10   consideration of whether allowing the people

11   to remain is or is not a national interest.  I

12   think that, too, would be a reasonable thing

13   to consider.

14       Q    Would the number of school-aged kids

15   bear specifically one way or another?

16            MR. MARUTOLLO:  Again, objection.

17   Vague.  Calls for speculation.  This is,

18   again, related to an email not drafted by

19   Mr. Cissna.  Mr. Cissna is not a 30(b)(6)

20   witness.  He's a fact witness.  There's been

21   no testimony that he's had any involvement in

22   this decision in April -- in the spring of



Page 78

1    2017, but -- again, it calls for internal

2    government deliberations, but you can answer

3    the question.

4         A    I have -- I don't -- I don't know

5    how specifically -- whether the population of

6    school-aged -- what the number of school-aged

7    children in the population would have any

8    bearing, but it might.  I don't -- I don't

9    know.

10        Q    Okay.  Okay.  And then the same

11   question for criminal convictions of any kind.

12   How in your view would that relate to the

13   statutory requirement that you read for us?

14             MR. MARUTOLLO:  Again, same

15   objection.  Calls for internal governmental

16   deliberations.  Calls for speculation.  But

17   you can answer the question.

18        A    I think the level of criminality of

19   a population that has been granted TPS is

20   something surely, again, that would be

21   reasonable to consider in determining whether

22   it's in the national interest to extend or not



Page 79

1    extend.

2         Q    Is it your understanding that if a

3    TPS beneficiary is convicted of a crime, that

4    they can be removed from the United States?

5              MR. MARUTOLLO:  Objection.  Calls

6    for a legal conclusion.  Also, goes beyond the

7    scope of his testimony here as a fact witness,

8    but you can answer to the extent you know.

9         A    The statute does provide for

10   termination of TPS status for people who

11   commit certain crimes.  I believe it's a

12   felony or two misdemeanors, but -- so the

13   short answer is yes, it is my understanding

14   that certain types of criminality do render a

15   person ineligible for TPS or make them lose

16   their TPS status.

17        Q    Okay.  Is it your understanding that

18   this data request was for a broader universe

19   of all crimes, essentially?

20             MR. MARUTOLLO:  Objection.  Again,

21   calls for speculation.  Mr. Cissna did not

22   draft this email and it also calls for



Page 80

1    internal governmental deliberations.  You can

2    answer to the extent you know.

3         A    All I know is what the email says,

4    the requester wants information on how many

5    have been convicted of crimes of any kind.

6         Q    And, finally, the fourth request for

7    how often they travel back and forth to the

8    island, remittances, what is your

9    understanding of how that would relate to the

10   national interest of the United States?

11             MR. MARUTOLLO:  Objection.  I also

12   think that misstates testimony from Mr. Cissna

13   and also is -- seeks internal governmental

14   deliberations, but you can answer the

15   question.

16        A    I don't know.  It may be that the --

17   whatever the answer is to that question would

18   be determined to be in apposite to the

19   determination.  I can't say what Mr. Hamilton

20   or the Secretary had in mind when requesting

21   that information.

22        Q    And in your view, would these



Page 81

1    categories of information go to any provision

2    of the statute other than the one that you

3    identified in subsection (C)?

4            MR. MARUTOLLO:  Objection.  Again,

5    calls for speculation that these items are

6    even in connection with a determination about

7    TPS designations, but you can answer the

8    question.

9        A    I don't know.

10       Q    I understand that, I think, at some

11   point you had responded to an inquiry from

12   Senator Feinstein on this same topic and had

13   stated that these sorts of categories of

14   information would help increase the

15   Secretary's understanding of how the TPS

16   program operates.  Do you recall that?

17           MR. MARUTOLLO:  Objection.  First,

18   to the extent -- first, objection on the

19   grounds of vagueness, but, second, to the

20   extent there are documents that you have, this

21   should not be a memory test for Mr. Cissna;

22   but given that objection, you can answer the



1   question.

2        Q    Fully understood it's not a memory

3   test.  Just do you recall that response at

4   some point to Senator Feinstein?

5        A    I don't recall that exact response,

6   no.

7        Q    Okay.  Do you recall -- do you

8   recall her making an inquiry to you in your

9   office about these -- those specific

10  categories of information?

11            MR. MARUTOLLO:  Objection.  You can

12  answer to the extent you remember.

13       A    You mean during the time that I was

14  director or --

15       Q    Yes, yes.

16       A    No, I don't recall a specific letter

17  from Senator Feinstein.  I must have received

18  hundreds of letters from members of Congress

19  and other outside groups, but I can't

20  specifically remember a letter to her.

21       Q    Okay.  Do you ever -- do you

22  remember ever -- do you think that these



Page 83

1   categories of information do have a bearing on

2   how the TPS program operates generally?

3          MR. MARUTOLLO:  Objection.  Vague,

4   and calls for a legal conclusion, but you can

5   answer based on your own understanding as a

6   fact witness in this case.

7       A    You mean the categories in the

8   Hamilton email?

9       Q    Yes.

10      A    They could.  They might.  It's --

11  national interest is a very broad term.  It

12  could.

13         MS. WEBB:  Okay.  Let's mark Exhibit

14  104.

15         (Exhibit 104 was marked for

16  identification and attached to the deposition

17  transcript.)

18         MR. MARUTOLLO:  Do you have three

19  copies?

20         MS. WEBB:  Sorry.  I have -- this

21  was a surprise this morning.

22         MR. MARUTOLLO:  That's okay.



Page 84

```
 1               I'm sorry, what number exhibit is
 2    this?
 3               MS. WEBB:  104.
 4               THE REPORTER:  104.
 5          A    (Document review.)
 6               I reviewed the document.
 7          Q    Just a few questions about this.
 8               So, do you recall this decision by
 9    Secretary Kelly in May of 2017?
10          A    I do recall it.
11          Q    Did you have any involvement in the
12    decision that was made?  Did you provide any
13    input?
14               MR. MARUTOLLO:  Objection to the
15    extent it calls for internal governmental
16    deliberations, but you can answer the
17    question.
18          A    I don't have any specific
19    recollection of having any involvement in this
20    decision.  As we discussed earlier, I was
21    certainly aware of it, but from what I recall,
22    USCIS was taking the lead on offering advice,
```



Page 85

1    but not sole -- we didn't have the sole role.

2    Other components were giving advice to

3    Secretary Kelly on this subject, but I

4    personally, I don't have any specific

5    recollection of being involved in this

6    decision.

7         Q    Okay.  Do you remember any

8    discussions about this decision prior to it

9    being made that you had?

10             MR. MARUTOLLO:  Objection to the

11   extent it calls for internal governmental

12   deliberations, but you can answer the

13   question.

14        A    No, I don't recall any discussions

15   that I had with anybody about this decision

16   during that time.

17        Q    Okay.  Do you recall being present

18   -- excuse me -- present at any meetings where

19   this decision was discussed?

20             MR. MARUTOLLO:  Objection to the

21   extent it calls for internal government

22   deliberations, but you can answer the



Page 86

1   question.

2       A    I don't -- truly, I do not

3   specifically recall being in any meetings on

4   the subject during this time frame, no.

5       Q    Okay.  Okay.

6           MS. WEBB:  Let's mark this.  I think

7   I just have two.  Let's see.

8           Here's one more.

9           MR. DUGAN:  Thank you.

10          (Exhibit 105 was marked for

11   identification and attached to the deposition

12   transcript.)

13   BY MS. WEBB:

14      Q    I'm also going to give you the memo

15   in question.

16          (Exhibit 106 was marked for

17   identification and attached to the deposition

18   transcript.)

19      A    (Document review.)

20          Okay, I removed -- I reviewed the

21   documents.

22      Q    Okay.  So just starting with 106,



Page 87

1    the memo, so what -- we've talked about the

2    process in the memos that move through USCIS

3    to the Secretary.

4              What is this document and where is

5    it in the process that we discussed?

6              MR. MARUTOLLO:  Objection.  Vague

7    and compound, ambiguous.  You can answer.

8         A    This document is the recommendation

9    from USCIS to the Secretary for Sudan, TPS

10   designation.  This would be like the same

11   document as is done for all the other TPS

12   countries, this one done during Mr. McCament's

13   time as acting director.  So it's the same

14   product that the director signs out and sends

15   up to the Secretary.

16        Q    And as we discussed -- as we

17   discussed before, RAIO would provide research

18   and input for this document; is that correct?

19             MR. MARUTOLLO:  Objection.  That

20   misstates testimony, but you can answer to the

21   extent you know.

22        A    As best I understand the process,



Page 88

1    even then, in the summer of 2017, RAIO had a

2    role in the coordinated product that OP&S,

3    Office of Policy and Strategy, put together.

4         Q    Okay.  Okay.  And then turning to

5    the email chain, so Mr. Dougherty on Tuesday,

6    August 29th, 5:05 p.m., emails -- excuse me --

7    emails James Nealon, with you copied, and

8    Briana Petyo copied and Gene Hamilton copied,

9    and says "Ambassador Nealon, Francis and I

10   looked over USCIS/McCament's TPS packages for

11   Sudan and South Sudan, and we agree with his

12   recommendations."

13             First, let me ask you, do you recall

14   this email chain?

15             MR. MARUTOLLO:  Objection.  First, I

16   would just note that, again, this is related

17   to TPS designations and packages for Sudan and

18   South Sudan, that South Sudan and Sudan are

19   not countries at issue in this litigation,

20   which is only limited to Haiti, so I would

21   object on the ground that this is unnecessary,

22   conducted in bad faith, but you can answer the



Page 89

1   question.

2        A    I recall at the time these

3   discussions happening.  I didn't remember this

4   email chain until I heard about it again some

5   time ago, and now have reread it.  So I do

6   remember it now.

7        Q    Okay.  Okay.  And why was Ambassador

8   Nealon -- I don't know if I'm pronouncing that

9   name right, I apologize.

10       A    Nealon.

11       Q    Why was he included in that email to

12  your understanding?

13            MR. MARUTOLLO:  Objection.  Calls

14  for speculation.  The email is not from

15  Mr. Cissna, but you can answer to the extent

16  you know as a fact witness.  Same objection

17  that this is related to a determination that

18  is for Sudan or South Sudan, which is not at

19  issue in this litigation, but you can answer.

20       A    At the time, as I recall, Ambassador

21  James Nealon, former Ambassador James Nealon

22  was -- had -- he had effectively become the



Page 90

1    political head of -- actually, I don't know

2    that he was a political appointee. He had

3    become the de facto head of the Office of

4    Policy. So it was appropriate that Assistant

5    Secretary Dougherty would loop Ambassador

6    Nealon into this issue.

7          The process was this document, the

8    memorandum, like all the other memoranda that

9    are going to the Secretary, like most other

10   memoranda that are going to the Secretary, are

11   reviewed by DHS component offices. So the

12   Office of Policy might look at a memorandum,

13   the Office of General Counsel, maybe other

14   components at headquarters that have an

15   interest in whatever the thing is.

16         So, as I recall, what would happen

17   with these, and I don't think I saw many

18   during the time that I was up there before I

19   took my current job, these would be

20   circulated, like memoranda like this one, the

21   Sudan memorandum, would be circulated amongst

22   DHS headquarter components for comment,



Page 91

1    review, clearance, and if component offices

2    had concerns or questions, then we would

3    communicate back with the originating

4    component through the executive Secretary of

5    process and express those concerns.

6              So, here we see an exchange where

7    Assistant Secretary Dougherty is telling

8    Ambassador Nealon at the staff level, because

9    in those days I was a career staff person, we

10   had reviewed the document, and he was

11   transmitting our conclusions.

12       Q    Who is Briana Petyo?

13       A    Briana Petyo --

14       Q    At the time, what was her position?

15       A    She was a career official in the DHS

16   Office of Policy.  She was working in the --

17   at the time, in the DHS policy front office.

18   She was -- as I understood her role, she acted

19   as a sort of counselor to Ambassador Nealon

20   and generally helped him manage the front

21   office of the Office of Policy.

22       Q    Okay.  So then this email was going



Page 92

1    from the Assistant Secretary of Immigration

2    Border to OPS officials and to Gene Hamilton,

3    who is counselor to the Secretary, correct?

4        A    Correct.

5        Q    And to you.

6        A    Right.

7        Q    At the head office.

8            And does that exhaust the group of

9    the DHS departments that this type of memo

10   would have gone to?

11           MR. MARUTOLLO:   Objection.   Calls

12   for speculation.   Vague.   Again, this is in

13   relation to the Sudan and South Sudan

14   determinations unrelated to this litigation,

15   but you can answer.

16       A    No.   I mean, typically, a memo --

17   memos that are going to the Secretary are

18   often, though I don't believe in every case,

19   circulated generally at the department

20   headquarters level.   So the Office of General

21   Counsel would see it.   Here, as you see, the

22   DHS Office of Policy.   Perhaps the Office of



Page 93

1    Civil Rights and Civil Liberties.  It all

2    depends on the nature of the memo.

3        Q    Okay.

4        A    So the addressees on this email are

5    just people in DHS policy with Mr. Hamilton

6    tacked on so ...

7        Q    So there would be separate emails to

8    those other departments potentially?

9        A    That's what I would assume, yes.

10       Q    Okay.  So in the next email that you

11   send on Tuesday, August 29, 2017, at 6:50

12   p.m., you say that "Looking more carefully at

13   the Sudan paper attached, it seems a bit

14   confused."  And then you quote some language

15   from it.

16            On page 1 of the decision memo it

17   says -- you highlight, "The draft package that

18   was submitted to Secretary Tillerson's office

19   for review assesses that the statutory

20   conditions supporting Sudan's TPS designation

21   continue to be met and recommends an 18-month

22   extension of Sudan's designation for TPS."



Page 94

1          Then, you note at the bottom of page

2    3, it says, you highlight again, "The review

3    of conditions in Sudan indicates that it

4    remains unsafe for individuals to return to

5    Sudan and that the statutory requirements to

6    designate a country for TPS under Immigration

7    Nationality Act, Section 244(b)(1)(A), ongoing

8    armed conflict, and under Section

9    244(b)(1)(C), extraordinary temporary

10   conditions, continue to be met."

11          Then, you highlight again, "Because

12   the conditions supporting Sudan's TPS

13   designation persist, termination does not

14   appear to be warranted."

15          Then you write -- and then on page

16   5, "Despite all the forgoing, the

17   recommendation is to terminate TPS for Sudan,

18   exclamation point."

19          Then you add at the end, "The memo

20   reads like one person who strongly supports

21   extending TPS for Sudan wrote everything up to

22   the recommendation section, and then someone



Page 95

1   who opposes extension snuck up behind the

2   first guy, clubbed him over the head, pushed a

3   senseless body out of the way and finished the

4   memo.  Am I missing something?"

5           So my question to you is, what did

6   you -- how did you understand that that --

7   those inconsistencies in the memo had

8   occurred?  What had happened there?

9           MR. MARUTOLLO:  Objection.  Again,

10  first, I would just note our objection on the

11  grounds of deliberative process privileges

12  that as that question is phrased calls for

13  internal governmental deliberations.  Second,

14  I object to the fact that this is related to

15  Sudan, which is not an issue in this

16  litigation, Haiti is the country of issue in

17  this litigation, and, third, I would object on

18  the grounds that the document speaks for

19  itself, but you can answer the question.

20      A    Before I answer, I commend counsel

21  in reading that with a straight face.  But I

22  would say the -- my point in making that



Page 96

1    communication in that email was that the memo

2    was internally -- it was not drafted well.  It

3    was -- it was just not drafted well.  It was

4    inconsistent, internally inconsistent.  And I

5    -- I have -- I have no idea why that happened

6    or what caused the bad drafting to take place.

7    My only point was that if something is going

8    to be sent to the Secretary, the document has

9    got to be right.  It has to be well drafted,

10   internally consistent, and it has to make

11   sense.  So I was just performing my duty as an

12   Office of Policy staffer and basically

13   expressing concern, the memo was just not

14   ready for prime time and recommending that

15   that be -- that the Office of Policy

16   communicate that back to the agency that

17   originated the document.

18        Q    Right.

19             And you seem to emphasize that the

20   memo had appeared to be drafted by two people

21   with competing agendas.  Is that correct of

22   what you felt at that time?



1          MR. MARUTOLLO:  Objection.  First,

2     again, with respect to calling for internal

3     governmental deliberations and calling for

4     Mr. Cissna's feelings on issues.

5     Additionally, objection on the ground that the

6     witness has just answered that question, but

7     you can answer it again.

8          A    I had -- again, I have had, and even

9     now, have no idea who drafted it or whether

10    there was more than one person or ten people.

11    I don't know.  I was only making the point

12    that however it came to be, the document was

13    badly crafted and needed to be made

14    consistent.

15         Q    Okay.  And in the prior email,

16    Mr. Dougherty had stated that you and others

17    agreed with the recommendation in the memo,

18    correct?

19         MR. MARUTOLLO:  Objection.  Again,

20    to the extent it calls for internal

21    governmental deliberations, I would object,

22    and also that the document speaks for itself,



Page 98

1    but you can answer.

2         A    Yes, that's what we said in the

3    email, correct.

4         Q    Okay.  Do you recall at the time

5    agreeing with the recommendation in the memo?

6              MR. MARUTOLLO:  Objection.  Again,

7    to the extent it calls for his personal

8    opinion, I direct the witness not to answer,

9    under the deliberative process privilege at

10   least how that question is phrased.

11             MS. WEBB:  I'm asking just about the

12   email.  It says he agrees.

13             MR. MARUTOLLO:  I think -- I think

14   the question was, did you agree with the

15   recommendation, correct me if I'm wrong, but

16   if the question is do you agree with the

17   recommendation for Sudan here, then I would

18   instruct the witness not to answer, not only

19   on deliberative process grounds but,

20   obviously, it's outside of this case.  We're

21   not dealing with Sudan in this case.  So that

22   -- if that's the way the question was phrased,



1    which I think it was, then I would direct the

2    witness not to answer.

3              MS. WEBB:  I'm asking him whether he

4    agreed in his capacity at the time at DHS

5    headquarters, reviewing this memo?  So it's

6    not his personal feelings, really.  It was

7    sort of his official position that he took.

8              MR. MARUTOLLO:  I still think --

9    again, I realize there was a ruling yesterday,

10   but the ruling yesterday did not touch on

11   personal opinions.  It touched on, based on

12   Plaintiff's motion, what was reviewed, what

13   the witnesses were instructed to do, facts

14   that were asked for, who asked certain

15   information.  Even at earlier depositions,

16   Plaintiffs have stated explicitly they're

17   seeking discovery of facts and not -- I

18   believe even at the first deposition, the

19   Plaintiff's attorney noted they're not

20   seeking, you know, views or recommendations

21   and internal recommendations.  So I think,

22   again, the question as phrased I would



Page 100

1    instruct the witness not to answer.

2            MS. WEBB:  I guess we have to take a

3    break.  Let's go ahead and take a break.

4            THE VIDEOGRAPHER:  Going off the

5    record at 12:15.

6                (A lunch recess was taken.)

7            THE VIDEOGRAPHER:  We're back on the

8    record at 1:05.

9    BY MS. WEBB:

10       Q    Okay.  So just a couple more

11   questions about the last exhibit, which is

12   106, yes.

13           Okay.  So, your attorney will be

14   relieved that I'm not going to ask any more

15   questions about your personal views on it, but

16   I want to get just a bit of a better

17   understanding of the process that happened

18   after you had sent that email on August 29th.

19           So, after you sent your email at

20   6:50 p.m., Mr. Hamilton sent an email at 9:35

21   p.m. the same day saying, "Who can take care

22   of this ASAP?  She needs to sign this



1    tomorrow."

2            Who did you understand "she" to be

3    there?

4        A    I'm not sure because -- yeah, I

5    don't know.  Secretary Nielsen wasn't

6    Secretary yet at the time, I don't think.  I

7    don't think she came in until later.

8        Q    Okay.

9        A    November, I think.  So I'm not sure.

10       Q    Would it be the acting Secretary

11   then, possibly?

12           MR. MARUTOLLO:  Objection.  Asked

13   and answered.  But you can answer again.

14       A    I don't -- I don't remember when

15   Kelly left and when Duke came in, so it -- I

16   don't know.

17       Q    Okay.  So, in general, the memo --

18   feel free to look at it again because it's

19   been a few minutes here -- would this memo

20   inform the -- well, would the Secretary sign

21   this memo?

22           MR. MARUTOLLO:  Objection.  You can



1    answer, to the extent you know.

2         A    If the decision memo had a decision

3    block at the end with options that the

4    Secretary can choose from, just as a general

5    matter, then, yes, the Secretary would circle

6    whatever option they want and then sign their

7    name next to it.

8         Q    Okay.  Okay.

9              So, but you're not sure whether

10   Mr. Hamilton was implying that the decision

11   memo needs to be signed tomorrow by the

12   Secretary?

13             MR. MARUTOLLO:  Objection.  You can

14   answer.

15        A    I think that's what -- what he's

16   implying.

17        Q    Okay.

18        A    The -- that's what it appears he's

19   applying -- implying, yes.

20        Q    Okay.  So, then, at 9:49 p.m. on the

21   same day, August 29th, Ms. Petyo sends an

22   email with some acronyms that I'm going to ask



Page 103

1    you about, but "PLCY only got PDFs and

2    clearance.  We can do but would need CIS

3    originals and would probably need to be

4    re-signed by CIS given one of the key pieces

5    we will actually need to change to make sure

6    it's consistent is the first part where you

7    mention this draft relies on the assessment

8    sitting on Tillerson's desk and CIS rec. which

9    don't align in this draft."

10           So, just quickly, what did you

11   understand what PLCY to refer to?

12        A    PLCY means the Office of Policy.

13        Q    And CIS is USCIS?

14        A    Correct.

15        Q    What did you understand her to mean

16   generally in her email there?

17        A    She is saying that if the memo in

18   question is to be amended in any way in

19   response to the comments I raised or whatever

20   comments anybody else has, then we, the DHS

21   Office of Policy, would need Microsoft Word

22   text in order to be able to edit it.  This



Page 104

1    document evidently only came as a PDF so it

2    couldn't be edited, and that's the substance

3    of her remarks.

4         Q    Okay.  And what about her remark

5    that it probably would need to be re-signed by

6    CIS?

7              MR. MARUTOLLO:  Objection.  Vague

8    and you can answer.

9         A    I think what that -- what she's

10   trying to say there is that if something on

11   the first page needs to be changed, then

12   Mr. McCament would have to re-sign the first

13   page because the existing page with his

14   signature on it is a PDF and couldn't be

15   changed so they would have to have him re-sign

16   it all over again.

17        Q    Okay.  Was it the first page or

18   first part?

19             MR. MARUTOLLO:  Objection to the

20   extent the document speaks for itself and,

21   also, just reassert our argument that this is

22   governmental deliberations, but you can answer



Page 105

1    the question.

2         A     As I understand what she's saying,

3    she is suggesting that if the people on this

4    email chain agree that something on the first

5    page needs to be changed, then, yes, they --

6    he would have to re-sign that first page to go

7    along with the rest of the memo where apparent

8    -- where it seems other changes may be

9    contemplated, too.

10        Q     Okay.  Okay.  So a couple questions.

11   First, what -- so the -- the changes that you

12   had highlighted here were with respect to

13   explanation of the country conditions in

14   Sudan, correct?

15             MR. MARUTOLLO:  Objection.  Asked

16   and answered, but you can answer again.

17        A     The -- I wasn't -- what I was

18   pointing out were things that I saw were

19   inconsistencies within the report.

20        Q     Okay.  But the highlighted language,

21   I guess, from your email goes to parts of the

22   first part of the memo that discussed the



Page 106

1    country conditions in Sudan.

2            MR. MARUTOLLO:  Objection.  Asked

3    and answered.  You can answer again.

4        A     Correct.

5        Q     And for those parts of the memo to

6    be changed or parts to be excised from the

7    memo, who in the process would have to sign

8    off on that before the memo arrived on the

9    Secretary's desk?

10            MR. MARUTOLLO:  Objection.  You can

11   answer to the extent you know.

12       A     As I understand the process, then,

13   if there were to be any changes to this memo,

14   which is a USCIS document, then the

15   then-director would have had to have signed

16   off on them.

17       Q     Anyone else that would need to sign

18   off?

19            MR. MARUTOLLO:  Objection, again,

20   just asserting that Mr. Cissna is not a

21   30(b)(6) witness and this does not even

22   pertain to the Haiti determination, but you



Page 107

1    can answer the question to the extent you

2    know.

3         A    The only person who clears a

4    document like this on behalf of the agency

5    would be the director.

6         Q    Okay.  In terms of a process for

7    making amendments like this, is there anyone

8    else that would be apprised of an amendment

9    like this at this late stage within USCIS?

10              MR. MARUTOLLO:  Objection as being

11   vague.  Objection, asked and answered, but you

12   can answer.

13        A    I think as a general matter, any

14   time a memo or document that's created by a

15   component of DHS gets sent back with comments

16   or suggested red lines from a DHS headquarters

17   component, then the memo is typically just

18   sent back to the original drafting office

19   within the component to assess those concerns

20   or red lines, and then adjudicate them; that

21   is to say, decide whether they accept them or

22   not.  And if the originating office accepts



1    them, then they do so, and then refinalize the

2    memo, send it back and eventually the process

3    reaches a point where everyone agrees the memo

4    is fine and then it can move on to the

5    Secretary's desk.

6        Q    Okay.  And here, who, again, was the

7    originating office for this memo?

8            MR. MARUTOLLO:  Objection.  You can

9    answer, but we would object on the extent that

10    it calls for internal government

11    deliberations, but you can still answer.

12        A    Since I wasn't at USCIS at the time,

13    I don't know.  Assuming the process is the

14    same as it is now, it would have been the

15    Office of Policy and Strategy, which

16    coordinated the memo, but I don't know for

17    certain that they did in this case.  I assume

18    they did.

19        Q    So it appears that Ms. Petyo offers

20    to handle the revisions and asks for, as you

21    said, asks for the Word documents.

22            So is that a typical part of this



Page 109

1    practice where her office would take over the

2    revision process at this stage as opposed to

3    the originating office?

4              MR. MARUTOLLO:  Objection, again.

5    The witness is not a 30(b)(6) witness and this

6    does not relate to a decision in which he was

7    the CIS director at the time or to Haiti, but

8    given those objections you can still answer

9    the question.

10        A    As I've long understood the process,

11    it's the originating components which is, I

12    guess for a lack of a better term, the owner

13    of the document, so it would be that

14    originating component, which would make the

15    edits and just send them back.  So it is

16    unclear to me what Ms. Petyo is referring to

17    there.

18        Q    Okay.  So it would not be typical,

19    at least in your experience, for her

20    department to take over ownership of the

21    document at this stage; is that correct?

22              MR. MARUTOLLO:  Objection.  I think



1    that mischaracterizes his testimony, but you

2    can answer.

3         A    In my experience, at least in the

4    Office of Policy, what would happen frequently

5    would be that the Office of Policy would have

6    comments or concerns or even red line edits

7    that we would propose to documents, not just

8    ones like this, and those would be sent back

9    and adjudicated by the originating component.

10        Q    Okay.  When you say adjudicated,

11   could you explain a little bit more what you

12   mean by that?

13        A    When a -- when one component of the

14   agency -- this is just in general government

15   experience -- when one component has comments

16   or suggested red lines on a document that is

17   drafted by a different component, in the usual

18   executive secretariate process, the document

19   goes back to the originating office and the

20   authors of the document -- the author or

21   authors of the document look at all the

22   suggested edits, red lines, comments, concerns



Page 111

1    and respond to them.  Sometimes the

2    originating office will agree with the

3    proposed red lines and sometimes they won't.

4    That process of deciding how to react to

5    different comments or red lines or comment

6    bubbles is the process of adjudicating those

7    suggested revisions.  That's what I mean by

8    adjudication.

9         Q    Okay.

10             And with respect to a TPS decision

11    memo like this, is it the director who would

12    have the final say in adjudicating conflicting

13    intra agency positions?

14             MR. MARUTOLLO:  Objection, again to

15    the extent it calls for internal government

16    deliberations, but you can answer the

17    question.

18        A    As a general matter, it would be

19    because the -- if the document comes back to,

20    in this case, USCIS, and edits are -- proposed

21    edits are responded to or adjudicated as I

22    just described, it would almost certainly



Page 112

1    require the front office to look at it again

2    before it goes off the second time, or a third

3    time, or however many times, and it may even

4    require the memo to be re-signed, but either

5    way, the -- at least the front office would

6    surely look at it again if they did the first

7    time.

8          Q    Okay.  Okay.  Let's move on.

9               MS. WEBB:  Exhibit 107.

10              (Exhibit 107 was marked for

11    identification and attached to the deposition

12    transcript.)

13         A    Excuse me, may I grab my water?  I

14    forgot.

15         Q    Sure.

16         A    Okay.

17              (Document review.)

18              Okay.  I have reviewed the document.

19         Q    Okay.

20              Do you recognize the document?

21         A    I do.

22         Q    There's not too many more of these



Page 113

1    but I'm going to ask you again, what is the

2    document and where are we in the process that

3    we've discussed today in terms of getting this

4    decision memo to your desk for signing?

5              MR. MARUTOLLO:  Objection.  You can

6    answer.

7         A    Well, the document appears to be an

8    unsigned draft of the decision memo that was

9    being prepared, unsigned and undated draft

10   revision of the draft that was being prepared

11   for the Secretary in connection with the Haiti

12   TPS designation situation.

13        Q    Okay.  Do you recall reviewing this

14   draft specifically?

15        A    I do not recall specifically this

16   draft, so, no.

17        Q    With respect to this decision memo

18   on Haiti, do you recall looking at drafts

19   prior to the version you signed?

20             MR. MARUTOLLO:  Objection to the

21   extent it calls for internal government

22   deliberations, but you can answer.



Page 114

1          A     I don't recall.  If there were

2     multiple drafts, there may have been, but I

3     don't recall specifically whether in the case

4     of Haiti there were multiple drafts.

5          Q     Okay.  Who within USCIS would have

6     ownership of the drafts as they're sort of

7     being prepared before they come to you?

8               MR. MARUTOLLO:  Objection.  It

9     assumes facts not in evidence, but you can

10    answer.

11         A     The Office of Policy and Strategy

12    would be, as we discussed, the office that

13    would be coordinating the drafting of these

14    documents so that office would be the one that

15    would, again, for lack of a better term, own

16    the document.

17         Q     Okay.

18               So the document references a country

19    conditions memo.

20               What other data sources would be

21    used to prepare this document?

22               MR. MARUTOLLO:  Objection.  You can



Page 115

1   answer.

2       A    I don't know enough to say, based on

3   my understanding of what OP&S, Office of

4   Policy and Strategy, does.

5       Q    Would anyone outside of USCIS have

6   seen, maybe not this draft, but would have

7   seen the drafts of the memo before they came

8   to you?

9           MR. MARUTOLLO:  Objection, again, to

10  the extent it calls for internal government

11  deliberations, also to the extent it calls for

12  speculation, but you can answer to the extent

13  you know.

14      A    I don't know if anybody outside of

15  CIS saw this or any of the other drafts for

16  the Haiti TPS decision memos.

17      Q    Would any other agencies or parts of

18  DHS, do they regularly provide input into this

19  type of memo before you sign it?

20          MR. MARUTOLLO:  Objection.  Again,

21  the witness is not a 30(b)(6) witness here.

22  He's testifying as a fact witness.  Also



Page 116

```
 1    object on the grounds that it calls for

 2    internal government deliberations and calls

 3    for speculation, but you can answer.

 4         A    I don't know if that happens.  What

 5    I do know is that once the memo is signed,

 6    then other DHS offices and component agencies,

 7    as it is circulated before it goes to the

 8    Secretary, can chime in and make comments or

 9    suggestions.

10         Q    Okay.

11         A    I would amend -- add that, as the

12    memo states, the Department of State also is a

13    part of this process.  As the memo states --

14    as this draft memo states, "As part of the

15    review process, USCIS has consulted with the

16    Department of State, DOS, and as of the date

17    of this memorandum, DOS has not provided a

18    formal recommendation."

19         Q    All right.  Thank you.

20              Okay.  So turning to page 3, which

21    contains the current country conditions

22    analysis, I just want to point your attention
```





Page 117

1    to a couple of statements in the statements

2    here.

3              So, in the first full paragraph

4    under "Current country conditions," the memo

5    states, "Already strained government resources

6    have been further tested by large numbers of

7    returns of Haitians from the Dominican

8    Republic increasing in pace in recent months."

9              So, in your view, is -- would that

10   type of information bear on the decision to

11   recommend extension or termination of TPS?

12             MR. MARUTOLLO:  Objection, to the

13   extent it calls for internal government

14   deliberations and also to the extent it

15   assumes facts not in evidence, but you can

16   answer.

17        A    Well, the Haiti TPS decision and the

18   potential extension were being considered

19   under the extraordinary -- according to this

20   memo, the extraordinary and temporary

21   conditions prong in Section 244(b)(1)(C), and

22   under that prong the statute provides that



1    "The Secretary must find that there exists

2    extraordinary and temporary conditions in the

3    foreign state that prevent aliens who are

4    nationals of the state from returning to the

5    state in safety."  So, based on that, any

6    conditions in the country that could be

7    considered to prevent people from returning in

8    safety are perfectly valid things to consider.

9         Q     To consider for the extension and

10   termination decision as opposed to just the

11   original designation, correct?

12             MR. MARUTOLLO:  Objection.  Vague.

13   You can answer.

14        A     Well, there is -- I mean, as the

15   memo states, there are a number of different

16   potential decision points.  One is to extend

17   the original existing TPS designation.

18   Alternately, to terminate or to redesignate

19   or, I suppose, newly designate, put in

20   different words, based on some other grounds,

21   or make no decision at all, which is actually

22   something provided in the statute too.  So



1    whatever the conditions are, they would inform

2    one of those -- one of those selections.

3         Q    Okay.  So, the statement further

4    down the page in the second long paragraph

5    that Haiti also -- it's at the very end of the

6    paragraph, "Haiti also still faces a

7    considerable housing shortage exacerbated by

8    the destruction caused by Hurricane Matthew,

9    which impacted over 236,000 homes and

10   displaced 175,000 persons."

11             Same -- is that also true for that

12   statement, that it's fair -- perfectly

13   acceptable for the department to consider that

14   type of condition in making its determination?

15             MR. MARUTOLLO:  Objection.  Vague.

16   It also calls for a legal conclusion in what

17   the Department of Homeland Security would do,

18   but you can answer.

19        Q    In your view.

20        A    That is -- assuming that is correct,

21   that is a fact on the ground.  It is a country

22   condition.  Whether the Secretary determines



Page 120

1    that that specific country condition is

2    something that makes it not -- makes it

3    impossible for people to return to the state

4    in safety is for her to decide.

5        Q    Okay.  Then, finally on the next

6    page, page 4 at the top, it says, "Haiti

7    successfully completed its presidential

8    election in February 2017.  However, Haiti's

9    government institutions continue to lack

10   sufficient resources to provide services to

11   more than a limited portion of the

12   population."

13            The same question, is that also a

14   fact on the ground for the Secretary to

15   consider under the statute --

16            MR. MARUTOLLO:  Objection.

17       Q    -- in your view?

18            MR. MARUTOLLO:  Objection, vague, to

19   the extent it calls for internal government

20   deliberations and also to the extent it calls

21   for a legal conclusion, but you can answer.

22       A    Assuming that's correct, that's a



Page 121

1    fact on the ground.  It is -- it is a country

2    condition and, as I said before, whether that

3    specific country condition is something that,

4    in fact, causes it -- makes it that it's not

5    safe for people to return, up to the Secretary

6    to decide whether she thinks that that -- that

7    meets that requirement -- meets that

8    criterion.

9         Q    Okay, thank you.

10             Okay, let me give you the final

11   version here.

12             (Exhibit 108 was marked for

13   identification and attached to the deposition

14   transcript.)

15        A    (Document review.)

16             I reviewed the document.  At this

17   point, though, may I take a break?

18        Q    Yes, absolutely.

19        A    Very quickly.

20             THE VIDEOGRAPHER:  Going off the

21   record at 1:43.

22             (A brief recess was taken.)



Page 122

1          THE VIDEOGRAPHER:  We're back on the

2     record at 1:47.

3     BY MS. WEBB:

4          Q     Okay.  So I think you had just

5     familiarized yourself with Exhibit 108, and do

6     you recognize this document?

7          A     Yes.

8          Q     Okay.  And do you recall the role

9     you played in this particular version -- let

10    me -- let me clarify that.

11          Do you recall making edits to this

12    version before you signed it?

13          A     I don't.

14          MR. MARUTOLLO:  Objection.  You can

15    answer.

16          A     I don't recall that, no.

17          Q     Okay.  Do you recall reviewing the

18    document before signing it?

19          A     I --

20          Q     Or just vaguely recall signing it?

21    I guess I'm just trying to gauge how well --

22    how well you remember sort of reviewing this



1   when it came to you.

2          MR. MARUTOLLO:  Objection.  Compound

3   and vague, but you can answer to the extent

4   you remember if you -- if you reviewed the

5   document.

6      A    I do remember reviewing this

7   document, yes.

8      Q    Do you remember when you reviewed

9   it, whether you -- strike that.

10          Let's -- so, I want to ask you just

11   a few questions about differences between this

12   document and the one that we just looked at

13   and discussed, and it's not -- it's not a

14   quiz, and you can take as much time as you

15   would like to look at the relevant portions,

16   but what I wanted to ask you is, so, in the

17   prior -- in the undated draft, we had -- we

18   had gone over some language in certain parts

19   of the draft that -- so the one -- the first

20   statement that we reviewed was that "Already

21   strained government resources have been

22   further tested by large numbers of returns of



1    Haitians from the Dominican Republic

2    increasing in pace in recent months."

3            And you acknowledge that that was

4    acceptable consideration for the Secretary.

5    And what I would like to ask you is whether

6    you see that language in this final draft that

7    you signed?

8            MR. MARUTOLLO:  First, just an

9    objection.  Mischaracterizes the prior

10   testimony and, second, to the extent counsel

11   knows that the language is or is not in here

12   as a matter of saving time it might be --

13           MS. WEBB:  Absolutely.  Absolutely.

14   BY MS. WEBB:

15       Q    It's not a quiz.  It's just to

16   highlight the missing language.

17           Are you aware that that language

18   about strain on government resources by large

19   numbers of returns of Haitians was removed

20   from this final draft that you signed?

21           MR. MARUTOLLO:  Objection, again, to

22   the extent it calls for internal government



Page 125

```
 1    deliberations, you can answer to the extent

 2    you know.

 3         A    I'm not aware of that, no.

 4         Q    Will you accept my representation

 5    that it was --

 6         A    Yes.

 7         Q    Feel free to look at it.

 8         A    Yes, I will accept your

 9    representation that it was taken out.

10         Q    Okay.  And I take it you did not

11    request to have the language removed yourself,

12    that you recall?

13              MR. MARUTOLLO:  Objection.  You can

14    answer.

15         A    I don't recall that, no.

16         Q    Do you know why the language would

17    have been removed?

18              MR. MARUTOLLO:  Objection.  You can

19    answer.

20         A    No.

21         Q    Okay.  What about the language we

22    reviewed that "Haiti also still faces a
```



Page 126

1    considerable housing shortage exacerbated by

2    the destruction caused by Hurricane Matthew

3    which impacted over 236,000 and displaced over

4    175,000 persons," were you aware that that

5    language was removed from this final draft

6    that you signed?

7            MR. MARUTOLLO:  I'm going to object

8    to the extent that it calls for internal

9    government deliberations and also calls for

10   speculation, but you can answer.

11      A    I was not aware of that removal, but

12   I accept your representation that it was.

13      Q    And any reason you can think of why

14   that language would have been removed from the

15   final draft?

16           MR. MARUTOLLO:  Objection.  Again,

17   that goes to internal government deliberations

18   and assumes facts not in evidence.  I think,

19   also, really calls for a legal conclusion as

20   well, but you can answer -- answer to the

21   extent you have any idea.

22      A    I don't know why, but it is worth



1   noting that whenever a document is in draft

2   form or under review, it often goes --

3   undergoes substantial changes.  So it is not

4   surprising that the final version, which I

5   signed, is different from some earlier

6   version.

7           Q    Sure.

8                Just one more statement on the

9   record.  So we discussed how the earlier

10  drafts said that the "Haiti government

11  institutions continue to lack sufficient

12  resources to provide services to more than a

13  limited portion of the population," were you

14  aware that that language was removed from the

15  final?

16          A    No.

17               MR. MARUTOLLO:  Objection, again, to

18  the extent it calls for internal government

19  deliberations, but you can answer.

20          A    No.

21          Q    I'll highlight another sentence from

22  the original -- excuse me, from the earlier



1    draft, which says, "Levels of crime and

2    violence, including gender-based violence,

3    remain high as does the potential for civil

4    unrest."

5         A    What page is that on?

6         Q    Sorry, it's on page 3.

7              It's in the middle of the very last

8    paragraph.

9              MR. MARUTOLLO:  I'm sorry, what page

10   did you say?

11             MS. WEBB:  Page 3 of the earlier

12   draft.

13             MR. MARUTOLLO:  I'll object to the

14   extent it calls for internal government

15   deliberations and calls for speculation.  You

16   can answer.

17        A    I was not aware that that was

18   removed either.

19        Q    So, duly noting that, obviously, the

20   revision process for a draft -- in the

21   revision process for a draft changes are made,

22   can you think of any reason why these types of



Page 129

1    statements which go to negative country

2    conditions would all have been removed from

3    the final version that you signed?

4            MR. MARUTOLLO:  Objection.  Again,

5    it calls for internal government

6    deliberations.  It also calls for speculation,

7    calls for a legal conclusion, and assumes

8    facts not in evidence.  But you can answer.

9        A    I don't know why.  To make a more

10   informed -- give you a more informed response,

11   I would really have to, you know, understand

12   the totality of things that were taken out or

13   put in, and I would also note that the memo in

14   question is a cover memo to a package, and the

15   package includes, at least looking at the

16   final version, Exhibit 108, an attachment that

17   describes -- attachment A is a legal authority

18   description, attachment B, according to this,

19   is the entirety of the USCIS RAIO unit report,

20   and then attachment C is the Department of

21   State recommendation.  So those other

22   documents, in particular, the latter two, may



Page 130

1    very well have information that is not

2    reflected in this cover memo, so just because

3    something was taken out of the cover memo from

4    a previous draft does not necessarily mean

5    that it wasn't a fact that was presented to

6    the Secretary in some other manner.

7        Q    Okay.  But this, what you're calling

8    the cover memo, is the decision memo with the

9    area for signing for the Secretary, correct?

10       A    That's right.

11       Q    And it encapsulates your specific

12   recommendation and what you have chosen to

13   highlight to the Secretary, correct?

14            MR. MARUTOLLO:  Objection.  You can

15   answer.

16       A    That's right.

17       Q    Once you signed this, do you recall

18   any additional revisions -- not revisions --

19   but any additional discussions that you had

20   with others in the agency about your -- your

21   decision memo?

22            MR. MARUTOLLO:  Objection to the



Page 131

1    extent it calls for internal government

2    deliberations and also to the extent it's

3    vague, but you can answer.

4         A    I don't recall specific meetings,

5    but it is my general recollection that there

6    were -- this is dated November 3rd, that there

7    were meetings after this, but I do not recall

8    with specificity when they were or who was at

9    them.

10        Q    Okay.  I have a document that I'll

11   show you that may refresh your recollection.

12              (Exhibit 109 was marked for

13   identification and attached to the deposition

14   transcript.)

15   BY MS. WEBB:

16        Q    This is, I will represent to you,

17   the government's objections and responses to

18   interrogatories in another case entirely, so

19   there's no need to review the whole thing

20   unless you would like to.  What I would like

21   to point you to is just the last few pages

22   beginning on page 15, which is an attachment



Page 132

1    A, and it's a list of meetings.  So if you

2    wouldn't -- if you wouldn't mind taking a look

3    at this and see if it helps refresh your

4    memory about specific meetings that you were

5    at.

6         A    Okay.

7              (Document review.)

8              MR. MARUTOLLO:  Also, this was

9    marked as Exhibit 109?

10             MS. WEBB:  Yes, yes.  This is 109.

11             MR. MARUTOLLO:  I direct the witness

12   to look at interrogatory number 2 first.  The

13   attachment seems to be in response to

14   interrogatory number 2.

15             MS. WEBB:  Yes.

16             MR. MARUTOLLO:  Interrogatory number

17   2 is on page 8.

18        A    (Document review.)

19             Okay, I reviewed the attachment.

20        Q    Okay.  So I want to ask you

21   specifically whether the meetings listed on

22   page 17, control after November 3rd, 2017, if



Page 133

1    any of those refresh your memory as to

2    meetings you had or discussed -- that

3    discussed the Haiti TPS decision.

4              MR. MARUTOLLO:  Objection.  Vague.

5    Again, to the extent it goes beyond this case,

6    you know, I would object, but you can answer

7    to the extent it refreshes any memory that you

8    have.

9         A    Well, like I said, I did recall,

10   apparently correctly, that there were meetings

11   after this memo dated November 3rd was sent on

12   TPS.  I do remember the November 15th meeting

13   -- no, the November 13th meeting with the

14   foreign minister of Haiti.

15        Q    Okay.

16        A    I remember that one.  And -- so that

17   one I do remember clearly.

18        Q    Okay.  And what about the one before

19   that, the same day?

20        A    That one truly I -- I have zero

21   recollection of what -- what was discussed at

22   that, but the one with the foreign minister,


MAGNA
LEGAL SERVICES

Page 134

1    that one I do remember very well because it

2    was notable, the foreign minister himself

3    came.

4         Q    Yes.  What do you remember about

5    that meeting?

6              MR. MARUTOLLO:  Objection.

7    Generally to the extent it calls for internal

8    government deliberations in terms of anything

9    that was not shared with the foreign minister,

10   you know, I would object, but otherwise you

11   can answer the question.

12        A    The meeting was between Acting

13   Secretary Duke and a number of other DHS

14   officials and the foreign minister and his

15   interage.  The meeting was held in Washington,

16   D.C. at the Ronald Reagan Building.  The

17   foreign minister basically expressed his

18   desire that the Secretary would extend TPS,

19   and just he and his staff made that desire

20   very clear, and Acting Secretary Duke replied

21   that she would take everything they had told

22   her into consideration, and that was basically



1    what the meeting -- how the meeting went.

2        Q    What role did you play in the

3    meeting, if you remember?

4        A    Well, I was there in my capacity as

5    the director of USCIS, and the -- I didn't do

6    much talking.  There were -- as I recall,

7    there were a few technical questions,

8    operational questions that the Acting

9    Secretary pitched to me regarding if there

10   were to be a termination, if she made the

11   termination, how would it be implemented, what

12   would be the -- I think there were questions

13   relating to extending employment

14   authorization, things like that.  That's what

15   I recall from the meeting.

16       Q    So at that time the Secretary had

17   not made her decision yet.

18            MR. MARUTOLLO:  Objection.  Calls

19   for speculation.  I mean, you can answer to

20   the extent you know.

21       Q    Let me rephrase because I don't mean

22   in her own head.



1          To your knowledge, at that time her

2     decision had not been issued yet.  She was

3     still in the process of reviewing the

4     materials; is that correct?

5               MR. MARUTOLLO:  Objection.  You can

6     answer.

7          A    Yes, as I recall, this meeting

8     happened during the time when she was still

9     reviewing all of the materials and considering

10    the issue.

11         Q    And did that meeting have any affect

12    on your view that you had -- well, did the

13    meeting affect your view of the decision that

14    you had come to in this decision memo?

15              MR. MARUTOLLO:  Objection.  Vague

16    and calls for a legal conclusion, but you can

17    answer.  Assumes facts not in evidence, but

18    you can answer.

19         A    No, it did not change my sense of

20    the correct recommendation to the Secretary.

21              It was informative, but it didn't

22    change as I saw it the -- it didn't change



Page 137

1     what I thought was the correct recommendation.

2          Q    And why is that?

3               MR. MARUTOLLO:  Objection to the

4     extent it calls for internal government

5     deliberations, but you can answer.

6          A    Because I didn't hear anything at

7     the meeting that added new information that

8     would have changed my opinion on the ability

9     or nonability of Haitian nationals to return

10    to Haiti in safety were TPS to be terminated

11    for them.

12         Q    So any other -- other than these

13    two, any other meetings you can remember after

14    you signed this decision memo that related to

15    the Haiti -- that related to this decision

16    memo?

17              MR. MARUTOLLO:  Objection.  You can

18    answer.

19         A    No, not that relate to the Haiti

20    memo, no.

21         Q    Okay.  What about to Haiti TPS

22    generally?



1          MR. MARUTOLLO:  Objection.  You can

2     answer.

3          A    No, I don't remember any specific

4     meetings on Haiti TPS generally.  I just have

5     no recollection of any additional meetings.

6     There may have been, but I just don't

7     remember.  I do remember that one with the

8     foreign minister, but I don't remember

9     anything else, really.

10         Q    Okay.  By chance do you remember any

11    phone calls related to your decision memo

12    outside of USCIS with other government

13    officials or agencies?

14         MR. MARUTOLLO:  Again, I would

15    object to the extent it calls for internal

16    government deliberations, but you can answer

17    given the court's order.

18         A    No, I truly don't remember any

19    specific phone calls on Haiti either.

20         Q    Okay.  So prior to signing this

21    memo, I think we talked a little bit about

22    what you recall in terms of the revision



Page 139

1    process for the memo.

2           What I would like to ask you is, do

3    you recall having any discussions with anyone

4    outside of USCIS about the Haiti TPS decision

5    prior to signing this memo?

6           MR. MARUTOLLO:  Objection to the

7    extent it calls for internal governmental

8    deliberations, but you can answer to the

9    extent -- to the extent you remember.

10   A    I can't say I recall with

11   specificity that I had conversations prior to

12   signing that, but such conversations could

13   very well have happened.  I just don't

14   remember.

15   Q    I guess let me make it a little

16   broader then.

17          Do you remember prior to signing the

18   decision memo here having conversations

19   outside of USCIS about TPS generally as

20   opposed to just Haiti specifically?

21          MR. MARUTOLLO:  Again, I would

22   object to the extent it calls for internal



Page 140

1    governmental deliberations.  Also, the

2    question has been asked and answered so I

3    would -- he can answer again, but ...

4         A    Just so I'm clear, you're asking if

5    there were conversations outside -- with

6    people outside of DHS or outside of CIS?

7         Q    We'll start with outside of DHS.

8    Any meetings or conversations with people

9    outside of DHS about TPS generally while you

10   were in your role as director?

11            MR. MARUTOLLO:  Objection to the

12   extent it calls for internal governmental

13   deliberations.  Also, just on vagueness

14   grounds, but you can answer to the extent you

15   recall conversations about TPS.

16        A    I do recall -- I do recall, and I'm

17   looking at other meetings here in this

18   attachment that happened that don't relate to

19   Haiti but did relate to TPS, for example, the

20   meeting with the minister of foreign affairs

21   of El Salvador.  I remember that meeting.  He

22   certainly -- or she, I don't recall, it was an



Page 141

1   outside DHS person, but I don't specifically

2   recall any conversations with people outside

3   of DHS about TPS.

4            Generally, again, such conversations

5   could have happened, but I just have no

6   specific recollection of talking about TPS

7   with people outside of DHS except for those

8   meetings where we had foreign ministers or

9   people like that, or there were also -- there

10  was a group of nuns that came in to talk about

11  Central American TPS.  We talked to them.  But

12  I -- aside from those interactions, I don't

13  recall talking to anybody outside of DHS about

14  TPS.

15       Q    What about with anyone at the White

16  House?

17            MR. MARUTOLLO:  We would object to

18  the extent it calls for internal government

19  deliberations.  Also, to the extent it

20  potentially calls for presidential

21  communications privilege and is covered in our

22  brief that's currently pending in the District



Page 142

```
 1    Court on White House related discovery.  You

 2    can answer to the extent whether you had any

 3    communications with the White House, but

 4    that's at least right now as far as we would

 5    permit you to answer.

 6         A    I don't recall any conversations

 7    with the White House about TPS during this

 8    time.

 9         Q    The same question, the Department of

10    State?

11              MR. MARUTOLLO:  We would object

12    again on the grounds for internal government

13    deliberations, but you can answer that

14    question.

15         A    I don't recall any specific

16    conversations that I had with the Department

17    of State.  I am aware that my staff was

18    certainly in communication with the Department

19    of State constantly because they're -- they

20    had an important role in the development of

21    USCIS's recommendation, but I don't recall

22    myself calling anybody over at the Department
```



Page 143

1    of State about it.  I just don't remember if I

2    did that.

3         Q    What about with other branches

4    within DHS, do you recall having any meetings

5    or conversations about Haiti TPS?

6              MR. MARUTOLLO:  Objection.  Vague.

7    But you can answer.

8         Q    Prior, prior to.

9         A    Prior.  I -- I don't recall specific

10   conversations, but -- I mean, even during the

11   time that I was -- before I was confirmed for

12   my job when I was working at DHS headquarters,

13   just in my normal job, you know, I -- I was

14   generally aware of, you know, ICE staff, you

15   know, points that ICE staff would make about

16   TPS or CBP, just kind of in general.  But I

17   don't recall any specific actually substantive

18   conversations I had with anybody from other

19   DHS components on this.

20        Q    You mentioned points ICE would make

21   about TPS generally.  What do you recall those

22   being, just generally?



Page 144

1          MR. MARUTOLLO:  Again, object to the

2     extent it calls for internal government

3     deliberations, but you can answer the question

4     based on the court's order.

5          A    Just as a general matter, ICE has an

6     interest in the extension or nonextension of

7     TPS because if TPS is terminated, then those

8     people after the wind-down period is

9     completed, if they haven't left and if they

10    have no other -- no other underlying status,

11    then they could potentially become removable

12    illegal aliens, in which case ICE would need

13    to deal with that.  So as a general matter,

14    they have an interest in that decision and --

15    that's about the extent of it.

16         Q    When you made your decision to

17    recommend termination of Haiti TPS, at the

18    time, did you -- were you aware of any other

19    agencies' views on whether TPS should be

20    terminated?

21         MR. MARUTOLLO:  Objection.  I would

22    say that question goes beyond what the court



1    allowed in terms of permitting questions on

2    deliberative process materials, so I would

3    direct this witness not to answer to the

4    extent they're about other opinions or views

5    of other agencies that are clearly

6    deliberative in nature.  So as the question is

7    phrased, I would direct the witness not to

8    answer.

9              MS. WEBB:  I guess I just want to

10   explore a little bit of what factors he had to

11   consider when he reviewed and signed the

12   decision memo.

13             MR. MARUTOLLO:  I think that's a

14   fair question.  I mean, I think we would still

15   object, but he can answer the question what

16   factors.  But to the extent the question is

17   what other agencies or other entities within

18   U.S. -- within DHS had particular views or

19   opinions prior to any decision being made, I

20   think that's inherently a deliberative

21   communication and we would -- and I don't

22   think that's covered by yesterday's order of



1   the court, so I would direct the witness not

2   to answer that question.  But I would allow

3   the witness to answer the question of what

4   factors, you know, did he consider in reaching

5   his determination.

6        A    The factors that I considered in

7   deciding whether to sign this or not were

8   really what's in the -- what was in the

9   packet, what was in the packet that was

10  presented to me.

11            So the overlaying memo and then the

12  other attachments that came with it, including

13  the Secretary of State's recommendation, which

14  as I recall was at least a several-page

15  document, and then the RAIO research report,

16  the memo -- the attachment describing the

17  legal basis -- the legal authority.  So all of

18  that was what I looked at.

19            The -- as I recall, I think at the

20  time that this memo was being sent to me,

21  there may have been an in-person meeting at

22  the agency with the Office of Policy and



Page 147

1    Strategy, the lawyers to explain this and what

2    was in the packet.  I don't recall

3    specifically what was discussed.  Beyond that,

4    to be sure, I was aware that other parts of

5    DHS had their own opinions, but I left it to

6    them to make their opinions known to the

7    Secretary in whatever manner they did that.

8    Truly I just relied on what was presented to

9    me in this packet.

10           MS. WEBB:  It makes sense to take a

11   quick break and then we may only have one more

12   session before we're done.

13           MR. MARUTOLLO:  Sure.

14           THE VIDEOGRAPHER:  We're going off

15   the record at 2:22.

16           (A brief recess was taken.)

17           THE VIDEOGRAPHER:  We're back on the

18   record at 2:29.

19   BY MS. WEBB:

20       Q    As part of your decision to

21   recommend termination of Haiti TPS, did you

22   make the determination that it was safe for



Page 148

1    Haiti TPS beneficiaries to return to Haiti?

2              MR. MARUTOLLO:  Objection.  You can

3    answer.

4         A    The -- the recommendation I made was

5    that the Secretary terminate the designation,

6    and I based that on my assessment based on the

7    information in the memo presented to me that,

8    in fact, there were not extraordinary and

9    temporary conditions in Haiti that prevented

10   Haitian nationals from returning to the state

11   in safety.

12        Q    Okay.  In making that determination,

13   did you examine some of the factors that we

14   discussed about the large numbers of Haitians

15   returning from the Dominican Republic and the

16   housing shortages and the weekend -- excuse me

17   -- the levels of crimes and violence and

18   resources at the government, did you examine

19   those factors in coming to your decision?

20             MR. MARUTOLLO:  Objection.  Again,

21   to the extent it calls for internal government

22   deliberations, and also to the extent it



Page 149

1    assumes facts not in evidence, but you can

2    answer the question.

3         A    My recommendation was based, as I

4    said before, on everything that was presented

5    to me in the packet, and that included

6    everything in this cover memo and everything

7    in the State Department's recommendation,

8    which I don't have before me but which I

9    recall had additional discussion in it, and

10   then the RAIO research document as well.

11            I don't recall if the points you

12   just talked about were included in any of

13   those other documents, but whatever was in all

14   of those documents was what I looked at and

15   what I based my decision on, even if it wasn't

16   specifically mentioned in that cover memo.

17            The -- I would note that in the

18   cover memo -- well, I'll leave it at that.

19        Q    So in the determination that it was

20   safe for Haiti TPS beneficiaries to return,

21   did that include all nearly 60,000

22   beneficiaries to return once the designation



Page 150

1    is terminated?

2           MR. MARUTOLLO:  Objection to the

3    extent it calls for speculation, and vague,

4    but you can answer.

5       A    Well, return, yes, it would cover

6    all of the people who had TPS status who would

7    then no longer have that status after -- if

8    TPS were terminated but who had no other

9    status.

10          It could be that -- it could be that

11   many people with TPS, not just Haitians, but

12   any TPS class of people, there could be many

13   recipients of TPS who have some other

14   underlying status that even if TPS were

15   removed, they could still remain somehow.

16          Many TPS recipients often, if

17   they're here long enough, they'll marry a U.S.

18   citizen.  Maybe they have an asylum claim.

19   Maybe they have, you know -- there's a wide

20   variety of ways in which people can stay.  So

21   the -- it wouldn't necessarily be all 40,000

22   or 60,000 or whatever it was of TPS



Page 151

1    beneficiaries would have to go back.

2          The other point I would make is when

3    you're talking about return, that includes

4    people voluntarily returning and people being

5    removed from the United States.  So -- and I

6    would note, I think it's mentioned explicitly

7    in the memorandum that, although immediately

8    after the earthquake, ICE stopped removing

9    people to Haiti.  Because of the chaotic

10   situation in the immediate aftermath of the

11   earthquake, as I recall, not long after that,

12   in a year or something like that, after a year

13   or two, they resumed removals, and to this day

14   people are removed to Haiti.

15         So these were all factors that we

16   pointed to in the memo regarding the safety

17   point.

18   Q    Sure.  So I think you're referring

19   to paragraph -- the last full paragraph on

20   page 3 of the signed memo where it does say

21   that "In 2011, ICE resumed removal of Haitians

22   on a limited basis, specifically those who had



Page 152

1    final orders of removal and had been convicted

2    of a serious crime."  And then, "On September

3    22nd, 2016" ... "DHS would resume removals of

4    Haitian nationals in accordance with ICE's

5    existing enforcement priorities."

6              So then at the end of paragraph it

7    does say, "In total, ICE his removed over

8    1,100 Haitians from fiscal years 2014 to 2016"

9    and lists, I guess, "382 in 2014 and 433 in

10   2015, and 310 in 2016."

11             Is that what you're referring to?

12        A    Yes, that's what I'm referring to.

13        Q    Would you agree that level of influx

14   of people into Haiti -- that number of people

15   removed from 2014 to 2016 was relatively

16   small, a few hundred a year?

17             MR. MARUTOLLO:  Objection.  Vague.

18   Calls for a legal conclusion, but you can

19   answer.

20        A    Compared to the population of Haiti,

21   which I believe is somewhere around 10 million

22   people, it is a small number, yes.



Page 153

1      Q    If -- when TPS is ended, it would be

2   potentially many, many more people returning

3   at the same time, correct, than those few

4   hundred a year?

5           MR. MARUTOLLO:  Objection.  Calls

6   for speculation.  It assumes facts not in

7   evidence and also assumes a legal conclusion

8   as to when removal proceedings would be

9   completed, but you can answer.

10     A    Not necessarily because -- this is a

11  misunderstanding amongst many people when

12  talking about TPS policy, and that is that

13  even if TPS is removed from a population, it

14  doesn't mean that the very next day all 40,000

15  or 60,000 or 250,000 will leave.

16          They may choose not to leave.  They

17  may choose to remain unlawfully, in which case

18  some will certainly leave on their own.  But I

19  would imagine that a number of people will

20  choose not to leave lawfully.  In that case,

21  if they were a removal priority, then ICE

22  would apprehend them and put them through



Page 154

1    removal proceedings, assuming they didn't have

2    a final order of removal already, and then

3    remove them.  But even in that circumstance,

4    ICE can only remove populations to the country

5    of origin at the rate and pace and frequency

6    which the receiving country allows.

7            So the receiving country needs to

8    give ICE travel documents for the people with

9    final orders, and no country I know of would

10   be giving tens of thousands of travel

11   documents instantaneously to ICE.  It would

12   necessarily be a protracted process.

13           So the ability of a country to

14   receive even relatively a large population of

15   TPS recipients is -- assuming they were

16   removed, would really be within their power to

17   control because they would be the ones issuing

18   the travel documents to ICE.

19       Q    Okay.  And was your determination

20   that the TPS beneficiaries could return to

21   Haiti in safety conditioned by your view that

22   it would be more of a trickle than sort of a


MAGNA
LEGAL SERVICES

Page 155

1   flood?

2            MR. MARUTOLLO:  Objection.  Vague.

3   But you can answer.

4       A    Not particularly.  The -- well, it

5   was a consideration.  It is a factor.  It's --

6   the ability of the country to receive the

7   population could potentially, perhaps, be a

8   factor to consider in whether those people are

9   returned in safety.

10           Really that's more applicable to one

11  of the other categories.  For example, under

12  the environmental prong, which is

13  244(b)(1)(B), the Secretary finds that there

14  has been an earthquake, flood, drought, et

15  cetera.  And the foreign state is unable

16  temporarily to handle adequately the return of

17  state aliens.  Clearly that would play into

18  that assessment, but it could arguably also be

19  a factor to consider in the safety point.

20           So, yes, it was a factor, but the

21  many other things that were discussed in this

22  cover memo and in the underlying documents,



Page 156

1    the State Department memo and the RAIO memo,

2    including the discussion of the impact of the

3    hurricanes in the preceding year or two.

4            So, again, to emphasize, we weren't

5    just looking at things from a long time ago.

6    It was -- we were looking at more recent

7    impacts on Haiti, including Hurricane Matthew.

8    I believe Hurricane Irma was the other

9    hurricane we looked at.

10           We concluded at CIS that, yes, those

11   hurricanes had an impact.  Their impact did

12   not rise to the level of preventing people

13   returning in safety.  We presented that to the

14   Secretary in the memo.

15      Q    Okay.  So in paragraph 2 of page 1,

16   I guess it is, of the decision memo, it does

17   say, "In summary, USCIS assesses that Haiti

18   has made significant progress in recovering

19   from the 2010 earthquake and no longer

20   continues to experience the extraordinary and

21   temporary conditions that formed the basis of

22   Haiti's designation and redesignation of TPS."



Page 157

1          So just so I understand, so your

2     testimony is that you considered all of the

3     current conditions of the country or beyond

4     just those from the originating event to make

5     your decision to recommend termination of TPS?

6              MR. MARUTOLLO:  Objection.  Again,

7     to the extent you're referring to the document

8     itself, the document speaks for itself, the

9     decision.  I believe it's also been asked and

10    answered, but you can answer.

11         A    That is correct.

12         Q    And are you aware of whether the

13    Secretary of Homeland Security took a

14    different view of what the statute requires in

15    that respect?

16              MR. MARUTOLLO:  Objection.  Calls

17    for speculation and, again, to the extent it's

18    a deliberative governmental communication that

19    he may be aware of, but given that objection,

20    you can answer the question to the extent you

21    know.

22         A    I'm not aware of what her view was



Page 158

1   on what the statute provides or doesn't

2   provide.

3           May I add one point on the earlier

4   question or what you just asked, actually.  It

5   is true that that first page does say, "In

6   summary, USCIS assesses," et cetera, et

7   cetera, and then accordingly, USCIS

8   "recommends that you terminate Haiti's TPS

9   designation."  That is true.  We did recommend

10  that the designation based on the earthquake

11  from 2010 be terminated.

12          Later on in the memo on page 5, this

13  would be the paragraph numbered 3, redesignate

14  Haiti for TPS.  We say, "In addition to making

15  a decision to terminate or extend Haiti's TPS

16  designation, you could also reconsider

17  redesignating the country for TPS."  In other

18  words, establishing a TPS designation based on

19  something else.  And we say, yes, there was

20  this hurricane in October 2016, which seems to

21  be the most impactful thing that has happened

22  to the country that could potentially be the



Page 159

1    basis of a TPS designation, but, we, USCIS,

2    don't think that that rises to the level that

3    is required for designation.

4           So, though, yes, we recommended that

5    she terminate the designation based on the

6    earthquake, we did assess whether there was

7    potentially some other basis to designate and

8    we decided that -- to not recommend that.  But

9    ultimately the decision was hers.  But we did

10   present that possibility as something she

11   could consider.

12      Q    Okay.  Thank you.

13          I just have one more question on

14   this subject before we move on.

15          When you were making your decision

16   to recommend termination, did you -- do you

17   recall it being in the packet that you

18   reviewed the data that we discussed earlier in

19   the deposition about the statistics related to

20   crime and welfare of the Haitian TPS

21   beneficiary population?

22          MR. MARUTOLLO:  Objection.



Page 160

1    Mischaracterizes prior testimony and assumes

2    facts not in evidence, and also was asked and

3    answered, but you can answer the question.

4         A    I don't recall that specifically,

5    whether any of that was in any part of the

6    packet, no.

7         Q    Do you recall considering that data

8    when you made your decision?

9              MR. MARUTOLLO:  Objection.  Vague

10   and also, again, asked and answered, but you

11   can answer.

12        A    No, I don't recall that, no.

13        Q    Okay.

14             MS. WEBB:  I'll mark this as Exhibit

15   110.

16             (Exhibit 110 was marked for

17   identification and attached to the deposition

18   transcript.)

19        A    (Document review.)

20             All right.  I have reviewed the --

21        Q    All right.  Do you recall this email

22   chain?



Page 161

1        A     I didn't until I just read it.

2        Q     I know we've been over some of these

3   people before, but I think it was earlier in

4   the year so I just want to go over really

5   quickly who was in what position.  So, at that

6   time you had been confirmed by Congress,

7   correct?

8        A     Uh-hmm.

9        Q     What position was Ms. Nuebel Kovarik

10  in?

11       A     So at this time in November of 2017,

12  Kathy Nuebel Kovarik was the chief of the

13  Office of Policy and Strategy.

14       Q     What about Craig Symons or Symons?

15       A     Craig Symons was the chief counsel

16  of USCIS.

17       Q     Dimple Shah?

18       A     Dimple Shah was, I believe at that

19  time, the deputy -- one of the deputy general

20  counsels in the DHS Office of the General

21  Counsel.

22       Q     Finally, what about Ms. Short?



Page 162

```
 1      A     Mr. Short.

 2      Q     Sorry.

 3      A     Tracy Short was a counselor -- he

 4   was detailed from ICE to be a counselor to the

 5   Secretary.

 6      Q     Okay.  If we go back to our list of

 7   meetings, so just to check, do you recall if

 8   in the first email here you were referring to

 9   the November 13th, 2017, meeting which

10   includes some of the recipients on the email

11   chain?  I know you said you didn't remember

12   that meeting, but just to check if that

13   refreshes your recollection.

14      A     Clearly I must have been referring

15   to it because that is the meeting that was

16   just a couple days after I sent the email.  I

17   know of no other meeting that I could have

18   been referring to.

19      Q     Why this group of individuals?  Why

20   did you email these specific people?

21            MR. MARUTOLLO:  Objection.  One note

22   I would make is to the extent there's anything
```



Page 163

1    related to attorney-client privilege with the

2    chief counsel, I would direct you not to

3    answer on those grounds, but otherwise you can

4    answer the question.

5        A    So these thoughts I was sending to

6    these people because I was supposed to be

7    going to that meeting, I gather, because I'm

8    on the invite list.  I assume I went, though I

9    don't recall that I did, but I assume that

10   this chart in attachment A of the

11   interrogatories document, Exhibit 109, is an

12   accurate reflection of who was invited to that

13   meeting.  But if that's accurate, Kathy Nuebel

14   Kovarik was also invited.  I had a plus one as

15   well in addition.  I may have taken Craig

16   Symons with me.  That would explain why I'm

17   emailing them.  Tracy Short, Dimple Shah was

18   also invited to the meeting, and Tracy Short

19   would have necessarily been at every such

20   meeting because he was counsel to the

21   Secretary on immigration matters.

22       Q    Okay.  So we had talked about the --



Page 164

1    your views essentially on the sort of reality

2    of terminated TPS beneficiaries returning to

3    their country.

4         A    Uh-hmm.

5         Q    Here in the email you write -- so,

6    "That doesn't mean as I read it that TPS must

7    stay in place if Haiti is able to show that it

8    can't handle the return of all 58,000 TSP

9    beneficiaries at the same time and have jobs

10   waiting for them.  It means, as I read it,

11   that TPS remains in place only if Haiti is

12   unable to accept anyone at all."

13            So is that an accurate

14   representation of your view on that portion of

15   the statute?

16            MR. MARUTOLLO:  Objection to the

17   extent that it calls for internal government

18   deliberations.  And also objection on the

19   grounds of vagueness, but you can answer.

20        A    Well, my -- my email refers to

21   section 244(b)(1)(B)(ii), and that was the

22   prong that I discussed earlier when we were



Page 165

1    talking about this where it says -- this is

2    the environmental prong.  And one of the

3    requirements for being designated for TPS

4    under the environmental prong is that the

5    foreign state is unable to temporarily 'handle

6    adequately' a return to the state of aliens --

7    to the state -- who are nationals to the

8    state.

9            So I was talking about that here,

10   and -- but, you know, I think in an informal

11   fashion I was trying to talk about how any

12   potential designation of Haiti under that

13   prong, we would necessarily have to address

14   the handle adequately point.

15           And as it is, that was in fact not

16   the prong that was being referenced in the

17   designation of Haiti.  Haiti was coming under

18   244(b)(1)(C), which was the extraordinary and

19   temporary conditions.

20           So, my views here on the

21   interpretation of what it means for a country

22   to be able to handle adequately the return of



Page 166

1    its nationals isn't really on point.  I mean,

2    it's talking about a totally different prong,

3    but, you know, to the extent it would come up,

4    I wanted people to know what my views were on

5    what -- how that prong should be interpreted

6    -- how that part of the prong should be

7    interpreted.

8        Q    And did the decision memo that you

9    signed, did it contemplate redesignating Haiti

10   under 244(b)(1)(B)(ii)?

11           MR. MARUTOLLO:  Objection.  I think

12   the memo speaks for itself, but you can

13   answer.

14       A    No, because, as I recall -- give me

15   one second.  In the signed memo, Exhibit 108,

16   at the bottom of page 1 where it says,

17   "Haiti's TPS Designation," the last sentence

18   that starts there, it says, "The designation"

19   -- and then turning to page 2, "was based on

20   extraordinary and temporary conditions rather

21   than environmental disaster because the

22   Haitian government had not requested



Page 167

1    designation for TPS - a statutory requirement

2    for a designation based on an environmental

3    disaster."

4            So that -- that was the case.  They

5    did not ask for designation pursuant to that

6    prong.

7        Q    Right.

8        A    So the -- the analysis that I -- the

9    musings that I proffer in my email from

10   November 10th were not applicable to the

11   considerations in the memo.

12       Q    Okay.  And since it wasn't

13   applicable or in play, what prompted your --

14   your discussion of this hypothetical scenario?

15   I know there's no email before yours, but ...

16       A    No.

17           MR. MARUTOLLO:  Objection.  Also to

18   the extent this is a question about -- that

19   postdates the memo that's Exhibit 108.  But,

20   in any event, you can answer the question.

21       A    I send a lot of emails like this

22   where I just have thoughts on issues of



1    immigration law.  I think this was the

2    244(b)(1)(B)(ii) issue had just for a long

3    time been rankling in my head and I just

4    wanted to share my thoughts on that.  I didn't

5    anticipate that I would actually come up in

6    the meeting because -- because that was not

7    the prong that Haiti was being considered

8    under.  So it was really more apropos of

9    nothing but just my musings on how

10   244(b)(2)(B) should be interpreted.

11        Q    Is that an accurate reflection of

12   your views on how 244(b)(1)(B)(ii) should be

13   interpreted, that essentially TPS will remain

14   in place only if the country is unable to

15   accept any of its nationals at all?

16             MR. MARUTOLLO:  Objection.  Again,

17   to the extent that this calls for internal

18   government deliberations, is not part of even

19   the internal USCIS memo which itself is

20   internal government deliberations, but this

21   certainly is deliberative materials.  But

22   given that objection and also on vagueness



1    grounds, you can answer the question.

2         A    I think that my -- the thoughts that

3    I express in that email and in the subsequent

4    comments are actually my -- my own internal

5    deliberations within myself.  These are just

6    thoughts I have, you know.  At some point

7    maybe a real lawyer should look at them and

8    determine if I actually make sense.  But these

9    are just, you know, initial musings on how

10   244(b)(1)(B)(ii) should be looked at.  But,

11   again, this is just an informal email amongst

12   colleagues, you know, with no direct

13   applicability to the decision at hand, which

14   is on a different prong altogether.  It's

15   really no more than that.

16        Q    And just, I guess, to compare the

17   two -- the two provisions, so one speaks in

18   terms of the foreign state being unable to

19   handle adequately the return of the aliens,

20   and that's (B)(ii).  And (C) speaks of

21   "conditions in the foreign state that prevent

22   aliens who are nationals of the state from



Page 170

1    returning to the state in safety."

2            What do you view as the sort of

3    differences, substantive differences between

4    those two provisions?

5            MR. MARUTOLLO:  Objection, again, to

6    the extent that this is a fact witness, not a

7    30(b)(6) witness, but you can answer the

8    question.

9        A    These are just my personal

10   reflections.  They're not -- it's not the

11   position of the agency.  I defer to their

12   better legal minds than mine.  But as I

13   interpret the statute under B where it talks

14   about handle adequately the return, the entire

15   environmental prong is imagining -- I think

16   Congress is contemplating a situation where

17   the country in question has suffered great

18   disruption to its infrastructure because of a

19   flood, an earthquake or some other kind of

20   horrific environmental disaster.  And as a

21   consequence, it is physically difficult for

22   the country to handle the return of people.



Page 171

1   There's no, you know, airports.  There's no

2   houses for them to live in, I suppose.

3           The next prong, which talks about

4   extraordinary and temporary conditions, is

5   more general, and there Congress is looking

6   only at whether it is safe for people to

7   return.  And the country could very well be

8   able to adequately handle the return of

9   people, but it may not be safe for whatever

10  reason.  There may be -- I can't imagine.

11  There would be some -- some reason why it's

12  not safe for them to return even if their

13  return could be adequately handled.  So there

14  are different situations.  There could be

15  overlap.  It could be that the -- whatever the

16  thing is, whatever the circumstances are that

17  are creating the lack of safety may impact the

18  ability of the country to handle adequately

19  the return.  So there may be some overlap or

20  connection between the two, but they're not

21  exactly the same.

22          Q    So, in other words, the nationals



Page 172

1   could physically return but might not be able

2   to do so safely, I think you said.  Is that

3   right?

4              MR. MARUTOLLO:  Objection.  I think

5   that mischaracterizes his testimony, and the

6   director's already answered that question, but

7   you can answer it a second time if you would

8   like.

9              MS. WEBB:  I'll withdraw it.  I was

10  just summarizing for myself.

11       Q    So you did -- you did mention that

12  you didn't have any specific factors that

13  would -- that would contribute to the lack of

14  safety in returning, but in your experience,

15  in your job, what are some of the factors that

16  would prevent safe return for those aliens?

17             MR. MARUTOLLO:  Objection.  You can

18  answer.

19       A    Well, let me see what I said here.

20             I think it could be any of the

21  things that are actually in the second prong,

22  in the environmental prong, any of those



Page 173

1    things, an earthquake, a flood, epidemic,

2    disease, any of those things are things which

3    I just talked about could be things which are

4    covered in both prongs.  They could be things

5    which affect the ability of the country to

6    adequately handle the return of people, but

7    there could also be things looking at their

8    safety.  The epidemic I think would be a very

9    good example.  If there were a raging epidemic

10   across the entire nation that -- you know,

11   like Ebola, as I recall, I forget which

12   countries in Africa were designated for a

13   while with TPS because of that.

14        Q    Right.

15        A    There's an example.  The -- like I

16   said, it could be something which really is

17   both, but for whatever reason, the country may

18   not specifically qualify under the

19   environmental prong, as in the case of Haiti,

20   because the government didn't formally

21   request, they still qualify under (C), under

22   extraordinary and temporary conditions.


MAGNA
LEGAL SERVICES

Page 174

1    Q    Would safety include the inability

2  to reabsorb a flood of nationals again?

3         MR. MARUTOLLO:  Objection.  Calls

4  for internal government deliberations, and

5  also it's been asked and answered, but you can

6  answer again.

7    A    I mean, that would really depend on

8  the specific facts of what exactly that meant.

9  It would be very fact dependent.

10   Q    But you made the determination here

11 in the decision memo that Haiti was able to

12 absorb -- to reabsorb the TPS beneficiaries,

13 correct?

14        MR. MARUTOLLO:  Objection.  Asked

15 and answered.  You can answer.

16   A    I made the determination -- rather,

17 I made the recommendation to the Secretary

18 that she should terminate based on our

19 assessment at USCIS that the people could

20 return in safety, which is, again, not

21 necessarily the same thing as being able to

22 adequately handle the return.



1     Q    One other question.  The November

2    12th email that you sent where you were

3    contemplating a TPS reform bill and you say,

4    "but seems to me that TPS should only" --

5    excuse me -- "should cover only nationals of

6    the affected country who are lawfully in the

7    U.S. at the time of designation."

8          Was your view -- was that limited to

9    244(b)(1)(B)(ii) or was that -- did you --

10   were you referring to the whole statute when

11   you wrote that, all categories of designation,

12   I should say?

13         MR. MARUTOLLO:  Objection.  You can

14   answer.

15    A    I was referring to the entire

16   statute.  This is my, you know, personal

17   belief of how the statute could be reformed.

18   Clearly Congress hasn't done that, but the

19   statute as it stands, that was scrupulously

20   enforced.  That's just my personal belief on

21   how they should change it.

22    Q    Okay.  So as it stands, the statute



Page 176

1    does not look at nationals who are or

2    foreigners who are unlawfully in the United

3    States at the time of designation, correct?

4            MR. MARUTOLLO:  Objection.  The

5    document speaks for itself, and also that

6    calls for a legal conclusion.  You can answer

7    the question.

8        A    Yes, it is my understanding that the

9    statute covers all aliens from the designated

10   country regardless of their immigration

11   status.

12       Q    I want to ask you just a few more

13   questions about the second portion of

14   subsection (C) that we were discussing earlier

15   where it has this qualifier, "Unless the

16   Attorney General, the Secretary of Homeland

17   Security, finds that permitting the aliens to

18   remain temporarily in the United States is

19   contrary to the national interest of the

20   United States."

21           In your view, what does national

22   interest mean there?



Page 177

1              MR. MARUTOLLO:  Objection.  Again,

2       this is a fact witness, not a 30(b)(6)

3       witness.  Also, objection to the extent it

4       calls for a legal conclusion, but you can

5       answer the question.

6          A     Well, it's -- that is a term that is

7       repeated throughout the U.S. code and, in

8       particular, in multiple places in the

9       immigration part of the U.S. code.  It could

10      refer to -- it could include considerations of

11      potential impact on national security, which

12      is one element of something in the national

13      interest, public safety.  It could -- I could

14      imagine it could even -- it could conceivably

15      include economic impact, economic safety.

16      It's a very, very broad term, but those are

17      the principal ones that come to mind.

18         Q     One more question.  So in the -- on

19      page 4 of the document you have, there's a

20      subsection entitled "Periodic review," and it

21      says, "At least 60 days before end of the

22      initial period of designation, and any



1    extended period of designation, of a foreign

2    state (or part thereof) under this section the

3    Attorney General, after consultation with

4    appropriate agencies of the government, shall

5    review the conditions in the foreign state (or

6    part of such foreign state) for which a

7    designation is in effect under this subsection

8    and shall determine whether the conditions for

9    such designation under this subsection

10   continue to be met."

11           In your view, if a country is

12   designated under subsection (C), which

13   includes those factors about temporary

14   conditions that prevent safe return and the

15   national interest of the United States, in

16   your view does -- should -- are those

17   considered in this periodic review process

18   that's laid out in the statute or -- apologies

19   for the compound -- or should the statute be

20   read just as it is, essentially to review the

21   conditions in the foreign state?

22           MR. MARUTOLLO:  Objection.  Compound



Page 179

1    question.  It also is vague and also calls for

2    a legal conclusion.  You can answer.

3        A    Well, the periodic review provision

4    does say that the Secretary "shall determine

5    whether the conditions for such designation

6    under this subsection continue to be met."  So

7    as I read that, the Secretary should look back

8    to see and examine those conditions for

9    designation, which would include both the

10   extraordinary and temporary conditions aspect

11   and the -- if there exists any, and national

12   interest concerns to letting them remain.

13       Q    Okay, thank you.

14            Then just one more question about

15   this email.

16            So you estimated that 56,000 of the

17   58,000 were in the U.S. unlawfully before the

18   earthquake and that you doubted that any of --

19   well, right, all in there -- were here

20   unlawfully before the earthquake.  I was just

21   wondering what you based that view on.

22            MR. MARUTOLLO:  Objection.  Asked



Page 180

1    and answered.  You can answer.

2         A    I said I would wager 56,000 of the

3    58,000.  I don't know for a fact that that's

4    true, but based on -- based on my experience

5    and general understanding of the populations

6    that have received TPS over the many years for

7    Haiti and for Central America countries in

8    particular, a large percentage of the

9    underlying population -- of the population

10   was, in fact, already here unlawfully.  So my

11   point was that if a large percentage of the

12   population of -- if the large -- if a large

13   percentage of the TPS population is already in

14   the country unlawfully, it is unlikely that --

15   and had been so for a long time, it is

16   unlikely that they would return willingly if

17   TPS were terminated for them as they did not

18   demonstrate any such inclination when they

19   didn't have TPS before.

20        So I think it's a -- it's not an

21   unreasonable supposition.

22        Q    We're nearing the end.



Page 181

1                    (Exhibit 111 was marked for

2       identification and attached to the deposition

3       transcript.)

4            A     (Document review.)

5                    Okay, I read the document.

6            Q     Okay.   Just bear with me for just

7       one second.

8                    So this is, I guess, two days after

9       the last email exchange that was November

10      10th.   Now we're at November 12th and

11      Ms. Kovarik sends you an email entitled "TPS

12      Strategy Meeting," and I presume we're still

13      talking here about the Monday, November 13th

14      strategy meeting.

15                   She says, "Got the briefing memo and

16      will forward an email" -- well, let me -- let

17      me step back and ask you, do you recall this

18      email chain with Ms. Nuebel Kovarik?

19           A     No, I don't recall -- I remember it

20      now that I'm reading it.   So, yes, now I do.

21           Q     Okay.   She says, "Got the briefing

22      memo and will forward an email from Ian Smith



Page 182

1    in a bit."

2            Do you know what she's referring to

3    there when she says "briefing memo"?

4        A    Whenever there is a meeting with the

5    Secretary on anything, the Secretary has a

6    briefing memo for that meeting.  Sometimes

7    it's one page.  Sometimes it's 20 pages.  It

8    all depends on the nature of the meeting.  I

9    think what she's referring to here is the

10   briefing memo that -- for the Secretary for

11   that meeting the next day.

12       Q    Okay.

13       A    Yes.

14       Q    And then she sends the first

15   attachment, and I apologize, I'm not sure we

16   have all of the attachment.  She says, "The

17   first attachment here is what DHS PLCY came up

18   with but two key additions from my staff.

19   This 'USCIS Annotated' doc has (1) a summary

20   of the country conditions and USCIS's

21   assessment (drawn from the D1-AS1 memo)."

22           Do you know what she's referring to



Page 183

1   there with D1-AS1 memo?

2          MR. MARUTOLLO:  Objection.  Calls

3   for speculation.  Also, this is an internal

4   government deliberation.  You can answer to

5   the extent you know.

6      A    Yes, I believe so.  D1 is the

7   abbreviation typically for director of USCIS.

8   AS1 would be Acting Secretary, in this case,

9   Acting Secretary Duke.

10     Q    Okay.  And do you know what memo

11  she's referring to that has the summary of

12  country conditions and USCIS's assessment?

13         MR. MARUTOLLO:  Same objection.  You

14  can answer.

15     A    I assume she's referring to the

16  November 3 memo, Exhibit 108.

17     Q    Okay.  Okay.  And then she says --

18  she mentions some information to reinforce

19  former Secretary Kelly's directive and then

20  says, "The new stuff is pasted below here,

21  too."  Then it says, "Country Conditions and

22  USCIS Assessment."



Page 184

1          So are these bullet points a summary

2    of what's in the decision memo that you

3    signed, that November 3rd decision memo you

4    signed?

5          MR. MARUTOLLO:  Objection, again, to

6    the extent that the memo speaks for itself and

7    the email speaks for itself, but you can

8    answer.

9          Q    Or in the packet, I should say.

10         A    I believe these bullet points are

11   points just lifted directly out of that

12   November 3rd memo.

13         Q    Okay.  Okay.  And then you respond

14   to her the same day shortly thereafter, and

15   you say, "The key, I think, is stressing the

16   point, if ogc agrees, that the statute does

17   not require that TPS stay if place if it

18   cannot be shown that every single Haitian in

19   the U.S. can be reintegrated all at once."

20   "As I said in an earlier email, is immediate

21   reintegration required of all nationals if the

22   TPS country who were in the U.S. when TPS was



Page 185

1   declared, regardless of whether they were ever

2   intending to return to their country?"

3            Then you go on to say, "All that

4   need be shown, I think, is that the country's

5   ability to handle returns is back to what it

6   was pre-TPS."

7            So here -- so obviously she's

8   emailed you about the decision memo that you

9   signed.  Did this -- did these points bear on

10  analysis of that decision memo?

11           MR. MARUTOLLO:  Objection.  Oh,

12  first, just -- there are two sentences that

13  were omitted from your recitation of the

14  email.

15           MS. WEBB:  Well, I'm happy to read

16  those.  I just --

17           MR. MARUTOLLO:  That's fine.  I just

18  want to put for the record, just so it's

19  clear, from Exhibit 111.  But, additionally, I

20  would object on the grounds again that this is

21  an internal government deliberation, but you

22  can answer the question.



1      A    So I think that -- well, as I

2  understand your question, you're asking --

3  were you asking -- are you asking are the

4  bullet points you see that she's adducing here

5  in some way -- I guess repeat your question.

6      Q    Sure.

7      A    Yes.

8      Q    So she emails you the bullet points

9  from the memo.  She's sort of talking about

10  the memo that you had signed and you respond

11  with some points about reintegration of

12  Haitians, right, at one time, sort of as we've

13  been discussing versus, you know, a trickle.

14  And you mention the country's ability to

15  handle returns is back to what it was pre-TPS.

16          So my question is, are those points

17  that you're making relevant to the decision

18  memo or are you talking about some other

19  portion of the statute?

20      A    Yes --

21          MR. MARUTOLLO:  Objection, but you

22  can answer.




1        A    -- so now that I read this, I'm

2   remembering now, the -- I think one of the

3   issues that kept coming up in the context of

4   all these TPS decision was it wasn't really a

5   legal point.  It was more of a policy point,

6   maybe, or -- it was more of an advocacy point.

7   People who opposed the termination of TPS,

8   many advocates who opposed the termination of

9   TPS would often say, well, one reason to not

10  terminate TPS is because country X could never

11  possibly reabsorb X tens of thousands or X

12  hundreds of thousands of people all at once.

13  And even though that is not exactly the prong

14  -- the adequately handle point is not the

15  prong upon which the Secretary was deciding

16  whether or not to extend or terminate the

17  designation for Haiti, the point kept getting

18  made by advocates.  And I think my email is

19  reacting to that.  I was concerned that nobody

20  within the agency was really addressing that

21  point and that if -- even though it is not

22  strictly one of the legal criteria, it is a



MAGNA ▶
LEGAL SERVICES

Page 188

1    point that needed to be talked about and in

2    one way or another addressed.

3              So I suppose what you -- what you

4    could -- you could look at my response to her

5    email basically saying, yes, okay, got it.

6    But you know there's this other thing, which

7    we have to remember to raise if it comes up or

8    if appropriate in the meeting.  It doesn't --

9    it is not actually part -- it is not actually

10   one of the factors that should relate to a --

11   to the extraordinary and temporary condition

12   analysis, but it is something that we need to

13   talk about because advocates keep raising that

14   as a reason to not terminate or are for

15   extension.

16        Q    I'll see if you remember this

17   meeting, if I can find it just really quickly

18   to see.

19              This is Exhibit 112, I believe.

20   Just take a look.  This is more recent, but I

21   just want to see if you remember this -- this

22   meeting.



1          (Exhibit 112 was marked for

2    identification and attached to the deposition

3    transcript.)

4          A    (Document review.)

5               I've reviewed the document.

6          Q    I'm sorry?

7          A    I've reviewed it.

8          Q    Okay.  I'm just checking to see if

9    you remember this meeting about Haiti TPS.

10         A    No, I don't.

11         Q    Or a conference call.  Okay.

12         A    I would note that they -- did they

13   -- yes, it got to my right email address.  I

14   thought it was a different email address.

15   It's the right one.

16              MS. WEBB:  One more.  That should be

17   the end of the exhibits.

18              (Exhibit 113 was marked for

19   identification and attached to the deposition

20   transcript.)

21         A    (Document review.)

22              Okay, I read it.



Page 190

1        Q    Okay.

2             So I think we've been over it, but

3    I'll just ask again because now we're in 2018,

4    April 27, 2018.  So Kaitlin Stoddard, what was

5    her role as of spring of this year?

6        A    So, she was the -- she's -- the same

7    role she has now.  She was the -- in the

8    counselor position.

9        Q    Okay.

10       A    In USCIS.

11       Q    What about Aaron Calkins?

12       A    Aaron Calkins at that time, he had

13   just come on as the head of legislative

14   affairs for USCIS.

15       Q    Okay.  So in the first email he's

16   emailing a group of -- are these all USCIS

17   officials, if you know?

18       A    Yes.  All USCIS people.

19       Q    Okay.  And just -- these are

20   summaries from some congressional hearings.

21       A    Uh-hmm.

22       Q    And then later that the day you



1   respond, "With respect to this, we have to

2   reconcile the decision to terminate TPS in

3   Haiti with recently released information that

4   suggests it should not have been terminated."

5            So do you recall what you were

6   referring to with respect to the recently

7   released information that suggests it should

8   not have been terminated?

9            MR. MARUTOLLO:  Objection.  To the

10  extent I would instruct the witness not to

11  reveal anything that was conveyed to him in an

12  attorney-client privilege, given the date here

13  after litigation has occurred, so with that

14  instruction in mind, you can answer the

15  question.

16       A    I think -- as I recall, what I was

17  reacting to here was -- I think it may have

18  been a media story where someone had leaked

19  some of these documents, including the

20  underlying RAIO report and some other things.

21  And as I recall the news stories were accusing

22  department leadership of having -- of having



Page 192

1    disregarded input from career staff.  I think

2    that's -- I think that's what I was reacting

3    to.  And -- yes.

4        Q    Okay.  Okay.  So it was the media

5    coverage essentially was the recently released

6    information, or was it internal agency

7    documents?

8             MR. MARUTOLLO:  Again, I'm going to

9    object, and to the extent it's anything that

10   conveys -- information conveys via your

11   attorney or attorneys at that point, I would

12   instruct you not to answer, but otherwise you

13   can answer the question.

14       A    To the best of my recollection, this

15   -- I am referring here to a news story which

16   either quoted from or referred to internal

17   agency documents that had somehow been leaked,

18   yes.

19       Q    Okay.  Okay.  Then you go on to say,

20   "I think we need to get Chad a one-pager

21   explaining for S1 why there is no

22   inconsistency between the underlying RAIO



1   report and the formal USCIS recommendation to

2   terminate.  The underlying memo talked about a

3   lot of things that had nothing to do with the

4   earthquake and its after-effects."  Then you

5   say, "The main points, as I recall:  ICE is

6   removing people to Haiti again at the same

7   rate as pre-earthquake.  The UN group packed

8   up and left; and only a small percentage of

9   Haitians are still living in those tent

10  camps."

11          So just to check, S1 there is

12  Secretary of Homeland Security, correct?

13      A    Correct.

14      Q    So you say -- when you say "The

15  underlying memo talked about a lot of things

16  that had nothing to do with the earthquake and

17  its after-effects," what did you mean by that?

18  I should -- let me ask you first, by

19  "underlying memo," are you referring to

20  decision memo that you signed, that November

21  memo we discussed?

22      A    I'm referring to the -- the decision



1    memo as I said -- as we talked about before

2    was the cover memo.

3         Q    Right.

4         A    I'm talking about the underlying

5    attachment.

6         Q    Right.

7         A    Which was the RAIO research piece.

8         Q    Okay.  The packet.

9         A    Uh-hmm.

10        Q    Okay.  And so when you say it

11   "talked about a lot of things that had nothing

12   to do with the earthquake and its

13   after-effects," what did you mean by that?

14             MR. MARUTOLLO:  Objection.  You can

15   answer.

16        A    The -- what I meant was that the --

17   as I recall, the news stories were talking

18   about -- that I was reacting to here were

19   talking about how the agency leadership at

20   USCIS, including myself, had wantedly

21   disregarded input from career staff, and --

22   which is not true.  And one of the -- what I



Page 195

1    thought needed -- what I'm saying here is --

2    and the Secretary had read these stories.

3    Everyone had read the story.  And I thought

4    that it was appropriate to send to Chad, who

5    is Chad Wolf, the Chief of Staff of the

6    department, a paper for her benefit,

7    explaining that the story is inaccurate and

8    that it is not true.

9           So the -- what I'm trying to say

10   here is that the -- that research paper, and

11   indeed the cover memo itself, talked about

12   other things, you know, the hurricanes and

13   other things that happened that were not

14   directly related to the earthquake.  But that

15   that didn't change the fact that the

16   earthquake-based designation should be

17   terminated.  What I'm not saying here is that

18   those other things were irrelevant.  They were

19   clearly in the memo that we talked about

20   earlier, we do mention them.  We cite them.

21   And then we say, but with respect to potential

22   redesignation or extension under new grounds,



Page 196

1    but we say, you know, yes, those things

2    happened.  The hurricane happened in 2016, but

3    it does not rise to the level of a new

4    designation.

5              So, again, what I'm saying here is,

6    the Secretary should be made aware that we did

7    not do anything wrong here.  We correctly took

8    the information that the staff prepared in the

9    underlying report.  We concluded that, indeed,

10   the earthquake-based designation should

11   terminate, but I'm not saying that the other

12   information that they generated was

13   irrelevant.  It was manifested so because we

14   talk about it and refer to it in the cover

15   memo that I sent to the Secretary, whenever

16   that was, earlier in the year, early in the

17   previous year.

18        Q    Okay.  But when you say there's no

19   inconsistency between that underlying memo and

20   the formal recommendation to terminate, and

21   then you say, "The underlying memo talked

22   about a lot of things that had nothing to do



Page 197

1    with the earthquake and its after-effects,"

2    where is the inconsistency that you're -- that

3    you're sort of referring to between the memo

4    and the recommendation?

5         MR. MARUTOLLO:  Objection.  Vague.

6    Also asked and answered.  You can answer.

7         A    I think the confusion was that -- it

8    was based on the mischaracterization by the

9    media, and I wish I could remember what the

10   outlet was, that evidence had been asserted

11   that unequivocally backed extending the TPS

12   for Haiti, and that I or other people in the

13   USCIS leadership discarded that and didn't

14   even consider it.  And the inconsistency that

15   I'm talking about here is -- I'm saying we

16   need to tell the Secretary that there is no

17   inconsistency between the underlying Refugee

18   Asylum and International Operations report and

19   the formal USCIS recommendation to terminate,

20   which was on the top memo.  There was no

21   inconsistency because the -- we did take into

22   account the evidence that they -- that they



Page 198

1    produced in the underlying report, and I think

2    fairly represented that to the Secretary.

3           With respect to the facts relating

4    to the earthquake-based designation, I think

5    the media accounts that I was reacting to made

6    it sound like we didn't even take into account

7    anything negative regarding the

8    earthquake-based designation.  We did.

9    Clearly so.  It was an attachment to the

10   underlying document that went to the

11   Secretary.

12          So that's what I'm trying to --

13   that's what I'm asking people to prepare for

14   the Secretary so she understands that we

15   didn't, you know, somehow frustrate the proper

16   process.

17      Q    Okay.  So, at this point, the

18   Secretary had made her decision, correct, to

19   terminate?

20          MR. MARUTOLLO:  Objection.  Vague.

21      Q    By April 2018, to terminate Haiti

22   TPS, correct?



Page 199

1      A    As I recall, that -- yes, that

2    decision had been -- had been made long

3    before.

4      Q    Right.

5      A    Back in January, I think, was when

6    the Fed Reg Notice came out, as I recall,

7    January of 2018.

8      Q    Okay.  Okay.

9           And are you aware of the grounds

10   that she cited in her decision for making that

11   termination?

12     A    As I recall from the -- as I recall,

13   there was Federal Register Notice in --

14   somewhere in January 2018, I think, and as I

15   recall, in that Fed Reg Notice, many of the

16   same grounds that we adduced in the memo we

17   sent to her were included.

18     Q    Okay.  Are you aware that she has

19   taken the position that the determination

20   should be based on whether the temporary

21   conditions caused by the originating event are

22   the only -- the only factor to consider as



Page 200

1    opposed to intervening events or subsequent

2    events?

3              MR. MARUTOLLO:  Objection.

4              First, that assumes facts not in

5    evidence.  Mischaracterizes evidence.  I would

6    also object to the extent it calls for

7    speculation as to what the Acting Secretary

8    who was deciding.

9              Also object on the grounds that the

10   Federal Registered Notice speaks for itself

11   and also to the extent that there's a

12   document, the document be shown to the

13   witness.

14             MS. WEBB:  Sure.

15       Q    It's the press release.  I'm happy

16   -- I'm happy to show it to you if that would

17   help, but I was just wondering generally if

18   you're aware of her official position in that

19   respect.

20             MR. MARUTOLLO:  Also, I just object

21   even with respect to this press release, my

22   understanding is that I believe this had been



Page 201

1    a deliberative -- a document marked as

2    deliberative material.

3            I'm not certain that this was the

4    final press release that was ultimately

5    issued, but you can certainly ask questions

6    about it.

7            (Exhibit 114 was marked for

8    identification and attached to the deposition

9    transcript.)

10       A    (Document review.)

11           Okay, I've reviewed the press

12   release.

13       Q    Okay.  I would just point you to the

14   second paragraph, which says -- I won't read

15   the whole thing, but -- "The decision to

16   terminate TPS for Haiti was made after review

17   of the conditions upon which the country's

18   original designation were based and whether

19   those extraordinary but temporary conditions

20   prevented Haiti from adequately handling the

21   return of their nationals, as required by

22   statute.  Based on all available information,



1   including recommendations received as part of

2   an inter-agency consultation process, Acting

3   Secretary Duke determined that those

4   extraordinary but temporary conditions caused

5   by the 2010 earthquake no longer exist.  Thus,

6   under the applicable statute, the current TPS

7   designation must be terminated."

8           So are you familiar with that

9   position that the Secretary has taken or that

10  interpretation of the statute that she's made?

11          MR. MARUTOLLO:  Objection.  Compound

12  and vague.  You can answer to the extent

13  you're aware of it and also without divulging

14  any attorney-client communications.

15      A    Yes, I'm generally aware of that

16  position.

17      Q    Okay.  And are you aware that it is

18  in some tension with, I guess, your own view

19  that you've expressed here today in terms of

20  how you reviewed the material and analyzed the

21  issues in signing the decision memo?

22          MR. MARUTOLLO:  Objection.  I think



Page 203

1    that's argumentative and also calls for a

2    legal conclusion.  Vague as well, but you can

3    answer.

4         A    I don't -- I don't think it is a

5    tension.  Assuming this is the final version

6    of what was sent out, the statement reads,

7    "The decision to terminate TPS for Haiti was

8    made after a review of the conditions upon

9    which the country's original designation were

10   based and whether those extraordinary but

11   temporary conditions prevented Haiti from

12   adequately handling the return of their

13   nationals," et cetera.

14           So, it is true, the conditions which

15   relate to the designation for the earthquake

16   no longer exist in the assessment of the

17   Secretary based upon the recommendation and

18   information we gave her.

19           That doesn't mean that she didn't

20   also consider whether there could be a new

21   designation based on something else.  And as

22   is clear from the memo that we sent to her, we



Page 204

1    did tell her about that and that that was an

2    option, a possibility, which I guess it was

3    the Acting Secretary who eventually signed it,

4    and that was not selected.

5              So my position would be that it is

6    not -- there is no tension between saying that

7    a given designation of TPS should be

8    terminated because the grounds upon which that

9    designation was based no longer exists and at

10   the same time to say -- and the country

11   shouldn't get TPS on any other basis either

12   because -- because that's a separate -- that's

13   a separate decision.  It's -- they are two

14   separate things.  So I don't think there is a

15   tension or a problem.

16       Q    Okay.  So I guess leaving aside the

17   potential decision to redesignate and just

18   focusing on the extension determination, is it

19   your view that she considered the

20   extraordinary and temporary conditions caused

21   by the 2010 earthquake and also the other

22   subsequent conditions, such as the hurricanes



Page 205

1    and the other sort of infrastructure problems

2    that you had looked at in reviewing and

3    signing the decision memo?

4              MR. MARUTOLLO:  Objection.  Again,

5    calls for speculation, and also asked and

6    answered, the last question, but you can

7    answer again.

8        A    Well, all I know is that that is

9    what I sent her.  What we presented to her was

10   the memo and the packet of attachments, which

11   talked about also sorts of things, not just

12   things related to the earthquake and its

13   after-effects, but the hurricanes and the

14   other items that we discussed.  So, I mean,

15   that's for sure.  We sent her all that

16   information.

17       Q    We're almost done.  I'm just trying

18   to finish up.

19            Do you recall at any point while

20   you've been director of USCIS meeting with or

21   conferring with anyone from any immigration

22   nonprofit groups to talk about Haiti TPS?



Page 206

1          MR. MARUTOLLO:  Objection.  I think

2     that's asked and answered, but you can answer.

3          A    To talk about TPS generally or Haiti

4     TPS?

5          Q    TPS generally, let's say.

6          A    I recall meeting with the Sisters of

7     Mercy, the religious organization with people

8     all over Central America to talk about TPS for

9     El Salvador -- rather, for the various

10    countries that were being considered some

11    months ago.  I recall meeting with them twice,

12    both times with the Secretary.  I think both

13    times with the Secretary.  At least one time

14    with the Secretary for sure.  I can't think of

15    any other groups at this moment.

16         Q    Okay.  Do you know who Robert Law

17    is, Robert Law?

18         A    Yes.

19         Q    Who is he?  What is his position?

20         A    Robert Law is a -- he works in the

21    Office of Policy and Strategy at USCIS.  He is

22    a political appointee.  He started there



1    sometime in early 2017, and he acts as kind of

2    a counselor to Kathy Nuebel Kovarik.

3         Q    Did you know him before he assumed

4    that position?

5              MR. MARUTOLLO:  Objection.  You can

6    answer.

7         A    I knew of him and I met him a couple

8    of times because, in his previous position, he

9    was the government relations coordinator for

10   FAIR.  When I was on the Hill, detailed to the

11   Office of Senator Grassley -- rather, to the

12   Judiciary Committee, like I think once or

13   twice during that two-year period, he came by

14   in the normal course of his duties to talk to

15   the Senator on, you know -- or his staff on

16   one or some other matters.  So I saw him -- I

17   knew him.  He came into the office, and then

18   he would move on to wherever his -- whoever he

19   was talking to next.

20        Q    Okay.  Do you recall whether you

21   discussed TPS with him during any of those

22   meetings?



Page 208

1          MR. MARUTOLLO:  Objection.

2     Q    Or whether TPS was discussed at any

3 of those meetings?

4          MR. MARUTOLLO:  You can answer.

5     A    I don't recall ever talking TPS with

6 him during those times when I saw him on the

7 Hill, no.

8          MS. WEBB:  Let's take a break.  I'll

9 look over -- I probably am done.

10          MR. MARUTOLLO:  Just note for the

11 record we would ask for a copy of the

12 transcript for the witness to read and sign.

13          MS. WEBB:  Sure.

14          THE VIDEOGRAPHER:  We're going off

15 the record at 3:58.

16               (A brief recess was taken.)

17          THE VIDEOGRAPHER:  We're back on the

18 record at 4:07.

19 BY MS. WEBB:

20     Q    Okay.  Just one more question, which

21 is what did you do just to prepare for this

22 deposition today?



Page 209

1              MR. MARUTOLLO:  Objection to the

2      extent not revealing any attorney-client

3      communications, you can answer.

4      A     To prepare for today's deposition I

5      met with my attorneys.

6      Q     Okay.  Did you review -- sorry.

7      A     No.

8      Q     I was going to ask, did you review

9      any documents?

10             MR. MARUTOLLO:  I would just object

11     only to the extent that the documents that

12     were used to refresh his recollection, but you

13     can answer.

14     A     The only document I reviewed was the

15     final signed memo from -- what is Exhibit 108,

16     the November 3rd memo.  That was it.

17     Q     Did you discuss the deposition with

18     anyone else?

19     A     I discussed the fact that I was

20     going to be deposed with my staff to let them

21     know where I was going to be today, but

22     otherwise I discussed the substance with



Page 210

1    nobody.

2           MS. WEBB:  Okay.  That's all I have.

3           MR. MARUTOLLO:  Thank you.

4           MS. WEBB:  Okay.

5           THE VIDEOGRAPHER:  The deposition is

6    concluded.  We're going off the record at

7    4:08.

8

9           (Whereupon, the proceeding was

10   concluded at 4:08 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22



Page 211

1    DEPOSITION ERRATA SHEET

2    Assignment No. 450087

3    Case Caption:  Patrick Saget vs. Donald Trump

4

5              DECLARATION UNDER PENALTY OF PERJURY

6      I declare under penalty of perjury that I have read

7    the entire transcript of my Deposition taken in the

8    captioned matter or the same has been read to me, and

9    the same is true and accurate, save and except for

10   changes and/or corrections, if any, as indicated by me

11   on the DEPOSITION ERRATA SHEET hereof, with the

12   understanding that I offer these changes as if still

13   under oath.

14

15

16   SIGNED ON THE _____ DAY OF _____, 20__.

17

18   _____

19   LEE FRANCIS CISSNA

20

21

22



Page 212

1                   E R R A T A   S H E E T

2     IN RE:  PATRICK SAGET V. DONALD TRUMP

3

4

5     RETURN BY: _____

6     PAGE     LINE                    CORRECTION AND REASON

7     _____    _____    _____

8     _____    _____    _____

9     _____    _____    _____

10    _____    _____    _____

11    _____    _____    _____

12    _____    _____    _____

13    _____    _____    _____

14    _____    _____    _____

15    _____    _____    _____

16    _____    _____    _____

17    _____    _____    _____

18    _____    _____    _____

19    _____    _____    _____

20    _____    _____    _____

21    _____    _____    _____

22    (DATE)           (SIGNATURE)



Page 213

1                 E R R A T A   S H E E T

2    IN RE:  PATRICK SAGET V. DONALD TRUMP

3

4    RETURN BY:  _____

5    PAGE     LINE                    CORRECTION AND REASON

6    _____    _____    _____

7    _____    _____    _____

8    _____    _____    _____

9    _____    _____    _____

10   _____    _____    _____

11   _____    _____    _____

12   _____    _____    _____

13   _____    _____    _____

14   _____    _____    _____

15   _____    _____    _____

16   _____    _____    _____

17   _____    _____    _____

18   _____    _____    _____

19   _____    _____    _____

20   _____    _____    _____

21   _____  _____

22   (DATE)                      (SIGNATURE)



Page 214

1              CERTIFICATE OF SHORTHAND REPORTER

2

3              I, Michele E. Eddy, Registered Professional

4    Reporter and Certified Realtime Reporter, the court

5    reporter before whom the foregoing deposition was

6    taken, do hereby certify that the foregoing transcript

7    is a true and correct record of the testimony given;

8    that said testimony was taken by me stenographically

9    and thereafter reduced to typewriting under my

10   supervision; and that I am neither counsel for,

11   related to, nor employed by any of the parties to this

12   case and have no interest, financial or otherwise, in

13   its outcome.

14              IN WITNESS WHEREOF, I have hereunto set my

15   hand and affixed my notarial seal this 20th day of

16   December, 2018.

17   My commission expires July 14, 2022

18

19

20   _____

21   MICHELE E. EDDY

     NOTARY PUBLIC IN AND FOR

22   THE DISTRICT OF COLUMBIA



## A

**Aaron** 8:4 190:11 190:12
**abbreviation** 183:7
**ability** 13:6,11 137:8 154:13 155:6 171:18 173:5 185:5 186:14
**able** 52:16 54:16 103:22 164:7 165:22 171:8 172:1 174:11,21
**absolutely** 121:18 124:13,13
**absorb** 174:12
**accept** 107:21 125:4,8 126:12 164:12 168:15
**acceptable** 119:13 124:4
**accepted** 16:1
**accepts** 107:22
**accomplish** 37:10
**account** 59:18 197:22 198:6
**accounts** 198:5
**accuracy** 50:10
**accurate** 163:12,13 164:13 168:11 211:9
**accusing** 191:21
**acknowledge** 124:3
**acronym** 51:7
**acronyms** 102:22
**Act** 58:18 94:7
**acted** 91:18
**acting** 8:8 25:14,16 25:18 26:18 29:22 31:16 32:3,5 36:9 66:10,14 67:15 87:13 101:10 134:12,20 135:8 183:8,9 200:7 202:2 204:3

**acts** 207:1
**actual** 24:1
**add** 94:19 116:11 158:3
**added** 137:7
**addition** 68:21 158:14 163:15
**additional** 43:21 130:18,19 138:5 149:9
**additionally** 97:5 185:19
**additions** 182:18
**address** 11:4 165:13 189:13,14
**addressed** 188:2
**addressees** 93:4
**addressing** 187:20
**adduced** 199:16
**adducing** 186:4
**adequately** 42:17 155:16 165:6,14 165:22 169:19 170:14 171:8,13 171:18 173:6 174:22 187:14 201:20 203:12
**adjudicate** 52:1 107:20
**adjudicated** 18:14 110:9,10 111:21
**adjudicating** 111:6 111:12
**adjudication** 54:14 111:8
**adjudications** 18:10
**administration** 50:14,14,21,21
**administrations** 27:11
**administrative** 33:7 36:4,10
**adverse** 59:18
**advice** 84:22 85:2
**advise** 44:22 45:4

**acts** 45:10,17
**advising** 45:20 74:2
**advocacy** 187:6
**advocates** 187:8,18 188:13
**affairs** 14:8 140:20 190:14
**affect** 13:6,10 136:11,13 173:5
**affixed** 214:15
**Africa** 173:12
**aftermath** 151:10
**after-effects** 193:4 193:17 194:13 197:1 205:13
**AG** 74:20
**agencies** 49:6 56:21 57:22 73:10 115:17 116:6 138:13 144:19 145:5,17 178:4
**agency** 23:13 24:2 30:19 31:20 32:19 33:10,14 34:3 35:4 37:3,9,9,14 37:20 38:4,9 39:21 47:16,21,22 54:1,21 55:16,16 67:4 70:14 72:3 96:16 107:4 110:14 111:13 130:20 146:22 170:11 187:20 192:6,17 194:19
**agency's** 54:19
**agendas** 96:21
**ago** 89:5 156:5 206:11
**agree** 88:11 98:14 98:16 105:4 111:2 152:13
**agreed** 97:17 99:4
**agreeing** 98:5
**agrees** 98:12 108:3 184:16
**ahead** 40:3 61:3

**acts** 100:3
**airports** 171:1
**al** 1:5,10 9:8
**aliens** 41:21 42:17 43:8,11 52:17 75:1,9 118:3 144:12 155:17 165:6 169:19,22 172:16 176:9,17
**align** 103:9
**allow** 12:5,6 146:2
**allowed** 145:1
**allowing** 75:14 76:12 77:10
**allows** 154:6
**Alternately** 118:18
**altogether** 169:14
**Ambassador** 88:9 89:7,20,21 90:5 91:8,19
**ambiguous** 87:7
**amend** 12:13 67:18 116:11
**amended** 103:18
**amendment** 107:8
**amendments** 107:7
**America** 180:7 206:8
**American** 20:5,6 52:17 141:11
**analysis** 116:22 167:8 185:10 188:12
**analyzed** 202:20
**and/or** 33:12 211:10
**Annotated** 182:19
**Announcement** 8:9
**answer** 12:3,5,6,13 12:16,21,21 13:6 19:3 20:14 24:13 26:20 28:21 31:6 31:15 33:1,2 35:14 36:2 40:1 42:7 43:3,18 44:10,18 45:14

**acts** 47:10 48:6 49:2,8 50:16 51:5 53:3 53:20 54:5 55:3,4 56:5,7,16 57:3 58:14 59:11 60:3 60:12,15 61:3,10 61:19 63:2,9,21 63:21 64:12 69:6 69:16 70:9 71:7 73:2,15 74:14 76:4,6 77:4 78:2 78:17 79:8,13 80:2,14,17 81:7 81:22 82:12 83:5 84:16 85:12,22 87:7,20 88:22 89:15,19 92:15 95:19,20 97:7 98:1,8,18 99:2 100:1 101:13 102:1,14 104:8,22 105:16 106:3,11 107:1,12 108:9,11 109:8 110:2 111:16 113:6,22 114:10 115:1,12 116:3 117:16 118:13 119:18 120:21 122:15 123:3 125:1,14,19 126:10,20,20 127:19 128:16 129:8 130:15 131:3 133:6 134:11 135:19 136:6,17,18 137:5 137:18 138:2,16 139:8 140:3,14 142:2,5,13 143:7 144:3 145:3,8,15 146:2,3 148:3 149:2 150:4 152:19 153:9 155:3 157:10,20 160:3,11 163:3,4 164:19 166:13



167:20 169:1
170:7 172:7,18
174:6,15 175:14
176:6 177:5 179:2
180:1 183:4,14
184:8 185:22
186:22 191:14
192:12,13 194:15
197:6 202:12
203:3 205:7 206:2
207:6 208:4 209:3
209:13
**answered** 55:4 97:6
101:13 105:16
106:3 107:11
140:2 157:10
160:3,10 172:6
174:5,15 180:1
197:6 205:6 206:2
**answers** 12:7 13:1
13:11
**anticipate** 168:5
**anybody** 85:15
103:20 115:14
141:13 142:22
143:18
**anymore** 24:10
**apart** 64:11
**apologies** 178:18
**apologize** 29:21
64:22 89:9 182:15
**apparent** 105:7
**apparently** 133:10
**appear** 94:14
**appeared** 96:20
**appears** 102:18
108:19 113:7
**applicability**
169:13
**applicable** 155:10
167:10,13 202:6
**application** 20:11
52:6
**applications** 18:15
20:2,2,8,10 54:15
**applying** 18:16

20:15,16,18
102:19
**appointed** 26:2
29:13
**appointee** 50:18
90:2 206:22
**apposite** 80:18
**apprehend** 153:22
**apprised** 107:8
**appropriate** 57:22
70:14 90:4 178:4
188:8 195:4
**approval** 39:1
**approve** 39:13
**approximately**
14:11,22 29:9
49:15
**April** 17:14 29:18
65:5 66:6 68:3
77:22 190:4
198:21
**apropos** 168:8
**area** 42:14 62:17
130:9
**areas** 31:13 35:18
35:20
**arguably** 155:18
**argument** 104:21
**argumentative**
203:1
**arm** 53:7,16 54:9
**armed** 41:19 94:8
**arrived** 106:8
**ASAP** 100:22
**aside** 56:20 141:12
204:16
**asked** 99:14,14
101:12 105:15
106:2 107:11
140:2 157:9 158:4
160:2,10 174:5,14
179:22 197:6
205:5 206:2
**asking** 54:13 98:11
99:3 140:4 186:2
186:3,3 198:13

**asks** 75:20 108:20
108:21
**aspect** 179:10
**asserted** 197:10
**asserting** 106:20
**assess** 107:19 159:6
**assesses** 93:19
156:17 158:6
**assessing** 50:2
**assessment** 56:1
103:7 148:6
155:18 174:19
182:21 183:12,22
203:16
**assigned** 16:13,15
18:9 38:17
**assignment** 17:10
17:19,21 18:5,7
211:2
**assist** 38:18 54:12
**assistance** 29:1,4
**Assistant** 26:3,7
27:12 67:8 90:4
91:7 92:1
**assists** 33:20
**associate** 4:13
14:17,20 15:7
21:2,6 22:14 23:4
**assume** 12:11 55:9
72:1,1 93:9
108:17 163:8,9
183:15
**assumed** 207:3
**assumes** 63:20
114:9 117:15
126:18 129:7
136:17 149:1
153:6,7 160:1
200:4
**assuming** 108:13
119:20 120:22
154:1,15 203:5
**asylum** 46:21 47:18
49:12 51:14,16,18
51:19,21 52:4
53:9 54:15 150:18

197:18
**AS1** 183:8
**attached** 5:8 40:6
65:14 83:16 86:11
86:17 93:13
112:11 121:13
131:13 160:17
181:2 189:2,19
201:8
**attachment** 129:16
129:17,18,20
131:22 132:13,19
140:18 146:16
163:10 182:15,16
182:17 194:5
198:9
**attachments**
146:12 205:10
**attend** 13:20 37:18
37:18
**ATTENDANCE**
4:1
**attended** 13:22
14:6
**attention** 64:8
116:22
**attorney** 12:18 15:7
24:9 34:19,20,22
41:18 42:9 43:6
43:10 57:21 58:16
99:19 100:13
176:16 178:3
192:11
**attorneys** 192:11
209:5
**Attorney's** 3:16
10:6
**attorney-client**
64:10 163:1
191:12 202:14
209:2
**audibly** 12:3
**August** 6:9 88:6
93:11 100:18
102:21
**author** 110:20

**authority** 129:17
146:17
**authorization**
135:14
**authors** 110:20,21
**available** 201:22
**aware** 60:9,9 61:5
62:2,20 63:3,4,15
63:22 64:4,6,16
64:18 70:13 71:2
71:9 84:21 124:17
125:3 126:4,11
127:14 128:17
142:17 143:14
144:18 147:4
157:12,19,22
196:6 199:9,18
200:18 202:13,15
202:17
**a.m** 9:13

**B**

**B** 5:7 41:15 42:9
44:4 129:18
169:20 170:13
**back** 12:14 17:19
18:4 22:19 39:12
44:12 45:6 55:19
57:11,14 62:18
65:7 70:5 73:18
73:19 80:7 91:3
96:16 100:7
107:15,18 108:2
109:15 110:8,19
111:19 122:1
147:17 151:1
162:6 179:7
181:17 185:5
186:15 199:5
208:17
**backed** 197:11
**background** 13:18
**bad** 88:22 96:6
**badly** 97:13
**based** 17:2 52:1
83:5 99:11 115:2



118:5,20 144:4
148:6,6 149:3,15
158:10,18 159:5
166:19 167:2
174:18 179:21
180:4,4 197:8
199:20 201:18,22
203:10,17,21
204:9
**basic** 12:3
**basically** 38:5
96:12 134:17,22
188:5
**basis** 62:20 146:17
151:22 156:21
159:1,7 204:11
**bear** 77:15 117:10
181:6 185:9
**bearing** 78:8 83:1
**beginning** 29:9
131:22
**behalf** 2:19 3:3,13
4:3 10:2,4 107:4
**belief** 175:7,20
**believe** 53:10 67:10
79:11 92:18 99:18
152:21 156:8
157:9 161:18
183:6 184:10
188:19 200:22
**Ben** 4:6
**beneficiaries** 148:1
149:20,22 151:1
154:20 164:2,9
174:12
**beneficiary** 79:3
159:21
**benefit** 52:18 195:6
**best** 15:12 25:9
28:12 33:11 47:12
49:9 52:10 53:4
87:22 192:14
**better** 100:16
109:12 114:15
170:12
**beyond** 70:17 74:11

79:6 133:5 144:22
147:3 157:3
**big** 72:18
**bill** 175:3
**bit** 13:17 38:3
75:20 93:13
100:16 110:11
138:21 145:10
182:1
**block** 102:3
**body** 95:3
**bold** 41:13
**Border** 67:9 92:2
**bottom** 94:1 166:16
**Box** 4:7
**Branch** 10:10
**branches** 143:3
**Brantley** 3:4 10:1
**breadth** 54:8
**break** 12:15 57:5
100:3,3 121:17
147:11 208:8
**Briana** 6:5 88:8
91:12,13
**brief** 57:10 73:5
121:22 141:22
147:16 208:16
**briefing** 68:17
72:14 181:15,21
182:3,6,10
**briefings** 73:8
**briefly** 17:20 36:19
**broad** 24:20 52:19
83:11 177:16
**broader** 34:20
79:18 139:16
**broadly** 36:21
**Brooklyn** 3:19
**brought** 64:7
**Brown** 2:7 3:6 9:16
10:2,4
**bubbles** 111:6
**Building** 134:16
**bulk** 16:10 36:17
**bullet** 184:1,10
186:4,8

**bureaucratic** 26:13
31:22 35:11,20
**bwebb@mayerb...**
3:10

---

## C

**C** 3:1 4:4 9:1 41:16
43:5 44:5 81:3
129:20 169:20
173:21 176:14
178:12
**Cadman** 3:18
**cadre** 51:10 52:8
**Calkins** 8:5 190:11
190:12
**call** 7:21 189:11
**called** 18:10
**calling** 97:2,3 130:7
142:22
**calls** 45:12 49:1
53:19 59:22 60:1
63:1,8 69:15 70:8
71:19 73:1 74:10
76:3 77:1,2,17
78:1,15,16 79:5
79:21,22 81:5
83:4 84:15 85:11
85:21 89:13 92:11
95:12 97:20 98:7
108:10 111:15
113:21 115:10,11
116:1,2 117:13
119:16 120:19,20
124:22 126:8,9,19
127:18 128:14,15
129:5,6,7 131:1
134:7 135:18
136:16 137:4
138:11,15,19
139:7,22 140:12
141:18,20 144:2
148:21 150:3
152:18 153:5
157:16 164:17
168:17 174:3
176:6 177:4 179:1

183:2 200:6 203:1
205:5
**camps** 193:10
**candidates** 51:13
**Canoles** 21:4
**capacity** 33:1 36:9
44:18 54:2 99:4
135:4
**Capitol** 28:4 30:1
65:7
**Caption** 211:3
**captioned** 211:8
**care** 100:21
**career** 50:12,19
91:9,15 192:1
194:21
**carefully** 93:12
**Carl** 67:13,14,19
67:20
**carried** 30:11
**carrying** 37:13
**case** 1:6 39:14
44:19 83:6 92:18
98:20,21 108:17
111:20 114:3
131:18 133:5
144:12 153:17,20
167:4 173:19
183:8 211:3
214:12
**cases** 21:19,20,21
21:22 52:15
**categories** 81:1,13
82:10 83:1,7
155:11 175:11
**caused** 59:18 96:6
119:8 126:2
199:21 202:4
204:20
**causes** 121:4
**CBP** 25:4 46:1
143:16
**Center** 14:10
**Central** 141:11
180:7 206:8
**certain** 34:2 47:12

52:15 53:11 68:5
73:22 79:11,14
99:14 108:17
123:18 201:3
**certainly** 16:15
40:2 61:4 77:2
84:21 111:22
140:22 142:18
153:18 168:21
201:5
**certainty** 67:20
**CERTIFICATE**
214:1
**Certified** 214:4
**certify** 214:6
**cetera** 70:6 155:15
158:6,7 203:13
**Chad** 192:20 195:4
195:5
**chain** 6:4 7:10,15
88:5,14 89:4
105:4 160:22
162:11 181:18
**chairman** 27:20
**chairmanship** 29:6
**chairmen** 28:13,15
**chance** 60:14 68:18
138:10
**change** 26:13 27:10
103:5 136:19,22
136:22 175:21
195:15
**changed** 26:1 58:17
104:11,15 105:5
106:6 137:8
**changes** 37:7 49:5
49:10 105:8,11
106:13 127:3
128:21 211:10,12
**chaotic** 151:9
**characteristics**
77:7
**charge** 26:3
**chart** 163:10
**Chase** 11:10
**check** 162:7,12



193:11
**checking** 189:8
**Chertoff** 73:19
**Chevy** 11:10
**chief** 19:17 22:14
  31:17,19,20 32:6
  32:7 33:10 35:2,4
  35:6,8 36:5,6,12
  36:12 38:13,14
  47:20 48:1 55:8
  67:15 161:12,15
  163:2 195:5
**children** 78:7
**chime** 116:8
**choice** 17:2,3,4
**cholera** 63:6
**choose** 71:17 73:21
  102:4 153:16,17
  153:20
**chosen** 130:12
**Christian** 3:5 10:3
  10:3
**Chuck** 27:20
**circle** 102:5
**circulated** 90:20,21
  92:19 116:7
**circulates** 38:20
**circumstance** 154:3
**circumstances**
  59:14 171:16
**CIS** 29:15 46:5,19
  103:2,4,8,13
  104:6 109:7
  115:15 140:6
  156:10
**Cissna** 1:14 2:1
  5:14 6:15,20 7:11
  7:16 8:5 9:6 10:17
  11:3,12 73:14
  77:19,19 79:21
  80:12 81:21 89:15
  106:20 211:19
**Cissna's** 97:4
**cite** 195:20
**cited** 199:10
**citizen** 150:18

**citizens** 20:6 52:17
**Citizenship** 4:14
  10:12 22:15
**city** 11:8
**civil** 10:9 50:12,19
  93:1,1 128:3
**claim** 51:19 52:4
  150:18
**claims** 51:18 52:1
**clarify** 12:10 68:8
  122:10
**class** 150:12
**clear** 37:10 38:1,3
  39:7 134:20 140:4
  185:19 203:22
**clearance** 38:11
  91:1 103:2
**cleared** 38:22
**clearing** 39:20
**clearly** 133:17
  145:5 155:17
  162:14 175:18
  195:19 198:9
**clears** 107:3
**clubbed** 95:2
**code** 177:7,9
**colleagues** 19:7
  169:12
**collected** 71:3,10
**Columbia** 14:7
  214:22
**come** 18:17 22:19
  23:9 38:21 39:9
  62:13 114:7
  136:14 166:3
  168:5 177:17
  190:13
**comes** 48:9 111:19
  188:7
**comfortable** 48:11
**coming** 14:14,16
  55:20 62:11
  148:19 165:17
  187:3
**commend** 95:20
**comment** 90:22

111:5
**comments** 103:19
  103:20 107:15
  110:6,15,22 111:5
  116:8 169:4
**commission** 214:17
**commit** 79:11
**committee** 28:13
  28:14 29:7 207:12
**communicate** 72:2
  72:11 91:3 96:16
**communication**
  96:1 142:18
  145:21 157:18
**communications**
  141:21 142:3
  202:14 209:3
**companies** 22:1,6
**compare** 169:16
**Compared** 152:20
**competing** 96:21
**complete** 13:11
  54:7
**completed** 120:7
  144:9 153:9
**component** 45:19
  72:3 90:11 91:1,4
  107:15,17,19
  109:14 110:9,13
  110:15,17 116:6
**components** 25:1,3
  25:4 46:1 85:2
  90:14,22 109:11
  143:19
**compound** 50:15
  71:6 87:7 123:2
  178:19,22 202:11
**conceivably** 177:14
**concern** 96:13
**concerned** 187:19
**concerns** 34:15
  91:2,5 107:19
  110:6,22 179:12
**concluded** 156:10
  196:9 210:6,10
**conclusion** 49:1

60:1 63:1,8 79:6
  83:4 119:16
  120:21 126:19
  129:7 136:16
  152:18 153:7
  176:6 177:4 179:2
  203:2
**conclusions** 91:11
**condition** 53:17
  54:2 119:14,22
  120:1 121:2,3
  188:11
**conditioned** 154:21
**conditions** 13:5
  42:14 43:7 49:13
  50:3 56:2,14 58:1
  58:4,20 59:5,7,12
  59:13,15,18 60:5
  74:19,22 93:20
  94:3,10,12 105:13
  106:1 114:19
  116:21 117:4,21
  118:2,6 119:1
  129:2 148:9
  156:21 157:3
  165:19 166:20
  169:21 171:4
  173:22 178:5,8,14
  178:21 179:5,8,10
  182:20 183:12,21
  199:21 201:17,19
  202:4 203:8,11,14
  204:20,22
**conduct** 56:14
**conducted** 88:22
**conference** 7:20
  189:11
**conferring** 205:21
**confirmed** 29:19
  30:11 65:2,5
  143:11 161:6
**conflict** 41:20,21
  94:8
**conflicting** 111:12
**confused** 93:14
**confusion** 197:7

**Congress** 38:8 39:6
  39:18 82:18 161:6
  170:16 171:5
  175:18
**congressional**
  190:20
**connection** 81:6
  113:11 171:20
**consequence**
  170:21
**consider** 60:5 76:8
  76:11,14 77:13
  78:21 118:8,9
  119:13 120:15
  145:11 146:4
  155:8,19 159:11
  197:14 199:22
  203:20
**considerable** 119:7
  126:1
**consideration**
  39:13 77:10 124:4
  134:22 155:5
**considerations**
  167:11 177:10
**considered** 117:18
  118:7 146:6 157:2
  168:7 178:17
  204:19 206:10
**considering** 75:14
  136:9 160:7
**consistent** 96:10
  97:14 103:6
**constantly** 51:11
  142:19
**consulate** 16:15,17
  17:10 18:12
**consult** 39:20 47:16
**consultation** 57:21
  178:3 202:2
**consulted** 49:17
  116:15
**contains** 116:21
**contemplate** 166:9
**contemplated**
  105:9



**contemplating** 74:1
170:16 175:3
**context** 187:3
**continue** 12:7
50:20 58:6 93:21
94:10 120:9
127:11 178:10
179:6
**Continued** 4:1 6:1
7:1 8:1
**continues** 41:14
59:1 156:20
**contrary** 43:12
75:10 76:20
176:19
**contribute** 56:22
172:13
**control** 132:22
154:17
**conversations**
139:11,12,18
140:5,8,15 141:2
141:4 142:6,16
143:5,10,18
**conveyed** 191:11
**conveys** 192:10,10
**convicted** 70:4 79:3
80:5 152:1
**convictions** 78:11
**coordinate** 24:22
34:7
**coordinated** 46:18
46:22 48:9 49:18
50:6 88:2 108:16
**coordinates** 46:8
47:4,10
**coordinating**
114:13
**coordination** 34:11
**coordinator** 207:9
**copied** 88:7,8,8
**copies** 83:19
**copy** 208:11
**correct** 24:14 29:11
30:9 58:8 60:11
61:11 63:17 65:1

68:14 87:18 92:3
92:4 96:21 97:18
98:3,15 103:14
105:14 106:4
109:21 118:11
119:20 120:22
130:9,13 136:4,20
137:1 153:3
157:11 161:7
174:13 176:3
193:12,13 198:18
198:22 214:7
**CORRECTION**
212:6 213:5
**corrections** 211:10
**correctly** 133:10
196:7
**correspondence**
38:8
**counsel** 4:13 9:21
10:19 22:14,15
23:4 31:20 35:2,4
45:22 47:20 90:13
92:21 95:20
124:10 161:15,21
163:2,20 214:10
**counselor** 31:18
32:9,10,12 38:14
66:7 91:19 92:3
162:3,4 190:8
207:2
**counselors** 73:21
**counsels** 161:20
**countries** 49:22
67:5 87:12 88:19
173:12 180:7
206:10
**country** 37:21
44:14,20 46:11,14
49:13 50:3 53:13
53:17 54:1 56:2
56:14 58:20,22
59:5,16 69:1
75:15 94:6 95:16
105:13 106:1
114:18 116:21

117:4 118:6
119:21 120:1
121:1,3 129:1
154:4,6,7,9,13
155:6 157:3
158:17,22 164:3
165:21 168:14
170:17,22 171:7
171:18 173:5,17
175:6 176:10
178:11 180:14
182:20 183:12,21
184:22 185:2
187:10 204:10
**country's** 185:4
186:14 201:17
203:9
**couple** 20:5 52:9
66:2 100:10
105:10 117:1
162:16 207:7
**course** 39:19 41:5
62:2 207:14
**courses** 16:11
**court** 1:1 9:10,19
10:14 75:5 142:1
144:22 146:1
214:4
**courtroom** 11:17
**court's** 45:14
138:17 144:4
**cover** 129:14 130:2
130:3,8 149:6,16
149:18 150:5
155:22 175:5
194:2 195:11
196:14
**coverage** 192:5
**covered** 141:21
145:22 173:4
**covers** 176:9
**CP_00000678** 6:7
**CP_00001526** 5:15
**CP_00021753** 6:16
**CP_00026912** 7:22
**CP_00028905** 6:21

**CP_00029138** 7:13
**CP_00031945** 7:18
**CP_00031967** 8:6
**crafted** 97:13
**Craig** 35:5 67:21
161:14,15 163:15
**created** 107:14
**creating** 171:17
**Creole** 19:10
**crime** 79:3 128:1
152:2 159:20
**crimes** 70:4 79:11
79:19 80:5 148:17
**criminal** 78:11
**criminality** 78:18
79:14
**criteria** 59:1
187:22
**criterion** 121:8
**Culver** 7:12
**current** 27:17
29:12,14 30:8,15
31:16 90:19
116:21 117:4
157:3 202:6
**currently** 32:12
35:8 36:8 66:19
141:22
**cut** 34:2

———————————
**D**
———————————
**D** 9:1
**data** 34:13 70:3
71:2,3 72:15 74:7
79:18 114:20
159:18 160:7
**date** 116:16 191:12
212:22 213:22
**dated** 5:13 6:4,18
7:10,15 8:4 131:6
133:11
**David** 4:15 9:17
**day** 22:21 37:5
100:21 102:21
133:19 151:13
153:14 182:11

184:14 190:22
211:16 214:15
**days** 37:6 57:17
91:9 162:16
177:21 181:8
**day-to-day** 37:2,4
**de** 90:3
**deal** 37:20 144:13
**dealing** 98:21
**dealt** 23:12 61:13
64:16
**December** 1:16 9:3
9:12 214:16
**decide** 107:21
120:4 121:6
**decided** 17:5 159:8
**deciding** 111:4
146:7 187:15
200:8
**decision** 6:9,14,18
27:4 44:20 45:2,5
45:19 48:20,20
69:11 74:3,8
77:22 84:8,12,20
85:6,8,15,19
93:16 102:2,2,10
109:6 111:10
113:4,8,17 115:16
117:10,17 118:10
118:16,21 130:8
130:21 133:3
135:17 136:2,13
136:14 137:14,15
138:11 139:4,18
144:14,16 145:12
145:19 147:20
148:19 149:15
156:16 157:5,9
158:15 159:9,15
160:8 166:8
169:13 174:11
184:2,3 185:8,10
186:17 187:4
191:2 193:20,22
198:18 199:2,10
201:15 202:21



203:7 204:13,17
205:3
**decisions** 62:3
73:22
**decision-maker**
74:13
**DECLARATION**
211:5
**declare** 211:6
**declared** 185:1
**Defendant** 7:7
**Defendants** 1:11
3:13 4:3 7:4
**defense** 10:10
**defer** 55:7 170:11
**degree** 14:7
**deliberation** 183:4
185:21
**deliberations** 45:13
70:9 74:10 77:2
78:2,16 80:1,14
84:16 85:12,22
95:13 97:3,21
104:22 108:11
111:16 113:22
115:11 116:2
117:14 120:20
125:1 126:9,17
127:19 128:15
129:6 131:2 134:8
137:5 138:16
139:8 140:1,13
141:19 142:13
144:3 148:22
164:18 168:18,20
169:5 174:4
**deliberative** 95:11
98:9,19 145:2,6
145:20 157:18
168:21 201:1,2
**demographic** 70:3
76:17 77:6,7
**demonstrate**
180:18
**department** 3:15
4:5 7:7 10:9 15:22

16:9 19:22 22:9
23:2 24:1 25:14
26:16 62:15 64:20
92:19 109:20
116:12,16 119:13
119:17 129:20
142:9,16,18,22
156:1 191:22
195:6
**departments** 92:9
93:8
**department's** 17:3
17:4 149:7
**depend** 174:7
**dependent** 174:9
**depending** 37:5
**depends** 93:2 182:8
**deposed** 11:19 12:1
37:6 209:20
**deposition** 1:14 2:1
5:9 6:3 7:3 8:3 9:6
9:14 11:13 40:6
40:10 65:14 83:16
86:11,17 99:18
112:11 121:13
131:13 159:19
160:17 181:2
189:2,19 201:8
208:22 209:4,17
210:5 211:1,7,11
214:5
**depositions** 99:15
**deputy** 24:6 25:8
26:2,7 31:16 32:3
32:5 36:6,12
38:14 161:19,19
**describe** 18:5 30:15
30:17 32:18 36:22
37:2 48:3
**described** 33:11
46:12 53:8 64:14
111:22
**describes** 51:7 59:2
129:17
**describing** 146:16
**description** 129:18

**designate** 48:20
94:6 118:19 159:7
**designated** 44:21
46:15,15,16 60:10
165:3 173:12
176:9 178:12
**designation** 5:19
42:20 44:5,6 45:9
48:17 57:18,19
58:3,5,22 59:8,20
60:9,18,20,22
62:19 63:5,16
64:1,4,17 69:1
74:19 87:10 93:20
93:22 94:13
113:12 118:11,17
148:5 149:22
156:22 158:9,10
158:16,18 159:1,3
159:5 165:12,17
166:17,18 167:1,2
167:5 175:7,11
176:3 177:22
178:1,7,9 179:5,9
187:17 195:16
196:4,10 198:4,8
201:18 202:7
203:9,15,21 204:7
204:9
**designations** 41:13
44:2,13 81:7
88:17
**desire** 134:18,19
**desk** 103:8 106:9
108:5 113:4
**Despite** 94:16
**destination** 39:17
**destruction** 119:8
126:2
**detail** 28:6,10,11,13
41:10
**detailed** 28:2,22
61:16 62:12 162:4
207:10
**detailee** 38:15
**detailees** 38:16

**details** 28:16 50:4
70:1 75:20
**determination**
80:19 81:6 89:17
106:22 119:14
146:5 147:22
148:12 149:19
154:19 174:10,16
199:19 204:18
**determinations**
62:3 92:14
**determine** 48:10
58:4,22 169:8
178:8 179:4
**determined** 80:18
202:3
**determines** 119:22
**determining** 44:14
78:21
**development** 70:19
142:20
**devoted** 21:5 53:1
**DHS** 24:7,8,20,22
29:1 30:5 35:16
36:3 45:21 56:20
61:7,11 64:14
65:9 66:15,17,21
66:21 67:1,11
68:9 72:2,7,9
90:11,22 91:15,17
92:9,22 93:5 99:4
103:20 107:15,16
115:18 116:6
134:13 140:6,7,9
141:1,3,7,13
143:4,12,19
145:18 147:5
152:3 161:20
182:17
**differences** 48:16
48:18 123:11
170:3,3
**different** 14:19
49:21 52:4 53:14
110:17 111:5
118:15,20 127:5

157:14 166:2
169:14 171:14
189:14
**difficult** 170:21
**dig** 54:17
**Dimple** 66:11,13,19
161:17,18 163:17
**direct** 11:7 32:2
56:6 63:11 76:3
98:8 99:1 132:11
145:3,7 146:1
163:2 169:12
**direction** 30:18
37:8
**directive** 183:19
**directly** 31:7 33:12
34:18 184:11
195:14
**director** 11:11 24:6
25:13,14,16,19
26:6,14,18 28:4
29:15,22 30:4,16
33:12 36:22 39:7
46:10 49:4 65:1
66:10 82:14 87:13
87:14 107:5 109:7
111:11 135:5
140:10 183:7
205:20
**directorates** 34:3
34:12,16 47:20,21
**director's** 33:5,7
47:1 172:6
**directs** 33:21,22
**disagree** 56:1
**disaster** 42:12
166:21 167:3
170:20
**discarded** 197:13
**discharge** 33:8
**disclose** 64:10
**discovery** 99:17
142:1
**discuss** 41:9 209:17
**discussed** 38:11
84:20 85:19 87:5



87:16,17 105:22
113:3 114:12
123:13 127:9
133:2,3,21 147:3
148:14 155:21
159:18 164:22
193:21 205:14
207:21 208:2
209:19,22
**discussing** 176:14
186:13
**discussion** 64:19
73:4 149:9 156:2
167:14
**discussions** 85:8,14
89:3 130:19 139:3
**disease** 173:2
**displaced** 119:10
126:3
**disregarded** 192:1
194:21
**disruption** 42:13
170:18
**District** 1:1,2 3:17
9:10,10 10:7
141:22 214:22
**Division** 10:9
**divulging** 202:13
**doc** 182:19
**document** 38:7,10
39:8,10,16 40:13
40:18,19 65:19,20
68:22 69:15 70:20
73:1 84:5,6 86:19
87:4,8,11,18 90:7
91:10 95:18 96:8
96:17 97:12,22
104:1,20 106:14
107:4,14 109:13
109:21 110:16,18
110:20,21 111:19
112:17,18,20
113:2,7 114:16,18
114:21 121:15,16
122:6,18 123:5,7
123:12 127:1

131:10 132:7,18
146:15 149:10
157:7,8 160:19
163:11 176:5
177:19 181:4,5
189:4,5,21 198:10
200:12,12 201:1
201:10 209:14
**documentation**
55:12
**documents** 36:20
37:11 38:2,19
39:20 56:9 81:20
86:21 108:21
110:7 114:14
129:22 149:13,14
154:8,11,18
155:22 191:19
192:7,17 209:9,11
**doing** 24:10 34:7
50:5 65:9 70:19
**Dominican** 117:7
124:1 148:15
**Donald** 1:8 9:8
211:3 212:2 213:2
**DOS** 116:16,17
**doubted** 179:18
**Dougherty** 67:6,7
88:5 90:5 91:7
97:16
**dozen** 31:11
**DPP_00000473**
6:12
**DPP_00019502**
8:11
**draft** 48:1 55:20
79:22 93:17 103:7
103:9 113:8,9,10
113:14,16 115:6
116:14 123:17,19
124:6,20 126:5,15
127:1 128:1,12,20
128:21 130:4
**drafted** 77:18 96:2
96:3,9,20 97:9
110:17

**drafting** 29:5 46:8
47:4 48:9 49:18
55:11 96:6 107:18
114:13
**drafts** 113:18 114:2
114:4,6 115:7,15
127:10
**drawn** 182:21
**drought** 42:11
155:14
**due** 41:20 63:5
**Dugan** 4:4 10:8,8
86:9
**Duke** 8:8 101:15
134:13,20 183:9
202:3
**duly** 10:18 128:19
**duties** 18:6 19:19
23:3 24:11 30:11
37:22 41:5 51:7
207:14
**duty** 17:10,19 18:8
96:11
**D.C** 1:15 2:9 3:8
4:8 9:2,15 15:8
22:20 53:1,12
134:16
**D1** 183:6
**D1-AS1** 182:21
183:1

---

**E**

**E** 1:18 3:1,1 5:7 9:1
9:1 212:1,1,1
213:1,1,1 214:3
214:21
**earlier** 17:16,16
30:3 84:20 99:15
127:5,9,22 128:11
158:3 159:18
161:3 164:22
176:14 184:20
195:20 196:16
**early** 17:13 25:22
68:3 196:16 207:1
**earthquake** 42:11

62:21 151:8,11
155:14 156:19
158:10 159:6
170:19 173:1
179:18,20 193:4
193:16 194:12
195:14 197:1
202:5 203:15
204:21 205:12
**earthquake-based**
195:16 196:10
198:4,8
**East** 3:18
**Eastern** 1:2 3:17
9:10 10:6
**Ebola** 173:11
**economic** 177:15
177:15
**Eddy** 1:18 9:19
214:3,21
**edit** 103:22
**edited** 104:2
**edits** 39:11 109:15
110:6,22 111:20
111:21 122:11
**effect** 58:3 178:7
**effectively** 89:22
**eight** 16:6,19
**either** 23:10 36:5
37:14 39:12,17
52:11,16 112:4
128:18 138:19
192:16 204:11
**EI** 140:21 206:9
**elaborate** 75:19
**Elaine** 8:8
**election** 120:8
**element** 177:12
**eligibility** 59:1,3
**email** 5:13 6:4,4
7:10,10,15,15 8:4
40:14 65:21,22
66:6 68:7,13,16
69:7,18 71:16
72:13,14 73:14
77:18 79:22 80:3

83:8 88:5,14 89:4
89:11,14 91:22
93:4,10 96:1
97:15 98:3,12
100:18,19,20
102:22 103:16
105:4,21 160:21
162:8,10,16,20
164:5,20 167:9,15
169:3,11 175:2
179:15 181:9,11
181:16,18,22
184:7,20 185:14
187:18 188:5
189:13,14 190:15
**emailed** 185:8
**emailing** 163:17
190:16
**emails** 88:6,7 93:7
167:21 186:8
**embassies** 16:12
**Embassy** 17:22
19:8,18
**emphasize** 96:19
156:4
**employed** 20:5
214:11
**employee** 23:18,22
**employees** 20:1
50:11,18 51:2
56:13
**employment**
135:13
**employment-based**
20:17 21:22 23:9
**encapsulates**
130:11
**ended** 28:7,7 153:1
**enforced** 175:20
**enforcement** 152:5
**engage** 37:17
**engaged** 47:16
**engages** 45:8
**enjoyed** 23:1
**entail** 16:7 19:20
**entailed** 16:9



entails 16:18 51:9
entire 27:6 30:9
  33:14 65:6 170:14
  173:10 175:15
  211:7
entirely 131:18
entirety 52:18
  129:19
entities 34:7 72:3
  145:17
entitled 57:16
  177:20 181:11
entity 38:13 45:17
  48:1
entry 16:14
environmental
  15:3 42:12 155:12
  165:2,4 166:21
  167:2 170:15,20
  172:22 173:19
epidemic 42:11
  173:1,8,9
ERRATA 211:1,11
ESQUIRE 3:4,5,14
  4:4
essentially 79:19
  164:1 168:13
  178:20 192:5
established 51:10
establishing 158:18
estimated 179:16
et 1:5,10 9:8 70:6
  155:14 158:6,6
  203:13
event 59:20 157:4
  167:20 199:21
events 59:19 200:1
  200:2
eventually 70:20
  108:2 204:3
evidence 63:20
  114:9 117:15
  126:18 129:8
  136:17 149:1
  153:7 160:2
  197:10,22 200:5,5

evidently 104:1
exacerbated 119:7
  126:1
exact 30:2 50:4
  66:16,20 68:2
  82:5
exactly 26:5 49:20
  171:21 174:8
  187:13
EXAMINATION
  5:1,3 10:19
examine 148:13,18
  179:8
example 20:18
  33:10 38:7 140:19
  155:11 173:9,15
examples 20:20
exchange 20:19
  91:6 181:9
excised 106:6
exclamation 94:18
excuse 40:21 48:17
  55:16,21 59:20
  85:18 88:6 112:13
  127:22 148:16
  175:5
executive 30:18
  33:9 38:5,19 91:4
  110:18
exhaust 92:8
exhibit 5:9,10,13
  5:17 6:1,3,4,9,14
  6:18 7:1,3,4,10,15
  7:20 8:1,3,4,8
  40:4,5 57:14
  65:12,13 74:18
  83:13,15 84:1
  86:10,16 100:11
  112:9,10 121:12
  122:5 129:16
  131:12 132:9
  160:14,16 163:11
  166:15 167:19
  181:1 183:16
  185:19 188:19
  189:1,18 201:7

209:15
exhibits 40:11
  189:17
exist 43:6 202:5
  203:16
existing 104:13
  118:17 152:5
exists 74:21 118:1
  179:11 204:9
experience 18:22
  19:4,5,12 73:16
  73:17,18 109:19
  110:3,15 156:20
  172:14 180:4
expert 29:2 56:4
expertise 50:2
  53:16 54:2
experts 47:15,17
  49:21 53:6
expiration 69:1
expire 64:5
expires 214:17
expiring 64:17
explain 35:11 38:2
  110:11 147:1
  163:16
explaining 192:21
  195:7
explanation 105:13
explicitly 99:16
  151:6
explore 145:10
express 91:5 169:3
expressed 134:17
  202:19
expressing 96:13
extend 48:21,21
  74:8 78:22 79:1
  118:16 134:18
  158:15 187:16
extended 57:19
  63:5,16 64:1
  178:1
extending 94:21
  135:13 197:11
extension 5:18 44:6

72:5 93:22 95:1
  117:11,18 118:9
  144:6 188:15
  195:22 204:18
Extensions 44:1
extent 32:22 45:12
  47:9 53:19 54:18
  55:3 58:13 63:19
  70:8 71:21 76:4
  79:8 80:2 81:18
  81:20 82:12 84:15
  85:11,21 87:21
  89:15 97:20 98:7
  102:1 104:20
  106:11 107:1
  108:9 111:15
  113:21 115:10,11
  115:12 117:13,14
  120:19,20 123:3
  124:10,22 125:1
  126:8,21 127:18
  128:14 131:1,2
  133:5,7 134:7
  135:20 137:4
  138:15 139:7,9,9
  139:22 140:12,14
  141:18,19 142:2
  144:2,15 145:4,16
  148:21,22 150:3
  157:7,17,20
  162:22 164:17
  166:3 167:18
  168:17 170:6
  177:3 183:5 184:6
  191:10 192:9
  200:6,11 202:12
  209:2,11
extraordinary 43:7
  74:18,22 94:9
  117:19,20 118:2
  148:8 156:20
  165:18 166:20
  171:4 173:22
  179:10 188:11
  201:19 202:4
  203:10 204:20

## F

face 95:21
faces 119:6 125:22
fact 33:1 44:18 54:6
  77:20 79:7 83:6
  89:16 95:14
  115:22 119:21
  120:14 121:1,4
  130:5 148:8
  165:15 170:6
  174:9 177:2 180:3
  180:10 195:15
  209:19
facto 90:3
factor 155:5,8,19
  155:20 199:22
factors 145:10,16
  146:4,6 148:13,19
  151:15 172:12,15
  178:13 188:10
facts 63:20 99:13
  99:17 114:9
  117:15 126:18
  129:8 136:17
  149:1 153:6 160:2
  174:8 198:3 200:4
fair 53:22 54:21
  55:6 119:12
  145:14 207:10
fairly 198:2
faith 88:22
falling 29:6
familiar 41:2 42:3
  42:22 43:15 44:7
  58:7 202:8
familiarize 40:13
familiarized 122:5
family 22:20
fantastic 19:5,12
far 47:19 50:17,18
  142:4
fashion 165:11
fast 19:14
February 28:5,8
  30:2 65:7 120:8



**Fed** 199:6,15
**federal** 10:10 15:2
  40:20 63:12
  199:13 200:10
**feel** 48:11 101:18
  125:7
**feelings** 97:4 99:6
**Feinstein** 81:12
  82:4,17
**felony** 79:12
**felt** 96:22
**field** 37:12,20 47:15
**filled** 36:8
**final** 37:12 47:1
  48:7,8 74:12
  111:12 121:10
  124:6,20 126:5,15
  127:4,15 129:3,16
  152:1 154:2,9
  201:4 203:5
  209:15
**finally** 43:5 80:6
  120:5 161:22
**financial** 214:12
**find** 118:1 188:17
**finds** 41:19 42:10
  43:6,11 74:21
  75:8 155:13
  176:17
**fine** 11:9 108:4
  185:17
**finish** 12:5,7 45:9
  205:18
**finished** 95:3
**finishing** 17:18
**firm** 14:17 15:7,8
  21:3,4,5,7
**first** 7:5 13:19
  14:15,16 17:9
  29:13 32:8,15
  45:16 66:4 73:12
  81:17,18 88:13,15
  95:2,10 97:1
  99:18 103:6
  104:11,12,17,18
  105:4,6,11,22

112:6 117:3
123:19 124:8
132:12 158:5
162:8 182:14,17
185:12 190:15
193:18 200:4
**fiscal** 152:8
**five** 17:12 18:19
  52:3
**flood** 42:11 155:1
  155:14 170:19
  173:1 174:2
**focusing** 204:18
**following** 69:2,10
**follows** 10:18
**foregoing** 214:5,6
**foreign** 15:22 16:2
  19:22 20:5 42:15
  42:19 43:8 57:19
  58:1,2 67:4 75:1
  118:3 133:14,22
  134:2,9,14,17
  138:8 140:20
  141:8 155:15
  165:5 169:18,21
  178:1,5,6,21
**foreigners** 176:2
**forget** 173:11
**forgetting** 36:14
**forgoing** 94:16
**forgot** 36:6 112:14
**form** 127:2
**formal** 39:9 56:12
  68:6 116:18 193:1
  196:20 197:19
**formally** 173:20
**formed** 156:21
**former** 89:21
  183:19
**forms** 52:15
**forth** 59:2 70:5
  80:7
**forward** 19:14 64:3
  181:16,22
**fourth** 80:6
**frame** 86:4

**Francis** 1:14 2:1
  5:14 6:15,20 7:11
  7:16 8:5 9:6 10:17
  11:3 88:9 211:19
**Franklin** 4:6
**fraud** 54:15
**free** 101:18 125:7
**frequency** 154:5
**frequently** 110:4
**front** 31:18 32:10
  32:17,18 33:4
  34:1 35:16 36:3,7
  36:15 38:10,12,17
  38:21 39:1 91:17
  91:20 112:1,5
**frustrate** 198:15
**full** 11:1 13:1,11
  54:8,18 117:3
  151:19
**fully** 50:4 82:2
**function** 38:6
**functions** 33:9,13
  35:11,21 51:2
  53:8
**fundamental** 52:2
**further** 39:12 41:15
  117:6 119:3
  123:22

---

**G**

**G** 9:1
**gain** 53:16
**gather** 69:22 163:7
**gauge** 122:21
**gender-based**
  128:2
**Gene** 5:13 6:6 66:4
  66:5 73:14 88:8
  92:2
**general** 21:4 29:6
  40:9 41:19 42:10
  43:6,10 45:22
  57:21 58:16 68:22
  70:3 76:17 77:5
  90:13 92:20
  101:17 102:4

107:13 110:14
111:18 131:5
143:16 144:5,13
161:19,20 171:5
176:16 178:3
180:5
**generally** 11:7 19:1
  31:12 32:16 33:3
  33:18 62:15 63:22
  64:19 83:2 91:20
  92:19 103:16
  134:7 137:22
  138:4 139:19
  140:9 141:4
  143:14,21,22
  200:17 202:15
  206:3,5
**generated** 196:12
**Georgetown** 14:9
**getting** 27:3 36:20
  113:3 187:17
**give** 13:1 86:14
  121:10 129:10
  154:8 166:14
**given** 38:17 39:1
  44:14 45:13 68:6
  81:22 103:4 109:8
  138:17 157:19
  168:22 191:12
  204:7 214:7
**giving** 85:2 154:10
**glean** 34:15
**gleaned** 71:11
**go** 12:2,14 39:16
  40:3 41:9 61:2
  81:1 100:3 105:6
  129:1 151:1 161:4
  162:6 185:3
  192:19
**goes** 14:18 47:6
  56:22 79:6 105:21
  110:19 112:2
  116:7 126:17
  127:2 133:5
  144:22
**going** 16:13,15 18:4

41:9 57:8 62:18
70:12 73:18,19
86:14 90:9,10
91:22 92:17 96:7
100:4,14 102:22
113:1 121:20
126:7 147:14
163:7 192:8
208:14 209:8,20
209:21 210:6
**good** 9:5 10:21,22
  173:9
**govern** 56:13
**government** 10:7
  10:13 22:22 57:22
  74:11 78:2 85:21
  108:10 110:14
  111:15 113:21
  115:10 116:2
  117:5,13 120:9,19
  123:21 124:18,22
  126:9,17 127:10
  127:18 128:14
  129:5 131:1 134:8
  137:4 138:12,16
  141:18 142:12
  144:2 148:18,21
  164:17 166:22
  168:18,20 173:20
  174:4 178:4 183:4
  185:21 207:9
**governmental**
  45:13 70:8 77:1
  78:15 80:1,13
  84:15 85:11 95:13
  97:3,21 104:22
  139:7 140:1,12
  157:18
**government's**
  131:17
**grab** 112:13
**graduate** 14:5,6
**graduated** 14:12
**granted** 28:16
  78:19
**Grassley** 27:20



28:12 61:16 62:7
207:11
**great** 37:20 170:17
**greatly** 54:10
**ground** 12:3 48:19
88:21 97:5 119:21
120:14 121:1
**grounds** 52:3 81:19
95:11,18 98:19
116:1 118:20
140:14 142:12
163:3 164:19
169:1 185:20
195:22 199:9,16
200:9 204:8
**group** 19:21,22
20:3,7 21:7 24:7
26:3,6 28:4 30:5
33:4 53:11 62:1,1
64:20 71:15,16
73:6 74:4 92:8
141:10 162:19
190:16 193:7
**groups** 26:4 73:9
82:19 205:22
206:15
**guess** 21:9 33:11
55:15 100:2
105:21 109:12
122:21 139:15
145:9 152:9
156:16 169:16
181:8 186:5
202:18 204:2,16
**guidance** 37:12
**guidelines** 56:12,18
**guy** 95:2

**H**

**H** 5:7 212:1 213:1
**Haiti** 7:21 8:10
17:10 18:5 60:8
60:10 61:1 62:19
62:21 64:4 69:2
69:10,11 88:20
95:16 106:22

109:7 113:11,18
114:4 115:16
117:17 119:5,6
120:6 125:22
127:10 133:3,14
137:10,15,19,21
138:4,19 139:4,20
140:19 143:5
144:17 147:21
148:1,1,9 149:20
151:9,14 152:14
152:20 154:21
156:7,17 158:14
164:7,11 165:12
165:17,17 166:9
168:7 173:19
174:11 180:7
187:17 189:9
191:3 193:6
197:12 198:21
201:16,20 203:7
203:11 205:22
206:3
**Haitian** 18:15
137:9 148:10
152:4 159:20
166:22 184:18
**Haitians** 117:7
124:1,19 148:14
150:11 151:21
152:8 186:12
193:9
**Haiti's** 5:18 120:8
156:22 158:8,15
166:17
**half** 15:13,19 18:3
21:10 22:7 31:11
**Hamilton** 5:14 6:6
66:4,5 69:7 71:17
73:14 80:19 83:8
88:8 92:2 93:5
100:20 102:10
**Hamilton's** 71:22
**hand** 169:13
214:15
**handful** 52:12

**handle** 23:5 42:16
51:8,17 108:20
155:16 164:8
165:5,14,22
169:19 170:14,22
171:8,18 173:6
174:22 185:5
186:15 187:14
**handled** 15:2,17
20:7 21:19 171:13
**handling** 201:20
203:12
**Hang** 75:4
**happen** 55:22
90:16 110:4
**happened** 95:8
96:5 100:17 136:8
139:13 140:18
141:5 158:21
195:13 196:2,2
**happening** 89:3
**happens** 116:4
**happy** 185:15
200:15,16
**Harrisburg** 14:19
**head** 12:4 19:21
50:9 66:14,19,21
66:22 72:1 90:1,3
92:7 95:2 135:22
168:3 190:13
**headquarter** 90:22
**headquarters** 24:8
61:12,15 64:14
65:9 72:3 90:14
92:20 99:5 107:16
143:12
**heads** 73:9
**hear** 32:16 137:6
**heard** 89:4
**hearings** 190:20
**held** 2:1 24:4,5
134:15
**help** 45:10 55:18
81:14 200:17
**helped** 91:20
**helpful** 33:16

**helping** 50:22
**helps** 132:3
**hereof** 211:11
**hereunto** 214:14
**high** 50:13 128:3
**highlight** 93:17
94:2,11 124:16
127:21 130:13
**highlighted** 105:12
105:20
**Hill** 28:5 30:1 65:7
207:10 208:7
**history** 13:18
**home** 11:4
**Homeland** 7:8
22:10 24:1 26:16
58:16,18,19
119:17 157:13
176:16 193:12
**homes** 119:9
**horrific** 170:20
**House** 141:16
142:1,3,7
**houses** 171:2
**housing** 119:7
126:1 148:16
**hundred** 52:9
152:16 153:4
**hundreds** 82:18
187:12
**hurricane** 119:8
126:2 156:7,8,9
158:20 196:2
**hurricanes** 156:3
156:11 195:12
204:22 205:13
**hypothetical** 56:6
59:10 76:5 77:3
167:14

**I**

**Ian** 181:22
**ICE** 25:4 46:1
143:14,15,20
144:5,12 151:8,21
152:7 153:21

154:4,8,11,18
162:4 193:5
**ICE's** 152:4
**idea** 69:18 96:5
97:9 126:21
**identification** 40:6
65:14 83:16 86:11
86:17 112:11
121:13 131:13
160:17 181:2
189:2,19 201:8
**identified** 81:3
**ii** 42:15 169:20
**iii** 42:19
**illegal** 144:12
**imagine** 153:19
171:10 177:14
**imagining** 170:15
**immediate** 33:8
73:21 151:10
184:20
**immediately** 151:7
**immigrant** 18:9,11
18:14,16 21:20
23:10
**immigration** 4:14
10:12 18:11 21:6
21:13,15,16,19
22:3,16 23:10
24:6 25:2,5 26:6
26:15 28:4 29:7
30:5 62:1 64:20
67:9,9 92:1 94:6
163:21 168:1
176:10 177:9
205:21
**immigration-rela...**
23:6 29:3 45:22
**impact** 77:9 156:2
156:11,11 171:17
177:11,15
**impacted** 119:9
126:3
**impactful** 158:21
**impacts** 156:7
**implemented**



135:11
implying 102:10,16
102:19
important 142:20
impossible 120:3
inability 174:1
inaccurate 195:7
inclination 180:18
include 59:6 149:21
174:1 177:10,15
179:9
included 48:13
69:17 72:6,7
89:11 149:5,12
199:17
includes 47:14
129:15 151:3
162:10 178:13
including 20:4 33:6
38:13 46:20 59:17
128:2 146:12
156:2,7 191:19
194:20 202:1
inconsistencies
95:7 105:19
inconsistency
192:22 196:19
197:2,14,17,21
inconsistent 96:4,4
increase 81:14
increasing 117:8
124:2
INDEX 5:1 6:1 7:1
8:1
indicate 72:16
indicated 211:10
indicates 94:3
individual 25:12
individuals 22:2,6
33:5 71:15 94:4
162:19
ineligible 79:15
influx 152:13
inform 101:20
119:1
informal 165:10

169:11
information 34:12
34:15 69:19,22
71:10 74:5 75:13
80:4,21 81:1,14
82:10 83:1 99:15
117:10 130:1
137:7 148:7
183:18 191:3,7
192:6,10 196:8,12
201:22 203:18
205:16
informative 136:21
informed 45:1,5,18
129:10,10
infrastructure
170:18 205:1
inherently 145:20
initial 48:17 57:18
59:7 64:1 169:9
177:22
initially 47:6
initiated 37:15
initiative 37:15,16
initiatives 23:13
33:22 34:2 37:7
input 55:10,17
84:13 87:18
115:18 192:1
194:21
inquiry 81:11 82:8
inside 24:7 30:5
insight 34:17
instances 39:14
instantaneously
154:11
Institute 14:1
institutions 120:9
127:11
instruct 56:5 98:18
100:1 191:10
192:12
instructed 99:13
instruction 191:14
instructs 12:20
instruments 37:13

intending 185:2
interactions 141:12
interage 134:15
interest 22:22
43:13 75:11,16
76:1,13,20 77:11
78:22 80:10 83:11
90:15 144:6,14
176:19,22 177:13
178:15 179:12
214:12
interesting 19:9
internal 37:19
45:12 70:8 74:10
77:1 78:1,15 80:1
80:13 84:15 85:11
85:21 95:13 97:2
97:20 99:21
108:10 111:15
113:21 115:10
116:2 117:13
120:19 124:22
126:8,17 127:18
128:14 129:5
131:1 134:7 137:4
138:15 139:7,22
140:12 141:18
142:12 144:2
148:21 164:17
168:17,19,20
169:4 174:4 183:3
185:21 192:6,16
internally 96:2,4,10
international 14:8
15:18 46:21 47:18
49:12,22 52:8
53:9 67:2 197:18
interpret 170:13
interpretation
165:21 202:10
interpreted 166:5,7
168:10,13
interrogatories 7:6
131:18 163:1
interrogatory
132:12,14,16

intervening 59:19
200:1
interview 19:11
51:12,17
inter-agency 202:2
intra 111:13
introduce 9:21
invite 163:8
invited 163:12,14
163:18
involved 25:2 34:9
39:3 62:16 85:5
involvement 34:1
77:21 84:11,19
in-person 146:21
Irma 156:8
irrelevant 195:18
196:13
island 70:6 80:8
issue 62:17 70:14
88:19 89:19 90:6
95:15,16 136:10
168:2
issued 136:2 201:5
issues 28:17 29:3
53:17 61:17,21
62:2,9 97:4
167:22 187:3
202:21
issuing 154:17
items 81:5 205:14

_____

J

J 6:20
James 6:11 66:8,9
88:7 89:21,21
January 60:10
62:19 199:5,7,14
Jared 7:12
job 1:19 14:15,16
15:6,20 20:21
22:8,9,11,13,18
28:2 30:3,12
65:10 90:19
143:12,13 172:15
jobs 164:9

Johnson 15:9
joined 21:2
Joseph 3:14 4:4
10:5,8
joseph.dugan@u...
4:10
joseph.marutollo...
3:21
Judiciary 28:14
207:12
July 64:5,21,22
65:3 214:17
Justice 3:15 4:5
10:9

_____

K

K 2:8 3:7 9:14
Kaitlin 32:12 36:9
190:4
Kathy 7:17 35:9
67:18,20 161:12
163:13 207:2
Kaufman 21:4
keep 72:13 188:13
Kelly 84:9 85:3
101:15
Kelly's 5:17 183:19
kept 73:5 187:3,17
key 103:4 182:18
184:15
kids 70:2 76:16,18
77:14
kind 15:1,15 21:16
53:1 70:4 78:11
80:5 143:16
170:19 207:1
Kirkpatrick 14:18
15:5
knew 207:7,17
know 12:13 19:7,7
23:5 27:2 29:5
36:22 38:16 40:15
47:12,19,22 49:3
49:19,20 50:1,17
50:19 53:4,21
55:6 56:19 57:4



68:1,3 69:17
70:17,18 71:21
72:10 78:4,9 79:8
80:2,3,16 81:9
87:21 89:8,16
90:1 97:11 99:20
101:5,16 102:1
106:11 107:2
108:13,16 115:2
115:13,14 116:4,5
125:2,16 126:22
129:9,11 133:6
134:10 135:20
143:13,14,15
146:4 150:19
154:9 157:21
161:2 162:11,17
165:10 166:3,4
167:15 169:6,9,12
171:1 173:10
175:16 180:3
182:2,22 183:5,10
186:13 188:6
190:17 195:12
196:1 198:15
205:8 206:16
207:3,15 209:21
**knowledge** 49:15
54:5 56:11,17
63:11 70:15 136:1
**known** 147:6
**knows** 124:11
**Kovarik** 7:17 35:9
67:17,18 161:9,12
163:14 181:11,18
207:2
**K-A-I-T-L-I-N**
32:13

_____
**L**
_____

**L** 6:15
**lack** 109:12 114:15
120:9 127:11
171:17 172:13
**laid** 178:18
**language** 16:9,20

16:21 19:10 93:14
105:20 123:18
124:6,11,16,17
125:11,16,21
126:5,14 127:14
**large** 76:9 117:6
123:22 124:18
148:14 154:14
180:8,11,12,12
**lasted** 28:6
**late** 22:12 25:15,17
107:9
**law** 14:9,9,12,14,16
14:17 15:7,15,18
21:3,3,5,6,7,13,15
21:16 74:16 168:1
206:16,17,20
**lawfully** 153:20
175:6
**lawyer** 169:7
**lawyers** 147:1
**lead** 84:22
**leadership** 191:22
194:19 197:13
**leaked** 191:18
192:17
**leaking** 72:19
**learn** 19:10
**leave** 19:6 149:18
153:15,16,18,20
**leaving** 38:9 56:20
204:16
**Lee** 1:14 2:1 10:17
11:3 211:19
**left** 25:13 27:13
30:3,13 32:1
101:15 144:9
147:5 193:8
**legal** 1:21 9:18,19
23:6 24:14 49:1
60:1 63:1,8 79:6
83:4 119:16
120:21 126:19
129:7,17 136:16
146:17,17 152:18
153:7 170:12

176:6 177:4 179:2
187:5,22 203:2
**legislation** 29:5
**legislative** 23:12
190:13
**letter** 38:7 39:5
82:16,20
**letters** 82:18
**letting** 179:12
**let's** 40:3 57:5
65:12 76:17 83:13
86:6,7 100:3
112:8 123:10
206:5 208:8
**level** 16:14 34:5,6
48:19 78:18 91:8
92:20 152:13
156:12 159:2
196:3
**levels** 128:1 148:17
**Liberties** 93:1
**life** 13:18
**lifted** 184:11
**limit** 73:9
**limited** 5:18 59:6
72:14 74:3 88:20
120:11 127:13
151:22 175:8
**line** 18:10 110:6
212:6 213:5
**lines** 107:16,20
110:16,22 111:3,5
**list** 132:1 162:6
163:8
**listed** 69:22 74:6
132:21
**lists** 152:9
**litigation** 15:3
88:19 89:19 92:14
95:16,17 191:13
**little** 17:16 18:2
35:12 38:3 41:10
75:20 110:11
138:21 139:15
145:10
**live** 11:10 18:18

171:2
**lives** 11:8
**living** 42:14 193:9
**LLP** 2:7
**locally** 20:4
**Lockhart** 14:18
15:6
**long** 14:20 15:11
16:4,16 18:1 21:8
23:15 25:6,18
27:15 109:10
119:4 150:17
151:11 156:5
168:2 180:15
199:2
**longer** 46:16 150:7
156:19 202:5
203:16 204:9
**look** 43:21 90:12
101:18 110:21
112:1,6 123:15
125:7 132:2,12
169:7 176:1 179:7
188:4,20 208:9
**looked** 88:10
123:12 146:18
149:14 156:9
169:10 205:2
**looking** 70:16
93:12 113:18
129:15 140:17
156:5,6 171:5
173:7
**loop** 90:5
**Lora** 32:7
**lose** 79:15
**lot** 23:12 32:17
167:21 193:3,15
194:11 196:22
**loved** 19:4
**lunch** 100:6
**L-O-R-A** 32:8

_____
**M**
_____

**Magna** 1:21 9:18
9:19

**main** 193:5
**major** 14:2
**majors** 14:3
**making** 45:1,5,18
74:1 82:8 95:22
97:11 107:7
119:14 122:11
148:12 158:14
159:15 186:17
199:10
**manage** 91:20
**managed** 20:3
**management** 33:13
**manages** 33:21
**manifested** 196:13
**manner** 37:13 39:9
130:6 147:7
**March** 17:14
**Marcus** 3:5 10:3
**mark** 40:3,10,65:12
83:13 86:6 160:14
**marked** 40:5 65:13
83:15 86:10,16
112:10 121:12
131:12 132:9
160:16 181:1
189:1,18 201:1,7
**marry** 150:17
**Marutollo** 3:14
10:5,5 11:6 19:2
20:13 24:12 26:19
28:20 30:21 31:3
31:5,14 32:20
35:13,22 39:22
42:6 43:2,17 44:9
44:16 45:11 47:8
48:5,22 49:7
50:15 51:4 53:2
53:18 54:3 55:1
56:3,15 57:2,7
58:12 59:9,22
60:12,19 61:2,9
61:18 62:22 63:7
63:18 64:9 69:5
69:12,14 70:7
71:4,6,19 72:22



73:11 74:9 75:4
76:2,22 77:16
78:14 79:5,20
80:11 81:4,17
82:11 83:3,18,22
84:14 85:10,20
87:6,19 88:15
89:13 92:11 95:9
97:1,19 98:6,13
99:8 101:12,22
102:13 104:7,19
105:15 106:2,10
106:19 107:10
108:8 109:4,22
111:14 113:5,20
114:8,22 115:9,20
117:12 118:12
119:15 120:16,18
122:14 123:2
124:8,21 125:13
125:18 126:7,16
127:17 128:9,13
129:4 130:14,22
132:8,11,16 133:4
134:6 135:18
136:5,15 137:3,17
138:1,14 139:6,21
140:11 141:17
142:11 143:6
144:1,21 145:13
147:13 148:2,20
150:2 152:17
153:5 155:2 157:6
157:16 159:22
160:9 162:21
164:16 166:11
167:17 168:16
170:5 172:4,17
174:3,14 175:13
176:4 177:1
178:22 179:22
183:2,13 184:5
185:11,17 186:21
191:9 192:8
194:14 197:5
198:20 200:3,20

202:11,22 205:4
206:1 207:5 208:1
208:4,10 209:1,10
210:3
**Maryland** 11:10
**Massachusetts** 14:1
**master's** 14:7
**material** 201:2
202:20
**materials** 136:4,9
145:2 168:21
**matter** 9:7,7 29:2
31:13 38:15 47:14
47:17 49:21 53:6
63:14 102:5
107:13 111:18
124:12 144:5,13
211:8
**matters** 15:17 20:7
23:7,11 25:2 29:6
163:21 207:16
**Matthew** 119:8
126:2 156:7
**Mayer** 2:7 3:6 9:16
10:1,4
**McCament** 6:11
66:8,10 104:12
**McCament's** 87:12
**mchristian@may...**
3:11
**mean** 29:15 31:8
35:12,15,15 38:3
58:11 76:3 82:13
83:7 92:16 103:15
110:12 111:7
118:14 130:4
135:19,21 143:10
145:14 153:14
164:6 166:1 174:7
176:22 193:17
194:13 203:19
205:14
**meaning** 38:22
**means** 39:8,15
59:12 103:12
164:10 165:21

**meant** 72:21 174:8
194:16
**media** 54:13 191:18
192:4 197:9 198:5
**medication** 13:10
**meet** 59:1
**meeting** 68:19,20
133:12,13 134:5
134:12,15 135:1,1
135:3,15 136:7,11
136:13 137:7
140:20,21 146:21
162:9,12,15,17
163:7,13,18,20
168:6 181:12,14
182:4,6,8,11
188:8,17,22 189:9
205:20 206:6,11
**meetings** 37:18,19
85:18 86:3 131:4
131:7 132:1,4,21
133:2,10 137:13
138:4,5 140:8,17
141:8 143:4 162:7
207:22 208:3
**meets** 121:7,7
**member** 38:8 39:5
39:17
**members** 82:18
**memo** 38:7 46:22
47:4,5,7,10 48:8
48:11,12 49:18
50:6 55:11 56:1
86:14 87:1 92:9
92:16 93:2,16
94:19 95:4,7 96:1
96:13,20 97:17
98:5 99:5 101:17
101:19,21 102:2
102:11 103:17
105:7,22 106:5,7
106:8,13 107:14
107:17 108:2,3,7
108:16 111:11
112:4 113:4,8,17
114:19 115:7,19

116:5,12,13,14
117:4,20 118:15
129:13,14 130:2,3
130:8,8,21 133:11
136:14 137:14,16
137:20 138:11,21
139:1,5,18 145:12
146:11,16,20
148:7 149:6,16,18
151:16,20 155:22
156:1,1,14,16
158:12 166:8,12
166:15 167:11,19
168:19 174:11
181:15,22 182:3,6
182:10,21 183:1
183:10,16 184:2,3
184:6,12 185:8,10
186:9,10,18 193:2
193:15,19,20,21
194:1,2 195:11,19
196:15,19,21
197:3,20 199:16
202:21 203:22
205:3,10 209:15
209:16
**memorable** 19:13
**memoranda** 37:10
90:8,10,20
**memorandum** 6:10
6:14,19 7:20 39:6
46:9,10,17 90:8
90:12,21 116:17
151:7
**memory** 81:21 82:2
132:4 133:1,7
**memos** 38:2 49:6
51:1 52:22 53:6
55:20 57:1 87:2
92:17 115:16
**mental** 13:5
**mention** 103:7
172:11 186:14
195:20
**mentioned** 29:8
32:10 35:10,17,19

36:20 49:11 58:7
67:19 70:22
143:20 149:16
151:6
**mentions** 68:16,17
183:18
**Mercy** 206:7
**met** 58:6 93:21
94:10 178:10
179:6 207:7 209:5
**Michael** 67:6,7
**Michele** 1:18 9:19
214:3,21
**Microsoft** 103:21
**middle** 128:7
**million** 152:21
**mind** 80:20 132:2
177:17 191:14
**minds** 170:12
**mine** 170:12
**minister** 133:14,22
134:2,9,14,17
138:8 140:20
**ministers** 141:8
**minutes** 101:19
**mischaracterizat...**
197:8
**mischaracterizes**
110:1 124:9 160:1
172:5 200:5
**misdemeanors**
79:12
**missed** 60:21
**missing** 95:4
124:16
**mission** 52:19
**misstates** 47:9
80:12 87:20
**misunderstanding**
153:11
**module** 16:11,16
**moment** 206:15
**Monday** 68:17
181:13
**month** 16:16
**months** 16:6,19



25:21 58:21 117:8
124:2 206:11
**morning** 9:5 10:21
10:22 83:21
**motion** 99:12
**mouth** 26:11
**move** 87:2 108:4
112:8 159:14
207:18
**moves** 38:5 48:15
**moving** 38:6 64:3
**multiple** 34:3,11
114:2,4 177:8
**musings** 167:9
168:9 169:9

**N**

**N** 3:1 9:1
**name** 11:2 14:19
32:8 89:9 102:7
**nation** 173:10
**national** 43:13
75:10,16 76:1,13
76:20 77:11 78:22
80:10 83:11
176:19,21 177:11
177:12 178:15
179:11
**Nationality** 94:7
**nationals** 18:15
20:5,6 41:22
42:18 43:9 75:1
118:4 137:9
148:10 152:4
165:7 166:1
168:15 169:22
171:22 174:2
175:5 176:1
184:21 201:21
203:13
**natural** 72:10
**naturally** 72:5
**nature** 16:12 19:9
24:20 46:10 51:20
52:3 54:19 93:2
145:6 182:8

**Nealon** 88:7,9 89:8
89:10,21,21 90:6
91:8,19
**nearing** 180:22
**nearly** 149:21
**necessarily** 25:1
130:4 150:21
153:10 154:12
163:19 165:13
174:21
**necessary** 39:12
**need** 39:7 72:15,15
103:2,3,5,21
104:5 106:17
131:19 144:12
185:4 188:12
192:20 197:16
**needed** 97:13 188:1
195:1
**needs** 38:10 100:22
102:11 104:11
105:5 154:7
**negative** 129:1
198:7
**neither** 214:10
**never** 187:10
**Nevertheless** 64:16
**new** 1:2 3:17,19
9:10 10:7 22:18
27:12 137:7
183:20 195:22
196:3 203:20
**newly** 118:19
**news** 71:11 191:21
192:15 194:17
**Nielsen** 101:5
**nominated** 29:17
30:7,10 65:1,4
**nonability** 137:9
**nonextension** 144:6
**nonimmigrant**
19:17 20:1,8,12
21:20 23:10
**nonprofit** 205:22
**normal** 39:3 65:10
143:13 207:14

**normally** 61:13
62:5 64:15
**Northwest** 2:8 3:7
9:15
**notable** 134:2
**notarial** 214:15
**NOTARY** 214:21
**note** 32:21 88:16
94:1 95:10 129:13
149:17 151:6
162:21 189:12
208:10
**noted** 99:19
**notice** 2:19 11:13
63:13 199:6,13,15
200:10
**noting** 127:1
128:19
**November** 23:19
101:9 131:6
132:22 133:11,12
133:13 161:11
162:9 167:10
175:1 181:9,10,13
183:16 184:3,12
193:20 209:16
**Nuebel** 7:17 35:9
67:17,18,20 161:9
161:12 163:13
181:18 207:2
**number** 31:7 34:8
77:14 78:6 84:1
118:15 132:12,14
132:16 134:13
152:14,22 153:19
**numbered** 158:13
**numbers** 117:6
123:22 124:19
148:14
**nuns** 141:10

**O**

**O** 9:1 52:7
**oath** 11:16,16
211:13
**object** 12:19 44:16

45:11 88:21 95:14
95:17 97:21 108:9
116:1 126:7
128:13 133:6
134:10 138:15
139:22 141:17
142:11 144:1
145:15 185:20
192:9 200:6,9,20
209:10
**objection** 11:6 19:2
20:13 24:12 26:19
28:20 30:21 31:5
31:14 32:20 35:13
35:22 36:1 39:22
42:6 43:2,17 44:9
47:8 48:5,22 49:7
50:15 51:4 53:2
53:18 54:3 55:1
56:3,15 57:2
58:12 59:9,22
60:19 61:9,18
62:22 63:7,18,19
64:9 69:5,12,14
70:7 71:4,19
72:22 73:11 74:9
76:2 77:1,16
78:15 79:5,20
80:11 81:4,17,18
81:22 82:11 83:3
84:14 85:10,20
87:6,19 88:15
89:13,16 92:11
95:9,10 97:1,5,19
98:6 101:12,22
102:13 104:7,19
105:15 106:2,10
106:19 107:10,11
108:8 109:4,22
111:14 113:5,20
114:8,22 115:9,20
117:12 118:12
119:15 120:16,18
122:14 123:2
124:9,21 125:13
125:18 126:16

127:17 129:4
130:14,22 133:4
134:6 135:18
136:5,15 137:3,17
138:1 139:6
140:11 143:6
144:21 148:2,20
150:2 152:17
153:5 155:2 157:6
157:16,19 159:22
160:9 162:21
164:16,18 166:11
167:17 168:16,22
170:5 172:4,17
174:3,14 175:13
176:4 177:1,3
178:22 179:22
183:2,13 184:5
185:11 186:21
191:9 194:14
197:5 198:20
200:3 202:11,22
205:4 206:1 207:5
208:1 209:1
**objections** 7:4
109:8 131:17
**obviously** 98:20
128:19 185:7
**occurred** 95:8
191:13
**October** 22:13
23:18,19 29:20
65:6,8 158:20
**offer** 211:12
**offered** 29:1
**offering** 84:22
**offers** 108:19
**office** 3:16 10:6
22:14 24:7,21
26:1,15 27:6 28:3
31:19,21 32:11,17
32:18 33:4,6 34:1
34:6 35:6,8,16
36:3,7,15 38:11
38:12,17,22 39:1
45:21,21 46:7,18



46:20 47:1,13,18
47:19 50:7 55:8
66:15,21 67:12
72:7 82:9 88:3
90:3,12,13 91:16
91:17,21,21 92:7
92:20,22,22 93:18
96:12,15 103:12
103:21 107:18,22
108:7,15 109:1,3
110:4,5,19 111:2
112:1,5 114:11,12
114:14 115:3
146:22 161:13,20
206:21 207:11,17
**officers** 16:14,16
51:16,21
**offices** 37:19,21
46:19 47:21 52:11
52:13 55:10 90:11
91:1 116:6
**official** 66:17 72:9
91:15 99:7 200:18
**officially** 42:19
**officials** 92:2
134:14 138:13
190:17
**ogc** 184:16
**Oh** 185:11
**okay** 13:16 15:10
15:19 16:21 17:1
17:6 18:13 19:14
20:21 22:5,7
23:20 25:6,11,17
26:10 27:18 28:9
30:6,14 32:3
33:15,16 36:18,18
40:17 44:12 47:3
53:15,22 55:18
56:8 59:17 60:8
61:6 62:6,18,18
63:4 64:3,21
65:11,18,20,21
66:2,8,11 67:3,6
67:13,17 68:7,12
68:13,21 69:9,21

70:22 71:15 72:12
75:18 78:10,10
79:17 82:7,21
83:13,22 85:7,17
86:5,5,20,22 88:4
88:4 89:7,7 91:22
93:3,10 97:15
98:4 100:10,13
101:8,17 102:8,8
102:17,20 104:4
104:17 105:10,10
105:20 107:6
108:6 109:18
110:10 111:9
112:8,8,16,18,19
113:13 114:5,17
116:10,20 119:3
120:5 121:9,10
122:4,8,17 125:10
125:21 130:7
131:10 132:6,19
132:20 133:15,18
137:21 138:10,20
148:12 154:19
156:15 159:12
160:13 162:6
163:22 167:12
175:22 179:13
181:5,6,21 182:12
183:10,17,17
184:13,13 188:5
189:8,11,22 190:1
190:9,15,19 192:4
192:4,19,19 194:8
194:10 196:18
198:17 199:8,8,18
201:11,13 202:17
204:16 206:16
207:20 208:20
209:6 210:2,4
**omitted** 185:13
**once** 116:5 130:17
149:22 184:19
187:12 207:12
**ones** 46:4 63:14
110:8 154:17

177:17
**one-pager** 192:20
**ongoing** 41:19 94:7
**operates** 81:16 83:2
**Operation** 58:17
**operational** 39:4
135:8
**operations** 46:22
47:19 49:12 50:1
51:8 52:8 53:9,10
54:11 197:18
**opinion** 98:8 137:8
**opinions** 99:11
145:4,19 147:5,6
**opposed** 109:2
118:10 139:20
187:7,8 200:1
**opposes** 95:1
**OPS** 47:3 92:2
**option** 102:6 204:2
**options** 102:3
**OP&S** 50:7 88:2
115:3
**order** 45:14 103:22
138:17 144:4
145:22 154:2
**orders** 152:1 154:9
**organization** 24:2
206:7
**origin** 154:5
**original** 107:18
118:11,17 127:22
201:18 203:9
**originals** 103:3
**originated** 96:17
**originating** 59:19
91:3 107:22 108:7
109:3,11,14 110:9
110:19 111:2
157:4 199:21
**outbreak** 63:6
**outcome** 214:13
**outlet** 197:10
**outreach** 54:12
**outside** 82:19 98:20
115:5,14 138:12

139:4,19 140:5,6
140:6,7,9 141:1,2
141:7,13
**Overall** 19:11
**overlap** 171:15,19
**overlaying** 146:11
**overseas** 16:3,12
17:7 52:6,11,16
52:18 54:11 67:1
**oversight** 29:4
62:14
**owner** 109:12
**ownership** 109:20
114:6

---

**P**

**P** 3:1,1 9:1
**pace** 117:8 124:2
154:5
**package** 93:17
129:14,15
**packages** 88:10,17
**packed** 193:7
**packet** 146:9,9
147:2,9 149:5
159:17 160:6
184:9 194:8
205:10
**page** 5:2,9 6:3 7:3
8:3 41:12,14
43:22 57:15 74:17
93:16 94:1,15
104:11,13,13,17
105:5,6 116:20
119:4 120:6,6
128:5,6,9,11
131:22 132:17,22
151:20 156:15
158:5,12 166:16
166:19 177:19
182:7 212:6 213:5
**pages** 131:21 182:7
**paper** 38:6 93:13
195:6,10
**paragraph** 117:3
119:4,6 128:8

151:19,19 152:6
156:15 158:13
201:14
**part** 18:11 42:1
49:18 51:14 57:20
58:2 66:22 75:12
76:19 103:6
104:18 105:22
108:22 116:13,14
147:20 160:5
166:6 168:18
177:9 178:2,6
188:9 202:1
**particular** 24:16
71:18 122:9
129:22 145:18
177:22 180:8
**particularly** 155:4
**parties** 2:20 214:11
**partner** 21:18
**parts** 41:9 56:19,20
56:21 105:21
106:5,6 115:17
123:18 147:4
**pass** 40:10
**pasted** 183:20
**Patrick** 1:4 9:7
211:3 212:2 213:2
**pause** 61:14
**PDF** 104:1,14
**PDFs** 103:1
**penalty** 211:5,6
**pending** 12:17
141:22
**Pennsylvania** 14:19
**people** 19:11 20:4
30:20,22 31:1,7
33:6,8,11 35:18
36:15 49:14 50:8
51:10,15,17 52:9
52:9 53:5,13,15
61:22 72:10,18
74:2 76:12 77:10
79:10 93:5 96:20
97:10 105:3 118:7
120:3 121:5 140:6



140:8 141:2,7,9
144:8 150:6,11,12
150:20 151:4,4,9
151:14 152:14,14
152:22 153:2,11
153:19 154:8
155:8 156:12
161:3 162:20
163:6 166:4
170:22 171:6,9
173:6 174:19
187:7,12 190:18
193:6 197:12
198:13 206:7
**percentage** 76:10
180:8,11,13 193:8
**perfectly** 118:8
119:12
**perform** 44:13
49:13 51:3
**performing** 33:6
96:11
**period** 57:18,19
58:22 144:8
177:22 178:1
207:13
**periodic** 43:22 44:4
57:16 177:20
178:17 179:3
**perjury** 211:5,6
**permanent** 17:21
**permit** 142:5
**permitting** 43:11
75:9 145:1 176:17
**persecution** 52:2,3
**persist** 94:13
**person** 26:2 27:6
36:11 48:1 79:15
91:9 94:20 97:10
107:3 141:1
**personal** 42:2 54:5
98:7 99:6,11
100:15 170:9
175:16,20
**personally** 34:17
85:4

**persons** 119:10
126:4
**pertain** 106:22
**Petyo** 6:5 88:8
91:12,13 102:21
108:19 109:16
**phone** 138:11,19
**phrased** 95:12
98:10,22 99:22
145:7
**physical** 13:5
**physically** 170:21
172:1
**physics** 14:3
**piece** 194:7
**pieces** 103:4
**pitched** 135:9
**place** 51:19 56:12
59:15 60:6 96:6
164:7,11 168:14
184:17
**places** 52:12 53:14
177:8
**plaintiff** 10:4
**plaintiffs** 1:6 3:3
7:5 10:2,19 99:16
**Plaintiff's** 99:12,19
**play** 135:2 155:17
167:13
**played** 122:9
**Plaza** 3:18
**PLCY** 103:1,11,12
182:17
**please** 9:21 10:15
11:1 12:3,5,10
57:15 72:13,16
**plus** 163:14
**point** 25:22 26:5
27:19 71:1 77:5
81:11 82:4 94:18
95:22 96:7 97:11
108:3 116:22
121:17 131:21
151:2,17 155:19
158:3 165:14
166:1 169:6

180:11 184:16
187:5,5,6,14,17
187:21 188:1
192:11 198:17
201:13 205:19
**pointed** 151:16
**pointing** 105:18
**points** 118:16
143:15,20 149:11
184:1,10,11 185:9
186:4,8,11,16
193:5
**policies** 56:12,18
**policy** 24:6,7,21,22
26:6,15,15 27:5,6
28:3 30:5,5 31:21
35:7 37:7,14 39:6
45:21 46:7,18
47:13,15 50:7
55:8 66:15,17,22
67:1,10,12 71:16
72:7,9 88:3 90:4
90:12 91:16,17,21
92:22 93:5 96:12
96:15 103:12,21
108:15 110:4,5
114:11 115:4
146:22 153:12
161:13 187:5
206:21
**political** 14:4 50:17
90:1,2 206:22
**population** 75:14
76:9,10 77:8 78:5
78:7,19 120:12
127:13 152:20
153:13 154:14
155:7 159:21
180:9,9,12,13
**populations** 154:4
180:5
**portfolio** 23:7
24:16,18,19 25:1
51:6
**portion** 120:11
127:13 164:14

176:13 186:19
**portions** 123:15
**Port-au-Prince**
17:11 18:18
**pose** 42:1
**position** 16:1 24:3,5
24:10,15,17 27:3
27:9 29:13,14,17
29:19 30:4,8
31:18 32:10 34:20
36:8 91:14 99:7
161:5,9 170:11
190:8 199:19
200:18 202:9,16
204:5 206:19
207:4,8
**positions** 111:13
**possibility** 159:10
204:2
**possible** 73:6
**possibly** 101:11
187:11
**postdates** 167:19
**posted** 16:3
**potential** 117:18
118:16 128:3
165:12 177:11
195:21 204:17
**potentially** 75:12
93:8 141:20
144:11 153:2
155:7 158:22
159:7
**power** 154:16
**practice** 15:16 21:5
21:12,13 73:7
109:1
**practiced** 21:14
**preceding** 156:3
**precision** 68:1
**preferable** 34:4
**prep** 72:13
**preparation** 73:4
**prepare** 49:6 51:1
114:21 198:13
208:21 209:4

**prepared** 113:9,10
114:7 196:8
**prepares** 47:5
**preparing** 73:8
**present** 2:19 4:12
59:20 85:17,18
159:10
**presented** 47:1
55:13 71:13 130:5
146:10 147:8
148:7 149:4
156:13 205:9
**presently** 13:4
**President** 1:8 9:8
**presidential** 120:7
141:20
**press** 200:15,21
201:4,11
**presume** 181:12
**pretty** 54:17
**prevent** 43:8 75:1
118:3,7 169:21
172:16 178:14
**prevented** 148:9
201:20 203:11
**preventing** 156:12
**previous** 130:4
196:17 207:8
**pre-earthquake**
193:7
**pre-TPS** 185:6
186:15
**prime** 96:14
**principal** 32:2 47:5
177:17
**principally** 15:2,17
16:8 23:8
**principles** 52:2
**prior** 29:21 47:9
85:8 97:15 113:19
123:17 124:9
138:20 139:5,11
139:17 143:8,8,9
145:19 160:1
**priorities** 152:5
**priority** 153:21



private 70:1 75:21
76:11
privilege 64:11
98:9 141:21 163:1
191:12
privileges 95:11
probably 21:10
25:9 103:3 104:5
208:9
problem 204:15
problems 205:1
proceeding 210:9
proceedings 153:8
154:1
process 22:3 45:8
46:6 48:4,10,17
48:19 49:5,10,19
51:1,17 52:4,6,15
54:22 55:17,18,22
65:3 87:2,5,22
90:7 91:5 95:11
98:9,19 100:17
106:7,12 107:6
108:2,13 109:2,10
110:18 111:4,6
113:2 116:13,15
128:20,21 136:3
139:1 145:2
154:12 178:17
198:16 202:2
prodding 72:18
produced 198:1
product 48:8 87:14
88:2
Professional 214:3
proffer 167:9
program 81:16
83:2
Programs 10:10
progress 156:18
project 34:8
projects 33:22 34:2
34:8
promoting 27:1
37:7
promotion 26:17

prompted 59:7
167:13
prong 45:9 74:19
117:21,22 155:12
164:22 165:2,4,13
165:16 166:2,5,6
167:6 168:7
169:14 170:15
171:3 172:21,22
173:19 187:13,15
prongs 59:3 173:4
pronounced 66:12
pronouncing 89:8
proper 198:15
propose 110:7
proposed 37:11,17
48:8 111:3,20
prospective 51:12
protected 5:11,20
8:10 40:22
protection 52:1
protracted 154:12
provide 11:7 13:11
79:9 84:12 87:17
115:18 120:10
127:12 158:2
provided 116:17
118:22
provides 117:22
158:1
provision 58:11
81:1 179:3
provisions 169:17
170:4
public 37:17 70:1
75:21 76:10
177:13 214:21
pull 72:16
purpose 24:21
purposes 69:20
pursuant 2:19
11:13 167:5
pushed 95:2
put 26:11 28:9,11
88:3 118:19
129:13 153:22

185:18
p.m 88:6 93:12
100:20,21 102:20
210:10
P.O 4:7

_____

## Q

qualifier 176:15
qualify 11:21
173:18,21
question 12:9,12,17
12:21 30:22 43:15
45:15 46:11 47:11
55:3,14 56:7
58:20 59:5,10,11
60:3 70:10 72:4
73:15 74:14 76:5
76:6 77:3,4,8 78:3
78:11,17 80:15,17
81:8 82:1 84:17
85:13 86:1,15
89:1 95:5,12,19
97:6 98:10,14,16
98:22 99:22
103:18 105:1
107:1 109:9
111:17 120:13
129:14 134:11
140:2 142:9,14
144:3,22 145:6,14
145:15,16 146:2,3
149:2 157:20
158:4 159:13
160:3 163:4
167:18,20 169:1
170:8,17 172:6
175:1 176:7 177:5
177:18 179:1,14
185:22 186:2,5,16
191:15 192:13
205:6 208:20
questioning 12:8
questions 12:6
13:14 56:6 62:13
66:2 84:7 91:2
100:11,15 105:10

123:11 135:7,8,12
145:1 176:13
201:5
quick 147:11
quickly 54:17
103:10 121:19
161:5 188:17
quite 36:1
quiz 123:14 124:15
quote 93:14
quoted 192:16

_____

## R

R 3:1 9:1 212:1,1
213:1,1
raging 173:9
RAIO 49:11,15,17
49:20 50:1,2,8,11
50:18 51:2,3,6,14
52:7,21 53:5,7
56:13 87:17 88:1
129:19 146:15
149:10 156:1
191:20 192:22
194:7
RAIO's 52:18
raise 188:7
raised 103:19
raising 188:13
ranging 21:20
54:14
rankling 168:3
rate 54:15 154:5
193:7
reabsorb 174:2,12
187:11
reach 52:20
reaches 108:3
reaching 146:4
react 111:4
reacting 187:19
191:17 192:2
194:18 198:5
read 39:9 41:8
63:12 69:7 77:5
78:13 161:1 164:6

164:10 178:20
179:7 181:5
185:15 187:1
189:22 195:2,3
201:14 208:12
211:6,8
reading 95:21
181:20
reads 94:20 203:6
ready 40:16 96:14
Reagan 134:16
real 169:7
reality 164:1
realize 99:9
really 54:18 70:18
99:6 126:19
129:11 138:9
146:8 154:16
155:10 161:4
166:1 168:8
169:15 173:16
174:7 187:4,20
188:17
Realtime 214:4
reason 12:22 64:18
69:20 126:13
128:22 171:10,11
173:17 187:9
188:14 212:6
213:5
reasonable 76:14
77:12 78:21
reasons 20:10
reassert 104:21
rec 103:8
recall 16:5 17:12
22:12,13 25:20
26:4,9 27:8 28:5
29:18 61:4,20
62:10,16 63:12
64:7 65:4 66:9
67:15 68:18,20
69:21 70:11 71:5
81:16 82:3,5,7,8
82:16 84:8,10,21
85:14,17 86:3



88:13 89:2,20
90:16 98:4 113:13
113:15,18 114:1,3
122:8,11,16,17,20
125:12,15 130:17
131:4,7 133:9
135:6,15 136:7
138:22 139:3,10
140:15,16,16,22
141:2,13 142:6,15
142:21 143:4,9,17
143:21 146:14,19
147:2 149:9,11
151:11 159:17
160:4,7,12,21
162:7 163:9
166:14 173:11
181:17,19 191:5
191:16,21 193:5
194:17 199:1,6,12
199:12,15 205:19
206:6,11 207:20
208:5
**receive** 52:16
154:14 155:6
**received** 82:17
180:6 202:1
**receiving** 154:6,7
**recess** 57:10 100:6
121:22 147:16
208:16
**recipients** 71:18
150:13,16 154:15
162:10
**recitation** 185:13
**recognize** 65:21
112:20 122:6
**recollection** 15:13
25:9 49:9 52:10
71:8,13 84:19
85:5 131:5,11
133:21 138:5
141:6 162:13
192:14 209:12
**recommend** 117:11
144:17 147:21

157:5 158:9 159:8
159:16
**recommendation**
46:12 48:12,13
87:8 94:17,22
97:17 98:5,15,17
116:18 129:21
130:12 136:20
137:1 142:21
146:13 148:4
149:3,7 174:17
193:1 196:20
197:4,19 203:17
**recommendations**
46:2 88:12 99:20
99:21 202:1
**recommended**
159:4
**recommending**
96:14
**recommends** 93:21
158:8
**reconcile** 191:2
**reconsider** 158:16
**record** 11:2,4 12:11
12:20 40:11 57:9
57:12 100:5,8
121:21 122:2
127:9 147:15,18
185:18 208:11,15
208:18 210:6
214:7
**recovering** 156:18
**red** 107:16,20
110:6,16,22 111:3
111:5
**redesignate** 118:18
158:13 204:17
**redesignating**
158:17 166:9
**redesignation**
63:16 156:22
195:22
**reduced** 214:9
**refer** 103:11 177:10
196:14

**reference** 69:3
**referenced** 165:16
**references** 69:9
114:18
**referred** 68:11
192:16
**referring** 69:8
109:16 151:18
152:11,12 157:7
162:8,14,18
175:10,15 182:2,9
182:22 183:11,15
191:6 192:15
193:19,22 197:3
**refers** 68:7 164:20
**refinalize** 108:1
**reflect** 12:11
**reflected** 130:2
**reflection** 163:12
168:11
**reflections** 170:10
**reform** 175:3
**reformed** 175:17
**refresh** 131:11
132:3 133:1
209:12
**refreshes** 133:7
162:13
**refugee** 46:21
47:18 49:11 51:12
51:21 52:5,14
53:8 54:14 197:17
**refugee-related**
51:8
**Reg** 199:6,15
**regard** 33:9
**regarding** 46:13
135:9 151:16
198:7
**regardless** 176:10
185:1
**Register** 63:12
199:13
**Registered** 200:10
214:3
**regularly** 115:18

**regulations** 37:11
37:11,12 39:21
**reinforce** 183:18
**reintegrated**
184:19
**reintegration**
184:21 186:11
**relate** 33:13 75:22
76:19 78:12 80:9
109:6 137:19
140:18,19 188:10
203:15
**related** 23:9 26:4
69:2,10 73:13
77:18 88:16 89:17
95:14 137:14,15
138:11 142:1
159:19 163:1
195:14 205:12
214:11
**relates** 67:1
**relating** 15:18
16:11 20:7 29:4
55:12 62:14 69:18
74:16 135:13
198:3
**relation** 69:11
92:13
**relations** 67:1,2
207:9
**relatively** 152:15
154:14
**release** 200:15,21
201:4,12
**released** 5:20 191:3
191:7 192:5
**relevant** 72:2 74:7
123:15 186:17
**reliance** 54:19
**relied** 147:8
**relief** 70:2 75:21
76:11
**relies** 54:1,22 55:16
103:7
**relieved** 100:14
**religious** 206:7

**remain** 43:11 46:14
46:15 75:9,15
76:12 77:11 128:3
150:15 153:17
168:13 176:18
179:12
**remained** 23:18
**remains** 22:21 94:4
164:11
**remark** 104:4
**remarks** 104:3
**remember** 14:11
27:11 65:22 66:15
82:12,20,22 85:7
89:3,6 101:14
122:22 123:4,6,8
133:12,16,17
134:1,4 135:3
137:13 138:3,7,7
138:8,10,18 139:9
139:14,17 140:21
143:1 162:11
181:19 188:7,16
188:21 189:9
197:9
**remembering**
187:2
**remind** 64:22
**remittances** 70:6
80:8
**remote** 53:14
**removable** 144:11
**removal** 126:11
151:21 152:1
153:8,21 154:1,2
**removals** 151:13
152:3
**remove** 154:3,4
**removed** 79:4
86:20 124:19
125:11,17 126:5
126:14 127:14
128:18 129:2
150:15 151:5,14
152:7,15 153:13
154:16



removing 151:8
193:6
Renaud 32:5
render 79:14
renewed 64:1
repeat 186:5
repeated 177:7
rephrase 135:21
replied 134:20
report 30:20 31:1,3
31:8,22 35:18,21
36:4,5 105:19
129:19 146:15
191:20 193:1
196:9 197:18
198:1
Reported 1:18
reporter 9:19 10:15
75:5 84:4 214:1,4
214:4,5
reports 31:19 32:2
36:11 71:11
reposes 53:11
represent 9:22
131:16
representation
125:4,9 126:12
164:14
represented 198:2
Representing 22:1
Republic 117:8
124:1 148:15
request 9:16 73:22
79:18 80:6 125:11
173:21
requested 28:13,15
37:15 42:20 74:6
166:22
requester 80:4
requesting 80:20
requests 34:10,12
34:13
require 34:1,11
112:1,4 184:17
required 58:19
159:3 184:21

201:21
requirement 60:5
78:13 121:7 167:1
requirements 94:5
165:3
requires 157:14
requiring 41:21
reread 89:5
research 27:18
47:6 48:19 49:13
53:7,16 54:9
56:14,22 87:17
146:15 149:10
194:7 195:10
researching 50:5
70:17
resettlement 51:13
52:5
resources 117:5
120:10 123:21
124:18 127:12
148:18
respect 46:5 50:8
74:5 75:19 97:2
105:12 111:10
113:17 157:15
191:1,6 195:21
198:3 200:19,21
respective 2:20
respond 111:1
184:13 186:10
191:1
responded 81:11
111:21
response 82:3,5
103:19 129:10
132:13 188:4
responses 7:5
131:17
responsibilities
19:16 30:16 33:19
37:3,4
responsibility
51:16
responsible 26:22
30:18

rest 105:7
resulting 42:12
resume 152:3
resumed 151:13,21
return 41:21 42:17
75:2 94:4 120:3
121:5 137:9 148:1
149:20,22 150:5
151:3 154:20
155:16 164:8
165:6,22 169:19
170:14,22 171:7,8
171:12,13,19
172:1,16 173:6
174:20,22 178:14
180:16 185:2
201:21 203:12
212:5 213:4
returned 21:1 30:1
30:2,4 155:9
returning 22:22
43:9 75:7 118:4,7
148:10,15 151:4
153:2 156:13
164:2 170:1
172:14
returns 117:7
123:22 124:19
185:5 186:15
reveal 191:11
revealing 209:2
review 37:10 38:1
39:13 40:11,18
44:1,4 47:2 48:7
55:13 57:16 58:1
58:19 59:4,13,16
59:21 60:6 65:19
84:5 86:19 91:1
93:19 94:2 112:17
116:15 121:15
127:2 131:19
132:7,18 160:19
177:20 178:5,17
178:20 179:3
181:4 189:4,21
201:10,16 203:8

209:6,8
reviewed 40:19
65:20 84:6 86:20
90:11 91:10 99:12
112:18 121:16
123:4,8,20 125:22
132:19 145:11
159:18 160:20
189:5,7 201:11
202:20 209:14
reviewing 39:19
55:20 99:5 113:13
122:17,22 123:6
136:3,9 205:2
revision 109:2
113:10 128:20,21
138:22
revisions 108:20
111:7 130:18,18
re-sign 104:12,15
105:6
re-signed 103:4
104:5 112:4
Richmond 21:3
Ries 32:7
right 17:15 24:11
26:9 32:4 35:3,7
65:11 66:12 89:9
92:6 96:9,18
116:19 130:10,16
142:4 160:20,21
167:7 172:3
173:14 179:19
186:12 189:13,15
194:3,6 199:4
Rights 93:1
Risch 67:13,14,20
rise 156:12 196:3
rises 159:2
Robert 206:16,17
206:20
role 19:20 23:16,17
25:7,8 27:15,16
27:17 34:2 36:21
44:13,22 45:20
46:20 48:4,7 50:5

55:19 60:18 68:6
85:1 88:2 91:18
122:8 135:2
140:10 142:20
190:5,7
roles 36:16
Ronald 134:16
roughly 20:3 28:5,7
routinely 39:3
rules 12:3
ruling 99:9,10
runs 27:6
R-I-E-S 32:8

S
S 3:1 5:7 9:1 212:1
213:1
sad 19:6
safe 121:5 147:22
149:20 171:6,9,12
172:16 178:14
safely 172:2
safety 42:2 43:10
75:2,8 118:5,8
120:4 137:10
148:11 151:16
154:21 155:9,19
156:13 170:1
171:17 172:14
173:8 174:1,20
177:13,15
Saget 1:4 9:8 211:3
212:2 213:2
Salvador 140:21
206:9
Sarah 4:13 10:11
save 211:9
saving 124:12
saw 90:17 105:18
115:15 136:22
207:16 208:6
saying 45:16
100:21 103:17
105:2 188:5 195:1
195:17 196:5,11
197:15 204:6



**says** 68:21 70:18
80:3 88:9 93:17
94:2 98:12 120:6
128:1 165:1
166:16,18 177:21
181:15,21 182:3
182:16 183:17,20
183:21 201:14
**scenario** 167:14
**school** 13:21,22
14:5,6,9,12,14,17
**school-aged** 70:2
76:16,18 77:14
78:6,6
**science** 14:4
**scope** 74:12 79:7
**screen** 9:13
**scribe** 48:1
**scrupulously**
175:19
**seal** 214:15
**second** 41:12 73:13
76:15 81:19 95:13
112:2 119:4
124:10 166:15
172:7,21 176:13
181:7 201:14
**secretariate** 38:5
38:20 110:18
**Secretary** 5:17 6:10
6:15,19 8:8 26:3,7
27:4,12 37:9
39:18 45:1,5,10
45:18 46:3,9,13
48:14 58:15,18
59:13 60:2 66:7
67:8 68:8,11 69:4
69:8,19 73:8,19
73:20,22 74:2,20
74:21 75:8 76:8
80:20 84:9 85:3
87:3,9,15 90:5,9
90:10 91:4,7 92:1
92:3,17 93:18
96:8 101:5,6,10
101:20 102:4,5,12

113:11 116:8
118:1 119:22
120:14 121:5
124:4 130:6,9,13
134:13,18,20
135:9,16 136:20
146:13 147:7
148:5 155:13
156:14 157:13
162:5 163:21
174:17 176:16
179:4,7 182:5,5
182:10 183:8,9,19
187:15 193:12
195:2 196:6,15
197:16 198:2,11
198:14,18 200:7
202:3,9 203:17
204:3 206:12,13
206:14
**Secretary's** 44:22
73:5 81:15 106:9
108:5
**section** 19:18 21:5
40:21 57:20 59:2
74:16,17 94:7,8
94:22 117:21
164:21 178:2
**sections** 41:10
**security** 7:8 22:10
24:1 26:16 58:16
58:18,19 119:17
157:13 176:17
177:11 193:12
**see** 36:21 41:12,14
59:12 66:1 71:2
86:7 91:6 92:21
92:21 124:6 132:3
172:19 179:8
186:4 188:16,18
188:21 189:8
**seeking** 18:16
52:17 99:17,20
**seeks** 55:17,17
80:13
**seen** 115:6,7

**selected** 204:4
**selections** 119:2
**Senate** 28:14 29:19
**Senator** 27:20
28:12,18 29:3
61:16 62:7,14
81:12 82:4,17
207:11,15
**send** 17:5 39:12
93:11 108:2
109:15 167:21
195:4
**sending** 51:9 163:5
**sends** 87:14 102:21
181:11 182:14
**senior** 66:17
**sense** 37:8 96:11
136:19 147:10
169:8
**senseless** 95:3
**sent** 17:9,19 51:11
66:6 96:8 100:18
100:19,20 107:15
107:18 110:8
133:11 146:20
162:16 175:2
196:15 199:17
203:6,22 205:9,15
**sentence** 127:21
166:17
**sentences** 185:12
**separate** 93:7
204:12,13,14
**separately** 14:4
**September** 152:2
**serious** 42:1 152:2
**servants** 50:12,20
**service** 15:22 16:2
22:22
**services** 1:21 4:14
9:18,20 10:13
22:16 54:20
120:10 127:12
**session** 147:12
**set** 7:6 59:1 64:5
72:15 214:14

**sets** 74:7
**settled** 26:14
**seven** 20:3
**several-page**
146:14
**Shah** 66:11,13
161:17,18 163:17
**shaking** 12:4
**share** 168:4
**shared** 134:9
**SHEET** 211:1,11
**short** 19:12 79:13
161:22 162:1,3
163:17,18
**shortage** 119:7
126:1
**shortages** 148:16
**SHORTHAND**
214:1
**shortly** 184:14
**show** 131:11 164:7
200:16
**showing** 69:1
**shown** 71:14
184:18 185:4
200:12
**sign** 39:15 48:14
100:22 101:20
102:6 106:7,17
115:19 146:7
208:12
**signature** 104:14
212:22 213:22
**signed** 102:11
106:15 113:19
116:5 122:12
124:7,20 126:6
127:5 129:3
130:17 137:14
145:11 151:20
166:9,15 184:3,4
185:9 186:10
193:20 204:3
209:15 211:16
**significant** 156:18
**signing** 48:11 113:4

122:18,20 130:9
138:20 139:5,12
139:17 202:21
205:3
**signs** 87:14
**similar** 51:22
**similarly** 28:15
**single** 184:18
**Sisters** 206:6
**sites** 53:14
**sitting** 103:8
**situation** 46:11
113:12 151:10
170:16
**situations** 34:4
171:14
**six** 16:6 17:12
18:19 19:6,8 20:3
**slow** 75:4
**small** 73:5,9 74:4
152:16,22 193:8
**Smith** 181:22
**snuck** 95:1
**sole** 85:1,1
**solicits** 55:9,9
**soon** 64:17
**sorry** 60:20 61:2
75:6 83:20 84:1
128:6,9 162:2
189:6 209:6
**sort** 18:13 19:19
20:17 28:17 34:1
37:2 45:6,8 50:12
51:1 56:12 71:16
91:19 99:7 114:6
122:22 154:22
164:1 170:2 186:9
186:12 197:3
205:1
**sorts** 20:10,20 23:8
26:17 81:13
205:11
**sound** 198:6
**sources** 114:20
**South** 88:11,18,18
89:18 92:13



speaks 58:13 69:15
73:1 95:18 97:22
104:20 157:8
166:12 169:17,20
176:5 184:6,7
200:10
special 33:22
specific 23:7 24:19
27:15 48:4 70:15
70:16 71:12 72:15
82:9,16 84:18
85:4 120:1 121:3
130:11 131:4
132:4 138:3,19
141:6 142:15
143:9,17 162:20
172:12 174:8
specifically 21:17
27:8 61:7 62:8,10
77:15 78:5 82:20
86:3 113:14,15
114:3 132:21
139:20 141:1
147:3 149:16
151:22 160:4
173:18
specificity 49:19
131:8 139:11
speculation 53:19
60:2 69:16 71:20
73:2 76:3 77:3,17
78:16 79:21 81:5
89:14 92:12
115:12 116:3
126:10 128:15
129:6 135:19
150:3 153:6
157:17 183:3
200:7 205:5
spelled 32:8
spring 70:12,22
77:22 190:5
staff 31:17 32:6,7
33:10 36:4,6,7,10
36:12,12 37:16
38:13,14,16 52:22

67:15 91:8,9
134:19 142:17
143:14,15 182:18
192:1 194:21
195:5 196:8
207:15 209:20
staffer 96:12
stage 107:9 109:2
109:21
stakeholders 37:18
54:12
stands 175:19,22
start 36:19 45:9,16
72:18,19 140:7
started 206:22
starting 23:17
86:22
starts 166:18
state 11:1 16:1,8
19:22 23:2 41:20
41:22,22 42:1,12
42:16,17,18,19
43:8,9,10 57:20
58:1,2 75:1,2,2,7
116:12,16 118:3,4
118:5 120:3
129:21 142:10,17
142:19 143:1
148:10 149:7
155:15,17 156:1
165:5,6,7,8
169:18,21,22
170:1 178:2,5,6
178:21
stated 81:13 97:16
99:16
statement 5:17
119:3,12 123:20
127:8 203:6
statements 117:1,1
129:1
states 1:1,9 3:16
9:9,9 10:12 15:22
18:17 21:2 22:15
41:18 42:9 43:12
43:14 51:18 52:5

57:17 72:13 75:10
75:11,17 76:1,21
79:4 80:10 116:12
116:13,14 117:5
118:15 151:5
176:3,18,20
178:15
State's 146:13
Station 4:6
stationed 17:7,8
19:15
statistics 34:13
54:13 71:14
159:19
status 5:11,20 8:10
40:22 44:15 79:10
79:16 144:10
150:6,7,9,14
176:11
statute 40:14,20
41:3,6,11 42:4
43:1,16 44:8
45:10 58:8,11,13
60:4 76:19 79:9
81:2 117:22
118:22 120:15
157:14 158:1
164:15 170:13
175:10,16,17,19
175:22 176:9
178:18,19 184:16
186:19 201:22
202:6,10
statutes 39:21
statutory 78:13
93:19 94:5 167:1
stay 150:20 164:7
184:17
stenographically
214:8
step 181:17
Steptoe 15:8,10,21
Stockholm 17:22
Stoddard 32:13
33:17,20 36:9
190:4

stopped 151:8
stories 191:21
194:17 195:2
story 191:18
192:15 195:3,7
straight 95:21
strain 124:18
strained 117:5
123:21
strategy 31:21 35:7
46:8,19 47:14
50:7 55:8 88:3
108:15 114:11
115:4 147:1
161:13 181:12,14
206:21
Street 2:8 3:7 9:15
stressing 184:15
strictly 24:9 187:22
strike 34:21 123:9
strong 22:21 51:11
strongly 94:20
struck 62:21
structure 26:1
31:22
student 20:15
studied 14:3 16:22
study 16:21
stuff 183:20
subcategories
41:15
subject 16:17 29:2
31:13 38:15 45:20
47:14,17 49:21
53:6 64:19 68:13
85:3 86:4 159:14
submitted 93:18
subparagraph
42:20
subparts 44:4
subpoena 11:13
subsection 42:4,15
43:1,16,21,22
44:8,15 57:15
58:3,5,8 81:3
176:14 177:20

178:7,9,12 179:6
subsequent 63:13
63:13 169:3 200:1
204:22
Subsequently 14:8
substance 104:2
209:22
substantial 38:10
38:21 39:6 42:13
127:3
substantially 37:1
substantive 143:17
170:3
successfully 120:7
Sudan 87:9 88:11
88:11,17,18,18,18
89:18,18 90:21
92:13,13 93:13
94:3,5,17,21
95:15 98:17,21
105:14 106:1
Sudan's 93:20,22
94:12
suffered 170:17
suffering 13:4
sufficient 120:10
127:11
suggested 107:16
110:16,22 111:7
suggesting 105:3
suggestions 116:9
suggests 191:4,7
suite 33:8
summaries 190:20
summarizing
172:10
summary 156:17
158:6 182:19
183:11 184:1
summer 88:1
superior 25:13
supervision 214:10
support 33:12
52:12 54:11,22
supporting 93:20
94:12



**supports** 53:7
94:20
**suppose** 118:19
171:2 188:3
**supposed** 163:6
**supposition** 180:21
**sure** 41:8 55:14
57:7 66:12 101:4
101:9 102:9 103:5
112:15 127:7
147:4,13 151:18
182:15 186:6
200:14 205:15
206:14 208:13
**surely** 78:20 112:6
**surprise** 83:21
**surprising** 127:4
**surround** 33:5
**swear** 10:15
**Sweden** 17:22 18:1
19:15
**Swedish** 16:22 17:1
**sworn** 10:18 65:9
**Symons** 35:5 67:21
161:14,14,15
163:16
**S-T-O-D-D-A-R-D**
32:13
**S-Y-M-O-N-S** 35:5
**S1** 68:8,10 192:21
193:11

**T**

**T** 5:7 212:1,1 213:1
213:1
**tacked** 93:6
**take** 12:15 21:12
22:17 29:10 40:12
40:15 43:21 57:5
65:17 76:17 96:6
100:2,3,21 109:1
109:20 121:17
123:14 125:10
134:21 147:10
188:20 197:21
198:6 208:8

**taken** 9:14 11:16
57:10 100:6
121:22 125:9
129:12 130:3
147:16 163:15
199:19 202:9
208:16 211:7
214:6,8
**talk** 141:10 165:11
188:13 196:14
205:22 206:3,8
207:14
**talked** 36:10 87:1
138:21 141:11
149:12 163:22
173:3 188:1 193:2
193:15 194:1,11
195:11,19 196:21
205:11
**talking** 60:20 135:6
141:6,13 151:3
153:12 165:1,9
166:2 181:13
186:9,18 194:4,17
194:19 197:15
207:19 208:5
**talks** 170:13 171:3
**task** 53:1
**tasks** 33:7
**technical** 29:1
135:7
**Technology** 14:1
**tell** 50:10 197:16
204:1
**telling** 91:7
**temporarily** 42:16
43:12 75:9 155:16
165:5 176:18
**temporary** 5:11,19
8:9 17:9,18 18:4,8
20:2,9,11,16
40:22 42:13 43:7
74:18,22 94:9
117:20 118:2
148:9 156:21
165:19 166:20

**171:4** 173:22
178:13 179:10
188:11 199:20
201:19 202:4
203:11 204:20
**ten** 97:10
**tens** 154:10 187:11
**tension** 202:18
203:5 204:6,15
**tent** 193:9
**term** 32:16 83:11
109:12 114:15
177:6,16
**terminate** 74:8
94:17 118:18
148:5 158:8,15
159:5 174:18
187:10,16 188:14
191:2 193:2
196:11,20 197:19
198:19,21 201:16
203:7
**terminated** 137:10
144:7,20 150:1,8
158:11 164:2
180:17 191:4,8
195:17 202:7
204:8
**termination** 44:5
72:5 79:10 94:13
117:11 118:10
135:10,11 144:17
147:21 157:5
159:16 187:7,8
199:11
**Terminations** 44:1
**terms** 107:6 113:3
134:8 138:22
145:1 169:18
202:19
**test** 81:21 82:3
**tested** 117:6 123:22
**testified** 10:18 36:2
**testify** 11:12
**testifying** 11:17
115:22

**testimony** 47:9
77:21 79:7 80:12
87:20 110:1
124:10 157:2
160:1 172:5 214:7
214:8
**text** 103:22
**thank** 30:14 32:14
33:15 36:18 68:12
86:9 116:19 121:9
159:12 179:13
210:3
**then-Assistant** 27:4
**then-director**
106:15
**thereof** 57:20 178:2
**thing** 72:18 76:14
77:12 90:15
131:19 158:21
171:16 174:21
188:6 201:15
**things** 23:8 39:4
54:16 70:16 72:19
105:18 118:8
129:12 135:14
155:21 156:5
172:21 173:1,2,2
173:3,4,7 191:20
193:3,15 194:11
195:12,13,18
196:1,22 204:14
205:11,12
**think** 12:22 26:8
31:10 36:1,16
37:8 39:11 49:17
63:19 66:14 76:7
76:13 77:5,12
78:18 80:12 81:10
82:22 86:6 90:17
98:13,13 99:1,8
99:21 101:6,7,9
102:15 104:9
107:13 109:22
122:4 126:13,18
128:22 135:12
138:21 145:13,14

145:20,22 146:19
151:6,18 159:2
161:3 165:10
166:11 168:1
169:2 170:15
172:2,4,20 173:8
180:20 182:9
184:15 185:4
186:1 187:2,18
190:2 191:16,17
192:1,2,20 197:7
198:1,4 199:5,14
202:22 203:4
204:14 206:1,12
206:14 207:12
**third** 95:17 112:2
**thought** 19:5 35:17
35:19 49:16 137:1
189:14 195:1,3
**thoughts** 163:5
167:22 168:4
169:2,6
**thousands** 154:10
187:11,12
**threat** 42:2
**three** 44:3,4 67:21
83:18
**Tillerson's** 93:18
103:8
**time** 9:13 12:13,16
12:19,19 16:10
22:18 23:1,14
27:7,9,10 28:19
28:22 30:10 34:14
38:17 40:12,15
59:16,21 60:6
61:5,7,12,15
62:12 64:13 65:6
65:17 66:5,9,13
67:7,14,22 68:2,6
70:11 71:9 72:8
82:13 85:16 86:4
87:13 89:2,5,20
90:18 91:14,17
96:14,22 98:4



99:4 101:6 107:14
108:12 109:7
112:2,3,7 123:14
124:12 135:16
136:1,8 142:8
143:11 144:18
146:20 153:3
156:5 161:6,11,19
164:9 168:3 172:7
175:7 176:3
180:15 186:12
190:12 204:10
206:13
**times** 52:14 63:17
64:2 112:3 206:12
206:13 207:8
208:6
**title** 26:10,14 27:3
66:16,20 67:10
68:6
**titled** 40:21
**titles** 68:2
**today** 9:12,17 11:12
13:2,7,12 37:5
113:3 202:19
208:22 209:21
**today's** 209:4
**told** 16:6 134:21
**tomorrow** 101:1
102:11
**top** 6:4 7:10,15
50:9 120:6 197:20
**topic** 81:12
**total** 152:7
**totality** 59:14
129:12
**totally** 166:2
**touch** 25:2 62:8
99:10
**touched** 29:7 99:11
**TPS** 7:21 44:15,21
49:14 53:6 54:22
55:12,21 59:3,7
60:8,10 61:8,12
61:17,20 62:2,8
62:10,19 64:4,15

68:14,17,22 69:11
69:18,20 70:13
72:4 74:8,19
78:19 79:3,10,15
79:16 81:7,15
83:2 87:9,11
88:10,17 93:20,22
94:6,12,17,21
111:10 113:12
115:16 117:11,17
118:17 133:3,12
134:18 137:10,21
138:4 139:4,19
140:9,15,19 141:3
141:6,11,14 142:7
143:5,16,21 144:7
144:7,17,19
147:21 148:1
149:20 150:6,8,11
150:12,13,14,16
150:22 153:1,12
153:13 154:15,20
156:22 157:5
158:8,14,15,17,18
159:1,20 164:2,6
164:11 165:3
166:17 167:1
168:13 173:13
174:12 175:3,4
180:6,13,17,19
181:11 184:17,22
184:22 187:4,7,9
187:10 189:9
191:2 197:11
198:22 201:16
202:6 203:7 204:7
204:11 205:22
206:3,4,5,8
207:21 208:2,5
**Tracy** 32:5 162:3
163:17,18
**trade** 15:18 67:10
**training** 16:2,4,5,9
16:10,20
**transcript** 5:8 40:7
65:15 83:17 86:12

86:18 112:12
121:14 131:14
160:18 181:3
189:3,20 201:9
208:12 211:7
214:6
**transmits** 34:10,14
**transmitting** 48:12
91:11
**travel** 37:20 70:5
80:7 154:8,10,18
**trick** 55:14
**trickle** 154:22
186:13
**true** 119:11 158:5,9
180:4 194:22
195:8 203:14
211:9 214:7
**truly** 86:2 133:20
138:18 147:8
**Trump** 1:8 9:8
211:3 212:2 213:2
**truthful** 13:1
**truthfully** 13:6
**trying** 22:2 55:15
104:10 122:21
165:11 195:9
198:12 205:17
**TSP** 164:8
**Tuesday** 88:5 93:11
**turn** 50:13 57:14
72:17
**turning** 44:12
55:19 60:8 88:4
116:20 166:19
**turnover** 50:13
**twice** 206:11
207:13
**two** 14:3,22 15:6,13
15:13,19,19 16:16
18:2 21:10 22:7
25:10,11,12 28:6
28:7 29:8 30:3
58:21 79:12 86:7
96:20 129:22
137:13 151:13

156:3 169:17,17
170:4 171:20
181:8 182:18
185:12 204:13
**two-year** 207:13
**type** 53:17 54:1
92:9 115:19
117:10 119:14
**types** 34:4 39:4
48:18 52:15 79:14
128:22
**typewriting** 214:9
**typical** 37:22 68:10
73:7 108:22
109:18
**typically** 21:21
23:9,11 36:11
92:16 107:17
183:7

———————
**U**

**Uh-hmm** 161:8
164:4 190:21
194:9
**ultimately** 159:9
201:4
**umbrella** 24:2
**UN** 193:7
**unable** 42:16
155:15 164:12
165:5 168:14
169:18
**unclear** 109:16
**uncommon** 73:20
**undated** 113:9
123:17
**undergoes** 127:3
**undergrad** 13:20
**undergraduate**
13:22
**underlying** 50:6
144:10 150:14
155:22 180:9
191:20 192:22
193:2,15,19 194:4
196:9,19,21

197:17 198:1,10
**understand** 11:11
11:15 12:9 28:12
31:21 46:6 47:13
50:4 55:15 58:10
58:15 60:4 81:10
87:22 95:6 101:2
103:11,15 105:2
106:12 129:11
157:1 186:2
**understanding**
45:3 53:5 54:8,9
63:10 69:4,13
72:20 73:3 79:2
79:13,17 80:9
81:15 83:5 89:12
100:17 115:3
176:8 180:5
200:22 211:12
**understands**
198:14
**understood** 12:12
82:2 91:18 109:10
**undoubtedly** 12:18
**unequivocally**
197:11
**unit** 129:19
**United** 1:1,9 3:16
9:9,9 10:12 15:22
18:17 21:1 22:15
43:12,13 51:18
75:10,11,16,22
76:21 79:4 80:10
151:5 176:2,18,20
178:15
**universe** 59:15
72:10 74:2 79:18
**University** 14:7,9
**unlawfully** 153:17
176:2 179:17,20
180:10,14
**unnecessary** 88:21
**unreasonable** 76:8
180:21
**unrelated** 92:14
**unrest** 128:4



**unsafe** 94:4
**unsigned** 113:8,9
**updates** 37:12
**USCIS** 23:4,18
    25:3 30:16 41:6
    44:13,22 45:4,8
    45:17,19 46:4,7
    46:13 49:4 56:20
    56:21 66:10 67:16
    67:22 68:4 69:21
    70:13 72:5 84:22
    87:2,9 103:13
    106:14 107:9
    108:12 111:20
    114:5 115:5
    116:15 129:19
    135:5 138:12
    139:4,19 156:17
    158:6,7 159:1
    161:16 168:19
    174:19 182:19
    183:7,22 190:10
    190:14,16,18
    193:1 194:20
    197:13,19 205:20
    206:21
**USCIS's** 142:21
    182:20 183:12
**USCIS/McCame...**
    88:10
**useful** 75:13
**usual** 110:17
**U.S** 3:15 4:5,14 7:7
    10:6,9 17:10,22
    40:20 145:18
    150:17 175:7
    177:7,9 179:17
    184:19,22
**U.S.C** 40:21
**U.S.C.A** 5:10

————————————
                V
————————————
**V** 212:2 213:2
**vague** 24:12 31:14
    48:22 49:7 50:16
    51:4 53:20 57:2

**60:1 61:18 62:22**
    63:7,21 71:6,8
    77:17 83:3 87:6
    92:12 104:7
    107:11 118:12
    119:15 120:18
    123:3 131:3 133:4
    136:15 143:6
    150:3 152:17
    155:2 160:9 179:1
    197:5 198:20
    202:12 203:2
**vaguely** 122:20
**vagueness** 81:19
    140:13 164:19
    168:22
**valid** 118:8
**variety** 21:19 23:6
    29:2 33:21 150:20
**various** 34:16
    35:18 54:2 59:3
    206:9
**vary** 37:1,4
**verbally** 60:13
**version** 113:19
    121:11 122:9,12
    127:4,6 129:3,16
    203:5
**versus** 9:8 48:20
    52:5 186:13
**video** 9:6,13
**videographer** 4:15
    9:5,17 10:14 57:8
    57:11 100:4,7
    121:20 122:1
    147:14,17 208:14
    208:17 210:5
**Videotaped** 1:14
    2:1
**view** 74:7 75:22
    78:12 80:22 117:9
    119:19 120:17
    136:12,13 154:21
    157:14,22 164:14
    170:2 175:8
    176:21 178:11,16

**179:21 202:18**
    204:19
**views** 99:20 100:15
    144:19 145:4,18
    164:1 165:20
    166:4 168:12
**violence** 128:2,2
    148:17
**Virginia** 21:3
**visa** 18:9,11,14
    19:18 20:1,2,8,9
    20:11,16,17,19
**visas** 18:16 20:20
**visit** 20:19
**Voigtsberger** 4:15
    9:18
**voluntarily** 151:4
**vs** 1:7 211:3
**Vuong** 4:13 10:11
    10:11

————————————
                W
————————————
**W** 6:11
**wager** 180:2
**waiting** 164:10
**walk** 45:7
**want** 22:17 31:11
    40:12 41:9 72:17
    100:16 102:6
    116:22 123:10
    132:20 145:9
    161:4 176:12
    185:18 188:21
**wanted** 22:19 29:4
    69:19 72:2 73:3
    123:16 166:4
    168:4
**wantedly** 194:20
**wants** 37:9 80:4
**warranted** 94:14
**Washington** 1:15
    2:9 3:8 4:8 9:2,15
    15:8 17:20 22:20
    53:12 134:15
**wasn't** 24:9 55:14
    65:5 101:5 105:17

**108:12 130:5**
    149:15 167:12
    187:4
**water** 112:13
**way** 68:10 73:19
    77:15 95:3 98:22
    103:18 112:5
    186:5 188:2
**ways** 33:21 150:20
**Webb** 3:4 5:3 10:1
    10:1,20 11:9 31:1
    31:4 40:3,8 56:8
    56:10 57:5,13
    60:22 65:12,16
    83:13,20 84:3
    86:6,13 98:11
    99:3 100:2,9
    112:9 122:3
    124:13,14 128:11
    131:15 132:10,15
    145:9 147:10,19
    160:14 172:9
    185:15 189:16
    200:14 208:8,13
    208:19 210:2,4
**week** 68:22
**weekend** 148:16
**weeks** 17:12 18:19
    19:6,8
**welfare** 159:20
**went** 14:8 16:1
    17:20 135:1 163:8
    198:10
**weren't** 156:4
**We'll** 140:7
**we're** 41:9 57:8,11
    98:20 100:7 122:1
    147:12,14,17
    180:22 181:10,12
    190:3 205:17
    208:14,17 210:6
**we've** 87:1 113:3
    161:2 186:12
    190:2
**WHEREOF**
    214:14

**White** 141:15 142:1
    142:3,7
**wide** 21:19 23:6
    29:2 51:6 150:19
**widely** 37:5
**willingly** 180:16
**wind-down** 144:8
**wish** 197:9
**withdraw** 172:9
**witness** 10:15 11:7
    32:21,22 33:1
    44:17,17,19 45:14
    54:4,4,6 55:2,2
    56:4,4 73:12,13
    74:12 76:4 77:20
    77:20 79:7 83:6
    89:16 97:6 98:8
    98:18 99:2 100:1
    106:21 109:5,5
    115:21,21,22
    132:11 145:3,7
    146:1,3 170:6,7
    177:2,3 191:10
    200:13 208:12
    214:14
**witnesses** 99:13
**Wolf** 195:5
**wondering** 179:21
    200:17
**Word** 103:21
    108:21
**words** 26:11 118:20
    158:18 171:22
**work** 15:1 16:12,17
    18:9,13 19:9 22:2
    28:17 30:22 34:16
    41:6 50:20 51:20
    52:10,13,14 53:5
    53:14 54:10 61:17
    62:7,8
**worked** 20:1 21:18
    23:12 62:1,5
**working** 15:5,21
    23:13 26:7 27:19
    52:22 61:7,20
    62:7 64:13 69:21



70:13 72:4 91:16 143:12
**works** 206:20
**world** 51:12 52:12
**worldwide** 52:19
**worth** 126:22
**wouldn't** 132:2,2 150:21
**write** 94:15 164:5
**wrong** 27:19 98:15 196:7
**wrote** 94:21 175:11
**www.MagnaLS.c...** 1:22

**X**
**X** 5:7 187:10,11,11

**Y**
**yeah** 101:4
**year** 14:12 17:17 151:12,12 152:16 153:4 156:3 161:4 190:5 196:16,17
**years** 14:22 15:6,14 15:20 18:3 21:10 22:8 25:10,11,12 25:21 28:6,7 29:8 30:3 61:21 62:5 73:18 152:8 180:6
**yesterday** 99:9,10
**yesterday's** 145:22
**York** 1:2 3:17,19 9:11 10:7

**Z**
**zero** 133:20

**1**
**1** 93:16 156:15 166:16 182:19
**1,100** 152:8
**1-18-18** 7:21
**1:05** 100:8
**1:43** 121:21
**1:47** 122:2

**10** 5:3 152:21
**10th** 167:10 181:10
**10:03** 9:13
**100** 51:10
**102** 5:10 40:4,5 57:15 74:18
**103** 5:13 65:12,13
**104** 5:17 83:14,15 84:3,4
**105** 6:4 86:10
**106** 6:9 86:16,22 100:12
**107** 6:14 112:9,10
**108** 6:18 121:12 122:5 129:16 166:15 167:19 183:16 209:15
**109** 7:4 131:12 132:9,10 163:11
**11-12-17** 7:11,16
**11-3-17** 6:18
**11:04** 57:9
**11:12** 57:12
**11:30** 7:21
**110** 7:10 160:15,16
**111** 7:15 181:1 185:19
**112** 6:14 7:20 188:19 189:1
**11201** 3:19
**113** 8:4 189:18
**114** 8:8 201:7
**12th** 175:2 181:10
**12:15** 100:5
**121** 6:18
**1254** 40:21
**1254a** 5:10
**13th** 133:13 162:9 181:13
**131** 7:4
**139** 7:13
**14** 214:17
**15** 131:22
**15th** 133:12
**150** 51:10
**160** 7:10

**17** 132:22
**175,000** 119:10 126:4
**18-cv-01599-WF...** 1:7
**18-month** 93:21
**181** 7:15
**190** 7:20 8:4
**1995** 14:13
**1999** 2:8 3:7 9:14

**2**
**2** 42:15 52:9 132:12 132:14,17 156:15 166:19
**2:22** 147:15
**2:29** 147:18
**20** 1:16 9:3 182:7 211:16
**20th** 9:12 214:15
**2000** 17:13,18
**20006** 3:8
**20044** 4:8
**2005** 22:12 23:18
**2006** 23:19
**2008** 25:16,17
**2009** 26:1
**201** 8:8
**2010** 26:8 27:14 60:11,22 61:5 62:19,21 156:19 158:11 202:5 204:21
**2011** 63:5,12,17 151:21
**2014** 152:8,9,15
**2015** 28:5 29:9 152:10
**2016** 152:3,8,10,15 158:20 196:2
**2017** 6:9 28:8 29:10 29:18,20 30:2 64:3,5,22 66:6 70:12 71:1 78:1 84:9 88:1 93:11 120:8 132:22

**161:11 162:9 207:1
**2018** 1:16 9:3,12 190:3,4 198:21 199:7,14 214:16
**202** 3:9 4:9
**2022** 214:17
**22nd** 152:3
**236,000** 119:9 126:3
**244(b)(1)** 59:2
**244(b)(1)(A)** 94:7
**244(b)(1)(B)** 155:13
**244(b)(1)(B)(ii)** 164:21 166:10 168:2,12 169:10 175:9
**244(b)(1)(C)** 74:17 94:9 117:21 165:18
**244(b)(2)(B)** 168:10
**250,000** 153:15
**254-6288** 3:20
**263-3188** 3:9
**27** 190:4
**271** 3:18
**28** 6:9
**29** 93:11
**29th** 88:6 100:18 102:21

**3**
**3** 41:14 42:18 43:22 57:16 74:17 94:2 116:20 128:6,11 151:20 158:13 183:16
**3rd** 131:6 132:22 133:11 184:3,12 209:16
**3:58** 208:15
**30(b)(6)** 32:22 44:17 54:4 55:2 73:12 77:19

**106:21 109:5 115:21 170:7 177:2
**300** 52:9
**310** 152:10
**382** 152:9

**4**
**4** 57:15 120:6 177:19
**4-27-18** 8:4
**4-7-17** 5:13
**4:07** 208:18
**4:08** 210:7,10
**40** 5:10
**40,000** 150:21 153:14
**433** 152:9
**450087** 1:19 211:2
**478** 6:12

**5**
**5** 51:15 94:16 158:12
**5-22-17** 5:21
**5:05** 88:6
**514-3259** 4:9
**56,000** 179:16 180:2
**58,000** 164:8 179:17 180:3

**6**
**6th** 65:8
**6:50** 93:11 100:20
**60** 57:17 177:21
**60,000** 149:21 150:22 153:15
**600** 51:15
**65** 5:13
**679** 6:7

**7**
**7th** 65:8
**718** 3:20
**759** 6:16



**8**

**8** 40:21 132:17
**8-29-17** 6:5
**83** 5:17
**86** 6:4,9
**866-624-6221** 1:21
**883** 4:7

**9**

**9:35** 100:20
**9:49** 102:20
**911** 6:21
**946** 7:18



| Errata Sheet for USCIS Director L. Francis Cissna | | |
|---|---|---|
| **Page** | **Line** | **Correction** |
| 19 | 11 | "to to" should be "to" |
| 20 | 19 | "exchange visit or visa" should be "exchange visitor visa" |
| 22 | 15 | "in the United States Citizenship and" should be "in United States Citizenship and" |
| 28 | 14 | "of Senate Judiciary committee" should be "other Senate Judiciary committee" |
| 38 | 5 | "executive secretariate" should be "executive secretariat" (throughout the document) |
| 47 | 21 | "other directorates in offices" should be "other directorates and offices" |
| 50 | 5 | "researching" should be "research" |
| 58 | 17-18 | "by the Operation Homeland Security Act" should be "by operation of the Homeland Security Act" |
| 74 | 21 | "there exists" should be "there exist" |
| 80 | 18 | "in apposite" should be "inapposite" |
| 93 | 5 | Strike "with" and insert "who" |
| 109 | 11 | Strike "components" and insert "component" |
| 134 | 15 | Strike "interage" and insert "entourage" |
| 154 | 14 | Strike "relatively a" and insert "a relatively" |
| 168 | 5 | Strike "that I would actually come up" and insert "that it would actually come up" |
| 170 | 11-12 | Strike "I defer to their better legal minds than mine" and insert "I defer to better legal minds than mine". |
| 187 | 4 | Strike "all these TPS decision" and insert "all these TPS decisions" |
| 194 | 20 | Strike "wantedly" and insert "wantonly" |
| 196 | 13 | Strike "manifested" and insert "manifestly" |

Signed by _2̄F̄ΛC̄_____

Dated _12/31/18_____