UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF NEW YORK

---------------------------

PATRICK SAGET,                    )Case No.

et al.,                           )18-cv-01599-WFK-ST

   Plaintiffs                     )

vs.                               )

DONALD TRUMP, President           )

of the United States              )

et al.,                           )

   Defendants                     )

---------------------------




Videotaped Deposition of Gene Hamilton

Washington, D.C.

January 3, 2019

9:45 a.m.


Reported by:  Bonnie L. Russo

Job No. 450092


Magna Legal Services

866-624-6221

www.MagnaLS.com



1   Videotaped Deposition of Gene Hamilton held at:

2

3

4

5                Mayer Brown, LLP

6                1999 K Street, N.W.

7                Washington, D.C.

8

9

10

11

12

13

14

15

16

17

18   Pursuant to Notice, when were present on behalf

19   of the respective parties:

20

21

22



```
 1   APPEARANCES:
 2   On behalf of the Plaintiffs:
          JONATHAN C. MEDOW, Esq.
 3        GEOFFREY M. PIPOLY, Esq.
          MAYER BROWN, LLP
 4        71 South Wacker Drive
          Chicago, Illinois 60606
 5        312-782-0600
          jmedow@mayerbrown.com
 6        gpipoly@mayerbrown.com
 7
 8   On behalf of Defendants:
          JOHN TYLER, Esq.
 9        UNITED STATES DEPARTMENT OF JUSTICE
          UNITED STATES ATTORNEY'S OFFICE
10        CIVIL DIVISION
          1100 L Street, N.W.
11        Washington, D.C. 20001
          202-514-2556
12        john.tyler@usdoj.gov
13
14
15   Also Present:
     Kevin Snell, Department of Justice, Federal
16   Programs Branch
     Brett A. Shumate, United States Department of
17   Justice
     Rene Browne, United States Department of
18   Homeland Security
     Nam Ngo, Videographer
19
20
21
22
```



Page 4

```
 1                C O N T E N T S
 2    EXAMINATION OF GENE HAMILTON          PAGE
 3    BY MR. MEDOW                          9
 4
 5
 6
                      EXHIBITS
 7
      Exhibit 132 News Article              30
 8                dated 10-27-17
 9    Exhibit 133 Immigration               58
10    Exhibit 134 USCIS Latest Headlines    81
11    Exhibit 135 Expert Report of          90
                  Leon Rodriguez
12
      Exhibit 136 Handwritten Notes         97
13                Anderson_00008-11
14    Exhibit 137 Letter dated 1-12-16      106
15    Exhibit 138 Transcript of Deposition  117
                  dated 10-20-17
16
      Exhibit 139 Federal Register          141
17                Vol.90/No. 164
18    Exhibit 140 Federal Register          143
                  Vol. 82/No. 99
19
      Exhibit 141 E-Mail Chain              163
20                dated 10-22-17
                  CP_00002736-2738
21
      Exhibit 142 E-Mail Chain              169
22                dated 10-25-17
```



```
                                                      Page 5
 1    EXHIBITS (CONTINUED):
 2
      Exhibit 143 E-Mail Chain                           171
 3                dated 10-22-17
                  CP_00003698-3699
 4
      Exhibit 144 Press Release                          182
 5                dated 11-20-17
                  CP_00033469-33470
 6
      Exhibit 145 Memorandum dated 11-3-17               192
 7                AR-S_HAITI-00000117-132
 8    Exhibit 146 Justice News Article                   197
                  dated 10-15-18
 9
      Exhibit 147 Handwritten Notes                      205
10                AR-S_HAITI-00000113-116
11    Exhibit 148 Handwritten Notes                      205
                  DPP_00003562-3565
12
      Exhibit 149 Exhibit 66                             213
13                E-Mail Chain dated 11-3-17
14    Exhibit 150 Federal Register                       222
                  Vol. 83/No. 12
15
      Exhibit 151 TPS Considerations:                    238
16                Haiti (October 2017)
                  Natural Disaster
17                Background & Overview
                  AR-HAITI-00000046-63
18
      Exhibit 152 8 U.S.C.A. Section 1254a               242
19
      Exhibit 153 E-Mail dated 4-7-17                    250
20                CP_00001526
21    Exhibit 154 AP News Article                        261
                  dated 5-9-17
22
```



Page 6

```
 1    EXHIBITS (CONTINUED):

 2    Exhibit 155 E-Mail dated 5-20-17          266
                  DPP_00007775-7778
 3

      Exhibit 156 Handwritten Notes             277
 4                Anderson_00012-18

 5    Exhibit 157 Handwritten Notes             277
                  Anderson_00001-6
 6

 7

 8

 9

10

11

      PREVIOUSLY MARKED EXHIBIT:

12

      Exhibit 97  Immigration Priorities for
13                the 2017 Presidential Transition

14

15

16

17

18

19

20

21

22    (Exhibits included with transcript.)
```



Page 7

```
 1              P R O C E E D I N G S

 2

 3              THE VIDEOGRAPHER:  We are now on the

 4    record.

 5              This begins Videotape No. 1 in the

 6    deposition of Gene Hamilton in the matter of

 7    Patrick Saget, Sabrina Badio Florial, et al.,

 8    versus Donald Trump, Department of Homeland

 9    Security, in the United States District Court

10    for the Eastern District of New York, Case No.

11    18-cv-01599-WFK-ST.

12              Today is January 3rd, 2019.  And the

13    time is 9:49 a.m.

14              This deposition is being taken at

15    Mayer Brown, LLP, 1999 K Street, Northwest,

16    Washington, D.C., 20006, at the request of

17    Mayer Brown, LLP.

18              The videographer is Nam Ngo of Magna

19    Legal Services.  And the court reporter is

20    Bonnie Russo of Magna Legal Services.

21              Will counsel and all present state

22    their appearance and whom they represent.
```



Page 8

1                MR. MEDOW:  Jonathan Medow of Mayer

2       Brown on behalf of plaintiffs.

3                MR. PIPOLY:  Geoffrey Pipoly, Mayer

4       Brown, on behalf of plaintiffs.

5                MR. TYLER:  John Tyler, Department

6       of Justice, on behalf of Defendant.

7                MR. SNELL:  Kevin Snell, Department

8       of Justice, on behalf of defendants.

9                MR. SHUMATE:  Brett Shumate,

10      Department of Justice, on behalf of the

11      defendants.

12                MS. BROWN:  Rene Browne, U.S.

13      Department of Homeland Security, on behalf of

14      the defendants.

15                THE VIDEOGRAPHER:  Will the court

16      reporter please swear in the witness.

17                     GENE HAMILTON,

18      being first duly sworn, to tell the truth, the

19          whole truth and nothing but the truth,

20                 testified as follows:

21          EXAMINATION BY COUNSEL FOR PLAINTIFFS

22                BY MR. MEDOW:



1      Q.     Good morning, sir.

2             Could you please state your name for

3      the record.

4      A.     Gene Hamilton.

5      Q.     Is your formal name Gene or Eugene?

6      A.     Gene.

7      Q.     Have you been deposed previously?

8      A.     I have.

9      Q.     Now, you were deposed in the DACA

10     litigation, Batalla Vidal, if I'm pronouncing

11     it right, that case about a year ago?

12     A.     Yes.  It was in October of 2017.

13     Q.     Yeah.  You gave testimony on that

14     day.

15            Did that deposition ever resume?

16     A.     No.

17     Q.     Have you given any other

18     depositions?

19     A.     No.

20     Q.     You're an attorney, correct?

21     A.     Correct.

22     Q.     Did you graduate from law school in



Page 10

1    2010?

2         A.    Correct.

3         Q.    Lee -- Washington Lee?

4         A.    Correct.

5         Q.    Are you licensed to practice as an

6    attorney?

7         A.    Correct.

8         Q.    In what states?

9         A.    Virginia.

10        Q.    Have you been continuously since

11   graduating from law school?

12        A.    Yes.

13        Q.    Are you represented today by

14   counsel?

15        A.    Yes.

16        Q.    Could you identify those counsels.

17        A.    All of the wonderful folks sitting

18   to my right.

19        Q.    The individuals who identified

20   themselves on the record, correct?

21        A.    That's correct.

22        Q.    Now, during the course of the



Page 11

1    testimony today, sir, I'll try and make the

2    questions as easy to understand for you as I

3    can.  I don't always succeed.

4            If, in fact, you do not understand a

5    question, will you so indicate so I have an

6    opportunity to rephrase?

7    A.    I most certainly will.

8    Q.    Thank you.

9            We talked about prior depositions.

10           Have you given any prior oral

11   testimony in other context:  trial, hearing,

12   arbitration, anything of that nature?

13   A.    I don't think so.

14   Q.    Have you submitted any written

15   testimony under oath in a proceeding?

16   A.    I don't think so.

17   Q.    Is there any reason at all that

18   you're unable today to give complete and

19   truthful testimony?

20   A.    No.

21   Q.    Are you employed?

22   A.    I am.



Page 12

1      Q.     By whom?

2      A.     The United States Department of

3   Justice.

4      Q.     Is your office here in Washington,

5   D.C.?

6      A.     Indeed.

7      Q.     Is this where you are -- regularly

8   transact business in D.C.?

9      A.     Yes.

10     Q.     Do you reside in the Washington,

11  D.C. area?

12     A.     I reside in the Commonwealth of

13  Virginia.

14     Q.     In the greater metropolitan D.C.

15  area?

16     A.     Correct.

17     Q.     What town?

18     A.     Fairfax.

19     Q.     Do you have any plans to be in the

20  New York metropolitan area in the next two

21  weeks?

22     A.     No.



Page 13

1      Q.    Do you have any plans to travel in

2    the next two weeks?

3      A.    Not that I know of at this moment.

4    But my job can change that at a moment's

5    notice.

6      Q.    Any plans to testify in the trial of

7    this matter?

8      A.    No.

9      Q.    Now, while you have been with the

10    government, were you aware of the pendency of

11    this lawsuit and others challenging various TPS

12    determinations by Homeland Security?

13      A.    Yes.

14      Q.    Did you -- in the -- in the course

15    of your employment, did you consult with any of

16    the attorneys defending those lawsuits?

17          MR. TYLER:  I'll object as vague.

18          THE WITNESS:  Could you clarify what

19    you mean by consulting with attorneys in those

20    lawsuits.

21          BY MR. MEDOW:

22      Q.    There were -- there were lawyers



Page 14

1  representing the government in those lawsuits,

2  right?

3      A.    I would presume so, yes.

4      Q.    Did you have any contact with those

5  lawyers in terms of talking about the case?

6      A.    In -- in general, yes.  My duties

7  are to advise the attorney general as to

8  matters of import affecting the Department.

9      Q.    Which -- in that -- given that, were

10  you getting updates on the cases?

11      A.    Occasional updates on things in the

12  immigration space, yes.

13      Q.    Have you reviewed any of the

14  pleadings from any of the TPS lawsuits?

15      A.    I might have.

16      Q.    Any that you recall?

17      A.    I don't recall any specifics.  I

18  tend to scan whatever's sent to me, pleadings

19  or draft responses.  Sometimes I assist with

20  editing some of our documents; sometimes I

21  don't.  It just depends.

22      Q.    Have you reviewed any of the



Page 15

1    testimony given by government witnesses in

2    connection with the TPS lawsuits?

3         A.    No.

4         Q.    Have you learned of the substance of

5    any such testimony?

6         A.    No.

7         Q.    Have you spoken to any of the

8    witnesses who have -- government witnesses who

9    have given testimony in connection with the

10   lawsuits regarding their testimony?

11        A.    No.

12        Q.    What did you do to prepare for

13   today's deposition?

14        A.    I met with this team of attorneys

15   yesterday.

16        Q.    Again, referring to the government

17   lawyers here in the room?

18        A.    That's correct.

19        Q.    Okay.  And you said you met

20   yesterday?

21        A.    We met yesterday.

22        Q.    Was that the only preparation



Page 16

```
 1   session you had?

 2        A.     That's correct.

 3        Q.     How long did yesterday's session go?

 4        A.     I don't know.  Off and on, four,

 5   five hours maybe.

 6        Q.     Was -- other than yourself and the

 7   attorneys in this room, was anybody else

 8   present during the preparation session?

 9        A.     There was one additional attorney

10   here.  And forgive me for not remembering his

11   name.  But he's employed by the Department of

12   Justice as well.

13        Q.     Was that one of the lawyers who will

14   try the case for the government?

15        A.     That's my understanding is he's on

16   this case.

17        Q.     Mr. Cho?

18             MR. TYLER:  I -- I can represent it

19   was not Mr. Cho.  It was an attorney with my

20   office here in the Department of Justice.  He

21   will not be trying this case.

22             MR. MEDOW:  Thank you.
```



```
 1              BY MR. MEDOW:

 2      Q.     Putting aside your preparation

 3   session, have you had -- have you discussed

 4   with anyone else what issues or questions might

 5   come up today?

 6      A.     No.

 7      Q.     Or what answers you might give in

 8   response?

 9      A.     No.

10      Q.     Have you reviewed any documents in

11   preparation for today's testimony?

12      A.     The only document that I reviewed

13   was yesterday we had a copy of INA Section 244

14   to refresh my recollection.

15      Q.     That's the TPS statute?

16      A.     That's correct.

17      Q.     Any other documents you've looked at

18   in preparation?

19      A.     No.

20              I -- I will clarify though that I

21   did see a couple pages of something regarding

22   a -- a desire to see something about a
```



Page 18

1    nondisclosure agreement or something.  But I

2    don't know if you'd qualify that as a document

3    or not, but...

4         Q.    Okay.  Are you referring to a

5    request we made to see any confidentiality

6    agreements you might have with the Trump

7    transition entity?

8         A.    I think so.

9         Q.    Okay.  So that request was passed on

10   to you?

11        A.    Yes.

12        Q.    Have you furnished a copy of that

13   confidential agreement to any attorneys --

14        A.    No.

15        Q.    -- representing the government?

16              Have you brought the agreement with

17   you today?

18        A.    No.

19        Q.    Do you have a copy of the agreement?

20        A.    I do.

21        Q.    Is it in paper form or electronic

22   form or both?



Page 19

1      A.     I have an electronic copy.

2      Q.     Are you willing to produce a copy to

3  -- of that agreement to us?

4      A.     I'll have to consult with the

5  transition counsel.  But so long as he doesn't

6  object, I wouldn't have a problem with doing

7  so.

8      Q.     Did you make any efforts yesterday

9  to talk to transition counsel about that issue?

10     A.     I did not talk about that issue.

11     Q.     What did you talk about?

12     A.     Just the fact that I was being

13 deposed today.

14     Q.     Who is transition counsel?

15     A.     Kory Langhofer.

16     Q.     Could you spell that, please.

17     A.     K-O-R-Y, L-A-N-G-H-O-F-F-E-R [sic].

18            I believe he's with a firm called

19 Statecraft, PLLC.  I believe they're

20 headquartered in Arizona.

21     Q.     Who are the parties to that

22 agreement?



Page 20

1       A.      Me and the transition entity.

2       Q.      Who is -- or who or what is the

3   transition entity?

4       A.      It's my understanding that it's a

5   transition 501(c)(4).

6       Q.      Do you know the name of it?

7       A.      I think it's Trump for America, Inc.

8       Q.      Besides you and the transition

9   entity, are there any other parties to that

10  agreement?

11      A.      Not to my knowledge.

12      Q.      How long is the agreement?

13      A.      I think it's in perpetuity.

14      Q.      I mean number of pages,

15  approximately.

16      A.      Oh.  Two pages maybe.  Two or three.

17      Q.      Was this a form, or was it a

18  negotiated agreement?

19      A.      It was a form.

20      Q.      Provided to you by the transition

21  entity?

22      A.      Yes.



Page 21

1      Q.    Okay.  What does it provide?

2      A.    In -- in general --

3      Q.    Yes.

4      A.    -- or --

5      Q.    Well, as far as you recall, what --

6  what -- what does the agreement provide?

7            We haven't seen it.

8      A.    It says that I am -- have a legal

9  obligation to keep the confidential matters

10 that I've worked on during the transition

11 period confidential.

12     Q.    Were there any exclusions in the

13 agreement from any such confidentiality

14 obligations?

15     A.    I don't remember.

16     Q.    There could be; you just don't

17 recall one way or the other?

18     A.    There might be.  I don't know.

19     Q.    Let's talk briefly about your

20 background.

21     A.    Okay.

22     Q.    And not going to the beginning of



Page 22

1   time.

2           Is it true that you interned with

3   ICE, I-C-E, during one of your law school

4   summers?

5       A.   Yes.

6       Q.   And for the record, ICE stands for

7   what?

8       A.   U.S. Immigration and Customs

9   Enforcement.

10      Q.   Okay.  After graduating from law

11   school in 2010, did you -- were you then

12   employed by the Department of Homeland

13   Security?

14      A.   Yes.

15      Q.   Were you in the secretary's honors

16   program?

17      A.   Yes.

18      Q.   Were you in that program until you

19   left in May of 2012?

20      A.   Yes.

21      Q.   During that roughly two-year period

22   while you were in the honors program, did you



Page 23

```
 1    rotate through various departments or offices

 2    of Homeland Security?

 3         A.    I did.

 4         Q.    From that job, which you left in May

 5    of 2012, did you then go to Atlanta?

 6         A.    I did go to Atlanta.

 7         Q.    Were you employed by -- were you in

 8    the office of chief counsel of ICE in Atlanta?

 9         A.    I was.

10         Q.    As assistant chief counsel?

11         A.    That's correct.

12         Q.    Did you stay in that position until

13    February of 2015?

14         A.    Yes.

15         Q.    Starting in 20 -- February of 2015,

16    did you come to D.C.?

17         A.    I did.

18         Q.    Were you general counsel to Senator

19    Sessions on the Judiciary Committee?

20         A.    I was.

21         Q.    Were you -- this was a legal

22    position, right?
```



1      A.    To the extent that any position on

2    the Hill is a legal position, yes.

3      Q.    I'm not sure how to take that, but

4    okay.

5            You -- but your -- your position was

6    general counsel?

7      A.    Yes.

8      Q.    Were you providing legal advice?

9      A.    Legal policy.

10     Q.    And who was your client; was it

11   Senator Sessions or the committee?

12     A.    Primarily Senator Sessions.  But

13   also he was chairman of the subcommittee, and

14   so it is kind of a hybrid.

15     Q.    The subcommittee is -- was the

16   Subcommittee on Immigration and the National

17   Interest?

18     A.    That's correct.

19     Q.    Did you leave that job on

20   inauguration day, January 20th of 2017?

21     A.    Yes.

22     Q.    During the, again, roughly two year



Page 25

1      -- so you spent roughly two years at that point

2      with Senator Sessions?

3          A.    Yeah, roughly.

4          Q.    During that -- that two -- two-year

5      period between 2015 and 2017, were you the

6      staffer with primary responsibility for

7      immigration issues?

8          A.    I think that's a fair assessment.

9          Q.    During that time period, did you

10     have contact with Stephen Miller?

11         A.    I did.

12         Q.    Did you know Mr. Miller before

13     working for Senator Sessions?

14         A.    I did not.

15         Q.    How did you come to know Mr. Miller

16     during your time with Senator Sessions?

17         A.    Stephen was the communications

18     director.  So we worked together.

19         Q.    For Sessions?

20         A.    Correct.

21         Q.    Okay.  So you were coworkers?

22         A.    Correct.



Page 26

```
 1      Q.     What does Mr. Miller do now?

 2      A.     Stephen is the senior policy adviser

 3  to the president.

 4      Q.     Does -- is his principal focus, to

 5  the extent you know, on immigration issues?

 6      A.     I -- Stephen works on immigration

 7  issues, but he covers a lot of issues for the

 8  president.

 9      Q.     But among them, immigration?

10      A.     Yeah.

11      Q.     Now, in -- on inauguration day in

12  2017, did you become senior counselor to the

13  secretary of Homeland Security?

14      A.     Yes.

15      Q.     And that secretary was John Kelly?

16      A.     John Kelly was the secretary in

17  January of 2017.

18      Q.     Were you a political appointee?

19      A.     Yes.

20      Q.     Could you describe your duties and

21  responsibilities as senior counselor to the

22  secretary of DHS.
```



1    A.    Primarily to advise the secretary on

2  matters falling within a portfolio and to carry

3  out duties as directed by the secretary.

4    Q.    Among the -- your response -- was

5  among your responsibilities to provide the

6  secretary with policy advice?

7    A.    Correct.

8    Q.    Was it to assist in -- with policy

9  formulation?

10    A.    If necessary, absolutely.

11    Q.    Did you edit documents in that job?

12    A.    I did edit documents --

13    Q.    Draft --

14    A.    -- from time to time.

15    Q.    Draft speeches?

16    A.    I was not the principal speech

17  writer.  There is a speech writer for -- in the

18  communications shop at DHS.  But I would

19  edit --

20    Q.    Speeches?

21    A.    -- documents, speeches, anything.

22    Q.    Did you -- you were working for the



Page 28

1    secretary himself, Mr. Kelly, right?

2         A.    That's correct.

3         Q.    Did you also work for the deputy

4    secretary, Elaine Duke?

5         A.    I did.

6         Q.    How about the chief of staff,

7    Ms. Nielsen?

8         A.    I don't know that I worked for her,

9    but I worked with her.  She was the chief of

10   staff.

11        Q.    Now, you left that job to become --

12   I'm sorry.

13              Secretary Kelly left that position

14   to become White House chief of staff at some

15   point, correct?

16        A.    He did.

17        Q.    Do you recall when that occurred?

18        A.    It was late July 2017.

19        Q.    Roughly the end of July?

20        A.    The end of July.

21        Q.    Who succeeded him as secretary, or

22   as acting secretary, as the case may be?



Page 29

1      A.     Elaine Duke was the senate confirmed

2   deputy secretary.  So pursuant to the Homeland

3   Security Act, she assumed the duties of the

4   secretary upon his departure.

5      Q.    Was she, at that point, an acting

6   secretary?

7      A.     She was.

8      Q.     And did you continue to serve as

9   senior counselor to the -- to the acting

10  secretary, Ms. Duke?

11     A.     I did.

12     Q.     Were your duties and

13  responsibilities the same as when Kelly had

14  been the secretary?

15     A.     I think that's a fair assessment.

16     Q.     In your job as senior counselor to

17  the either secretary or acting secretary of

18  DHS, were you acting as an attorney?

19     A.     No.

20     Q.     You were offering policy as opposed

21  to legal advice, correct?

22     A.     That's correct.



Page 30

1    Q.    When did you leave that position?

2    A.    I guess it was the last week of

3  October of 2017.

4    Q.    Where did you go?

5    A.    To the Department of Justice.

6    Q.    Why did you make the switch?

7    A.    It was a good opportunity to go back

8  to working with Senator -- or Attorney General

9  Sessions.

10          MR. MEDOW:  Let me ask the

11  reporter to mark our first exhibit today.

12          (Deposition Exhibit 132 was marked

13  for identification.)

14          BY MR. MEDOW:

15    Q.    Okay.  Mr. Hamilton, you should now

16  have what the reporter has marked as Exhibit

17  132.  It appears to be an article from CNN

18  dated October 27, 2017, talking about your move

19  from DHS to DOJ.

20          Why don't you take a moment to

21  review the document and indicate for us when

22  you have.



Page 31

1      A.    Okay.

2      Q.    Have you seen this article

3  previously?

4      A.    I recall seeing it.

5      Q.    Did the reporter reach out to you

6  for comment?

7      A.    Not to -- I don't think so.

8      Q.    The reason I ask, if you look on the

9  second page, there's a quotation from you.

10          Was that as a result of your

11  conversation with the reporter?

12     A.    I don't believe I had a direct

13  conversation with the reporter.  I might have.

14  I don't remember if I gave a -- a comment to

15  our press shop --

16     Q.    Who --

17     A.    -- or if I gave the comment

18  directly.  But there is a comment in here.

19     Q.    And it came from you.

20     A.    It came from me.

21     Q.    Now, the article indicates -- I'm

22  looking on the first page towards the middle.



Page 32

```
 1   It says:  "Two sources familiar with his

 2   actions told CNN that Hamilton first announced

 3   the move October 13th in a staff meeting, but

 4   it took some time for it to be finalized."

 5           Is that true?

 6       A.    I do recall knowing about the

 7   opportunity to come to DOJ in early October.

 8   And I think it obviously did take some time to

 9   get finalized.

10       Q.    The article goes on to say, a couple

11   paragraphs down -- it says:  "After the

12   pushback" -- do you see that paragraph? -- "the

13   personnel office," referring to White House

14   personnel office, "relented late Wednesday

15   evening shortly before Hamilton's previously

16   scheduled farewell gathering."

17           The article is dated on a Friday,

18   October 27th, from which I deduce Wednesday was

19   October 25th.

20           Is that, in fact, the day you left

21   DHS?

22       A.    I don't remember.  I think it was
```



Page 33

1    that Friday, the 27th.

2         Q.    27th?

3               But it -- but it's -- it's clear --

4    I think you said last week in October?

5         A.    Yeah.  I mean it was -- it was a,

6    you know -- it was a Friday was my last day in

7    the office.  Saturday was the last day of the

8    pay period.  Sunday was the first day of the

9    next pay period.  And I was in the office of

10   the Department of Justice on Monday.

11        Q.    Okay.  The article also says,

12   towards the bottom of the first page, the third

13   paragraph from the bottom:  "One of the sources

14   who is familiar with immigration issues said

15   the departure was a 'big loss' for the agency.

16   Hamilton was the key staffer liaising with the

17   Hill and the White House on implementing the

18   president's immigration agenda."

19              Do you see that?

20        A.    I do see that.

21        Q.    Is that a fair characterization?

22              MR. TYLER:  I'll object to the



Page 34

1   extent this is a packed sentence.  If you could

2   break it down perhaps to its various elements.

3            BY MR. MEDOW:

4       Q.    I'm focusing on the second sentence:

5   "Hamilton was the key staffer liaising with the

6   Hill and the White House on implementing the

7   president's immigration agenda."

8            Do you think that is a fair

9   characterization?

10      A.    That is one reporter's assessment of

11  a statement from some anonymous source.  If

12  they think I was the key staffer, then I guess

13  that's their statement of opinion.

14      Q.    I'm asking whether you agree with

15  that.

16      A.    I was a staffer liaising with the

17  Hill and the White House on immigration matters

18  for the Department of Homeland Security.

19      Q.    Do you think it a fair

20  characterization to say your actions were

21  implementing the president's immigration

22  agenda?



Page 35

1      A.    I don't know that it was -- I don't

2   know that's necessarily a fair

3   characterization.  I mean, to the extent that

4   there's overlap between the president's

5   immigration agenda and the serving as senior

6   adviser to the secretary of Homeland Security,

7   to the extent that those have any kind of

8   connection, sure.

9            But if not, there's areas maybe

10  where they depart.  I don't know.

11     Q.    Do you -- can you think of any --

12  any activities you did as the senior counselor

13  to DHS secretary that was inconsistent with the

14  president's immigration agenda?

15           MR. TYLER:  I'll object that it's

16  vague, it's open.

17           THE WITNESS:  That would require me

18  -- I mean that's a very vague, broad question

19  that would require me to delineate every single

20  portion of the president's agenda and recall

21  everything I did as senior counselor to the

22  secretary.  And I don't think I'm capable of


MAGNA
LEGAL SERVICES

Page 36

1    doing that.

2              BY MR. MEDOW:

3         Q.    Listen to my question.  My question

4    was simple.

5              As you sit here, can you identify

6    anything you did as senior counselor to the

7    secretary of DHS that was inconsistent with the

8    president's immigration agenda?

9              MR. TYLER:  Same objection.  The

10   witness has responded.

11             THE WITNESS:  I -- I don't know.

12             BY MR. MEDOW:

13        Q.    Can you recall anything?

14        A.    I don't -- I don't recall at this

15   moment.  But I -- i honestly don't know.

16        Q.    Who succeeded you at DHS?

17        A.    I think -- there wasn't anyone on

18   the first day.  But eventually I think the --

19   Tracy Short resumed the duties that I was

20   performing.

21        Q.    Tracy a female or male?

22        A.    Tracy is a male.



Page 37

```
 1              I don't recall when he came on
 2   board.  It might have been towards the end of
 3   November, maybe later.
 4        Q.    Okay.  So now you moved to DOJ,
 5   correct?
 6        A.    Correct.
 7        Q.    What's your -- what position did you
 8   take a DOJ?
 9        A.    Counselor to the attorney general.
10        Q.    Are you still -- is that still your
11   role?
12        A.    That's correct.
13        Q.    What are your duties and
14   responsibilities as counselor to the attorney
15   general?
16        A.    To provide legal and policy advice
17   to the attorney general on issues primarily
18   related to immigration, border security, some
19   national security issues, advise him on
20   litigation that is affecting our areas, and
21   performing other duties as necessary.
22        Q.    Are you the attorney general's lead
```



Page 38

```
 1   advisor on immigration-related issues?

 2        A.    I think so, yes.

 3        Q.    In your capacity as counselor to the

 4   attorney general, do you continue to have

 5   dealings with Homeland Security?

 6        A.    Yes.

 7        Q.    Are there particular individuals at

 8   Homeland Security you deal with on a -- more

 9   often than others?

10        A.    I interact with a lot of folks over

11   there, just depending on what's needed by the

12   situation.

13        Q.    Give me some names of people you

14   deal with.

15        A.    We deal a lot with the DHS front

16   office.  So whether that's the secretary

17   herself, Chad Wolf, Miles Taylor.

18        Q.    The secretary currently is

19   Ms. Nielsen?

20        A.    That's correct.

21        Q.    Chad Wolf is chief of staff?

22        A.    That's correct.
```



Page 39

1     Q.    Okay.  Miles Taylor?

2     A.    Is deputy chief of staff.

3     Q.    Are those the three -- since you've

4  gone to Justice, are those the three people --

5  well, I guess there was a period when Duke was

6  the acting secretary.

7           When did Nielsen become secretary,

8  if you recall?

9     A.    I think she became secretary in

10  December of 2017.

11     Q.    So the -- so for the last few months

12  of 2017 when you were at DOJ, you would have

13  been dealing with Nielsen -- I'm sorry --

14  dealing with Duke as opposed to Nielsen at --

15  at Homeland Security?

16     A.    Yeah.

17     Q.    Other than either Duke, Nielsen,

18  Wolf or Taylor, are there other folks at

19  Homeland Security that you've been dealing with

20  on any kind of regular basis while at DOJ?

21     A.    I mean it depends on what you mean

22  by "regular basis."



Page 40

1     Q.     Well, let me -- we've got Duke,

2  Nielsen, Wolf, Taylor.

3            Are there other people you've dealt

4  with at -- at Homeland Security on more than

5  one occasion?

6     A.     Yes.

7     Q.     Can you give me some of those names?

8     A.     Jeez.  I mean it's a lots of people.

9  I mean it depends on the issue and the subject.

10 But I deal a lot with their general counsel's

11 office, with the front office of ICE, CBP,

12 USCIS.  You name it.

13           I deal with a lot of different folks

14 from a lot of different places.

15    Q.     Who in general counsel's office do

16 you deal with principally?

17    A.     John Mitnick, George Fishman, Joe

18 Maher, Hayley Chang, Nader Baroukh.  A whole

19 litany of folks.

20    Q.     You mention USCIS.  I think that

21 acronym's going to come up today on more than

22 one occasion.



1              Could you define it for the record?

2        A.     That's United States Citizenship and

3   Immigration Services.

4        Q.     Is that a division or department of

5   Homeland Security?

6        A.     It is a agency within the Department

7   of Homeland Security.

8        Q.     Okay.  You referred to the front

9   office of USCIA -- USCIS.

10             Who in the front office have you

11   been dealing with?

12        A.     With the director, Francis Cissna;

13   their chief counsel, Craig Symons; occasionally

14   with Kathy Nuebel Kovarik; occasionally Kaitlin

15   Vogt.

16             I mean it just -- again, it depends.

17   It's anyone that's required to get the job done

18   for the attorney general.

19        Q.     Okay.  We -- we touched briefly

20   before on the Trump transition team, which you

21   were a part of, correct?

22        A.     That's correct.



Page 42

1    Q.    Did you join in August of 2016?

2    A.    That's correct.

3    Q.    While you were working the first

4    time with Senator Sessions, correct?

5    A.    That's correct.

6    Q.    Were you an advisor on

7    immigration-related issues on the transition

8    team?

9    A.    Yes.

10    Q.    Were you the lead person on

11    developing all immigration-related policy

12    issues for the transition team?

13    A.    Yes.

14    Q.    To whom did you report on the

15    transition team?

16    A.    It depends on the issue.

17    Q.    Immigration issues.

18    A.    This is an area where I need to

19    think about the nondisclosure agreement.

20    Because that includes personnel working on

21    transition matters.  There was a lot of people

22    involved in the transition.



Page 43

```
 1               What I can say right now is that I

 2     don't recall TPS ever coming up during the

 3     transition period.  I don't recall ever working

 4     on it.  I don't recall ever advising anyone on

 5     it.  I don't recall it being an issue that we

 6     dealt with at all.

 7          Q.    The pending question was who did you

 8     report to.

 9               Are you refusing to answer on the

10     basis of the nondisclosure agreement?

11          A.    For the time being, yes.  I would

12     need to consult with counsel for the transition

13     entity.

14          Q.    When do you anticipate doing that?

15          A.    It depends on if I need to.

16          Q.    What will determine whether you need

17     to?

18          A.    Well, I just said that we didn't

19     work on TPS.  So I'm not sure what matters what

20     happened on the transition period if it doesn't

21     relate at all to this lawsuit.

22          Q.    That's for the court to decide,
```



Page 44

1    isn't it, sir?

2         A.    I don't know.

3         Q.    You're a lawyer.

4               You don't know?

5         A.    I'm a lawyer.  It's indeed true.

6         Q.    Did you work with Stephen Miller

7    while on the transition team?

8         A.    Stephen worked on the transition

9    entity at the same time I did.

10        Q.    Did the two of you work together on

11   any matters in connection with the transition

12   team?

13        A.    Generally, yes.

14        Q.    Subsequent to the election of

15   President Trump, did you discuss formulation of

16   immigration policies with Miller while on the

17   transition team?

18        A.    Subsequent to the election, so post

19   election day, did I discuss immigration matters

20   with Stephen?

21        Q.    Did you discuss -- discuss

22   formulation of immigration policy with him?



Page 45

1      A.    I did.

2      Q.    Did TPS come up in that context at

3  all?

4      A.    No.

5      Q.    Prior to the election of the -- of

6  President Trump, did you equally discuss

7  formulation of immigration policy with Mr.

8  Miller in connection with the transition team?

9      A.    I did discuss immigration issues

10  generally with Stephen.

11     Q.    Okay.  Did TPS come up then?

12     A.    No.

13     Q.    Did you recommend people for

14  appointment to Homeland Security?

15     A.    Yes.

16     Q.    Including to USCIS?

17     A.    I made a variety of recommendations.

18     Q.    Who did you recommend?

19          MR. TYLER:  What time frame are we

20  dealing with here?

21          You said "transition."

22          Is this preelection? postelection?



Page 46

1           MR. MEDOW:  During the -- it's --

2     it's -- it's not limited in time.

3           BY MR. MEDOW:

4     Q.    Did you -- the question is who have

5     you recommended for appointment to DHS?

6           MR. TYLER:  Well, it gets into

7     deliberative process privilege.  So I'm trying

8     also to understand the relevance of this

9     testimony.

10          So to the extent that he was in

11    government and he was making recommendations, I

12    would object.

13          MR. MEDOW:  I -- I get your point.

14    Let me rephrase.

15          BY MR. MEDOW:

16    Q.    Prior to January 20th of 2017, who

17    did you recommend for appointment to DHS?

18    A.    There were a lot of different names

19    that were offered, but I -- I don't recall all

20    of them.

21    Q.    Give me the names you do remember.

22    A.    And this is preelection day -- I



Page 47

```
 1   mean pre --

 2        Q.    Inauguration.

 3        A.    -- inauguration day.

 4              I -- anywhere in the Department of

 5   Homeland Security?

 6        Q.    Let me narrow it down to USCIS or --

 7   or the front office of Homeland Security, one

 8   of the two.

 9        A.    I did recommend that Francis Cissna

10   would be a good director; Craig Symons would be

11   a good chief counsel; Karl Rich would be a good

12   chief of staff; Kathy would be good wherever,

13   Kathy could be.

14        Q.    Kathy is?

15        A.    Nuebel Kovarik.

16        Q.    Who else?

17        A.    I don't recall any else -- anyone

18   else.

19        Q.    Now, Ms. Nuebel Kovarik was also on

20   the transition team, right?

21        A.    The names and identities of people

22   on the transition team I don't know if I'm
```



Page 48

1  allowed to say under my NDA.

2      Q.    Okay.  Based on that, you're

3  refusing to answer now?

4      A.    At this point in time, yes.

5      Q.    Aside from you and possibly

6  Ms. Nuebel Kovarik, was there anybody else on

7  the transition team who ended up at DHS?

8      A.    Define "transition team."

9      Q.    People working on the tran -- for

10  the transition entity you identified earlier.

11      A.    Well, John Kelly worked on the

12  transition entity.  Kirstjen Nielsen worked on

13  the transition entity.

14      Q.    Who else?

15      A.    But they -- that's publicly known --

16  publicly available information.

17            I don't recall other folks at this

18  point in time.

19      Q.    Did your work on the transition team

20  generate work product?

21            MR. TYLER:  Object to form.  Vague.

22            THE WITNESS:  What is a work



Page 49

1    product?

2            BY MR. MEDOW:

3        Q.    You don't know what "work product"

4    means?

5        A.    You tell me.

6            MR. TYLER:  Objection.  Vague.

7            THE WITNESS:  What -- what -- what

8    are you defining as "work product"?

9            BY MR. MEDOW:

10       Q.    When you use the term "work

11   product," what do you understand it to mean?

12           MR. TYLER:  Objection.

13   Argumentative.  Vague.

14           THE WITNESS:  Tell me what you mean

15   by "work product."

16           BY MR. MEDOW:

17       Q.    You tell me what -- you tell me what

18   you understand the term to mean.

19           MR. TYLER:  You are asking this

20   witness -- you used this term, and now you're

21   demanding him to interpret it?

22           MR. MEDOW:  It's a commonly used



Page 50

1    term, Counsel.  Everybody knows that.

2            If the witness wants to continue

3    testifying that way, that's fine.  I'm asking

4    him, when he uses the term, how does he use it

5    so then I can adopt his definition.

6            THE WITNESS:  Why don't you offer me

7    what you think --

8            MR. MEDOW:  No.

9            THE WITNESS:  -- of as "work

10   product."

11           MR. MEDOW:  I'll ask the question

12   I've asked.

13           THE WITNESS:  What do you mean by

14   "work product"?

15           BY MR. MEDOW:

16      Q.   What do you understand the term to

17   mean?

18           MR. TYLER:  Counsel, if you offered

19   your own definition, you could possibly ask

20   whether he accedes it to or not.

21           This is just becoming argumentative

22   and really --



Page 51

1          MR. MEDOW:  No.  It's -- it's -- the

2    witness is just refusing to answer.

3          THE WITNESS:  I'm just having -- I

4    mean I want to answer your question what --

5          BY MR. MEDOW:

6      Q.    I'm not here to answer your

7    questions.

8          I've given you a question:  What do

9    you understand the term "work product" to mean?

10     A.    Counsel, I just said I want to

11   answer your question --

12     Q.    And I --

13     A.    -- the right way.

14     Q.    Then answer the question --

15     A.    Then I --

16     Q.    -- I've just asked you.

17     A.    What I'm asking for is for

18   clarification, which is what you offered at the

19   start of this deposition.  If I didn't

20   understand something, to ask you for

21   clarification.  I'm asking you for

22   clarification.



Page 52

1      Q.    My question is simply what is your

2   definition of "work product"?

3            MR. TYLER:  Now you're just

4   badgering the witness.

5            MR. MEDOW:  No.  He's not answer.

6            MR. TYLER:  Well, because -- for

7   good reason, as he explained.  And you gave him

8   that opportunity to explain -- or to tell you

9   of any question that you asked that was vague

10  and he didn't understand.

11           MR. MEDOW:  You're just --

12           MR. TYLER:  So you have this

13  obligation, Counsel.  Otherwise you're just

14  engaging in harassment right now.

15           We can call an end to the deposition

16  sooner rather than later if that's your intent

17  over the next how many hours.

18           BY MR. MEDOW:

19      Q.    Are you able to answer the question?

20      A.    I asked for clarification.

21      Q.    Are you able to answer the question

22  as --

Page 53

1          MR. TYLER:  Again, same thing.  This

2     is harassment and just argumentative.

3          THE WITNESS:  I would like some

4     clarification.

5          BY MR. MEDOW:

6     Q.    I understand --

7     A.    I would like you to oblige by what

8     you offered at the beginning of this

9     deposition.

10    Q.    Oh, come on.

11         MR. TYLER:  Counsel --

12         BY MR. MEDOW:

13    Q.    I understand that, sir.

14         I've simply -- the question now is

15    are you unable to answer the question that was

16    posed to you?

17         MR. TYLER:  Meaning what?

18         THE WITNESS:  I am unable to answer

19    to the extent that I do not understand what

20    your definition of the term "work product"

21    means.

22         BY MR. MEDOW:



Page 54

1      Q.      Do you consider memoranda to be work

2   product?

3              MR. TYLER:  Objection.  Really

4   vague.

5              THE WITNESS:  Could you -- could a

6   memoranda be a work product hypothetically?

7   Sure.

8              BY MR. MEDOW:

9      Q.      Can you give me other examples of

10  what could hypothetically be work product?

11             MR. TYLER:  Same objection.

12             I mean the -- the witness has no

13  idea whether you're using it as a term of art

14  within the meaning of Rule 26; within the

15  meaning of -- on Supreme Court precedent, for

16  example; or whether you have something else

17  entirely in mind, something more colloquial in

18  meaning.

19             MR. MEDOW:  That's exactly what I

20  have in mind.  It is not Rule 26 work product.

21             MR. TYLER:  Well, then why don't --

22             BY MR. MEDOW:



Page 55

1      Q.      And my --

2              MR. TYLER:  -- you make yourself --

3              MR. MEDOW:  I thought it was --

4              MR. TYLER:  -- plain.

5              MR. MEDOW:  I thought it was

6      perfectly clear.

7              MR. TYLER:  Why are we engaging in

8      these kind of shenanigans?

9              BY MR. MEDOW:

10     Q.      When using the term --

11     A.      I just want to answer your question

12     carefully.

13     Q.      I --

14     A.      That's all.

15     Q.      I appreciate --

16     A.      I'm trying -- I'm trying to be a

17     good witness for you.

18     Q.      I'm using the term colloquially.  I

19     just want to know your colloquial understanding

20     of the term "work product."

21     A.      I mean that's a term that could have

22     a variety of meanings -- meanings.  It could



Page 56

1    mean memos, briefing materials, you name it.

2    It could have a -- a thousand different uses.

3        Q.    Under that definition, did you

4    generate any work product in connection with

5    your work on the transition team?

6        A.    If we use it as broadly as possible,

7    sure.

8        Q.    And you did so with respect to

9    immigration issues, I take it?

10       A.    Yes.

11       Q.    What type of work product did you

12   generate in connection with immigration issues?

13           MR. TYLER:  Objection.  Vague.

14           THE WITNESS:  What kinds of work

15   product.  So as broadly as possible.  Could --

16   a variety of things.  Could be briefing

17   materials, memos, you name it.

18           BY MR. MEDOW:

19       Q.    I -- I understand it could be.

20           I'm asking what work product you did

21   generate in connection with immigration issues.

22           MR. TYLER:  Objection.  Vague.



1          THE WITNESS:  It's -- it's been two

2    years since the transition period.  I don't

3    recall every work product that I worked on.  I

4    don't recall many products that we worked on

5    other than briefing materials, general briefing

6    materials.

7          BY MR. MEDOW:

8     Q.    What do you mean by "general

9    briefing materials"?

10    A.    Materials to brief senior leaders

11    who intended to advice the president elect of

12    the United States.

13    Q.    For whom did -- did you prepare

14    briefing materials?

15    A.    The transition entity.

16    Q.    Who in the transition entity?

17    A.    This is an -- again, an area where

18    I -- I want to be careful with the

19    nondisclosure agreement as to who I

20    specifically performed work for.

21          I would like the opportunity to

22    consult with counsel for the transition entity



Page 58

1    on that issue if this -- if we need to go

2    further into it.

3        Q.    So at this point you're refusing to

4    answer the question.

5        A.    At this point, yes.

6            MR. MEDOW:  Let me ask the

7    reporter to mark the next exhibit.

8            (Deposition Exhibit 133 was marked

9    for identification.)

10           BY MR. MEDOW:

11       Q.    Mr. Hamilton, you should now have

12    what's been marked as Exhibit 133.

13           Let me tell you where we got this.

14    This is a printout from an immigration page

15    from a web site www.greatagain.gov.

16           You see at the top?

17       A.    Uh-huh.

18       Q.    Was that, in fact, the web site of

19    the Trump transition team?

20       A.    I seem to recall that might -- might

21    have been their outward facing web site.

22       Q.    And this was a -- we pulled this off



Page 59

1    the Wayback Machine.  It's a December 3rd,

2    2016, so preelection, printout.

3              And do you see the title is

4    "Immigration"?

5         A.    I do.

6         Q.    And if you go to the second page of

7    the exhibit, it says:  "A Trump administration

8    would execute on the following 10-point plan to

9    restore integrity to our immigration system,

10   protect our communities and put America first."

11             Do you see that?

12        A.    I do see that.

13        Q.    Did you take the lead in putting

14   together this 10-point plan?

15             MR. TYLER:  I'll object on grounds

16   of relevance.

17             THE WITNESS:  Did I take the lead on

18   putting -- could you clarify?

19             BY MR. MEDOW:

20        Q.    Well, we see a 10-point plan was

21   published on the web site.

22             Were you involved in the generation



Page 60

1   of this 10-point plan?

2        A.    Yes.

3        Q.    What was your role?

4        A.    I helped advise as to policy issues

5   that the president elect could put forth in a

6   10-point plan.

7        Q.    Were you in charge -- were you the

8   person on the transition team in charge of

9   putting together this 10-point plan?

10            MR. TYLER:  Objection.  Vague.

11            THE WITNESS:  I was the lead for the

12  immigration team on the transition entity.

13            BY MR. MEDOW:

14       Q.    And in that capacity, was one of

15  your jobs to put together this 10-point plan?

16       A.    Probably.

17       Q.    Who else worked on it?

18       A.    That brings up the same issue that

19  we've talked about.

20       Q.    About the nondisclosure issue and --

21       A.    That's correct.

22       Q.    And you're refusing to answer that



Page 61

1    question, too, on that ground?

2         A.    That's correct at this time.

3    Although I'll reiterate my testimony that no

4    one talked about TPS to my recollection; no one

5    worked on TPS; TPS wasn't something that was

6    discussed --

7              MR. TYLER:  And this --

8              THE WITNESS:  -- at all.

9              MR. TYLER:  -- document does not

10   refer the TPS; hence, my objection on grounds

11   of relevance.

12             MR. MEDOW:  Object to the speaking

13   objection.

14             BY MR. MEDOW:

15        Q.    Are you familiar with the term "day

16   one book"?

17        A.    I am.

18        Q.    What does it refer to?

19        A.    A series of action items that a new

20   administration could potentially take.

21        Q.    Does "day one" refer to the day

22   after election?



Page 62

1      A.     It could be the day of election;

2  could be the day after election.

3      Q.     One of the two?

4      A.     One of the two.  Could be the first

5  business day after the election, given that the

6  inauguration was on a Saturday.  I don't know.

7      Q.     Was the day one book a compilation

8  of potential policy proposals on immigration?

9      A.     There were a variety of materials

10 prevented -- presented across a variety of

11 subject areas.

12     Q.     Was -- was one subject area

13 immigration?

14     A.     Yes.

15     Q.     In connection with immigration, were

16 the -- did the book contain a compilation of

17 potential policy proposals?

18     A.     I think so.

19     Q.     Formulated by the transition team?

20     A.     Yes.

21     Q.     Was the -- was there a physical

22 book, a binder of some kind?



Page 63

```
 1        A.      Probably.

 2        Q.      Did you ever see one?

 3        A.      I think so, but I don't -- I mean

 4  we're talking about two years ago.  I don't

 5  remember if someone put it in an actual binder

 6  or -- or what.

 7        Q.      Did the day one book include

 8  legislative proposals?

 9        A.      I don't recall.

10        Q.      I'll represent to you -- and to try

11  to avoid burdening the record with a lot of

12  paper, though, if you want the see it, just let

13  me -- just tell me.

14        A.      Okay.

15        Q.      This -- I have your transcript from

16  the prior deposition you gave in October.

17        A.      October of 2017?

18        Q.      Yeah.  October 20, 2017, in the

19  matter of Martin Jonathan Batalla Vidal versus

20  Elaine C. Duke.

21        A.      Okay.  Great.

22        Q.      And I'm looking at Page 199 --
```



Page 64

1      A.     Okay.

2      Q.     -- lines 18 through 20:  "To your

3  knowledge, did the day one book include any

4  legislative proposals?"

5             Answer:  "I think so."

6             Does that refresh your recollection

7  at all as to whether or not there were

8  legislative proposals in the day one book?

9      A.     Not necessarily refresh my

10  recollection.  I mean it refreshes my

11  recollection about what I said at that

12  deposition.  But I'll just repeat that it's

13  been two years, and I -- I don't -- I don't

14  know.

15     Q.     Would you stand by what you said in

16  the testimony I just read?

17     A.     I think so.  I will stand by my

18  testimony then because, at that point in time,

19  maybe I thought so.  But --

20     Q.     You were --

21     A.     -- I mean today I -- I don't -- I

22  don't remember.

MAGNA
LEGAL SERVICES

Page 65

1    Q.    When you gave that testimony, you

2  were closer in time to the events, correct?

3    A.    That's correct.

4    Q.    Did the day one book include any

5  proposed changes to policy?

6    A.    I think so, yes.

7    Q.    Okay.  Let's -- the term "TPS" has

8  come up today.  I guess that's not a surprise.

9         So we're all clear, what does "TPS"

10 refer to?

11   A.    Usually means Temporary Protected

12 Status.

13   Q.    Is there -- I think we referred to

14 it before.

15        There is a statute commonly referred

16 to as the TPS statute?

17   A.    There is a statute, Section 244 of

18 the Immigration and Nationality Act.  I think

19 it's codified at 8 USC 1254.

20   Q.    Was that statute enacted in 1990

21 during the first President Bush's

22 administration?


MAGNA
LEGAL SERVICES

Page 66

1      A.     That sounds correct.

2      Q.     Prior to January 20th of 2017 when

3  you became senior counselor to the secretary of

4  Homeland Security, prior to then had any of

5  your work concerned TPS?

6      A.     Yes.

7      Q.     How so?

8      A.     Well, as an assistant chief counsel

9  at ICE, we dealt with people who were TPS

10  beneficiaries on a regular basis or TPS

11  applicants in some cases.

12          There are laws that pertain to what

13  they're eligible for to receive in immigration

14  court regarding, you know, TPS or their ability

15  to be removed from the United States.

16          And so it was something that you

17  would encounter on a fairly regular basis.

18      Q.     How else did you have occasion to

19  deal with TPS prior to January 20th of 2017?

20      A.     I mean general familiarity with the

21  immigration laws and studying immigration laws

22  in general.  I don't recall any other specific



Page 67

1   projects, but --

2       Q.     Well, let --

3       A.     -- I know it came up at ICE from

4   time to time.

5       Q.     Let -- let's focus on your period --

6   the first time you worked for Senator Sessions

7   at -- as his general counsel on the judiciary

8   committee.

9              Did the -- and you mentioned there

10  was a subcommittee specifically on immigration,

11  immigration and the national interest, I think

12  it was?

13      A.     That's correct.

14      Q.     Did that subcommittee, during your

15  tenure there, take up any issues relating to

16  TPS?

17      A.     I don't remember.

18      Q.     The subcommittee held hearings,

19  right?

20      A.     That's correct.

21      Q.     I think you -- you testified in the

22  prior deposition ten or more during the two



Page 68

1   years you were there?

2           Does that sounds about right?

3       A.      That sounds about right.  I -- I

4   don't recall specifically.

5       Q.      Did any of the hearings -- the

6   subcommittee's hearings pertain to TPS?

7       A.      I -- I don't remember.  We did --

8   covered a lot of topics.  I don't want to tell

9   you wrong.

10      Q.      Did the subcommittee or the

11  judiciary committee itself consider any

12  legislation -- new legislation relating to TPS?

13      A.      I don't recall any legislation being

14  introduced in that congress that dealt with

15  TPS, but -- it could have happened, but I -- I

16  just don't remember.

17      Q.      Do you recall any consideration,

18  during your time at the judiciary committee, of

19  TPS issues?

20      A.      What do you mean by "consideration"?

21      Q.      Let me -- during your time with the

22  judiciary committee, were any legislative



Page 69

1  amendments or changes to the TPS statute under

2  consideration?

3      A.   I -- I don't -- I don't have any

4  idea.  I don't remember.

5      Q.   Do you recall any?

6      A.   I don't recall anything.

7      Q.   Now, you've said, on -- in moving to

8  the transition team, you said a couple of times

9  that TPS never came up?

10     A.   I don't remember ever talking about

11 TPS.

12     Q.   Okay.  Let me just make sure -- poke

13 a little more and see if your -- where your

14 recollection is.

15          You -- you talked about discussing

16 formulation of policy with Stephen Miller.

17          In any of those conversations did

18 TPS come up?

19     A.   No.

20     Q.   Looking again at the 10-point plan

21 in Exhibit 133 -- do you -- you have that in

22 front of you now?



Page 70

1      A.    I do.

2      Q.    Do any of those items 1 through 10

3   relate to TPS?

4      A.    No.  Nope.

5      Q.    Item No. 5 is "Cancel

6   unconstitutional executive orders and enforce

7   all immigration laws," correct?

8      A.    That's what it says.

9      Q.    Enforcing all immigration laws would

10  include TPS, I assume?

11         Is that a fair statement?

12     A.    I don't -- I mean that's somewhat

13  argumentative.  Enforcing all immigration laws

14  I think could be characterized as following the

15  immigration laws as they're written.

16     Q.    One of which was TPS?

17     A.    TPS Section 244 of the INA is one of

18  the immigration laws.

19     Q.    Item No. 10 is "Reform legal

20  immigration to serve the best interests of

21  America and its workers," correct?

22     A.    That's what it says.



Page 71

1      Q.     And that was part -- part of the
2    10-point plan to restore integrity to our
3    immigration system, protect our communities and
4    put America first, correct?
5      A.     It's No. 10.
6      Q.     On that list?
7      A.     On that list.
8      Q.     In the -- I can't remember if I
9    asked you.
10           In the day one book, did any of the
11   legislative proposals relate to TPS?
12     A.     Well, I've already said that I don't
13   remember that there were legislative proposals
14   at this point in time today.  So I couldn't
15   tell you.
16     Q.     And did any of the proposed policy
17   changes in the day one book relate to TPS?
18     A.     As I've said, I don't recall TPS
19   ever being discussed during transition.  So it
20   would be strange for it to not be discussed and
21   then appear in a policy book.  That wouldn't
22   make sense.



Page 72

1    Q.    During your time on the transition

2    team, did you deal with outside groups or

3    individuals on immigration issues?

4    A.    Not really.

5    Q.    Are you familiar with the

6    organization FAIR, F-A-I-R?

7    A.    I am.

8    Q.    What does "FAIR" stand for?

9    A.    I think it's Federation For America

10   Immigration Reform.  I might have botched a

11   word, but I think that's what it stands for.

12   Q.    During the transition team, did you

13   deal with any representatives of FAIR?

14   A.    Rep -- define what you mean by

15   "representatives of FAIR."

16   Q.    Persons acting on behalf of FAIR.

17   A.    No one acting on behalf of FAIR.

18   Q.    Did you deal with people who had

19   some connection with FAIR?

20        MR. TYLER:  Objection.  Vague.

21        THE WITNESS:  What do you mean by

22   "some connection"?



Page 73

1          BY MR. MEDOW:

2     Q.    Well, I -- you seem to be -- you

3  said not people acting on behalf of FAIR, which

4  led me to think that there's somebody who has

5  some connection to FAIR but wasn't acting on

6  their behalf that you might have had dealings

7  with.

8          Is that what you were trying to

9  imply?

10    A.    There might have been people who had

11  past experience with them.  But I -- they

12  weren't acting on behalf of FAIR.

13    Q.    Let me hand you what's been

14  previously marked as Exhibit 97.

15          It's a multi-page document entitled

16  "FAIR Immigration Priorities for the 2017

17  Presidential Transition, a Special Report from

18  the Federation for American Immigration

19  Reform."

20          Do you see that?

21    A.    I do see it.

22    Q.    Have you seen this before?



Page 74

1      A.    I don't remember.

2      Q.    You may have, but you're not sure?

3      A.    I -- I don't remember.

4      Q.    You're free to look at whatever you

5  want.  But I'm going to direct your attention

6  to the bottom of Page 15, carry over to 16.

7      A.    Okay.

8      Q.    And the last bullet item says:  "DHS

9  must issue regulations making illegal aliens

10 ineligible for TPS.  The secretary of Homeland

11 Security must revoke TPS for any country that

12 has received more than two renewals.  Future

13 grants on TPS must only occur in limited

14 circumstances."

15           Do you see where I've read?

16     A.    I see that.

17     Q.    Were any of these proposals by FAIR

18 brought to your attention?

19     A.    No.

20           MR. TYLER:  Objection.  Compound.

21           BY MR. MEDOW:

22     Q.    In particular, the proposal by FAIR



Page 75

1    that the secretary must revoke TPS for any

2    country that has received more than two

3    renewals, was that idea ever brought to your

4    attention in connection with the transition?

5         A.    No.

6         Q.    Or thereafter?

7         A.    No.  And it doesn't make sense.

8         Q.    Why is that?

9         A.    TPS -- the conditions for granting

10   or extending -- designating -- redesignating

11   TPS are set out in statute.

12        Q.    And is the -- is the proposal by

13   FAIR here -- is what you're saying the proposal

14   by FAIR here is inconsistent with the statute?

15        A.    I -- I don't know.  It just -- it --

16   it doesn't make sense to me.  Because it --

17   there's no specific statutory citation.  I

18   don't know exactly what they mean by you must

19   revoke for any country's that's received two

20   renewals.

21             I don't -- I don't even know what

22   that means in relation to the statute.



Page 76

1     Q.    Is there any -- to your knowledge,

2  having read the statute, is there any language

3  in the statute that requires the secretary to

4  revoke TPS for any country that has received

5  more than two renewals?

6           MR. TYLER:  Objection.  Calls for

7  legal conclusion.

8           THE WITNESS:  I'm -- I am not

9  familiar with anything in Section 244 of the

10  INA that has such a provision.

11           BY MR. MEDOW:

12     Q.    Did you meet with representatives of

13  FAIR after January 20th of 2017 while you were

14  at DHS?

15     A.    There might have been one meeting

16  that we had with a number of outside groups, I

17  want to say like late spring of 2017.  FAIR may

18  have been one of them.

19     Q.    I will represent to you you

20  testified in the DACA case that, consistent

21  with what you just said, you had a meeting with

22  FAIR attend by representatives of FAIR, another



Page 77

1    group Center For Immigration Studies, CIS --

2         A.    Yes.  Uh-huh.

3         Q.    -- and Numbers U.S.A., another

4    group.

5               Does that --

6         A.    Sure.  Yeah.  I --

7         Q.    Is that true?

8         A.    -- I recall -- I recall that

9    meeting --

10        Q.    Okay.  Did --

11        A.    -- generally.

12        Q.    Did the subject -- anything come up

13   during that meeting relating to TPS?

14        A.    I couldn't tell you.

15        Q.    You just don't remember one way --

16        A.    I don't remember.

17        Q.    -- or the other?

18              Sorry.  You got to respond audibly?

19        A.    I -- I -- I don't remember.

20        Q.    At that meeting was FAIR represented

21   by a Mr. Robert Law?

22        A.    I think Rob was there.



Page 78

1      Q.      Was that the -- this meeting in the

2  spring of 2017, was that the first time you had

3  met Mr. Law?

4      A.      No.

5      Q.      How long had you known him?

6      A.      I had crossed paths with Rob in my

7  capacity on the Hill previously.

8      Q.      With Senator Sessions?

9      A.      Correct.

10     Q.      And what -- what brought you into

11 contact with Law in that context?

12     A.      As most Hill staffers are familiar,

13 there are a number of outside groups that want

14 to get your attention, want to get your boss's

15 attention on any number of issues.

16          And so I engaged with outside groups

17 from all across the spectrum on many occasions

18 as part of my job to help inform the senator.

19     Q.      In that context, when you were on

20 the Hill, did any of your interactions with Mr.

21 Law relate to TPS?

22     A.      I couldn't tell you.  I don't



1    remember.

2         Q.    Do you recall any outside groups --

3    during your time on the Hill with Senator

4    Sessions, did any outside groups reach out to

5    you with respect to TPS issues?

6         A.    I don't remember.

7         Q.    May have but you just don't recall?

8         A.    I don't think -- I -- that doesn't

9    ring a bell.

10        Q.    Is -- is there anything at all you

11   remember on that subject?

12        A.    No.

13        Q.    After your -- the meeting with Mr.

14   -- I'm sorry.

15             After the meeting in the spring of

16   2017 with the three groups we mentioned, did

17   you have any further dealings with Mr. Law

18   while you were at DHS?

19        A.    I don't remember.  Because I -- it's

20   my understanding, I think -- I think Rob still

21   works there.  I -- because I'm pretty sure I've

22   had some e-mail contact with him in some



Page 80

1   capacity where I've seen his name on e-mail.

2           So I don't know if he came on when I

3   was still there or if he came on aft -- I

4   just -- I don't remember.

5       Q.   As you just mentioned, Mr. Law

6   ultimately joined DHS, correct?

7       A.   I think so, yeah.

8       Q.   Do you know what his position is?

9       A.   I don't.

10      Q.   Were you involved at all in the

11  process of hiring him?

12      A.   Not -- no.

13      Q.   Did you recommend him?

14      A.   I might -- I might have recommended

15  his name to someone at some point in the past.

16  But I -- I don't recall specifically.

17      Q.   Do you know who did hire him or who

18  was in charge of hiring him?

19      A.   I don't know who was in charge of

20  making a hiring decision.  I don't know if you

21  would say that was the director or -- I don't

22  know.



Page 81

1      Q.    Now, as of January 20, 2017 when you

2  joined DHS, the TPS statute had been on the

3  books roughly -- or more than 25 years,

4  correct?

5      A.    I -- seems to add up.

6      Q.    It is listed on the DHS web site as

7  a humanitarian program; is that true?

8      A.    I don't know how it's listed on

9  their web site.

10          I'm not sure the relevance of that,

11  how it's listed on a web site, what that means.

12          (Deposition Exhibit 134 was marked

13  for identification.)

14          BY MR. MEDOW:

15      Q.    Okay.  Mr. Hamilton, you should have

16  what's been marked by the reporter as Exhibit

17  134.

18          This is a printout we did from the

19  USCIS section of the DHS web site.

20      A.    When did you print it?

21      Q.    Yesterday, I believe.

22          I'll just read -- do you see on the



 1    first page -- well, the -- the title is --

 2    under USCIS there's the word "humanitarian."

 3              Do you see that?

 4        A.    I see that.

 5        Q.    And putting aside the -- then

 6    there's an entry about Cubans.  Let's pass on

 7    that.

 8              The next section says:  UC -- "USCIS

 9    provides a number of humanitarian programs and

10    protection to assist individuals in need of

11    shelter or aid from disasters, oppression,

12    emergency medical issues and other urgent

13    circumstances."

14              Do you see that?

15        A.    I do see that.

16        Q.    And one of the programs listed in

17    this section of the web site is TPS, correct?

18        A.    On the next page there is a section

19    that says "Temporary Protected Status."  And it

20    says:  "USCIS may grants TPS to eligible

21    nationals of certain countries or parts of

22    countries who are already in the United States

Page 83

1    to stay here for a limited period of time.

2    Eligible individuals without nationality who

3    last resided in the designated country may also

4    be granted TPS."

5         Q.    Do you agree with the

6    characterization of TPS as a humanitarian

7    program?

8         A.    Is it a humanitarian program?  I

9    mean that's how the agency --

10        Q.    I understand that.

11        A.    -- qualifies it.

12        Q.    I'm asking do you agree with that

13   characterization?

14        A.    Depends on how you define

15   "humanitarian."  TPS generally has three

16   grounds upon which TPS can be designated.  You

17   can make arguments that there are humanitarian

18   purposes.  But it depends on what you define as

19   humanitarian.

20             What matters is what's in the

21   statute, not how an agency classifies it on

22   their web site.



Page 84

1    Q.    Was -- while you were at DHS, was

2    there any discussion you recall about whether

3    or not the characterization of the program as

4    humanitarian was appropriate or not?

5    A.    I couldn't tell you.  I don't...

6    Q.    You don't remember?

7    A.    I don't remember.

8    Q.    Did you help Senator Sessions

9    prepare for his confirmation hearing as

10   attorney general?

11   A.    I seem -- yes.  I did some

12   assistance.  That's correct.

13   Q.    Okay.  His hearing was in January of

14   2017, correct?

15   A.    I think so.

16   Q.    I'll represent to you -- we can -- I

17   can show you the language if you want -- he

18   said during that testimony that -- I'm quoting

19   here:  "The immigration policy of the United

20   States should serve the national interest."

21          Do you agree with that?

22   A.    Sounds like his statement.



Page 85

1      Q.    Something you agree with?

2      A.    That the immigration policy of the

3  United States should serve the national

4  interest.  I think that's pretty

5  unobjectionable.

6      Q.    Objection or unobjection?

7      A.    Unobjectionable.

8      Q.    As of January 20th of 2017, did you

9  think the TPS program served the national

10  interest?

11      A.    What do you mean by that?

12      Q.    What I just asked.

13      A.    Well, it depends on what you define

14  as "the national interest."

15      Q.    As you define it, did you believe

16  the program served the national interest?

17      A.    TPS certainly can serve the national

18  interest.

19      Q.    How?

20      A.    Well, it depends on if the

21  secretary, in his or her discretion, decides

22  that one of the three statutory categories are



Page 86

1   met and makes that determination, then sure it

2   can advance the national interest.

3           But it depends on what you define as

4   the national interest.  There's a lot of ways

5   it could or could not serve the national

6   interest.

7       Q.    How could it not serve?

8       A.    That calls for a lot of speculation

9   on my part in a hypothetical situation.

10          I'm not going to sit here and recite

11  every litany of reasons why TPS couldn't serve

12  the national interest, just like I'm not going

13  to sit here and tell you every reason why it

14  could serve the national interest.

15          It's a very fact-specific

16  determination.

17      Q.    As of January 20th, 2017, did you

18  think the TPS had been properly run or

19  administered by prior administrations?

20          MR. TYLER:  Objection.  Vague.

21          THE WITNESS:  What to you mean by

22  "properly run"?



Page 87

```
 1              And what do you mean by "prior

 2    administrations"?

 3              BY MR. MEDOW:

 4         Q.   Well, let's -- let's back up a

 5    little to more objective level and talk a

 6    little bit about the process under TPS.

 7         A.   Okay.

 8         Q.   Countries get designated by the

 9    secretary under the statute; is that true?

10         A.   After the Homeland Security Act of

11    2002, yes.  Prior to that, it was the attorney

12    general.

13         Q.   And after a country is designated,

14    is it true that the secretary

15    thereafter periodic -- periodically reviews

16    whether or not that designation should continue

17    or end or be redesignated, those types of

18    things?

19         A.   In general, yes.

20         Q.   Okay.  The ultimate decision, post

21    the statute you just mentioned, is with the

22    secretary of Homeland Security, right?
```



Page 88

1       A.      That's correct.

2       Q.      But was the process for making the

3    decisions for the secretary to receive a

4    recommendation from the director of USCIS?

5       A.      During which period?

6       Q.      Well, I'm -- I'm asking, to your

7    knowledge, to the extent you have it, for the

8    statute generally.

9               And as far as you know, has the

10   process been for the secretary to get a

11   recommend -- recommendation from the director

12   of USCIS?

13      A.      I know that's what happened.  It's

14   my understanding that that's what happened, at

15   least when -- in this administration.

16      Q.      Trump.

17      A.      I couldn't speak to -- I -- I could

18   speculate that that's what they did in prior

19   administrations.

20      Q.      Now, when you joined DHS, was there

21   a director of USCIS in place?

22      A.      Was there a director?



Page 89

1              With -- do you mean like a senate

2    confirmed?  Do you mean someone performing the

3    duties of the director?

4         Q.    Let's start --

5         A.    What do you mean.

6         Q.    Senate -- let's start with senate

7    confirmed.

8         A.    There was not senate confirmed.

9         Q.    Was there an acting director?

10        A.    There was an acting director.

11        Q.    Was that Mr. McCament?

12        A.    No.

13        Q.    Who was it?

14        A.    Was Lori Scialabba.

15        Q.    At some point did McCament take over

16   in that position as acting director?

17        A.    I believe, after Lori left, he

18   became the acting director.

19        Q.    When was that, to the best of your

20   recollection?

21        A.    Spring of 2017.

22        Q.    Was the prior director under the



Page 90

1   Obama administration Leon Rodriguez?

2     A.    Yes.

3        (Deposition Exhibit 135 was marked

4   for identification.)

5        BY MR. MEDOW:

6     Q.    Okay.  Mr. Hamilton, you've been

7   handed a copy of what's been marked as Exhibit

8   135, which is a multi-page document entitled

9   "Expert Report of Leon Rodriguez" in this

10   lawsuit.

11        Again, you're free to look at the

12   doc -- any portion of the document you'd like.

13   I'm going to direct your attention though to

14   principally Paragraph 21.

15        So why don't you give that and

16   perhaps -- why don't you read 20 and 21.  20

17   may give you some context for 21.

18     A.    Okay.

19     Q.    Let's look at 21.  And I'll just

20   read it for the record:  "In making a

21   recommendation to the DHS secretary regarding

22   extension or termination of TPS, intervening



Page 91

1    factors arising after a country's original TPS

2    designation, such as subsequent natural

3    disasters, issue of governance, housing,

4    healthcare, poverty, crime, general security

5    and other humanitarian considerations, were

6    considered relevant to determining whether a

7    country continued to meet the conditions for

8    continuing TPS designation.  This was true

9    regardless of whether those intervening factors

10   had any connection to the event that formed the

11   basis for the original designation or to the

12   country's recovery from that originating

13   event."

14           Do you see where I've read?

15      A.    I do.

16      Q.    In your view, is Mr. Rodriguez's

17   description of how he made recommendations to

18   the secretary consistent with the language of

19   the TPS statute?

20           MR. TYLER:  Well, objection.  It's

21   vastly compound.  It's a paragraph with much

22   information in it.  You're calling for a legal



Page 92

1   conclusion.  His personal view.

2          MR. MEDOW:  I'm asking for his

3   personal view.

4          THE WITNESS:  I mean it certainly

5   appears to be Director Rodriguez's belief.

6          BY MR. MEDOW:

7     Q.    And I'm asking do you think his --

8   his belief is consistent with the language of

9   the statute, in your view -- the view you held

10  as of January 20th --

11         MR. TYLER:  I object.

12         BY MR. MEDOW:

13    Q.    -- 2017?

14         MR. TYLER:  It's an unfair question

15  to the extent it is so vastly compound.

16         THE WITNESS:  This is a very

17  compound question.

18         There is at least eight factors

19  listed there that they considered -- he lists,

20  if not more.  So I don't know.  Some of those

21  might be relevant, and some of them might not

22  be.



Page 93

1              But it seems to be a very broad,

2    self-serving statement.

3              BY MR. MEDOW:

4         Q.    In -- in that paragraph we just

5    read, Mr. Rodriguez, as you've just indicated,

6    identified various factors he thought relevant

7    to determining whether a country continued to

8    meet the conditions for continuing TPS

9    designation, correct?

10        A.    Yes.  He seems to list a lot of

11   factors.

12        Q.    Okay.  Then let's look at the last

13   sentence of the paragraph:  "This was true,"

14   meaning these factors were relevant,

15   "regardless of whether those intervening

16   factors had any connection to the event that

17   formed the basis for the original designation

18   or to the country's recovery from that

19   originating event."

20              Do you see that?

21        A.    I do see that.

22        Q.    Is that statement in that sentence



Page 94

1    by Mr. Rodriguez consistent, in your view, with

2    the language of the TPS statute?

3           MR. TYLER:  Same objection.  Vastly

4    compound.  Calls for legal conclusion.

5           THE WITNESS:  This is -- I mean, as

6    counsel just stated -- this says:  "This was

7    true," referring to the consideration of eight

8    different factors, "regardless of whether those

9    intervening factors had any connection to the

10   event that formed the basis for the original

11   designation or to the country's recovery from

12   that originating event."

13          That is fairly vague.  So maybe;

14   maybe not.

15          BY MR. MEDOW:

16   Q.    Maybe not what?

17   A.    Could be consistent; could not be

18   consistent.  Just depends.

19   Q.    Depends on what?

20   A.    It depends on the specific facts and

21   circumstances of every TPS designation and

22   which one of the three subsections of the



Page 95

1    statute under which TPS was designated.

2        Q.    In your view, sir, is it

3    appropriate, under the TPS statute, to consider

4    intervening factors that were unrelated to the

5    basis for the original designation or to the

6    country's recovery from that originating event?

7             MR. TYLER:  Objection.  Calls for

8    legal conclusion.

9             THE WITNESS:  Could you repeat your

10   question.

11            BY MR. MEDOW:

12       Q.    Is it your view, sir, that it is

13   appropriate, under the TPS statute, to consider

14   intervening factors that were unrelated to the

15   basis for the original designation or to the

16   country's recovery from that originating

17   events?

18       A.    It could be; it could not be.  It

19   depends on the facts and circumstances.

20       Q.    During the Trump administration, has

21   the -- has the -- during the Trump

22   administration, has D -- DHS considered



Page 96

1    relevant intervening factors that were

2    unrelated to the event that formed the basis

3    for the original designation or to the

4    country's recovery from that originating event?

5            MR. TYLER:  Objection.  Wide-open

6    question.  Vague.

7            THE WITNESS:  For which TPS

8    designation?

9            BY MR. MEDOW:

10     Q.    Any.

11     A.    Couldn't tell you.

12     Q.    You don't know?

13     A.    I mean I think so.  I think, in some

14   of them, it -- something was considered.

15   Whether there's an intervening factor or not

16   and which one of the intervening factors is

17   a -- it's a very broad question.

18     Q.    Are -- in making TPS determinations,

19   are intervening factors unrelated to the basis

20   for the original designation or to the

21   country's recovery from that originating event

22   relevant, in your view, to the decision?



Page 97

```
 1      A.     They -- they might be.  They might

 2  not be.  You have to do a very rigorous

 3  analysis of the specific facts and

 4  circumstances and the particular basis under

 5  which TPS was designated under the statute.

 6             (Deposition Exhibit 136 was marked

 7  for identification.)

 8             BY MR. MEDOW:

 9      Q.     Okay.  Mr. Hamilton, you've been

10  handed what's been marked as Exhibit 136.

11             These -- I'll represent to you that

12  these are handwritten notes from Kathryn

13  Anderson.

14             Are you -- are you familiar with who

15  she is?

16      A.     To my recollection, she works at

17  USCIS.

18      Q.     Okay.  And I'll represent to you

19  that Ms. Anderson has testified these are her

20  notes from an embargoed call meeting.

21             Is that term familiar to you?

22      A.     An embargoed call meeting?
```



MAGNA
LEGAL SERVICES

Page 98

```
 1      Q.    Embargoed call, does that -- does
 2   that term have meaning to you?
 3      A.    It -- it could have meaning; could
 4   not.  I mean depends on the context.
 5            Are we talking about press or -- I
 6   mean --
 7      Q.    Yes.
 8      A.    -- I don't know what an embargoed
 9   call --
10      Q.    Yes.
11      A.    -- meeting --
12      Q.    A -- a call with press.  Embargoed I
13   believe she explained that it was supposed to
14   be not disclosed until a future point in time.
15      A.    That is typically what -- yes.  I'm
16   familiar with that.
17      Q.    Okay.  Now, she also testified that
18   you were present during the call reflected in
19   these notes and that you spoke during it.
20      A.    Okay.
21      Q.    This is in May of 2017.
22            And look -- I'm looking on the first
```



Page 99

1    page.

2              Do you see the -- looks like the

3    third bullet item, "Congress asked"?

4         A.    Okay.

5         Q.    And I will read to you -- she

6    read -- because it's her handwriting.  She read

7    it into the record, and I'll just read it to

8    you so you have it.

9              This is on Page 297 of Anderson's

10   transcript in this case.  She read her

11   handwriting to read:  "Congress asked us to

12   look at conditions that led to initial

13   designations and not at other conditions.

14   Understand some fine lines to draw there."

15             That's how she read it.

16             Were these -- was -- was this a

17   statement you made during this call?

18        A.    I -- I don't know if that was a

19   statement I made.  I don't recall.

20        Q.    Do you agree with those statements?

21        A.    Do I agree with her...

22        Q.    What she wrote down there.



1     A.    It depends.

2     Q.    On?

3     A.    The specific subsection under which

4   TPS was designated.

5     Q.    How does the specific subsection

6   play into the analysis?

7     A.    Well, you have to look at the

8   wording of the subsection.  There's -- TPS can

9   be designated for periods of ongoing armed

10   conflict; natural disasters, generally

11   speaking; or extraordinary or temporary

12   conditions are the three general prongs.

13         Each one has specific language that

14   you have to follow.

15     Q.    Okay.  Focusing on that last prong,

16   the temporary and extraordinary conditions

17   prong, is her -- do you agree with the

18   statement Ms. Anderson wrote down in connection

19   with those designations?

20     A.    It depends on if she's saying that

21   just in general or she's saying that in terms

22   of an extension or a redesignation or



Page 101

1    specifically what she's referring to.

2        Q.    Directing your attention in the same

3    Exhibit 136 to a page Bates stamped Anderson

4    10.

5            Do you see that?

6        A.    I do.

7        Q.    Okay.  I'm looking -- there's a --

8    some handwriting.  Then there's a blank line.

9    Then handwriting continues "Does S1."

10           Do you see that?

11       A.    I do.

12       Q.    Okay.  She has testified S1 refers

13   to the secretary.  So assuming this is in the

14   May 2000 [sic] time period, that would be

15   Kelly.

16           Was that common at DHS to refer to

17   the secretary as S1?

18       A.    Yes.

19       Q.    She writes:  "Does S1 for

20   administration have concerns about TPS program

21   as a whole?  Short answer, yes.  S1 is looking

22   at program with fresh eyes and wants to ensure



Page 102

1    all programs administered in a way that

2    benefits national interest."

3            Are these statements you made during

4    this call?

5        A.    I don't know.

6        Q.    Do you recall who -- who did make

7    them, if not you?

8        A.    I don't -- I don't know who else was

9    on that call, if I said this.  I mean this is

10   her handwritten notes that you're representing

11   was from a call from May of 2017, nearly two

12   years ago.  I couldn't tell you.

13       Q.    As of May of 2 -- 2017, did the

14   administration have concerns about the TPS

15   program as a whole?

16       A.    What do you mean by "the

17   administration"?

18       Q.    Trump administration.

19       A.    What do you mean by the "Trump

20   administration"?

21       Q.    Persons in the Trump administration.

22       A.    I don't -- can't represent to you


MAGNA
LEGAL SERVICES

Page 103

```
 1    the views of every person in the Trump

 2    administration.

 3        Q.    Do you know of any people in the

 4    Trump administration who, as of May of 2017,

 5    had concerns about the TPS program as a whole?

 6              MR. TYLER:  Objection.  Wide open.

 7              THE WITNESS:  I -- do I know any

 8    single person who had concerns with the TPS

 9    program as a whole?

10              MR. MEDOW:  Yes.

11              THE WITNESS:  I don't know that

12    anyone had concerns about the program as a

13    whole.  They -- people may have had feelings

14    about individual designations and whether the

15    conditions were met under the statute for

16    continued designation extension or

17    redesignation.

18              I -- it's pretty wide open.

19              BY MR. MEDOW:

20        Q.    At any point in time, did Mr.

21    Miller, Stephen Miller, express to you his

22    views on TPS?
```



Page 104

```
 1            MR. TYLER:  At any time.

 2            MR. MEDOW:  At any time.

 3            THE WITNESS:  At any time in

 4   history, has Stephen Miller represented his

 5   views on TPS to me.

 6            MR. MEDOW:  Yes.

 7            MR. TYLER:  Well, it -- it's when he

 8   was in government, Mr. Hamilton was in

 9   government.

10            MR. MEDOW:  Let's --

11            MR. TYLER:  Then it comes squarely

12   within the deliberative process privilege.

13            BY MR. MEDOW:

14       Q.    Let -- let's take it step by -- just

15   -- I think it's just a yes-or-no question at

16   this point.  And then we can break it down and

17   see what time periods we are talking about.

18       A.    I don't recall him expressing his

19   personal views on TPS to me.

20       Q.    At any point in time.

21       A.    I don't recall him expressing his

22   personal views about INA Section 244
```



Page 105

1    individually to me.

2         Q.    Do you know who James Nealon is?

3         A.    I do.

4         Q.    Who is that?

5         A.    He was the assistant secretary for

6    international affairs at DHS.

7         Q.    He has testified not in this case

8    but in the Ramos case in California.  In his

9    deposition on August 22nd of 2018 at Page 292,

10   lines 22 to 24, he testified:  "So I recall Mr.

11   Hamilton on a couple of occasions saying that

12   Mr. Miller favored the termination of TPS."

13             Did you, in fact, say that on

14   occasion?

15        A.    I don't know.

16        Q.    Did Mr. Miller, in fact, say to you

17   that he favored the termination of TPS?

18        A.    I dont recall Stephen saying that he

19   favored the termination of TPS.

20        Q.    Are you saying he didn't say it or

21   you don't remember?

22        A.    I don't -- I don't remember.



Page 106

1              (Deposition Exhibit 137 was marked

2    for identification.)

3              BY MR. MEDOW:

4      Q.    Mr. Hamilton, you've been handed by

5    the reporter what's been marked as Exhibit 137.

6              It appears to be a January 12th,

7    2016 letter from Senator Sessions and

8    Congressman Brat, B-R-A-T, to "Dear Republica

9    Colleague" and attaching a -- an article by the

10   two individuals in roll call.

11             Have you ever seen either the letter

12   or the article previously?

13     A.    I don't remember.

14     Q.    Did you -- you worked for Senator

15   Sessions in January '16, right?

16     A.    I did.

17     Q.    Did you draft or assist in drafting

18   either the letter or the article?

19     A.    I don't remember.

20     Q.    Would that -- would you have been

21   the -- to the extent any staffer assisted him

22   on these subjects, would you have been the



Page 107

1  person?

2      A.    Sometimes; sometimes not.  It

3  depends.

4      Q.    Who else would have dealt with --

5  you can, again, look at wherever you want in

6  the document, but I'll represent to you it all

7  deals with immigration issues.

8      A.    Okay.

9      Q.    Were there others who the senator

10 relied on at this time period to assist in

11 drafting materials on immigration?

12     A.    There is other staff members in the

13 office.  And certainly outward facing things

14 could have come from the press shop, or they

15 could have come from committee staff.  I --

16 there's a number of folks who advise members of

17 congress.

18     Q.    Let me -- let me direct your

19 attention to specific --

20     A.    Okay.

21     Q.    -- portions, see if it jogs your

22 recollection at all.



Page 108

1           I'm looking in the roll call

2   article --

3       A.    Okay.

4       Q.    -- second page.  And there's a --

5   towards the middle there's a paragraph, the --

6   starts:  "Following the 1880 to 1920

7   immigration wave."

8           Do you see that?

9       A.    I do.

10      Q.    Let me just read for the record:

11  "Following the 1880 to 1920 immigration wave,

12  which saw the foreign-born population double

13  from 7 million to 14 million people, congress

14  passed the law to reduce future immigration.

15  Between 1920 and 1970, America's foreign-born

16  population shrank from 14 million to

17  9.6 million.  For half a century the number of

18  immigrants declined both in total number and as

19  a share of the population."

20          New paragraph:  "This period

21  witnessed rapid wage growth."

22          New -- new paragraph:  "According to



1   the Congressional Research Service, from 1945

2   to 1970, as the foreign-born population fell,

3   the bottom 90 percent of wage earners saw an

4   82.5 percent increase in their wages.  During

5   this time, millions of prior immigrants were

6   able to" curb -- I'm sorry -- "able to climb

7   out of the tenements and into the middle

8   class."

9           New Paragraph:  "In 1965 congress

10  passed a new immigration law which helped

11  produce an unprecedented wave of low-skilled

12  immigration.  The foreign-born population more

13  than quadrupled from fewer to 10 million in

14  1970to more than 42 million today.  In 1970

15  fewer than 1 in 21 residents were foreign-born.

16  Today it is approaching 1 in 7.  In cities such

17  as Los Angeles and New York, almost 4 in 10

18  current residents were born in another country.

19  One-fifth of our residents now speak a language

20  other than English at home.  One-quarter of our

21  residents is now either an immigrant or born to

22  immigrant parents."



Page 110

1              My -- does my reading that refresh

2      your recollection as to any involvement you had

3      in putting together this article?

4         A.    No.

5         Q.    Included within the foreign-born

6      population in the country would be TPS

7      beneficiaries, correct?

8              MR. TYLER:  Oh, objection.  This

9      goes -- this -- your question spans multiple

10     paragraphs, a broad recitation of facts having

11     nothing to do with TPS on its face.  It's

12     grossly unfair.

13             MR. MEDOW:  You're not listening to

14     the question.

15             BY MR. MEDOW:

16        Q.    The question is simply does the

17     foreign-born population in the U.S. include TPS

18     beneficiaries?

19        A.    I don't know specifically what the

20     Congressional Research Service survey that's

21     referenced in this article looked at.

22     Presumably it could include TPS holders.  But



Page 111

1   again, that would require me to look at that

2   specific study, to look at the underlying data

3   that they relied upon, and then make a judgment

4   from there.

5           I have no idea what this has to do

6   with TPS.

7       Q.    Was it your view, as of January

8   20th, 2017, that the number of foreign-born

9   individuals in the United States was too high?

10          MR. TYLER:  Objection.  This is

11  becoming argumentative.  It's irrelevant.  It's

12  harassing.  It's outside the scope of relevance

13  under Rule 26.

14          Counsel, you have some leeway.  But

15  this is a mystery where you're trying to go

16  with this, other than to get into perhaps a

17  philosophical debate with this witness on broad

18  immigration matters having no bearing upon this

19  case.

20          MR. MEDOW:  The question stands.

21          THE WITNESS:  Your question seems to

22  be intended to annoy or harass me as a witness.



Page 112

1  And I think it is a patently absurd that you

2  would waste your limited time on deposition

3  asking that question.

4          BY MR. MEDOW:

5      Q.    The question is, as of January 20th,

6  2017, did you believe the number of

7  foreign-born individuals in the United States

8  was too high?

9          MR. TYLER:  This is objectionable.

10  It's unfair.  It's harassing.  It's

11  argumentative.  It's way beyond the scope of

12  appropriate discovery.  I object.

13          THE WITNESS:  I think that your

14  question -- I will repeat my comment.  I don't

15  know what you're getting at.  This is the

16  biggest waste of time in history.  The answer

17  to your question is no.

18          And if you want to keep bringing

19  ridiculous questions like that, then I'm going

20  to keep raising the fact that this appears to

21  not be intended to get any relevant evidence

22  whatsoever.



Page 113

1          MR. MEDOW:  Move to strike the

2   witness's superfluous comment?

3          MR. TYLER:  It stays in.  It's not

4   superfluous at all.  It's -- it's appropriate

5   comment to really objectionable line of

6   questioning.  You should know better.

7          THE WITNESS:  I mean what you're

8   insinuating is that --

9          MR. MEDOW:  I'm not going to debate

10  this.

11         THE WITNESS:  -- I have some kind of

12  problem.

13         MR. TYLER:  Well, then -- then

14  don't -- don't engage in this kind of inquiry.

15         MR. MEDOW:  I'll engage in whatever

16  inquiry --

17         MR. TYLER:  No.  Actually --

18         MR. MEDOW:  -- I deem appropriate.

19         MR. TYLER:  Actually, the results

20  of -- of the civil procedure also apply to this

21  deposition.

22         MR. MEDOW:  I'm well aware of that.



Page 114

```
 1                 MR. TYLER:  And you are -- you are

 2      engaging in violation of Rule 26(c).  You are

 3      harassing this witness for no good cause other

 4      than to get into argument with him on matters

 5      that have no bearing upon the specific

 6      matters --

 7                 MR. MEDOW:  In your --

 8                 MR. TYLER:  -- before the court.

 9                 MR. MEDOW:  In your view.

10                 MR. TYLER:  In any objective view.

11                 THE WITNESS:  Counsel --

12                 MR. MEDOW:  That's --

13                 THE WITNESS:  -- I mean this -- this

14      is the biggest waste of time, asking me about

15      an article citing some survey from the

16      Congressional Research Service about the

17      foreign-born population and trying to tie it to

18      a TPS decision.

19                 You know, if you want to keep doing

20      this, that's great.  But I'm just telling you

21      you are wasting your time, and you're trying to

22      harass me.  And I don't appreciate it.
```



Page 115

1              MR. MEDOW:  I'm not trying to harass

2      you, sir.

3              And I move to strike your comments.

4              Let's take a break.

5              THE VIDEOGRAPHER:  We are going off

6      the record.

7              The time is 11:30 a.m.

8              (A short recess was taken.)

9              THE VIDEOGRAPHER:  We are back on

10     the record.

11             The time is 11:43 a.m.

12             BY MR. MEDOW:

13      Q.    Mr. Hamilton, I just want to clean

14     up a point from what we were talking about

15     previously.  And again, I'll just like to read

16     you a short snippet from your testimony --

17      A.    Okay.

18      Q.    -- from the DACA case and just see

19     if you're -- you stand by the testimony you

20     gave.

21      A.    Okay.

22      Q.    It's Page 156, lines 8 through 11.



Page 116

1          Question:  "Would you agree that,

2   during that time" -- I guess I ought to read a

3   little bit before that so you know what "that

4   time" is.  I'll just start at the top of 156,

5   Line 1.

6          Question:  "Okay.  I would like to

7   talk with you a bit more about your role in the

8   secretary's office.  And I know you previously

9   testified that you served in the office of the

10  secretary for DHS for essentially the entire

11  Trump administration; is that correct?"

12          Answer:  "That's correct."

13          Which it was correct as of that

14  point in time, correct?

15      A.    Yes.  As of October, there was only

16  one place I worked.

17          MR. TYLER:  Counsel, are you going

18  to introduce this testimony into the record,

19  the -- this -- the deposition transcript?

20          MR. MEDOW:  I -- I can mark it if

21  you'd like.

22          MR. TYLER:  Yeah.  It might be more



Page 117

```
 1   fair to the witness.

 2              MR. MEDOW:  I was just trying to --

 3              MR. TYLER:  I understand.

 4              MR. MEDOW:  -- avoid paper, but --

 5              MR. TYLER:  Yeah.  I understand.

 6              MR. MEDOW:  -- purposely.

 7              We brought copies, so --

 8              MR. TYLER:  I understand.

 9              MR. MEDOW:  -- they're yours.

10              (Deposition Exhibit 138 was marked

11   for identification.)

12              MR. TYLER:  And the pages you're

13   referring to?

14              MR. MEDOW:  I was referring to 156.

15              BY MR. MEDOW:

16      Q.    Okay.  Do you see where I just

17   previously read, lines 1 through 7 on 156?

18      A.    Yes.

19      Q.    Okay.  So the time frame talked --

20   being talked about was the Trump

21   administration.

22              Do you see that?
```



Page 118

```
 1      A.    I do.

 2      Q.    Okay.  Then Line 8:  "Would you

 3   agree that, during that time, the office of the

 4   secretary has changed existing administration

 5   policies on immigration?"

 6            Answer:  "Yes."

 7            Do you see that?

 8      A.    I do.

 9      Q.    Was that the testimony you gave in

10   the deposition?

11      A.    It appears to be what was recorded.

12      Q.    Have you any basis to challenge the

13   transcription?

14      A.    No.  I don't think so.

15      Q.    Do you stand by that testimony?

16            MR. TYLER:  Objection.  Vague.

17            THE WITNESS:  What -- which -- which

18   part of which testimony?

19            BY MR. MEDOW:

20      Q.    Lines -- the question and answer in

21   lines 8 through 11.

22      A.    Yeah.
```



Page 119

1     Q.     Okay.  Thank you.

2            Okay.  Let -- let me -- I'd like to

3     talk on a more general level about your role

4     with TPS determinations --

5     A.     Okay.

6     Q.     -- to give you a little sense of

7     where we're heading.

8            Now, I think we talked about earlier

9     there would be a recommendation that would come

10    out of USCIS and go up to the secretary,

11    correct?

12    A.     That -- we talked about that.  And

13    that sounds vaguely -- my recollection seems to

14    be that that was the case.

15    Q.     And the -- would the recommendation

16    from USCIS be in the form of a decision memo

17    with blanks for the secretary to indicate what

18    he or she decided to do:  terminate, extend, et

19    cetera?

20    A.     I think there were decision memos on

21    this.  There's a multitude of meetings and

22    things that occurred leading to any TPS



MAGNA
LEGAL SERVICES

Page 120

1  decisions.  There wasn't one singular

2  recommendation memo that happened in a vacuum

3  without further information.

4      Q.    I understand that.  I'm just -- I'm

5  focusing just right now on the paper trial and

6  to find out your involvement.

7      A.    Okay.

8      Q.    To the extent there were these

9  decision memos that came up from USCIS to the

10  secretary, would you review them?

11      A.    I don't have any specific

12  recollection.  But I think, generally, yes.

13      Q.    Would you advise the secretary --

14  well, would you advise the secretary generally

15  on the decision, as TPS issues arose, as to

16  what the secretary should do?

17      A.    I would provide counsel and advice

18  to the secretary.

19      Q.    Would you share that counsel and

20  advice in writing? orally? how?

21      A.    It depends.  Usually orally.  And we

22  worked very closely together.  So...



Page 121

1      Q.      Did you deal on a daily basis with

2  the secretary?

3      A.      Absolutely.

4      Q.      Were your offices next-door to each

5  other or close?

6      A.      They were close.

7      Q.      Is that -- was most of your

8  communication with the secretary then orally as

9  opposed to in writing?

10      A.      I think so.

11      Q.      Now, once a decision was made on a

12  TPS country decision, the decision would be

13  publicly announced, right?

14      A.      Yes.  The process typically was to

15  announce a decision and publish something on

16  the Federal Register, to the best of my

17  recollection.

18      Q.      Would there typically be both a

19  press release put out and then a notice in the

20  Federal Register?

21      A.      I don't recall specifically.  That

22  sounds -- that sounds right.



Page 122

1    Q.    What role, if any, did you have in

2    the preparation or the finalization of either

3    press releases or Federal Register notices?

4    A.    I would, on a variety of documents,

5    and I would assume including those documents

6    you described, provide, you know, any edits for

7    consistency or whatever consistent with

8    direction from the secretary.

9    Q.    Would the secretary want you to

10   review and approve either the press release or

11   the Federal Register notice before it went out?

12   A.    Typically I would -- I don't -- I

13   don't know if I can recall a specific instance

14   of the secretary asking me directly, "Please

15   approve this press release."  But it was just

16   assumed that was part of my job.

17   Q.    Same with the Federal Register

18   notice?

19   A.    A visibility onto it for the

20   secretary to ensure that it was consistent with

21   what the secretary wanted.

22   Q.    When you say "visibility," what do



Page 123

1    you mean?

2         A.    I would see the documents.  And if I

3    -- they needed to be edited, I'd have an

4    opportunity to edit.  If not, then I wouldn't.

5         Q.    And if you saw a problem, you'd

6    speak up, I assume?

7         A.    To the best of my ability.  But

8    during that time, we were working on a lot of

9    different things.  And so it could be that

10   sometimes maybe I didn't have the ability to --

11   to edit something that needed to be edited.

12        Q.    Okay.  Did you work with USCIS on

13   the preparation of its recommendation or

14   decision memo?

15        A.    I -- I think I might have.  But

16   again, this was an iterative process that

17   involved multiple meetings and memos.  And I --

18   I -- I don't remember specifically at what

19   point in time I came in or where I didn't.

20        Q.    Would you typically review drafts of

21   the USCIS decision memo before it'd be sent up

22   to the secretary?



Page 124

1      A.     I think sometimes I -- I might have

2    seen drafts of memos.  But I -- I have no

3    specific recollection.

4      Q.     Okay.  When you did, you would

5    review and comment, I assume?

6      A.     Sometimes, I think.  Just -- again,

7    it really depends on the -- on the context and

8    on the situation.

9      Q.     Now, would the decision memo

10   typically be proceeded by another document

11   generated within USCIS describing in greater

12   detail conditions in the relevant country?

13     A.     That sounds right.  But I don't have

14   a specific recollection.

15     Q.     Country condition memo, does that

16   have any --

17     A.     I -- I can --

18     Q.     -- resonance?

19     A.     What I can tell you is that I can

20   recall, whether it was a USCIS document or

21   whether it was something else, country

22   condition were evaluated, and they were part of



Page 125

1    the decision in making a TPS decision.

2        Q.    Did you have any role in USCIS's

3    evaluation of country conditions?

4        A.    I -- did I have any role?

5             What do you mean by that?

6        Q.    Did you participate in the process

7    by which USCIS generated its conclusions

8    regarding country conditions?

9        A.    I don't recall specifically.  I -- I

10   know that we -- I discussed that issue with

11   USCIS.  But I -- I don't have any specific

12   recollection.

13       Q.    In terms of the -- and again, we're

14   -- the focus here is on an ultimate decision

15   with regard to a specific country under TPS.

16            Would you -- and we've talked now

17   about some of your interactions with various

18   persons within DHS in that process.

19            Did you deal with people outside of

20   DHS in connection with the consideration of how

21   to treat individual countries?

22       A.    I -- again, it's been a while.  I



Page 126

1    think so.  I -- my recollection is that, as

2    part of my duties advising the secretary, I

3    would consult with anyone that was necessary to

4    make the decision.

5         Q.    Okay.  Specifically do you recall

6    consulting with White House staff?

7              MR. TYLER:  Objection.  Vague.

8              BY MR. MEDOW:

9         Q.    With -- with respect to specific

10   country decisions.

11        A.    Which decision?

12        Q.    Whether to extend, terminate,

13   redesignate --

14        A.    For which country?

15        Q.    Any county.  Just a general -- just

16   trying to get a general sense right now.  And

17   then we'll dive down to see if there's anything

18   relevant to Haiti.

19        A.    I think that there was -- there had

20   to have been interaction of some kind.

21        Q.    Who -- can you put any names on that

22   in terms of who on the White House staff you



Page 127

1    would have dealt with in connection with

2    individual country decisions?

3         A.    I -- I don't recall.  I know that

4    there was -- on -- and again, it's been so

5    long, and there's so many of these decisions, I

6    don't remember if NSC was involved in some of

7    these or DPC.  I think maybe both may have had

8    some involvement.

9              But I -- I just don't -- I don't

10   want to tell you wrong.

11        Q.    Let's just make sure we understand

12   the acronym.

13             NSC is National Security Council?

14        A.    That's correct.

15        Q.    And did you say DPC?

16        A.    That's correct.

17        Q.    That's Domestic Policy Council?

18        A.    Yes.

19        Q.    Did you attend meetings hosted by

20   DPC related to immigration?

21        A.    Did I attend meetings hosted by DPC.

22   At -- I'm certain that DPC was present at



Page 128

1    meetings that I attended that involved

2    immigration.

3        Q.    Okay.  You can check me, but on

4    pages -- I used that phrasing because that's

5    what you said on pages 184 and 185, that --

6        A.    Okay.

7        Q.    -- you attended meetings hosted by

8    DPC.

9              Does that refresh your recollection?

10             Again, if you want to look at the

11   testimony, go ahead.

12       A.    I suppose they were hosted.  I

13   just -- again, you know, that was closer to

14   time than it is now.  So I -- if they hosted or

15   they were just there.  I...

16       Q.    In meet -- in meetings with DP -- do

17   you recall meetings with DPC regarding -- or

18   where one subject, at least, was an individual

19   country determination under TPS?

20       A.    Not any meetings, no.

21       Q.    Any communications with DPS

22   members -- or DPC members?



Page 129

1          Excuse me.

2     A.     There -- there may have been on a

3   couple of them.  I...

4     Q.     Did DPC report to Mr. Miller?

5     A.     I don't know that they report to

6   Stephen.  DPC is headed by Andrew Bremberg,

7   who's the director of the Domestic Policy

8   Council.  It has a deputy director.  I believe

9   Stephen has some oversight of it but -- but not

10   a direct reporting type of relationship.

11     Q.     You testified in the DACA case, 180

12   -- Page 186, lines 17 to 19:  "Domestic Policy

13   Council technically reports to Stephen Miller."

14          What did you mean by that?

15     A.     I think it was the same kind of

16   description that I have now.  I don't know

17   about technically reporting or if it's -- it's

18   hard to describe.  Because no one has been

19   exactly clear on what that relationship is.

20   And there's not like an org chart that shows,

21   you know, that Stephen supervises their work or

22   if they -- if he just has oversight of it.



Page 130

1          It depends on -- I don't -- I don't

2     know specifically.  But he has some involvement

3     with the Domestic Policy Council.

4          Q.    Okay.  Do you recall any discussions

5     with Mr. Miller about individual country TPS

6     decisions?

7          A.    I know that I had to have had, at

8     some point, individual discussions with Stephen

9     about general updates so that he could inform

10    the president about individual TPS decisions.

11         Q.    So the -- the -- the updates would

12    be provided by you to Miller?

13         A.    Yes.  That's correct.

14         Q.    And that -- that would include where

15    the department was going on individual country

16    decisions?

17         A.    Where the department was going, I

18    don't know specifically.  I know that I

19    discussed.  I don't know what -- at what point

20    it was, if it was predecision, after decision.

21    I -- I just don't recall.

22         Q.    Do you recall any discussions with



Page 131

1   Mr. Miller regarding any TPS decisions relating

2   the Haiti?

3       A.     Not specifically to Haiti; although,

4   as part of a -- my duties, I generally would

5   have probably kept him updated.

6       Q.     Did you have discussions with Steve

7   Bannon when he was in the White House?

8       A.     Did I have discussions with Steve

9   Bannon when he was in the White House?  I think

10  so.

11      Q.     Did any of those discussions touch

12  on TPS?

13      A.     Not to the best of my recollection.

14      Q.     And just to close it out, do you

15  recall any discussions with Mr. Bannon about

16  individual country decisions by DHS relating to

17  TPS?

18      A.     No.

19      Q.     Were there -- did you have any

20  discussions -- and again, focusing when you

21  were at DHS.

22      A.     Okay.



Page 132

```
 1        Q.     Did you, in that time period, had --
 2   have any discussions with Sen -- well, then
 3   Attorney General Sessions regarding individual
 4   country decisions on TPS?
 5        A.     When I was at DHS --
 6        Q.     Correct.
 7        A.     -- if I had discussions with
 8   Sessions about individual TPS decisions.
 9        Q.     Correct.
10        A.     I don't think so.
11        Q.     Okay.  Do you remember specifically
12   anything said between the two of you on Haiti?
13        A.     I don't.
14        Q.     Now, you -- you testified in -- in
15   your prior deposition that you've been in
16   meetings with the president.
17               Do you recall that?
18        A.     Yes.
19        Q.     Approximately how many?
20        A.     I don't know.  Somewhere between
21   five and ten.
22        Q.     Are these one-on-one meetings, or
```



Page 133

1    are you there part of a --

2         A.    No.

3         Q.    -- larger group?

4         A.    I'm there as part of a larger group.

5         Q.    Is there a -- a routine or recurring

6    type of meeting that brings you into contact

7    with the president?

8         A.    A -- what -- what do you mean by

9    like a -- a routine type of...

10        Q.    Of out -- of -- of your five to ten

11   meetings, are they all of one type? are they

12   all different types of meetings?

13              I'm just trying to get a sense of

14   it.

15        A.    I think they've always kind of

16   varied.  It's been from -- could be -- involve

17   substance of issues of import to the president.

18   And sometimes it's been things like, you know,

19   the new chief of staff getting sworn in.

20              You know, there's just a variety of

21   meetings that I've attended, whether it's -- I

22   don't know -- a bill signing, executive order



Page 134

1    signing.

2              I've been around the president

3    probably five to ten times.

4        Q.    Have you personally communicated

5    with the president?

6        A.    I have spoken with the president.

7        Q.    Small talk, substance, or what?

8        A.    Mostly small talk.

9        Q.    Do you recall any substance --

10   substantive discussions between you and the

11   president on immigration issues?

12       A.    Not that I -- not that I can think

13   of.

14       Q.    Do you recall specifically any

15   discussions with -- or let me rephrase.

16             Do you recall any discussions with

17   the president in your presence relating to TPS?

18       A.    No.

19       Q.    Do you recall any discussions in

20   your presence -- let me rephrase.

21             Do you recall any discussions that

22   you've personally observed with the president



Page 135

1    relating the Haiti?

2         A.    No.

3         Q.    And just make it absolutely clear,

4    were you present at any time when there was a

5    discussion with the president regarding Haiti's

6    status under TPS?

7         A.    No.

8         Q.    Did -- while you were at DHS and

9    individual countries were under consideration

10   with respect to their TPS status, did you

11   receive input from people outside of the

12   government?

13        A.    Outside of the government?

14        Q.    Yes.

15             MR. TYLER:  Objection.  Vague.

16             THE WITNESS:  If you could offer

17   some more explanation of what --

18             BY MR. MEDOW:

19        Q.    Well, I'm just -- anybody outside of

20   the government.

21             If -- if the answer is "yes," then

22   the next question will --



Page 136

1      A.    Outside --

2      Q.    -- be who?

3      A.    Outside of the United States

4  Government, yes.

5      Q.    Who?

6      A.    Government of Haiti, for example.

7      Q.    Okay.  Well, let's -- let's focus

8  specifically on Haiti.

9            In connection with the decisions on

10 Haiti, to whom -- or from whom did you receive

11 input on those decisions outside of the

12 government?

13           You mentioned the government of

14 Haiti.

15           Anyone else?

16           Any other third parties, if you

17 will, who weighed in on the decision?

18     A.    I mean weighing in on the decision,

19 there were a variety of advocacy groups and

20 members of congress who expressed an interest.

21 I couldn't tell you who they were specifically

22 or which organizations they were and -- or, you



Page 137

1    know, who they contacted.

2         And it -- there's a lot of people

3    who write letters to the secretary.  Sometimes

4    I see them.  Most of the times I would see

5    them.  Occasionally one might slip by that I

6    don't.

7         But generally speaking, that was the

8    universe.

9    Q.    Do you -- do you recall any

10   face-to-face meetings -- start with that --

11   face-to-face meetings with people outside of

12   government relating to the Haiti TPS decision?

13   A.    Yes.  We met with the Haitian

14   government several times.

15   Q.    Who else, if anyone?

16   A.    I don't recall any other specific

17   meetings, other than there may have been a

18   briefing or two with congress where members of

19   congress on the -- the then minority side may

20   have raised issue as a question.  But I -- I

21   don't recall specifically.

22   Q.    The then major -- minority would be



Page 138

1   the democrats?

2       A.    That correct.

3       Q.    Now, you -- as we established, you

4   left DHS October 27th, I think was the most

5   precise --

6       A.    Yes.

7       Q.    -- date you gave.

8            After October 27th of 2017, did you

9   have any continuing role with respect to TPS

10  decisions by DHS?

11      A.    Not with respect to decisions by

12  TPS.  But I did have a role in advising the

13  attorney general on immigration matters

14  generally.

15      Q.    And to do that, did you try to keep

16  in touch with DHS to see what was happening on

17  various country decisions?

18      A.    Sometimes I think so.

19      Q.    To the extent you wanted to get

20  information from DHS regarding how it was

21  dealing with individual country determinations,

22  who would you talk to or communicate with?



Page 139

```
 1       A.    It depends.  It's -- could be

 2  the chief of staff.  Could be general counsel's

 3  office.  Could be the director of USCIS.  Any

 4  number of people.  Whoever -- whoever --

 5  whatever it takes to get an answer for my boss.

 6       Q.    Okay.  Are those the most likely

 7  candidates:  chief of staff --

 8       A.    I think so.

 9       Q.    -- general counsel and director of

10  USCIS?

11       A.    Most likely.  Maybe the head of the

12  office of policy.

13       Q.    That'd be Ms. Nuebel Kovarik?

14       A.    No.  The DHS office of policy.  I

15  mean I -- I may have asked Kathy.  I don't

16  recall.

17       Q.    Who was the head of the office of

18  policy?

19       A.    Well, at the time -- well, it

20  depends on which time we're talking about.  For

21  some time, I think summer of 2017, it was Jim

22  Nealon who was performing the duties of the
```



Page 140

1    undersecretary for policy.

2            And after he left, I don't -- I

3    don't remember who took over then.  And then

4    now it's James McCament.  But it depends on the

5    time period in question.

6        Q.    Now, once the Trump administration

7    began in January of 2017 and following

8    thereafter, was the first decision to be made

9    on TPS related to Haiti?

10       A.    I think so.

11       Q.    What is your understanding of the

12   circumstances that prompted the original

13   designation of Haiti under TPS?

14       A.    There was an earthquake.

15       Q.    In what year?

16       A.    2010, I think.

17       Q.    As of January 20th of 2017, is it

18   true that Haiti's initial designation had been

19   extended several times?

20       A.    It had been, yes, extended several

21   times.

22       Q.    Do you recall when the last



Page 141

1    extension was through, what date?

2        A.    I don't -- I don't recall.  I know

3    that the extensions tend to be for 18 months.

4    So it would have been 18 months prior to

5    whatever it was coming up.  I don't remember.

6            (Deposition Exhibit 139 was marked

7    for identification.)

8            BY MR. MEDOW:

9        Q.    Okay.  Mr. Hamilton, you've now been

10   handed what's been marked as Exhibit 139, which

11   I see we didn't have to mark because it was

12   previously marked, but such is life.

13           Do you recognize this to be the -- a

14   Federal Register notice?

15       A.    It appears to be a Federal Register

16   notice.

17       Q.    And looks like the date is August

18   25th, 2015?

19       A.    Yep.

20       Q.    And do you see in the first

21   paragraph on the first page it indicates that,

22   as of that date, the secretary had extended the



Page 142

1    designation of Haiti for TPS for 18 months

2    through July 22nd of 2017?

3           Do you see that?

4       A.    That's what it says.

5       Q.    And does that -- does that jibe with

6    your recollection as to when the Haiti

7    designation was coming up for decision?

8       A.    Seems right.

9       Q.    Okay.  Now, is it true under the

10   statute that the secretary is to decide within

11   60 days before the termination date?

12      A.    I think so.

13      Q.    And is it your understanding that,

14   if there's no decision by the secretary, there

15   is an automatic extension?

16      A.    Yes.

17      Q.    So if you work back from the July

18   date, that would put the 60-day trigger in

19   basically late May of 2017?

20      A.    Seems right.

21      Q.    Now, does that jibe -- again, jibe

22   with your recollection that that's when the



Page 143

1    decision point was first time on Haiti?

2         A.    Yeah.

3              MR. MEDOW:  Okay.  Let's move to --

4              (Deposition Exhibit 140 was marked

5    for identification.)

6              BY MR. MEDOW:

7         Q.    Okay.  You should now have Exhibit

8    140.

9              Mr. Hamilton, do you recognize this

10   as another Federal Register notice?

11        A.    Sure looks like one.

12        Q.    And does this, again, relate to the

13   decision -- or a decision by DHS regarding

14   Haiti's status under TPS?

15        A.    It looks that way.

16        Q.    This is a registered notice dated

17   May 24th of 2017?

18        A.    That's what it says.

19        Q.    Okay.  So is this the notice then

20   reflecting what the agency's decision was on

21   Haiti in advance of the termination of the --

22        A.    I think yeah.



Page 144

1    Q.    -- of the -- of the prior extension?

2    A.    Seems -- seems to be the one you

3 describe.

4    Q.    Okay.  Did you -- what role, if any,

5 did you have in the preparation of this Federal

6 Register notice, Exhibit 140?

7    A.    I have no specific recollection;

8 although, as I've testified earlier, I -- I

9 probably edited the document.  I -- I don't

10 specifically remember.

11    Q.    Okay.  And let's look briefly at the

12 section of the notice that starts on the second

13 page of the exhibit and continues on to the

14 third.

15    A.    Okay.

16    Q.    I am looking at the third column,

17 farthest right column.

18         Do you see the heading "Why is the

19 Secretary Extending the TPS Designation For

20 Haiti through January 22, 2018"?

21    A.    I see it.

22    Q.    Okay.  At -- why don't you take a



Page 145

1   minute to review that section.  I think it --

2   it continues to the end of the second page and

3   the first two columns of the third.

4        A.    Okay.

5        Q.    You've had an opportunity to review

6   that portion?

7        A.    I did.

8        Q.    Does this section discuss actual

9   conditions in Haiti as of the date of the

10  notice?

11       A.    It seems to describe things that

12  have happened since the last designation.

13       Q.    Up through the May 24th, 2017 date?

14       A.    It -- it -- I think it could

15  generally be characterized as doing so.

16       Q.    And looking at the second paragraph

17  of -- of this section -- so that would be the

18  first paragraph on Page 3 --

19       A.    Okay.

20       Q.    -- do you see that that paragraph

21  addresses, among other things, issues specific

22  to the earthquake?



Page 146

1           Do you see that?

2      A.   Yes.

3      Q.   Then if -- the -- the paragraph

4  after that then discusses the impact of

5  Hurricane Matthew, which made landfall in Haiti

6  in October of 2016, correct?

7      A.   I see it.  It says that.

8      Q.   And then the following paragraph,

9  does it discuss the impact of heavy rains

10  approximately six months later in April of

11  2017?

12     A.   That's what it looks like.

13     Q.   And then the next paragraph, does

14  that discuss Haiti's -- what it refers to as

15  weak system -- public health system, including

16  the lingering impact of a cholera epidemic?

17     A.   Those are the words.

18     Q.   Okay.  Then the next paragraph says

19  "Based upon this review."

20          Do you see that?

21     A.   I do.

22     Q.   And do you understand that to be --



Page 147

1   "this review" being -- to refer back to the

2   review of country conditions in the prior

3   paragraphs?

4        A.    In general, yes.

5        Q.    Okay.

6        A.    But it also talks -- it could be --

7   also be referring to a more general review.

8   Because the first paragraph under this section

9   says:  "Since the last extension was announced,

10  DHS has reviewed conditions in Haiti."

11        So the fact that there might not be

12  conditions specifically mentioned in this

13  section doesn't mean that they weren't

14  necessarily considered.

15        So this -- "based upon this review,"

16  could be referring to that first paragraph,

17  which refers to things that are outside of the

18  four corners of this document.

19        And then there's five bullet points

20  that --

21        Q.    Right.

22        A.    -- have different things below it.



Page 148

1      Q.    Okay.  Let's look at those bullets

2  or at least the first two.

3            So based upon the review, it reads

4  that the -- secretary made various

5  determinations, correct?

6      A.    It says "Secretary has determined

7  that," and followed by five bullet points.

8      Q.    The first bullet point is that

9  conditions that prompted the July 23rd, 2011

10 redesignation of Haiti for TPS continue to be

11 met, correct?

12     A.    That's what it says.

13     Q.    The next bullet is:  "There continue

14 to be extraordinary and temporary conditions in

15 Haiti that prevent Haitian nationals (or aliens

16 having no nationality who last habitually

17 resided in Haiti) from returning to Haiti in

18 safety," correct?

19     A.    That's what it says.

20     Q.    Is it true then, sir, that the

21 secretary determined that conditions in Haiti

22 as of late May 2017 warranted an extension of



Page 149

1    Haiti's TPS status for a further six months?

2              MR. TYLER:  I object to the extent,

3    of course, the document speaks for itself.

4              So you are asking, upon his reading

5    of this document this morning in this

6    deposition, does he understand it to come to

7    that conclusion?

8              MR. MEDOW:  Yes.  I'm asking for

9    his -- making -- his help in understanding what

10   the document says.

11             THE WITNESS:  Well, I think the

12   document also has three other bullet points.

13   Because it is not contrary to the national

14   interest of the United States to permit

15   Haitians or aliens having no nationality who

16   last habitually resided in Haiti who meet the

17   eligibility requirements of TPS to remain in

18   the United States temporarily.

19             It also says:  "The designation of

20   Haiti for TPS should be extended for a

21   six-month period."

22             And the last one says:  "It is in



Page 150

1  the best interest of TPS beneficiaries to

2  prepare for their return to Haiti in the event

3  that Haiti's TPS designation is not extended

4  again, including requesting updated travel

5  documents from the government of Haiti."

6           BY MR. MEDOW:

7      Q.    Was it the view of DHS in May of

8  2017 that conditions in Haiti as of that point

9  in time warranted an extension of TPS status

10  for Haiti for six months?

11          MR. TYLER:  I -- I object.  He's not

12  a 30(b)(6) witness.  He's not speaking on

13  behalf of the agency.  And I'm confused by

14  counsel's --

15          MR. MEDOW:  Then I'll --

16          MR. TYLER:  -- question again.

17          MR. MEDOW:  Then I'll rephrase.

18          BY MR. MEDOW:

19      Q.    Was it your understanding, sir,

20  that, as of late May 2017, that the secretary

21  had determined that conditions were such that a

22  further extension of Haiti's TPS status for six



Page 151

1  months was warranted?

2      A.    Well, if it wasn't warranted, he

3  wouldn't have made the designation.  But he

4  was -- my recollection is that it was a very,

5  very close call; and that, based upon a

6  assurances from the Haitian government and the

7  conditions that met the statutory factors,

8  Secretary Kelly made the decision to extent it

9  for six months.

10            There were specific -- there were

11  specific assurances made from the Haitian

12  government that they wanted TPS recipients in

13  the United States back in Haiti; they would

14  welcome them with open arms; they view them as

15  tremendous assets to their country.

16            We flew to Haiti.  We met with the

17  Haitian president.  We discussed TPS with the

18  Haitian president.  And all that they asked for

19  was a little bit more time to prepare for the

20  eventual return of their nationals.

21      Q.    The meeting in Haiti was after this

22  notice came out, correct?



Page 152

1      A.     I don't remember when it was.

2      Q.     If I suggested to you the meeting

3  occurred on May 31st, would that sound right to

4  you?

5      A.     I don't know.  It was sometime in

6  May.

7      Q.     Do you --

8      A.     I --

9      Q.     Can -- do you recall specifically

10  whether the trip to Haiti occurred before the

11  publication of this notice?

12      A.     I don't remember.  I know we met

13  with them, and we met with their ambassador in

14  the United States multiple time in 2017, both

15  before this and after this.

16           And the repeated ask of the Haitian

17  government was simply for a little bit of time

18  of an extension if the conditions were

19  warranted, because they wanted their people

20  back, and they just simply needed more time to

21  do it; that they were excited about the

22  opportunity of having their nationals return to



Page 153

1  Haiti; they viewed them as tremendous economic

2  assets to their country; and they simply wanted

3  more time.

4          This is burned in my memory.

5      Q.    Did the --

6      A.    And --

7      Q.    Did the Haitian government -- in

8  connection with this decision in May of 2017,

9  did the Haitian government affirmatively

10 request that the TPS designation be extended?

11     A.    That is my recollection.

12     Q.    For how long?

13     A.    I don't recall.  As long as

14 possible.  I don't remember if they said

15 multiple years or if they recognized that

16 there's an outer 18-month boundary.  I -- I

17 don't recall the specifics.

18          They wanted more time.  They said

19 they were going to set up offices in the United

20 States across the country to produce travel

21 documents for their nationals; they were going

22 to do all kinds of wonderful things to prepare



Page 154

1    for the return of their nationals.

2              We assured them though, of course,

3    that the decision -- if a decision was made to

4    end TPS, it would not result in the automatic

5    deportation of TPS recipients; that oftentimes

6    TPS recipients are eligible for other

7    immigration benefits; that they could apply for

8    those immigration benefits; There is no

9    automatic deportation; they would not have tens

10   of thousands of people coming back to their

11   country overnight.

12             And they understood that and simply

13   wanted more time.

14        Q.    Isn't it true the Haitian government

15   asked for at least an 18-month extension?

16        A.    As I just said, I think they asked

17   for as much time as we could give them.

18        Q.    And the -- the maximum you could

19   give under the statute was 18 months?

20        A.    18 months is the maximum.

21        Q.    And instead they got six months,

22   right?



Page 155

1      A.      Instead they got six months.

2      Q.      The -- the assurances you -- you

3  referred to from the government of Haiti, I

4  want to focus on prior to the issuance of the

5  notice.

6              From whom were those assurances

7  provided?

8      A.      The ambassador.

9      Q.      To Haiti -- I'm sorry.

10             To the Haitian ambassador to the

11 United States?

12     A.      Yeah.  I believe it was Ambassador

13 Altidor and some other representatives of their

14 government.

15             And again, I -- I apologize.  I

16 don't remember specifically when we went to

17 Haiti, whether it was before or after this

18 Federal Register notice.

19             I know that we met in -- with the

20 president in the presidential palace of Haiti.

21 We talked to them about TPS.  It was something

22 we discussed.



Page 156

1              It could have been in those

2      discussions that we talked about the progress

3      that -- that General Kelly -- or Secretary

4      Kelly expected to see over the -- in this

5      period.  But I don't -- I don't recall

6      specifically.

7          Q.    I didn't make copies.  I'll -- but

8      I'll represent to you, sir, that on May 31st of

9      2017 DHS published a readout of Secretary

10     Kelly's trip to Haiti which indicates that it

11     occurred today, meaning May 31st.

12         A.    Okay.

13         Q.    So assuming the readout published by

14     DHS is accurate, then the trip would have been

15     after the publication of the Federal Register

16     notice, correct?

17         A.    It seems that way.

18         Q.    So again, focusing on contact with

19     the Haitian government prior to the publication

20     of the notice, there was the meeting with the

21     ambassador, correct?

22         A.    Yeah.  We met with the ambassador on



Page 157

1    multiple occasions. And I couldn't tell you

2    the specific other governmental officials. He

3    was typically not alone when he came. I don't

4    remember who came with him.

5         But he came and made those -- it was

6    the repeated ask. And there were -- and those

7    were the repeated assurances that were provided

8    every step throughout this process.

9    Q.    Did the -- do you recall, sir,

10   whether or not the ambassador publicly

11   criticized the decision after it was announced

12   in May?

13   A.    He might have. I don't -- I don't

14   recall. People often say things publicly that

15   are different than what they said behind closed

16   doors.

17   Q.    Do you have a specific recollection

18   that he said something publicly different than

19   what was said in -- behind closed doors?

20   A.    I don't have a specific

21   recollection.

22   Q.    Other than -- again, focusing on the



Page 158

1    period before the Federal Register notice.

2              Aside from whatever you heard from

3    the ambassador, were there any other

4    communications that provided what you called

5    assurances from the government of Haiti?

6        A.    The ambassador would have

7    communicated anything on behalf of his

8    government, to the best of my recollection.

9        Q.    There was -- I was just trying to

10   see is there anybody else --

11       A.    I --

12       Q.    -- that you remember?

13       A.    I don't remember anyone else.  I --

14   I remember him.  And I remember him as the

15   primary conduit that we engaged with.

16       Q.    So this extension lasted through

17   January 22nd of 2018?

18              I'm looking at the very first

19   paragraph of the notice.

20       A.    Yep.

21       Q.    So again, working back 60 days,

22   would that mean the next decision point would



Page 159

1   be roughly in late November of 2017?

2        A.    That seems reasonable.

3              MR. MEDOW:  It's 12:30 now.  This

4   may be as good a point as any to take -- break

5   for lunch, but...

6              THE WITNESS:  I defer to you-all's

7   stomachs.  I'm fine for whatever.

8              MR. MEDOW:  Okay.

9              MR. TYLER:  Well --

10             MR. MEDOW:  We can break now.

11             MR. TYLER:  Let's break now.

12             MR. MEDOW:  Okay.

13             THE VIDEOGRAPHER:  We are going off

14  the record.

15             The time is 12:27 p.m.

16             (A short recess was taken.)

17             THE VIDEOGRAPHER:  We are back on

18  the record.

19             The time is 1:14 p.m.

20             BY MR. MEDOW:

21       Q.    Okay.  Mr. Hamilton, I think when we

22  broke we had just looked at some documents that



Page 160

1    indicated that the next decision point for DHS

2    on Haiti would be in late November 2017.

3            Do you recall that?

4    A.    I do recall that.

5    Q.    Okay.  Now, I'd like to talk first

6    about your involvement in that decision through

7    October 27th when you left DHS.

8            As of the date when you left DHS in

9    the end of October of 2017, had a decision been

10   made at that point as to whether or not to

11   extend Haiti under TPS?

12   A.    I don't recall a decision having

13   been made.

14   Q.    And I know you -- you testified in

15   the DACA deposition -- you said several times

16   there's no decision -- I think your term was

17   until there's ink on the page.  I -- I

18   understand that.

19            But you also at other times talked

20   or distinguished that from a tentative

21   decision.

22            Had any tentative decision been made



Page 161

1    on Haiti's TPS status as of the end of October

2    of 2017?

3         A.    As of the time that I left the

4    Department of Homeland Security, I was unaware

5    of a decision of any kind.

6         Q.    As of that point in time, where did

7    you think things stood with respect to Haiti in

8    terms of the -- the upcoming decision on

9    whether or not to extend?

10              MR. TYLER:  Objection.  Vague.

11              THE WITNESS:  If you could clarify a

12   little bit I could probably give you a better

13   answer.

14              BY MR. MEDOW:

15        Q.    I -- part of the problem with

16   discovery is you don't know.  So that's why I

17   got to ask.  So I'm not sure how much more I

18   can clarify it.

19              I'm just -- as of the time when you

20   left DHS, where did you -- or how -- where were

21   things in the process, where did you think they

22   stood, with respect to the decision on whether



Page 162

1    or not to extend?

2         A.    I think, in the process, it was in

3    progress.  Outside of that, I have no specific

4    recollection of, you know, precisely what was

5    being done.

6              I know that people were working on

7    evaluating country conditions.  I know that

8    there were ongoing consultations with the

9    Haitian government.

10             As I testified earlier, I -- I seem

11   to recall meeting with the Haitian ambassador

12   at least once maybe in the September, October

13   time frame.  Could be a little off on that.

14   But I think it was generally around September,

15   October.

16             So there was general preparation

17   work, to the best of my recollection.  But I

18   don't -- I couldn't tell you any specifics.

19        Q.    Had -- within DHS, had views been

20   expressed one way or the other in terms of

21   whether or not Haiti should be extended?

22        A.    Had views been expressed by?



Page 163

1      Q.     Various people within the

2  department?

3      A.     Well, I'm certain that, if people

4  were working on the preparation and evaluating

5  country conditions, some people may have been

6  talking about it.  But I don't have any

7  specific recollections.

8      Q.     All I can ask is your recollection.

9             I'm just curious, as of the time you

10  left, had you heard some people within DHS

11  advocate for extension, advocate against, that

12  type of thing?

13      A.     I don't recall any specifics.

14             MR. MEDOW:  Let me...

15             (Deposition Exhibit 141 was marked

16  for identification.)

17             BY MR. MEDOW:

18      Q.     Okay.  Mr. Hamilton, you've been

19  handed what's been marked as Exhibit 141.

20             Appears to be an e-mail chain

21  bearing Bates CP 00002736 through 38.  You are

22  shown as a recipient of at least -- I think of



Page 164

1    all the e-mails on this chain, or if not that,

2    some of them.

3           Let me direct your attention to the

4    beginning e-mail on the chain on the last page.

5       A.    Okay.

6       Q.    Actually -- no.  You're shown as a

7    CC on that.

8           Do you see it?

9       A.    I do see --

10      Q.    It's a --

11      A.    -- my name.

12      Q.    Yeah.  It's an e-mail on Sunday,

13   October 22nd, 2017, 4:47 p.m., from

14   Ms. Nuebel Kovarik to various people, correct?

15      A.    It appears that way.

16      Q.    And Ms. Nuebel Kovarik indicates in

17   the first line of her e-mail that Acting

18   Secretary Duke has to make a decision for

19   TPS -- or on TPS for, among other countries,

20   Haiti.

21           Do you see that?

22      A.    I do.



Page 165

```
 1      Q.    So that would be consistent with

 2  your recollection that no decision had been

 3  made as of late October?

 4      A.    Yes.

 5      Q.    Indicates the acting secretary

 6  wanted input from various other departments and

 7  agencies; is that correct?

 8      A.    Yes.

 9      Q.    And she was reaching out to various

10  people in the White House, is it?

11      A.    It appears that way.

12      Q.    And I -- I'm looking at the e-mail

13  addresses WHO -- or various people at

14  WHO.EOP.gov.

15            Is that the e-mail address for the

16  executive office of the president?

17      A.    That's my general understanding

18  that's one of the general conventions.

19      Q.    Had Assistant Secretary Duke -- I'm

20  sorry -- Acting Secretary Duke raised with you

21  this notion of reaching out to other

22  departments and agencies?
```



Page 166

1    A.    I don't remember.  I -- I know that

2    that was part of the process generally, but I

3    -- I don't remember.

4    Q.    And you have an e-mail on later --

5    about a half hour later, it looks like.

6          On the first page at the bottom, is

7    that your e-mail responding back to the group

8    at 5:17 p.m. on the same day?

9    A.    On a Sunday afternoon, working hard,

10   appears that way.

11   Q.    And you talk about it - on getting

12   this agency input to do it through OMB, and

13   they have 24 to 48 hours to tell us, et cetera.

14         Do you see that?

15   A.    I do.

16   Q.    Were -- were you trying to put these

17   agencies on a tight clock to get their input

18   in?

19   A.    If I can just -- give me a second to

20   look --

21   Q.    Sure.

22   A.    -- at the rest of the...



Page 167

1      Q.     Go ahead.

2      A.     Judging from the e-mail chain, it

3  appears as though, yes, I was trying to get

4  information produced to the secretary -- acting

5  secretary in a timely fashion.

6      Q.     Okay.  And then you write at the

7  last two sentences of your e-mail:  "We aren't

8  going to get into a whole 'there are a lot of

9  people who would be impacted' type of PCC, DC

10  or PC.  We have to show fidelity to the laws

11  passed by congress."

12          Do you see that?

13      A.     I do see that.

14      Q.     First of all, let's just make sure

15  we understand the abbreviation.

16          PCC is what?

17      A.     PCC typically refers to a policy

18  coordinating committee.

19      Q.     DC is what?

20      A.     A deputies committee.

21      Q.     And PC is what?

22      A.     Principals committee.



Page 168

1      Q.     And does principals refer to the

2   heads of cabinet-level agencies?

3      A.     Generally, and senior White House

4   officials.

5      Q.     What did you mean when you say we're

6   not "going to get into a whole" lot of "'there

7   are a lot of people who would be impacted' type

8   of PCC, DC or PC"?

9      A.     I don't remember my specific mindset

10  at that point in time.  It seems to be

11  indicating -- and I can speak to my experience

12  with interagency processes generally.  Because

13  in a e-mail chain below, there is a mention

14  about convening a PCC.  There is a -- bottom of

15  the e-mail chain says that she has to make her

16  decisions by November 6.

17          This is October 22nd of 2017.

18  Putting things to a PCC, DC, PC is a --

19  generally a very slow process.  And generally

20  you're not going to get the information that

21  you need to get out of the relevant agencies if

22  you want to go through that type of a route.



Page 169

1          And so what I see my e-mail

2   indicating is a desire to go through OMB

3   because that will provide quicker results and

4   relevant results.

5          (Deposition Exhibit 142 was marked

6   for identification.)

7          THE WITNESS:  Thank you.

8          BY MR. MEDOW:

9     Q.    Okay.  Mr. Hamilton, you've now been

10  given Exhibit 142.

11         Appears to be another e-mail chain,

12  this one with Bates CP 00026652 through 54.

13    A.    Okay.

14    Q.    Let's start with the first -- the

15  e-mail at the bottom of the chain, the first

16  one chronologically, this was an e-mail from

17  Ms. Nuebel Kovarik, correct?

18    A.    It looks that way.

19    Q.    We're now two days later, October

20  24th?

21    A.    That would be two days later.

22    Q.    And you're -- you're listed as a CC



Page 170

1    recipient?

2         A.    That's my e-mail address, yes, sir.

3         Q.    Okay.  And Ms. Nuebel Kovarik -- I'm

4    -- I'm -- I'm looking at the last line.

5    She's -- writes:  "I anticipate that our

6    director will send up a memo with

7    recommendations by weekend."

8              Do you understand that to be a

9    reference to the USCIS director?

10        A.    I would assume so.

11        Q.    And the memo with a recommendation,

12   would that be the decision memo that we had

13   talked about earlier in the process?

14        A.    It seems to be related.

15        Q.    Okay.  So would this indicate then

16   to you that, at least as of October 24th, there

17   had not been a -- a decision memo released from

18   USCIS up to the secretary or acting secretary?

19        A.    Looking at her e-mail only, I would

20   assume that.  But I have no specific

21   recollection.

22              MR. MEDOW:  Let me give you another



Page 171

1   document.

2           (Deposition Exhibit 143 was marked

3   for identification.)

4           BY MR. MEDOW:

5       Q.   Okay.  You should now have Exhibit

6   143, Mr. Hamilton, another e-mail chain bearing

7   Bates CP 00003698 and 99.

8           I don't believe you are on this

9   chain.

10          So have you ever seen it before?

11      A.   No.  I don't -- no recollection of

12  seeing this document.

13      Q.   Okay.  Let me -- let me just ask you

14  a few questions around it.

15          You see the top e-mail is from

16  remember Robert Law?

17      A.   I -- yes.

18      Q.   And that -- that's the gentleman we

19  talked about earlier who was with the FAIR

20  organization and later joined DHS?

21      A.   I think that's one and the same.

22      Q.   Okay.  Do you recall how -- by



Page 172

1    looking at the date here, he's -- he's pretty

2    clearly at DHS by October 22nd.

3              You'd agree with that, I guess.

4    A.    I -- I would agree with that.

5    Otherwise he wouldn't have had that e-mail

6    address.

7    Q.    Do you have -- does that help you

8    tie at all when he joined the agency?

9    A.    No.

10   Q.    Why don't you take a minute to just

11   review briefly the chain.

12   A.    Okay.

13   Q.    Do you read this as referring to the

14   USCIS decision memo we've been talking about?

15   A.    It appears to refer to a decision

16   memo based on the text of the e-mail, but --

17   Q.    That may -- the RE line -- or the

18   subject line for the e-mail chain is Haiti

19   draft TPS memo, correct?

20   A.    That's what it says.

21   Q.    Okay.  Given that, would you

22   understand this to be referring to a draft



Page 173

1   decision memo on Haiti TPS?

2        A.    Probably.

3        Q.    Do you see in the second -- I'm

4   sorry -- third e-mail down on the first page

5   Mr. Law's e-mail on another Sunday -- or I

6   guess the same Sunday, October 22nd, 2017, at

7   6:28?

8              Do you see that?

9        A.    I do.

10       Q.    And he writes -- again, the subject

11  line is "Haiti draft TPS memo."

12             This -- "The draft is overwhelmingly

13  weighted for extension, which I do not think is

14  the conclusion we are looking for."

15             Do you see that?

16       A.    I see that.

17       Q.    Do you know who the "we" is that

18  he's referring to?

19       A.    I do not.

20       Q.    Do you know where Mr. Law got the

21  opinion that the conclusion -- extension was

22  not "the conclusion we are looking for"?



Page 174

1      A.     I do not know.

2      Q.     Had you discussed, as of this point

3    in time, with Mr. Law the upcoming decision on

4    Haiti TPS?

5      A.     I have no specific recollections of

6    a discussion about extending TPS.  It's

7    possible he was there at a meeting.  I have no

8    idea.

9      Q.     In the first -- for the top e-mail

10   on the chain, he writes:  Edit -- "Edits

11   attached.  I made the document fully support

12   termination," and continues on.

13           Do you see that?

14     A.     I see that.

15     Q.     Do you know what changes he made to

16   the document to make it fully support

17   termination?

18     A.     I have no idea.  Not on this e-mail

19   chain.  Didn't see this document.  I couldn't

20   tell you.

21     Q.     As of this point in time,

22   October 22nd -- or I guess, more generally, the



Page 175

1    last week in October, your last week with --

2    with DHS, as of that point in time, did you

3    personally have a view as to whether or not TPS

4    should be extended for Haiti or not?

5         A.    I don't recall having a specific

6    view.

7         Q.    Did you have a general view?

8         A.    I recall the last designation being

9    a close -- a very, very close call for the

10   secretary.  Secretary Kelly, that is.

11             And again, I recall the government

12   of Haiti expressing a strong desire to have

13   their nationals return to Haiti.

14             So other than that, I -- I don't

15   recall having any specific thoughts.

16        Q.    Did the government of Haiti express

17   this view between the May 2017 decision that

18   we've already talked about and November of

19   2017?

20        A.    To the best of my recollection, yes.

21        Q.    In writing or orally?

22        A.    Primarily orally.  I don't know that



Page 176

1   anything came in writing.  But as we discussed

2   earlier, there was a trip to Haiti.  We met

3   with the Haitian government, the highest

4   levels.

5            And then in the fall, as I testified

6   earlier, I recall meeting with the ambassador,

7   if not others, where the same sentiments were

8   expressed, simply expressing a desire for a

9   little bit more time.

10       Q.    Did the Haitian government request

11  termination of TPS for Haiti?

12       A.    Not to my recollection.

13       Q.    Did they -- let -- let's -- let's

14  break the time periods down so we have a clean

15  record.  Let -- let's focus -- go back a little

16  bit to the time period leading up to the May

17  2017 decision to extend.

18       A.    Okay.

19       Q.    Prior to then, had the government of

20  Haiti requested termination of TPS for Haiti?

21       A.    I don't recall them making any

22  recommendation to terminate TPS.



Page 177

1    Q.    Did they request extension?

2    A.    I believe, as I said earlier, that

3    they requested more time, which would be the

4    equivalent of an extension.

5    Q.    Of at least 18 months?

6    A.    At least 18 months or as long as we

7    could give them.

8    Q.    Now, the -- then let's focus on the

9    time period again between May and November

10   2017.

11          In that time period, did the

12   government of Haiti request termination of

13   Haiti's designation under TPS?

14   A.    Not to my recollection.

15   Q.    Did it request extension?

16   A.    They -- as I've said multiple times,

17   they requested more time.

18   Q.    Would that include an extension past

19   -- as you may recall, the -- the decision in

20   May had extended TPS through January 22nd of

21   2018, correct?

22   A.    That's -- yes.



Page 178

```
 1      Q.     Okay.  Did the government of Haiti

 2   request an extension beyond January 22nd, 2018?

 3      A.     They asked for more time.  So I

 4   would assume that means an extension.

 5      Q.     How much more time?

 6      A.     I don't recall specifically.

 7      Q.     Was it again at least --

 8      A.     I think it was generally as much

 9   time as we could give them.

10      Q.     So again, at least 18 months?

11      A.     I would assume so.  That's the

12   statutory maximum.  I don't know that they --

13   again, I don't know that they have any specific

14   knowledge of the statute and what it permits

15   and what it doesn't.

16      Q.     Did the government of Haiti submit

17   written submissions to DHS in connection with

18   these two decisions in May and November?

19      A.     I don't remember.

20      Q.     Had they done so, would that be

21   something that would have been routed to you

22   for your review?
```



Page 179

1      A.     I think so.

2      Q.     But as you --

3      A.     Probably would have.

4      Q.     But as you sit here, you have no

5   recollection --

6      A.     I don't --

7      Q.     -- of those?

8      A.     I don't recall seeing anything

9   specifically from the government.  But it --

10  there may have been a letter or two that

11  expressed generally we want more time.  But

12  I -- I don't recall anything specific.

13     Q.     And so you're clear, I'm -- when I'm

14  talking about the government of Haiti, I'm

15  including their ambassador to the U.S.

16            Have you understood the questions

17  that way?

18     A.     Yes.

19     Q.     Now -- okay.  So now we move to

20  November, and you move to Department of

21  Justice, right?

22     A.     In the last week of October, I moved



Page 180

1    to the Department of Justice.

2         Q.    Your first -- let's see.  The 27th

3    was a Friday.

4               So the first -- your first day at

5    Justice was what, the -- Monday the 30th of

6    October?

7         A.    Whatever Monday that was, yeah.

8         Q.    From that point forward, did you

9    have any involvement with the decision on

10   whether or not to extend Haiti -- Haiti's

11   designation under TPS beyond January 22nd of

12   2018?

13        A.    My only involvement was to advise

14   the attorney general on anything that

15   influenced Department of Justice pertaining to

16   TPS.

17        Q.    I'm not sure I followed you there.

18              You said advise the attorney general

19   only on anything that influenced the Department

20   of Justice pertain -- did you mean anything

21   that affected the Department of Justice?

22        A.    No.  So what -- what I mean by that



Page 181

1    is obviously the attorney general doesn't have

2    a statutory role in making the decision after

3    the Homeland Security Act of 2002.

4            So if TPS came up in discussion at

5    any point in time, I would have advised the

6    attorney general on the laws surrounding it.

7    But I don't recall any specifics.

8    Q.    Did you personally have any further

9    involvement in the discussions about whether or

10   not TPS should be extended for Haiti?

11   A.    I know I attended a meeting at the

12   White House where TPS was a subject of

13   discussion.  But other than that, I have no

14   specific recollection.

15   Q.    First of all, the -- well, we'll get

16   to that meeting in a second.

17           The -- the ultimate decision was

18   what with respect to Haiti.

19   A.    I think it was to terminate with 18

20   months.

21   Q.    18 months to?

22   A.    Terminate.



Page 182

1      Q.    So the termination wouldn't become

2  effective for 18 months?

3      A.    That's correct.

4            MR. MEDOW:  Let's tie down some

5  dates.

6            (Deposition Exhibit 144 was marked

7  for identification.)

8            BY MR. MEDOW:

9      Q.    Okay.  You should now have Exhibit

10  144, Mr. Hamilton.

11            Appears to be an e-mail from DHS

12  press office to at least your DHS e-mail

13  address on November 20th, 2017, attaching a

14  press release.  Bears Bates CP 00033469 and 70.

15            Was that e-mail address still active

16  on November 20?

17      A.    I don't know whether it was still

18  active.  But I certainly didn't have access to

19  it.

20      Q.    Okay.  That's kind of what I assumed

21  you -- was the situation.

22            Were you aware though -- did you, by



Page 183

1    one means or another, get ahold of this press

2    release or see it?

3         A.    I don't remember --

4         Q.    Do you --

5         A.    -- seeing it specifically.  But I

6    assume -- I see a lots of their press releases.

7         Q.    This indicates that the decision was

8    at least announced on November 20th of 2017,

9    right, the date of the --

10        A.    That's what --

11        Q.    -- press release?

12        A.    -- it says, "today," and the date is

13   November 20th.

14        Q.    Did you have any role in the

15   drafting of the press release?

16        A.    I didn't work at DHS anymore.  So I

17   don't...

18        Q.    Did they share drafts with you

19   before it went out?

20        A.    I don't have any recollection.

21        Q.    Does this -- does that date,

22   November 20th, is that consistent with your



Page 184

1   general recollection as to when the decision

2   was made as to whether or not to extend Haiti?

3        A.    I mean, to the extent that I was

4   aware of it from where I was at Department of

5   Justice, it seems right.  But I -- I don't know

6   specifically when Elaine Duke made her

7   decision.

8        Q.    Okay.

9        A.    It was on November 20th.  Maybe it

10  was 5:00 o'clock in the morning.  I -- you

11  know, 11:00 o'clock.  I have no idea.

12       Q.    Typical process though was to issue

13  a press release once the decision was made,

14  correct?

15       A.    I think so.

16       Q.    Okay.  Now, let's -- the -- the

17  meeting at the White House, was this a meeting

18  of a principal small group?

19       A.    Yes.  I think so.

20       Q.    And who -- when -- when did it

21  occur?

22       A.    Well, it would have been between



Page 185

1     this date and the date I came to Justice.

2          Q.     "This date" being 10 --

3          A.     November 20th and, you know, October

4     30th.  Some time between there.  In that time

5     period.

6          Q.     You attended, you said?

7          A.     I believe so.

8          Q.     Who else do you recall attending?

9          A.     The -- the attorney general, the

10    acting secretary, the Tom Bossert, Stephen

11    Miller.  There may have been some other

12    attendees, but I can't remember everyone off

13    the top of my head.

14         Q.     Mr. Bossert's position was what?

15         A.     Tom Bossert was the Homeland

16    Security adviser.

17         Q.     At the White House?

18         A.     Yes.

19         Q.     Anyone -- again, anyone else you

20    recall at the meeting?

21         A.     I know there's people there, but I

22    -- I don't remember.



Page 186

```
 1      Q.     Was this a meeting in the situation

 2   room?

 3      A.     It was.

 4      Q.     How long did it last?

 5      A.     I couldn't tell you.

 6      Q.     Hour?  More than an hour?

 7      A.     I have no -- no recollection at all.

 8      Q.     It wasn't a full day, though, was

 9   it?

10      A.     I don't think so.

11      Q.     What do you recall the meeting in

12   terms of what was said?

13             MR. TYLER:  Object to the extent it

14   calls for deliberations between government --

15   government people at -- present at that

16   meeting.

17             You can ask what the subject of the

18   meeting was.

19             MR. MEDOW:  Well, let's start with

20   that.

21             BY MR. MEDOW:

22      Q.     What was the subject of the meeting?
```



Page 187

1      A.      I seem to recall TPS being generally
2   the subject of the meeting.
3      Q.      When you say "generally," was it in
4   connection with specific countries or TPS more
5   generally?
6      A.      I couldn't tell you.
7      Q.      Were any presentations made?
8      A.      Not to my recollection.
9      Q.      Were there materials distributed in
10  advance of the meeting?
11     A.      There may have been.
12     Q.      Do you recall?
13     A.      They typically -- most White House
14  meetings have materials generated in advance.
15  So likely yes.
16     Q.      I take it you don't recall the
17  contents of those materials, if there -- if
18  there were any, that were circulated in
19  advance?
20     A.      I assume they would have discussed
21  TPS.
22     Q.      Beyond that?



Page 188

```
 1       A.      I have no specific recollection of

 2   the contents of the materials.

 3       Q.      Other than I think you said the

 4   acting secretary was there, correct?

 5       A.      Yes.

 6       Q.      That'd be Duke?

 7       A.      Yes.

 8       Q.      Was anyone else there from DHS?

 9       A.      I couldn't tell you specifically.  I

10   know that the chief of staff attended most

11   meetings with its acting secretary.  So...

12       Q.      That'd be Mr. Wolf?

13       A.      Ted Wolf, probably.  I seem to

14   recall him being there, although I could be --

15   that's largely speculation.

16       Q.      How about Ms. Nuebel Kovarik?

17       A.      I don't recall.

18       Q.      Were any decisions reached at that

19   meeting?

20       A.      I don't remember.

21       Q.      Let me ask this in a yes-or-no

22   format first.
```



Page 189

1              Do you recall the specific contents

2    of what was said during the meetings?

3         A.    The specific contents?

4         Q.    Do you recall anything that was

5    specifically said during the meeting?

6         A.    I remember no specific discussions

7    during the meet -- or anything specifically

8    said during the meeting.

9         Q.    Other than -- well, let -- let me

10   ask you this:  Did -- did the subject of Haiti

11   come up?

12        A.    I would -- I -- I have no specific

13   recollection of the subject of Haiti being

14   discussed.  But given the time frame, that

15   generally seems right.

16        Q.    Did you take any notes during the

17   meeting?

18        A.    I don't recall.

19        Q.    So do you generally take notes

20   during meetings of this kind?

21        A.    No.  Not anymore.

22        Q.    Since when?



Page 190

```
 1      A.     Since probably October of 2017.

 2      Q.     What happened?

 3      A.     I don't recall.

 4             I mean what do you mean what

 5   happened?

 6      Q.     Well, what -- what made -- so prior

 7   to October of '17 you did have -- you would

 8   take notes at meetings, and then you stopped?

 9      A.     I would take -- I would take notes

10   at meetings.  And sometimes occasionally I'll

11   take notes at meetings now.  But most of the

12   time I don't take very copious notes.

13      Q.     Was there something that happened in

14   October of 2017 that had you change your

15   practice?

16      A.     I don't know that there was anything

17   specific.

18      Q.     What generally then occurred that

19   led to the change?

20      A.     We were facing a lot of intrusive

21   litigation.  And I recall -- maybe it was

22   November.  After my last deposition --
```



Page 191

1      Q.     In the DACA case, correct?

2      A.     -- in the DACA case, the plaintiffs'

3  counsel felt it appropriate to turn over the

4  deposition transcript to a reporter, who then

5  wrote an article.

6            And she Tweeted on Twitter all about

7  it and talked about how proud she was to have

8  deposed me and all the information that they

9  got in their deposition.

10           And so, given that their primary

11  interest seemed to be in abusing the discovery

12  process, I tried to commit more to memory than

13  on paper.

14     Q.     The -- the article you're referring

15  to, was that in the New Yorker?

16     A.     I think so.

17     Q.     On the subject of intrusive

18  litigation, is it true that I guess about two

19  months ago Attorney General Sessions gave a

20  speech on that topic at the Heritage

21  Foundation?

22     A.     I don't remember.



Page 192

1        Q.    Did you have any involvement with

2    that -- the preparation or drafting of that

3    speech?

4        A.    I generally helped the attorney

5    general on a variety of issues.  But I don't

6    remember.  You'd have to give me the specific

7    date and location of the speech.

8        Q.    Okay.  At this -- at this point in

9    time, do you recall any -- going back to the

10   White House meeting -- do you recall anything

11   else about the meeting in terms of its

12   substance?

13       A.    Just that TPS was generally

14   discussed.

15            (Deposition Exhibit 145 was marked

16   for identification.)

17            BY MR. MEDOW:

18       Q.    Okay.  Mr. Hamilton, you should now

19   have what's been marked as Exhibit 145, a

20   multi-page document bearing Bates

21   AR-S_HAITI-00000117 through 31.

22       A.    Okay.



Page 193

1      Q.     Is this the -- was this document

2    circulated in advance of the White House

3    meeting we've been talking about?

4      A.     It looks like it was.

5      Q.     And this -- does this document

6    relate to that -- the meeting you attended?

7      A.     It -- again, on its face, it appears

8    to relate to that meeting.

9      Q.     And it indicates the -- on the

10   first -- looking on the first page, it says it

11   was circulated by the executive secretary and

12   chief of staff of the National Security

13   Council, right?

14     A.     It appears that way.

15     Q.     And that's Retired General Keith --

16   I'm sorry -- Retired General Kellogg, correct?

17     A.     Yes.

18     Q.     And he writes on the first page:

19   "There will be a principal small group meeting

20   on Temporary Protected Status on Friday,

21   November 3rd, 2017, from 9:15 to 10:00 a.m. in

22   the White House situation room," correct?



Page 194

1      A.     That is what it says.

2      Q.     And that -- that timing is

3  consistent with your recollection of the White

4  House meeting you attended, correct?

5      A.     Yes.

6      Q.     Okay.  And if you go -- you see the

7  -- there are two attachments.  I'm looking on

8  Bates Page 119.  Refers to an agenda and a

9  discussion paper.

10          Do you see that?

11     A.     Yep.

12     Q.     And then continuing on in the

13  document, going to Bates Page 127, do you see

14  the discussion paper which starts there,

15  continues on through 129 with appears an

16  attachment that continues on to 131?

17     A.     Yep.

18     Q.     Okay.  Let's look at the -- the

19  discussion paper on 127 at the top.

20          It's -- it's -- the first section is

21  "Purpose," correct?

22     A.     That is what it says.



Page 195

```
 1      Q.    And it and it says:  "To coordinate
 2  the conditions and process for terminating
 3  Temporary Protected Status (TPS) for aliens
 4  from El Salvador, Honduras, Nicaragua and
 5  Haiti, the acting secretary of Homeland
 6  Security must make a decision by Monday,
 7  November 6, 2017," correct?
 8      A.    That is what it says.
 9      Q.    And if you look on the second page
10  of the discussion paper though, two Bates
11  numbers down, for whatever reason, Bates 129,
12  do you see in the second paragraph the first
13  line reads:  "In the cases of El Salvador,
14  Honduras, Nicaragua and Haiti, the temporary
15  conditions that arose out of natural disasters
16  and supported TPS designations have long ceased
17  to exist."
18            That what it says?
19      A.    That is what it says.
20      Q.    And under "Recommendation" on that
21  same page, the recommendation was to terminate;
22  is that true?
```



Page 196

1       A.      It says:  "Terminate with an

2    effective date of January 5th, 2019, and engage

3    congress to pass a comprehensive immigration

4    reform to include a merit-based entry system.

5    A 12-month delay in the effective termination

6    date would allow for an orderly transition

7    period for beneficiaries.  Moreover, it would

8    allow congress time to act to factor the fate

9    of TPS beneficiaries into legislation.  While

10   many TPS beneficiaries may not qualify for

11   legal status under a merit-based system,

12   congress could craft alternatives to allow

13   members of this group to remain.  This

14   administration could signal its support for

15   such a resolution provided congress enact

16   needed immigration reforms."

17       Q.      Does looking at this document

18   refresh your recollection at all as to any

19   discussions had at the meeting on November 3rd

20   in the White House situation room?

21       A.      Other than TPS generally being

22   discussed, no.



Page 197

1          MR. MEDOW:  All right.  Now, going

2   back to -- you mentioned intrusive litigation.

3   We had a little bit of discussion about a

4   speech the attorney general gave.  Let me give

5   you a copy of the speech to see if it jogs your

6   recollection any.

7          (Deposition Exhibit 146 was marked

8   for identification.)

9          BY MR. MEDOW:

10     Q.    Okay.  Exhibit 146, Mr. Hamilton, we

11  got off I think the Department of Justice web

12  site.

13     A.    Okay.

14     Q.    It's at least entitled "Attorney

15  General Jeff Sessions Delivers Remarks to the

16  Heritage Foundation on Judicial Encroachment in

17  Washington on Monday, October 15th" --

18     A.    Okay.

19     Q.    -- "2018."

20     A.    Nearly a year after this time period

21  in question.  Correct.

22     Q.    That -- that time period.  Correct.



Page 198

1      A.    And not at all related to TPS.

2      Q.    Well, there are references to TPS.

3  That's why I'm bringing it to your attention.

4           And again, do you have any

5  recollection of your role in preparing this

6  speech, if any?

7      A.    I have no specific recollection.

8      Q.    Any general recollection?

9      A.    I mean generally we have speech

10  writers who prepare speeches for the attorney

11  general.  And --

12      Q.    Do you --

13      A.    -- sometimes we edit them; and

14  sometimes we don't.

15      Q.    Would a speech like this typically

16  be passed to you for review?

17      A.    Maybe.  This one --

18      Q.    Okay.

19      A.    -- might not have.  I -- I don't

20  remember.

21      Q.    Okay.  I'm looking -- it's -- it's

22  not -- the pages are not numbered.  But if you



Page 199

1    look at the four -- fifth physical page.

2         A.    You mean the --

3         Q.    But I'll?

4         A.    -- one, two, three, four, five.

5    Kind of in the middle.

6         Q.    Yeah.  It start -- it starts --

7         A.    It says:  "But an increasing number

8    of judges" --

9         Q.    Yes.

10        A.    -- "are ignoring these boundaries

11   and view themselves as something akin to roving

12   inspectors general for the entire executive

13   branch."

14        Q.    Yes.  That -- that page.

15             If you look down -- one, two, three

16   -- I think the sixth paragraph on the page, the

17   one that references

18   "one of the DACA cases last year."

19             Do you see that?

20        A.    Yes.

21        Q.    It reads in the first sentence:  "In

22   one of the DACA cases last year, the district



Page 200

1    court authorized the deposition of a senior

2    counselor to the secretary of Department of

3    Homeland Security about confidential advice he

4    and others had given to the secretary."

5              Do you understand that to be a

6    reference to your deposition in the DACA case?

7        A.    Yes.

8              MR. TYLER:  Counsel, I -- I'll --

9    I'll object to this entire line of questioning.

10   As the witness points out and as the document

11   makes plain on its face, this occurred a year

12   after the matters at issues in this lawsuit.

13             You're now questioning him about

14   matters concerning DACA that have no relation

15   to this lawsuit.

16             So where are we going with this?

17             MR. MEDOW:  We're going to this next

18   question.

19             BY MR. MEDOW:

20       Q.    If you go -- if you see on the prior

21   page, do you see -- one, two -- fourth

22   paragraph from the bottom:  "The third



1  manifestation of judicial encroachment is the

2  increasing" -- "increasing authorization of

3  invasive discovery into executive branch

4  deliberations"?

5           Do you see that?

6      A.    I see that.

7           I see the next paragraph:  "An

8  increasing number of district judges are using

9  purely legal disputes, which should be resolved

10 by legal argument alone, to depose executive

11 branch officials in order to disrupt an

12 extensive disclosure of their internal

13 deliberations and documents.  These judges

14 contend that all this information is necessary

15 for the judge to decide whether the executive

16 branch official had, in the judge's view, the

17 wrong motives and taking away what otherwise

18 would be a lawful administrative action.  But

19 in almost all of these cases motive is

20 irrelevant.  It is simply a legal question."

21      Q.    And it continues on, discussing the

22 subject of intrusive discovery, which you



Page 202

1    mentioned today as well, correct?

2         A.    Yeah.

3         Q.    Okay.  Going on the -- on that fifth

4    page, the page just from where you were

5    reading, look to the -- toward the bottom of

6    the page, fourth paragraph from the bottom:

7    "Indeed, in the TPS case, the judge has gone so

8    far as to order the production of a cabinet

9    secretary's handwritten notes taken during a

10   high-level White House meeting."

11             Do you see that?

12        A.    I do see that.

13        Q.    Is that -- do you know is that

14   referring to notes taken at the meeting we're

15   talking about on November 3rd?

16        A.    I think so.

17        Q.    Have you seen such notes?

18        A.    I think so.  I seem to recall seeing

19   the notes.

20        Q.    And were these Ms. Duke's notes that

21   she took during the meeting?

22        A.    Yes.



Page 203

1      Q.      How did you come into possession of

2   them?

3      A.      Just in my role as being the advisor

4   to the attorney general on litigation matters

5   involving immigration.

6              So any time there is high profile

7   litigation, my job is to keep them in the loop,

8   especially when it involves abusive discovery

9   processes of cabinet officials.

10      Q.      So did you get the -- Ms. Duke's

11   notes from Ms. Dukes -- Ms. Duke -- excuse

12   me -- or someone else at DHS; or did you get

13   them from the public disclosure as a result of

14   the discovery?

15      A.      I would have received them as part

16   of the discovery process, not directly from

17   DHS.

18      Q.      Okay.  So they came to light in the

19   Ramos case; is that right?

20      A.      I think that's right.

21      Q.      That was --

22              MR. TYLER:  Counsel, I'm going to



Page 204

1    also have to object to this.  It's venturing

2    into attorney work product privilege.  It's --

3    again, it's -- it's outside of any relevance to

4    this lawsuit.

5              Where are we going with this?  I ask

6    the question again.

7              MR. MEDOW:  The answer remains.

8    We're going to the next question.

9              BY MR. MEDOW:

10       Q.    Did the -- did Ms. Duke's notes

11   reflect discussions on TPS?

12       A.    I don't remember.

13       Q.    Did they reflect discussions on

14   Haiti?

15       A.    I -- they might have -- I don't want

16   to tell you wrong.  I don't remember exactly

17   what they said.  I think they talked -- might

18   have mentioned -- made mention of TPS.

19       Q.    Okay.

20       A.    But again, I don't have a

21   photographic memory.  So I couldn't tell you.

22       Q.    Okay.



Page 205

```
 1      A.    And I'll -- I'll go ahead and offer

 2    that I'm -- upon further reflection, this

 3    Sessions speech, I didn't work on this speech.

 4    I do recall other people, including the

 5    attorney general, wrote this speech.  And I

 6    didn't -- I was not aware of it until he made

 7    it.  So I had no recollection, no knowledge of

 8    its contents.

 9              MR. MEDOW:  Okay.

10              (Deposition Exhibit 147 was marked

11    for identification.)

12              (Deposition Exhibit 148 was marked

13    for identification.)

14              THE WITNESS:  Could we take a break

15    for a second?

16              MR. TYLER:  Yeah.

17              Do we have coffee yet?  We can --

18              MR. MEDOW:  Okay.

19              MR. TYLER:  Let's take a break.

20              THE VIDEOGRAPHER:  We are going off

21    the record.

22              The time is 2:02 p.m.
```



Page 206

```
 1                (A short recess was taken.)

 2                THE VIDEOGRAPHER:  Back on the

 3    record.

 4                The time is 2:09 p.m.

 5                BY MR. MEDOW:

 6        Q.    Mr. Hamilton, you -- right before

 7    the break you were handed two exhibits.  And

 8    let me hopefully explain what they are or at

 9    least what we -- they purport to be.

10                Exhibit 147 is a series of

11    handwritten notes.  Bears Bates

12    AR-S_HAITI-00000113 through 16.

13                148 I believe are the same -- is

14    another copy of the same notes.  And it bears

15    the Bates DPP_00003562 and 65.

16                The only reason we've given you two

17    copies is the second appears to be a better

18    copy and a little bit more legible than the

19    first.  So I wanted you to have both available.

20                I guess the first question is have

21    you seen these before, these --

22        A.    These --
```



Page 207

1    Q.    -- handwritten notes?

2    A.    I -- these look familiar, so they

3  might have -- might have been what was produced

4  in discovery that I saw, but...

5    Q.    Okay.  Well, I'll -- I'll represent

6  to you, sir, that the government in this case

7  has stipulated that these are Ms. Duke's notes.

8    A.    Okay.

9    Q.    I'll tell you further they -- they

10  appear -- Exhibit 147 is part of the

11  administrative record.  And it appears right

12  next to what we have marked as Exhibit 145, the

13  White House memo regarding the November 3rd

14  meeting; and that -- the Exhibit 147 has been

15  identified in the privilege log provided by the

16  government as reflecting Ms. Duke's notes "RE:

17  Conversations with various officials during

18  meeting at the White House about upcoming TPS

19  decisions."

20        So --

21    A.    Okay.

22    Q.    -- just -- I wanted to share that



Page 208

1    with you.

2              I'd like to direct your attention to

3    -- well, let me back up.

4              Have you had a chance to discuss

5    these notes with Ms. Dukes --

6         A.   No.

7         Q.   -- or Ms. Duke.  Excuse me.  Okay.

8              Have you had a chance to discuss the

9    notes with anybody who attended the meeting on

10   November 3rd?

11        A.   I don't think I discussed these

12   specific notes with anyone who attended that

13   meeting.

14        Q.   I am directing your attention on the

15   first page of the notes.

16              Do you see there's a segment that

17   says "Session" under cored a couple times?

18        A.   Okay.

19        Q.   And there's handwriting that goes to

20   the end of that page and then appears to carry

21   over to the next page.

22              And at 147 it's a little hard to



Page 209

1    read.  It's easier to read on 148, the next

2    page.  I believe it says "Sessions continued."

3            Do you see that?

4    A.    Sure.

5    Q.    Okay.  Let me read to you at least

6    what I make out the handwriting to be.  And I'm

7    principally working off the better, more

8    legible copy, 148.

9    A.    Okay.

10   Q.    The first word kind of stumps me.

11   Under -- I'm focusing on the portion under

12   "Sessions."

13           First word, I don't know if you can

14   make it out.  I can't.

15           Seems to then say:  "Time is long

16   expected."

17           Next line:  "Under law can't keep

18   certifying."

19           Next line:  "Can't concede the law."

20           Then it goes on:  "If congress wants

21   to deal with them, okay.  Don't imply they've

22   been mistreated.  Not warned about dates."



Page 210

1          Next line:  "Problematic to

2     recertify.  Just bite the bullets.  Dangerous

3     to separate Haiti out - prejudice against the

4     Haitians."

5          Continuing to the next page, says:

6     "How did you let this happen? is what" American

7     people "will say."

8          I'm -- it looks like AM.  I'm

9     inferring that's American people.

10          Then under that:  "No one has the

11     guts to pull the trigger.  Cannot certify."

12     Certify double underscored.

13          Does that refresh your recollection

14     at all, sir, as to any discussions at the

15     November 3rd meeting?

16     A.     A little bit.

17     Q.     Tell me about that.

18          MR. TYLER:  No.  Object to the

19     extent it calls for deliberative information,

20     deliberative discussions outside the four

21     corners of this document.

22          BY MR. MEDOW:



Page 211

1      Q.     Do you -- do you recall these

2   comments made by Attorney General Sessions?

3      A.     Which comments?

4      Q.     Any of the ones I read.

5      A.     I don't recall any specific

6   comments.  These are shorthand notes, and I

7   don't know that they represent the comments

8   that were made at the meeting or not.  It might

9   have been the note that she took, but I -- I

10  don't -- I just don't know.

11     Q.     Are you saying her notes are

12  inaccurate?

13     A.     I have no idea whether they're

14  accurate or not.  I -- I mean we could sit

15  here, and I could ask you to transcribe by hand

16  my deposition testimony right now.  It'd

17  probably differ from what the court reporter

18  testimony is.  So who knows?

19     Q.     Okay.  Have you specifically had

20  occasion to talk to Attorney General Sessions

21  about these notes and what he -- the notes

22  appear to report him saying?



Page 212

1      A.    I don't -- I don't recall a specific

2  discussion with him on it.  Although I think --

3  I think I talked to him about this topic

4  generally.  But I -- I -- I don't recall

5  specifically --

6      Q.    "This" --

7      A.    -- what we said.

8      Q.    -- "topic generally" means what?

9      A.    The -- the production of these notes

10  and the litigation.

11      Q.    And I -- I take it both you and he

12  think that should not have occurred.

13      A.    Well, I think that the speech that

14  we read seemed to indicate as much from him.

15  And I certainly think that it's pretty absurd

16  that these were produced in that litigation.

17      Q.    Your counsel instructed you not to

18  answer a question a few back.

19          And I forgot to ask you are you --

20  are you following his instruction?

21      A.    I am.

22          MR. MEDOW:  Okay.



Page 213

1           (Deposition Exhibit 149 was marked

2     for identification.)

3           BY MR. MEDOW:

4     Q.    Okay.  You've now been handed what's

5     been marked as Exhibit 149.  It was previously

6     an exhibit I think in one of the pleadings in

7     the Ramos case.  It was submitted as Exhibit

8     66, document 99 -- 96-66 in Ramos.

9           I just want to direct your attention

10    to a couple of entries here.

11          Do you see the -- the -- the

12    earliest entry is on Wednesday, November 1st,

13    2017, from Ms. Nuebel Kovarik?

14    A.    Yes.

15    Q.    And the subject line is "TPS

16    decision memo in Haiti"; is that correct?

17    A.    That's what it says.

18    Q.    Okay.  Then the next e-mail up is

19    date -- dated November 3rd, 2017, in the

20    afternoon?

21    A.    That's what it says.

22    Q.    And that's the same day as the White



Page 214

1    House meeting that Exhibit 145 indicated was in

2    the morning, correct?

3         A.    If that's what it says.

4    November 3rd.

5         Q.    Meeting was scheduled for -- I think

6    it says 9:15 to 10:00?

7         A.    That's what that exhibit indicates.

8         Q.    Okay.  And going back in Exhibit 149

9    on November 3rd, that same day in the

10   afternoon, the -- it's redacted so we don't

11   know who it's from.

12              But the second line of the e-mail

13   says:  "Per Kathy's read-out of today's PC,

14   this needs to go to AS1's office today."

15              Do you see that?

16        A.    I do see that.

17        Q.    Okay.  Just "read-out" at DHS meant

18   what?

19        A.    I don't know.

20        Q.    Was -- was that a general term for a

21   summary of a meeting or a report on a meeting?

22        A.    I've heard that term used before --



Page 215

1      Q.      In that --

2      A.      -- as a read-out, the meaning.  But

3  I have no idea what -- it seems to imply that's

4  what that might mean.  But I don't know.  Never

5  seen this e-mail.

6      Q.      "Today's PC."

7              "PC" would you understand to be

8  principal's committee?

9      A.      Typically, yes.

10     Q.      And that's what was reflected in

11  Exhibit 145, the White House meeting?

12     A.      Well, the White House meeting I

13  think was technically represented as a

14  principal small group meeting and not a PC.

15  But I don't know if people meant that to be

16  interchangeable.  I'm not sure.

17     Q.      What's the distinction between the

18  two?

19     A.      My understanding generally is that a

20  PC is -- involves all principals.  And a

21  principals small group might just be ones that

22  have equities in a subject.



Page 216

1     Q.     Some subset of the --

2     A.     Could be.

3     Q.     -- broader PC?

4     A.     Could be.

5     Q.     Okay.  And --

6     A.     I don't -- but I don't run the White

7  House.  So I -- I couldn't tell you how they

8  make those decisions.

9     Q.     Okay.  AS1, is that -- at DHS, was

10  that a typical reference for the acting

11  secretary?

12     A.     It was.

13     Q.     Okay.  At -- the reference to Kathy,

14  you see that the e-mail is being sent to

15  Ms. Nuebel Kovarik.

16          Do you see that?

17     A.     I do.

18     Q.     And it references her read-out from

19  today's PC.

20          Does reading that refresh your

21  recollection as to whether or not she attended

22  the November 3rd White House meeting?



Page 217

1      A.    Don't remember.

2      Q.    Then the last e-mail on the chain,

3  one at the top of the second page of the

4  exhibit, from Ms. Nuebel Kovarik to Mr.

5  McCament and others that are redacted.

6            Do you see that?

7      A.    Yes.

8      Q.    And that -- that is another e-mail

9  that same day, November 3rd, 2017, still in the

10 afternoon?

11     A.    It look that way.  2:46 p.m.

12     Q.    And --

13     A.    2:45.

14     Q.    -- she writes:  "Frances has the

15 clean version printed at the NAC, is" readying

16 -- "is reading now and is ready to sign.  After

17 he signs, he is going to scan back to me but is

18 likely to personally hand AS1 the memo at the

19 4:30 meeting he has with her.  Any problems

20 with that?"

21            Do you see that?

22     A.    I do.



Page 218

```
 1        Q.     Again, the subject line of the

 2   e-mail is "TPS decision memo on Haiti,"

 3   correct?

 4        A.     That's what it says.

 5        Q.     Would you understand Frances to be a

 6   reference to Mr. Cissna, the head of USCIS?

 7        A.     I would assume so.

 8        Q.     And he is the -- as the head of

 9   USCIS, is it true he is the person who would

10   send the decision memo from USCIS to the

11   secretary?

12        A.     Either -- most likely either him or

13   his designee.  I don't know if he physically

14   carries it or sends it or if his secretary does

15   it.  I...

16        Q.     NAC, is that the headquarters of

17   DHS?

18        A.     It is.

19        Q.     Do you know if the decision memo

20   did, in fact, go out on November 3rd, 2017, in

21   the afternoon following the White House

22   meeting?
```



Page 219

```
 1              MR. TYLER:  I'll object.  At this
 2    time this e-mail was written, he was no longer
 3    with DHS or employed with the Department of
 4    Justice.  That calls for speculation.
 5              MR. MEDOW:  Object to the speaking
 6    objection.
 7              If the witness doesn't know, he can
 8    answer and say that.
 9              THE WITNESS:  Like I said earlier,
10    I've never seen this e-mail before.  I wasn't
11    at DHS when this was written.  I have no idea.
12              You know, we can keep looking at it
13    if you want.
14              MR. MEDOW:  No.  That's fine.
15              BY MR. MEDOW:
16       Q.    Do you know of any follow-up
17    communications with Acting Secretary Duke
18    following the November 3rd meeting?
19              MR. TYLER:  Objection.  Vague.
20              With whom?  That's fair.
21              BY MR. MEDOW:
22       Q.    Are you aware of any follow-up
```



Page 220

1 communications with Acting Secretary Duke

2 following the November 3rd meeting on the same

3 subjects addressed at that meeting?

4     A.     Follow-up meetings with who though,

5 specifically.

6     Q.     Well, let me ask you direct.

7            Do you recall press report -- seeing

8 press reports of calls by Mr. Kelly and

9 Mr. Bossert to Ms. Duke the weekend following

10 this meeting?

11     A.     It sounds vaguely familiar but not

12 specifically.

13     Q.     Okay.  Do you recall those press

14 reports indicated that, in those calls, Mr.

15 Kelly and Mr. Bossert repeated the message that

16 the TPS designation should end?

17     A.     I -- do you have copies of those

18 reports?  I'm not going to say something based

19 off something I don't have --

20     Q.     No.  I --

21     A.     -- have in front of me.

22     Q.     I -- I have the article.



Page 221

1     A.     I -- I -- I mean I have -- I -- I

2  don't remember.

3     Q.     Okay.  That's --

4     A.     There's been a lot of stuff that's

5  been reported in the press that's false that --

6  so I'm not going to...

7     Q.     My -- my question -- I mean that

8  really is just a predicate to ask you do you

9  know -- do you have any knowledge yourself,

10  have you been told anything, as to what, if

11  anything, was said in any such calls between

12  Kelly and Bossert and Duke?

13     A.     I was not involved, didn't work

14  there.  I have no idea.

15     Q.     Anybody tell you what was said, even

16  though you weren't there anymore?

17     A.     No.  Not to my recollection.

18     Q.     Do you recall now that Mr. Kelly

19  took exception to the way those calls were

20  portrayed in the press?

21     A.     I don't know.

22            They take exception to the way many



Page 222

1    things are reported in the press.

2         Q.    So as we have seen, the -- the White

3    House meeting was November 3rd; and the

4    reported decision on Haiti was about two and a

5    half weeks later, November 20th?

6         A.    I think that seems to be the general

7    time line.

8               MR. MEDOW:  Okay.  Let's -- let's

9    look at the Federal Register notice on that

10   termination.

11              THE WITNESS:  Okay.

12              (Deposition Exhibit 150 was marked

13   for identification.)

14              BY MR. MEDOW:

15        Q.    Okay.  You should now have Exhibit

16   150, Mr. Hamilton.

17              Do you recognize this to be a notice

18   in the Federal Register dated January 18th,

19   2018?

20        A.    Sure looks like it.

21        Q.    Okay.  And does this relate to the

22   decision to terminate Haiti's designation under



Page 223

1   TPS?

2        A.    In bold letters it says:

3   "Termination of the designation of Haiti for

4   Temporary Protected Status."

5        Q.    Now, this Federal Register notice

6   was published roughly two months after the

7   press release we looked at announcing the

8   decision.

9             Is that a typical amount of delay

10  between press release decision and a Federal

11  Register notice?

12       A.    I have no idea what the typical time

13  frame is.

14       Q.    Do you know why there was roughly

15  two months between the press release and the

16  Federal Register notice?

17       A.    No.

18       Q.    What role, if any, did you have in

19  generating the Federal Register notice, Exhibit

20  150?

21       A.    Well, given that I didn't work at

22  the Department of Homeland Security, my -- my



Page 224

1    understanding is that I had zero role in

2    generating that notice.

3         Q.    Did you see any drafts of it?

4         A.    I have no recollection of seeing a

5    draft.

6         Q.    Did you give any input as to what

7    the contents should be or should not be?

8         A.    I -- I don't have any recollection.

9         Q.    Directing your attention to -- in

10   the third page, first column, the heading "Why

11   is the Secretary Terminating the TPS

12   Designation For Haiti as of July 22nd, 2019"?

13              Do you see that?

14        A.    I do.

15        Q.    Why don't you take a minute to

16   review that section and indicate when you have.

17        A.    Okay.

18        Q.    Does this section contain a

19   discussion of conditions on the ground in Haiti

20   as of January 18th, 2018?

21        A.    It seems to.

22        Q.    For the next series of questions,



Page 225

1    you might want to have the prior notice out,

2    the May 24, Exhibit 140 handy.

3            And the question I have is, to the

4    extent you know, had the situation in Haiti

5    improved since May 24th, 2017?

6        A.    I think it was generally getting

7    better, from my recollection of my time at DHS.

8            And I note one thing in here that

9    does refresh my recollection.

10       Q.    Which document are you looking at?

11       A.    The -- the -- 150.

12       Q.    Okay.  So this is the --

13       A.    This is --

14       Q.    -- January --

15       A.    This is the January notice.

16       Q.    Yes, sir.

17       A.    And it talks about the progress that

18   has been made.  And it notes that, in October

19   of 2017, the United Nations withdrew its

20   peacekeeping mission, noting the mission had

21   achieved its goals.

22            I do recall -- I do recall that



Page 226

1    being something that -- I do recall that being

2    the case.

3         Q.    That -- the -- the withdrawal had

4    been announced in March of 2017, correct?

5         A.    They had announced it earlier on in

6    the year.

7         Q.    And that had been referenced in the

8    earlier Federal Register notice, Exhibit 140,

9    correct?

10        A.    I don't recall seeing that.  If it's

11   in there, that's great.

12        Q.    I direct your attention in 140 to --

13        A.    Yeah.  It says it right there.

14        Q.    Yeah.  It --

15        A.    Great.

16        Q.    Just so we have it, it's the third

17   page, first column, bottom of the first

18   paragraph.

19        A.    Yep.  So it seems like they

20   announced the security situation was improving

21   in March.  And they had plans to leave in

22   October if it wasn't warranted.  And seems like



Page 227

1    it did, and they left.

2            So it's great.

3       Q.    Okay.  In -- so back -- it was known

4    in May that the United Nations at least planned

5    to remove its peacekeeping mission in October,

6    correct?

7       A.    Yeah.  I remember that being --

8       Q.    Okay.

9       A.    -- an issue.

10      Q.    Now, it's noted in the -- going to

11   the January notice, it is cited that 98 percent

12   of IDP, internally displaced persons, sites

13   have closed.

14           Do you see that?

15      A.    I see that.

16      Q.    And in May -- the May notice,

17   Exhibit 140, on the third page, first

18   paragraph, it notes that a -- 96 percent of --

19   it says over 98 percent of IDP camps have

20   closed, correct?

21      A.    It says that.

22      Q.    Okay.  So that was not a change



Page 228

1    between May -- the May notice and January

2    notice; the closing of the camps had occurred

3    by the May notice.

4         A.    Well, that is one factor that

5    appears to be the same.  But I don't know that

6    that's --

7         Q.    Okay.  Well, I'm just --

8         A.    -- exclusive of all the --

9         Q.    I'm -- I'm not --

10        A.    -- things that's they looked at.

11              Like we talked about earlier though,

12   the fact that they mentioned a few things in

13   this May notice doesn't mean that they didn't

14   think about other things.  And I would assume

15   that was the same practice that they maintained

16   when I was gone.

17        Q.    I'm not trying to imply that's the

18   -- the only factor.  I'm just --

19        A.    Sure.

20        Q.    -- trying to --

21        A.    I was just trying to explain myself.

22        Q.    Yeah.  Just trying to go through and



Page 229

1    see what was different; what wasn't different.

2    That's the basic exercise.

3              In the January notice, there's also

4    a reference to only approximately 38,000 of the

5    estimated 2 million Haitians who lost their

6    homes in earthquake were still living in camps.

7              Do you see that?

8         A.    I see that.

9         Q.    And the comparable statement in the

10   May notice is 55 -- over -- over 55,000

11   Haitians who lost their homes in the earthquake

12   are still living in the camps, correct?

13        A.    That's what it says.

14        Q.    Now, in the May notice as well, it

15   goes on to say that:  "Some" -- in the same

16   paragraph:  "Some people who were displaced by

17   the earthquake, although no longer living in

18   camps, had moved back to unsafe homes or

19   relocated to informal settlements located in

20   hazardous areas."

21             Do you see that?

22        A.    I do.



Page 230

1       Q.     Was that still true as of January of

2     2018?

3              MR. TYLER:  Objection.  I mean these

4     documents speak to themselves.

5              Are -- are you asking whether those

6     facts are reflected in the January 2018

7     document?

8              MR. MEDOW:  Yes.  That's -- I'm

9     asking if those facts were still true as of

10    January '18.

11             MR. TYLER:  If he has independent

12    knowledge?

13             MR. MEDOW:  If he knows.

14             THE WITNESS:  I was not familiar

15    with what went into the January notice.  I

16    didn't work at DHS.  I'm not an independent

17    subject matter expert on conditions in Haiti.

18             Again, though, it seems to note the

19    difference between 55,000 Haitians in May and

20    38,000.  That's, what, 17,000 people.  That's a

21    pretty substantial improvement.

22             BY MR. MEDOW:

Page 231

1    Q.    Outs of 2 million total, correct?

2    A.    "Only 38,000 of 2 million total were

3    still living in camps," is what the thing says.

4    Q.    So --

5    A.    So that's -- but between 55 to 38,

6    17,000, that's a substantial percentage of the

7    folks who were living in temporary shelters of

8    some kind.

9          So to me that's -- that look -- that

10   appears to be market progress.  But again,

11   I'm --

12   Q.    So in --

13   A.    -- just seeing this for the --

14   Q.    So in May, of the 2 million who had

15   lost their homes, there were 55,000 left in the

16   camps; and that -- of those 2 million, it

17   was -- it moved from 55,000 to 38,000 between

18   May and January, according to the notices,

19   correct?

20   A.    According to the notices.

21   Q.    Now, it's also referenced in the

22   January notice that Haiti successfully



Page 232

1   completed its presidential election in February

2   of 2017, correct?

3       A.    Where does it say that?

4       Q.    Exhibit 150, third page, first

5   column.

6       A.    Yep.  I see that.  "Haiti

7   successfully completed its president election

8   in February 2017.  The 2010 earthquake

9   destroyed key government infrastructure,

10  including dozens of primary federal buildings,

11  which the Haitian government is working to

12  rebuild.  The supreme court is already

13  reinstructed and operational.  And in April

14  2017, the president announced a project to

15  rebuild Haiti's national palace."

16      Q.    Focusing on "Haiti successfully

17  completed its presidential election in February

18  2017."

19            So that had occurred by the time of

20  the May 2017 notice, correct?

21      A.    Yes.  I would assume so.

22      Q.    And the notion -- also it's



Page 233

```
 1   referenced, as you just read, in the January

 2   2018 notice:  "The Supreme Court is already"

 3   reconstruction "and operational."

 4           Do you see that?

 5      A.    That's what I just read.

 6      Q.    And that -- that occurred in 2015,

 7   didn't it, sir?

 8      A.    I couldn't tell you.

 9      Q.    Did it happen between May of 2017

10   and January of 2018?

11      A.    Don't know.

12      Q.    And it goes on -- in the paragraph

13   you read, in -- in the January of 2018 notice,

14   it goes on to say that, in April of 2017, the

15   president had announced a project to rebuild

16   the national palace, correct?

17      A.    I see that.

18      Q.    And that had happened then before

19   the May 2017 notice, correct?

20      A.    Well, it appears from the text that

21   it was an announcement in April.  So that would

22   be before May.
```



Page 234

1     Q.    In the January notice, it also

2  indicates that -- last paragraph in that first

3  column:  "The economy continues to recover."

4          It goes on to say that:  "Annual GDP

5  growth has been 1.7 percent over the period

6  2010 to 2016," right?

7     A.    That's what it says.

8     Q.    So that covered a period prior to

9  the May 2017 notice, correct?

10    A.    That's -- again, predates the May

11 notice.

12    Q.    And the May notice itself had

13 indicated -- well, I'm not finding the

14 reference.  So I don't want to waste more of

15 your time.

16          In the January notice, there's also

17 a reference to cholera, the cholera outbreak

18 being at its lowest level.

19          Do you see that?

20    A.    That's what it says.

21    Q.    How much had it improved -- the

22 situation improved, to your knowledge, between



Page 235

1    May of 2017 and January of 2018?

2              MR. TYLER:  So you're asking for his

3    personal knowledge?

4              MR. MEDOW:  To the extent he knows.

5              THE WITNESS:  You -- we've already

6    covered this.  And again, I am not a subject

7    matter expert on conditions on the ground in

8    Haiti.

9              So I assume that they improved.  But

10   as -- as far as the information that was

11   conveyed to me before I left DHS, conditions

12   were improving.  And as I said before, the

13   decision in May was a very, very, very close

14   call for then Secretary Kelly.

15             BY MR. MEDOW:

16        Q.    But nevertheless, the decision in

17   May was to extend, correct?

18        A.    The secretary did make a decision to

19   extend in May.  It was a very, very close call.

20   And that's the type of decision that is

21   properly committed to the head of a cabinet

22   agency to make.  Those are the tough calls that



Page 236

1    the executive branch has to make.

2         Q.    Focusing again on the cholera.

3    So -- just so we're clear.

4              To the -- you don't know whether or

5    to what extent the cholera situation improved

6    between May of 2017 and January of 2018.

7         A.    Sitting before you today --

8         Q.    Yes.

9         A.    -- I don't -- I didn't research

10   cholera conditions on the ground in Haiti

11   before I came to my deposition today.  So I

12   couldn't tell you.

13        Q.    Did you research them at any point

14   in time?

15        A.    I don't know.  I don't remember.

16        Q.    Okay.

17        A.    I -- I know that these were --

18   things were generally made known to us when I

19   was at DHS as we were evaluating this issue.

20   But I couldn't tell you specifically what rates

21   of cholera were sitting here before you today.

22        Q.    In the May notice, Exhibit 140,



Page 237

1    third page, second column now:  "It was noted

2    that, as of May, progress has been made in

3    combatting cholera," correct?

4         A.    Where does it say that?

5         Q.    In that column about seven lines

6    down?

7         A.    This is the May notice.

8         Q.    Yes, sir.

9               Third --

10        A.    "However, progress has been made in

11   combatting cholera."

12        Q.    So that was in the May notice,

13   correct?

14        A.    Well, it says -- it doesn't say.  It

15   just says Haiti has made some progress in the

16   health sector.

17               Whereas, this one from January says:

18   "Cholera is currently at its lowest level since

19   the outbreak began."

20               I would assume that there must be

21   some kind of a difference between those two

22   statements.  To the laymen, it wouldn't.  It



Page 238

1   would appear that way.

2       Q.   But again, you can't tell us to what

3   extent conditions actually did improve with

4   respect to cholera between the two dates?

5       A.   No.  All I can do is read -- read to

6   you what the words say.  And the words seem to

7   indicates that things were likely different.

8   They didn't use the same language.

9           (Deposition Exhibit 151 was marked

10  for identification.)

11          BY MR. MEDOW:

12      Q.   Okay.  Now, you've been handed,

13  Mr. Hamilton, what's been marked as Exhibit

14  151.

15          This is a document from the

16  certified administrative record.  Bears Bates

17  AR-HAITI-00000046 through 63.

18          This is -- do you see this is a

19  USCIS document?

20      A.   It appears to be.

21      Q.   And the -- it deals with "TPS

22  considerations:  Haiti, October 2017"?



Page 239

1          Do you see that?

2     A.    That's what it says.

3     Q.    If you -- directing your attention

4  to Page 4, I --

5     A.    Is this Bates page 49?

6     Q.    Yeah.  Let me -- let me clean that

7  up.

8          If you look at Bates 48, do you see

9  the section beginning "Cholera Epidemic and

10 Healthcare" --

11    A.    I --

12    Q.    -- which continues on to 49?

13    A.    Yes.

14    Q.    Okay.  On 49 do you see at the

15 bottom of the text on that page, last paragraph

16 says:  "While progress has been made in

17 combating cholera, since the peak of the

18 epidemic in 2011, cholera has become endemic in

19 Haiti with 'seasonal peaks regularly triggering

20 emergency interventions.'  In 2016 the number

21 of suspected" -- well, let me stop there.

22          To your knowledge, sir, was that



Page 240

1    information that cholera has become endemic in

2    Haiti with seasonal peaks triggering emergency

3    intervention, was that information conveyed in

4    the January 2018 Federal Register notice,

5    Exhibit 150?

6         MR. TYLER:  I'll object.  These

7    documents speak for itself.

8         You, sir, have made the point that

9    this witness has no independent knowledge of

10   the cholera outbreak, its history, et cetera,

11   et cetera.

12        MR. MEDOW:  I want to make sure I'm

13   not misreading the document and missing

14   something.

15        THE WITNESS:  Well, I mean there's

16   -- there appears to be 17 pages of country

17   conditions reflected in this report that are

18   not -- clearly this Federal Register notice is

19   not the same length.  So there's a lot of

20   information that's probably in here that may

21   not be in the Federal Register notice.

22        But I don't know what bearing that



Page 241

1  has on anything.

2          MR. MEDOW:  Well, we'll let the

3  court decide that.

4          BY MR. MEDOW:

5     Q.    My question is simply was there any

6  discussion in the January, February '18 notice

7  of the fact that cholera has become endemic in

8  Haiti?

9          MR. TYLER:  Objection.  The

10 documents speaks for themselves.

11         THE WITNESS:  I -- I don't see that

12 sentence.  But again, there's 18 pages here.

13 Just because something's not represented in a

14 Federal Register notice doesn't mean that it

15 wasn't before the agency.

16         And it clearly is, as you pointed

17 out, a U.S. Citizenship and Immigration

18 Services document.  So I have no idea why

19 things were selected go to in the Federal

20 Register notice and why they weren't.

21         BY MR. MEDOW:

22    Q.    The Federal Register notice sets



Page 242

1   forth the basis for the secretary's

2   determination, correct?

3       A.    In general, it explains the basis

4   for the determination.

5       Q.    Doesn't the statute require that the

6   secretary "publish notice in the Federal

7   Register of his determination (including the

8   basis for the determination)"?

9           MR. TYLER:  Objection.  Calls for

10  legal conclusion.

11          THE WITNESS:  I -- counsel, what --

12  where are you reading from?

13          MR. MEDOW:  The statute.

14          THE WITNESS:  INA Section 244?

15          MR. MEDOW:  Yes.

16          THE WITNESS:  Do you have a copy of

17  it I can see?

18          MR. MEDOW:  Yes.

19          (Deposition Exhibit 152 was marked

20  for identification.)

21          BY MR. MEDOW:

22      Q.    You've been handed Exhibit 152.



Page 243

1          Do you recognize this as the TPS

2    statute?

3        A.    It appears to be the -- the Westlaw

4    printout of the TPS statute.

5        Q.    Okay.  Directing your attention to 8

6    USC Section 1254a(b)(3)(B), the termination of

7    designation provision.

8        A.    Okay.

9        Q.    Do you see where it reads that, if

10   certain conditions are met, the attorney

11   general -- which that later is read to mean the

12   secretary of DHS, correct, under the DHS

13   statute?

14       A.    That's correct.

15       Q.    Okay.  So the secretary of DHS

16   "shall terminate the designation by publishing

17   notice in the Federal Register of the

18   determination under this subparagraph

19   (including the basis for the determination),"

20   correct?

21       A.    That's what it says.

22       Q.    Okay.  Going back to the longer



Page 244

1   memo, 151.

2            Do you have that?

3       A.    Yes.

4       Q.    Bates 50.  Still on the cholera

5   discussion, the top sentence reads:  "While the

6   number of suspected cases of cholera has

7   decline since 2016, Haiti nevertheless remains

8   'extremely vulnerable" to the disease."

9            Do you see that?

10      A.    I do.

11      Q.    Was that information put forth in

12  the Federal Register notice in January 2 --

13  2018?

14           MR. TYLER:  Objection.  The document

15  speaks for itself.

16           It's just -- this is argumentative.

17  Just -- you're seemingly arguing on behalf of

18  your opinion that the wrong decision was

19  reached.  Yet this is a fact witness.

20           THE WITNESS:  I mean I -- I can --

21  we can sit here all day, and we can read the

22  different TPS notices.



Page 245

1          But as I've pointed out repeatedly,

2    there's 18 pages of things here.  Just because

3    something appears in this report and it doesn't

4    appear in the notice doesn't mean that the

5    notice is somehow inadequate.

6          It explains the basis for the

7    secretary's decision.  It's a discretionary

8    decision that's committed to the secretary

9    that's not supposed to be judicially reviewable

10   by statute.

11         So, you know, I -- I don't know what

12   we're doing here.  But we can keep -- we can

13   keep reading the documents.  It's fine by me.

14             BY MR. MEDOW:

15     Q.    Somebody had to make a decision as

16   to what information in 151 would make its way

17   into 150, correct?

18     A.    Presumably someone would have to

19   decide what to put in the Federal Register

20   notice.

21     Q.    And as far as we can tell, whoever

22   that person was decided not to include the



Page 246

1    information that "Haiti remains 'extremely

2    vulnerable' to cholera," correct?

3             MR. TYLER:  Objection.

4    Argumentative.

5             THE WITNESS:  I -- there is, again,

6    18 pages of things in here that mostly do not

7    appear to be captured in the Federal Register

8    notice.  It does not mean they were not

9    considered.  And it doesn't mean that it's

10   relevant whatsoever.

11            Because there's a lot of good things

12   in here, and there's a lot of, you know, maybe

13   not so good things.  I don't know.  Just

14   depends on your perspective.

15            There is a lot of factual

16   information in this USCIS report.  And there's

17   no requirement for USCIS to put an 18-page

18   report into a Federal Register notice.

19            What's required is for the secretary

20   to record their decision and why they're making

21   that decision.  And that appears to be what

22   they did in January of 2018.



Page 247

1          BY MR. MEDOW:

2     Q.    Can you point me to any good

3  information in 151 that -- that was not

4  reported in 150?

5          MR. TYLER:  Objection.  This is

6  argumentative.  The document speaks for itself.

7          What's the purpose for this, other

8  than arguing with this witness about whether an

9  appropriate decision was made or not.

10         THE WITNESS:  I mean, like I said,

11 if you want to -- if you want to sit here, give

12 me time, I will read over this entire 18-page

13 document right now, and we can talk about every

14 specific sentence in this document if that's

15 what you want to do.

16         BY MR. MEDOW:

17     Q.    Are you -- as you sit here right

18 now, are you aware of what -- anything that you

19 could call good information that was not

20 reflected in the notice?

21         MR. TYLER:  Objection.

22         Again, you're referring to a January



Page 248

1    2018 notice.  This witness was no longer with

2    the Department of Homeland Security.  He has no

3    factual knowledge of this as such.  You're just

4    arguing with him.

5           THE WITNESS:  This document

6    allegedly describes varying changing conditions

7    within the country of Haiti, various

8    improvements, various declines, just depending

9    on the subject matter that you're looking at,

10   describing all kinds of different factors.

11           You know, again, I don't -- I don't

12   know specifically what it is that you're

13   interested in here.  There's all kinds of

14   information in here that is not necessarily

15   reflecting in the Federal Register notice, nor

16   does this purport to be the only document that

17   DHS looked at at the time they made their

18   decision.

19           So if, you know, if -- if your

20   insinuation is that somehow this entire report

21   needed to be reported in the Federal Register,

22   you're fine to -- you're fine to believe that.



Page 249

1          BY MR. MEDOW:

2     Q.     Exhibit 151, first page.

3            Do you have that?

4     A.     I do.

5     Q.     Second paragraph, second sentence

6    reads:  "Many of the conditions prompting the

7    original January 2010 TPS designation persist,

8    and the country remains vulnerable to external

9    shocks and internal fragility," correct?

10    A.     That's what it says.

11    Q.     Last page of the exhibit, last

12   sentence is:  "Due to the conditions outlined

13   in this report, Haiti's recovery from the 2010

14   earthquake could be characterized as falling

15   into what one nongovernmental organization

16   recently described as 'the country's tragic

17   pattern of 'one step forward, two steps back.'"

18            Did I read that correctly?

19    A.     That's what it says.

20            MR. MEDOW:  Okay.  Let -- let me

21   give you another exhibit.

22            MR. TYLER:  Counsel, you're just



Page 250

1   asking him to read from documents that speak

2   for themselves.

3          Is this why we're here this

4   afternoon?

5          MR. MEDOW:  We're here for

6   discovery.

7          MR. TYLER:  Of facts.

8          MR. MEDOW:  Yeah.

9          MR. TYLER:  Which we have not

10  touched upon in some 45 minutes now.

11         MR. MEDOW:  Well, that's your view.

12         (Deposition Exhibit 153 was marked

13  for identification.)

14         BY MR. MEDOW:

15     Q.    Okay.  Mr. Hamilton, you should now

16  have Exhibit 153 --

17     A.    Yep.

18     Q.    -- in front of you, a one-page

19  document.  Appears to been an e-mail you sent

20  on Friday, April 7th, 2017, 7:58 a.m., Bates

21  CP_00001526.

22     A.    Got it.



Page 251

1      Q.     Is this, in fact, an e-mail you sent

2  on April 7, 2017?

3      A.     It looks like it.

4      Q.     And you -- this was an internal

5  e-mail, right; it went to just people at DHS?

6      A.     It looks that way.

7      Q.     The subject of the e-mail is "TPS"?

8      A.     It is.

9      Q.     Okay.  You write -- you make

10  reference in the first line to S1.

11             That, again, is Mr. Kelly at this

12  point?

13     A.     That would be correct.

14     Q.     And you -- you say in the first

15  paragraph:  "Mr. Kelly wants a small briefing

16  on TPS likely on Monday."

17             I'll skip the next sentence.

18             You go on in the next paragraph to

19  say:  "In addition to the general TPS document

20  we had last week (showing country, designation,

21  expiration, et cetera) he would like the

22  following related to Haiti."



Page 252

1          Do you see that?

2     A.    I do.

3     Q.    "He," again, would be referring to

4  Secretary Kelly, correct?

5     A.    Yep.

6     Q.    And you -- you ask questions -- or

7  the information -- for example, the first

8  bullet on -- you like the -- it says:

9  "Secretary Kelly would like the following

10 related to Haiti," first item, "Details on how

11 many are on public and private relief,"

12 correct?

13    A.    That's what it says.

14    Q.    Okay.  By "how many" there, you're

15 referring to how many Haiti beneficiaries of

16 TPS?

17    A.    I would assume so.

18    Q.    And what you're asking -- or you're

19 passing on the secretary's request to learn how

20 many of those beneficiaries, among other

21 things, are on public or private relief,

22 correct?


MAGNA
LEGAL SERVICES

Page 253

1      A.     That -- it appears that that is,

2   yes, what this e-mail represents.

3      Q.     Okay.  Public or -- by public or

4   private relief, you meant welfare or what?

5      A.     I would assume so.

6      Q.     And you also, among other things,

7   were passing on the secretary's request for

8   information on how many of the TPS Haitian

9   beneficiaries had been convicted of crimes of

10  any kind, correct?

11     A.     Correct.

12     Q.     Okay.  Do you recall when Secretary

13  Kelly communicated to you that he wanted this

14  information?

15     A.     I don't recall specifically.

16  Presumably it would have been before Friday,

17  April 7th at --

18     Q.     Would have been --

19     A.     -- 7:58 a.m.

20     Q.     -- about that time?

21     A.     I don't know.

22     Q.     Is this --



Page 254

1        A.     Maybe.

2        Q.     If the secretary asked you for

3    information, is it something you jump on to get

4    out or --

5        A.     I tend to take quick action on

6    whatever my principal wants.

7        Q.     Did the secretary tell you why he

8    wanted the information?

9        A.     Did he tell me why he wanted this

10   information?

11       Q.     The information you're seeking in

12   the e-mail.

13       A.     I don't recall this specific

14   situation.  But what I can recall is that

15   Secretary Kelly was very interested in

16   background, circumstantial evidence,

17   information, facts related to various decisions

18   he made as secretary at DHS.

19            He wanted to be informed, make the

20   best decisions that he could, and so was very

21   interested in receiving any available

22   information so that he could make an informed



Page 255

1   decision.

2       Q.    Do you know if the idea to seek this

3   information came from Secretary Kelly himself

4   or if somebody in turn had asked him to get it?

5       A.    I -- I couldn't tell you every

6   discussion Secretary Kelly ever had.  But

7   Secretary Kelly, again, as I've just said,

8   repeatedly was interested in getting additional

9   information, no matter what the subject was, on

10  things so that he could make informed

11  decisions.

12          And so this appears to be my attempt

13  to get that information for him.

14      Q.    Do you know had DHS sought this type

15  of information previously in connection with a

16  decision on whether or not to extend of

17  terminate a country under TPS?

18      A.    I don't -- I don't know specifically

19  what the prior administration did or didn't ask

20  for, what they did internally.  I wasn't there.

21          I have no idea what they looked at,

22  what they considered.  That would be pure



Page 256

1   speculation on my part.

2       Q.      Did DHS track the type of

3   information you were seeking to collect?

4       A.      Oftentimes not.  Oftentimes their

5   systems did not collect information that a

6   principal might assume that an agency would

7   have, such as how many people have been

8   convicted of crimes who were living in the

9   United States under the good graces of the

10  United States Government so I -- that seems

11  like a reasonable thing for a principal to want

12  to ask to know.

13          And the fact that the department

14  didn't seem to have it oftentimes was

15  interesting.

16      Q.      As you write in the e-mail, this

17  request was specific to Haiti, correct?

18      A.      It looks -- it says:  "He would like

19  the following related to Haiti."

20      Q.      Was the -- the same information

21  sought with respect to citizens of any other

22  country designated under TPS, to your



Page 257

1   knowledge?

2        A.     I don't remember.  But what I do

3   know is that Secretary Kelly was gone in July

4   of 2017.  And many of those other decisions

5   were made after July of 2017.

6              So I don't -- I don't know.  I don't

7   remember what was asked for.  Different

8   principals have different styles.  They want

9   different kinds of information.  I don't recall

10  if Acting Secretary Duke wanted this

11  information or if she doesn't.

12             All I know is that Secretary Kelly

13  wanted more information, very curious by

14  nature, wanted to know things so he could make

15  good decisions.

16       Q.     Looking at the -- I guess formally

17  third paragraph from the bottom, you write:

18  "Please keep the prep for this briefing limited

19  to those on this e-mail.  If you need a

20  specific data set and need to ask someone to

21  pull it, please do not indicate what is it for.

22  I don't want this to turn into a big thing



Page 258

1    where people start prodding and things start

2    leaking out."

3            Do you see that?

4       A.    I do.

5       Q.    What were you concerned might start

6    leaking out?

7       A.    Well, as I recall -- I seem to have

8    a vague recollection of some of this

9    information -- the fact that this was asked for

10   actually did seem to get in the news somehow.

11           People run to the media when

12   they think that there's something that's

13   newsworthy.  And it's disappointing because a

14   principal needs to have information to make

15   informed decisions; and if a principal can't

16   get that information without it going to the

17   media or to some kind of litigant or somebody,

18   they can't make the right decisions that they

19   heed to make.  It is very unfortunate.

20           So this is an expression from me

21   that we wanted to get this information, but at

22   the same time, we don't want it to blow up and



Page 259

1    turn into a media spectacle, media circus, so

2    that he couldn't make the decision that he

3    needs to make.

4        Q.    Was there something about the

5    request itself that concerned you it might blow

6    up into a media spectacle?

7        A.    Any time you ask for information on

8    anything -- anything that we've done involving

9    immigration anywhere where I have worked gets

10   medical were attention.  It's just the nature

11   of it.

12            This is April.  I mean there's media

13   inquiry poking into everything.  Things leak

14   out of USCIS left and right.  It's just the

15   nature of business right now.

16            So if -- if -- it -- it's very

17   rational that a principal would want to ask for

18   information, be able to ensure that his

19   requests for confidential information are kept

20   confidential, and that he receives that

21   information without having to deal with

22   inquiries as to why he's asking for it.



1          It's -- it's -- it's why this --

2    this entire exercise is silly.

3         Q.     Did you believe, at the time you

4    sent the e-mail, that the information being

5    sought was relevant to the decision on Haiti?

6         A.     It could have been.  It could not

7    have been.  He wanted more information.  As I

8    recall, there is one specific subsection under

9    the TPS statutes.  And you have it here in

10   Exhibit 152 about designations under subsection

11   C.

12          And it says specifically:  "Unless

13   the attorney general," secretary, "finds that

14   permitting the aliens to remain temporarily in

15   the United States is contrary to the national

16   interest of the United States."

17          So conceivably maybe some of this

18   could factor into that decision.  But who

19   knows.  If it's -- you know, I mean if there's

20   lots of criminals, I think a principal could

21   decide that there's -- it might be contrary to

22   the interest of the United States.  But maybe



Page 261

 1    there's not, and so maybe he decides it is not

 2    contrary to the interest of the United States.

 3            It's -- it's, again, part of a

 4    practice of getting information so you can make

 5    good decisions.

 6        Q.    As you alluded to, the fact this

 7    information was being sought did leak, correct?

 8        A.    It -- it seems to ring a bell.

 9            (Deposition Exhibit 154 was marked

10    for identification.)

11            THE WITNESS:  Thank you, ma'am.

12            BY MR. MEDOW:

13        Q.    Okay.  Mr. Hamilton, you now have

14    Exhibit 154, which is simply an article we

15    printed off the Internet dated May 9, so

16    roughly a month after your e-mail in 2017.

17            Is this related to the leak you were

18    mentioning?

19        A.    This -- I mean, again, I don't have

20    a specific recollection of how it leaked or

21    where or when.  But it appears to be related.

22        Q.    Okay.  And just so we have the



Page 262

1  context, looking on the first page, the author

2  of the article says:  "Internal e-mails

3  obtained by the Associated Press show a top

4  immigration official wanted not only crime data

5  on Haitians who are protected under -- from

6  deportation under the Temporary Protected

7  Status program but also how many were receiving

8  public benefits," correct?

9      A.    Yep.

10     Q.    And that is the same subject matter

11 as your -- or addressed in your e-mail, 153,

12 correct?

13     A.    Appears to be the same.

14           It's unfortunate that principals

15 can't ask questions to get information.  They

16 can't get facts without being worried about it

17 leaking to the press or coming out in

18 litigation.  So it frustrates their ability to

19 make decisions.

20     Q.    Looking on the second page of the --

21 Exhibit 154, third paragraph says:  "Department

22 spokesman David" -- is it Lapan?



Page 263

1     A.    Lapan.

2     Q.    -- "said Tuesday that criminal

3  history and other information requested by

4  policy chief Kathy Nuebel Kovarik won't be used

5  to make a final decision about Temporary

6  Protected Status.  Lapan" -- or "Lapan" -- how

7  is it said?

8     A.    Lapan.

9     Q.    Lapan.

10        "Lapan said the questions were asked

11  so that Kelly could have a fuller understanding

12  of who is in the program."

13        Was Mr. Lapan authorized, as far as

14  you know, to make those statements?

15    A.    Dave Lapan was the department

16  spokesman.  So he would have been authorized to

17  talk to the press.

18    Q.    Did you have input or weigh in on

19  how the department should respond to the leaked

20  e-mails?

21    A.    I don't recall.

22    Q.    Okay.  Did you agree with the



Page 264

1    approach Mr. Lapan took, as reported in Exhibit

2    154?

3              MR. TYLER:  Objection.  Vague.

4              THE WITNESS:  Which part?  The last

5    sentence?

6              BY MR. MEDOW:

7         Q.   Actually, I'm more -- I'm more

8    focused on the first sentence that -- where

9    Lapan says "criminal history and other

10   information requested won't be used to make a

11   final decision."

12             Do you see that?

13             Were you in agreement with that

14   approach?

15        A.   I don't know.  I mean it won't be

16   used.  I'm not sure if that's accurate or not.

17   I suppose it could be used for that reasons

18   that I said earlier.

19             But I -- I mean, you know, who knows

20   if it's -- the press has a -- what a reporter

21   says -- it's not a direct quote.  It says that

22   it won't be used to -- I don't know what Dave



Page 265

1    told Ms. Caldwell, the reporter, if he said

2    that it wouldn't be the factor, a factor.  I

3    have no idea what he told her, what their

4    conversation was like.

5              And so I couldn't tell you whether

6    or not I agree with it or disagree with it

7    completely.

8    Q.    Now, the decision -- as we've seen

9    before, the decision on Haiti, the first

10   decision, was in late May of 2017, right?

11   A.    It sure was.

12   Q.    Prior to the release -- public

13   release of the decision, do you recall being

14   involved in discussions and -- or -- or

15   internal meetings about how do you respond to

16   press inquiries relating to that decision?

17   A.    I generally, as part of my duties,

18   assisted with guidance from the secretary's

19   perspective on responding to press inquiries.

20   Q.    That -- that's something you would

21   typically do, right, on a --

22   A.    In general.



Page 266

1      Q.     Yeah?

2      A.     I couldn't tell you if we did it

3   every time or most of the time or -- or not.  I

4   just know that it -- from time to time it would

5   come up.

6             MR. MEDOW:  Okay.

7             (Deposition Exhibit 155 was marked

8   for identification.)

9             BY MR. MEDOW:

10     Q.     Okay.  Mr. Hamilton, you should now

11  have 155, Exhibit 155, a multipage e-mail

12  bearing Bates DPP_00007775 through 78.

13            Note -- and direct your attention --

14  do you see in the "To" line on the first page

15  you're one of the recipients?

16     A.     I see that.

17     Q.     Is this, in fact, an e-mail you

18  received on or about May 20th of 2017?

19     A.     I assume so.

20     Q.     And this -- the subject line of the

21  e-mail is "Approval and Input Needed:  Draft

22  Talking Points in QA for Haiti TPS Announcement



Page 267

1    Monday," correct?

2         A.     That's what it says.

3         Q.     And the author, a Ms. Claffey,

4    C-L-A-F-F-E-Y, correct?

5         A.     Yep.

6         Q.     Was she in the press office or what?

7         A.     Her signature line says "Deputy

8    Assistant Secretary for Strategic

9    Communications, Office of Public Affairs, U.S.

10   Department of Homeland Security."

11        Q.     It does indeed.

12               And she writes that:  "Please find

13   attached and below draft talking points in Q&A

14   document for Monday's announcement on Haiti TPS

15   extension," correct?

16        A.     That's what it says.

17        Q.     And she asks for edits and approval,

18   right?

19        A.     "We are asking for edits and

20   approval as well as any additional questions

21   and answers that you think could come up in

22   conversations with media and stakeholders."



Page 268

1    Q.    Okay.  And is this -- is it a

2    typical practice surrounding decisions of this

3    nature to try to anticipate questions that may

4    come up and provide proposed answers?

5    A.    I mean it's a very broad question.

6    But generally, yes, that's the job of a press

7    office --

8    Q.    The --

9    A.    -- department to provide information

10   and, in this case, to, as the subject line

11   says, draft, to have deliberative process, and

12   to have -- be able to freely discuss draft

13   documents.

14        Who knows if all the information is

15   correct.  And so they solicit viewpoints from

16   various people within the departments to make

17   edits and make the best product that they can.

18   Q.    Okay.  Second page of the document

19   under "Questions and answers," do you see that?

20   A.    I do.

21   Q.    Skipping over the first block, do

22   you see the next block says:  "War crime and



Page 269

1   public benefits data used to make the

2   decision?"

3            Then it appears to be the proposed

4   answer is:  "No.  Criminal history and public

5   benefit usage was not used as criteria for the

6   TPS determination.  The decision was based on

7   whether Haiti met the statutory conditions for

8   TPS."

9            Do you see that?

10      A.    I see that.

11      Q.    Did you provide any edits or

12  approval for that response?

13      A.    I have no idea.  This is the draft

14  that the office --

15      Q.    I understand that?

16      A.    -- of public affairs sent.  I don't

17  -- I couldn't tell you --

18      Q.    Did you --

19      A.    -- what I edited, if I edited.  I

20  have no recollection.

21      Q.    Do you recall whether or not you

22  agreed or disagreed with the proposed answer?



Page 270

1       A.     Don't -- I don't recall.

2       Q.     Turning the page, so Bates 77.

3   Third paragraph reads:  "Why Secretary Kelly

4   requested data on TPS Haiti recipients to USCIS

5   staff?"

6              Seems the proposed answer is:

7   "Secretary Kelly, separate and distinct from

8   the decision on TPS for Haiti, asked DHS staff

9   for information to increase his understanding

10  of how the TPS program operates and the

11  elements of information we have on program

12  recipients."

13             Do you see that?

14      A.     I see that.

15      Q.     Same question as before:  Did you

16  offer any opinion on that proposed answer?

17      A.     I could not tell you today, nearly

18  two years later, whether or not I edited

19  specific questions and answers on a draft

20  deliberative document circulated between lots

21  of people within the department.  I have no

22  idea.  That's why we have a deliberative



Page 271

1  process.

2       Q.    Do -- does- - as you sit here, do

3  you recall whether or not you agreed with the

4  proposed answer?

5       A.    I have -- I have no idea.  I don't

6  recall what I thought then.  You're asking me

7  about what I thought two years ago about a

8  draft document that the press shop put

9  together.  I have no idea.

10      Q.    And two paragraphs down reads:  "How

11 much did information about criminal activity by

12 Haitians in the U.S. factor into the decision?"

13            Proposed answer is:  "None.  The

14 decision was based on whether Haiti met the

15 statutory conditions for TPS."

16            Same question:  Do you recall

17 whether at the time you agreed or disagreed

18 with the proposed answer?

19      A.    And I'll give you the same answer,

20 which is I have no idea.

21            This -- this is crazy.  Because

22 we're sitting here talking about a draft



Page 272

1    document circulated within a department and

2    not -- I -- I don't know what we're doing here.

3              BY MR. MEDOW:

4        Q.    The press call that happened

5    thereafter, the embargoed call we talk about

6    before --

7        A.    The one that someone said was

8    embargoed in their notes?

9        Q.    Yes.

10             Or actually testified that's what

11   the notes were of, an embargoed press call.

12       A.    Okay.

13       Q.    During that press call, did this

14   subject come up, namely the seeking of

15   information on Haitian criminal activity and

16   benefits --

17       A.    I couldn't -- I couldn't tell you.

18       Q.    Let's -- if we could pull out 136.

19             MR. TYLER:  What document is that?

20             MR. MEDOW:  It is the notes.

21             BY MR. MEDOW:

22       Q.    Got them?



Page 273

1      A.     These were Ms. Anderson's --

2      Q.     Correct.

3             Let me direct your -- I'm going to

4      direct your attention to certain sections and

5      see if it jogs your recollection.

6             Again, I'll -- I'll represent to you

7      she testified this was her notes from this call

8      with media members embargoed.  She said -- she

9      testified that you were there, and you spoke

10     during the call.

11            Looking on the first page, the --

12     the very first entry -- make sure I read it

13     right -- she read this into the record at her

14     deposition on Page 90 -- 297.

15            And that first -- first entry she

16     read is:  "S1," again Mr. Kelly "made decision

17     on Section 244, nothing more."

18            Do you see that?

19     A.     I see that.

20     Q.     Do you recall whether or not you

21     were the person who made that comment?

22     A.     I -- I don't recall.



Page 274

1      Q.    That comment would be consistent

2   with the talking points memo we just looked at,

3   correct?

4      A.    It seems to indicate the same thing.

5      Q.    Similarly on the next page, Bates

6   Page 9, at the bottom she recorded the

7   following, according to her testimony at Page

8   301 of her deposition:  "Crime?  S1 made his

9   decision on factors outlined in" -- "in 244."

10          It goes on:  "S1 asked" -- "asked

11   for" -- "S1 asked for information.  Is about

12   program -- programatic integrity, common sense

13   questions like crime, employed, in school.

14   U.S. has not previously collected or reported

15   on previously.  S1 needs to be able to answer

16   to American people."

17          Do you -- were you the person who

18   uttered those comments, to the best of your

19   recollection?

20      A.    I have no idea.  As I've said

21   before, if I was on this specific call, if

22   those are my -- in fact, my comments, I don't



Page 275

1    know.

2        Q.     The message again is consistent with

3    the talking points, correct?

4        A.     It seems to be consistent with the

5    talking points.  And it seems to be consistent

6    with the general proposition that the secretary

7    wanted to make his decisions with information.

8        Q.     Did you believe at that time that

9    efforts should continue to try to collect the

10   type of information you had addressed in your

11   April e-mail?

12       A.     Did I believe at that time that we

13   should be able to collect that information?

14       Q.     We've -- we've been looking at the

15   talking points and the press call late May.

16       A.     Sure.

17       Q.     In April, the prior month, you had

18   sent around an e-mail seeking various

19   information.

20             At the time of the press inquiries

21   and calls in late May, did you remain of the

22   view that the department should continue trying



Page 276

1    to seek the information on Haitian TPS

2    beneficiaries as reflected in your April

3    e-mail?

4              MR. TYLER:  Objection.  It misstates

5    testimony -- prior testimony and the evidence.

6    The -- the record seems to indicate it was the

7    secretary that asked Mr. Hamilton to collect

8    that information.

9              BY MR. MEDOW:

10     Q.    Did you think that information

11   should be collected --

12     A.    Did I think --

13     Q.    -- going forward from May?

14     A.    Did I think that this information

15   should be collected?

16     Q.    Yes.  The information reflected in

17   your April 7th e-mail, 153.

18     A.    I couldn't tell you my state of mind

19   at that point in time.  But seems reasonable.

20   To be able to determine how many people have

21   been convicted of crimes seems like pretty

22   relevant information for a decision maker.



Page 277

1           MR. MEDOW:  Let me -- let me show

2    you another document.

3           (Deposition Exhibit 156 was marked

4    for identification.)

5           THE WITNESS:  Thank you, ma'am.

6           BY MR. MEDOW:

7      Q.    Okay.  Mr. Hamilton, you've been

8    given now what's been marked as Exhibit --

9           MR. MEDOW:  May have given you the

10   wrong one.  I apologize.  Put that one aside

11   for now.  Yes.  I apologize.

12          (Deposition Exhibit 157 was marked

13   for identification.)

14          THE WITNESS:  Thank you, ma'am.

15          BY MR. MEDOW:

16     Q.    Okay.  Let -- let me orient you,

17   Mr. Hamilton, on Exhibit 157.  These are,

18   again, notes from Ms. Anderson.

19     A.    Okay.

20     Q.    And she has testified that -- it is

21   268 of her transcript -- that these are notes

22   from a meeting she had on May 19 -- so roughly



Page 278

1  the same time period we've been talking

2  about -- with you and -- I guess it's- - at

3  that point Assistant Secretary Duke.

4       A.    You mean Deputy Secretary --

5       Q.    I --

6       A.    -- Duke.

7       Q.    I'll take your correction.

8             Ms. Duke and you.

9       A.    Okay.

10      Q.    And let me direct your -- direct you

11  to the carryover from Bates Page 2 to Bates

12  Page 3.  And let me read to you from Page 275

13  of Ms. Anderson's deposition how she read her

14  notes for us.

15            And it -- it's starting with -- five

16  lines from the bottom on Bates 02, she wrote:

17  "Gene - we haven't tracked data public

18  benefits.  We don't know," with a question mark

19  -- I'm sorry.  Question mark after "public

20  benefits."

21            Goes on to say:  "We don't know,

22  hey, what are you doing with your time here.



Page 279

1    During next six months for Haiti and going

2    forward, have to increase reporting and metrics

3    so we can tell American people what is

4    happening, not limit it to TPS."

5             Do you see that?

6        A.    I do.

7        Q.    She I believe said you were the

8    speaker of these comments as indicated by the

9    notation "Gene."

10            Do you recall making comments of

11   this sort in the May 19, 2017 time period?

12       A.    I don't remember a May 19th meeting.

13   I don't remember what meeting this specifically

14   was.

15            But as I've indicated, it seems

16   rational for a department to have facts and

17   information for principals to be able to make

18   decisions on.

19       Q.    And are these notes consistent with

20   your view as of May 19th of 2017 that, in

21   particular during the next six months, this --

22   the type of information we've been talking



Page 280

1    about should be sought on Haitians?

2         A.    Which parts of the notes?

3         Q.    The -- the part I read, the

4    carryover from Bates 2 to Bates 3.

5              See, the very last line on 2 is:

6    "During next six months for Haiti and going

7    forward, have to increase reports of metrics so

8    we can tell American people what is happening."

9         A.    And so what's your question?

10        Q.    My question is are these notes

11   consistent with your recollection of your view

12   as of May 19th of 2017 that going forward the

13   information should be sought with respect to

14   Haitian beneficiaries of TPS?

15        A.    I don't think that it -- it's a fair

16   characterization of this being limited to

17   Haitian beneficiaries.

18             I think my view has been and is now

19   that department should be able to maintain and

20   report on facts so that the principals can make

21   good decisions.

22        Q.    Again, do you have any recollection



Page 281

1    of the department at any time seeking crime or

2    benefit data on any TPS population other than

3    Haitians?

4            MR. TYLER:  Asked and answered.

5    Objection.

6            THE WITNESS:  I've already answered

7    your question.

8            BY MR. MEDOW:

9        Q.    Your testimony remains as you

10   testified before?

11       A.    Yes.

12            And I see in this note:  "S1 and S2

13   like to make decisions on the facts."

14       Q.    Is that something you said?

15       A.    I don't know if I said that or not.

16   But there's a lot of stuff in here that seems

17   fairly rational.

18       Q.    Did -- to your knowledge, sir, did

19   anyone at DHS ever study whether or not the

20   Haitian TPS population took more out or put

21   more in, in a monetary sense, once you take

22   into account things like tax payments?



Page 282

1          Do you recall any --

2     A.    I have --

3     Q.    -- study of that sort?

4     A.    -- no idea.  Not to -- not to my

5     knowledge.

6     Q.    Was that type of information as to

7     the net benefit or cost of the Haitian TPS

8     population, to your recollection, ever

9     furnished to DHS by any outside groups?

10    A.    I don't know.

11          But it would be awfully strange for

12    an outside group to furnish information like

13    that if the department itself can't even speak

14    to it.  So it -- therein lies the reason why

15    you would want to have this information.

16          You can know if it's a good benefit

17    or if it's not or -- again, principals need to

18    have information.

19          MR. MEDOW:  Okay.  We're --

20          THE WITNESS:  There is nothing wrong

21    with asking for information.

22          MR. MEDOW:  We're at a good stopping



Page 283

1    point.  About to change subjects.  So I'd

2    recommend we take a short break and try to

3    finish up.

4              THE VIDEOGRAPHER:  We are going off

5    the record.

6              The time is 3:33 p.m.

7              (A short recess was taken.)

8              THE VIDEOGRAPHER:  We are back on

9    the record.

10             The time is 3:41 p.m.

11             MR. MEDOW:  Mr. Hamilton, at this

12   time I have no further questions.

13             I pass the witness.

14             MR. TYLER:  No questions from

15   defendants -- by counsel on behalf of the

16   defendants.

17             MR. MEDOW:  Okay.

18             THE VIDEOGRAPHER:  This marks the

19   end of the deposition of Gene Hamilton.

20             We are going off the record.

21             The time is 3:42 p.m.

22             (Whereupon, the proceeding was



Page 284

1    concluded at 3:42 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22



Page 285

1          CERTIFICATE OF NOTARY PUBLIC

2          I, Bonnie L. Russo, the officer before

3    whom the foregoing deposition was taken, do

4    hereby certify that the witness whose testimony

5    appears in the foregoing deposition was duly

6    sworn by me; that the testimony of said witness

7    was taken by me in shorthand and thereafter

8    reduced to computerized transcription under my

9    direction; that said deposition is a true

10   record of the testimony given by said witness;

11   that I am neither counsel for, related to, nor

12   employed by any of the parties to the action in

13   which this deposition was taken; and further,

14   that I am not a relative or employee of any

15   attorney or counsel employed by the parties

16   hereto, nor financially or otherwise interested

17   in the outcome of the action.

18

19                   _____.

20                   Notary Public in and for

21                      the District of Columbia

22   My Commission expires:  June 30, 2020



Page 286

1                 ACKNOWLEDGMENT OF DEPONENT

2        I, GENE HAMILTON, do hereby certify that I

3    have read the foregoing transcript of my

4    testimony taken on 1/3/19, and further certify

5    that it is a true and accurate record of my

6    testimony (with the exception of the

7    corrections listed below):

8    Page      Line           Correction

9    ____      ____           _____

10   ____      ____           _____

11   ____      ____           _____

12   ____      ____           _____

13   ____      ____           _____

14   ____      ____           _____

15   ____      ____           _____

16   ____      ____           _____

17   ____      ____           _____

18                            _____
                              GENE HAMILTON

19

     SUBSCRIBED AND SWORN TO BEFORE ME

20   THIS _____DAY OF _____, 2019.

21

     _____    _____

22   (NOTARY PUBLIC)       MY COMMISSION EXPIRES:



**A**

**abbreviation** 167:15
**ability** 66:14 123:7 123:10 262:18
**able** 52:19,21 109:6 109:6 259:18 268:12 274:15 275:13 276:20 279:17 280:19
**absolutely** 27:10 121:3 135:3
**absurd** 112:1 212:15
**abusing** 191:11
**abusive** 203:8
**accedes** 50:20
**access** 182:18
**account** 281:22
**accurate** 156:14 211:14 264:16 286:5
**achieved** 225:21
**ACKNOWLED...** 286:1
**acronym** 127:12
**acronym's** 40:21
**act** 29:3 65:18 87:10 181:3 196:8
**acting** 28:22 29:5,9 29:17,18 39:6 72:16,17 73:3,5 73:12 89:9,10,16 89:18 164:17 165:5,20 167:4 170:18 185:10 188:4,11 195:5 216:10 219:17 220:1 257:10
**action** 61:19 201:18 254:5 285:12,17
**actions** 32:2 34:20
**active** 182:15,18
**activities** 35:12
**activity** 271:11

272:15
**actual** 63:5 145:8
**add** 81:5
**addition** 251:19
**additional** 16:9 255:8 267:20
**address** 165:15 170:2 172:6 182:13,15
**addressed** 220:3 262:11 275:10
**addresses** 145:21 165:13
**administered** 86:19 102:1
**administration** 59:7 61:20 65:22 88:15 90:1 95:20 95:22 101:20 102:14,17,18,20 102:21 103:2,4 116:11 117:21 118:4 140:6 196:14 255:19
**administrations** 86:19 87:2 88:19
**administrative** 201:18 207:11 238:16
**adopt** 50:5
**advance** 86:2 143:21 187:10,14 187:19 193:2
**advice** 24:8 27:6 29:21 37:16 57:11 120:17,20 200:3
**advise** 14:7 27:1 37:19 60:4 107:16 120:13,14 180:13 180:18
**advised** 181:5
**adviser** 26:2 35:6 185:16
**advising** 43:4 126:2 138:12
**advisor** 38:1 42:6

203:3
**advocacy** 136:19
**advocate** 163:11,11
**affairs** 105:6 267:9 269:16
**affirmatively** 153:9
**aft** 80:3
**afternoon** 166:9 213:20 214:10 217:10 218:21 250:4
**agencies** 165:7,22 166:17 168:2,21
**agency** 33:15 41:6 83:9,21 150:13 166:12 172:8 235:22 241:15 256:6
**agency's** 143:20
**agenda** 33:18 34:7 34:22 35:5,14,20 36:8 194:8
**ago** 9:11 63:4 102:12 191:19 271:7
**agree** 34:14 83:5,12 84:21 85:1 99:20 99:21 100:17 116:1 118:3 172:3 172:4 263:22 265:6
**agreed** 269:22 271:3,17
**agreement** 18:1,13 18:16,19 19:3,22 20:10,12,18 21:6 21:13 42:19 43:10 57:19 264:13
**agreements** 18:6
**ahead** 128:11 167:1 205:1
**ahold** 183:1
**aid** 82:11
**akin** 199:11
**al** 1:4,6 7:7
**aliens** 74:9 148:15

149:15 195:3 260:14
**allegedly** 248:6
**allow** 196:6,8,12
**allowed** 48:1
**alluded** 261:6
**alternatives** 196:12
**Altidor** 155:13
**ambassador** 152:13 155:8,10,12 156:21,22 157:10 158:3,6 162:11 176:6 179:15
**amendments** 69:1
**America** 20:7 59:10 70:21 71:4 72:9
**American** 73:18 210:6,9 274:16 279:3 280:8
**America's** 108:15
**amount** 223:9
**analysis** 97:3 100:6
**Anderson** 97:13,19 100:18 101:3 277:18
**Anderson's** 99:9 273:1 278:13
**Anderson_00001-6** 6:5
**Anderson_00008...** 4:13
**Anderson_00012...** 6:4
**Andrew** 129:6
**Angeles** 109:17
**announce** 121:15
**announced** 32:2 121:13 147:9 157:11 183:8 226:4,5,20 232:14 233:15
**announcement** 233:21 266:22 267:14
**announcing** 223:7

**annoy** 111:22
**Annual** 234:4
**anonymous** 34:11
**answer** 43:9 48:3 51:2,4,6,11,14 52:5,19,21 53:15 53:18 55:11 58:4 60:22 64:5 101:21 112:16 116:12 118:6,20 135:21 139:5 161:13 204:7 212:18 219:8 269:4,22 270:6,16 271:4,13 271:18,19 274:15
**answered** 281:4,6
**answers** 17:7 267:21 268:4,19 270:19
**anticipate** 43:14 170:5 268:3
**anybody** 16:7 48:6 135:19 158:10 208:9 221:15
**anymore** 183:16 189:21 221:16
**AP** 5:21
**apologize** 155:15 277:10,11
**appear** 71:21 207:10 211:22 238:1 245:4 246:7
**appearance** 7:22
**APPEARANCES** 3:1
**appears** 30:17 92:5 106:6 112:20 118:11 141:15 163:20 164:15 165:11 166:10 167:3 169:11 172:15 182:11 193:7,14 194:15 206:17 207:11 208:20 228:5 231:10 233:20



238:20 240:16
243:3 245:3
246:21 250:19
253:1 255:12
261:21 262:13
269:3 285:5
**applicants** 66:11
**apply** 113:20 154:7
**appointee** 26:18
**appointment** 45:14
46:5,17
**appreciate** 55:15
114:22
**approach** 264:1,14
**approaching**
109:16
**appropriate** 84:4
95:3,13 112:12
113:4,18 191:3
247:9
**approval** 266:21
267:17,20 269:12
**approve** 122:10,15
**approximately**
20:15 132:19
146:10 229:4
**April** 146:10
232:13 233:14,21
250:20 251:2
253:17 259:12
275:11,17 276:2
276:17
**arbitration** 11:12
**area** 12:11,15,20
42:18 57:17 62:12
**areas** 35:9 37:20
62:11 229:20
**arguing** 244:17
247:8 248:4
**argument** 114:4
201:10
**argumentative**
49:13 50:21 53:2
70:13 111:11
112:11 244:16
246:4 247:6

**arguments** 83:17
**arising** 91:1
**Arizona** 19:20
**armed** 100:9
**arms** 151:14
**arose** 120:15
195:15
**art** 54:13
**article** 4:7 5:8,21
30:17 31:2,21
32:10,17 33:11
106:9,12,18 108:2
110:3,21 114:15
191:5,14 220:22
261:14 262:2
**AR-HAITI-0000...**
238:17
**AR-HAITI-0000...**
5:17
**AR-S_HAITI-00...**
206:12
**AR-S_HAITI-00...**
5:10
**AR-S_HAITI-00...**
192:21
**AR-S_HAITI-00...**
5:7
**aside** 17:2 48:5
82:5 158:2 277:10
**asked** 50:12 51:16
52:9,20 71:9
85:12 99:3,11
139:15 151:18
154:15,16 178:3
254:2 255:4 257:7
258:9 263:10
270:8 274:10,10
274:11 276:7
281:4
**asking** 34:14 49:19
50:3 51:17,21
56:20 83:12 88:6
92:2,7 112:3
114:14 122:14
149:4,8 230:5,9
235:2 250:1

252:18 259:22
267:19 271:6
282:21
**asks** 267:17
**assessment** 25:8
29:15 34:10
**assets** 151:15 153:2
**assist** 14:19 27:8
82:10 106:17
107:10
**assistance** 84:12
**assistant** 23:10
66:8 105:5 165:19
267:8 278:3
**assisted** 106:21
265:18
**Associated** 262:3
**assume** 70:10 122:5
123:6 124:5
170:10,20 178:4
178:11 183:6
187:20 218:7
228:14 232:21
235:9 237:20
252:17 253:5
256:6 266:19
**assumed** 29:3
122:16 182:20
**assuming** 101:13
156:13
**assurances** 151:6
151:11 155:2,6
157:7 158:5
**assured** 154:2
**AS1** 216:9 217:18
**AS1's** 214:14
**Atlanta** 23:5,6,8
**attached** 174:11
267:13
**attaching** 106:9
182:13
**attachment** 194:16
**attachments** 194:7
**attempt** 255:12
**attend** 76:22
127:19,21

**attended** 128:1,7
133:21 181:11
185:6 188:10
193:6 194:4 208:9
208:12 216:21
**attendees** 185:12
**attending** 185:8
**attention** 74:5,18
75:4 78:14,15
90:13 101:2
107:19 164:3
198:3 208:2,14
213:9 224:9
226:12 239:3
243:5 259:10
266:13 273:4
**attorney** 9:20 10:6
14:7 16:9,19
29:18 30:8 37:9
37:14,17,22 38:4
41:18 84:10 87:11
132:3 138:13
180:14,18 181:1,6
185:9 191:19
192:4 197:4,14
198:10 203:4
204:2 205:5 211:2
211:20 243:10
260:13 285:15
**attorneys** 13:16,19
15:14 16:7 18:13
**ATTORNEY'S** 3:9
**audibly** 77:18
**August** 42:1 105:9
141:17
**author** 262:1 267:3
**authorization**
201:2
**authorized** 200:1
263:13,16
**automatic** 142:15
154:4,9
**available** 48:16
206:19 254:21
**avoid** 63:11 117:4
**aware** 13:10 113:22

182:22 184:4
205:6 219:22
247:18
**awfully** 282:11
**a.m** 1:15 7:13 115:7
115:11 193:21
250:20 253:19

---
**B**
**back** 30:7 87:4
115:9 142:17
147:1 151:13
152:20 154:10
158:21 159:17
166:7 176:15
192:9 197:2 206:2
208:3 212:18
214:8 217:17
227:3 229:18
243:22 249:17
283:8
**background** 5:17
21:20 254:16
**badgering** 52:4
**Badio** 7:7
**Bannon** 131:7,9,15
**Baroukh** 40:18
**based** 48:2 146:19
147:15 148:3
151:5 172:16
220:18 269:6
271:14
**basic** 229:2
**basically** 142:19
**basis** 39:20,22
43:10 66:10,17
91:11 93:17 94:10
95:5,15 96:2,19
97:4 118:12 121:1
242:1,3,8 243:19
245:6
**Batalla** 9:10 63:19
**Bates** 101:3 163:21
169:12 171:7
182:14 192:20
194:8,13 195:10



195:11 206:11,15 238:16 239:5,8 244:4 250:20 266:12 270:2 274:5 278:11,11 278:16 280:4,4
**bearing** 111:18 114:5 163:21 171:6 192:20 240:22 266:12
**bears** 182:14 206:11,14 238:16
**becoming** 50:21 111:11
**began** 140:7 237:19
**beginning** 21:22 53:8 164:4 239:9
**begins** 7:5
**behalf** 2:18 3:2,8 8:2,4,6,8,10,13 72:16,17 73:3,6 73:12 150:13 158:7 244:17 283:15
**belief** 92:5,8
**believe** 19:18,19 31:12 81:21 85:15 89:17 98:13 112:6 129:8 155:12 171:8 177:2 185:7 206:13 209:2 248:22 260:3 275:8,12 279:7
**bell** 79:9 261:8
**beneficiaries** 66:10 110:7,18 150:1 196:7,9,10 252:15 252:20 253:9 276:2 280:14,17
**benefit** 269:5 281:2 282:7,16
**benefits** 102:2 154:7,8 262:8 269:1 272:16 278:18,20
**best** 70:20 89:19

121:16 123:7 131:13 150:1 158:8 162:17 175:20 254:20 268:17 274:18
**better** 113:6 161:12 206:17 209:7 225:7
**beyond** 112:11 178:2 180:11 187:22
**big** 33:15 257:22
**biggest** 112:16 114:14
**bill** 133:22
**binder** 62:22 63:5
**bit** 87:6 116:3,7 151:19 152:17 161:12 176:9,16 197:3 206:18 210:16
**bite** 210:2
**blank** 101:8
**blanks** 119:17
**block** 268:21,22
**blow** 258:22 259:5
**board** 37:2
**bold** 223:2
**Bonnie** 1:17 7:20 285:2
**book** 61:16 62:7,16 62:22 63:7 64:3,8 65:4 71:10,17,21
**books** 81:3
**border** 37:18
**born** 109:18,21
**boss** 139:5
**Bossert** 185:10,15 220:9,15 221:12
**Bossert's** 185:14
**boss's** 78:14
**botched** 72:10
**bottom** 33:12,13 74:6 109:3 166:6 168:14 169:15 200:22 202:5,6

226:17 239:15 257:17 274:6 278:16
**boundaries** 199:10
**boundary** 153:16
**branch** 3:16 199:13 201:3,11,16 236:1
**Brat** 106:8
**break** 34:2 104:16 115:4 159:4,10,11 176:14 205:14,19 206:7 283:2
**Bremberg** 129:6
**Brett** 3:16 8:9
**brief** 57:10
**briefing** 56:1,16 57:5,5,9,14 137:18 251:15 257:18
**briefly** 21:19 41:19 144:11 172:11
**bringing** 112:18 198:3
**brings** 60:18 133:6
**broad** 35:18 93:1 96:17 110:10 111:17 268:5
**broader** 216:3
**broadly** 56:6,15
**broke** 159:22
**brought** 18:16 74:18 75:3 78:10 117:7
**Brown** 2:5 3:3 7:15 7:17 8:2,4,12
**Browne** 3:17 8:12
**buildings** 232:10
**bullet** 74:8 99:3 147:19 148:7,8,13 149:12 252:8
**bullets** 148:1 210:2
**burdening** 63:11
**burned** 153:4
**Bush's** 65:21
**business** 12:8 62:5 259:15

**B-R-A-T** 106:8

---
**C**

**C** 3:2 4:1 7:1 63:20 260:11
**cabinet** 202:8 203:9 235:21
**cabinet-level** 168:2
**Caldwell** 265:1
**California** 105:8
**call** 52:15 97:20,22 98:1,9,12,18 99:17 102:4,9,11 106:10 108:1 151:5 175:9 235:14,19 247:19 272:4,5,11,13 273:7,10 274:21 275:15
**called** 19:18 158:4
**calling** 91:22
**calls** 76:6 86:8 94:4 95:7 186:14 210:19 219:4 220:8,14 221:11 221:19 235:22 242:9 275:21
**camps** 227:19 228:2 229:6,12,18 231:3,16
**Cancel** 70:5
**candidates** 139:7
**capable** 35:22
**capacity** 38:3 60:14 78:7 80:1
**captured** 246:7
**careful** 57:18
**carefully** 55:12
**carries** 218:14
**carry** 27:2 74:6 208:20
**carryover** 278:11 280:4
**case** 1:3 7:10 9:11 14:5 16:14,16,21 28:22 76:20 99:10

105:7,8 111:19 115:18 119:14 129:11 191:1,2 200:6 202:7 203:19 207:6 213:7 226:2 268:10
**cases** 14:10 66:11 195:13 199:18,22 201:19 244:6
**categories** 85:22
**cause** 114:3
**CBP** 40:11
**CC** 164:7 169:22
**ceased** 195:16
**Center** 77:1
**century** 108:17
**certain** 82:21 127:22 163:3 243:10 273:4
**certainly** 11:7 85:17 92:4 107:13 182:18 212:15
**CERTIFICATE** 285:1
**certified** 238:16
**certify** 210:11,12 285:4 286:2,4
**certifying** 209:18
**cetera** 119:19 166:13 240:10,11 251:21
**Chad** 38:17,21
**chain** 4:19,21 5:2 5:13 163:20 164:1 164:4 167:2 168:13,15 169:11 169:15 171:6,9 172:11,18 174:10 174:19 217:2
**chairman** 24:13
**challenge** 118:12
**challenging** 13:11
**chance** 208:4,8
**Chang** 40:18
**change** 13:4 190:14



190:19 227:22 283:1
**changed** 118:4
**changes** 65:5 69:1 71:17 174:15
**changing** 248:6
**characterization** 33:21 34:9,20 35:3 83:6,13 84:3 280:16
**characterized** 70:14 145:15 249:14
**charge** 60:7,8 80:18 80:19
**chart** 129:20
**check** 128:3
**Chicago** 3:4
**chief** 23:8,10 28:6,9 28:14 38:21 39:2 41:13 47:11,12 66:8 133:19 139:2 139:7 188:10 193:12 263:4
**Cho** 16:17,19
**cholera** 146:16 234:17,17 236:2,5 236:10,21 237:3 237:11,18 238:4 239:9,17,18 240:1 240:10 241:7 244:4,6 246:2
**chronologically** 169:16
**circulated** 187:18 193:2,11 270:20 272:1
**circumstances** 74:14 82:13 94:21 95:19 97:4 140:12
**circumstantial** 254:16
**circus** 259:1
**CIS** 77:1
**Cissna** 41:12 47:9 218:6

**citation** 75:17
**cited** 227:11
**cities** 109:16
**citing** 114:15
**citizens** 256:21
**Citizenship** 41:2 241:17
**civil** 3:10 113:20
**Claffey** 267:3
**clarification** 51:18 51:21,22 52:20 53:4
**clarify** 13:18 17:20 59:18 161:11,18
**class** 109:8
**classifies** 83:21
**clean** 115:13 176:14 217:15 239:6
**clear** 33:3 55:6 65:9 129:19 135:3 179:13 236:3
**clearly** 172:2 240:18 241:16
**client** 24:10
**climb** 109:6
**clock** 166:17
**close** 121:5,6 131:14 151:5 175:9,9 235:13,19
**closed** 157:15,19 227:13,20
**closely** 120:22
**closer** 65:2 128:13
**closing** 228:2
**CNN** 30:17 32:2
**codified** 65:19
**coffee** 205:17
**Colleague** 106:9
**collect** 256:3,5 275:9,13 276:7
**collected** 274:14 276:11,15
**colloquial** 54:17 55:19
**colloquially** 55:18

**Columbia** 285:21
**column** 144:16,17 224:10 226:17 232:5 234:3 237:1 237:5
**columns** 145:3
**combating** 239:17
**combatting** 237:3 237:11
**come** 17:5 23:16 25:15 32:7 40:21 45:2,11 53:10 65:8 69:18 77:12 107:14,15 119:9 149:6 189:11 203:1 266:5 267:21 268:4 272:14
**comes** 104:11
**coming** 43:2 141:5 142:7 154:10 262:17
**comment** 31:6,14 31:17,18 112:14 113:2,5 124:5 273:21 274:1
**comments** 115:3 211:2,3,6,7 274:18,22 279:8 279:10
**Commission** 285:22 286:22
**commit** 191:12
**committed** 235:21 245:8
**committee** 23:19 24:11 67:8 68:11 68:18,22 107:15 167:18,20,22 215:8
**common** 101:16 274:12
**commonly** 49:22 65:15
**Commonwealth** 12:12

**communicate** 138:22
**communicated** 134:4 158:7 253:13
**communication** 121:8
**communications** 25:17 27:18 128:21 158:4 219:17 220:1 267:9
**communities** 59:10 71:3
**comparable** 229:9
**compilation** 62:7 62:16
**complete** 11:18
**completed** 232:1,7 232:17
**completely** 265:7
**compound** 74:20 91:21 92:15,17 94:4
**comprehensive** 196:3
**computerized** 285:8
**concede** 209:19
**conceivably** 260:17
**concerned** 66:5 258:5 259:5
**concerning** 200:14
**concerns** 101:20 102:14 103:5,8,12
**concluded** 284:1
**conclusion** 76:7 92:1 94:4 95:8 149:7 173:14,21 173:22 242:10
**conclusions** 125:7
**condition** 124:15 124:22
**conditions** 75:9 91:7 93:8 99:12 99:13 100:12,16

103:15 124:12 125:3,8 145:9 147:2,10,12 148:9 148:14,21 150:8 150:21 151:7 152:18 162:7 163:5 195:2,15 224:19 230:17 235:7,11 236:10 238:3 240:17 243:10 248:6 249:6,12 269:7 271:15
**conduit** 158:15
**confidential** 18:13 21:9,11 200:3 259:19,20
**confidentiality** 18:5 21:13
**confirmation** 84:9
**confirmed** 29:1 89:2,7,8
**conflict** 100:10
**confused** 150:13
**congress** 68:14 99:3,11 107:17 108:13 109:9 136:20 137:18,19 167:11 196:3,8,12 196:15 209:20
**Congressional** 109:1 110:20 114:16
**Congressman** 106:8
**connection** 15:2,9 35:8 44:11 45:8 56:4,12,21 62:15 72:19,22 73:5 75:4 91:10 93:16 94:9 100:18 125:20 127:1 136:9 153:8 178:17 187:4 255:15
**consider** 54:1 68:11



95:3,13
**consideration** 68:17,20 69:2 94:7 125:20 135:9
**considerations** 5:15 91:5 238:22
**considered** 91:6 92:19 95:22 96:14 147:14 246:9 255:22
**consistency** 122:7
**consistent** 76:20 91:18 92:8 94:1 94:17,18 122:7,20 165:1 183:22 194:3 274:1 275:2 275:4,5 279:19 280:11
**consult** 13:15 19:4 43:12 57:22 126:3
**consultations** 162:8
**consulting** 13:19 126:6
**contact** 14:4 25:10 78:11 79:22 133:6 156:18
**contacted** 137:1
**contain** 62:16 224:18
**contend** 201:14
**contents** 187:17 188:2 189:1,3 205:8 224:7
**context** 11:11 45:2 78:11,19 90:17 98:4 124:7 262:1
**continue** 29:8 38:4 50:2 87:16 148:10 148:13 275:9,22
**continued** 5:1 6:1 91:7 93:7 103:16 209:2
**continues** 101:9 144:13 145:2 174:12 194:15,16 201:21 234:3

239:12
**continuing** 91:8 93:8 138:9 194:12 210:5
**continuously** 10:10
**contrary** 149:13 260:15,21 261:2
**convening** 168:14
**conventions** 165:18
**conversation** 31:11 31:13 265:4
**conversations** 69:17 207:17 267:22
**conveyed** 235:11 240:3
**convicted** 253:9 256:8 276:21
**coordinate** 195:1
**coordinating** 167:18
**copies** 117:7 156:7 206:17 220:17
**copious** 190:12
**copy** 17:13 18:12 18:19 19:1,2 90:7 197:5 206:14,18 209:8 242:16
**cored** 208:17
**corners** 147:18 210:21
**correct** 9:20,21 10:2,4,7,20,21 12:16 15:18 16:2 17:16 23:11 24:18 25:20,22 27:7 28:2,15 29:21,22 37:5,6,12 38:20 38:22 41:21,22 42:2,4,5 60:21 61:2 65:2,3 66:1 67:13,20 70:7,21 71:4 78:9 80:6 81:4 82:17 84:12 84:14 88:1 93:9 110:7 116:11,12

116:13,14 119:11 127:14,16 130:13 132:6,9 138:2 146:6 148:5,11,18 151:22 156:16,21 164:14 165:7 169:17 172:19 177:21 182:3 184:14 188:4 191:1 193:16,22 194:4,21 195:7 197:21,22 202:1 213:16 214:2 218:3 226:4,9 227:6,20 229:12 231:1,19 232:2,20 233:16,19 234:9 235:17 237:3,13 242:2 243:12,14 243:20 245:17 246:2 249:9 251:13 252:4,12 252:22 253:10,11 256:17 261:7 262:8,12 267:1,4 267:15 268:15 273:2 274:3 275:3
**correction** 278:7 286:8
**corrections** 286:7
**correctly** 249:18
**cost** 282:7
**Council** 127:13,17 129:8,13 130:3 193:13
**counsel** 7:21 8:21 10:14 19:5,9,14 23:8,10,18 24:6 41:13 43:12 47:11 50:1,18 51:10 52:13 53:11 57:22 66:8 67:7 94:6 111:14 114:11 116:17 120:17,19 139:9 191:3 200:8 203:22 212:17

242:11 249:22 283:15 285:11,15
**counselor** 26:12,21 29:9,16 35:12,21 36:6 37:9,14 38:3 66:3 200:2
**counsels** 10:16
**counsel's** 40:10,15 139:2 150:14
**countries** 82:21,22 87:8 125:21 135:9 164:19 187:4
**country** 74:11 75:2 76:4 83:3 87:3 91:7 93:7 109:18 110:6 121:12 124:12,15,21 125:3,8,15 126:10 126:14 127:2 128:19 130:5,15 131:16 132:4 138:17,21 147:2 151:15 153:2,20 154:11 162:7 163:5 240:16 248:7 249:8 251:20 255:17 256:22
**country's** 75:19 91:1,12 93:18 94:11 95:6,16 96:4,21 249:16
**county** 126:15
**couple** 17:21 32:10 69:8 105:11 129:3 208:17 213:10
**course** 10:22 13:14 149:3 154:2
**court** 1:2 7:9,19 8:15 43:22 54:15 66:14 114:8 200:1 211:17 232:12 233:2 241:3
**covered** 68:8 234:8 235:6
**covers** 26:7

**coworkers** 25:21
**CP** 163:21 169:12 171:7 182:14
**CP_00001526** 5:20 250:21
**CP_00002736-27...** 4:20
**CP_00003698-36...** 5:3
**CP_00033469-33...** 5:5
**craft** 196:12
**Craig** 41:13 47:10
**crazy** 271:21
**crime** 91:4 262:4 268:22 274:8,13 281:1
**crimes** 253:9 256:8 276:21
**criminal** 263:2 264:9 269:4 271:11 272:15
**criminals** 260:20
**criteria** 269:5
**criticized** 157:11
**crossed** 78:6
**Cubans** 82:6
**curb** 109:6
**curious** 163:9 257:13
**current** 109:18
**currently** 38:18 237:18
**Customs** 22:8
**C-L-A-F-F-E-Y** 267:4

**D**
**D** 7:1 95:22
**DACA** 9:9 76:20 115:18 129:11 160:15 191:1,2 199:18,22 200:6 200:14
**daily** 121:1
**Dangerous** 210:2



**data** 111:2 257:20 262:4 269:1 270:4 278:17 281:2
**date** 138:7 141:1,17 141:22 142:11,18 145:9,13 160:8 172:1 183:9,12,21 185:1,1,2 192:7 196:2,6 213:19
**dated** 4:8,14,15,20 4:22 5:3,5,6,8,13 5:19,21 6:2 30:18 32:17 143:16 213:19 222:18 261:15
**dates** 182:5 209:22 238:4
**Dave** 263:15 264:22
**David** 262:22
**day** 9:14 24:20 26:11 32:20 33:6 33:7,8 36:18 44:19 46:22 47:3 61:15,21,21 62:1 62:2,5,7 63:7 64:3 64:8 65:4 71:10 71:17 166:8 180:4 186:8 213:22 214:9 217:9 244:21 286:20
**days** 142:11 158:21 169:19,21
**DC** 167:9,19 168:8 168:18
**deal** 38:8,14,15 40:10,13,16 66:19 72:2,13,18 121:1 125:19 209:21 259:21
**dealing** 39:13,14,19 41:11 45:20 138:21
**dealings** 38:5 73:6 79:17
**deals** 107:7 238:21

**dealt** 40:3 43:6 66:9 68:14 107:4 127:1
**Dear** 106:8
**debate** 111:17 113:9
**December** 39:10 59:1
**decide** 43:22 142:10 201:15 241:3 245:19 260:21
**decided** 119:18 245:22
**decides** 85:21 261:1
**decision** 80:20 87:20 96:22 114:18 119:16,20 120:9,15 121:11 121:12,12,15 123:14,21 124:9 125:1,1,14 126:4 126:11 130:20 136:17,18 137:12 140:8 142:7,14 143:1,13,13,20 151:8 153:8 154:3 154:3 157:11 158:22 160:1,6,9 160:12,16,21,22 161:5,8,22 164:18 165:2 170:12,17 172:14,15 173:1 174:3 175:17 176:17 177:19 180:9 181:2,17 183:7 184:1,7,13 195:6 213:16 218:2,10,19 222:4 222:22 223:8,10 235:13,16,18,20 244:18 245:7,8,15 246:20,21 247:9 248:18 255:1,16 259:2 260:5,18 263:5 264:11 265:8,9,10,13,16

**269**:2,6 270:8 271:12,14 273:16 274:9 276:22
**decisions** 88:3 120:1 126:10 127:2,5 130:6,10 130:16 131:1,16 132:4,8 136:9,11 138:10,11,17 168:16 178:18 188:18 207:19 216:8 254:17,20 255:11 257:4,15 258:15,18 261:5 262:19 268:2 275:7 279:18 280:21 281:13
**decline** 244:7
**declined** 108:18
**declines** 248:8
**deduce** 32:18
**deem** 113:18
**Defendant** 8:6
**defendants** 1:7 3:8 8:8,11,14 283:15 283:16
**defending** 13:16
**defer** 159:6
**define** 41:1 48:8 72:14 83:14,18 85:13,15 86:3
**defining** 49:8
**definition** 50:5,19 52:2 53:20 56:3
**delay** 196:5 223:9
**deliberations** 186:14 201:4,13
**deliberative** 46:7 104:12 210:19,20 268:11 270:20,22
**delineate** 35:19
**Delivers** 197:15
**demanding** 49:21
**democrats** 138:1
**depart** 35:10
**department** 3:9,15

**3**:16,17 7:8 8:5,7 8:10,13 12:2 14:8 16:11,20 22:12 30:5 33:10 34:18 41:4,6 47:4 130:15,17 161:4 163:2 179:20 180:1,15,19,21 184:4 197:11 200:2 219:3 223:22 248:2 256:13 262:21 263:15,19 267:10 268:9 270:21 272:1 275:22 279:16 280:19 281:1 282:13
**departments** 23:1 165:6,22 268:16
**departure** 29:4 33:15
**depending** 38:11 248:8
**depends** 14:21 39:21 40:9 41:16 42:16 43:15 83:14 83:18 85:13,20 86:3 94:18,19,20 95:19 98:4 100:1 100:20 107:3 120:21 124:7 130:1 139:1,20 140:4 246:14
**DEPONENT** 286:1
**deportation** 154:5 154:9 262:6
**depose** 201:10
**deposed** 9:7,9 19:13 191:8
**deposition** 1:12 2:1 4:15 7:6,14 9:15 15:13 30:12 51:19 52:15 53:9 58:8 63:16 64:12 67:22 81:12 90:3 97:6 105:9 106:1 112:2

**113**:21 116:19 117:10 118:10 132:15 141:6 143:4 149:6 160:15 163:15 169:5 171:2 182:6 190:22 191:4,9 192:15 197:7 200:1,6 205:10,12 211:16 213:1 222:12 236:11 238:9 242:19 250:12 261:9 266:7 273:14 274:8 277:3,12 278:13 283:19 285:3,5,9,13
**depositions** 9:18 11:9
**deputies** 167:20
**deputy** 28:3 29:2 39:2 129:8 267:7 278:4
**describe** 26:20 129:18 144:3 145:11
**described** 122:6 249:16
**describes** 248:6
**describing** 124:11 248:10
**description** 91:17 129:16
**designated** 83:3,16 87:8,13 95:1 97:5 100:4,9 256:22
**designating** 75:10
**designation** 87:16 91:2,8,11 93:9,17 94:11,21 95:5,15 96:3,8,20 103:16 140:13,18 142:1,7 144:19 145:12 149:19 150:3 151:3 153:10 175:8 177:13



180:11 220:16 222:22 223:3 224:12 243:7,16 249:7 251:20
**designations** 99:13 100:19 103:14 195:16 260:10
**designee** 218:13
**desire** 17:22 169:2 175:12 176:8
**destroyed** 232:9
**detail** 124:12
**Details** 252:10
**determination** 86:1 86:16 128:19 242:2,4,7,8 243:18,19 269:6
**determinations** 13:12 96:18 119:4 138:21 148:5
**determine** 43:16 276:20
**determined** 148:6 148:21 150:21
**determining** 91:6 93:7
**developing** 42:11
**DHS** 26:22 27:18 29:18 30:19 32:21 35:13 36:7,16 38:15 46:5,17 48:7 74:8 76:14 79:18 80:6 81:2,6 81:19 84:1 88:20 90:21 95:22 101:16 105:6 116:10 125:18,20 131:16,21 132:5 135:8 138:4,10,16 138:20 139:14 143:13 147:10 150:7 156:9,14 160:1,7,8 161:20 162:19 163:10 171:20 172:2 175:2 178:17

182:11,12 183:16 188:8 203:12,17 214:17 216:9 218:17 219:3,11 225:7 230:16 235:11 236:19 243:12,12,15 248:17 251:5 254:18 255:14 256:2 270:8 281:19 282:9
**differ** 211:17
**difference** 230:19 237:21
**different** 40:13,14 46:18 56:2 94:8 123:9 133:12 147:22 157:15,18 229:1,1 238:7 244:22 248:10 257:7,8,9
**direct** 31:12 74:5 90:13 107:18 129:10 164:3 208:2 213:9 220:6 226:12 264:21 266:13 273:3,4 278:10,10
**directed** 27:3
**directing** 101:2 208:14 224:9 239:3 243:5
**direction** 122:8 285:9
**directly** 31:18 122:14 203:16
**director** 25:18 41:12 47:10 80:21 88:4,11,21,22 89:3,9,10,16,18 89:22 92:5 129:7 129:8 139:3,9 170:6,9
**disagree** 265:6
**disagreed** 269:22 271:17

**disappointing** 258:13
**Disaster** 5:16
**disasters** 82:11 91:3 100:10 195:15
**disclosed** 98:14
**disclosure** 201:12 203:13
**discovery** 112:12 161:16 191:11 201:3,22 203:8,14 203:16 207:4 250:6
**discretion** 85:21
**discretionary** 245:7
**discuss** 44:15,19,21 44:21 45:6,9 145:8 146:9,14 208:4,8 268:12
**discussed** 17:3 61:6 71:19,20 125:10 130:19 151:17 155:22 174:2 176:1 187:20 189:14 192:14 196:22 208:11
**discusses** 146:4
**discussing** 69:15 201:21
**discussion** 84:2 135:5 174:6 181:4 181:13 194:9,14 194:19 195:10 197:3 212:2 224:19 241:6 244:5 255:6
**discussions** 130:4,8 130:22 131:6,8,11 131:15,20 132:2,7 134:10,15,16,19 134:21 156:2 181:9 189:6 196:19 204:11,13 210:14,20 265:14
**disease** 244:8

**displaced** 227:12 229:16
**disputes** 201:9
**disrupt** 201:11
**distinct** 270:7
**distinction** 215:17
**distinguished** 160:20
**distributed** 187:9
**district** 1:2,2 7:9,10 199:22 201:8 285:21
**dive** 126:17
**division** 3:10 41:4
**doc** 90:12
**document** 17:12 18:2 30:21 61:9 73:15 90:8,12 107:6 124:10,20 144:9 147:18 149:3,5,10,12 171:1,12 174:11 174:16,19 192:20 193:1,5 194:13 196:17 200:10 210:21 213:8 225:10 230:7 238:15,19 240:13 241:18 244:14 247:6,13,14 248:5 248:16 250:19 251:19 267:14 268:18 270:20 271:8 272:1,19 277:2
**documents** 14:20 17:10,17 27:11,12 27:21 122:4,5 123:2 150:5 153:21 159:22 201:13 230:4 240:7 241:10 245:13 250:1 268:13
**doing** 19:6 36:1 43:14 114:19

145:15 245:12 272:2 278:22
**DOJ** 30:19 32:7 37:4,8 39:12,20
**Domestic** 127:17 129:7,12 130:3
**Donald** 1:5 7:8
**dont** 105:18
**doors** 157:16,19
**double** 108:12 210:12
**dozens** 232:10
**DP** 128:16
**DPC** 127:7,15,20 127:21,22 128:8 128:17,22 129:4,6
**DPP_00003562** 206:15
**DPP_00003562-3...** 5:11
**DPP_00007775** 266:12
**DPP_00007775-7...** 6:2
**DPS** 128:21
**draft** 14:19 27:13 27:15 106:17 172:19,22 173:11 173:12 224:5 266:21 267:13 268:11,12 269:13 270:19 271:8,22
**drafting** 106:17 107:11 183:15 192:2
**drafts** 123:20 124:2 183:18 224:3
**draw** 99:14
**Drive** 3:4
**Due** 249:12
**Duke** 28:4 29:1,10 39:5,14,17 40:1 63:20 164:18 165:19,20 184:6 188:6 203:11 208:7 219:17


MAGNA
LEGAL SERVICES

220:1,9 221:12
257:10 278:3,6,8
**Dukes** 203:11
208:5
**Duke's** 202:20
203:10 204:10
207:7,16
**duly** 8:18 285:5
**duties** 14:6 26:20
27:3 29:3,12
36:19 37:13,21
89:3 126:2 131:4
139:22 265:17
**D.C** 1:13 2:7 3:11
7:16 12:5,8,11,14
23:16

**E**

**E** 4:1 7:1,1
**earlier** 48:10 119:8
144:8 162:10
170:13 171:19
176:2,6 177:2
219:9 226:5,8
228:11 264:18
**earliest** 213:12
**early** 32:7
**earners** 109:3
**earthquake** 140:14
145:22 229:6,11
229:17 232:8
249:14
**easier** 209:1
**Eastern** 1:2 7:10
**easy** 11:2
**economic** 153:1
**economy** 234:3
**edit** 27:11,12,19
123:4,11 174:10
198:13
**edited** 123:3,11
144:9 269:19,19
270:18
**editing** 14:20
**edits** 122:6 174:10
267:17,19 268:17

269:11
**effective** 182:2
196:2,5
**efforts** 19:8 275:9
**eight** 92:18 94:7
**either** 29:17 39:17
106:11,18 109:21
122:2,10 218:12
218:12
**El** 195:4,13
**Elaine** 28:4 29:1
63:20 184:6
**elect** 57:11 60:5
**election** 44:14,18
44:19 45:5 61:22
62:1,2,5 232:1,7
232:17
**electronic** 18:21
19:1
**elements** 34:2
270:11
**eligibility** 149:17
**eligible** 66:13 82:20
83:2 154:6
**embargoed** 97:20
97:22 98:1,8,12
272:5,8,11 273:8
**emergency** 82:12
239:20 240:2
**employed** 11:21
16:11 22:12 23:7
219:3 274:13
285:12,15
**employee** 285:14
**employment** 13:15
**enact** 196:15
**enacted** 65:20
**encounter** 66:17
**encroachment**
197:16 201:1
**ended** 48:7
**endemic** 239:18
240:1 241:7
**enforce** 70:6
**Enforcement** 22:9
**Enforcing** 70:9,13

**engage** 113:14,15
196:2
**engaged** 78:16
158:15
**engaging** 52:14
55:7 114:2
**English** 109:20
**ensure** 101:22
122:20 259:18
**entire** 116:10
199:12 200:9
247:12 248:20
260:2
**entirely** 54:17
**entitled** 73:15 90:8
197:14
**entity** 18:7 20:1,3,9
20:21 43:13 44:9
48:10,12,13 57:15
57:16,22 60:12
**entries** 213:10
**entry** 82:6 196:4
213:12 273:12,15
**epidemic** 146:16
239:9,18
**equally** 45:6
**equities** 215:22
**equivalent** 177:4
**especially** 203:8
**Esq** 3:2,3,8
**essentially** 116:10
**established** 138:3
**estimated** 229:5
**et** 1:4,6 7:7 119:18
166:13 240:10,11
251:21
**Eugene** 9:5
**evaluated** 124:22
**evaluating** 162:7
163:4 236:19
**evaluation** 125:3
**evening** 32:15
**event** 91:10,13
93:16,19 94:10,12
95:6 96:2,4,21
150:2

**events** 65:2 95:17
**eventual** 151:20
**eventually** 36:18
**Everybody** 50:1
**evidence** 112:21
254:16 276:5
**exactly** 54:19 75:18
129:19 204:16
**EXAMINATION**
4:2 8:21
**example** 54:16
136:6 252:7
**examples** 54:9
**exception** 221:19
221:22 286:6
**excited** 152:21
**exclusions** 21:12
**exclusive** 228:8
**excuse** 129:1
203:11 208:7
**execute** 59:8
**executive** 70:6
133:22 165:16
193:11 199:12
201:3,10,15 236:1
**exercise** 229:2
260:2
**exhibit** 4:7,9,10,11
4:12,14,15,16,18
4:19,21 5:2,4,6,8
5:9,11,12,12,14
5:15,18,19,21 6:2
6:3,5,11,12 30:11
30:12,16 58:7,8
58:12 59:7 69:21
73:14 81:12,16
90:3,7 97:6,10
101:3 106:1,5
117:10 141:6,10
143:4,7 144:6,13
163:15,19 169:5
169:10 171:2,5
182:6,9 192:15,19
197:7,10 205:10
205:12 206:10
207:10,12,14

213:1,5,6,7 214:1
214:7,8 215:11
217:4 222:12,15
223:19 225:2
226:8 227:17
232:4 236:22
238:9,13 240:5
242:19,22 249:2
249:11,21 250:12
250:16 260:10
261:9,14 262:21
264:1 266:7,11
277:3,8,12,17
**exhibits** 4:6 5:1 6:1
6:22 206:7
**exist** 195:17
**existing** 118:4
**expected** 156:4
209:16
**experience** 73:11
168:11
**expert** 4:11 90:9
230:17 235:7
**expiration** 251:21
**expires** 285:22
286:22
**explain** 52:8 206:8
228:21
**explained** 52:7
98:13
**explains** 242:3
245:6
**explanation** 135:17
**express** 103:21
175:16
**expressed** 136:20
162:20,22 176:8
179:11
**expressing** 104:18
104:21 175:12
176:8
**expression** 258:20
**extend** 119:18
126:12 160:11
161:9 162:1
176:17 180:10



184:2 235:17,19
255:16
**extended** 140:19,20
141:22 149:20
150:3 153:10
162:21 175:4
177:20 181:10
**extending** 75:10
144:19 174:6
**extension** 90:22
100:22 103:16
141:1 142:15
144:1 147:9
148:22 150:9,22
152:18 154:15
158:16 163:11
173:13,21 177:1,4
177:15,18 178:2,4
267:15
**extensions** 141:3
**extensive** 201:12
**extent** 24:1 26:5
34:1 35:3,7 46:10
53:19 88:7 92:15
106:21 120:8
138:19 149:2
151:8 184:3
186:13 210:19
225:4 235:4 236:5
238:3
**external** 249:8
**extraordinary**
100:11,16 148:14
**extremely** 244:8
246:1
**eyes** 101:22
**e-mail** 4:19,21 5:2
5:13,19 6:2 79:22
80:1 163:20 164:4
164:12,17 165:12
165:15 166:4,7
167:2,7 168:13,15
169:1,11,15,16
170:2,19 171:6,15
172:5,16,18 173:4
173:5 174:9,18

182:11,12,15
213:18 214:12
215:5 216:14
217:2,8 218:2
219:2,10 250:19
251:1,5,7 253:2
254:12 256:16
257:19 260:4
261:16 262:11
266:11,17,21
275:11,18 276:3
276:17
**e-mails** 164:1 262:2
263:20

---

**F**

**face** 110:11 193:7
200:11
**face-to-face** 137:10
137:11
**facing** 58:21 107:13
190:20
**fact** 11:4 19:12
32:20 58:18
105:13,16 112:20
147:11 218:20
228:12 241:7
244:19 251:1
256:13 258:9
261:6 266:17
274:22
**factor** 96:15 196:8
228:4,18 260:18
265:2,2 271:12
**factors** 91:1,9
92:18 93:6,11,14
93:16 94:8,9 95:4
95:14 96:1,16,19
151:7 248:10
274:9
**facts** 94:20 95:19
97:3 110:10 230:6
230:9 250:7
254:17 262:16
279:16 280:20
281:13

**factual** 246:15
248:3
**fact-specific** 86:15
**fair** 25:8 29:15
33:21 34:8,19
35:2 70:11 72:6,8
72:13,15,16,17,19
73:3,5,12,16
74:17,22 75:13,14
76:13,17,22,22
77:20 117:1
171:19 219:20
280:15
**Fairfax** 12:18
**fairly** 66:17 94:13
281:17
**fall** 176:5
**falling** 27:2 249:14
**false** 221:5
**familiar** 32:1 33:14
61:15 72:5 76:9
78:12 97:14,21
98:16 207:2
220:11 230:14
**familiarity** 66:20
**far** 21:5 88:9 202:8
235:10 245:21
263:13
**farewell** 32:16
**farthest** 144:17
**fashion** 167:5
**fate** 196:8
**favored** 105:12,17
105:19
**February** 23:13,15
232:1,8,17 241:6
**federal** 3:15 4:16
4:18 5:14 121:16
121:20 122:3,11
122:17 141:14,15
143:10 144:5
155:18 156:15
158:1 222:9,18
223:5,10,16,19
226:8 232:10
240:4,18,21

241:14,19,22
242:6 243:17
244:12 245:19
246:7,18 248:15
248:21
**Federation** 72:9
73:18
**feelings** 103:13
**fell** 109:2
**felt** 191:3
**female** 36:21
**fewer** 109:13,15
**fidelity** 167:10
**fifth** 199:1 202:3
**final** 263:5 264:11
**finalization** 122:2
**finalized** 32:4,9
**financially** 285:16
**find** 120:6 267:12
**finding** 234:13
**finds** 260:13
**fine** 50:3 99:14
159:7 219:14
245:13 248:22,22
**finish** 283:3
**firm** 19:18
**first** 8:18 30:11
31:22 32:2 33:8
33:12 36:18 42:3
59:10 62:4 65:21
67:6 71:4 78:2
82:1 98:22 140:8
141:20,21 143:1
145:3,18 147:8,16
148:2,8 158:18
160:5 164:17
166:6 167:14
169:14,15 173:4
174:9 180:2,4,4
181:15 188:22
193:10,10,18
194:20 195:12
199:21 206:19,20
208:15 209:10,13
224:10 226:17,17
227:17 232:4

234:2 249:2
251:10,14 252:7
252:10 262:1
264:8 265:9
266:14 268:21
273:11,12,15,15
**Fishman** 40:17
**five** 16:5 132:21
133:10 134:3
147:19 148:7
199:4 278:15
**flew** 151:16
**Florial** 7:7
**focus** 26:4 67:5
125:14 136:7
155:4 176:15
177:8
**focused** 264:8
**focusing** 34:4
100:15 120:5
131:20 156:18
157:22 209:11
232:16 236:2
**folks** 10:17 38:10
39:18 40:13,19
48:17 107:16
231:7
**follow** 100:14
**followed** 148:7
180:17
**following** 59:8
70:14 108:6,11
140:7 146:8
212:20 218:21
219:18 220:2,9
251:22 252:9
256:19 274:7
**follows** 8:20
**follow-up** 219:16
219:22 220:4
**foregoing** 285:3,5
286:3
**foreign-born**
108:12,15 109:2
109:12,15 110:5
110:17 111:8



112:7 114:17
**forgive** 16:10
**forgot** 212:19
**form** 18:21,22
20:17,19 48:21
119:16
**formal** 9:5
**formally** 257:16
**format** 188:22
**formed** 91:10 93:17
94:10 96:2
**Formulated** 62:19
**formulation** 27:9
44:15,22 45:7
69:16
**forth** 60:5 242:1
244:11
**forward** 180:8
249:17 276:13
279:2 280:7,12
**Foundation** 191:21
197:16
**four** 16:4 147:18
199:1,4 210:20
**fourth** 200:21
202:6
**fragility** 249:9
**frame** 45:19 117:19
162:13 189:14
223:13
**Frances** 217:14
218:5
**Francis** 41:12 47:9
**free** 74:4 90:11
**freely** 268:12
**fresh** 101:22
**Friday** 32:17 33:1,6
180:3 193:20
250:20 253:16
**front** 38:15 40:11
41:8,10 47:7
69:22 220:21
250:18
**frustrates** 262:18
**full** 186:8
**fuller** 263:11

**fully** 174:11,16
**furnish** 282:12
**furnished** 18:12
282:9
**further** 58:2 79:17
120:3 149:1
150:22 181:8
205:2 207:9
283:12 285:13
286:4
**future** 74:12 98:14
108:14
**F-A-I-R** 72:6

---

**G**

**G** 7:1
**gathering** 32:16
**GDP** 234:4
**Gene** 1:12 2:1 4:2
7:6 8:17 9:4,5,6
278:17 279:9
283:19 286:2,18
**general** 14:6,7 21:2
23:18 24:6 30:8
37:9,15,17 38:4
40:10,15 41:18
57:5,8 66:20,22
67:7 84:10 87:12
87:19 91:4 100:12
100:21 119:3
126:15,16 130:9
132:3 138:13
139:2,9 147:4,7
156:3 162:16
165:17,18 175:7
180:14,18 181:1,6
184:1 185:9
191:19 192:5
193:15,16 197:4
197:15 198:8,11
199:12 203:4
205:5 211:2,20
214:20 222:6
242:3 243:11
251:19 260:13
265:22 275:6

**generally** 44:13
45:10 77:11 83:15
88:8 100:10
120:12,14 131:4
137:7 138:14
145:15 162:14
166:2 168:3,12,19
168:19 174:22
178:8 179:11
187:1,3,5 189:15
189:19 190:18
192:4,13 196:21
198:9 212:4,8
215:19 225:6
236:18 265:17
268:6
**general's** 37:22
**generate** 48:20
56:4,12,21
**generated** 124:11
125:7 187:14
**generating** 223:19
224:2
**generation** 59:22
**gentleman** 171:18
**Geoffrey** 3:3 8:3
**George** 40:17
**getting** 14:10
112:15 133:19
166:11 225:6
255:8 261:4
**give** 11:18 17:7
38:13 40:7 46:21
54:9 90:15,17
119:6 154:17,19
161:12 166:19
170:22 177:7
178:9 192:6 197:4
224:6 247:11
249:21 271:19
**given** 9:17 11:10
14:9 15:1,9 51:8
62:5 169:10
172:21 189:14
191:10 200:4
206:16 223:21

277:8,9 285:10
**go** 16:3 23:5,6 30:4
30:7 58:1 59:6
111:15 119:10
128:11 167:1
168:22 169:2
176:15 194:6
200:20 205:1
214:14 218:20
228:22 241:19
251:18
**goals** 225:21
**goes** 32:10 110:9
208:19 209:20
229:15 233:12,14
234:4 274:10
278:21
**going** 21:22 40:21
74:5 86:10,12
90:13 112:19
113:9 115:5
116:17 130:15,17
153:19,21 159:13
167:8 168:6,20
192:9 194:13
197:1 200:16,17
202:3 203:22
204:5,8 205:20
214:8 217:17
220:18 221:6
227:10 243:22
258:16 273:3
276:13 279:1
280:6,12 283:4,20
**good** 9:1 30:7 47:10
47:11,11,12 52:7
55:17 114:3 159:4
246:11,13 247:2
247:19 256:9
257:15 261:5
280:21 282:16,22
**governance** 91:3
**government** 13:10
14:1 15:1,8,16
16:14 18:15 46:11
104:8,9 135:12,13

135:20 136:4,6,12
136:13 137:12,14
150:5 151:6,12
152:17 153:7,9
154:14 155:3,14
156:19 158:5,8
162:9 175:11,16
176:3,10,19
177:12 178:1,16
179:9,14 186:14
186:15 207:6,16
232:9,11 256:10
**governmental**
157:2
**gpipoly@mayerb...**
3:6
**graces** 256:9
**graduate** 9:22
**graduating** 10:11
22:10
**granted** 83:4
**granting** 75:9
**grants** 74:13 82:20
**great** 63:21 114:20
226:11,15 227:2
**greater** 12:14
124:11
**grossly** 110:12
**ground** 61:1 224:19
235:7 236:10
**grounds** 59:15
61:10 83:16
**group** 77:1,4 133:3
133:4 166:7
184:18 193:19
196:13 215:14,21
282:12
**groups** 72:2 76:16
78:13,16 79:2,4
79:16 136:19
282:9
**growth** 108:21
234:5
**guess** 30:2 34:12
39:5 65:8 116:2
172:3 173:6



174:22 191:18
206:20 257:16
278:2
**guidance** 265:18
**guts** 210:11

### H

**habitually** 148:16
149:16
**Haiti** 5:16 126:18
131:2,3 132:12
135:1 136:6,8,10
136:14 137:12
140:9,13 142:1,6
143:1,21 144:20
145:9 146:5
147:10 148:10,15
148:17,17,21
149:16,20 150:2,5
150:8,10 151:13
151:16,21 152:10
153:1 155:3,9,17
155:20 156:10
158:5 160:2,11
161:7 162:21
164:20 172:18
173:1,11 174:4
175:4,12,13,16
176:2,11,20,20
177:12 178:1,16
179:14 180:10
181:10,18 184:2
189:10,13 195:5
195:14 204:14
210:3 213:16
218:2 222:4 223:3
224:12,19 225:4
230:17 231:22
232:6,16 235:8
236:10 237:15
238:22 239:19
240:2 241:8 244:7
246:1 248:7
251:22 252:10,15
256:17,19 260:5
265:9 266:22

267:14 269:7
270:4,8 271:14
279:1 280:6
**Haitian** 137:13
148:15 151:6,11
151:17,18 152:16
153:7,9 154:14
155:10 156:19
162:9,11 176:3,10
232:11 253:8
272:15 276:1
280:14,17 281:20
282:7
**Haitians** 149:15
210:4 229:5,11
230:19 262:5
271:12 280:1
281:3
**Haiti's** 135:5
140:18 143:14
146:14 149:1
150:3,22 161:1
177:13 180:10
222:22 232:15
249:13
**half** 108:17 166:5
222:5
**Hamilton** 1:12 2:1
4:2 7:6 8:17 9:4
30:15 32:2 33:16
34:5 58:11 81:15
90:6 97:9 104:8
105:11 106:4
115:13 141:9
143:9 159:21
163:18 169:9
171:6 182:10
192:18 197:10
206:6 222:16
238:13 250:15
261:13 266:10
276:7 277:7,17
283:11,19 286:2
286:18
**Hamilton's** 32:15
**hand** 73:13 211:15

217:18
**handed** 90:7 97:10
106:4 141:10
163:19 206:7
213:4 238:12
242:22
**handwriting** 99:6
99:11 101:8,9
208:19 209:6
**handwritten** 4:12
5:9,11 6:3,5 97:12
102:10 202:9
206:11 207:1
**handy** 225:2
**happen** 210:6
233:9
**happened** 43:20
68:15 88:13,14
120:2 145:12
190:2,5,13 233:18
272:4
**happening** 138:16
279:4 280:8
**harass** 111:22
114:22 115:1
**harassing** 111:12
112:10 114:3
**harassment** 52:14
53:2
**hard** 129:18 166:9
208:22
**Hayley** 40:18
**hazardous** 229:20
**head** 139:11,17
185:13 218:6,8
235:21
**headed** 129:6
**heading** 119:7
144:18 224:10
**Headlines** 4:10
**headquartered**
19:20
**headquarters**
218:16
**heads** 168:2
**health** 146:15

237:16
**healthcare** 91:4
239:10
**heard** 158:2 163:10
214:22
**hearing** 11:11 84:9
84:13
**hearings** 67:18
68:5,6
**heavy** 146:9
**heed** 258:19
**held** 2:1 67:18 92:9
**help** 78:18 84:8
149:9 172:7
**helped** 60:4 109:10
192:4
**hereto** 285:16
**Heritage** 191:20
197:16
**hey** 278:22
**high** 111:9 112:8
203:6
**highest** 176:3
**high-level** 202:10
**Hill** 24:2 33:17 34:6
34:17 78:7,12,20
79:3
**hire** 80:17
**hiring** 80:11,18,20
**history** 104:4
112:16 240:10
263:3 264:9 269:4
**holders** 110:22
**home** 109:20
**Homeland** 3:18 7:8
8:13 13:12 22:12
23:2 26:13 29:2
34:18 35:6 38:5,8
39:15,19 40:4
41:5,7 45:14 47:5
47:7 66:4 74:10
87:10,22 161:4
181:3 185:15
195:5 200:3
223:22 248:2
267:10

**homes** 229:6,11,18
231:15
**Honduras** 195:4,14
**honestly** 36:15
**honors** 22:15,22
**hopefully** 206:8
**hosted** 127:19,21
128:7,12,14
**hour** 166:5 186:6,6
**hours** 16:5 52:17
166:13
**House** 28:14 32:13
33:17 34:6,17
126:6,22 131:7,9
165:10 168:3
181:12 184:17
185:17 187:13
192:10 193:2,22
194:4 196:20
202:10 207:13,18
214:1 215:11,12
216:7,22 218:21
222:3
**housing** 91:3
**humanitarian** 81:7
82:2,9 83:6,8,15
83:17,19 84:4
91:5
**Hurricane** 146:5
**hybrid** 24:14
**hypothetical** 86:9
**hypothetically** 54:6
54:10

### I

**ICE** 22:3,6 23:8
40:11 66:9 67:3
**idea** 54:13 69:4
75:3 111:5 174:8
174:18 184:11
211:13 215:3
219:11 221:14
223:12 241:18
255:2,21 265:3
269:13 270:22
271:5,9,20 274:20



282:4
**identification** 30:13
58:9 81:13 90:4
97:7 106:2 117:11
141:7 143:5
163:16 169:6
171:3 182:7
192:16 197:8
205:11,13 213:2
222:13 238:10
242:20 250:13
261:10 266:8
277:4,13
**identified** 10:19
48:10 93:6 207:15
**identify** 10:16 36:5
**identities** 47:21
**IDP** 227:12,19
**ignoring** 199:10
**illegal** 74:9
**Illinois** 3:4
**immigrant** 109:21
109:22
**immigrants** 108:18
109:5
**immigration** 4:9
6:12 14:12 22:8
24:16 25:7 26:5,6
26:9 33:14,18
34:7,17,21 35:5
35:14 36:8 37:18
41:3 42:17 44:16
44:19,22 45:7,9
56:9,12,21 58:14
59:4,9 60:12 62:8
62:13,15 65:18
66:13,21,21 67:10
67:11 70:7,9,13
70:15,18,20 71:3
72:3,10 73:16,18
77:1 84:19 85:2
107:7,11 108:7,11
108:14 109:10,12
111:18 118:5
127:20 128:2
134:11 138:13

154:7,8 196:3,16
203:5 241:17
259:9 262:4
**immigration-rela...**
38:1 42:7,11
**impact** 146:4,9,16
**impacted** 167:9
168:7
**implementing**
33:17 34:6,21
**imply** 73:9 209:21
215:3 228:17
**import** 14:8 133:17
**improve** 238:3
**improved** 225:5
234:21,22 235:9
236:5
**improvement**
230:21
**improvements**
248:8
**improving** 226:20
235:12
**INA** 17:13 70:17
76:10 104:22
242:14
**inaccurate** 211:12
**inadequate** 245:5
**inauguration** 24:20
26:11 47:2,3 62:6
**include** 63:7 64:3
65:4 70:10 110:17
110:22 130:14
177:18 196:4
245:22
**included** 6:22
110:5
**includes** 42:20
**including** 45:16
122:5 146:15
150:4 179:15
205:4 232:10
242:7 243:19
**inconsistent** 35:13
36:7 75:14
**increase** 109:4

270:9 279:2 280:7
**increasing** 199:7
201:2,2,8
**independent**
230:11,16 240:9
**indicate** 11:5 30:21
119:17 170:15
212:14 224:16
257:21 274:4
276:6
**indicated** 93:5
160:1 214:1
220:14 234:13
279:8,15
**indicates** 31:21
141:21 156:10
164:16 165:5
183:7 193:9 214:7
234:2 238:7
**indicating** 168:11
169:2
**individual** 103:14
125:21 127:2
128:18 130:5,8,10
130:15 131:16
132:3,8 135:9
138:21
**individually** 105:1
**individuals** 10:19
38:7 72:3 82:10
83:2 106:10 111:9
112:7
**ineligible** 74:10
**inferring** 210:9
**influenced** 180:15
180:19
**inform** 78:18 130:9
**informal** 229:19
**information** 48:16
91:22 120:3
138:20 167:4
168:20 191:8
201:14 210:19
235:10 240:1,3,20
244:11 245:16
246:1,16 247:3,19

248:14 252:7
253:8,14 254:3,8
254:10,11,17,22
255:3,9,13,15
256:3,5,20 257:9
257:11,13 258:9
258:14,16,21
259:7,18,19,21
260:4,7 261:4,7
262:15 263:3
264:10 268:9,14
270:9,11 271:11
272:15 274:11
275:7,10,13,19
276:1,8,10,14,16
276:22 279:17,22
280:13 282:6,12
282:15,18,21
**informed** 254:19
254:22 255:10
258:15
**infrastructure**
232:9
**initial** 99:12 140:18
**ink** 160:17
**input** 135:11
136:11 165:6
166:12,17 224:6
263:18 266:21
**inquiries** 259:22
265:16,19 275:20
**inquiry** 113:14,16
259:13
**insinuating** 113:8
**insinuation** 248:20
**inspectors** 199:12
**instance** 122:13
**instructed** 212:17
**instruction** 212:20
**integrity** 59:9 71:2
274:12
**intended** 57:11
111:22 112:21
**intent** 52:16
**interact** 38:10
**interaction** 126:20

**interactions** 78:20
125:17
**interagency** 168:12
**interchangeable**
215:16
**interest** 24:17
67:11 84:20 85:4
85:10,14,16,18
86:2,4,6,12,14
102:2 136:20
149:14 150:1
191:11 260:16,22
261:2
**interested** 248:13
254:15,21 255:8
285:16
**interesting** 256:15
**interests** 70:20
**internal** 201:12
249:9 251:4 262:2
265:15
**internally** 227:12
255:20
**international** 105:6
**interned** 22:2
**Internet** 261:15
**interpret** 49:21
**intervening** 90:22
91:9 93:15 94:9
95:4,14 96:1,15
96:16,19
**intervention** 240:3
**interventions**
239:20
**introduce** 116:18
**introduced** 68:14
**intrusive** 190:20
191:17 197:2
201:22
**invasive** 201:3
**involve** 133:16
**involved** 42:22
59:22 80:10
123:17 127:6
128:1 221:13
265:14



MAGNA
LEGAL SERVICES

**involvement** 110:2 120:6 127:8 130:2 160:6 180:9,13 181:9 192:1
**involves** 203:8 215:20
**involving** 203:5 259:8
**irrelevant** 111:11 201:20
**issuance** 155:4
**issue** 19:9,10 40:9 42:16 43:5 58:1 60:18,20 74:9 91:3 125:10 137:20 184:12 227:9 236:19
**issues** 17:4 25:7 26:5,7,7 33:14 37:17,19 38:1 42:7,12,17 45:9 56:9,12,21 60:4 67:15 68:19 72:3 78:15 79:5 82:12 107:7 120:15 133:17 134:11 145:21 192:5 200:12
**item** 70:5,19 74:8 99:3 252:10
**items** 61:19 70:2
**iterative** 123:16
**it'd** 123:21 211:16
**I-C-E** 22:3

**J**

**James** 105:2 140:4
**January** 1:14 7:12 24:20 26:17 46:16 66:2,19 76:13 81:1 84:13 85:8 86:17 92:10 106:6 106:15 111:7 112:5 140:7,17 144:20 158:17 177:20 178:2

180:11 196:2 222:18 224:20 225:14,15 227:11 228:1 229:3 230:1 230:6,10,15 231:18,22 233:1 233:10,13 234:1 234:16 235:1 236:6 237:17 240:4 241:6 244:12 246:22 247:22 249:7
**Jeez** 40:8
**Jeff** 197:15
**jibe** 142:5,21,21
**Jim** 139:21
**jmedow@mayer...** 3:5
**job** 1:18 13:4 23:4 24:19 27:11 28:11 29:16 41:17 78:18 122:16 203:7 268:6
**jobs** 60:15
**Joe** 40:17
**jogs** 107:21 197:5 273:5
**John** 3:8 8:5 26:15 26:16 40:17 48:11
**john.tyler@usdo...** 3:12
**join** 42:1
**joined** 80:6 81:2 88:20 171:20 172:8
**Jonathan** 3:2 8:1 63:19
**judge** 201:15 202:7
**judges** 199:8 201:8 201:13
**judge's** 201:16
**Judging** 167:2
**judgment** 111:3
**judicial** 197:16 201:1
**judicially** 245:9

**judiciary** 23:19 67:7 68:11,18,22
**July** 28:18,19,20 142:2,17 148:9 224:12 257:3,5
**jump** 254:3
**June** 285:22
**Justice** 3:9,15,17 5:8 8:6,8,10 12:3 16:12,20 30:5 33:10 39:4 179:21 180:1,5,15,20,21 184:5 185:1 197:11 219:4

**K**

**K** 2:6 7:15
**Kaitlin** 41:14
**Karl** 47:11
**Kathryn** 97:12
**Kathy** 41:14 47:12 47:13,14 139:15 216:13 263:4
**Kathy's** 214:13
**keep** 21:9 112:18 112:20 114:19 138:15 203:7 209:17 219:12 245:12,13 257:18
**Keith** 193:15
**Kellogg** 193:16
**Kelly** 26:15,16 28:1 28:13 29:13 48:11 101:15 151:8 156:3,4 175:10 220:8,15 221:12 221:18 235:14 251:11,15 252:4,9 253:13 254:15 255:3,6,7 257:3 257:12 263:11 270:3,7 273:16
**Kelly's** 156:10
**kept** 131:5 259:19
**Kevin** 3:15 8:7
**key** 33:16 34:5,12

232:9
**kind** 24:14 35:7 39:20 55:8 62:22 113:11,14 126:20 129:15 133:15 161:5 182:20 189:20 199:5 209:10 231:8 237:21 253:10 258:17
**kinds** 56:14 153:22 248:10,13 257:9
**Kirstjen** 48:12
**know** 13:3 16:4 18:2 20:6 21:18 25:12,15 26:5 28:8 33:6 35:1,2 35:10 36:11,15 44:2,4 47:22 49:3 55:19 62:6 64:14 66:14 67:3 75:15 75:18,21 80:2,8 80:17,19,20,22 81:8 88:9,13 92:20 96:12 98:8 99:18 102:5,8 103:3,7,11 105:2 105:15 110:19 112:15 113:6 114:19 116:3,8 122:6,13 125:10 127:3 128:13 129:5,16,21 130:2 130:7,18,18,19 132:20 133:18,20 133:22 137:1 141:2 152:5,12 155:19 160:14 161:16 162:4,6,7 166:1 173:17,20 174:1,15 175:22 178:12,13 181:11 182:17 184:5,11 185:3,21 188:10 190:16 202:13 209:13 211:7,10

214:11,19 215:4 215:15 218:13,19 219:7,12,16 221:9 221:21 223:14 225:4 228:5 233:11 236:4,15 236:17 240:22 245:11,11 246:12 246:13 248:11,12 248:19 253:21 255:2,14,18 256:12 257:3,6,12 257:14 260:19 263:14 264:15,19 264:22 266:4 272:2 275:1 278:18,21 281:15 282:10,16
**knowing** 32:6
**knowledge** 20:11 64:3 76:1 88:7 178:14 205:7 221:9 230:12 234:22 235:3 239:22 240:9 248:3 257:1 281:18 282:5
**known** 48:15 78:5 227:3 236:18
**knows** 50:1 211:18 230:13 235:4 260:19 264:19 268:14
**Kory** 19:15
**Kovarik** 41:14 47:15,19 48:6 139:13 164:14,16 169:17 170:3 188:16 213:13 216:15 217:4 263:4
**K-O-R-Y** 19:17

**L**

**L** 1:17 3:10 285:2
**landfall** 146:5



Langhofer 19:15
language 76:2
  84:17 91:18 92:8
  94:2 100:13
  109:19 238:8
Lapan 262:22
  263:1,6,6,8,9,10
  263:13,15 264:1,9
largely 188:15
larger 133:3,4
lasted 158:16
late 28:18 32:14
  76:17 142:19
  148:22 150:20
  159:1 160:2 165:3
  265:10 275:15,21
Latest 4:10
law 9:22 10:11 22:3
  22:10 77:21 78:3
  78:11,21 79:17
  80:5 108:14
  109:10 171:16
  173:20 174:3
  209:17,19
lawful 201:18
laws 66:12,21,21
  70:7,9,13,15,18
  167:10 181:6
lawsuit 13:11 43:21
  90:10 200:12,15
  204:4
lawsuits 13:16,20
  14:1,14 15:2,10
lawyer 44:3,5
lawyers 13:22 14:5
  15:17 16:13
Law's 173:5
laymen 237:22
lead 37:22 42:10
  59:13,17 60:11
leaders 57:10
leading 119:22
  176:16
leak 259:13 261:7
  261:17
leaked 261:20

263:19
leaking 258:2,6
  262:17
learn 252:19
learned 15:4
leave 24:19 30:1
  226:21
led 73:4 99:12
  190:19
Lee 10:3,3
leeway 111:14
left 22:19 23:4
  28:11,13 32:20
  89:17 138:4 140:2
  160:7,8 161:3,20
  163:10 227:1
  231:15 235:11
  259:14
legal 1:20 7:19,20
  21:8 23:21 24:2,8
  24:9 29:21 37:16
  70:19 76:7 91:22
  94:4 95:8 196:11
  201:9,10,20
  242:10
legible 206:18
  209:8
legislation 68:12,12
  68:13 196:9
legislative 63:8
  64:4,8 68:22
  71:11,13
length 240:19
Leon 4:11 90:1,9
letter 4:14 106:7,11
  106:18 179:10
letters 137:3 223:2
let's 21:19 65:7
  67:5 82:6 87:4,4
  89:4,6 90:19
  93:12 104:10,14
  115:4 127:11
  136:7,7 143:3
  144:11 148:1
  159:11 167:14
  169:14 176:13,13

176:15 177:8
  180:2 182:4
  184:16 186:19
  194:18 205:19
  222:8,8 272:18
level 87:5 119:3
  234:18 237:18
levels 176:4
liaising 33:16 34:5
  34:16
licensed 10:5
lies 282:14
life 141:12
light 203:18
limit 279:4
limited 46:2 74:13
  83:1 112:2 257:18
  280:16
line 101:8 113:5
  116:5 118:2
  164:17 170:4
  172:17,18 173:11
  195:13 200:9
  209:17,19 210:1
  213:15 214:12
  218:1 222:7
  251:10 266:14,20
  267:7 268:10
  280:5 286:8
lines 64:2 99:14
  105:10 115:22
  117:17 118:20,21
  129:12 237:5
  278:16
lingering 146:16
list 71:6,7 93:10
listed 81:6,8,11
  82:16 92:19
  169:22 286:7
Listen 36:3
listening 110:13
lists 92:19
litany 40:19 86:11
litigant 258:17
litigation 9:10
  37:20 190:21

191:18 197:2
  203:4,7 212:10,16
  262:18
little 69:13 87:5,6
  116:3 119:6
  151:19 152:17
  161:12 162:13
  176:9,15 197:3
  206:18 208:22
  210:16
living 229:6,12,17
  231:3,7 256:8
LLP 2:5 3:3 7:15
  7:17
located 229:19
location 192:7
log 207:15
long 16:3 19:5
  20:12 78:5 127:5
  153:12,13 177:6
  186:4 195:16
  209:15
longer 219:2
  229:17 243:22
  248:1
look 31:8 74:4
  90:11,19 93:12
  98:22 99:12 100:7
  107:5 111:1,2
  128:10 144:11
  148:1 166:20
  194:18 195:9
  199:1,15 202:5
  207:2 217:11
  222:9 231:9 239:8
looked 17:17
  110:21 159:22
  223:7 228:10
  248:17 255:21
  274:2
looking 31:22
  63:22 69:20 98:22
  101:7,21 108:1
  144:16 145:16
  158:18 165:12
  170:4,19 172:1

173:14,22 193:10
  194:7 196:17
  198:21 219:12
  225:10 248:9
  257:16 262:1,20
  273:11 275:14
looks 99:2 141:17
  143:11,15 146:12
  166:5 169:18
  193:4 210:8
  222:20 251:3,6
  256:18
loop 203:7
Lori 89:14,17
Los 109:17
loss 33:15
lost 229:5,11
  231:15
lot 26:7 38:10,15
  40:10,13,14 42:21
  46:18 63:11 68:8
  86:4,8 93:10
  123:8 137:2 167:8
  168:6,7 190:20
  221:4 240:19
  246:11,12,15
  281:16
lots 40:8 183:6
  260:20 270:20
lowest 234:18
  237:18
low-skilled 109:11
lunch 159:5
L-A-N-G-H-O-F-...
  19:17

_____

M

M 3:3
Machine 59:1
Magna 1:20 7:18
  7:20
Maher 40:18
maintain 280:19
maintained 228:15
major 137:22
maker 276:22



making 46:11 74:9
80:20 88:2 90:20
96:18 125:1 149:9
176:21 181:2
246:20 279:10
male 36:21,22
manifestation
201:1
March 226:4,21
mark 30:11 58:7
116:20 141:11
278:18,19
marked 6:11 30:12
30:16 58:8,12
73:14 81:12,16
90:3,7 97:6,10
106:1,5 117:10
141:6,10,12 143:4
163:15,19 169:5
171:2 182:6
192:15,19 197:7
205:10,12 207:12
213:1,5 222:12
238:9,13 242:19
250:12 261:9
266:7 277:3,8,12
market 231:10
marks 283:18
Martin 63:19
materials 56:1,17
57:5,6,9,10,14
62:9 107:11 187:9
187:14,17 188:2
matter 7:6 13:7
63:19 230:17
235:7 248:9 255:9
262:10
matters 14:8 21:9
27:2 34:17 42:21
43:19 44:11,19
83:20 111:18
114:4,6 138:13
200:12,14 203:4
Matthew 146:5
maximum 154:18
154:20 178:12

Mayer 2:5 3:3 7:15
7:17 8:1,3
ma'am 261:11
277:5,14
McCament 89:11
89:15 140:4 217:5
mean 13:19 20:14
33:5 35:3,18
39:21,21 40:8,9
41:16 47:1 49:11
49:14,18 50:13,17
51:4,9 54:12
55:21 56:1 57:8
63:3 64:10,21
66:20 68:20 70:12
72:14,21 75:18
83:9 85:11 86:21
87:1 89:1,2,5 92:4
94:5 96:13 98:4,6
102:9,16,19 113:7
114:13 123:1
125:5 129:14
133:8 136:18
139:15 147:13
158:22 168:5
180:20,22 184:3
190:4,4 198:9
199:2 211:14
215:4 221:1,7
228:13 230:3
240:15 241:14
243:11 244:20
245:4 246:8,9
247:10 259:12
260:19 261:19
264:15,19 268:5
278:4
meaning 53:17
54:14,15,18 93:14
98:2,3 156:11
215:2
meanings 55:22,22
means 49:4 53:21
65:11 75:22 81:11
178:4 183:1 212:8
meant 214:17

215:15 253:4
media 258:11,17
259:1,1,6,12
267:22 273:8
medical 82:12
259:10
Medow 3:2 4:3 8:1
8:1,22 13:21
16:22 17:1 30:10
30:14 34:3 36:2
36:12 46:1,3,13
46:15 49:2,9,16
49:22 50:8,11,15
51:1,5 52:5,11,18
53:5,12,22 54:8
54:19,22 55:3,5,9
56:18 57:7 58:6
58:10 59:19 60:13
61:12,14 73:1
74:21 76:11 81:14
87:3 90:5 92:2,6
92:12 93:3 94:15
95:11 96:9 97:8
103:10,19 104:2,6
104:10,13 106:3
110:13,15 111:20
112:4 113:1,9,15
113:18,22 114:7,9
114:12 115:1,12
116:20 117:2,4,6
117:9,14,15
118:19 126:8
135:18 141:8
143:3,6 149:8
150:6,15,17,18
159:3,8,10,12,20
161:14 163:14,17
169:8 170:22
171:4 182:4,8
186:19,21 192:17
197:1,9 200:17,19
204:7,9 205:9,18
206:5 210:22
212:22 213:3
219:5,14,15,21
222:8,14 230:8,13

230:22 235:4,15
238:11 240:12
241:2,4,21 242:13
242:15,18,21
245:14 247:1,16
249:1,20 250:5,8
250:11,14 261:12
264:6 266:6,9
272:3,20,21 276:9
277:1,6,9,15
281:8 282:19,22
283:11,17
meet 76:12 91:7
93:8 128:16
149:16 189:7
meeting 32:3 76:15
76:21 77:9,13,20
78:1 79:13,15
97:20,22 98:11
133:6 151:21
152:2 156:20
162:11 174:7
176:6 181:11,16
184:17,17 185:20
186:1,11,16,18,22
187:2,10 188:19
189:5,8,17 192:10
192:11 193:3,6,8
193:19 194:4
196:19 202:10,14
202:21 207:14,18
208:9,13 210:15
211:8 214:1,5,21
214:21 215:11,12
215:14 216:22
217:19 218:22
219:18 220:2,3,10
222:3 277:22
279:12,13
meetings 119:21
123:17 127:19,21
128:1,7,16,17,20
132:16,22 133:11
133:12,21 137:10
137:11,17 187:14
188:11 189:2,20

190:8,10,11 220:4
265:15
members 107:12
107:16 128:22,22
136:20 137:18
196:13 273:8
memo 119:16 120:2
123:14,21 124:9
124:15 170:6,11
170:12,17 172:14
172:16,19 173:1
173:11 207:13
213:16 217:18
218:2,10,19 244:1
274:2
memoranda 54:1,6
Memorandum 5:6
memory 153:4
191:12 204:21
memos 56:1,17
119:20 120:9
123:17 124:2
mention 40:20
168:13 204:18
mentioned 67:9
79:16 80:5 87:21
136:13 147:12
197:2 202:1
204:18 228:12
mentioning 261:18
merit-based 196:4
196:11
message 220:15
275:2
met 15:14,19,21
78:3 86:1 103:15
137:13 148:11
151:7,16 152:12
152:13 155:19
156:22 176:2
243:10 269:7
271:14
metrics 279:2
280:7
metropolitan 12:14
12:20



**middle** 31:22 108:5
109:7 199:5
**Miles** 38:17 39:1
**Miller** 25:10,12,15
26:1 44:6,16 45:8
69:16 103:21,21
104:4 105:12,16
129:4,13 130:5,12
131:1 185:11
**million** 108:13,13
108:16,17 109:13
109:14 229:5
231:1,2,14,16
**millions** 109:5
**mind** 54:17,20
276:18
**mindset** 168:9
**minority** 137:19,22
**minute** 145:1
172:10 224:15
**minutes** 250:10
**misreading** 240:13
**missing** 240:13
**mission** 225:20,20
227:5
**misstates** 276:4
**mistreated** 209:22
**Mitnick** 40:17
**moment** 13:3 30:20
36:15
**moment's** 13:4
**Monday** 33:10
180:5,7 195:6
197:17 251:16
267:1
**Monday's** 267:14
**monetary** 281:21
**month** 261:16
275:17
**months** 39:11
141:3,4 142:1
146:10 149:1
150:10 151:1,9
154:19,20,21
155:1 177:5,6
178:10 181:20,21

182:2 191:19
223:6,15 279:1,21
280:6
**morning** 9:1 149:5
184:10 214:2
**motive** 201:19
**motives** 201:17
**move** 30:18 32:3
113:1 115:3 143:3
179:19,20
**moved** 37:4 179:22
229:18 231:17
**moving** 69:7
**multipage** 266:11
**multiple** 110:9
123:17 152:14
153:15 157:1
177:16
**multitude** 119:21
**multi-page** 73:15
90:8 192:20
**mystery** 111:15

## N

**N** 4:1,1 7:1
**NAC** 217:15
218:16
**Nader** 40:18
**Nam** 3:18 7:18
**name** 9:2,5 16:11
20:6 40:12 56:1
56:17 80:1,15
164:11
**names** 38:13 40:7
46:18,21 47:21
126:21
**narrow** 47:6
**national** 24:16
37:19 67:11 84:20
85:3,9,14,16,17
86:2,4,5,12,14
102:2 127:13
149:13 193:12
232:15 233:16
260:15
**nationality** 65:18

83:2 148:16
149:15
**nationals** 82:21
148:15 151:20
152:22 153:21
154:1 175:13
**Nations** 225:19
227:4
**natural** 5:16 91:2
100:10 195:15
**nature** 11:12
257:14 259:10,15
268:3
**NDA** 48:1
**Nealon** 105:2
139:22
**nearly** 102:11
197:20 270:17
**necessarily** 35:2
64:9 147:14
248:14
**necessary** 27:10
37:21 126:3
201:14
**need** 42:18 43:12
43:15,16 58:1
82:10 168:21
257:19,20 282:17
**needed** 38:11 123:3
123:11 152:20
196:16 248:21
266:21
**needs** 214:14
258:14 259:3
274:15
**negotiated** 20:18
**neither** 285:11
**net** 282:7
**never** 69:9 215:4
219:10
**nevertheless**
235:16 244:7
**new** 1:2 7:10 12:20
61:19 68:12
108:20,22,22
109:9,10,17

133:19 191:15
**news** 4:7 5:8,21
258:10
**newsworthy** 258:13
**next-door** 121:4
**Ngo** 3:18 7:18
**Nicaragua** 195:4
195:14
**Nielsen** 28:7 38:19
39:7,13,14,17
40:2 48:12
**nondisclosure** 18:1
42:19 43:10 57:19
60:20
**nongovernmental**
249:15
**Nope** 70:4
**Northwest** 7:15
**Notary** 285:1,20
286:22
**notation** 279:9
**note** 211:9 225:8
230:18 266:13
281:12
**noted** 227:10 237:1
**notes** 4:12 5:9,11
6:3,5 97:12,20
98:19 102:10
189:16,19 190:8,9
190:11,12 202:9
202:14,17,19,20
203:11 204:10
206:11,14 207:1,7
207:16 208:5,9,12
208:15 211:6,11
211:21,21 212:9
225:18 227:18
272:8,11,20 273:7
277:18,21 278:14
279:19 280:2,10
**notice** 2:18 13:5
121:19 122:11,18
141:14,16 143:10
143:16,19 144:6
144:12 145:10
151:22 152:11

155:5,18 156:16
156:20 158:1,19
222:9,17 223:5,11
223:16,19 224:2
225:1,15 226:8
227:11,16 228:1,2
228:3,13 229:3,10
229:14 230:15
231:22 232:20
233:2,13,19 234:1
234:9,11,12,16
236:22 237:7,12
240:4,18,21 241:6
241:14,20,22
242:6 243:17
244:12 245:4,5,20
246:8,18 247:20
248:1,15
**notices** 122:3
231:18,20 244:22
**noting** 225:20
**notion** 165:21
232:22
**November** 37:3
159:1 160:2
168:16 175:18
177:9 178:18
179:20 182:13,16
183:8,13,22 184:9
185:3 190:22
193:21 195:7
196:19 202:15
207:13 208:10
210:15 213:12,19
214:4,9 216:22
217:9 218:20
219:18 220:2
222:3,5
**NSC** 127:6,13
**Nuebel** 41:14 47:15
47:19 48:6 139:13
164:14,16 169:17
170:3 188:16
213:13 216:15
217:4 263:4
**number** 20:14



76:16 78:13,15
82:9 107:16
108:17,18 111:8
112:6 139:4 199:7
201:8 239:20
244:6
**numbered** 198:22
**numbers** 77:3
195:11
**N.W** 2:6 3:10

## O

**O** 4:1 7:1
**oath** 11:15
**Obama** 90:1
**object** 13:17 19:6
33:22 35:15 46:12
48:21 59:15 61:12
92:11 112:12
149:2 150:11
186:13 200:9
204:1 210:18
219:1,5 240:6
**objection** 36:9 49:6
49:12 54:3,11
56:13,22 60:10
61:10,13 72:20
74:20 76:6 85:6
86:20 91:20 94:3
95:7 96:5 103:6
110:8 111:10
118:16 126:7
135:15 161:10
219:6,19 230:3
241:9 242:9
244:14 246:3
247:5,21 264:3
276:4 281:5
**objectionable**
112:9 113:5
**objective** 87:5
114:10
**obligation** 21:9
52:13
**obligations** 21:14
**oblige** 53:7

**observed** 134:22
**obtained** 262:3
**obviously** 32:8
181:1
**occasion** 40:5,22
66:18 105:14
211:22
**Occasional** 14:11
**occasionally** 41:13
41:14 137:5
190:10
**occasions** 78:17
105:11 157:1
**occur** 74:13 184:21
**occurred** 28:17
119:22 152:3,10
156:11 190:18
200:11 212:12
228:2 232:19
233:6
**October** 5:16 9:12
30:3,18 32:3,7,18
32:19 33:4 63:16
63:17,18 116:15
138:4,8 146:6
160:7,9 161:1
162:12,15 164:13
165:3 168:17
169:19 170:16
172:2 173:6
174:22 175:1
179:22 180:6
185:3 190:1,7,14
197:17 225:18
226:22 227:5
238:22
**offer** 50:6 135:16
205:1 270:16
**offered** 46:19 50:18
51:18 53:8
**offering** 29:20
**office** 3:9 12:4
16:20 23:8 32:13
32:14 33:7,9
38:16 40:11,11,15
41:9,10 47:7

107:13 116:8,9
118:3 139:3,12,14
139:17 165:16
182:12 214:14
267:6,9 268:7
269:14
**officer** 285:2
**offices** 23:1 121:4
153:19
**official** 201:16
262:4
**officials** 157:2
168:4 201:11
203:9 207:17
**oftentimes** 154:5
256:4,4,14
**Oh** 20:16 53:10
110:8
**okay** 15:19 18:4,9
21:1,21 22:10
24:4 25:21 30:15
31:1 33:11 37:4
39:1 41:8,19
45:11 48:2 63:14
63:21 64:1 65:7
69:12 74:7 77:10
81:15 84:13 87:7
87:20 90:6,18
93:12 97:9,18
98:17,20 99:4
100:15 101:7,12
107:8,20 108:3
115:17,21 116:6
117:16,19 118:2
119:1,2,5 120:7
123:12 124:4
126:5 128:3,6
130:4 131:22
132:11 136:7
139:6 141:9 142:9
143:3,7,19 144:4
144:11,15,22
145:4,19 146:18
147:5 148:1
156:12 159:8,12
159:21 160:5

163:18 164:5
167:6 169:9,13
170:3,15 171:5,13
171:22 172:12,21
176:18 178:1
179:19 182:9,20
184:8,16 192:8,18
192:22 194:6,18
197:10,13,18
198:18,21 202:3
203:18 204:19,22
205:9,18 207:5,8
207:21 208:7,18
209:5,9,21 211:19
212:22 213:4,18
214:8,17 216:5,9
216:13 220:13
221:3 222:8,11,15
222:21 224:17
225:12 227:3,8,22
228:7 236:16
238:12 239:14
243:5,8,15,22
249:20 250:15
251:9 252:14
253:3,12 261:13
261:22 263:22
266:6,10 268:1,18
272:12 277:7,16
277:19 278:9
282:19 283:17
**OMB** 166:12 169:2
**once** 121:11 140:6
162:12 184:13
281:21
**ones** 211:4 215:21
**One-fifth** 109:19
**one-on-one** 132:22
**one-page** 250:18
**One-quarter**
109:20
**ongoing** 100:9
162:8
**open** 35:16 103:6
103:18 151:14
**operates** 270:10

**operational** 232:13
233:3
**opinion** 34:13
173:21 244:18
270:16
**opportunity** 11:6
30:7 32:7 52:8
57:21 123:4 145:5
152:22
**opposed** 29:20
39:14 121:9
**oppression** 82:11
**oral** 11:10
**orally** 120:20,21
121:8 175:21,22
**order** 133:22
201:11 202:8
**orderly** 196:6
**orders** 70:6
**org** 129:20
**organization** 72:6
171:20 249:15
**organizations**
136:22
**orient** 277:16
**original** 91:1,11
93:17 94:10 95:5
95:15 96:3,20
140:12 249:7
**originating** 91:12
93:19 94:12 95:6
95:16 96:4,21
**ought** 116:2
**outbreak** 234:17
237:19 240:10
**outcome** 285:17
**outer** 153:16
**outlined** 249:12
274:9
**Outs** 231:1
**outside** 72:2 76:16
78:13,16 79:2,4
111:12 125:19
135:11,13,19
136:1,3,11 137:11
147:17 162:3



204:3 210:20 282:9,12
**outward** 58:21 107:13
**overlap** 35:4
**overnight** 154:11
**oversight** 129:9,22
**Overview** 5:17
**overwhelmingly** 173:12
**o'clock** 184:10,11

**P**

**P** 7:1
**packed** 34:1
**page** 4:2 31:9,22 33:12 58:14 59:6 63:22 74:6 82:1 82:18 99:1,9 101:3 105:9 108:4 115:22 129:12 141:21 144:13 145:2,18 160:17 164:4 166:6 173:4 193:10,18 194:8 194:13 195:9,21 199:1,14,16 200:21 202:4,4,6 208:15,20,21 209:2 210:5 217:3 224:10 226:17 227:17 232:4 237:1 239:4,5,15 249:2,11 262:1,20 266:14 268:18 270:2 273:11,14 274:5,6,7 278:11 278:12,12 286:8
**pages** 17:21 20:14 20:16 117:12 128:4,5 198:22 240:16 241:12 245:2 246:6
**palace** 155:20 232:15 233:16
**paper** 18:21 63:12

117:4 120:5 191:13 194:9,14 194:19 195:10
**paragraph** 32:12 33:13 90:14 91:21 93:4,13 108:5,20 108:22 109:9 141:21 145:16,18 145:20 146:3,8,13 146:18 147:8,16 158:19 195:12 199:16 200:22 201:7 202:6 226:18 227:18 229:16 233:12 234:2 239:15 249:5 251:15,18 257:17 262:21 270:3
**paragraphs** 32:11 110:10 147:3 271:10
**parents** 109:22
**part** 41:21 71:1,1 78:18 86:9 118:18 122:16 124:22 126:2 131:4 133:1 133:4 161:15 166:2 203:15 207:10 256:1 261:3 264:4 265:17 280:3
**participate** 125:6
**particular** 38:7 74:22 97:4 279:21
**parties** 2:19 19:21 20:9 136:16 285:12,15
**parts** 82:21 280:2
**pass** 82:6 196:3 283:13
**passed** 18:9 108:14 109:10 167:11 198:16
**passing** 252:19 253:7

**patently** 112:1
**paths** 78:6
**Patrick** 1:3 7:7
**pattern** 249:17
**pay** 33:8,9
**payments** 281:22
**PC** 167:10,21 168:8 168:18 214:13 215:6,7,14,20 216:3,19
**PCC** 167:9,16,17 168:8,14,18
**peacekeeping** 225:20 227:5
**peak** 239:17
**peaks** 239:19 240:2
**pendency** 13:10
**pending** 43:7
**people** 38:13 39:4 40:3,8 42:21 45:13 47:21 48:9 66:9 72:18 73:3 73:10 103:3,13 108:13 125:19 135:11 137:2,11 139:4 152:19 154:10 157:14 162:6 163:1,3,5 163:10 164:14 165:10,13 167:9 168:7 185:21 186:15 205:4 210:7,9 215:15 229:16 230:20 251:5 256:7 258:1 258:11 268:16 270:21 274:16 276:20 279:3 280:8
**percent** 109:3,4 227:11,18,19 234:5
**percentage** 231:6
**perfectly** 55:6
**performed** 57:20
**performing** 36:20

37:21 89:2 139:22
**period** 21:11 22:21 25:5,9 33:8,9 39:5 43:3,20 57:2 67:5 83:1 88:5 101:14 107:10 108:20 132:1 140:5 149:21 156:5 158:1 176:16 177:9,11 185:5 196:7 197:20,22 234:5,8 278:1 279:11
**periodic** 87:15
**periodically** 87:15
**periods** 100:9 104:17 176:14
**permit** 149:14
**permits** 178:14
**permitting** 260:14
**perpetuity** 20:13
**persist** 249:7
**person** 42:10 60:8 103:1,8 107:1 218:9 245:22 273:21 274:17
**personal** 92:1,3 104:19,22 235:3
**personally** 134:4 134:22 175:3 181:8 217:18
**personnel** 32:13,14 42:20
**persons** 72:16 102:21 125:18 227:12
**perspective** 246:14 265:19
**pertain** 66:12 68:6 180:20
**pertaining** 180:15
**philosophical** 111:17
**photographic** 204:21
**phrasing** 128:4

**physical** 62:21 199:1
**physically** 218:13
**Pipoly** 3:3 8:3,3
**place** 88:21 116:16
**places** 40:14
**plain** 55:4 200:11
**plaintiffs** 1:4 3:2 8:2,4,21 191:2
**plan** 59:8,14,20 60:1,6,9,15 69:20 71:2
**planned** 227:4
**plans** 12:19 13:1,6 226:21
**play** 100:6
**pleadings** 14:14,18 213:6
**please** 8:16 9:2 19:16 122:14 257:18,21 267:12
**PLLC** 19:19
**point** 25:1 28:15 29:5 46:13 48:4 48:18 58:3,5 64:18 71:14 80:15 89:15 98:14 103:20 104:16,20 115:14 116:14 123:19 130:8,19 143:1 148:8 150:8 158:22 159:4 160:1,10 161:6 168:10 174:2,21 175:2 180:8 181:5 192:8 236:13 240:8 247:2 251:12 276:19 278:3 283:1
**pointed** 241:16 245:1
**points** 147:19 148:7 149:12 200:10 266:22 267:13 274:2 275:3,5,15
**poke** 69:12



poking 259:13
policies 44:16
  118:5
policy 24:9 26:2
  27:6,8 29:20
  37:16 42:11 44:22
  45:7 60:4 62:8,17
  65:5 69:16 71:16
  71:21 84:19 85:2
  127:17 129:7,12
  130:3 139:12,14
  139:18 140:1
  167:17 263:4
political 26:18
population 108:12
  108:16,19 109:2
  109:12 110:6,17
  114:17 281:2,20
  282:8
portfolio 27:2
portion 35:20
  90:12 145:6
  209:11
portions 107:21
portrayed 221:20
posed 53:16
position 23:12,22
  24:1,2,5 28:13
  30:1 37:7 80:8
  89:16 185:14
possession 203:1
possible 56:6,15
  153:14 174:7
possibly 48:5 50:19
post 44:18 87:20
postelection 45:22
potential 62:8,17
potentially 61:20
poverty 91:4
practice 10:5
  190:15 228:15
  261:4 268:2
pre 47:1
precedent 54:15
precise 138:5
precisely 162:4

predates 234:10
predecision 130:20
predicate 221:8
preelection 45:22
  46:22 59:2
prejudice 210:3
prep 257:18
preparation 15:22
  16:8 17:2,11,18
  122:2 123:13
  144:5 162:16
  163:4 192:2
prepare 15:12
  57:13 84:9 150:2
  151:19 153:22
  198:10
preparing 198:5
presence 134:17,20
present 2:18 3:15
  7:21 16:8 98:18
  127:22 135:4
  186:15
presentations
  187:7
presented 62:10
president 1:5 26:3
  26:8 44:15 45:6
  57:11 60:5 65:21
  130:10 132:16
  133:7,17 134:2,5
  134:6,11,17,22
  135:5 151:17,18
  155:20 165:16
  232:7,14 233:15
presidential 6:13
  73:17 155:20
  232:1,17
president's 33:18
  34:7,21 35:4,14
  35:20 36:8
press 5:4 31:15
  98:5,12 107:14
  121:19 122:3,10
  122:15 182:12,14
  183:1,6,11,15
  184:13 220:7,8,13

221:5,20 222:1
  223:7,10,15 262:3
  262:17 263:17
  264:20 265:16,19
  267:6 268:6 271:8
  272:4,11,13
  275:15,20
Presumably 110:22
  245:18 253:16
presume 14:3
pretty 79:21 85:4
  103:18 172:1
  212:15 230:21
  276:21
prevent 148:15
prevented 62:10
previously 6:11 9:7
  31:3 32:15 73:14
  78:7 106:12
  115:15 116:8
  117:17 141:12
  213:5 255:15
  274:14,15
primarily 24:12
  27:1 37:17 175:22
primary 25:6
  158:15 191:10
  232:10
principal 26:4
  27:16 184:18
  193:19 215:14
  254:6 256:6,11
  258:14,15 259:17
  260:20
principally 40:16
  90:14 209:7
principals 167:22
  168:1 215:20,21
  257:8 262:14
  279:17 280:20
  282:17
principal's 215:8
print 81:20
printed 217:15
  261:15
printout 58:14 59:2

81:18 243:4
prior 11:9,10 45:5
  46:16 63:16 66:2
  66:4,19 67:22
  86:19 87:1,11
  88:18 89:22 109:5
  132:15 141:4
  144:1 147:2 155:4
  156:19 176:19
  190:6 200:20
  225:1 234:8
  255:19 265:12
  275:17 276:5
Priorities 6:12
  73:16
private 252:11,21
  253:4
privilege 46:7
  104:12 204:2
  207:15
probably 60:16
  63:1 131:5 134:3
  144:9 161:12
  173:2 179:3
  188:13 190:1
  211:17 240:20
problem 19:6
  113:12 123:5
  161:15
Problematic 210:1
problems 217:19
procedure 113:20
proceeded 124:10
proceeding 11:15
  283:22
process 46:7 80:11
  87:6 88:2,10
  104:12 121:14
  123:16 125:6,18
  157:8 161:21
  162:2 166:2
  168:19 170:13
  184:12 191:12
  195:2 203:16
  268:11 271:1
processes 168:12

203:9
prodding 258:1
produce 19:2
  109:11 153:20
produced 167:4
  207:3 212:16
product 48:20 49:1
  49:3,8,11,15
  50:10,14 51:9
  52:2 53:20 54:2,6
  54:10,20 55:20
  56:4,11,15,20
  57:3 204:2 268:17
production 202:8
  212:9
products 57:4
profile 203:6
program 22:16,18
  22:22 81:7 83:7,8
  84:3 85:9,16
  101:20,22 102:15
  103:5,9,12 262:7
  263:12 270:10,11
  274:12
programatic
  274:12
programs 3:16
  82:9,16 102:1
progress 156:2
  162:3 225:17
  231:10 237:2,10
  237:15 239:16
project 232:14
  233:15
projects 67:1
prompted 140:12
  148:9
prompting 249:6
prong 100:15,17
prongs 100:12
pronouncing 9:10
properly 86:18,22
  235:21
proposal 74:22
  75:12,13
proposals 62:8,17



63:8 64:4,8 71:11
71:13 74:17
**proposed** 65:5
71:16 268:4 269:3
269:22 270:6,16
271:4,13,18
**proposition** 275:6
**protect** 59:10 71:3
**protected** 65:11
82:19 193:20
195:3 223:4 262:5
262:6 263:6
**protection** 82:10
**proud** 191:7
**provide** 21:1,6 27:5
37:16 120:17
122:6 169:3 268:4
268:9 269:11
**provided** 20:20
130:12 155:7
157:7 158:4
196:15 207:15
**provides** 82:9
**providing** 24:8
**provision** 76:10
243:7
**public** 146:15
203:13 252:11,21
253:3,3 262:8
265:12 267:9
269:1,4,16 278:17
278:19 285:1,20
286:22
**publication** 152:11
156:15,19
**publicly** 48:15,16
121:13 157:10,14
157:18
**publish** 121:15
242:6
**published** 59:21
156:9,13 223:6
**publishing** 243:16
**pull** 210:11 257:21
272:18
**pulled** 58:22

**pure** 255:22
**purely** 201:9
**purport** 206:9
248:16
**purpose** 194:21
247:7
**purposely** 117:6
**purposes** 83:18
**pursuant** 2:18 29:2
**pushback** 32:12
**put** 59:10 60:5,15
63:5 71:4 121:19
126:21 142:18
166:16 244:11
245:19 246:17
271:8 277:10
281:20
**putting** 17:2 59:13
59:18 60:9 82:5
110:3 168:18
**p.m** 159:15,19
164:13 166:8
205:22 206:4
217:11 283:6,10
283:21 284:1

---

**Q**

**QA** 266:22
**quadrupled** 109:13
**qualifies** 83:11
**qualify** 18:2 196:10
**question** 11:5 35:18
36:3,3 43:7 46:4
50:11 51:4,8,11
51:14 52:1,9,19
52:21 53:14,15
55:11 58:4 61:1
92:14,17 95:10
96:6,17 104:15
110:9,14,16
111:20,21 112:3,5
112:14,17 116:1,6
118:20 135:22
137:20 140:5
150:16 197:21
200:18 201:20

204:6,8 206:20
212:18 221:7
225:3 241:5 268:5
270:15 271:16
278:18,19 280:9
280:10 281:7
**questioning** 113:6
200:9,13
**questions** 11:2 17:4
51:7 112:19
171:14 179:16
224:22 252:6
262:15 263:10
267:20 268:3,19
270:19 274:13
283:12,14
**quick** 254:5
**quicker** 169:3
**quotation** 31:9
**quote** 264:21
**quoting** 84:18
**Q&A** 267:13

---

**R**

**R** 7:1
**rains** 146:9
**raised** 137:20
165:20
**raising** 112:20
**Ramos** 105:8
203:19 213:7,8
**rapid** 108:21
**rates** 236:20
**rational** 259:17
279:16 281:17
**reach** 31:5 79:4
**reached** 188:18
244:19
**reaching** 165:9,21
**read** 64:16 74:15
76:2 81:22 90:16
90:20 91:14 93:5
99:5,6,6,7,10,11
99:15 108:10
115:15 116:2
117:17 172:13

209:1,1,5 211:4
212:14 233:1,5,13
238:5,5 243:11
244:21 247:12
249:18 250:1
273:12,13,16
278:12,13 280:3
286:3
**reading** 110:1
149:4 202:5
216:20 217:16
242:12 245:13
**readout** 156:9,13
**reads** 148:3 195:13
199:21 243:9
244:5 249:6 270:3
271:10
**ready** 217:16
**readying** 217:15
**read-out** 214:13,17
215:2 216:18
**really** 50:22 54:3
72:4 113:5 124:7
221:8
**reason** 11:17 31:8
52:7 86:13 195:11
206:16 282:14
**reasonable** 159:2
256:11 276:19
**reasons** 86:11
264:17
**rebuild** 232:12,15
233:15
**recall** 14:16,17 21:5
21:17 28:17 31:4
32:6 35:20 36:13
36:14 37:1 39:8
43:2,3,4,5 46:19
47:17 48:17 57:3
57:4 58:20 63:9
66:22 68:4,13,17
69:5,6 71:18 77:8
77:8 79:2,7 80:16
84:2 99:19 102:6
104:18,21 105:10
105:18 121:21

122:13 124:20
125:9 126:5 127:3
128:17 130:4,21
130:22 131:15
132:17 134:9,14
134:16,19,21
137:9,16,21
139:16 140:22
141:2 152:9
153:13,17 156:5
157:9,14 160:3,4
160:12 162:11
163:13 171:22
175:5,8,11,15
176:6,21 177:19
178:6 179:8,12
181:7 185:8,20
186:11 187:1,12
187:16 188:14,17
189:1,4,18 190:3
190:21 192:9,10
202:18 205:4
211:1,5 212:1,4
220:7,13 221:18
225:22,22 226:1
226:10 253:12,15
254:13,14 257:9
258:7 260:8
263:21 265:13
269:21 270:1
271:3,6,16 273:20
273:22 279:10
282:1
**receive** 66:13 88:3
135:11 136:10
**received** 74:12 75:2
75:19 76:4 203:15
266:18
**receives** 259:20
**receiving** 254:21
262:7
**recertify** 210:2
**recess** 115:8 159:16
206:1 283:7
**recipient** 163:22
170:1



**recipients** 151:12
154:5,6 266:15
270:4,12
**recitation** 110:10
**recite** 86:10
**recognize** 141:13
143:9 222:17
243:1
**recognized** 153:15
**recollection** 17:14
61:4 64:6,10,11
69:14 89:20 97:16
107:22 110:2
119:13 120:12
121:17 124:3,14
125:12 126:1
128:9 131:13
142:6,22 144:7
151:4 153:11
157:17,21 158:8
162:4,17 163:8
165:2 170:21
171:11 175:20
176:12 177:14
179:5 181:14
183:20 184:1
186:7 187:8 188:1
189:13 194:3
196:18 197:6
198:5,7,8 205:7
210:13 216:21
221:17 224:4,8
225:7,9 258:8
261:20 269:20
273:5 274:19
280:11,22 282:8
**recollections** 163:7
174:5
**recommend** 45:13
45:18 46:17 47:9
80:13 88:11 283:2
**recommendation**
88:4,11 90:21
119:9,15 120:2
123:13 170:11
176:22 195:20,21

**recommendations**
45:17 46:11 91:17
170:7
**recommended** 46:5
80:14
**reconstruction**
233:3
**record** 7:4 9:3
10:20 22:6 41:1
63:11 90:20 99:7
108:10 115:6,10
116:18 159:14,18
176:15 205:21
206:3 207:11
238:16 246:20
273:13 276:6
283:5,9,20 285:10
286:5
**recorded** 118:11
274:6
**recover** 234:3
**recovery** 91:12
93:18 94:11 95:6
95:16 96:4,21
249:13
**recurring** 133:5
**redacted** 214:10
217:5
**redesignate** 126:13
**redesignated** 87:17
**redesignating**
75:10
**redesignation**
100:22 103:17
148:10
**reduce** 108:14
**reduced** 285:8
**refer** 61:10,18,21
65:10 101:16
147:1 168:1
172:15
**reference** 170:9
200:6 216:10,13
218:6 229:4
234:14,17 251:10
**referenced** 110:21

226:7 231:21
233:1
**references** 198:2
199:17 216:18
**referred** 41:8 65:13
65:15 155:3
**referring** 15:16
18:4 32:13 94:7
101:1 117:13,14
147:7,16 172:13
172:22 173:18
191:14 202:14
247:22 252:3,15
**refers** 101:12
146:14 147:17
167:17 194:8
**reflect** 204:11,13
**reflected** 98:18
215:10 230:6
240:17 247:20
276:2,16
**reflecting** 143:20
207:16 248:15
**reflection** 205:2
**reform** 70:19 72:10
73:19 196:4
**reforms** 196:16
**refresh** 17:14 64:6
64:9 110:1 128:9
196:18 210:13
216:20 225:9
**refreshes** 64:10
**refusing** 43:9 48:3
51:2 58:3 60:22
**regard** 125:15
**regarding** 15:10
17:21 66:14 90:21
125:8 128:17
131:1 132:3 135:5
138:20 143:13
207:13
**regardless** 91:9
93:15 94:8
**Register** 4:16,18
5:14 121:16,20
122:3,11,17

141:14,15 143:10
144:6 155:18
156:15 158:1
222:9,18 223:5,11
223:16,19 226:8
240:4,18,21
241:14,20,22
242:7 243:17
244:12 245:19
246:7,18 248:15
248:21
**registered** 143:16
**regular** 39:20,22
66:10,17
**regularly** 12:7
239:19
**regulations** 74:9
**reinstructed**
232:13
**reiterate** 61:3
**relate** 43:21 70:3
71:11,17 78:21
143:12 193:6,8
222:21
**related** 37:18
127:20 140:9
170:14 198:1
251:22 252:10
254:17 256:19
261:17,21 285:11
**relating** 67:15
68:12 77:13 131:1
131:16 134:17
135:1 137:12
265:16
**relation** 75:22
200:14
**relationship** 129:10
129:19
**relative** 285:14
**release** 5:4 121:19
122:10,15 182:14
183:2,11,15
184:13 223:7,10
223:15 265:12,13
**released** 170:17

**releases** 122:3
183:6
**relented** 32:14
**relevance** 46:8
59:16 61:11 81:10
111:12 204:3
**relevant** 91:6 92:21
93:6,14 96:1,22
112:21 124:12
126:18 168:21
169:4 246:10
260:5 276:22
**relied** 107:10 111:3
**relief** 252:11,21
253:4
**relocated** 229:19
**remain** 149:17
196:13 260:14
275:21
**remains** 204:7
244:7 246:1 249:8
281:9
**Remarks** 197:15
**remember** 21:15
31:14 32:22 46:21
63:5 64:22 67:17
68:7,16 69:4,10
71:8,13 74:1,3
77:15,16,19 79:1
79:6,11,19 80:4
84:6,7 105:21,22
106:13,19 123:18
127:6 132:11
140:3 141:5
144:10 152:1,12
153:14 155:16
157:4 158:12,13
158:14,14 166:1,3
168:9 171:16
178:19 183:3
185:12,22 188:20
189:6 191:22
192:6 198:20
204:12,16 217:1
221:2 227:7
236:15 257:2,7



279:12,13
**remembering**
16:10
**remove** 227:5
**removed** 66:15
**Rene** 3:17 8:12
**renewals** 74:12
75:3,20 76:5
**Rep** 72:14
**repeat** 64:12 95:9
112:14
**repeated** 152:16
157:6,7 220:15
**repeatedly** 245:1
255:8
**rephrase** 11:6
46:14 134:15,20
150:17
**report** 4:11 42:14
43:8 73:17 90:9
129:4,5 211:22
214:21 220:7
240:17 245:3
246:16,18 248:20
249:13 280:20
**reported** 1:17
221:5 222:1,4
247:4 248:21
264:1 274:14
**reporter** 7:19 8:16
30:11,16 31:5,11
31:13 58:7 81:16
106:5 191:4
211:17 264:20
265:1
**reporter's** 34:10
**reporting** 129:10
129:17 279:2
**reports** 129:13
220:8,14,18 280:7
**represent** 7:22
16:18 63:10 76:19
84:16 97:11,18
102:22 107:6
156:8 207:5 211:7
273:6

**representatives**
72:13,15 76:12,22
155:13
**represented** 10:13
77:20 104:4
215:13 241:13
**representing** 14:1
18:15 102:10
**represents** 253:2
**Republica** 106:8
**request** 7:16 18:5,9
153:10 176:10
177:1,12,15 178:2
252:19 253:7
256:17 259:5
**requested** 176:20
177:3,17 263:3
264:10 270:4
**requesting** 150:4
**requests** 259:19
**require** 35:17,19
111:1 242:5
**required** 41:17
246:19
**requirement**
246:17
**requirements**
149:17
**requires** 76:3
**research** 109:1
110:20 114:16
236:9,13
**reside** 12:10,12
**resided** 83:3 148:17
149:16
**residents** 109:15,18
109:19,21
**resolution** 196:15
**resolved** 201:9
**resonance** 124:18
**respect** 56:8 79:5
126:9 135:10
138:9,11 161:7,22
181:18 238:4
256:21 280:13
**respective** 2:19

**respond** 77:18
263:19 265:15
**responded** 36:10
**responding** 166:7
265:19
**response** 17:8 27:4
269:12
**responses** 14:19
**responsibilities**
26:21 27:5 29:13
37:14
**responsibility** 25:6
**rest** 166:22
**restore** 59:9 71:2
**result** 31:10 154:4
203:13
**results** 113:19
169:3,4
**resume** 9:15
**resumed** 36:19
**Retired** 193:15,16
**return** 150:2
151:20 152:22
154:1 175:13
**returning** 148:17
**review** 30:21
120:10 122:10
123:20 124:5
145:1,5 146:19
147:1,2,7,15
148:3 172:11
178:22 198:16
224:16
**reviewable** 245:9
**reviewed** 14:13,22
17:10,12 147:10
**reviews** 87:15
**revoke** 74:11 75:1
75:19 76:4
**Rich** 47:11
**ridiculous** 112:19
**right** 9:11 10:18
14:2 23:22 28:1
43:1 47:20 51:13
52:14 67:19 68:2
68:3 87:22 106:15

120:5 121:13,22
124:13 126:16
142:8,20 144:17
147:21 152:3
154:22 179:21
183:9 184:5
189:15 193:13
197:1 203:19,20
206:6 207:11
211:16 226:13
234:6 247:13,17
251:5 258:18
259:14,15 265:10
265:21 267:18
273:13
**rigorous** 97:2
**ring** 79:9 261:8
**Rob** 77:22 78:6
79:20
**Robert** 77:21
171:16
**Rodriguez** 4:11
90:1,9 93:5 94:1
**Rodriguez's** 91:16
92:5
**role** 37:11 60:3
116:7 119:3 122:1
125:2,4 138:9,12
144:4 181:2
183:14 198:5
203:3 223:18
224:1
**roll** 106:10 108:1
**room** 15:17 16:7
186:2 193:22
196:20
**rotate** 23:1
**roughly** 22:21
24:22 25:1,3
28:19 81:3 159:1
223:6,14 261:16
277:22
**route** 168:22
**routed** 178:21
**routine** 133:5,9
**roving** 199:11

**Rule** 54:14,20
111:13 114:2
**run** 86:18,22 216:6
258:11
**Russo** 1:17 7:20
285:2

---

**S**

**S** 4:1 7:1
**Sabrina** 7:7
**safety** 148:18
**Saget** 1:3 7:7
**Salvador** 195:4,13
**Saturday** 33:7 62:6
**saw** 108:12 109:3
123:5 207:4
**saying** 75:13
100:20,21 105:11
105:18,20 211:11
211:22
**says** 21:8 32:1,11
33:11 59:7 70:8
70:22 74:8 82:8
82:19,20 94:6
142:4 143:18
146:7,18 147:9
148:6,12,19
149:10,19,22
168:15 172:20
183:12 193:10
194:1,22 195:1,8
195:18,19 196:1
199:7 208:17
209:2 210:5
213:17,21 214:3,6
214:13 218:4
223:2 226:13
227:19,21 229:13
231:3 234:7,20
237:14,15,17
239:2,16 243:21
249:10,19 252:8
252:13 256:18
260:12 262:2,21
264:9,21,21 267:2
267:7,16 268:11



268:22
**scan** 14:18 217:17
**scheduled** 32:16
214:5
**school** 9:22 10:11
22:3,11 274:13
**Scialabba** 89:14
**scope** 111:12
112:11
**seasonal** 239:19
240:2
**second** 31:9 34:4
59:6 108:4 144:12
145:2,16 166:19
173:3 181:16
195:9,12 205:15
206:17 214:12
217:3 237:1 249:5
249:5 262:20
268:18
**secretary** 26:13,15
26:16,22 27:1,3,6
28:1,4,13,21,22
29:2,4,6,10,14,17
29:17 35:6,13,22
36:7 38:16,18
39:6,7,9 66:3
74:10 75:1 76:3
85:21 87:9,14,22
88:3,10 90:21
91:18 101:13,17
105:5 116:10
118:4 119:10,17
120:10,13,14,16
120:18 121:2,8
122:8,9,14,20,21
123:22 126:2
137:3 141:22
142:10,14 144:19
148:4,6,21 150:20
151:8 156:3,9
164:18 165:5,19
165:20 167:4,5
170:18,18 175:10
175:10 185:10
188:4,11 193:11

195:5 200:2,4
216:11 218:11,14
219:17 220:1
224:11 235:14,18
242:6 243:12,15
245:8 246:19
252:4,9 253:12
254:2,7,15,18
255:3,6,7 257:3
257:10,12 260:13
267:8 270:3,7
275:6 276:7 278:3
278:4
**secretary's** 22:15
116:8 202:9 242:1
245:7 252:19
253:7 265:18
**section** 5:18 17:13
65:17 70:17 76:9
81:19 82:8,17,18
104:22 144:12
145:1,8,17 147:8
147:13 194:20
224:16,18 239:9
242:14 243:6
273:17
**sections** 273:4
**sector** 237:16
**security** 3:18 7:9
8:13 13:12 22:13
23:2 26:13 29:3
34:18 35:6 37:18
37:19 38:5,8
39:15,19 40:4
41:5,7 45:14 47:5
47:7 66:4 74:11
87:10,22 91:4
127:13 161:4
181:3 185:16
193:12 195:6
200:3 223:22
226:20 248:2
267:10
**see** 17:21,22 18:5
32:12 33:19,20
58:16 59:3,11,12

59:20 63:2,12
69:13 73:20,21
74:15,16 81:22
82:3,4,14,15
91:14 93:20,21
99:2 101:5,10
104:17 107:21
108:8 115:18
117:16,22 118:7
123:2 126:17
137:4,4 138:16
141:11,20 142:3
144:18,21 145:20
146:1,7,20 156:4
158:10 164:8,9,21
166:14 167:12,13
169:1 171:15
173:3,8,15,16
174:13,14,19
180:2 183:2,6
194:6,10,13
195:12 197:5
199:19 200:20,21
201:5,6,7 202:11
202:12 208:16
209:3 213:11
214:15,16 216:14
216:16 217:6,21
224:3,13 227:14
227:15 229:1,7,8
229:21 232:6
233:4,17 234:19
238:18 239:1,8,14
241:11 242:17
243:9 244:9 252:1
258:3 264:12
266:14,16 268:19
268:22 269:9,10
270:13,14 273:5
273:18,19 279:5
280:5 281:12
**seeing** 31:4 171:12
179:8 183:5
202:18 220:7
224:4 226:10
231:13

**seek** 255:2 276:1
**seeking** 254:11
256:3 272:14
275:18 281:1
**seemingly** 244:17
**seen** 21:7 31:2
73:22 80:1 106:11
124:2 171:10
202:17 206:21
215:5 219:10
222:2 265:8
**segment** 208:16
**selected** 241:19
**self-serving** 93:2
**Sen** 132:2
**senate** 29:1 89:1,6
89:6,8
**senator** 23:18
24:11,12 25:2,13
25:16 30:8 42:4
67:6 78:8,18 79:3
84:8 106:7,14
107:9
**send** 170:6 218:10
**sends** 218:14
**senior** 26:2,12,21
29:9,16 35:5,12
35:21 36:6 57:10
66:3 168:3 200:1
**sense** 71:22 75:7,16
119:6 126:16
133:13 274:12
281:21
**sent** 14:18 123:21
216:14 250:19
251:1 260:4
269:16 275:18
**sentence** 34:1,4
93:13,22 199:21
241:12 244:5
247:14 249:5,12
251:17 264:5,8
**sentences** 167:7
**sentiments** 176:7
**separate** 210:3
270:7

**September** 162:12
162:14
**series** 61:19 206:10
224:22
**serve** 29:8 70:20
84:20 85:3,17
86:5,7,11,14
**served** 85:9,16
116:9
**Service** 109:1
110:20 114:16
**Services** 1:20 7:19
7:20 41:3 241:18
**serving** 35:5
**session** 16:1,3,8
17:3 208:17
**Sessions** 23:19
24:11,12 25:2,13
25:16,19 30:9
42:4 67:6 78:8
79:4 84:8 106:7
106:15 132:3,8
191:19 197:15
205:3 209:2,12
211:2,20
**set** 75:11 153:19
257:20
**sets** 241:22
**settlements** 229:19
**seven** 237:5
**share** 108:19
120:19 183:18
207:22
**shelter** 82:11
**shelters** 231:7
**shenanigans** 55:8
**shocks** 249:9
**shop** 27:18 31:15
107:14 271:8
**short** 36:19 101:21
115:8,16 159:16
206:1 283:2,7
**shorthand** 211:6
285:7
**shortly** 32:15
**show** 84:17 167:10



262:3 277:1
**showing** 251:20
**shown** 163:22
164:6
**shows** 129:20
**shrank** 108:16
**Shumate** 3:16 8:9,9
**sic** 19:17 101:14
**side** 137:19
**sign** 217:16
**signal** 196:14
**signature** 267:7
**signing** 133:22
134:1
**signs** 217:17
**silly** 260:2
**Similarly** 274:5
**simple** 36:4
**simply** 52:1 53:14
110:16 152:17,20
153:2 154:12
176:8 201:20
241:5 261:14
**single** 35:19 103:8
**singular** 120:1
**sir** 9:1 11:1 44:1
53:13 95:2,12
115:2 148:20
150:19 156:8
157:9 170:2 207:6
210:14 225:16
233:7 237:8
239:22 240:8
281:18
**sit** 36:5 86:10,13
179:4 211:14
244:21 247:11,17
271:2
**site** 58:15,18,21
59:21 81:6,9,11
81:19 82:17 83:22
197:12
**sites** 227:12
**sitting** 10:17 236:7
236:21 271:22
**situation** 38:12

86:9 124:8 182:21
186:1 193:22
196:20 225:4
226:20 234:22
236:5 254:14
**six** 146:10 149:1
150:10,22 151:9
154:21 155:1
279:1,21 280:6
**sixth** 199:16
**six-month** 149:21
**skip** 251:17
**Skipping** 268:21
**slip** 137:5
**slow** 168:19
**small** 134:7,8
184:18 193:19
215:14,21 251:15
**Snell** 3:15 8:7,7
**snippet** 115:16
**solicit** 268:15
**somebody** 73:4
245:15 255:4
258:17
**something's** 241:13
**somewhat** 70:12
**sooner** 52:16
**sorry** 28:12 39:13
77:18 79:14 109:6
155:9 165:20
173:4 193:16
278:19
**sort** 279:11 282:3
**sought** 255:14
256:21 260:5
261:7 280:1,13
**sound** 152:3
**sounds** 66:1 68:2,3
84:22 119:13
121:22,22 124:13
220:11
**source** 34:11
**sources** 32:1 33:13
**South** 3:4
**space** 14:12
**spans** 110:9

**speak** 88:17 109:19
123:6 168:11
230:4 240:7 250:1
282:13
**speaker** 279:8
**speaking** 61:12
100:11 137:7
150:12 219:5
**speaks** 149:3
241:10 244:15
247:6
**Special** 73:17
**specific** 66:22
75:17 94:20 97:3
100:3,5,13 107:19
111:2 114:5
120:11 122:13
124:3,14 125:11
125:15 126:9
137:16 144:7
145:21 151:10,11
157:2,17,20 162:3
163:7 168:9
170:20 174:5
175:5,15 178:13
179:12 181:14
187:4 188:1 189:1
189:3,6,12 190:17
192:6 198:7
208:12 211:5
212:1 247:14
254:13 256:17
257:20 260:8
261:20 270:19
274:21
**specifically** 57:20
67:10 68:4 80:16
101:1 110:19
121:21 123:18
125:9 126:5 130:2
130:18 131:3
132:11 134:14
136:8,21 137:21
144:10 147:12
152:9 155:16
156:6 178:6 179:9

183:5 184:6 188:9
189:5,7 211:19
212:5 220:5,12
236:20 248:12
253:15 255:18
260:12 279:13
**specifics** 14:17
153:17 162:18
163:13 181:7
**spectacle** 259:1,6
**spectrum** 78:17
**speculate** 88:18
**speculation** 86:8
188:15 219:4
256:1
**speech** 27:16,17
191:20 192:3,7
197:4,5 198:6,9
198:15 205:3,3,5
212:13
**speeches** 27:15,20
27:21 198:10
**spell** 19:16
**spent** 25:1
**spoke** 98:19 273:9
**spoken** 15:7 134:6
**spokesman** 262:22
263:16
**spring** 76:17 78:2
79:15 89:21
**squarely** 104:11
**staff** 28:6,10,14
32:3 38:21 39:2
47:12 107:12,15
126:6,22 133:19
139:2,7 188:10
193:12 270:5,8
**staffer** 25:6 33:16
34:5,12,16 106:21
**staffers** 78:12
**stakeholders**
267:22
**stamped** 101:3
**stand** 64:15,17 72:8
115:19 118:15
**stands** 22:6 72:11

111:20
**start** 51:19 89:4,6
116:4 137:10
169:14 186:19
199:6 258:1,1,5
**starting** 23:15
278:15
**starts** 108:6 144:12
194:14 199:6
**state** 7:21 9:2
276:18
**Statecraft** 19:19
**stated** 94:6
**statement** 34:11,13
70:11 84:22 93:2
93:22 99:17,19
100:18 229:9
**statements** 99:20
102:3 237:22
263:14
**states** 1:2,6 3:9,9,16
3:17 7:9 10:8 12:2
41:2 57:12 66:15
82:22 84:20 85:3
111:9 112:7 136:3
149:14,18 151:13
152:14 153:20
155:11 256:9,10
260:15,16,22
261:2
**status** 65:12 82:19
135:6,10 143:14
149:1 150:9,22
161:1 193:20
195:3 196:11
223:4 262:7 263:6
**statute** 17:15 65:15
65:16,17,20 69:1
75:11,14,22 76:2
76:3 81:2 83:21
87:9,21 88:8
91:19 92:9 94:2
95:1,3,13 97:5
103:15 142:10
154:19 178:14
242:5,13 243:2,4



243:13 245:10
**statutes** 260:9
**statutory** 75:17
    85:22 151:7
    178:12 181:2
    269:7 271:15
**stay** 23:12 83:1
**stays** 113:3
**step** 104:14 157:8
    249:17
**Stephen** 25:10,17
    26:2,6 44:6,8,20
    45:10 69:16
    103:21 104:4
    105:18 129:6,9,13
    129:21 130:8
    185:10
**steps** 249:17
**Steve** 131:6,8
**stipulated** 207:7
**stomachs** 159:7
**stood** 161:7,22
**stop** 239:21
**stopped** 190:8
**stopping** 282:22
**strange** 71:20
    282:11
**Strategic** 267:8
**Street** 2:6 3:10 7:15
**strike** 113:1 115:3
**strong** 175:12
**Studies** 77:1
**study** 111:2 281:19
    282:3
**studying** 66:21
**stuff** 221:4 281:16
**stumps** 209:10
**styles** 257:8
**subcommittee**
    24:13,15,16 67:10
    67:14,18 68:10
**subcommittee's**
    68:6
**subject** 40:9 62:11
    62:12 77:12 79:11
    128:18 172:18

173:10 181:12
186:17,22 187:2
189:10,13 191:17
201:22 213:15
215:22 218:1
230:17 235:6
248:9 251:7 255:9
262:10 266:20
268:10 272:14
**subjects** 106:22
220:3 283:1
**submissions** 178:17
**submit** 178:16
**submitted** 11:14
213:7
**subparagraph**
243:18
**SUBSCRIBED**
286:19
**subsection** 100:3,5
100:8 260:8,10
**subsections** 94:22
**subsequent** 44:14
44:18 91:2
**subset** 216:1
**substance** 15:4
133:17 134:7,9
192:12
**substantial** 230:21
231:6
**substantive** 134:10
**succeed** 11:3
**succeeded** 28:21
36:16
**successfully** 231:22
232:7,16
**suggested** 152:2
**summary** 214:21
**summer** 139:21
**summers** 22:4
**Sunday** 33:8
164:12 166:9
173:5,6
**superfluous** 113:2
113:4
**supervises** 129:21

**support** 174:11,16
196:14
**supported** 195:16
**suppose** 128:12
264:17
**supposed** 98:13
245:9
**supreme** 54:15
232:12 233:2
**sure** 24:3 35:8
43:19 54:7 56:7
69:12 74:2 77:6
79:21 81:10 86:1
127:11 143:11
161:17 166:21
167:14 180:17
209:4 215:16
222:20 228:19
240:12 264:16
265:11 273:12
275:16
**surprise** 65:8
**surrounding** 181:6
268:2
**survey** 110:20
114:15
**suspected** 239:21
244:6
**swear** 8:16
**switch** 30:6
**sworn** 8:18 133:19
285:6 286:19
**Symons** 41:13
47:10
**system** 59:9 71:3
146:15,15 196:4
196:11
**systems** 256:5
**S1** 101:9,12,17,19
101:21 251:10
273:16 274:8,10
274:11,15 281:12
**S2** 281:12

_____
**T**
_____
**T** 4:1,1

**take** 24:3 30:20
32:8 37:8 56:9
59:13,17 61:20
67:15 89:15
104:14 115:4
144:22 159:4
172:10 187:16
189:16,19 190:8,9
190:9,11,12
205:14,19 212:11
221:22 224:15
254:5 278:7
281:21 283:2
**taken** 7:14 115:8
159:16 202:9,14
206:1 283:7 285:3
285:7,13 286:4
**takes** 139:5
**talk** 19:9,10,11
21:19 87:5 116:7
119:3 134:7,8
138:22 160:5
166:11 211:20
247:13 263:17
272:5
**talked** 11:9 60:19
61:4 69:15 117:19
117:20 119:8,12
125:16 155:21
156:2 160:19
170:13 171:19
175:18 191:7
204:17 212:3
228:11
**talking** 14:5 30:18
63:4 69:10 98:5
104:17 115:14
139:20 163:6
172:14 179:14
193:3 202:15
266:22 267:13
271:22 274:2
275:3,5,15 278:1
279:22
**talks** 147:6 225:17
**tax** 281:22

**Taylor** 38:17 39:1
39:18 40:2
**team** 15:14 41:20
42:8,12,15 44:7
44:12,17 45:8
47:20,22 48:7,8
48:19 56:5 58:19
60:8,12 62:19
69:8 72:2,12
**technically** 129:13
129:17 215:13
**Ted** 181:13
**tell** 8:18 49:5,14,17
49:17 52:8 58:13
63:13 68:8 71:15
77:14 78:22 84:5
86:13 96:11
102:12 124:19
127:10 136:21
157:1 162:18
166:13 174:20
186:5 187:6 188:9
204:16,21 207:9
210:17 216:7
221:15 233:8
236:12,20 238:2
245:21 254:7,9
255:5 265:5 266:2
269:17 270:17
272:17 276:18
279:3 280:8
**telling** 114:20
**temporarily** 149:18
260:14
**temporary** 65:11
82:19 100:11,16
148:14 193:20
195:3,14 223:4
231:7 262:6 263:5
**ten** 67:22 132:21
133:10 134:3
**tend** 14:18 141:3
254:5
**tenements** 109:7
**tens** 154:9
**tentative** 160:20,22



tenure 67:15
term 49:10,18,20
  50:1,4,16 51:9
  53:20 54:13 55:10
  55:18,20,21 61:15
  65:7 97:21 98:2
  160:16 214:20,22
terminate 119:18
  126:12 176:22
  181:19,22 195:21
  196:1 222:22
  243:16 255:17
terminating 195:2
  224:11
termination 90:22
  105:12,17,19
  142:11 143:21
  174:12,17 176:11
  176:20 177:12
  182:1 196:5
  222:10 223:3
  243:6
terms 14:5 100:21
  125:13 126:22
  161:8 162:20
  186:12 192:11
testified 8:20 67:21
  76:20 97:19 98:17
  101:12 105:7,10
  116:9 129:11
  132:14 144:8
  160:14 162:10
  176:5 272:10
  273:7,9 277:20
  281:10
testify 13:6
testifying 50:3
testimony 9:13
  11:1,11,15,19
  15:1,5,9,10 17:11
  46:9 61:3 64:16
  64:18 65:1 84:18
  115:16,19 116:18
  118:9,15,18
  128:11 211:16,18
  274:7 276:5,5

281:9 285:4,6,10
  286:4,6
text 172:16 233:20
  239:15
Thank 11:8 16:22
  119:1 169:7
  261:11 277:5,14
That'd 139:13
  188:6,12
thing 53:1 163:12
  225:8 231:3
  256:11 257:22
  274:4
things 14:11 56:16
  87:18 107:13
  119:22 123:9
  133:18 145:11,21
  147:17,22 153:22
  157:14 161:7,21
  168:18 222:1
  228:10,12,14
  236:18 238:7
  241:19 245:2
  246:6,11,13
  252:21 253:6
  255:10 257:14
  258:1 259:13
  281:22
think 11:13,16 18:8
  20:7,13 25:8
  29:15 31:7 32:8
  32:22 33:4 34:8
  34:12,19 35:11,22
  36:17,18 38:2
  39:9 40:20 42:19
  50:7 62:18 63:3
  64:5,17 65:6,13
  65:18 67:11,21
  70:14 72:9,11
  73:4 77:22 79:8
  79:20,20 80:7
  84:15 85:4,9
  86:18 92:7 96:13
  96:13 104:15
  112:1,13 118:14
  119:8,20 120:12

121:10 123:15
  124:1,6 126:1,19
  127:7 129:15
  131:9 132:10
  133:15 134:12
  138:4,18 139:8,21
  140:10,16 142:12
  143:22 145:1,14
  149:11 154:16
  159:21 160:16
  161:7,21 162:2,14
  163:22 171:21
  173:13 178:8
  179:1 181:19
  184:15,19 186:10
  188:3 191:16
  197:11 199:16
  202:16,18 203:20
  204:17 208:11
  212:2,3,12,13,15
  213:6 214:5
  215:13 222:6
  225:6 228:14
  258:12 260:20
  267:21 276:10,12
  276:14 280:15,18
third 33:12 99:3
  136:16 144:14,16
  145:3 173:4
  200:22 224:10
  226:16 227:17
  232:4 237:1,9
  257:17 262:21
  270:3
thought 55:3,5
  64:19 93:6 271:6
  271:7
thoughts 175:15
thousand 56:2
thousands 154:10
three 20:16 39:3,4
  79:16 83:15 85:22
  94:22 100:12
  149:12 199:4,15
tie 114:17 172:8
  182:4

tight 166:17
time 7:13 22:1 25:9
  25:16 27:14,14
  32:4,8 42:4 43:11
  44:9 45:19 46:2
  48:4,18 61:2
  64:18 65:2 67:4,4
  67:6 68:18,21
  71:14 72:1 78:2
  79:3 83:1 98:14
  101:14 103:20
  104:1,2,3,17,20
  107:10 109:5
  112:2,16 114:14
  114:21 115:7,11
  116:2,4,14 117:19
  118:3 123:8,19
  128:14 132:1
  135:4 139:19,20
  139:21 140:5
  143:1 150:9
  151:19 152:14,17
  152:20 153:3,18
  154:13,17 159:15
  159:19 161:3,6,19
  162:13 163:9
  168:10 174:3,21
  175:2 176:9,14,16
  177:3,9,11,17
  178:3,5,9 179:11
  181:5 185:4,4
  189:14 190:12
  192:9 196:8
  197:20,22 203:6
  205:22 206:4
  209:15 219:2
  222:7 223:12
  225:7 232:19
  234:15 236:14
  247:12 248:17
  253:20 258:22
  259:7 260:3 266:3
  266:3,4,4 271:17
  275:8,12,20
  276:19 278:1,22
  279:11 281:1

283:6,10,12,21
timely 167:5
times 69:8 134:3
  137:4,14 140:19
  140:21 160:15,19
  177:16 208:17
timing 194:2
title 59:3 82:1
today 7:12 10:13
  11:1,18 17:5
  18:17 19:13 30:11
  40:21 64:21 65:8
  71:14 109:14,16
  156:11 183:12
  202:1 214:14
  236:7,11,21
  270:17
today's 15:13 17:11
  214:13 215:6
  216:19
told 32:2 221:10
  265:1,3
Tom 185:10,15
top 58:16 116:4
  171:15 174:9
  185:13 194:19
  217:3 244:5 262:3
topic 191:20 212:3
  212:8
topics 68:8
total 108:18 231:1
  231:2
touch 131:11
  138:16
touched 41:19
  250:10
tough 235:22
town 12:17
TPS 5:15 13:11
  14:14 15:2 17:15
  43:2,19 45:2,11
  61:4,5,5,10 65:7,9
  65:16 66:5,9,10
  66:14,19 67:16
  68:6,12,15,19
  69:1,9,11,18 70:3



70:10,16,17 71:11
71:17,18 74:10,11
74:13 75:1,9,11
76:4 77:13 78:21
79:5 81:2 82:17
82:20 83:4,6,15
83:16 85:9,17
86:11,18 87:6
90:22 91:1,8,19
93:8 94:2,21 95:1
95:3,13 96:7,18
97:5 100:4,8
101:20 102:14
103:5,8,22 104:5
104:19 105:12,17
105:19 110:6,11
110:17,22 111:6
114:18 119:4,22
120:15 121:12
125:1,15 128:19
130:5,10 131:1,12
131:17 132:4,8
134:17 135:6,10
137:12 138:9,12
140:9,13 142:1
143:14 144:19
148:10 149:1,17
149:20 150:1,3,9
150:22 151:12,17
153:10 154:4,5,6
155:21 160:11
161:1 164:19,19
172:19 173:1,11
174:4,6 175:3
176:11,20,22
177:13,20 180:11
180:16 181:4,10
181:12 187:1,4,21
192:13 195:3,16
196:9,10,21 198:1
198:2 202:7
204:11,18 207:18
213:15 218:2
220:16 223:1
224:11 238:21
243:1,4 244:22

249:7 251:7,16,19
252:16 253:8
255:17 256:22
260:9 266:22
267:14 269:6,8
270:4,8,10 271:15
276:1 279:4
280:14 281:2,20
282:7
**track** 256:2
**tracked** 278:17
**Tracy** 36:19,21,22
**tragic** 249:16
**tran** 48:9
**transact** 12:8
**transcribe** 211:15
**transcript** 4:15
  6:22 63:15 99:10
  116:19 191:4
  277:21 286:3
**transcription**
  118:13 285:8
**transition** 6:13
  18:7 19:5,9,14
  20:1,3,5,8,20
  21:10 41:20 42:7
  42:12,15,21,22
  43:3,12,20 44:7,8
  44:11,17 45:8,21
  47:20,22 48:7,8
  48:10,12,13,19
  56:5 57:2,15,16
  57:22 58:19 60:8
  60:12 62:19 69:8
  71:19 72:1,12
  73:17 75:4 196:6
**travel** 13:1 150:4
  153:20
**treat** 125:21
**tremendous** 151:15
  153:1
**trial** 11:11 13:6
  120:5
**tried** 191:12
**trigger** 142:18
  210:11

**triggering** 239:19
  240:2
**trip** 152:10 156:10
  156:14 176:2
**true** 22:2 32:5 44:5
  77:7 81:7 87:9,14
  91:8 93:13 94:7
  140:18 142:9
  148:20 154:14
  191:18 195:22
  218:9 230:1,9
  285:9 286:5
**Trump** 1:5 7:8 18:6
  20:7 41:20 44:15
  45:6 58:19 59:7
  88:16 95:20,21
  102:18,19,21
  103:1,4 116:11
  117:20 140:6
**truth** 8:18,19,19
**truthful** 11:19
**try** 11:1 16:14
  63:10 138:15
  268:3 275:9 283:2
**trying** 16:21 46:7
  55:16,16 73:8
  111:15 114:17,21
  115:1 117:2
  126:16 133:13
  158:9 166:16
  167:3 228:17,20
  228:21,22 275:22
**Tuesday** 263:2
**turn** 191:3 255:4
  257:22 259:1
**Turning** 270:2
**Tweeted** 191:6
**Twitter** 191:6
**two** 12:20 13:2
  20:16,16 24:22
  25:1,4 32:1 44:10
  47:8 57:1 62:3,4
  63:4 64:13 67:22
  74:12 75:2,19
  76:5 102:11
  106:10 132:12

137:18 145:3
148:2 167:7
169:19,21 178:18
179:10 191:18
194:7 195:10
199:4,15 200:21
206:7,16 215:18
222:4 223:6,15
237:21 238:4
249:17 270:18
271:7,10
**two-year** 22:21
  25:4
**Tyler** 3:8 8:5,5
  13:17 16:18 33:22
  35:15 36:9 45:19
  46:6 48:21 49:6
  49:12,19 50:18
  52:3,6,12 53:1,11
  53:17 54:3,11,21
  55:2,4,7 56:13,22
  59:15 60:10 61:7
  61:9 72:20 74:20
  76:6 86:20 91:20
  92:11,14 94:3
  95:7 96:5 103:6
  104:1,7,11 110:8
  111:10 112:9
  113:3,13,17,19
  114:1,8,10 116:17
  116:22 117:3,5,8
  117:12 118:16
  126:7 135:15
  149:2 150:11,16
  159:9,11 161:10
  186:13 200:8
  203:22 205:16,19
  210:18 219:1,19
  230:3,11 235:2
  240:6 241:9 242:9
  244:14 246:3
  247:5,21 249:22
  250:7,9 264:3
  272:19 276:4
  281:4 283:14
**type** 56:11 129:10

133:6,9,11 163:12
167:9 168:7,22
235:20 255:14
256:2 275:10
279:22 282:6
**types** 87:17 133:12
**typical** 184:12
  216:10 223:9,12
  268:2
**typically** 98:15
  121:14,18 122:12
  123:20 124:10
  157:3 167:17
  187:13 198:15
  215:9 265:21

─────────────

**U**

**UC** 82:8
**Uh-huh** 58:17 77:2
  125:14 181:17
**ultimate** 87:20
  125:14 181:17
**ultimately** 80:6
**unable** 11:18 53:15
  53:18
**unaware** 161:4
**unconstitutional**
  70:6
**underlying** 111:2
**underscored**
  210:12
**undersecretary**
  140:1
**understand** 11:2,4
  46:8 49:11,18
  50:16 51:9,20
  52:10 53:6,13,19
  56:19 83:10 99:14
  117:3,5,8 120:4
  127:11 146:22
  149:6 160:18
  167:15 170:8
  172:22 200:5
  215:7 218:5
  269:15
**understanding**
  16:15 20:4 55:19



79:20 88:14
140:11 142:13
149:9 150:19
165:17 215:19
224:1 263:11
270:9
**understood** 154:12
179:16
**unfair** 92:14
110:12 112:10
**unfortunate** 258:19
262:14
**United** 1:2,6 3:9,9
3:16,17 7:9 12:2
41:2 57:12 66:15
82:22 84:19 85:3
111:9 112:7 136:3
149:14,18 151:13
152:14 153:19
155:11 225:19
227:4 256:9,10
260:15,16,22
261:2
**universe** 137:8
**unobjection** 85:6
**unobjectionable**
85:5,7
**unprecedented**
109:11
**unrelated** 95:4,14
96:2,19
**unsafe** 229:18
**upcoming** 161:8
174:3 207:18
**updated** 131:5
150:4
**updates** 14:10,11
130:9,11
**urgent** 82:12
**usage** 269:5
**USC** 65:19 243:6
**USCIA** 41:9
**USCIS** 4:10 40:12
40:20 41:9 45:16
47:6 81:19 82:2,8
82:20 88:4,12,21

97:17 119:10,16
120:9 123:12,21
124:11,20 125:7
125:11 139:3,10
170:9,18 172:14
218:6,9,10 238:19
246:16,17 259:14
270:4
**USCIS's** 125:2
**use** 49:10 50:4 56:6
238:8
**uses** 50:4 56:2
**Usually** 65:11
120:21
**uttered** 274:18
**U.S** 8:12 22:8
110:17 179:15
241:17 267:9
271:12 274:14
**U.S.A** 77:3
**U.S.C.A** 5:18

—————————
**V**
**vacuum** 120:2
**vague** 13:17 35:16
35:18 48:21 49:6
49:13 52:9 54:4
56:13,22 60:10
72:20 86:20 94:13
96:6 118:16 126:7
135:15 161:10
219:19 258:8
264:3
**vaguely** 119:13
220:11
**varied** 133:16
**variety** 45:17 55:22
56:16 62:9,10
122:4 133:20
136:19 192:5
**various** 13:11 23:1
34:2 93:6 125:17
138:17 148:4
163:1 164:14
165:6,9,13 207:17
248:7,8 254:17

268:16 275:18
**varying** 248:6
**vastly** 91:21 92:15
94:3
**venturing** 204:1
**version** 217:15
**versus** 7:8 63:19
**Vidal** 9:10 63:19
**videographer** 3:18
7:3,18 8:15 115:5
115:9 159:13,17
205:20 206:2
283:4,8,18
**Videotape** 7:5
**Videotaped** 1:12
2:1
**view** 91:16 92:1,3,9
92:9 94:1 95:2,12
96:22 111:7 114:9
114:10 150:7
151:14 175:3,6,7
175:17 199:11
201:16 250:11
275:22 279:20
280:11,18
**viewed** 153:1
**viewpoints** 268:15
**views** 103:1,22
104:5,19,22
162:19,22
**violation** 114:2
**Virginia** 10:9 12:13
**visibility** 122:19,22
**Vogt** 41:15
**Vol** 4:18 5:14
**Vol.90/No** 4:17
**vs** 1:5
**vulnerable** 244:8
246:2 249:8

—————————
**W**
**Wacker** 3:4
**wage** 108:21 109:3
**wages** 109:4
**want** 51:4,10 55:11
55:19 57:18 63:12

68:8 74:5 76:17
78:13,14 84:17
107:5 112:18
114:19 115:13
122:9 127:10
128:10 155:4
168:22 179:11
204:15 213:9
219:13 225:1
234:14 240:12
247:11,11,15
256:11 257:8,22
258:22 259:17
282:15
**wanted** 122:21
138:19 151:12
152:19 153:2,18
154:13 165:6
206:19 207:22
253:13 254:8,9,19
257:10,13,14
258:21 260:7
262:4 275:7
**wants** 50:2 101:22
209:20 251:15
254:6
**War** 268:22
**warned** 209:22
**warranted** 148:22
150:9 151:1,2
152:19 226:22
**Washington** 1:13
2:7 3:11 7:16 10:3
12:4,10 197:17
**wasn't** 36:17 61:5
73:5 120:1 151:2
186:8 219:10
226:22 229:1
241:15 255:20
**waste** 112:2,16
114:14 234:14
**wasting** 114:21
**wave** 108:7,11
109:11
**way** 21:17 50:3
51:13 77:15 102:1

112:11 143:15
156:17 162:20
164:15 165:11
166:10 169:18
179:17 193:14
217:11 221:19,22
238:1 245:16
251:6
**Wayback** 59:1
**ways** 86:4
**weak** 146:15
**web** 58:15,18,21
59:21 81:6,9,11
81:19 82:17 83:22
197:11
**Wednesday** 32:14
32:18 213:12
**week** 30:2 33:4
175:1,1 179:22
251:20
**weekend** 170:7
220:9
**weeks** 12:21 13:2
222:5
**weigh** 263:18
**weighed** 136:17
**weighing** 136:18
**weighted** 173:13
**welcome** 151:14
**welfare** 253:4
**went** 122:11 155:16
183:19 230:15
251:5
**weren't** 73:12
147:13 221:16
241:20
**Westlaw** 243:3
**we'll** 126:17 181:15
241:2
**we're** 63:4 65:9
119:7 125:13
139:20 168:5
169:19 200:17
202:14 204:8
236:3 245:12
250:3,5 271:22



272:2 282:19,22
**we've** 40:1 60:19
125:16 172:14
175:18 193:3
206:16 235:5
259:8 265:8
275:14,14 278:1
279:22
**whatever's** 14:18
**whatsoever** 112:22
246:10
**White** 28:14 32:13
33:17 34:6,17
126:6,22 131:7,9
165:10 168:3
181:12 184:17
185:17 187:13
192:10 193:2,22
194:3 196:20
202:10 207:13,18
213:22 215:11,12
216:6,22 218:21
222:2
**WHO.EOP.gov**
165:14
**wide** 103:6,18
**Wide-open** 96:5
**willing** 19:2
**withdrawal** 226:3
**withdrew** 225:19
**witness** 8:16 13:18
35:17 36:10,11
48:22 49:7,14,20
50:2,6,9,13 51:2,3
52:4 53:3,18 54:5
54:12 55:17 56:14
57:1 59:17 60:11
61:8 72:21 76:8
86:21 92:4,16
94:5 95:9 96:7
103:7,11 104:3
111:17,21,22
112:13 113:7,11
114:3,11,13 117:1
118:17 135:16
149:11 150:12

159:6 161:11
169:7 200:10
205:14 219:7,9
222:11 230:14
235:5 240:9,15
241:11 242:11,14
242:16 244:19,20
246:5 247:8,10
248:1,5 261:11
264:4 277:5,14
281:6 282:20
283:13 285:4,6,10
**witnessed** 108:21
**witnesses** 15:1,8,8
**witness's** 113:2
**Wolf** 38:17,21
39:18 40:2 188:12
188:13
**wonderful** 10:17
153:22
**word** 72:11 82:2
209:10,13
**wording** 100:8
**words** 146:17 238:6
238:6
**work** 28:3 43:19
44:6,10 48:19,20
48:22 49:3,8,10
49:15 50:9,14
51:9 52:2 53:20
54:1,6,10,20
55:20 56:4,5,11
56:14,20 57:3,20
66:5 123:12
129:21 142:17
162:17 183:16
204:2 205:3
221:13 223:21
230:16
**worked** 21:10
25:18 28:8,9 44:8
48:11,12 57:3,4
60:17 61:5 67:6
106:14 116:16
120:22 259:9
**workers** 70:21

**working** 25:13
27:22 30:8 42:3
42:20 43:3 48:9
123:8 158:21
162:6 163:4 166:9
209:7 232:11
**works** 26:6 79:21
97:16
**worried** 262:16
**wouldn't** 19:6
71:21 123:4 151:3
172:5 182:1
237:22 265:2
**write** 137:3 167:6
251:9 256:16
257:17
**writer** 27:17,17
**writers** 198:10
**writes** 101:19 170:5
173:10 174:10
193:18 217:14
267:12
**writing** 120:20
121:9 175:21
176:1
**written** 11:14 70:15
178:17 219:2,11
**wrong** 68:9 127:10
201:17 204:16
244:18 277:10
282:20
**wrote** 99:22 100:18
191:5 205:5
278:16
**www.greatagain....**
58:15
**www.MagnaLS.c...**
1:22

––––––––––––––
**Y**
––––––––––––––
**yeah** 9:13 25:3
26:10 33:5 39:16
63:18 77:6 80:7
116:22 117:5
118:22 143:2,22
155:12 156:22

164:12 180:7
199:6 202:2
205:16 226:13,14
227:7 228:22
239:6 250:8 266:1
**year** 9:11 24:22
140:15 197:20
199:18,22 200:11
226:6
**years** 25:1 57:2
63:4 64:13 68:1
81:3 102:12
153:15 270:18
271:7
**Yep** 141:19 158:20
194:11,17 226:19
232:6 250:17
252:5 262:9 267:5
**yesterday** 15:15,20
15:21 17:13 19:8
81:21
**yesterday's** 16:3
**yes-or-no** 104:15
188:21
**York** 1:2 7:10
12:20 109:17
**Yorker** 191:15
**you-all's** 159:6

––––––––––––––
**Z**
––––––––––––––
**zero** 224:1

––––––––––––––
**0**
––––––––––––––
**00002736** 163:21
**00003698** 171:7
**00026652** 169:12
**00033469** 182:14
**02** 278:16

––––––––––––––
**1**
––––––––––––––
**1** 7:5 70:2 109:15
109:16 116:5
117:17
**1st** 213:12
**1-12-16** 4:14
**1.7** 234:5

**1/3/19** 286:4
**1:14** 159:19
**10** 70:2,19 71:5
101:4 109:13,17
185:2
**10-point** 59:8,14,20
60:1,6,9,15 69:20
71:2
**10-15-18** 5:8
**10-20-17** 4:15
**10-22-17** 4:20 5:3
**10-25-17** 4:22
**10-27-17** 4:8
**10:00** 193:21 214:6
**106** 4:14
**11** 115:22 118:21
**11-20-17** 5:5
**11-3-17** 5:6,13
**11:00** 184:11
**11:30** 115:7
**11:43** 115:11
**1100** 3:10
**117** 4:15
**119** 194:8
**12** 5:14
**12th** 106:6
**12-month** 196:5
**12:27** 159:15
**12:30** 159:3
**1254** 65:19
**1254a** 5:18
**1254a(b)(3)(B)**
243:6
**127** 194:13,19
**129** 194:15 195:11
**13th** 32:3
**131** 194:16
**132** 4:7 30:12,17
**133** 4:9 58:8,12
69:21
**134** 4:10 81:12,17
**135** 4:11 90:3,8
**136** 4:12 97:6,10
101:3 272:18
**137** 4:14 106:1,5
**138** 4:15 117:10



**139** 4:16 141:6,10
**14** 108:13,16
**140** 4:18 143:4,8
  144:6 225:2 226:8
  226:12 227:17
  236:22
**141** 4:16,19 163:15
  163:19
**142** 4:21 169:5,10
**143** 4:18 5:2 171:2
  171:6
**144** 5:4 182:6,10
**145** 5:6 192:15,19
  207:12 214:1
  215:11
**146** 5:8 197:7,10
**147** 5:9 205:10
  206:10 207:10,14
  208:22
**148** 5:11 205:12
  206:13 209:1,8
**149** 5:12 213:1,5
  214:8
**15** 74:6
**15th** 197:17
**150** 5:14 222:12,16
  223:20 225:11
  232:4 240:5
  245:17 247:4
**151** 5:15 238:9,14
  244:1 245:16
  247:3 249:2
**152** 5:18 242:19,22
  260:10
**153** 5:19 250:12,16
  262:11 276:17
**154** 5:21 261:9,14
  262:21 264:2
**155** 6:2 266:7,11,11
**156** 6:3 115:22
  116:4 117:14,17
  277:3
**157** 6:5 277:12,17
**16** 74:6 106:15
  206:12
**163** 4:19

**164** 4:17
**169** 4:21
**17** 129:12 190:7
  240:16
**17,000** 230:20
  231:6
**171** 5:2
**18** 64:2 141:3,4
  142:1 154:19,20
  177:5,6 178:10
  181:19,21 182:2
  230:10 241:6,12
  245:2 246:6
**18th** 222:18 224:20
**18-cv-01599-WF...**
  1:4 7:11
**18-month** 153:16
  154:15
**18-page** 246:17
  247:12
**180** 129:11
**182** 5:4
**184** 128:5
**185** 128:5
**186** 129:12
**1880** 108:6,11
**19** 129:12 277:22
  279:11
**19th** 279:12,20
  280:12
**192** 5:6
**1920** 108:6,11,15
**1945** 109:1
**1965** 109:9
**197** 5:8
**1970** 108:15 109:2
  109:14
**1970to** 109:14
**199** 63:22
**1990** 65:20
**1999** 2:6 7:15

---

**2**

**2** 102:13 229:5
  231:1,2,14,16
  244:12 278:11

  280:4,5
**2:02** 205:22
**2:09** 206:4
**2:45** 217:13
**2:46** 217:11
**20** 23:15 63:18 64:2
  81:1 90:16,16
  182:16
**20th** 24:20 46:16
  66:2,19 76:13
  85:8 86:17 92:10
  111:8 112:5
  140:17 182:13
  183:8,13,22 184:9
  185:3 222:5
  266:18
**2000** 101:14
**20001** 3:11
**20006** 7:16
**2002** 87:11 181:3
**2010** 10:1 22:11
  140:16 232:8
  234:6 249:7,13
**2011** 148:9 239:18
**2012** 22:19 23:5
**2015** 23:13,15 25:5
  141:18 233:6
**2016** 42:1 59:2
  106:7 146:6 234:6
  239:20 244:7
**2017** 5:16 6:13 9:12
  24:20 25:5 26:12
  26:17 28:18 30:3
  30:18 39:10,12
  46:16 63:17,18
  66:2,19 73:16
  76:13,17 78:2
  79:16 81:1 84:14
  85:8 86:17 89:21
  92:13 98:21
  102:11,13 103:4
  111:8 112:6 138:8
  139:21 140:7,17
  142:2,19 143:17
  145:13 146:11
  148:22 150:8,20

  152:14 153:8
  156:9 159:1 160:2
  160:9 161:2
  164:13 168:17
  173:6 175:17,19
  176:17 177:10
  182:13 183:8
  190:1,14 193:21
  195:7 213:13,19
  217:9 218:20
  225:5,19 226:4
  232:2,8,14,18,20
  233:9,14,19 234:9
  235:1 236:6
  238:22 250:20
  251:2 257:4,5
  261:16 265:10
  266:18 279:11,20
  280:12
**2018** 105:9 144:20
  158:17 177:21
  178:2 180:12
  197:19 222:19
  224:20 230:2,6
  233:2,10,13 235:1
  236:6 240:4
  244:13 246:22
  248:1
**2019** 1:14 7:12
  196:2 224:12
  286:20
**202-514-2556** 3:11
**2020** 285:22
**205** 5:9,11
**21** 90:14,16,17,19
  109:15
**213** 5:12
**22** 105:10 144:20
**22nd** 105:9 142:2
  158:17 164:13
  168:17 172:2
  173:6 174:22
  177:20 178:2
  180:11 224:12
**222** 5:14
**23rd** 148:9

**238** 5:15
**24** 105:10 166:13
  225:2
**24th** 143:17 145:13
  169:20 170:16
  225:5
**242** 5:18
**244** 17:13 65:17
  70:17 76:9 104:22
  242:14 273:17
  274:9
**25** 81:3
**25th** 32:19 141:18
**250** 5:19
**26** 54:14,20 111:13
**26(c)** 114:2
**261** 5:21
**266** 6:2
**268** 277:21
**27** 30:18
**27th** 32:18 33:1,2
  138:4,8 160:7
  180:2
**275** 278:12
**277** 6:3,5
**292** 105:9
**297** 99:9 273:14

---

**3**

**3** 1:14 145:18
  278:12 280:4
**3rd** 7:12 59:1
  193:21 196:19
  202:15 207:13
  208:10 210:15
  213:19 214:4,9
  216:22 217:9
  218:20 219:18
  220:2 222:3
**3:33** 283:6
**3:41** 283:10
**3:42** 283:21 284:1
**30** 4:7 285:22
**30th** 180:5 185:4
**30(b)(6)** 150:12
**301** 274:8



**31** 192:21
**31st** 152:3 156:8,11
**312-782-0600** 3:5
**38** 163:21 231:5
**38,000** 229:4
  230:20 231:2,17

### 4

**4** 109:17 239:4
**4-7-17** 5:19
**4:30** 217:19
**4:47** 164:13
**42** 109:14
**45** 250:10
**450092** 1:18
**48** 166:13 239:8
**49** 239:5,12,14

### 5

**5** 70:5
**5th** 196:2
**5-20-17** 6:2
**5-9-17** 5:21
**5:00** 184:10
**5:17** 166:8
**50** 244:4
**501(c)(4)** 20:5
**54** 169:12
**55** 229:10 231:5
**55,000** 229:10
  230:19 231:15,17
**58** 4:9

### 6

**6** 168:16 195:7
**6:28** 173:7
**60** 142:11 158:21
**60-day** 142:18
**60606** 3:4
**63** 238:17
**65** 206:15
**66** 5:12 213:8

### 7

**7** 108:13 109:16
  117:17 251:2

**7th** 250:20 253:17
  276:17
**7:58** 250:20 253:19
**70** 182:14
**71** 3:4
**77** 270:2
**78** 266:12

### 8

**8** 5:18 65:19 115:22
  118:2,21 243:5
**81** 4:10
**82.5** 109:4
**82/No** 4:18
**83/No** 5:14
**866-624-6221** 1:21

### 9

**9** 4:3 261:15 274:6
**9.6** 108:17
**9:15** 193:21 214:6
**9:45** 1:15
**9:49** 7:13
**90** 4:11 109:3
  273:14
**96** 227:18
**96-66** 213:8
**97** 4:12 6:12 73:14
**98** 227:11,19
**99** 4:18 171:7 213:8

