UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
– – – – – – – – – – – – – – – – – — – – – – – – – – – – – X

PATRICK SAGET, SABINA BADIO FLORIAL,
NAÏSCHA VILME, GERALD MICHAUD,
BEATRICE BELIARD, RACHELLE GUIRAND,          Docket No. CV-18-1599
JEAN CLAUDE MOMPOINT, YOLNICK JEUNE,
GUERLINE FRANCOIS, LEOMA PIERRE,             (Kuntz, J.)
HAÏTI LIBERTÉ, and FAMILY ACTION            (Tiscione, M.J.)
NETWORK MOVEMENT, INC.,

                              Plaintiffs,

          v.

DONALD TRUMP, President of the United States of
America, UNITED STATES OF AMERICA,
DEPARTMENT OF HOMELAND SECURITY,
KIRSTJEN NIELSEN, Secretary of Homeland
Security, and CLAIRE M. GRADY, Acting Deputy
Secretary of Homeland Security,
                              Defendants.
– – – – – – – – – – – – – – – – – — – – – – – – – – – – – X


**THE GOVERNMENT'S RESPONSE TO
PLAINTIFFS' AMENDED PROPOSED
FINDINGS OF FACT
AND CONCLUSIONS OF LAW**


                         RICHARD P. DONOGHUE
                         United States Attorney
                         Eastern District of New York
                         271 Cadman Plaza East
                         Brooklyn, New York 11201


March 1, 2019

JOSEPH A. MARUTOLLO
JAMES R. CHO
Assistant U.S. Attorneys
      (Of Counsel)

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................... iii

PRELIMINARY STATEMENT ................................................................................... 1

ARGUMENT ............................................................................................................... 1

    I.     This Court Lacks Subject Matter Jurisdiction over this Action............................. 1

         A.    The TPS statute's preclusion provision bars Plaintiffs' claims. ................. 1

         B.    At minimum, there is no subject matter jurisdiction over the
President....................................................................................................... 7

    II.    Haïti Liberté's Regulatory Flexibility Act Claim Should Be
Dismissed. ........................................................................................................... 8

         A.    Pertinent legal standard................................................................................ 8

         B.    Haïti Liberté does not have organizational standing to bring an
RFA claim. ................................................................................................... 10

         C.    Haïti Liberté also cannot bring a cause of action under the RFA. ............ 12

         D.    Even if the Court were to find that Haïti Liberté has standing,
Plaintiffs' RFA  claim still fails on the merits. ......................................... 13

    III.   Judicial Review of Plaintiffs' Claims Should Be Limited to the
Administrative Record. ....................................................................................... 13

    IV.   Plaintiffs Fail to Prove their APA Claims........................................................... 14

         A.    The Duke Decision did not adopt a new TPS standard of
review.......................................................................................................... 15

              i.     The Duke Decision properly assessed both conditions
related to the 2010  earthquake as well as current
country conditions in Haiti............................................................ 15

              ii.    Plaintiffs fail to prove that the Duke Decision required
notice-and-comment. ..................................................................... 17

         B.    The Department of Homeland Security and the Department of
State followed the proper procedures in preparing their
recommendations and assessments for Acting Secretary Duke's
review.......................................................................................................... 19

              i.     Acting Secretary Duke thoughtfully considered the
information pertaining to conditions in Haiti before
reaching her decision. .................................................................... 20

      ii.     USCIS properly relayed its assessment and recommendation to Acting Secretary Duke. ................................. 22

            a.     USCIS's assessments between December 2016 and May 2017 have no bearing on the validity of the Duke Decision. ............................................ 22

            b.     USCIS used the proper procedures to prepare its recommendation and assessment for Acting Secretary Duke ................................................. 26

      iii.    The State Department properly relayed its assessment and recommendation to Acting Secretary Duke. .......................... 30

    C.     Plaintiffs fail to prove their *ultra vires* claim ............................................. 31

  V.     Plaintiffs Fail to Prove their Constitutional Claims. ............................................. 32

    A.     Plaintiffs fail to prove their Equal Protection claim. ............................... 32

      i.     Plaintiffs cannot show discriminatory animus. ............................ 32

      ii.     Plaintiffs' assertion related to H-2A and H-2B visas is irrelevant and, in any event, lacks merit. ...................................... 37

    B.     Plaintiffs fail to prove their procedural Due Process claim. .................... 39

  VI.    The Court Should Not Enter Permanent Injunctive Relief. ................................. 41

    A.     Legal standards for permanent injunction ................................................. 41

    B.     Permanent injunction is not warranted. ..................................................... 42

    C.     Should the Court find for Plaintiffs, the only available relief is remand ................................................................................................ 46

CONCLUSION ................................................................................................ 48

## **TABLE OF AUTHORITIES**

### **Cases**

*ACE Partners, LLC v. Town of E. Hartford*, 883 F.3d 190 (2d Cir. 2018) ...................................40

*Allen v. Wright*, 468 U.S. 737 (1984) ...................................................................................9

*Amgen Inc. v. Smith*, 357 F.3d 103 (D.C. Cir. 2004) .....................................................3

*Aretakis v. Caesars Entm't*, 16-CV-8751 (KPF), 2018 WL 1069450
(S.D.N.Y. Feb. 23, 2018) ...............................................................................................42

*Arlington Heights v. Metropolitan Housing Development Corporation*,
429 U.S. 252 (1977)......................................................................................................33

*ASARCO, Inc. v. Kadish*, 490 U.S. 605 (1989)................................................................9

*Baker v. Carr*, 369 U.S. 186 (1962).................................................................................8

*Barrows v. Burwell*, 777 F.3d 106 (2d Cir. 2015) ........................................................40

*Baur v. Veneman*, 352 F.3d 625 (2d Cir. 2003)...............................................................9

*Board of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) ....................................40

*Califano v. Yamasaki*, 442 U.S. 682 (1979) .............................................................43, 46

*Cancel v. N.Y.C. Human Resources Admin./Dep't of Social Servs.*,
527 Fed. App'x 42 (2d Cir. 2013)................................................................................40

*Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402 (1971) ............................13

*City of Rialto v. West Coast Loading Corp.*, 581 F.3d 865 (9th Cir. 2009) ...................6

*Clapper v. Amnesty Int'l USA*, 568 U.S. 398 (2013) .................................................9, 10

*Doe 2 v. Trump,* 319 F. Supp. 3d 539 (D.D.C. Aug. 6, 2018).........................................7

*Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) .......................................18

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009)...........................................18

*Fla. Power & Light Co. v. Lorion*, 470 U.S. 729 (1985)...............................................46

*Forschner Grp. v. Arrow Trading Co.*, 124 F.3d 402 (2d Cir. 1997)............................46

*Fort v. Am. Fed'n of State, Cty. & Mun. Employees*, 375 F. App'x 109 (2d Cir. 2010) ..............45

*Garelick v. Sullivan*, 987 F.2d 913 (2d Cir. 1993)...................................................9,11

*Gebhardt v. Nielsen*, 879 F.3d 980 (9th Cir. 2018) ..............................................2, 6

*Gill v. Whitford*, 138 S. Ct. 1916 (2018)...............................................................44

*Good Samaritan Hosp. v. Shalala*, 508 U.S. 402 (1993)........................................47

*Hayden v. Cty. of Nassau*, 180 F.3d 42 (2d Cir. 1999)...........................................33

*Himber v. Intuit, Inc.*, No. 10-CV-2511, 2012 WL 4442796 (E.D.N.Y. Sept. 25, 2012)..........9, 10

*Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) ........................................5

*In re Dep't of Commerce*, 139 S.Ct. 16 (2018) ....................................................27, 28

*Jafarzadeh v. Duke*, 270 F. Supp. 3d 296 (D.D.C. 2017) .......................................31

*Kapps v. Wing*, 404 F.3d 105 (2d Cir. 2015) .........................................................40

*Keene Corp. v. United States*, 508 U.S. 200 (1993) ................................................6

*Knight First Amendment Inst. at Columbia Univ. v. Trump*,
302 F. Supp. 3d 541 (S.D.N.Y. 2018)......................................................................7

*Lewis v. Casey*, 518 U.S. 343 (1996) ....................................................................44

*Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644 (9th Cir. 2011) .............46

*Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992) .................................................8, 9, 11

*Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753 (1994) .....................................46

*Makransky v. Johnson*, 176 F. Supp. 3d 217 (E.D.N.Y. 2016) .................................28

*McKenzie v. City of Chicago*, 118 F.3d 552 (7th Cir. 1997) .....................................46

*McNary v. Haitian Refugee Ctr., Inc.*, 498 U.S. 479 (1991) .....................................6

*Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139 (2010).....................................41

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
463 U.S.29 (1977).................................................................................................3

*NAACP v. Trump*, 298 F. Supp. 3d 209 (D.D.C. 2018).............................................12

*Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7 (2d Cir. 1997) ......................................13

*Nat. Res. Def. Council v. EPA,* 676 F.Supp.2d 307 (S.D.N.Y. 2009) ...........................47

*New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186 (E.D.N.Y. 2008) ...........................43

*Nixon v. Sirica*, 487 F. 2d 700 (D.C. Cir. 1973) ............................................................7

*Nken v. Holder*, 556 U.S. 418 (2009) ....................................................................45

*Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9 (D.D.C. 1998)........................................8

*Okaw Drainage Dist. of Champaign and Douglas County v. Nat'l Distillers and Chem. Corp.*, 882 F.2d 1241 (7th Cir. 1989) ....................................................43

*Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400 (D.C. Cir. 2005) ............................4

*Patchak v. Zinke*, 138 S. Ct. 897 (2018) ...................................................................6

*Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256 (1979) ..............................................33

*Pursuing Am. Greatness v. FEC*, 831 F.3d 500 (D.C. Cir. 2016) ...............................42

*Ramos v. Nielsen*, 321 F. Supp. 3d 1083 (N.D. Cal. 2018) .......................................40

*Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018) .......................................43

*Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ............5, 33

*Roach v. Morse*, 440 F.3d 53 (2d Cir. 2006) ............................................................45

*Saget v. Trump*, 345 F. Supp. 3d 287 (E.D.N.Y. 2018)..........................................2, 47

*Saget v. Trump*, 351 F. Supp. 3d 251 (E.D.N.Y. 2019)..............................................15

*Sepulveda v. Gonzales*, 407 F.3d 59 (2d Cir. 2005) ...................................................5

*Shands Jacksonville Med. Ctr., Inc. v. Azar*, 2018 WL 6831167 (D.D.C. Dec. 28, 2018).........4, 6

*Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26 (1976)............................................9

*Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379 (9th Cir. 1996)...............2, 4

*Spartan Capital Sec., LLC v. Stonbely*, No. 18-CV-6819 (LAK/JLC), 2018 WL 6070001 (S.D.N.Y. Nov. 21, 2018), *report and recommendation adopted sub nom., Spartan Capital Sec., Inc. v. Stonbely,* No. 18-CV-6819 (LAK*)* 2019 WL 95476 (S.D.N.Y. Jan. 3, 2019), ..................................................................42

*Spokeo, Inc. v. Robins*, 136 S. Ct. 1540 (2016) ........................................................8

*State of New York Dep't of Soc. Servs. v. Shalala*, 21 F.3d 485 (2d Cir. 1994) ............46

*Staub v. Proctor Hosp.*, 562 U.S. 411 (2011) ...........................................................34

*Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) ............................................................9, 11

*Treiber v. Aspen Dental Mgmt., Inc.*, 635 F. App'x 1 (2d Cir. 2016) ...............................8

*Trump v. Hawaii*, 138 S. Ct. 2392 (2018)..................................................................33

*U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993).............................................46

*Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775 (2d Cir. 1994)..........................46

*Warth v. Seldin*, 422 U.S. 490 (1975) ..........................................................................8

*Wisconsin v. City of New York*, 517 U.S. 1 (1996) ......................................................27

*Whitmore v. Arkansas*, 495 U.S. 149 (1990) ...............................................................11

*You v. Nielsen*, 321 F. Supp. 3d 451 (S.D.N.Y. 2018)................................................45

## Statutes

5 U.S.C. § 601(4) ...........................................................................................................12

5 U.S.C. § 611(a) ...........................................................................................................12

6 U.S.C. § 557 ............................................................................................................7, 42

8 U.S.C. § 1103 ..........................................................................................................7, 42

8 U.S.C. § 1229a ............................................................................................................41

8 U.S.C. § 1254a ..............................................................................................................7

8 U.S.C. § 1254a(a)(1)(C) ...................................................................................... *passim*

8 U.S.C. § 1254a(b)(1) ..................................................................................................31

8 U.S.C. § 1254a(b)(1)(C) .............................................................................................15

8 U.S.C. § 1254a(b)(3)(C) .............................................................................................29

8 U.S.C. § 1254a(b)(5)(A) ...................................................................................... *passim*

8 U.S.C. § 1254a(c)(1)(A) .............................................................................................44

## Regulations

8 C.F.R. § 214.2(h)(5)(F).............................................................................................39

8 C.F.R. § 214.2(h)(5)(i)(F).........................................................................................39

8 C.F.R. § 214.2(h)(6)(i)(E) .................................................................... *passim*

8 C.F.R.§ 1229a ...................................................................................... 37

8 C.F.R. § 1003 ....................................................................................... 36

8 C.F.R. § 1240 ....................................................................................... 36

## Other Authorities

80 Fed Reg. 72079 ................................................................................... 39

82 Fed. Reg. 44 ....................................................................................... 21

82 Fed. Reg. 59630 .................................................................................. 21

83 Fed. Reg. 2646 .................................................................................... 33

83 Fed. Reg. 2646-01 ............................................................................... 33

83 Fed. Reg. 2647 .................................................................................... 33

83 Fed. Reg. 2654 ................................................................................ 21, 33

83 Fed. Reg. 9329 (Mar. 5, 2018) ............................................................ 21

83 Fed. Reg. 40307 (Aug. 14, 2018) ........................................................ 21

83 Fed. Reg. 43695 (Aug. 27, 2018) ........................................................ 21

<u>**PRELIMINARY STATEMENT**</u>

Pursuant to the Court's January 10, 2019 Order and Rule 52 of the Federal Rules of Civil Procedure, Defendants United States of America, President Donald Trump, the Department of Homeland Security ("DHS"), Secretary of Homeland Security Kirstjen Nielsen, and Acting Deputy Secretary of Homeland Security Claire M. Grady (collectively, "the Government" or "Defendants") respectfully submit the following response in opposition to Plaintiffs' amended Proposed Findings of Fact and Conclusions of Law, Dkt. No. 146-1 ("Pls. Findings").  For the reasons set forth below, the Court should adopt, in full, the Government's Proposed Findings of Fact and Conclusions of Law, Dkt. No. 135 ("Gov. Findings"), reject Plaintiffs' amended Proposed Findings of Fact and Conclusions of Law, and enter judgment in favor of the Government.

<u>**ARGUMENT**</u>

**I.      This Court Lacks Subject Matter Jurisdiction over this Action.**

**A.      The TPS statute's preclusion provision bars Plaintiffs' claims.**

In their amended Proposed Findings of Fact and Conclusions of Law and as demonstrated by the evidence presented at trial, Plaintiffs challenge the decision of then-Acting Secretary of Homeland Security Elaine C. Duke's November 20, 2017 to end the Temporary Protected Status ("TPS") designation for Haiti, effective July 22, 2019 ("the Duke Decision").  *See* Pls. Findings 87 ¶ 1—93 ¶ 14.[1]   Plaintiffs persist in making this challenge despite the express statutory preclusion provision set forth in the TPS statute.

The TPS statute's preclusion provision states that "[t]here is *no judicial review* of any determination of the [Secretary] with respect to the designation, or termination or extension of a

---

[1] Citations to Plaintiffs' amended Proposed Finding of Fact and Conclusions of Law and the Government's Proposed Findings of Fact and Conclusions of Law, respectively, include both page numbers as well as paragraph numbers, if available.

designation, of a foreign state" for TPS.  8 U.S.C. § 1254a(b)(5)(A) (emphasis added).[2]  Provisions of this kind preclude challenges to "the substantive standards that the [decisionmaker] uses" to make the decision and also to "the methods by which the [decisionmaker] adopts those standards." *See Gebhardt v. Nielsen*, 879 F.3d 980, 987 (9th Cir. 2018); *see* Gov. Findings 47—50.  It also bars procedural challenges where "a procedure is challenged only in order to reverse the individual [unreviewable] decision."  *Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996).

In its December 14, 2018 decision, the Court explained that "Plaintiffs here challenge the process of the adjudication and whether an evidence-based determination under the statutory criteria occurred, *rather than the content of the decision*[.]"  *Saget v. Trump*, 345 F. Supp. 3d 287, 295 (E.D.N.Y. 2018) (emphasis added).  Plaintiffs concede that the TPS statute's "prohibition on judicial review of the Secretary's 'determination' with respect to the designation of a country for TPS might prevent the Court from second-guessing factual conclusions as to the statutorily-prescribed questions, made in good faith by the Secretary based on review of the relevant evidence."  Pls. Findings 87 ¶ 3; *see also* Dkt. No. 62 at 13 (Plaintiffs concede that their "claims are barred only if they seek review of a TPS 'determination' under the [TPS] statute.").  Plaintiffs nevertheless insist that they are not seeking judicial review of the Duke Decision itself, but of the "process by which the TPS decision was made."  Pls. Findings 87 ¶ 3.

The trial record, however, shows otherwise.  First, Plaintiffs make the illogical assertion that the Duke Decision is not a decision "at all," and thus, the TPS statute's preclusion provision

---

[2] Although Plaintiffs identify certain portions of the TPS statute in their Statutory Background, Plaintiffs omit any discussion of the explicit judicial preclusion language set forth in 8 U.S.C. § 1254a(b)(5)(A).  *See* Pls. Findings 2—4.  Thus, the Government respectfully requests that the Court adopt the Government's full history and purpose of the TPS statute as set forth in the Government's Proposed Findings of Fact and Conclusions of Law.  *See* Gov. Findings 5 ¶ 14 through 7 ¶ 25.

does not apply.  *See* Pls. Findings 88 ¶ 4.  The Court already rejected this nonsensical claim at trial.  *See* Trial Tr. 647 ("The Court: But are you asking this Court to second-guess the determination that the Secretary made? [Plaintiffs' counsel]: I'm saying the Secretary didn't make one.  The Court: No, they made a determination.  You don't like the determination").  As the Court correctly pointed out, the Duke Decision is indeed a determination.

Next, Plaintiffs argue "that the review process was a sham designed to create a pretext for terminating TPS for Haiti; that in violation of the statute the Secretary improperly excluded from consideration conditions in Haiti that she asserted were not related to the earthquake and failed to provide a reasoned explanation for this new standard; that DHS officials intentionally minimized, omitted, or ignored negative information about country conditions; and that Defendants failed to undertake notice-and-comment rulemaking or to conduct the required analysis under the Regulatory Flexibility Act [RFA]"  Pls. Findings 88 ¶ 4.  But an allegation that an agency "failed to provide a reasoned explanation" or failed to consider certain "country conditions" is a quintessential arbitrary-and-capricious challenge to the agency decision itself.  *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  A bar on all judicial review "with respect to [a] determination" prohibits review of an agency's alleged failure to explain adequately a purported change in the standards the agency employed in making an unreviewable determination.  Similarly, Plaintiffs' claim that DHS failed to engage in notice-and-comment rulemaking or a similar undertaking under the RFA remains barred by the preclusion provision in the TPS statute.  *See Amgen Inc. v. Smith*, 357 F.3d 103, 113 (D.C. Cir. 2004) ("If a no-review provision shields particular types of administrative action, a court may not inquire whether a challenged agency decision is arbitrary, capricious, or procedurally defective.").

Ultimately, Plaintiffs' assertion that the Duke Decision either gave insufficient weight to particular factors or failed to explain its decision are fundamentally challenges to the Duke Decision itself, and are not challenges to a collateral procedure or practice.  That is also clear from the relief Plaintiffs seek: as discussed further, *infra*, at Section VI, Plaintiffs ask this Court to issue a permanent injunction that restrains the Government "from implementing or enforcing the decision to terminate Haiti's TPS and from taking any other action to terminate Haiti's TPS that is not in compliance with applicable law."  Pls. Findings 125 ¶ 1.  Plaintiffs do not ask the Court to enjoin a collateral policy adopted by Acting Secretary Duke.  Instead, they ask the Court to bar the Government from implementing the Duke Decision—which is, at bottom, a challenge to Acting Secretary Duke's decision. *See Skagit Cty. Pub. Hosp. Dist. No. 2 v. Shalala*, 80 F.3d 379, 386 (9th Cir. 1996) (preclusion provision applies when "a procedure is challenged only in order to reverse the individual [unreviewable] decision"); *Palisades Gen. Hosp. Inc. v. Leavitt*, 426 F.3d 400, 403 (D.C. Cir. 2005).

Plaintiffs' request for a permanent injunction exposes their true objective in this matter: to second-guess the determination made by Acting Secretary Duke—despite the clear bar on judicial review of such a determination under 8 U.S.C. § 1254a(b)(5)(A).  Allowing Plaintiffs to circumvent the TPS statute's preclusion provision through a thinly-veiled challenge to the Duke Decision and the reasoning underlying that determination would run counter to the very purpose of the preclusion provision.  In enacting the TPS statute, Congress recognized that TPS designations will involve sensitive and uncertain foreign-policy judgments (about, for example, the nature of foreign hostilities, an assessment of on-the-ground conditions abroad and a foreign government's response, and the ability of foreign nations to accept the return of their nationals) made at a country-wide level of generality.  It is well-established that such considered judgments,

"implicat[ing] sensitive and weighty interests of national security and foreign affairs" and based on an "evaluation of the [ever-changing] facts," are within the province of the Executive Branch, not the courts. *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33–34 (2010). Congress thus deliberately shielded such judgments, as reflected in the TPS determinations, from judicial second-guessing.

Congress was aware that TPS designations would affect thousands of individuals, many of whom could be expected to desire that TPS designations be extended indefinitely. It thus would not have been difficult for Congress to predict that litigation over the termination of TPS designations, under the Administrative Procedure Act ("APA") or otherwise, could mire TPS-related decisions (which Congress expressly intended to be temporary) in litigation for years and undermine the discretionary nature of the designations. *See Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 490 (1999) (noting that delay "is often the principal object of resistance to a deportation proceeding"). Congress may also have concluded that Secretaries would be less likely to designate countries initially if doing so would inevitably lead to protracted and burdensome litigation, with corresponding lengthy extensions. Congress precluded judicial review of TPS determinations to avoid these consequences.

And contrary to Plaintiffs' contention, there is simply no ambiguity in the TPS statute's preclusion provision, which states, unequivocally, that "[t]here is *no judicial review*." 8 U.S.C. § 1254a(b)(5)(A) (emphasis added). Plaintiffs' reliance on *Sepulveda v. Gonzales*, 407 F.3d 59, 62 (2d Cir. 2005), is misplaced. Pls. Findings 87 ¶ 2. While *Sepulveda* states that the "longstanding principle" of construing "lingering ambiguities" in immigration statutes should be "in favor of the alien," the TPS statute's preclusion provision refers to country-wide determinations—not specific aliens. Plaintiffs have no basis to state that the TPS statute's preclusion provision allows for certain

process-claims when such language is nowhere to be found in the statute. Plaintiffs simply cannot disregard the clear constraints that Congress built into the statutory framework. *See Keene Corp. v. United States*, 508 U.S. 200, 207 (1993) ("Congress has the constitutional authority to define the jurisdiction of the lower federal courts." (citation omitted)); *Patchak v. Zinke*, 138 S. Ct. 897, 907 (2018) (plurality opinion) ("Congress generally does not infringe the judicial power when it strips jurisdiction because, with limited exceptions, a congressional grant of jurisdiction is a prerequisite to the exercise of judicial power.").

Finally, Plaintiffs rely on *McNary v. Haitian Refugee Ctr., Inc*., 498 U.S. 479 (1991) (Pls. Findings 88 ¶ 5—89 ¶ 8) in support of their jurisdictional argument. *McNary*, however, is inapposite. The plaintiffs in *McNary* challenged agency procedures in processing applications that were "collateral" to a particular determination. 498 U.S. at 492. The Supreme Court noted that plaintiffs did "not seek a substantive declaration that they [were] entitled to" a particular immigration status and that, even if plaintiffs prevailed on the merits, they would "only be entitled to have their case files reopened and their applications reconsidered in light of … newly prescribed INS procedures." *Id.* at 495. Unlike the collateral challenge in *McNary*, Plaintiffs here seek a permanent injunction that sets aside the Duke Decision, and thus their claim is squarely covered by the review bar. *See City of Rialto v. West Coast Loading Corp*., 581 F.3d 865, 877 (9th Cir. 2009) (concluding that *McNary*-type rationale was inapplicable to a "pattern and practice" claim that sought "the very same [relief] that successful direct review … would produce: invalidation of the" underlying unreviewable agency decision); *see also Gebhardt*, 879 F.3d at 987.

In sum, the trial record revealed that Plaintiffs are challenging the content of the Duke Decision itself, and thus Plaintiffs' suit is precisely the kind of action Congress sought to prevent

and contrary to the Court's assessment in its December 14, 2018 decision.  Accordingly, the Court should dismiss this matter for lack of subject matter jurisdiction.

### B.      At minimum, there is no subject matter jurisdiction over the President.

Plaintiffs argue that "[t]his is one of the rare cases where the extraordinary remedy of injunctive relief against the President is appropriate."  Pls. Findings 93 ¶ 14.  As set forth in the Government's Proposed Findings of Fact and Conclusions of Law at 50, however, Plaintiffs have not proffered sufficient evidence to show why their purported injury cannot be redressed through an injunction against DHS, rather than the President.   "[A]s a matter of comity, courts should normally direct legal process to a lower Executive official even though the effect of the process is to restrain or compel the President."  *Knight First Amendment Inst. at Columbia Univ. v. Trump*, 302 F. Supp. 3d 541, 579 (S.D.N.Y. 2018) (citing *Nixon v. Sirica*, 487 F.2d 700, 709 (D.C. Cir. 1973)).  Indeed, there is no dispute that the Secretary of DHS is, as a matter of law, the official vested with the power to designate countries for TPS, to extend such designations, and ultimately to terminate such designations.  *See* 8 U.S.C. § 1254a; 8 U.S.C. § 1103; 6 U.S.C. § 557; *see also Doe 2 v. Trump*, 319 F. Supp. 3d 539, 542 (D.D.C. Aug. 6, 2018) (dismissing the President from a lawsuit in which the plaintiffs sought to enjoin a policy concerning transgender service members and explaining that "[i]t makes little sense to retain a party in a case from whom no relief will be granted under ordinary circumstances, and especially little sense when retaining that party risks unnecessary constitutional confrontations.").[3]   Accordingly, the Court should, at minimum, dismiss the President of the United States from this action.

---

[3] Interestingly, Plaintiffs do not even list the President on their "list of relevant government employees."  Pls. Findings 4—5.

## II.     Haïti Liberté's Regulatory Flexibility Act Claim Should Be Dismissed.

Plaintiff Haïti Liberté, one of the largest Haitian weekly newspapers in the United States, Europe, and Haiti, alleges that the Duke Decision violated the Regulatory Flexibility Act ("RFA") because DHS failed to conduct a regulatory flexibility analysis prior to promulgating the purported new rule.  As stated in the Government's Proposed Findings of Fact and Conclusions of Law, Plaintiff Haïti Liberté does not have Article III standing to bring such a claim; even if it did, Plaintiffs allege no facts to establish that it is a "small entit[y]" entitled to seek judicial review under the RFA, and even if so, the RFA claim fails on the merits.  *See* Gov. Findings 44 ¶ 170—46 ¶ 175; 65—67; *see, e.g.*, *Nw. Mining Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 13 (D.D.C. 1998) ("[T]he language of the RFA extends standing to seek judicial review only to a 'small entity.'").  Accordingly, Plaintiffs' RFA claim should be dismissed.

### A.     Pertinent legal standard.

The doctrine of constitutional standing, an essential aspect of an Article III case or controversy, demands that a plaintiff have "'a personal stake in the outcome of the controversy' [so] as to warrant his invocation of federal-court jurisdiction."  *Warth v. Seldin*, 422 U.S. 490, 498 (1975) (quoting *Baker v. Carr*, 369 U.S. 186, 204 (1962)).  At its "irreducible constitutional minimum," the doctrine requires a plaintiff, as the party invoking the Court's jurisdiction, to establish three elements: (1) a concrete and particularized injury-in-fact, either actual or imminent; (2) a causal connection between the injury and defendants' challenged conduct, such that the injury is "fairly … trace[able] to the challenged action of the defendant"; and (3) a likelihood that the injury suffered will be redressed by a favorable decision.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (citations omitted).

The standing requirement of "injury-in-fact" requires an allegation that the plaintiff "has sustained or is immediately in danger of sustaining a direct injury" as a result of the challenged

action.  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1552 (2016) (citations omitted).  The injury must be "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural' or 'hypothetical' or otherwise speculative."  *Summers v. Earth Island Inst.*, 555 U.S. 488, 505 (2009) (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Baur v. Veneman*, 352 F.3d 625, 637 (2d Cir. 2003) ("[A] plaintiff cannot rely solely on conclusory allegations of injury or ask the court to draw unwarranted inferences in order to find standing.") (citation omitted); *Treiber v. Aspen Dental Mgmt., Inc.*, 635 F. App'x 1, 3 (2d Cir. 2016) ("[B]ecause the allegation [of injury] is wholly conclusory and unsupported by any facts, it is insufficient to support standing.").  Thus, an alleged future injury must be "certainly impending"; "[a]llegations of possible future injury are not sufficient."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013) (citations omitted).

The causation prong of standing requires Plaintiffs to prove that their certainly impending injuries "fairly can be traced to the challenged conduct of the defendant, and not injury that results from the independent action of some third party not before the court."  *Simon v. E. Ky. Welfare Rights Org.*, 426 U.S. 26, 41-42 (1976); *see also Allen v. Wright*, 468 U.S. 737, 757-58 (1984); *Garelick v. Sullivan*, 987 F.2d 913, 919 (2d Cir. 1993) (the "fairly traceable" requirement "insures that the injury alleged by a plaintiff is attributable to the defendant.").  Moreover, it is well-settled that "claims of harm based upon speculation regarding decisions by third parties is insufficient to confer Article III standing."  *Himber v. Intuit, Inc.*, No. 10-CV-2511, 2012 WL 4442796, at *7-*9 (E.D.N.Y. Sept. 25, 2012) (Bianco, J.); *see also ASARCO, Inc. v. Kadish*, 490 U.S. 605, 615 (1989) (finding that the plaintiffs' claim failed the causation requirement when their allegations of economic harm depended upon "the unfettered choices made by independent actors not before the

courts and whose exercise of broad and legitimate discretion the courts cannot presume either to control or to predict.").

>   **B.      Haïti Liberté does not have organizational standing to bring an RFA claim.**

Plaintiffs first argue that Haïti Liberté has "organizational standing" in this action because (1) the potential removal of thousands of Haitians from the United States will reduce Haïti Liberté's readership in the United States by approximately 10 percent; (2) "as businesses owned and frequented by TPS recipients close and/or lose revenue, Haïti Liberté's advertising revenue will decrease"; and (3) "the departure of a key employee [Mr. Jackson Rateau] will make it exceedingly difficult for Haïti Liberté to cover news and current events in Haiti in both Creole and French and will weaken Haïti Liberté's vital community support group: le club des amis d'Haiti Liberté."  Pls. Findings 84 ¶ 13.

Each of Plaintiffs' arguments regarding Haïti Liberté's organizational standing is meritless. Plaintiffs claim that Haïti Liberté will lose 10 percent of readership along with advertising revenue is illogical.  On the one hand, Plaintiffs submit that Haïti Liberté will lose readers because its Haitian readers in the United States will be forced to return to Haiti.  On the other hand, Plaintiffs concede that Haïti Liberté has a heavy readership in Haiti.  *See* Gov. Findings 45 ¶ 172 (noting that Plaintiffs' witness Kim Ives testified that even if Haïti Liberté's readership consisting of current TPS holders moved to Haiti, they would continue to have access to the newspaper, as it is printed in that country (along with printed copies that are distributed in Boston, Montreal, and Paris)).  Thus, while the residence of some of Haïti Liberté's readers may change, there is no evidence to suggest that the number of readers will actually be reduced; indeed, Haitian nationals removed from the United States to Haiti will still be able to access Haïti Liberté both in print and online.  And the alleged 10 percent reduction in readership is mere guesswork on the part of Mr.

Ives, who made up this figure on the witness stand without any evidentiary support. *See* Trial Tr. 356-60.

Additionally, Plaintiffs fail to show how the purported removal of one of Haïti Liberté's writers, Mr. Rateau, to Haiti "will make it exceedingly difficult for Haïti Liberté to cover news and current events in Haiti in both Creole and French." Pls. Findings 84 ¶ 13. Mr. Ives testified that Mr. Rateau currently writes, on average, two articles per week in Haïti Liberté—in both French and Creole—and covers news, analysis, and events in Haiti. Trial Tr. 363-64. Mr. Ives conceded that Mr. Rateau could still write the same articles from Haïti Liberté's Port-au-Prince office, in Haiti's capital, as he currently does from the Haïti Liberté office in New York where Mr. Ives and Mr. Rateau both work. *See* Gov. Findings 45 ¶ 174. Further, Plaintiffs presented no evidence about Mr. Rateau's legal status and therefore, it is not clear that he will be subject to removal. Thus, there is no evidence supporting Plaintiffs' claim that the termination of TPS for Haitian beneficiaries would lead to a concrete and particularized injury for Haïti Liberté on account of Mr. Rateau's legal status. Plaintiffs have therefore fallen far short of demonstrating that Haïti Liberté has suffered an "injury-in-fact" that is "concrete and particularized," *Defs. of Wildlife*, 504 U.S. at 560 (citations omitted), and not "merely 'conjectural or 'hypothetical' or otherwise speculative." *Summers*, 555 U.S. at 505 (quoting *Defs. of Wildlife*, 504 U.S. at 560); *see also Clapper*, 568 U.S. at 409 (alleged future injury must be '*certainly impending*'; "'[a]llegations of *possible* future injury' are not sufficient") (emphasis added) (quoting *Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990)).

Moreover, Plaintiffs cannot prove the causation prong to show Haïti Liberté's organizational standing, since Plaintiffs' claim that "advertising revenue will decrease" because third-party businesses may close or lose revenue (Pls. Findings 84 ¶ 13) is not "fairly traceable"

to the Duke Decision.  *See Garelick*, 987 F.2d at 919.  The alleged economic harm of losing third-party advertising is based entirely on the decisions and actions of unnamed business owners, who may or may not continue advertising with Haïti Liberté, whether they are in the United States or Haiti.  These hypothetical, speculative harms caused by the loss of unidentified third-party advertisers break the link within the causation chain, and thus do not confer standing on the newspaper in this action.  *See Himber*, 2012 WL 4442796, at *9 (dismissing claims as a matter of law because, "[n]o standing exists for this type of hypothetical, speculative harm that was preventable only by the discretionary decisions of third parties").  Accordingly, Haïti Liberté lacks organizational standing in this action.

### C.   Haïti Liberté also cannot bring a cause of action under the RFA.

As Plaintiffs state, the RFA "provides a cause of action for "a small entity that is adversely affected or aggrieved by final agency action.'"  Pls. Findings 86 ¶ 17 (citing 5 U.S.C. § 611(a)).  Plaintiffs, however, failed to establish that Haïti Liberté is a "small entity."  *See NAACP v. Trump*, 298 F. Supp. 3d 209, 235 (D.D.C. 2018) (rejecting plaintiffs' RFA claim when the "complaint contain[ed] only a single conclusory allegation that [they] fall within the statutory definition, and any factual support for that claim is missing from (and arguably contradicted by) the [plaintiffs'] declarations ….").

Plaintiffs concede that Haïti Liberté is the "largest Haitian weekly [newspaper] published in New York."  Pls. Findings 78 ¶ 271.  When compared to its three other Haitian newspaper competitors, Haïti Liberté is the largest.  Gov. Findings 67.  Thus, Haïti Liberté is dominant in its field, which disqualifies it from being a "small entity" under the RFA. *See* 5 U.S.C. § 601(4) ("the term 'small organization' means 'any not-for-profit enterprise which is independently owned and operated and is not dominant in its field …'").  Further, while Plaintiffs submit that Haïti Liberté, as business, "does not make a profit" (Pls. Findings 78 ¶ 274), such losses do not legally qualify

Haïti Liberté as a "not-for-profit enterprise" under the RFA.  Indeed, Mr. Ives did not know whether Haïti Liberté was a not-for-profit enterprise but stated that Haïti Liberté is "*not* a 501(c)(3) corporation."  Trial Tr. 369 (emphasis added).  Thus, Haïti Liberté is unable to raise an RFA violation herein.

> **D.    Even if the Court were to find that Haïti Liberté has standing, Plaintiffs' RFA claim still fails on the merits.**

Finally, even if, *arguendo*, the Court were to find that Haïti Liberté has standing, Plaintiffs' RFA claim still fails.  As stated in the Government's Proposed Finding of Fact and Conclusions of Law, and as discussed further, *infra*, at Section IV.A.ii, since DHS was not required to use notice-and-comment rulemaking procedures and since no new rule was promulgated, DHS was not required to conduct a regulatory flexibility analysis in connection with the Duke Decision." *See* Gov. Findings 65-67.  Accordingly, the Court should dismiss Plaintiffs' RFA claim.

## III.    Judicial Review of Plaintiffs' Claims Should Be Limited to the Administrative Record.

As set forth in the Government's Proposed Findings of Fact and Conclusions of Law, judicial review of this action should be limited to the Administrative Record.  Gov. Findings 52-55, 68.  Importantly, Plaintiffs make no showing in their amended Proposed Findings of Facts and Conclusion of Law that the Administrative Record produced herein was the product of bad faith or improper behavior.  Further, there has been no Court finding that the Administrative Record was formulated through "bad faith or improper behavior," which is necessary before a Court may permit extra-record discovery.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971), *abrogated by Califano v. Sanders*, 430 U.S. 99 (1977); *Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997).

And even if the Court relies on extra-record evidence, the Court should not credit the various double and triple-hearsay excerpts from newspaper articles, media reports, and similar

sources that Plaintiffs rely upon to make their merits-based arguments.  Gov. Findings 71-72.  As an initial matter, contrary to Plaintiffs' declarative statements in their amended Proposed Findings of Fact and Conclusions of Law (*see* Pls. Findings 120 ¶ 8, to wit: "Following the trial, the Court has carefully reviewed the evidence and has concluded that Plaintiffs' evidence shall be admitted"), the Court has not yet determined which exhibits will be admitted into evidence for purposes of the Court reaching its judgment.  Instead, the Court made clear that "[t]he way we're going to proceed is we're going to take the testimony from both sides and then [the parties are] going to submit proposed findings of fact and conclusions of law after the proceeding and then [the Court] will write a decision and [the Court] will make it very clear what [the Court has] relied on and what [the Court has] not relied on and [the parties] will see what [the Court has] admitted into evidence or not admitted into evidence and then [the parties] will be able to proceed as [the parties] wish to proceed with respect to taking appeals or not taking appeals or cross appeals." Trial Tr. 8.  Thus, the Court should only rely on the Administrative Record in making its judgment in this case.

## IV.   Plaintiffs Fail to Prove their APA Claims.

The gravamen of Plaintiffs' APA claims is that the Duke Decision was arbitrary and capricious on the grounds that first, the Government adopted a new standard for TPS review; and second, the Government did not follow the proper procedures for terminating Haiti's TPS designation.  *See* Pls. Findings 93 ¶ 1—112 ¶ 50.  As set forth in the Government's Proposed Findings of Fact and Conclusions of Law (Gov. Findings 50—63) and as set forth below, both the Administrative Record and the trial record clearly establish that (A) Acting Secretary Duke did not adopt a new TPS standard of review, as the Duke Decision properly assessed both conditions related to the 2010 earthquake as well as contemporary conditions in Haiti; and (B) DHS and the State Department followed the proper procedures in making their recommendations and sharing

14

their assessments with Acting Secretary Duke, who, in turn, thoughtfully considered the information and made her decision.  Thus, Plaintiffs fail to prove, by a preponderance of the evidence, that the Duke Decision was arbitrary and capricious.

    **A.**    **The Duke Decision did not adopt a new TPS standard of review.**

        **i.**    **The Duke Decision properly assessed both conditions related to the 2010 earthquake as well as current country conditions in Haiti.**

Plaintiffs contend that the Duke Decision was "predicated on an explicit and legally erroneous interpretation of 8 U.S.C. § 1254a(a)(1)(C)," whereby "DHS under the Trump Administration took the position that it could not consider conditions that were not 'directly tied to' the event that originally triggered the TPS designation."  Pls. Findings 97 ¶ 11—98 ¶ 12. Plaintiffs claim that the Duke Decision set forth a "new standard" whereby "only conditions DHS political appointees deemed linked to the originating event are considered."  Pls. Findings 111 ¶ 45.

Contrary to this oft-repeated and baseless contention from Plaintiffs, both the Administrative Record and the extra-record evidence demonstrate that Acting Secretary Duke considered Haiti's conditions stemming from the originating conditions that triggered Haiti's TPS designation *and* Haiti's overall current country conditions.  *See* Gov. Findings, 14 ¶ 51—17 ¶ 57; 18 ¶ 62—19 ¶ 65; 20 ¶ 67—27 ¶ 85; *see* Deposition Transcript of USCIS Director L. Francis Cissna ("Cissna Tr.")[4] 59-60 ("As I see it, conditions mean conditions. So the Secretary should review the totality of the circumstances, the universe of conditions in place in that country at the time of review… the [TPS statute] requirement is to consider all conditions in place at the time of

---

[4] Each deposition transcript referenced herein and in the Government's Proposed Findings of Fact and Conclusions of Law have been admitted into evidence.  *See Saget v. Trump*, 351 F. Supp. 3d 251 (E.D.N.Y. 2019).   Courtesy copies of the full deposition transcripts will be delivered to the Court along with the courtesy copy of the instant filing.

the review, everything, yes."). Director Cissna testified that there was "no tension" between Acting Secretary Duke reviewing both the conditions related to the 2010 earthquake and conditions in Haiti generally. Cissna Tr. 203-04. Director Cissna believed that the TPS statute required the Secretary to "review the totality of the circumstances," including "adverse conditions caused by intervening events between the originating designation and… the time of review." Cissna Tr. 59:13-21. Director Cissna's predecessor—and Plaintiffs' expert— León Rodriguez agreed, testifying at trial that "you are really looking at the totality of the circumstances that affect a particular country at the time that you are making your decision." Trial Tr. 285.

As explained in the Government's Proposed Findings of Fact and Conclusions of Law, the Duke Decision was consistent with prior Secretaries' TPS termination decisions and was consistent with Congress's objective of providing temporary relief (subject to mandatory agency review after designated intervals) for nationals of a country recovering from, *inter alia*, a natural disaster until such nationals, who have not attained other lawful immigration status in the United States, can safely return home. *See* Gov. Findings 58—62. Plaintiffs even acknowledge that former Secretary Jeh Johnson followed the same process of focusing on Haiti's original extraordinary and temporary condition—the 2010 earthquake—in making his TPS determination. *See* Pls. Findings 8 ¶ 8 ("In the final extension of Haiti's TPS designation on August 25, 2015, DHS Secretary Jeh Johnson concluded that 'many of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist, including a housing shortage, a cholera epidemic, limited access to medical care, damage to the economy, political instability, security risks, limited access to food and water, a heightened vulnerability of women and children,

and environmental risks.  More than 5 years after the earthquake, Haiti continues to recover.' PX 339.002.").[5]

While Plaintiffs rely on Mr. Rodriguez's opinion that "Director Cissna did not 'give[ ] the secretary everything [she] need[ed] to make a full and sound decision as to TPS' for Haiti, Trial Tr. 273:25–274:1…."  (Pls. Findings 62 ¶ 207), Mr. Rodriguez's own testimony belies this position.   Mr. Rodriguez testified that USCIS's "very extensive" Refugee, Asylum, and International Operations Directorate ("RAIO") Report, which was indisputably attached to the Cissna Memorandum, "gives the Secretary everything that [she] need[s]." Trial Tr. 235.  Contrary to Plaintiffs' conclusory assertions, the USCIS assessment and recommendation "considered all of the current conditions" in Haiti as well as "those from the originating event" of the 2010 earthquake.   Cissna Tr. 156-57.   Director Cissna added that the USCIS assessment and recommendation—consisting of the Cissna Memorandum, the State Department's assessment and recommendation, USCIS's TPS legal authority statement, and the RAIO Report (Gov. Findings 13-26)—included "not just things related to the earthquake and its after-effects, but the hurricanes" and the other current country conditions.  Cissna Tr. 204-05.

Accordingly, Plaintiffs failed to show, by a preponderance of the evidence, that Acting Secretary Duke adopted a new standard for TPS review.

### ii.     Plaintiffs fail to prove that the Duke Decision required notice-and-comment.

---

[5] Plaintiffs cite a June 2017 email from Tina Wimbush, a writer-editor of USCIS's Office of the Executive Secretariat, who quotes then-Secretary of DHS John Kelly as stating that responses regarding Haiti's TPS determination should "[h]ighlight [the] temporary nature" of TPS, and state that the "2010 Earthquake is the only reason for TPS being granted-Not based on hurricane or current economic conditions-Not based on cholera epidemic." Pls. Findings 44 ¶ 134.  Plaintiffs ostensibly cite this email to show that only conditions stemming from the 2010 earthquake were considered in reaching a determination regarding Haiti's TPS designation.  But there is no dispute that the 2010 earthquake was, in fact, the reason for Haiti's initial TPS designation and continued to be the core reason for Haiti's TPS redesignation in 2011, and Secretary Kelly's purported comments do not state otherwise.

Plaintiffs contend that the Duke Decision creates a "new standard" that violates the APA's notice-and-comment rulemaking procedures.  *See* Pls. Findings 109 ¶ 40—112 ¶ 50.  As explained in Section IV.A.i *supra*, Acting Secretary Duke did not create a new standard to review Haiti's TPS designation.

But even if the Court were to find that Acting Secretary Duke put more emphasis on the originating event than did prior Secretaries, the TPS statute, nevertheless, requires a consideration of current conditions to determine whether there remain "extraordinary and temporary conditions" which prevent nationals of the country from returning in safety.  *See* 8 U.S.C. § 1254a(b)(1)(C) (requiring such a consideration under the statute); PX 341.  Plaintiffs cannot prove, by a preponderance of the evidence, that a new rule was created here simply because they disagree with the outcome of Acting Secretary Duke's decision.  Nor does an emphasis on different factors create an explicit regulatory change that would require notice-and-comment under the APA.

Plaintiffs' reliance on *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) and *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117 (2016) (Pls. Findings 95 ¶¶ 5—6) is misguided, as neither case shows that a shift in fact-finding or the weighing of criteria by a decision-maker with otherwise unreviewable authority is tantamount to a new rule.  Both cases involved instances in which a new policy or interpretation immediately affected a regulated party's rights or obligations.  In sharp contrast, in the TPS context, how the Secretary emphasizes different factors does not by itself create any rights or obligations; rather, any rights or obligations would flow from the unreviewable decision of whether to terminate or extend a TPS designation.

In particular, *Fox Television* involved the FCC's evolving approach to "enforcing the statutory prohibition against indecent broadcasts," *id.* at 507, and the agency's position had the practical effect of imposing burdens (and, potentially, penalties) on a regulated industry. Indeed,

18

the FCC expressly acknowledged in the opinion leading up to the challenged agency actions that its prior interpretations were "no longer good law." *Id.* at 510. Similarly, in *Encino Motorcars*, the Department of Labor was acting in its regulatory capacity over a regulated industry when it (1) promulgated an interpretive rule that had the effect of excluding automobile dealership service advisors from the overtime exemption under the Fair Labor Standards Act, then (2) issued an opinion letter stating that service advisors could in fact be exempt, then (3) updated its field operations handbook to confirm its change in position, then (4) issued a notice of proposed rulemaking in line with that changed position, but then (5) promulgated a final rule that reverted to the original position. Contrary to both of these cases, Acting Secretary Duke's analysis of the facts, with which Plaintiffs disagree, does not place a new burden or obligation on a TPS beneficiary.

In short, a potential difference in emphasis does not make a new rule, nor does it establish an APA violation.

### B.  The Department of Homeland Security and the Department of State followed the proper procedures in preparing their recommendations and assessments for Acting Secretary Duke's review.

Plaintiffs claim that DHS's "review process was a sham designed to create a pretext for terminating TPS for Haiti." Pls. Findings 88 ¶ 4. But as explained in the Government's Proposed Findings of Fact and Conclusions of Law, Acting Secretary Duke followed a materially similar procedure as prior Secretaries in reaching her decision with respect to Haiti's TPS designation. *See* Gov. Findings 13 ¶ 49—34 ¶ 116; 63—64. Like prior Secretaries who made TPS decisions, Acting Secretary Duke reviewed, *inter alia*, USCIS's RAIO Report and the State Department's Country Conditions Report, both of which were exhaustive and contained discussion of current country conditions; USCIS and State Department recommendations; and considered the

assessments and opinions of various stakeholders, including SOUTHCOM,[6] country officials, religious and civic leaders, and DHS's Office of Intelligence and Analysis.  *Id.*  And after carefully reviewing these materials, Acting Secretary Duke thoughtfully made her decision to end Haiti's TPS designation, effective 18 months later.  Plaintiffs' simply cannot show, by a preponderance of the evidence, that the DHS review process for TPS designations was a "sham."

        **i.**      **Acting Secretary Duke thoughtfully considered the information pertaining to conditions in Haiti before reaching her decision.**

In their closing argument at trial, Plaintiffs belittled Acting Secretary Duke by claiming that "poor Ms. Duke" was pressured by the White House to "do something that she doesn't want to do": terminate Haiti's TPS designation.  Trial Tr. 669.  Similarly, in their amended Proposed Findings of Fact and Conclusions of Law, Plaintiffs argue that Acting Secretary Duke "succumbed to pressure from White House officials to terminate TPS for Haiti and then searched for a rationale for the decision."  Pls. Findings 96 ¶ 7.

Contrary to Plaintiffs' patronizing assertion, there is no evidence that Acting Secretary Duke—a public servant[7] who spent decades working in the federal government before attaining the Cabinet-level post of Acting Secretary of Homeland Security—succumbed to pressure or searched for a rationale for her decision to end Haiti's TPS designation.  Instead, the Administrative Record clearly shows—in the page-after-page of her handwritten notes and highlights—that Acting Secretary Duke meticulously reviewed and contemplated the pertinent

---

[6] Plaintiffs incorrectly state that SOUTHCOM "weighed in against terminating Haiti's TPS on November 6, 2017."  Pls. Findings 49 ¶ 160.  SOUTHCOM did not weigh in against terminating Haiti's TPS designation; rather they merely provided input on the consequences of terminating.  Gov. Findings 26 ¶ 81—27 ¶ 84.

[7] Over the course of her federal government service, Acting Secretary Duke received the Presidential Meritorious Rank Award, the DHS Secretary's Medal, the TSA Silver Medal for Customer Service, the Department of the Army Commander's Award for Public Service, and the U.S. Coast Guard's Distinguished Public Service Medal. *See* https://www.dhs.gov/archive/person/elaine-c-duke

documents prior to making her decision regarding Haiti's TPS designation.  *See* Government Trial Exhibit ("GX") A at AR-S_HAITI 225-60, 261-74.  Ambassador James Nealon testified that Acting Secretary Duke "struggle[ed]" with her TPS decisions, but that this was "struggling [] in a good sense of the word … struggling with [the decision] as an intelligent, hard-working government employee would struggle with a very consequential decision."  Gov. Findings 32 ¶ 108.  Ambassador Nealon described Acting Secretary Duke as a "voracious" reader; one who read intelligence reports, outside analyses provided by members of society, and who even solicited oral opinions from staff members.  Gov. Findings 32 ¶ 106-07.  Acting Secretary Duke took her responsibility seriously, and the evidence shows she conscientiously reviewed and analyzed documents before reaching her decision.

Moreover, Plaintiffs' claim that the Duke Decision was a pre-ordained "sham" is belied by the fact that Acting Secretary Duke decided *not* to terminate TPS designations for Honduras's and El Salvador, despite recommendations to do so from both the Secretary of State and the White House. *See* PX 218, 239, 82 Fed. Reg. 59630, 83 Fed. Reg. 2654.  Further, contrary to Plaintiffs' assertions, there is no evidence that the current administration is determined to ensure that TPS "must end" (Pls. Findings 63 ¶ 212).  To the contrary, Acting Secretary Duke also extended TPS for South Sudan for eighteen months (82 Fed. Reg. 44, 205-01 (Sept. 21, 2017)) and Secretary Kirstjen Nielsen extended TPS for Syria for eighteen months (83 Fed. Reg. 9329 (Mar. 5, 2018)); TPS for Yemen for eighteen months (83 Fed. Reg. 40307 (Aug. 14, 2018)); and TPS for Somalia for eighteen months (83 Fed. Reg. 43695 (Aug. 27, 2018)).[8]

_____

[8] Upon information and belief, and given the context in which it was written, Acting Secretary Duke's handwritten note regarding "rationale: don't know, need to rationalize conflicting info" (Pls. Findings 63 ¶ 212) refers to Acting Secretary Duke's deliberations regarding the *Honduras* TPS designation, not the Haiti TPS designation—as evident by the fact that Acting Secretary Duke ultimately did extend the TPS designation for Honduras for 6 months.  PX 218.  There is no evidence that this note refers to Haiti.

Accordingly, Plaintiffs fail to show that the Duke Decision was the result of a "sham" process.

### ii.    USCIS properly relayed its assessment and recommendation to Acting Secretary Duke.

Plaintiffs claim that USCIS did not follow proper procedures in providing its assessment and recommendation to Acting Secretary Duke.  Pls. Findings 107 ¶ 31.  USCIS, however, provided Acting Secretary Duke with a comprehensive and detailed overview in advance of her decision regarding Haiti's TPS designation, which consisted of: Director Cissna's November 3, 2017 Recommendation Memorandum, the State Department's assessment and recommendation, USCIS's TPS legal authority statement, and the RAIO report.  *See* Gov. Findings 13 ¶ 50—25 ¶ 80.  Thus, Plaintiffs fail to show how USCIS's procedures were deficient or in violation of the TPS statute or the APA.

### a.    USCIS's assessments between December 2016 and May 2017 have no bearing on the validity of the Duke Decision.

Plaintiffs spend over thirty pages of their amended Proposed Findings of Fact and Conclusions of Law discussing actions taken by USCIS officials between December 2016 and May 2017, culminating in Secretary of DHS John Kelly's decision on Haiti's TPS designation.  *See* Pls. Findings 15 ¶ 28—38 ¶ 115.  As an initial matter, it is undisputed that in May 2017, Secretary Kelly decided to *extend* Haiti's TPS designation, not terminate said designation.[9]  *See* PX 340; Gov. Findings 11 ¶ 43—12 ¶ 46.  And indeed, Plaintiffs are not challenging Secretary Kelly's decision in this action; they are only challenging the Duke Decision.  Thus, Plaintiffs'

---

[9] Plaintiffs incorrectly state that the final extension of Haiti's TPS designation occurred on August 25, 2015, when Secretary Johnson "concluded that 'many of the conditions prompting the original January 2010 TPS designation and the May 2011 redesignation persist.'"  Plaintiffs Findings 8 ¶ 8.  Contrary to Plaintiffs' assertion, the final extension of Haiti's TPS designation occurred in May of 2017, when Secretary John Kelly extended Haiti's TPS designation for a six months.  *See* Gov. Findings 11 ¶ 43—12 ¶ 46.

myriad proposed findings of fact arising out of this period are a red herring: they have no bearing on anything related to Acting Secretary Duke's decision on whether to extend, re-designate, or terminate Haiti's TPS designation, and should be rejected wholesale.

But even if the Court were to make factual findings on said allegations, Plaintiffs claims still fail to show that USCIS engaged in improper practices regarding TPS recommendations. Plaintiffs first argue that December 2016 and February 2017 RAIO reports established "bleak" conditions in Haiti.  Pls. Findings 50 ¶ 164.   Plaintiffs offer these RAIO Reports as support for their theory that DHS officials in the Trump Administration sought to minimize or remove factual findings about Haiti's conditions.  *See id.*  Plaintiffs, however, fail to note that the facts presented in both the December 2016 and February 2017 RAIO reports were included, *at times verbatim*, in the October 2017 RAIO Report that Acting Secretary Duke considered in reaching her decision to end Haiti's TPS designation.  *Compare* Pls. Findings 15 ¶ 27, *with* GX A at AR-S_HAITI 225 (providing the same summary of conditions in Haiti); *compare* Pls. Findings 15 ¶ 28, *with* GX A at AR-S_HAITI 227 (language similar between the two documents, including an identical quotation); *compare* Pls. Findings 16 ¶ 30 (referencing PX326.003, which provides citations in footnote 24) *with*, GX A at AR-S_HAITI 231 (footnoting the same documents in footnote 37, adding updated number from the United Nations Office for the Coordination of Humanitarian Affairs, July 24, 2017); *compare* Pls. Findings 16 ¶¶ 31-32, *with* GX A at AR-S_HAITI 233—35; *compare* Pls. Findings 17 ¶ 34, *with* GX A at AR-S_HAITI 251; *compare* Pls. Findings 17, ¶¶ 37-38, *with* GX A at AR-S_HAITI 00000251—55.  Consequently, Plaintiffs' attempt to demonstrate that Acting Secretary Duke could not have considered all the facts reported in the December 2016 and February 2017 RAIO reports fails, as those statistics and statements were also reported in the October 2017 RAIO report that is part of the Administrative Record here.  Indeed, as evidenced

by her handwritten notes on the report, Acting Secretary Duke carefully considered the RAIO Report and found that the facts supported termination. *See* GX A at AR-S_HAITI-225—260.[10]

Plaintiffs also claim that the then-Acting USCIS Director James W. McCament recommendation memo dated April 10, 2017 is evidence of the Trump Administration's pre-textual decision to terminate Haiti's TPS designation. Pls. Findings 28 ¶ 77—30 ¶ 83. Contrary to Plaintiffs' contention, the April 10, 2017 McCament recommendation memorandum actually presented three options for Secretary Kelly: re-designation, extension, or termination; it ultimately recommended termination of Haiti's TPS designation with an effective date of January 22, 2018, which is six-months after the then-current expiration date. PX 122.004-006. Secretary Kelly ultimately rejected this recommendation and extended Haiti's TPS designation for six months. PX 340.

Additionally, Plaintiffs claim that in Spring of 2017, the Government re-wrote critical memos and "sought criminality and welfare data about TPS recipients in an effort to gin up pretext—political appointees of the Trump Administration were poised to terminate TPS for Haiti, no matter what career officials told them the facts on the ground in Haiti warranted." Pls. Findings 103 ¶ 22. But requesting such data is not, on its own, an unlawful request. Plaintiffs' own expert Mr. Rodriguez testified, consistent with 8 U.S.C. § 1254a(b)(1)(C), that "national interest" of the

---

[10] Plaintiffs contend that "great deference" should be given to the RAIO report. *See* Pls. Findings Section IV.A. Yet, even Plaintiffs themselves cannot seem to agree which source of information should receive the "most deference." In fact, Plaintiffs' witness, Michael Posner, testified at trial that U.S. embassy reports should be given the most deference (presumably over the RAIO report). Trial Tr. 114-16 (State Department gives great deference to the ambassador's factual reports); *see also* Pls. Findings 46 ¶ 144-45. No one source of information, however, is given greater deference over others. *See* Deposition Transcript of James Nealon Tr. 43 ("[Acting Secretary Duke] cast a very wide net in terms of gathering information"). Indeed, as Director Cissna testified, USCIS is not the only entity that advises the Secretary in making "the most informed decision" and that USCIS, including the RAIO, "is only one component that has a role in advising her on this subject." Cissna Tr. 45-46.

United States can include "national security, public safety, and criminality." Trial Tr. 339. Indeed, the section of the TPS statute under which Haiti was designated specifically states that the Secretary may designate a foreign country for TPS where extraordinary and temporary conditions in the country prevent its nationals from returning in safety, "...unless [the Secretary] finds that permitting the aliens to remain temporarily in the United States is contrary to the national interest of the United States." 8 U.S.C. § 1254a(b)(1)(C). Whether a subset of TPS holders was engaged in criminal activity or reliant on public assistance are factors that could impact the "national interest" of the United States. As Director Cissna testified at his deposition, ". . . the level of criminality of a population that has been granted TPS is something surely, again, that would be reasonable to consider in determining whether it's in the national interest to extend or not extend." Cissna Tr. 78-79; Deposition Transcript of Kathy Kovarik ("Kovarik Tr.") 201 ("there is a fair argument that that sort of data could be considered under the statute for Haiti's designation and extensions on the basis of extraordinary and temporary conditions, given the national interest component.") (citing email from Brandon Prelogar); Deposition Transcript of Donald Neufeld ("Neufeld Tr.") 172 (Secretary must look at "what the impact is on the United States if they were to—are to remain").

Plaintiffs also mischaracterize DHS internal review of a policy memorandum to imply that the criminality and welfare inquiries about Haiti's TPS recipients were part of the decision-making process. Rather, "review[ing] a briefing memo generated by DHS policy … is very common practice." Deposition Transcript of Kathryn Anderson ("Anderson Tr.") 224:1-11. Moreover, because none of this data was available, *see* Pls. Findings 21 ¶ 51, 22 ¶ 55, it simply could not have been used to inform Acting Secretary Duke's decision. *See also* Kovarik Tr. 86, 116 (criminal and public assistance information relating to TPS recipients was not available or

accessible and was not considered in the decision-making process); Kovarik Tr. 178-79.  To the extent Kovarik sought "positive stories" about conditions in Haiti in response to Secretary Kelly's request for information, Kovarik wanted "to paint a full picture of the situation in Haiti and those with TPS . . . to make sure the Secretary had all the information that [Secretary Kelly] needed to make a decision."  Kovarik Tr. 152, 171.

Finally, Plaintiffs gloss over Secretary Kelly's *extension* of Haiti's TPS designation by claiming that "press leaks apparently caused Secretary Kelly and DHS management to reconsider the termination recommended in the April 10, 2017 [USCIS] Director Memo" from Mr. McCament.  Pls. Findings 32 ¶ 90.  In support of this theory, Plaintiffs cite to PX 123.  Pls. Findings 32 ¶ 90.  But PX 123—an email dated May 8, 2017—provides no such support; there is no mention of press leaks or anything of the sort.  Plaintiffs are simply speculating about Secretary Kelly's decision, which ultimately did *not* terminate Haiti's TPS designation.

### b.    USCIS used the proper procedures to prepare its recommendation and assessment for Acting Secretary Duke

Plaintiffs attempt to portray Director Cissna as a mere "political appointee" who ignored the recommendations of "career researchers" Brandon Prelogar and Kathryn Anderson.  Pls. Findings 14 ¶ 23, 26 ¶ 70.  Plaintiffs' portrayal lacks any basis in the trial record.

As an initial matter, Plaintiffs derisively dismiss Director Cissna as a "political appointee."[11]  Plaintiffs omit the fact that Director Cissna, who was confirmed by the Senate to his current position as USCIS Director, spent most of his career in federal government service; first working as a Foreign Service Officer in Haiti and then working in various capacities for DHS

---

[11] Plaintiffs fail to cast similar aspersions on their own purported experts, León Rodriguez and Michael Posner, despite both individuals having served as "political appointees" in the Obama Administration.

beginning in 2005.  *See* Cissna Dep. Tr. 15:21—16:3, 22:12-16; Cissna Dep. Tr. 23:17—29:20.

To Director Cissna's knowledge, he made "no changes to th[e] process" for TPS review.  Cissna

Dep. Tr. 45:7—49:10.

Similarly, Mr. Prelogar and Ms. Anderson are not, and never have been, "career

researchers" at USCIS—or for that matter, "career subject matter experts at RAIO."[12]  *See, e.g.,*

Plaintiffs' Findings 20 ¶ 46, 26 ¶ 70, 102 ¶ 18.  Instead, during the period at issue in this litigation,

both Mr. Prelogar and Ms. Anderson served USCIS's Office of Policy and Strategy ("OPS"): Mr.

Prelogar as the Chief of the International Humanitarian Affairs Division and Ms. Anderson as the

Deputy Chief of the International Humanitarian Affairs Division at USCIS/OPS.  *See* Anderson

Dep. Tr. 21-23; Prelogar Tr. 15-16, Kovarik Tr. 51.  Like Mr. Robert Law, Mr. Prelogar and Ms.

Anderson served as USCIS policy advisors who requested or received the facts from RAIO and

other sources, compiled them, and helped draft a recommendation that would be sent for

consideration by Secretary Kelly and, subsequently, Acting Secretary Duke.  And ultimately, the

fact that two policy advisors in the USCIS Office of Policy and Strategy disagreed with a USCIS

policy recommendation does not, in turn, automatically cause the Duke Decision to be arbitrary

and capricious.[13]  *See, e.g., Wisconsin v. City of New York*, 517 U.S. 1, 23 (1996) ("[w]e need note

only that the Secretary's conclusion is supported by the reasoning of some of his advisers, and was

therefore a reasonable choice in an area where technical experts disagree"); *In re Dep't of*

---

[12] Indeed, contrary to Plaintiffs' contention (Pls. Findings 14 ¶ 22), the process for gathering information does not start with RAIO; it starts with the USCIS Office of Policy and Strategy *requesting* information from RAIO as well as from the State Department.  *See* Prelogar Tr. 31.

[13] Plaintiffs note that Mr. Prelogar testified that the May 2017 decision was "handled differently" than prior TPS reviews he had participated in.  Pls. Findings 36 ¶ 107.  But Mr. Prelogar also testified that there are "different bases for different temporary protected status designations, different events that prompt different designations, obviously impact countries in different ways, so it's [] sort of the same basket, full basket of metrics that one might draw from, but some might not be wholly relevant in one context versus another, say depending on whether you are talking about a TPS designation based on an ongoing armed conflict versus environmental disasters or something different."  Prelogar Tr. 198.

*Commerce*, 139 S. Ct. 16, 17 (2018) (Gorsuch, J.) (concurring in part and dissenting in part) ("there's nothing unusual about a new cabinet secretary coming to office inclined to favor a different policy direction, soliciting support from other agencies to bolster his views, disagreeing with staff, or cutting through red tape."). Indeed, Ms. Anderson—who worked at USCIS in both the Obama and Trump Administrations—acknowledged that "TPS decisions are normally made by political leadership." Anderson Tr. 21-22, 199.

Plaintiffs also assert that Mr. Law observed, in an email to Ms. Kovarik, that an early draft of the Cissna Memorandum "is overwhelmingly weighted for extension which I do not think is the conclusion we are looking for." Pls. Findings 104 ¶ 25. Mr. Law subsequently edited the draft Cissna Memorandum and, in Plaintiffs' view, "completely changed the conclusion." Pls. Findings 57 ¶ 189. Contrary to Plaintiffs' assertion, Mr. Law did not "change" any conclusion. Instead, Mr. Law testified that his email to Ms. Kovarik "was trying to convey [] that there was no recommendation included" in the original draft, despite the original draft "providing four options for which to choose from." Deposition Transcript of Robert Law ("Law Tr.") 106-109.

Moreover, Mr. Law did not "change" any of the underlying research documents, including the comprehensive RAIO Report, which Mr. Rodriguez, as noted *supra*, described as "very extensive" and which "gives the Secretary everything that [she] need[s]." Trial Tr. 235. When providing his inputs into the draft, Mr. Law testified that he reviewed, *inter alia*, the RAIO Report. Law Tr. 113-14. And there is no dispute that Acting Secretary Duke closely reviewed the RAIO Report, as shown by her handwritten notes on said report. *See* GX A at AR-S_HAITI 225-259.

Plaintiffs claim that the Cissna Memorandum improperly includes information about former Secretary Johnson's September 2016 announcement that "DHS would resume removals of Haitians nationals" to Haiti, since such information was not part of the RAIO Report. Pls. Findings

61 ¶ 203.  Director Cissna explained, however, that Secretary Johnson's announcement included the following rationale for the resumption of removals, which is wholly relevant to Director Cissna's own recommendation: '[T]he situation in Haiti has *improved sufficiently* to permit the U.S. government to remove Haitian nationals on a more regular basis, consistent with the practice for nationals from other nations.'  In total, ICE has removed over 1,100 Haitians from fiscal years 2014-2016 []."  GX A at AR-S_HAITI 40 (emphasis added).  Plaintiffs fail to show how the inclusion of Secretary Johnson's announcement violates USCIS's proper procedures.[14]

Finally, Plaintiffs refer to Appendices A and B to show that only certain facts from prior USCIS memoranda were ultimately included in the *Federal Register* Notice.  Pls. Findings 107 ¶ 33—108 ¶ 34.  Plaintiffs are not challenging the validity of the *Federal Register* Notice; instead, they now appear to be arguing that it was drafted in a way not to their liking.  In essence, Plaintiffs are of the opinion that any progress made by the Haitian government that pre-dated May 2017 should not be analyzed and weighed by the Secretary six months later.  Finally, despite the fact that the FRN states that "cholera is currently at its lowest level since the outbreak began," Plaintiffs fault the Acting Secretary for not providing the information relied upon in reaching this finding.  Even if the Court finds jurisdiction to review the Acting Secretary's decision to terminate Haiti's TPS designation, this Court should not be adjudicating what constitutes a well-written *Federal Register* Notice.

---

[14] Plaintiffs also claim that the Cissna Memorandum fails to acknowledge that former Secretary of State John Kerry recommended that Haiti's TPS designation be extended. Pls. Findings 61 ¶ 204. Plaintiffs provide no reason why, in their view, Director Cissna was required to include, in his USCIS recommendation memorandum, a recommendation given by a former Secretary of State.  In any event, Secretary Kerry's recommendation made clear that "conditions in Haiti have improved since the earthquake, and Haiti has taken significant steps to improve the stability and the quality of life of its citizens."  GX M.  Further, while Secretary Kerry recommended an extension of Haiti's TPS designation "upon its expiration" on July 22, 2017, the longest any such extension could have lasted at that time—18 months (*see* 8 U.S.C. § 1254a(b)(3)(C))—would have been January 22, 2019.  The Duke Decision does not terminate TPS until July 22, 2019.

### iii.    The State Department properly relayed its assessment and recommendation to Acting Secretary Duke.

Plaintiffs claim that the State Department's process for providing input to Acting Secretary Duke in connection with the Duke Decision was "highly unusual."  Pls. Findings 48 ¶¶ 153-54. Plaintiffs base this assertion solely on testimony from former Assistant Secretary of State Michael Posner.   Pls. Findings 48 ¶ 153 ("Assistant Secretary Posner testified that the WHA's recommendation was 'highly unusual.' Trial Tr. 126:12.").   Plaintiffs' assertion is incorrect.

As set forth in the Government's Proposed Findings of Fact and Conclusions of Law, Mr. Posner's testimony revealed that he had little, if any, understanding of how the TPS determination process worked.  *See* Gov. Findings 35 ¶ 118—38 ¶ 130; 60-61.  For instance, Mr. Posner had not reviewed the pertinent State Department documents relevant to the TPS decision-making process in this case—including the internal State Department "split memo" that had previously been produced to Plaintiffs; Mr. Posner did not, for that matter, even realize that the State Department had created a split memo or provided it to Secretary Tillerson.  Trial Tr. 144-48, 161-63, PX 246. The "split memo" contained recommendations from two State Department entities that recommended termination of Haiti's TPS designation and from one bureau that recommended extension of Haiti's TPS designation.  PX 246; *see also* Trial Tr. 162-65.

Importantly, Mr. Posner reached his "highly unusual" assumption before he realized his error.  *Compare* Trial Tr. 126 *with* Trial Tr. 147-165.  Mr. Posner ultimately testified that a "split memo" is "evidence that a thorough review of the various perspectives were completed" (Trial Tr. 147-48)—and a thorough review of the various perspectives is precisely what occurred in connection with the Duke Decision.  Additionally, while Plaintiffs concede that "[t]he split memo did include a clearance page" (Pls. Findings 49 ¶ 158), Plaintiffs now claim that the U.S. Embassy should have "cleared the document" as well.  *Id.*  Plaintiffs' claim, however, remains unfounded.

Plaintiffs point to no evidence that the U.S. Embassy itself would need to "clear" such a split memo; rather, the Embassy would channel its views through the relevant regional bureau Assistant Secretary, who might adopt them, reject them, or incorporate them in part into the regional bureau's recommendation to the Secretary of State.  Trial 129-30.  Here, the Western Hemisphere Affairs bureau ("WHA") did, in fact, "clear" the split memo.  PX 246.005.  Further, the country conditions report, which was drafted by the Embassy and then edited and cleared, as appropriate, by other relevant State Department entities, was attached to the memorandum sent to Secretary of State Tillerson.  *See* PX 247.001 ("Tab 5—Country Conditions Report for Haiti").

### C.      Plaintiffs fail to prove their *ultra vires* claim.

Plaintiffs seek to invalidate the Duke Decision by asserting that the Government acted *ultra vires* pursuant to 8 U.S.C. § 1254a(b)(1).  Pls. Findings 93 ¶ 1.  Because Plaintiffs assert the same claim—that the Duke Decision was "undertaken without statutory authority and without the procedures required by law" (*Compare* Am. Compl. ¶ 7 with ¶¶ 159-60 and Pls. Findings 93 ¶ 1)— as both a violation of the INA and as a substantive violation of the APA, Plaintiffs cannot obtain relief "through the Court's inherent power to review *ultra vires* agency actions."  *See Jafarzadeh v. Duke*, 270 F. Supp. 3d 296, 311-12 (D.D.C. 2017) (dismissing *ultra vires* claim since the same claim could be asserted through the APA).  Assuming Plaintiffs' claims survive the TPS statute's preclusion provision, Plaintiffs have a means of obtaining review of the agency action under the APA and therefore cannot make a separate *ultra vires* claim.

In any event, even if the Court were to find that Plaintiffs have set forth a separate *ultra vires* claim, Plaintiffs have failed to prove, by a preponderance of the evidence said claim.  "To determine whether an agency acted *ultra vires*, the Court must follow the two-step *Chevron* analysis."  *Makransky v. Johnson*, 176 F. Supp. 3d 217, 227-28 (E.D.N.Y. 2016) (citations omitted).  The Court must first "question whether Congress has directly spoken to the precise

question at issue.  If the intent of Congress is clear, that is the end of the matter …"; second, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute."  *Id.* (citing *Chevron*).

The plain language of 8 U.S.C. § 1254a(b)(5)(A) is clear and the Duke Decision is consistent with the plain text of the statute.  And even assuming, *arguendo*, that § 1254a(b)(5)(A) is ambiguous, the Duke Decision is clearly a permissible interpretation of the statute for the reasons set forth above, particularly since it was consistent with longstanding DHS practice.

## V.     Plaintiffs Fail to Prove their Constitutional Claims.

### A.     Plaintiffs fail to prove their Equal Protection claim.

Plaintiffs' alleged evidence at trial of racial animus fails to establish an equal protection claim.  Plaintiffs assert that Acting Secretary Duke terminated Haiti's TPS designation because she was implementing the asserted racial animus reflected in various statements that the President purportedly made.  The evidence at trial fails to support this argument.  As the Government explained in its Proposed Findings of Facts and Conclusions of Law, Congress precluded judicial review of TPS determinations, regardless of the nature of Plaintiffs' challenge.  But even if Plaintiffs' equal protection claim were reviewable, Plaintiffs' claim fails because Plaintiffs offered insufficient evidence at trial to establish said claim.

#### i.     Plaintiffs cannot show discriminatory animus.

To prevail on their equal protection claim, Plaintiffs must prove that the Duke Decision was "motivated by discriminatory animus" and that "its application results in a discriminatory

effect." *Hayden v. Cty. of Nassau*, 180 F.3d 42, 48 (2d Cir. 1999).[15]  Discriminatory animus "implies more than intent as volition or intent as awareness of consequences. It implies that the decisionmaker ... selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group."  *Pers. Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).  Here, Plaintiffs fail to prove, by a preponderance of evidence, discriminatory animus.

Plaintiffs offered no evidence at trial that Acting Secretary Duke—the official who made the decision to terminate Haiti's TPS designation—harbored any discriminatory animus.  Acting Secretary Duke carefully considered the conditions of Haiti in reaching her decision.  She received input from relevant agencies and stakeholders, and at the end of the process, Acting Secretary Duke determined that the conditions in Haiti warranted termination.  Notably, at approximately the same time that Acting Secretary Duke made the decision to terminate Haiti's TPS designation, she decided against terminating TPS designations for Honduras and El Salvador.  Gov. Findings ¶ 110.[16]

---

[15] In its December 14, 2018 Decision and Order, the Court rejected the Government's arguments that, pursuant to *Trump v. Hawaii*, 138 S. Ct. 2392 (2018), rational basis review applies here.  Additionally, the Court rejected the Government's argument that *Reno v. Am.-Arab Anti-Discrimination Comm.*, 525 U.S. 471 (1999) ("*AADC*") requires Plaintiffs to meet a "particularly demanding" standard of showing by "clear evidence" that the TPS termination was based on "outrageous" discrimination.  *Id.*  Instead, the Court applied the standard set forth in *Arlington Heights v. Metropolitan Housing Development Corporation*, 429 U.S. 252 (1977).  The Government respectfully disagrees with the Court's December 14, 2018 and submits that *Hawaii* and *AADC* are applicable here.  But given the Court's ruling, the Government analyzes the Plaintiffs' constitutional claims under the *Arlington Heights* framework.

[16] As noted in Section IV.B, *supra*, Acting Secretary Duke did not simultaneously terminate TPS for Honduras or El Salvador notwithstanding a recommendation to terminate Honduras's and El Salvador's TPS designations from both the Secretary of State and the White House.  *See* PX 218.  Thus, in November 2017, Honduras's TPS designation was extended for 6 months (PX 218, 82 Fed. Reg. 59630) and Acting Secretary Duke did not deem it necessary to make a determination regarding El Salvador's TPS, given that its TPS designation did not expire until March 9, 2018 (PX 218, 239, 83 Fed. Reg. 2654).

Plaintiffs contend that President Trump harbored animus against non-white immigrants and that his purported animus should be imputed to Acting Secretary Duke. That logic is flawed in every respect. As the Government explained in its Proposed Findings of Fact and Conclusions of Law (Gov. Findings 67—73), it is inappropriate to impute the supposed animus in the President's purported statements to Acting Secretary Duke.

In any event, Plaintiffs have not proven, by a preponderance of the evidence, that the supposed animus in the President's purported statements was an intended and proximate cause of Acting Secretary Duke's Haiti TPS decision. *See Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011). Tellingly, the best evidence Plaintiffs identify is a meeting in which the President allegedly made remarks about Haiti that supposedly influenced the TPS decision-making process. But that meeting was held on January 11, 2018—*after* Acting Secretary Duke had already made and announced the decision to terminate Haiti TPS two months earlier in November 2017. Gov. Findings ¶ 100.[17]

Plaintiffs also cite a December 2017 article which references the President allegedly stating that Haitians "all have AIDS." Pl. Findings 116 ¶ 58 (citing PX 369.001).[18] Again, the December 2017 article was published *after* Acting Secretary Duke had already made her decision to terminate Haiti TPS, and could not have played any role in her decision-making process. Further, to the extent the article references a comment allegedly made by the President in June 2017, there is no

---

[17] Although the Federal Register notices announcing the termination of TPS for Haiti was posted on January 18, 2018, Acting Secretary Duke announced her decision to terminate Haiti's TPS designation on November 20, 2017—well before the January 11 meeting. *See* Press Release, Department of Homeland Security, Acting Secretary Elaine Duke *Announcement on Temporary Protected Status For Haiti* (Nov. 20, 2017); PX 114.001.

[18] Plaintiffs also cite PX361 and PX360 neither of which support Plaintiffs claim regarding the alleged comment made by President Trump. Pl. Findings 116 ¶ 58.

evidence that Acting Secretary Duke was aware of the alleged comment, or that she was present at the meeting where the alleged comment was made.

Plaintiffs further argue that an inquiry into criminal information and welfare data relating to Haitian TPS recipients in or around May 2017—during the time period when then-Secretary Kelly was assessing Haiti's TPS designation—is evidence of animus.  Pl. Findings 116-17 ¶ 59.  As stated in the Government's Proposed Findings of Fact and Conclusions of Law and as set forth in Part IV.B.ii.a *supra*, evidence relating to Secretary Kelly's decision-making process as it relates to Haiti TPS is beyond the scope of this action, as Plaintiffs here only challenge Acting Secretary Duke's decision.   Further, notwithstanding this purported animus, Secretary Kelly made the decision to *extend*—not terminate—Haiti's TPS designation.  Despite the irrelevance of Plaintiffs' arguments relating to Secretary Kelly's decision-making process, criminal information and public assistance data are relevant factors based on the TPS statute itself to the extent they impact the "national interest" of the United States.  *See* Section IV.B *supra*; *see also* 8 U.S.C. § 1254a(b)(1)(C).

Plaintiffs further argue that the Administration's "political appointees" adopted what they refer to as a "new standard contrary to the TPS statute and past practice."  *See* Pl. Findings 117 ¶ 59.  Plaintiffs cite evidence that political appointees overruled recommendations from career employees at the agency.  *See, e.g.,* Pls. Findings Sections IV.D. and IV.H.  As set forth in the Government's Proposed Findings of Fact and Conclusions of Law, this is a commonplace feature of agency decision-making, and Plaintiffs do not contend otherwise.  They point to no evidence that DHS officials were motivated by anything other than a legitimate belief that the countries in question no longer met the statutory criteria for TPS.  Further, and more important, Acting Secretary Duke did not employ any new standard when making her TPS determination, nor is there

any evidence of any new standard.  *See* Section IV.A *supra*.  Similarly, Haiti's participation in the H-2A/H-2B visa program similarly has no relevance to Acting Secretary Duke's TPS determination, and is not evidence of animus.  *See* Section V.A.ii, *infra*.

Indeed, the evidence that Plaintiffs themselves rely on shows that White House officials favored terminating TPS for certain countries because they believed that those countries no longer met the statutory requirements for TPS.  *See* Pls. Findings 63 ¶ 214—64 ¶ 216.  For example, the agenda for the cabinet-level principals' meeting on November 3, 2017 notes that "[e]xtending TPS for any or all of the four countries would prolong the distortion between the temporary protections that TPS was designed to provide and current circumstances."  PX 152.013; GX J (AR-S-_HAITI 129).  In that regard, the agenda discusses the economic conditions, rates of crime, access to food, and progress recovering from natural disasters in each of the countries.  *See id*.  The agenda ultimately recommended terminating TPS for the countries at issue, but noted that "[t]he Administration could signal its support" for a resolution "allow[ing] [TPS beneficiaries] to remain" as part of "a comprehensive immigration reform" bill focusing on a "merit based entry system."  PX 152.013; GX J (AR-S-_HAITI 129).

Plaintiffs rely (Pls. Findings 62 ¶¶ 209-10; 123 ¶ 14) on Acting Secretary Duke's reference to "America First" in her memo as evidence that the asserted animus in the President's purported statements played a role in her decision to terminate TPS.  Plaintiffs' argue that the Administration's "America First" approach to immigration "infected" the decision to "terminate TPS for Haiti and other predominantly non-white countries."  Pls. Findings 10 ¶ 16.  However, Plaintiffs' argument that the "America First" approach is somehow evidence of racial animus toward Haitians is not supported by the evidence adduced at trial.  Indeed, Acting Secretary Duke noted in a memo that the "America First view" might cut in favor of *extending* TPS because

terminating the designations might hinder the ability of the countries in question "to partner with USA on key initiatives" related to the nation's immigration and drug enforcement goals.  PX 179.001.  That she ultimately concluded that terminating Haiti TPS was most consistent with the national interest in no way suggests impermissible animus.

Accordingly, this Court should not impugn Acting Secretary Duke's careful decision, the multi-agency review that led to it, and the presumption of regularity that attaches to them, based on Plaintiffs' baseless and unsupported assertions of racial animus.

> ii.     **Plaintiffs' assertion related to H-2A and H-2B visas is irrelevant and, in any event, lacks merit.**

Plaintiffs assert that the Trump Administration targeted "Haiti in connection with the H-2A and H-2B visa programs," where "citizens of participating countries may apply for temporary work visas in certain fields."  Pls. Findings 13 ¶ 21, 116-117 ¶ 59.  Plaintiffs claim that the Government used "outdated data" to terminate Haiti's participation in the H-2A and H-2B visa program, which Plaintiffs claim is ostensibly proof of the Government's racial animus.  *Id.* Plaintiffs' unfounded assertion has no bearing on the Duke Decision or, for that matter, any claims in this litigation.  Indeed, it is not even clear whether Plaintiffs raise this claim with respect to their Equal Protection claim or procedural due process claim.

By way of background, under DHS regulations, USCIS may generally only approve petitions for H-2A and H-2B nonimmigrant status for nationals of countries that the Secretary of Homeland Security, with the concurrence of the Secretary of State, has designated by notice published in the *Federal Register*.  *See* 8 C.F.R. 214.2(h)(5)(i)(F) and 8 C.F.R. 214.2(h)(6)(i)(E). This designation is generally published yearly.  *Id.*  In 2018—over a year after the Duke Decision was announced—Secretary of DHS Kirstjen Nielsen identified the countries whose nationals are eligible to participate in the H-2A and H-2B program for 2018.  *See Identification of Foreign*

*Countries Whose Nationals Are Eligible To Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 83 Fed. Reg. 2646-01.  Secretary Nielsen determined, "with the concurrence of the Secretary of State, that the following countries should no longer be designated as eligible countries because they are not meeting the standards set out in the regulation: Belize, Haiti, and Samoa."  *Id.* at 2647.  As set forth in the *Federal Register* Notice, DHS found that:

> Haitian nationals applying for H-2A and H-2B visas present extremely high rates of refusal, and those issued H-2A or H-2B visas have historically demonstrated high levels of fraud and abuse and a high rate of overstaying the terms of their H-2 admission. Haiti has shown no improvement in these areas, and the Secretary of Homeland Security has determined, with the concurrence of the Secretary of State, that Haiti's inclusion on the 2018 H-2A and H-2B lists is no longer in the U.S. interest.

*Id.*[19]  Despite the rationale given in Secretary Nielsen's *Federal Register* Notice, Plaintiffs offer the conclusory suggestion that Haiti's termination from this program is rooted in alleged racial animus.  In support of their theory, Plaintiffs cite to Mr. Rodriguez, who testified that, when he was USCIS Director, he "would have wanted to see current data demonstrating what the current overstay rate and the current refusal rate were before entertaining such a decision."  Pls. Findings 13 ¶ 21 (citing Trial Tr. 308:7-309:4).

As an initial matter, Plaintiffs failed to even acknowledge that Mr. Rodriguez conceded that he has "not" [] "formed an opinion as to whether or not the evidence [] [was] sufficient to terminate H-2A and H-2B programs for Haitians."  Trial Tr. 308: 3-6.  In any event, contrary to Mr. Rodriguez's mistaken belief (Trial Tr. 307), the final decision would not have been left to Mr.

---

[19] DHS found that "Belize is listed on the U.S. Department of State's 2017 Trafficking in Persons Report as a 'Tier 3' country.  'Tier 3' means the country does not fully meet the Trafficking Victims Protection Act's minimum standards and is not making significant efforts to do so."  83 Fed. Reg. 2646, 2647.  DHS also found that "Samoa is currently listed as 'At Risk of Non-Compliance' according to ICE's year-end assessment of foreign countries' cooperation in accepting back their nationals that have been ordered removed from the United States. Despite attempts to improve cooperation on removals to Samoa, there has been not been sufficient progress on removals to Samoa."  *Id.*

Rodriguez while he was USCIS Director.  Under the controlling regulation, only the Secretary of Homeland Security, not the USCIS Director, has the authority to make the decision to remove Haiti from the list of countries eligible for the H-2A and H-2B programs. *See* 8 C.F.R. § 214.2(h)(5)(F) and 8 C.F.R. § 214.2(h)(6)(i)(E).  Mr. Rodriguez's testimony cannot substitute for the judgment of the current Secretary (or indeed past Secretaries) of DHS.  The Secretary of Homeland Security, with the concurrence of the Secretary of State, has the discretion to consider any factors that may serve the U.S. interest in making a determination, including the potential for abuse, fraud, or other harm to the integrity of the H-2A and H-2A visa programs. *See, e.g.,* 8 C.F.R. § 214.2(h)(5)(F) and 8 C.F.R. § 214.2(h)(6)(i)(E); *Identification of Foreign Countries Whose Nationals Are Eligible to Participate in the H-2A and H-2B Nonimmigrant Worker Programs*, 80 Fed. Reg. 72079 (published November 18, 2015) (removing Moldova from the H-2B list because Moldova did not continue to meet standards set out in the regulation for participation in the H-2B program, with no further explanation).  The Secretary's determination necessarily involves the input and advice of all DHS components, the Department of State, and other executive branch agencies and components.

Accordingly, the Court should not credit Plaintiffs' claims related to H-2A and H-2B visas, as they are totally irrelevant to the instant litigation and, in any event, without any merit.

**B.      Plaintiffs fail to prove their procedural Due Process claim.**

Plaintiffs claim that the Government has "deprived Plaintiffs of their property and liberty interests in violation of Procedural Due Process by terminating their TPS without complying with the requirements of the TPS statute."  Plaintiffs' Findings 118 ¶ 1—120 ¶ 7.  As noted in Section IV *supra*, Plaintiffs have not proven, by a preponderance of the evidence, that the Government failed to comply with the TPS statute, and thus, their Due Process claim fails as well.

"To succeed on a procedural due process claim … a plaintiff must first establish that the challenged action deprived [her] of a protected property interest." *ACE Partners, LLC v. Town of E. Hartford*, 883 F.3d 190, 195 (2d Cir. 2018) (internal quotation marks omitted). "To have a property interest, a person must have more than a unilateral expectation of it. [She] must, instead, have a legitimate claim of entitlement" based on, *inter alia*, an existing statute. *Id.* (citing *Board of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)); *accord Cancel v. N.Y.C. Human Resources Admin./Dep't of Social Servs.*, 527 Fed. App'x 42, 44 (2d Cir. 2013). When determining "whether a given benefits regime creates a property interest protected by the Due Process Clause" courts consider the "statutes and regulations governing the distribution of benefits." *Kapps v. Wing*, 404 F.3d 105, 113 (2d Cir. 2015). Where those "statutes or regulations … meaningfully channel official discretion by mandating a defined administrative outcome," a property interest exists. *Barrows v. Burwell*, 777 F.3d 106, 113-14 (2d Cir. 2015).

Plaintiffs claim that the TPS statute "meaningfully channel[s] official discretion with respect to extensions and terminations of TPS status," and are thus entitled to the DHS Secretary's determination to extend or terminate TPS status. *See* Pls. Findings 118 ¶1—120 ¶ 7. Plaintiffs cite *Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1121-23 (N.D. Cal. 2018) in support of this claim. In *Ramos*, however, the district court held that it is "doubtful whether Plaintiffs can state … a viable due process claim absent Defendants' violation of the APA or Equal Protection." *Id.* Here, Plaintiffs' reasoning rests on similarly fatal footing. Plaintiffs state plainly that "because the Secretary's determination violated the APA … it also violated Plaintiffs' [property and liberty interest]." *See* Pls. Findings 120 ¶ 6. Thus, as there is no APA violation, there is no violation of Plaintiffs' liberties and the due process claim must fail.

Moreover, to the extent Plaintiffs allege that Haitian TPS recipients will be denied due process in any individual actions, such a claim is without merit.  In the event that TPS is terminated, a TPS recipient who has no other lawful immigration status or authorization to remain in the United States,  and who does not have an existing, unexecuted order of removal, will still receive due process in the form of any potential removal proceedings, which includes proceedings in Immigration Court and, potentially, the pertinent U.S. Court of Appeals.[20]  It is also important to note that TPS is not automatic for all nationals of TPS-designated countries, as there are eligibility requirements and an application process.  And nothing prevents nationals who obtained TPS from seeking additional avenues towards permanent legal status in the United States if they are eligible.

## VI.    The Court Should Not Enter Permanent Injunctive Relief.

As set forth in the Government's Conclusions of Law, in the event that the Court enters judgment in favor of Plaintiffs, remand to the Department of Homeland Security is the only appropriate remedy.  *See* Gov. Findings 74—77.  Plaintiffs' request for permanent injunctive relief should be rejected.  *See* Pls. Findings 125 ¶ 1—128 ¶ 7.

### A.    Legal standards for permanent injunction.

Plaintiffs seeking permanent injunction must establish that: (1) they will suffer "an irreparable injury; (2) … remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) … considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) … the public interest would not be disserved by a permanent injunction." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156-57 (2010) (citation omitted).  Since "the government's interest *is* the public interest," the last two factors

---

[20] TPS beneficiaries who have prior final, unexecuted orders of removal also received due process before those orders were issued.  *See generally* 8 U.S.C. § 1229a; 8 C.F.R. Parts 1003, 1240.

merge.  *Pursuing Am. Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) (emphasis in original).  The standard for a permanent injunction is essentially the same as for a preliminary injunction, "except the plaintiff must show actual success on the merits for a permanent injunction rather than a likelihood of success."  *Spartan Capital Sec., LLC v. Stonbely*, No. 18CV6819LAKJLC, 2018 WL 6070001, at *4 (S.D.N.Y. Nov. 21, 2018), *report and recommendation adopted sub nom. Spartan Capital Sec., Inc. v. Stonbely*, No. 18-CV-6819 (LAK), 2019 WL 95476 (S.D.N.Y. Jan. 3, 2019) (citing *Aretakis v. Caesars Entm't*, 16-CV-8751 (KPF), 2018 WL 1069450, at *13 (S.D.N.Y. Feb. 23, 2018)).

**B.   Permanent injunction is not warranted.**

As noted in Section I *supra*, the permanent injunctive relief sought by Plaintiff is evidence that Plaintiffs' claims are subject to the TPS statute's preclusion provision, and thus not subject to judicial review.  But even assuming that the Duke Decision is subject to review, the Court should not grant Plaintiffs' request for permanent injunctive relief.

As an initial matter, Plaintiffs request that the Court "restrain[]" the Government "from implementing or enforcing" the Duke Decision, or, for that matter, any decision to terminate Haiti's TPS designation that does not meet Plaintiffs' understanding of the applicable law.  Pls. Findings 125 ¶ 1.  Implicit in Plaintiffs' requested relief is that the Court order Haiti's TPS designation to remain in effect seemingly *ad infinitum*—or alternatively, for as long as President Trump remains in office.  *See* Pls. Findings 127 ¶ 5 ("An injunction is thus necessary to prevent the *Trump Administration* from arriving at the same decision") (emphasis added); Am. Compl. at 44 (d) through (f).  Should the Court adopt Plaintiffs' sweeping request, the Court would essentially preclude the Secretary of Homeland Security—whom Congress has entrusted to make this decision (*see* U.S.C. § 1103; 6 U.S.C. § 557)—from terminating Haiti's TPS designation unless the Secretary agrees with Plaintiffs' assessment of Haiti's conditions.  And since Plaintiffs

have already agreed that "it is [not] possible to have a principle[d] review of the real facts under TPS and to come to a conclusion that it is proper and appropriate to terminate TPS status for Haiti at this time" (Trial Tr. 686), the Secretary would be obliged to maintain Haiti's TPS designation until Plaintiffs state that it is permissible to do otherwise.  Such an injunction would clearly place an enormous burden on the Government, as the Secretary would be forced to acquiesce to the views of Plaintiffs' attorneys rather than the assessment of DHS, the Department of State, or any other pertinent stakeholders.  *See, e.g., Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (equitable principles require that "injunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs."); *New York v. Shinnecock Indian Nation*, 560 F. Supp. 2d 186, 191 (E.D.N.Y. 2008) (Bianco, J.) (noting that an "injunction so much broader in scope than the injury sought to be prevented would, if granted, exhibit a lack of equity on its face, and this is reason enough for refusing to issue the injunction.") (quoting *Okaw Drainage Dist. of Champaign and Douglas County v. Nat'l Distillers and Chem. Corp.*, 882 F.2d 1241, 1247–48 (7th Cir. 1989)).  Plaintiffs' proposed injunction should therefore be rejected.

Further, Plaintiffs' proposed injunction does not cabin the proposed relief to the parties in this case.  Instead, as discussed at Gov. Findings 76—77, Plaintiffs are effectively seeking a permanent nationwide injunction.[21]  Plaintiffs, however, have not shown that they have standing for such a far-reaching, nationwide order.  The Supreme Court recently applied this principle to hold that a set of voters had not demonstrated standing to challenge alleged statewide partisan

---

[21] In *Ramos v. Nielsen*, 336 F. Supp. 3d 1075 (N.D. Cal. 2018), the district court issued a preliminary injunction enjoining the Secretary from enforcing the decisions to terminate TPS for Sudan, Nicaragua, Haiti, and El Salvador.  Though the Government construes the *Ramos* order as applying nationwide, the order does not expressly state whether the injunction so applies; nor did the district court make findings to justify application of the injunction beyond the *Ramos* plaintiffs.  In any event, on October 26, 2018, the parties in *Ramos* reached an agreement to stay district court proceedings pending final appellate review of the preliminary injunction. *See Ramos* Dkt. No. 137. That same day, the Court signed the parties' proposed stipulation, thereby staying the proceedings. *Id.* at Dkt No. 138.

gerrymandering beyond the legislative districts in which they resided, reasoning that a "plaintiff's remedy must be limited to the inadequacy that produced [his] injury-in-fact" (*Gill v. Whitford*, 138 S. Ct. 1916, 1930 (2018) (quoting *Lewis v. Casey*, 518 U.S. 343, 357 (1996)) and that "[t]he Court's constitutionally prescribed role is to vindicate the individual rights of the people appearing before it." *Gill*, 138 S. Ct. at 1933. An injunction barring the Government from enforcing the TPS termination decisions against the individual Plaintiffs—who are not part of a putative class— and their relatives would provide Plaintiffs with complete relief. Moreover, the TPS program already treats nationals of the same foreign state non-uniformly. TPS protections are available only to otherwise eligible aliens who have been  continuously physically present in the United States since the effective date of a TPS designation and who have continuously resided in this country since the date established by the Secretary. *See* 8 U.S.C. § 1254a(c)(1)(A). Individuals who arrive one month later than the earliest of those two dates, without other U.S. immigration authorization, and who are fleeing the same conditions, nevertheless receive no protection under the TPS statute.

Additionally, any harm Plaintiffs may suffer is based on the inherent nature of the TPS statute. Plaintiffs allege injuries resulting from the TPS terminations at issue here that are inherent in the temporary nature of TPS, including the "high levels of stress" that Haitian TPS recipients are purportedly experiencing. Pls. Findings 72 ¶ 248. Plaintiffs further contend that they are left with the choice of bringing their children with them to Haiti or being separated from their children. Pls. Findings 126 ¶ 4. Plaintiffs' concerns, however, are the inevitable result of the expressly temporary nature of the TPS program. These alleged harms would exist with or without the terminations at issue. As discussed above and in the Government's Proposed Findings of Fact and Conclusions of Law, a country's TPS designation must be reviewed at least every 18 months, and

there is no guarantee of renewal.  A TPS beneficiary is therefore always subject to the same uncertainties and concerns that Plaintiffs allege here.  It is worth noting again that any country's temporary protected status is temporary, as dictated by law.

Moreover, as the Supreme Court has explained in an immigration context, the questions of the harm to the defendant and the public interest "merge" when the government is the defendant. *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also You v. Nielsen*, 321 F. Supp. 3d 451, 461 (S.D.N.Y. 2018) (applying "the 'traditional' [*Nken*] test for stays in cases involving the government").  The government and public share an interest in ensuring that the process established by Congress—under which the Secretary of Homeland Security is vested with unreviewable discretion to carefully weigh the statutory factors governing TPS designations—is followed as Congress intended.  For these reasons, even where Plaintiffs have identified concrete harms, those harms will not be remedied by the requested injunction. The assurances that Plaintiffs seek can only be truly safeguarded through legislative action, not an injunction by this Court. Consequently, Plaintiffs have failed to show a likelihood of irreparable harm that could be remedied by this Court, and their request for a permanent injunction should therefore be denied. *See, e.g., Fort v. Am. Fed'n of State, Cty. & Mun. Employees*, 375 F. App'x 109, 112 (2d Cir. 2010) ("Plaintiffs' patent inability to demonstrate imminent and irreparable harm further supports the dismissal of their complaint seeking permanent injunctive relief.") (citing *Roach v. Morse*, 440 F.3d 53, 56 (2d Cir. 2006)).

Finally, as expressed in the Government's Conclusions of Law (*see* Gov. Findings 74—77), should the Court decide, over the Government's objection, to vacate the Duke Decision or issue an injunction, any such relief should be limited to the parties before the Court, and  should not be applied nationwide.  The Supreme Court and Second Circuit have made clear that a court's

injunctive power is limited to relief "no broader than necessary to cure the effects of the harm caused by the violation," and that courts must "mould each decree to the necessities of the particular case." *Forschner Grp. v. Arrow Trading Co.*, 124 F.3d 402, 406 (2d Cir. 1997) (citations omitted). "Injunctive relief should be narrowly tailored to fit specific legal violations." *Waldman Publ'g Corp. v. Landoll, Inc.*, 43 F.3d 775, 785 (2d Cir. 1994); *see also Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994); *Califano*, 442 U.S. at 702; *U.S. Dep't of Def. v. Meinhold*, 510 U.S. 939 (1993) (granting stay of military-wide injunction except as to individual plaintiff). Issuing injunctions that provide relief to non-parties subverts the class-action mechanism provided under the Federal Rules of Civil Procedure. *See McKenzie v. City of Chicago*, 118 F.3d 552, 555 (7th Cir. 1997); *Los Angeles Haven Hospice, Inc. v. Sebelius*, 638 F.3d 644, 664 (9th Cir. 2011) (nationwide injunctions are especially inappropriate "where there is no class certification.").

In sum, the injunctive relief sought by Plaintiffs would frustrate and displace the Secretary od DHS's substantive judgment as to how to implement the TPS statute.

### C.    Should the Court find for Plaintiffs, the only available relief is remand.

Should the Court conclude that the Duke Decision is not supported by the administrative record or is otherwise unlawful, the Court should remand this matter, without vacatur, to DHS for further consideration. *See State of New York Dep't of Soc. Servs. v. Shalala*, 21 F.3d 485, 493 (2d Cir. 1994) ("If the record before the agency does not support the agency action . . . or if the reviewing court simply cannot evaluate the challenged agency action on the basis of the record before it, the proper course … is to remand to the agency for additional investigation or explanation.") (quoting *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985)).  Remand, without vacatur, would afford the Secretary of DHS an opportunity to craft a remedy in the first instance over a decision to which Congress has entrusted the Secretary to operate.  *Cf. Shands Jacksonville Med. Ctr., Inc. v. Azar*, 2018 WL 6831167, at *13 (D.D.C. Dec. 28, 2018) (finding

46

that remand is consistent with the "substantial deference that Courts owe to the Secretary [of Health and Human Services] in the administration of such a 'complex statutory and regulatory regime.'") (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 404 (1993)).   In the alternative, the Court should remand with vacatur rather than enter into any form of injunctive relief. *See Nat. Res. Def. Council v. EPA*, 676 F. Supp. 2d 307, 312 (S.D.N.Y. 2009) ("Where a court remands an agency action for further proceedings, the determination of whether to vacate the action is within the court's discretion.").

Importantly, as the Court noted in its December 14, 2018 decision, "[w]ere Plaintiffs to prevail on their claims, [the Government] would not be compelled to extend Haiti's TPS designation, but rather would be required to make a new, good faith, evidence-based determination regarding Haiti's status by applying lawful criteria. Such a new determination may very well still result in Haiti losing its temporary protected status." *Saget*, 345 F. Supp. 3d at 295.

In short, should the Court find for Plaintiffs, the only proper remedy is a remand of this matter to DHS without vacatur of the Duke Decision, and a denial of the remainder of the relief sought by Plaintiffs.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in the Government's Proposed

Findings of Fact and Conclusions of Law, the Government respectfully requests that the Court

dismiss this action in its entirety, and judgment should issue in favor of the Government.

Dated:  Brooklyn, New York
      March 1, 2019

                                        RICHARD P. DONOGHUE
                                        United States Attorney

                  By:            /s/
                                        Joseph A. Marutollo
                                        James R. Cho
                                        Assistant U.S. Attorneys
                                        718-254-6288/6519
                                        Joseph.marutollo@usdoj.gov
                                        James.cho@usdoj.gov

cc:    **BY E.C.F.**
        Counsel of Record

48