# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

PATRICK SAGET, SABINA BADIO FLORIAL, )
NAÏSCHA VILME, GERALD MICHAUD, )
BEATRICE BELIARD, RACHELLE GUIRAND, )
JEAN CLAUDE MOMPOINT, YOLNICK )
JEUNE, GUERLINE FRANCOIS, LEOMA )
PIERRE, HAÏTI LIBERTÉ, and FAMILY )
ACTION NETWORK MOVEMENT, INC., )
                               )    No. 1:18-cv-01599
          Plaintiffs,               )    Kuntz, J.
                                 )    Tiscione, M.J.
      vs.                               )
                                 )
DONALD TRUMP, President of the United States )
of America, UNITED STATES OF AMERICA, )
DEPARTMENT OF HOMELAND SECURITY, )
KIRSTJEN NIELSEN, Secretary of Homeland )
Security, and ELAINE C. DUKE, Deputy
Secretary of Homeland Security,

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Ira J. Kurzban, (NY Bar No. 5347083)
Kevin Gregg*
KURZBAN, KURZBAN,
TETZELI & PRATT, P.A.
2650 S.W. 27th Avenue, 2nd Floor
Miami, FL 33133
Phone: (305) 440-0060
ira@kktplaw.com

Sejal Zota*
NATIONAL IMMIGRATION PROJECT OF THE
NATIONAL LAWYERS GUILD
89 South Street, Suite 603
Boston, MA 02111
Phone: (919) 698-5015
sejal@nipnlg.org

Christopher J. Houpt (NY Bar No. 4452462)
MAYER BROWN LLP
1221 Avenue of the Americas
New York, NY 10020
Phone: (212) 506-2500
choupt@mayerbrown.com

Howard Roin*
Geoffrey M. Pipoly*
MAYER BROWN LLP
71 S. Wacker Drive
Chicago, IL 60606
Phone: (312) 782-0600
gpipoly@mayerbrown.com

Miriam Nemetz*
MAYER BROWN LLP
1999 K Street, N.W.
Washington, D.C. 20006
Phone: (202) 263-3253
mnemetz@mayerbrown.com

*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs*

## <u>TABLE OF CONTENTS</u>

Page

TABLE OF CONTENTS ............................................................................................................ ii

TABLE OF AUTHORITIES ...................................................................................................... iv

INTRODUCTION ....................................................................................................................... 1

FINDINGS OF FACT ................................................................................................................. 1

I.      DEFENDANTS IGNORE MOST OF THE PROCEDURAL IRREGULARITIES DURING THE TRUMP ADMINISTRATION'S TPS REVIEW. .................................................................................................................... 1

      A.    Defendants Ignore DHS's Statutorily-Irrelevant Focus on Criminality, Legality, and Welfare Data About Haitian TPS Recipients. ............................................................................................... 1

      B.    Defendants Ignore The Evidence That Trump Administration Political Appointees Simply Edited Out Bad Facts In Order To Reach Its Preferred Outcome, Terminating Haiti's TPS. ........................ 2

II.     DEFENDANTS MISCHARACTERIZE THE EVIDENCE CONCERNING ACTING SECRETARY DUKE'S ROLE IN THE TPS DECISION FOR HONDURAS AND EL SALVADOR. ...................................... 3

III.    DEFENDANTS MISCHARACTERIZE OR IGNORE OTHER FACTS RELEVANT TO ACTING SECRETARY DUKE'S CONDUCT. ...................... 5

      A.    The Termination of Haiti's TPS Was the Result of Political Pressure, Not a Good Faith Examination of the Evidence. ....................... 5

      B.    Defendants Present No Evidence of How—If At All—Acting Secretary Duke Considered or Weighed the Evidence She Was Presented. .............................................................................................. 7

IV.    THE FACT THAT REMOVALS OF NON-TPS RECIPIENTS TO HAITI HAD RESUMED IN 2016 IS IRRELEVANT TO WHETHER TO EXTEND HAITI'S TPS. ............................................................................... 9

V.     DEFENDANTS MISCONSTRUE AND MISCHARACTERIZE THE TESTIMONY OF PLAINTIFFS' TRIAL WITNESSES. ................................. 10

      A.    Defendants Mischaracterize the Testimony of Former Assistant Secretary of State Michael Posner. ......................................................... 10

      B.    Defendants Mischaracterize The Testimony of Former USCIS Director Leon Rodriguez. ........................................................................ 14

      C.    Defendants Mischaracterize The Testimony of Plaintiffs' Country Conditions Experts. .............................................................................. 19

CONCLUSIONS OF LAW ....................................................................................................... 21

ii

I.    THIS COURT HAS JURISDICTION OVER PLAINTIFFS' STATUTORY AND CONSTITUTIONAL CLAIMS. ....................................... 21

II.   PLAINTIFFS HAVE PROVEN THEIR STATUTORY AND ULTRA VIRES CLAIMS. ...................................................................... 26

      A.    This Court's Review is Not Limited to the 318 Pages Defendants Designated as the "Administrative Record." ............................ 26

      B.    Defendants' Decision to Terminate TPS Was Arbitrary and Capricious Under the Administrative Procedures Act and Also Was Ultra Vires ...................................................................... 27

      C.    Defendant's Decision to Terminate TPS Was Based on A New Interpretation of the TPS Statute, Which Focused Only On The Original Event Prompting the Designation for TPS—in Haiti's Case, the 2010 Earthquake—While Ignoring or Minimizing Subsequent, Intervening Events. ................................................ 32

      D.    Plaintiffs Have Proven Their Notice and Comment Claim. .................. 38

      E.    Plaintiffs Have Proven Their RFA Claims. ............................... 39

III.  PLAINTIFFS HAVE PROVEN THEIR CONSTITUTIONAL CLAIMS.......... 41

      A.    Plaintiffs' Constitutional Claims Are Not Limited To The Administrative Record. .......................................................... 41

      B.    The Evidence Supports Plaintiffs' Constitutional Claims. .................... 42

      C.    Plaintiffs' Evidence Is Admissible ........................................... 45

IV.   PLAINTIFFS ARE ENTITLED TO AN INJUNCTION. ................................... 47

CONCLUSION.................................................................................... 50

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Batalla Vidal v. Nielsen*,
   291 F. Supp. 3d 260 (E.D.N.Y. 2018) .................................................................... 39, 42, 43, 49

*Battaglia v. Gen. Motors Corp.*,
   169 F.2d 254 (2d Cir. 1948) ............................................................................................ 25

*Centro Presente v. DHS*,
   332 F. Supp. 3d 393 (D. Mass. 2018)............................................................................ 35, 36

*Chamber of Commerce v. SEC*,
   443 F.3d 890 (D.C. Cir. 2006)........................................................................................ 31

*Citizens to Preserve Overton Park v. Volpe*,
   401 U.S. 402 (1971) ..................................................................................................... 31, 41

*City Club of New York v. United States Army Corps of Engineers*,
   246 F. Supp. 3d 860 (S.D.N.Y. 2017) ........................................................................... 49

*Cowpasture River Preservation Ass'n v. Forest Serv.*,
   911 F.3d 150 (4th Cir. 2018).......................................................................................... 27

*F.D.I.C. v. Stovall*,
   2014 WL 8251465 (N.D. Ga. Oct. 2, 2014) ................................................................. 46

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..................................................................................................... 27, 30

*Gonzales v. Oregon*,
   546 U.S. 243 (2006) ....................................................................................................... 48

*Green v. Cty. Sch. Bd.*,
   391 U.S. 430 (1968) ....................................................................................................... 48

*Grill v. Quinn*,
   2012 WL 174873 (E.D. Cal. Jan. 20, 2012) ................................................................. 41

*Guertin v. United States*,
   743 F.3d 382 (2d Cir. 2014)........................................................................................ 48, 49

*Hobbs v. Employers Mut. Cas. Co.*,
   No. 17-CV-5040, 2018 WL 1221166 (D.S.D. Mar. 8, 2018)......................................... 46

*Impresa Construzioni Geom. Domenico Garufi v. United States,*
  238 F.3d 1324 (Fed. Cir. 2001) ........................................................... 31

*Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Protection,*
  482 F.3d 79 (2d Cir. 2006) ................................................................. 31

*L.M. v. Johnson,*
  150 F. Supp. 3d 202 (E.D.N.Y. 2015) ............................................. 38, 39

*L.V.M. v. Lloyd,*
  318 F. Supp. 3d 601 (S.D.N.Y. 2018) ............................................. 49, 50

*Lane v. Page,*
  272 F.R.D. 581 (D.N.M. 2011) ........................................................... 46

*Leedom v. Kyne,*
  358 U.S. 184 (1958) ........................................................................... 25

*Lewis-Mota v. Sec'y of Labor,*
  469 F.2d 478 (2d Cir. 1972) .............................................................. 38

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ........................................................................... 48

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ........................................................................ 30, 31

*N.C. State Conference of NAACP v. McCrory,*
  831 F.3d 204 (4th Cir. 2016) ............................................................. 48

*Nat'l Audubon Soc. v. Hoffman,*
  132 F.3d 7 (2d Cir. 1997) .................................................................. 41

*Nat'l Audubon Soc'y v. Dep't of Navy,*
  422 F.3d 174 (4th Cir. 2005) ............................................................. 27

*Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs,*
  145 F.3d 1399 (D.C. Cir. 1998) .......................................................... 47

*National Archives & Records Administration v. Favish,*
  541 U.S. 157 (2004) ........................................................................... 31

*New York v. United States Dep't of Commerce,*
  351 F. Supp. 3d 502 (S.D.N.Y. 2019) ......................................... 47, 48, 49

*Nw. Min. Ass'n v. Babbitt,*
  5 F. Supp. 2d 9 (D.D.C. 1998) ...................................................... 40, 50

*Organized Vill. of Kake v. U.S. Dep't of Agriculture,*
  795 F.3d 956 (9th Cir. 2015) ............................................................. 27

*Ramos v. Nielsen*,
  321 F. Supp. 3d 1083 (N.D. Cal. 2018)........................................................*passim*

*Regents of the Univ. of California v. DHS*,
  908 F.3d 476 (9th Cir. 2018)................................................................ 47

*Ru Jun Zhang v. Lynch*,
  2018 WL 1157756 (E.D.N.Y. Mar. 1, 2018)................................................ 27

*Scialabba v. Cuellar de Osorio*,
  573 U.S. 41 (2014) ............................................................................ 28

*Sierra Club v. U.S. Army Corps of Eng'rs*,
  701 F.2d 1011 (2d Cir. 1983) ................................................................ 30

*Sierra Club v. U.S. Army Corps of Engineers*,
  614 F. Supp. 1475 (S.D.N.Y. 1985) ........................................................ 41

*Thornburg v. Open Dealer Exch.*,
  LLC, No. 17-CV-6056, 2018 WL 340050 (W.D. Mo. Jan. 9, 2018) ................... 46

*Town of Orangetown v. Ruckleshaus*,
  740 F.2d 185 (2d Cir. 1984) ................................................................. 27

*Trump v. Hawaii*,
  138 S. Ct. 2392 (2018) ....................................................................... 49

*Tummino v. Hamburg*,
  936 F. Supp. 2d 162 (E.D.N.Y. 2013) ..................................................... 26

*U.S. Telecom Ass'n v. FCC*,
  400 F.3d 29 (D.C. Cir. 2005)................................................................ 39

*United States v. New Orleans Public Service, Inc.*,
  723 F.3d 22 (5th Cir. 1984) ................................................................. 31

*Weitnauer Trading Co. Ltd. v. Annis*,
  516 F.2d 878 (2d Cir. 1975) ................................................................ 45

**Statutes**

5 U.S.C. § 601(3) ............................................................................ 39, 40

5 U.S.C. § 601(6) ............................................................................ 39, 40

5 U.S.C. § 603(a) ............................................................................... 39

5 U.S.C. § 604(a) ............................................................................... 39

5 U.S.C. § 611(4)(A)........................................................................... 50

5 U.S.C. § 611(4)(B)........................................................................... 50

5 U.S.C. § 706(2)(A) ........................................................................................................... 47

8 U.S.C. § 1254a .......................................................................................................... *passim*

**Other Authorities**

13 C.F.R. § 121.201 ........................................................................................................... 40

65 Fed. Reg. 33356 ............................................................................................................ 36

67 Fed. Reg. 22,454 .......................................................................................................... 33

68 Fed. Reg. 3,896 ............................................................................................................ 36

69 Fed. Reg. 40,642 .......................................................................................................... 36

71 Fed. Reg. 16,333 .......................................................................................................... 33

77 Fed. Reg. 59,943 .......................................................................................................... 33

80 Fed. Reg. 893 ............................................................................................................... 33

81 Fed. Reg. 44,645 ............................................................................................................ 5

83 Fed. Reg. 26,074 ....................................................................................................... 4, 35

83 Fed. Reg. 2,654 ............................................................................................................. 5

5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1264 (3d ed.) ...................... 46

Fed. R. Civ. P. 8 ............................................................................................................... 45

Fed. R. Evid. 801(d)(2) ..................................................................................................... 45

Senator Joseph McCarthy. Hendrik Hertzberg, *The "IC" Factor*, THE NEW YORKER,
   August 7, 2006 ............................................................................................................ 11

*Statement to Congress*, N.Y. Times, Feb. 27, 2017,
   https://www.nytimes.com/2019/02/27/us/politics/cohen-documents-testimony.html ......................... 46

## INTRODUCTION

Plaintiffs respectfully submit the following proposed supplemental Findings of Fact and Conclusions of Law.  They are submitted in response to the Government's Post-Trial Findings of Fact and Conclusions of Law, Dkt.135 ("Defs' F&C").

## FINDINGS OF FACT

### I.   DEFENDANTS IGNORE MOST OF THE PROCEDURAL IRREGULARITIES DURING THE TRUMP ADMINISTRATION'S TPS REVIEW.

1.      In their closing argument at trial (s*ee* Trial Tr. 613:4-689:18), and then again in the Corrected Proposed Findings of Fact and Conclusions of Law ("Plfs' F&C"), Plaintiffs presented a comprehensive factual account of the many ways in which Trump Administration political appointees, working behind closed doors, cast aside the actual country conditions in Haiti, and manipulated or disregarded established norms and practices for TPS review in order to achieve their preordained goal of terminating Haiti's TPS.  Plfs' F&C Section IV.

2.      At trial, Defendants said that they would "address" the facts set forth in Plaintiffs' closing argument "in full in [Defendants'] proposed findings of fact and conclusions of law." Trial Tr. 691:16-19.  But Defendants have done no such thing, opting instead to remain completely silent about the statutory and procedural violations that occurred at USCIS and DHS.  Defendants' disregard of this evidence in their Findings and Conclusions suggests that Defendants either have no answer or have elected to hold their fire in order to sandbag Plaintiffs in their responsive submission.  In either event, the facts Defendants ignore are critical.

#### A.   Defendants Ignore DHS's Statutorily-Irrelevant Focus on Criminality, Legality, and Welfare Data About Haitian TPS Recipients.

3.      Plaintiffs presented unrebutted evidence showing that, beginning in the Spring of 2017, Secretary Kelly and other Trump Administration political appointees insisted on investigations within USCIS to ascertain how many Haitian TPS recipients were criminals, on

welfare, or "illegal, pre-TPS designation."  Plfs' F&C Section IV.C, pp. 18-24.  The Trump Administration political employees persisted in these investigations (*id*. ¶ 57) even though non-political career officials within USCIS repeatedly told them that this data was irrelevant to the statutorily-required TPS review process because criminals are ineligible for TPS; "in general, TPS holders don't qualify for federal benefits" (*id*., p. 20, ¶ 50); and the "TPS statute does not require individual to have lawful status in order to qualify for TPS" (*id*. p. 22, ¶ 55).

4.      The evidence presented at trial further showed that the purpose of these inquiries was to manufacture a rationale to terminate Haiti's TPS regardless of whether or not Haitian nationals could safely return to Haiti.  *See, e.g*., Plfs' F&C p. 23, ¶ 59; *see also id.* Section III.A.1, p. 101-102, ¶¶ 17-19.

5.      Although Plaintiffs focused on these tellingly irrelevant investigations in their response to Defendants' motion to dismiss (ECF Dkt. No. 62, at 6); at trial, including in closing argument (Trial Tr. 626:6-628:21; 633:16-22); and in their proposed findings and conclusions; Defendants' proposed findings and conclusions do not even mention the Trump Administration political appointees' repeated requests for criminality, legality, and welfare information about Haitian TPS recipients, let alone attempt to explain why such requests were appropriate.

**B.      Defendants Ignore The Evidence That Trump Administration Political Appointees Simply Edited Out Bad Facts In Order To Reach Its Preferred Outcome, Terminating Haiti's TPS.**

6.      The uncontested record shows that the TPS review process within USCIS begins at RAIO, a directorate within USCIS staffed by non-political civil servants who are subject-matter experts on country conditions.  Plfs' F&C Section IV.A, p. 13, ¶ 22.  RAIO compiles a country conditions report, which then forms the basis of a more "distilled" memorandum from the USCIS director to the DHS Secretary (the "Director Memo"), in which the USCIS director makes a

recommendation to the Secretary about whether to extend, terminate, or re-designate a country for TPS. *Id*, p. 14, ¶¶ 23-24.

7.      The evidence at trial established that after RAIO reported on the country conditions in Haiti, which showed that extension of Haiti's TPS was warranted, Trump Administration political appointees edited the Director Memos to remove inconvenient facts and recommend that Haiti's TPS be terminated. Plfs' F&C Section IV.D, pp. 24-31; *id.* Section IV.L, pp. 55-58.  The Director Memo signed by USCIS Director Cissna (the "Cissna Memo") also employed a new interpretation of the TPS statute, embracing the legally erroneous premise that country conditions not attributable directly to the 2010 earthquake are irrelevant to the TPS analysis.  *See* PX 136.004 (concluding that Haiti's continuing problems are not "directly tied to the 2010 earthquake"). This evidence shows that the Director's Memo's recommendation, which Acting Secretary Duke essentially adopted in the Federal Register notice terminating TPS for Haiti, was not a good-faith examination of the facts but rather was the product of a deliberate effort to manufacture a rationale for the predetermined result: termination.

8.      Even through Plaintiffs consistently focused on these points throughout the litigation and trial, Defendants' Findings and Conclusions do not even mention them, let alone attempt to refute them.

## II.      DEFENDANTS MISCHARACTERIZE THE EVIDENCE CONCERNING ACTING SECRETARY DUKE'S ROLE IN THE TPS DECISION FOR HONDURAS AND EL SALVADOR.

9.      In their findings and conclusions, Defendants argue that the fact that Acting Secretary Duke "did not simultaneously terminate TPS for Honduras or El Salvador" proves that Duke "was making her own decisions regarding TPS designations."  Defs' F&C Section V.A, p. 33, ¶ 110.  This assertion is flatly incorrect, and is based on a misinterpretation of the evidence.

10.     First, as to Honduras, Defendants claim that Acting Secretary Duke "extended for 6 months" Honduras' TPS designation, and point to a November 6, 2017 email from Chad Wolf, Duke's Chief of Staff, as support.  PX 218.002; *see also* PX 96.001.  Wolf's email passed on a message from Duke regarding her decisions on Honduras and Nicaragua.  Wolf's email, however, contradicts Defendants' contention that Duke made a dispassionate decision to affirmatively extend Honduras's TPS designation.  In reality, Duke simply issued a "'No Determination' decision for Honduras," PX 218.002, which triggered an automatic six-month extension under the TPS Statute. Wolf's email relayed that Duke made no decision on Honduras because she had only received documents on Honduras "within the last 5 days." *Id.*

11.     More critically, the text of the email Defendants rely on reveals that Duke already intended to terminate Honduras's TPS but simply wanted more time to assemble the reasons for doing so.  According to Wolf's email, Duke "want[ed] to understand [facts related to Honduras] better so [she] can adequately determine the appropriate ***plan and path for termination.***" PX 218.002 (emphasis added).  Indeed, in Duke's own words, "[b]y not affirmatively extending, I'm stating that I'm not satisfied that the country conditions [justifying TPS] remain – but not yet sure how to best ***end TPS for this country***." PX 218.002 (emphasis added).

12.     The sixth months Acting Secretary Duke provided was apparently enough time for the Trump Administration to come up with a "plan and path for termination," (PX 218.002), as it indeed terminated Honduras' TPS at the next possible opportunity. *See* 83 Fed. Reg. 26074 (June 5, 2018) (terminating TPS for Honduras).

13.     *Second*, as to El Salvador, Defendants assert that Acting Secretary Duke "did not deem it necessary to make a determination regarding El Salvador's TPS, given that its TPS designation did not expire until March 9, 2018."  Defs' F&C Section V.A, p. 33, ¶ 110; *see also*

81 Fed. Reg. 44645-03 (July 8, 2016).  But Defendants' argument is a red herring:  making a decision one way or the other on El Salvador's TPS was not Duke's job., as the decision on El Salvador fell to her successor, Defendant Kirstjen Nielsen.  Under the TPS statute's 60-day review procedure, a decision whether to extend or terminate was due on January 9, 2018. Nielsen was confirmed as Duke's successor on December 6, 2017—over a month before a decision on El Salvador was due.

14.     Defendants again refer to Chad Wolf's November 6 email, PX 218—but this email contains no reference whatsoever to El Salvador—confirming that Duke took no action on El Salvador because it was not her decision to make.

15.     Significantly, as it did with Honduras, the Trump Administration terminated El Salvador's TPS status at the earliest opportunity. 83 Fed. Reg. 2654 (Jan. 18, 2018).

## III.     DEFENDANTS MISCHARACTERIZE OR IGNORE OTHER FACTS RELEVANT TO ACTING SECRETARY DUKE'S CONDUCT.

### A.     The Termination of Haiti's TPS Was the Result of Political Pressure, Not a Good Faith Examination of the Evidence.

16.     The record establishes that the Trump White House pressured Acting Secretary Duke to terminate Haiti's TPS.   Plfs' F&C, at Section IV.O, pp. 63-66. Attempting to wave off this evidence, Defendants deem it "unremarkable" that "a White House would provide input" on a matter such as whether to extend or terminate TPS.  Defs' F&C Section II.C.iii, p. 69.  But Plaintiffs' evidence shows that the Trump White House did far more than merely "provide input." It pressured Acting Secretary Duke to make the only decision the Trump White House would accept: termination of Haiti's TPS.

17.     For example, although Defendants acknowledge PX 152, a discussion paper for a "Principles Small Group Meeting" on TPS created for a November 3, 2017 White House Meeting (Defs' F&C Section V.a.vii, p. 29, ¶¶ 94-95), they ignore the document's stated purpose—to

"coordinate the … process for ***terminating temporary protected status***" for four countries, including Haiti. PX152.011 (emphasis added). Thus, before Duke made any decisions about TPS, the White House called her in to discuss how Haiti's TPS was to be terminated.

18.    Defendants also ignore the evidence—including Duke's handwritten notes— showing that at the White House meeting, then-Attorney General Jeff Sessions told  Duke that she "can't keep certifying," that until the Trump administration "no one ha[d] the guts to pull the trigger," and that Duke should simply "bite the bullet" and terminate Haiti's TPS. Plfs' F&C Section IV.O, p. 64, ¶ 216. Although the notes are part of the Administrative Record, and although at trial Plaintiffs specifically discussed the Attorney General's directive that Duke terminate Haiti's TPS (Trial Tr. 667-668), Defendants simply ignore that directive.

19.    Similarly, Defendants cherry-pick from and misconstrue Acting Secretary Duke's handwritten notes memorializing a call she had with Trump White House officials Tom Bossert and Zack Fuentes. For example, Defendants note that someone on the call said that whether to extend or terminate TPS was "entirely [Duke's] decision." Defs' F&C Section V.B, p. 30, ¶ 100. But Defendants omit the critical facts that on that call, Duke was told that "conditions [for extension] in 4 countries no longer exist," that in the White House's view, prior extensions of TPS were the result of "gutless federal bureaucrats," and that the White House would be "extremely disappointed" if she did not terminate, "kick[ing]" the decision into the "lap of [the] next sec[retary]." Plfs' F&C Section V.O, p. 54, ¶ 217.

20.    Defendants likewise ignore Acting Secretary Duke's ***own written admission that she terminated TPS because the White House wanted her to***. Defendants never mention the fact that in a November 6, 2017 email to then-White House Chief of staff John Kelly, Duke wrote that she was terminating in order to "send a clear signal that TPS in general is coming to a close," and

that her decision was "consistent with the President's position on immigration," and a way to "get to the President's objectives" on immigration. Plfs' F&C Section V.O, p. 65, ¶ 218 (quoting PX 096.001).

21. Nor do Defendants ever mention that John Kelly, while White House Chief of Staff, essentially admitted in a November 10, 2017 email that he pressured Duke to terminate, writing that he had "ensur[ed]" Duke's "agenda adherence" during a phone call about TPS. Plfs' F&C Section V.O, p. 65, ¶ 221 (quoting PX 184.001).  In short, Defendants omit or mischaracterize critical evidence showing that the White House pressured Acting Secretary Duke to terminate TPS.

**B.**     **Defendants Present No Evidence of How—If At All—Acting Secretary Duke Considered or Weighed the Evidence She Was Presented.**

22. Defendants assert that, when making her TPS decision, Acting Secretary Duke "receive[d] input" from many sources including the October, 2017 RAIO Report, the Cissna Director's Memo, the State Department's recommendation, a statement of legal authority from USCIS, assessments from other agencies within DHS, and assessments from the Haitian government.  Defs' F&C Section V.A, pp. 13-29.  But the mere fact that Acting Secretary Duke may have *received* information from a variety of sources says nothing about how—if at all—she *weighed* the information in making her decision.

23. In an effort to fill that gap, Defendants point to the character testimony of former Ambassador James Nealon, who worked with Duke at DHS. Defendants note that Nealon testified that Duke was, in general "'very interested'" in TPS.  They highlight Nealon's testimony that Duke was, on the whole, a "hard-working government employee" who "struggled" with TPS decisions because she knew they were "consequential." Nealon described Duke as a "very active consumer of information about TPS," and noted that she met with various community leaders and read "voraciously." Defs' F&C Section VI.A, p. 32. Defendants also claim—without any supporting

testimony—that Duke read and "digested" the RAIO report because she took handwritten notes in the margins of that document. Defs' F&C Section V.A.i.d, p. 25, ¶ 80.

24.     Defendants contend that Nealon's testimony establishes that Duke dispassionately and even-handedly reviewed all the information that came before her and paid no heed to either the skewed advice in the Cissna Memo or to White House pressure to come to a particular outcome. In reality, however, Nealon's general testimony that Duke was "hard working" sheds no light on how Duke made the decision to terminate Haiti's TPS. Moreover, because Defendants elected not to call Duke at trial, they are estopped from affirmatively relying on Nealon's testimony to speculate about Duke's supposed thought processes when she terminated Haiti's TPS.

25.     Had Defendants called Duke as a witness at trial, all parties—and this Court—could have evaluated how much weight Duke gave to the various sources placed in front of her. But Defendants chose not to present Duke as a witness at trial.

26.     More to the point, none of Defendants' evidence shows that Duke ignored the sustained pressure exerted on her by the White House as the TPS decision date approached, and none of Defendants' evidence shows that she even considered the 2017 RAIO Report.  Rather, the evidence shows that Acting Secretary Duke simply adopted the Cissna Memo, which was rewritten by political operatives to support "the conclusion" that the Trump Administration was "looking for."  PX 078.001. For this reason and as shown below, the Federal Register Notice terminating Haiti's TPS closely tracked, and is in material respects nearly identical to, the Cissna Memo, not the RAIO Report.  Plfs' F&C Section V.P, pp. 66-67; *id*. at Section IV.M., pp. 58-62 (showing the numerous ways in which the Cissna Memo differs from the October, 2017 RAIO Report).

## IV.   THE FACT THAT REMOVALS OF NON-TPS RECIPIENTS TO HAITI HAD RESUMED IN 2016 IS IRRELEVANT TO WHETHER TO EXTEND HAITI'S TPS.

27.    Defendants make much of the fact that, in September, 2016, then-DHS Secretary Jeh Johnson resumed deportation of unlawfully present, non-TPS Haitians to Haiti.  Defs' F&C Section IV.D, pp. 10-11. By relying on this fact at numerous points in their Findings and Conclusions, Defendants imply that the resumption of removals of non-TPS Haitians is somehow relevant to TPS and to this case.  Defendants' position misconstrues both the TPS statute and consistent DHS policy.

28.    As a threshold matter, under its express terms, the TPS statute allows only TPS recipients to live and work in the United States.  8 U.S.C. § 1254a(a)(1).  The statute contemplates and permits the deportation of individuals from a designated country who do not hold TPS—such as individuals who arrived *after* the country was already designated or did not qualify for TPS for another reason.  Furthermore, designations under 8 U.S.C. § 1254a(b)(1)(C) may be terminated only if TPS holders can return to their country safely.  There exists no comparable "safety" requirement governing the removal of people who do not have TPS.  The deportation of Haitians who do not hold TPS therefore has no bearing on whether Haiti's TPS should have been extended.  For that reason, as Plaintiffs previously noted, Secretary of State John Kerry recommended extending TPS in December 2016, notwithstanding the fact that, three months earlier, Secretary Johnson had resumed removals.  *See* Plfs' F&C Section III.A.1, p. 105, ¶ 28.

29.    Moreover, as former USCIS Director Leon Rodriguez testified at trial, it is not uncommon for the U.S. to grant TPS to nationals of a country while at the same time removing non-TPS recipients to that country. Trial Tr. 215:7-17.

30.    In fact, Defendants implicitly acknowledge that the resumption of removals for non-TPS Haitians is irrelevant to TPS, factually and legally. Defendants note that one of the

documents presented to Acting Secretary Duke was a USCIS statement of "legal authority," which is supposed to inform the Secretary of the legal standards governing TPS review. Defs' F&C Section V.A.i.c, pp. 13-14, ¶ 50. Conspicuously absent from that document as a factor for the Secretary's consideration is any discussion of whether non-TPS recipients are currently being removed to their country of origin. *See* AR-S_HAITI00000050.

31.     For these reasons, this Court finds it irrelevant that DHS resumed removals of non-TPS Haitians in the fall of 2016.

## V.     DEFENDANTS MISCONSTRUE AND MISCHARACTERIZE THE TESTIMONY OF PLAINTIFFS' TRIAL WITNESSES.

32.     Having decided not to call any witnesses of their own, Defendants attempted to impeach Plaintiffs' witnesses on collateral and irrelevant matters.   These efforts did not undercut the credibility of their testimony.

### A.     Defendants Mischaracterize the Testimony of Former Assistant Secretary of State Michael Posner.

33.     At trial, Plaintiffs called former Assistant Secretary of State Michael Posner as an expert in State Department procedures. Mr. Posner was qualified to opine on those issues.

34.     Assistant Secretary Posner testified, based on his review of various State Department documents related to the Trump Administration's TPS decision-making process, that the Trump State Department "at the most senior levels abandoned the normal way of doing things. Abandoned the notion that the [Haitian] embassy's reporting is valuable. Abandoned the notion of deliberative process …. This to me, from beginning to end, is bad process, that led to a bad outcome." Trial Tr. 133:24-134:9.

35.     In their Findings and Conclusions, Defendants attempt to disparage not only Mr. Posner's opinions, but his character.  None of their attacks are warranted.

36.     Defendants' contend in their Findings and Conclusions that this Court should discount Assistant Secretary Posner's expert opinion because he belongs to the Democratic Party. *See* Defs' F&C Section VI.C.i, p. 35, ¶ 120.  Defendants relied on this same strategy at trial. Trial Tr. 143:6-144:4.  In this unbecoming line of attack, Defendants pejoratively refer to the "Demo*crat*" party (*id.* (emphasis added)), a tactic with a long and disturbing history in American politics that dates back at least to Senator Joseph McCarthy. Hendrik Hertzberg, *The "IC" Factor*, THE NEW YORKER, August 7, 2006 ("There's no great mystery about the motives behind this deliberate misnaming. 'Democrat Party' is a slur, or intended to be.").

37.     Defendants' implication seems to be that Assistant Secretary Posner's opinion is somehow tainted by his membership in the Democratic Party. Defendants' evidence of Mr. Posner's alleged bias consists of the facts that (1) Mr. Posner volunteered as an election minder on behalf of the Democratic party in the 2004, 2008, and 2010 elections and (2) the Democratic party invited Mr. Posner to provide testimony at a platform committee hearing at the 2016 Democratic National Convention.  Defendants never even attempt to explain how these isolated interactions with a national political party constitute evidence that Mr. Posner cannot be impartial regarding whether the State Department's recommendation to terminate TPS for Haiti complied with existing processes and procedures.  Defendants offer no authority for the proposition that a citizen's membership in the Democratic party—or, for the matter, the Republican party—is a legitimate basis on which to attempt to impeach a witness's trial testimony.  Defendants' attempt to disparage Mr. Posner's expert opinion on account of his membership in the Democratic party is tantamount to stating that a Judge cannot be impartial because he or she had been appointed by a Democratic president.

38.     As to the substance of Assistant Secretary Posner's opinion, Defendants argue that Assistant Secretary Posner had no direct experience at the State Department with TPS recommendations.  Defs' F&C Section VI.C.i, p. 35, ¶ 119.  But, as Assistant Secretary Posner testified, (1) he had extensive experience with the State Department's country conditions determinations,  (2) TPS determinations are supposed to be based on country conditions, and (3) the State Department uses the same procedures for all decisions that are based on a review of country conditions.  Trial Tr. 154:18-155:3. Assistant Secretary Posner's expert opinion reliably explains how the termination of TPS for Haiti deviated significantly from these established procedures and norms—it does not discuss the minutia of a TPS adjudication. *See* PX 331.

39.     Defendants also contend that Assistant Secretary Posner relied solely on information he looked up on the internet and on a Senate Foreign Relations Committee Report that Democratic Party staffers prepared.  Defs' F&C Section VI.C.i, pp. 35-36, ¶ 121.  This is simply not true.  As Mr. Posner's report discloses, Mr. Posner relied upon many documents produced in this case, including many in the government's own administrative record, in addition to his own review of external sources.  PX 331.014.

40.     Defendants also make much of the fact that Assistant Secretary Posner mistakenly thought that Acting Secretary Duke terminated TPS for Honduras (she did not— as noted above, Duke could not devise a "plan and path" for termination, and so the Trump Administration later accomplished Honduras' Termination via Defendant Secretary Nielsen).  However, Mr. Posner did not base his expert opinion that the termination of TPS for Honduras was improper on the involvement of Acting Secretary Duke, but rather, on the fact that the termination of TPS for Honduras suffered from the same procedural deficiencies and improprieties as the termination for

Haiti.  *See* PX 331.005 at ¶ 15. The fact that Mr. Posner's opinion focuses on deficient process, rather than individual actors, in no way undermines his opinion.

41.     Tellingly, Defendants have failed to adduce any evidence to rebut Assistant Secretary Posner's expert opinion that Secretary Tillerson's recommendation to terminate TPS for Haiti is tainted because it did not consider, or even include, the factual analysis and recommendation provided by the U.S. Embassy in Haiti

42.     *First*, as discussed in Plaintiffs' Findings and Conclusions, the split memo Defendants tout with great fanfare does not reflect any input from or clearance by the U.S. Embassy in Haiti, in violation of the State Department's practice of giving the greatest deference to the findings and analysis of embassies relating to country conditions.  Plfs' F&C Section IV.I, pp. 49-50, ¶¶ 155-158.

43.     *Second*, far from evincing the thorough, thoughtful, and time-intensive review typical of State Department split memoranda, the split memo in this case constitutes yet another example of a rush decision motivated by improper political pressure.  Instead of reflecting an attempt to build consensus and "avoid[ ] rash or ill-considered decisions" (PX 331.004, ¶ 10), the evidence shows that the relevant bureaus drafted the split memo in mere days and were concerned they were "running out of time to get a memo—whether split or joint—to S[ecretary Tillerson]" before he left on a trip.  PX 225.002.  Indeed, the split memo confirms that the State Department rushed through a recommendation to terminate TPS.

44.     This Court finds the opinions and testimony of former Assistant Secretary Posner credible.

**B.     Defendants Mischaracterize The Testimony of Former USCIS Director Leon Rodriguez.**

45.     Plaintiffs' expert witness Leon Rodriguez ("Director Rodriguez") served as the Director of USCIS from 2014 to 2016, and is qualified to testify as expert on (1) "[t]he process from July 2014 to January 2017, whereby USCIS provides a recommendation to the DHS secretary to either designate or redesignate or extend or terminate TPS"; (2) "[t]he process and procedures that USCIS applied in 2017, in terminating Haiti TPS, which departs from the prior process and procedures"; and (3) "the interpretation of 8 U.S.C. § 1254, the TPS statute, and how the agency [USCIS] interpreted that during his tenure and before." Trial Tr. 220:2-11, 221:2-3

46.     In his capacity as USCIS Director, Director Rodriguez oversaw "all aspects of the agency's operations." Trial Tr. 212:16. All USCIS Directors, including Director Rodriguez, are responsible for providing a "recommend[ation] to the Secretary of Homeland Security" regarding TPS "after an extensive internal processes within both USCIS and the Department of State." *Id.* 216:12-13, 217:20-21.  Director Rodriguez actively participated in DHS's decisions to designate, redesignate, extend, or terminate TPS for recipient countries on at least a dozen occasions for a variety of countries, including Haiti. *Id.* 213:20-25, 216:8–217:5; PX 330.02 (Expert Report of Director Leon Rodriguez) ¶ 10.

47.     The internal process utilized by USCIS to provide a recommendation to the DHS Secretary was "well settled" by the time Director Rodriguez became Director. Trial Tr. 322:7; *see id.* 244:21–245:22; *see also* PX 330 ¶¶ 10–22 (describing the process); Plfs' F&C Section IV.A, pp. 13–15.

48.     The DHS Secretary affords the USCIS Director's TPS assessment and recommendation "a high level of deference." Trial Tr. 246:7.  In this vein and consistent with past practice, it is "highly likely" that Director Cissna's office drafted the Federal Register notice

14

terminating TPS for Haiti reflected at PX 341.  Trial Tr. 244:11-17, 289:6-10. Defendants offered no evidence to the contrary.

49.     Defendants emphasize that Director Cissna attached the RAIO Report to the recommendation provided to Acting Secretary Duke.  Defs' F&C, p. 39 ¶ 137. The evidence shows, however, that Duke relied nearly entirely on the facts and legal conclusions contained in Director Cissna's recommendation. Indeed, and as Director Rodriguez testified, a comparison of Directors Cissna's recommendation at PX 136 and the Federal Register notice at PX 341 shows that the material portion of Secretary Duke's analysis mirrors Director Cissna's recommendation, and adopts Director Cissna's erroneous interpretation of the TPS statute. Trial Tr. 274:11–275:25, 277:4–287:11.

| **Directors Cissna's recommendation, PX 136** | **The Federal Registrar Notice, PX 341** |
|---|---|
| Haiti has made significant progress in recovering from the 2010 earthquake, and no longer continues to meet the conditions for designation.<br><br>PX 136.003. | Haiti has made progress recovering from the 2010 earthquake and subsequent effects that formed the basis for its designation.<br><br>PX 341.003. |
| 98% of the sites for IDPs have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake are still living in camps as of June 2017.<br><br>PX 136.003. | 98 percent of IDP sites have closed, and only approximately 38,000 of the estimated 2 million Haitians who lost their homes in the earthquake were still living in camps as of June 2017.<br><br>PX 341.003. |
| On October 16, 2017, it was replaced by successor operation (MINUJUSTH), a police-only force, that will focus on strengthening rule of law; supporting and further enveloping the National Police; and engaging in human rights monitoring, reporting, and analysis.<br><br>PX 136.003 | In October 2017 … The peacekeeping mission has been replaced by a successor operation that is a police-only force focused on strengthening the rule of law, promoting human rights and supporting the Haitian National Police.<br><br>PX 341.003. |

| | |
|---|---|
| Haiti successfully completed its presidential election in February 2017. The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings.<br><br>The Supreme Court of Justice is already reconstructed and operational and President Moïse is marshalling plans for Haiti's continued recovery and redevelopment. In April 2017, President Moïse announced a project to rebuild Haiti's National Palace, but reconstruction has not yet commenced.<br><br>PX 136.003. | Haiti successfully completed its presidential election in February 2017. The 2010 earthquake destroyed key government infrastructure, including dozens of primary federal buildings, …<br><br>The Supreme Court is already reconstructed and operational, and, in April 2017, President Moïse announced a project to rebuild Haiti's National Palace … a project to reconstruct the Palace would commence on January 12, 2018.<br><br>PX 341.003. |
| Annual GDP growth following the 2010 earthquake has been erratic, but predominantly positive.<br><br>PX 136.003. | Annual GDP growth has been generally positive since 2010.<br><br>PX 341.003. |
| Haiti's weak public health system has grappled with a cholera epidemic that began in 2010 in the aftermath of the earthquake, but cholera is currently at its lowest level since the outbreak started.<br><br>PX 136.004. | Although Haiti has grappled with a cholera epidemic that began in 2010 in the aftermath of the earthquake, cholera is currently at its lowest level since the outbreak began.<br><br>PX 341.003. |
| USCIS assesses that Haiti has made significant progress in **recovering from the 2010 earthquake and no longer continues to experience the extraordinary and temporary conditions <u>that formed the basis of</u>** Haiti's designation and redesignation of TPS.<br><br>PX 136.001 (emphasis added). | [T]he Acting Secretary of Homeland Security determined on November 20, 2017 that the conditions for Haiti's designation for TPS–on the **basis of "extraordinary and temporary conditions" <u>relating to the 2010 earthquake</u>** that prevented Haitian nationals from returning in safety–are no longer met.<br><br>PX 341.003 (emphasis added). |

50.     Consistent with the TPS statute and past USCIS practice, the "extraordinary and temporary conditions" that the DHS Secretary (and USCIS Director) must review to determine whether it is safe for nationals to return to a country under 8 U.S.C. § 1254a(b)(1)(C) "are a

16

combination of conditions that exist at the particular point in time when the adjudication is occurring, which could be either the original designation or the subsequent decision as to extension, redesignation, or determination." Trial Tr. 250:8-14. Under the statute and pursuant to established USCIS practice, these conditions include circumstances at the "particular point in time when the adjudication is occurring" that "prevent nationals from returning to the country in safety, which means significant threat to life or health." *Id*. 248:30–249:12, 250:11-12, 268:16–269:9.

51.     While Director Cissna may have "flag[ged]" certain of these issues for Secretary Duke, Defs' F&C ¶ 139, Director Cissna's express recommendation that Secretary Duke *exclude* these issues from her determination violated the TPS statute, USCIS legal standards, and long-standing USCIS policy, as did Director Cissna's failure to fully relate all facts related to Haiti's cholera epidemic and economy. Trial Tr. 291:14–292:15.

52.     The factors Secretary Duke excluded from consideration on Director Cissna's recommendation are material and highly relevant to whether 50,000 to 60,000 Haitians can return safely to Haiti. For example, the October, 2017 RAIO Report relays that over 50% of Haiti's population faces "food insecurity," and thus lack "a supply of food adequate for the preservation of life and health." This is "an overwhelming factor in favor of extension of TPS." Trial Tr. 254:5-8, 265–66; *see* PX 136.004 ("The deterioration in food security is the consequence of Hurricane Matthew's severe impact on south west Haiti. Food insecurity is expected to be further impacted by Hurricane Irma, which struck Haiti in September … Currently, Haiti's food insecurity problems seem related to tropical storms and a drought rather than from lingering effects of the 2010 earthquake.").

53.     Contrary to Defendants' proposed Findings and Conclusions (at ¶ 135), Director Rodriguez *did* consistently opine at deposition and trial that Director Cissna "exclud[ed] factors

not directly linked to the 2010 earthquake."  Rodriguez Dep. Tr. 34:4–13 ("Q. But you would not call those exclusional factors improper? A. I do think they are contrary to the statute.")

54.     Contrary to Defendants' proposed Findings and Conclusions ¶ 136, Director Rodriguez *did not* testify (at Trial Tr. 328) that he believed Director Cissna "considered the totality of the circumstances affecting Haiti and the ability of Haitian nationals to return."  Rather, he simply (and unsurprisingly) testified that he believed Director Cissna probably "read the entire Country Conditions [RAIO] Report." Trial Tr. 328:18. Whether Director Cissna read the entire RAIO report or not, his express recommendation that Secretary Duke *discount and decline to consider* material country condition evidence not directly tethered to the 2010 earthquake violated USCIS policy.

55.     Director Rodriguez testified that during his time as Director, he did not consider crime rates of TPS beneficiaries when deciding whether to recommend an extension or termination of TPS.  Director Rodriguez explained that is because "by definition, you do not qualify to receive TPS in the first place if you are a convicted criminal, either in the United States or in another country, if [USCIS had] records that show you were convicted in another country. And if you are convicted while you were on TPS, your TPS would ordinarily be … terminated … based on that conviction."  Trial Tr. 255:25-256:6.

56.     For similar reasons, the question of whether the U.S. should enforce removal orders against individuals, such as criminals and other non-TPS holding immigrants, and whether 50,000 to 60,000 TPS holders can *safely return* to Haiti, are—according to Director Rodriguez—two distinct questions, the former of which is unrelated to the TPS determination.  *Id.* 288:4-15.  The fact that Director Rodriguez does not recall entering an objection to Secretary Johnson's decision

to recommence removal of certain Haitians who lacked TPS to Haiti, therefore, is unsurprising. *See* Defs' F&C ¶ 145.

### C. Defendants Mischaracterize The Testimony of Plaintiffs' Country Conditions Experts

57.     Plaintiffs called two country conditions experts at trial: Brian Concannon and Ellie Happel. This Court finds that Plaintiffs called these witnesses solely for the purpose of explaining and validating the factual findings of the October 2017 RAIO Report.  Plaintiffs do not now argue, nor have they ever argued, that these experts' testimony should be a substitute for a lawful, fact-based determination by the DHS Secretary.

58.     Regardless, Defendants' recounting of Concannon's and Happel's expert testimony repeatedly takes testimony out of context and removes inconvenient facts, rendering Defendants' entire characterization of this testimony unreliable.

59.     For example, Defendants claim, with no citation, that Plaintiffs' expert Brian Concannon "made clear that he would substitute his long-held judgment that Haiti should have been accorded TPS as far back as the President George W. Bush Administration." Defs' F&C, Section IV.C.iii, p. 41, ¶ 148.

60.     In reality, Concannon testified merely that he had advocated for a designation of TPS for Haiti in 2008 and 2009. Trial Tr. 510:24-511:8. This sleight-of-hand by Defendants attempts to convert an expert's opinion into a suggestion of judicial overreach, subtly shifting the Defendants' own questions – "as early as 2008…you advocated for TPS for Haiti, didn't you?" – and the witness's agreement into a suggestion that Concannon would, or the Court should, substitute his judgment for Acting Secretary Duke's.

61.     Defendants likewise mischaracterized Happel's testimony. Again without citation, Defendants claim that Happel "admitted that she does not even understand the factors that go into

TPS re-designations." Defs' F&C, Section IV.C.iv, p. 44, ¶ 164.  In reality, Happel was asked about whether, after Hurricane Matthew, Haiti's TPS should have been extended or redesignated, a technical distinction on which she simply had no opinion.  Consistent with her expertise in country conditions in Haiti, Happel testified that she believed that Hurricane Matthew caused "significant" destruction, including "severe impact" on the "bread basket of Haiti," one of the country's "chief agriculture production areas," a "significant spike in [cholera] cases," and the destruction of "over 100,000 homes." Trial Tr. 100:13-101:7. Happel declined to offer an opinion on the technical difference between extension and redesignation and which was appropriate following Hurricane Matthew. *Id.* 87:12-18.

62.    In addition to these mischaracterizations, Defendants also omit large portions of country conditions expert testimony entirely.

63.    For example, Defendants' lone comment on the extensive expert testimony at trial regarding housing in Haiti is a single sentence: "Mr. Concannon testified that 96% of displaced people have departed the IDP camps and 98% of the IDP camps have closed." Defs' F&C, Section IV.C.iii, p. 43, ¶ 157. This statement twists the experts' testimony and, like the Federal Register Notice in which these statistics appear, omits the salient facts regarding Haiti's housing crisis, which were set forth not only by these expert witnesses but also the RAIO report.  PX 366.

64.    Both Concannon and Happel explained that this single data point about the closure of IDP camps, trumpeted by the Trump Administration to the exclusion of all other housing facts, failed to reflect a much more complex and unsafe reality. Concannon testified that people who left IDP camps "went back to houses that had been declared dangerous, but were not repaired" and that this number "does not count people who are again living in scattered settlements and the 250,000 people living in Canaan" even though "many of those people fit the definition of IDP,"

with the result that "under international law, they are IDPs, they're just not counted as IDPs the way they are counted in Haiti." Trial Tr. 472:18-473:11. Happel likewise testified that in 2013, the Haitian Government requested that the settlement in Canaan, initially an IDP camp, "be removed from the list of IDP camps," with the result that "in one day the IDP figures declined by 50,000*."* *Id* . 50:6-22.

65.     Concannon's and Happel's nuanced testimony regarding housing is consistent with the October, 2017 RAIO report, which found that although the number of IDP camps had significantly declined, "Haiti still faces considerable obstacles related to housing;" that  many Haitians who left the IDP camps "moved back into unsafe houses;" and that many Haitians who left IDP camps now live in "informal settlements located in hazardous areas." PX 366.002.

66.     Defendants' incomplete and acontextual rendition of the Plaintiffs' country conditions expert testimony does not undermine that testimony, which the Court finds credible and persuasive.

## **CONCLUSIONS OF LAW**

## I.     **THIS COURT HAS JURISDICTION OVER PLAINTIFFS' STATUTORY AND CONSTITUTIONAL CLAIMS.**

67.     Defendants reassert their position that the TPS statute (8 U.S.C. § 1254a(b)(5)(A)) deprives this Court of subject-matter jurisdiction to adjudicate Plaintiff's claims. Defs' F&C, p. 48. Defendants acknowledge that the Court has already rejected their position. *Id*. The Court reaffirms its prior ruling that the TPS statute does not preclude the Court from hearing Plaintiffs' claims arising under the U.S. Constitution or Plaintiffs non-constitutional claims to the extent they relate to "Defendants' [TPS] determination practices or adoption of general policies or practices employed in making such determinations," including "the process of the adjudication [of Haiti's TPS] and whether an evidence-based determination under the statutory criteria occurred, rather

than the content of the decision" or "the factual accuracy of Secretary Duke's findings." Decision & Order, Dkt. 96, at 6-9.

68.     Defendants now argue, however, that subject-matter jurisdiction does not exist because "[t]he evidence Plaintiffs presented at trial … demonstrates that Plaintiffs' real objective is not to establish a process-based deficiency, but instead to challenge both the content of the Duke Decision and the factual accuracy of Acting Secretary Duke's findings." Defs' F&C, p. 48.  In support of this assertion, Defendants argue that the testimony regarding current conditions in Haiti by Plaintiffs' expert witnesses Brian Concannon and Ellie Happel purportedly "ha[s] nothing to do with Plaintiffs' challenges related to the process by which Acting Secretary Duke made her decision or the purported racial animus allegedly driving her decision." *Id.*  Defendants' argument mischaracterizes Plaintiffs' claims and the trial.

69.     If Plaintiffs were challenging the "content" of Acting Secretary Duke's decision, they would have proposed that the Court make findings of fact concerning current conditions in Haiti.  They have not done so.  Nor have Plaintiffs proposed that the Court evaluate the factual accuracy of findings by the Secretary, such as the findings published in the Federal Register Notice used to justify the Haiti termination decision. Rather, Plaintiffs have requested that the Court make findings of fact relating to ***deficiencies in the process*** employed by Defendants to terminate TPS for Haiti. In particular, Plaintiffs have proposed for the Court to find that Defendants were motivated by a discriminatory political agenda to terminate TPS for Haiti; that they intentionally ignored undisputed facts concerning current conditions in Haiti because the facts were inconsistent with their preordained termination decision; and that they instead contrived pretextual reasons to justify their decision, including a new rule that purportedly required them to ignore current conditions in Haiti in violation of the APA.  Plfs' F&C Section IV, pp. 13-68.

70.     Importantly, most of the evidence that Plaintiffs presented at trial speaks directly to process-based deficiencies in the Trump Administration's policies and practices for reviewing TPS as well as the racial animus driving the Haiti decision.  It included trial testimony by Leon Rodriguez and Michael Posner, deposition testimony of DHS officials, and trial exhibits (including exhibits from the supplemental administrative record).   This evidence is not probative of country conditions in Haiti.

71.     Although it represented only a small part of Plaintiffs' case, the trial testimony and expert reports by Concannon and Happel  are also relevant to Plaintiffs' process-based challenge to the Haiti termination decision.  Plaintiffs presented their testimony to assist the Court in understanding the significance of country condition evidence that was available to Defendants, including the RAIO report.  Notably, Defendants did not present evidence to show that they were ever aware of information contradicting the RAIO report, or that they ever pursued any additional fact-finding regarding country conditions.   As the testimony of Plaintiffs' witnesses was fundamentally consistent with the RAIO report, the information presented through that testimony was also available to Defendants during their review of Haiti's TPS status.  The testimony of these witnesses speaks to whether Defendants intentionally disregarded and/or misconstrued relevant, available evidence and therefore violated the procedural requirements of the TPS statute.

72.     As further support for their contention that Plaintiffs are challenging the "content and accuracy of the Duke Decision," Defendants assert that "Plaintiffs' counsel stated, in his summation, that 'it is [not] possible to have a princip[al] review of the real facts under TPS and to come to a conclusion that it is proper and appropriate to terminate TPS status for Haiti at this time.' Trial Tr. 686." Defs' F&C, p. 48. Defendants neglect to mention that the quoted language was not

offered by Plaintiffs' counsel to sum up the argument at trial, but is taken from a question posed

directly to Plaintiffs' counsel by the Court:

> THE COURT: Let me ask you this hypothetical question. Do you believe there's any way at the present time, based on your understanding of conditions in Haiti, . . . that a principle[d] decision based on real facts could be made terminating Haiti from TPS protection today?
>
> MR. ROIN: Not on this record.
>
> THE COURT: I'm not asking on this record. . . .  I'm saying on any record. . . . [D]o you believe it is possible to have a principle[d] review of the real facts under TPS and to come to a conclusion that it is proper and appropriate to terminate TPS status for Haiti at this time; do you believe that that is possible?
>
> MR. ROIN: Based on what I know – I know –
>
> THE COURT: Based on what you know.
>
> MR. ROIN: No.
>
> THE COURT: Okay. Next.

Trial Tr. 686.

73.     Moreover, Plaintiffs' counsel immediately went on to say: "Your Honor, I would

say that we think that the Government cheated. They didn't follow what the statute requires [them]

to do. They didn't follow the correct process. [They] changed their interpretations of law." *Id.* at

687. Obviously, Plaintiffs' counsel's one-word answer ("No") to a direct question from the Court

cannot support Defendants' contention that Plaintiffs' real objective is to challenge the content and

factual accuracy of Defendants' decision to terminate Haiti's TPS rather than the process that

Defendants employed to reach their decision—especially where Plaintiffs' counsel immediately

qualified that answer by explaining that Plaintiffs are making just such a process-based challenge.

74.     For the foregoing reasons, the Court finds that Plaintiffs are not challenging the

content or factual accuracy of Defendants' decision to terminate TPS for Haiti. Plaintiffs are

challenging the Defendants' practices for making TPS decisions and their adoption of general policies or practices employed in making such decisions, including the process of reviewing Haiti's TPS; whether an evidence-based determination under the statutory criteria occurred; whether Defendants unlawfully adopted a new legal standard when they began limiting review of TPS termination decisions to the conditions on which TPS designations were originally based; whether the decision to terminate Haiti's TPS was premised on facts and motivations that the TPS statute does not permit the Secretary to consider; and whether the Haiti TPS decision was driven by unconstitutional racial animus. Thus, this Court is not precluded from reviewing Plaintiffs' claims by the TPS statute's judicial-review bar. The Court has subject-matter jurisdiction over this case.

75.     Even if the TPS statute did preclude the Court from hearing certain process-based claims arising under the APA, moreover, it could not prevent this Court from hearing Plaintiffs' claim that Defendants have violated the TPS statute. *See Leedom v. Kyne*, 358 U.S. 184, 188-89 (1958) (district court had jurisdiction to hear claim that federal agency had acted *ultra vires* notwithstanding otherwise applicable statutory bar on judicial review). Nor could it preclude the Court from hearing Plaintiffs' constitutional claims. *See Battaglia v. Gen. Motors Corp.*, 169 F.2d 254, 257 (2d Cir. 1948) (indicating that Congress does not have the power to strip all courts of jurisdiction to hear constitutional claims).[1]

---

[1]This case is unlike the security clearance cases on which Defendants rely (at p. 49). There, courts have held that challenges to security clearance decisions are not subject to judicial review because the decisions are committed to discretion of the Executive. Here, the TPS statute does *not* commit TPS decisions to the discretion of the Executive, but rather, the statute imposes substantive and procedural requirements with which the Executive must comply.

## II.     PLAINTIFFS HAVE PROVEN THEIR STATUTORY AND ULTRA VIRES CLAIMS.

### A.     This Court's Review is Not Limited to the 318 Pages Defendants Designated as the "Administrative Record."

76.     Both before and during trial, Defendants repeatedly objected to discovery and review of evidence outside the administrative record, and the Court repeatedly overruled those objections on the basis that that Plaintiffs had alleged specific facts showing that the Government's rationale for terminating TPS for Haiti was a pretext created to cover up the true motivation for that decision.

77.     Defendants concede that in cases where an administrative agency has acted in bad faith or engaged in improper behavior, the Court may rely on evidence outside the administrative record. Defs' F&C, Section II.A.ii, p. 52; *see Tummino v. Hamburg*, 936 F. Supp. 2d 162, 195 (E.D.N.Y. 2013) ("the law is clear that a reviewing court may consider extra-record materials" when Plaintiffs make "a strong showing of bad faith or improper behavior"). Indeed, "when the agency action cannot be adequately explained in the record it compiled, the court's consideration of evidence outside the agency's 'administrative record' is not only warranted, but necessary to a meaningful judicial review of the agency's action." *Id*. at 196.

78.     Plaintiffs introduced a wealth of specific evidence showing bad faith and improper behavior by Defendants.  For example, Plaintiffs submitted documentary evidence and testimony that chronicled the process by which Trump Administration political appointees manipulated agency documents in order to further a political edict to terminate Haiti's TPS.  *See* Plfs' F&C, Section IV.C, pp. 18-24; *id*., Section IV.L, pp. 55-58.  The evidence also showed that the White House put immense pressure on Acting Secretary Duke to terminate.  *See id.* at Section IV.O, pp. 63-66.  Plaintiffs also showed that this process took place within a broader climate of discriminatory, anti-immigrant, "America First" sentiments within the Trump Administration.  *See*

*id.* at Section IV.N, pp. 62-63.  Plaintiffs have made a strong showing that Defendants' stated rationale for the TPS termination decision was a pretext to mask its true, unlawful, motivation.

79.    This Court finds that Plaintiffs have established that the decision to terminate Haiti's TPS was the result of bad faith and improper behavior by Defendants, and therefore concludes that reliance on evidence beyond the administrative record is appropriate.

### B.    Defendants' Decision to Terminate TPS Was Arbitrary and Capricious Under the Administrative Procedures Act and Also Was Ultra Vires

80.    Defendants concede that "[u]nder the APA, a court is authorized to set aside an agency action if it is arbitrary and capricious." Defs' F&C p. 51.  Moreover, Defendants' proposed findings largely ignore that the decision to terminate Haiti's TPS was arbitrary and capricious because it (1) "disregard[ed] contrary or inconvenient factual determinations that [they] made in the past" (*id.* at 95 (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009) (Kennedy, J., concurring)); *see Organized Vill. of Kake v. U.S. Dep't of Agriculture*, 795 F.3d 956, 968 (9th Cir. 2015);[2] (2) reflected a preordained "outcome" accomplished by "sweeping negative evidence under the rug" (Plfs' F&C, p. 106 (quoting *Cowpasture River Preservation Ass'n v. Forest Serv.*, 911 F.3d 150, 179 (4th Cir. 2018)), 108 (alteration omitted) (quoting *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 194 (4th Cir. 2005)); and (3) was the product of "improper political influence" that dictated Defendants' strategy to terminate TPS—an independent APA

---

[2] Defendants cite *Ru Jun Zhang v. Lynch*, 2018 WL 1157756 (E.D.N.Y. Mar. 1, 2018), in which the agency "considered the pertinent evidence, examined the relevant factors, and articulated a satisfactory explanation for its action including whether there was a rational connection between the facts found and the choice made." This case is patently inapplicable here, where the decision did none of those things.

violation. Plfs' F&C, p. 106 (quoting *Town of Orangetown v. Ruckleshaus*, 740 F.2d 185, 188 (2d Cir. 1984)).[3]

81.     Defendants' distorted review process also violated the TPS statute's mandate to review country conditions and to determine whether the statutory criteria for termination were met based on their review.  Whether Defendants' interpretation of the statute was correct is a question of law for the Court.  *See, e.g.*,  *Scialabba v. Cuellar de Osorio*, 573 U.S. 41, 57 (2014) (immigration "statute's plain meaning controls").[4]

82.     Rather than attempt to address the law or facts establishing these points, Defendants make four arguments. *First*, Defendants argue that terminating Haiti's TPS was not arbitrary and capricious because Acting Secretary Duke fairly and impartially made her decision based on her investigation of "a wide array of candid information." Defs' F&C, p. 51. There is, however, virtually no evidence to support that assertion. As the Court reminded Defendants at trial, they deliberately chose not to call any witnesses, including Duke. Defendants also vociferously opposed

---

[3] Defendants assert that Plaintiffs cannot obtain relief for their common-law *ultra vires* claim because they assert the same claim under the APA. Defs' F&C, p. 74. If, however, an appellate court were to hold that the APA does not provide a cause of action here, Plaintiffs would still be entitled to pursue a standalone ultra vires claim. *See Chamber of Commerce of the U.S. v. Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996). The Court therefore finds that Plaintiffs have established their common-law *ultra vires* claim for the same reasons that the Court finds that they have established their claim under the APA that Defendants acted in excess of statutory authority.

[4] Under the statute's plain terms, Acting Secretary Duke was required to "review the conditions" in a designated state and determine whether "the conditions for such designation under [8 U.S.C. § 1254a(b)(1)(C) no longer] continue to be met." 8 U.S.C. § 1254a(b)(3)(A), (B).  Defendants acknowledge that "'[s]uch designation' plainly refers to the antecedent decision to designate a country for TPS under one of the three qualifying circumstances (armed conflict, disaster, extraordinary conditions)." Defs' F&C, p. 59.  Under both parties' reading, therefore, the statute required the Secretary to assess the facts and determine whether "there exist[ed] extraordinary and temporary conditions" in Haiti that "prevent[ed]" Haitian nationals "from returning to [Haiti] in safety"—the circumstances necessary for a designation under subparagraph C.  Id. § 1254a(b)(1)(C).

any discovery from or a deposition of Duke.[5] In light of all of the evidence actually in the record in the absence of Duke's testimony, it simply is impossible for the Court to conclude that Duke fairly and impartially considered all of the relevant information.

83.    Defendants attempt to get around the absence of Duke's testimony by referring to the deposition of former Ambassador Nealon ("Nealon"), which was taken in another case. Defendants assert that Nealon's deposition proves that Duke "thoughtfully considered the information provided to her relating to conditions in Haiti" and that she "struggled with the decision." Defs' F&C , p. 57.

84.    In reality, however, Nealon never discussed Duke's review process leading up to termination of Haiti's TPS designation. In fact, he testified that the decision to terminate had essentially been made *before* he even arrived at DHS, thus supporting Plaintiffs' claim that any purported review that occurred was pretextual.  Nealon Tr. 128 ("by the time I got to Homeland Security, there was a general feeling that TPS for … Haiti was going to be terminated"). Nealon's statements about Duke's general practices (*id.* at 42) and her supposed "struggl[e]" with whether to terminate TPS for Honduras, Nicaragua, and El Salvador (*id.* at 196), do not prove anything about the process that led to Duke's termination of *Haiti's* TPS designation. Nealon's testimony does not negate the overwhelming evidence of procedural improprieties described above.

85.    *Second*, Defendants argue that Duke's termination of Haiti's TPS was not arbitrary and capricious because the decision rested on factual findings, including that "98 percent of displaced person camps had closed"; the United Nations had withdrawn its peacekeeping mission in favor of a "police-only force"; Haiti had held a presidential election in February 2017 and

---

[5] In the pretrial order, Defendants stipulated that the lack of a deposition of Duke could not be used against Plaintiffs.  Joint Pretrial Order 7 (Dkt. 119).  There was no corresponding stipulation from Plaintiffs, so Defendants are fully responsible for their decision to not to present Duke's testimony.

"announced a plan to rebuild the national palace"; "Haiti's Supreme Court of Justice had been reconstructed"; and the economy and cholera level had improved. Defs' F&C , pp. 55-56.

86.     However, these purported factual findings evidence the very procedural and substantive failings that make the termination of Haiti's TPS arbitrary and capricious. For example, the finding that almost all of the displaced persons camps had closed disregarded the underlying RAIO finding that many of those persons merely moved to other substandard housing, so that housing in Haiti remained dangerous and inadequate. PX 366.002 (October 2017 RAIO Report). Similarly, the DHS factual findings simply ignored evidence that it would not be safe for TPS recipients to return to Haiti for a variety of reasons, including Haiti's food insecurity, which still afflicted "approximately 5.82 million people … in Haiti" (PX 366.012) (October 2016 RAIO Report) and the ongoing lack of access to health care, which served as a basis for earlier TPS extensions (PX 340.003) (May 2017 TPS Extension) and which persisted through late 2017. PX 366.003-004 (October 2017 RAIO Report). These are examples of Defendants "disregarding contrary or inconvenient factual determinations." Plfs' F&C Sectiion III.A, p. 95 (quoting *Fox Television*, 556 U.S. at 537 (Kennedy, J., concurring)). This violated the APA, which requires agencies to "consider [all] important aspect[s] of the problem." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

87.     Similarly, the DHS findings that Haiti had rebuilt its Supreme Court building and planned to rebuild its presidential palace, which plainly have no bearing on whether it would be safe for TPS recipients to return to Haiti, are examples where Defendants relied on "so little information that it could only be explained as resulting from an almost fixed predetermination.'" Plfs' F&C Section III.A, p. 106, ¶ 30 (quoting *Sierra Club v. U.S. Army Corps of Eng'rs*, 701 F.2d 1011, 1032 (2d Cir. 1983)). Indeed, the record shows that Kovarik, a political appointee, directed

30

USCIS research staff to "dig for" information reflecting "rebuilding stories." *Id*., p. 102, ¶ 20 (quoting PX 212.003) (4/28/17 email from Kovarik to USCIS staff). Thus, Defendants' explicit statements make clear that Defendants violated the APA by executing "a 'strategy' to justify a foreordained opposition to" extending TPS. *Id.*, p. 106, ¶ 30 (quoting *Islander E. Pipeline Co., LLC v. Conn. Dep't of Envtl. Protection*, 482 F.3d 79, 105 (2d Cir. 2006)).

88.     *Third*, Defendants contend that Duke's termination of Haiti's TPS could not have been arbitrary and capricious because "Duke's assessment that Haiti has improved is consistent with assessments made by two previous cabinet officials," President Obama's DHS Secretary Jeh Johnson and Secretary of State John Kerry. Defs' F&C p. 57. Defendants rely on the determination that it was appropriate to "resume[] DHS removal operations for *Haitian nationals who were not TPS recipients*. . . ." *Id*., p. 56 (*quoting* AR-S_HAITI 40) (emphasis added).

89.     However, by definition, the treatment of Haitians who are not TPS recipients is wholly irrelevant to the determination whether TPS should be extended or terminated, as the TPS statute expressly provides that only TPS recipients are entitled to stay and work in the United States. 8 U.S.C. § 1254a(a)(1).

90.     *Finally*, Defendants contend that a "presumption of regularity supports the official acts of public officers and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." Defs' F&C, p. 56 (*quoting National Archives & Records Administration v. Favish*, 541 U.S. 157, 174 (2004). That presumption, however, does not "shield [an agency's] action from a thorough, probing, in-depth review." *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 416 (1971). The presumption may be rebutted by "record evidence suggesting that the agency decision is arbitrary and capricious*"* (*Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1338 (Fed. Cir. 2001)), such as evidence

that "throw[s] into question the regularity of [the agency's] proceedings." *Chamber of Commerce v. SEC*, 443 F.3d 890, 899 (D.C. Cir. 2006); *see also United States v. New Orleans Public Service, Inc.*, 723 F.3d 22, 429 (5th Cir. 1984) (presumption of regularity was "amply rebutted" where "the agency and its officials were understaffed, underfinanced, and in a transition stage" and "the record reveals that the newly established procedures were not always followed").

91.     Here, as is discussed above, the record establishes that nothing about Acting Secretary Duke's decision was regular. The Defendants decided to terminate Haiti's TPS regardless of the conditions in Haiti, they spent months searching for things to cite in an effort to reach that result, they simply ignored or deleted facts they found inconvenient, and placed enormous political pressure on Duke to ensure the termination of Haiti's TPS.  This was the epitome of an arbitrary and capricious decision, and the presumption of regularity therefore gives way.

C.     **Defendant's Decision to Terminate TPS Was Based on A New Interpretation of the TPS Statute, Which Focused Only On The Original Event Prompting the Designation for TPS—in Haiti's Case, the 2010 Earthquake—While Ignoring or Minimizing Subsequent, Intervening Events.**

92.     Defendants argue that "Acting Secretary Duke did not apply a new standard in making the decision to terminate Haiti." Defs' F&C, p. 58. That is incorrect.  Whether the Court considers only the Administrative Record or all of the evidence presented at trial, the conclusion is inescapable that the Secretary applied a new standard in interpreting the TPS statute when deciding whether to extend or terminate Haiti's TPS designation.  Moreover, the evidence establishes that the new standard was contrary to the statute and well-established USCIS practices, both of which required the Acting Secretary to consider *all* current conditions in determining whether grounds for designation continued to exist and whether nationals could safely return to Haiti.  *See* 8 U.S.C. § 1254a(a)(1)(C); Trial Tr. 248:30–249:12, 250:11-12, 268:16–269:9;

Defendants' Memorandum of Law in Further Support of the Government's Motion to Dismiss p. 11 (conceding that the TPS statute "requires a consideration of current conditions to determine whether there remain 'extraordinary and temporary conditions' which prevent nationals of the country from returning in safety").

93.     Defendants first argue that the termination of Haiti's TPS was "in keeping with the Department's prior termination decisions" (Defs' F&C, p. 58), but the evidence shows otherwise. Before October 2017, as required by the statute, DHS consistently considered subsequent intervening events in reviewing whether an existing TPS designation should be extended or terminated.[6] *See Ramos v. Nielsen,* 321 F. Supp. 3d 1083, 1112 (N.D. Cal. 2018).  Secretary Kelly applied this long-held standard when he extended TPS for Haiti in May, 2017.  In the Federal Register Notice, Secretary Kelly explained that Hurricane Matthew's landfall in October 2016 and heavy rains in October 2017 had caused the deterioration of conditions in Haiti.  Based in part on those events, he found that "[t]here continue to be extraordinary and temporary conditions in Haiti that prevent Haitian nationals (or aliens having no nationality who last habitually resided in Haiti) from returning to Haiti in safety." PX 340.001.

---

[6] *See* Extension of the Designation of Nicaragua Under the Temporary Protected Status Program, 67 Fed. Reg. 22,454 (May 3, 2002) ("[R]ecent droughts as well as flooding from Hurricane Michelle in 2001 compounded the humanitarian, economic, and social problems initially brought on by Hurricane Mitch in 1998"); Extension of the Designation of Temporary Protected Status for Nicaragua, 71 Fed. Reg. 16,333-01 (Mar. 31, 2006) ("While progress has been made in reconstruction from Hurricane Mitch, Nicaragua has not been able to fully recover, in part due to follow on natural disasters that have severely undermined progress towards an economic recovery that would enable Nicaragua to adequately handle the return of its nationals."); Extension of the Designation of El Salvador for Temporary Protected Status, 80 Fed. Reg. 893-01, 894-95 (Jan. 7, 2015) (documenting a series of natural disasters that "have caused substantial setbacks to infrastructure recovery and development since the 2001 earthquakes"); Extension of the Designation of Haiti for Temporary Protected Status, 77 Fed. Reg. 59,943-01 (Oct. 1, 2012) (concluding that "the extraordinary and temporary conditions that prompted the original January 2010 TPS designation and the July 2011 extension and redesignation persist" and noting that camp conditions were exacerbated by later—steady rains" and ongoing problems of food security).

94.     After the May 2017 extension, however, as part of an effort to "begin[] to build a case for not extending" TPS for Haiti (PX 029.003), Secretary Kelly advanced the new position that the "2010 Earthquake is the only reason for TPS being granted," that it was "not based on [the] hurricane or current economic conditions," and that it was "[n]ot based on cholera epidemic." PX 029.003.  He expressed this same view in his June 2017 congressional testimony, testifying that "Haiti had horrible conditions before the earthquake, and those conditions aren't much better after the earthquake. But the earthquake was why TPS was … granted and … that's how I have to look at it." PX 213.070.

95.     Director Cissna's Decision Memo recommending termination of Haiti's TPS implemented this new interpretation, embracing the premise that country conditions not attributable directly to the 2010 earthquake are irrelevant to the TPS analysis.  *See* PX 136.004 (concluding that Haiti's continuing problems are not "directly tied to the 2010 earthquake"); *id*. ("Currently, Haiti's food insecurity problems seem related to tropical storms and a drought rather than from lingering effects of the 2010 earthquake.").

96.     The Secretary's termination decision adopted Director Cissna's novel recommended approach.  In the press release announcing the termination, Acting Secretary Duke stated that "those extraordinary but temporary conditions ***caused by the 2010 earthquake*** no longer exist" (PX 114.001) (emphasis added). She ignored important factors such as Haiti's food insecurity, which had been greatly exacerbated by events since the earthquake but which Secretary Cissna's memo discounted as not directly unrelated to the earthquake.

97.     The January 2018 Federal Register Notice also expressly invoked the new standard, stating that Acting Secretary Duke was terminating the TPS designation for Haiti because "the conditions for Haiti's designation for TPS – on the basis of 'extraordinary and temporary

conditions *relating to the 2010 earthquake* that prevented Haitian nationals from returning in safety – are no longer met." PX 341.003 (emphasis added).  In contrast to prior Federal Register notices, the January 2018 Notice failed to address numerous conditions that had been cited in the most recent prior notice as justifying extensions of TPS status.  *See Ramos*, 321 F. Supp. 3d at 1112, 1114.  For example, the May 2017 Notice acknowledged that Hurricane Matthew in October 2016 had damaged crops, housing, livestock, and infrastructure, and that heavy rains in late April 2017 had killed people, damaged homes, and destroyed crops.  PX 340.003. In contrast, the 2018 Notice ignored these intervening conditions.  *See generally* PX 341. In fact, the January 2018 Notice identified no meaningful improvements in Haiti since May 2017, when Haiti's TPS was extended. *See* Plfs' F&C, Appendix. A.  This shows that the application of a different standard, not changes in the facts, drove the outcome.

98.     The Trump Administration also applied its new standard in decisions terminating the TPS designations for other countries after the fall of 2017, including El Salvador and Nicaragua.  83 Fed. Reg. 26074, 26076 (stating that "the Secretary has determined that conditions for Nicaragua's 1999 designation for TPS *on the basis of environmental disaster due to the damage caused by Hurricane Mitch* are no longer met" (emphasis added)); 83 Fed. Reg. 2654, 2656-57 (2018) (stating that "the Secretary . . . has determined that the conditions supporting El Salvador's 2001 designation for TPS on the basis of environmental disaster *due to the damage caused by the 2001 earthquakes* are no longer met." (emphasis added)).  The critical determination made by the Secretary in each case was not that the countries no longer met the standards for designation generally, but that the specific conditions which had led to the initial designation no longer existed. *See Centro Presente v. DHS*, 332 F. Supp. 3d 393, 413 (D. Mass. 2018).

99.     Defendants argue that "the Acting Secretary's predecessors terminated TPS for countries despite ongoing crises." Defs' F&C, p. 59.  The earlier TPS termination decisions that Defendants cite, however, contain no language confining review to conditions caused by the events precipitating the original designations.  *See Centro Presente,* 332 F. Supp. 3d at 413.  Instead, in each case, the Attorney General or the Secretary reviewed all current conditions and found that they no longer supported that country's TPS designation.  *See* 65 Fed. Reg. 33356, 33356 (2000) (stating that "the Attorney General finds that ***conditions in the Kosovo Province*** no longer support a TPS designation" (emphasis added); 68 Fed. Reg. 3896, 3896 (2003) (stating that "the Attorney General finds that ***conditions in Angola*** no longer support a TPS designation" (emphasis added)); 69 Fed. Reg. 40642, 40643-44 (2004) (stating that "the Secretary … finds that Montserrat no longer continues to meet ***the conditions*** for designation under the TPS program"); *see also Ramos*, 321 F. Supp. 3d at 1116.

100.     For example, in terminating Angola's TPS designation, the Attorney General thoroughly reviewed intervening developments in the country, noting the existence of certain "challenging circumstances," but finding them to be outweighed by positive changes, including that "more than 860,000 internally displaced persons [had] spontaneously returned to their home areas since February 2002" and that hundreds of thousands of Angolan refugees in other parts of Africa were beginning to be repatriated.  68 Fed. Reg. at 3896.  In light of all the circumstances, the Attorney General concluded that the 416 TPS holders living in the United States "may return safely to Angola at this time."  *Id.*

101.     Similarly, in terminating the TPS designation for the Kosovo, the Attorney General found that "conditions in the Kosovo Province no longer support a TPS designation" because "[a]lthough conditions remain difficult with bursts of ethnically-motivated violence, the situation

in Kosovo cannot now be classified as 'ongoing internal conflict,'" which was the basis for the TPS designation.  65 Fed. Reg. 33356, 33356.  The Attorney General noted that "the vast majority of those who fled Kosovo during the conflict had already returned and that "[t]he United High Commissioner for Refugees has determined that Kosovar Albanians, who constitute the majority of the Kosovo population, can now return to Kosovo in safety to all areas of Kosovo except the Serb-dominated Mitrovica and certain areas in Eastern Kosovo."  *Id.*

102.    The January 2018 Federal Register Notice does not evidence similar weighing of current conditions, but focuses exclusively on conditions relating to the 2010 earthquake, as urged by Director Cissna.  *See* PX341.003.

103.    Defendants insist that "Acting Secretary Duke took into account current country conditions in making her decision" because she made notes in the margins of the RAIO Report and the State Department's Country Conditions Report.  Defs' F&C, pp. 59-60.  Even assuming that Acting Secretary Duke carefully read these reports—which the cited evidence does not establish—her actual decision discounted or ignored many of the facts that these reports contain, adopting Director Cissna's incorrect interpretation of the TPS statute.

104.    Defendants also point to evidence that Acting Secretary Duke expressed concern about whether Honduras could "adequately hand[le] the return of their 86,000+ nationals"—asking the Court to infer that she must have made a determination that Haitian TPS holders and their families could safely return to Haiti.  Def. F&C ,p. 60.  There is no evidence that Duke determined that Haiti could accept a large influx of returning citizens, however.

105.    Defendants lastly argue that Acting Secretary Duke may have "emphasized different factors or weighed the statutory criteria differently than past Secretaries" is not proof of a new standard.  Defs' F&C, p. 62. This is a mischaracterization of Plaintiffs' claim, which is not

a challenge to the balancing of various factors, but rather to DHS's improper and unlawful refusal to consider subsequent intervening conditions *at all*.

106.    The Court finds, therefore, that Defendants' termination of Haiti's TPS was based upon the application of a new standard that the agency did not acknowledge, explain, or justify. For this independently sufficient reason, the decision was arbitrary and capricious.

###     D.    Plaintiffs Have Proven Their Notice and Comment Claim.

107.    Defendants do not dispute that they did not satisfy the APA's notice-and-comment procedures, but instead contend that the Haiti TPS determination did not constitute a "new legislative rule" triggering those requirements. *See* Defs' F&C Section II.A.v, p. 63. To the contrary, the APA's procedural requirements apply because in making that TPS determination, Defendants applied a new standard that constituted a substantive rule, as it materially changes the circumstances under which DHS will extend or terminate TPS.  *See* Plfs' F&C Section II.B, p. 111, ¶ 45. Defendants assert that the Haiti TPS determination does not fall within the realm of agency actions subject to the APA's procedural protections, but the DHS cannot simply re-cast its own action in order to skirt the APA.

108.    In determining whether an agency action is excused from the notice-and-comment requirement, "the court looks not to labels given by the agency, but rather to the nature of the impact of the agency action." *L.M. v. Johnson*, 150 F. Supp. 3d 202, 215 (E.D.N.Y. 2015) (Garaufis, J.) (citation omitted). Rather, it is "what the agency does in fact" that is conclusive. *See Lewis-Mota v. Sec'y of Labor*, 469 F.2d 478, 481-82 (2d Cir. 1972).

109.    Nor was the TPS determination an "interpretive rule," as Defendants argue in the alternative. In general, "notice and comment is required if the rule makes a *substantive impact on the rights and duties* of the person subject to regulation." *L.M.*, 150 F. Supp. 3d at 215 (internal quotation marks omitted) (emphasis added). Courts generally find rules procedural, such that the

APA's notice-and-comment requirements do not apply, if "they do not change the substantive standards by which the [agency] evaluates applications which seek a benefit that the agency has the power to provide." *Id.* (internal quotation marks omitted). Without doubt, Plaintiffs have established that DHS changed the standards by which it evaluates TPS designations, a benefit that DHS has the power to provide. That DHS "never codified the factors" the Secretary must consider in making a TPS determination does not change that fact, and Defendants offer no authority for their suggestion that it does. *See* Defs' F&C Section II.A.v, p. 64. This change constituted a substantive rule to which the APA's notice-and comment requirements apply.

### E. Plaintiffs Have Proven Their RFA Claims.

110. As established in Plaintiffs' Findings and Conclusions (at Section III.B, pp. 109–112), because Defendants termination of TPS for Haiti under a new legal standard required that Defendants utilize the APA's notice and comment procedures, Defendants were also required to conduct a final regulatory flexibility analysis. *Batalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 274 (E.D.N.Y. 2018) (Garaufis, J.) (citing 5 U.S.C. §§ 603(a), 604(a) and *U.S. Telecom Ass'n v. FCC*, 400 F.3d 29, 42 (D.C. Cir. 2005).

111. The RFA applies to Haiti Liberte because Haiti Liberte is a "small entity" as defined at 5 U.S.C. § 601(3), (6), and Haiti Liberte has standing to bring a cause of action against Defendants under the RFA. *See* Plfs' F&C, Section I.C, pp. 86–87. "[T]he term 'small entity' [has] the same meaning as the terms 'small business', 'small organization' and 'small governmental jurisdiction' defined in paragraphs (3), (4) and (5) of this section." 5 U.S.C. § 601(6).

112. Haiti Liberte is a "small entity" (and "small business") because it is "independently owned and operated and [it] is not dominant in its field of operation." 15 U.S.C. § 632(a)(1)

(providing definition of "small business concern," the same definition used for a "small business" under the RFA pursuant to 5 U.S.C. § 601(3), (6)).

113.    Defendants do not contest that Haiti Liberte is "independently owned and operated."  And, Haiti Liberte – an entity with only 12 employees and no annual profit – is not dominant in its field of newspaper publishing.  *See* 13 C.F.R. § 121.201(511110) (listing "small business" in the category of "newspaper publishers" as those entities with under 1001 employees); *see id.*(519130) (same, for category of "Internet Publishing and Broadcasting and Web Search Portals").

114.    Defendants' attempt to narrow Haiti Liberte's "field" to "Haitian weekly newspaper[s] in New York" lacks any basis in law.  The Small Business Association ("SBA") does not list this category, *see* 13 C.F.R. § 121.201, nor does common sense dictate this conclusion.  In any event, "[b]y using a definition other than the SBA's," Defendants ask the Court to "violate[ ] the procedure of law mandated by the statute."  *Nw. Min. Ass'n v. Babbitt*, 5 F. Supp. 2d 9, 15 (D.D.C. 1998).

115.    Contrary to Defendants' position, Haiti Liberte is also entitled to relief under the RFA as a matter of fact.  Haiti Liberte will suffer concrete injury, through both the loss of one of its most important writers and through a decrease in readership and revenue, should TPS end for Haiti.  Plfs' F&C Section V.E, pp. 78–79.  Defendants, who have not produced witness testimony or evidence to challenge the evidence and testimony provided by Haiti Liberte, have failed to establish otherwise.

III.    **PLAINTIFFS HAVE PROVEN THEIR CONSTITUTIONAL CLAIMS.**

A.    **Plaintiffs' Constitutional Claims Are Not Limited To The Administrative Record.**

116.    Defendants once again object to the consideration of any evidence outside the administrative record, despite the Court's repeated rejection of that argument.  See Defs' F&C Section II.C.ii., p 68.   Plaintiffs' constitutional claims are not limited to the administration record.

117.    *First*, constitutional claims are not subject to the so-called record rule:  "A direct constitutional challenge is reviewed independent of the APA," and courts routinely order discovery in cases involving both APA and constitutional claims. *Grill v. Quinn*, 2012 WL 174873, at *2 (E.D. Cal. Jan. 20, 2012) (listing cases). Plaintiffs constitutional claims rest on their contention that Defendants' termination of Haiti's TPS was motivated by discriminatory animus against Haitians, and these claims are independent of their APA claims.

118.    *Second*, even if Plaintiffs' equal protection and due process claims were "folded into" the APA cause of action—as Defendants contend (Defs' F&C Section II.C.ii., p. 68), Plaintiffs would be entitled to rely on extra-record evidence. The Court may properly consider extra-record evidence upon a showing of "bad faith or improper behavior" by an agency, or when the agency's decision cannot be adequately explained by the record provided. *See Nat'l Audubon Soc. v. Hoffman*, 132 F.3d 7, 14 (2d Cir. 1997) (citing *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971), *overruled on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977)); *see also Sierra Club v. U.S. Army Corps of Engineers*, 614 F. Supp. 1475, 1516 (S.D.N.Y. 1985).   Plaintiffs have introduced evidence that Defendants decision-making was affected by bad faith and improper behavior, and therefore have established their right to rely on facts outside the administrative record under this standard.

**B.      The Evidence Supports Plaintiffs' Constitutional Claims.**

119.    The admissible evidence presented in this case establishes Plaintiffs' procedural Due Process and Equal Protection claims. *See* Plfs' F&C Section IV.B, pp. 116-118, ¶¶ 57-60 (equal protection); *id.* Section V, pp. 119-120, ¶¶ 5-7 (procedural due process, as co-extensive with established violations of the Equal Protection Clause and APA); Section VI, pp. 122-125, ¶¶ 13-17 (Plaintiffs' evidence is admissible). Plaintiffs have established their Equal Protection claim by showing that a discriminatory purpose was a motivating factor for the decision to terminate Haiti's TPS designation.   And because Plaintiffs have shown that Defendants violated their Equal Protection rights, as well as the APA, they have also established that Defendants violated their Procedural Due Process rights. *See* Plfs' F&C Section V, pp. 119-120, ¶¶ 5-7. Defendants' contrary arguments are unpersuasive.

120.    First, Defendants miss the mark in arguing that the Court may not impute President Trump's biases to Acting Secretary Duke.  *See* Defs' F&C Section II.C.iii., p. 69.  Defendants made the same argument in their motion to dismiss. ECF Dkt. No. 59 at 28 (claiming that Plaintiffs were required to show as a matter of law that Acting Secretary Duke "personally harbored discriminatory animus). In denying the motion, this Court explicitly rejected this argument. (ECF Dkt. No. 96 at 22 (holding that "Plaintiffs are not require to show that Acting Secretary Duke personally harbored discriminatory animus."). It now does so again.

121.    As this Court previously explained (ECF Dkt. No. 96 at 22), in *Battalla Vidal v. Nielsen*, 291 F. Supp. 3d 260, 278-79 (E.D.N.Y. 2018), a case about President Trump's decision to rescind the DACA program, the court found this same attempt to "pass the buck" to Duke "remarkable" in light of the fact that the "Constitution vests 'executive power' in the President," not Duke, "who reports to the President and is removable by him at will." *Id.* The court noted that "in far more mundane contexts, liability for discrimination will lie when a biased individual

manipulates a non-biased decision-maker into taking discriminatory action." *Id.* (collecting cases which explain "cat's paw" liability and hold that it applies in the equal protection context). Indeed, "it would be surprising" if the law were to permit President Trump's racial animus to "be laundered by being implemented by an agency under his control." *Id.* (citation omitted).

122.    Moreover, the evidence shows that Acting Secretary Duke carried out President Trump's agenda. Plaintiffs have previously shown, and Defendants' own documents establish, that Duke was striving to follow President Trump's directives. For example, Duke wrote an email to then-White House Chief of Staff John Kelly on November 6, 2017, regarding her decision to terminate TPS for Nicaragua and extend a "no decision" for Honduras. *See* PX 169.001; *see also* Plfs' F&C Section IV.O, p. 65 ¶ 218. In that email, Duke stated that "this decision is really just a difference in strategy to get to the President's objectives." PX 169.001.

123.    Similarly misplaced is the Defendants' focus on Kelly's November 10, 2017 email, relaying a conversation in which it apparently was said that "the decision on TPS was entirely hers [Secretary Duke's]." *See* Defs' F&C Section II.C.iv., p. 70.  That statement was simply part of what Kelly referred to in that same email as "agenda adherence"; specifically, Kelly indicated in the same email that the White House chief of staff's phone call with Acting Secretary Duke was for the purpose of ensuring "agenda adherence," which he claimed is "EXACTLY what a chief-of-staff does." See PX 184.001. Per Kelly's own email, the President's staff made clear to Duke that she was to act in accordance with the President's own agenda. President Trump's biased statements and discriminatory motives, therefore, plainly affected Acting Secretary Duke's decision and are directly relevant to Plaintiffs' constitutional claims.

124.    Defendants also suggest that the evidence of President Trump's bias is insufficient to establish Plaintiffs' constitutional claims. They contend, for example, that the January 2018

meeting with U.S. Senators and DHS Secretary Kirstjen Nielsen during which the President made disparaging comments about Haitians occurred "months after" the TPS determination was made. *See* Defs' F&C Section II.C.iii., pp. 69.  That timing makes the evidence no less relevant.  As is shown by the other evidence in the case, the President's racial animus did not suddenly spring up in January 2018.  In fact, the President made equally if not more shocking remarks about Haitians in a meeting that took place in June 2018. Plfs' F&C Section IV.B, p. 116, ¶ 58.

125.    Defendants do not deny, moreover, that the President has made numerous statements evincing bias against other non-white immigrants.  For example, Plaintiffs have presented a video showing President Trump in June 2015 saying in part that "[w]hen Mexico sends its people, they're not sending their best. . . . They're sending people that have lots of problems . . . . They're bringing drugs. They're bringing crime. They're rapists." PX 261 (video exhibit); *see also* Plfs' F&C Section III, pp.10-11, ¶ 16. Plaintiffs have pointed to similarly discriminatory statements by the President about non-white immigrants on Twitter (PX 262.001 (June 19, 2015)), in a televised CNN interview (PX 264.011-012 (June 28, 2015)), in a written statement he released (PX 266.002 (July 6, 2015)), and in his public statements while in office (PX 295 (May 16, 2018); PX 298.001 (June 19, 2018); PX 299.001 (June 24, 2018)).

126.    Defendants argue that many of President Trump's biased statements do not concern Haitians (see Defs' F&C Section II.C.iv, p. 70), but that objection misses the mark.  The evidence shows that President Trump's anti-immigrant agenda was animated by explicit bias against non-white immigrants in general.  That agenda and bias also drove his policy toward the TPS program in general and Haiti's TPS designation in particular.  The overwhelming evidence of President Trump's race-based bias is sufficient to support Plaintiffs' constitutional claims.

### C.     Plaintiffs' Evidence Is Admissible.

127.    The Court has already ruled that Plaintiffs' exhibits demonstrating President Trump's bias against Haitians and other non-white immigrants are relevant and admissible.

128.    Defendants object to the C-Span (PX 352) and Fox News (PX 353) excerpts that Plaintiffs introduced as exhibits, asserting that "statements" made by Senator Durbin in those videos are "unquestionably hearsay." *See* Defs' F&C Section II.C.iv, pp. 72-73. That argument misunderstands the nature of the videos and their purpose and relevance in this litigation. The C-Span video depicts Secretary Nielsen's testimony before the U.S. Senate Committee on the Judiciary regarding the January 2018 meeting at which President Trump made discriminatory statements, and which Nielsen attended. That video was introduced to show Nielsen's statements, which were made by a party-opponent and are therefore not hearsay. *See* Fed. R. Evid. 801(d)(2). The same is true of the Fox News video, in which Nielsen discusses the January 2018 meeting in an interview. Nielsen's statements in both videos are admissible and highly relevant.  The comments and questions by Senator Durbin and the Fox News reporter in those excerpts are admitted only to provide context for Secretary Nielson's remarks, not for the truth of any matters asserted. *See* Defs' F&C Section II.C.iv., pp. 73-74.

129.    Plaintiffs contend that Defendants have effectively admitted the Amended Complaint's allegations that President Trump made derogatory statements about Haitians at the June 2017 and January 2018 meetings.  *See* Fed. R. Civ. P. 8; *Weitnauer Trading Co. Ltd. v. Annis*, 516 F.2d 878, 880-81 (2d Cir. 1975) (complaint's "averment was admitted by appellant's failure to deny"). Defendants argue that their responses to those allegations—that each of the relevant paragraphs of the Amended Complaint "consists of Plaintiffs' characterization of and quotations from various news articles," and that "[t]o the extent a response is required, Defendants aver that the quotations and news articles speak for themselves," *see* PX 351.009 at ¶¶ 61-62—do not

constitute admissions. *See* Defs' F&C Section II.C.iv, p. 73.  They are incorrect.  In the relevant paragraphs, Plaintiffs made no allegations about the contents of news articles or any other documents.  Instead, they squarely alleged that President Trump made the statements at issue.  *See* PX 351.017-018 at ¶¶ 61-62 (Amended Complaint).  That Plaintiffs cited news articles in support of their factual allegations neither changes the nature of the allegations nor excuses Defendant from responding to them.  Indeed, the *Ramos* court ruled that Defendants' evasive answers were admissions (*Ramos v. Nielsen*, No. 18-cv-01554 (N.D. Cal), Order Granting Plaintiffs' Motion For Preliminary Injunction (Oct. 3, 2018) (Doc. 127), at 30 n. 13), yet Defendants intentionally employed the same tactics here—perhaps because they do not want to admit the allegations but cannot deny them.[7]

130.    Courts have found similar "speaks for itself" responses in Answers to be improper. *See, e.g., Lane v. Page*, 272 F.R.D. 581, 602 (D.N.M. 2011) ("Responses that documents speak for themselves and that allegations are legal conclusions do not comply with [R]ule 8(b)'s requirements."); *F.D.I.C. v. Stovall*, 2014 WL 8251465, at *11 (N.D. Ga. Oct. 2, 2014) ("Stating that a document 'speaks for itself' is nonsensical and completely contrary to the Federal Rules of Civil Procedure."); *id.* at *12 ("No reasonable party would deny an allegation describing an event on the basis that 'the events described in paragraph [x] speak for themselves.'"); *see also* 5 Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1264 (3d ed.) ("It also is insufficient to . . . claim that 'the documents speak for themselves.'").  In the cases that Defendants rely on for this point, the defendants disputed the "underlying claims." *See Hobbs v. Employers Mut. Cas. Co.*,

---

[7] It is easy to see why Defendants have not denied the allegations.  Just this week, President Trump's former attorney Michael Cohen testified under oath that Mr. Trump once asked him to "name a country run by a black person that wasn't a shithole." *Full Transcript: Michael Cohen's Opening Statement to Congress*, N.Y. Times, Feb. 27, 2017, https://www.nytimes.com/2019/02/27/us/politics/cohen-documents-testimony.html

No. 17-CV-5040, 2018 WL 1221166, at *3 (D.S.D. Mar. 8, 2018); *Thornburg v. Open Dealer Exch.*, LLC, No. 17-CV-6056, 2018 WL 340050, at *3 (W.D. Mo. Jan. 9, 2018).  Defendants do not dispute the statements alleged Paragraphs 61 and 62 of the Amended Complaint, and without a denial, those allegations are admitted.

## IV.     PLAINTIFFS ARE ENTITLED TO AN INJUNCTION.

131.    Plaintiffs have demonstrated that Defendants violated Plaintiffs' constitutional and statutory rights.  Plaintiffs are entitled to an injunction restraining Defendants, their agents, servants, employees, and attorneys from implementing or enforcing the decision to terminate Haiti's TPS and from taking any other action to terminate Haiti's TPS that is not in compliance with applicable law.  Plfs' F&C Section VII, pp. 125–28.

132.    Defendants argue that the Court should issue a permanent injunction only as to the named Plaintiffs in this case.  Defs' F&C at 76–77.  Defendants are mistaken.  When federal courts determine that agency action is arbitrary and capricious, 5 U.S.C. 706(2)(A), "'the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed.'"[8] *Regents of the Univ. of California v. DHS*, 908 F.3d 476, 511 (9th Cir. 2018) (quoting *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (in turn citing *Lujan v. National Wildlife Federation*, 497 U.S. 871 (1990) (Blackmun, J.) ("writing in dissent but apparently expressing the view of all nine Justices on this question"))); *see New York v. United States Dep't of Commerce*, 351 F. Supp. 3d 502 (S.D.N.Y. 2019) ("because the statutory remedy is directed at the *entire* final agency action that the APA subjects to judicial review, the normal remedy is to set aside the agency action wholesale, not merely as it applies to the particular plaintiff

---

[8]     Nationwide injunctions also promote "uniformity in national immigration policy." *Regents*, 908 F.3d at 512.

or plaintiffs who brought the agency action before the court." (citations omitted) (emphasis in the original) (pincites not yet available)).

133.    Similarly, "once a court rules that an official act purposefully discriminates, the 'racial discrimination [must] be eliminated root and branch.'"  *N.C. State Conference of NAACP v. McCrory*, 831 F.3d 204, 239 (4th Cir. 2016) (quoting *Green v. Cty. Sch. Bd.*, 391 U.S. 430, 437–39 (1968)); *see also Guertin v. United States*, 743 F.3d 382, 388 (2d Cir. 2014) ("there are occasions in which remand to the agency for further review is not appropriate.").  In such cases, where either APA or constitutional violations are present, a court may "enjoin future action by government officials where the principles of equity support such relief."  *New York*, 351 F. Supp. 3d 502 (citing *Gonzales v. Oregon*, 546 U.S. 243 (2006) (affirming an injunction against the Attorney General in an APA action).

134.    Whether injunctive relief is warranted turns on the traditional four factors, namely whether the plaintiff proves "(1) that it [will suffer] an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction."  *Id.* (quoting *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 156–57 (2010).   As explained in Plaintiffs' Findings and Conclusions (at Section VII, pp. 125-128), such relief is appropriate in this case.

135.    In addition, Defendants' position ignores that Plaintiffs have not challenged DHS's refusal to grant TPS to any individual plaintiff, but have instead challenged the unlawful process Defendants deployed to terminate Haiti's TPS designation.  "[T]here is a strong federal interest in the uniformity of federal immigration law," particularly where the challenged action has   a

"systemwide impact."  *Batalla Vidal*, 279 F. Supp. 3d at 438.  The Court, therefore, enjoins Defendants' TPS termination in its entirety.[9]

### [Plaintiffs offer the following paragraphs in the alternative:]

136.    In the alternative, remand to the DHS with vacatur of Defendants' decision is the appropriate remedy in this case.[10]  *See Guertin*, 743 F.3d at 388 ("when an agency violates its obligations under the APA," a court properly "vacate[s] a judgment and remand to the agency to conduct further proceedings.").  "To determine if vacatur is appropriate, a court weighs," in its discretion, "the seriousness of the agency action's deficiency (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed."  *L.V.M. v. Lloyd*, 318 F. Supp. 3d 601, 621 (S.D.N.Y. 2018) (quotations omitted).  Only "in rare circumstances" should a court remand an agency decision violative of the APA without also vacating the agency's decision.  *City Club of New York v. United States Army Corps of Engineers*, 246 F. Supp. 3d 860, 872 (S.D.N.Y. 2017) (quoting *Guertin*, 743 F.3d at 388).

137.    Defendants have not provided any evidence or argument to establish that this is one of the "rare circumstances" where vacatur is not appropriate.  To the contrary, Defendants' decision violated both the TPS statute and the U.S. Constitution, and both violations are "serious," to say the least.  *See L.V.M.*, 318 F. Supp. 3d at 621 (remanding and vacating agency action where the "review policy was adopted in violation of the APA, adding unnecessary delay to the release process (which already takes too long), and in the end achieves no discernable benefit.").

---

[9]      Defendants' reliance on Justice Thomas's concurrence in *Trump v. Hawaii is* misplaced, as the Court's disposition of that case made "it unnecessary to consider the propriety of the nationwide scope of the injunction issued by the District Court."  *Trump v. Hawaii*, 138 S. Ct. 2392, 2423 (2018).

[10]     Importantly, as in *New York*, the Court may also remand and vacate Defendants' decision, and *additionally* issue an injunction.  351 F. Supp. 3d 502 ("in an exercise of its discretion, the Court does grant an injunction.").

Moreover, as Defendants' decision to terminate TPS for Haiti is already subject to a preliminary injunction in *Ramos*, and TPS has not yet expired for Haiti, no "disruptive consequences" will occur in the interim. *See id.* However, should the Court decline to vacate Defendants' decision and should Defendants then appeal the Court's decision, Haitian TPS holders are at risk of deportation to Haiti and separation from their U.S. citizen children in the interim.

138.   Finally, and in the alternative, should the Court, instead grant relief under only the RFA, it must remand proceedings and order the agency to take corrective action, including, but not limited to, remanding the rule to the agency, and deferring the enforcement of the rule against small entities unless the court finds that continued enforcement of the rule is in the public interest. 5 U.S.C. § 611(4)(A)-(B). If the Court adopts this remedy, it should vacate/set aside Defendants' decision because "continued enforcement" is not in the "public interest." *See Babbitt*, 5 F. Supp. 2d at 15

139.   As explained in Plaintiffs' Findings and Conclusions (at Sections V (Findings), pp. 68–79, and I (Conclusions), pp. 80–87), both the individual and institutional Plaintiffs – as well as the 50,000 to 60,000 Haitian nationals with TPS, their U.S. citizen children, and the community at large – will suffer immensely if TPS for Haiti terminates. Having lived in the United States for nine years and become members of their community, it is not in the "public interest" to allow enforcement of Defendants' decision while Defendants rework that decision to comply with the RFA, or while either party appeals the Court's decision. To the contrary, the public has a strong interest in setting aside Defendants decision until, at a minimum, Defendants comply with the law.

## CONCLUSION

This Court should issue an injunction restraining Defendants, their agents, servants, employees, and attorneys from implementing or enforcing the decision to terminate Haiti's TPS

and from taking any other action to terminate Haiti's TPS that is not in compliance with applicable law.

Dated:  March 1, 2019

Respectfully Submitted,

/s/ Miriam Nemetz

/s/ Ira J. Kurzban

/s/ Sejal Z

1